UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:  Mr. Austin learned to perceive discriminatory animus through experience and embodies "Equal opportunity …..This oft-stated creed of President John F. Kennedy .." for Which Georgetown violates, Fundamentally (under 1981, and Title XI ) In Honor of the Civil Rights Act of 1964,Title VI,** (full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus")* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

## **Mr. Austin learned to perceive discriminatory animus through experience**

1.      There are several ways to ascertain racial discriminatory animus.  Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.

2.      Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Blacks as 'inferior' or 'less worthy' (*presuming derogatory stereotypes to deprive making a contract*), or b. Treating Whites as 'superior' or more worthy is doubly offensive to the Constitution of the United States because *"[Georgetown's] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetow's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy] but not to others necessarily advantages the former at the expense of the latter.")"*

3.      Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of Black (male) students (as the process should be the same regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."* Mr. Austin learned the value of treating everyone equally well, and non-discriminatory service from the use of 'blind' or 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates), in Mr. Austin's first W-2, benefit plan, stock awarding, job as a teenager. In that role, while in high school, Mr. Austin worked approximately 4 years in the grocery, and logistics, business with heavy public interface with customers and regular, at least monthly (if not more) unknown interactions with secret or mystery shoppers. The location was in a well to do (generational wealth) area of town, in walking distance from his home (although Mr. Austin drove due to other competing time commitments outside of work), that attracted a variety of social classes, races, cultures, orientations, etc. with the expectation of exceptional service to all customers, and invitees.

4.      In that role Mr. Austin internalized the creed, and went out of his way to embody the wisdom Judge Orrick II (Judge Orrick III's father) cited in *NAACP v. San Francisco Unified School District, No. C-78-1445 WHO,* from President Kennedy, and personally provided *"equal opportunity for [all customers, and invitees] of exceptionally diverse origins"* in Mr. Austin's first W-2, benefit plan, stock awarding company, role. Because of that embodiment, and effort to actualize the

principles Mr. Austin was taught in that role, Mr. Austin received regular incentive bonuses, commendations, and positive work reviews because of his consistent, positive, attentive, non-discriminatory service to the public and customers (*without knowing who or when a mystery shopper or secret shopper was present*).   That role, interacting with thousands of people weekly, helped teach Mr. Austin early on, intuitively, 1. the standards of how to treat people well regardless of race or other protected characteristics 2. How not to take things personally (*as there are some acerbic & myopic personalities in the world that make the metaphorical buttholes seem like 'nice' people and no matter how kind & good a person is they will find something wrong*) 3. How to provide great service regardless of race, class, gender, or other protected statuses no matter whether Mr. Austin was personally having a great or challenging day and 4. How to stand up for yourself, or others, when someone is wrong (*on principle and with conviction*).   Georgetown's conduct toward Mr. Austin constitutes the latter (4.) lesson: standing up to racist bullies.

5.      Mr. Austin was blessed at this impressionable stage of his life to be exposed to examples of good, customer centric, non-discriminatory workplace leadership, and practices, that led to company success (last time Mr. Austin checked its share price it was well over $1,000+ per share), with many persons who have ascended within and outside of that company in various sectors of business, law, NGO, and government: their modeling not only help me embody that creed cited by Judge Orrick II, but helps Mr. Austin decipher between 1. discriminatory, perverse practices on one hand and 2. healthy anti-discriminatory 'equal opportunity' models of success on the other.   See e.g. Johnson v. San Francisco Unified School Dist., 339 F. Supp. 1315, 1320 (N.D. Cal. 1971) ("*Opposition to desegregation fosters false*

*concepts of racial superiority and of racial inferiority…works to prevent the kind of exchange in formative years which can best inoculate against racial hatred. Racial hatred is an adult rather than a childhood disease.*")   His workplace at TSLA taught him a different lesson through negative modeling of anti-Black hostile work practices as he observed first hand discriminatory, derogatory, conduct right out of America's Jim Crow, South Africa's Apartheid, and Germany's Third Reich racial apartheid Regimes.   Georgetown's conduct was of the latter negative modeling toward Black male students using anti-Black derogatory caste like policies to deprive Mr. Austin's "equal opportunity" to make a contract as customer violating not only the creed Judge Orrick II cites to, but violates the very Constitution of the United States, 13th, 14th and 15th Reconstruction Amendments, sec. 1981, and Civil Rights Acts of 1866 and 1964 from which that creed derives.

6.    Per the Supreme Court's *General Dynamics Land Sys. v. Cline, 540 U.S. 581, 608-11 (2004)*, Georgetown's conduct *admits, publicly,* along with US Department of Education, that excluding Mr. Austin because he is a Black male admitted student from essential Georgetown activities or programs violates the *essence,* Originalist purpose, and Legislative *intent of* Title VI of the 1964 Civil Rights Act whereas *"There is little doubt that the motivation behind the enactment of the Civil Rights Act of 1964 was to prevent invidious discrimination against racial minorities, especially [B]lacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey) ("The goals of this bill are simple ones: To extend to Negro citizens the same rights and the same opportunities that white Americans take for granted"). President Kennedy, in announcing his Civil Rights proposal, identified several social problems, such as how a "Negro baby born in America today . . . has about one-half as much*

*chance of completing a high school as a [W]hite baby . . . one-third as much chance of*

*becoming a professional man"* See e.g. General Dynamics Land Sys. v. Cline, 540

U.S. 581, 608-11 (2004):

"There is little doubt that the motivation behind the enactment of the Civil Rights Act of 1964 was to prevent invidious discrimination against racial minorities, especially [B]lacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey) ("The goals of this bill are simple ones: To extend to Negro citizens the same rights and the same opportunities that white Americans take for granted").

President Kennedy, in announcing his Civil Rights proposal, identified several social problems, such as how a "Negro baby born in America today . . . has about one-half as much chance of completing a high school as a [W]hite baby . . . one-third as much chance of becoming a professional man, twice as much chance of becoming unemployed, . . . and the prospects of earning only half as much." Radio and Television Report to the American People on Civil Rights, Public Papers of the Presidents, John F. Kennedy, No. 237, June 11, 1963, pp. 468-469 (1964).  He gave no examples, and cited no occurrences, of discrimination against [W]hites or indicated that such discrimination motivated him (even in part) to introduce the bill. Considered by some to be the impetus for the submission of a Civil Rights bill to Congress, the 1961 Civil Rights Commission Report focused its employment section solely on discrimination against racial minorities, noting, for instance, that the "twin problems" of unemployment and a lack of skilled workers "are magnified for minority groups that are subject to discrimination." 3 U. S. Commission on Civil Rights Report 1 (1961). It also discussed and analyzed the more severe unemployment statistics of [B]lack workers compared to white workers. See id., at 1-4; see also id., at 153 (summarizing findings of the Commission, listing examples only of discrimination against [B]lacks).

The report presented no evidence of any problems (or even any incidents) of discrimination against [W]hites. The congressional debates and hearings, although filled with statements decrying discrimination against racial minorities and setting forth the disadvantages those minorities suffered, contain no references that I could find to any problem of discrimination against whites. See, e. g., 110 Cong. Rec. 7204 (1964) (statement of Sen. Clark) ("I turn now to the background of racial discrimination in the job market, which is the basis for the need for this legislation. I suggest that economics is at the heart of racial bias. The Negro has been condemned to poverty because of lack of equal job opportunities. This poverty has kept the Negro out of the mainstream of American life") ; id., at 7379 (statement of Sen. Kennedy) ("Title ... is directed toward what, in my judgment, American Negroes need most to increase their health and happiness. . . . [T]o be deprived of the chance to make a decent living and of the income needed to bring up children is a family tragedy"); id., at 6547 (statement of Sen. Humphrey) ("I would like to turn now to the problem of racial discrimination in employment. At the present time Negroes and members of other minority groups do not have an equal chance to be hired, to be promoted, and to be given the most desirable assignments"); Ibid., (citing disfavorable unemployment rates of non[W]hites as compared to [W]hites); ibid. ("Discrimination in employment is not confined to any region — it is widespread in every part of the country. It is harmful to Negroes and to members of other minority groups"); id., at 6548 ("The crux of the problem is to open employment opportunities for Negroes in occupations which have been traditionally closed to them"); id., at 6562 (statement of Sen. Kuchel) ("If a Negro or a Puerto Rican or an Indian or a Japanese-American or an American of Mexican descent cannot secure a job and the opportunity to advance on that job commensurate with his skill, then his right to be served in places of public accommodation is a meaningless one. . . . And if a member of a so-called minority group believes that no matter how hard he studies, he will be confronted with a life of unskilled and menial labor, then a loss has occurred, not only for a human being, but also for our Nation"); id., at 6748 (statement of Sen. Moss)

("All of us, that is except the person who is discriminated against on the basis of race, color, or national origin. . . . He frequently knows that he is not going to school to prepare for a job. . . . He frequently knows that no matter how hard he works, how diligently he turns up day after day, how much overtime he puts in, that he will never get to be the boss of a single work crew or the foreman of a single division. And that is what the fair employment practices title is about — not the right to displace a white man or be given preference over him — but simply the right to be in the running"). I find no evidence that even a single legislator appeared concerned about whether there were incidents of discrimination against [W]hites, and I find no citation to any such incidents. In sum, there is no record evidence "that [White] workers were suffering at the expense of [racial minorities]," and in 1964, discrimination against whites in favor of racial minorities was hardly "a social problem requiring] a federal statute to place a [White] worker in parity with [racial minorities]." Ante, at 591. Thus, "talk about discrimination because of [race would] naturally [be] understood to refer to discrimination against [racial minorities]." Ibid.")

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

7.    Mr. Austin utilizes *"This oft-stated creed of President John F. Kennedy…equal opportunity"*, and applies Judge Orrick III father's, William Orrick II's, memorialized wisdom, in *San Francisco NAACP v. San Francisco Unified School Dist.,* that is fundamentally violated (*per the 14th Amendment's Equal Protection Clause as coextensive with section 42 USC 1981*) by Georgetown when Defendant Georgetown, a private offeror, goes out of their way from 7.15.21 to present to 1. refuse to make a contract with Mr. Austin on the same basis as Whites, and 2. Exclude Mr. Austin because of race or derogatory racial stereotypes from essential campus services, to which he is entitled, violating his Equal Protection rights.

8.    Defendant Georgetown, a private offeror, "blatantly" violates 1981 and Civil Rights as well as *"This oft-stated creed of President John F. Kennedy…equal opportunity"* when it refuses Mr. Austin, an admitted Black student, offerree mandatory media written contract, per its own promulgated terms,, because Mr. Austin is a Black man & the derogatory racist stereotypes Georgetown holds of Black People  *in service of its segregationist, Klu Klux Klan, enslaver, like conduct based on racist fiction, not facts*). See San Francisco NAACP  v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)

(*"Hay[wood] Gilliam [[Judge Haywood Gilliam spelled incorrectly](#) in the order], McCutcheon, Doyle, Brown Enersen, San Francisco, CA, for San Francisco National Association for the Advancement of Colored People…..OPINION AND ORDER ORRICK [II], District Judge [Judge Orrick III's father]….*

*…"All of us …. should have an equal opportunity ….. This oft-stated creed of President John F. Kennedy is at the core of the dispute between the parties…"*)

9.      As an interesting aside, presiding Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson, and represented the NAACP in the matter above. Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects this principle, and creed, of *'Equal Opportunity'* (Which Georgetown fundamentally, & egregiously, violates): "www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

10.     **Fact 4:** Mr. Austin combines Judge Orrick's II *"equal opportunity"* wisdom cited in *San Francisco NAACP v. San Francisco Unified School Dist.,* with the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* prohibition on the *"blatant deprivation of Civil Rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White students]"* to undergird the a. plead facts, b. cited direct evidence in the record, and

c. other controlling legal precedent to highlight how atrocious, and per se illegal,

Defendant's conduct truly is toward Mr. Austin. See e.g. Comcast Corp. v. Nat'l

Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

11.     The US Supreme Court's 1. *Connecticut v. Teal* and 2. *New York Transit*

*Authority v. Beazer* applies similar metrics, and methodology to determine and

ascertain a facially discriminatory practice whereas *"A prima facie violation … may*

*be established by… evidence showing that a …. practice … den[ies] members of one*

*race [or a single member as 1981 rights are individual rights] equal access to …*

*opportunities [to make a contract]'"* similar to Georgetown's *"blatant deprivation of*

*Civil Rights"* practices per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned*

*Media* of refusing to contract with Mr. Austin, *at all*, based solely on Mr. Austin's

race andGeorgetown's use of derogatory false racist stereotypes of "Black

Inferiority" or "less worthy" Connecticut v. Teal, 457 U.S. 440, 462 n.6 (1982)

G-town's conduct is akin to "Blatant," Dejure or Defacto Segregationist Conduct

12.     Per the 2020 US Supreme Court's *Bostock v. Clayton County* Georgetown's

conduct against Mr. Austin [*refusing to contract with a Black man because he is a*

*Black man, or derogatory stereotypes of Black men*] *" is discriminating on a ground*

*that history tells us is a core form of race discrimination. "It would require absolute*

*blindness to the history of racial discrimination in this country not to understand*

*what is at stake in such cases …. grounded in bigotry … was an integral part of*

*preserving the rigid hierarchical distinction that denominated members of the*

*[B]lack race as inferior to [W]hites."* Bostock v. Clayton County, 140 S. Ct. 1731,

1765 (2020).  Georgetown's conduct is not just racist, but extreme, and sadly

resembles the underlying logic that led to the US Civil War in the Supreme Court's

most embarrassing and racist 1857 opinion in *Dred Scott v. Sandford* (overturned

by the Civil War, and Reconstruction Amendments) whereas the Court evilly, and

wrongly said "*[Black people] had for more than a century before been regarded as*

*beings of an inferior order, and altogether unfit to associate with the [W]hite race,*

*either in social or political relations; and so far inferior, that they had no rights*

*which the [W]hite man was bound to respect*" sounding like propagandist directly

from the Ku Klux Klan or later White Citizens Council, that de-legitimized the US

Supreme Court of its era (sparking the Civil War in 1861).  Dred Scott v. Sandford,

19 How. 393 (1857)  And, is reflected in Georgetown's previous participation in this

vile criminal enterprise [Slavery archive. georgetown.edu/](https://Slavery archive. georgetown.edu/) (...*Sale of Maryland*

*Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate*

*to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*)

13.     Judge Orrick II's wisdom in *San Francisco NAACP v. San Francisco Unified*

*School District* is relevant per *"Equal Opportunity"* (in this case Equal Opportunity

to make a contract), however Georgetown's *"blatant violations of Civil Rights"* are

even more akin to the underlying segregationist, overtly racist, conduct in Judge

Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315,

1317 (N.D. Cal. 1971) cited to by Judge Orrick II regarding, a school district's choice

to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct

(to isolate, confine, or refuse to equally serve or contract with Black students, Black

Teachers, or Black Administrators in violation of Equal Protection Clause), despite

knowing *"More than seventeen years ago [in 1971], a unanimous decision of the*

*United States Supreme Court made it clear that racial discrimination in public*

*education violates the [US]Constitution. Today it is established beyond all question*

*that any law, ordinance or regulation of any governmental agency (whether federal, state, county or city) requiring or furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … by other courts located throughout the nation."*

14.     Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects* Georgetown's*] … Racial hatred [which] is an adult rather than a childhood disease."* Georgetown's *"adult …. disease"* of anti-Black *"Racial hatred"* or animus is exemplified in multiple opportunities to make a contract from 7.15.21 to present, but still using a knowingly derogatory stereotype, as pretext, to attempt to justify not making a contract with Mr. Austin and excluding in violation of his Equal Protection.  Per the US Supreme Court's 1. *Patterson v. McLean Credit Union* 2. *Bob Jones University v. United States* 3. *Brown v. Board of Education* Georgetown's ongoing violations from 7.15.21 to present  Mr. Austin's right *"to make"* a contract with use of outright segregationist, Klu Klux Klan, like policies to purposefully isolate Mr. Austin for inferior treatment based on his race is *"antagonistic to our Nation's commitment to the ideal of a society in which a person's opportunities do not depend on .. race"* and completely violates Judge Orrick II's, memorialized wisdom, in *San Francisco NAACP v. San Francisco Unified School Dist., "This oft-stated creed of President John F. Kennedy…equal opportunity.*"

15.      Georgetown violates even the most narrow conception of 1981 (i.e. before the 1991 Amendments: *Pub. L. 102-166, §402, 105 Stat. 1099*), and triggers liability per

"*our society's deep commitment to the eradication of discrimination based on a person's race or the color of ... skin...[E]very pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination.... national consensus that racial discrimination is incompatible with our best conception of our communal life, and with each individual's rightful expectation that .. full participation in the community will not be contingent upon .. race.*" Patterson v. McLean Credit Union, 491 U.S. 164, 176-77, 191 (1989)  Per 4*2 U.S.C. § 1981's EFFECTIVE DATE OF 1991 AMENDMENT Pub. L. 102-166, §402, 105 Stat. 1099*, the entire contract formation, and making, process (i.e. "make and enforce contracts:" *"making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"*) is secured by 42 USC 1981, and protected against discriminatory Georgetown conduct harming Mr. Austin on the front end of the spectrum in the "making," as well as the latter parts with regard to exclusion. See 42 U.S.C. § 1981.

<u>Mr. Austin is mindful, a good person, with good credit (although not required for making contract).</u>

16.    In addition to the aforementioned lessons learned at my first W2 job-role, Mr. Austin was also blessed to learn & applied two additional very valuable lessons that have helped him avoid unnecessary drama, or issues in life, education, and the workplace.  Although Mr. Austin was and is blessed to work with many beautiful people (both inside and out), from all shades of the rainbow, as a principle, Mr. Austin doesn't date where he works as I saw beginning in that first W-2 role (as a minor) how tricky and messy workplace romps or romances can get  (*although it*

*works out for some: see e.g. President Barack and 1st lady Michelle Obama who met at work in a law firm*). That early decision and discipline by Mr. Austin facilitated never having even 1 Complaint, whisper, or allegation of sexual impropriety in any of my roles despite various opportunities provided by beautiful people (inside and out) of the opposite sex in the workplace for over 20 years of professional experience. Mr. Austin's practice of mindfulness, fidelity to principle over pleasure, and discipline of healthy personal boundaries separating the personal and professional have helped him avoid the many pitfalls Mr. Austin saw countless other Black men, and others, fall into since antiquity.

The second lesson: Don't prejudge others as you never know what someone else is going through. Mr. Austin was required daily in that first role to be 1. Neat 2. Clean 3. Presentable to a critical public 3. All hair cut shaven precisely and tailored 4. Smell good etc. and overall presentable to a more conservative dress standard (or that worker would be sent home: in approximately 4 years Mr. Austin was never sent home) but came in contact daily with a people in a variety of socioeconomic circumstances and some who did not smell so good, nor look their best, with some appearing in rough or challenging circumstances, but the discipline of mind, and character, Mr, Austin learned was to treat the well off & well liked person the same, with the same care, as the idiosyncratic, struggling, or perhaps somewhat off putting potential customer with rough edges (*because you never quite know who is who and it is best to remain humbly empathetic (strength under control), refraining from prejudgment*).

17.     Further, Mr. Austin's professional role while working as a Committee Consultant in the California Senate, after winning acceptance through Capital

Fellows Program as a Senate Fellow (with less than a 4% National acceptance rate), analyzing bills (*which ultimately becomes California law*) going through Committee for the California Senate and ultimately the California public was also insightful. Mr. Austin's role working with the California Legislative Counsel, Judiciary Committee, and various Members, and Staffers, Committees of the Legislature, Executive Branch, Interest Groups, Members of the Public, and the Private Sector, was also insightful-helpful to become familiar with the precise requirements for non-discriminatory service, and making contracts, for businesses open to the public as part of the learning process while writing analysis for approximately 40 Million Californians.

18.      Mr. Austin was also informed more generally, in corporate law context, through MoFo (Morrison Foerster www.mofo.com/resources/news/240526-mofo -recognized-by-vault-law ), with several Board Members providing direct insights in a variety of context during our trainings, and Board meetings, in an organization I served as both a full time paid Director (managing 12+ staff, and over 100+ volunteers) and separately as a Consultant after I successfully finished my contractual commitment, to create an intern program to help students thereafter develop their legal skills early on (and gain additional exposure to a top firm, if interested), entitled *"Stiles Hall Intern Program"* on pg. 441, 2012, See Attached (Check out Vault's 2013 Pro Bono Guide! | Career Advice - Vault).   The due diligence & research process to create that program, from scratch, with aid, and partnership, from MoFo decisionmakers, in goodwill not for profit, by myself, and my team, to pitch to their board, and decision makers within Mofo informed me at a more broad level about the legal requirements for  non-discriminatory service to the

public, and especially students, prior to winning acceptance, and working in the

Senate via the Capital Fellows Program as a Senate Fellow (with less than a 4%

National acceptance rate), analyzing bills (*which ultimately becomes California law*)

as a Committee Consultant.

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin          11.11.24**

---

**SENATE GOVERNANCE & FINANCE COMMITTEE**
**Senator Lois Wolk, Chair**

---

**BILL NO:** AB 408                    **HEARING:** 6/12/13
**AUTHOR:** Bonta                      **FISCAL:** Yes
**VERSION:** 4/15/13                   **TAX LEVY:** No
**CONSULTANT:** Austin

### *MUNICIPAL UTILITY DISTRICTS' BOARD ELECTIONS*

---

*Allows seven member municipal utility district boards to appoint board members to uncontested seats.*

---

## Background and Existing Law

In 1965, the Legislature approved the Uniform District Election Law (UDEL), which allows special district boards to appoint candidates for uncontested board seats (AB 1892, Porter, 1965). Several special districts incorporated the UDEL into their enabling acts giving them the same authority to appoint uncontested candidates who are running in uncontested races for seats on district boards.

Current law allows cities, regional park and open-space districts, water storage districts, water replenishment districts, school districts, and special districts that have incorporated UDEL into their enabling acts to appoint uncontested candidates in place of elections.

In 1921, the Legislature enacted the Municipal Utility District (MUD) Act (SB 755, Spence, 1921). The Legislature later allowed any district formed prior to January 1, 1974, with a population of 1,000,000 or more on that date to increase the size of its board of directors from five to seven members (SB 379, Nejedley, 1973).

East Bay Municipal Utility District (EBMUD) has a publicly elected seven-member board of directors. EBMUD was established by vote in 1923, and provides drinking water for 1.3 million customers in Alameda and Contra Costa counties. EBMUD supplies water to East Bay customers and treats wastewater before it is discharged to the bay.

Unlike most other local governments, EBMUD's principal act does not allow its board to appoint candidates to seats that are uncontested in an election. EBMUD wants the same authority to appoint candidates to its board directors that state law grants to other local governments.

## Proposed Law

**AB 408** allows seven member municipal utility district boards, at a regular or special meeting held within a 7 day period beginning after 5pm on or before the 83rd day of the election and ending on or before the 76th day prior to election, to adopt one of the following courses of action:

- If one person files for candidacy, appoint that person or hold an election; or,
- If no person files for candidacy, appoint any qualified person or hold an election.

**AB 408** establishes appointment procedures for municipal utility districts with a seven-member board of directors, if no candidate or only one candidate files for candidacy by 5 p.m. on or before the 83rd day prior to the election.

Specifically the bill:

- Requires a county elections official to submit a certificate of facts to the district board if no candidate or only one candidate files for candidacy by 5 p.m. on or before the 83rd day prior to the election.
- Allows the board to adopt a process to appoint any qualified person to office on or before the 76th day prior to the election, and requires the board, upon adoption of the process, to make the actual appointment prior to the election.
- Requires the board to hold an election for the office, if an appointment has not been made or an appointment process has not been adopted by the 76th day prior to the election.
- Requires appointed directors to take office and serve exactly as if elected at an election for the office.
- Prohibits the elections official from accepting any statement filing of a write-in candidate submitted after an appointment is made.
- States that this bill's provisions are effective for any election that takes place after January 1, 2014.

**AB 408** provides that no reimbursement will be made because the local agency is requesting the authority established by this bill.

## State Revenue Impact

No estimate.

## Comments

1. Purpose of the bill.  East Bay Municipal Utility District is looking for ways to be more efficient and cut costs.  In the last 6 EBMUD elections, races for 15 of the available 21 elected seats were uncontested.  Although, the candidates ran un-opposed, EBMUD's ratepayers had to pay for the election costs.  It appears that in the two counties EBMUD serves (Alameda and Contra Costa), EBMUD is the only special district that cannot use an appointment process for uncontested elections.  For the 2011-2012 election the author's office identified 36 special districts in Alameda and Contra Costa counties that used an appointment process for uncontested election candidates. For that same election, EBMUD's ratepayers paid $475,000 in election costs for three uncontested seats because the MUD Act does not contain the appointment provisions.  AB 408 adds appointment provisions that will be used to save EBMUD ratepayers money.

2. Apply to all?  EBMUD and Sacramento Municipal Utility District (SMUD) have seven member boards.  The other three MUDs have five member boards.  AB 408 only applies to MUDs with seven member boards.  If the bill's provisions are good for districts with seven member boards, should this tool also be available for others? *The Committee may wish to consider amending AB 408 to apply to all MUDs.*

## Assembly Actions

| | |
|---|---|
| Assembly Local Government | 9-0 |
| Assembly Elections and Redistricting | 70-0 |
| Assembly Appropriations | 17-0 |
| Assembly Floor | 70-0 |

## Support and Opposition (6/6/13)

Support:  East Bay Municipal Utility District; California Association of Sanitation Agencies; California Special Districts Association; Sacramento Municipal Utility District.

Opposition: Unknown.

# COMMITMENT IS OUR CORE VALUE

**Morrison & Foerster's attorneys provided 95,000 hours of pro bono service in 2011 – and the commitment continues.**

**Sustaining diverse communities**
MoFo joined forces with public interest law firms to stop California from ending adult day health-care programs, which elderly individuals and people with serious disabilities rely on to stay in their communities and avoid the isolation of institutions.

**Recognizing the rights of same-sex couples**
MoFo's battle for the rights of Karen Golinski, our client since 2008, won a court ruling that the Defense of Marriage Act (DOMA), which prohibits federal recognition of same-sex marriages, is unconstitutional. Ms. Golinski, a federal employee, finally has health coverage for her wife as a result.

**Building a better world**
MoFo works with Build Change to spread its techniques for building low-cost, earthquake-resistant houses to earthquake-prone developing countries, while protecting the organization's intellectual property rights.

**Protecting women's rights**
MoFo partners regularly with the Center for Reproductive Rights to challenge state laws that seek to restrict reproductive rights, including a Texas requirement that women seeking abortion have an invasive ultrasound, and an Arizona abortion ban.

**Easing the burden**
MoFo's patent attorneys are helping the social venture Wello as it markets the WaterWheel, an innovative rolling barrel that allows people in developing countries to transport 25 gallons of water in a single trip, drastically reducing the time and labor they spend carrying water.

*National Law Journal*
– 2012 Pro Bono Award

*Law 360*
– 2010, 2011, 2012 Top Pro Bono Firms

**Bar Association of San Francisco**
– 2011 Outstanding Law Firm in Public Service

**ABA**
– 2011 John Minor Wisdom Public Interest and Professionalism Award

**Pro Bono Institute**
– 2011 John W. Pickering Award

## MORRISON FOERSTER

©2012 Morrison & Foerster LLP, mofo.com

# MORRISON & FOERSTER LLP

425 Market Street
San Francisco, CA 94105
Phone: (415) 268-7000
www.mofo.com

## LOCATIONS

Denver, CO • Los Angeles, CA • New York, NY • Northern
VA • Palo Alto, CA • Sacramento, CA • San Diego, CA • San
Francisco, CA • Washington, DC • Beijing • Brussels • Hong
Kong • London • Shanghai • Tokyo

## MAJOR DEPARTMENTS & PRACTICES

Antitrust • Bankruptcy/Creditors' Rights • Clean Technology/
Renewable Energy • Corporate • Energy • Intellectual Property
• International Arbitration • Labor & Employment • Litigation •
Real Estate • Tax

Information Technology—Business Department:
Capital Markets • Financial Services • Financial Transactions •
Investment Management • Land Use & Environmental • Patent
• Project Finance & Development • Technology & Transactions

Litigation:
Consumer Class Action Litigation • Financial Services
Litigation • Patent • Product Liability • Securities Litigation/
White Collar Defense • Trademark & Copyright & Trial Practice

Tax:
State & Local Tax • Federal Tax • Employee Benefits &
Executive Compensation & Property Tax

## THE STATS

No. of Attorneys: 1,083
No. of Offices: 15
Chairman: Larren Nashelsky
Managing partners: Anna Erickson White
                   Craig Martin
                   Eric Piesner
Hiring Partner(s): Craig Martin

## EMPLOYMENT CONTACT

Anand David
Director of Recruiting
Phone: (212) 468-8039
Email: adavid@mofo.com
Careers website: www.mofocareers.com



## WHO'S WHO

**Does the firm have one or more pro bono coordinators and/or partners? If so, how many?**

More than 3

**For each of your pro bono coordinators and/or partners, please specify how much of his/her time is spent on pro bono work and/or administering the firm's pro bono program.**

Each spends 100% of his or her time.

**Please provide the primary pro bono contact(s)'s information below.**

Jennifer K. Brown
Pro Bono Counsel
Phone: (212) 336-4094
Email: jbrown@mofo.com

Kathi J. Pugh
Senior Pro Bono Counsel
Phone: (415) 268-6370
Email: kpugh@mofo.com

Rachel Williams
Pro Bono Counsel
Phone: (415) 268-6340
Email: RachelWilliams@mofo.com

**Does the firm have a pro bono committee?**

Yes

**How often does the committee meet?**

Quarterly

**Please describe the composition of the committee.**

The firmwide pro bono committee is made up of associates, partners, and of counsels. We include attorneys from the different practice groups, and each department has at least one representative on the committee in each office. Most of our domestic offices have at least one representative on the firmwide pro bono committee, as does our London office.

## THE SCOOP

**Does your firm have a written pro bono policy?**

Yes

**Can associates bring pro bono matters of interest to the firm?**

Yes

**How does the firm decide whether to take on a pro bono matter?**

While attorneys are encouraged to seek out their own pro bono projects, the majority of our pro bono work is referred to the firm through established legal service providers. We rely on legal service organizations to triage the needs of the community and refer appropriate work to the firm. We also actively seek out opportunities to work in partnership with local and national public interest organizations to develop impact litigation and other initiatives. As well, we work with a variety of nonprofit organizations in a wide variety of matters including incorporation, corporate governance, employment, contract review, and intellectual property among other types of work. Our dedicated pro bono professionals are involved in all aspects of the pro bono process and work in conjunction with department and practice group leaders, as well as work coordinators. The initial screening of any new pro bono matter is first done by the pro bono staff. It is then reviewed by a member of the pro bono committee in the local office and routed to the firmwide pro bono committee. This process typically takes less than 24 hours, so the vast majority of matters are quickly approved. Some routine matters from clinics and legal service organizations are considered preapproved and do not require committee oversight.

**Has the firm signed on to the Law Firm Pro Bono Challenge?**

Yes

**What are some of the areas of law in which your firm has performed pro bono legal work since 2010?**

Arts and historic preservation, Asylum, Bankruptcy, Civil rights, Community economic development, Consumer law and small claims court, Death penalty defense, Disability benefits, Domestic violence, Education, Elder law, Employment, Environment, Fair housing/tenants rights, Family law, First Amendment and constitutional issues, HIV/AIDS advocacy, Homeless advocacy, Immigration, Indigent criminal defense, International human rights, Juvenile justice reform, Nonprofit corporate law, Nonprofit incorporation/tax exemptions, Nonprofit intellectual property, Parole hearings, Police misconduct, Prisoners' rights, Probate law, Public benefits, Real estate transactions, Social Security law, Veterans' benefits/appeals, Voting rights

**Are there areas of law in which, as a matter of policy or practice, your firm does not perform pro bono work?**

No

**List up to 10 of your firm's pro bono clients or partners since 2010, including legal service providers or clearinghouses.**

- Advocates for Children
- Lex Mundi Pro Bono Foundation
- Volunteer Legal Services Program of the Bar Association of San Francisco
- Nature Conservancy

© 2012 Vault.com Inc.

- Public Counsel
- American Civil Liberties Union
- Lawyers Committee for Civil Rights Under Law
- Center for Reproductive Rights
- DC Bar Pro Bono Program
- New York Lawyers for the Public Interest

**List up to three representative examples of your firm's pro bono matters since 2010. Please limit your answer to a short paragraph per matter.**

- In 2011, the firm partnered with the Center for Reproductive Rights to file a class action lawsuit against a newly enacted Texas law that requires women seeking abortion to be subjected to an ultrasound examination for the sole purpose of making her see and hear images of the developing embryo. We contended that the law "profoundly intrudes on the practice of medicine, forces physicians to deliver ideological speech to patients, and treats women as less than fully competent adults," in violation of constitutional guarantees including freedom of speech, privacy, equal protection of the laws, due process, and freedom from unreasonable searches and seizures. We won a preliminary injunction that limited the law's effect, but it was vacated by the Fifth Circuit Court of Appeals in early 2012. The district court then dismissed the case, strongly disagreeing with the Fifth Circuit's legal conclusions but recognizing them as binding.

