Case No. **24-6943**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――――――――――――――――

GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: 53-0196603*)

―――――――――――――――――――――――

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

―――――――――――――――――――――――

**MR. AUSTIN'S (APPELLANT'S) EXCERPTS OF RECORD
VOLUME 4 of 9**

―――――――――――――――――――――――

Mr. George Jarvis Austin,

Plaintiff-Appellant (Self-represented)

2107 Montauban Ct., Stockton, CA

209.915.6304,

gaustin07@berkeley.edu

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**TOA - RULE 59 Motion on Judge CRB's Order**

Good Faith Complaint, Substantive Issues, Facts,
Direct evidence per 2023 Supreme Court, facially
discriminatory ongoing conduct from 7.15.21 to
present (Which has not had opportunity to be heard)
is not vexatious per Supreme Court's *Cootergel* or
any other controlling law (it is the right thing to do).
**AMENDED (FAC) COMPLAINT**
**In Honor of the** Civil Rights Act of 1964,Title VI,
**Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*) included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

## Table of Authorities

1.  *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) ("Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing .. is … 28 days from entry of the judgment")

2.  *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times  "when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.   An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

3.  14th Amend. (Equal Protection Clause); Title VI of the Civil Rights Act of 1964, 42 USC 1981, FERPA, etc.

4.  *Brown v. Board of Education, 347 U.S. 483, 494 (1954),*

5.  *How the Nazis Were Inspired by Jim Crow | HISTORY;*

6.  *How American Racism Influenced Hitler | The New Yorker ;*

7.  *What America Taught the Nazis in the 1930s - The Atlantic;*

8.  *The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -Holocaust Museum)*

9.  Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*).

10. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)  "....The words of the amendment,.[that].. contain …the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

11. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens- according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."*

12. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

**2 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

13. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)

14. *NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge

   Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.

15. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

16. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)*"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."*

17. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African-American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White  Georgetown students]."*

## **Georgetown violates Mr. Austin's 1981 rights**

18. Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal standard.  Because legendary Judge Henderson has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a

keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate. California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY

(" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

19.   As an interesting aside, presiding Judge Judge Breyer's and Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

20.   Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)…"* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/Gilliam%20Responses%209-17-14.pdf

21.   (dckt. 76).

22.   (dckt. 80).

23.   (dckt. 81).

24.   (dckt. 79).

25.   *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020), …"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

26.   Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr.

**4 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use. Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).

27. Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

28. Georgetown admits, *publicly,* that a student, or *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")"* can make a complaint via email or in person, and is encouraged to do so; https://facultyhandbook. georgetown.edu/section4/a/ Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

29. When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook. georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or

**5 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3. IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

30.  Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant 6. The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7. The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9. The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

31  Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

32.     Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14. The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 15. The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

33.     Mr. Austin had no complaints against him, he simply inquired, and

**7 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

34. As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase `the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

*"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

35. dckt. 75)

36. **(faculty handbook.georgetown.edu/ section4/a/)**

37. Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the *"private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):  Georgetown is a private offeror  Mr. Austin is a private offeree,

admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*). The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.   However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed). Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

### Georgetown violates Mr. Austin's Equal Protection

38.   Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

39.   Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's)*

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

40.     Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

41.     Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that*

**10 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## Mr. Austin's other claims are substantive

42. **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**
"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")

43. **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986) Cited 304 times**
"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made ... to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"

## Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata

44. It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata. **Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal (Without Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption). The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint (**FAC;**Dckt. 14)**,** without need of court order upon receipt. Plaintiff's notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice').

45. Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard causes of action. Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR] under Rule 41 of FRCP without need of Judicial Order. Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

11 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete adverse, new, legal harms

46.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present.

47.    Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case).  Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward).  See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.

48.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

49.    Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts,Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law (Alternatively, it is the right thing to do).  Thus, Mr. Austin should not be sanctioned.

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin        11.11.24**

**12 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**Proposed Order: RULE 59 Motion on Judge CRB's Order**

Good Faith Complaint, Substantive Issues, Facts, Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do). **AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus")* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

<u>Proposed Order:  Rule 59 Motion per Judge Breyer's Order on Defendant's Motion</u>

1.    The Court grants Mr. Austin's Rule 59 Motion to Amend, Alter or Reconsider Judge Breyer's order regarding Defendant's Sanctions Motion under the Supreme Court's *Banister v. Davis, 140 S. Ct. 1698, 1703 (2020)* which *"allows a litigant to file a "motion to alter or amend a judgment." [in] … 28 days from entry of the judgment"*  Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying substantive, complaint and *"when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.   An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

2.    Mr. Austin demonstrates that he acts in good faith, follows well settled and 2023 Supreme Court's precedent, as well as Georgetown's own school policy with this complaint whereas Mr. Austin documents, substantiates, and pleads that Georgetown continues to violate the Equal Protection Clause, Title VI of the Civil Rights Act of 1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21 to present.  Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use of the precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr. Austin, *"implying inferiority in civil society"* originate from

**2 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the

staunchest Jim Crow segregationist who inspired the Nazi's Third Reich *(How the*

*Nazis Were Inspired by Jim Crow | HISTORY;   How American Racism Influenced*

*Hitler | The New Yorker ; What America Taught the Nazis in the 1930s - The*

*Atlantic;       The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -*

*Holocaust Museum)*

Georgetown admits it took active part, in the horrific crimes of enslavement of

Black Peoples, as part of the Black Holocaust, as an institution: Slavery archive.

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838.  These archival materials relate to the sale of 272 men, women, and children*

*by Rev. Thomas Mulledy in 1838.*).  See attached.  Georgetown's precise derogatory

stereotype usage is similar to defendant *Board of Education's* usage against

plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*

whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts

(expressly promulgated as mandatory under Georgetown's policies), and not be

treated in an inferior manner in civil society (creating Stigma) while doing so, in the

context of higher education, whereas Georgetown violates *"....The words of the*

*amendment,.[that].. contain …the right to exemption..from legal discriminations,*

*implying inferiority in civil society….*" (referring to Civil Rights Amendments 13th,

14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023)* use of

derogatory stereotypes is per se illegal in a. business, b. the entire contractual

relationship (*i.e. "to make or enforce a contract*), c. education (& d. other areas of

society), because it *"furthers "stereotypes that treat individuals as the product of*

*their race, evaluating their thoughts and efforts -their very worth as Citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [<u>co-extensive with sec. 1981</u>]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making with Mr. Austin and 2. complaint procedures with Mr. Austin b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial "*"stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." …. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in*

*Georgetown advertisement, etc.)* "*ergo*" *c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & per se illegal racist presumption, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights, as Whites, in both areas are respected, and exercised)*]. Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023):* "*Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " less worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.     Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still

**5 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

5.    Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."* This *"adult rather than a childhood disease"* demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* <u>prohibits the *"blatant deprivation of Civil Rights*</u> such as where a private offeror [in this case* Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White  Georgetown students]."*

## <u>Georgetown violates Mr. Austin's 1981 rights</u>

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

6.     Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal standard.  Because legendary Judge Henderson has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after Mr. Austin's speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society."*")

7.     As an interesting aside, presiding Judge Judge Breyer's and Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

**7 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Questions for the record *"6...to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties ... 7. ... treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered...The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.      Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the process which deprived Mr. Austin's contract rights.   Mr. Austin is a high performing, accomplished, highly recruited, and high potential admitted Georgetown student who has 1981 right to contract, and Title VI Equal Protection rights just like everyone else, and fully expects to be treated on the same basis as Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to attend, as well as its own promulgated mandatory policies, and instructions demonstrates it knew better, but willfully, intentionally, intended to deprive Mr. Austin's mandated written media contract, and failed to correct once Mr. Austin

**8 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

made formal complaints, and excluded Mr. Austin, violating his Equal Protection rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.    Mr. Austin learned to perceive discriminatory animus, and embody "Equal Opportunity" non-discriminatory service attitude, through experience.   There are several ways to ascertain racial discriminatory animus.   Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service, from the use of 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates) as well as how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S.*

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981,
Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and
engaged in a *"blatant deprivation of civil rights such as where a private offeror [in
this case Georgetown] refuses to extend to [an African- American, in this case Mr.
Austin], because he is an [African-American], the same opportunity to enter into
contracts he extends to White offerees [in this case White admitted students]."*

11.     When Defendant Georgetown made White, or Non-Black male, students
contract offers, they provided Whites: 1. with respect to their persons, as human
beings, (and provided a heads-up, or forewarning, that Georgetown desired to take a
photo of them and use it for commercial, marketing, purposes), whereas they
disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted,
and defrauded out of economic contract rights, or even knowledge that his image,
and likeness, was being used for commercial-marketing purposes because he is
Black 2. knowledge of what the photo was used for (and where it may be sent for
marketing purposes) for Whites, but hid knowledge, and fact photo was being used
at all (after already stealing rights from him) for Mr. Austin because he is Black 3.
Pre-approval of use of the photo by the non-Black male, or White students whereas
they didn't even think to ask Mr. Austin in disrespect of his overall person, and
rights to not give pre-approval because he is Black 4. An opportunity to accept or
decline the offer itself for Whites, whereas they stole the opportunity to make his
own choice, decline or accept, after already stealing economic-IP-rights of publicity
from Mr. Austin because he is Black 5. An opportunity to review the written
contract offer before making the decision 6. An opportunity to agree to the terms of
the contract offer 7. An opportunity to provide a counteroffer if terms were not

acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits,

privileges, rights provided in a contractual relationship.

12.      Georgetown willfully chose to deprive Mr. Austin's rights in this manner

because he is a Black male admitted student compared to similarly situated White,

or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization

requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose,

c. notice of business use, d. presentation of written contractual agreement to

consent to business use, e. with General Counsel approval of form f. signature

consenting *prior* to use.  Per Georgetown, written authorization requires a written

contract between the student and those utilizing the IP-Publicity Rights-Photo

(including Georgetown themselves) for photos taken prior to commercial use.

Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's

right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even

explains why they violated his rights.   Georgetown's first acknowledgement of

business use was *after* Georgetown's exploitation without consent (*after* lying to Mr.

Austin in the first place denying that they stole some of his rights without asking,

or attempting to engage in making a contact).   Georgetown admits there was No

offer, acceptance, consideration, or signature (per required written authorization),

and thus no contract was made with Mr. Austin because he is Black, in the same

way as similarly situated Whites, with George- town's 'blatant' violations of Mr.

Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.      Georgetown admits, *publicly,* that a student, or  *"Any applicant for*

**11 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*employment or admission, current or former employee or student, or third party*

*(hereinafter referred to as "Complainant")*" can make a complaint via email or in

person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/**

Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin

did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981,

a set of mandatory steps *must* be done by IDEAA to avoid violating its own

Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook.**

**georgetown.edu/section4/a/**

14.     When Defendant Georgetown receives a complaint via email made by *"Any*

*applicant for employment or admission, current or former employee or student, or*

*third party"* similarly situated Whites, or Non-Black males, they provided Whites a

set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/)**  per

Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be

done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI)

coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement

of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's

IDEAA needs more information to proceed through the Complaint process, whereas

they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is

Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black

males, but not only did not schedule an intake meeting for Mr. Austin, but failed to

even acknowledge the first step of complaint because Mr. Austin is Black

(demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any*

*applicant for employment or admission, current or former employee or student, or*

*third party"* or human being) 3.  IDEAA staff provides a general understanding of

**12 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

15    Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant  6. The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10

**13 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

16.    Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

**14 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

17.    Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

18.    Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

19.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005).  Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

> "E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse ..  action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."

20.     Mr. Austin 1. Is an African American or Black man who is  high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound

EoR - 676 of 2347

mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required]* and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by complet-ely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue. Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (see para. 11-19; see attached; dckt. 75)

21.   In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly

**17 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

situated Whites, or Non-Black males, are provided via a set of mandatory steps

(**faculty handbook.georgetown.edu/ section4/a/**)  per Georgetown written

policy **"Procedures for Processing Grievances"** that *must* be done in accord with

Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC

1981.

22.    Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined

with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant

Georgetown's conduct is "blatantly" racist whereas similarly situated White, or

non-Black, student offerees are made offers by Georgetown, respecting their person,

and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil*

*rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts.*"

Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016

(2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted

student (*who expects to be treated on the same basis as White, non-Black, admitted*

*students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th,*

*15th Amendments, and Civil Rights of 1964*).   The only requirements for making a

Georgetown media contract, as an admitted student, is to a. Be an admitted student

on campus, & b. Have an organization desire to use your image, or likeness, to

market or economically exploit their product-service for their benefit.  Unbeknownst

to Mr. Austin, Georgetown went out of its way to take and use his image and

likeness while he was an admitted student on campus to market or economically

exploit their product-service for their benefit, and thus fulfills all requirements "to

**18 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

make" a contract.   However, despite meeting all requirements, and following up to

make a contract, get an explanation as to why they violated the law, and school

policy in the first place, Georgetow illegally refuses to make a contract with Mr.

Austin because of his race, or derogatory racial stereotypes (as Georgetown

explicitly admits to Mr. Austin in both word, and deed).  Georgetown violated

existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights

when it completely excluded Mr. Austin from essential campus IDEAA

services-procedures, illegally because Mr. Austin is a Black man.

### <u>Georgetown violates Mr. Austin's Equal Protection</u>

23.    Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494

(1954),* 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School

District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used

Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously

violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's

Title VI Equal Protection rights when it completely excluded Mr. Austin from

essential campus IDEAA to treat an admitted student, and Black man, in a

derogatory manner to "deny, restrict, separate, segregate (in application of policy),"

and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a

Black man.

24.    Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits,

explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming

derogatory stereotype to deprive making a contract*), or b. Treating Whites, or

non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract*) is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

25.    Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a*

**20 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*…. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

26.     Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## Mr. Austin's other claims are substantive

**21 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

27.    Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3. Georgetown induced contract formation with Mr. Austin as a student through actual fraud, misstatements on its commitment to follow the law, misstatements regarding its contract, misstatements regarding its own policies, and continues its deceitful pattern in its ongoing pattern of *still* omitting material information after admitting its violations of its own policy, contract, and the law. 4. Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's cases (including this one) are neither meritless, nor groundless, and in fact are rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California Supreme Court Jurisprudence (and standards for factual pleading).

> "The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
> -    **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

> "We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made ... to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
> -    **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

## **Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata**

28.    It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**22 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

**Relevant Background:** On 4/05/2024, [52], Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without Prejudice) of this entire, unrelated case, [137] (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption).  The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint **(FAC;**Dckt. [14]**),** without need of court order upon receipt.   Plaintiff's notice is controlling under [Rule 41] of FRCP without need of Judicial Order per [Rule 41] of FRCP(A)(1)(A)(i - 'notice').  Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it"  See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) This is a new, unrelated, unheard case, Dckt. [137] with new defendants, never heard causes of action.  Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case [4:24-cv-00260-CRB [DMR]] under Rule [41 of FRCP] without need of Judicial Order.  Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete adverse, new, legal harms
29.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present. Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case). Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward). See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*See attached*), and the process which deprived Mr. Austin's contract rights.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

30.    Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts, Direct evidence, per 2023 Supreme Court, and is experiencing facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law. Alternatively, this action is the right thing to do. Thus, Mr. Austin should not be sanctioned, and the Court grants Mr. Austin's Rule 59 Motion

to Amend, Alter or Reconsider Judge Breyer's order regarding Defendant's

Sanctions Motion under the Supreme Court's *Banister v. Davis, 140 S. Ct. 1698,*

*1703 (2020)* which *"allows a litigant to file a "motion to alter or amend a judgment."*

*[in] … 28 days from entry of the judgment"*   Per the Supreme Court's *Cooter Gell v.*

*Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be

sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying

substantive, complaint and *"when a plaintiff has voluntarily dismissed a complaint*

*pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint*

*is well grounded will stretch out the matter long beyond the time in which either the*

*plaintiff or the defendant would otherwise want to litigate the merits of the claim.*

*An interpretation that can only have the unfortunate consequences of encouraging*

*the filing of sanction motions and discouraging voluntary dismissals cannot be a*

*sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive*

*determination of every action." Fed. Rule Civ. Proc. 1"*  the Court grants Mr. Austin's

Rule 59 Motion.


**Judge Charles Breyer**    _____

**Date**    _____

**25 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**Motion for Judicial Notice of Settlement**

**per US Dept. of Education Owes Georgetown nothing**

**In Honor of the Civil Rights Act of 1964,Title VI,**
**Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: **53-0196603***)

District Case No. **4:24-cv-00260-CRB (DMR)**
Appeal Case No. **24-6943**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons. As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time. See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

EoR - 686 of 2347

<u>Motion for Judicial Notice of Settlement:</u>
<u>Department of Education Independently Confirms & Verifies the Substance &</u>
<u>Seriousness of Georgetown's violations as of February 2025.</u>

1.    Mr. George Jarvis Austin moves for the Ninth Circuit to make Judicial Notice

that the US Department of Education has declared Mr. Austin owes Georgetown

University nothing based upon their conduct as reported to the Department of

Education on or prior to 2022.  I, Mr. Austin, declare under penalty of perjury that

the United States Department of Education was made aware of Georgetown's

initially known violations on or before 2022 and contacted Mr. Austin in January

2025. I, Mr. Austin, declare under penalty of perjury that based on just those

underlying violations as shared with the Department of Education at that time,

alone (let alone the ongoing violations included here) ***the Department of***

***Education has determined Georgetown's conduct is so egregious that***

***anything owed them by Mr. Austin, the student, is no longer owed as of***

***January 2025 per their official communication(s)***. The Department of

Education not only affirms the substance, seriousness, and illegality of

Georgetown's conduct but further shows through the cancellation of any debts owed

by Mr. Austin, the student, the level of violations they, Georgetown, engaged in.

2.    Thus, Mr. Austin moves for the Ninth Circuit to make Judicial Notice of this

already entered into settlement, based upon the allegations and wrongs (within

Department of Educations purview) on or before 2022 (as made known to them).

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin          2.6.25**

**2 ; Motion for Judicial Notice: Settlement Entered Into based on Georgetown's conduct**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:  Department of Education verifies Substance, and seriousness of Georgetown's Underlying Violations against Mr. Austin  ;  In Honor of the Civil Rights Act of 1964,Title VI, (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: **53-0196603**)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

## Department of Education Independently Confirms & Verifies the
## Substance & Seriousness of Georgetown's violations as of January 2025.

1.      I, Mr. Austin, declare under penalty of perjury that the United States

Department of Education was made aware of Georgetown's initially known

violations on or before 2022 and contacted Mr. Austin in January 2025.  I, Mr.

Austin, declare under penalty of perjury that based on just those underlying

violations as shared with the Department of Education at that time, alone (let alone

the ongoing violations included here) ***the Department of Education has***

***determined Georgetown's conduct is so egregious that anything owed them***

***by Mr. Austin, the student, is no longer owed as of January 2025*** per their

official communication(s).  The Department of Education not only affirms the

substance, seriousness, and illegality of Georgetown's conduct but further shows

through the cancellation of any debts owed by Mr. Austin, the student, the level of

violations they, Georgetown, engaged in.



# unique

## GEORGETOWN LAW

Combining a world-renowned faculty, a dedication to intellectual stimulation and community, and a location in the heart of the nation's capital, Georgetown is a **unique** place to study law.

### Legal Education in its Fullest Sense

Georgetown Law seeks not only to impart the tools of the lawyer's trade, but also to foster reflection and inquiry into the nature of law and the role and responsibility of lawyers in a global society. The goal is education in its fullest sense — not only mastery of "black letter law," but a sense of the philosophical, political, social and ethical dimensions of law, the awakening of an abiding curiosity about its nature and purposes, and the instilling of a sense of responsibility for its development and direction.

### A Dynamic Intellectual Community

Georgetown nurtures the very highest standards of scholarly inquiry, intellectual rigor and ethical behavior in a way that respects each student's individuality and fosters his or her particular interests and career goals. The result is a dynamic intellectual community, in which students have an unparalleled range of academic opportunities both inside and outside the classroom.

### An unparalleled Vantage Point

Located in Washington, D.C., within blocks of the U.S. Congress that enacts laws, the Supreme Court that interprets them, and the administrative agencies that enforce them, Georgetown provides an unparalleled vantage point from which its faculty and students explore the dynamic legal processes of our nation and world.

"What law school in the country is better positioned to deal with the way the profession is going than Georgetown? We have connections to the corporate bar and criminal justice, and we have extensive clinics. We have been oriented to government and politics for decades. Wherever the legal market is going, what law school has more beachheads there than we do? This is a good place to be."

**Daniel R. Ernst, Professor of Law**



*GEORGETOWN UNIVERSITY LAW CENTER*

*Office of the Dean of Students*

February 28, 2019

George Austin
CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin            1.31.25**

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**64-PAGE AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964, Title VI,**
**Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-DMR**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's
*ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and
Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental
violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over
50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as
well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or
settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,
context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown
ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu,
media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents
@georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert
'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and
whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

## TABLE OF CONTENTS

Argument Summary                                                    **i.**

Introduction                                                        **ii.**

Intro; Photo Affidavits                                             **iii.**

Procedural History; Facts                                           **1.**

Complies with Rule 8; 'Original' Jurisdiction                       **31.**

Argument Summary (Causes of Action)

1. Georgetown (in concert with Yvonne Gonzales Rogers) is currently violating Mr. Austin's rights, as a Black man and an admitted student, to Equal Protection under the 14th Amendment and Title VI by impermissibly using race (and perhaps gender), as a Black man, to his detriment, and treating him as an inferior due to his race, compared to similarly situated non-Black male admitted students, repeatedly (refusing, and violating the basic, and foundational tenets, duties and rights Georgetown publicly espouses for ALL students, staff, professors, and third party community members).

2. Georgetown (in concert with Yvonne Gonzales Rogers)is currently violating Mr. Austin's rights, as an admitted student and Black man, to contract per 42 USC 1981, and 42 USC 1985, under 13th Amendment.

3. Georgetown made false promises to induce contract formation, and is still materially omitting, overtly deceiving, and misrepresenting in an *ongoing* malicious pattern of deceit to illegally deprive Mr. Austin.

4. Georgetown is currently negligent in violation of multiple duties owed Mr. Austin

5. Georgetown is currently acting in Bad Faith violating multiple duties to deprive of valuable, hard fought, and essential, fundamental rights extraneous to frustrated fruits (benefits) of contract.

Relief : **$10- $15 Million** *Minimum* Demand, as well as Injunctive (and other relief).

EoR - 694 of 2347

"**Cinque** : Ens. : [ Covey translating for Cinque in Mende]  You are a chief.

**President John Quincy Adams** : I was a chief. Yes….

**Cinque** : [in Mende]  Is he going to help? He has far many more questions than answers….

**President John Quincy Adams**: Cinque, look. *I'm being honest with you. Anything less would be disrespectful*…

**Cinque**: (speaking in Mende / Ens. Covey translating) We won't be going in there alone.

**President John Quincy Adams**: Alone? Indeed not. We have right at our side. We have righteousness at our side. We have Mr Baldwin over there.

**Cinque**: (speaking in Mende / Ens. Covey translating) I meant my ancestors. I will call into the past, far back to the beginning of time….. I will reach back and draw them into me. And they must come, for at this moment, I am the whole reason they have existed at all."
https://m.youtube.com/watch?v=y8Jkls3xgvg
- **Cinque (Djimon Hounsou) and President John Quincy Adams (Anthony Hopkins) conversation before winning Supreme Court Argument, and Case: *The United States v. the Amistad, 40 U.S. 518 (1841), Amistad*, Movie by Steven Spielberg**

"Freeing yourself was one thing, claiming ownership of that freed self was another….To the sixty million or more, …Beloved"
- **Toni Morrison**

"I come as one, but I stand as 10000 to the 10th power!"
- (*I, George Jarvis Austin, happened to be sitting next to both Oprah and Gayle —front row next to Gayle in red, Myself in the gray suit—, before and after she gave this speech and spoke with her during commercial breaks on the depth of meaning for that particular award, and context for that speech and after learning, and listening, a bit more adopted that wisdom within myself*).
https://m.youtube.com/watch?v=wqJ7hmYhBMg
- **Oprah Winfrey, Hall of Fame Acceptance Speech, *36th Annual NAACP Image Awards*, 2005**

**Maya Angelou to Tupac**: "May I speak with you?....Do you know how important you are?  Did you know You're the best we have, and We need you desperately? Did you know that our people (*fought and*) stood on auction blocks for you?  Did you know we got up before sunrise, and slept after sunset so you could be alive this day?   Did you know our ancestors decided they would stay alive despite all this? Did you know they laid in their own, and others, excrement, urine, menstrual flow, feces, and filthy hatches of slave ships to stay alive for you?  When was the last time someone reminded you're more valuable than you can imagine?"…..
("… *I talked to him and he calmed down. Later, when he wept, I wiped his face with my hands because I didn't have a napkin or handkerchief. Then we turned back to our location. I went to my trailer and Janet Jackson came*")
**Janet Jackson with Maya Angelou**, "Dr. Angelou, I can't believe you actually spoke to Tupac Shakur." I said, "Who is that?" I didn't know six pack or eight pack…. I didn't know who he was because in my age group his name didn't register"
- **Maya Angelou, with Tupac Shakur, then with Janet Jackson, on set of *Poetic Justice*, directed by John Singleton , Classic, 1993 https://m.youtube.com/watch?v=rye1jb98LSA httpsm.youtube.com/watch?v=gCDm6UGQSBU**

4:7 Wisdom is the principal thing; therefore get wisdom:
and with all thy getting get understanding.
3:13 Blessed are those who find wisdom,  those who gain understanding,
3:14 for she is more profitable than silver and yields better returns than gold.
- **Proverbs, 4:7, 3:13-14**

ii.

"You Know, Kindergarten Is Like The Ocean. You Don't Want To Turn Your Back On It."
**- Ms. Joyce (Penelope Ann Miller) to Mr. Kimble (Arnold Swarzenegger), Kindergarten Cop, 1990**

"It doesn't matter what you say you believe - it only matters what you do."
**- Robert Fulghum, All I Really Need to Know I Learned in Kindergarten**





iii.



iv.