- Morrison & Foerster has provided pro bono assistance to Build Change, a nonprofit organization that designs low-cost, earthquake-resistant houses for earthquake-prone developing countries. Our work has included assisting Build Change in preparing an agreement to license the organization's earthquake-resistant building material for free to nonprofits and individuals in places like Haiti, while allowing the organization to generate profits to support its work by licensing the materials for commercial use elsewhere.

- Morrison & Foerster patent attorneys are advising Wello Water, a social enterprise, on intellectual property issues related to its WaterWheel. The WaterWheel is an innovative water-carrying device that makes it possible for people in developing countries who have to travel to collect water to collect 25 gallons of water in a single trip, five times the amount possible using traditional methods.

**List up to three pro bono matters that are highlights (e.g., a Supreme Court case). Please limit your answer to a short paragraph per matter.**

*Defense of Marriage Act (DOMA)*

- In *Golinski v. Office of Personnel Management*, we won a federal district court ruling that Section 3 of the federal Defense of Marriage Act (DOMA), which prohibits federal recognition of same sex marriages, violates the equal protection clause of the U.S. Constitution. The court held that the long history of discrimination on the basis of sexual orientation required applying heightened scrutiny to DOMA, which the statute failed, and further, that Section

3's differential treatment of same-sex and opposite-sex married couples failed rational basis scrutiny. The ruling secured health benefits for the wife of Karen Golinski, a federal employee who has been our client since 2008. The U.S. Department of Justice has asked the Supreme Court to bypass circuit court review of this and a second ruling on DOMA, and decide the appeals directly.

*Saving Community-Based Health Services in California*

- California tried repeatedly to eliminate its Adult Day Health Care (ADHC) programs. Designed for elderly and disabled individuals who are one step away from institutionalization, ADHC programs provide a range of daily medical and rehabilitative services in a single, supportive outpatient environment. Morrison & Foerster attorneys participated in earlier rounds of litigation against ADHC cuts by representing organizations with amicus briefs. Then the firm stepped up its role, joining forces with Disability Rights California, the National Health Law Project, the National Senior Citizens Law Center, and the AARP Foundation to represent the plaintiffs directly. The result: a settlement that ensures community-based services will continue for elderly and severely disabled low-income individuals who need them in California.

*Gender Equality in Schools*

- With *Doe v. Wood County Board of Education*, our litigators restored co-education at a West Virginia middle school where girls and boys were being separated for their core academic classes based on a scientifically meritless theory of brain differences. Working with the ACLU, our team achieved victory practically overnight: the complaint was filed August 15, 2012, and by August 29, we had prevailed at a preliminary injunction hearing and won relief that will remain in place for the rest of this school year and "unless and until any single sex program offered meets the requirements of the Constitution and Title IX." The decision advanced the law on gender equality, holding that federal regulations demand that parents give "clear and affirmative assent" before their children are enrolled in any single-sex programs at public schools receiving federal funding.

# BY THE NUMBERS

**What is the total number of hours that lawyers at your U.S. office(s) spent performing pro bono legal services, as defined by the Law Firm Pro Bono Challenge, in 2010 and 2011? Do not include summer associate or non-lawyer pro bono hours in your answers.**

*Total number of pro bono hours in 2010:* 91,195

*Total number of pro bono hours in 2011:* 91,114

**What was the attorney headcount in your firm's U.S. offices?**

*Number of attorneys as of December 31, 2010:* 861

*Number of attorneys as of December 31, 2011:* 857

Visit www.vault.com for company rankings, ratings and reviews to learn what it's
really like to work in an industry or company—and how to position yourself to land that job.

437

**Using the number of attorneys listed above, what is the average number of pro bono hours per attorney in your firm's U.S. office(s) during the following years?**

*Average number of hours per attorney in 2010*: 106

*Average number of hours per attorney in 2011*: 106

**What percentage of attorneys employed during 2010 and 2011 in your firm's U.S. office(s) did at least 20 hours of pro bono during that calendar year?**

*Percentage of attorneys who did pro bono work in 2010*: 61–70%

*Percentage of attorneys who did pro bono work in 2011*: 51–60%

## SUPERVISION AND EVALUATIONS

**Is there partner supervision on all pro bono matters?**

Yes

**Do partner supervisors or, if applicable, senior associates provide written evaluations of associates' work on pro bono matters?**

Yes

**Are those evaluations taken into account in determining salary or bonuses?**

- Yes, they are taken into account when determining salary
- Yes, they are taken into account when determining bonuses

**Are those evaluations taken into account in determining advancement within the firm?**

Yes

**Is there a pro bono requirement at your firm?**

Yes

**What is the requirement and to whom does it apply?**

We urge every lawyer in the firm to take on at least one pro bono project each year.

**Does the firm give billable hour credit for pro bono work?**

Yes

**Does the firm have a maximum number of pro bono hours that can be applied toward the billable hour target?**

No

**Does the firm consider pro bono hours when determining bonuses?**

Yes

## PRO BONO POINTS

**What training opportunities are open to associates working on pro bono matters?**

The firm organizes its own pro bono training programs led by firm attorneys and staff attorneys at legal service organizations. The firm also encourages attorneys to participate in training programs sponsored by legal service organizations. As well, the firm assists the organizations in digitally recording these trainings, and posts the files on the pro bono portal page on the firm's intranet so that the programs are available for viewing on the attorneys' individual computers. The firm also allows legal service organizations to use its facilities to host training programs open to outside attorneys.

**Does the firm offer the use of support staff in handling pro bono matters?**

Yes

**Please indicate how many total hours and average hours per person your summer associates spent performing pro bono in 2010 and 2011.**

Total hours summer associates spent on pro bono work

2010: 2,526

2011: 2,207

**Average hours per summer associate spent on pro bono work**

2010: 49

2011: 39

**Percentage of summer associates in your firm's U.S. office(s) engaged in pro bono work**

2010: 82%

2011: 82%

**Please provide any additional information about pro bono opportunities available to summer associates.**

Each summer associate is encouraged to work on at least one pro bono matter during the summer whether it is a clinic or an existing pro bono matter of the firm. Along with attorneys, summer associates participate in our regular clinical programs in each of our offices, which allow summer associates a chance to do hands-on pro bono work. However, we also have a number of opportunities that are specifically targeted to the summer associates allowing them their own hands-on pro bono experience.

- Examples of past summer associate activities in California include representing clients at administrative hearings and in school expulsion matters.
- Summer associates throughout the firm including our international offices have participated in the Anti-Defamation League's annual Summer Associate Research Project.

© 2012 Vault.com Inc.

- In New York, summer associates participated in the Courtroom Advocate Project run by Sanctuary for Families which gave them invaluable courtroom experience helping battered women obtain protective orders.

- In New York, summer associates were invited to represent clients seeking unemployment insurance benefits and to help veterans apply for disability benefits.

- In San Francisco, summer associates have participated in the Bar Association of San Francisco's Summer Associate Public Service Program, where they worked with individuals through the Homeless Advocacy Project. They also negotiate settlements in eviction matters through the Housing Negotiation Project, a program run by the Bar Association of San Francisco's Volunteer Legal Services Program. They also have the opportunity to participate in Homeless Connect, a day-long program offering legal services to homeless individuals, among other services.

**Does the firm have established programs, such as externships, that enable its associates to work in a public interest setting?**

Yes

**Please describe the established program(s) and their duration, if applicable.**

The firm participates in several governmental externship programs. This assistance provides a much-needed resource to the many city attorneys, public defenders, and prosecutors' offices, and other governmental entities that are overburdened and experiencing severe budgetary constraints. In addition, these opportunities give our senior litigation associates intensive trial experience.

- In New York, litigation associates spend one day a week taking depositions in civil cases against the City of New York in the Corporation Counsel's Deposition Program.

- In Washington, DC, litigation associates are loaned to the Office of the Attorney General of the District of Columbia, where they spend 50 percent of their time for six months prosecuting civil and criminal cases.

- In San Diego, litigation attorneys work with the County of San Diego, to handle civil commitment proceedings regarding mentally disabled individuals who are a danger to themselves and others. Many of these hearings result in jury trials to verdict. San Diego attorneys also work with the public defender's office to handle aspects of particular complex cases.

**What other law-related public interest and community service programs (that are not "pro bono" as defined by the Law Firm Pro Bono Challenge) do you offer and manage? For example, list any law school collaborations and public interest scholarships, auctions at law schools, monetary support, or fellowships.**

Morrison & Foerster supports dozens of law-related public interest and community service programs. The firm allows its attorneys and paralegals to bill these activities to community service time, which counts towards their overall firm participation hours but not towards their pro bono time. Most of these programs are brought to the attention of the firm by the attorney or paralegal who would like to participate. However, there are some law-related projects that the firm supports year after year, encouraging the participation of its attorneys, paralegals, and staff. Firm attorneys also serve on the board of directors of law schools, legal service organizations and other law-related public interest and community service organizations. Our attorneys regularly contribute to the local law schools by teaching law school classes, participating in moot court programs, serving as clinical and club advisors and mentoring students, among other activities.

The Morrison & Foerster Foundation was established in 1986 as a nonprofit organization to help the partners of Morrison & Foerster make the best use of their charitable resources in each of the communities the firm serves. Since its founding, firm partners have donated a percentage of the firm's annual net income to the Foundation, which also accepts donations from firm employees and others. Over the years, it has given millions of dollars in charitable contributions to nonprofit organizations at the local and national levels. The Morrison & Foerster Foundation financially supports many legal service organizations, including our pro bono partners as well as local nonprofit organizations and other community service programs. The Morrison & Foerster Foundation also sponsors Equal Justice Works Fellowships, which run on an academic calendar year.

In 2011 and 2012 YTD as of September 2012, The Morrison & Foerster Foundation provided financial support to the following law-related public interest and community service programs:

*Law-Related Public Interest Organizations Supported by the Foundation:*

- ABA's Senior Lawyers Division's Women Trailblazers Project—Chicago, IL

- Historical Society of the District of Columbia—Washington, DC

- Law Library Justice Foundation's San Diego Law Library Renovation Fund—San Diego, CA

- Legal Outreach's College Bound Program—Long Island City, NY

- Ninth Judicial Circuit Historical Society—Pasadena, CA

- Supreme Court Historical Society—Washington, DC

*Law-Related Fellowship Programs Supported by the Foundation:*

- Equal Justice Works' General Legal Fellowship Program Fund

- Equal Justice Works' Post-Graduate Legal Fellowships at:

  - The Children's Law Center—Washington, DC

  - East Bay Children's Law Offices—Oakland, CA

  - East Bay Community Law Center—Berkeley, CA

  - Kids In Need of Defense—Washington, DC

Visit www.vault.com for company rankings, ratings and reviews to learn what it's really like to work in an industry or company—and how to position yourself to land that job.

**439**

- Legal Aid Society of San Diego—San Diego, CA
- Rocky Mountain Immigrant Advocacy Network—Westminster, CO
- Watsonville Law Center—Watsonville, CA
- Youth Represent—New York, NY

- Fordham Student Sponsored Fellowship Program—New York, NY
- UC Berkeley School of Law's Summer Public Interest Fellowship Fund—Berkeley, CA

*Law-Related Scholarship Programs Supported by the Foundation:*

- ABA's Judicial Intern Opportunity Program—Chicago, IL
- ABA's Legal Opportunity Scholarship Fund—Chicago, IL
- American Intellectual Property Law Education Foundation's Scholarships for Minority Scholars Program—Oradell, NJ
- The BASF (Bar Association of San Francisco) Foundation's Bay Area Minority Law Student Scholarship Program—San Francisco, CA
- The BASF (Bar Association of San Francisco) Foundation's Legal Employment Action Program—San Francisco, CA
- California Bar Foundation's Diversity Scholarship Program—San Francisco, CA
- Columbia Law School's Public Interest Law Foundation—New York, NY
- La Raza Lawyers of Santa Clara County Charitable Foundation's Law School Scholarship Program—San Jose, CA
- Monmouth Bar Foundation Law School Scholarship Fund—Red Bank, NJ
- The Morrison & Foerster Foundation - Stephen S. Dunham Scholarship at Golden Gate University School of Law—San Francisco, CA
- The Morrison & Foerster Foundation - Stephen S. Dunham Scholarship at the University of the District of Columbia David A. Clark School of Law—Washington, DC
- NAACP Legal Defense and Educational Fund's Scholarship Programs—New York, NY
- UC Davis School of Law's Santiago and Gregoria Gonzalez Award—Davis, CA
- University of the Pacific, McGeorge School of Law's Jeffrey K. Poilé Scholarship Fund—Sacramento, CA

*Community Service Related Activities:*

- AIDS Walk (San Francisco)
- Adopt-a-School (San Francisco)
- Adopt-a-Family (gifts collected as well as a Santa provided to distribute the gifts, plus monetary donations matched by MoFo Foundation) (San Francisco)

- Bar Association of San Francisco Intern Program (San Francisco)
- Constitutional Rights Foundation Intern Program (Los Angeles)
- American Cancer Society's Daffodil Days Annual Fundraising Event (New York)
- Black History Month African Read-In (San Francisco)
- Constitutional Rights Foundation (CRF): Annually, we participate in the CRF's Intern Program, which provides selected high school students the opportunity to perform paid work while obtaining job work experience. We also regularly participate in other CRF programs such as Courtroom to Classroom and the State Mock Trial Competition. (Los Angeles)
- Cristo Rey Corporate Work Study Program in New York—five high school students spend one day per week for the school year with clerical tasks. Cristo Rey's unique Corporate Work Study Program enables the students to earn 70% of the cost of their education while introducing them to some of the most prestigious corporations and not-for-profit institutions in New York City. The firm pays the school a stipend each year. (New York)
- "Dress for Success" Clothing Drive (San Francisco)
- Food from the Bar (Bar Association of San Francisco)
- Harlem Interagency Council for the Aging (New York)
- Head Start Holiday Gift Program (San Francisco)
- Host High School mock trials (Bar Association of San Francisco)
- Helping Young People Excel (HYPE): provides talented low-income students in Los Angeles with the guidance and resources to qualify for admission at elite college-prep independent high schools. HYPE provides a blend of intensive programming and services to help students gain admission, finance their education, and succeed in high school and beyond. This past summer we hosted students from HYPE Los Angeles for a constitutional law appellate advocacy project with our summer associates.
- ICA High School Intern Program (San Francisco)
- Legal Outreach Summer Internship Program-the firm hosts six college bound students for four days in July and provides training exercises and/or seminars for the benefit of the students and makes a donation to Legal Outreach each year. (New York)
- Little Brothers (holiday gifts were provided to elders, plus monetary donations matched by MoFo Foundation) (San Francisco)
- Literacy Volunteers—book exchange with all proceeds to the organization (New York)
- Mayor's Youth Education and Employment Program (San Francisco)
- New York Cares Coat Drive (New York)

© 2012 Vault.com Inc.

- Provide "judge" and space for high school mock trial (charter school) (San Francisco)

- Rebuilding Together (San Francisco)

- See's Candy Fundraisers (profits matched by MoFo Foundation and sent to Bessie Carmichael Elementary School for books and for student enrichment) (San Francisco)

- Stanford Public Interest Law Foundation Annual Auction

- Stiles Hall Intern Program

- Summer Intern Program—college students interested in law school work in various departments for summer months

- Toys for Tots (New York)

- University of California Davis Immigration Law Clinic 30th Anniversary Celebration

- UCLA Public Interest Law Foundation Auction (Los Angeles)

- United Way's Week of Caring (San Francisco)

- University of Michigan School of Law-sponsored Student Funded Fellowship Auction; 34th Annual Butch Carpenter Scholarship Banquet; and APALSA Public Interest Fellowship Origins Banquet

- University of Michigan School of Law L-Star Program. The Law School and the Students Funded Fellowships board (SFF) invite employers that recruit here to participate in the Law Student Travel and Accommodation Reimbursement (L-STAR) Program. This initiative works as follows: students interviewing with participating firms are given the option of waiving the overnight accommodations offered by the employer in favor of a $215 donation by those firms to SFF. Additionally, in lieu of paying for cab rides to/from the airport, firms may also choose to contribute $35 on behalf of a student who is able to get a ride from friends instead. This money along with donations from students is used to award a modest stipend to students who take summer jobs in unpaid or extremely low-paid public interest positions.

**What non-law related volunteer opportunities does your firm offer? For example, list any work with high school students and non-legal volunteerism for organizations like Habitat for Humanity.**

Morrison & Foerster supports its many attorneys and staff who share its commitment to public service. Each year, the firm offers a number of organized community service projects, many of which also receive financial support from The Morrison & Foerster Foundation. The firm also encourages its personnel to pursue independently chosen community projects. Community Service Day offers staff members one paid day off each year to participate in a community service activity of their own choosing. Staff and attorneys are also given time off to participate in programs sponsored by the local offices, such as adopt-a-school programs. Many attorneys and staff also serve on the boards of directors and other leadership committees of local and national nonprofits and government entities.

**Please list any special recognition or awards your firm has won since 2010 for its pro bono work.**

*2012 Awards*

- 10/02/12: The United States District Court for the Northern District of California's honored Morrison & Foerster for its high level of participation in the Federal Pro Bono Project.

- 9/12/12: New York litigation partner Jamie Levitt is featured in a *New York Law Journal* special supplement, "Lawyers Who Lead By Example." Levitt, former Chair of the firm's Pro Bono Committee, is recognized for her "particular passion for defending vulnerable populations against fraud, even in the most controversial matters," and her leadership on the boards of several public interest legal organizations.

- 8/29/12: James Brosnahan has been honored by *American Lawyer* with a Lifetime Achiever Award. Mr. Brosnahan is one of only eight attorneys to receive the award this year, which honors outstanding private sector success and a devotion to public service. According to *Am Law*, the 2012 Lifetime Achiever recipient's contributions were "tremendous." Mr. Brosnahan's profile highlights his pro bono accomplishments on behalf of a Mexican housewife accused of helping Central American refugees escape into the United States—although convicted, she served no prison time—and alleged Irish Republican Army member Kevin Artt, whom Brosnahan represented in extradition proceedings—a case close to Brosnahan's heart, given his Irish roots. Mr. Brosnahan is also recognized for founding the Volunteer Legal Services Program of the Bar Association in San Francisco.

- 8/17/12: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2012 list for the third year in a row. The list recognizes the top twenty pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. MoFo is one of only four firms to appear on the *Law 360* list in each year since it was inaugurated in 2010.

- 6/14/12: Volunteer Lawyers for the Arts (VLA) selected the firm to receive the 2012 S. Jeanne Hall Pro Bono Service Award for its exceptional pro bono service through the support of its programs and individual cases as well as hosting VLA's Art & Law Residency since the program began in 2009.

- 5/23/12: The AIDS Legal Referral Panel recognized Keith Wetmore with its 2012 James C. Hormel Philanthropist Award for Morrison & Foerster's many years of outstanding service to ALRP.

- 5/17/12: Starlight Children's Foundation honored the firm with its 2012 Jacki Carlish Humanitarian Award in recognition of over 20 years of pro bono services valued at over $3 million. Since 1991, attorneys in several of our California offices, Washington, DC, Northern Virginia, New York, and London have represented Starlight in intellectual property matters, employment issues, real estate leasing, trademark and general corporate matters.

Visit www.vault.com for company rankings, ratings and reviews to learn what it's really like to work in an industry or company—and how to position yourself to land that job.

441

- 5/14/12: The McCarton Foundation for Developmental Disabilities honored Morrison & Foerster for its extensive pro bono contributions to the Foundation's work with children with autism, at its Celebration of Learning Gala.

- 5/09/12: *The Daily Journal* named San Francisco associate Rita Lin to its list of top women lawyers for 2012 in recognition of her work as co-counsel with Lambda Legal in *Golinski v. Office of Personnel Management*, which challenges the federal Defense of Marriage Act (DOMA) on behalf of a federal district court employee who was rebuffed when she sought to enroll her same-sex spouse on her federal employee health plan.

- 5/01/12: The New York State Bar Association recognized Natalie Fleming Nolen with its 2012 President's Pro Bono Service Award in the Young Lawyer Category for her work on behalf of immigrants and refugees, including winning humanitarian parole for Haitian victims of rape and obtaining special immigrant juvenile status for minors who were facing deportation from the United States.

- 4/25/12: The HIV Law Project in New York gave Morrison & Foerster its Distinguished Pro Bono Award, citing the firm's lengthy and successful representation of an HIV positive man who was threatened with eviction from his home.

- 4/18/12: Arturo Gonzalez was honored as Attorney of the Year by Centro Legal de la Raza, for advancing the rights of immigrant, low-income and Latino communities through legal representation, education and advocacy.

- 3/29/12: The Federal DC Circuit Judicial Conference Standing Committee on Pro Bono Legal Services honored the firm's Washington, DC office at the annual 40 at 50 Judicial Pro Bono Recognition Breakfast, recognizing that at least 40 percent of the attorneys in that office performed 50 hours or more of pro bono work during 2011.

- 3/26/12: The District of Columbia Court of Appeals and Superior Court of the District of Columbia named 37 lawyers from Morrison & Foerster's Washington, DC office to the Capital Pro Bono Honor Roll, for performing at least 50 hours of pro bono service in 2011. Twenty-four of these attorneys were also named to the court's High Honor Roll, for pro bono contributions in excess of 100 hours.

- 3/14/12: The Volunteer Legal Services Program of the Bar Association of San Francisco ("VLSP") awarded Morrison & Foerster its 2011 Outstanding Law Firm in Public Service Award. In presenting the award to Jim Brosnahan, Judge Katherine Feinstein, San Francisco Superior Court's Presiding Judge, noted that more than 70 Morrison & Foerster attorneys participated in VLSP pro bono matters in 2011, contributing over $1 million in pro bono legal services.

- 3/09/12: Bay Area Lawyers for Individual Freedom honored Rita Lin with its 2012 Legal Service Award in recognition of her important and vital work to advance the rights of the LGBT community, including representation of Karen Golinski.

- 2/16/12: Susan Mac Cormac was one of the attorneys named as California Lawyer of the Year by *California Lawyer* magazine for co-chairing the working group that drafted

SB 201 creating Flexible Purpose Corporations. The law now makes it possible for California businesses to fold goals of sustainability and social morality into their missions.

- 1/02/12: *The National Law Journal* named Morrison & Foerster a recipient of its annual Pro Bono Awards for its display of exemplary commitment to access to justice. San Diego attorney Drew Woodmansee was profiled for his advocacy and litigation work that led to the repeal of Don't Ask, Don't Tell on September 30, 2011. Beginning in 2009, a Morrison & Foerster pro bono team has represented four gay service members who served their country with distinction but were dismissed, or were poised to be dismissed, under Don't Ask, Don't Tell.

### 2011 Awards

- 12/13/11: Casa Cornelia honored Morrison & Foerster with its La Mancha Law Firm of the Year Award for its extraordinary level of pro bono legal services to indigent immigrant victims of human and civil rights violations. Casa Cornelia stated that this "extraordinary level of commitment is only possible when a firm's leadership encourages and facilitates pro bono service among its partners and associates."

- 12/09/11: Disability Rights California (DRC) honored Morrison & Foerster for its considerable and critical contributions to the *Darling v. Douglas* lawsuit challenging cutbacks to Medi-Cal funded Adult Day Health Care (ADHC). DRC commended Palo Alto litigators Ken Kuwayti and Stefan Szpajda for their strategic and successful efforts to stop the elimination of ADHC as well as Los Angeles litigators Ben Fox and Shirley Hufstedler for their compelling appellate efforts in the Ninth Circuit.

- 11/22/11: The National Legal Aid & Defender Association (NLADA) honored the firm with its 2011 Beacon of Justice Award for its significant contribution to pro bono appellate representation. NLADA was moved by Morrison & Foerster's true commitment to justice by stepping up to represent issues and people that would otherwise be forced to navigate the appeals process without any guidance.

- 11/03/11: *The Financial Times* highly commended the Los Angeles office of Morrison & Foerster in its 2011 U.S. Innovative Lawyers issue for winning a landmark education rights case by using the California constitution's guarantee of equal educational opportunity. The result prevents teacher layoffs at inner city public schools and has repercussions for schools across the U.S.

- 11/03/11: The Pro Bono Institute (PBI) selected Morrison & Foerster as the recipient for the John H. Pickering Award for its unwavering commitment to pro bono, noting that the firm billed over 95,000 pro bono hours in 2010. PBI highlighted the firm's recent pro bono victories including a ruling from the U.S. Supreme Court regarding protecting juveniles from life sentences without parole in non-homicide offenses as well as securing the release of a man wrongly imprisoned for 20 years.

- 10/26/11: Gordon Erspamer has been honored by *American Lawyer* with a Lifetime Achiever Award. Mr. Erspamer is one of only eight attorneys to receive the award this year, which honors outstanding private sector success and a

© 2012 Vault.com Inc.

devotion to public service. According to *Am Law*, the 2011 Lifetime Achiever recipients "are extraordinary lawyers, certainly, but for them, that's just the beginning of what makes them successful." Gordy's profile highlights his pro bono accomplishments on behalf of U.S. veterans that have spanned more than three decades, making him "a legend in military circles." The special section is published in the September 2011 issue of *American Lawyer*.

- 10/05/11: Tokyo attorney Jack Londen was named as one of the recipients of the Brinsley Award by the Western Center on Law & Poverty (WCLP). Named in honor of former WCLP Board Chair John Brinsley, the award celebrates the heart of Western Center which is passionate service, leadership and extraordinary commitment to pro bono services and the community.

- 7/18/11: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2011 list. The list recognizes the top ten pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. In particular, *Law 360* recognizes the firm's impact in juvenile justice, education rights, and advocacy for people with disabilities.

- 6/16/11: The American Civil Liberties Union Foundation of Southern California awarded its 2011 Social Justice Award to Sean Gates and his team for their extraordinary work in *Reed v. State of California* to protect the equal education rights of students affected by teacher layoffs in the Los Angeles Unified School District. The award was presented at the ACLU's 17th Annual Law Luncheon in Los Angeles.

- 6/15/11: Public Counsel gave its 2011 Pro Bono Award to Los Angeles attorneys Sean Gates, Hailly Korman, and Miriam Vogel, and Tokyo attorney Jack Londen for devoting eight months to negotiating and protecting a resolution in *Reed v. State of California*. The result is a landmark protection of students' fundamental right to equal educational opportunity that protects at least 75,000 students annually in the Los Angeles Unified School District.

- 4/15/11: The American Bar Association Section of Litigation awarded its top pro bono honor, the 2011 John Minor Wisdom Public Interest and Professionalism Award to the firm on behalf of its work on educational reform for low-income children and children with disabilities.

- 4/11/11: The AIDS Legal Referral Panel recognized the firm with a certificate of appreciation for our generous participation in the Pro Bono Connections Initiative with ALRP.

- 2/15/11: Los Angeles attorney Sean Gates has been named the recipient of a 2011 California Lawyer Attorneys of the Year (CLAY) Award in the public interest law category for achieving an innovative class action settlement in *Reed v. State of California*, to protect the equal education rights of students who are affected by teacher layoffs. The settlement goes far beyond the three public schools attended by the initial plaintiffs, to protect up to 45 schools. As a result, the Los Angeles Unified School District must consider equal protection implications as well as teacher seniority in making layoff decisions.

*2010 Awards*

- 12/07/10: Legal Services NYC named Morrison & Foerster a 2010 Pro Bono Leader, for launching and sustaining the Unemployment Insurance Project in conjunction with Brooklyn Legal Services Corporation A.

- 12/06/10: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2010 list. The list recognizes the top ten pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. In particular, *Law 360* recognizes the firm's impact in juvenile justice, education rights, and advocacy for people with disabilities.

- 10/06/10: The National Legal Aid & Defender Association (NLADA) honored the firm with its 2010 Beacon of Justice Award for its significant contribution to pro bono representation in the area of immigration law.

- 9/24/10: The State Bar of California gave the President's Pro Bono Service Award to Kimberly Van Voorhis, Richard Ballinger and Marc Peters for their representation of the California State Foster Parent Association in an action in the U.S. District court for Northern California by California foster parents to increase the state's reimbursement rates for providing basic necessities to federally qualified foster children.

- 6/25/10: The Federal Circuit Bar Association honored the firm at the Broadmoor Bench and Bar Conference for its support of the general, government and veterans pro bono programs.

- 5/10/10: The Washington Lawyers' Committee for Civil Rights honored Jeremy McLaughlin, John Kolakowski, Vanessa Waldref and Robert Salerno with its Outstanding Achievement Award for their work ensuring access for people with disabilities in the Johnny Rockets chain.

- 5/03/10: The Colorado Lawyers Committee presented the Denver office with its Law Firm of the Year Award. Steve Kaufmann, who has won Lawyers Committee awards for individual and sustained contributions in the past, accepted the award on behalf of the firm.

- 4/21/10: The AIDS Legal Referral Panel recognized the firm with a certificate of appreciation for our generous participation in the Pro Bono Connections Initiative with ALRP.

- 3/23/10: The Volunteer Legal Services Program of the Bar Association of San Francisco presented Kathryn Davis and Sandra Nazzal with its Outstanding Volunteer in Public Service Award.

- 3/10: *California Lawyer* magazine has named 44 attorneys around the state to receive the 14th annual *California Lawyer* Attorneys of the Year Awards. Kevin A. Calia and Gordon P. Erspamer are being honored with the Public-Law Interest award for their extensive work for veterans' rights.

- 3/11/10: Morrison & Foerster was honored at the 2010 Northern California Innocence Project's third annual awards dinner with the Pro Bono Award for the hundreds of pro bono hours and generous contribution of resources to NCIP cases.

Visit www.vault.com for company rankings, ratings and reviews to learn what it's really like to work in an industry or company—and how to position yourself to land that job.

443

Morrison & Foerster LLP

- 2/19/10: *California Lawyer* magazine awarded San Francisco attorneys Gordon Erspamer and Kevin Calia with the 2010 California Lawyer's Attorney of the Year (CLAY) Award in the public interest law category for their work in *Cushman v. Shinseki*, a Vietnam War veteran. As a result of the attorneys' work, veterans can now argue that an undue delay or unfair treatment in the processing of an application for benefits is, in itself, a constitutional violation.

- 2/09/10: Kathi Pugh was honored by the Bay Area Lawyer Chapter of the American Constitution Society for her extensive work in the community as well as her continued work for disability rights.

### Please add any additional information about your firm's pro bono program.

In the words of a Morrison & Foerster partner, "A commitment to pro bono practice is in our firm's DNA." Advancing the legal profession's commitment to donating services pro bono publico for the public good has been at the core of Morrison & Foerster's mission since firm founder Alexander Morrison assisted in the creation of the Legal Aid Society of San Francisco in 1916. In the 1950s, partner Herbert Clark led the effort to reorganize and revitalize the Legal Aid Society; in the 1980s, the firm created the Girvan Peck Memorial Fund to dedicate attorney fees and costs earned through pro bono cases to fund further pro bono work; and in 1991, partner Bob Raven convened the first American Bar Association meeting of large law firm chairs on pro bono work, a meeting that led to the creation of the Law Firm Pro Bono Challenge. MoFo was instrumental to the development of the Challenge, including the commitment to contribute five percent of billable time to pro bono work, and was a charter signatory firm. Morrison & Foerster was one of the first firms to establish a full-time Pro Bono Counsel position, and more recently created a second such position to focus on the firm's East Coast offices. The institutional commitment to pro bono is lived out every day in MoFo's 15 offices worldwide. Every lawyer in the firm is expected to take on at least one pro bono matter each year, but at Morrison & Foerster, we don't tell lawyers how to contribute their services. Rather, we invite lawyers at all levels and in all practices to bring pro bono projects to the firm, while also smoothing the way for them to participate in established pro bono clinics and other programs. Every project is approved by the local and national pro bono committee, and supervised by a partner or, in appropriate cases, a senior of counsel attorney. Pro bono work counts fully towards our associates' and partners' client service hours goals and bonuses. Most importantly, whether the project is incorporating a new nonprofit, advising a low-income entrepreneur, representing an inmate on death row or helping parents to get special education services for their child, Morrison & Foerster lawyers provide legendary service to every one of our clients, fee-paying and pro bono alike.

© 2012 Vault.com Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF**
**PERJURY:  Per the Supreme Court, and Georgetown**
**itself, these are fundamental and valuable rights which are**
**being violated against Mr. Austin's interest, and rights.***;*
**In Honor of the ; Civil Rights Act of 1964,Title VI,** (full
filing fee paid on site); Hyperlinked with Affidavits,
Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's**
***ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and**
**Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental**
**violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over**
**50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as**
**well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or**
**settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,**
**context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown**
**ideaa@georgetown.edu,  generalcounsel@georgetown.edu,  presidentsoffice@georgetown.edu,**
**media@georgetown.edu,  privacy@georgetown.edu,  visualidentity@georgetown.edu,  lawdeanofstudents**
**@georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert**
**'witnesses' including  ocr@ed.gov,  privacyTA@ed.gov,  studentaid@ed.gov, and**
**whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1.      Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights. On June 8, 2023, Justice Kagan delivered the unanimous opinion for the Supreme Court of the United States who unanimously sided with Jack Daniel's and overturned the Ninth Circuit in a trademark infringement and dilution case stemming from VIP Products' "Bad Spaniels," a novelty dog toy that intentionally parodied Jack Daniel's iconic 'Tennessee whiskey' bottle and label elements.  The decision clarifies that when a parody of another's trademark is used as a trademark, the … use does not qualify as "noncommercial."