See **Supplement Intro VI-XXVI** *(hereafter referred to a S-Intro, S-1, etc.)*





v.

## FACTS

"Courage must come from the soul within,
The man must furnish the will to win,
So figure it out for yourself, my lad,
You were born with all that the great have had,
With your equipment they all began.
Get hold of yourself, and say: "I can."   S-1.

- **George Washington Carver, famous Black inventor read Mr. Guest's poem; "EQUIPMENT" during his commencement address at *Selma* University, *Selma Alabama* on May 27, 1942.**

1.      Approximately 23 years before Selma, Alabama's 'Bloody Sunday' a pivotal

moment in the Civil Rights Movement, George Washington Carver, one of our

country's and the world's most brilliant-creative minds, reminded Selma's future

leadership of its ability to overcome *any* challenge while reading Mr. Guest's poem;

"EQUIPMENT" (*whether that challenge is facing inward, or heading outward,*

*including the evils of racial anti-Black segregation, anti-Black subordination,*

*anti-Black degradation, and infliction of Black inferiority throughout all strains of*

*society*).  See also e.g. (*in the Court's 237 page opinion*) Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 104 (U.S.

Jun. 29, 2023) ("In fact, [truly] meritocratic systems have long refuted bigoted

misperceptions of what [B]lack students [men, and people] can accomplish.").  It's

important to note that Dr. Carver did so at an historically Black college, at a time

when Black history, and Black identity (even at HBCU's), was highly suppressed

and oppressed (*with America's own Nazification, or 'Gleichschaltung,' victimizing*

*Black people with overlapping totalitarian control mechanisms, and extra-legal*

*torture in Jim Crow era*).  Moreover, it was taught in a way to ultimately fuel notions

of Black inhumanity, or Black inferiority, that Dr. Carter G. Woodson (*founder of*

*Black History Month; which 'should' be celebrated throughout the year, not just*

*February*) articulated so brilliantly, and poignantly, in the 'Mis-Education of the [so

called] Negro' (*originally published 9 years before Dr. Carver's Speech*).See S-1

**1**

2.      Dr. Carver reminds us all, as he reminded that specific portion of leadership, and survivors of the _Black American Holocaust,_ through a message of self development, edification, self knowledge, and self confidence that "I can."  I, George Jarvis Austin, am an autodidact, and developing polymath like a. Frederick Augustus Washington Bailey Douglass, abolitionist Lion of Anacostia against anti-Black racism, racial abuse in its many iterations, and American Chattel enslavement (the most brutal, damaging), and b. Abraham Lincoln, Eagle and President of the United States of America, who learned the law, and practiced, through self-teaching, and self edification.  Lincoln, as a store clerk rising from rural poverty, had a uniquely autodidactic, interesting, path to the bar, and Presidency at a time in the U.S. when one could practice law and legally advocate for others in the Courts, _if considered a White man in America's racial caste system (at the time),_ without attending law school, passing the bar, or getting bar certified (or licensed) in the ways and means now mandatory.  See S-2

3.      Of course, A Party can legally represent (_and advocate for_) themselves even under current law with the ways and means now mandatory, but cannot act as an attorney 'for another' until bar certified in the respective State, or Jurisdiction.  See 28 U.S.C. § 1654.  Like Mr. Curt Flood in 1956, Mr. Austin, 56 years later, began his professional process and consummated with $400 consideration for Georgetown's student contract without the aid of an attorney.  Mr. Austin is recovering from severe injuries causing temporary physical disability both in the workplace at Tesla, and a separate car accident creating strains on every part of life, study (Straight A's, and A+'s last nine semesters), healing process and employment (working more than full time while representing himself (self-represented), and notes in advance his

likely need for physical ADA Accommodation(s) until fully healed.  Contextually, it's

important to note *Mr. Austin is still healing from ongoing severe physical injuries*

*that have been very slow to recover due to the unanticipated severity of his soft tissue*

*injuries*).  *Mr. Austin also reminds to be mindful of Erickson v. Pardus mandate(s),*

*especially in this context.*  See S-3

4.     Mr. Austin, who is self represented, is not a juris-doctor (JD) nor has *ever*

taken the bar, has a pristine, clean and clear background, with great and strong

character (eligible for any employment, or position, including President of the

United States).  Although not a licensed attorney, Mr. Austin is empowered to

represent himself *legally*, has good credit, is a good person, is a member of protected

classes (*Black man, recovering from temporary disability*.)  See S-4

5.     In the Supreme Court's *237* page opinion they remind of how Black students,

and people, have long befuddled bigotry and run circles around racism (*especially*

*when there is a meritocratic system*).  Mr. Austin is previously identified as top 5%

out of 20,000+ students, accepted to 100% of top tier colleges applied to including

UCLA and Berkeley, graduated and did well at Berkeley (#1 in major, public, [&

overall per Forbes www.forbes.com/sites/madisonfernandez/2021/09/08/why

-berkeley-is-number-one/?sh=2bbb1b7a47e0 ]).  See e.g. Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S.

Jun. 29, 2023) ("California amended its State Constitution to prohibit

race-conscious college admissions in 1996…University of California, Berkeley, a top

public university not just in California but also nationally…For example, the

University of California purportedly recently admitted its "most diverse

undergraduate class ever," despite California's ban on racial preferences. … UC

Admits Largest, Most Diverse Class Ever, But It Was Harder To Get Accepted, L. A.

Times, July 20, 2021,,") Mr. Austin had already scored in LSAT's top 1% of Black

students... (top 5-10% overall world- wide; & *several* timed *perfect scores, can easily*

*score ..higher*). See S-5

6.     Mr. Austin Won (along with 17 others) a top 10 out of 820+, elite, uber-

competitive Senate fellowship (1 of 64 Capital Fellowship winners; *CA Senate*) See

e.g. www.senate.ca.gov/media/20130814_267/video





**4 ; Opening Complaint**

As articulated above, Mr. Austin Won a Fellowship in the top 10 out of 820+ (in CA Senate; most competitive entry less than 4% acceptance rate, my year, for that program, 1 of 18 selected winners (1 of 2 *winners* out of that area) www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/ was unavailable for press interview at the time but celebrated and honored publicly in the piece of over 400 elite competitors nationwide, declined automatic job offer as I gave my word to another commitment and already deferred for a year), accepted into multiple top tier law schools (including T-14), offered highest scholarship award honors from VP Kamala Harris' alma mater (in San Francisco), more recently chosen as most outstanding student, as well as top ten business student ever (selected by professor with over 20 years experience). Yet, Mr. Austin, an admitted Black male student, following Georgetown's publicly outlined policies, *even after Georgetown's written admission to him that they violated their own written authorization agreement policy, and the law*, was outright intentionally, facially, and repeatedly discriminated against in violation of Equal Protection, 42 USC 1981, 13th, 14th Amend. and (Title VI, on which Title IX was based). See S-6

7.    This case is not about admissions, although Mr. Austin, as a Black man, and person, is aware (as is the Country) of the recent rulings with *Harvard*, and *UNC* (California, previously, had a similar change in *1996*, with the passage of Proposition 209). Although the 237 page opinion *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*. argues heavily in favor (both majority and dissent) for Georgetown's legal liability to Mr. Austin; Liability emerges outside of the admissions context as Georgetown has impermissibly used race, or derogatory racial stereotypes, repeatedly against Mr. Austin to his detriment to exclude and

EoR - 703 of 2347

deprive him.  Instead, this case is about respecting the human being, *admitted student*, and their respective Equal protection, and 42 USC 1981, rights along with their rights not be negligently-maliciously failed duties owed.. nor deceived or defrauded (i.e. fundamental privacy, and publicity rights; *which are very similar to trademarks foundational concepts as applied to human beings*).  Georgetown decided to repeatedly, and ongoing *treat him as an inferior*, because he is a Black male, regardless of him being an admitted student, once Mr. Austin entered in contract with Georgetown (*see affidavits embedded above including precise moment when consideration was given and offer accepted*).   Georgetown keeps attempting to mark him with a badge of inferiority repeatedly and ongoing, to completely disregard and disrespect his personhood and fundamental rights.  Georgetown, and the US Dept. of Ed. *admits, and knows,* Georgetown is covered by Title VI, Equal Protection, as a recipient of Federal funds.  See S-7

### Georgetown's Admissions of Fact as of November 2023

8.     Prior to 2019, A fellow student of University of California Berkeley discovered, and alerted Mr. Austin that his image and likeness was being used for commercial purposes by Georgetown, in California as 1 of its top recruiting markets; It was more recently revealed it was likely with thousands of physical brochures, and an interactive website, both with his close up, readily identifiable, photo (*to help Georgetown generate Billions of dollars in annual revenue.  The fellow student alerted his photo was being used to promote, market, or sell Georgetown without his knowledge, nor consent (Commercial Use) to violate his privacy, publicity and other rights.  Mr. Austin is a human being, a citizen, and an admitted student at Georgetown University, and other elite institutions of law, with active

and ongoing rights to 1. Equal Protection, 14th Amend, Title VI, 2. 42 USC 1981,

13th Amend. 3. not be deceived or defrauded (out of privacy, publicity., property,

1981, or others rights), 4 & 5. not have duties breached or violated maliciously

through bad faith or negligently as a person or human being. See S-8

9.      Georgetown never informed, nor obtained written, or *any*, authorization from

Mr. Austin.  Outside of a litigation context, Mr. Austin thereafter followed up with

Georgetown to which they initially denied use of his image or likeness was true.

Mr. Austin sought verification of violations and had no way of knowing if true or

authentic (as several organizations he initially reached out to verify would not

confirm, nor deny). However, they later admitted their violations by sending him

the same physical copies, to California, already discovered by a fellow UC Berkeley

student, with a letter by Georgetown leadership admitting their violations in 2019.

From the date of that letter till now, quickly approaching 5 years, Mr. Austin has

diligently followed up with Georgetown leadership, with over 300+ witnesses, and

100+ formal complaints made to Georgetown's appropriate divisions, (*IDEAA,*

*President Office, etc.*) outside of the litigation context, to proactively address and

solve the issues at hand (including getting the specific numbers of physical

commercial brochures sent, where, and to whom).  Specifically, Mr. Austin emailed

and faxed IDEAA complaints, with other leadership cc'd,.  Mr. Austin formally

complained. Georgetown leadership violated school policies, standards of care,

statutes, customs, and laws. Mr. Austin had no idea, nor anyway to predict, they

would continually conduct themselves in this illegal manner up to the present, 2024

(and would have preferred to solve outside of a litigation context) Georgetown has

*not* responded, *or* acknowledged complaint(s) *but made several admissions of fact*:

10.     Georgetown admits, *publicly,* they owed duty to notify Mr. Austin prior to

filming him as part of Georgetown's *standard of care* to an admitted student (*as*

*reflected in policies, statutes (which Georgetown's policies cross reference), common*

*law, agency regulations and..common practice*) See S-10

11.     Georgetown admits, *publicly,* that they owed Mr. Austin the duty to obtain

his *written* authorization *prior* to taking, or using, his photograph for Georgetown

Business or commercial purposes (as part of their owed standard of care).See S-11

12.     Georgetown admits, and knows, *publicly,* that a written authorization form to

agree to business use of a photo is a contract, or contractual agreement (*between the*

*person whose picture is being taken and the person or organization who is taking the*

*picture for commercial purposes*). Georgetown requires *prior* approval of this

contract by Georgetown's General Counsel, requires signed written authorization,

(contract), *prior* to business use or it violates their privacy, publicity, and 1981 right

to contract (when facially discriminatory; i.e. one policy for Black male students,

and one for similarly situated non-Black male students).  See S-12

13.     Georgetown admits, *publicly,* this specific duty owed is part of Georgetown's

*standard of care* to an admitted student; (obtain *prior* written consent*)* of person

being photographed for Georgetown business is reflected in 1. Georgetown's privacy

policy as part of the student contract, and 2. Georgetown's Media policy).

14.     Georgetown admits, *publicly,* that information regarding the breach or

violation of the aforementioned duties is material to the person who was filmed or

recorded; Georgetown admits this through its emphasis, explanation, and

admissions of the current law's legal requirements that inform, guide, and direct,

their publicly stated policy (*as well as their argument in what is considered the Court of second highest prestige under the Supreme Court of the United States;* S-14.

15.    Further, Georgetown admits, *publicly,* that the 'commercial purpose' of the filming adds extra legal barriers, and creates additional material information for the person being filmed for business purposes (which would need to be included in the written authorization, and notice, *prior* to the filming or recording).

16.    Georgetown admits that it commenced or consummated its contractual relationship with Mr. George Jarvis Austin, as an admitted student, with $400 payment from Mr. Austin and both parties', to the contract, agreement to the terms and conditions of Georgetown's standard contract with admitted students; S-16

17.    Georgetown admits, *publicly,* that as part of student contract, their mandatory policies (privacy, media, IDEAA, etc.)  and procedures must be followed by Georgetown or they in fact break the law, and incur legal liability.

18.    Georgetown admits, *publicly,* that *a material* part of their advertising *to induce* contract formation with incoming students is their commitment to follow the law, their policies, and their consummated student contracts. See S-18

19.    Georgetown admits, *publicly,* through their own publications and protections of privacy, publicity, and other rights that these rights are in fact not only valuable, but essential in the modern interconnected world we live in.See S-19

20.    Georgetown *knew* it had a duty to inform Mr. Austin of the precise usage of his photo *prior* to using for business purposes which includes where they will be sent, how many, and how else may be utilized (I.e. websites, interactive forums etc.) so informed written consent, and mutual assent for contract, can be made.

21.    Georgetown itself admits, *publicly, (in its .. filming required steps ..)*, that it

holds itself to the same standards for students, faculty and staff.

> *"too often they have stimulated their prejudices by referring to the [so called Negro; Black people] as **unworthy of consideration**….."*
> -    **Carter Godwin Woodson, 1933, The Mis-Education of the Negro.**

22.    Georgetown itself admits, *publicly,* that not only must written authorization,

as a contractual agreement, be signed by the student *prior* to use, but that the form

itself 'must' include certain information, (*including acknowledgement of*

*'consideration' per contract law;*) to be valid, and enforceable (and even includes an

example photographic/ videographic release form for students in their continuing

education programs; Georgetown's neighbor George Washington University publicly

provides a comparative example for its own students). See S-22;

23.    Georgetown admits they at least twice used Mr. Austin's photo for

business purposes without obtaining written consent, nor 'Consideration,' nor notice

provision in violation of student contract, the law, and *publicly* stated policies.

> "Looky here, America, What you done done-
> Let things drift, Until the riots come.
>
> Now your policemen, Let your mobs run free.
> I reckon you don't care, Nothing about me.
>
> You tell me that hitler, Is a mighty bad man.
> I guess he took lessons, From the ku klux klan.
>
> You tell me mussolini's, Got an evil heart
> Well, it mus-a-been in Beaumont, That he had his start-
>
> Cause everything that hitler, And Mussolini do,
> Negroes get the same, Treatment from you.
>
> You jim crowed me, Before hitler rose to power-
> And you're STILL jim crowing me, Right now, this very hour.
>
> Yet you say we're fighting, For democracy
> Then why don't democracy, Include me?
>
> I ask you this question, Cause I want to know
> How long I got to fight, BOTH HITLER – AND JIM CROW "
> -    **Langston Hughes; Beaumont to Detroit: 1943**

24.    Georgetown admits they in fact never disclosed, notified, nor obtained

written consent from Mr. Austin, *ever*;  Georgetown knows Mr. Austin Identifies as

Black-African American, and takes pride,& joy, in his heritage. See S-24

25.    Georgetown knows, and admits, *publicly,* that when an organization *refuses* to contract in facially discriminatory manner, when they are obligated to contract under the circumstances (i.e. *when exploiting a Black male admitted student's picture for business purposes as Georgetown did without Mr. Austin's written authorization*), they are liable under 42 USC 1981 See S-25

26.    Georgetown *publicly* admits that enslavement of Black people in this country, which Georgetown partook in, was in part exploitation of Black people *without even considering* Black people's rights or needs; This is a similar pattern to how Georgetown behaved in exploiting Mr. Austin's right to contract (i.e. violated written authorization agreement requirements in reference to his person, privacy, publicity, etc.); 42 USC 1981 had to explicitly state Black men, and people, have the "same right to contract as a White man" because racism, & discrimination built in the assumption of inferiority and presumed it could take from Black people without 'consideration,' nor 'mutual assent,' but instead by force. See S-26

27.    Georgetown *publicly* admits written authorization requires Mr. Austin's *prior* a.notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. *&* Georgetown General Counsel approval of form and f. his signature consenting to it *prior* to its use.  Georgetown *admits* it had none of the above (as *first* acknowledgement of its use was in the 2019 letter *after the fact).*

28.    Georgetown admits, *publicly,* that a student, or "Any applicant.., current or former employee or student, or third party ( "Complainant")" can make a complaint via email… and is encouraged to do so; See S-28

**11 ; Opening Complaint**

29.     Georgetown admits, *publicly,* that once complaint is made via email, as Mr.

Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its

own policies or the law that informs and undergirds IDEAA; See S-29

30.     Georgetown admits, *publicly,* that discriminatory conduct by leadership,

faculty or staff to student's detriment, particularly a Black male student, is

especially concerning; According to their policy is of the highest priority; Yet,

Georgetown themselves discriminated by not even taking a first step to acknow-

-ledge, nor investigate or correct an administrators written admission of serious

school policy, & legal violations to the immediate detriment of an admitted Black

male student showing discriminatory animus towards him. ; See S-30

31.     Georgetown *admits* that they *never* provided this fraudulently omitted

material information per Mitch Bailin's, and Georgetown's President's Office, Vice

President's Office, General Counsel's Office, and other leadership's, *lack of response*

*nor answers*, despite over 100+ formal written complaints in front of over 300+

separate witnesses (including other Georgetown leadership who could chime in).

32.     Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+

witnesses, as its failure to correct, nor provide the materially omitted information,

was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial*

*use,* of how important that information is in regards to privacy, publicity, and

contract rights (as well as its own policies requiring disclosure of these material

facts to Mr. Austin, especially after already violating his rights).

33.     Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to

a different filming (for business purposes) policy than similarly situated non-Black

male admitted students, faculty, staff, is treating him in an inferior manner; shows..

they intended to facially discriminate against him. See S-33

34.    Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to

a different IDEAA complainant policy than similarly situated non-Black male adm-

-itted students, faculty, staff, or even third parties, is treating him in an inferior

manner; Refusing to even acknowledge his complaint, nor investigate, escalate, or

correct, *as guaranteed*, shows intent to facially discriminate against him; See S-34

35.    Georgetown admits, *publicly,* in subjecting a Black male student (Mr. Austin)

to..a different privacy policy than similarly situated non-Black male admitted

students, faculty, staff, and policy it publicly advocated for in *GEORGETOWN*

*COLLEGE v. D.C. BRD., ZONING ADJ,* when being 'forced' to disclose, not

voluntarily or willfully violate (*as they did to Mr. Austin*), is treating him in an

inferior (facially discriminatory) manner. See S-35

36.    Georgetown *publicly* admits that it takes written authorization forms seri-

-ously for both medical and student privacy protected information, and that should

define an admitted Georgetown student's reasonable expectation of privacy.See S-36

37.    Georgetown *admits in writing and conduct,* that under no circumstances

should medical information or a photo be released or commercially used (photo)

without the student's written authorization agreement (contract); Georgetown

advocates this position so strongly (*despite California's CMIA, or US Statute's*

*HIPAA  all that's required is oral, or written patient request*) that they refused to

release Mr. Austin's own medical records *to himself* without signed written

authorization (*but ironically commercially used his photo without his a. knowledge,*

*b. consent, nor c. written authorization in violation of their mandatory policy*).  See

S-37  To illustrate the irony, and misplaced priorities, when Mr. Austin has

repeatedly requested in writing, and orally (via phone), his Georgetown medical

records, as an admitted student, they have refused to provide his own required

information (*per California's CMIA, or US Statute's HIPAA  all that's required is

oral or written request*), and mandated multiple steps of unrequired verification to

get *his own medical information.*  Yet, in opposition to the legal, contractual, and

policy standards Georgetown itself has enshrined, and argued, use of his close up

Photo for commercial advertising purposes, that would require my authorization

(*I.e. signed form, written consent, notice, etc.*), they completely ignored those legal

necessities and violated his privacy, and publicity rights throughout CA forum state

(and subsequently his Equal Protection, Due Process, 42 USC 1981, duties against

deceit, negligence and bad faith, rights also).  Georgetown completely inverted their

responsibility and refused what they are obligated to provide, and went out of their

way to exploit, and violate, Mr. Austin's privacy and publicity rights that they have

an admitted, publicly proclaimed, and publicly advocated, obligation to protect; S-37

38.     Georgetown admits, *through its conduct in front of 300+ witnesses,* that it a.

intended to violate Mr. Austin's right to privacy, publicity, Equal Protection, and

1981 right to contract b. intended to fraudulently omit material information, and

mis-state its commitment to the law to induce contract with Mr. Austin c. intended

to do so *maliciously, knowingly, and egregiously,* as they never apologized,

investigated, nor corrected, even while admitting their violations in writing and to

date have never presented a written authorization for Mr. Austin to sign as

mandated in accord with Federal, State laws. See S-38

EoR - 712 of 2347

39.    Georgetown admits, as Courts have repeatedly held, that an organization's
failure to follow its own policies can support a discriminatory pretext, as George-
-town *knowingly, willfully, and maliciously did,* without apology, investigation,
correction, nor disclosed material information to cause *ongoing* harm.

40.    Georgetown *admits its own* impermissible use of race, or derogatory racial
stereotypes to harm, Mr. Austin a Black male admitted student, *through their*
*words, and conduct*, as the June 29, 2023, 237 page Supreme Court opinion in
*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*
repeatedly highlighted as illegal (in violation of students.. Equal Protection);
Georgetown repeatedly chooses to presume an admitted Black male student, Black
men, and Black people as "*inferior,*" and *"unworthy of consideration"* habitually
refusing basic, required *publicly admitted* steps for essential policy, practices,
programs/activities that non-Black male admitted students are granted providing
unfair advantage to them, and stigma, over 100+ discrete adverse acts creating
immediate, and ongoing, detriment to Mr. Austin (as *none of publicly listed **IDEAA***
***steps I-V** were even attempted*, nor were.. complaints acknowledged conveying, re-
inforcing, *derogatory racist stereotypes, presumptive inferiority);* Dckt S-40;

41.    Georgetown admits impermissible use of race or racial stereotypes, through
explicit conduct over 100+ times, and explicit classification (conditions participation
in student activities/programs) on race, while excluding a Black male admitted
student, or students, from programs, etc in an organization receiving federal funds.

42.    Georgetown admits decision making by derogatory racial stereotypes is
absolutely prohibited especially when used to exclude an admitted Black student
from essential programs and activities receiving federal funds to operate.

**15 ; Opening Complaint**

43.   Georgetown admits, *publicly,* that it has a history of specifically depriving Black persons rights, even in the most brutal expression of enslavement. S-43

44.   Georgetown *publicly admits* that it literally deprived Mr. Austin's right to make a contract; Because Georgetown authorization agreements are *mandatory* contracts of adhesion when Georgetown uses an admitted students', or other person's, image for business purposes per their own policy (and the law), their choice to purposefully violate their own mandate, and preemptively deprive the making of that contract violates 42 USC 1981 by refusing to offer a Black man, admitted student, the same contract it is a. legally mandated to do for *all* students and b. it would offer a White, or non-Black male, offeree (*as 1981 protects would-be contract makers in the contract making process as well as those violated in the broad language of rights, enjoyment of benefit, or enforcement process*);See S-44

45.   Georgetown *admits, publicly,* excluding Mr. Austin because he is a Black male admitted student from essential Georgetown activities/programs violates the *essence,* Originalist purpose, and Legislative *intent of* Title VI ; See S-45

46.   Georgetown *admits*, with over 300+ witnesses, it had actual notice of policy violative, discriminatory, conduct, refused to take action, and failed to correct; *on-going* violations (i.e. extreme deliberate indifference.);See S-46

47.   Mr. Austin documented all of Georgetown's previous admissions (paragraphs 7-46 above) with over 300+ witnesses, providing *direct evidence*: See S-47

48.   On June 8, 2023, Justice Kagan delivered the unanimous opinion for the Supreme Court of the United States who unanimously sided with Jack Daniel's and overturned the Ninth Circuit in a trademark infringement and dilution case stemming from VIP Products' "Bad Spaniels," a novelty dog toy that intentionally

16 ; Opening Complaint

parodied Jack Daniel's iconic 'Tennessee whiskey' bottle and label elements.  The

decision clarifies that when a parody of another's trademark is used as a trade-

-mark, the ... use does not qualify as "noncommercial." Georgetown has already

*publicly* admitted the inherent harms of their conduct in violation of their media,

privacy (publicity) and written authorization policy, but the Supreme Court high-

-lights a 'smooth' analogy to a person's right of publicity, as a trademark is "any

word, name, symbol, or device, or any combination thereof" used to "identify and dis

-tinguish" one's goods-service (*shows harm in purely legal context*); See S-48

49.    Also, similar to the right of publicity, trademarks perform a key function of

identifying the source of a product, thus enabling businesses (or person, in context

of publicity rights) to build goodwill and consumer recognition with high quality

products and are an essential tool in any businesses' intellectual property arsenal.

Analogous to violations of right of publicity, a Trademark infringement is the

unauthorized use of a trademark.  As The Court, per Justice Kavanaugh,

articulated in *TransUnion LLC v. Ramirez* "a plaintiff searching for a "common-law

analogue for their asserted injury" need not identify "an exact duplicate."