> "You're as smooth as 'Tennessee whiskey'
> You're as sweet as strawberry wine
> You're as warm as a glass of brandy
> And honey, I stay stoned on your love all the time
> I've looked for love in all the same old places
> Found the bottom of a bottle's always dry
> But when you poured out your heart, I didn't waste it
> 'Cause there's nothing like your love to get me high
> You're as smooth as 'Tennessee whiskey"
> **-   George Jones (Original); Chris Stapleton (More Recent Remake) (with 'multivariate' artist covers)**

2.      Georgetown has already *publicly* admitted the inherent harm of their conduct in violation of their media, privacy (publicity) and written authorization policy, but the Supreme Court highlights a 'smooth' analogy to a person's right of publicity, as a trademark is *"any word, name, symbol, or device, or any combination thereof"* used to "identify and distinguish" one's goods or services (*reaffirming the harm in a purely legal, outside of policy, context*).  See Jack Daniel's Props. v. VIP Prods., No. 22-148, 6 (U.S. Jun. 8, 2023) (""[A]ny word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish")  See also Cal. Civ. Code § 3344 (*"(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of,*

*products, merchandise, goods or services, without such person's prior consent …*

*shall be liable for any damages sustained by the person or persons injured as a result*

*thereof"*).  See also e.g. Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1268 (D.C.

2015) ("*"The District of Columbia has adopted the definition set forth by the*

*Restatement (Second) of Torts § 652C for ... the tort of misappropriation of name."*

*Teltschik v. Williams & Jensen, PLLC, 683 F.Supp.2d 33, 55 (D.D.C.2010*) ; see also

Vassiliades, 492 A.2d at 592–93. *"One who appropriates to his own use or benefit the*

*name or likeness of another is subject to liability to the other for invasion of his*

*privacy." Restatement (Second) of Torts SSS § 652C (1977)."*)

3.      Also, similar to the right of publicity, trademarks perform a key function of

identifying the source of a product, thus enabling businesses (or person, in context

of publicity rights) to build goodwill and consumer recognition with high quality

products and are an essential tool in any businesses' intellectual property arsenal.

Analogous to violations of right of publicity, a Trademark infringement is the

unauthorized use of a trademark.  As The Supreme Court, per Justice Kavanaugh,

articulated in *TransUnion LLC v. Ramirez (quoting Spokeo, 578 U.S. at 341) "a*

*plaintiff searching for a "common-law analogue for their asserted injury" need not*

*identify "an exact duplicate." TransUnion, 141 S. Ct. at 2204. But the plaintiff's*

*alleged injury must still have a "close relationship" to a traditionally recognized*

*harm."*  Mr. Austin's right of publicity (and for that matter privacy), also deprived

along with Mr. Austin's 1981 rights to contract, and Equal Protection, is a close

analogue, in this case statutory (and common law), a similar harm, to Jack Daniels

*'Tennessee Whiskey."* See Jack Daniel's Props. v. VIP Prods., No. 22-148, 6 (U.S. Jun.

8, 2023)

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University……**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act** (*i.e. reasonable expectation of privacy*) of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

"**NOT "permitting** the release of education records . . . of students without the[ir] written consent (*i.e. reasonable expectation of privacy*)" - Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8 (D.D.C. Apr. 10, 2020)

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent*. *If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:
- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

*Make sure you have permission before using a person's image or likeness*….."

- **Georgetown University Library)**

4.    The broad, but specific, categories of privacy violations that Georgetown

themselves help to articulate as part of a reasonable expectation of privacy for

students for which contracts must be offered and made (above cited argument &

Georgetown *public* references), illustrate at least two ways that Georgetown

specifically violated Mr. Austin's privacy, and publicity rights as they failed to make

contract offer on same basis as Whites (*as well as Equal Protection , 42 USC 1981, Duties to not violate Deceit, Negligence and Bad Faith rights*).  See e.g. Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015) ("*"Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded." Wolf v. Regardie, 553 A.2d 1213, 1216–17 (D.C.1989). "In the District of Columbia, courts have adopted the Second Restatement of Torts to 'determin[e] the appropriate contours of a cause of action for' invasion of privacy." Budik v. Howard Univ. Hosp., 986 F.Supp.2d 1, 11 (D.D.C.2013) (citing Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 587 (D.C.1985) (brackets in original)). "The four constituent torts are (1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit."*")

5.     Georgetown *knows* both DC's and California's jurisdictions affirm that Georgetown's conduct using an up close photo-IP-economic-contract rights without his consent, nor knowledge, nor written agreement, was violative of Mr. Austin's privacy, and publicity rights and per this matter his right to contract under 1981. The Supreme Court has also repeatedly re-affirmed this position directly.  See e.g. Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 n.7 (1977) ("*"The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff . . . 'to be let alone.'" Prosser, Privacy, 48 Calif. L. Rev., at 389. Thus, according to Prosser, some courts had recognized a cause of action for "intrusion"*

*upon the plaintiff's seclusion or solitude; public disclosure of "private facts" about the plaintiff's personal life; publicity that places the plaintiff in a "false light" in the public eye; and "appropriation" of the plaintiff's name or likeness for commercial purposes. One may be liable for "appropriation" if he "pirate[s] the plaintiff's identity for some advantage of his own." Id., at 403. See, for example, W. Prosser, Law of Torts 842 (3d ed. 1964); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y. U. L. Rev. 962, 986-991 (1964)"*) See also e.g. Time, Inc. v. Hill, 385 U.S. 374, 380-81 (1967) (*"traced the theory to the celebrated article of Warren and Brandeis, entitled The Right to Privacy, published in 1890. 4 Harv. L. Rev. 193. … observed that "[t]he legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent…..the appropriation and use in advertising or to promote the sale of goods, of another's name, portrait or picture without his consent."*)

6.      Not only was Georgetown aware, but *admits* publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/, and it is commonly understood that their conduct violated his reasonable expectation of privacy, but violated Mr. Austin's right to contract especially as an admitted student in the forum state of California (whereas this requirements was doubly required). See e.g. Air Transport Ass'n of America v. Public Utilities Commission of California - 833 F.2d 200 (9th Cir. 1987) (*In California, a citizen's interest in privacy has been raised to the dignity of an express state constitutional right. See Cal. Const. art. I, § 1. California has seen fit to protect this right with statutes providing criminal sanctions for.. one's privacy [violation], as well as a statutory civil cause of action*

*for..person whose rights are violated*)  See e.g. Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1141-42 (9th Cir. 2006) ("*Laws points to two cases for support. Both cases, however, involve photographs used in advertising, ... published the photo in connection with a broad ... advertising campaign, .... [the violation]... is the use of the [plaintiffs'] likenesses .... in the published photograph."..... . . . The defendants did not have her consent to continue to use the photograph.*")  See also e.g. Hill v. National Collegiate Athletic Ass'n, 18 Cal.App.4th 1290, 1294 (Cal. Ct. App. 1990) ("*However, California Constitution article 1, section 1, was intended to reach both governmental and nongovernmental conduct. (Wilkinson v. Times Mirror Corp. (1989) 215 Cal.App.3d 1034, 1041-1043, 264 Cal.Rptr. 194.) That section "provides: 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.' By this provision, California accords privacy the constitutional status of an inalienable right, on a par with defending life and possessing property. [Citation.]" (Luck v. Southern Pacific Transportation Co. (1990) 218 Cal.App.3d 1, 15, 267 Cal.Rptr. 618.) "Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone." (Porten v. University of San Francisco (1976) 64 Cal.App.3d 825, 829, 134 Cal.Rptr. 839, fn. omitted.)*")

7.    Nationally, it is clear, and codified in various forms (applying to a variety of contexts), that Georgetown's behavior violates not only privacy, and publicity rights, but Mr. Austin's right to written contract under 1981, and Georgetown's policies for admitted students (*publicaffairs.georgetown.edu/communications/policies/ policy-for-filming-at-georgetown-university/*).  See e.g. Cox Broadcasting Corp. v.

Cohn, 420 U.S. 469, 488 (1975) (*More compellingly, the century has experienced a strong tide running in favor of the so-called right of privacy. In 1967, we noted that "[i]t has been said that a `right of privacy' has been recognized at common law in 30 States plus the District of Columbia and by statute in four States." Time, Inc. v. Hill, 385 U.S. 374, 383 n. 7. We there cited the 1964 edition of Prosser's Law of Torts. The 1971 edition of that same source states that "[i]n one form or another, the right of privacy is by this time recognized and accepted in all but a very few jurisdictions." W. Prosser, Law of Torts 804 (4th ed.)*") See also e.g. Davis v. Fed. Election Comm'n, 554 U.S. 724, 744 (2008) (" *"[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Buckley, 424 U.S., at 64, 96 S.Ct. 612.*")  See also e.g. TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) (*"Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Id. , at 340–341, 136 S.Ct. 1540. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. See, e.g., …Davis v. Federal Election Comm'n , 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (disclosure of private information); see also Gadelhak v. AT&T Services, Inc. , 950 F.3d 458, 462 (CA7 2020) (Barrett, J.) (intrusion upon seclusion).*")

8.    Although Georgetown already *publicly* admits it, another way to ascertain common understandings of a reasonable expectation of privacy is a comparative approach perusing similar privacy protected information, in similar contextual frameworks, to have an understanding of the metes and bounds of our zones of

protected information.  For example "In *Persinger*, a collection agency seeking to collect on a dis‑ charged debt asked a credit reporting agency for an aspect of a consumer's credit history without her permission. 20 F.4th at 1188. The consumer sued under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. This court ruled that such an *un‑ authorized inquiry was sufficiently close to the common‑law tort of intrusion upon seclusion to confer standing*. Id. at 1193.  In *Gadelhak*, this court looked to the kind (rather than the degree) of harm that the common law recognized to deter‑ mine if any intrusion was a concrete harm that Congress has chosen to make legally cognizable. Id. at 462–63. [to see if the harm…] may create an injury because they can disrupt a person anytime, anywhere, thereby invading "private solitude." Id. at 462. Indeed, as we explain in Gadelhak, "The undesired buzz‑ ing of a cell phone from a text message, like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal." Id. at 462 n.1" Pucillo v. Nat'l Credit Sys., No. 21-3131 (7th Cir. Apr. 26, 2023)

9.      As Georgetown *publicly admits (publicaffairs.georgetown.edu/ communications/policies/policy-for-filming-at-georgetown-university/)* privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable (and require written contract under 1981, and Georgetown policies).  See e.g.  Maracich v. Spears, 570 U.S. 48, 48-49 (2013) ("*Held: An attorney's solicitation of clients is not a permissible purpose covered by the (b)(4) litigation exception. Pp. 57-78, 186 L. Ed. 2d, at 286-299. (a) State DMVs generally require someone seeking a driver's license or registering a vehicle to disclose detailed personal information such as name, address, telephone number, Social Security number, and medical information. The*

*DPPA--responding to a threat from stalkers and criminals who could acquire state*
*DMV information, and concerns over the States' common practice of selling such*
*information to direct marketing and solicitation businesses--bans disclosure, absent*
*a driver's consent, of "personal information," e.g., names, addresses, or telephone*
*numbers, as well as "highly restricted personal information," e.g., photographs,*
*Social Security numbers, and medical or disability information,")*

10.     Georgetown not only violated privacy, and publicity rights of Mr. Austin, but
purposefully availed when it a. specifically targeted Mr. Austin's forum state of
California (utilizing his up close photo without his consent, nor knowledge in
violation of both privacy, and publicity rights), b. Did "something more" including
multiple mailed physical copies, *likely thousands*, of advertisements to forum state,
and presented physical copies including said privacy violating photo of Mr. Austin,
and separately maintained interactive website for advertising, commercial,
purposes of the multi-billion dollar organization.  See e.g. Mavrix Photo Inc. v.
Brand Techs. Inc., 647 F.3d 1218, 1229 (9th Cir. 2011) (*"we have held that "operating*
*even a passive website in conjunction with 'something more'—conduct directly*
*targeting the forum—is sufficient." Rio Props., 284 F.3d at 1020. In determining*
*whether a nonresident defendant has done "something more," we have considered*
*several factors, including the interactivity of the defendant's website, e.g., Pebble*
*Beach, 453 F.3d at 1153–54, 1158; Cybersell, 130 F.3d at 417–20; the geographic*
*scope of the defendant's commercial ambitions, e.g., Pebble Beach, 453 F.3d at*
*1156–58; Rio Props., 284 F.3d at 1020–21; and whether the defendant "individually*
*targeted" a plaintiff known to be a forum resident, e.g., Brayton Purcell, 606 F.3d at*
*1129; Pebble Beach, 453 F.3d at 1156–57; Panavision, 141 F.3d at 1321–22. In this*

*case, we find most salient the fact that Brand used Mavrix's copyrighted photos as part of its exploitation of the California market for its own commercial gain. The Court's decision in Keeton is directly relevant. See Schwarzenegger, 374 F.3d at 803")*

11.     A typical Georgetown media policy, and photo business or commercial use process, for similarly situated non-Black male admitted students would entail 1. Providing notice of the photo(s) being taken *prior to business use* 2. Providing notice of potential uses of photo *prior to use* (as outlined in agreement) 3. Presenting subject of photo(s) with contract for purpose of obtaining informed consent 4. Presenting subject of photo(s) contract with 'consideration' defined or included as required per contract law 5. Obtaining written authorization *prior to exploitation of photo(s) for commercial purposes.* See e.g. https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/

12.     Georgetown is well aware of its admitted student's role in helping shape the future of our Nation, and the World, in the Public Sector, *and elsewhere*, as one of a very few schools with at least (one) 1, and perhaps (two) 2, US President(s) (POTUS) listed as alumni, or previous students, (library.georgetown.edu/infrequently-asked-questions/blog/other-bill-clinton-have-any-us-presidents-attended-georgetown; See also Congress.gov, Robert A. Caro, "The Passage of Power." ), and the second highest feeder to members of the United States Legislature, behind Harvard, as well as Private Sector, NGOs, etc.  Because of the rigorous, scrutinizing, and elite admissions process its student body is filled with high potential leaders who in fact, not just theory, fundamentally impact World, Domestic, State, and Local affairs in all sectors of our Economy.  Principally because of this key developmental, and exploratory, period in a persons, and admitted

student's life as well as every admitted student's high potential for positive impact it is essential to protect not only their privacy, and publicity rights, but Equal Protection and 13th Amendment, or 42 USC 1981 rights to contract as students "do not waive…..when walking through school gates…"

13.     As soon as a Georgetown Dean, and Leadership, Mitch Bailin admitted in writing to using my photo to market the school without asking my permission, nor informing me, nor getting my written consent with written contract offer, Mr. Austin immediately began a series of questions, and formal complaints to ascertain and figure out why they chose to "impermissibly use race" (*and perhaps gender*) to treat, me, a Black man, and admitted student with less respect, less rights, and in an inferior manner than other similarly situated admitted students with use of material misrepresentations, omissions and deceit (with malice) to deprive Mr. Austin (*in direct violation of their explicitly publicly stated contract, and policy terms*).

> "Privacy Policy: In keeping with *state and federal legislation*, the University safeguards the privacy of patients, **students**, employees, University business, and other matters by protecting electronic records classified as confidential information. *Unauthorized accessing and/or disclosure of confidential information by University* employees is *prohibited* and may result in legal penalties. This policy applies to records maintained in any type of electronic record: computer, voice, or video. It also applies to records created via the Georgetown University website." - www.georgetown.edu/privacy-policy/

> "Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University…..**Georgetown complains that … requiring it to report …. forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

> "As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

14.    When Defendant Georgetown made White, or Non-Black male, students

contract offers, they provided Whites: 1. with respect to their persons, as human

beings, (and provided a head-up, or forewarning, that Georgetown desired to take a

photo of them and use it for commercial, marketing, purposes), whereas they

disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted,

and defrauded out of economic contract rights, or even knowledge that his image,

and likeness, was being used for commercial-marketing purposes because he is

Black 2. knowledge of what the photo was used for (and where it may be sent for

marketing purposes) for Whites, but hid knowledge, and fact photo was being used

at all (after already stealing rights from him) for Mr. Austin because he is Black 3.

Pre-approval of use of the photo by the non-Black male, or White students whereas

they didn't even think to ask Mr. Austin in disrespect of his overall person, and

rights to not give pre-approval because he is Black 4. An opportunity to accept or

decline the offer itself for Whites, whereas they stole the opportunity to make his

own choice, decline or accept, after already stealing economic-IP-rights of publicity

from Mr. Austin because he is Black 5. An opportunity to review the written

contract offer before making the decision 6. An opportunity to agree to the terms of

the contract offer 7. An opportunity to provide a counteroffer if terms were not

acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits,

privileges, rights provided in a contractual relationship.    Georgetown willfully

chose to deprive Mr. Austin's rights in this manner because he is a Black male

admitted student compared to similarly situated White, or non-Black students.

Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's

*prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

15.     Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.   Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*





GEORGETOWN UNIVERSITY LAW CENTER

Office of the Dean of Students

February 28, 2019

George Austin

CA

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-9090

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY RIGHTS) THEY WERE NOT ENTITLED TO. 64-PAGE AMENDED (FAC) COMPLAINT
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. 4:24-cv-00260-CRB (DMR)

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing.**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu, generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing "*deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1.    Georgetown knew better, but did not do better.  It demonstrated 1. it knew

how to make a written contract with Mr. Austin (see below), 2. Itself promulgated a

the written media contract requirements and 3. Purposefully violated its own

promulgated written contractual requirements toward Mr. Austin because he is

Black (as compared to Whites whose rights to contract, and personhood was

respected).  Mr. Austin never gave consent (written or otherwise); Never was *asked*

for the opportunity to provide consent; Georgetown just took, exploited, and profited

in violation of his Constitutional rights to contract and current applicable law with

the *ongoing* attitude, pattern, policy and practice of an enslaver.



2.    Defendant Georgetown went out of their way to violate their own policies,

student contract, standard(s) of care, the Constitution (including Equal Protection

Clause; section 1981), and Current law, to exploit Mr. Austin's person, rights, and

likeness for commercially.  Mr. Austin notes for the Court that Defendant

Georgetown has provided its own Affidavit in its written admission of

non-consensual business or commercial usage (See Mitch Bailin's letter) use of Mr.

Austin's photo which is in direct violation of applicable laws, its own

policies-contract, and the Constitution including 42 USC 1981 right to contract.

3.      Mr. Austin was previously 'consensually' recorded by other organizations for

non-commercial, government, use as part of his job responsibilities *knowingly, and*

*consensually,* in the California Senate as an example of the proper way to provide

notice, gain consent, and partake in the enjoyment of a mutually beneficial contract

per Fellowship Capital Fellows.  Mr. Austin has never before experienced the

combined illegal audacity of a Defendant's admitting their violations along with

their publicly hypocritical (and illegal) exploitation for business use (with expressly

discriminatory *ongoing* conduct to exclude from campus activity in violation of Mr.

Austin's Equal Protection per Title VI). Compare (Consensual; Knowing use)

**www.senate. ca.gov/media/20130814_267/video**;

4.      Notice as Mr. Austin Won (along with 17 others) a top 10 out of 820+, elite,

uber- competitive Senate fellowship (1 of 64 Capital Fellowship winners; *CA Senate*)

his consent from beginning was respectfully asked for (even for something

non-commercial, non-business, and in the public-government service-interest)  See

e.g. https://www.youtube.com/watch?v=FWCleEPIPK4 ("Capital Fellows Is Tops

Again; YouTube · Sacramento State; Nov 29, 2012")  From the beginning, and with

each different use of his name-photo-likeness, Mr. Austin's express consent was

sought not just directly with the Senate-Legislature; Capital Fellows organizations,

but with each antecedent or auxiliary announcements ( as well as with the potential

breadth and depth of uses of likeness *prior* to their use).  See e.g.

> "The now-25-year-old, along with fellow Stockton native George Austin, is receiving the
> opportunity to be at the forefront of state politics for 11 months starting in October after
> being chosen to be among 18 Senate Fellows as part of the state's Capital Fellows
> Program….. But being chosen for the program is no easy task…..The Capital Fellows

program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing out of 821 internship programs, bases its high-ranking selections on the all-around experience interns receive….."It's a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship, they're also taking graduate courses."...There were more than 1,300 applications for the program each of the past two years. Only 64 people are chosen for the entire program."

- www.recordnet.com/story/news/2012/09/08/just-one-fellows/ 49419856007/

 



**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

5.    As articulated above, Mr. Austin Won a Fellowship in the top 10 out of 820+

(in CA Senate; most competitive entry less than 4% acceptance rate, my year, for

that program, 1 of 18 selected winners (1 of 2 *winners* out of that area)

www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/  was

unavailable for press interview at the time but celebrated and honored publicly in

the piece of over 400 elite competitors nationwide, declined automatic job offer as I

gave my word to another commitment and already deferred for a year).   Mr. Austin

was asked ahead of time from colleagues and supervisors to use name, image, or

likeness in Senate Daily File (see below), California Channel Committee Recordings

(see e.g. www.senate.ca.gov/ media/20130814_267/video), Capital Fellows Video (see

above; see below screenshot) which appears on Google search "Capital Fellows Still

Tops," Respective newspaper announcements, etc.  See below examples:









**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



**SENATE GOVERNANCE & FINANCE COMMITTEE**
**Senator Lois Wolk, Chair**

**BILL NO:** AB 458
**AUTHOR:** Wieckowski
**VERSION:** 2/19/13
**CONSULTANT:** Austin

**HEARING:** 8/14/13
**FISCAL:** Yes
**TAX LEVY:** Yes

*INCOME TAXES: DEDUCTIONS: PUNITIVE DAMAGES*

*Repeals authority to deduct punitive damages on personal and corporate tax filings.*

### Background and Existing Law

Current law authorizes individuals and corporations to file tax deductions for the payment of monetary damages in legal cases. Under existing law plaintiffs can seek "punitive" or "exemplary" damages in legal cases where the defendant is guilty of "oppression, fraud, or malice." "Malice" means conduct which is intended by the defendant to cause injury or despicable conduct that is carried on with a willful and conscious disregard of the rights or safety of others. "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

California courts hold that punitive damages punish the defendant and deter similar conduct. The goal of deterrence of similar conduct is both for the specific defendant who may repeat or continue offensive behavior and to other potential parties who may commit similar offenses. Punitive damages are not intended to compensate a plaintiff unlike compensatory damages, which are intended for compensation.

The Book of Approved Jury Instructions (BAJI) provides that a jury should consider two factors to determine the amount of punitive damages to award:
- The reprehensibility of the defendant's conduct.
- The amount of punitive damages, which will have a deterrent effect on the defendant in the light of defendant's financial condition.

In addition, a defendant may ask that a jury be instructed to consider that the punitive damages bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff.

8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order

 

5046.

**Environmental Quality—(9)—** Hill (Chair), Gaines (Vice Chair), Calderon, Corbett, Fuller, Hancock, Jackson, Leno and Pavley. Chief Consultant: Rachel Machi Wagoner. Consultants: Rebecca Newhouse and Joanne Roy. Assistant: Sue Kampulainen. Phone: (916)651-4108. Room 2205.

**Governance and Finance—(7)—** Wolk (Chair), Knight (Vice Chair), Beall, DeSaulnier, Emmerson, Hernandez and Liu. Staff Director: Gayle Miller. Consultants: George Austin, Toby Ewing, Colin Grinnell, Samantha Lui and Brian Weinberger. Assistants: Marisa Lanchester and Krimilda McKenzie. Phone: (916) 651-4119. Room 408.

**Governmental Organization—(11)** Wright (Chair), Vacant (Vice Chair), Berryhill, Calderon, Cannella, Correa, de León, Galgiani, Hernandez, Lieu and Padilla. Staff Director: Arthur Terzakis. Consultant: Paul Donahue. Assistant: Brenda K. Heiser. Phone: (916)651-1530. 1020 N Street, Room 584.

**Health—(9)** Hernandez (Chair), Anderson (Vice Chair), Beall, de León, DeSaulnier, Morning, Nielsen, Pavley and Wolk. Staff Director: Melanie Moreno. Consultants: Scott Bain, Vincent D. Marchand, Tanya Robinson-Taylor and Katie Trueworthy. Assistants: Dina Lucero and Alex Norring. Phone (916)651-4111. Room 2191.

**Human Services—(6)—** Yee (Chair), Berryhill (Vice Chair), Emmerson, Evans, Liu and Wright. Chief Consultant: Mareva Brown. Consultant: Sara Rogers. Assistant: Mark A. Teemer Jr. Phone: (916)651-1524. 1020 N Street, Room 521.





6.    In various other situations the obviousness of the need to ask Mr. Austin's

consent before using his likeness, image, or name by organizations, and subsequent

indications of likely consent are demonstrated in various examples including work

IDs (Tesla Work ID below; Senate Consultant Work ID above) school IDs (Georgetown School ID), early (Kindergarten) newspaper article interview (See below), or even knowing and consented commercial use (Fox - 36th NAACP Image Awards See below), and College Graduation photo.  Notice Mr. Austin's awareness, front facing, or direct engagement to contrast with Georgetown's exploitative, right to contract violating capture, non-awareness, non-consensual choices (and *ongoing* refusal to correct).





**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



"From: Ashley L Jennings <alb225@law.georgetown.edu>
To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,

This e-mail serves as official notification that your request to defer admissions to Georgetown
University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward
to welcoming you to the full-time program next fall.  As mentioned in our previous
correspondence, your deferment is binding and you should begin withdrawing all other
pending law school applications.  Please note it is your responsibility to notify us, in writing,
of any change of address during your deferment period so that we may forward future
correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This
deposit is non-refundable and will be credited toward the tuition for your first year.

Your second tuition deposit will be due in June 2013.  You'll be able to find more information once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!

Warm regards,


Ashley Jennings

Assistant Manager, Office of Admissions

Georgetown University Law Center

600 New Jersey Ave., NW, Room 589

Washington, DC 20001

202.662.9010 Phone

202.662.9439 Fax




From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.

Please let me know if anything else is needed for a successful request.

**13 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Thank you,

George

Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school.  To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program.  As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school.  The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding.  It will also help provide an additional depth of experience to add value to classroom discussions. From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.

George Austin

**14 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

--------------Senate Fellows Acceptance Letter----------------------------------------------

May 15, 2012

Dear George Austin,

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow.  You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program.  We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.

As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget.  The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits.  If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000.  For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ███████. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero

Jennifer Calbonero, Program Assistant

California Senate Fellows"

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**





--------- Forwarded message ---------
From: George Austin <gaustin07@berkeley.edu>
Date: Mon, Sep 11, 2023 at 11:51 AM

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Subject: 9.11.23 - List of Previously, and Still, Unanswered Questions Re: Misstatements and Omissions
To: ideaa@georgetown.edu <ideaa@georgetown.edu>
CC: <Olabisi.Okubadejo@georgetown.edu>, emb257@georgetown.edu <emb257@georgetown.edu>,
<kilkennr@georgetown.edu>, <lawdeanofstudents@georgetown.edu>, presidentsoffice@georgetown.edu
<presidentsoffice@georgetown.edu>, vicepresident@georgetown.edu <vicepresident@georgetown.edu>

Good Afternoon, Georgetown University

1. Why did Georgetown not ask my permission before using my up close photo for advertising purposes?

2. Why did Georgetown not get my written consent, nor use of form (as reasonable expectation of privacy standards are similar for medical and student records) for use or release of an up close photo of an admitted student for advertising or marketing purposes?

3. Why was it materially omitted that the photo was taken, was made public, and was used without my consent, to the person and admitted student [whose] rights were being exploited?

4. Why when I first asked Georgetown leadership, (after someone outside of the school was the first to tell me my photo was being used for that purpose) was the photo authentic, and actually being used for advertising, was it affirmatively denied, and I was lied to?

5. Why when several months later, after Mitch Bailin finally admitting that they in fact took the photo and used the photo for that purpose, did they refuse to tell how many physical brochures were sent or used in California, and elsewhere for that matter?

6. Why was that material information repeatedly omitted by Mitch Bailin and Georgetown University Leadership, and continues to be omitted to date, despite my repeated inquiries?

7. I have placed at least [5]0+ formal and informal complaints related to this specific set of topics with IDEAA and Georgetown Leadership ; why has no investigation, nor even follow up inquiry by those tasked to investigate these types of issues taken even a cursory step toward investigation nor resolution despite me being an admitted student?

Thank you,

George Jarvis Austin

7.      Georgetown knew it was supposed to get Mr. Austin's consent, and make a

written contract with Mr. Austin before commercial usage, or marketing, but chose

to steal from Mr. Austin in a racially discriminatory manner instead of expressly

enter into contract make  Mr. Austin an offer on the same basis as Whites.

Georgetown knew the same tenets of contract formation controlled under 42 USC

1981 (and Equal Protection) for mandatory written media authorization agreement

(contract), per their own publicly admitted policy-contract-standard of care.


### FACTS

"From: Ashley L Jennings <alb225@law.georgetown.edu>

**17 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,


This e-mail serves as official notification that your request to defer admissions to Georgetown University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward to welcoming you to the full-time program next fall.  As mentioned in our previous correspondence, your deferment is binding and you should begin withdrawing all other pending law school applications.  Please note it is your responsibility to notify us, in writing, of any change of address during your deferment period so that we may forward future correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This deposit is non-refundable and will be credited toward the tuition for your first year.

Your second tuition deposit will be due in June 2013.  You'll be able to find more information once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!



Warm regards,



Ashley Jennings

Assistant Manager, Office of Admissions

Georgetown University Law Center

600 New Jersey Ave., NW, Room 589

Washington, DC 20001

202.662.9010 Phone

202.662.9439 Fax


From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

**18 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.

Please let me know if anything else is needed for a successful request.

Thank you,

George

Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school.  To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program.  As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school.  The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding.  It will also help provide an additional depth of experience to add value to classroom discussions. From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

**19 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.


George Austin


--------------Senate Fellows Acceptance Letter-------------------------------------------

May 15, 2012


Dear George Austin,

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow.  You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program.  We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.


As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget.  The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

**20 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits.  If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000.  For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ███████. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero

Jennifer Calbonero, Program Assistant

California Senate Fellows"

**21 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**





--------- Forwarded message ---------
From: George Austin <gaustin07@berkeley.edu>
Date: Mon, Sep 11, 2023 at 11:51 AM
Subject: 9.11.23 - List of Previously, and Still, Unanswered Questions Re: Misstatements and Omissions

**22 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

To: ideaa@georgetown.edu <ideaa@georgetown.edu>
CC: <Olabisi.Okubadejo@georgetown.edu>, emb257@georgetown.edu <emb257@georgetown.edu>,
<kilkennr@georgetown.edu>, <lawdeanofstudents@georgetown.edu>, presidentsoffice@georgetown.edu
<presidentsoffice@georgetown.edu>, vicepresident@georgetown.edu <vicepresident@georgetown.edu>

Good Afternoon, Georgetown University

1. Why did Georgetown not ask my permission before using my up close photo for advertising purposes?

2. Why did Georgetown not get my written consent, nor use of form (as reasonable expectation of privacy standards are similar for medical and student records) for use or release of an up close photo of an admitted student for advertising or marketing purposes?

3. Why was it materially omitted that the photo was taken, was made public, and was used without my consent, to the person and admitted student [whose] rights were being exploited?

4. Why when I first asked Georgetown leadership, (after someone outside of the school was the first to tell me my photo was being used for that purpose) was the photo authentic, and actually being used for advertising, was it affirmatively denied, and I was lied to?

5. Why when several months later, after Mitch Bailin finally admitting that they in fact took the photo and used the photo for that purpose, did they refuse to tell how many physical brochures were sent or used in California, and elsewhere for that matter?

6. Why was that material information repeatedly omitted by Mitch Bailin and Georgetown University Leadership, and continues to be omitted to date, despite my repeated inquiries?

7. I have placed at least [5]0+ formal and informal complaints related to this specific set of topics with IDEAA and Georgetown Leadership ; why has no investigation, nor even follow up inquiry by those tasked to investigate these types of issues taken even a cursory step toward investigation nor resolution despite me being an admitted student?