TransUnion, 141 S. Ct. at 2204. But the plaintiff's alleged injury must still have a

"close relationship" to a traditionally recognized harm."   Mr. Austin's right of

publicity (and privacy) is a close analogue, in this case statutory (and common law),

a similar harm, to Jack Daniels *'Tennessee Whiskey."*

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......**Georgetown complains**
that ... requiring it to report .... **forces the University to violate the Federal Educational Rights and
Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the
release of allegedly protected information regarding students who live off campus. ....FERPA protects students '
privacy interests by withholding federal financial assistance to educational institutions that ...release .. educational
records" ..... Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN
COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific
exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency

**17 ; Opening Complaint**

or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

"**NOT "permitting** the release of education records . . . of students without the[ir] written consent (*i.e. reasonable expectation of privacy*)" - Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8 (D.D.C. Apr. 10, 2020)

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:
- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

*Make sure you have permission before using a person's image or likeness*….."
-    **Georgetown University Library**

The broad, but specific, categories of privacy violations that Georgetown themselves

help to articulate as part of a reasonable expectation of privacy for students illus-

-trate at least two ways that Georgetown specifically violated Mr. Austin's privacy,

and publicity rights (*as well as Equal Protection , 42 USC 1981, Duties to not violate*

*Deceit, Negligence and Bad Faith rights*); See S-49

50.    Georgetown *knows* both DC's and California's jurisdictions affirm that

Georgetown's conduct using an up close photo without his consent, nor knowledge,

nor written agreement, was violative of Mr. Austin's privacy, publicity, 1981 rights.

The Supreme Court repeatedly reaffirmed this position; See S-50

51.    Not only was Georgetown aware, but *admits,* and it is commonly understood that their conduct violated his reasonable expectation of <u>privacy</u>, especially as an admitted student in the forum state of California. <u>See S-51</u>

52.    Nationally, it is clear,(codified in various forms), that Georgetown's conduct violates privacy, publicity, <u>1981</u> rights for admitted students; <u>See S-52</u>

53.    Georgetown already *publicly* admits it; Yet, another way to ascertain common understandings of a reasonable expectation of privacy is a comparative approach perusing similar privacy protected information, in similar contextual frameworks, to discern the metes & bounds of our zones of protected information; <u>See S-53</u>

54.    As Georgetown *publicly admits* privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable; <u>See S-54</u>

55.    Georgetown not only violated privacy, publicity, 1981 rights of Mr. Austin, but purposefully availed under *Mavrix Photo v. Brand Techs* when it a. specifically targeted Mr. Austin's forum state of California (utilizing his up close photo without his consent, nor knowledge b. Did "something more" including multiple mailed physical copies, *likely thousands*, of advertisements to forum state, and presented physical copies including said privacy, <u>1981(contract)</u> violating photo of Mr. Austin, and separately maintained interactive website for advertising, commercial, purpose of a multi-billion dollar organization; <u>See S-55</u>

56.    A typical <u>Georgetown media (film) policy, and business use process</u>, for similarly situated non-Black male admitted students would entail 1. Providing notice of the photo(s) being taken *prior to business use* 2. Providing notice of potential uses of photo *prior to use* (as outlined in agreement) 3. Presenting subject

19 ; Opening Complaint

of photo(s) with contract for purpose of obtaining informed consent 4. Presenting

subject of photo(s) contract with 'consideration' defined-included as required per

contract law 5. Obtaining written authorization *prior to business use.*; S-56

> "Yeah? You sure look like the man to me.....See that? I like that.
>
> He's straight out the gut.  It's like none of this sh\*t impresses him.  I like that, homeboy."
> - **Above the Rim, Birdie (Tupac Shakur) to Kyle Watson (Dwayne Martin)**
>
> "Yeah? You gon make it?"
> - **He Got Game, *A Spike Lee Joint*, Big Time (Roger Guenveur Smith) to Jesus Shuttlesworth (Ray Allen)**

57.    Georgetown is well aware of its admitted student's role in helping shape the

future of our Nation, and the World, in the Public Sector, *and elsewhere*, as one of a

very few schools with at least (one) 1, and perhaps (two) 2, US President(s)

(POTUS) listed as alumni, or previous students, and the second highest feeder to

members of the United States Legislature, behind Harvard, as well as Private

Sector, NGOs, etc.  The rigorous, scrutinizing, and elite admissions process fills its

student body with high potential leaders who in fact, not just theory, fundamentally

impact World, Domestic, State, and Local affairs in all sectors of our Economy.

Principally because of this key developmental-exploratory period in a person's,

admitted students', life and every admitted student's high potential for positive

impact, it is essential to protect not only their privacy, and publicity rights, but

Equal Protection and 13th Amend., or 1981 rights to contract as students do not

"shed their constitutional rights .. at the schoolhouse gate" per *Tinker*. ; See S-57

> "Specifics, Bob {change scene}.......What I'm talking about is the *human spirit*. That's the challenge, that's the voyage, that's the expedition...."
> - **Phenomenon (1996) - George Malley (John Travolta), portion of scene at University of California, Berkeley**

58.    As soon as a Georgetown Leadership admitted in writing to using my photo

to market the school without asking permission, notifying, nor getting written

consent, Mr. Austin immediately began a series of questions, formal complaints, to

figure out why they chose to "impermissibly use race" (*and perhaps gender*) to treat,

**20 ; Opening Complaint**

a Black man, and admitted student with less respect, less rights, and in an inferior

manner than other similarly situated admitted students with use of material

misrepresentations, omissions and deceit (with malice) to deprive (*in direct*

*violation of their explicitly stated contract, and policy terms*). See S-58

59.     Over four years later, Mr. Austin made over 100+ formal complaints of

intentional discrimination per Georgetown's exhibited inferior treatment (*combined*

*with other enumerated causes of action*) to IDEAA (*the investigative, and*

*enforcement body tasked with correcting these issues for admitted students, staff,*

*and members of the public: third parties*), since Georgetown's initial admission of

violative use of my image.  Georgetown has not yet taken even a mandatory

perfunctory, or performative, first step towards *any* investigation, let alone any

substantive investigation, correction or enforcement, whatsoever (despite the fact

that is precisely what Georgetown's agreement-contract mandates once complaint is

made by students, staff, or third party community members). See S-59

60.     However, when Georgetown leadership got caught exploiting Mr. Austin's

photo for business purposes (*without **mandatory** written authorization, knowledge,*

*nor consent*), and thus depriving Mr. Austin to his right to contract, they did not self

correct, Georgetown instead made clear through admissions and conduct that they

*intended* to impermissibly use race to discriminate against him and "stamp him

with a badge of inferiority," even after the fact when they already partially admitted

their mistakes.  Georgetown treated Mr. Austin in an inferior manner, under 1981

by a. Subjecting him to a facially discriminatory policy for Black admitted male

students that is inherently inferior (*by not even considering his person, nor right to*

*contract*) to the separate policy for non-Black admitted male  students b. Refusal to

even offer a contract to Mr. Austin, at all, let alone on non-discriminatory terms as compared to non-Black male admitted similarly students.   This test to ascertain straightforward racial discrimination also applies to having different media policies, privacy policies and written authorization policies for Black male admitted students vs. non Black male similarly situated admitted students to deprive Mr. Austin's 1981 rights producing promising section 1981 claim(s); See S-60



**William Forrester (Sean Connery)** "You don't know what to do right now…If you tell me what you really want to tell me I may not read any more…, but if you let me run you down with this racist bullshit what does that make you?"

**Jamal Wallace (Rob Brown)** "I'm not playing this game…"

**William Forrester (Sean Connery)** "I'd say you are playing it, expression is worth a thousand words…perhaps in your case … just two" (scene change)

**Jamal Wallace (Rob Brown)** "…See, you have to know the rules to play the game…"

**William Forrester (Sean Connery)** "It was written by a writer you've never heard of…."Thy duty, winged flame of spring "is but to love and fly "and sing" He was writing about the song of the tanager.  A song about new seasons, new life."

**Jamal Wallace (Rob Brown)** "That's James Lowell, man. I know who he is….  I'll stay with "Poor Assumptions" for $800, Alex."
- **Finding Forrester**

61.     After admissions of their violated policy, Georgetown Leadership showed repeated *deliberate indifference,* and *malice,* over 100+ times, when they failed to correct their displayed discriminatory animus, as well as their material omissions, misstatements and ongoing pattern of fraud to deprive Mr. Austin of rights, opportunity, and spent Capital.  Despite their admitted duties to correct, Georgetown over 100+ times in over 4 years displayed disparate treatment compared to similarly situated non-Black male admitted students by employing one IDEAA

policy for Black male admitted students to their immediate detriment, and one for

non-Black male admitted students to non-Black male unfair advantage.  The first

*publicly defined mandatory* step for Georgetown's IDEAA policy (regardless of

perceived merit, race or gender) is defined as acknowledgement and receipt (as

applied for non-Black male admitted students).  However, in practice, Georgetown's

conduct *admits* they not only continually refuse the first step, but all of the

following mandated steps, with regard to Black male admitted students, and subject

Black male Complainants to an inherently inferior IDEAA policy to their detriment,

as applied. Georgetown's different privacy, and complaint. policy for Black men, and

in this case facially discriminatory privacy, and complaint, policy based on

impermissible use of race, or derogatory racial stereotypes, for Black male admitted

students vs. similarly situated non-Black male admitted students highlights this

very straightforward, and promising, section 1981 claim.  See S-61

62.    Georgetown *knows and admits* use of derogatory stereotypes constitutes

discrimination and is an impermissible use of race; See S-62

63.    Georgetown *admits,* that use of derogatory racial stereotyping evidenced by

words, or conduct (*including exclusion or disparate treatment*) is illegal, and against

its own policy; Yet, Georgetown *admits, and evidences* this illegal conduct to "mark

with a badge of inferiority" *intentionally,* and *deliberately*; See S-63

64.    Georgetown *admits* use of derogatory stereotypes illegally creates stigma

whether in a forced '*De Jure'* segregation context like *Brown v. Board of Ed.* or an

integrated, but *De Facto discriminatory* context toward protected groups, especially

those historically racially oppressed, victimized, or excluded vis a vis enslavement,

debt peonage, torture, and many other nefarious mechanisms.See S-64

EoR - 721 of 2347

Better is a dinner of vegetables and herbs where love is present Than a fattened ox served with hatred.
- **Proverbs 15:17**

65. *Any* of the Leadership of Georgetown could have, and according to their policy *should* have spoken up, or themselves investigated; O*ngoing* disparate treatment of Mr. Austin was documented on display, in front of them, but they instead chose *deliberate indifference* furthering their discriminatory animus, conduct, and malice; Georgetown's IDEAA policy is designed to mandate Georgetown stakeholders (*especially Administrative Leadership*) to "Lift Every Voice" against anti-Black discriminatory conduct as James Weldon Johnson (*from Duval County, Jacksonville Florida*), the first self identified Black man (Negro) barred attorney in the State of Florida *after* the Civil War, & Reconstruction, brilliantly wrote; See S-65

66. Before the 1960s Civil Rights Acts, corrective measures to combat centuries of degradation, humiliation, oppression against Black people, as well as unfair advantages for *non-Black* people, and Educational Racial Equality Accountability Advancements therewith, Dr. Dubois and Dr. Carter penned the penetratingly pithy articulate analysis of their first person *direct experience* of racism, disparate treatment, in integrated elite schools: ""Admitted and tolerated; but …. not educated; they are crucified… cannot get fair recognition….on campus…or in human common courtesy…. Admitted, but not welcomed…" Here Georgetown, approximately 90 years after Dr. W.E.B. Dubious and Dr. Carter G. Woodson (the 1st and 2nd self identified Black Harvard PhDs, respectively) penned those words about their own, and other Black students' direct experience in then *integrated* elite schools, *mirrors* Georgetown's *illegal conduct* and intentional discri- -mination to Mr. Austin's detriment; They treat Mr. Austin in an inferior manner with "impermissible use of race" or derogatory racial stereotypes in at least three

EoR - 722 of 2347

separate essential policy processes, with one process for Black male admitted students whereas to their detriment no Georgetown duties/policies/laws publicly stated are followed,  and another for non-Black male admitted students who benefit from unjust advantage provided by Georgetown's one-sided system: 1. privacy policy process 2. contract formation process specifically with photo (I.e. written consent required), 3. Contract enforcement (etc. right privileges etc.) of contract already entered into with consideration provided (I.e. Ashley Jennings email); See S-66

67.    Georgetown *admits,* that a "thumb on the scale" to *reinforce,* not correct "the badges and incidents" of anti-Black slavery and oppression through "impermissible use of race" or derogatory racial stereotypes to exclude Black male admitted students from essential programs-activities not only creates stigma, but gives unfair advantage to non-Black male admitted students; perverts outcomes in a (regarded) "zero sum game" detrimental to Black male admitted students; See S-67

68.    Georgetown *admits,* that the enslavement period, as well as the 'badges and incidents' of that period, (*that are still reflected in US society today in anti-Black discriminatory conduct*) was not just a bad chapter in US history, but a fundamental *theft* of Black men's, and Black people's, rights, history, language, culture, personhood, life, liberty, land, & property resulting in massive wealth redistribution (from Black people via theft) with resulting *ongoing* inequality *still* to the detriment of African-American, Black men, and people, today in 2024; See S-68

69.    Because a significant proportion of Black Wealth is generated from earned income, often directly connected to educational opportunities for white collar or professional workers, the nexus between Black educational development, Wealth creation, (Mr. Austin's) Constitutional economic contract rights (with property,

EoR - 723 of 2347

privacy and publicity mandating a written authorization agreement) Georgetown's discriminatory illegal conduct is similar pattern of theft; See S-69

70.    Given the history, and present reality, of Racial Abuse in this country, the Judicial Branches complicit, or explicit, refusal to enforce anti-Black anti-discrimination laws as it relates to Black People especially magnifies the impact of racism, discrimination, and widens the wealth gap. Non-enforcement of Black People's rights, *currently in 2024,* is part and parcel of why the Black White Wealth Gap remains a constant *ongoing* issue;(*Georgetown's disparate treatment per mandatory policies, to Black male admitted student illustrates*):See S-70

71.    Georgetown's deprivation of Mr. Austin's Constitutional economic rights to contract, as a Black male admitted student, reflects the long ugly history in the United States of America regarding the intersection of Intellectual Property, which rights of publicity is a part of (as a subsect of privacy), with use of derogatory racial stereotypes, racial oppression, and *theft* of Black wealth-economic rights; S-71

72.    Georgetown is aware that their impermissible use of race, and discriminatory conduct, is rooted in ugliest parts of American history, and racist jurisprudence; Georgetown's intent to deprive Mr. Austin's rights, despite knowing his rights as Black admitted student are guaranteed under 1981, Equal Protection, 13th, and 14th Amendments show animus.   The Reconstruction Civil Rights Amendments, along with the Civil War, overturned the most racist, and embarrassing Dred Scott decision, so racist in its complete, and utter, disrespect for ALL Black Life, and Black Persons rights that it delegitimized  the US Supreme Court of its day: triggering Civil War: Apr 12, 1861 – Apr 9, 1865  (no matter enslaved or free, as it presumed inferiority and assumed Black People did no Rights.)See S-72

73.   Georgetown knows Black people fought in the Revolutionary war, yet the one drop rule for Black exploitation-subordination, purposes still became law, & custom, based on the same racist thought patterns reflecting (deep hypocrisy) Georgetown's current disparate treatment, impermissible-derogatory use of race; See S-73

74.   Taking persons, or human beings, without consent is kidnapping, or enslavement.  See e.g. Amistad (written decades before the 13th, 14th or 15th Amendments' Constitutional enshrinement, 16 years before Dred Scott [most racist opinion which helped directly spark the Civil War within 5 years of its ruling,] argued by 1 of 2 non-slave holding ex-Presidents of the United States, at the time, already recognizing the personhood, and fundamental rights of Black men and persons, including the right to self defense, even against White Corporate for-profit enslavers per La Amistad) The United States v. the Amistad, 40 U.S. 518 (1841) See S-74 Stripping rights, or reducing a human being to anything less than a full human being, with all rights and privileges is enslavement; barbarity.  Sex without consent is rape. Taking another's Property without consent is theft or conversion.

75.   Under current law these are principles commonly understood, as is the legal, and moral, liability of a world renowned university, in the business of teaching law, admitting it is illegal to take-exploit an up close photo without *prior written author--ization agreement,* and consent, of an admitted student See S-75

76.   Georgetown made this argument in Federal Court (*in D.C. Circuit; status and prestige among American federal courts generally considered second only to the U.S. Supreme Court*): See S-76;  Use of Mr. Austin's close up photo to publicize, market, for pecuniary gain heightens illegality-liability (privacy; publicity, 1981 rights). Yet, Georgetown did so willfully (despite their own Federal Court arguments against

**27 ; Opening Complaint**

being *forced* to disclose); They admit violation(s), but still proceed, to date, in a

pattern of 1. Equal Protection, 2. 1981 3. Deceit 4. Negligence and 5. Bad Faith to

Mr. Austin's detriment (without repentance, nor correction to Mr. Austin's ongoing

legal injuries proximately caused by Georgetown);

77.     Unfortunately, for Georgetown, they have chosen to treat Mr. Austin, an

admitted student, Black man, person, and human being, in an inferior manner as

compared to similarly situated non-Black male admitted students, *repeatedly and

ongoingly*, to (attempt) stamp or mark him with a badge of inferiority with multiple

1.Equal Protection, 2. 1981, 3. negligence, 4. bad faith  5. deceit violations to his

detriment creating immediate and *ongoing*  harms (& Georgetown' legal liability).

78.     Georgetown *intentionally* chose to "go astray" without fear the ones they

teach, and lead, will "go the self-same way" (*teaching, and modeling illegal conduct*):

**A Little Fellow Follows Me**

A careful man I ought to be, A little fellow follows me.
I dare not go astray, For fear he'll go the self-same way.
I cannot once escape his eyes, Whatever he see me do, he tries.

Like me, he says, he's going to be, The little chap who follows me.
He thinks that I am good and fine, Believes in every word of mine.
The base in me he must not see, That little fellow who follows me.

I must remember as I go, Thru summers' sun and winters' snow.
I am building for the years to be, This little chap who follows me.

*[Mindfully, I ponder each step I take; Knowing the path chosen they'll too partake
With each bit of wisdom I learn and share; So they are wise as the tortoise and swift as the hare
Though some may not care, excellence is aimed to be; So as the little chap looks in the mirror to see
True greatness shall be reflected in their own identity*

*A careful man I choose to be ; Because the day will come, eventually
When roles reverse, little seeds become strong trees; And, the little chap that follows me
Is now the one empowered, and shall be; The who is teaching, and caring for me]*

- by Rev. Claude Wisdom White, Sr (Quoted by John Wooden, of UCLA, one of the greatest (and winningest),
basketball coaches in NCAA history, establishing an NCAA men's basketball record winning streak of 88 games and
four perfect 30–0 seasons, and John C. Maxwell *Developing the Leader Within*, with an original added stanza, or two,
at the end by me, George Jarvis Austin, Self Represented Autodidact, and Developing Polymath).

Georgetown, in its role of teaching future leaders of our world, especially in the

legal realm, in walking distance from many of our nation's citadels of power, knew,

admitted, and publicly details per its own contractual, and policy, stated minimum

requirements its obligation-duties, to admitted student's written authorization

agreement (contract; 1981), privacy, and by extension publicity (as part of the 4-part privacy matrix).   Unlike *Rev. White's 'Little Fellow'* Georgetown demonstrates conduct that should not be followed, & induces legal liability for those who would; S-78

79.       Because Mr. Austin is early on in his career, and still in development, the improper use violations triggering Constitutional, statutory, and common law liability (*particularly by an institution charged with the public and private trust, receiving federal funds, to educate our populace in the law)* is particularly disturbing and violative of Mr. Austin's rights.   Georgetown's conduct toward Mr. Austin more resembles *Rev. Thomas Mulledy as they totally ignored Mr. Austin's Constitutional rights, enshrined after the Civil War, to eradicate all of the badges and vestiges of the enslavement period because he is a Black man*; See S-79

80.       Georgetown's illegal, facially discriminatory, and *extremely* hypocritical conduct toward Mr. Austin intends to "mark with inferiority." Georgetown's conduct in *direct opposition* to their own policy, and own arguments (*in the second (2nd) most prestigious US Court, outside of Supreme Court*), against *forced* privacy disclosures on the precise issue whereas they *knowingly, willingly, illegally* and *egregiously* violated-deprived, Mr. Austin's Constitutional rights to "stamp with inferiority" is akin to, but worse than the Letters of Recommendations in Ralph Ellison's *Invisible Man (used to mark the central character, a Black man, as inferior unbeknownst to him)*.  Here Georgetown went out of its way to a. disrespect,& show disrespect toward Mr. Austin b. violate the law c. violate its own policy d. violate a student's Constitutional rights while teaching them the law, and modeling illegal conduct e. violate the law to oppress, racially abuse, facially discriminate and exploit a Black male admitted student using race, or racially derogatory stereotypes, to exclude from programs and activities and to ultimately mark with a

EoR - 727 of 2347

badge of inferiority.   Georgetown's choice to go out of its way to disrespect Mr.

Austin's fundamental rights, person, and have over 100+ opportunities to

self-correct, but refuse was Georgetown, repeatedly, telling me, Mr. Austin, exactly

who they are.   Georgetown was being clear that they in fact *intended* to mark with

badge of inferiority not just in the present, but wherever I would use Georgetown as

a starting point for my formal legal career similar to the Letters of Recommendation

in *Ellison's Invisible Man*.   Because I believe Georgetown when they told me who

they are, and made clear that they *intended* to "run me down with this racist

b*llsh*t," as Sean Connery's character in *Finding Forrester* so aptly put it,

Georgetown's conduct is completely unacceptable.   Old habits appear to die hard;

Georgetown's conduct and communications, even Georgetown's letter admitting its

violations in 2019, seems to be asking the unstated question of *"But, if you let me*

*run you down with this racist bullshit….what does that make you?";* See S-80

81.     Georgetown owes duties to serve its Black male admitted students, and to not

violate their Black male admitted student's 1. Equal Protection 2. 1981 3. Due care

duties 4. Good faith duties 5. Non-deceit Duties (*defrauded out of above enumerated*

*rights, or privacy, or publicity rights, or Capital expended-committed by Mr. Austin*

*including $400.00 Consideration paid to consummate student contract with*

*Georgetown, and over $100,000+ committed thereafter; Mr. Austin can generate and*

*disclose more precise numbers when time for discovery, or settlement negotiations*).

**FAC COMPLIES WITH FRCP RULE 8, 15; 'ORIGINAL' JURISDICTION**

82.     It is well established, a complaint's length does not violate Rule 8 when

intelligible, organized, and provides fair notice of claims.   There are no page number

limits.   Mr. Austin's 64-page Amended Complaint, 17 pages less than *Hearns* in the

abundance of caution meets Rule 8 pleading standards under Ninth Circuit's

*Hearns.* See e.g. Hearns v. San Bernardino, 530 F.3d 1124, 1127 (9th Cir. 2008)

("81-page complaint alleging discrimination by an African American police officer …

meets Rule 8 standards). "Original," Federal Question, Jurisdiction exists per 28

U.S.C. 1331; See S-82

## ARGUMENT

It has also been observed that the "truth rarely catches up with a lie."
- **Gertz, 418 U.S. at 344 n.9, 94 S.Ct. 2997**

If you can wait and not be tired by waiting,
  Or being lied about, don't deal in lies,
Or being hated, don't give way to hating,
  And yet don't look too good, nor talk too wise
(*Proverbs warns of winks, their smiles hide the lies*
  *Let your yay be yay, then no need to surmise*
*Deceit seduces with sweet, but ends in its own demise*
  *For a loaf of broad, a whorish soul is fed*
*The wicked act as friends, but work as spies*
  *Siblings born for adversity, friends love at all times*

*How Devious to violate student's privacy, 13th, & 14th rights using lies*
  *Malicious harm when failing duties to investigate; pecuniary gain publicized*
*Violating Equal Protection, Due Process, Disparate Treatment, standardized*
  *When Georgetown's violations are clear; black letter law, no need to improvise*
*Dishonest scales, Detested, pride's avarice, lust of eyes*
  *Bold as a lion, Just, Goliath cut down to size*
*To keep one's peace in the midst of deceit, is a secret of the wise*
  *Seek first to Understand, Myopic Egotism makes hard to compromise*
*Wisdom is Better Than Strength, although the wise & poor maybe despised*
  *Ecclesiates, Better than shouts of rulers of fools, are quiet words of the wise*
*Devil's Advocate "Vanity is my favorite sin" because its ability to hypnotize -*
  *www.forbes.com/sites/luisromero/2021/06/21/vanity-the-devils-favorite-sin-and-leaderships-worst-enemy/?sh=2
4a1b05d114f*

  *Vain is a net in sight of any bird, traps hide from the eyes*
*I know why the caged bird sings, doubtless dreams materialize*
  *Body locked but can't trap my mind, in darkness see via mind's eyes*
*David in sheep dung, Joseph in the pit, leadership not yet fully realized*
  *Speak up for those who cannot, while seeing through a child's eyes*
*Jesus asked did you feed, clothe, visit, those in need?; He didn't hypothesize*
  *Separate the wheat; chaff, judge by Corinth or Galatia fruit, not criticize*
*Samson lusted for trust, Delilah pretended to empathize*

  *Joseph; Job, shined in adversity, disciplined mind, tongue, single eyes*
*Full of light, who they were in secret set them apart among the wise*
  *Honorable leadership listens for the oppressed or poor's cries*
*Deliberate indifference toward disparate treatment equals same shoe; same size*
  *Run down shoes, worn with scorn, malice cannot hide from Justice's eyes*
*A haughty look, gossip, lies are Vehemently despised*
  *Begin with end in mind, holes lead to ships capsized*
*Pride precedes a fall, Titanic didn't sink because iceberg unrecognized*
  *Humility before honor, integrity, Character is the prize*
*Be wise, A wolf is still a wolf even in a sheep's disguise*)
- **Kipling, IF (with extra stanza by me, George Jarvis Austin)**

**A.    Georgetown (in concert with YGR) impermissibly used race, or racial
stereotypes, to violate Mr. Austin's Equal Protection, as an admitted Black
male student, (after violating foundational school policies). Georgetown**

EoR - 729 of 2347

**impermissibly used race, or racial stereotypes to a. exclude (*from essential Georgetown controlled programs or activities*), b. create stigma, and c. stamp or mark with a badge of inferiority in as a recipient of federal funds *despite over 100+ opportunities for it to self correct after Georgetown's own admission(s) of guilt or liability.***

Georgetown with YGR impermissibly used race to deprive Mr. Austin's  rights.