Thank you,

George Jarvis Austin

8.      Instead of respecting Mr. Austin as a student, human being, and person, Georgetown decided to repeatedly, and ongoing *treating him as an inferior*, because he is a Black male, regardless of him being an admitted student.   Georgetown keeps attempting to mark him with a badge of inferiority repeatedly and ongoing, to completely disregard and disrespect his personhood and fundamental rights each time Georgetown chose to exclude Mr. Austin from campus complaint procedures rather than self correct its own mistakes.  Georgetown, and the US Department of Education *admits, and knows,* Georgetown is covered by Title VI, Equal Protection, as a recipient of Federal funds.  See e.g.:

**23 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

https://www2.ed.gov/about/offices/list/ocr/docs/hq43e4.html (EDUCATION AND TITLE VI OF THE CIVIL RIGHTS
ACT OF 1964 - Title VI and Race, Color and National Origin Discrimination

Title VI of the Civil Rights Act of 1964 protects people from discrimination based on race, color or national origin in
programs or activities that receive Federal financial assistance. Title VI states that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation
in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal
financial assistance.
Programs and activities that receive Federal financial assistance from the United States Department of Education
(ED) are covered by Title VI. ED maintains an Office for Civil Rights, with 10 regional offices and a headquarters
office in Washington, D.C., to enforce Title VI.

Education Programs and Activities Covered by Title VI

Agencies and institutions that receive ED funds covered by Title VI include: 50 state education agencies, their
subrecipients, and vocational rehabilitation agencies; the education and vocational rehabilitation agencies of the
District of Columbia and of the territories and possessions of the United States; 17,000 local education systems;
4,700 colleges and universities; 10,000 proprietary institutions; and other institutions, such as libraries and
museums that receive ED funds.

Programs and activities that receive ED funds must operate in a non-discriminatory manner. These may include,
but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services,
counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical
education, athletics, housing and employment, if it affects those who are intended to benefit from the Federal funds.
Also, a recipient may not retaliate against any person because he or she opposed an unlawful discriminatory practice or
policy, or made charges, testified or participated in any complaint action under Title VI. For a recipient to retaliate
in any way is considered a violation of Title VI. The ED Title VI regulations (Volume 34, Code of Federal
Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.)

9.     Per New Jersey v. T. L. O 469 U.S. 325 (1985) Georgetown admitted students

not only have these rights provided per Georgetown's promulgated policies, but also

because *"However one may characterize their privacy expectations, students properly*

*are afforded … constitutional protections. In an often quoted statement, the Court*

*said that students do not "shed their constitutional rights . . . at the schoolhouse*

*gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503,*

*506 (1969).).*  Georgetown never informed, nor obtained written, or *any*,

authorization from Mr. Austin and never made Mr. Austin an offer to enter into

written media contract as mandated per Georgetown's policies.  Outside of a

litigation context, Mr. Austin thereafter followed up with Georgetown to which they

initially denied use of his image or likeness was true.  Mr. Austin sought

verification of violations and had no way of knowing if true or authentic (as several

organizations he initially reached out to verify would not confirm, nor deny).

However, Georgetown later admitted their violations by sending him the same

physical copies, to California, already discovered by a fellow UC Berkeley student,

with a letter by Georgetown leadership admitting their violations (see below).  From

the date of that letter till now, with legal harms beginning in this action on 7.15.21

to present, Mr. Austin has diligently followed up with Georgetown leadership, with

over 50+ witnesses, and 100+ formal complaints made to Georgetown's appropriate

divisions, (*IDEAA, President Office, etc.*) outside of the litigation context, to

proactively address and solve the issues at hand (including getting the specific

numbers of physical commercial brochures sent, where, and to whom).  Specifically,

Mr. Austin emailed and faxed IDEAA complaints, with other leadership cc'd,.  Mr.

Austin formally complained. Georgetown leadership violated several mandatory

school policies, standards of care, statutes, customs, and laws. Mr. Austin had no

idea, nor had anyway to predict, Georgetown would continually conduct themselves

in this illegal manner up to the present, (and would have preferred to solve outside

of a litigation context).  To date Georgetown has *not* responded, *not* acknowledged

any formally filed complaint(s), but has made several admissions of fact:

10.    Georgetown admits, *publicly,* that they owed Mr. Austin the duty to notify

him prior to filming or photographing him as part of Georgetown's *standard of care*

to an admitted student (*as reflected in policies, statutes (which Georgetown's policies

cross reference), common law, agency regulations and admitted common practice*).

See e.g.  publicaffairs.georgetown.edu/communications/policies/

#:~:text=Full%20Filming%20Policy-,On%2DCampus%20Media%20Policy,or%20inte

rior%20spaces%20on%2Dcampus;  publicaffairs.georgetown.edu/communications/

policies/policy-for-filming-at-georgetown-university/ You may not film a person in an

identifiable manner unless you first have obtained that person's express consent.).

11.      Georgetown admits, *publicly,* that they owed Mr. Austin the duty to obtain

his *written* authorization *prior* to taking, or using, his photograph for Georgetown

Business or commercial purposes (as part of their owed standard of care).  See e.g.

publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgeto

wn-university/ University Business…. Relevant model/image releases must be

signed by all identifiable subjects….You may not film a person in an identifiable

manner unless you first have obtained that person's express consent. If the person

is a Georgetown student, you must use a written consent form that has been

approved in advance by the Office of the General Counsel.)

12.      Georgetown admits, and knows, *publicly,* that a written authorization form to

agree to commercial or business use of a photo is a contract, or contractual

agreement (*between the person whose picture is being taken and the person or*

*organization who is taking the picture for commercial or business purposes*).

Georgetown also requires *prior* approval of this contract by Georgetown's Office of

the General Counsel, and then requires signed written authorization, a contract

between student and organization, *prior* to commercial or business use or it violates

their privacy, publicity, and right to contract under 42 USC 1981 (when done in a

facially discriminatory manner; i.e. one policy for Black male students, and one for

similarly situated non-Black male students).

   o   https://publicaffairs.georgetown.edu/communications/policies/policy-for
       -filming-at-georgetown-university/ ("You may not film a person in an
       identifiable manner unless you first have obtained that person's *express consent. If*
       *the person is a Georgetown student, you must use a written consent form* that has
       been approved in advance by the Office of the General Counsel.")

- https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
    - unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
    - appropriation of another's name or likeness; or
    - unreasonable publicity given to another's private life; or
    - publicity that unreasonably places another in a false light before the public.
- (See Restatement (Second) of Torts § 652 for more information.)
- **Example**: An advertiser wants to use a photograph of a woman for a billboard supporting a [campaign; advertisement]. The advertiser negotiates a license to use the photo with the photographer, who holds the copyright. If the photographer doesn't have a release from the woman in the photo (permitting the photographer to license all uses of the photo, or otherwise waiving her rights), then the advertiser must get permission from the woman before using her photo on the billboard.
- **If there was no release, the woman has kept both privacy and publicity rights** in the use of her likeness. And, depending on how she feels about the … cause for which her image is used … she could claim she was portrayed in a false light, as well claiming unlawful commercial appropriation of her likeness….
- **The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).
- To avoid violating someone's right of publicity you must be careful about using their:
    - image (photos, videos, film);
    - likeness (drawings, paintings, prints, etc.);
    - name (this includes nicknames and former names);
    - voice; or
    - signature.
- Make sure you have permission before using a person's image or likeness, or their voice or signature, in connection with advertising for products or services; product packaging; or on any merchandise that you sell.
- **Example**: A company films an instructional video of a man installing an acrylic bathtub liner and distributes the video to its customers. (The man agreed to be filmed for the video.) The company then hires a production company to make a TV commercial for them. The production company uses footage of the man in the commercial. He did not consent to that use of his image. The man sues both companies for unlawful appropriation and, depending on the state law applied, damages could be based on the infringers' profits and/or emotional distress.")

13.    Georgetown admits, *publicly,* that this specific duty owed as part of

Georgetown's *standard of care* to an admitted student (of obtaining written consent

*prior)* to the person being photographed (subject) for Georgetown business is both reflected in 1. Georgetown's privacy policy as part of the contract between admitted Georgetown students and Georgetown (as well as staff, professors, etc.), and 2. Georgetown's Media policy.

14.    Georgetown admits, *publicly,* that information regarding the breach or violation of the aforementioned duties is material to the person who was filmed or recorded; Georgetown admits this through its emphasis, explanation, and admissions of the current law's legal requirements that inform, guide, and direct, their publicly stated policy (*as well as their argument in what is considered the Court of second highest prestige under the Supreme Court of the United States per GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)*).

15.    Further, Georgetown admits, *publicly,* that the 'commercial purpose' of the filming or recording adds extra legal barriers, and creates additional material information for the person being recorded or filmed for business or commercial purposes (which would need to be included in the written authorization, and notice, *prior* to the filming or recording).

16.    Georgetown admits that it commenced or consummated its contractual relationship with Mr. George Jarvis Austin, as an admitted student, with $400 payment from Mr. Austin and both parties', to the contract, agreement to the terms and conditions of Georgetown's standard contract with admitted students.  *See embedded message from Georgetown admissions.*

> **Note***: At moment of signed contract already had guaranteed job offer (as part of winning uber-competitive fellowship), and had other competitive schools gain acceptance to, and had other lucrative employment or business opportunities to pursue*

17.     Georgetown itself admits, *publicly,* that not only must the written

authorization, as a contractual agreement, be signed by the student *prior* to use,

but that the form itself 'must' include certain information, (*including*

*acknowledgement of 'consideration' per contract law; see below*) to be valid, and

enforceable (and even includes an example photographic/ videographic release form

for students in their continuing education programs; Georgetown's neighbor George

Washington University publicly provides a comparative example for its own

students ). See e.g

https://static.scs.georgetown.edu/upload/kb_file/2015_release_form.pdf

"For good and valuable Consideration herein acknowledged as received, and by signing this release, I hereby give
the Photographers/Filmmakers and Assigns my permission to use the Recording, and to license the Recording for
use by others, in any media (including digital, electronic, print, television, film and other media now known or to be
invented) in perpetuity for all commercial and non-commercial purposes. I agree that the Recording may be
combined with other images, text and graphics, and cropped, altered or modified. I agree that I have no rights in or
to the Recording, and all rights to the Recording belong to the Photographer/Filmmaker and Assigns. I acknowledge
and agree that I have no further right to additional consideration or accounting, and that I will make no further
claim for any reason to Photographer/Filmmaker and/or Assigns. I hereby release Georgetown University, and its
assignees and designees, from any and all claims and demands arising out of or in connection with the use of the
Recording, including but not limited to any claims for copyright infringement, defamation, invasion of privacy, or
right of publicity. I acknowledge and agree that this release is binding upon my heirs and assigns. I agree that this
release is irrevocable, worldwide and perpetual.

Releasor Information Name (print) _____

(print name)

Address _____

City _____ State _____ Zip Code _____

Country _____ Phone _____

Email _____ Date of Birth _____

Signature _____ Date _____"

https://communications.gwu.edu/photo-video-release

**Photo & Video Recording Release**
This release and authorization agreement ("Agreement") shall confirm that I, (insert full name in form below),
(hereafter "I" or "Student"), for good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, grant permission to the George Washington University ("GW" or "University") and its licensees,
assignees, and other successors-in-interest all rights whatsoever in perpetuity in and to my performance,
appearance, voice, and other reproductions of my likeness, name, and/or material ("Appearance") taken in
conjunction with (insert name of event or photo/video project below), and to use the same or portions thereof,
including making and using derivative works thereof in any medium, including without limitation, videos, online
broadcasts and brochures (collectively the "Works"), for any university purpose.

**29 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

I further grant to GW all rights of every kind and nature in and the results and proceeds of my Appearance. I acknowledge that GW shall be the sole and exclusive owner of all rights in and to the Works, including, without limitation, the copyright therein and all of the results and proceeds of my Appearance hereunder and shall have the right to exploit any or all of the foregoing in any manner and in any media, whether now known or hereafter devised in perpetuity…..I agree that GW shall have sole editing discretion in determining the extent and manner of use of my Appearance. Nothing herein will be deemed to obligate GW to use my Appearance or the results and proceeds thereof, in the Work or otherwise, or to produce, release or distribute the Works, or to otherwise exploit any rights granted to GW hereunder. GW shall have the right to assign this Agreement (or any of its rights hereunder) to any person, firm, partnership or corporation for any reason and without notice to Student.

I hereby voluntarily assume any and all risks, known or unknown, associated with my Appearance. I and my heirs, executors, administrators and assigns, hereby voluntarily release, discharge, waive and relinquish any and all claims, complaints, liabilities, actions and causes of actions ("Claims") against GW. I agree to defend, indemnify (including any and all attorney's fees) and hold harmless GW in the event of any and all Claims, by whomever or wherever asserted……I have read, understand and agree to the above terms and conditions. I warrant that I have the right and power to enter into and fully perform this Agreement and to grant GW the rights herein granted. I am over the age of 18 years of age, or I have the approval of my parent or legal guardian if I am under the age of 18. I understand that this contains the entire understanding of the parties relating to the subject matter and cannot be changed or terminated without the written consent of both parties. The provisions shall be binding upon me and my heirs, executors, administrators and successors. All rights, licenses and privileges herein granted are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

Name
Event Name or Photo/Video Project Title
Date
Date: Date
mm/dd/yyyy
Student Address
Email Address
Signature

18.     Georgetown admits, per Mitch Bailin, that they at least twice used Mr. George Jarvis Austin's photo for commercial or business purposes without obtaining written consent, nor providing 'Consideration,' nor providing notice, nor making a written contract as required per Georgetown's policies in violation of their admitted student contract, the law, and *publicly* stated policies.  Georgetown admits, per Mitch Bailin, that they in fact never disclosed, notified, nor obtained written consent from Mr. Austin, *ever*;

19.     Georgetown *publicly* admits, and knows, that written authorization requires making a contract with Mr. Austin and requires a. Mr. Austin's *prior* notice of his picture being taken, b. *prior* notice of purpose, c. *prior* notice of commercial or business use, d. *prior* presentation of written contractual agreement to consent to business or commercial use, e. *prior* Georgetown General Counsel approval of form

and f. his signature consenting to it *prior* to its use.  Georgetown *admits* it had none

of the above (as *first* acknowledgement of its use was in the 2019 letter *after the*

*fact).*

20.     Mr. Austin is the person whose economic, property, and 42 USC 1981 rights

to contract were violated in the following picture (*page 4*), and the process which

deprived Mr. Austin's contract rights.   Per US Supreme Court's *General Building*

*Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981,

Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and

engaged in a *"blatant deprivation of civil rights such as where a private offeror [in*

*this case Georgetown] refuses to extend to [an African- American, in this case Mr.*

*Austin], because he is an [African-American], the same opportunity to enter into*

*contracts he extends to White offerees [in this case non-Black, or White admitted*

*students]."* See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

21.     Non-Black male, or White, students were made contract offers, and provided:

1. with respect to their persons, as human beings, (and provided a head-ups, or

forewarning, that Georgetown desired to take a photo of them and use it for

commercial, marketing, purposes), 2. knowledge of what the photo was used for

(and where it may be sent for marketing purposes) 3. Pre-approval of use of the

photo by the non-Black male, or White students 4. An opportunity to accept or

decline the offer itself 5. An opportunity to review the written contract offer before

making the decision 6. An opportunity to agree to the terms of the contract offer 7.

An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

22.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students. Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

23.     Per Georgetown, written authorization requires is a contract.  Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.  Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).  Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):





GEORGETOWN UNIVERSITY LAW CENTER

Office of the Dean of Students

February 28, 2019

George Austin

CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW    Washington DC 20001-2075
(202) 662-9000

**34 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**35 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:  Georgetown violates Mr. Austin's equal Protection per Supreme Court's 1. Brown v. Board of Education, 347 U.S. 483, 494 (1954), 2. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023) 3. Gebser v. Lago Vista Independent School District 4. Lawrence v. Texas 539 U.S. 558 (2003)  ;  In Honor of the Civil Rights Act of 1964,Title VI, (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: **53-0196603**)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing "*deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**Georgetown violates Mr. Austin's Equal Protection**

1. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

2. Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract*) is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's] twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in*

*a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")*" Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

3.      Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

4.     When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3.  IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

5.      Further, per **faculty handbook.georgetown .edu/section4/a/** Whites are

provided: 5. The opportunity at any time, even if informal resolution was initially

chosen, to request in writing to alternatively proceed to Investigation for Whites,

whereas this opportunity was deprived and not provided for Mr. Austin, as well as

all the previous steps in the process, because he is a Black Complainant  6.  The

opportunity to initiate a formal Complaint by providing a written signed statement

(via email) for Whites whereas they deprived this opportunity for Mr. Austin (and

all other steps because he is Black) 7.  The opportunity to provide any supporting

documentation, or evidence, to substantiate a formal Complaint (via email) for

Whites whereas they deprived this opportunity for Mr. Austin (and all other steps

because he is Black) 8. The opportunity to receive a written response from the

Respondent in 20 days or less after filing complaint, if they have one, as to why they

conducted themselves in that manner, violating the law or policy, for Whites,

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black

9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10

days, after receiving Respondent's response to the initial complaint for Whites,

whereas whereas they deprived that opportunity for Mr. Austin (and completely

excluded him from this Equal Protection required procedure, and policy) because he

is Black.

6.      Moreover, per **faculty handbook.georgetown .edu/section4/a/** Whites are

provided: 10. The opportunity, or right, to present additional evidence, identify

witnesses, and cross examine opposing witnesses in per the Complaint for Whites

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites,  whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

7.      Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward

its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

8.      Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**faculty handbook.georgetown.edu/ section4/a/**)

9.      Per the Supreme Court's 1. *Lawrence v. Texas 539 U.S. 558 (2003) Cited 1,124* and 2. *Fisher v. Univ. of Tex. at Austin 570 U.S. 297 (2013)   Cited 114 times* Georgetown's actions toward Mr. Austin thereafter show their true racially discriminatory intent or purpose, upholding notions of "White Supremacy" and

enforcing stigma and "Black [Male] Inferiority" *"because … was "designed to maintain White Supremacy." Id., at 6, 11. A racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race. See Washington v. Davis, 426 U.S. 229, 241-24"* as they refused to even acknowledge Mr Austin's 100+ complaints *(despite him following their written policy)*, *after* already admitting the violations, let alone actually doing their mandated duties whereas *"the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight."* …. *Strict scrutiny does not permit a court to accept a school's assertion that its [programs or activities policies] uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice."*

10.    Per the US Supreme Court's 1. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 109-10 (U.S. Jun. 29, 2023)* 2. *Shaw v. Reno, 509 U.S. 630, 647 (1993)* and 3. *Automobile Workers v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991)* When Mr. Austin, admitted student, (*who per their express policy, and Department of Education under Title VI mandate, is entitled to the essential "program or activity" of Georgetown,*) followed Georgetown's directions to participate for the purpose of correction of Georgetown's admitted wrongs per their promulgated mandatory media written contract policy, he was excluded based on race, or racial stereotypes, in a facially discriminatory manner whereas *"the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect" or "alter [its] intentionally discriminatory character".…."In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial*

*group-regardless of their age, education, economic status, or the community in which they live-think [or presumptively act] alike '"* (quoting *Shaw v. Reno, 509 U.S. 630, 647 (1993))...*"the Court's Equal Protection Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory] stereotyping").

11.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49; see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

12.    In *Brown v. Arizona* the alleged violator was a fellow student in an area of University control, but the liability and violation itself is heightened when the violator is the University, or Administrators of the University, itself (as is the case here when Mitch Bailin *admits violations*).  In fact, Georgetown's policy explicitly

says that Georgetown heightens the liability when there is a power imbalance or abuse of power between a student (experiencing the violations) and professor or administrator (the violators). See also policymanual.hr.georgetown.edu/ 1000-university-policies/1004 -policy-statement-on-harassment/ (...*discrimination …is especially serious when it occurs between teachers and students or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly 'exploits' the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University* ….).   Mr. Austin did nothing wrong; Georgetown's display of discriminatory animus is heightened not only by the violator's (University leadership's) relationship to the violated (student), but by the subsequent 100+ discrete adverse acts, and non-acts, all showing deliberate indifference (disparate treatment)

13.    Generally speaking, once the University has notice of the violation, and has notice of the complaint by the student, a failure to act is in itself deliberate indifference and disparate treatment (discrimination) of that complainant or student entitling, the student, to damages in private suit.  See also e.g. Gebser v. Lago Vista Independent School District, 524 U.S. 274, (1998) (*"Damages may … be recovered for [racial discrimination or harassment] in [when] a school … official who at a minimum has authority to institute corrective measures on the [school's] behalf has actual notice of, and is deliberately indifferent to, the [school's, administrator's, or leadership's] misconduct. Pp. 280-293….Title IX was modeled after Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in programs receiving*

*federal funds…..Absent further direction from Congress, the implied damages*

*remedy should be fashioned along the same lines as the express remedial scheme.*

*Thus, a damages remedy will … lie [when] an official who at a minimum has*

*authority to address the alleged discrimination and to institute corrective measures*

*on the recipient's behalf has actual knowledge of discrimination and fails adequately*

*to respond. Moreover, the response must amount to deliberate indifference to*

*discrimination…[which includes exclusion from programs or*

*activities]"…."Presumably, a central purpose of requiring notice of the violation "to*

*the appropriate person" and an opportunity for voluntary compliance before ….*

*enforcement proceedings …. commence. ")* See also e.g. Cannon v. University of

Chicago, 441 U.S. 677, 688 n.7 (1979)

> (" In addition to reflecting this sentiment in the Senate Report on the 1976 amendment, see n. 6, supra, numerous legislators said as much on the floor of the two Houses: "It is Congress['] obligation to enforce the 14th amendment by eliminating entirely such forms of discrimination….. As basic provisions of the civil rights enforcement scheme that Congress has created, it is essential that private enforcement be made possible…." 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy). See also id., at 31471 (Sen. Scott); id., at 31482 (Sen. Allen); id., at 31832 (Sen. Hathaway); id., at 33313 (Sen. Tunney); id., at 33314 (Sen. Abourezk); id., at 35122 (Rep. Drinan); id., at 35125-35126 (Rep. Kastenmeier); id., at 35127 (Rep. Holtzman); id., at 35128 (Rep. Seiberling). Although we cannot accord these remarks the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX and its place within "the civil rights enforcement scheme" that successive Congresses have created over the past 110 years.")

14.    Per the Supreme Court's *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101,*

*114 (2002)* Both action, and inaction when duty arises, can constitute discrete acts

of adverse actions (non-actions) and thus disparate treatment and violations of

policy, law and the Constitution whereas *"Discrete acts such as [overt adverse acts],*

*failure to [take action], denial of [requested action], or refusal to [take required*

*action] are easy to identify. Each incident of discrimination and each …. adverse …..*

*decision constitutes a separate actionable "unlawful …. practice."* See also e.g.

Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998) *("the*

*response … deliberate indifference …. The …. enforcement scheme presupposes that*

*an official who is advised of a …. violation refuses to take action to bring the*

*recipient into compliance. The premise, in other words, is an official decision by the*

*recipient not to remedy the violation. That framework finds a rough parallel in the*

*standard of deliberate indifference….damages remedy [available when] an official*

*who at a minimum has authority to address the alleged discrimination and to*

*institute corrective measures on the recipient's behalf has actual knowledge of*

*discrimination in the recipient's programs and fails adequately to respond"*)

15.    Georgetown knew its own policies, and the overarching law, and willfully

violated privacy, publicity, mandatory media contract rights under 42 USC 1981, on

the front end.  And, was put on notice school wide, once Mitch Bailin admitted the

privacy violation in writing (*partially, but still did not disclose materially omitted,*

*or misstated facts to Mr. Austin i.e. how many brochures, where exactly mailed to or*

*utilized, exactly when was photo exploited, etc.*), but made no apology for violating

Georgetown Media Written Contract Policy, Privacy Policies, and the surrounding

law they are based on (including 42 USC 1981).  Further, when Mr. Austin publicly,

with over 50+ witnesses, made over 100+ complaints, and inquiries, in a span of 4+

years to the designated body under the Universities control (IDEAA) designed to

investigate and correct discriminatory violations of school policy, Georgetown was

willfully-deliberately indifferent further showing racial animus, and malice (as it

went out of its way to be facially discriminatory toward Mr. Austin's 100+

complaints, not one was even acknowledged, followed up on, let alone escalated for

investigation nor remedy per their own promulgated mandatory steps).  See e.g.

Brown v. Arizona, No. 20-15568, 35 (9th Cir. Sep. 25, 2023) (*"In Davis, decided a*

*year after Gebser, the Court indicated that its definition of "knowledge" included*

*"notice," holding that the plaintiff could establish liability by showing that the school board had failed to respond to "five months [of] complaints of [the alleged [discriminator's] in-school misconduct." 526 U.S. at 649; see also Doe v. Galster, 768 F.3d 611, 614 (7th Cir. 2014) ("To have actual knowledge of an incident, school officials must have witnessed it or received a report of it.")*

16.    Mr. Austin's notice provision more than meets *Brown v. Arizona* standards, as Mr. Austin still followed University policy, and recommended guidelines on over 100+ instances, with over 50+ witnesses, from 7.15.21 to present, to complain (providing 'notice') to IDEAA regarding violation of his rights and school policy *(as instructed by Georgetown policy and despite the explicit admissions of violation of University policy (after the fact), extreme departures of ordinary standards of care, violations of Mr. Austin's rights to contract in a facially discriminatory manner).*

17.    Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident and seek redress through IDEAA's Grievance Procedures, but again excluded Mr. Austin who reported at least 50+ times *(after University leadership admitted unequal treatment to Mr. Austin's detriment violating his rights of privacy, publicity, and contract)* and to date have not received even one follow up email for a cursory beginning of an investigation *(let alone resolution)*. See facultyhandbook.georgetown.edu/section4/a/.  Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of

Georgetown policy, (*after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown controlled area program or activity; for business purposes*) is the essence of Equal Protection violations.  See e.g. Thornton v. City of St. Helens, 425 F.3d 1158, 1166-67 (9th Cir. 2005)(*To state a … claim for violation of the Equal Protection Clause, a plaintiff must show that he was treated in a manner inconsistent with others similarly situated, and the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.*)

18.    Per the Ninth Circuit's *Monteiro v. the Tempe Union High School Dist, 158 F.3d 1022, 1034 (9th Cir. 1998)* beyond Georgetown's intentional exclusion, Georgetown's intentional, or 'deliberate indifference' to that discrimination also highlights their discriminatory animus (as they internally already knew they violated Mr. Austin's right to contract under 42 USC 1981, *discriminatorily*, but continued to exclude from 'program(s) or activity' that would help to correct Georgetown's previous violations*).*  See e.g.  Monteiro v. the Tempe Union High School Dist, 158 F.3d 1022, 1034 (9th Cir. 1998) ("*refused to accept the complaints regarding racial problems at McClintock High School or to put a stop to the students' racist conduct. Once on notice of the problem, a school district "has a legal duty to take reasonable steps to eliminate" a racially hostile environment. 59 Fed. Reg. 11450. When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI. Gebser v. Lago Vista Indep. Sch. Dist., 118 S.Ct. 1989, 1999 (1998) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-92 (1989)). Under this standard, the district is liable for its failure to act if the need for intervention*

*was so obvious, or if inaction was so likely to result in discrimination, that "it can be*

*said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.*

*There can be no doubt that Ms. Monteiro's amended complaint alleges a pattern of*

*egregious public racial harassment including the use of the epithet "n\*gg\*r," that*

*Black students and their parents complained but were rebuffed, and that nothing*

*was ever done about the problem. It goes without saying that being called a "n\*gg\*r"*

*by your [W]hite peers (or hearing that term applied to your Black classmates) exposes*

*Black children to a "risk of discrimination" that is so substantial and obvious that a*

*failure to act can only be the result of deliberate indifference."*)

19.     Calling a Black man a n\*gg\*r is perhaps the most obvious racial slur, or

derogatory stereotype (*imbedded in the definition of the word [www.merriam](http://www.merriam)*

*[-webster.com/dictionary/n\*gg\*r](http://-webster.com/dictionary/n*gg*r)*), but is clearly not the only one, and the same

message can be communicated verbally, or with Conduct.  Treating someone as an

"n-word" without actually saying the word, especially via disparate treatment to

exclude and to "mark with a badge of inferiority," is just as illegal and damaging to

that person.  In fact, that conduct is exactly what Georgetown did here (i.e.

presumed "unworthy of consideration"), unapologetically, repeatedly, and *ongoingly*

in violation of their own policies, and the law.  See [policymanual.hr.](http://policymanual.hr.)

[georgetown.edu/1000-university-policies/1004-policy-statement-on-harassment/](http://georgetown.edu/1000-university-policies/1004-policy-statement-on-harassment/)

> (Harassment is a form of discrimination prohibited by law. It is the policy of Georgetown University to prohibit harassment (and discrimination) on the basis of …. color, …. gender …. race… ("Protected Categories")… Harassment may include… slurs, epithets, and stereotyping; … and …. conduct carried out through the internet, email…is especially serious when it occurs between teachers and students or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly exploits the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University …. This Policy Statement …. will be widely disseminated to members of the University community, and will be consistently enforced.)

20.     Georgetown's Equal Protection violations were evident in Georgetown's

repeated refusal to investigate, at all (*after their own leadership admitted 42 USC*

*1981, privacy, publicly, and media policy violations in writing,*) when Mr. Austin

reported, or inquired, and formally complained (broadly to the President's office,

and other Georgetown leadership).  Mr. Austin sought initially to find out what was

going on in the first place, and have subsequent investigation and correction to the

victim or survivor of the discriminatory conduct by the university (i.e. the one being

wronged; George Jarvis Austin), but Georgetown's continued displaying

discriminatory intent…in refusing to investigate [discriminatory, illegal, violative]

acts against a victim."  See e.g.  Neaves v. City of San Diego, 70 F. App'x 428, 432-33

(9th Cir. 2003) *("discriminatory intent [shown] in refusing to investigate … acts*

*against a victim. See e.g., Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th*

*Cir.2000); Navarro v. Block, 72 F.3d 712, 716-17 (9th Cir.1995). …. the equal*

*protection analysis we employed in those cases should [not] be limited …. Indeed, the*

*Equal Protection Clause guarantees that all persons who are similarly situated are*

*entitled to equal treatment ….. City of Cleburne v. Cleburne Living Center, 473 U.S.*

*432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, an individual who alleges ….*

*intentionally treated him or her differently than other similarly-situated individuals*

*and alleges that there was no rational basis for the difference in treatment states a*

*viable Fourteenth Amendment Equal Protection Claim. Vill. of Willowbrook v. Olech,*

*528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)….. a violation of equal*

*protection can occur when … act[ing] with … discriminatory intent in refusing to*

*investigate a particular case. See e.g., Estate of Macias v. Ihde, 219 F.3d 1018, 1028*

*(9th Cir.2000); Navarro v. Block, 72 F.3d 712, 716-17 (9th Cir.1995). In these*

*instances, however, it is the victims themselves…. who have alleged a violation of*
*their equal protection rights based on discriminatory … conduct. See e.g., Estate of*
*Macias, 219 F.3d at 1028; Navarro, 72 F.3d at 716. ")*

21.    Yet, Mr. Austin was completely excluded and blackballed creating "stigma' as
outlined in *Brown v. Board of Education* with Georgetown refusing to even take the
first *mandated* step, or action, for an admitted Black male student, that they would
take *even* for a non student 3rd party complainant per their own policy (displaying
even more disparate treatment; discriminatory animus), let alone similarly situated
non-Black, or White, similarly situated students  Per the Supreme Court's 1. *Brown*
*v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions,*
*Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3.
*Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558*
*(2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black
racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in
existing contract, and Mr. Austin's Title VI Equal Protection rights when it
completely excluded Mr. Austin from essential campus IDEAA to treat an admitted
student, and Black man, in a derogatory manner to "deny, restrict, separate,
segregate (in application of policy)," and exclude Mr. Austin from
services-procedures, illegally because Mr. Austin is a Black man.

22.  Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
*No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly,
to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory*
*stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as
'superior' or more worthy (*ensuring Whites had opportunity to review, decline,*

*counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*





**20 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF
PERJURY:** DIRECT EVIDENCE GEORGETOWN
STOLE ECONOMIC RIGHTS TO CONTRACT (& IP
PROPERTY RIGHTS) THEY WERE NOT ENTITLED
TO. **64**-PAGE AMENDED (FAC) COMPLAINT
**In Honor of the Civil Rights Act of 1964,Title VI,
Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's
*ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and
Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental
violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over
50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as
well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or
settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,
context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown
ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu,
media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents
@georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert
'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and
whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE
GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY
RIGHTS) THEY WERE NOT ENTITLED TO.

1.      Mr. George Jarvis Austin DECLARES UNDER PENALTY OF PERJURY

that Mr. Austin shall file direct evidence, declarations, signed under penalty of

perjury to reinforce, and help further substantiate, the plead facts prior to FRCP 59

Motion.   **Fact 1:**    Mr. Austin is the person whose economic, property, and 42 USC

1981 rights to contract were violated in the following picture (*page 4*), and the

process which deprived Mr. Austin's contract rights.   **Fact 2:**      Per US Supreme

Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast*

*Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial

animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr.

Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such*

*as where a private offeror [in this case Georgetown] refuses to extend to [an African-*

*American, in this case Mr. Austin], because he is an [African-American], the same*

*opportunity to enter into contracts he extends to White offerees [in this case*

*non-Black, or White admitted students]."*  See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982),
the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a
private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same
opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

2.      **Fact 3:**        Non-Black male, or White, students were made contract offers,

and provided: 1. with respect to their persons, as human beings, (and provided a

head-ups, or forewarning, that Georgetown desired to take a photo of them and use

it for commercial, marketing, purposes), 2. knowledge of what the photo was used

for (and where it may be sent for marketing purposes) 3. Pre-approval of use of the

photo by the non-Black male, or White students 4. An opportunity to accept or

decline the offer itself 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 4:**    Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.    **Fact 5:**  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

3.    **Fact 6:**    Per Georgetown, written authorization requires is a contract.

**Fact 7:**    Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. **Fact 8:**   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).See S-111

**Fact 5:**  Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):





**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          10.16.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**DECLARATION UNDER PENALTY OF
PERJURY:  Enslaver, Jim Crow origins of Georgetown's
use of derogatory racist stereotypes*; ;*  In Honor of the
Civil Rights Act of 1964,Title VI,** (full filing fee paid on
site); Hyperlinked with Affidavits, Supplements, & Direct
Evidence.

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's
*ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and
Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental
violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over
50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as
well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or
settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,
context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown
ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu,
media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents
@georgetown.edu, (showing *"deliberate indifference; discriminatory animus)"* included 50+ outside expert
'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and
whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**Enslaver, Jim Crow, origins of Georgetown use of derogatory stereotypes**

1.      Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use of the precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr. Austin, *"implying inferiority in civil society"* originate from anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow segregationist who inspired the Nazi's Third Reich (*How the Nazis Were Inspired by Jim Crow | HISTORY*; *How American Racism Influenced Hitler | The New Yorker* ; *What America Taught the Nazis in the 1930s - The Atlantic*; *The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws - Holocaust Museum*)

for which Georgetown admits it took active part as an institution: Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*)  Georgetown literally took a page out of this vile history by depriving Mr. Austin's right to make a written media contract, which Georgetown itself mandates publicaffairs.georgetown.edu/communications/ policies/policy-for-filming-at-georgetown-university/ to explicitly treat Mr. Austin in an inferior manner as compared to similarly situated Whites to whom they respected their persons, rights to contract, rights to decline or accept offer, rights to counter offer, rights to review and inspect or inquire about contract and consideration prior to agreement or denial, rights to obtain meeting of the minds, and rights to enjoyment of mutually beneficial contractual agreement.  Instead Georgetown behaved like a racist rapist during enslavement period where they thought it was ok just to take what they wanted without asking, at all, *illegally*.

2.    Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954)* Georgetown's

precise derogatory stereotype usage is similar to defendant *Board of Education's*

usage against plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483,*

*494 (1954)* whereas Mr. Austin seeks to exercise & enforce his Federal rights to

make contracts (expressly promulgated as mandatory under Georgetown's policies),

and not be treated in an inferior manner in civil society (creating Stigma) while

doing so, in the context of higher education, whereas Georgetown violates *"....The*

*words of the amendment,.[that].. contain …the right to exemption..from legal*

*discriminations, implying inferiority in civil society…."* (referring to Civil Rights

Amendments 13th, 14th, 15th Amend.).

3.    Per the 2023 US Supreme Court's Students for Fair Admissions, Inc. v.

President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) use of

derogatory stereotypes is <u>per se illegal</u> in a. business, b. the entire contractual

relationship (*i.e. "to make or enforce a contract*), c. education (& d. other areas of

society), because it *"furthers "stereotypes that treat individuals as the product of*

*their race, evaluating their thoughts and efforts -their very worth as Citizens-*

*according to a criterion barred to the Government by history and the Constitution."*

*Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury,"*

*Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection*

*Clause [co-extensive with sec. 1981]."* Georgetown's admission of a. Using race in the

"negative" via both its 1. media contract making and 2. complaint procedures b.

Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2.

media contract offer process and c. providing Whites unfair advantage by

alternatively considering them 'superior' or 'more worthy' constitutes this type of

derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial *""stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens-according to a criterion barred to the Government by history and the Constitution."* *…. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in Georgetown advertisement, etc.)* "*ergo*" *c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & per se illegal racist presumption, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights in both areas are respected, and excersized)*]. Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows*

*of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.    Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague [Judge Haywood Gilliam](#) (although the order cited above spelled his name wrong) clerked for the [Legendary Judge Thelton Henderson](#),; [.Gilliam Responses 9-17-14.pdf](#).  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding*

*are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

5.     Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."* This *"adult rather than a childhood disease"* demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* <u>prohibits the *"blatant deprivation of Civil Rights* </u>*such as where a private offeror [in this case* Georgetown*] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White  Georgetown students]."*

6.     The precise *"less worthy"* or *"inferior"* derogatory racist stereotypes utilized by Georgetown, against Mr. Austin, *"implying inferiority in civil society"* are extremely damaging-harmful, and originate from anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow segregationist.  Black Inferiority and typically White Supremacy or Superiority undergird all anti-Black derogatory stereotypes for Black men, and are used explicitly to deprive Black men, and people, of life, liberty, and fundamental rights like making, enjoying or enforcing contracts.  Since before the American Revolution, and Founding of the American Republic which grew into what we now know as the

United States of America, Black people in America have battled against derogatory

stereotypes whether enslaved, or free, first with the false "*N\*gg\*r*" derogatory

stereotypes, and archetypes, in itself, and its patently offensive off-shoots of

*"Monkeys, Gorillas, Sambos, Jigaboos, Aunt Jamimas, Uncle Bens, Pickaninnies,*

*Jezebels, Mandingos, etc to its most recent false derogatory "Black Criminal."* Use of

anti-Black derogatory stereotypes are forbidden in every sphere of life.  Per 1. *Smith*

*v. Lockheed-Martin Corp.* 2. *Jordan v. Alternative Resources Corp.* 3. *Harden v.*

*Hillman* 4. *Henderson v. Thompson* anti-Black derogatory stereotypes are so

powerful they can get cases overturned, or thrown, new trials ordered, immunity

pierced, judicial or other official discipline or removal, jurors struck (*to protect*

*against their use*). Smith v. Lockheed-Martin Corp. 644 F.3d 1321 (11th Cir. 2011)

(...supervisor at Lockheed's plant in Marietta, Georgia, received a racially insensitive "joke" email. The email, entitled "Top Ten Reasons Why There are No Black NASCAR Drivers" (the "NASCAR email"), featured a top-ten list of derogatory stereotypes, all of which portrayed [B]lack people as criminals, pimps, and gang members.)

Jordan v. Alternative Resources Corp. 458 F.3d 332 (4th Cir. 2006) Cited 456 times

(... the severity of Farjah's racially hostile "black monkeys" comment merits our consideration. It is plain that a reference to our African-American fellow citizens as "monkeys" reflects the speaker's deep hostility towards them — on the sole basis of their color. And it is equally clear that such comments constitute profound insults to our friends in the African-American community. By referring to African-Americans as "monkeys," the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized, non-human creatures who are intellectually and culturally inferior to whites. See, e.g., Jennifer M. Russell, On Being a Gorilla in Your Midst, or, the Life of One Black woman in the Legal Academy, 28 Harv. C.R.-C.L. L.Rev. 259, 260 (1993) (discussing message conveyed by gorilla picture placed anonymously in mailbox of African-American law professor: "'Claim no membership to the human race. You are not even a subspecies. You are of a different species altogether. A brute. Animal, not human.'"). Indeed, our Court probably understated the impact of such racially charged references in recently observing that "'[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'" White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir. 2004) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)).

Harden v. Hillman Civil Action 3:15-CV-594-CHB (W.D. Ky. Aug. 5, 2022)

( Like in Heller, one or more jurors made "jokes," unrelated to any evidence at trial, applying racist stereotypes not only to Harden, but also to his significant other and his trial team. 785 F.2d at 1527 . These racist jokes were "an expression of prejudice" guised as humor and went unconfronted. See id. As explained by the Eleventh Circuit, "[a] wolf in sheep's clothing is, despite clever disguise, still a wolf." …. scope and timing of the various comments magnify their pernicious effect. Indeed, the stereotypes were not reserved for Harden alone, but likewise were leveled against his African American significant other and counsel. …. racially charged comments continued into the heart of the deliberations. …. As in Heller, this Court likewise finds that the jurors who made and laughed at racially biased remarks could not have easily "expunged themselves of the pernicious taint" of racial bias to render a verdict based solely on the evidence presented. …"[I]f the [ Remmer ] hearing reveals that racial bias or stereotypes 'prejudicially affected jury deliberations,' Harden would be entitled to a new trial." Harden , 993 F.3d at 485 .

Henderson v. Thompson 518 P.3d 1011 (Wash. 2022)

(During closing arguments, Thompson's counsel alluded to racist stereotypes about Black women as untrustworthy and motivated by the desire to acquire an unearned financial windfall. … counsel's argument … appealed to these negative and false stereotypes about Black women being untrustworthy, lazy, deceptive, and greedy. Presenting… this way can allow jurors to make decisions on impermissible grounds rooted in prejudice or biases about race …courts have recognized that racist misconduct by the prevailing party or jurors may justify a new trial under CR 59(a)(2). For example, in 1931, this court ordered a new trial when a white attorney in a civil case argued for a verdict against a company based in Japan because " 'we don't like Japanese [people] and they don't like us.' " Schotis

v. N. Coast Stevedoring Co. , 163 Wash. 305, 316, 1 P.2d 221 (1931) (quoting the record). ... appeals to racial bias
that affect a verdict .... require reversal. Zamora , 199 Wash.2d at 721, 512 P.3d 512. )

7.      At no point does Georgetown even consider the ridiculousness of their

position, or even acknowledge the mountains of direct evidence (documented)

against them (including their own self authenticated promulgated contractual

terms, and policy, for which they mandate written media contracts in this precise

scenario), as they are so racist that they that simply repeat over, and over again an

'old White Supremacist Propaganda playbook' of coded or explicit "Black inferiority"

or "less worthy" (i.e. Colored Water fountains, etc.) from the racist Jim Crow era

(which inspired Hitler's Third Reich, and the Nazi's www.history.com/news/how

-the-nazis -were-inspired-by -Jim-Crow).  Georgetown's conduct shows they would

prefer Jim Crow America, or perhaps Nazi Germany What America Taught the

Nazis in the 1930s - The Atlantic (*In the 1930s, the Germans were fascinated by the*

*global leader in codified racism—the United States.*)  Mr. Austin is saying no to

Georgetown's racist, and facially discriminatory practices against Him 1. both with

each of the multiple times he sought to get Georgetown to self correct their unforced

errors and sought written contract as Georgetown's policy, and 42 USC 1981

mandate, and 2. When he made multiple formal complaints via email to

Georgetown's IDEAA complaint center per their promulgated instructions.:

Georgetown is like a racist enslaver rapist who no matter how many times the

victim says "NO" keeps going, and going (because they, Georgetown , does not

recognize the humanity of their victims, they just seek to exploit for their own gain).

8.      This conduct is part of  an 'old White Supremacist Propaganda playbook' of

"Black inferiority" from the racist Jim Crow era to create *knee jerk* reactions with

the "*number one excuse they used to justify slavery, lynching, Jim Crow and various*

*forms of mass incarceration"* to deprive Black victims of racial oppression of

fundamental rights (including life, liberty, pursuit of happiness, let alone 1981). See

e.g. The Biggest Lie in the White Supremacist Propaganda Playbook: …. Southern
Poverty Law Center

(….damaging narrative with a very long history in America. White Americans' unsubstantiated views about the potential of
violence from Black people was the number one excuse they used to justify slavery, lynching, Jim Crow and various forms of
mass incarceration. Never was Klan violence or the lynching of Black people by White people ascribed to an inherent White
trait. Without the ability to claim oppression of Black people as a form of self-defense, racial segregation and White supremacy
would be seen for what they are: rank oppression of other people for financial or other benefit…")

9.      Georgetown's use of racist propaganda is similar to its use during Jim Crow,

and enslavement, as it *attempts to assuage its own White guilt for its own illegal*

*conduct against Black people (and others)*.  The tragic irony of that 'old White

Supremacist Propaganda playbook' using "Black inferiority" derogatory stereotypes

from the racist Jim Crow era is that the opposite was actually true (as any honest

historian can attest).  Unfortunately, many White people (millions) were members of

the Ku Klux Klan, *(a violent domestic terrorist organization; for context the Klan*

*recruited over 4 million Whites by 1920, less than 60 years prior 3 million, or so, men*

*fought in the entire American Civil War (about: 2 million serving for the Union &*

*750,000 for the Confederacy)*, whereas Black people still found ways to survive, and

thrive.  For context the Klu Klux Klan was in 1920 over 530+ times the size of

Georgetown's entire current listed global workforce (approx. 7,500).  If adjusted for

the United States population growth, in 2024, it would be approx. 15-16 million

members, and be 2000+ times the size of Georgetown's current listed global

workforce.  Unfortunately, many White people were genocidal, homicidal, rapist,

thieves (of people, land, and other valuables - *as was Georgetown /slaveryarchive.*

*georgetown.edu/* ) as well as violent criminals, with a multi-century history of the

most atrocious, vile, inhumane, enslaver, segregationist, and murderous history the

world over, and especially in the United States.  Some White people are in fact still

violent, thieving, White Supremacist, atrocious, vile, enslaving, segregationist, and

genocidal, terrorists (*especially toward Black men, and people*), but Black people are

stereotyped as inferior, criminal, or less worthy whereas Whites are presumed

superior?  [Django Unchained and the racist science of phrenology | Neuroscience | The Guardian](#)  "Phrenology really was used to justify slavery, as portrayed in Django Unchained. ..James Poskett



==**"Why don't they kill us?"**== - *asks Calvin Candie,*

the southern slave owner in Quentin Tarantino's Django Unchained. He wants to know why the African slaves he brutalises do not rise up and take revenge.

Before long, he has the skull of a recently deceased slave on the dinner table. "The science of phrenology," he announces, "is crucial to understanding the separation of our two species." He hacks away at the back of the skull with a saw, removing a section of the cranium and pointing to an allegedly enlarged area. In African slaves, Candie claims, this bump is found in the region of the brain associated with "submissiveness".

For Candie, phrenology not only explained slavery, it justified it.

Needless to say, phrenology has now been thoroughly debunked: the idea that the shape of the skull can be used to infer mental characteristics is just plain wrong. But it was extremely popular all over the world during the 19th century, finding converts among reform-minded Bengalis in Kolkata, India, and colonial settlers in Australia. As part of my research into the global history of phrenology, I came across the real-life Calvin Candie.

He was called Charles Caldwell, a doctor from Kentucky who revelled in both phrenology and slave ownership. As in the film, Caldwell was a Europhile….

Caldwell deployed phrenology in almost exactly the same manner as the fictional Candie. In 1837 he wrote to a friend claiming that "tameableness" explained the apparent ease with which Africans could be enslaved. This was a standard phrenological argument. Areas located towards the top and back of the skull, such as "Veneration" and "Cautiousness", were routinely claimed to be large in Africans. His correspondent concurred, writing: "They are slaves because they are tameable." Clearly enjoying himself, Caldwell replied: "Depend upon it my good friend, the Africans must have a master.

It's worth emphasising that these words are not from a Tarantino script, crafted for Hollywood shock value. They were written by a slave owner desperate to preserve his brutal way of life. And, while the physical violence of slavery is masked in Caldwell's letters, they betray his warped sense of morality. In a letter written on Christmas Eve 1838, Caldwell made the outrageous claim: "My slaves live much more comfortably than I do.""

<u>Calvin Candie</u> : [HOLDING A SKULL..]  This is Ben. He's an old joe that lived around here for a long time, and I do mean a long damn time. Old Ben here took care of my daddy and my daddy's daddy. Till he up and keeled over one day, old Ben took care of me.

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Growin' up the son of a huge plantation owner in Mississippi puts a white man in contact with a whole lotta black faces. I spent my whole life here, right here in Candieland, surrounded by black faces.

Now seein' 'em every day, day in and day out, I only had one question: why don't they kill us?     Now right out there on that porch, three times a week for fifty years, old Ben here would shave my daddy with a straight razor.

<u>Now, if I was old Ben, I woulda cut my daddy's goddamn throat, an' it wouldn't-a taken me no fifty years of doin' neither.</u>

But he never did. Why not? See, the science of phrenology is crucial to understandin' the separation of our two species. And the skull of the African here? The area associated with submissiveness is larger than any human or any other sub-human species on planet Earth. If you examine this piece of skull here you'll notice three distinct dimples. Here, here and here. Now, if I was holdin' the skull of an Issac Newton or a Gallileo, these three dimples would be found in the area of the skull most associated with creativity. But this is the skull of old Ben. And in the skull of old Ben, unburdened by genius, these three dimples exist in the area of the skull most associated with servility.

Now bright boy, I will admit you are pretty clever. But if I took this hammer here, and I bashed in your skull with it, you would have the same three dimples...in the same place...as old Ben…

........

[Lets go of Broomhilda's head and slams the hammer loudly on the table]  SOLD... TO THE MAN WITH EXCEPTIONAL BEARD, AND HIS UNEXCEPTIONAL N*GG*R!....

........

<u>Stephen</u> : [after Django is recaptured, stripped naked, taken to a barn and chained upside down from the ceiling; Stephen walks in and throws a bag of filthy clothes on the barn floor]  You leaving. This here is what you take with you.

[Stephen pulls up a stool and sits in front of the hanging Django]

<u>Stephen</u> : Your Black ass is what all them motherfuckers at the Big House could talk about for the last few hours. Seem like white folk ain't never had a bright idea in they life was coming up with all kinds of ways to kill your ass. Now, mind you, most of them ideas had to do with fucking with your fun parts. Now, that may seem like a good idea, but the truth is, when you snip a n*gg*'s nuts, most of them bleed out in, oh, about... seven minutes. Most of them.

[Stephen chuckles at the shivering, then-helpless Django]

<u>Stephen</u> : Well, more than most. Then I says, "Shitfire! The n*gg*s we sell to LeQuint Dickey got it worse than that!" And they say, "Let's whip him to death!", or "Throw him to the Mandingos. Feed him to Stonesipher's dogs." And I said, "What's so special about that? We do that shit all the time! Hell's bells, the n*gg*s we sell to LeQuint Dickey got it worse than that!" Lo and behold, out of nowhere, Miss Laura come up with the bright idea of giving your ass to the LeQuint Dickey Mining Company!

[Django just stares at the old man talking to him]

<u>Stephen</u> : And as a sl*ve of the LeQuint Dickey Mining Company, henceforth until the day you die, all day, every day, you will be swingin' a sledgehammer, turnin' big rocks into little rocks.

Now, when you get there, they gonna take away your name, give you a number and a sledgehammer, and say, "Get to work!" One word of sass, they cut out your tongue. And they good at it, too. You won't bleed out. Oh, they does that real good! They gonna work ya all day, every day 'till your back give out. Then, they're gonna hit you in the head with a hammer, throw your ass down the n*gg*r hole.

[Django looks on]

<u>Stephen</u> : And THAT will be the story of you, Django!

........

<u>Django</u> : Stephen, how you like my new duds? You know, before now I didn't know that burgundy was my color........You said in seventy-six years on this plantation, you've seen all manner of shit done to n*gg*rs but I notice... you didn't mention kneecapping….

[Django shoots Stephen in the kneecap]

<u>Stephen</u> : Oh, God-motherfucking-damn it!

<u>Django</u> : Seventy-six years, Stephen. How many n*gg*rs you think you seen come and go?
Seven thousand?

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Eight thousand?

Nine thousand?

Nine thousand nine hundred and ninety nine?

Every single word that came out of Calvin Candie's mouth was <u>nothing but horseshit</u>,

[B]ut, he was right about one thing: I am that one [Man] in ten thousand…..

                    [He shoots Stephen in the other kneecap]

<u>Stephen</u> : Oh, you son of a bitch! Oh, you motherfucker! Oh, sweet Jesus, let me kill this n\*gg\*r!

<u>Stephen</u> : DJANGO! You uppity son of a b…
                            [Plantation blows up]

<u>Django</u> : Hey little troublemaker

<u>Broomhilda</u> : Hey big troublemaker

<u>Django</u> : Let's get outta here….
-   **Jamie Foxx as Django, Kerry Washington as Broomhilda, Samuel L. Jackson as Stephen, Leonardo Di Caprio as Calvin Candie,** *Django Unchained (2012), Dir.Quentin Tarantino.*

<u>Black People are highest targets for Hate Crimes</u>

10.     Black people have <u>every reason</u> to be cautious and wary of White, or anti-Black, violence and racism targeted against them (<u>and take all needed precautions of every kind</u>) provided the breadth, and depth of the atrocities per the <u>African-Black Holocaust</u> committed against them as ***Toni Morrison via Time Magazine Interview: The Pain Of Being Black, 1989; <u>TONI MORRISON: The Pain Of Being Black | TIME</u>***, astutely articulated:  *"Some historians told me <u>200 million died</u>…The smallest number I got from anybody was 60 million….There were travel accounts of people who were in the Congo — that's a wide river — saying, "We could not get the boat through the river, it was choked with bodies." That's like a logjam. A lot of people died….Half of them died in those ships."* The atrocities go well beyond the genocidal murders.  Black business owners, and other successful Black people are, and were the leading targets of Racist Violence. <u>Black People have long been the highest targets of US hate crimes year after year</u>.  *"researchers have long documented: Black Americans are the most frequent victims of racially motivated hate crimes in the United States."* See e.g.:
-   www.voanews.com/amp/report-african-americans-remain-top-target-of-hate-crimes/7246965.html
-   ucr.fbi.gov/hate-crime/2017/topic-pages/victims
-   www.justice.gov/hatecrimes/hate-crimes-case-examples

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

- www.justice.gov/crs/highlights/2020-hate-crimes-statistics
- publicintegrity.org/politics/Black-americans-still-are-victims-of-hate-crimes-more-than-any-other-group
- www.theroot.com/take-one-guess-whos-the-most-targeted-group-for-hate-cr-1850787981
- www.pbs.org/newshour/show/fbi-Blacks-most-often-targeted-in-hate-crimes
- time.com/6178301/buffalo-shooting-anti-Black-hate-crime/
- www.nbcnews.com/news/amp/ncna938541
- www.courier-journal.com/story/opinion/2024/02/07/anti-Black-hate-fbi-report-nobody-cares/72492410007/

"I feel personally sorrowful about Black-White relations a lot of the time because Black people have always been used as a buffer in this country between powers to prevent class war, to prevent other kinds of real conflagrations.  If there were no Black people here in this country, it would have been Balkanized. The immigrants would have torn each other's throats out, as they have done everywhere else.   But in becoming an American, from Europe, what one has in common with that other immigrant is contempt for me — it's nothing else but color. Wherever they were from, they would stand together. They could all say, "I am not that."

So in that sense, becoming an American is based on an attitude: an exclusion of me.  It wasn't negative to them — it was unifying. When they got off the boat, the second word they learned was "n*gg*r."       Ask them — I grew up with them. I remember in the fifth grade a smart little boy who had just arrived and didn't speak any English. He sat next to me. I read well, and I taught him to read just by doing it. I remember the moment he found out that I was Black — *a n*gg*r*... It took him six months; he was told. And that's the moment when he belonged, that was his entrance. Every immigrant knew he would not come as the very bottom. He had to come above at least one group — and that was us.....

**Q.** You've said that you didn't like the idea of writing about slavery. Yet Beloved, your most celebrated book, is set in slavery and its aftermath.

**A.** I had this terrible reluctance about dwelling on that era. Then I realized I didn't know anything about it, really. And I was overwhelmed by how long it was. Suddenly the time — *300 years* — began to drown me.

*Three hundred years* — think about that.

Now, that's not a war, that's generation after generation. And they were expendable. True, they had the status of good horses, and nobody wanted to kill their stock. And, of course, they had the advantage of reproducing without cost.

**Q.** Beloved is dedicated to the 60 million who died as a result of slavery. A staggering number — is this proved historically?

**A.** Some historians told me *200 million died.*

The *smallest* number I got from anybody was *60 million.*

There were travel accounts of people who were in the Congo — that's a wide river — saying, "*We could not get the boat through the river, it was choked with bodies.*" That's like a logjam. A lot of people died.

**Half of them died in those ships.**

Slave trade was like cocaine is now — even though it was against the law, that didn't stop anybody. Imagine getting $1,000 for a human being. That's a lot of money. There are fortunes in this country that were made that way.

- **TONI MORRISON** *Time Magazine Interview: The Pain Of Being Black, 1989;* TONI MORRISON; The Pain Of Being Black | TIME

11.    This over-indexed, and over abundance of *anti-Black US Hate is astounding.*

American White (and other) Racist lynch mobs, during *Jim Crow*, regularly

targeted Black US Military Veterans, the Economically Prosperous, Entereprenerial

and Independent, and especially Mentally Strong Black men stand up to racial

injustice to lynch, economically deprive, burn, mutilate, abuse, and

castrate (literally).

[The mob hangs Mr. Man on top of his horse, Booker T., placing a noose tied to the tree around his neck.]

| | |
|---|---|
| **Mr. Man (Ving Rhames):** | "Wasn't no Colored boy had nothing to do what happened here |
| **Lynching Mob member:** | Shut up, Jessie |
| **Mr. Man (Ving Rhames):** | That ain't my name... |

[Sheriff hits the horse and yells get, so as to hang Mr. Man, but Mr. Man's horse is so well trained it only responds to his command, and knows no fear, just like him.  Lynching mob member yells to just shoot the horse while aiming his shotgun.  Mr. Man, taking empathy on his horse, and for strategic purposes yells:]

| | |
|---|---|
| **Mr. Man (Vingh Rhames):** | 'Booker T. go'.." |

[and the horse sprints off; with Mr. Man in a nose beginning to lose oxygen, hanging]

**13 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

- Mr. Man (Ving Rhames) conversations before and leading to attempted lynching, dialogue while the hero, protagonist, Black WW1 Veteran (Ving Rhames) is being lynched for a false accusation used as pre-text to destroy a Black, Self Sufficient thriving town in 1923 Florida, *Rosewood, Movie 1997, John Singleton Classic;*

https://en.wikipedia.org/wiki/Lynching_of_African-American_veterans_after_World_War_I#:~:text=Lynched%20African%2DAmerican%20veterans,-The%20following%20is&text=The%20accurate%20number%20of%20African,in%20the%20spring%20of%201919. *( The following is an incomplete list of African Americans who had served in the military during WWI and were killed by White mobs with no trials for alleged crimes. Lynching is embedded deep in America's racial psyche…. By 1919, lynching had developed into a programmatic ritual of torture and empowerment to the White race….The accurate number of African American veterans lynched in military uniform is unknown, but there were several cases of beatings and lynchings for the refusal to remove a military uniform)* https://www.defense.gov/News/News-Stories/Article/Article/1429624/african-american-troops-fought-to-fight-in-world-war-i/#:~:text=More%20than%20380%2C000%20African%2DAmericans,to%20labor%20and%20stevedore%20battalions. *(More than 380,000 African- Americans served in the Army during World War I, according to the National Archives.)*

12.    In fact, US White Supremacist tendencies, and anti-Black atrocities were so strong and horrific toward Black men, and people, that enemies of the US, Nazi Germany Prisoners of War were treated better by US Soldiers, and the American Public than the Black Soldiers who defeated the Nazis (*as an extra way to degrade Black people and spit in their face*).  The heroics of Black soldiers, and fighters, like the Tuskegee Airmen, and their genius was overshadowed by the simultaneous Wars they had to fight 1. Within their ranks for basic respect 2. On enemy territory in Nazi Germany, and 3. At Home in the US from the same type of Racial Apartheid Regime they were fighting a war against giving rise to Black Double V Campaign (against Nazis abroad and US Nazis, Ku Klux Klan members, etc. at in America *who were not fringe groups, but core decision-makers* in every part of American society: including judges, elected officials, administrators, employers, etc…) See e.g.

- Fighting Germans and Jim Crow: Role of Black troops on D-Day
- Unsung Heroes: World War II's Black Veterans | Faculty of Arts and Sciences
- In 'Half American,' Matthew Delmont explores mistreatment of Black servicemen : NPR
- The Original Black Panthers Fought in the 761st Tank Battalion During WWII | HISTORY
- The Black Messiah | Dissident Voices (written by a Holocaust survivor: Sonia Schreiber Weitz);
- Sonia Weitz, 81; Holocaust survivor kept history alive - The Boston Globe
- In WWII, the U.S. Treated Nazi POWs Better Than Black Troops | TIME
- In 'Half American,' Matthew Delmont explores mistreatment of Black servicemen : NPR
- Black vets were excluded from GI bill benefits — a bill in congress aims to fix that : NPR
- Black Americans Who Served in WWII Faced Segregation Abroad and at Home | HISTORY
- Absent From the Front: What the Case of the Missing World War II Black Combat Soldier Can Teach Us About Diversity and Inclusion > National Defense University Press > News Article View
- The Double V Victory | The National WWII Museum | New Orleans
- Black Americans Who Served in WWII Faced Segregation Abroad and at Home | HISTORY
- 'Half American' explores how Black WWII servicemen were treated better abroad | KOSU
- A short history of integration in the US armed forces > Air Force > Display
- Black US Military Veterans Face Enemies at Home and at War - The War Horse
- How a Hostile America Undermined Its Black World War II Veterans – Mother Jones
- African Americans in Nazi Germany | Holocaust Encyclopedia
- African Americans Military: (billofrightsinstitute.org/essays/double-v-for-victory-the-effort-to-integrate-the-US-military)

13.     Similar to larger patterns in society (sampled from the Jim Crow Era, Nazi Germany, & Apartheid South Africa), Georgetown engages in its own form of *racist propaganda* to achieve nefarious goals with regard to Mr. Austin because he is a Black male admitted Georgetown student through "*dissemination of … half-truths, or lies—to influence*" delegitimize, dehumanize and disenfranchise (and to attempt to cheat out of 1. His 1981 rights to mandatory written media contract per Georgetown's own promulgated policies and 2. His Equal Protection rights per Title VI of the Civil Rights Act of 1964 . See Propaganda | Definition, History, Techniques, Examples, & Facts | Britannica

(...Propaganda: dissemination of information—facts, arguments, rumours, half-truths, or lies—to influence.... Propaganda is the more or less systematic effort to manipulate other people's beliefs, attitudes, or actions by means of symbols (words, gestures, banners, monuments, music, clothing, insignia, hairstyles, designs on coins and postage stamps, and so forth). Deliberateness and a relatively heavy emphasis on manipulation distinguish propaganda from casual conversation or the free and easy exchange of ideas. Propagandists have a specified goal or set of goals. To achieve these, they deliberately select facts, arguments, and displays of symbols and present them in ways they think will have the most effect. To maximize effect, they may omit or distort pertinent facts or simply lie, and they may try to divert the attention of the reactors (the people they are trying to sway) from everything but their own propaganda....)

A variety of racist derogatory stereotypes including "*caricature[s which portray] Black men as innately savage, animalistic, destructive, and criminal -- deserving punishment, maybe death*" and tied directly to Jim Crow Era's racist legal regime that inspired Nazi Germany (*causing innumerous deaths, and other unjust harms, atrocities, to Black US victims, particularly Black men*) and undergird the premise of Black inferiority or less worthy that Georgetown utilizes.  See e.g The Brute ; Caricature - Jim Crow Museum: jimcrowmuseum.ferris.edu/brute/

(" ...The brute caricature portrays Black men as innately savage, animalistic, destructive, and criminal -- deserving punishment, maybe death. This brute is a fiend, a sociopath, an anti-social menace. Black brutes are depicted as hideous, terrifying predators who target helpless victims, especially White women. Charles H. Smith (1893), writing in the 1890s, claimed, "A bad Negro is the most horrible creature upon the earth, the most brutal and merciless"(p. 181)....
During slavery the dominant caricatures of Black people -- Mammy, Coon, Tom, and picaninny -- portrayed them as childlike, ignorant, docile, groveling, and generally harmless. These portrayals were pragmatic and instrumental. Proponents of slavery created and promoted images of black people that justified slavery and soothed white consciences. If slaves were childlike, for example, then a paternalistic institution where masters acted as quasi-parents to their slaves was humane, even morally right. More importantly, slaves were rarely depicted as brutes because that portrayal might have become a self-fulfilling prophecy..........During the Radical Reconstruction period (1867-1877), many White writers argued that without slavery -- which supposedly suppressed their animalistic tendencies -- Black people were reverting to criminal savagery. The belief that the newly-emancipated Black people were a "black peril" continued into the early 1900s. Writers like the novelist Thomas Nelson Page (1904) lamented that the slavery-era "good old darkies" had been replaced by the "new issue" (Black people born after slavery) whom he described as "lazy, thriftless, intemperate, insolent, dishonest, and without the most rudimentary elements of morality" (pp. 80, 163). Page, who helped popularize the images of cheerful and devoted Mammies and Sambos in his early books, became one of the first writers to introduce a literary Black brute. In 1898 he published Red Rock, a Reconstruction novel, with the heinous figure of Moses, a loathsome and sinister Black politician. Moses tried to rape a White woman: "He gave a snarl of rage and sprang at her like a wild beast" (pp. 356-358). He was later lynched for "a terrible crime."