83.    Georgetown impermissibly used race to treat derogatorily differently, "deny,

restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from

essential programs or activities because he is a Black male admitted student in

violation of his Equal protection, violating the face of the statute, and

Constitutional Jurisprudence (*after exploiting his image; violating his right to

contract.*)  See S-83; para 8-81: Georgetown chose to exploit Mr. Austin's image,

rights for business purpose, without consideration of his personhood, nor rights

(*including contract*) under sec. 1981 because he is a Black man (*echoing the pattern

of the enslavement period toward Black people*). See para.8-81;44; S-83

84.    Georgetown admits to violating Mr. Austin's rights to contract, privacy, and

publicity, in a racially intentionally discriminatory manner, in violation of its

mandatory written authorization agreement policy (with an 'evil eye and unequal

hand" to his detriment) that marks Mr. Austin with a badge of inferiority. The badg-

-es of inferiority violate Mr. Austin's equal protection and reflects "badges and incid-

-ents of slavery," as Black persons' contract, and other rights were routinely racially

abused, or ignored altogether during enslavement to connote presumed "inferiority"

via disparate treatment)  See para. 8-81;  S-84

Georgetown, a recipient of Federal Funds, impermissibly used race, or derogatory
racial stereotypes, to exclude Mr. Austin from essential programs and activities

85.    After Georgetown admitted this first violation they 'should have' taken

initiative, disclosed materially omitted information, and proactively investigated

why they went out of their way to treat Mr. Austin in an inferior manner (to correct disparate treatment), but did not. See Facts para 8-81;57: See S-85

86.    Instead, Mr. Austin had to formally complain to an essential program or activity of Georgetown, IDEAA, about Georgetown's leadership's actions to violate their own policies (*at least 3 separate essential Georgetown violated policies by Georgetown*)  in a discriminatory manner using "race…. as a negative" to deprive Mr. Austin.  See para. 8-81;  The Originalist prohibition on Anti-Black intentional discrimination in sec. 1981, and 13th Amend., is coextensive with Equal Protection and sheds light on Georgetown's precise use of anti-Black derogatory treatment based explicitly on race, or racial stereotypes to both a. illegally give similarly situated non-Black male admitted students unfair advantage in resolving comp-

-laints throughout their educational process and b. intentionally disadvantage Mr. Austin, a Black or African-American male admitted student, preemptively depriv--ing of opportunity (right to make,  enforce, etc., a contract); See S-86

87.    Georgetown's actions toward Mr. Austin thereafter show their true racially discriminatory intent, upholding notions of "White Supremacy," enforcing stigma, "Black [Male] Inferiority" as they refused to even acknowledge Mr Austin's 100+ complaints *(despite him following their written policy)*, *after* already admitting the violations, let alone actually doing their mandated duties.  When Mr. Austin, (*who per their express policy, and Title VI , is entitled to the essential "program or activity" of Georgetown,*) followed their directions to participate for the purpose of correction of their admitted wrongs; he was excluded based on race, or racial stereotypes, in a facially discriminatory manner. See para. 8-81; See S-87

88.    The Ninth Circuit recently ruled, when a student is experiencing a violation

of school policy and reports that conduct to the appropriate University body,

especially when violation is by someone-something under University control, then

it's a violation of Equal Protection to deny the student investigatory-enforcement,

services as a victim, or survivor, of the violation. See para. 8-81; S-88

89.    In *Brown v. Arizona* the alleged violator was a fellow student in an area of

University control; the liability-violation.. heightens when the University, or

Administrators, itself is violator (as is the case here when Mitch Bailin *admits*

*violations*). See para 8-81  In fact, Georgetown's policy explicitly says they

themselves heighten the liability when there is a power imbalance or abuse of

power between a student (experiencing the violations) and professor or adminis-

-trator (violators). See para. 8-81**;** 58-59; See S-89

Georgetown's display of discriminatory animus is heightened by the violator's
(University leadership's) relationship to the violated (student), and the subsequent
100+ discrete adverse (non)acts ..showing deliberate indifference (discrimination)

90.    Once the University has notice of the violation, and has notice of the

complaint by the student, a failure to act is in itself deliberate indifference and

disparate treatment (discrimination) of that complainant or student entitling, the

student, to damages in private suit. See para. 8-81; See S-90

91.    Both action, and inaction when duty arises, can constitute discrete acts of

adverse actions (non-actions) and thus disparate treatment and violations of policy,

law and the Constitution.; See para. 8-81; See S-91

92.    Georgetown knew its own policies, the overarching law, and willfully violated

privacy, publicity, 1981 contract rights.  And, was put on notice school wide, once

Mitch Bailin admitted 1981, privacy, violations in writing (*but, still did not disclose*

*materially omitted, or misstated facts to Mr. Austin i.e. how many brochures, where exactly mailed to or utilized, exactly when was photo exploited, etc.*), but made no apology for violating Georgetown Media Policy, Privacy Policies, and the surrounding law they are based on (including sec.1981). Further, when Mr. Austin publicly, with over 300+ witnesses, made over 100+ complaints, and inquiries, in a span of 4+ years to the designated body under the Universities control (IDEAA) designed to investigate-correct discriminatory violations of school policy, George--town showed deliberate indifference animus & malice (*going out of its way to be facially discriminatory to Mr. Austin's 100+ complaints, zero acknowledged, followed up on, let alone escalated for investigation; remedy*); See S-92

93.    Mr. Austin's notice [report] provision more than meets *Brown v. Arizona* standards, as Mr. Austin followed University policy, and recommended guidelines on over 100+ instances, with over 300+ witnesses, for quickly approaching 5 years, to complain (providing 'notice') to IDEAA regarding violation of his rights and school policy *(as instructed by Georgetown policy; despite explicit admissions of violation of University policy in 2019 (after the fact), extreme departures of ordinary standards of care, violations of Mr. Austin's rights to contract in a facially discriminatory manner).* See para. 8-81 ; See S-93

94.    Georgetown impermissibly used Mr. Austin's race (and perhaps gender, too) to his repeated detriment, as an admitted student, and Black man to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin. Georgetown willfully violates its explicitly stated duties to "provide a mechanism for … a prompt, fair, and impartial investigation and resolution of grievances" or *ANY* first step to an investigation (let alone

EoR - 733 of 2347

correction-resolution), at all per Georgetown's explicit standards. Georgetown's discriminatory conduct is highlighted in its *publicly stated policy* that every "faculty, staff, students, third parties and applicants for employment and admission" are entitled to receive a prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation," but *intentionally excluded* Mr. Austin, preemptively because he is a Black man admitted student. Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident & seek redress through IDEAA's Grievance Procedures, but excluded Mr. Austin who reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981,privacy, publicity rights* and have not received even one follow up email to begin process (*let alone resolution*). S-94

95.    Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of Georgetown policy, (*after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown controlled area program or activity; for business purposes*) is the essence of Equal Protection violations; See S-95

96.    Beyond Georgetown's exclusion, 'deliberate indifference' to that discrimination also highlights their animus (as they internally already knew they violated Mr. Austin's 1981 rights, *discriminatorily*, but continued to exclude from 'program(s) to correct Georgetown's previous violations*). See S-96

36 ; Opening Complaint

97.    Calling a Black man a n*gg*r is perhaps the most obvious racial slur, or

derogatory stereotype (*imbedded in the definition of the word www.merriam*

*-webster.com/dictionary/n\*gg\*r*), but is clearly not the only one, and the same

message can be communicated verbally, or with Conduct.  Treating someone as an

"n-word" without actually saying the word, especially via disparate treatment to

exclude and to "mark with a badge of inferiority," is just as illegal and damaging to

that person as Georgetown did here (presumed "unworthy of consideration"), unapo-

logetically, repeatedly, *ongoingly* violate their policies, & the law. See  S-97

98.    Georgetown's Equal Protection violations were evident in Georgetown's

repeated refusal to investigate, at all (*after they admitted 1981, privacy, publicly,*

*and media policy violations in writing,)* as Mr. Austin reported, inquired, & formally

complained (to the President's office, and other Georgetown leadership).  Mr. Austin

sought to find out what was going on in the first place, and have subsequent

investigation and correction to the victim or survivor of the discriminatory conduct

by the university (i.e. the one being wronged; George Jarvis Austin), but

Georgetown's continued displaying discriminatory intent…in refusing to investigate

[discriminatory, illegal, violative] acts against a victim."; See S-98

99.    Mr. Austin was completely excluded-blackballed creating "stigma' .. outlined

in *Brown v. Board of Education*; Georgetown refused..take the first *mandated*

step-action, for an admitted Black male student, that they would take *even* for a non

student 3rd party complainant per their own policy (displaying even more disparate

treatment; discriminatory animus), let alone similarly situated non-Black, or White,

similarly situated students. See para. 8-81; 63-66; See S-99

100.   It is well established that facially discriminatory rule application, as

Georgetown is doing, *even on* facially neutral laws-policy offends the Constitution.

Any statute-policy which classifies people 'may' be irrational (or facially discrimin-

-atory) as applied in particular cases.  Unequal application of law-policy, only to Mr.

Austin's detriment, disrespecting his personhood, or rights because he is a Black

man, student, & person equates to Equal Protection violations (i.e. when simultan-

-eous unfair benefits to similarly situated others while depriving him); S-100

101.   Georgetown's choices to create stigma with unequal treatment, attempt to

mark Mr. Austin with a badge of inferiority by repeatedly, over and over again

treating Mr. Austin in an inferior manner highlights Georgetown's commitment to

violating Mr. Austin's right to Equal Protection.  See S-101

102.   Mr. Austin provided Georgetown over 100+ opportunities for self correction,

with over 300+ witnesses; They refused to provide even a *veneer* of following the law

& violate Mr. Austin's Equal Protection by exclusionary conduct (I.e. ***IDEAA steps***

***I-V)***.  See para. 8-81; 28-29 ("Requirements for Filing Grievances" ideaa@george

town.edu; "Procedures for Processing Grievances" IDEAA steps I-V beginning with

intake - none which were complied with by Georgetown); S-102

   Georgetown's initial violations of law and policy, to deprive Mr. Austin's  rights,
combined with subsequent discrete, repeated, overt, and extreme deprivation along
with Georgetown's impermissible use of race, or derogatory racial stereotype, made
   clear Georgetown intended to mark [Mr. Austin] with a badge of inferiority.

103.   To avoid the stigma of disparate treatment (via separate and unequal

treatment and application of policies) as *Brown v. Board* articulates Georgetown's

application of law and school policy toward him should not presume 'inferiority' for

Black male admitted students, as compared to similarly situated non-Black male, or

White, admitted students (but it was, and continues to be). See S-103

**38 ; Opening Complaint**

104.    Georgetown chose to make clear their *intent* to facially discriminate based on race, or derogatory racial stereotypes. See para. 8-81; 40-47. Georgetown didn't acknowledge Mr. Austin's complaints (as mandated), let alone take *any required* steps on his formal complaints (i.e. excluding him) as compared to similarly situated non-Black male, or White, admitted students. See para. 8-81:  S-104

105.    Georgetown's impermissible use of race, or derogatory racial stereotype(s) of Black males to convey assumptions of inferiority, preemptively excludes a Black male admitted student from essential Georgetown 'program(s)-activity' based on express classification identified through Georgetown's conduct toward Mr. Austin (*and violates Equal Protection as Georgetown engaged in official adverse decision making by derogatory racial stereotypes*). See para. 6-81; S-105

106.    The combination of initial violations in total disregard of Mr. Austin's rights as a Black male admitted student, admitting violations only *after* getting caught, refusal to apologize for violating 1981 rights-Georgetown's (written authorization agreement policy), with anti-Black male exclusionary policy-practices, demonstrate Georgetown's *repeated* choices to "mark with a badge of inferiority" because of Mr. Austin race, or derogatory racial stereotypes.  See para. 8-81  If Mr. Austin had any doubt before hand, Georgetown made clear after that they absolutely *intended* to discriminate because of Mr. Austin's race; See para 8-81; S-106:  Ms. Gonzalez Rogers previously has demonstrated extreme incompetence, ultimate repeated disrespect, & anti-Black male discriminatory animus, toward Mr. Austin.  Ms. Gonzalez Rogers demonstrates an ongoing propensity to interfere with Mr. Austin's legal exercise of his rights (*including rights to Equal Protection under the law, Privacy, 42 USC 1981, Due Process, and other Constitutional Rights*).  Ms. Gonzalez

Rogers has gone out of her way to, making overt administrative acts, show a

disrespect of the Federal Rules of Civil Procedure, or extreme incompetence of them,

with discriminatory animus toward Mr. Austin (i.e. not understanding service of

process by the ECF system, nor Amending Complaints).  Mr. Austin adds YGR as a

Defendant not for liability in the damages portion of the Demand, but simply as the

Supreme Court, Ninth Circuit, and California Supreme Court explicitly provides for

injunctive relief to prevent her *ongoing* negative, administrative, & discriminatory

interference with Mr. Austin's exercise of his Constitutional Rights to Due Process,

Equal Protection, & other fundamental rights, creating both conspiratorial criminal,

& civil injunctive, liability for Ms. YGR.  See e.g. 18 USC §241, 242.  See Dckt 15-16

**B.     Georgetown (with YGR) violates 42 USC 1981 by a. literally depriving Mr. Austin's rights to contract before and after exploitation of his image or likeness for business purposes in refusing to even offer a contract, *as mandated* ([written authorization agreement](#)) in the same way similarly situated non-Black male admitted students are offered, in violation of their own *publicly* stated filming policy, b. Subjecting Mr. Austin to separate, facially discriminatory, unequal student contract policy conduct for Black male admitted students to their detriment.**

Georgetown impermissibly used race to deprive Mr. Austin's 42 USC 1981 rights.

107.    Georgetown impermissibly used race to deprive Mr. Austin's section 1981

contract rights making clear Georgetown employs one set of essential policies for

Black male admitted students, to their detriment, and another for non-Black male,

or White, admitted students to their unfair advantage; [See S-107](#)*;*

108.    Georgetown's different 1981, privacy, publicity, media and complaint policies

for Black men, and facially discriminatory policies based on impermissible use of

race, or derogatory racial stereotypes, for Black male admitted students vs.similarly

situated non-Black male admitted students highlights this very straightforward,

and promising, section 1981 claim.See para. 8-81; 12-..15,56; [S-108](#)

109.   Georgetown's violation of sec.1981 right "to make" contracts (*written auth-*
*-orization agreement; required*) is such a blatant violation that the more limited
1981 language would encapsulate this scenario as Georgetown's conduct deprived
Mr. Austin's contract rights even prior to 1991 Congressional expansive language
clarification expressed in *Patterson v. McLean Cred.Union;* See S-109

110.   Georgetown admits, *publicly,* that when an organization *refuses* to contract in
facially discriminatory manner, (i.e. obligated to contract)  they violate 1981 even
prior to Congress' more expansive language beyond just "make and enforce"
terminology. (i.e. *when exploiting a student's picture for business purposes as George-*
*-town did without Mr. Austin's written authorization*); See S-110

111.   Georgetown *publicly* admits, that written authorization requires Mr. Austin's
*prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business
use, d. presentation of written contractual agreement to consent to business use, e.
with General Counsel approval of form f. signature consenting *prior* to use.  George-
-town *admits* it had none of the above.  Georgetown's first acknowledgement of
business use was *after* Georgetown's exploitation without consent (*after* lying to Mr.
Austin).See S-111 No offer, acceptance, consideration, or signature (per required
written authorization), then no contract; thus Georgetown's violation;

112.   Georgetown went out of its way to violate every related Georgetown *publicly*
*listed* policy-law (i.e. mandatory written authorization agreement) while exploiting
Mr. Austin's image, for business purposes to *intentionally*-literally deprive Mr.
Austin's 1981 right to contract because he is a Black man and admitted student,
while providing unfair advantages with limited resources to similarly situated
non-Black male, or White, students.  See para. 8-81; 20-25; See S-112

**41 ; Opening Complaint**

113.    Georgetown violates 1981, in one of the most "blatant deprivations of civil rights," by refusing to offer Mr. Austin a contract because he is a Black male stud-ent, on the same basis as non-Black male, or White, similarly situated offerrees ( admits-exploiting image for pecuniary gain; no consent); See S-113

114.    Because both the law, and Georgetown's own explicitly stated policy requires notice to Mr. Austin, disclosure to Mr. Austin of possible usage for mutual assent, offer or presentation of contract (written authorization), and contract signature, *prior to* Georgetown's business usage of Mr. Austin's likeness or photo they literally deprived his right to contract by not doing the required process, or steps.  See para. 8-81  Further, because those steps are the steps a non-Black, or White, similarly situated student would be offered, and Georgetown chose to employ a separate and unequal process, or policy, for Mr. Austin to his detriment, Georgetown discrimin- -ated against him. See para. 8-81   Moreover, because they continue to employ this facially discriminatory policy to date, despite having numerous opportunities to correct Georgetown made clear their intent to discriminate, and  "but for" Mr. Austin's race he would have been offered a contract the same way non-Black, or White, similarly situated offerees would be offered.  See para. 8-81

Georgetown's 42 USC 1981 contract violations are not just similarly situated would-be offerees, but disparate treatment in the existing consummated student contract.

115.    Georgetown violates 42 USC 1981 by treating Mr. Austin in an inferior manner in violation of its consummate student contractual mandates, its own privacy, IDEAA, and other policies, as compared to similarly situated non-Black male students.  The Originalist prohibition on Anti-Black intentional discrimination in sec.1981, and 13th Amend.., is coextensive with Equal Protection and sheds light on Georgetown's precise use of anti-Black derogatory treatment based explicitly on

race, or racial stereotypes to both a. illegally give similarly situated non-Black male admitted students unfair advantage in resolving their complaints throughout their educational process and b. intentionally disadvantage Mr. Austin, a Black or African-American male admitted student, preemptively depriving Mr. Austin of, opportunity, right to make and enforce, etc., a contract; See S-115

116.    Georgetown chose to exploit Mr. Austin's image and rights for commercial or business purpose without consideration of his personhood, nor rights (*including contract*) under sec. 1981 because he is a Black man (*echoing the pattern of the enslavement period toward Black people*).  See para. 8-81;44; See S-116

117.    Georgetown's written admitted choice, in 2019, to violate Mr. Austin's rights to contract, privacy, and publicity, in a racially intentionally discriminatory manner, in violation of its mandatory written authorization agreement policy (with an 'evil eye and unequal hand" to his detriment) already marked Mr. Austin with a badge of inferiority.; The badge of inferiority violating Mr. Austin's right to contract is part of the "badges and incidents of slavery" because Black persons' contract, and other rights were routinely racially abused, or ignored altogether during the enslavement period (to connote presumed "inferiority.") See para. 8-81;16-17 See S-117

118.    Georgetown's discriminatory animus is not just shown in failing to 'make' a contract when required to do so with written authorization agreement (before *and* after *already* exploiting Mr. Austin's image for commercial gain, or business purposes), but in the discriminatory or disparate treatment after consummating the student contract by depriving essential benefits of the agreement, and subjecting to different, facially discriminatory policy as compared to similarly situated non-Black, or White, students. See para. 8-81**;** 27-35,52-59; See S-118

119.  Georgetown's conduct toward Mr. Austin violates multiple sections of the broad definition of 42 USC 1981 with its disparate privacy, publicity, contract, IDEAA (anti-discrimination), policies.  See S-119

120.  Georgetown's deprivation of rights to contract toward Mr. Austin, as a student, is highlighted in Georgetown's refusal to follow its own policies *(in the full language of 'make and enforce contracts' including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.")*  Thus, the Court should consider whether Defendant failed to follow its own privacy, media, contract, publicity, IDEAA, etc. policies as evidence of discriminatory intent can be inferred from an organization's failure to follow its own policy.; See S-120

121.  One of the more obvious failures to follow their own policy, showing discriminatory animus or intent, is Georgetown's abject failure to abide by *any* of their **mandatory** steps in IDEAA conflict resolution policy (I-V).  Georgetown admits, *publicly,* that a student, or "Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")" can make a complaint via email or in person, and is encouraged to do so;  Further, Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its own policies or the law that informs and undergirds IDEAA; S-121

122.  Georgetown admits, *publicly,* that facially discriminatory conduct, by administrators, faculty or staff to the detriment of a student, particularly a Black male student in this case, is especially concerning and according to their policy is of the highest priority, yet they themselves discriminated by not even taking a first

step to acknowledge, let alone investigate and correct an administrators written admission of serious, illegal, school policy, and legal violations, of an admitted Black male student  showing discriminatory animus towards him.; See para.  8-81; S-122

123.    Georgetown admits, per Mitch Bailin's, and Georgetown's President's Office, Vice President's Office, General Counsel's Office, and other leadership's *lack of response nor answers*, despite over 100+ formal written complaints in front of over 300+ separate witnesses (including other Georgetown leadership who could also chime in), that they *never* provided this fraudulently omitted material information. Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+ witnesses, as its failure to correct, nor provide the materially omitted information, was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial use,* of how important that information is in regards to privacy, publicity, and contract rights (as well as policies requiring disclosure of these material facts to Mr. Austin,having violated his rights).  See para. 8-81;33-37; See S-123

124.    Georgetown *publicly* admits that it takes written authorization forms seriously for both medical and student privacy protected information, and that should define an admitted Georgetown student's reasonable expectation of privacy See para. 8-81  Georgetown *demonstrates, and admits in writing and via conduct,* that under no circumstances should medical information or a photo be released or commercially used (photo) without the student's written authorization agreement (contract); Georgetown advocates this position so strongly (*despite California's CMIA, or HIPAA requiring only patient request*) that they refused to release Mr. Austin's own medical records *to himself* without signed written authorization (*but*

*ironically commercially used his photo without his a. knowledge, b. consent, nor c. written authorization in violation of policy mandate*). See S-124

125.   The expansive language of sec.1981 covers a. Georgetown's failure to make a contract per mandatory written authorization agreement-contract b. Georgetown's disparate treatment within contractual relationships depriving Mr. Austin of the "performance, benefits, privileges, terms, and conditions" of the admitted student "contractual relationship" to his detriment. See S-125

126.   Mr. Austin is a Black or African-American man (protected category), whose economic contract IP (intellectual property; likeness; publicity) rights were non-consensually commercially exploited by Georgetown.  Georgetown preemptively violated 1981 rights (created mandate for Georgetown to attempt contract; denied contract rights).   Mr. Austin repeatedly complained to get facially discriminatory ("but for"; "because of") violations corrected-investigated per consummated student contract's privacy, publicity, media, contract, and IDEAA mandatory policies, but was denied over 100+ instances (repeated denials of contract rights; inferior treatment); Constitutes a 1981 prima facie case, & more.  See S-126

127.   Georgetown's display of discriminatory animus toward Mr. Austin is transparent enough to even pierce the veil of a public official's qualified immunity under the Ninth Circuit's *Yoshikawa v. Seguirant;* Georgetown a. made the initial technical and substantive violations (sec.1981) to Mr. Austin's detriment b. admits the violations in writing c. continued the discriminatory pattern of conduct by not taking required non-prompted corrective measures to make right with Mr. Austin (after taking something they did not own nor were entitled to) d. refused appropriate investigative, or corrective action after Mr. Austin made over 100+

formal complaints and e. has no explanation, nor justification, (to date) for why they

behaved in that manner and felt entitled to take economic rights that did not belong

to them (outside of discriminatory animus).  Georgetown' discriminatory conduct

trumps *Yoshikawa v. Seguirant as they* first made the errors, and then continued

discriminating whereas in *Yoshikawa* defendant's asserted reason was plaintiffs

technical violation which still didn't justify their discriminatory application of law

or policy *(Georgetown did the technical and substantive violations with the lower*

*threshold of liability for a private actor receiving federal funds, making an even*

*more obvious finding of discriminatory intent-animus).* See S-127

 Georgetown stole, converted, or took valuable property-economic rights that belong
to Mr. Austin that they are not entitled to without his express written authorization
    agreement (*which they did not obtain*), and thus violated his sec. 1981 rights.
128.    Georgetown knows, and publicly admits, the rights they stole, converted, or

took without authorization do not belong to them, nor are they entitled to those

rights.  See para. 8-81; 68-71; See  S-128

129.    Georgetown admits, the rights they stole.. took without authorization are

valuable-important, even for persons without an easily definable-referenced, pre-set

commercial value.  See para. 8-81;19,48-49; See S-129

130.    Georgetown admits, *publicly, (in its description of the required pre, and post,*

*photo or filming required steps for outside photographers*), that it holds itself to the

same standards for students, faculty and staff;  Georgetown also admits, *publicly,*

that not only must the written authorization, as a contractual agreement, be signed

by the student *prior* to use, but that the form itself 'must' include certain

information to be valid, and enforceable (and even includes an example

photographic/ videographic release form for students in their continuing education

programs; Georgetown's neighbor George Washington University publicly provides a comparative example for its own students ).; See S-130

131.    Georgetown also knows its students are hand selected, go through an elite screening process, and very high potential, with at least two past US Presidents, 2nd highest feeder to US Legislature and world leaders in a variety of spheres; Of course, privacy is extremely important in the USA's physical locale with the highest concentration of espionage (D.C.) especially at a vulnerable, impressionable and developing point in a person's life. See Facts sec. para. 8-81 ; See S-131
Georgetown took what wasn't theirs, impermissibly used race, & disparately treated a Black male admitted student; they openly *intended* to mark him with a badge of inferiority 'stigma' echoing in *Brown v. Board. See para. 40,80* See S-131

132.    Georgetown's impermissibly use of race, & derogatory racial stereotypes, to mark Mr. Austin with a badge of inferiority through disparate treatment has a long, ugly, history in Education (i.e. *Brown v. Board)* See.para. 8-81; See S-132

133.    Georgetown's 1981 violations attempt to mark Mr. Austin with a "badge of inferiority"(*overt disparate treatment*; stigma). See para. 63-73; See S-133

134.    Georgetown, with YGR, went out of their way (repeatedly breaking normal policy, protocol and process) to demonstrate they *internally* 'possessed' no intention (despite outward proclamation, written policy, the law and Constitution) on treating him equally to similarly situated non-Black male students, but instead bent on promulgating  facially discriminatory, separate and unequal policies toward Mr. Austin in violation of *Brown v. Board*.; See S-134 ; See para.106 (YGR)
Georgetown's conduct mirrors that of an 'enslaver' to a Free Black man imposing the "badges and incidents of enslavement"  irregardless of his rights, needs, concerns, questions, complaints or objections to Mr. Austin's detriment.