The "terrible crime" most often mentioned in connection with the Black brute was rape, specifically the rape of a White woman. At the beginning of the twentieth century, much of the virulent, anti-Black propaganda that found its way into scientific journals, local newspapers, and best-selling novels focused on the stereotype of the Black rapist. The claim that Black brutes were, in epidemic numbers, raping White women became the public rationalization for the lynching of Black people.  The lynching of Black people was relatively common between Reconstruction and World War II…..")

  

; [Lynching in America: Confronting the Legacy of Racial Terror](#) ; [lynchinginamerica.eji. org/report/](#)

("…History, despite its wrenching pain,Cannot be unlived, but if faced With courage, need not be lived again….**Maya Angelou,** *On the Pulse of Morning*……

…..During the period between the Civil War and World War II, thousands of African Americans were lynched in the United States. Lynchings were violent and public acts of torture that traumatized Black people throughout the country and were largely tolerated by state and federal officials. These lynchings were terrorism. "Terror lynchings" peaked between 1880 and 1940 and claimed the lives of African American men, women, and children who were forced to endure the fear, humiliation, and barbarity of this widespread phenomenon unaided.

Lynching profoundly impacted race relations in this country and shaped the geographic, political, social, and economic conditions of African Americans in ways that are still evident today. Terror lynchings fueled the mass migration of millions of Black people from the South into urban ghettos in the North and West throughout the first half of the twentieth century. Lynching created a fearful environment where racial subordination and segregation was maintained with limited resistance for decades. Most critically, lynching reinforced a legacy of racial inequality that has never been adequately addressed in America. The administration of criminal justice in particular is tangled with the history of lynching in profound and important ways that continue to contaminate the integrity and fairness of the justice system.

This report begins a necessary conversation to confront the injustice, inequality, anguish, and suffering that racial terror and violence created. The history of terror lynching complicates contemporary issues of race, punishment, crime, and justice. Mass incarceration, excessive penal punishment, disproportionate sentencing of racial minorities, and police abuse of people of color reveal problems in American society that were framed in the terror era. The narrative of racial difference that lynching dramatized continues to haunt us. Avoiding honest conversation about this history has undermined our ability to build a nation where racial justice can be achieved.

In America, there is a legacy of racial inequality shaped by the enslavement of millions of Black people. The era of slavery was followed by decades of terrorism and racial subordination most dramatically evidenced by lynching. The civil rights movement of the 1950s and 1960s challenged the legality of many of the most racist practices and structures that sustained racial subordination but the movement was not followed by a continued commitment to truth and reconciliation.
 Consequently, this legacy of racial inequality has persisted, leaving us vulnerable to a range of problems that continue to reveal racial disparities and injustice….)

; [How White Supremacy Returned to Mainstream Politics - Center for American Progress](#)("……In many ways, this is a return of an old American political tradition rather than a wholly new phenomenon, but it has taken on a new form and uses a language that must be properly understood if it is to be successfully challenged. Concepts of white supremacy were at the heart of the defense of slavery and central to the Lost Cause myth that justified segregation after the fall of the Confederacy……. In such a changing landscape, old-fashioned racist and xenophobic appeals are unlikely to be politically successful beyond a small fringe, so the propagandists of racism have had to develop subtler approaches to stoking fear and hatred for political ends. To do so, they have repackaged racist traditions in language and forms that could more easily enter mainstream political discourse……
…….This report explores the background of these poisonous concepts—reviewing their origins, development, and diffusion—and explores how white supremacist ideas have seeped into America's mainstream political discourse, with some examples of politicians who traffic in this language. It then discusses ways to combat the spread of white nationalism in U.S. politics. This report is meant to help readers recognize and call out attempts to smuggle white supremacy into everyday politics and to support civic leaders of all political persuasions who stand up to this poison….the fear and hatred of others, be they of a different race, religion, or ethnicity, leads directly to cruel, xenophobic policies….Most politicians know that being directly associated with white nationalism harms their reputation, so they use dog whistles, or euphemisms….")

[Asian American Conservatives Have Become Key Allies of White Supremacy](#)
("…These Asian Americans are those who feel most at ease with the paradigm that Claire Jean Kim observes in her theory of "racial triangulation," which characterizes how Asian Americans have long been recruited into functioning as a "model minority" to reinforce the structural oppression of Black people and the privilege of white people. Despite the fact that they cannot fully assimilate into Whiteness, certain Asian Americans do enjoy privileges in Kim's framework. Indeed, as she wrote

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

in The Nation, "It is the convergence of this nascent, conservative Chinese immigrant nationalism with an older, conservative white nationalism that is driving anti–[Black] politics today."....This disturbing alliance has only grown in strength in recent years, finding a common cause in the safeguarding of [perverse iteration of] capitalism and anti-Blackness......

....Unpacking how these prejudices serve as powerful allies to [W]hite supremacy entails refusing that [W]hite supremacy can completely explain how Asian American conservative politics emerges. Indeed, as Adrian De Leon and Jane Hong write, "Asian American conservatism is not just about claiming [W]hiteness, even though these alignments are indelibly forged from the politics of [W]hite supremacy."....For one, Kun Huang identifies contemporary anti-Black racism in China with a long history of "Chinese racial-nationalism" constructed from anxieties that intermixing between Chinese and Africans would disrupt the coherence of "Chineseness."  ...White supremacy gains strength not because it supersedes the distinct histories and practices of other reactionary ideologies, but because it pluralistically maintains these long-standing forms of cultural reaction that are able to persuasively mobilize other communities of color in a common cause. To truly understand how Asian American conservatives serve white supremacy, in other words, requires exploring the distinct cultural politics that make [White Supremacy] persuasive to those communities in their own right."...)

[The alt-right likes Asian American women. We shouldn't be surprised. - The Washington Post](  "...Along with being stereotyped as hypersexual and submissive, Asian women are also presumed to be aggressive when it comes to propagating family success, which may ultimately be an attractive combination of stereotypes for some white supremacists.....These days, many people want a meme rather than the real, and for some white supremacist men who are ultimately concerned with their survival and power, the tiger mom may be just the thing.....The tiger mom, a trope popularized by scholar Amy Chua, is a variation of the model minority, which mythologizes the role of parenting, family structure, family values, and ethnic pride as the primary determinants of minorities succeeding in a competitive and hostile society. As a model minority type, the tiger mom is demanding, has extremely high expectations of her children, and—relevant to white supremacist anxiety of self-protection—ethnocentric.....Ethnocentrism can be important to white nationalists in their quests for survival...... The manifesto reportedly written by Dylann Roof exemplifies this. While Lim notes that the manifesto said Asians would make "great allies of the White race," she doesn't mention what preceded this point:  "I have great respect (sic) for the East Asian races," Roof wrote. "Even if we were to go extinct they could carry something on. They are by nature very racist and could be great allies of the White race.....'

; [White supremacists who stormed US Capitol are only the most visible product of racism]( (White supremacy, then and now ... As an ideology, White supremacy is the belief that white people are inherently superior to people of color. It relies on the notion that distinct races of people exist, and ranks those categorized as "white" at the top of the racial hierarchy.......For hundreds of years, American leaders overtly embraced White supremacy. It was used to rationalize the genocide of Native Americans and the enslavement of Africans and their descendants from the Colonial period to the 19th century.......After abolition in 1865, White supremacy continued in official and unofficial ways. It drove the legal racial segregation of Jim Crow and the banking practice of redlining, which robbed Black families of the loans necessary to buy homes in certain neighborhoods. White supremacy also underlay the forced assimilation and killing of Native Americans.........Boarding schools for Native American youths, like Montana's Fort Shaw, cut students off from their culture and taught them that white values, practices and dress were American culture....Outright racist policies were banned after the civil rights era of the 1960s. But systemic racism remained. Today's well-documented inequalities between Black and white Americans in savings, longevity, home ownership and health are directly related to the white supremacist hierarchy created centuries ago.....White people need not endorse white supremacy to benefit from this hierarchy. As psychologist Beverly Tatum has explained, the privileges afforded to whiteness are so much a part of the structure of U.S. society that many white people don't even notice them.")

; [Why 'White' supremacists are not always White | The Far Right | Al Jazeera]( (....That mix of anger and disbelief was recently repeated when 19-year-old Sai Varshith Kandula was arrested after crashing a U-Haul van into a barrier near the White House while carrying a Nazi flag. Kandula, an Indian American man from Missouri, later discussed with authorities his plan to attack President Biden, and his admiration for Hitler. Add to these incidents a variety of cases that range from Enrique Tarrio...In addition to the allure of white supremacy, many non-white people are being drawn into racist movements through shared antipathy for groups placed at the bottom of the social ladder. Nick Fuentes, a 24-year-old Holocaust denier and purveyor of white superiority who has dined with former President Trump .... is a useful case in point. Much of Fuentes' pro-white belief system appears to be rooted in anti-Black prejudice instilled in him by his parents. His white American mother and his father, of mixed American and Mexican descent, still publicly support him and his racist views....The processes of radicalisation – from Fox News to online message boards – has ensnared a growing variety of people, mostly disaffected men, not only by touting their own superiority but, more potently, by pointing out to them who they should hate or disdain. These recruits – again, mostly men, usually young –
<u>unite over a shared hatred for marginal groups</u>: immigrants, working and poor classes, <u>Black people</u>…")







14.      These powerful false "Black Inferiority" stereotypes that Georgetown *uses* to

denigrate, and defraud, Mr. Austin were used to fuel the recruitment of <u>4.5 million</u>

<u>or so Whites, and the rise of the Klu Klux Klan</u>, (i.e. Birth of a Nation), even when

these derogatory stereotypes were played by a White, or Jewish, actor in Blackface.

[The Birth of a Nation | Cast, Plot, Summary, & Facts | Britannica](#)

("...The Birth of a Nation, landmark silent film starring Lillian Gish, released in 1915, that was the first blockbuster Hollywood hit. It was the longest and most-profitable film then produced and the most artistically advanced film of its day. It secured both the future of feature-length films and the reception of film as a serious medium. An epic about the American Civil War (1861—65) and the Reconstruction era that followed....the movie's overt racism outraged African Americans and civil rights advocates. Blacks, particularly in the film's second part dramatizing Reconstruction, are portrayed as the root of all evil and unworthy of freedom and voting rights. In addition, male African Americans are depicted as always lusting after white women. In contrast, the KKK is portrayed in a heroic light as a healing force restoring order to the chaos and lawlessness of Reconstruction........Protests against the film accompanied its premiere in Los Angeles in February 1915 and continued when the movie debuted in New York City the following month. But it was in Boston, where the film opened in April, that Griffith faced the most intense and protracted opposition. William Monroe Trotter—a civil rights leader and editor of a radical Boston weekly newspaper, The Guardian—teamed up with the local branch of the National Association for the Advancement of Colored People (NAACP) in a bid to ban the film. Throughout the spring of 1915, Trotter, an 1895 graduate of Harvard and the college's first black member of Phi Beta Kappa, was at the forefront of the protests, which included mass rallies at which thousands of demonstrators were confronted by a small army of Boston police. Foreshadowing the direct-action civil rights strategies of the 1960s, the demonstrations, which sometimes turned violent, played out in every venue imaginable: city hall, the streets, the courts, and the Massachusetts state legislature...")

[https://www.jta.org/2019/02/06/ny/Jews-and-Blackface-its-complicated](https://www.jta.org/2019/02/06/ny/Jews-and-Blackface-its-complicated)

("...When it comes to the Jewish experience with Blackface, the picture is, well, not so black and white....For Jews, the controversy surrounding Virginia Gov. Ralph Northam suggests a complicated history that runs from Al Jolson to Eddie Cantor to former Brooklyn Assemblyman Dov Hikind....Northam's political career is foundering because his 1984 medical school yearbook page featured a photograph of two white people, one in blackface, the other in a KKK costume. (He denies being in the photo or even knowing it was on his page, but admits he darkened his skin to look like Michael Jackson for a 1984 talent show.)....Northam is walking in the footsteps of Al Jolson, born Asa Yoelson in Lithuania to Jewish parents who immigrated to the United States; the actor-singer known at the height of his popularity as "The World's Greatest Entertainer" often performed in blackface.....Then came "The Jazz Singer," which took blackface to a wider, national audience. In addition to Jolson, leading Jewish entertainers who also performed in blackface included such prominent names as Eddie Cantor, George Burns, George Jessel and Sophie Tucker.....Jews then played a disproportionate role in the entertainment industry......"Jews performed this kind of minstrelsy in the 1910s and 1920s better and more than any other group in America. Jewish faces covered in cork were ubiquitous," Michael Alexander, University of California religious studies professor, wrote in "Jazz Age Jews" (University of Princeton Press, 2003)...."In actuality," wrote film scholar Lester Friedman in "Hollywood's Image of the Jew" (Ungar Publishing Co., 1982), "many Jewish performers gained early and continued success using [blackface] … Indeed, it is too easy to ignore the derogatory aspects of such activities, the unconscious racism accepted and nourished by such cruel parodies, by citing historical contexts....."The undisguised elements of ridicule in such blackface portrayals by Jews mimicking the outlandish stereotypes of blacks," he continued, "now looks suspiciously like one group's desperate need to assert its own superiority by mimicking another."...)

**18 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

As American as the Blues: Lynching in Film and TV | PBS

(In D.W. Griffith's Birth of a Nation (1916), a sexually rapacious Black captain Gus ("played by a White actor in blackface) is lynched by the Klan after trying to marry a White woman named Flora, who would rather plunge to her death than elope with him. Griffith casts the Klan as heroes and Blacks, including Black soldiers and statesmen during Reconstruction, as the villains. On the heels of the film, the KKK resurged and along with it, racial terror inflicted upon Black Americans. National membership in the Klan peaked at about 4.5 million a few years later. However, even back then, there was pushback against the film, with the NAACP attempting to ban it….")

- www.washingtonpost.com/posteverything/wp/2015/03/03/the-birth-of-a-nation
- nmaahc.si.edu/explore/stories/blackface-birth-american-stereotype
- www.history.com/news/blackface-history-racism-origins
- nmaahc.si.edu/explore/stories/blackface-birth-american-stereotype
- www.shogafilms.com/jews-in-blackface
- amp.cnn.com/cnn/2019/02/02/us/racist-origins-of-blackface
- en.wikipedia.org/wiki/Blackface
- Deride the lightning: assessing The Birth of a Nation 100 years on | Movies | The Guardian

15.     The irony is the derogatory stereotypes, & propaganda, that was used to fuel

a rise in the Klu Klux Klan domestically, with assistance from some Jewish

American Actors via Blackface, and US racial Apartheid during Jim Crow as part of

the Black Holocaust (", was expropriated and utilized against German Jews

in the German Holocaust.  What is the Black Holocaust? - America's Black

Holocaust Museum

("…Similarities Between the Black Holocaust and Other Holocausts… The four hundred-year history of captured Africans and their descendants shares many features with the Holocaust experiences of European Jews – and the victims of other mass atrocities….These include: Dehumanization and vilification, Forced marches and migrations, [En-]Slave (forced, unpaid) labor, Stolen property, Mass incarceration, Torture, Medical experimentation, Discrimination in law and custom, Ethnic cleansing (race riots, pogroms), Lynchings and other forms of terrorism, Mass murder, Long-lasting psychological effects (Post-Traumatic Stress Disorder) on survivors – and their descendants….")

16.     As articulated above the"Black Inferior" or "less worthy" racist derogatory

stereotype a. fueled Lynching in America (in the Black Holocaust): Confronting ..

Legacy of Racial Terror b. Inspired the Third Reich, and Nazi's racial legal regime

(www.history. com/news/how-the- Nazis-were-inspired-by-Jim-Crow) and c. Runs

deep in the American Consciousness, championed by White Supremacist, especially

post Reconstruction and served to ease the consciousness of crimes done by White

People to Black Victims.  What Georgetown engages in is more than lies, deceit,

fraud (out of 1981 rights to contract, a law abiding University as advertised (and

money expended), or Equal Protection rights violated) or surface level

discriminatory animus;  Georgetown actually takes part in attempting to

dehumanize Mr. Austin through use of knowingly false derogatory

anti-Black racist stereotypes in the same way Jim Crow White Supremacist, Ku

Klux Klan, powerbrokers did to alienate and oppress Black people in such a

stunning, and evil way, that they inspired The Third Reich (Nazi Germany).

17.    Georgetown's free wheeling use of knowingly false derogatory stereotypes

<u>without consequences</u> (*despite Mr. Austin's persistent communications,*

*documentation, follow up, formal complaints, etc.*) combined with segregationist,

Klu Klux Klan, enslaver like conduct of racial apartheid anti-Black policies toward

Mr. Austin (*to openly deprive his right to contract because of his race utilizing a per*

*se illegal facially discriminatory racial exclusion structure*), is not an accident but a

series of concerted choices by Georgetown's leadership-management;  When

combined with purposeful '*dog whistle*' labeling of honest, upstanding, intelligent,

hard working, law abiding Black male students like Mr. Austin, with the "Black

Inferiority" or "less worthy" racist derogatory stereotype (*that fueled Lynching in*

*America: .. Racial Terror* ) for purposes of inflicting harm, and creating adverse

actions (*and concealing racist motive through pretext*) Georgetown's conduct exhibits

its translucent desire to dehumanize, delegitimize, and disrespect (as well

as literally steal valuable rights from) Mr. Austin.  See e.g.: How White Supremacy

Returned to Mainstream Politics - Center for American Progress (As psychologist Albert
Bandura explains,28 dehumanization is a form of moral disengagement that allows people to abandon normal human
sympathies toward oppressed minorities. Dehumanization allows politicians and the public to excuse abuses …. and it
mobilizes voters through fear….)

What Is Dehumanization, Anyway? | Psychology Today

(When you see the president or other politicians use terms like "animals" or, even worse, "infestation" (a term usually
reserved for insects), they are engaging in dehumanization. People use dehumanization to justify greed, violence, and abuse.
Although dehumanization is most associated with right-wing nationalism, others sometimes use dehumanizing language,
too….Dehumanization is one of eight forms of "moral disengagement" described by the psychologist Albert Bandura. Humans
are capable of terrible crimes, and civilization has developed ways to inhibit aggression. However, we have not eliminated
violence, in part because of techniques for creating (false) excuses and justifications for immoral behavior. All moral
disengagement techniques are tricks to get people to accept behaviors that they would otherwise immediately recognize as
unethical and unfair….Dehumanization is not limited to political issues, however. Any time someone reduces a human being
to a single characteristic, especially a negative one, they are dehumanizing. Terms like ["Black criminal"]…. rob people of the
full complexity of their lives and reduce them to a symptom or disorder….All slurs (insults based on race, gender, sexual
orientation, health status or other characteristic) are … <u>dehumanizing</u>.")

<u>G-town's use of derogatory Jim Crow racist stereotypes is dehumanizing-harmful</u>

18.    Mr. Austin does not demean himself, or others different from him &
appreciates his own appearance, history, and culture.  Mr. Austin loves being Black,
knows Black is beautiful (as well as other shades of the rainbow), enjoys his racial
self identification, and expects his personhood, and rights, to be respected just like
Whites.  He takes cultural pride in his heritage-history which is healthy (*and helps
explain Georgetown's racist conduct toward him as a Black man*).  See e.g. Students
for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 104
(U.S. Jun. 29, 2023) ("*In fact, [truly] meritocratic systems have long refuted bigoted
misperceptions of what [B]lack students [men, and people] can accomplish.*")
Because Mr. Austin loves himself, he has no need to demean either himself or
anyone else, as self hate is what produces the need to make others feel 'less than' or
inferior. [Loving Yourself and Others The Impact of Compassion on Mental Health
and Wellness | VCU Health](#)
("....When we can be compassionate toward ourselves, it opens the door for us to be accepting and loving toward other people.
When we're stuck in a negative state in our mind – even if it is just toward ourselves and not toward others – the emotional
impacts can close us off from connecting to other people. One of the main components of self-compassion is keeping in mind
the common humanity and awareness that your experiences are connected to other people's experiences....")
[The Power of Self-Love | Psychology Today](#)
("...The Importance of Self-Love...Self-love lays the foundation for assertiveness, establishing boundaries, nurturing healthy
relationships, practicing self-care, pursuing personal interests and goals, and feeling pride in one's identity....")
Racial derogatory stereotypes really stem from the [inferiority complexes](#) of those
who engage in trafficking, and promulgating the derogatory stereotypes and serve
as defense mechanisms, often projected on the victims of racial violence, to
assuage guilty consciousnesses of Racial abusers own behaviors.    [White
supremacy's inferiority complex | Racism | Al Jazeera](#) ; [Chapter 42: The Traumatic
Impact of Racism and Discrimination on Young People and How to Talk About It](#) ;
[People With Low Self-Esteem Show More Signs of Prejudice – Association for
Psychological Science – APS](#) ;
19.    Per the Ninth Circuit's *Jinro America Inc.,* Georgetown's use of derogatory
racist anti-Black man 'Black inferiority" or "less worthy" stereotypes not only
sought to harm, demean, degrade, dehumanize, and disrespect, Mr. Austin, but is

now using that to *"[invite] the [fact finder] to distrust [Mr. Austin] by invoking [a racist] stereotype"* that is prejudicial, and harmful.  See Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1008 (9th Cir. 2001)

> ("We do not suggest that expert testimony relating to certain aspects of a defendant's race, ethnicity or nationality can never be admissible. Testimony about cultural traits or behavior, for instance, is not inherently prejudicial. The cases we have just reviewed acknowledge as much. But as reflected in these decisions, the risk of racial or ethnic stereotyping is substantial, appealing to bias, guilt by association and even xenophobia. That is why Pelham's testimony — his ethnic syllogism — was fatally flawed here. It invited the jury to distrust Jinro by invoking an ethnic, national stereotype.")

20.    Per *Jinro America Inc. v. Secure Investments, Inc, United States v. Doe, United States v. Vue, United States v. Socony-Vacuum Oil Co., Inc.*, Georgetown knows a. they were wrong, b. they have no legitimate reasons for their initial, nor *ongoing,* discrete, adverse, facially discriminatory conduct, and c. they even admitted to utilizing and relying on derogatory racist stereotypes against Mr. Austin via their conduct (as compared to their promulgated policies) and attempted to use a derogatory racist stereotype of somehow "less worthy" or "inferior" to steal mandatory 1. Rights to written media contract and 2. Mandatory Equal Protection rights not be excluded in campus services including IDEAA complaint required steps with *"a blatant appeal to racism and xenophobia")*.  See

Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1007 (9th Cir. 2001):

("Analyzing Brooks' references to "Cubans" under the conventional standards of relevance and prejudice, as dictated by Fed.R.Evid. §§ 401 and 403, we held that his testimony was largely irrelevant, but in any event was unfairly prejudicial under Rule 403. "[I]t was unnecessary to inject [defendants'] national origin into the trial." Id. at 596. Highlighting the ethnicity of other Cuban drug dealers under investigation "merely made it seem more likely in the eyes of the jury that [defendants] were drug dealers because of their ethnicity." Id. In sum, Detective Brooks' "repeated references to their Cuban origin and his generalizations about the Cuban community prejudiced [the defendants] in the eyes of the jury." Id."....

…"Our sister circuits, too, have condemned the inappropriate injection of race or ethnicity into a trial. The Eighth Circuit, for example, in United States v. Vue, 13 F.3d 1206 (8th Cir. 1994), held it was error to admit the testimony of a customs officer that suggested persons of Hmong descent were likely to be involved in opium smuggling. After noting such evidence was either irrelevant or, if arguably relevant, unfairly prejudicial, the court concluded that "the introduction of such evidence is highly improper." Id. at 1213. "....

"The Second Circuit addressed this issue in United States v. Cruz, 981 F.2d 659 (2nd Cir. 1992). That case involved a drug prosecution where the principals were all Hispanic and the defendant was repeatedly referred to as "the Dominican." The government's expert witness described the area of Manhattan in which the alleged drug transactions took place as has having "a very high Hispanic population," including "Dominicans." The court held such testimony was highly improper and prejudicial. "Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." Id. at 663-64;

see also United States v. Doe, 903 F.2d 16, 20-21 (D.C. Cir. 1990) (holding that expert's testimony that the retail crack and cocaine market in Washington, D.C. "has been taken over basically by Jamaicans" was unfairly prejudicial under Rule 403, because it "strongly suggested that appellants were guilty because two of them are Jamaican"); cf. United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (noting that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them")")

21.     Per 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* use of derogatory racist stereotypes in business, or contracts, or education or other areas of society is wrong, & per se illegal under 1981 (and other laws) as *" Such stereotyping can only "cause[] continued hurt and injury," … contrary… to the "core purpose".. Equal Protection ..(co-extensive with 1981)."* Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29, 2023)

("furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." …. Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S., at 631, contrary as it is to the "core purpose" of the Equal Protection Clause (*co-extensive with sec. 1981*), Palmore, 466 U.S., at 432.")





**Signed, Under Penalty of Perjury.**

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**25 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE MR. AUSTIN IS HIGH ACHIEVING, HIGHLY RECRUITED, ACCOMPLISHED, HIGH POTENTIAL ADMITTED GEORGETOWN STUDENT.
**AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus)"* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE MR. AUSTIN IS HIGH ACHIEVING, HIGHLY RECRUITED, ACCOMPLISHED, HIGH POTENTIAL ADMITTED GEORGETOWN STUDENT.

1.      Mr. George Jarvis Austin DECLARES UNDER PENALTY OF PERJURY

that Mr. Austin shall file direct evidence, declarations, signed under penalty of

perjury to reinforce, and help further substantiate, the plead facts prior to FRCP 59

Motion.  **Fact 1:**    Mr. Austin is a high achieving, highly recruited, accomplished,

high potential, admitted Georgetown student.  Mr. Austin is a  person of great

character, pristine, clean and clear background, identified as top 5% out of over

20,000 competitive students, admitted to 100% of all top tier undergraduate schools

(including UCLA and Berkeley he applied to), did well at Berkeley, which he

selected, and graduated. www.forbes.com/sites/madisonfernandez/2021/09/08/why-

berkeley-is -number-one/ ?sh=2bbb1b7a47e0 ]).  See e.g. Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S.

Jun. 29, 2023) ("*California amended its State Constitution to prohibit race-conscious*

*college admissions in 1996…University of California, Berkeley, a top public*

*university not just in California but also nationally…For example, the University of*

*California purportedly recently admitted its "most diverse undergraduate class ever,"*

*despite California's ban on racial preferences. … UC Admits Largest, Most Diverse*

*Class Ever, But It Was Harder To Get Accepted, L. A. Times, July 20, 2021*") (FAC

para.5)      **Fact 2:**  Mr. Austin has straight As, & A+'s the last nine semesters

(FAC para.5).       **Fact 3:**  Mr. Austin regularly scores in the top 1% of

standardized testing for multiple exams, above 99% of test takers, (including the

LSAT) (FAC para.5).       Mr. Austin is highly recruited for both professional and

law schools.

2.    **Fact 4:**  Mr. Austin was awarded highest scholarship honors in multiple top

tier institutions as incentives for enrollment, as well as free application offers to

nearly every T-14 institution, by those institutions, due solely to Mr. Austin's

proven, documented, successful academic & professional track record, and

accomplishments.  **Fact 5:**  Georgetown was only one of many top tier options with

whom Mr. Austin was made offers to attend;  Because of Mr. Austin's already

established built-in network in DC, and surrounding locations, it became one of the

more attractive East Coast offers made to Mr. Austin, but still only one of many.

**Fact 6:**  Separate from earning acceptance to a variety of top tier schools, Mr.

Austin also simultaneously earned highly coveted spots in a variety of professional

development programs, and top 10 paid fellowships (*based on his demonstrated

leadership, work experience, and academic excellence*).  For example, Mr. Austin

Won (along with 17 others) a top 10 out of 820+, elite, uber- competitive Senate

fellowship (1 of 64 Capital Fellowship winners; *CA Senate*):

> "The now-25-year-old, along with fellow Stockton native George Austin, is receiving the opportunity to be at the
> forefront of state politics for 11 months starting in October after being chosen to be among 18 Senate Fellows as part
> of the state's Capital Fellows Program….. But being chosen for the program is no easy task…..The Capital Fellows
> program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian
> Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing
> out of 821 internship programs, bases its high-ranking selections on the all-around experience interns receive…."It's
> a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship,
> they're also taking graduate courses."...There were more than 1,300 applications for the program each of the past
> two years. Only 64 people are chosen for the entire program."
>
>            -    www.recordnet.com/story/news/2012/09/08/just-one-fellows/ 49419856007/



**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



3.    **Fact 7:** As articulated above, Mr. Austin Earned, and Won in a  top 10 out of

820+ paid Fellowships per Vault and Forbes, in the CA Senate with the most

competitive entry *(less than 4% acceptance rate nationwide, my year, for that program)*, as 1 of 18 selected winners (and 1 of 2 *winners* out of that area)

www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/

Although, Mr. Austin was unavailable for press interview at the time he was still publicly celebrated and honored in the piece of over 400 elite competitors nationwide, and Mr. Austin declined automatic job offer as part of the elite program selectin process as I had already given my word to another commitment for which I already deferred for an additional year. **Fact 8:** As stated above Mr. Austin was accepted into multiple top tier law schools (including T-14), offered highest scholarship award honors from a variety of schools including VP Kamala Harris' alma mater (in San Francisco), and more recently was chosen as most outstanding student, as well as top ten business student ever (selected by professor with over 20 years experience).

3.      **Fact 9:** For additional context in this complaint, Mr. Austin is self represented, is not a juris-doctor (JD), nor has *ever* taken the bar, and is a severely injured worker *still* recovering from temporary disability, and is a member of protected classes (*Black man, recovering from temporary disability from car accident, and injury working at Tesla*) with pristine, clean and clear background. See above and below embedded exhibits (all authentic representations under signed penalty of perjury helping to substantiate, and provide some examples of statements under penalty of perjury).

"From: Ashley L Jennings <alb225@law.georgetown.edu>
To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,

This e-mail serves as official notification that your request to defer admissions to Georgetown University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward to welcoming you to the full-time program next fall.  As mentioned in our previous correspondence, your deferment is binding and you should begin withdrawing all other pending law school applications.  Please note it is your responsibility to notify us, in writing, of any change of address during your deferment period so that we may forward future correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This deposit is non-refundable and will be credited toward the tuition for your first year.

Your second tuition deposit will be due in June 2013.  You'll be able to find more information once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!

Warm regards,

Ashley Jennings

Assistant Manager, Office of Admissions
Georgetown University Law Center
600 New Jersey Ave., NW, Room 589
Washington, DC 20001
202.662.9010 Phone
202.662.9439 Fax


From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Please let me know if anything else is needed for a successful request.

Thank you,

George

Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school. To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program. As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school. The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding. It will also help provide an additional depth of experience to add value to classroom discussions. From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.

George Austin

--------------Senate Fellows Acceptance Letter----------------------------------------------

May 15, 2012

Dear George Austin,

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow.  You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program.  We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.

As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget.  The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits.  If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000.  For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ▮▮▮▮▮▮. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero


Jennifer Calbonero, Program Assistant
California Senate Fellows"

**8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



Today                                    Personalize

**728**                                  **717**
TransUnion                               Equifax
Good                                     +8 pts • Good

✅ Next check tomorrow

Scores calculated using VantageScore 3.0 ⓘ

💵 **Credit Karma Money™**               **$11.23**
   2 accounts

The card your wallet's                   See all
been waiting for

Personalized offers shown from paid partners are



Today    Credit    Cards    Loans    Money



**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



**Fact 1:**    Mr. Austin is the person whose economic, property, and 42 USC 1981

rights to contract were violated in the following picture (*see below*), and the process

which deprived Mr. Austin's contract rights.    **Fact 2:**    Per US Supreme Court's

*General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v.*

*Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus

under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's

rights to contract and engaged in a *"blatant deprivation of civil rights such as where*

*a private offeror [in this case Georgetown] refuses to extend to [an African- American,*

*in this case Mr. Austin], because he is an [African-American], the same opportunity*

*to enter into contracts he extends to White offerees [in this case non-Black, or White*

*admitted students]."*  See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982),
the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a
private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same
opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

2.    **Fact 3:**    Non-Black male, or White, students were made contract offers,

and provided: 1. with respect to their persons, as human beings, (and provided a

head-ups, or forewarning, that Georgetown desired to take a photo of them and use

it for commercial, marketing, purposes), 2. knowledge of what the photo was used

for (and where it may be sent for marketing purposes) 3. Pre-approval of use of the

photo by the non-Black male, or White students 4. An opportunity to accept or

decline the offer itself 5. An opportunity to review the written contract offer before

making the decision 6. An opportunity to agree to the terms of the contract offer 7.

An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 4:**    Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.    **Fact 5:**  Per Georgetown, (i.e. FAC para.111.), <u>written authorization requires</u> Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with <u>General Counsel</u> approval of form f. signature consenting *prior* to use.