135.    Because Georgetown knew, on the front end, that these rights did not belong to them, nor were they entitled, and according to their own *publicly admitted*

48 ; Opening Complaint

explicit written text required written authorization from Mr. Austin, their conduct toward Mr. Austin is extremely telling of their own racist presumption(s), resembling an "enslaver" as they felt entitled to just take without informing, asking, nor receiving permission or authorization in any form whatsoever. ; See S-135

136.   As articulated above in paragraph 74:

"Taking persons, or human beings, without consent is kidnapping, or enslavement. See e.g. (written decades before the *13th, 14th or 15th* Amendments' Constitutional enshrinement, 16 years before *Dred Scott* [most racist opinion which helped directly spark the Civil War within 5 years of its ruling,] argued by 1 of 2 non-slave holding ex-Presidents of the United States, at the time, already recognizing the personhood, and fundamental rights of Black men and persons, including the right to self defense, even against White Corporate for-profit enslavers per *La Amistad*) The United States v. the Amistad, 40 U.S. 518 (1841); Stripping rights, and reducing a human being to anything less than a full human being, with all the rights and privileges is enslavement, and barbarity.  Sex without consent is rape.  Taking Property of another without consent is theft or conversion.  Under current law these are principles commonly understood, as is the legal, and moral, liability of a world renowned university, in the business of teaching law, knowing  that it is illegal to take, and make public, an up close photo without prior written authorization agreement, and consent, of an admitted student:(by its own written admissions"

See paragraphs 8-81; See S-136

137.   Georgetown admits, *publicly,* that it has a history of depriving Black persons rights, even in the most brutal expression of enslavement.  S  Georgetown *publicly admits* that it literally deprived Mr. Austin right to make a contract because authorization agreements are mandatory contracts of adhesion when Georgetown uses admitted students, or other persons, image for business purposes; their choice to purposefully violate their own mandate, and preemptively deprive the making of that contract violates 42 USC 1981 (*as 1981 protects would-be contract makers in the contract making process as well as those violated in the broad language of rights, enjoyment of benefit, or enforcement process*). See S-137

138.   Georgetown *publicly* admits that enslavement of Black people in this country, which Georgetown personally partook in, was in part exploitation of Black people *without even considering* Black people's rights or needs, (*and including rights of recognized personhood, citizenship, "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the*

*security of persons and property as is enjoyed by White citizens*," etc.) and ironically

is a similar pattern to which Georgetown behaved in exploiting Mr. Austin's right to

contract (i.e. written authorization agreement in reference to his person, privacy,

publicity, etc.); this is why 1981 had to explicitly state Black men, and people, have

the "same right to contract as a White man" because racism, and discrimination

built in assumptions of inferiority & presumed it could take from Black people with-

-out 'consideration,' or 'mutual assent,' but instead by force;  See S-138

**C.     Georgetown induced contract formation with Mr. Austin as a student
through actual fraud, misstatements on its commitment to follow the law,
misstatements regarding its contract, misstatements regarding its own
policies, and continues its deceitful pattern in its ongoing pattern of *still*
omitting material information after admitting its violations of its own
policy, contract, and the law.**

"look. I'm being honest with you. Anything less  would be disrespectful…"
- **President John Quincy Adams** with **Cinque** (pre-trial dialogue before winning in the Supreme Court of the United States)

  Georgetown made false promises of fact to induce student contract formation.

139.    As President John Quincy Adams articulated to Joseph Cinque, while

representing him before the Supreme Court of the United States, galvanizing the

abolitionist movement, "Anything less (than honesty) would be disrespectful."

However, in choosing the *disrespectful and deceitful* path, Georgetown made several

false promises to induce contract formation with Mr. Austin as an admitted student,

that their subsequent, and *ongoing,* conduct (*and admissions of fact*) demonstrate

they had no intention of ever following through on like Ninth Circuits *City

Solutions, Inc. v. Clear Channel*, upholding 2004 $9,800,000 million fraud

judgments (*approx. $16,000,000 million adjusted for 2023*)]; See S-139

140.    Specifically, Georgetown promised to be a law abiding university that seeks

justice, and an organization that 1. holds themselves accountable, 2. responds to

student needs, 3. follows privacy, publicity, media, commercial usage, and contract (1981) best practices (and at minimum a written authorization agreement before commercial usage), 4. is committed to students' Equal protection and anti-discrimination, etc. to induce contract formation, but went out of their way to violate these provisions. See para. 1-81; 18; See S-140;

141.    Georgetown then went out of their way not to correct their conduct (while alerting me that they knew it was wrong in 2019, and did it *anyway)*, just to show they had no *intent* on ever fulfilling their promises. See para. 8-81  However, this is not their only fraud; Georgetown is *continuing in a pattern of deceit,* as they continue to omit material information *after* already violating Mr. Austin's 13th, 14th, Equal Protection, 42 USC 1981, and Title VI rights, and choose to "remain quiet when they have a duty to speak." See S-141

142.    Georgetown's ongoing pattern of deceit, false promises, misrepresentations, omissions, from the time Georgetown sought to enter into student contract,has continued until the present. Georgetown's pattern of deception by virtue of an offer they made to induce contract with a series of false promises (written), material omissions, and affirmative misstatements (*admitted publicly)* that to date continue to deprive or harm Mr. Austin. See  para.. 8-81;17-35;  See S-142

143.    All of Georgetown's highlighted above conduct (para. 17-35) violates their promises to induce student contract formation with Mr. Austin.  Mr. Austin is aware (and includes the required facts) for the precision of pleading required for fraud per FRCP 9b, and is also aware of the exceptions whereas Georgetown and Georgetown only would have access to those facts (Mr. Austin motions for missing materially omitted facts causing *ongoing* harm). Georgetown has purposely refused over 100+

times to provide the required materially omitted information, and failed to correct

conduct showing material misstatements & false promises. See S-143

144. *Gilbert v. Minnesota's* quoted Army recruiter handbook's statement applies to

Georgetown's conduct."All progress and success rests fundamentally on truth….

Hence never resort to indirection or misrepresentation or suppression … of the

facts."  Because of the significant amount of sacrifice, and delayed gratification

involved in the choice of which law school an admitted student chooses, when

weighing the options, truth is essential and fraud (especially by an Organization,

like Georgeown, held in the public trust) is disastrous. See S-144

   Georgetown induced Mr. Austin to leave his state of residence, job offer
 accompanying winning Elite fellowship, other business opportunities, other top tier
 law school offers with false promise of a law, policy, and promise abiding University.
145.  Mr. Austin reasonably or justifiably relied on Georgetown's false promises;

See para. 16; See S-145

146.   If Georgetown had not made misrepresentations to Mr. Austin then he would

not have entered their student contract (shows reliance).See S-146

147.   Georgetown defrauded out of initial $400 consideration, and thousands more

thereafter, as well as missed opportunities; Mr. Austin had guaranteed job as part of

winning elite, uber-competitive, fellowship that I turned down based on giving my

word, other employment or business opportunities (outside of that context), as well

as time, frustration, and energy expended holding Georgetown accountable for their

illegal conduct when they should be the one teaching me in word & deed (modeling

good behavior for their students, and future leaders). See S-147

   Georgetown's fraud includes material omissions, misrepresentations, and false
 promises violating 1981 and refused to disclose materially omitted information.

148.    Georgetown made material representations (material statements of fact) to induce consummating a contract between University and student (Mr. Austin). Georgetown promised to be a law abiding university that seeks justice, and an organization that 1. holds themselves accountable, 2. responds to student needs, 3. follows privacy, publicity, media, commercial usage, and contract (1981) best practices (and at minimum a written authorization agreement before commercial usage), 4. is committed to students Equal protection and anti-discrimination as well as others  to induce contract formation, but then went out of their way to violate these provisions with regard to Mr. Austin.  See para. 8-81  All of these statements, and promises, are material as they were designed to "influence" Mr. Austin's decision to enter into contract, and in fact did. See S-148

149.    Georgetown admits, it induced Mr. Austin with "material" false promises of its fundamental, and guiding, *principles* (policies, and law) *publicly espoused* while doing opposite toward Mr. Austin as a Black male admitted student (explicit *publicly stated* privacy policy; *IDEAA policy* to address and eradicate *violations of school policy especially by administrators or school leadership, themselves ; written authorization policy whereas Mr. Austin could and should feel safe without worry of unreasonable intrusion on his privacy, publicity or contract rights without foreknowledge or written consent authorization contract)*; See S-149

150.    Georgetown continues to omit material information, despite .. admitting their violations, and without regard or consideration to Mr. Austin's privacy, publicity, nor 1981 rights violations, as well as 100+ complaints, in the following approx- -imately 5 years, with over 300+ witnesses (in writing). Georgetown's overall conduct establishes a pattern-practice of deceitful conduct that harms Mr. Austin.

53 ; Opening Complaint

University leadership's 1.compliance (or non-compliance) or 2.conduct following (or violating) the law-policies (especially when precisely written) is foundational and material to admitted students, as well as the government; See S-150

151.   Outright false statements, silence when duty calls to speak, omissions, false reasons, specific promises of future conduct, are material, repetition of the fraud or materially omitted information is not necessary for materiality, but can add to liability (as Georgetown continues its material omissions).See S-151

152.   Comparing to criminal liability's higher threshold helps to show how illegal, Georgetown's conduct actually is.See para. 8-81; 54-61; See  S-152

Georgetown displays *scienter and intent to deceive* as it continues in an *ongoing pattern of 'material' deceit, misrepresentation and omissions.*

153.   Georgetown's conduct (para. 54-61) displays scienter-intent to deceive as they continue to evidence an ongoing pattern of 'material' deceit, omissions & misrepres- -entation .See para.8-81  Georgetown's *ongoing* conduct shows scienter, pattern, direct evidence it never intended to follow through; See S-153

154.   Georgetown's representations were false; Georgetown is still showing, four years after already admitting falsehoods, (& violations) they had no intention of 1. them being true 2.correcting 3.apologizing for violations.  See S-154

155.   When made, Georgetown knew the statements were false (as they have shown no *intent* on correcting even after admission of violation) and engaged in reckless, willful, malicious conduct that knowingly violates previous promissory inducements, and even more have continue to omit material information (which should have been included in the letter from Georgetown admitting their violations); Similar to *Andrade's Locke v. Warner Bros.* analysis, Here Georgetown admits, and continually demonstrates, Georgetown's unwillingness to not only

follow its policy, but absolute unwillingness to even give the 'facade' of its minimum standard of care (*including its self defined legally required steps collaboratively with Mr. Austin*) to resolve why they chose to break the law in the first place. Also similar to *Andrade's Locke v. Warner Bros.* analysis, Georgetown's direct evidentiary conduct with over 300+ witnesses shows they "never intended to give …a good faith evaluation," or even an acknowledgement of receipt, before intake, a pre-1st step, to Mr. Austin's 100+ formal complaints. See  S-155

156.   Georgetown intended Mr. Austin to rely on Georgetown's representations of fact ("knowingly made false promises") as they continually advertise with the same principles, policies, and laws they have deceived Mr. Austin with (and continue to knowingly and willfully omit material information).See S-156

   Georgetown defrauded Mr. Austin of opportunity, time, money (and other harms).
157.   Mr. Austin did in fact rely on Georgetown's promissory inducements, and material representations of fact (misrepresentations) as he consummated contract with the University based on those promises; In fact, had he known Georgetown would violate those sacred, enshrined Constitutional, statutory, policy and moral laws and rules he would not have accepted the contractual offer.  Mr. Austin has suffered a variety of damages directly from relying on the representations; Further, Mr. Austin continues to suffer from the *ongoing* material omissions which despite repeated complaints, inquiry and other efforts to get Georgetown to take ownership of their unforced lies, errors, legal violations.  Mr. Austin would not have consummated the contract with Georgetown, but for their false promises to induce contract, and materially omitted information, which caused direct *ongoing* harm to Mr. Austin.   See para. 8-81; 80-81; See S-157

**D.    Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct to Mr. Austin's detriment in the extreme.**

Georgetown admits breach of its *minimum* duties of care *(in the extreme).*

158.   Georgetown's *willful, malicious* conduct falls so far below the standard of care owed (perhaps *recklessly)* to an admitted student that Georgetown's ongoing conduct constitutes negligence on its face (*especially toward admitted Black male students under these facts-context*) in regard to the specifically plead privacy, publicity, media, contract (42 USC 1981), and IDEAA (anti- discrimination) violations.;See para. 8-81 ; See (in-depth) paragraphs 10-17; See S-158

159.   Georgetown's actions, or inactions, both constitute negligence (*especially when Georgetown's deliberately indifferent inactions to their mandatory policies and required action; due care*). See para. 20-22, 27-31; See S-159

160.   Georgetown's *ongoing* extreme departure from "ordinary standard of care" it *publicly* promulgates-*admits*, while repeatedly ignoring a.the well known risks to an admitted Black male student, b.repeated formal complaints, c.repeated inquiry-requests d.state, federal, administrative, policy and custom specific commands constitutes negligence (gross) towards Mr. Austin as they repeatedly demonstrated "a want of even scant care" (and deliberate indifference);See S-160

The *minimum* Standard of Care is unanimously articulated and owed to students from Universities per Statute, Common law, California Constitution, Georgetown's own *publicly admitted* policies, instructions, and custom.

161.   At minimum, Georgetown was required to obtain Mr. Austin's written authorization *prior* to exploitation of his image for business use (which they did not). See para. 8-81.  This standard, for this type of photo, is unanimously

articulated inside and outside of a School or University context.See S-161

162.    One policy, manual, procedure by itself may or may not be dispositive in determining the appropriate standard of care for Georgetown in regard to its admitted Black male students;  But, the combination of statutes (in Federal and State jurisdictions), judicial common law, legislatively delegated administrative agency rules, regulations, and guidance, school policy based on statute, law and administrative agency, provide a vivid, and precise, standard that Georgetown themselves *publicly admit (as a minimum standard of Defendant Georgetown conduct),* especially when unanimously reinforcing another. See S-162

163.    Georgetown's policies, as they reflect custom, statute, and common law requirements (i.e. written authorization agreement mandate), may be used to inform their *publicly* admitted standard of care. See S-163

164.    Organizations in highly regulated areas (.precisely defined standards.) who do not follow those precisely defined standards of care, (due care). are negligent *(i.e. medical procedures, privacy or education;Georgetown* );See S-164

165.    Federal statute, including FERPA, as part of the regulatory-statutory framework may be used to inform standard of care.  Other related statutes, including Ca Civ. Code 3344, Federal, California, or DC law, common law as part of the relevant legal, common law, regulatory or statutory framework may also be used to inform their standard of care. See para. 8-81; See S-165

Georgetown's conduct would have breached the *general reasonable person standard,* but is made worse as Universities have a special relationship of trust with students.

166.    Georgetown owes duties to protect students from foreseeable harm that their policy, law, expressly outlaw.  Georgetown has duty to not itself be the party who

EoR - 755 of 2347

harms its own students in violation of publicly stated policies (duty to refrain from act causing harm with which party has special relationship) See S-166

167.    Georgetown owes a duty to correct their violations of due care once already taking, and admitting, actions that caused Mr. Austin harm (i.e. duty to act to stop-prevent further harm after initial Georgetown harms);See S-167

168.    Georgetown's failure to correct, or investigate, their own admitted violations of mandatory school policies-law, doesn't just fall on Mitch Bailin (letter admitting violations), nor only the IDEAA personnel who received all 100+ complaints, but everyone from the President's Office down. They could have, and according to Georgetown policy, should have stepped in to formally complain-ed about "deliberate indifference" displayed.  This pattern of conduct illustrates negligent training, or control-supervision as multiple GU leadership, tasked with this responsibility, failed essential duties, and continue to do so with the express purpose of depriving essential rights to Mr. Austin as an admitted student.; See S-168

169.    Georgetown operated extremely below its duty of care for a reasonable law abiding University towards an admitted student by flaunting its violations of well-known, and self promulgated policies, laws, statutes and Constitutional requirements (the height of hypocrisy).  Georgetown was negligent in its written authorization policy, privacy policy, IDEAA policy, and obligation to not fraudulently deceive or omit 'material' information to its admitted students.  Georgetown is negligent in its obligation to the US Constitution under 13th, and 14th Amend., Equal Protection, Civil Rights Act of 1964 (Title IV), as well as 42 USC 1981. Georgetown's negligence shows in failing its duty to not discriminate against Black male admitted students to their detriment, and providing unfair advantages, or

protections, to non-Black male admitted students while depriving his Constitutional

enshrined protections to eradicate all "badges and incidents" of enslavement for

Black men after the Civil War, and passage of Civil Rights Amendments and Acts.

See Facts;paragraphs 8-81; <u>See S-169</u>

<u>Adherence to, or following, industry custom, *alone*, does not immunize Georgetown
from liability as a defendant; However, Georgetown didn't even attempt that
baseline which willfully violates the *minimum* Standard of Care.</u>

170.   Georgetown's conduct is negligent on its face, as it doesn't conform to

industry custom, nor their own specifically outlined *publicly admitted* standards of

care.  It is well established that industry custom *usually provides* a baseline of

reasonable standard of care (i.e. written authorization agreement), but still doesn't

immunize, nor ensure that following that *minimum standard* actually is due care or

*minimum standard of care* for that organization; <u>See S-170</u>

171.   The standard of care required in a particular circumstance may be based on a

statute or the custom and practice (as defined by policy statement) in the relevant

community.  While Georgetown's custom in the community does not necessarily

establish how a reasonable person must act, it is evidence to be considered in

determining the proper standard of care for Georgetown (partially based on their

own policy statements as "they can be more reliable reflections of that standard

than, for example, the declarations of expert witnesses").<u>See S-171</u>

<u>'But for' Georgetown's negligent conduct Mr. Austin would not have been injured;
The policies were designed to protect against the admitted injuries Georgetown
inflicted (violation of privacy, publicity, contract, and anti-discrimination).</u>

172.   Georgetown's failure to follow policy (*along with law, statute, custom and

constitution*), or failure to properly or take reasonable steps to train its employees in

policy(ies), when that policy is designed to prevent the foreseeable harm suffered, is

the proximate harm of the injury.; <u>See S-172</u>

**59 ; Opening Complaint**

173.    Mr. Austin was injured; The proximate cause of injuries (*as admitted in Georgetown's policies*) are the violations of the policies, and laws they are based on (*i.e. violated privacy, publicity, media, contract, anti-discrimination and the damages of realizing Mr. Austin was being taught law by an institution who went out of its way to disrespect-violate his rights most fundamental ways*).  Mr. Austin reasonably or justifiably relied on Georgetown's false promises, but they grossly negligently (willfully) defrauded him compounding harm. See S-173

174.    Georgetown defrauded out of initial $400 consideration, and thousands more thereafter, as well as missed opportunities of choosing them when already had guaranteed job as part of winning elite fellowship that I turned down based on giving my word, other employment or business opportunities (outside of that context), as well as time, frustration, and energy expended holding Georgetown accountable for their illegal conduct when they should be the one teaching me both in word, and deed (modeling good behavior for their students, and future leaders).

Georgetown's conduct by University leadership, *post admitted breach*, shows wilful-ness, recklessness, and malice (along with disparate treatment).

175.    Georgetown's conduct, post written admittance of breach of duty in 2019 (*to obtain written authorization agreement prior to exploitation of Mr. Austin's photo*), demonstrates willfulness, recklessness, and malicious intent as it completely disregarded the rights-needs of an admitted Black male student over 100+ times *after they admit exploited him.*  See para. 8-81; See S-175

Mr. Austin is harmed; the way statutes, school policy, public policy, common law design, and articulate the harm(s), & is the class of person intended for protection.

176.    Mr. Austin is the class of person intended for privacy, publicity, media, anti-discrimination, and other essential statutes, law and policies that shape the standard of care.  Mr. Austin also suffered the type of harm these standards of care,

defined through statute, law, and policy specified as the type of harm they tried to

protect. See para. 8-81; See S-176

**E.    Georgetown exhibits extreme bad faith to Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did; Moreover, Georgetown's repeated refusal to correct, and attempt to make right the harm already done, with full knowledge it *already* caused harm exemplifies *malicious* intent, discriminatory animus, and the essence of bad faith.**

Georgetown exhibits bad faith conduct external to the student contract.

177.    Georgetown's repeated, intentional and egregious conduct to expressly violate

their own policies, the law, and overarching purpose of the contract to frustrate the

benefits or fruits of the contract constitutes bad faith (*i.e. the purpose of the agree-*

*-ment is to learn the law in a safe environment; for an admitted student to grow*

*protected from privacy, publicity, Equal Protection, 1981, violations; especially by*

*Georgetown as violator*).  Georgetown's conduct cuts to the very heart of the agree-

-ment, frustrating-depriving essential contract fruits, benefits, and rights that adm-

-itted White, or non-Black male students take for granted; See S-177

178.    Georgetown's conduct was not only objectively unreasonable, violating

standards of good faith and displaying bad faith, but also the subjective standards

of dishonesty, lack of integrity, and refusal to present even the facade of following

their own mandatory policies based on current law.  Here, Georgetown themselves,

with specificity, outlined their various duties toward Mr. Austin, as *publicly*

detailed, which they themselves also acknowledge violation; See S-178

179.    Georgetown's conduct triggers bad faith claims and liability because they

continue to act in an unethical or deceptive manner in violation of specific

provisions, and the spirit of the agreement itself.  Georgetown's unreasonable

actions are inclusive of, but not limited to, dishonesty as their conduct is intentional and crosses the bad faith spectrum to frustrate, destroy, or injure Mr. Austin from enjoying the benefits-fruits of contract constitute bad faith; See S-179

180.   Georgetown's failed duties operating extremely below their requisite standard of care, deceit (fraud), intentional discriminatory conduct, and other extraneous malicious conduct to frustrate contract is Bad Faith (to an admitted Black student ).  Mr. Austin took requisite action to consummate and solidify contract (including initial $400 consideration), and performance (including making required complaints and other policy steps as Georgetown contract instructs), yet Georgetown still unfairly interfered with Mr. Austin's rights to receive benefits of contract and harmed Mr. Austin in the process; See S-180.

181.   Georgetown repeatedly exhibits deceit, discriminatory and unfair conduct to take advantage of an admitted Black male student maliciously, which breaches the duty of good faith required in student contracts; See S-181

Georgetown's discriminatory conduct constitutes bad faith.

182.   To begin, Georgetown's choice to take and exploit fundamental commercial rights that they were not entitled to not only violated 1981 (contract) but constitutes bad faith.  See para. 8-81.  The fact that Mr. Austin is smiling in the picture (*unaware he is currently being exploited as eyes and smile are away from the camera*), and the fact that Georgetown's presentation itself may be seen as "polite" does nothing to excuse the overtly racist manner his rights to contract were violated, and him discriminated against.  Bad Faith is shown by Georgetown's discriminatory animus toward Mr. Austin, violating both Equal Protection, and 1981.  See Sections A; B (Equal Protection; 1981) para. 83-138; See S-182

183.   Georgetown's discriminatory conduct, providing a presumption of bad faith, is
not a normal part of the student contract, is extraneous to contract, and is
absolutely unreasonable conduct constituting bad faith.   Mr. Austin, an admitted
Black male student, following Georgetown's publicly outlined policies, *even after
Georgetown's written admission to him that they violated their own written
authorization agreement policy, and the law*, was outright facially, and repeatedly,
discriminated against in violation of Equal Protection, 1981, 13th, 14th Amend and
Civil rights Acts (Title VI, on which Title IV was based); See S-183

184.   Although, anti-Black discriminatory animus is far too common, it is illegal,
and not an expected part of the bargain or contract (especially not a student
contract), and thus extraneous.;In fact, discrimination is so much not an expected
nor normal condition of a student contract that is expressly prohibited, and
expressly commandated or encouraged to report with precisely defined steps;
expected prompt action (*partially based on the premise that it is abhorrent,
abnormal-immoral conduct*). Georgetown deceit, misrepresentations, omissions
constitute bad faith;  See S-184

185.   Georgetown's initial and *ongoing* fraudulent conduct constitutes bad faith.
See Sections C (Deceit; Fraud) paragraphs 139-157; See S-185

186. When Georgetown, or other organizations, enter into contracts, they have an
implied duty to act honestly, in good faith, and fairly. When they do not, they can be
sued for a breach of this duty whether conduct is objectively or subjectively
unreasonable regardless of motive.;  Bad Faith is shown by Georgetown's initial
fraudulent inducement, and ongoing fraudulent omissions of material information

despite Mr. Austin making Georgetown aware and attempted over 100+ times,

through formal complaints and direct inquiry to obtain the materially omitted

information.  See Sections C (Deceit; Fraud) para.139-157; See S-186

   Georgetown's grossly negligent conduct, to take unfair advantage, is bad faith.
187.   Georgetown's willful breach of statute, law, policy (defining due care) displays

Georgetown's willingness to "take grossly unfair advantage of other[s]" in this case

a Black male admitted student, by operating extremely below a University

*minimum* standards of care.  See Sections D (Negligence; Gross Negligence;

Malice-Willfulness) para. 158-176 ;Willful misconduct is a form of subjective bad

faith. It is action or failure to act despite a duty to do so, in full appreciation of the

consequences (intending them or indifference);  See S-187

188.   Georgetown's repeated willful utter disregard of Mr. Austin's rights, and

well-being when they had over 100+ opportunities in over 4 years *after* admitting 42

USC 1981, policy and other violations *in writing* is malicious, tantamount bad faith.