3.    **Fact 6:**    Per Georgetown, <u>written authorization requires</u> is a contract.

**Fact 7:**    Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.  **Fact 8:**   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).<u>See S-111</u>

**Fact 5:**  Georgetown admits there was No offer, acceptance, consideration, or signature (per required <u>written authorization</u>), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):







**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:  shall cite to world renowned Thelton E. Henderson, for the 1981 legal standard as he has a particularly unique insight to its operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in Society Judge Breyer's And Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam , clerked for the Legendary Judge Thelton Henderson;  In Honor of the Civil Rights Act of 1964,Title VI,** (full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

DECLARATION UNDER PENALTY OF PERJURY: 1981, Animus, Legal Standards
per Legendary Judge Thelton Henderson

1.    **Fact 1:** Mr. George Jarvis Austin DECLARES UNDER PENALTY OF

PERJURY that in Mr. Austin's forthcoming FRCP 59 Motion, Mr. Austin shall cite

to world renown Thelton E. Henderson, for the 1981 legal standard. **Fact 2 :**

Because legendary Judge Henderson has a particularly unique insight to 1981's

operation, and personal understanding of how anti-Black racial animus operates

regardless of status or position in society (*as he experienced both subtle, and not so*

*subtle forms of anti-Black discriminatory animus even after his ascension and*

*success*) his analysis is particularly valuable under these facts. **Fact 3 :** Mr. Austin

was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote

speakers to raise school funds for students in need (Mr. Austin had no personal gain

in the efforts, and was happy to share and help others): Judge Henderson was

impressed after my speech, and thereafter invited Mr. Austin back to his home for a

bit of Tea, Mentorship, and Wisdom. **Fact 4:** Legendary Judge Thelton Henderson,

who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a

keynote speech at his home in Berkeley, has extra credibility of analysis (provided

his depth of personal experience with racism as a Black man, despite his

accomplishments), his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate. California Newsreel - SOUL OF JUSTICE:
THELTON HENDERSON'S AMERICAN JOURNEY

("*He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when*
*Medgar Evers was assassinated and when four little girls were killed in the Birmingham*
*church bombing. In his role at the Justice Department, Henderson embodied the tension*
*described by Andrew Young as being an "arm of the law in a sometimes lawless society*.")

2.    **Fact 5:** As an interesting aside, presiding Judge Judge Breyer's

and Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam

clerked for the Legendary Judge Thelton Henderson, and represented the *NAACP*

in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father [Gilliam Responses 9-17-14.pdf](); Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)…"* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

(6. What is the most important attribute of a judge, and do you possess it?

Response: I believe that the most important attribute of a judge is the commitment to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties. I do possess this attribute.

7. Please explain your view of the appropriate temperament of a judge. What elements of judicial temperament do you consider the most important, and do you meet that standard?

Response: In my view, the most important element of judicial temperament is treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered, and should then render decisions in a timely manner. To carry out these responsibilities, a judge should maintain a calm yet firm demeanor, be an attentive and careful listener and work diligently to promptly reach a decision. I do meet these standards, and am deeply committed to upholding these principles.

13. What assurances or evidence can you give this Committee that, if confirmed, your decisions will remain grounded in precedent and the text of the law rather than any underlying political ideology or motivation?

Response: I believe that there is no greater honor, or greater responsibility, than serving as a district judge. The citizens of our country entrust federal judges to dispense equal justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations. I had the privilege of beginning my career as a district court law clerk to the Honorable Thelton E. Henderson, and I have served as a federal prosecutor, a defense lawyer and counsel for clients in a range of civil matters. I have never viewed my legal practice as ideological, and I can assure the Committee that if confirmed as a district judge, I would base my decisions solely on the facts of each case and the applicable precedent, without regard to any political ideology or motivation…..)

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

3.    **Fact 6:**    Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the following picture [image, likeness, etc.] (*page 4: see below*), and the process which deprived Mr. Austin's contract rights.    **Fact 7:** Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

4.    **Fact 8:**    When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: 1. with respect to their persons, as human beings, (and provided a head-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and

rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 9:**       Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.     **Fact 10:**    Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

5.     **Fact 11:**    Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. **Fact 12:**    Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. **Fact 13:**       Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of

his rights without asking, or attempting to engage in making a contact).  **Fact 14:**
Georgetown admits there was No offer, acceptance, consideration, or signature (per
required written authorization), and thus no contract was made with Mr. Austin
because he is Black, in the same way as similarly situated Whites, with George-
town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast*
*Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

28.    **Fact 15:**  Georgetown admits, *publicly,* that a student, or  *"Any applicant for*
*employment or admission, current or former employee or student, or third party*
*(hereinafter referred to as "Complainant")"* can make a complaint via email or in
person, and is encouraged to do so; :

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Requirements for Filing Grievances**
> Any applicant for employment or admission, current or former employee or student, or third party (hereinafter
> referred to as "Complainant") of Georgetown University may file a discrimination or harassment complaint with
> IDEAA....
>
> A grievance must be filed in writing with IDEAA at M-36 Darnall Hall, electronically at ideaa@georgetown.edu, or
> by fax at (202) 687-7778."

6.    **Fact 16:**  Georgetown admits, *publicly,* that once complaint is made via
email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to
contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid
violating its own Georgetown policies or the law that informs-undergirds IDEAA

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Procedures for Processing Grievances**
>
> **Intake**
> IDEAA staff shall schedule intake meetings with Complainants and Respondents in order to provide a general
> understanding of the relevant policy and this grievance procedure, as well as University support resources, as
> appropriate. The intake meeting may also involve a discussion of any interim or supportive measures that may be
> appropriate concerning the individual's academic, University housing, and/or University employment arrangements.
> At the request of the Complainant, IDEAA staff shall proceed to Step I Informal Resolution, or the Step II
> Investigation process detailed below. Pursuant to the Policy on Sexual Misconduct, Informal Resolution will not be
> used to resolve allegations of Title IX Sexual Harassment made by a student against an employee. If the
> Complainant wishes to proceed with Step I Informal Resolution or Step II Investigation, then IDEAA staff will meet
> with the Respondent to provide the Respondent a general understanding of the relevant policy and procedure.
> In the event the Respondent is a member of a collective bargaining unit, IDEAA will coordinate with Human
> Resources or the appropriate administrative unit to ensure that any required notices are provided to the union.
> Questioning of a witness or party who is a member of a collective bargaining unit will proceed in accordance with
> applicable law, policies, and collective bargaining agreements.

**Step I.  Informal Resolution**

Unless otherwise prohibited by University policy, IDEAA shall propose voluntary informal resolution, including mediation, to a Complainant desiring to resolve a dispute with a potential Respondent. If the Complainant agrees to informal resolution, the potential Respondent will be informed about the allegations and the informal resolution process, and offered an opportunity to participate in informal resolution. If both parties do not voluntarily agree to participate in the informal resolution process, the Complainant may proceed to Step II. In cases where Title IX Sexual Harassment is alleged by a student against an employee, IDEAA will not offer Informal Resolution to resolve the Complainant's allegations; in instances of alleged sexual harassment where both the Complainant and the Respondent request to mediate, the Complainant will not be asked to resolve his/her/their concerns directly with the Respondent.

If both parties agree to informal resolution, IDEAA's staff or a representative chosen by IDEAA will conduct the informal resolution within a prompt and reasonable time frame.If a mutually acceptable resolution is achieved through informal resolution, a written agreement between the parties will reflect the resolution and shall be signed and dated by the parties. Copies will be provided to both parties and IDEAA will monitor compliance with the terms of the agreement by both parties. The case will then be closed.

If informal resolution fails, IDEAA will inform the Complainant about the option to proceed to Step II.
All Complainants and Respondents have a right to end the informal resolution process at any time and can ask in writing for IDEAA to begin a Step II Investigation.

The process for informal resolution of Title IX Sexual Harassment matters is described in Appendix A.

**Step II. Investigation by IDEAA**

An individual or group of individuals may initiate a formal Complaint by providing IDEAA a written and signed statement and any supporting documentation detailing the allegations of discrimination, harassment or related retaliation and identifying the individuals who engaged in the alleged conduct (the Respondent(s)).

IDEAA shall provide the Respondent and the Respondent's supervisor, if applicable, a copy of the formal complaint and its supporting documents. The Respondent shall have an opportunity to submit a written response to the allegations and any supporting documents within twenty (20) days of receipt of the formal complaint and its supporting documents. The Complainant will be provided a copy of this response and given the opportunity to submit a written rebuttal to Respondent's statement within ten (10) days of receipt of the response. Respondent will be given a final opportunity to respond in writing to Complainant's written rebuttal within ten (10) days of receipt of the rebuttal. Both Complainant and Respondent may present evidence and identify witnesses who can provide information relevant to the allegations.

IDEAA shall within a prompt and reasonable time frame investigate the Complaint and shall have access to all necessary information to do so and the opportunity to interview witnesses, as well as Complainant and Respondent. Upon completion of the investigation, IDEAA shall prepare a written report. IDEAA uses the standard of preponderance of the evidence to ascertain if the University's policies have been violated. IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, and at the discretion of IDEAA, transcripts, and audio recordings.

**Step III. Notification**

When IDEAA finds that no violation of policies governing harassment or discrimination has occurred, IDEAA will provide notice of the results to the parties on the same day, which shall be within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**

When IDEAA finds that a violation of policies governing harassment or discrimination has occurred, IDEAA will: Provide written notice of the results to the parties on the same day, to the extent consistent with the confidentiality accorded to University personnel actions, and within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**

Forward its report to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality. Direct that prompt remedial action be taken to correct the situation. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

**Step IV. Corrective Action**

If corrective actions are imposed, IDEAA shall monitor their implementation. In Title IX Sexual Harassment matters, the Title IX Coordinator will monitor implementation of corrective actions. The appropriate Executive Vice

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

President, Chief Operating Officer or Senior Vice President shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions related to the allegations resulting in the corrective actions.

**Step V. Appeal**
Where IDEAA finds a violation of the Policy on Sexual Misconduct, IDEAA may notify the Complainant of the sanction or remedial action imposed on the Respondent where the sanction or remedial action relates to the Complainant."

7.     **Fact 17:** When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"*  or human being) 3.  IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an

Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

8.      **Fact 18:**  Further, When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/section4/a/**) per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant  6.  The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection

required procedure, and policy) because he is Black 9. The opportunity provide

rebuttal to Respondent's statement, if needed, within 10 days, after receiving

Respondent's response to the initial complaint for Whites, whereas whereas they

deprived that opportunity for Mr. Austin (and completely excluded him from this

Equal Protection required procedure, and policy) because he is Black.

9.      **Fact 19:** Moreover, When Defendant Georgetown receives a complaint via

email made by *"Any applicant for employment or admission, current or former*

*employee or student, or third party"* similarly situated Whites, or Non-Black males,

they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.**

**edu/section4/a/**) per Georgetown written policy ***"Procedures for Processing***

***Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights

Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 10. The opportunity,

or right, to present additional evidence, identify witnesses, and cross examine

opposing witnesses in per the Complaint for Whites whereas they deprived that

opportunity for Mr. Austin (and completely excluded him from this Equal Protection

required procedure, and policy) because he is Black 11. The opportunity, and right,

to receive IDEAA's investigation, interviewing of witnesses, complainant and

respondent(s), of complaint, within a prompt and reasonable time frame, for Whites,

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black

12. The opportunity, and right, to have complaint substance and evidence evaluated

and ascertained by IDEAA's experts for violations (and remedies), where IDEAA

shall maintain documentation to support the findings in its report, including, as

applicable, written findings of fact, transcripts, and audio recordings whereas

defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

10.     **Fact 20:**  Lastly, When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook.georgetown.edu/ section4/a/)**  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15. The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that

prompt remedial action be taken to correct the situation for Whites , whereas

defendant Georgetown deprived that opportunity for Mr. Austin (and completely

excluded him from this Equal Protection required procedure, and policy) because he

is Black 16. The opportunity, and right, for corrective actions to be imposed on

Respondents, where IDEAA shall monitor their implementation (and additional

legal action outside of campus is still able to be pursued especially when the limits

of internal corrective measures do not remedy the violations by Respondents),

whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and

completely excluded him from this Equal Protection required procedure, and policy)

because he is Black.

11.     **Fact 21:**  Mr. Austin had no complaints against him, he simply inquired, and

complained as to why Georgetown 1. Violated school policy 2. Violated his

Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission,*

*current or former employee or student, or third party"* similarly situated Whites, or

Non-Black males, they provided Whites a set of mandatory steps **([faculty](#)**

**[handbook.georgetown.edu/ section4/a/](#))**  per Georgetown written policy

***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal

Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

12.     **Fact 22:** As Legendary Judge [Henderson](#) explains in *Walker v. Contra Costa*

*County: a "refusal to enter into … contract [on the same basis as Whites] is*

*actionable under § 1981. In making this determination, a lower court should give a*

*fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making,*

*performance, modification, and termination of contracts, and the enjoyment of all*

*benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in *Walker v. Contra Costa County* Judge <u>Henderson</u> expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

> *"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

13. **Fact 24 :** Mr. Austin 1. Is an African American or Black man who is high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required*] and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by completely disrespecting Mr. Austin's Constitutional rights to

contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue.

14.     **Fact 25:** Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (i.e. Whites were treated 1. with respect to their persons, as human beings, (and provided a head-ups, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, humanness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits,

privileges, rights provided in a contractual relationship.)

15. **Fact 26:**  In addition to violating Mr. Austin's right to make media contract, as

mandated per Georgetown's own policies, Georgetown simultaneously violated Mr.

Austin's rights in existing contract per *"performance, modification, … and the*

*enjoyment of all benefits, privileges, terms, and conditions of the contractual*

*relationship"* as well Equal Protection per Title VI of the Civil Rights Act of 1964.

**Fact 27:**  Georgetown did so when it completely excluded Mr. Austin on the basis of

race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and

illegally excluded from essential campus services-procedures for *"Any applicant for*

*employment or admission, current or former employee or student, or third party"*

that similarly situated Whites, or Non-Black males, are provided via a set of

mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)**  per

Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be

done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI)

coexistent with 42 USC 1981.

16.     **Fact 28:** Per Judge Henderson's analysis in *Walker v. Contra Costa County,*

combined with US Supreme Court's *General Building Contractors Assn., Inc. v.*

*Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*

defendant Georgetown's conduct is "blatantly" racist whereas similarly situated

White, or non-Black, student offerees are made offers by Georgetown, respecting

their person, and rights (economic and otherwise) the *"private offeror [who blatantly*

*violates Civil rights when it] refuses to extend to [an African- American, in this case*

*Mr. Austin], because he is an [African-American], the same opportunity to enter into*

*contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020): **Fact 29:** Georgetown is a private offeror   **Fact 30**: Mr. Austin is a private offeree, admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*).   **Fact 31**: The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.   **Fact 32:** Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.   **Fact 33:** However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed).   **Fact 34:** Further Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

17.   **Fact 35 :** Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating

Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract*) is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* **Fact 36:** Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*


  Mr. Civil Rights Justice Thurgood Marshall's combined with  Legendary Judge
  Thelton Henderson's guiding analysis on demonstrated pretext & racial animus

18.    **Fact 37:**    Per the United States Courts Justice Thurgood Marshall, nicknamed Mr. Civil Rights, by the Supreme Court, (the first Black, non-White) Supreme Court Justice, was only the second Supreme Court justice to have his casket laid in state in the Great Hall of the Supreme Court before his funeral.

 

**Fact 38:**    Per the United States Court Thurgood Marshall's analysis both as a litigator, and as a Supreme Justice serve as guiding 'Eastern Stars' to discern, and correct, per se illegal discriminatory conduct (especially anti-Black discriminatory conduct), as early as 1938, when Thurgood Marshall, as a litigator, took over the NAACP Legal Defense and Education Fund and argued *Sweat v. Painter (1950)* and *McLaurin v. Oklahoma Board of Regents of Higher Education (1950)* as well *Brown v. Board of Education (1954).* As the legendary Civil Rights activist, and American Hero (thinker, and entertainer) Harry Belafonte so eloquently sung *"There's a star in the east … Rise up shepherd and follow." Harry Belafonte, 96, Dies; Barrier-Breaking Singer, Actor and Activist - The New York Times* (..In the 1950s, when segregation was still widespread, his ascent to the upper echelon of show business was historic. But his *primary focus was Civil Rights*….)



19.    **Fact 39:** Two Thurgood Marshall cases, 1. *Brown v. Board* (keying in on *anti-Black Stigma*) as a Litigator, and 2 *MacDonald* as Supreme Court Justice writing the majority opinion *(keying in on the application of the precise mandate under anti-discrimination Statutes including 1981's requirement to apply policies equally to Blacks, and non-Blacks, without regard to race)* are particularly helpful Eastern stars, in this case.  Georgetown's Constitutionally offending conduct "*implying inferiority in civil society*" toward a law abiding Black Citizen, and admitted Georgetown student, Mr. Austin is similar to Oliver Brown in *Brown v. Board of Education*.  **Fact 40:** Mr. Austin seeks to exercise & enforce his Federal rights to not be treated in an inferior manner in civil society (creating Stigma), in the context of Higher Education, and making contracts per Georgetown's own express policies (in accord with 42 USC 1981, and other laws), as a law abiding Black male student, because he is a Black man, from 7.15.21 and continue into the present, violating Mr. Austin's Federal Rights that are reflected in "*....The words of*

*the amendment ,.[which].. <u>contain …the right to exemption … from legal
discriminations, implying inferiority in civil society….</u>"* (referring to Civil Rights
Amendments 13th, 14th, 15th Amend.)  See Brown v. Board of Education, 347 U.S.
483, 494 (1954)

20.    **Fact 41:**    Georgetown's Constitutionally offending conduct *"implying
inferiority in civil society"* seeks to a. <u>harm Mr. Austin's dignity interest</u> (as 2023 US
Supreme Court's [303 Creative LLC, v. Elenis et. al.](#), highlights to *"vindicate the
deprivation of personal dignity that surely accompanies denials of equal access to
public establishments." Heart of Atlanta Motel, Inc."*), b. <u>stigmatize Mr. Austin</u> (as
US Supreme Court's [Brown v. Board of Education](#) highlights *"the policy of
separating the races is usually interpreted as denoting the inferiority of the [N]egro
group… [conveying] a sense of inferiority… has a tendency to [retard] the …..
development of [N]egro [people] and to deprive them of some of the benefits they
would receive in a racial[ly] integrated [civil society." …, in regard to the [C]olored
race, for whose protection the amendment was primarily designed, that no
discrimination shall be made against them"*), c. <u>utilize knowingly false anti-Black
male racist derogatory stereotypes</u> against Mr. Austin (as 2023 US Supreme Court's
[Students for Fair Admissions, Inc. v. President & Fellows of Harvard College](#)…..
Highlights "" *[Forbids] from intentionally treating one person worse than another
similarly situated person because of his race, [or derogatory racial stereotypes]"…"In
cautioning against 'impermissible racial stereotypes,' …"the Court's Equal Protection
Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory]
stereotyping"…."furthers "stereotypes that treat individuals as the product of their
race, evaluating their thoughts and efforts-their very worth as citizens-according to a*

*criterion barred to the Government by history and the Constitution." Id., at 912 …. Such stereotyping can only "cause[] continued hurt and injury"* ), and d. to explicitly deprive his Federal 1981, Constitutional, right to contract (outright) per US Supreme Court's [Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media](#), to guide the analysis of Georgetown's admitted, willing, facially discriminatory, per se illegal *"blatant deprivation of [Mr. Austin's] civil rights … where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African- American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White litigants, customers, business invitees]."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

21.    **Fact 42:** Mr Austin a. has a pristine, clean & clear background b. with great and strong character (*eligible for any employment, or position, including President of the United States*), c. has good credit, d. timely pays his debts, e. is a good person, f. is a Straight A student (the last 9 semesters), g. is a member of protected classes (*Black man, recovering from temporary disability from car accident, and injury working at Tesla*).

22.    **Fact 43:** Justice Thurgood Marshall, who argued against *ongoing* facially discriminatory conduct before becoming a US Justice in *Brown I, & II (when the discriminatory conduct continued),* makes clear in *McDonald v. Santa Fe Trail Transp. Co.* that in an employment context, even when a worker has engaged in *"serious misconduct or crime directed against the employer [i.e. where a worker was "arrested, convicted, and fined"*] sec. 1981 (or Title VII) *"prohibits all racial discrimination"* whereas adverse action must be refrained from or applied *"only if …*

*criterion is applied alike to members of all races,*" uniformly without regard to race. Per 1981, coextensive with Equal Protection (under Civil Rights Act of 1964, Title VI), this model of uniform treatment without regard to race is directly applicable to Georgetown's ongoing violations of Mr. Austin's rights.

23.    **Fact 44:**    Unlike the *McDonald v. Santa Fe Trail Transp. Co.* **WHITE Criminal Plaintiffs** (*who engaged in, and admitted, illegal conduct against a company, and were arrested, fined, for that illegal conduct*) in Justice Marshall's majority opinion in *McDonald v. Santa Fe Trail Transp. Co.* Mr. Austin (is Black or African American and) was 1. Not engaged in illegal conduct, *at all,* nor against Georgetown as an admitted student and thus was not *"arrested, convicted, and fined"* for non-existent conduct against Georgetown as an admitted student exercising his 1981, 2. Instead, a law abiding admitted student who reported Georgetown's per se illegal *ongoing* conduct against Mr. Austin (as the victim of discriminatory conduct whereas his 1981 rights to contract, Title VI, and Equal Protection rights per Georgetown's own express policies was, and is, violated) 3. Denied right to make contracts, in an ongoing manner for valuable rights that were stolen without notice from Mr. Austin by Georgetown, and then violating Title VI, and Equal Protection rights on several occasions with Georgetown using derogatory racial stereotypes, with a false anti-Black male racist stereotype (*as pretext to cover up Georgetown's invidious racist motivations*).

24.    **Fact 45:** Similar to the *McDonald* plaintiffs (creating liability for defendants) Georgetown applies racially motivated different standards, or policies (*one for non-Black, or White, admitted students, and a different inferior policy toward Black male admitted students, like Mr. Austin*) whereas 1. Mr. Austin

suffered repeated discrete adverse harms despite reporting Georgetown's harms 2. Whites were treated with respect to their persons, as human beings, (and provided a head-ups, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, humanness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 3. Whites were treated provided knowledge of what the photo was used for (and where it may be sent for marketing purposes), but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 4. Whites were provided with Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 5. Whites were treated with an opportunity to accept or decline the offer itself, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. Whites were treated with an opportunity to review the written contract offer before making the decision 6. Whites were treated with An opportunity to agree to the terms of the contract offer 7. Whites were treated with An opportunity to provide a counteroffer if terms were not acceptable 8. Whites were treated with An opportunity to have a meeting of the minds and 9. Whites were treated with opportunity to Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.)

25. **Fact 46:** In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964.

**Fact 47:** Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for **(faculty handbook.georgetown.edu/ section4/a/)**.  Per Justice Marshall's majority opinion in *McDonald*, combined with the more recent *Cbocs West, Inc's* analysis, this is a "*promising….straight- forward [1981] claim of racial discrimination"*, with use of false, derogatory, racist pretext ("inferiority," "less worthy" applying one policy to Mr. Austin because he is Black man refusing to even offer the ability to enter into a mandatory media contract that Georgetown themselves mandate when exploiting a students image, or likeness, overtly treating him as an inferior, and utilizing a different policy for Whites, non-Blacks, where their rights to contract, and complaint policy Equal Protection under Title VI rights are fully respected.

26.    **Fact 48:** Combining Justice Marshall's analysis in *McDonald v. Santa Fe Trail Transp. Co.* with Judge Henderson in *Walker v. Contra Costa County* Georgetown's a. Racial Animus and b. Pretext becomes crystal clear as their actions present no explanation, and conduct is not worthy of credence, nor do they even make sense with typical media contract making process (and complaint process), shows extreme animus toward Mr. Austin as compared to Whites, or non-Blacks. Similar to defendants in *Walker v. Contra Costa County* Georgetown shows animus

through a. disregard-violation of Court Mandates (in this case Supreme Court's per

se standards for private offerors) b. False, & Baseless use of derogatory stereotypes

(with no real goal but discriminating, and ignoring legal requirements that they

themselves promulgate) c. strategic segregationists, racial caste, tactics to block

Blacks, particularly Black males d. Use of racial bans or exclusion from required

services to deter making contracts, and block-stall proactive resolution of the

Georgetown created violations of law (whereas they violate their own mandatory

policies, and laws).  See Walker v. Contra Costa County, No. C03-3723 TEH, 7-9

(N.D. Cal. Sep. 6, 2005)

> ("1. <u>Racial Animus</u>
>
> Plaintiff alleges that Richter demonstrated a racially discriminatory animus, particularly through his opposition to a court mandated obligation to ensure equal employment opportunity. Some of the incidents that would support this notion include: (a) In 1998, Defendant Richter launched an investigation into alleged cheating by African American fire fighters and refused to release the findings (Walker Decl. 8:24-9:10); (b) since Defendant Richter became Fire Chief, recruiting and outreach for minority candidates virtually ceased (Price Decl., Ex. K 50:10-17); (c) in 2000, in a meeting with the Black Firefighters Association representatives to discuss the group's concerns regarding racial and gender bias in the hiring of an all-white male firefighter paramedic class, Defendant Richter stated "I don't hire by the consent decree" (Walker Decl. 15:2; see also Price Decl. Ex. L 42:1-49:25, 55:1-25); (d) in November 2002, Defendant Richter banned the Croskrey Consent Decree Board from using the District training center, and there is some question as to whether other groups were permitted to use the facility (Walker Decl. 15:20-16:1).

27.  **Facts 49:** Similar to defendants in *Walker v. Contra Costa County*

Georgetown shows pretext through a. Both false and subjective criteria (in that 1.

Whites contract rights are respected (on the front end), and 2. Whites are not

blocked and provided multiple opportunities later in the process to add additional

information, if needed to substantiate Investigatory) whereas *"the Ninth Circuit has*

*held that "subjective practices are particularly susceptible to discriminatory abuse*

*and should be closely scrutinized"* b. Skewing the interactions to prejudice a

negative outcome (purposefully avoiding Georgetown's publicly promulgated duties,

violating requirement to make a contract for economic-IP-publicly-privacy rights

already stolen without consent, and going to extreme measures like illegally

excluding from mandatory campus services in violation of Equal Protection, Title VI

) c.  Shifting the goal post only for Blacks, whereas Whites are not subjected to this

two tiered contract making, and complaint process,  to make it harder and harder

for a fair shake (with no intent on making a contract in the first place to

demonstrate that Georgetown's racist attitudes towards Blacks has not change

since they were admitted, vile, enslavers).   See Walker v. Contra Costa County, No.

C03-3723 TEH, 7-9 (N.D. Cal. Sep. 6, 2005)

(2. <u>Pretext</u>
There is a genuine issue of material fact as to whether Defendants' stated reasons for the decisions made in 2003 are pretextual. ...the Ninth Circuit has held that "subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized." Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1481 (9th Cir. 1987). Many of the criteria chosen, as well as aspects of the decision-making process, for selecting candidates for the two Assistant Fire Chief positions in 2003 were subjective. Plaintiff identifies a number of changes to the hiring process that could be pretexts for selecting another candidate. The 2003 Assistant Fire Chief Position openings were the first time that the position was opened to candidates from outside the Department. (Walker Decl. 16:10). Defendant Richter also asserted that the two vacant positions were interchangeable, necessitating that both needed a background in Support Services, while Plaintiff's primary area of expertise is operations. (Walker Decl. 17:25-17:27). Further, the examination was skewed to addressing administrative support concern — 11 of the 14 questions dealt with support services. Additionally, after Plaintiff finished as one of the top candidates under the initial panel, Defendant Richter convened a second panel; this was an unprecedented move in the hiring process. (Walker Decl. 16:13-14). One of the members of this second panel had been involved in the issues that led to Plaintiff's first suit against the County in 1985. (Walker Decl. 16:20-28; Price Decl. Ex. J 57:5-9). Richter also asked a question regarding lateral hiring that was not on the standard list of questions and that was a "hot button issue which the Black Firefighters Association had opposed [because] lateral hiring . . . would provide for an all white recruitment pool." (Walker Decl. 10:11-17. 10:22-23). Further, Plaintiff alleges that Defendant Richter scored the candidates before the final interview for the position had taken place. (Price Decl. 84:5-85:20; Ex. B290:16-291:13; Ex. N 4; Ex. 120). Many of the factors that Plaintiff scored lower on were highly subjective, such as inter-personal skills. (Richter Decl. Ex. 123). Thus, there are genuine issues of material fact compelling the Court to deny summary adjudication on this claim. ")

28.    **Facts 50:**  Mr. Austin shall cite to world renown <u>Thelton E. Henderson</u>, for

the 1981 legal standard in Mr. Austin's forthcoming FRCP 59 Motion, because

legendary Judge <u>Henderson</u> has a particularly unique insight to 1981's operation,

and personal understanding of how anti-Black racial animus operates regardless of

status or position in society (*as he experienced both subtle, and not so subtle forms of*

*anti-Black discriminatory animus even after his ascension and success*) his analysis

is particularly valuable under these facts.  **Fact 51 :**  Mr. Austin was blessed to be

invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise

school funds for students in need (Mr. Austin had no personal gain in the efforts,

and was happy to share and help others):  Judge Henderson was impressed after my

speech, and thereafter invited Mr. Austin back to his home for a bit of Tea,

Mentorship, and Wisdom.  **Fact 52:** Legendary Judge Thelton Henderson, who Mr.

Austin had the pleasure of meeting personally after Mr. Austin gave a keynote

speech at his home in Berkeley, has extra credibility of analysis (provided his depth

of personal experience with racism as a Black man, despite his accomplishments),

his knowledge of how the Klu Klux Klan (and other proponents of White

Supremacy) operate.  California Newsreel - SOUL OF JUSTICE: THELTON
HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**





GEORGETOWN UNIVERSITY LAW CENTER

Office of the Dean of Students

February 28, 2019

George Austin
CA

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW    Washington DC 20001-2075
(202) 662-9000

**29 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          10.16.24**

**30 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

Judicial Notice per **RULE 59 Motion on Judge CRB's Order**  Good Faith Complaint, Substantive Issues, Facts, evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) <u>is not</u> vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do).**AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number:* **53-0196603**)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus)"* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

Judicial Notice per Rule 59 Motion per Judge Breyer's Order on Defendant's Motion

Table of Contents

Intro                                                              2
Georgetown violates Mr. Austin's 1981 rights                       6
Georgetown violates Mr. Austin's Equal Protection                  19
Mr. Austin's other claims are substantive                          22
Mr. Austin's claims are new harms not barred by Res Judicata       24
Mr. Austin's should not be sanctioned per Supreme Court            25

1.      Mr. Austin provides Judicial Notice that Judge Breyer makes 3 stunning errors in his first order on the Rule 59 Motion a. Mr. Austin *only pleads conduct from 7.15.21 to present* which has never had the opportunity to be heard on the merits, and began after termination of the first case b. Per the Supreme Court ongoing, future, conduct cannot be preemptively assumed, nor litigated, and is *not barred by Res Judiciata* ergo Mr. Austin *could not have failed to plead something that had not yet happened* c. Mr. Austin sought to prevent administrative, non-judicial, illegal interference from pre-determining outcome of cases (which is not allowable, and not vexatious, either).    Mr. Austin notices the **Friday, 2.7.25, at 10a.m. via Zoom** civil hearing for Rule 59 Motion to Amend, Alter or Reconsider within 28 days of Judge Breyer's order per Sanctions Motion under the Supreme Court's *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) ("Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing .. is … 28 days from entry of the judgment")

2.  Per the Supreme Court, and Ninth Circuit, there are at least 9 exceptions to judicial immunity (some of which create criminal liability as well as injunctive civil liability) 1. Non-judicial acts, generally 2.  Where a judge connives with one of the parties to predetermine the outcome of a judicial proceeding 3. Where a judge makes a vexatious litigant prefiling order 4. Where anyone including a judge

engages in criminal activity like obstruction of justice, or accepting bribes 5. Where anyone including a judge violates a Citizen's, particularly a Black Citizen's ("whom are the targets of the amendments per *Brown v. Board*"), 14th (and 5th) Amendment rights to Due Process and Equal Protection which at minimum provides "a guarantee of fair procedure" and "equal protection of the laws." U.S. Const. amend. XIV, § 1 6. Where a Judge attempts to declare a Black person enslaved in violation of the thirteenth Amend- ment (or any of the rights enshrined therein) 7. Where a judge rapes a litigant (or other like harms) in violation of penal or civil code (and the Constitution) 8. Where a judge tortures, attempts to murder, or actually murders a litigant alone or in conspiracy with the Klu Klux Klan or other like domestic White Supremacist terrorist in violation of civil or penal code, 18 USC 241, 242, 245, etc. (and the Constitution) 9. Where a judge chooses to disregard the Constitution and become unfaithful to the oath and trust provided to them by the Citizenry._Per the US Supreme Court's *Pierson v. Ray 386 U.S. 547 (1967) "a judge who excluded*" Black People, or African Americans from Juries (and subsequently Due Process or Equal Protection of the laws) can be held liable under the Civil Rights Law meant to protect from that very behavior.   Typically judicial liability ensues only when the act is outside of what the Ninth Circuit's *Beard v. Udall* calls "a judicial act" (i.e. an administrative act) however (as noted above), the US Supreme Court's *Pierson v. Ray* cautions:

> "a judge who excluded Negroes from juries [or like offenses to the Constitution] .... would be liable under the statute even if his actions were judicial." Importantly, the Ninth Circuit's *Beard v. Udall 648 F.2d 1264 (9th Cir. 1981)* makes clear "[I]f a judge connives with one of the parties to predetermine the outcome of a judicial proceeding, the other parties' expectations are frustrated. Id. Moreover, the court noted, an agreement by a judge to predetermine the outcome of a proceeding is "not a function normally performed by a judge."

Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying substantive, complaint and

**3 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*"when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim. An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

See also e.g.Wolfe v. Strankman, 392 F.3d 358, 367 (9th Cir. 2004) ("*complete relief is available in an action against Chief Justice George in his administrative capacity and Ms. Silva. We reverse the dismissal of Chief Justice George in his administrative capacity and Ms. Silva, and we remand to the district court for further proceedings.*")

2.      Mr. Austin acts in good faith, follows well settled and 2023 Supreme Court's precedent, and Georgetown school policy with this complaint as Georgetown continues to violate the Equal Protection Clause, Title VI of the Civil Rights Act of 1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21 to present. Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use of the precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr. Austin, *"implying inferiority in civil society"* originate from anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow segregationist who inspired the Nazi's Third Reich (*How the Nazis Were Inspired by Jim Crow | HISTORY; How American Racism Influenced Hitler | The New Yorker ; What America Taught the Nazis in the 1930s - The Atlantic; The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws - Holocaust Museum)*

for  which Georgetown admits it took active part as an institution: Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838. These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*). See attached.  Georgetown's precise derogatory stereotype usage is similar to defendant *Board of Education's* usage against plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)* whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts

(expressly promulgated as mandatory under Georgetown's policies), and not be treated in an inferior manner in civil society (creating Stigma) while doing so, in the context of higher education, whereas Georgetown violates *"....The words of the amendment,.[that].. contain ...the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) use of derogatory stereotypes is per se illegal in a. business, b. the entire contractual relationship (*i.e.* *"to make or enforce a contract"*), c. education (& d. other areas of society), because it *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens- according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making and 2. complaint procedures b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial *""stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist*

*presumptions], evaluating their thoughts and efforts -their very worth as citizens-according to a criterion barred to the Government by history and the Constitution."* .... *only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in Georgetown advertisement, etc.) "ergo" c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & under se illegal racist presumption, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights in both areas are respected, and exercised)]*.  Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing*

*Grutter foreswore….it engages in … offensive … demeaning [and derogatory]*
*assumption[s]."*

5.      Georgetown's facially discriminatory anti-Black conduct reflects the pattern
of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco*
*Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge
Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F.*
*Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's
colleague [Judge Haywood Gilliam](although the order cited above spelled his name
wrong) clerked for the [Legendary Judge Thelton Henderson](; .[Gilliam Responses](
[9-17-14.pdf](.  The highlighted pattern in *Johnson v. San Francisco Unified School*
*Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct
similar to Georgetown's toward Mr. Austin whereas a school district chooses to still
engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to
isolate, confine, or refuse to equally serve or contract with Black students, Black
Teachers, or Black Administrators in violation of Equal Protection Clause), despite
knowing *"More than seventeen years ago [in 1971], a unanimous decision of the*
*United States Supreme Court made it clear that racial discrimination in public*
*education violates the [US]Constitution. Today it is established beyond all question*
*that any law, ordinance or regulation of any governmental agency .. furthering such*
*discrimination violates the Constitution of the United States. The cases so holding*
*are legion. They have been handed down, not only by the Supreme Court of the*
*United States, but, … throughout the nation."*

5.      Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.*
Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr.*

*Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."* This *"adult rather than a childhood disease"* demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights* such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White Georgetown students]."*

## **Georgetown violates Mr. Austin's 1981 rights**

6.    Mr. Austin cites to world renown [Thelton E. Henderson](), for the 1981 legal standard.  Because legendary Judge [Henderson]() has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary [Judge Thelton Henderson](), who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a keynote

speech at his home in Berkeley, has extra credibility of analysis (provided his depth

of personal experience with racism as a Black man, despite his accomplishments),

his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE:
THELTON HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society.*")

7.      As an interesting aside, presiding Judge Judge Breyer's and Magistrate

Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

Questions for the record *"6…to faithfully and impartially apply the law in every*

*case, without regard to the type of matter or the identity of the parties … 7. …*

*treating every person who comes into the courtroom, whether they are litigants,*

*counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy.*

*The judge also must ensure that all parties in a case receive the opportunity to have*

*their arguments heard and fairly considered…The citizens of our country entrust*

*federal judges to dispense 'equal' justice under the law, and to decide cases by*

*applying controlling precedent to the facts of the cases before them, without regard to*

*any other considerations (including race)…"* also reflects the principle, and creed, of

*'Equal Opportunity'* which is not only central to the doctrine of equality as embodied

42 USC 1981, but which defendant Georgetown fundamentally, & egregiously,

violated (producing Mr. Austin's complaints) and violates in an ongoing manner.

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.      Mr. Austin is the person, admitted student, and offeree whose economic,
IP-publicity, property, & 42 USC 1981 rights to contract were violated by
Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the
process which deprived Mr. Austin's contract rights.   Mr. Austin is a high
performing, accomplished, highly recruited, and high potential admitted
Georgetown student who has 1981 right to contract, and Title VI Equal Protection
rights just like everyone else, and fully expects to be treated on the same basis as
Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to
attend, as well as its own promulgated mandatory policies, and instructions
demonstrates it knew better, but willfully, intentionally, intended to deprive Mr.
Austin's mandated written media contract, and failed to correct once Mr. Austin
made formal complaints, and excluded Mr. Austin's violating his Equal Protection
rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme
Court, and Georgetown itself, these are fundamental and valuable rights which are
being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.      Mr. Austin learned to perceive discriminatory animus, and embody "Equal
Opportunity" non-discriminatory service attitude, through experience.  There are
several ways to ascertain racial discriminatory animus.  Some of the ways
applicable here include a. observation of different policies applied for different racial
groups b. Admissions by the racial abusers or discriminator that they in fact
discriminated with disparate treatment or application of inferior or superior policies
to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or
Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or

their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service from the use of 'blind' or 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates) as well as how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.     Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

11.     When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: 1. with respect to their persons, as human beings, (and provided a head-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image,

and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

12.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.

Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.    Georgetown admits, *publicly,* that a student, or  *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")*" can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

14.    When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/**)  per

Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3. IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

15      Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as

all the previous steps in the process, because he is a Black Complainant 6. The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7. The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9. The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

16.    Moreover, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr.

Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites,  whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

17.    Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the

situation for Whites , whereas  defendant Georgetown deprived that opportunity for

Mr. Austin (and completely excluded him from this Equal Protection required

procedure, and policy) because he is Black 16. The opportunity, and right, for

corrective actions to be imposed on Respondents, where IDEAA shall monitor their

implementation (and additional legal action outside of campus is still able to be

pursued especially when the limits of internal corrective measures do not remedy

the violations by Respondents), whereas  defendant Georgetown deprived that

opportunity for Mr. Austin (and completely excluded him from this Equal Protection

required procedure, and policy) because he is Black.

18.     Mr. Austin had no complaints against him, he simply inquired, and

complained as to why Georgetown 1. Violated school policy 2. Violated his

Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission,*

*current or former employee or student, or third party"* similarly situated Whites, or

Non-Black males, they provided Whites a set of mandatory steps **(faculty**

**handbook.georgetown.edu/ section4/a/)**  per Georgetown written policy

***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal

Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

19.     As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a*

*"refusal to enter into … contract [on the same basis as Whites] is actionable under §*

*1981. In making this determination, a lower court should give a fair and natural*

*reading to the statutory phrase ` the same right[s] . . .[in "making, performance,*

*modification, and termination of contracts, and the enjoyment of all benefits,*

*privileges, terms, and conditions of the contractual relationship"], and should not*

*strain in an undue manner the language of § 1981…..*" Walker v. Contra Costa

County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in

*Walker v. Contra Costa County* Judge Henderson expounds on the elements, and

standards of proof, to survive Summary Judgment for a 1981 claim (at later stages

in the litigation process):

> *"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

20.    Mr. Austin 1. Is an African American or Black man who is  high achieving,

highly recruited, accomplished, high potential, and an admitted Georgetown

student (protected group[s]) 2. was & is qualified to make the contract (of sound

mind, admitted student, Georgetown took photo and sought to economically exploit

photo, and Georgetown already demonstrated it understood how to properly engage

in written contract when Mr. Austin deferred for a year to participate in Capital

Fellows, Senate Fellows Program *[with a written contract similarly required*] and

$400 consideration exchanged to solidify that contract) 3. Suffered adverse actions

(Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without

telling Mr. Austin, and when he confronted them on their violation still continued to

refuse to make a contract on the same basis as Whites because of Mr. Austin's race

or derogatory racial stereotypes presuming "inferiority" or "less worthy" by complet-

ely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to

contract remains open, and Mr. Austin has continued to follow up on the issue.

Further, per the fourth or fifth element, Whites, or non-Black admitted students,

under this school policy (and Constitutional requirement) were treated

demonstrably better, and Mr. Austin was treated demonstrably in an inferior

manner (see para. 11-19; see attached; dckt. 75)

21.    In addition to violating Mr. Austin's right to make media contract, as mandated

per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's

rights in existing contract per *"performance, modification, … and the enjoyment of*

*all benefits, privileges, terms, and conditions of the contractual relationship"* as well

as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so

when it completely excluded Mr. Austin on the basis of race, derogatory racial

stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from

essential campus services-procedures for *"Any applicant for employment or*

*admission, current or former employee or student, or third party"* that similarly

situated Whites, or Non-Black males, are provided via a set of mandatory steps

**(faculty handbook.georgetown.edu/ section4/a/)**  per Georgetown written

policy **"Procedures for Processing Grievances"** that *must* be done in accord with

Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC

1981.

22.      Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined

with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant

Georgetown's conduct is "blatantly" racist whereas similarly situated White, or

non-Black, student offerees are made offers by Georgetown, respecting their person,

and rights (economic and otherwise) the *"private offeror [who blatantly violates Civil*

*rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*).   The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.   However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed).  Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

### <u>Georgetown violates Mr. Austin's Equal Protection</u>

23. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School*

*District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

24.    Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's] twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-

presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the

contract offer process and 2. The IDEAA complaint process should be the same for

regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the*

*disfavored group as innately inferior and therefore as less worthy"—certainly may*

*confer Article III standing in discrimination cases."*

25.    Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290*

*(1998)* Georgetown's conduct provides for Equal Protection

*"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

26.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25,*

*2023)* when a student is experiencing a violation of school policy and reports that

conduct to the appropriate University body, especially when the violation was by

someone or something under University control, then it's a violation of Equal

Protection to deny that student investigatory, or enforcement, services as a victim,

or survivor, of the violation whereas Plaintiff

*"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;.Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## **Mr. Austin's other claims are substantive**

27.    Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3.

Georgetown induced contract formation with Mr. Austin as a student through

actual fraud, misstatements on its commitment to follow the law, misstatements

regarding its contract, misstatements regarding its own policies, and continues its

deceitful pattern in its ongoing pattern of *still* omitting material information after

admitting its violations of its own policy, contract, and the law. 4. Georgetown

breached its duties of care toward an admitted Black male student and is negligent

in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating

conduct and b. Managing, correcting, or controlling their illegal, Equal Protection,

policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to

Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully

harmful conduct it could have easily avoided, and by its own policies were

mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's

cases (including this one) are neither meritless, nor groundless, and in fact are

rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California

Supreme Court Jurisprudence (and standards for factual pleading).

> "The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
> -    **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

> "We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments)
> -    **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

## **Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata**

28.    It is well settled law per the Supreme Court that ongoing conduct, which

cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George

Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without

Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING*

*MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135]*

*Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is

the presumption).  The Notice terminated the case, its operative complaint, Mr.

Austin's First Amended Complaint **(FAC;**Dckt. 14)**,** without need of court order

upon receipt.   Plaintiff's notice is controlling under Rule 41 of FRCP without need

of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice').  Finding that it is

"beyond debate that a dismissal under Rule 41 is effective on filing, no court order is

required, the parties are left as though no action had been brought, the defendant

can't complain, and the district court lacks jurisdiction to do anything about it"  See

e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)

This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard

causes of action.  Mr. Austin voluntarily withdrew or voluntarily (dismissed)

because of documented Due Process, Equal Protection non-judicial act violations

(without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR]  under Rule

41 of FRCP without need of Judicial Order.  Under Supreme Court's *Cooter Gel,*

provided these facts, *Defendant's motion shouldn't even be considered.*

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III,
Supreme Court recognized, well settled, discrete adverse, new, legal harms

29.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e.

Civ. Code 3344, privacy), nor did he refile the same exact case which causes of

action terminated with the 7.14.21 judgment-disposition per lack of diversity

jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown

University to an admitted Black male student *after 7.15.21* to the present.  Neither

Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action

(outside of context setting up for the current, and ongoing, causes of action *after*

disposition of the previous case).  Mr. Austin has never been disciplined or in any

trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward).  See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts,Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law (Alternatively, it is the right thing to do).  Thus, Mr. Austin should not be sanctioned.

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin          11.13.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**TOA - RULE 59 Motion on Judge CRB's Order**

Good Faith Complaint, Substantive Issues, Facts, Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do). **AMENDED (FAC) COMPLAINT**

**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note: Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons. As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu, generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus")* included 50+ outside expert 'witnesses' including ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time. See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*) Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

## Table of Authorities

1.   *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) ("Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing .. is … 28 days from entry of the judgment")

2.   *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times  "when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.   An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

3.   14th Amend. (Equal Protection Clause); Title VI of the Civil Rights Act of 1964, 42 USC 1981, FERPA, etc.

4.   *Brown v. Board of Education, 347 U.S. 483, 494 (1954),*

5.   *How the Nazis Were Inspired by Jim Crow | HISTORY*;

6.   *How American Racism Influenced Hitler | The New Yorker* ;

7.   *What America Taught the Nazis in the 1930s - The Atlantic*;

8.   *The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -Holocaust Museum)*

9.   Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*).

10.   *Brown v. Board of Education, 347 U.S. 483, 494 (1954)  "....The words of the amendment,.[that].. contain …the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

11.   Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens- according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."*

12.   *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

13.    *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)

14.    *NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge

   Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.

15.    *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

16.    *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)*"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."*

17.    *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African-American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White  Georgetown students]."*

## <u>Georgetown violates Mr. Austin's 1981 rights</u>

18.    Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal standard.  Because legendary Judge Henderson has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a

keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate. California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

19.    As an interesting aside, presiding Judge Judge Breyer's and Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

20.    Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6...to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

21.    (dckt. 76).

22.    (dckt. 80).

23.    (dckt. 81).

24.    (dckt. 79).

25.    *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020), …"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

26.    Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr.

**4 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.  Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).

27.  Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

28.   Georgetown admits, *publicly,* that a student, or  *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")*" can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook. georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

29.  When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook. georgetown.edu/ section4/a/)**  per Georgetown written policy **"Procedures for Processing Grievances"** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or

non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3. IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

30. Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant 6. The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7. The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9. The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

31. Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive

IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

32.    Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14. The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 15. The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

33.    Mr. Austin had no complaints against him, he simply inquired, and

complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

34.  As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

*"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

35.  dckt. 75)

36.  **(faculty handbook.georgetown.edu/ section4/a/)**

37.  Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the *"private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):  Georgetown is a private offeror  Mr. Austin is a private offeree,

admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*). The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.  However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed). Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

## Georgetown violates Mr. Austin's Equal Protection

38. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

39. Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's)*

*twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

40.  Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

41.  Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that*

*required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

<u>**Mr. Austin's other claims are substantive**</u>

42. **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")

43. **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)  Cited 304 times**

"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"

<u>**Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata**</u>

44. It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.  **Relevant Background:** On 4/05/2024, <u>52</u>, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without Prejudice) of this entire, unrelated case, <u>137</u> (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption).  The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint (**<u>FAC</u>;**Dckt. <u>14</u>)**,** without need of court order upon receipt.  Plaintiff's notice is controlling under <u>Rule 41</u> of FRCP without need of Judicial Order per <u>Rule 41</u> of FRCP(A)(1)(A)(i - 'notice').

45. Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it"  See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)  This is a new, unrelated, unheard case, Dckt. <u>137</u> with new defendants, never heard causes of action. Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case <u>4:24-cv-00260-CRB [DMR]</u> under Rule <u>41 of FRCP</u> without need of Judicial Order.  Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

<u>Mr. Austin's cases are not repetitive refilings, but reflect independent Article III,
Supreme Court recognized, well settled, discrete adverse, new, legal harms</u>

46.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e.
Civ. Code 3344, privacy), nor did he refile the same exact case which causes of
action terminated with the 7.14.21 judgment-disposition per lack of diversity
jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms
of ongoing discriminatory conduct never before plead, nor experienced, by
Georgetown University to an admitted Black male student *after 7.15.21* to
the present.

47.    Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of
this action (outside of context setting up for the current, and ongoing, causes
of action *after* disposition of the previous case).  Mr. Austin has never been
disciplined or in any trouble with any institution of higher education, *ever*,
has straight A's the last nine semesters, is a good student, good person, and
good citizen (attentive, conscientious and straightforward).  See Dckt. 14;
FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981
rights to contract were violated in the following picture (*page 4*), and the
process which deprived Mr. Austin's contract rights.

48.    Per US Supreme Court's *General Building Contractors Assn., Inc. v.
Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
standards of demonstrated racial animus under sec. 1981, Georgetown
purposefully, and willfully, deprived Mr. Austin's rights to contract and
engaged in a *"blatant deprivation of civil rights such as where a private
offeror [in this case Georgetown] refuses to extend to [an African- American, in
this case Mr. Austin], because he is an [African-American], the same
opportunity to enter into contracts he extends to White offerees [in this case
non-Black, or White admitted students]."*

49.    Mr. Austin's complaint is in Good Faith, with Substantive Issues,
Facts,Direct evidence per 2023 Supreme Court, facially discriminatory
ongoing conduct from 7.15.21 to present (Which has not had opportunity to be
heard) and is not vexatious per Supreme Court's *Cootergel* or any other
controlling law (Alternatively, it is the right thing to do).  Thus, Mr. Austin
should not be sanctioned.

**Signed, Under Penalty of Perjury.**

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United
States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross
referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin          11.11.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**Proposed Order: RULE 59 Motion on Judge CRB's Order**

Good Faith Complaint, Substantive Issues, Facts,
Direct evidence per 2023 Supreme Court, facially
discriminatory ongoing conduct from 7.15.21 to
present (Which has not had opportunity to be heard)
is not vexatious per Supreme Court's *Cootergel* or
any other controlling law (it is the right thing to do).
**AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI,**
**Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*) included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

Proposed Order:  Rule 59 Motion per Judge Breyer's Order on Defendant's Motion

1.    The Court grants Mr. Austin's Rule 59 Motion to Amend, Alter or Reconsider

Judge Breyer's order regarding Defendant's Sanctions Motion under the Supreme

Court's *Banister v. Davis, 140 S. Ct. 1698, 1703 (2020)* which *"allows a litigant to*

*file a "motion to alter or amend a judgment." [in] ... 28 days from entry of the*

*judgment"*  Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384*

*(1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be sanctioned, *at all*, as he properly

withdrew, or voluntarily dismissed the underlying substantive, complaint and

"*when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a*

*collateral proceeding to examine whether the complaint is well grounded will stretch*

*out the matter long beyond the time in which either the plaintiff or the defendant*

*would otherwise want to litigate the merits of the claim.   An interpretation that can*

*only have the unfortunate consequences of encouraging the filing of sanction motions*

*and discouraging voluntary dismissals cannot be a sensible interpretation of Rules*

*that are designed "to secure the just, speedy, and inexpensive determination of every action."*

*Fed. Rule Civ. Proc. 1"*

2.    Mr. Austin demonstrates that he acts in good faith, follows well settled and

2023 Supreme Court's precedent, as well as Georgetown's own school policy with

this complaint whereas Mr. Austin documents, substantiates, and pleads that

Georgetown continues to violate the Equal Protection Clause, Title VI of the Civil

Rights Act of 1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21

to present.  Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),*

Georgetown's, use of the precise *"less worthy"* or *"inferior"* derogatory racist

stereotypes, against Mr. Austin, *"implying inferiority in civil society"* originate from

anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the

staunchest Jim Crow segregationist who inspired the Nazi's Third Reich *(How the*

*Nazis Were Inspired by Jim Crow | HISTORY; How American Racism Influenced*

*Hitler | The New Yorker ; What America Taught the Nazis in the 1930s - The*

*Atlantic; The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -*

*Holocaust Museum)*

Georgetown admits it took active part, in the horrific crimes of enslavement of

Black Peoples, as part of the Black Holocaust, as an institution: Slavery archive.

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838. These archival materials relate to the sale of 272 men, women, and children*

*by Rev. Thomas Mulledy in 1838*.). See attached. Georgetown's precise derogatory

stereotype usage is similar to defendant *Board of Education's* usage against

plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*

whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts

(expressly promulgated as mandatory under Georgetown's policies), and not be

treated in an inferior manner in civil society (creating Stigma) while doing so, in the

context of higher education, whereas Georgetown violates *"....The words of the*

*amendment,.[that].. contain ...the right to exemption..from legal discriminations,*

*implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th,

14th, 15th Amend.).

3.    Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023)* use of

derogatory stereotypes is <u>per se illegal</u> in a. business, b. the entire contractual

relationship (*i.e. "to make or enforce a contract"*), c. education (& d. other areas of

society), because it *"furthers "stereotypes that treat individuals as the product of*

*their race, evaluating their thoughts and efforts -their very worth as Citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 ....Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [<u>co-extensive with sec. 1981</u>]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making with Mr. Austin and 2. complaint procedures with Mr. Austin b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial *""stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." …. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in*

*Georgetown advertisement, etc.) "ergo" c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & per se illegal racist presumption, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights, as Whites, in both areas are respected, and exercised)].* Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " less worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.     Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still

engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to

isolate, confine, or refuse to equally serve or contract with Black students, Black

Teachers, or Black Administrators in violation of Equal Protection Clause), despite

knowing *"More than seventeen years ago [in 1971], a unanimous decision of the*

*United States Supreme Court made it clear that racial discrimination in public*

*education violates the [US]Constitution. Today it is established beyond all question*

*that any law, ordinance or regulation of any governmental agency .. furthering such*

*discrimination violates the Constitution of the United States. The cases so holding*

*are legion. They have been handed down, not only by the Supreme Court of the*

*United States, but, … throughout the nation."*

5.      Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.*

Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr.*

*Austin] fosters false concepts of racial [White] superiority and of racial [Black]*

*inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather*

*than a childhood disease."* This *"adult rather than a childhood disease"*

demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is

clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building*

*Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of*

*African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant*

*deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*]*

*refuses to extend to [an African- American, in this case Mr. Austin], because he is an*

*[African-American], the same opportunity to enter into contracts he extends to White*

*offerees [in this case non-Black, or White* Georgetown *students]."*

## **Georgetown violates Mr. Austin's 1981 rights**

6.      Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal

standard.  Because legendary Judge Henderson has a particularly unique insight to

1981's operation, and personal understanding of how anti-Black racial animus

operates regardless of status or position in society (*as he experienced both subtle,*

*and not so subtle forms of anti-Black discriminatory animus even after his ascension*

*and success*) his analysis is particularly valuable under these facts.  Mr. Austin was

blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote

speakers to raise school funds for students in need (Mr. Austin had no personal gain

in the efforts, and was happy to share and help others):  Judge Henderson was

impressed after Mr. Austin's speech, and thereafter invited Mr. Austin back to his

home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton

Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin

gave a keynote speech at his home in Berkeley, has extra credibility of analysis

(provided his depth of personal experience with racism as a Black man, despite his

accomplishments), his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE:

THELTON HENDERSON'S AMERICAN JOURNEY

        ("*He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when*
        *Medgar Evers was assassinated and when four little girls were killed in the Birmingham*
        *church bombing. In his role at the Justice Department, Henderson embodied the tension*
        *described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

7.      As an interesting aside, presiding Judge Judge Breyer's and Magistrate

Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

Questions for the record *"6...to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.      Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the process which deprived Mr. Austin's contract rights.   Mr. Austin is a high performing, accomplished, highly recruited, and high potential admitted Georgetown student who has 1981 right to contract, and Title VI Equal Protection rights just like everyone else, and fully expects to be treated on the same basis as Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to attend, as well as its own promulgated mandatory policies, and instructions demonstrates it knew better, but willfully, intentionally, intended to deprive Mr. Austin's mandated written media contract, and failed to correct once Mr. Austin

**8 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

made formal complaints, and excluded Mr. Austin, violating his Equal Protection

rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme

Court, and Georgetown itself, these are fundamental and valuable rights which are

being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.      Mr. Austin learned to perceive discriminatory animus, and embody "Equal

Opportunity" non-discriminatory service attitude, through experience.   There are

several ways to ascertain racial discriminatory animus.  Some of the ways

applicable here include a. observation of different policies applied for different racial

groups b. Admissions by the racial abusers or discriminator that they in fact

discriminated with disparate treatment or application of inferior or superior policies

to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or

Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or

their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the

Constitution) d. Admitted use of per se illegal segregationist, racial caste like,

tactics that block or refuse to serve (in violation of 1981, and Equal Protection

under Civil Rights Act 1964, Title VI, in an education context) certain persons based

on race, or derogatory racial stereotypes and several other ways.   Mr. Austin

learned the value of treating everyone equally well, non-discriminatory service,

from the use of 'volunteer' testers like DOJ or HUD uses for housing discrimination

or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the

quality of service (including non-discriminatory mandates) as well as how to

proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.      Per US Supreme Court's *General Building Contractors Assn., Inc. v.*

*Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S.*

*Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

11.    When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: 1. with respect to their persons, as human beings, (and provided a heads-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not

acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits,

privileges, rights provided in a contractual relationship.

12.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner

because he is a Black male admitted student compared to similarly situated White,

or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization

requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose,

c. notice of business use, d. presentation of written contractual agreement to

consent to business use, e. with General Counsel approval of form f. signature

consenting *prior* to use.  Per Georgetown, written authorization requires a written

contract between the student and those utilizing the IP-Publicity Rights-Photo

(including Georgetown themselves) for photos taken prior to commercial use.

Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's

right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even

explains why they violated his rights.   Georgetown's first acknowledgement of

business use was *after* Georgetown's exploitation without consent (*after* lying to Mr.

Austin in the first place denying that they stole some of his rights without asking,

or attempting to engage in making a contact).    Georgetown admits there was No

offer, acceptance, consideration, or signature (per required written authorization),

and thus no contract was made with Mr. Austin because he is Black, in the same

way as similarly situated Whites, with George- town's 'blatant' violations of Mr.

Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.     Georgetown admits, *publicly,* that a student, or  *"Any applicant for*

*employment or admission, current or former employee or student, or third party* *(hereinafter referred to as "Complainant")*" can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

14.     When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3.  IDEAA staff provides a general understanding of

the relevant policy and this grievance procedure as a normal part of intake for

Whites whereas they refuse to answer any questions about relevant policy or

procedure, and fail to provide any relevant information to Mr. Austin because he is

Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to

proceed either with an Informal Resolution or an Investigation of the responded for

Whites, whereas they failed to provide Mr. Austin with either opportunity, and

failed at the very beginning to acknowledge his humanity (by refusing to even

acknowledge his complaint to begin the process) because he is Black.

15      Further, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are

provided: 5. The opportunity at any time, even if informal resolution was initially

chosen, to request in writing to alternatively proceed to Investigation for Whites,

whereas this opportunity was deprived and not provided for Mr. Austin, as well as

all the previous steps in the process, because he is a Black Complainant  6.  The

opportunity to initiate a formal Complaint by providing a written signed statement

(via email) for Whites whereas they deprived this opportunity for Mr. Austin (and

all other steps because he is Black) 7.  The opportunity to provide any supporting

documentation, or evidence, to substantiate a formal Complaint (via email) for

Whites whereas they deprived this opportunity for Mr. Austin (and all other steps

because he is Black) 8. The opportunity to receive a written response from the

Respondent in 20 days or less after filing complaint, if they have one, as to why they

conducted themselves in that manner, violating the law or policy, for Whites,

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black

9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10

days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

16.     Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

17.    Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

18.    Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

19.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005).  Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

> "E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."

20.     Mr. Austin 1. Is an African American or Black man who is  high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound

mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required]* and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by complet-ely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue. Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (see para. 11-19; see attached; dckt. 75)

21.   In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly

situated Whites, or Non-Black males, are provided via a set of mandatory steps

(**faculty handbook.georgetown.edu/ section4/a/**)  per Georgetown written

policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with

Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC

1981.

22.    Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined

with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant

Georgetown's conduct is "blatantly" racist whereas similarly situated White, or

non-Black, student offerees are made offers by Georgetown, respecting their person,

and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil*

*rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts."*

Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016

(2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted

student (*who expects to be treated on the same basis as White, non-Black, admitted*

*students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th,*

*15th Amendments, and Civil Rights of 1964*).   The only requirements for making a

Georgetown media contract, as an admitted student, is to a. Be an admitted student

on campus, & b. Have an organization desire to use your image, or likeness, to

market or economically exploit their product-service for their benefit.  Unbeknownst

to Mr. Austin, Georgetown went out of its way to take and use his image and

likeness while he was an admitted student on campus to market or economically

exploit their product-service for their benefit, and thus fulfills all requirements "to

make" a contract.   However, despite meeting all requirements, and following up to

make a contract, get an explanation as to why they violated the law, and school

policy in the first place, Georgetow illegally refuses to make a contract with Mr.

Austin because of his race, or derogatory racial stereotypes (as Georgetown

explicitly admits to Mr. Austin in both word, and deed).  Georgetown violated

existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights

when it completely excluded Mr. Austin from essential campus IDEAA

services-procedures, illegally because Mr. Austin is a Black man.

## <u>Georgetown violates Mr. Austin's Equal Protection</u>

23.    Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494

(1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School

District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used

Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously

violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's

Title VI Equal Protection rights when it completely excluded Mr. Austin from

essential campus IDEAA to treat an admitted student, and Black man, in a

derogatory manner to "deny, restrict, separate, segregate (in application of policy),"

and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a

Black man.

24.    Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits,

explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming

derogatory stereotype to deprive making a contract*), or b. Treating Whites, or

non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract*) is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

25.    Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a*

*…. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause".*

26.     Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## Mr. Austin's other claims are substantive

27.    Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3. Georgetown induced contract formation with Mr. Austin as a student through actual fraud, misstatements on its commitment to follow the law, misstatements regarding its contract, misstatements regarding its own policies, and continues its deceitful pattern in its ongoing pattern of *still* omitting material information after admitting its violations of its own policy, contract, and the law. 4. Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's cases (including this one) are neither meritless, nor groundless, and in fact are rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California Supreme Court Jurisprudence (and standards for factual pleading).

"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
-    **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
-    **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

## Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata

28.    It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal (Without Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption). The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint **(FAC;**Dckt. 14**),** without need of court order upon receipt. Plaintiff's notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice'). Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard causes of action. Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR] under Rule 41 of FRCP without need of Judicial Order. Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

<u>Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete adverse, new, legal harms</u>
29.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction. Instead, Mr. Austin filed a new case, with new Defendant harms of

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present. Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case). Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward). See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*See attached*), and the process which deprived Mr. Austin's contract rights.   Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

30.    Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts, Direct evidence, per 2023 Supreme Court, and is experiencing facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law. Alternatively, this action is the right thing to do. Thus, Mr. Austin should not be sanctioned, and the Court grants Mr. Austin's Rule 59 Motion

to Amend, Alter or Reconsider Judge Breyer's order regarding Defendant's

Sanctions Motion under the Supreme Court's *Banister v. Davis, 140 S. Ct. 1698,*

*1703 (2020)* which *"allows a litigant to file a "motion to alter or amend a judgment."*

*[in] … 28 days from entry of the judgment"*  Per the Supreme Court's *Cooter Gell v.*

*Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be

sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying

substantive, complaint and *"when a plaintiff has voluntarily dismissed a complaint*

*pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint*

*is well grounded will stretch out the matter long beyond the time in which either the*

*plaintiff or the defendant would otherwise want to litigate the merits of the claim.*

*An interpretation that can only have the unfortunate consequences of encouraging*

*the filing of sanction motions and discouraging voluntary dismissals cannot be a*

*sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive*

*determination of every action." Fed. Rule Civ. Proc. 1"*  the Court grants Mr. Austin's

Rule 59 Motion.



**Judge Charles Breyer**            _____

**Date**                           _____