Georgetown's Bad Faith is shown through Georgetown's *demonstrated malice*,

highlighted not only in repeated willful policy violations, non-correction and

non-explanation for previous violations, but ongoing intentional and deliberate

indifference to ongoing violations of Mr. Austin Constitutional, and other rights

with over 100+ opportunities and quickly approaching 5 years to self correct; See

para. 8-81; 80-81; See S-188

**RELIEF.**     Mr. Austin *never* gave Georgetown consent to exploit his image-

likeness violating §1981, 13th, 14th Amend. and Equal Protection (Title VI)

producing $15 Million Minimum Demand, as well as Injunctive *[i.e.YGR]*  (and

other relief including production of *ongoing* materially omitted to Mr. Austin).

**Thus, Mr. Austin sued with demand for Jury Trial.  s/ George Jarvis Austin**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ), | **DECLARATION UNDER PENALTY OF PERJURY:  Mr. Austin learned to perceive discriminatory animus through experience and embodies "Equal opportunity …..This oft-stated creed of President John F. Kennedy .." for Which Georgetown violates, Fundamentally (under 1981, and Title XI ) In Honor of the <u>Civil Rights Act of 1964,Title VI,</u> (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence. |

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. <u>Equal Protection</u> 2. <u>42 USC 1981</u> 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a <u>whistleblower</u>; As part of providing 'notice' of documented formal complaints to Georgetown <u>ideaa@georgetown.edu</u>,  <u>generalcounsel@georgetown.edu</u>, <u>presidentsoffice@georgetown.edu</u>, <u>media@georgetown.edu</u>, <u>privacy@georgetown.edu</u>, <u>visualidentity@georgetown.edu</u>, <u>lawdeanofstudents @georgetown.edu</u>, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including  <u>ocr@ed.gov</u>, <u>privacyTA@ed.gov</u>, <u>studentaid@ed.gov</u>, and <u>whistleblowercoordinator.oig@ed.gov</u>, in real time.  See <u>Supplement-Affidavit</u>**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

**Mr. Austin learned to perceive discriminatory animus through experience**

1.      There are several ways to ascertain racial discriminatory animus.  Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.

2.      Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Blacks as 'inferior' or 'less worthy' (*presuming derogatory stereotypes to deprive making a contract*), or b. Treating Whites as 'superior' or more worthy is doubly offensive to the Constitution of the United States because *"[Georgetown's] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetow's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy] but not to others necessarily advantages the former at the expense of the latter.")"*

3.    Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)*
Georgetown confers their own perceived-presumed inferiority (or "stigma") of Black
(male) students (as the process should be the same regardless of race) to create
*"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately*
*inferior and therefore as less worthy"—certainly may confer Article III standing in*
*discrimination cases."* Mr. Austin learned the value of treating everyone equally
well, and non-discriminatory service from the use of 'blind' or 'volunteer' testers like
DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that
various retail industries use to evaluate the quality of service (including
non-discriminatory mandates), in Mr. Austin's first W-2, benefit plan, stock
awarding, job as a teenager. In that role, while in high school, Mr. Austin worked
approximately 4 years in the grocery, and logistics, business with heavy public
interface with customers and regular, at least monthly (if not more) unknown
interactions with secret or mystery shoppers. The location was in a well to do
(generational wealth) area of town, in walking distance from his home (although
Mr. Austin drove due to other competing time commitments outside of work), that
attracted a variety of social classes, races, cultures, orientations, etc. with the
expectation of exceptional service to all customers, and invitees.

4.    In that role Mr. Austin internalized the creed, and went out of his way to
embody the wisdom Judge Orrick II (Judge Orrick III's father) cited in *NAACP v.*
*San Francisco Unified School District, No. C-78-1445 WHO,* from President
Kennedy, and personally provided *"equal opportunity for [all customers, and*
*invitees] of exceptionally diverse origins"* in Mr. Austin's first W-2, benefit plan, stock
awarding company, role. Because of that embodiment, and effort to actualize the

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

principles Mr. Austin was taught in that role, Mr. Austin received regular incentive

bonuses, commendations, and positive work reviews because of his consistent,

positive, attentive, non-discriminatory service to the public and customers (*without*

*knowing who or when a mystery shopper or secret shopper was present*).   That role,

interacting with thousands of people weekly, helped teach Mr. Austin early on,

intuitively, 1. the standards of how to treat people well regardless of race or other

protected characteristics 2. How not to take things personally (*as there are some*

*acerbic & myopic personalities in the world that make the metaphorical buttholes*

*seem like 'nice' people and no matter how kind & good a person is they will find*

*something wrong*) 3. How to provide great service regardless of race, class, gender,

or other protected statuses no matter whether Mr. Austin was personally having a

great or challenging day and 4. How to stand up for yourself, or others, when

someone is wrong (*on principle and with conviction*).   Georgetown's conduct toward

Mr. Austin constitutes the latter (4.) lesson: standing up to racist bullies.

5.      Mr. Austin was blessed at this impressionable stage of his life to be exposed

to examples of good, customer centric, non-discriminatory workplace leadership,

and practices, that led to company success (last time Mr. Austin checked its share

price it was well over $1,000+ per share), with many persons who have ascended

within and outside of that company in various sectors of business, law, NGO, and

government: their modeling not only help me embody that creed cited by Judge

Orrick II, but helps Mr. Austin decipher between 1. discriminatory, perverse

practices on one hand and 2. healthy anti-discriminatory 'equal opportunity' models

of success on the other.  See e.g. Johnson v. San Francisco Unified School Dist., 339

F. Supp. 1315, 1320 (N.D. Cal. 1971) ("*Opposition to desegregation fosters false*

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*concepts of racial superiority and of racial inferiority…works to prevent the kind of*

*exchange in formative years which can best inoculate against racial hatred. Racial*

*hatred is an adult rather than a childhood disease.*")   His workplace at TSLA

taught him a different lesson through negative modeling of anti-Black hostile work

practices as he observed first hand discriminatory, derogatory, conduct right out of

America's Jim Crow, South Africa's Apartheid, and Germany's Third Reich racial

apartheid Regimes.  Georgetown's conduct was of the latter negative modeling

toward Black male students using anti-Black derogatory caste like policies to

deprive Mr. Austin's "equal opportunity" to make a contract as customer violating

not only the creed Judge Orrick II cites to, but violates the very Constitution of the

United States, 13th, 14th and 15th Reconstruction Amendments, sec. 1981, and

Civil Rights Acts of 1866 and 1964 from which that creed derives.

6.      Per the Supreme Court's *General Dynamics Land Sys. v. Cline, 540 U.S. 581,*

*608-11 (2004)*, Georgetown's conduct *admits, publicly,* along with US Department of

Education, that excluding Mr. Austin because he is a Black male admitted student

from essential Georgetown activities or programs violates the *essence,* Originalist

purpose, and Legislative *intent of* Title VI of the 1964 Civil Rights Act whereas

*"There is little doubt that the motivation behind the enactment of the Civil Rights*

*Act of 1964 was to prevent invidious discrimination against racial minorities,*

*especially [B]lacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey)*

*("The goals of this bill are simple ones: To extend to Negro citizens the same rights*

*and the same opportunities that white Americans take for granted"). President*

*Kennedy, in announcing his Civil Rights proposal, identified several social problems,*

*such as how a "Negro baby born in America today . . . has about one-half as much*

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*chance of completing a high school as a [W]hite baby . . . one-third as much chance of*

*becoming a professional man"* See e.g. General Dynamics Land Sys. v. Cline, 540

U.S. 581, 608-11 (2004):

"There is little doubt that the motivation behind the enactment of the Civil Rights Act of 1964 was to prevent invidious discrimination against racial minorities, especially [B]lacks. See 110 Cong. Rec. 6552 (1964) (statement of Sen. Humphrey) ("The goals of this bill are simple ones: To extend to Negro citizens the same rights and the same opportunities that white Americans take for granted").

President Kennedy, in announcing his Civil Rights proposal, identified several social problems, such as how a "Negro baby born in America today . . . has about one-half as much chance of completing a high school as a [W]hite baby . . . one-third as much chance of becoming a professional man, twice as much chance of becoming unemployed, . . . and the prospects of earning only half as much." Radio and Television Report to the American People on Civil Rights, Public Papers of the Presidents, John F. Kennedy, No. 237, June 11, 1963, pp. 468-469 (1964).  He gave no examples, and cited no occurrences, of discrimination against [W]hites or indicated that such discrimination motivated him (even in part) to introduce the bill. Considered by some to be the impetus for the submission of a Civil Rights bill to Congress, the 1961 Civil Rights Commission Report focused its employment section solely on discrimination against racial minorities, noting, for instance, that the "twin problems" of unemployment and a lack of skilled workers "are magnified for minority groups that are subject to discrimination." 3 U. S. Commission on Civil Rights Report 1 (1961). It also discussed and analyzed the more severe unemployment statistics of [B]lack workers compared to white workers. See id., at 1-4; see also id., at 153 (summarizing findings of the Commission, listing examples only of discrimination against [B]lacks).

The report presented no evidence of any problems (or even any incidents) of discrimination against [W]hites. The congressional debates and hearings, although filled with statements decrying discrimination against racial minorities and setting forth the disadvantages those minorities suffered, contain no references that I could find to any problem of discrimination against whites. See, e. g., 110 Cong. Rec. 7204 (1964) (statement of Sen. Clark) ("I turn now to the background of racial discrimination in the job market, which is the basis for the need for this legislation. I suggest that economics is at the heart of racial bias. The Negro has been condemned to poverty because of lack of equal job opportunities. This poverty has kept the Negro out of the mainstream of American life"); id., at 7379 (statement of Sen. Kennedy) ("Title … is directed toward what, in my judgment, American Negroes need most to increase their health and happiness. . . . [T]o be deprived of the chance to make a decent living and of the income needed to bring up children is a family tragedy"); id., at 6547 (statement of Sen. Humphrey) ("I would like to turn now to the problem of racial discrimination in employment. At the present time Negroes and members of other minority groups do not have an equal chance to be hired, to be promoted, and to be given the most desirable assignments"); Ibid., (citing disfavorable unemployment rates of non[W]hites as compared to [W]hites); ibid. ("Discrimination in employment is not confined to any region — it is widespread in every part of the country. It is harmful to Negroes and to members of other minority groups"); id., at 6548 ("The crux of the problem is to open employment opportunities for Negroes in occupations which have been traditionally closed to them"); id., at 6562 (statement of Sen. Kuchel) ("If a Negro or a Puerto Rican or an Indian or a Japanese-American or an American of Mexican descent cannot secure a job and the opportunity to advance on that job commensurate with his skill, then his right to be served in places of public accommodation is a meaningless one. . . . And if a member of a so-called minority group believes that no matter how hard he studies, he will be confronted with a life of unskilled and menial labor, then a loss has occurred, not only for a human being, but also for our Nation"); id., at 6748 (statement of Sen. Moss)

("All of us, that is except the person who is discriminated against on the basis of race, color, or national origin. . . . He frequently knows that he is not going to school to prepare for a job. . . . He frequently knows that no matter how hard he works, how diligently he turns up day after day, how much overtime he puts in, that he will never get to be the boss of a single work crew or the foreman of a single division. And that is what the fair employment practices title is about — not the right to displace a white man or be given preference over him — but simply the right to be in the running"). I find no evidence that even a single legislator appeared concerned about whether there were incidents of discrimination against [W]hites, and I find no citation to any such incidents. In sum, there is no record evidence "that [White] workers were suffering at the expense of [racial minorities]," and in 1964, discrimination against whites in favor of racial minorities was hardly "a social problem requiring] a federal statute to place a [White] worker in parity with [racial minorities]." Ante, at 591. Thus, "talk about discrimination because of [race would] naturally [be] understood to refer to discrimination against [racial minorities]." Ibid.")

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

7.      Mr. Austin utilizes *"This oft-stated creed of President John F. Kennedy…equal opportunity"*, and applies Judge Orrick III father's, William Orrick II's, memorialized wisdom, in *San Francisco NAACP v. San Francisco Unified School Dist.,* that is fundamentally violated (*per the 14th Amendment's Equal Protection Clause as coextensive with section 42 USC 1981*) by Georgetown when Defendant Georgetown, a private offeror, goes out of their way from 7.15.21 to present to 1. refuse to make a contract with Mr. Austin on the same basis as Whites, and 2. Exclude Mr. Austin because of race or derogatory racial stereotypes from essential campus services, to which he is entitled, violating his Equal Protection rights.

8.      Defendant Georgetown, a private offeror, "blatantly" violates 1981 and Civil Rights as well as *"This oft-stated creed of President John F. Kennedy…equal opportunity"* when it refuses Mr. Austin, an admitted Black student, offerree mandatory media written contract, per its own promulgated terms,, because Mr. Austin is a Black man & the derogatory racist stereotypes Georgetown holds of Black People  *in service of its segregationist, Klu Klux Klan, enslaver, like conduct based on racist fiction, not facts*). See San Francisco NAACP  v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)

**(***"Hay[wood] Gilliam [[Judge Haywood Gilliam spelled incorrectly](#) in the order], McCutcheon, Doyle, Brown Enersen, San Francisco, CA, for San Francisco National Association for the Advancement of Colored People…..OPINION AND ORDER ORRICK [II], District Judge [Judge Orrick III's father]....*

*…"All of us …. should have an equal opportunity ….. This oft-stated creed of President John F. Kennedy is at the core of the dispute between the parties…"***)**

9.    As an interesting aside, presiding Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson, and represented the NAACP in the matter above.Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects this principle, and creed, of *'Equal Opportunity'* (Which Georgetown fundamentally, & egregiously, violates): " www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

10.    **Fact 4:** Mr. Austin combines Judge Orrick's II "*equal opportunity*" wisdom cited in *San Francisco NAACP v. San Francisco Unified School Dist.,* with the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* prohibition on the *"blatant deprivation of Civil Rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White students]"* to undergird the a. plead facts, b. cited direct evidence in the record, and

c. other controlling legal precedent to highlight how atrocious, and per se illegal, Defendant's conduct truly is toward Mr. Austin. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

11.     The US Supreme Court's 1. *Connecticut v. Teal* and 2. *New York Transit Authority v. Beazer* applies similar metrics, and methodology to determine and ascertain a facially discriminatory practice whereas *"A prima facie violation … may be established by… evidence showing that a …. practice … den[ies] members of one race [or a single member as 1981 rights are individual rights] equal access to … opportunities [to make a contract]'"* similar to Georgetown's *"blatant deprivation of Civil Rights"* practices per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media* of refusing to contract with Mr. Austin, *at all*, based solely on Mr. Austin's race andGeorgetown's use of derogatory false racist stereotypes of "Black Inferiority" or "less worthy" Connecticut v. Teal, 457 U.S. 440, 462 n.6 (1982)

G-town's conduct is akin to "Blatant," Dejure or Defacto Segregationist Conduct

12.     Per the 2020 US Supreme Court's *Bostock v. Clayton County* Georgetown's conduct against Mr. Austin [*refusing to contract with a Black man because he is a Black man, or derogatory stereotypes of Black men*] *" is discriminating on a ground that history tells us is a core form of race discrimination. "It would require absolute blindness to the history of racial discrimination in this country not to understand what is at stake in such cases .... grounded in bigotry … was an integral part of preserving the rigid hierarchical distinction that denominated members of the [B]lack race as inferior to [W]hites."* Bostock v. Clayton County, 140 S. Ct. 1731, 1765 (2020).  Georgetown's conduct is not just racist, but extreme, and sadly resembles the underlying logic that led to the US Civil War in the Supreme Court's

**9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

most embarrassing and racist 1857 opinion in *Dred Scott v. Sandford* (overturned by the Civil War, and Reconstruction Amendments) whereas the Court evilly, and wrongly said "*[Black people] had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the [W]hite race, either in social or political relations; and so far inferior, that they had no rights which the [W]hite man was bound to respect"* sounding like propagandist directly from the Ku Klux Klan or later White Citizens Council, that de-legitimized the US Supreme Court of its era (sparking the Civil War in 1861).  Dred Scott v. Sandford, 19 How. 393 (1857)  And, is reflected in Georgetown's previous participation in this vile criminal enterprise Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*)

13.      Judge Orrick II's wisdom in *San Francisco NAACP v. San Francisco Unified School District* is relevant per *"Equal Opportunity"* (in this case Equal Opportunity to make a contract), however Georgetown's *"blatant violations of Civil Rights"* are even more akin to the underlying segregationist, overtly racist, conduct in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II regarding, a school district's choice to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question*

*that any law, ordinance or regulation of any governmental agency (whether federal, state, county or city) requiring or furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … by other courts located throughout the nation."*

14.     Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects* Georgetown's*] … Racial hatred [which] is an adult rather than a childhood disease."* Georgetown's "*adult …. disease"* of anti-Black "*Racial hatred"* or animus is exemplified in multiple opportunities to make a contract from 7.15.21 to present, but still using a knowingly derogatory stereotype, as pretext, to attempt to justify not making a contract with Mr. Austin and excluding in violation of his Equal Protection.  Per the US Supreme Court's 1. *Patterson v. McLean Credit Union* 2. *Bob Jones University v. United States* 3. *Brown v. Board of Education* Georgetown's ongoing violations from 7.15.21 to present  Mr. Austin's right *"to make"* a contract with use of outright segregationist, Klu Klux Klan, like policies to purposefully isolate Mr. Austin for inferior treatment based on his race is *"antagonistic to our Nation's commitment to the ideal of a society in which a person's opportunities do not depend on .. race"* and completely violates Judge Orrick II's, memorialized wisdom, in *San Francisco NAACP v. San Francisco Unified School Dist., "This oft-stated creed of President John F. Kennedy…equal opportunity*."

15.     Georgetown violates even the most narrow conception of 1981 (i.e. before the 1991 Amendments: *Pub. L. 102-166, §402, 105 Stat. 1099*), and triggers liability per

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

"*our society's deep commitment to the eradication of discrimination based on a person's race or the color of … skin…[E]very pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination…. national consensus that racial discrimination is incompatible with our best conception of our communal life, and with each individual's rightful expectation that .. full participation in the community will not be contingent upon .. race.*" Patterson v. McLean Credit Union, 491 U.S. 164, 176-77, 191 (1989)  Per 4*2 U.S.C. § 1981's EFFECTIVE DATE OF 1991 AMENDMENT Pub. L. 102-166, §402, 105 Stat. 1099*, the entire contract formation, and making, process (i.e. "make and enforce contracts:" *"making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"*) is secured by 42 USC 1981, and protected against discriminatory Georgetown conduct harming Mr. Austin on the front end of the spectrum in the "making," as well as the latter parts with regard to exclusion. See 42 U.S.C. § 1981.

<u>Mr. Austin is mindful, a good person, with good credit (although not required for making contract).</u>

16.    In addition to the aforementioned lessons learned at my first W2 job-role, Mr. Austin was also blessed to learn & applied two additional very valuable lessons that have helped him avoid unnecessary drama, or issues in life, education, and the workplace.  Although Mr. Austin was and is blessed to work with many beautiful people (both inside and out), from all shades of the rainbow, as a principle, Mr. Austin doesn't date where he works as I saw beginning in that first W-2 role (as a minor) how tricky and messy workplace romps or romances can get  (*although it*

*works out for some: see e.g. President Barack and 1st lady Michelle Obama who met at work in a law firm*).  That early decision and discipline by Mr. Austin facilitated never having even 1 Complaint, whisper, or allegation of sexual impropriety in any of my roles despite various opportunities provided by beautiful people (inside and out) of the opposite sex in the workplace for over 20 years of professional experience. Mr. Austin's practice of mindfulness, fidelity to principle over pleasure, and discipline of healthy personal boundaries separating the personal and professional have helped him avoid the many pitfalls Mr. Austin saw countless other Black men, and others, fall into since antiquity.

The second lesson: Don't prejudge others as you never know what someone else is going through.  Mr. Austin was required daily in that first role to be 1. Neat 2. Clean 3. Presentable to a critical public 3. All hair cut shaven precisely and tailored 4. Smell good etc. and overall presentable to a more conservative dress standard (or that worker would be sent home: in approximately 4 years Mr. Austin was never sent home) but came in contact daily with a people in a variety of socioeconomic circumstances and some who did not smell so good, nor look their best, with some appearing in rough or challenging circumstances, but the discipline of mind, and character, Mr, Austin learned was to treat the well off & well liked person the same, with the same care, as the idiosyncratic, struggling, or perhaps somewhat off putting potential customer with rough edges (*because you never quite know who is who and it is best to remain humbly empathetic (strength under control), refraining from prejudgment*).

17.     Further, Mr. Austin's professional role while working as a Committee Consultant in the California Senate, after winning acceptance through Capital

Fellows Program as a Senate Fellow (with less than a 4% National acceptance rate),

analyzing bills (*which ultimately becomes California law*) going through Committee

for the California Senate and ultimately the California public was also insightful.

Mr. Austin's role working with the California Legislative Counsel, Judiciary

Committee, and various Members, and Staffers, Committees of the Legislature,

Executive Branch, Interest Groups, Members of the Public, and the Private Sector,

was also insightful-helpful to become familiar with the precise requirements for

non-discriminatory service, and making contracts, for businesses open to the public

as part of the learning process while writing analysis for approximately 40 Million

Californians.

18.     Mr. Austin was also informed more generally, in corporate law context,

through MoFo (Morrison Foerster www.mofo.com/resources/news/240526-mofo

-recognized-by-vault-law ), with several Board Members providing direct insights in

a variety of context during our trainings, and Board meetings, in an organization I

served as both a full time paid Director (managing 12+ staff, and over 100+

volunteers) and separately as a Consultant after I successfully finished my

contractual commitment, to create an intern program to help students thereafter

develop their legal skills early on (and gain additional exposure to a top firm, if

interested), entitled *"Stiles Hall Intern Program"* on pg. 441, 2012, See Attached

(Check out Vault's 2013 Pro Bono Guide! | Career Advice - Vault).   The due

diligence & research process to create that program, from scratch, with aid, and

partnership, from MoFo decisionmakers, in goodwill not for profit, by myself, and

my team, to pitch to their board, and decision makers within Mofo informed me at a

more broad level about the legal requirements for  non-discriminatory service to the

**14 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

public, and especially students, prior to winning acceptance, and working in the

Senate via the Capital Fellows Program as a Senate Fellow (with less than a 4%

National acceptance rate), analyzing bills (*which ultimately becomes California law*)

as a Committee Consultant.

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin        11.11.24**

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

**SENATE GOVERNANCE & FINANCE COMMITTEE**
**Senator Lois Wolk, Chair**

**BILL NO:** AB 408                    **HEARING:** 6/12/13
**AUTHOR:** Bonta                      **FISCAL:** Yes
**VERSION:** 4/15/13                   **TAX LEVY:** No
**CONSULTANT:** Austin

### *MUNICIPAL UTILITY DISTRICTS' BOARD ELECTIONS*

*Allows seven member municipal utility district boards to appoint board members to un-contested seats.*

### Background and Existing Law

In 1965, the Legislature approved the Uniform District Election Law (UDEL), which allows special district boards to appoint candidates for uncontested board seats (AB 1892, Porter, 1965). Several special districts incorporated the UDEL into their enabling acts giving them the same authority to appoint uncontested candidates who are running in uncontested races for seats on district boards.

Current law allows cities, regional park and open-space districts, water storage districts, water replenishment districts, school districts, and special districts that have incorporated UDEL into their enabling acts to appoint uncontested candidates in place of elections.

In 1921, the Legislature enacted the Municipal Utility District (MUD) Act (SB 755, Spence, 1921). The Legislature later allowed any district formed prior to January 1, 1974, with a population of 1,000,000 or more on that date to increase the size of its board of directors from five to seven members (SB 379, Nejedley, 1973).

East Bay Municipal Utility District (EBMUD) has a publicly elected seven-member board of directors. EBMUD was established by vote in 1923, and provides drinking water for 1.3 million customers in Alameda and Contra Costa counties. EBMUD supplies water to East Bay customers and treats wastewater before it is discharged to the bay.

Unlike most other local governments, EBMUD's principal act does not allow its board to appoint candidates to seats that are uncontested in an election. EBMUD wants the same authority to appoint candidates to its board directors that state law grants to other local governments.

**Proposed Law**

**AB 408** allows seven member municipal utility district boards, at a regular or special meeting held within a 7 day period beginning after 5pm on or before the 83rd day of the election and ending on or before the 76th day prior to election, to adopt one of the following courses of action:

- If one person files for candidacy, appoint that person or hold an election; or,
- If no person files for candidacy, appoint any qualified person or hold an election.

**AB 408** establishes appointment procedures for municipal utility districts with a seven-member board of directors, if no candidate or only one candidate files for candidacy by 5 p.m. on or before the 83rd day prior to the election.

Specifically the bill:

- Requires a county elections official to submit a certificate of facts to the district board if no candidate or only one candidate files for candidacy by 5 p.m. on or before the 83rd day prior to the election.
- Allows the board to adopt a process to appoint any qualified person to office on or before the 76th day prior to the election, and requires the board, upon adoption of the process, to make the actual appointment prior to the election.
- Requires the board to hold an election for the office, if an appointment has not been made or an appointment process has not been adopted by the 76th day prior to the election.
- Requires appointed directors to take office and serve exactly as if elected at an election for the office.
- Prohibits the elections official from accepting any statement filing of a write-in candidate submitted after an appointment is made.
- States that this bill's provisions are effective for any election that takes place after January 1, 2014.

**AB 408** provides that no reimbursement will be made because the local agency is requesting the authority established by this bill.

**State Revenue Impact**

No estimate.

## Comments

1. Purpose of the bill. East Bay Municipal Utility District is looking for ways to be more efficient and cut costs. In the last 6 EBMUD elections, races for 15 of the available 21 elected seats were uncontested. Although, the candidates ran unopposed, EBMUD's ratepayers had to pay for the election costs. It appears that in the two counties EBMUD serves (Alameda and Contra Costa), EBMUD is the only special district that cannot use an appointment process for uncontested elections. For the 2011-2012 election the author's office identified 36 special districts in Alameda and Contra Costa counties that used an appointment process for uncontested election candidates. For that same election, EBMUD's ratepayers paid $475,000 in election costs for three uncontested seats because the MUD Act does not contain the appointment provisions. AB 408 adds appointment provisions that will be used to save EBMUD ratepayers money.

2. Apply to all? EBMUD and Sacramento Municipal Utility District (SMUD) have seven member boards. The other three MUDs have five member boards. AB 408 only applies to MUDs with seven member boards. If the bill's provisions are good for districts with seven member boards, should this tool also be available for others? *The Committee may wish to consider amending AB 408 to apply to all MUDs.*

## Assembly Actions

| | |
|---|---|
| Assembly Local Government | 9-0 |
| Assembly Elections and Redistricting | 70-0 |
| Assembly Appropriations | 17-0 |
| Assembly Floor | 70-0 |

## Support and Opposition (6/6/13)

Support: East Bay Municipal Utility District; California Association of Sanitation Agencies; California Special Districts Association; Sacramento Municipal Utility District.

Opposition: Unknown.

# COMMITMENT IS OUR CORE VALUE

**Morrison & Foerster's attorneys provided 95,000 hours of pro bono service in 2011 – and the commitment continues.**

### Sustaining diverse communities
MoFo joined forces with public interest law firms to stop California from ending adult day health-care programs, which elderly individuals and people with serious disabilities rely on to stay in their communities and avoid the isolation of institutions.

### Recognizing the rights of same-sex couples
MoFo's battle for the rights of Karen Golinski, our client since 2008, won a court ruling that the Defense of Marriage Act (DOMA), which prohibits federal recognition of same-sex marriages, is unconstitutional. Ms. Golinski, a federal employee, finally has health coverage for her wife as a result.

### Building a better world
MoFo works with Build Change to spread its techniques for building low-cost, earthquake-resistant houses to earthquake-prone developing countries, while protecting the organization's intellectual property rights.

### Protecting women's rights
MoFo partners regularly with the Center for Reproductive Rights to challenge state laws that seek to restrict reproductive rights, including a Texas requirement that women seeking abortion have an invasive ultrasound, and an Arizona abortion ban.

### Easing the burden
MoFo's patent attorneys are helping the social venture Wello as it markets the WaterWheel, an innovative rolling barrel that allows people in developing countries to transport 25 gallons of water in a single trip, drastically reducing the time and labor they spend carrying water.

## MORRISON FOERSTER

©2012 Morrison & Foerster LLP, mofo.com

*National Law Journal*
– 2012 Pro Bono Award

*Law 360*
– 2010, 2011, 2012
Top Pro Bono Firms

**Bar Association of San Francisco**
– 2011 Outstanding Law Firm in Public Service

**ABA**
– 2011 John Minor Wisdom Public Interest and Professionalism Award

**Pro Bono Institute**
– 2011 John W. Pickering Award

# MORRISON & FOERSTER LLP

**425 Market Street**
**San Francisco, CA 94105**
**Phone: (415) 268-7000**
**www.mofo.com**

## LOCATIONS

Denver, CO • Los Angeles, CA • New York, NY • Northern
VA • Palo Alto, CA • Sacramento, CA • San Diego, CA • San
Francisco, CA • Washington, DC • Beijing • Brussels • Hong
Kong • London • Shanghai • Tokyo

## MAJOR DEPARTMENTS & PRACTICES

Antitrust • Bankruptcy/Creditors' Rights • Clean Technology/
Renewable Energy • Corporate • Energy • Intellectual Property
• International Arbitration • Labor & Employment • Litigation •
Real Estate • Tax

Information Technology—Business Department:
Capital Markets • Financial Services • Financial Transactions •
Investment Management • Land Use & Environmental • Patent
• Project Finance & Development • Technology & Transactions

Litigation:
Consumer Class Action Litigation • Financial Services
Litigation • Patent • Product Liability • Securities Litigation/
White Collar Defense • Trademark & Copyright & Trial Practice

Tax:
State & Local Tax • Federal Tax • Employee Benefits &
Executive Compensation & Property Tax

## THE STATS

No. of Attorneys: 1,083
No. of Offices: 15
Chairman: Larren Nashelsky
Managing partners: Anna Erickson White
           Craig Martin
           Eric Piesner
Hiring Partner(s): Craig Martin

## EMPLOYMENT CONTACT

Anand David
Director of Recruiting
Phone: (212) 468-8039
Email: adavid@mofo.com
Careers website: www.mofocareers.com



**Vault Guide to Law Firm Pro Bono Programs, 2013 Edition**
Morrison & Foerster LLP

## WHO'S WHO

**Does the firm have one or more pro bono coordinators and/or partners? If so, how many?**

More than 3

**For each of your pro bono coordinators and/or partners, please specify how much of his/her time is spent on pro bono work and/or administering the firm's pro bono program.**

Each spends 100% of his or her time.

**Please provide the primary pro bono contact(s)'s information below.**

Jennifer K. Brown
Pro Bono Counsel
Phone: (212) 336-4094
Email: jbrown@mofo.com

Kathi J. Pugh
Senior Pro Bono Counsel
Phone: (415) 268-6370
Email: kpugh@mofo.com

Rachel Williams
Pro Bono Counsel
Phone: (415) 268-6340
Email: RachelWilliams@mofo.com

**Does the firm have a pro bono committee?**

Yes

**How often does the committee meet?**

Quarterly

**Please describe the composition of the committee.**

The firmwide pro bono committee is made up of associates, partners, and of counsels. We include attorneys from the different practice groups, and each department has at least one representative on the committee in each office. Most of our domestic offices have at least one representative on the firmwide pro bono committee, as does our London office.

## THE SCOOP

**Does your firm have a written pro bono policy?**

Yes

**Can associates bring pro bono matters of interest to the firm?**

Yes

**How does the firm decide whether to take on a pro bono matter?**

While attorneys are encouraged to seek out their own pro bono projects, the majority of our pro bono work is referred to the firm through established legal service providers. We rely on legal service organizations to triage the needs of the community and refer appropriate work to the firm. We also actively seek out opportunities to work in partnership with local and national public interest organizations to develop impact litigation and other initiatives. As well, we work with a variety of nonprofit organizations in a wide variety of matters including incorporation, corporate governance, employment, contract review, and intellectual property among other types of work. Our dedicated pro bono professionals are involved in all aspects of the pro bono process and work in conjunction with department and practice group leaders, as well as work coordinators. The initial screening of any new pro bono matter is first done by the pro bono staff. It is then reviewed by a member of the pro bono committee in the local office and routed to the firmwide pro bono committee. This process generally takes less than 24 hours, so the vast majority of matters are quickly approved. Some routine matters from clinics and legal service organizations are considered preapproved and do not require committee oversight.

**Has the firm signed on to the Law Firm Pro Bono Challenge?**

Yes

**What are some of the areas of law in which your firm has performed pro bono legal work since 2010?**

Arts and historic preservation, Asylum, Bankruptcy, Civil rights, Community economic development, Consumer law and small claims court, Death penalty defense, Disability benefits, Domestic violence, Education, Elder law, Employment, Environment, Fair housing/tenants rights, Family law, First Amendment and constitutional issues, HIV/AIDS advocacy, Homeless advocacy, Immigration, Indigent criminal defense, International human rights, Juvenile justice reform, Nonprofit corporate law, Nonprofit incorporation/tax exemptions, Nonprofit intellectual property, Parole hearings, Police misconduct, Prisoners' rights, Probate law, Public benefits, Real estate transactions, Social Security law, Veterans' benefits/appeals, Voting rights

**Are there areas of law in which, as a matter of policy or practice, your firm does not perform pro bono work?**

No

**List up to 10 of your firm's pro bono clients or partners since 2010, including legal service providers or clearinghouses.**

- Advocates for Children
- Lex Mundi Pro Bono Foundation
- Volunteer Legal Services Program of the Bar Association of San Francisco
- Nature Conservancy

© 2012 Vault.com Inc.

Case: 24-6943, 02/06/2025, DktEntry: 20.1, Page 99 of 318
Case 3:24-cv-00260-CRB    Document 98-4    Filed 03/05/25    Page 137 of 151

Vault Guide to Law Firm Pro Bono Programs, 2013 Edition
Morrison & Foerster LLP

- Public Counsel
- American Civil Liberties Union
- Lawyers Committee for Civil Rights Under Law
- Center for Reproductive Rights
- DC Bar Pro Bono Program
- New York Lawyers for the Public Interest

**List up to three representative examples of your firm's pro bono matters since 2010. Please limit your answer to a short paragraph per matter.**

- In 2011, the firm partnered with the Center for Reproductive Rights to file a class action lawsuit against a newly enacted Texas law that requires women seeking abortion to be subjected to an ultrasound examination for the sole purpose of making her see and hear images of the developing embryo. We contended that the law "profoundly intrudes on the practice of medicine, forces physicians to deliver ideological speech to patients, and treats women as less than fully competent adults," in violation of constitutional guarantees including freedom of speech, privacy, equal protection of the laws, due process, and freedom from unreasonable searches and seizures. We won a preliminary injunction that limited the law's effect, but it was vacated by the Fifth Circuit Court of Appeals in early 2012. The district court then dismissed the case, strongly disagreeing with the Fifth Circuit's legal conclusions but recognizing them as binding.

- Morrison & Foerster has provided pro bono assistance to Build Change, a nonprofit organization that designs low-cost, earthquake-resistant houses for earthquake-prone developing countries. Our work has included assisting Build Change in preparing an agreement to license the organization's earthquake-resistant building material for free to nonprofits and individuals in places like Haiti, while allowing the organization to generate profits to support its work by licensing the materials for commercial use elsewhere.

- Morrison & Foerster patent attorneys are advising Wello Water, a social enterprise, on intellectual property issues related to its WaterWheel. The WaterWheel is an innovative water-carrying device that makes it possible for people in developing countries who have to travel to collect water to collect 25 gallons of water in a single trip, five times the amount possible using traditional methods.

**List up to three pro bono matters that are highlights (e.g., a Supreme Court case). Please limit your answer to a short paragraph per matter.**

*Defense of Marriage Act (DOMA)*

- In *Golinski v. Office of Personnel Management*, we won a federal district court ruling that Section 3 of the federal Defense of Marriage Act (DOMA), which prohibits federal recognition of same sex marriages, violates the equal protection clause of the U.S. Constitution. The court held that the long history of discrimination on the basis of sexual orientation required applying heightened scrutiny to DOMA, which the statute failed, and further, that Section

3's differential treatment of same-sex and opposite-sex married couples failed rational basis scrutiny. The ruling secured health benefits for the wife of Karen Golinski, a federal employee who has been our client since 2008. The U.S. Department of Justice has asked the Supreme Court to bypass circuit court review of this and a second ruling on DOMA, and decide the appeals directly.

*Saving Community-Based Health Services in California*

- California tried repeatedly to eliminate its Adult Day Health Care (ADHC) programs. Designed for elderly and disabled individuals who are one step away from institutionalization, ADHC programs provide a range of daily medical and rehabilitative services in a single, supportive outpatient environment. Morrison & Foerster attorneys participated in earlier rounds of litigation against ADHC cuts by representing organizations with amicus briefs. Then the firm stepped up its role, joining forces with Disability Rights California, the National Health Law Project, the National Senior Citizens Law Center, and the AARP Foundation to represent the plaintiffs directly. The result: a settlement that ensures community-based services will continue for elderly and severely disabled low-income individuals who need them in California.

*Gender Equality in Schools*

- With *Doe v. Wood County Board of Education*, our litigators restored co-education at a West Virginia middle school where girls and boys were being separated for their core academic classes based on a scientifically meritless theory of brain differences. Working with the ACLU, our team achieved victory practically overnight: the complaint was filed August 15, 2012, and by August 29, we had prevailed at a preliminary injunction hearing and won relief that will remain in place for the rest of this school year and "unless and until any single sex program offered meets the requirements of the Constitution and Title IX." The decision advanced the law on gender equality, holding that federal regulations demand that parents give "clear and affirmative assent" before their children are enrolled in any single-sex programs at public schools receiving federal funding.

# BY THE NUMBERS

**What is the total number of hours that lawyers at your U.S. office(s) spent performing pro bono legal services, as defined by the Law Firm Pro Bono Challenge, in 2010 and 2011? Do not include summer associate or non-lawyer pro bono hours in your answers.**

*Total number of pro bono hours in 2010:* 91,195

*Total number of pro bono hours in 2011:* 91,114

**What was the attorney headcount in your firm's U.S. offices?**

*Number of attorneys as of December 31, 2010:* 861

*Number of attorneys as of December 31, 2011:* 857

Visit www.vault.com for company rankings, ratings and reviews to learn what it's really like to work in an industry or company—and how to position yourself to land that job.

**437**

EoR - 784 of 2347

**Using the number of attorneys listed above, what is the average number of pro bono hours per attorney in your firm's U.S. office(s) during the following years?**

*Average number of hours per attorney in 2010*: 106

*Average number of hours per attorney in 2011*: 106

**What percentage of attorneys employed during 2010 and 2011 in your firm's U.S. office(s) did at least 20 hours of pro bono during that calendar year?**

*Percentage of attorneys who did pro bono work in 2010*: 61–70%

*Percentage of attorneys who did pro bono work in 2011*: 51–60%

## SUPERVISION AND EVALUATIONS

**Is there partner supervision on all pro bono matters?**

Yes

**Do partner supervisors or, if applicable, senior associates provide written evaluations of associates' work on pro bono matters?**

Yes

**Are those evaluations taken into account in determining salary or bonuses?**

- Yes, they are taken into account when determining salary
- Yes, they are taken into account when determining bonuses

**Are those evaluations taken into account in determining advancement within the firm?**

Yes

**Is there a pro bono requirement at your firm?**

Yes

**What is the requirement and to whom does it apply?**

We urge every lawyer in the firm to take on at least one pro bono project each year.

**Does the firm give billable hour credit for pro bono work?**

Yes

**Does the firm have a maximum number of pro bono hours that can be applied toward the billable hour target?**

No

**Does the firm consider pro bono hours when determining bonuses?**

Yes

## PRO BONO POINTS

**What training opportunities are open to associates working on pro bono matters?**

The firm organizes its own pro bono training programs led by firm attorneys and staff attorneys at legal service organizations. The firm also encourages attorneys to participate in training programs sponsored by legal service organizations. As well, the firm assists the organizations in digitally recording these trainings, and posts the files on the pro bono portal page on the firm's intranet so that the programs are available for viewing on the attorneys' individual computers. The firm also allows legal service organizations to use its facilities to host training programs open to outside attorneys.

**Does the firm offer the use of support staff in handling pro bono matters?**

Yes

**Please indicate how many total hours and average hours per person your summer associates spent performing pro bono in 2010 and 2011.**

Total hours summer associates spent on pro bono work

2010: 2,526

2011: 2,207

**Average hours per summer associate spent on pro bono work**

2010: 49

2011: 39

**Percentage of summer associates in your firm's U.S. office(s) engaged in pro bono work**

2010: 82%

2011: 82%

**Please provide any additional information about pro bono opportunities available to summer associates.**

Each summer associate is encouraged to work on at least one pro bono matter during the summer whether it is a clinic or an existing pro bono matter of the firm. Along with attorneys, summer associates participate in our regular clinical programs in each of our offices, which allow summer associates a chance to do hands-on pro bono work. However, we also have a number of opportunities that are specifically targeted to the summer associates allowing them their own hands-on pro bono experience.

- Examples of past summer associate activities in California include representing clients at administrative hearings and in school expulsion matters.
- Summer associates throughout the firm including our international offices have participated in the Anti-Defamation League's annual Summer Associate Research Project.

© 2012 Vault.com Inc.

Case: 24-6943  02/06/2025  DktEntry: 20.1  Page 101 of 318
Case 3:24-cv-00260-CRB    Document 98-4    Filed 03/05/25    Page 139 of 151

**Vault Guide to Law Firm Pro Bono Programs, 2013 Edition**
Morrison & Foerster LLP

- In New York, summer associates participated in the Courtroom Advocate Project run by Sanctuary for Families which gave them invaluable courtroom experience helping battered women obtain protective orders.

- In New York, summer associates were invited to represent clients seeking unemployment insurance benefits and to help veterans apply for disability benefits.

- In San Francisco, summer associates have participated in the Bar Association of San Francisco's Summer Associate Public Service Program, where they worked with individuals through the Homeless Advocacy Project. They also negotiate settlements in eviction matters through the Housing Negotiation Project, a program run by the Bar Association of San Francisco's Volunteer Legal Services Program. They also have the opportunity to participate in Homeless Connect, a day-long program offering legal services to homeless individuals, among other services.

**Does the firm have established programs, such as externships, that enable its associates to work in a public interest setting?**

Yes

**Please describe the established program(s) and their duration, if applicable.**

The firm participates in several governmental externship programs. This assistance provides a much-needed resource to the many city attorneys, public defenders, and prosecutors' offices, and other governmental entities that are overburdened and experiencing severe budgetary constraints. In addition, these opportunities give our senior litigation associates intensive trial experience.

- In New York, litigation associates spend one day a week taking depositions in civil cases against the City of New York in the Corporation Counsel's Deposition Program.

- In Washington, DC, litigation associates are loaned to the Office of the Attorney General of the District of Columbia, where they spend 50 percent of their time for six months prosecuting civil and criminal cases.

- In San Diego, litigation attorneys work with the County of San Diego, to handle civil commitment proceedings regarding mentally disabled individuals who are a danger to themselves and others. Many of these hearings result in jury trials to verdict. San Diego attorneys also work with the public defender's office to handle aspects of particular complex cases.

**What other law-related public interest and community service programs (that are not "pro bono" as defined by the Law Firm Pro Bono Challenge) do you offer and manage? For example, list any law school collaborations and public interest scholarships, auctions at law schools, monetary support, or fellowships.**

Morrison & Foerster supports dozens of law-related public interest and community service programs. The firm allows its attorneys and paralegals to bill these activities to community service time, which counts towards their overall firm

participation hours but not towards their pro bono time. Most of these programs are brought to the attention of the firm by the attorney or paralegal who would like to participate. However, there are some law-related projects that the firm supports year after year, encouraging the participation of its attorneys, paralegals, and staff. Firm attorneys also serve on the board of directors of law schools, legal service organizations and other law-related public interest and community service organizations. Our attorneys regularly contribute to the local law schools by teaching law school classes, participating in moot court programs, serving as clinical and club advisors and mentoring students, among other activities.

The Morrison & Foerster Foundation was established in 1986 as a nonprofit organization to help the partners of Morrison & Foerster make the best use of their charitable resources in each of the communities the firm serves. Since its founding, firm partners have donated a percentage of the firm's annual net income to the Foundation, which also accepts donations from firm employees and others. Over the years, it has given millions of dollars in charitable contributions to nonprofit organizations at the local and national levels. The Morrison & Foerster Foundation financially supports many legal service organizations, including our pro bono partners as well as local nonprofit organizations and other community service programs. The Morrison & Foerster Foundation also sponsors Equal Justice Works Fellowships, which run on an academic calendar year.

In 2011 and 2012 YTD as of September 2012, The Morrison & Foerster Foundation provided financial support to the following law-related public interest and community service programs:

*Law-Related Public Interest Organizations Supported by the Foundation:*

- ABA's Senior Lawyers Division's Women Trailblazers Project—Chicago, IL

- Historical Society of the District of Columbia—Washington, DC

- Law Library Justice Foundation's San Diego Law Library Renovation Fund—San Diego, CA

- Legal Outreach's College Bound Program—Long Island City, NY

- Ninth Judicial Circuit Historical Society—Pasadena, CA

- Supreme Court Historical Society—Washington, DC

*Law-Related Fellowship Programs Supported by the Foundation:*

- Equal Justice Works' General Legal Fellowship Program Fund

- Equal Justice Works' Post-Graduate Legal Fellowships at:

    - The Children's Law Center—Washington, DC

    - East Bay Children's Law Offices—Oakland, CA

    - East Bay Community Law Center—Berkeley, CA

    - Kids In Need of Defense—Washington, DC

Visit www.vault.com for company rankings, ratings and reviews to learn what it's
really like to work in an industry or company—and how to position yourself to land that job.

**439**

EoR - 786 of 2347

- Legal Aid Society of San Diego—San Diego, CA
- Rocky Mountain Immigrant Advocacy Network—Westminster, CO
- Watsonville Law Center—Watsonville, CA
- Youth Represent—New York, NY

- Fordham Student Sponsored Fellowship Program—New York, NY
- UC Berkeley School of Law's Summer Public Interest Fellowship Fund—Berkeley, CA

***Law-Related Scholarship Programs Supported by the Foundation:***

- ABA's Judicial Intern Opportunity Program—Chicago, IL
- ABA's Legal Opportunity Scholarship Fund—Chicago, IL
- American Intellectual Property Law Education Foundation's Scholarships for Minority Scholars Program—Oradell, NJ
- The BASF (Bar Association of San Francisco) Foundation's Bay Area Minority Law Student Scholarship Program—San Francisco, CA
- The BASF (Bar Association of San Francisco) Foundation's Legal Employment Action Program—San Francisco, CA
- California Bar Foundation's Diversity Scholarship Program—San Francisco, CA
- Columbia Law School's Public Interest Law Foundation—New York, NY
- La Raza Lawyers of Santa Clara County Charitable Foundation's Law School Scholarship Program—San Jose, CA
- Monmouth Bar Foundation Law School Scholarship Fund—Red Bank, NJ
- The Morrison & Foerster Foundation - Stephen S. Dunham Scholarship at Golden Gate University School of Law—San Francisco, CA
- The Morrison & Foerster Foundation - Stephen S. Dunham Scholarship at the University of the District of Columbia David A. Clark School of Law—Washington, DC
- NAACP Legal Defense and Educational Fund's Scholarship Programs—New York, NY
- UC Davis School of Law's Santiago and Gregoria Gonzalez Award—Davis, CA
- University of the Pacific, McGeorge School of Law's Jeffrey K. Poilé Scholarship Fund—Sacramento, CA

***Community Service Related Activities:***

- AIDS Walk (San Francisco)
- Adopt-a-School (San Francisco)
- Adopt-a-Family (gifts collected as well as a Santa provided to distribute the gifts, plus monetary donations matched by MoFo Foundation) (San Francisco)

- Bar Association of San Francisco Intern Program (San Francisco)
- Constitutional Rights Foundation Intern Program (Los Angeles)
- American Cancer Society's Daffodil Days Annual Fundraising Event (New York)
- Black History Month African Read-In (San Francisco)
- Constitutional Rights Foundation (CRF): Annually, we participate in the CRF's Intern Program, which provides selected high school students the opportunity to perform paid work while obtaining job work experience. We also regularly participate in other CRF programs such as Courtroom to Classroom and the State Mock Trial Competition. (Los Angeles)
- Cristo Rey Corporate Work Study Program in New York—five high school students spend one day per week for the school year with clerical tasks. Cristo Rey's unique Corporate Work Study Program enables the students to earn 70% of the cost of their education while introducing them to some of the most prestigious corporations and not-for-profit institutions in New York City. The firm pays the school a stipend each year. (New York)
- "Dress for Success" Clothing Drive (San Francisco)
- Food from the Bar (Bar Association of San Francisco)
- Harlem Interagency Council for the Aging (New York)
- Head Start Holiday Gift Program (San Francisco)
- Host High School mock trials (Bar Association of San Francisco)
- Helping Young People Excel (HYPE): provides talented low-income students in Los Angeles with the guidance and resources to qualify for admission at elite college-prep independent high schools. HYPE provides a blend of intensive programming and services to help students gain admission, finance their education, and succeed in high school and beyond. This past summer we hosted students from HYPE Los Angeles for a constitutional law appellate advocacy project with our summer associates.
- ICA High School Intern Program (San Francisco)
- Legal Outreach Summer Internship Program-the firm hosts six college bound students for four days in July and provides training exercises and/or seminars for the benefit of the students and makes a donation to Legal Outreach each year. (New York)
- Little Brothers (holiday gifts were provided to elders, plus monetary donations matched by MoFo Foundation) (San Francisco)
- Literacy Volunteers—book exchange with all proceeds to the organization (New York)
- Mayor's Youth Education and Employment Program (San Francisco)
- New York Cares Coat Drive (New York)

© 2012 Vault.com Inc.

- Provide "judge" and space for high school mock trial (charter school) (San Francisco)

- Rebuilding Together (San Francisco)

- See's Candy Fundraisers (profits matched by MoFo Foundation and sent to Bessie Carmichael Elementary School for books and for student enrichment) (San Francisco)

- Stanford Public Interest Law Foundation Annual Auction

- Stiles Hall Intern Program

- Summer Intern Program—college students interested in law school work in various departments for summer months

- Toys for Tots (New York)

- University of California Davis Immigration Law Clinic 30th Anniversary Celebration

- UCLA Public Interest Law Foundation Auction (Los Angeles)

- United Way's Week of Caring (San Francisco)

- University of Michigan School of Law-sponsored Student Funded Fellowship Auction; 34th Annual Butch Carpenter Scholarship Banquet; and APALSA Public Interest Fellowship Origins Banquet

- University of Michigan School of Law L-Star Program. The Law School and the Students Funded Fellowships board (SFF) invite employers that recruit here to participate in the Law Student Travel and Accommodation Reimbursement (L-STAR) Program. This initiative works as follows: students interviewing with participating firms are given the option of waiving the overnight accommodations offered by the employer in favor of a $215 donation by those firms to SFF. Additionally, in lieu of paying for cab rides to/from the airport, firms may also choose to contribute $35 on behalf of a student who is able to get a ride from friends instead. This money along with donations from students is used to award a modest stipend to students who take summer jobs in unpaid or extremely low-paid public interest positions.

### What non-law related volunteer opportunities does your firm offer? For example, list any work with high school students and non-legal volunteerism for organizations like Habitat for Humanity.

Morrison & Foerster supports its many attorneys and staff who share its commitment to public service. Each year, the firm offers a number of organized community service projects, many of which also receive financial support from the Morrison & Foerster Foundation. The firm also encourages its personnel to pursue independently chosen community projects. Community Service Day offers staff members one paid day off each year to participate in a community service activity of their own choosing. Staff and attorneys are also given time off to participate in programs sponsored by the local offices, such as adopt-a-school programs. Many attorneys and staff also serve on the boards of directors and other leadership committees of local and national nonprofits and government entities.

### Please list any special recognition or awards your firm has won since 2010 for its pro bono work.

*2012 Awards*

- 10/02/12: The United States District Court for the Northern District of California's honored Morrison & Foerster for its high level of participation in the Federal Pro Bono Project.

- 9/12/12: New York litigation partner Jamie Levitt is featured in a *New York Law Journal* special supplement, "Lawyers Who Lead By Example." Levitt, former Chair of the firm's Pro Bono Committee, is recognized for her "particular passion for defending vulnerable populations against fraud, even in the most controversial matters," and her leadership on the boards of several public interest legal organizations.

- 8/29/12: James Brosnahan has been honored by *American Lawyer* with a Lifetime Achiever Award. Mr. Brosnahan is one of only eight attorneys to receive the award this year, which honors outstanding private sector success and a devotion to public service. According to *Am Law*, the 2012 Lifetime Achiever recipient's contributions were "tremendous." Mr. Brosnahan's profile highlights his pro bono accomplishments on behalf of a Mexican housewife accused of helping Central American refugees escape into the United States—although convicted, she served no prison time—and alleged Irish Republican Army member Kevin Artt, whom Brosnahan represented in extradition proceedings—a case close to Brosnahan's heart, given his Irish roots. Mr. Brosnahan is also recognized for founding the Volunteer Legal Services Program of the Bar Association in San Francisco.

- 8/17/12: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2012 list for the third year in a row. The list recognizes the top twenty pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. MoFo is one of only four firms to appear on the *Law 360* list in each year since it was inaugurated in 2010.

- 6/14/12: Volunteer Lawyers for the Arts (VLA) selected the firm to receive the 2012 S. Jeanne Hall Pro Bono Service Award for its exceptional pro bono service through the support of its programs and individual cases as well as hosting VLA's Art & Law Residency since the program began in 2009.

- 5/23/12: The AIDS Legal Referral Panel recognized Keith Wetmore with its 2012 James C. Hormel Philanthropist Award for Morrison & Foerster's many years of outstanding service to ALRP.

- 5/17/12: Starlight Children's Foundation honored the firm with its 2012 Jacki Carlish Humanitarian Award in recognition of over 20 years of pro bono services valued at over $3 million. Since 1991, attorneys in several of our California offices, Washington, DC, Northern Virginia, New York, and London have represented Starlight in intellectual property matters, employment issues, real estate leasing, trademark and general corporate matters.

Visit www.vault.com for company rankings, ratings and reviews to learn what it's
really like to work in an industry or company—and how to position yourself to land that job.

**441**

EoR – 788 of 2347

Case: 24-6943  02/06/2025  DktEntry: 20.1  Page 104 of 318
Case 3:24-cv-00260-CRB  Document 98-4  Filed 03/05/25  Page 142 of 151

**Vault Guide to Law Firm Pro Bono Programs, 2013 Edition**
Morrison & Foerster LLP

- 5/14/12: The McCarton Foundation for Developmental Disabilities honored Morrison & Foerster for its extensive pro bono contributions to the Foundation's work with children with autism, at its Celebration of Learning Gala.

- 5/09/12: *The Daily Journal* named San Francisco associate Rita Lin to its list of top women lawyers for 2012 in recognition of her work as co-counsel with Lambda Legal in *Golinski v. Office of Personnel Management*, which challenges the federal Defense of Marriage Act (DOMA) on behalf of a federal district court employee who was rebuffed when she sought to enroll his same-sex spouse on her federal employee health plan.

- 5/01/12: The New York State Bar Association recognized Natalie Fleming Nolen with its 2012 President's Pro Bono Service Award in the Young Lawyer Category for her work on behalf of immigrants and refugees, including winning humanitarian parole for Haitian victims of rape and obtaining special immigrant juvenile status for minors who were facing deportation from the United States.

- 4/25/12: The HIV Law Project in New York gave Morrison & Foerster its Distinguished Pro Bono Award, citing the firm's lengthy and successful representation of an HIV positive man who was threatened with eviction from his home.

- 4/18/12: Arturo Gonzalez was honored as Attorney of the Year by Centro Legal de la Raza, for advancing the rights of immigrant, low-income and Latino communities through legal representation, education and advocacy.

- 3/29/12: The Federal DC Circuit Judicial Conference Standing Committee on Pro Bono Legal Services honored the firm's Washington, DC office at the annual 40 at 50 Judicial Pro Bono Recognition Breakfast, recognizing that at least 40 percent of the attorneys in that office performed 50 hours or more of pro bono work during 2011.

- 3/26/12: The District of Columbia Court of Appeals and Superior Court of the District of Columbia named 37 lawyers from Morrison & Foerster's Washington, DC office to the Capital Pro Bono Honor Roll, for performing at least 50 hours of pro bono service in 2011. Twenty-four of these attorneys were also named to the court's High Honor Roll, for pro bono contributions in excess of 100 hours.

- 3/14/12: The Volunteer Legal Services Program of the Bar Association of San Francisco ("VLSP") awarded Morrison & Foerster its 2011 Outstanding Law Firm in Public Service Award. In presenting the award to Jim Brosnahan, Judge Katherine Feinstein, San Francisco Superior Court's Presiding Judge, noted that more than 70 Morrison & Foerster attorneys participated in VLSP pro bono matters in 2011, contributing over $1 million in pro bono legal services.

- 3/09/12: Bay Area Lawyers for Individual Freedom honored Rita Lin with its 2012 Legal Service Award in recognition of her important and vital work to advance the rights of the LGBT community, including representation of Karen Golinski.

- 2/16/12: Susan Mac Cormac was one of the attorneys named as California Lawyer of the Year by *California Lawyer* magazine for co-chairing the working group that drafted

SB 201 creating Flexible Purpose Corporations. The law now makes it possible for California businesses to fold goals of sustainability and social morality into their missions.

- 1/02/12: *The National Law Journal* named Morrison & Foerster a recipient of its annual Pro Bono Awards for its display of exemplary commitment to access to justice. San Diego attorney Drew Woodmansee was profiled for his advocacy and litigation work that led to the repeal of Don't Ask, Don't Tell on September 30, 2011. Beginning in 2009, a Morrison & Foerster pro bono team has represented four gay service members who served their country with distinction but were dismissed, or were poised to be dismissed, under Don't Ask, Don't Tell.

### *2011 Awards*

- 12/13/11: Casa Cornelia honored Morrison & Foerster with its La Mancha Law Firm of the Year Award for its extraordinary level of pro bono legal services to indigent immigrant victims of human and civil rights violations. Casa Cornelia stated that this "extraordinary level of commitment is only possible when a firm's leadership encourages and facilitates pro bono service among its partners and associates."

- 12/09/11: Disability Rights California (DRC) honored Morrison & Foerster for its considerable and critical contributions to the *Darling v. Douglas* lawsuit challenging cutbacks to Medi-Cal funded Adult Day Health Care (ADHC). DRC commended Palo Alto litigators Ken Kuwayti and Stefan Szpajda for their strategic and successful efforts to stop the elimination of ADHC as well as Los Angeles litigators Ben Fox and Shirley Hufstedler for their compelling appellate efforts in the Ninth Circuit.

- 11/22/11: The National Legal Aid & Defender Association (NLADA) honored the firm with its 2011 Beacon of Justice Award for its significant contribution to pro bono appellate representation. NLADA was moved by Morrison & Foerster's true commitment to justice by stepping up to represent issues and people that would otherwise be forced to navigate the appeals process without any guidance.

- 11/03/11: *The Financial Times* highly commended the Los Angeles office of Morrison & Foerster in its 2011 U.S. Innovative Lawyers issue for winning a landmark education rights case by using the California constitution's guarantee of equal educational opportunity. The result prevents teacher layoffs at inner city public schools and has repercussions for schools across the U.S.

- 11/03/11: The Pro Bono Institute (PBI) selected Morrison & Foerster as the recipient for the John H. Pickering Award for its unwavering commitment to pro bono, noting that the firm billed over 95,000 pro bono hours in 2010. PBI highlighted the firm's recent pro bono victories including a ruling from the U.S. Supreme Court regarding protecting juveniles from life sentences without parole in non-homicide offenses as well as securing the release of a man wrongly imprisoned for 20 years.

- 10/26/11: Gordon Erspamer has been honored by *American Lawyer* with a Lifetime Achiever Award. Mr. Erspamer is one of only eight attorneys to receive the award this year, which honors outstanding private sector success and a

© 2012 Vault.com Inc.

EoR – 789 of 2347

Case: 24-6943, 02/06/2025, DktEntry: 20.1, Page 105 of 318
Case 3:24-cv-00260-CRB    Document 98-4    Filed 03/05/25    Page 143 of 151

Vault Guide to Law Firm Pro Bono Programs, 2013 Edition
Morrison & Foerster LLP

devotion to public service. According to *Am Law*, the 2011 Lifetime Achiever recipients "are extraordinary lawyers, certainly, but for them, that's just the beginning of what makes them successful." Gordy's profile highlights his pro bono accomplishments on behalf of U.S. veterans that have spanned more than three decades, making him "a legend in military circles." The special section is published in the September 2011 issue of *American Lawyer*.

- 10/05/11: Tokyo attorney Jack Londen was named as one of the recipients of the Brinsley Award by the Western Center on Law & Poverty (WCLP). Named in honor of former WCLP Board Chair John Brinsley, the award celebrates the heart of Western Center which is passionate service, leadership and extraordinary commitment to pro bono services and the community.

- 7/18/11: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2011 list. The list recognizes the top ten pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. In particular, *Law 360* recognizes the firm's impact in juvenile justice, education rights, and advocacy for people with disabilities.

- 6/16/11: The American Civil Liberties Union Foundation of Southern California awarded its 2011 Social Justice Award to Sean Gates and his team for their extraordinary work in *Reed v. State of California* to protect the equal education rights of students affected by teacher layoffs in the Los Angeles Unified School District. The award was presented at the ACLU's 17th Annual Law Luncheon in Los Angeles.

- 6/15/11: Public Counsel gave its 2011 Pro Bono Award to Los Angeles attorneys Sean Gates, Hailly Korman, and Miriam Vogel, and Tokyo attorney Jack Londen for devoting eight months to negotiating and protecting a resolution in *Reed v. State of California*. The result is a landmark protection of students' fundamental right to equal educational opportunity that protects at least 75,000 students annually in the Los Angeles Unified School District.

- 4/15/11: The American Bar Association Section of Litigation awarded its top pro bono honor, the 2011 John Minor Wisdom Public Interest and Professionalism Award to the firm on behalf of its work on educational reform for low-income children and children with disabilities.

- 4/11/11: The AIDS Legal Referral Panel recognized the firm with a certificate of appreciation for our generous participation in the Pro Bono Connections Initiative with ALRP.

- 2/15/11: Los Angeles attorney Sean Gates has been named the recipient of a 2011 California Lawyer Attorneys of the Year (CLAY) Award in the public interest law category for achieving an innovative class action settlement in *Reed v. State of California*, to protect the equal education rights of students who are affected by teacher layoffs. The settlement goes far beyond the three public schools attended by the initial plaintiffs, to protect up to 45 schools. As a result, the Los Angeles Unified School District must consider equal protection implications as well as teacher seniority in making layoff decisions.

## 2010 Awards

- 12/07/10: Legal Services NYC named Morrison & Foerster a 2010 Pro Bono Leader, for launching and sustaining the Unemployment Insurance Project in conjunction with Brooklyn Legal Services Corporation A.

- 12/06/10: Morrison & Foerster is named to the *Law 360* Pro Bono Firms of 2010 list. The list recognizes the top ten pro bono firms in the country, based on a record of pro bono victories, a willingness to tackle tough pro bono cases, and an overall outstanding commitment to pro bono work. In particular, *Law 360* recognizes the firm's impact in juvenile justice, education rights, and advocacy for people with disabilities.

- 10/06/10: The National Legal Aid & Defender Association (NLADA) honored the firm with its 2010 Beacon of Justice Award for its significant contribution to pro bono representation in the area of immigration law.

- 9/24/10: The State Bar of California gave the President's Pro Bono Service Award to Kimberly Van Voorhis, Richard Ballinger and Marc Peters for their representation of the California State Foster Parent Association in an action in the U.S. District court for Northern California by California foster parents to increase the state's reimbursement rates for providing basic necessities to federally qualified foster children.

- 6/25/10: The Federal Circuit Bar Association honored the firm at the Broadmoor Bench and Bar Conference for its support of the general, government and veterans pro bono programs.

- 5/10/10: The Washington Lawyers' Committee for Civil Rights honored Jeremy McLaughlin, John Kolakowski, Vanessa Waldref and Robert Salerno with its Outstanding Achievement Award for their work ensuring access for people with disabilities in the Johnny Rockets chain.

- 5/03/10: The Colorado Lawyers Committee presented the Denver office with its Law Firm of the Year Award. Steve Kaufmann, who has won Lawyers Committee awards for individual and sustained contributions in the past, accepted the award on behalf of the firm.

- 4/21/10: The AIDS Legal Referral Panel recognized the firm with a certificate of appreciation for our generous participation in the Pro Bono Connections Initiative with ALRP.

- 3/23/10: The Volunteer Legal Services Program of the Bar Association of San Francisco presented Kathryn Davis and Sandra Nazzal with its Outstanding Volunteer in Public Service Award.

- 3/10: *California Lawyer* magazine has named 44 attorneys around the state to receive the 14th annual *California Lawyer* Attorneys of the Year Awards. Kevin A. Calia and Gordon P. Erspamer are being honored with the Public-Law Interest award for their extensive work for veterans' rights.

- 3/11/10: Morrison & Foerster was honored at the 2010 Northern California Innocence Project's third annual awards dinner with the Pro Bono Award for the hundreds of pro bono hours and generous contribution of resources to NCIP cases.

Visit www.vault.com for company rankings, ratings and reviews to learn what it's really like to work in an industry or company—and how to position yourself to land that job.

**443**

EoR - 790 of 2347

- 2/19/10: *California Lawyer* magazine awarded San Francisco attorneys Gordon Erspamer and Kevin Calia with the 2010 California Lawyer's Attorney of the Year (CLAY) Award in the public interest law category for their work in *Cushman v. Shinseki*, a Vietnam War veteran. As a result of the attorneys' work, veterans can now argue that an undue delay or unfair treatment in the processing of an application for benefits is, in itself, a constitutional violation.

- 2/09/10: Kathi Pugh was honored by the Bay Area Lawyer Chapter of the American Constitution Society for her extensive work in the community as well as her continued work for disability rights.

### Please add any additional information about your firm's pro bono program.

In the words of a Morrison & Foerster partner, "A commitment to pro bono practice is in our firm's DNA." Advancing the legal profession's commitment to donating services pro bono publico for the public good has been at the core of Morrison & Foerster's mission since firm founder Alexander Morrison assisted in the creation of the Legal Aid Society of San Francisco in 1916. In the 1950s, partner Herbert Clark led the effort to reorganize and revitalize the Legal Aid Society; in the 1980s, the firm created the Girvan Peck Memorial Fund to dedicate attorney fees and costs earned through pro bono cases to fund further pro bono work; and in 1991, partner Bob Raven convened the first American Bar Association meeting of large law firm chairs on pro bono work, a meeting that led to the creation of the Law Firm Pro Bono Challenge. MoFo was instrumental to the development of the Challenge, including the commitment to contribute five percent of billable time to pro bono work, and was a charter signatory firm. Morrison & Foerster was one of the first firms to establish a full-time Pro Bono Counsel position, and more recently created a second such position to focus on the firm's East Coast offices. The institutional commitment to pro bono is lived out every day in MoFo's 15 offices worldwide. Every lawyer in the firm is expected to take on at least one pro bono matter each year, but at Morrison & Foerster, we don't tell lawyers how to contribute their services. Rather, we invite lawyers at all levels and in all practices to bring pro bono projects to the firm, while also smoothing the way for them to participate in established pro bono clinics and other programs. Every project is approved by the local and national pro bono committee, and supervised by a partner or, in appropriate cases, a senior of counsel attorney. Pro bono work counts fully towards our associates' and partners' client service hours goals and bonuses. Most importantly, whether the project is incorporating a new nonprofit, advising a low-income entrepreneur, representing an inmate on death row or helping parents to get special education services for their child, Morrison & Foerster lawyers provide legendary service to every one of our clients, fee-paying and pro bono alike.

© 2012 Vault.com Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ), | **DECLARATION UNDER PENALTY OF PERJURY:  Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights.***;* **In Honor of the ;** Civil Rights Act of 1964,Title VI, **(**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence. |

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1.** Equal Protection **2.** 42 USC 1981 **3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a** whistleblower**; As part of providing 'notice' of documented formal complaints to Georgetown** ideaa@georgetown.edu**,** generalcounsel@georgetown.edu**,** presidentsoffice@georgetown.edu**,** media@georgetown.edu**,** privacy@georgetown.edu**,** visualidentity@georgetown.edu**,** lawdeanofstudents @georgetown.edu**, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including** ocr@ed.gov**,** privacyTA@ed.gov**,** studentaid@ed.gov**, and** whistleblowercoordinator.oig@ed.gov**, in real time.  See** Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**1**

1.     Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights. On June 8, 2023, Justice Kagan delivered the unanimous opinion for the Supreme Court of the United States who unanimously sided with Jack Daniel's and overturned the Ninth Circuit in a trademark infringement and dilution case stemming from VIP Products' "Bad Spaniels," a novelty dog toy that intentionally parodied Jack Daniel's iconic 'Tennessee whiskey' bottle and label elements.  The decision clarifies that when a parody of another's trademark is used as a trademark, the … use does not qualify as "noncommercial."

> "You're as smooth as 'Tennessee whiskey'
> You're as sweet as strawberry wine
> You're as warm as a glass of brandy
> And honey, I stay stoned on your love all the time
> I've looked for love in all the same old places
> Found the bottom of a bottle's always dry
> But when you poured out your heart, I didn't waste it
> 'Cause there's nothing like your love to get me high
> You're as smooth as 'Tennessee whiskey"
> **-   George Jones (Original); Chris Stapleton (More Recent Remake) (with 'multivariate' artist covers)**

2.     Georgetown has already *publicly* admitted the inherent harm of their conduct in violation of their media, privacy (publicity) and written authorization policy, but the Supreme Court highlights a 'smooth' analogy to a person's right of publicity, as a trademark is *"any word, name, symbol, or device, or any combination thereof"* used to "identify and distinguish" one's goods or services (*reaffirming the harm in a purely legal, outside of policy, context*).  See Jack Daniel's Props. v. VIP Prods., No. 22-148, 6 (U.S. Jun. 8, 2023) (""[A]ny word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish")  See also Cal. Civ. Code § 3344 (*"(a) Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of,*

**2 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*products, merchandise, goods or services, without such person's prior consent …*
*shall be liable for any damages sustained by the person or persons injured as a result*
*thereof"*).  See also e.g. Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1268 (D.C.
2015) (*""The District of Columbia has adopted the definition set forth by the*
*Restatement (Second) of Torts § 652C for ... the tort of misappropriation of name."*
*Teltschik v. Williams & Jensen, PLLC, 683 F.Supp.2d 33, 55 (D.D.C.2010*) ; see also
Vassiliades, 492 A.2d at 592–93. *"One who appropriates to his own use or benefit the*
*name or likeness of another is subject to liability to the other for invasion of his*
*privacy." Restatement (Second) of Torts SSS § 652C (1977)."*)

3.     Also, similar to the right of publicity, trademarks perform a key function of
identifying the source of a product, thus enabling businesses (or person, in context
of publicity rights) to build goodwill and consumer recognition with high quality
products and are an essential tool in any businesses' intellectual property arsenal.
Analogous to violations of right of publicity, a Trademark infringement is the
unauthorized use of a trademark.  As The Supreme Court, per Justice Kavanaugh,
articulated in *TransUnion LLC v. Ramirez (quoting Spokeo, 578 U.S. at 341) "a*
*plaintiff searching for a "common-law analogue for their asserted injury" need not*
*identify "an exact duplicate." TransUnion, 141 S. Ct. at 2204. But the plaintiff's*
*alleged injury must still have a "close relationship" to a traditionally recognized*
*harm."*  Mr. Austin's right of publicity (and for that matter privacy), also deprived
along with Mr. Austin's 1981 rights to contract, and Equal Protection, is a close
analogue, in this case statutory (and common law), a similar harm, to Jack Daniels
*"Tennessee Whiskey."* See Jack Daniel's Props. v. VIP Prods., No. 22-148, 6 (U.S. Jun.
8, 2023)

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is: (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

"**NOT "permitting** the release of education records . . . of students without the[ir] written consent (*i.e. reasonable expectation of privacy*)**" - Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8 (D.D.C. Apr. 10, 2020)

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:

- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity**; A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:

- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

*Make sure you have permission before using a person's image or likeness*….."

- **Georgetown University Library)**

4.    The broad, but specific, categories of privacy violations that Georgetown themselves help to articulate as part of a reasonable expectation of privacy for students for which contracts must be offered and made (above cited argument & Georgetown *public* references), illustrate at least two ways that Georgetown specifically violated Mr. Austin's privacy, and publicity rights as they failed to make

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

EoR - 795 of 2347

contract offer on same basis as Whites (*as well as Equal Protection , 42 USC 1981,*

*Duties to not violate Deceit, Negligence and Bad Faith rights*).  See e.g. Doe v.

Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015) ("*"Invasion of privacy*

*is not one tort, but a complex of four, each with distinct elements and each describing*

*a separate interest capable of being invaded." Wolf v. Regardie, 553 A.2d 1213,*

*1216–17 (D.C.1989). "In the District of Columbia, courts have adopted the Second*

*Restatement of Torts to 'determin[e] the appropriate contours of a cause of action for'*

*invasion of privacy." Budik v. Howard Univ. Hosp., 986 F.Supp.2d 1, 11*

*(D.D.C.2013) (citing Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 587*

*(D.C.1985) (brackets in original)). "The four constituent torts are (1) intrusion upon*

*one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that*

*places one in a false light in the public eye; and (4) appropriating one's name or*

*likeness for another's benefit."*")

5.    Georgetown *knows* both DC's and California's jurisdictions affirm that

Georgetown's conduct using an up close photo-IP-economic-contract rights without

his consent, nor knowledge, nor written agreement, was violative of Mr. Austin's

privacy, and publicity rights and per this matter his right to contract under 1981.

The Supreme Court has also repeatedly re-affirmed this position directly.  See e.g.

Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 n.7 (1977) ("*"The*

*law of privacy comprises four distinct kinds of invasion of four different interests of*

*the plaintiff, which are tied together by the common name, but otherwise have almost*

*nothing in common except that each represents an interference with the right of the*

*plaintiff . . . 'to be let alone.'" Prosser, Privacy, 48 Calif. L. Rev., at 389. Thus,*

*according to Prosser, some courts had recognized a cause of action for "intrusion"*

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*upon the plaintiff's seclusion or solitude; public disclosure of "private facts" about the plaintiff's personal life; publicity that places the plaintiff in a "false light" in the public eye; and "appropriation" of the plaintiff's name or likeness for commercial purposes. One may be liable for "appropriation" if he "pirate[s] the plaintiff's identity for some advantage of his own." Id., at 403. See, for example, W. Prosser, Law of Torts 842 (3d ed. 1964); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y. U. L. Rev. 962, 986-991 (1964)"*)  See also e.g. Time, Inc. v. Hill, 385 U.S. 374, 380-81 (1967) (*"traced the theory to the celebrated article of Warren and Brandeis, entitled The Right to Privacy, published in 1890. 4 Harv. L. Rev. 193. … observed that "[t]he legislative body could very well interfere and arbitrarily provide that no one should be permitted for his own selfish purpose to use the picture or the name of another for advertising purposes without his consent…..the appropriation and use in advertising or to promote the sale of goods, of another's name, portrait or picture without his consent."*)

6.      Not only was Georgetown aware, but *admits* [publicaffairs.georgetown.edu/](publicaffairs.georgetown.edu/) [communications/policies/policy-for-filming-at-georgetown-university/](communications/policies/policy-for-filming-at-georgetown-university/), and it is commonly understood that their conduct violated his reasonable expectation of privacy, but violated Mr. Austin's right to contract especially as an admitted student in the forum state of California (whereas this requirements was doubly required). See e.g. Air Transport Ass'n of America v. Public Utilities Commission of California - 833 F.2d 200 (9th Cir. 1987) (*In California, a citizen's interest in privacy has been raised to the dignity of an express state constitutional right. See Cal. Const. art. I, § 1. California has seen fit to protect this right with statutes providing criminal sanctions for.. one's privacy [violation], as well as a statutory civil cause of action*

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*for..person whose rights are violated*)  See e.g. Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1141-42 (9th Cir. 2006) ("*Laws points to two cases for support. Both cases, however, involve photographs used in advertising, … published the photo in connection with a broad … advertising campaign, …. [the violation]… is the use of the [plaintiffs'] likenesses …. in the published photograph."….. . . . The defendants did not have her consent to continue to use the photograph."*)  See also e.g. Hill v. National Collegiate Athletic Ass'n, 18 Cal.App.4th 1290, 1294 (Cal. Ct. App. 1990) ("*However, California Constitution article 1, section 1, was intended to reach both governmental and nongovernmental conduct. (Wilkinson v. Times Mirror Corp. (1989) 215 Cal.App.3d 1034, 1041-1043, 264 Cal.Rptr. 194.) That section "provides: 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.' By this provision, California accords privacy the constitutional status of an inalienable right, on a par with defending life and possessing property. [Citation.]" (Luck v. Southern Pacific Transportation Co. (1990) 218 Cal.App.3d 1, 15, 267 Cal.Rptr. 618.) "Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone." (Porten v. University of San Francisco (1976) 64 Cal.App.3d 825, 829, 134 Cal.Rptr. 839, fn. omitted.)*")

7.      Nationally, it is clear, and codified in various forms (applying to a variety of contexts), that Georgetown's behavior violates not only privacy, and publicity rights, but Mr. Austin's right to written contract under 1981, and Georgetown's policies for admitted students (*publicaffairs.georgetown.edu/communications/policies/ policy-for-filming-at-georgetown-university/*).  See e.g. Cox Broadcasting Corp. v.

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**