Cohn, 420 U.S. 469, 488 (1975) (*"More compellingly, the century has experienced a strong tide running in favor of the so-called right of privacy. In 1967, we noted that "[i]t has been said that a `right of privacy' has been recognized at common law in 30 States plus the District of Columbia and by statute in four States." Time, Inc. v. Hill, 385 U.S. 374, 383 n. 7. We there cited the 1964 edition of Prosser's Law of Torts. The 1971 edition of that same source states that "[i]n one form or another, the right of privacy is by this time recognized and accepted in all but a very few jurisdictions." W. Prosser, Law of Torts 804 (4th ed.)"*) See also e.g. Davis v. Fed. Election Comm'n, 554 U.S. 724, 744 (2008) (" *"[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Buckley, 424 U.S., at 64, 96 S.Ct. 612."*) See also e.g. *TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Id. , at 340–341, 136 S.Ct. 1540. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. See, e.g., …Davis v. Federal Election Comm'n , 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (disclosure of private information); see also Gadelhak v. AT&T Services, Inc. , 950 F.3d 458, 462 (CA7 2020) (Barrett, J.) (intrusion upon seclusion).*")

8.    Although Georgetown already *publicly* admits it, another way to ascertain common understandings of a reasonable expectation of privacy is a comparative approach perusing similar privacy protected information, in similar contextual frameworks, to have an understanding of the metes and bounds of our zones of

**8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

protected information.  For example "In *Persinger*, a collection agency seeking to collect on a dis‑ charged debt asked a credit reporting agency for an aspect of a consumer's credit history without her permission. 20 F.4th at 1188. The consumer sued under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. This court ruled that such an *un‑ authorized inquiry was sufficiently close to the common‑law tort of intrusion upon seclusion to confer standing*. Id. at 1193.  In *Gadelhak*, this court looked to the kind (rather than the degree) of harm that the common law recognized to deter‑ mine if any intrusion was a concrete harm that Congress has chosen to make legally cognizable. Id. at 462–63. [to see if the harm…] may create an injury because they can disrupt a person anytime, anywhere, thereby invading "private solitude." Id. at 462. Indeed, as we explain in Gadelhak, "The undesired buzz‑ ing of a cell phone from a text message, like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal." Id. at 462 n.1" Pucillo v. Nat'l Credit Sys., No. 21-3131 (7th Cir. Apr. 26, 2023)

9.     As Georgetown *publicly admits ([publicaffairs.georgetown.edu/](publicaffairs.georgetown.edu/) [communications/policies/policy-for-filming-at-georgetown-university](communications/policies/policy-for-filming-at-georgetown-university)/)* privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable (and require written contract under 1981, and Georgetown policies).  See e.g.  Maracich v. Spears, 570 U.S. 48, 48-49 (2013) ("*Held: An attorney's solicitation of clients is not a permissible purpose covered by the (b)(4) litigation exception. Pp. 57-78, 186 L. Ed. 2d, at 286-299. (a) State DMVs generally require someone seeking a driver's license or registering a vehicle to disclose detailed personal information such as name, address, telephone number, Social Security number, and medical information. The*

**9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*DPPA--responding to a threat from stalkers and criminals who could acquire state*

*DMV information, and concerns over the States' common practice of selling such*

*information to direct marketing and solicitation businesses--bans disclosure, absent*

*a driver's consent, of "personal information," e.g., names, addresses, or telephone*

*numbers, as well as "highly restricted personal information," e.g., photographs,*

*Social Security numbers, and medical or disability information,"*)

10.     Georgetown not only violated privacy, and publicity rights of Mr. Austin, but

purposefully availed when it a. specifically targeted Mr. Austin's forum state of

California (utilizing his up close photo without his consent, nor knowledge in

violation of both privacy, and publicity rights), b. Did "something more" including

multiple mailed physical copies, *likely thousands*, of advertisements to forum state,

and presented physical copies including said privacy violating photo of Mr. Austin,

and separately maintained interactive website for advertising, commercial,

purposes of the multi-billion dollar organization.  See e.g. Mavrix Photo Inc. v.

Brand Techs. Inc., 647 F.3d 1218, 1229 (9th Cir. 2011) (*"we have held that "operating*

*even a passive website in conjunction with 'something more'—conduct directly*

*targeting the forum—is sufficient." Rio Props., 284 F.3d at 1020. In determining*

*whether a nonresident defendant has done "something more," we have considered*

*several factors, including the interactivity of the defendant's website, e.g., Pebble*

*Beach, 453 F.3d at 1153–54, 1158; Cybersell, 130 F.3d at 417–20; the geographic*

*scope of the defendant's commercial ambitions, e.g., Pebble Beach, 453 F.3d at*

*1156–58; Rio Props., 284 F.3d at 1020–21; and whether the defendant "individually*

*targeted" a plaintiff known to be a forum resident, e.g., Brayton Purcell, 606 F.3d at*

*1129; Pebble Beach, 453 F.3d at 1156–57; Panavision, 141 F.3d at 1321–22. In this*

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*case, we find most salient the fact that Brand used Mavrix's copyrighted photos as part of its exploitation of the California market for its own commercial gain. The Court's decision in Keeton is directly relevant. See Schwarzenegger, 374 F.3d at 803"*)

11.    A typical Georgetown media policy, and photo business or commercial use process, for similarly situated non-Black male admitted students would entail 1. Providing notice of the photo(s) being taken *prior to business use* 2. Providing notice of potential uses of photo *prior to use* (as outlined in agreement) 3. Presenting subject of photo(s) with contract for purpose of obtaining informed consent 4. Presenting subject of photo(s) contract with 'consideration' defined or included as required per contract law 5. Obtaining written authorization *prior to exploitation of photo(s) for commercial purposes.*  See e.g. https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/

12.    Georgetown is well aware of its admitted student's role in helping shape the future of our Nation, and the World, in the Public Sector, *and elsewhere*, as one of a very few schools with at least (one) 1, and perhaps (two) 2, US President(s) (POTUS) listed as alumni, or previous students, (library.georgetown.edu/infrequently-asked-questions/blog/other-bill-clinton-have-any-us-presidents-attended-georgetown; See also Congress.gov, Robert A. Caro, "The Passage of Power." ), and the second highest feeder to members of the United States Legislature, behind Harvard, as well as Private Sector, NGOs, etc.  Because of the rigorous, scrutinizing, and elite admissions process its student body is filled with high potential leaders who in fact, not just theory, fundamentally impact World, Domestic, State, and Local affairs in all sectors of our Economy.  Principally because of this key developmental, and exploratory, period in a persons, and admitted

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

student's life as well as every admitted student's high potential for positive impact it is essential to protect not only their privacy, and publicity rights, but Equal Protection and 13th Amendment, or 42 USC 1981 rights to contract as students "do not waive…..when walking through school gates…"

13.    As soon as a Georgetown Dean, and Leadership, Mitch Bailin admitted in writing to using my photo to market the school without asking my permission, nor informing me, nor getting my written consent with written contract offer, Mr. Austin immediately began a series of questions, and formal complaints to ascertain and figure out why they chose to "impermissibly use race" (*and perhaps gender*) to treat, me, a Black man, and admitted student with less respect, less rights, and in an inferior manner than other similarly situated admitted students with use of material misrepresentations, omissions and deceit (with malice) to deprive Mr. Austin (*in direct violation of their explicitly publicly stated contract, and policy terms*).

> "Privacy Policy: In keeping with *state and federal legislation*, the University safeguards the privacy of patients, **students**, employees, University business, and other matters by protecting electronic records classified as confidential information. *Unauthorized accessing and/or disclosure of confidential information by University* employees is *prohibited* and may result in legal penalties. This policy applies to records maintained in any type of electronic record: computer, voice, or video. It also applies to records created via the Georgetown University website." - www.georgetown.edu/privacy-policy/

> "Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University......**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (***i.e. reasonable expectation of privacy***)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

> "As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution **(***i.e. explaining commonly understood reasonable expectation of privacy***)**. …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

14.    When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: 1. with respect to their persons, as human beings, (and provided a head-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.    Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students. Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's

*prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

15.   Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.   Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*



**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin

CA

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**17 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ), | **DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY RIGHTS) THEY WERE NOT ENTITLED TO. **64**-PAGE AMENDED (FAC) COMPLAINT **In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence. |

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

1.     Georgetown knew better, but did not do better.  It demonstrated 1. it knew how to make a written contract with Mr. Austin (see below), 2. Itself promulgated a the written media contract requirements and 3. Purposefully violated its own promulgated written contractual requirements toward Mr. Austin because he is Black (as compared to Whites whose rights to contract, and personhood was respected).  Mr. Austin never gave consent (written or otherwise); Never was *asked* for the opportunity to provide consent; Georgetown just took, exploited, and profited in violation of his Constitutional rights to contract and current applicable law with the *ongoing* attitude, pattern, policy and practice of an enslaver.



2.     Defendant Georgetown went out of their way to violate their own policies, student contract, standard(s) of care, the Constitution (including Equal Protection Clause; section 1981), and Current law, to exploit Mr. Austin's person, rights, and likeness for commercially.  Mr. Austin notes for the Court that Defendant Georgetown has provided its own Affidavit in its written admission of non-consensual business or commercial usage (See Mitch Bailin's letter) use of Mr.

Austin's photo which is in direct violation of applicable laws, its own

policies-contract, and the Constitution including 42 USC 1981 right to contract.

3.      Mr. Austin was previously 'consensually' recorded by other organizations for

non-commercial, government, use as part of his job responsibilities *knowingly, and*

*consensually,* in the California Senate as an example of the proper way to provide

notice, gain consent, and partake in the enjoyment of a mutually beneficial contract

per Fellowship Capital Fellows.  Mr. Austin has never before experienced the

combined illegal audacity of a Defendant's admitting their violations along with

their publicly hypocritical (and illegal) exploitation for business use (with expressly

discriminatory *ongoing* conduct to exclude from campus activity in violation of Mr.

Austin's Equal Protection per Title VI). Compare (Consensual; Knowing use)

**www.senate. ca.gov/media/20130814_267/video**;

4.      Notice as Mr. Austin Won (along with 17 others) a top 10 out of 820+, elite,

uber- competitive Senate fellowship (1 of 64 Capital Fellowship winners; *CA Senate*)

his consent from beginning was respectfully asked for (even for something

non-commercial, non-business, and in the public-government service-interest)  See

e.g. https://www.youtube.com/watch?v=FWCleEPIPK4 ("Capital Fellows Is Tops

Again; YouTube · Sacramento State; Nov 29, 2012")  From the beginning, and with

each different use of his name-photo-likeness, Mr. Austin's express consent was

sought not just directly with the Senate-Legislature; Capital Fellows organizations,

but with each antecedent or auxiliary announcements ( as well as with the potential

breadth and depth of uses of likeness *prior* to their use).  See e.g.

> "The now-25-year-old, along with fellow Stockton native George Austin, is receiving the
> opportunity to be at the forefront of state politics for 11 months starting in October after
> being chosen to be among 18 Senate Fellows as part of the state's Capital Fellows
> Program….. But being chosen for the program is no easy task…..The Capital Fellows

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing out of 821 internship programs, bases its high-ranking selections on the all-around experience interns receive...."It's a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship, they're also taking graduate courses."...There were more than 1,300 applications for the program each of the past two years. Only 64 people are chosen for the entire program."

- **www.recordnet.com/story/news/2012/09/08/just-one-fellows/ 49419856007/**





**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

5.      As articulated above, Mr. Austin Won a Fellowship in the top 10 out of 820+ (in CA Senate; most competitive entry less than 4% acceptance rate, my year, for that program, 1 of 18 selected winners (1 of 2 *winners* out of that area) www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/  was unavailable for press interview at the time but celebrated and honored publicly in the piece of over 400 elite competitors nationwide, declined automatic job offer as I gave my word to another commitment and already deferred for a year).   Mr. Austin was asked ahead of time from colleagues and supervisors to use name, image, or likeness in Senate Daily File (see below), California Channel Committee Recordings (see e.g. www.senate.ca.gov/ media/20130814_267/video), Capital Fellows Video (see above; see below screenshot) which appears on Google search "Capital Fellows Still Tops," Respective newspaper announcements, etc.  See below examples:







**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



### SENATE GOVERNANCE & FINANCE COMMITTEE
### Senator Lois Wolk, Chair

**BILL NO:** AB 458
**AUTHOR:** Wieckowski
**VERSION:** 2/19/13
**CONSULTANT:** Austin

**HEARING:** 8/14/13
**FISCAL:** Yes
**TAX LEVY:** Yes

*INCOME TAXES: DEDUCTIONS: PUNITIVE DAMAGES*

*Repeals authority to deduct punitive damages on personal and corporate tax filings.*

### Background and Existing Law

Current law authorizes individuals and corporations to file tax deductions for the payment of monetary damages in legal cases. Under existing law plaintiffs can seek "punitive" or "exemplary" damages in legal cases where the defendant is guilty of "oppression, fraud, or malice." "Malice" means conduct which is intended by the defendant to cause injury or despicable conduct that is carried on with a willful and conscious disregard of the rights or safety of others. "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

California courts hold that punitive damages punish the defendant and deter similar conduct. The goal of deterrence of similar conduct is both for the specific defendant who may repeat or continue offensive behavior and to other potential parties who may commit similar offenses. Punitive damages are not intended to compensate a plaintiff unlike compensatory damages, which are intended for compensation.

The Book of Approved Jury Instructions (BAJI) provides that a jury should consider two factors to determine the amount of punitive damages to award:
- The reprehensibility of the defendant's conduct.
- The amount of punitive damages, which will have a deterrent effect on the defendant in the light of defendant's financial condition.

In addition, a defendant may ask that a jury be instructed to consider that the punitive damages bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff.

**8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**




5046.

**Environmental Quality**—(9)—Hill (Chair), Gaines (Vice Chair), Calderon, Corbett, Fuller, Hancock, Jackson, Leno and Pavley. Chief Consultant: Rachel Machi Wagoner. Consultants: Rebecca Newhouse and Joanne Roy. Assistant: Sue Kampulainen. Phone; (916)651-4108. Room 2205.

**Governance and Finance**—(7)—Wolk (Chair), Knight (Vice Chair), Beall, DeSaulnier, Emmerson, Hernandez and Liu. Staff Director: Gayle Miller. Consultants: George Austin, Toby Ewing, Colin Grinnell, Samantha Lui and Brian Weinberger. Assistants: Marisa Lanchester and Krimilda McKenzie. Phone: (916) 651-4119. Room 408.

**Governmental Organization**—(11)—Wright (Chair), Vacant (Vice Chair), Berryhill, Calderon, Cannella, Correa, de León, Galgiani, Hernandez, Lieu and Padilla. Staff Director: Arthur Terzakis. Consultant: Paul Donahue. Assistant: Brenda K. Heiser. Phone: (916)651-1530. 1020 N Street, Room 584.

**Health**—(9)—Hernandez (Chair), Anderson (Vice Chair), Beall, de León, DeSaulnier, Monning, Nielsen, Pavley and Wolk. Staff Director: Melanie Moreno. Consultants: Scott Bain, Vincent D. Marchand, Tanya Robinson-Taylor and Katie Trueworthy. Assistants: Dina Lucero and Alex Norriag. Phone (916)651-4111. Room 2191.

**Human Services**—(6)—Yee (Chair), Berryhill (Vice Chair), Emmerson, Evans, Liu and Wright. Chief Consultant: Mareva Brown. Consultant: Sara Rogers. Assistant: Mark A. Teemer Jr. Phone: (916)651-1524. 1020 N Street, Room 521.





6. In various other situations the obviousness of the need to ask Mr. Austin's consent before using his likeness, image, or name by organizations, and subsequent indications of likely consent are demonstrated in various examples including work

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

IDs (Tesla Work ID below; Senate Consultant Work ID above) school IDs

(Georgetown School ID), early (Kindergarten) newspaper article interview (See

below), or even knowing and consented commercial use (Fox - 36th NAACP Image

Awards See below), and College Graduation photo. Notice Mr. Austin's awareness,

front facing, or direct engagement to contrast with Georgetown's exploitative, right

to contract violating capture, non-awareness, non-consensual choices (and *ongoing*

refusal to correct).





**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



"From: Ashley L Jennings <alb225@law.georgetown.edu>
To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,

This e-mail serves as official notification that your request to defer admissions to Georgetown University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward to welcoming you to the full-time program next fall.  As mentioned in our previous correspondence, your deferment is binding and you should begin withdrawing all other pending law school applications.  Please note it is your responsibility to notify us, in writing, of any change of address during your deferment period so that we may forward future correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This deposit is non-refundable and will be credited toward the tuition for your first year.

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Your second tuition deposit will be due in June 2013.  You'll be able to find more information once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!

Warm regards,


Ashley Jennings

Assistant Manager, Office of Admissions

Georgetown University Law Center

600 New Jersey Ave., NW, Room 589

Washington, DC 20001

202.662.9010 Phone

202.662.9439 Fax




From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.

Please let me know if anything else is needed for a successful request.


**13 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Thank you,

George


Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school. To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program. As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school. The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding. It will also help provide an additional depth of experience to add value to classroom discussions. From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.

George Austin

**14 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

---------------Senate Fellows Acceptance Letter------------------------------------------------

May 15, 2012

Dear George Austin,

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow.  You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program.  We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.

As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget.  The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits.  If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000.  For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ████████. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero

Jennifer Calbonero, Program Assistant

California Senate Fellows"

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**





--------- Forwarded message ---------
From: George Austin <gaustin07@berkeley.edu>
Date: Mon, Sep 11, 2023 at 11:51 AM

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Subject: 9.11.23 - List of Previously, and Still, Unanswered Questions Re: Misstatements and Omissions
To: ideaa@georgetown.edu <ideaa@georgetown.edu>
CC: <Olabisi.Okubadejo@georgetown.edu>, emb257@georgetown.edu <emb257@georgetown.edu>,
<kilkennr@georgetown.edu>, <lawdeanofstudents@georgetown.edu>, presidentsoffice@georgetown.edu
<presidentsoffice@georgetown.edu>, vicepresident@georgetown.edu <vicepresident@georgetown.edu>

Good Afternoon, Georgetown University

1. Why did Georgetown not ask my permission before using my up close photo for advertising purposes?

2. Why did Georgetown not get my written consent, nor use of form (as reasonable expectation of privacy standards
are similar for medical and student records) for use or release of an up close photo of an admitted student for
advertising or marketing purposes?

3. Why was it materially omitted that the photo was taken, was made public, and was used without my consent, to
the person and admitted student [whose] rights were being exploited?

4. Why when I first asked Georgetown leadership, (after someone outside of the school was the first to tell me my
photo was being used for that purpose) was the photo authentic, and actually being used for advertising, was it
affirmatively denied, and I was lied to?

5. Why when several months later, after Mitch Bailin finally admitting that they in fact took the photo and used the
photo for that purpose, did they refuse to tell how many physical brochures were sent or used in California, and
elsewhere for that matter?

6. Why was that material information repeatedly omitted by Mitch Bailin and Georgetown University Leadership,
and continues to be omitted to date, despite my repeated inquiries?

7. I have placed at least [5]0+ formal and informal complaints related to this specific set of topics with IDEAA and
Georgetown Leadership ; why has no investigation, nor even follow up inquiry by those tasked to investigate these
types of issues taken even a cursory step toward investigation nor resolution despite me being an admitted student?

Thank you,

George Jarvis Austin

7.    Georgetown knew it was supposed to get Mr. Austin's consent, and make a

written contract with Mr. Austin before commercial usage, or marketing, but chose

to steal from Mr. Austin in a racially discriminatory manner instead of expressly

enter into contract make  Mr. Austin an offer on the same basis as Whites.

Georgetown knew the same tenets of contract formation controlled under 42 USC

1981 (and Equal Protection) for mandatory written media authorization agreement

(contract), per their own publicly admitted policy-contract-standard of care.

## FACTS

"From: Ashley L Jennings <alb225@law.georgetown.edu>

**17 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,

This e-mail serves as official notification that your request to defer admissions to Georgetown
University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward
to welcoming you to the full-time program next fall.  As mentioned in our previous
correspondence, your deferment is binding and you should begin withdrawing all other
pending law school applications.  Please note it is your responsibility to notify us, in writing,
of any change of address during your deferment period so that we may forward future
correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This
deposit is non-refundable and will be credited toward the tuition for your first year.

Your second tuition deposit will be due in June 2013.  You'll be able to find more information
once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!

Warm regards,

Ashley Jennings

Assistant Manager, Office of Admissions

Georgetown University Law Center

600 New Jersey Ave., NW, Room 589

Washington, DC 20001

202.662.9010 Phone

202.662.9439 Fax

From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

**18 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.

Please let me know if anything else is needed for a successful request.

Thank you,

George

Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school.  To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program.  As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school.  The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding.  It will also help provide an additional depth of experience to add value to classroom discussions.  From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

**19 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.

George Austin

---------------Senate Fellows Acceptance Letter-----------------------------------------------

May 15, 2012

Dear George Austin,

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow.  You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program.  We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.

As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget.  The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

**20 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits.  If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000.  For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ▓▓▓▓▓▓. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero

Jennifer Calbonero, Program Assistant

California Senate Fellows"

**21 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**





--------- Forwarded message ---------
From: George Austin <gaustin07@berkeley.edu>
Date: Mon, Sep 11, 2023 at 11:51 AM
Subject: 9.11.23 - List of Previously, and Still, Unanswered Questions Re: Misstatements and Omissions

**22 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

To: ideaa@georgetown.edu <ideaa@georgetown.edu>
CC: <Olabisi.Okubadejo@georgetown.edu>, emb257@georgetown.edu <emb257@georgetown.edu>,
<kilkennr@georgetown.edu>, <lawdeanofstudents@georgetown.edu>, presidentsoffice@georgetown.edu
<presidentsoffice@georgetown.edu>, vicepresident@georgetown.edu <vicepresident@georgetown.edu>

Good Afternoon, Georgetown University

1. Why did Georgetown not ask my permission before using my up close photo for advertising purposes?

2. Why did Georgetown not get my written consent, nor use of form (as reasonable expectation of privacy standards are similar for medical and student records) for use or release of an up close photo of an admitted student for advertising or marketing purposes?

3. Why was it materially omitted that the photo was taken, was made public, and was used without my consent, to the person and admitted student [whose] rights were being exploited?

4. Why when I first asked Georgetown leadership, (after someone outside of the school was the first to tell me my photo was being used for that purpose) was the photo authentic, and actually being used for advertising, was it affirmatively denied, and I was lied to?

5. Why when several months later, after Mitch Bailin finally admitting that they in fact took the photo and used the photo for that purpose, did they refuse to tell how many physical brochures were sent or used in California, and elsewhere for that matter?

6. Why was that material information repeatedly omitted by Mitch Bailin and Georgetown University Leadership, and continues to be omitted to date, despite my repeated inquiries?

7. I have placed at least [5]0+ formal and informal complaints related to this specific set of topics with IDEAA and Georgetown Leadership ; why has no investigation, nor even follow up inquiry by those tasked to investigate these types of issues taken even a cursory step toward investigation nor resolution despite me being an admitted student?

Thank you,

George Jarvis Austin

8.    Instead of respecting Mr. Austin as a student, human being, and person, Georgetown decided to repeatedly, and ongoing *treating him as an inferior*, because he is a Black male, regardless of him being an admitted student.   Georgetown keeps attempting to mark him with a badge of inferiority repeatedly and ongoing, to completely disregard and disrespect his personhood and fundamental rights each time Georgetown chose to exclude Mr. Austin from campus complaint procedures rather than self correct its own mistakes.  Georgetown, and the US Department of Education *admits, and knows,* Georgetown is covered by Title VI, Equal Protection, as a recipient of Federal funds.  See e.g.:

23 ; Signed **DECLARATION** (direct evidence) in Accord with Judge Breyer's Order

https://www2.ed.gov/about/offices/list/ocr/docs/hq43e4.html] (EDUCATION AND TITLE VI OF THE CIVIL RIGHTS
ACT OF 1964 - Title VI and Race, Color and National Origin Discrimination

Title VI of the Civil Rights Act of 1964 protects people from discrimination based on race, color or national origin in
programs or activities that receive Federal financial assistance. Title VI states that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation
in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal
financial assistance.
Programs and activities that receive Federal financial assistance from the United States Department of Education
(ED) are covered by Title VI. ED maintains an Office for Civil Rights, with 10 regional offices and a headquarters
office in Washington, D.C., to enforce Title VI.

Education Programs and Activities Covered by Title VI

Agencies and institutions that receive ED funds covered by Title VI include: 50 state education agencies, their
subrecipients, and vocational rehabilitation agencies; the education and vocational rehabilitation agencies of the
District of Columbia and of the territories and possessions of the United States; 17,000 local education systems;
4,700 colleges and universities; 10,000 proprietary institutions; and other institutions, such as libraries and
museums that receive ED funds.

Programs and activities that receive ED funds must operate in a non-discriminatory manner. These may include,
but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services,
counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical
education, athletics, housing and employment, if it affects those who are intended to benefit from the Federal funds.
Also, a recipient may not retaliate against any person because he or she opposed an unlawful educational practice or
policy, or made charges, testified or participated in any complaint action under Title VI. For a recipient to retaliate
in any way is considered a violation of Title VI. The ED Title VI regulations (Volume 34, Code of Federal
Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.)

9.    Per New Jersey v. T. L. O 469 U.S. 325 (1985) Georgetown admitted students

not only have these rights provided per Georgetown's promulgated policies, but also

because *"However one may characterize their privacy expectations, students properly*

*are afforded … constitutional protections. In an often quoted statement, the Court*

*said that students do not "shed their constitutional rights . . . at the schoolhouse*

*gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503,*

*506 (1969).).*  Georgetown never informed, nor obtained written, or *any*,

authorization from Mr. Austin and never made Mr. Austin an offer to enter into

written media contract as mandated per Georgetown's policies.  Outside of a

litigation context, Mr. Austin thereafter followed up with Georgetown to which they

initially denied use of his image or likeness was true.  Mr. Austin sought

verification of violations and had no way of knowing if true or authentic (as several

organizations he initially reached out to verify would not confirm, nor deny).

However, Georgetown later admitted their violations by sending him the same

physical copies, to California, already discovered by a fellow UC Berkeley student,

with a letter by Georgetown leadership admitting their violations (see below). From

the date of that letter till now, with legal harms beginning in this action on 7.15.21

to present, Mr. Austin has diligently followed up with Georgetown leadership, with

over 50+ witnesses, and 100+ formal complaints made to Georgetown's appropriate

divisions, (*IDEAA, President Office, etc.*) outside of the litigation context, to

proactively address and solve the issues at hand (including getting the specific

numbers of physical commercial brochures sent, where, and to whom). Specifically,

Mr. Austin emailed and faxed IDEAA complaints, with other leadership cc'd,. Mr.

Austin formally complained. Georgetown leadership violated several mandatory

school policies, standards of care, statutes, customs, and laws. Mr. Austin had no

idea, nor had anyway to predict, Georgetown would continually conduct themselves

in this illegal manner up to the present, (and would have preferred to solve outside

of a litigation context). To date Georgetown has *not* responded, *not* acknowledged

any formally filed complaint(s), but has made several admissions of fact:

10.     Georgetown admits, *publicly,* that they owed Mr. Austin the duty to notify

him prior to filming or photographing him as part of Georgetown's *standard of care*

to an admitted student (*as reflected in policies, statutes (which Georgetown's policies*

*cross reference), common law, agency regulations and admitted common practice*).

See e.g.  publicaffairs.georgetown.edu/communications/policies/

#:~:text=Full%20Filming%20Policy-,On%2DCampus%20Media%20Policy,or%20inte

rior%20spaces%20on%2Dcampus;  publicaffairs.georgetown.edu/communications/

**25 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

policies/policy-for-filming-at-georgetown-university/ You may not film a person in an identifiable manner unless you first have obtained that person's express consent.).

11.    Georgetown admits, *publicly,* that they owed Mr. Austin the duty to obtain his *written* authorization *prior* to taking, or using, his photograph for Georgetown Business or commercial purposes (as part of their owed standard of care).  See e.g. publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgeto wn-university/ University Business…. Relevant model/image releases must be signed by all identifiable subjects….You may not film a person in an identifiable manner unless you first have obtained that person's express consent. If the person is a Georgetown student, you must use a written consent form that has been approved in advance by the Office of the General Counsel.)

12.    Georgetown admits, and knows, *publicly,* that a written authorization form to agree to commercial or business use of a photo is a contract, or contractual agreement (*between the person whose picture is being taken and the person or organization who is taking the picture for commercial or business purposes*). Georgetown also requires *prior* approval of this contract by Georgetown's Office of the General Counsel, and then requires signed written authorization, a contract between student and organization, *prior* to commercial or business use or it violates their privacy, publicity, and right to contract under 42 USC 1981 (when done in a facially discriminatory manner; i.e. one policy for Black male students, and one for similarly situated non-Black male students).

- ○ https://publicaffairs.georgetown.edu/communications/policies/policy-for -filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

**26 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

- https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. '**The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:
    - unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
    - appropriation of another's name or likeness; or
    - unreasonable publicity given to another's private life; or
    - publicity that unreasonably places another in a false light before the public.
- (See Restatement (Second) of Torts § 652 for more information.)
- **Example**: An advertiser wants to use a photograph of a woman for a billboard supporting a [campaign; advertisement]. The advertiser negotiates a license to use the photo with the photographer, who holds the copyright. If the photographer doesn't have a release from the woman in the photo (permitting the photographer to license all uses of the photo, or otherwise waiving her rights), then the advertiser must get permission from the woman before using her photo on the billboard.
- **If there was no release, the woman has kept both privacy and publicity rights** in the use of her likeness. And, depending on how she feels about the … cause for which her image is used … she could claim she was portrayed in a false light, as well claiming unlawful commercial appropriation of her likeness….
- **The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).
- To avoid violating someone's right of publicity you must be careful about using their:
    - image (photos, videos, film);
    - likeness (drawings, paintings, prints, etc.);
    - name (this includes nicknames and former names);
    - voice; or
    - signature.
- Make sure you have permission before using a person's image or likeness, or their voice or signature, in connection with advertising for products or services; product packaging; or on any merchandise that you sell.
- **Example**: A company films an instructional video of a man installing an acrylic bathtub liner and distributes the video to its customers. (The man agreed to be filmed for the video.) The company then hires a production company to make a TV commercial for them. The production company uses footage of the man in the commercial. He did not consent to that use of his image. The man sues both companies for unlawful appropriation and, depending on the state law applied, damages could be based on the infringers' profits and/or emotional distress.")

13.    Georgetown admits, *publicly,* that this specific duty owed as part of

Georgetown's *standard of care* to an admitted student (of obtaining written consent

**27 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*prior)* to the person being photographed (subject) for Georgetown business is both reflected in 1. Georgetown's privacy policy as part of the contract between admitted Georgetown students and Georgetown (as well as staff, professors, etc.), and 2. Georgetown's Media policy.

14.   Georgetown admits, *publicly,* that information regarding the breach or violation of the aforementioned duties is material to the person who was filmed or recorded; Georgetown admits this through its emphasis, explanation, and admissions of the current law's legal requirements that inform, guide, and direct, their publicly stated policy (*as well as their argument in what is considered the Court of second highest prestige under the Supreme Court of the United States per GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)*).

15.   Further, Georgetown admits, *publicly,* that the 'commercial purpose' of the filming or recording adds extra legal barriers, and creates additional material information for the person being recorded or filmed for business or commercial purposes (which would need to be included in the written authorization, and notice, *prior* to the filming or recording).

16.   Georgetown admits that it commenced or consummated its contractual relationship with Mr. George Jarvis Austin, as an admitted student, with $400 payment from Mr. Austin and both parties', to the contract, agreement to the terms and conditions of Georgetown's standard contract with admitted students.  *See embedded message from Georgetown admissions.*

> **Note**: *At moment of signed contract already had guaranteed job offer (as part of winning uber-competitive fellowship), and had other competitive schools gain acceptance to, and had other lucrative employment or business opportunities to pursue*

**28 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

17.     Georgetown itself admits, *publicly,* that not only must the written authorization, as a contractual agreement, be signed by the student *prior* to use, but that the form itself 'must' include certain information, (*including acknowledgement of 'consideration' per contract law; see below*) to be valid, and enforceable (and even includes an example photographic/ videographic release form for students in their continuing education programs; Georgetown's neighbor George Washington University publicly provides a comparative example for its own students ). See e.g

https://static.scs.georgetown.edu/upload/kb_file/2015_release_form.pdf

"For good and valuable Consideration herein acknowledged as received, and by signing this release, I hereby give the Photographers/Filmmakers and Assigns my permission to use the Recording, and to license the Recording for use by others, in any media (including digital, electronic, print, television, film and other media now known or to be invented) in perpetuity for all commercial and non-commercial purposes. I agree that the Recording may be combined with other images, text and graphics, and cropped, altered or modified. I agree that I have no rights in or to the Recording, and all rights to the Recording belong to the Photographer/Filmmaker and Assigns. I acknowledge and agree that I have no further right to additional consideration or accounting, and that I will make no further claim for any reason to Photographer/Filmmaker and/or Assigns. I hereby release Georgetown University, and its assignees and designees, from any and all claims and demands arising out of or in connection with the use of the Recording, including but not limited to any claims for copyright infringement, defamation, invasion of privacy, or right of publicity. I acknowledge and agree that this release is binding upon my heirs and assigns. I agree that this release is irrevocable, worldwide and perpetual.

Releasor Information Name (print) _____

(print name)

Address _____

City _____ State _____ Zip Code _____

Country _____ Phone _____

Email _____ Date of Birth _____

Signature _____ Date _____ "

https://communications.gwu.edu/photo-video-release

**Photo & Video Recording Release**
This release and authorization agreement ("Agreement") shall confirm that I, (insert full name in form below), (hereafter "I" or "Student"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, grant permission to the George Washington University ("GW" or "University") and its licensees, assignees, and other successors-in-interest all rights whatsoever in perpetuity in and to my performance, appearance, voice, and other reproductions of my likeness, name, and/or material ("Appearance") taken in conjunction with (insert name of event or photo/video project below), and to use the same or portions thereof, including making and using derivative works thereof in any medium, including without limitation, videos, online broadcasts and brochures (collectively the "Works"), for any university purpose.

**29 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

I further grant to GW all rights of every kind and nature in and the results and proceeds of my Appearance. I acknowledge that GW shall be the sole and exclusive owner of all rights in and to the Works, including, without limitation, the copyright therein and all of the results and proceeds of my Appearance hereunder and shall have the right to exploit any or all of the foregoing in any manner and in any media, whether now known or hereafter devised in perpetuity…..I agree that GW shall have sole editing discretion in determining the extent and manner of use of my Appearance. Nothing herein will be deemed to obligate GW to use my Appearance or the results and proceeds thereof, in the Work or otherwise, or to produce, release or distribute the Works, or to otherwise exploit any rights granted to GW hereunder. GW shall have the right to assign this Agreement (or any of its rights hereunder) to any person, firm, partnership or corporation for any reason and without notice to Student.

I hereby voluntarily assume any and all risks, known or unknown, associated with my Appearance. I and my heirs, executors, administrators and assigns, hereby voluntarily release, discharge, waive and relinquish any and all claims, complaints, liabilities, actions and causes of actions ("Claims") against GW. I agree to defend, indemnify (including any and all attorney's fees) and hold harmless GW in the event of any and all Claims, by whomever or wherever asserted……I have read, understand and agree to the above terms and conditions. I warrant that I have the right and power to enter into and fully perform this Agreement and to grant GW the rights herein granted. I am over the age of 18 years of age, or I have the approval of my parent or legal guardian if I am under the age of 18. I understand that this contains the entire understanding of the parties relating to the subject matter and cannot be changed or terminated without the written consent of both parties. The provisions shall be binding upon me and my heirs, executors, administrators and successors. All rights, licenses and privileges herein granted are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

Name
Event Name or Photo/Video Project Title
Date
Date: Date
mm/dd/yyyy
Student Address
Email Address
Signature

18.     Georgetown admits, per Mitch Bailin, that they at least twice used Mr.

George Jarvis Austin's photo for commercial or business purposes without obtaining

written consent, nor providing 'Consideration,' nor providing notice, nor making a

written contract as required per Georgetown's policies in violation of their admitted

student contract, the law, and *publicly* stated policies.  Georgetown admits, per

Mitch Bailin, that they in fact never disclosed, notified, nor obtained written

consent from Mr. Austin, *ever*;

19.     Georgetown *publicly* admits, and knows, that written authorization requires

making a contract with Mr. Austin and requires a. Mr. Austin's *prior* notice of his

picture being taken, b. *prior* notice of purpose, c. *prior* notice of commercial or

business use, d. *prior* presentation of written contractual agreement to consent to

business or commercial use, e. *prior* Georgetown General Counsel approval of form

**30 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

and f. his signature consenting to it *prior* to its use.  Georgetown *admits* it had none

of the above (as *first* acknowledgement of its use was in the 2019 letter *after the*

*fact).*

20.    Mr. Austin is the person whose economic, property, and 42 USC 1981 rights

to contract were violated in the following picture (*page 4*), and the process which

deprived Mr. Austin's contract rights.   Per US Supreme Court's *General Building*

*Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981,

Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and

engaged in a *"blatant deprivation of civil rights such as where a private offeror [in*

*this case Georgetown] refuses to extend to [an African- American, in this case Mr.*

*Austin], because he is an [African-American], the same opportunity to enter into*

*contracts he extends to White offerees [in this case non-Black, or White admitted*

*students]."*  See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982),
the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a
private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same
opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

21.    Non-Black male, or White, students were made contract offers, and provided:

1. with respect to their persons, as human beings, (and provided a head-ups, or

forewarning, that Georgetown desired to take a photo of them and use it for

commercial, marketing, purposes), 2. knowledge of what the photo was used for

(and where it may be sent for marketing purposes) 3. Pre-approval of use of the

photo by the non-Black male, or White students 4. An opportunity to accept or

decline the offer itself 5. An opportunity to review the written contract offer before

making the decision 6. An opportunity to agree to the terms of the contract offer 7.

**31 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

22.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students. Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

23.     Per Georgetown, written authorization requires is a contract.  Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.  Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).  Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):





**34 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**35 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:  Georgetown violates Mr. Austin's equal Protection per Supreme Court's 1. Brown v. Board of Education, 347 U.S. 483, 494 (1954), 2. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023) 3. Gebser v. Lago Vista Independent School District 4. Lawrence v. Texas 539 U.S. 558 (2003)  ;  In Honor of the Civil Rights Act of 1964,Title VI, (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: **53-0196603**)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

## Georgetown violates Mr. Austin's Equal Protection

1. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

2. Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in*

a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")*  Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

3.      Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

4.    When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook.georgetown.edu/ section4/a/)**  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3.  IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complaint, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

5.      Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant  6.  The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

6.      Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

7.      Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14. The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15. The opportunity, and right, for IDEAA to forward

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

8.      Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **([faculty handbook.georgetown.edu/ section4/a/](faculty handbook.georgetown.edu/ section4/a/))**

9.      Per the Supreme Court's 1. *Lawrence v. Texas 539 U.S. 558 (2003) Cited 1,124* and 2. *Fisher v. Univ. of Tex. at Austin 570 U.S. 297 (2013)   Cited 114 times* Georgetown's actions toward Mr. Austin thereafter show their true racially discriminatory intent or purpose, upholding notions of "White Supremacy" and

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

enforcing stigma and "Black [Male] Inferiority" *"because … was "designed to maintain White Supremacy." Id., at 6, 11. A racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race. See Washington v. Davis, 426 U.S. 229, 241-24"* as they refused to even acknowledge Mr Austin's 100+ complaints *(despite him following their written policy)*, *after* already admitting the violations, let alone actually doing their mandated duties whereas *"the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." …. Strict scrutiny does not permit a court to accept a school's assertion that its [programs or activities policies] uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice."*

10.     Per the US Supreme Court's 1. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 109-10 (U.S. Jun. 29, 2023) 2. Shaw v. Reno, 509 U.S. 630, 647 (1993)* and 3. *Automobile Workers v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991)* When Mr. Austin, admitted student, (*who per their express policy, and Department of Education under Title VI mandate, is entitled to the essential "program or activity" of Georgetown,*) followed Georgetown's directions to participate for the purpose of correction of Georgetown's admitted wrongs per their promulgated mandatory media written contract policy, he was excluded based on race, or racial stereotypes, in a facially discriminatory manner whereas *"the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect" or "alter [its] intentionally discriminatory character"….."In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial*

**8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*group-regardless of their age, education, economic status, or the community in which they live-think [or presumptively act] alike '"* (quoting *Shaw v. Reno, 509 U.S. 630, 647 (1993))...*"*the Court's Equal Protection Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory] stereotyping"*).

11.     Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49; see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

12.     In *Brown v. Arizona* the alleged violator was a fellow student in an area of University control, but the liability and violation itself is heightened when the violator is the University, or Administrators of the University, itself (as is the case here when Mitch Bailin *admits violations*).  In fact, Georgetown's policy explicitly

**9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

says that Georgetown heightens the liability when there is a power imbalance or abuse of power between a student (experiencing the violations) and professor or administrator (the violators). See also policymanual.hr.georgetown.edu/ 1000-university-policies/1004 -policy-statement-on-harassment/ (...*discrimination …is especially serious when it occurs between teachers and students or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly 'exploits' the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University* ….).  Mr. Austin did nothing wrong; Georgetown's display of discriminatory animus is heightened not only by the violator's (University leadership's) relationship to the violated (student), but by the subsequent 100+ discrete adverse acts, and non-acts, all showing deliberate indifference (disparate treatment)

13.     Generally speaking, once the University has notice of the violation, and has notice of the complaint by the student, a failure to act is in itself deliberate indifference and disparate treatment (discrimination) of that complainant or student entitling, the student, to damages in private suit.  See also e.g. Gebser v. Lago Vista Independent School District, 524 U.S. 274, (1998) (*"Damages may … be recovered for [racial discrimination or harassment] in [when] a school … official who at a minimum has authority to institute corrective measures on the [school's] behalf has actual notice of, and is deliberately indifferent to, the [school's, administrator's, or leadership's] misconduct. Pp. 280-293….Title IX was modeled after Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in programs receiving*

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*federal funds…..Absent further direction from Congress, the implied damages remedy should be fashioned along the same lines as the express remedial scheme. Thus, a damages remedy will … lie [when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination and fails adequately to respond. Moreover, the response must amount to deliberate indifference to discrimination…[which includes exclusion from programs or activities]"…."Presumably, a central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before …. enforcement proceedings …. commence. "*) See also e.g. Cannon v. University of Chicago, 441 U.S. 677, 688 n.7 (1979)

("In addition to reflecting this sentiment in the Senate Report on the 1976 amendment, see n. 6, supra, numerous legislators said as much on the floor of the two Houses: "It is Congress['] obligation to enforce the 14th amendment by eliminating entirely such forms of discrimination….. As basic provisions of the civil rights enforcement scheme that Congress has created, it is essential that private enforcement be made possible…." 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy). See also id., at 31471 (Sen. Scott); id., at 31482 (Sen. Allen); id., at 31832 (Sen. Hathaway); id., at 33313 (Sen. Tunney); id., at 33314 (Sen. Abourezk); id., at 35122 (Rep. Drinan); id., at 35125-35126 (Rep. Kastenmeier); id., at 35127 (Rep. Holtzman); id., at 35128 (Rep. Seiberling). Although we cannot accord these remarks the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX and its place within "the civil rights enforcement scheme" that successive Congresses have created over the past 110 years.")

14.    Per the Supreme Court's *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)* Both action, and inaction when duty arises, can constitute discrete acts of adverse actions (non-actions) and thus disparate treatment and violations of policy, law and the Constitution whereas *"Discrete acts such as [overt adverse acts], failure to [take action], denial of [requested action], or refusal to [take required action] are easy to identify. Each incident of discrimination and each …. adverse ….. decision constitutes a separate actionable "unlawful …. practice."* See also e.g. Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290 (1998) (*"the response … deliberate indifference …. The …. enforcement scheme presupposes that*

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*an official who is advised of a …. violation refuses to take action to bring the*

*recipient into compliance. The premise, in other words, is an official decision by the*

*recipient not to remedy the violation. That framework finds a rough parallel in the*

*standard of deliberate indifference….damages remedy [available when] an official*

*who at a minimum has authority to address the alleged discrimination and to*

*institute corrective measures on the recipient's behalf has actual knowledge of*

*discrimination in the recipient's programs and fails adequately to respond"*)

15.     Georgetown knew its own policies, and the overarching law, and willfully

violated privacy, publicity, mandatory media contract rights under 42 USC 1981, on

the front end.  And, was put on notice school wide, once Mitch Bailin admitted the

privacy violation in writing (*partially, but still did not disclose materially omitted,*

*or misstated facts to Mr. Austin i.e. how many brochures, where exactly mailed to or*

*utilized, exactly when was photo exploited, etc.*), but made no apology for violating

Georgetown Media Written Contract Policy, Privacy Policies, and the surrounding

law they are based on (including 42 USC 1981).  Further, when Mr. Austin publicly,

with over 50+ witnesses, made over 100+ complaints, and inquiries, in a span of 4+

years to the designated body under the Universities control (IDEAA) designed to

investigate and correct discriminatory violations of school policy, Georgetown was

willfully-deliberately indifferent further showing racial animus, and malice (as it

went out of its way to be facially discriminatory toward Mr. Austin's 100+

complaints, not one was even acknowledged, followed up on, let alone escalated for

investigation nor remedy per their own promulgated mandatory steps).  See e.g.

Brown v. Arizona, No. 20-15568, 35 (9th Cir. Sep. 25, 2023) (*"In Davis, decided a*

*year after Gebser, the Court indicated that its definition of "knowledge" included*

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*"notice," holding that the plaintiff could establish liability by showing that the school board had failed to respond to "five months [of] complaints of [the alleged [discriminator's] in-school misconduct." 526 U.S. at 649; see also Doe v. Galster, 768 F.3d 611, 614 (7th Cir. 2014) ("To have actual knowledge of an incident, school officials must have witnessed it or received a report of it."")*

16.     Mr. Austin's notice provision more than meets *Brown v. Arizona* standards, as Mr. Austin still followed University policy, and recommended guidelines on over 100+ instances, with over 50+ witnesses, from 7.15.21 to present, to complain (providing 'notice') to IDEAA regarding violation of his rights and school policy *(as instructed by Georgetown policy and despite the explicit admissions of violation of University policy (after the fact), extreme departures of ordinary standards of care, violations of Mr. Austin's rights to contract in a facially discriminatory manner).*

17.     Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident and seek redress through IDEAA's Grievance Procedures, but again excluded Mr. Austin who reported at least 50+ times (*after University leadership admitted unequal treatment to Mr. Austin's detriment violating his rights of privacy, publicity, and contract*) and to date have not received even one follow up email for a cursory beginning of an investigation (*let alone resolution*). See facultyhandbook.georgetown.edu/section4/a/. Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of

**13 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Georgetown policy, (*after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown controlled area program or activity; for business purposes*) is the essence of Equal Protection violations.  See e.g. Thornton v. City of St. Helens, 425 F.3d 1158, 1166-67 (9th Cir. 2005)(*To state a … claim for violation of the Equal Protection Clause, a plaintiff must show that he was treated in a manner inconsistent with others similarly situated, and the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.*)

18.     Per the Ninth Circuit's *Monteiro v. the Tempe Union High School Dist, 158 F.3d 1022, 1034 (9th Cir. 1998)* beyond Georgetown's intentional exclusion, Georgetown's intentional, or 'deliberate indifference' to that discrimination also highlights their discriminatory animus (as they internally already knew they violated Mr. Austin's right to contract under 42 USC 1981, *discriminatorily*, but continued to exclude from 'program(s) or activity' that would help to correct Georgetown's previous violations*).*  See e.g.  Monteiro v. the Tempe Union High School Dist, 158 F.3d 1022, 1034 (9th Cir. 1998) ("*refused to accept the complaints regarding racial problems at McClintock High School or to put a stop to the students' racist conduct. Once on notice of the problem, a school district "has a legal duty to take reasonable steps to eliminate" a racially hostile environment. 59 Fed. Reg. 11450. When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI. Gebser v. Lago Vista Indep. Sch. Dist., 118 S.Ct. 1989, 1999 (1998) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-92 (1989)). Under this standard, the district is liable for its failure to act if the need for intervention*

**14 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*was so obvious, or if inaction was so likely to result in discrimination, that "it can be*

*said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.*

*There can be no doubt that Ms. Monteiro's amended complaint alleges a pattern of*

*egregious public racial harassment including the use of the epithet "n\*gg\*r," that*

*Black students and their parents complained but were rebuffed, and that nothing*

*was ever done about the problem. It goes without saying that being called a "n\*gg\*r"*

*by your [W]hite peers (or hearing that term applied to your Black classmates) exposes*

*Black children to a "risk of discrimination" that is so substantial and obvious that a*

*failure to act can only be the result of deliberate indifference.")*

19.     Calling a Black man a n\*gg\*r is perhaps the most obvious racial slur, or

derogatory stereotype (*imbedded in the definition of the word <u>www.merriam</u>*

<u>*-webster.com/dictionary/n\*gg\*r*</u>*)*, but is clearly not the only one, and the same

message can be communicated verbally, or with Conduct.  Treating someone as an

"n-word" without actually saying the word, especially via disparate treatment to

exclude and to "mark with a badge of inferiority," is just as illegal and damaging to

that person.  In fact, that conduct is exactly what Georgetown did here (i.e.

presumed "unworthy of consideration"), unapologetically, repeatedly, and *ongoingly*

in violation of their own policies, and the law.  See <u>policymanual.hr.</u>

<u>georgetown.edu/1000-university-policies/1004-policy-statement-on-harassment/</u>

(Harassment is a form of discrimination prohibited by law. It is the policy of Georgetown University to prohibit harassment (and discrimination) on the basis of …. color, …. gender …. race… ("Protected Categories")… Harassment may include… slurs, epithets, and stereotyping; … and …. conduct carried out through the internet, email…is especially serious when it occurs between teachers and students or supervisors and subordinates.  In such situations, harassment [or discrimination] unfairly exploits the power inherent in a faculty member's [, administrator's] or supervisor's position…harassment [or discrimination] often occurs when one person takes advantage of a position of authority over another…This policy applies to any … student of Georgetown University …. This Policy Statement …. will be widely disseminated to members of the University community, and will be consistently enforced.)

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

20. Georgetown's Equal Protection violations were evident in Georgetown's repeated refusal to investigate, at all (*after their own leadership admitted 42 USC 1981, privacy, publicly, and media policy violations in writing,*) when Mr. Austin reported, or inquired, and formally complained (broadly to the President's office, and other Georgetown leadership). Mr. Austin sought initially to find out what was going on in the first place, and have subsequent investigation and correction to the victim or survivor of the discriminatory conduct by the university (i.e. the one being wronged; George Jarvis Austin), but Georgetown's continued displaying discriminatory intent…in refusing to investigate [discriminatory, illegal, violative] acts against a victim." See e.g. Neaves v. City of San Diego, 70 F. App'x 428, 432-33 (9th Cir. 2003) *("discriminatory intent [shown] in refusing to investigate … acts against a victim. See e.g., Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th Cir.2000); Navarro v. Block, 72 F.3d 712, 716-17 (9th Cir.1995). …. the equal protection analysis we employed in those cases should [not] be limited …. Indeed, the Equal Protection Clause guarantees that all persons who are similarly situated are entitled to equal treatment ….. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Thus, an individual who alleges …. intentionally treated him or her differently than other similarly-situated individuals and alleges that there was no rational basis for the difference in treatment states a viable Fourteenth Amendment Equal Protection Claim. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)….. a violation of equal protection can occur when … act[ing] with … discriminatory intent in refusing to investigate a particular case. See e.g., Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th Cir.2000); Navarro v. Block, 72 F.3d 712, 716-17 (9th Cir.1995). In these*

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*instances, however, it is the victims themselves…. who have alleged a violation of*

*their equal protection rights based on discriminatory … conduct. See e.g., Estate of*

*Macias, 219 F.3d at 1028; Navarro, 72 F.3d at 716. "*)

21.     Yet, Mr. Austin was completely excluded and blackballed creating "stigma' as

outlined in *Brown v. Board of Education* with Georgetown refusing to even take the

first *mandated* step, or action, for an admitted Black male student, that they would

take *even* for a non student 3rd party complainant per their own policy (displaying

even more disparate treatment; discriminatory animus), let alone similarly situated

non-Black, or White, similarly situated students  Per the Supreme Court's 1. *Brown*

*v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions,*

*Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3.

*Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558*

*(2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black

racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in

existing contract, and Mr. Austin's Title VI Equal Protection rights when it

completely excluded Mr. Austin from essential campus IDEAA to treat an admitted

student, and Black man, in a derogatory manner to "deny, restrict, separate,

segregate (in application of policy)," and exclude Mr. Austin from

services-procedures, illegally because Mr. Austin is a Black man.

22.  Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*

*No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly,

to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory*

*stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as

'superior' or more worthy (*ensuring Whites had opportunity to review, decline,*

**17 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*





GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin

CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW · Washington DC 20001-2075
(202) 662-9066

**20 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY RIGHTS) THEY WERE NOT ENTITLED TO. **64**-PAGE AMENDED (FAC) COMPLAINT
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus")* included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**1**

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY RIGHTS) THEY WERE NOT ENTITLED TO.

1.     Mr. George Jarvis Austin DECLARES UNDER PENALTY OF PERJURY

that Mr. Austin shall file direct evidence, declarations, signed under penalty of

perjury to reinforce, and help further substantiate, the plead facts prior to FRCP 59

Motion.   **Fact 1:**    Mr. Austin is the person whose economic, property, and 42 USC

1981 rights to contract were violated in the following picture (*page 4*), and the

process which deprived Mr. Austin's contract rights.   **Fact 2:**     Per US Supreme

Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast*

*Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial

animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr.

Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such*

*as where a private offeror [in this case Georgetown] refuses to extend to [an African-*

*American, in this case Mr. Austin], because he is an [African-American], the same*

*opportunity to enter into contracts he extends to White offerees [in this case*

*non-Black, or White admitted students]."*  See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):
("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982),
the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a
private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same
opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

2.    **Fact 3:**      Non-Black male, or White, students were made contract offers,

and provided: 1. with respect to their persons, as human beings, (and provided a

head-ups, or forewarning, that Georgetown desired to take a photo of them and use

it for commercial, marketing, purposes), 2. knowledge of what the photo was used

for (and where it may be sent for marketing purposes) 3. Pre-approval of use of the

photo by the non-Black male, or White students 4. An opportunity to accept or

**2 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

decline the offer itself 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 4:** Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students. **Fact 5:** Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

3. **Fact 6:** Per Georgetown, written authorization requires is a contract.

**Fact 7:** Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. **Fact 8:** Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).See S-111

**Fact 5:** Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):





GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin

CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin            10.16.24**

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF
PERJURY:  Enslaver, Jim Crow origins of Georgetown's
use of derogatory racist stereotypes*; ;*  In Honor of the
Civil Rights Act of 1964,Title VI,** (**full filing fee paid on
site); Hyperlinked with Affidavits, Supplements, & Direct
Evidence.

v.


GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)


Case No. **4:24-cv-00260-CRB (DMR)**


**George Jarvis Austin, Plaintiff (Self-represented)
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu**


Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's
*ongoing* **1.** Equal Protection **2.** 42 USC 1981 **3.** Deceit, False Promises, Misrepresentations, Omissions and
Actual Fraud (with Malice) **4.** Negligence and **5.** Bad Faith violations of his rights (including fundamental
violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over
50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as
well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or
settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,
context and timing).

Mr. Austin is a whistleblower**;** As part of providing 'notice' of documented formal complaints to Georgetown
ideaa@georgetown.edu**,**  generalcounsel@georgetown.edu**,** presidentsoffice@georgetown.edu**,**
media@georgetown.edu**,** privacy@georgetown.edu**,** visualidentity@georgetown.edu**,** lawdeanofstudents
@georgetown.edu**,** (**showing *"deliberate indifference; discriminatory animus*")** included 50+ outside expert
'witnesses' including  ocr@ed.gov**,** privacyTA@ed.gov**,** studentaid@ed.gov**,** and
whistleblowercoordinator.oig@ed.gov**, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

**Enslaver, Jim Crow, origins of Georgetown use of derogatory stereotypes**

1.      Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use

of the precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr.

Austin, "*implying inferiority in civil society"* originate from anti-Black propaganda

of the vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow

segregationist who inspired the Nazi's Third Reich *(How the Nazis Were*

*Inspired by Jim Crow | HISTORY;   How American Racism Influenced Hitler | The*

*New Yorker ; What America Taught the Nazis in the 1930s - The Atlantic;       The*

*Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws - Holocaust*

*Museum)*

for  which Georgetown admits it took active part as an institution: Slavery archive,

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838.  These archival materials relate to the sale of 272 men, women, and children*

*by Rev. Thomas Mulledy in 1838.*)  Georgetown literally took a page out of this vile

history by depriving Mr. Austin's right to make a written media contract, which

Georgetown itself mandates publicaffairs.georgetown.edu/communications/

policies/policy-for-filming-at-georgetown-university/ to explicitly treat Mr. Austin in

an inferior manner as compared to similarly situated Whites to whom they

respected their persons, rights to contract, rights to decline or accept offer, rights to

counter offer, rights to review and inspect or inquire about contract and

consideration prior to agreement or denial, rights to obtain meeting of the minds,

and rights to enjoyment of mutually beneficial contractual agreement.  Instead

Georgetown behaved like a racist rapist during enslavement period where they

thought it was ok just to take what they wanted without asking, at all, *illegally*.

2.      Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954)* Georgetown's

precise derogatory stereotype usage is similar to defendant *Board of Education's*

usage against plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483,*

*494 (1954)* whereas Mr. Austin seeks to exercise & enforce his Federal rights to

make contracts (expressly promulgated as mandatory under Georgetown's policies),

and not be treated in an inferior manner in civil society (creating Stigma) while

doing so, in the context of higher education, whereas Georgetown violates *"....The*

*words of the amendment,.[that].. contain …the right to exemption..from legal*

*discriminations, implying inferiority in civil society…."* (referring to Civil Rights

Amendments 13th, 14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's Students for Fair Admissions, Inc. v.

President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) use of

derogatory stereotypes is <u>per se illegal</u> in a. business, b. the entire contractual

relationship (*i.e. "to make or enforce a contract*), c. education (& d. other areas of

society), because it *"furthers "stereotypes that treat individuals as the product of*

*their race, evaluating their thoughts and efforts -their very worth as Citizens-*

*according to a criterion barred to the Government by history and the Constitution."*

*Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury,"*

*Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection*

*Clause [<u>co-extensive with sec. 1981</u>]."* Georgetown's admission of a. Using race in the

"negative" via both its 1. media contract making and 2. complaint procedures b.

Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2.

media contract offer process and c. providing Whites unfair advantage by

alternatively considering them 'superior' or 'more worthy' constitutes this type of

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

derogatory use of stereotypes, and is per se illegal.

4.    Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial "*"stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens-according to a criterion barred to the Government by history and the Constitution."* *…. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in Georgetown advertisement, etc.) "ergo" c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & <u>per se illegal racist presumption</u>, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights in both areas are respected, and excersized)*]. Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows*

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.     Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding*

*are legion. They have been handed down, not only by the Supreme Court of the*
*United States, but, … throughout the nation."*

5.     Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.*
Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr.*
*Austin] fosters false concepts of racial [White] superiority and of racial [Black]*
*inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather*
*than a childhood disease."* This *"adult rather than a childhood disease"*
demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is
clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building*
*Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of*
*African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant*
*deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*]*
*refuses to extend to [an African- American, in this case Mr. Austin], because he is an*
*[African-American], the same opportunity to enter into contracts he extends to White*
*offerees [in this case non-Black, or White* Georgetown *students]."*

6.     The precise *"less worthy"* or *"inferior"* derogatory racist stereotypes utilized
by Georgetown, against Mr. Austin, "*implying inferiority in civil society"* are
extremely damaging-harmful, and originate from anti-Black propaganda of the
vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow
segregationist.  Black Inferiority and typically White Supremacy or Superiority
undergird all anti-Black derogatory stereotypes for Black men, and are used
explicitly to deprive Black men, and people, of life, liberty, and fundamental rights
like making, enjoying or enforcing contracts.  Since before the American Revolution,
and Founding of the American Republic which grew into what we now know as the

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

United States of America, Black people in America have battled against derogatory

stereotypes whether enslaved, or free, first with the false "*N\*gg\*r*" derogatory

stereotypes, and archetypes, in itself, and its patently offensive off-shoots of

*"Monkeys, Gorillas, Sambos, Jigaboos, Aunt Jamimas, Uncle Bens, Pickaninnies,*

*Jezebels, Mandingos, etc to its most recent false derogatory "Black Criminal."* Use of

anti-Black derogatory stereotypes are forbidden in every sphere of life. Per 1. *Smith*

*v. Lockheed-Martin Corp.* 2. *Jordan v. Alternative Resources Corp.* 3. *Harden v.*

*Hillman* 4. *Henderson v. Thompson* anti-Black derogatory stereotypes are so

powerful they can get cases overturned, or thrown, new trials ordered, immunity

pierced, judicial or other official discipline or removal, jurors struck (*to protect*

*against their use*). Smith v. Lockheed-Martin Corp. 644 F.3d 1321 (11th Cir. 2011)

> (...supervisor at Lockheed's plant in Marietta, Georgia, received a racially insensitive "joke" email. The email, entitled "Top Ten Reasons Why There are No Black NASCAR Drivers" (the "NASCAR email"), featured a top-ten list of derogatory stereotypes, all of which portrayed [B]lack people as criminals, pimps, and gang members.)

Jordan v. Alternative Resources Corp. 458 F.3d 332 (4th Cir. 2006) Cited 456 times

> (... the severity of Farjah's racially hostile "black monkeys" comment merits our consideration. It is plain that a reference to our African-American fellow citizens as "monkeys" reflects the speaker's deep hostility towards them — on the sole basis of their color. And it is equally clear that such comments constitute profound insults to our friends in the African-American community. By referring to African-Americans as "monkeys," the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized, non-human creatures who are intellectually and culturally inferior to whites. See, e.g., Jennifer M. Russell, On Being a Gorilla in Your Midst, or, the Life of One Black woman in the Legal Academy, 28 Harv. C.R.-C.L. L.Rev. 259, 260 (1993) (discussing message conveyed by gorilla picture placed anonymously in mailbox of African-American law professor: "'Claim no membership to the human race. You are not even a subspecies. You are of a different species altogether. A brute. Animal, not human.'"). Indeed, our Court probably understated the impact of such racially charged references in recently observing that "'[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'" White v. BFI Waste Servs., LLC, 375 F.3d 288, 298 (4th Cir. 2004) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)).

Harden v. Hillman Civil Action 3:15-CV-594-CHB (W.D. Ky. Aug. 5, 2022)

> ( Like in Heller, one or more jurors made "jokes," unrelated to any evidence at trial, applying racist stereotypes not only to Harden, but also to his significant other and his trial team. 785 F.2d at 1527 . These racist jokes were "an expression of prejudice" guised as humor and went unconfronted. See id. As explained by the Eleventh Circuit, "[a] wolf in sheep's clothing is, despite clever disguise, still a wolf." .... scope and timing of the various comments magnify their pernicious effect. Indeed, the stereotypes were not reserved for Harden alone, but likewise were leveled against his African American significant other and counsel. .... racially charged comments continued into the heart of the deliberations. .... As in Heller, this Court likewise finds that the jurors who made and laughed at racially biased remarks could not have easily "expunged themselves of the pernicious taint" of racial bias to render a verdict based solely on the evidence presented. ..."[I]f the [ Remmer ] hearing reveals that racial bias or stereotypes 'prejudicially affected jury deliberations,' Harden would be entitled to a new trial." Harden , 993 F.3d at 485 .

Henderson v. Thompson 518 P.3d 1011 (Wash. 2022)

> (During closing arguments, Thompson's counsel alluded to racist stereotypes about Black women as untrustworthy and motivated by the desire to acquire an unearned financial windfall. ... counsel's argument ... appealed to these negative and false stereotypes about Black women being untrustworthy, lazy, deceptive, and greedy. Presenting... this way can allow jurors to make decisions on impermissible grounds rooted in prejudice or biases about race ...courts have recognized that racist misconduct by the prevailing party or jurors may justify a new trial under CR 59(a)(2). For example, in 1931, this court ordered a new trial when a white attorney in a civil case argued for a verdict against a company based in Japan because " 'we don't like Japanese [people] and they don't like us.' " Schotis

v. N. Coast Stevedoring Co. , 163 Wash. 305, 316, 1 P.2d 221 (1931) (quoting the record). … appeals to racial bias
that affect a verdict …. require reversal. Zamora , 199 Wash.2d at 721, 512 P.3d 512. )

7.      At no point does Georgetown even consider the ridiculousness of their

position, or even acknowledge the mountains of direct evidence (documented)

against them (including their own self authenticated promulgated contractual

terms, and policy, for which they mandate written media contracts in this precise

scenario), as they are so racist that they that simply repeat over, and over again an

'old White Supremacist Propaganda playbook' of coded or explicit "Black inferiority"

or "less worthy" (i.e. Colored Water fountains, etc.) from the racist Jim Crow era

(which inspired Hitler's Third Reich, and the Nazi's www.history.com/news/how

-the-nazis -were-inspired-by -Jim-Crow).  Georgetown's conduct shows they would

prefer Jim Crow America, or perhaps Nazi Germany What America Taught the

Nazis in the 1930s - The Atlantic (*In the 1930s, the Germans were fascinated by the*

*global leader in codified racism—the United States.*)  Mr. Austin is saying no to

Georgetown's racist, and facially discriminatory practices against Him 1. both with

each of the multiple times he sought to get Georgetown to self correct their unforced

errors and sought written contract as Georgetown's policy, and 42 USC 1981

mandate, and 2. When he made multiple formal complaints via email to

Georgetown's IDEAA complaint center per their promulgated instructions.:

Georgetown is like a racist enslaver rapist who no matter how many times the

victim says "NO" keeps going, and going (because they, Georgetown , does not

recognize the humanity of their victims, they just seek to exploit for their own gain).

8.      This conduct is part of  an 'old White Supremacist Propaganda playbook' of

"Black inferiority" from the racist Jim Crow era to create *knee jerk* reactions with

the "*number one excuse they used to justify slavery, lynching, Jim Crow and various*

*forms of mass incarceration"* to deprive Black victims of racial oppression of

fundamental rights (including life, liberty, pursuit of happiness, let alone 1981). See

e.g. The Biggest Lie in the White Supremacist Propaganda Playbook: .... Southern
Poverty Law Center

(....damaging narrative with a very long history in America. White Americans' unsubstantiated views about the potential of
violence from Black people was the number one excuse they used to justify slavery, lynching, Jim Crow and various forms of
mass incarceration. Never was Klan violence or the lynching of Black people by White people ascribed to an inherent White
trait. Without the ability to claim oppression of Black people as a form of self-defense, racial segregation and White supremacy
would be seen for what they are: rank oppression of other people for financial or other benefit...")

9.      Georgetown's use of racist propaganda is similar to its use during Jim Crow,

and enslavement, as it *attempts to assuage its own White guilt for its own illegal*

*conduct against Black people (and others)*.  The tragic irony of that 'old White

Supremacist Propaganda playbook' using "Black inferiority" derogatory stereotypes

from the racist Jim Crow era is that the opposite was actually true (as any honest

historian can attest).  Unfortunately, many White people (millions) were members of

the Ku Klux Klan, *(a violent domestic terrorist organization; for context the Klan*

*recruited over 4 million Whites by 1920, less than 60 years prior 3 million, or so, men*

*fought in the entire American Civil War (about: 2 million serving for the Union &*

*750,000 for the Confederacy)*), whereas Black people still found ways to survive, and

thrive.  For context the Klu Klux Klan was in 1920 over 530+ times the size of

Georgetown's entire current listed global workforce (approx. 7,500).  If adjusted for

the United States population growth, in 2024, it would be approx. 15-16 million

members, and be 2000+ times the size of Georgetown's current listed global

workforce.  Unfortunately, many White people were genocidal, homicidal, rapist,

thieves (of people, land, and other valuables - *as was Georgetown /slaveryarchive.*

*georgetown.edu/* ) as well as violent criminals, with a multi-century history of the

most atrocious, vile, inhumane, enslaver, segregationist, and murderous history the

world over, and especially in the United States.  Some White people are in fact still

**9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

violent, thieving, White Supremacist, atrocious, vile, enslaving, segregationist, and genocidal, terrorists (*especially toward Black men, and people*), but Black people are stereotyped as inferior, criminal, or less worthy whereas Whites are presumed superior?  [Django Unchained and the racist science of phrenology | Neuroscience | The Guardian](#)   "Phrenology really was used to justify slavery, as portrayed in Django Unchained. ..James Poskett



**"Why don't they kill us?"** - *asks Calvin Candie,*

the southern slave owner in Quentin Tarantino's Django Unchained. He wants to know why the African slaves he brutalises do not rise up and take revenge.

Before long, he has the skull of a recently deceased slave on the dinner table. "The science of phrenology," he announces, "is crucial to understanding the separation of our two species." He hacks away at the back of the skull with a saw, removing a section of the cranium and pointing to an allegedly enlarged area. In African slaves, Candie claims, this bump is found in the region of the brain associated with "submissiveness".

For Candie, phrenology not only explained slavery, it justified it.

Needless to say, phrenology has now been thoroughly debunked: the idea that the shape of the skull can be used to infer mental characteristics is just plain wrong. But it was extremely popular all over the world during the 19th century, finding converts among reform-minded Bengalis in Kolkata, India, and colonial settlers in Australia. As part of my research into the global history of phrenology, I came across the real-life Calvin Candie.

He was called Charles Caldwell, a doctor from Kentucky who revelled in both phrenology and slave ownership. As in the film, Caldwell was a Europhile....

Caldwell deployed phrenology in almost exactly the same manner as the fictional Candie. In 1837 he wrote to a friend claiming that "tameableness" explained the apparent ease with which Africans could be enslaved. This was a standard phrenological argument. Areas located towards the top and back of the skull, such as "Veneration" and "Cautiousness", were routinely claimed to be large in Africans. His correspondent concurred, writing: "They are slaves because they are tameable." Clearly enjoying himself, Caldwell replied: "Depend upon it my good friend, the Africans must have a master."

It's worth emphasising that these words are not from a Tarantino script, crafted for Hollywood shock value. They were written by a slave owner desperate to preserve his brutal way of life. And, while the physical violence of slavery is masked in Caldwell's letters, they betray his warped sense of morality. In a letter written on Christmas Eve 1838, Caldwell made the outrageous claim: "My slaves live much more comfortably than I do.""

Calvin Candie : [HOLDING A SKULL..]  This is Ben. He's an old joe that lived around here for a long time, and I do mean a long damn time. Old Ben here took care of my daddy and my daddy's daddy. Till he up and keeled over one day, old Ben took care of me.

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Growin' up the son of a huge plantation owner in Mississippi puts a white man in contact with a whole lotta black faces. I spent my whole life here, right here in Candieland, surrounded by black faces.

Now seein' 'em every day, day in and day out, I only had one question: why don't they kill us?     Now right out there on that porch, three times a week for fifty years, old Ben here would shave my daddy with a straight razor.

Now, if I was old Ben, I woulda cut my daddy's goddamn throat, an' it wouldn't-a taken me no fifty years of doin' neither.

But he never did. Why not? See, the science of phrenology is crucial to understandin' the separation of our two species. And the skull of the African here? The area associated with submissiveness is larger than any human or any other sub-human species on planet Earth. If you examine this piece of skull here you'll notice three distinct dimples. Here, here and here. Now, if I was holdin' the skull of an Issac Newton or a Gallileo, these three dimples would be found in the area of the skull most associated with creativity. But this is the skull of old Ben. And in the skull of old Ben, unburdened by genius, these three dimples exist in the area of the skull most associated with servility.

Now bright boy, I will admit you are pretty clever. But if I took this hammer here, and I bashed in your skull with it, you would have the same three dimples...in the same place...as old Ben...

........

[Lets go of Broomhilda's head and slams the hammer loudly on the table]  SOLD... TO THE MAN WITH EXCEPTIONAL BEARD, AND HIS UNEXCEPTIONAL N*GG*R!....

........

Stephen : [after Django is recaptured, stripped naked, taken to a barn and chained upside down from the ceiling; Stephen walks in and throws a bag of filthy clothes on the barn floor]  You leaving. This here is what you take with you.

[Stephen pulls up a stool and sits in front of the hanging Django]

Stephen : Your Black ass is what all them motherfuckers at the Big House could talk about for the last few hours. Seem like white folk ain't never had a bright idea in they life was coming up with all kinds of ways to kill your ass. Now, mind you, most of them ideas had to do with fucking with your fun parts. Now, that may seem like a good idea, but the truth is, when you snip a n*gg*'s nuts, most of them bleed out in, oh, about... seven minutes. Most of them.

[Stephen chuckles at the shivering, then-helpless Django]

Stephen : Well, more than most. Then I says, "Shitfire! The n*gg*s we sell to LeQuint Dickey got it worse than that!" And they say, "Let's whip him to death!", or "Throw him to the Mandingos. Feed him to Stonesipher's dogs." And I said, "What's so special about that? We do that shit all the time! Hell's bells, the n*gg*s we sell to LeQuint Dickey got it worse than that!" Lo and behold, out of nowhere, Miss Laura come up with the bright idea of giving your ass to the LeQuint Dickey Mining Company!

[Django just stares at the old man talking to him]

Stephen : And as a sl*ve of the LeQuint Dickey Mining Company, henceforth until the day you die, all day, every day, you will be swingin' a sledgehammer, turnin' big rocks into little rocks.

Now, when you get there, they gonna take away your name, give you a number and a sledgehammer, and say, "Get to work!" One word of sass, they cut out your tongue. And they good at it, too. You won't bleed out. Oh, they does that real good! They gonna work ya all day, every day 'till your back give out. Then, they're gonna hit you in the head with a hammer, throw your ass down the n*gg*r hole.

[Django looks on]

Stephen : And THAT will be the story of you, Django!

........

Django : Stephen, how you like my new duds? You know, before now I didn't know that burgundy was my color........You said in seventy-six years on this plantation, you've seen all manner of shit done to n*gg*rs but I notice... you didn't mention kneecapping....

[Django shoots Stephen in the kneecap]

Stephen : Oh, God-motherfucking-damn it!

Django : Seventy-six years, Stephen. How many n*gg*rs you think you seen come and go? Seven thousand?

## 11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order

Eight thousand?

Nine thousand?

Nine thousand nine hundred and ninety nine?

Every single word that came out of Calvin Candie's mouth was <u>nothing but horseshit</u>,

[B]ut, he was right about one thing: I am that one [Man] in ten thousand…..

                    [He shoots Stephen in the other kneecap]

<u>Stephen</u> : Oh, you son of a bitch! Oh, you motherfucker! Oh, sweet Jesus, let me kill this n\*gg\*r!

<u>Stephen</u> : DJANGO! You uppity son of a b…
                    [Plantation blows up]

<u>Diango</u> : Hey little troublemaker

<u>Broomhilda</u> : Hey big troublemaker

<u>Diango</u> : Let's get outta here….
-    **Jamie Foxx as Django, Kerry Washington as Broomhilda, Samuel L. Jackson as Stephen, Leonardo Di Caprio as Calvin Candie,  *Django Unchained (2012), Dir.Quentin Tarantino.***

## <u>Black People are highest targets for Hate Crimes</u>

10.    Black people have <u>every reason</u> to be cautious and wary of White, or anti-Black, violence and racism targeted against them (<u>and take all needed precautions of every kind</u>) provided the breadth, and depth of the atrocities per the <u>African-Black Holocaust</u> committed against them as ***Toni Morrison via Time Magazine Interview: The Pain Of Being Black, 1989; <u>TONI MORRISON: The Pain Of Being Black | TIME</u>***, astutely articulated:  *"Some historians told me <u>200 million died</u>…The smallest number I got from anybody was 60 million….There were travel accounts of people who were in the Congo — that's a wide river — saying, "We could not get the boat through the river, it was choked with bodies." That's like a logjam. A lot of people died….Half of them died in those ships."* The atrocities go well beyond the genocidal murders.  Black business owners, and other successful Black people are, and were the leading targets of Racist Violence. <u>Black People have long been the highest targets of US hate crimes year after year</u>. *"researchers have long documented: Black Americans are the most frequent victims of racially motivated hate crimes in the United States.*" See e.g.:
- www.voanews.com/amp/report-african-americans-remain-top-target-of-hate-crimes/7246965.html
- ucr.fbi.gov/hate-crime/2017/topic-pages/victims
- www.justice.gov/hatecrimes/hate-crimes-case-examples

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

- www.justice.gov/crs/highlights/2020-hate-crimes-statistics
- publicintegrity.org/politics/Black-americans-still-are-victims-of-hate-crimes-more-than-any-other-group
- www.theroot.com/take-one-guess-whos-the-most-targeted-group-for-hate-cr-1850787981
- www.pbs.org/newshour/show/fbi-Blacks-most-often-targeted-in-hate-crimes
- time.com/6178301/buffalo-shooting-anti-Black-hate-crime/
- www.nbcnews.com/news/amp/ncna938541
- www.courier-journal.com/story/opinion/2024/02/07/anti-Black-hate-fbi-report-nobody-cares/72492410007/

"I feel personally sorrowful about Black-White relations a lot of the time because Black people have always been used as a buffer in this country between powers to prevent class war, to prevent other kinds of real conflagrations. If there were no Black people here in this country, it would have been Balkanized. The immigrants would have torn each other's throats out, as they have done everywhere else.   But in becoming an American, from Europe, what one has in common with that other immigrant is contempt for me — it's nothing else but color. Wherever they were from, they would stand together. They could all say, "I am not that."

So in that sense, becoming an American is based on an attitude: an exclusion of me.  It wasn't negative to them — it was unifying. When they got off the boat, the second word they learned was "n*gg*r."        Ask them — I grew up with them. I remember in the fifth grade a smart little boy who had just arrived and didn't speak any English. He sat next to me. I read well, and I taught him to read just by doing it. I remember the moment he found out that I was Black — *a n*gg*r...* It took him six months; he was told. And that's the moment when he belonged, that was his entrance. Every immigrant knew he would not come as the very bottom. He had to come above at least one group — and that was us…..

**Q.** You've said that you didn't like the idea of writing about slavery. Yet Beloved, your most celebrated book, is set in slavery and its aftermath.

**A.** I had this terrible reluctance about dwelling on that era. Then I realized I didn't know anything about it, really. And I was overwhelmed by how long it was. Suddenly the time — *300 years* — began to drown me.

*Three hundred years* — think about that.

Now, that's not a war, that's generation after generation. And they were expendable. True, they had the status of good horses, and nobody wanted to kill their stock. And, of course, they had the advantage of reproducing without cost.

**Q.** Beloved is dedicated to the 60 million who died as a result of slavery. A staggering number — is this proved historically?

**A.** Some historians told me *200 million died.*

**The *smallest* number I got from anybody was *60 million.***

There were travel accounts of people who were in the Congo — that's a wide river — saying, "*We could not get the boat through the river, it was choked with bodies.*" That's like a logjam. A lot of people died.

**Half of them died in those ships.**

Slave trade was like cocaine is now — even though it was against the law, that didn't stop anybody. Imagine getting $1,000 for a human being. That's a lot of money. There are fortunes in this country that were made that way.
  - **TONI MORRISON *Time Magazine Interview: The Pain Of Being Black, 1989;* TONI MORRISON: The Pain Of Being Black | TIME**

11.    This over-indexed, and over abundance of *anti-Black US Hate is astounding.*

American White (and other) Racist lynch mobs, during *Jim Crow*, regularly

targeted Black US Military Veterans, the Economically Prosperous, Enterprenerial

and Independent, and especially Mentally Strong Black men stand up to racial

injustice to lynch, economically deprive, burn, mutilate, abuse, and

castrate (literally).

**[The mob hangs Mr. Man on top of his horse, Booker T., placing a noose tied to the tree around his neck.]**

| | |
|---|---|
| **Mr. Man (Ving Rhames):** | **"**Wasn't no Colored boy had nothing to do what happened here |
| **Lynching Mob member:** | Shut up, Jessie |
| **Mr. Man (Ving Rhames):** | That ain't my name… |

**[Sheriff hits the horse and yells get, so as to hang Mr. Man, but Mr. Man's horse is so well trained it only responds to his command, and knows no fear, just like him.  Lynching mob member yells to just shoot the horse while aiming his shotgun.  Mr. Man, taking empathy on his horse, and for strategic purposes yells:]**

| | |
|---|---|
| **Mr. Man (Vingh Rhames):** | 'Booker T. go'.." |

**[and the horse sprints off; with Mr. Man in a nose beginning to lose oxygen, hanging]**

**13 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

- Mr. Man (Ving Rhames) conversations before and leading to attempted lynching, dialogue while the hero, protagonist, Black WW1 Veteran (Ving Rhames) is being lynched for a false accusation used as pre-text to destroy a Black, Self Sufficient thriving town in 1923 Florida, Rosewood, Movie 1997, John Singleton Classic;

*https://en.wikipedia.org/wiki/Lynching_of_African-American_veterans_after_World_War_I#:~:text=Lynched%20African%2DAmerican%20veterans,-The%20following%20is&text=The%20accurate%20number%20of%20African,in%20the%20spring%20of%201919. ( The following is an incomplete list of African Americans who had served in the military during WWI and were killed by White mobs with no trials for alleged crimes. Lynching is embedded deep in America's racial psyche…. By 1919, lynching had developed into a programmatic ritual of torture and empowerment to the White race….The accurate number of African American veterans lynched in military uniform is unknown, but there were several cases of beatings and lynchings for the refusal to remove a military uniform) https://www.defense.gov/News/News-Stories/Article/Article/1429624/african-american-troops-fought-to-fight-in-world-war-i/#:~:text=More%20than%20380%2C000%20African%2DAmericans,to%20labor%20and%20stevedore%20battalions. (More than 380,000 African- Americans served in the Army during World War I, according to the National Archives.)*

12.    In fact, US White Supremacist tendencies, and anti-Black atrocities were so strong and horrific toward Black men, and people, that enemies of the US, Nazi Germany Prisoners of War were treated better by US Soldiers, and the American Public than the Black Soldiers who defeated the Nazis (*as an extra way to degrade Black people and spit in their face*). The heroics of Black soldiers, and fighters, like the Tuskegee Airmen, and their genius was overshadowed by the simultaneous Wars they had to fight 1. Within their ranks for basic respect 2. On enemy territory in Nazi Germany, and 3. At Home in the US from the same type of Racial Apartheid Regime they were fighting a war against giving rise to Black Double V Campaign (against Nazis abroad and US Nazis, Ku Klux Klan members, etc. at in America *who were not fringe groups, but core decision-makers* in every part of American society: including judges, elected officials, administrators, employers, etc…) See e.g.

- Fighting Germans and Jim Crow: Role of Black troops on D-Day
- Unsung Heroes: World War II's Black Veterans | Faculty of Arts and Sciences
- In 'Half American,' Matthew Delmont explores mistreatment of Black servicemen : NPR
- The Original Black Panthers Fought in the 761st Tank Battalion During WWII | HISTORY
- The Black Messiah | Dissident Voices (written by a Holocaust survivor: Sonia Schreiber Weitz);
- Sonia Weitz, 81; Holocaust survivor kept history alive - The Boston Globe
- In WWII, the U.S. Treated Nazi POWs Better Than Black Troops | TIME
- In 'Half American,' Matthew Delmont explores mistreatment of Black servicemen : NPR
- Black vets were excluded from GI bill benefits — a bill in congress aims to fix that : NPR
- Black Americans Who Served in WWII Faced Segregation Abroad and at Home | HISTORY
- Absent From the Front: What the Case of the Missing World War II Black Combat Soldier Can Teach Us About Diversity and Inclusion > National Defense University Press > News Article View
- The Double V Victory | The National WWII Museum | New Orleans
- Black Americans Who Served in WWII Faced Segregation Abroad and at Home | HISTORY
- 'Half American' explores how Black WWII servicemen were treated better abroad | KOSU
- A short history of integration in the US armed forces > Air Force > Display
- Black US Military Veterans Face Enemies at Home and at War - The War Horse
- How a Hostile America Undermined Its Black World War II Veterans – Mother Jones
- African Americans in Nazi Germany | Holocaust Encyclopedia
- African Americans Military: (billofrightsinstitute.org/essays/double-v-for-victory-the-effort-to-integrate-the-US-military

**14 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

13.     Similar to larger patterns in society (sampled from the Jim Crow Era, Nazi

Germany, & Apartheid South Africa), Georgetown engages in its own form of *racist*

*propaganda* to achieve nefarious goals with regard to Mr. Austin because he is a

Black male admitted Georgetown student through "*dissemination of … half-truths,*

*or lies—to influence"* delegitimize, dehumanize and disenfranchise (and to attempt

to cheat out of 1. His 1981 rights to mandatory written media contract per

Georgetown's own promulgated policies and 2. His Equal Protection rights per Title

VI of the Civil Rights Act of 1964 . See Propaganda | Definition, History,

Techniques, Examples, & Facts | Britannica

(…Propaganda: dissemination of information—facts, arguments, rumours, half-truths, or lies—to influence…. Propaganda is the more or less systematic effort to manipulate other people's beliefs, attitudes, or actions by means of symbols (words, gestures, banners, monuments, music, clothing, insignia, hairstyles, designs on coins and postage stamps, and so forth). Deliberateness and a relatively heavy emphasis on manipulation distinguish propaganda from casual conversation or the free and easy exchange of ideas. Propagandists have a specified goal or set of goals. To achieve these, they deliberately select facts, arguments, and displays of symbols and present them in ways they think will have the most effect. To maximize effect, they may omit or distort pertinent facts or simply lie, and they may try to divert the attention of the reactors (the people they are trying to sway) from everything but their own propaganda….)

A variety of racist derogatory stereotypes including *"caricature[s which portray]*

*Black men as innately savage, animalistic, destructive, and criminal -- deserving*

*punishment, maybe death"* and tied directly to Jim Crow Era's racist legal regime

that inspired Nazi Germany (*causing innumerous deaths, and other unjust*

*harms, atrocities, to Black US victims, particularly Black men*) and undergird the

premise of Black inferiority or less worthy that Georgetown utilizes.  See e.g The Brute ; Caricature - Jim Crow Museum: jimcrowmuseum.ferris.edu/brute/

(" …The brute caricature portrays Black men as innately savage, animalistic, destructive, and criminal -- deserving punishment, maybe death. This brute is a fiend, a sociopath, an anti-social menace. Black brutes are depicted as hideous, terrifying predators who target helpless victims, especially White women. Charles H. Smith (1893), writing in the 1890s, claimed, "A bad Negro is the most horrible creature upon the earth, the most brutal and merciless"(p. 181)….
During slavery the dominant caricatures of Black people -- Mammy, Coon, Tom, and picaninny -- portrayed them as childlike, ignorant, docile, groveling, and generally harmless. These portrayals were pragmatic and instrumental. Proponents of slavery created and promoted images of black people that justified slavery and soothed white consciences. If slaves were childlike, for example, then a paternalistic institution where masters acted as quasi-parents to their slaves was humane, even morally right. More importantly, slaves were rarely depicted as brutes because that portrayal might have become a self-fulfilling prophecy……….During the Radical Reconstruction period (1867-1877), many White writers argued that without slavery -- which supposedly suppressed their animalistic tendencies -- Black people were reverting to criminal savagery. The belief that the newly-emancipated Black people were a "black peril" continued into the early 1900s. Writers like the novelist Thomas Nelson Page (1904) lamented that the slavery-era "good old darkies" had been replaced by the "new issue" (Black people born after slavery) whom he described as "lazy, thriftless, intemperate, insolent, dishonest, and without the most rudimentary elements of morality" (pp. 80, 163). Page, who helped popularize the images of cheerful and devoted Mammies and Sambos in his early books, became one of the first writers to introduce a literary Black brute. In 1898 he published Red Rock, a Reconstruction novel, with the heinous figure of Moses, a loathsome and sinister Black politician. Moses tried to rape a White woman: "He gave a snarl of rage and sprang at her like a wild beast" (pp. 356-358). He was later lynched for "a terrible crime."

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

The "terrible crime" most often mentioned in connection with the Black brute was rape, specifically the rape of a White woman. At the beginning of the twentieth century, much of the virulent, anti-Black propaganda that found its way into scientific journals, local newspapers, and best-selling novels focused on the stereotype of the Black rapist. The claim that Black brutes were, in epidemic numbers, raping White women became the public rationalization for the lynching of Black people.  The lynching of Black people was relatively common between Reconstruction and World War II…..")

  

; [Lynching in America: Confronting the Legacy of Racial Terror](lynchinginamerica.eji.org/report/) ; lynchinginamerica.eji. org/report/

("...History, despite its wrenching pain,Cannot be unlived, but if faced With courage, need not be lived again….**Maya Angelou**, *On the Pulse of Morning*……

…..During the period between the Civil War and World War II, thousands of African Americans were lynched in the United States. Lynchings were violent and public acts of torture that traumatized Black people throughout the country and were largely tolerated by state and federal officials. These lynchings were terrorism. "Terror lynchings" peaked between 1880 and 1940 and claimed the lives of African American men, women, and children who were forced to endure the fear, humiliation, and barbarity of this widespread phenomenon unaided.

Lynching profoundly impacted race relations in this country and shaped the geographic, political, social, and economic conditions of African Americans in ways that are still evident today. Terror lynchings fueled the mass migration of millions of Black people from the South into urban ghettos in the North and West throughout the first half of the twentieth century. Lynching created a fearful environment where racial subordination and segregation was maintained with limited resistance for decades. Most critically, lynching reinforced a legacy of racial inequality that has never been adequately addressed in America. The administration of criminal justice in particular is tangled with the history of lynching in profound and important ways that continue to contaminate the integrity and fairness of the justice system.

This report begins a necessary conversation to confront the injustice, inequality, anguish, and suffering that racial terror and violence created. The history of terror lynching complicates contemporary issues of race, punishment, crime, and justice. Mass incarceration, excessive penal punishment, disproportionate sentencing of racial minorities, and police abuse of people of color reveal problems in American society that were framed in the terror era. The narrative of racial difference that lynching dramatized continues to haunt us. Avoiding honest conversation about this history has undermined our ability to build a nation where racial justice can be achieved.

In America, there is a legacy of racial inequality shaped by the enslavement of millions of Black people. The era of slavery was followed by decades of terrorism and racial subordination most dramatically evidenced by lynching. The civil rights movement of the 1950s and 1960s challenged the legality of many of the most racist practices and structures that sustained racial subordination but the movement was not followed by a continued commitment to truth and reconciliation.
 Consequently, this legacy of racial inequality has persisted, leaving us vulnerable to a range of problems that continue to reveal racial disparities and injustice….)

; How White Supremacy Returned to Mainstream Politics - Center for American Progress("……In many ways, this is a return of an old American political tradition rather than a wholly new phenomenon, but it has taken on a new form and uses a language that must be properly understood if it is to be successfully challenged. Concepts of white supremacy were at the heart of the defense of slavery and central to the Lost Cause myth that justified segregation after the fall of the Confederacy……. In such a changing landscape, old-fashioned racist and xenophobic appeals are unlikely to be politically successful beyond a small fringe, so the propagandists of racism have had to develop subtler approaches to stoking fear and hatred for political ends. To do so, they have repackaged racist traditions in language and forms that could more easily enter mainstream political discourse……

…….This report explores the background of these poisonous concepts—reviewing their origins, development, and diffusion—and explores how white supremacist ideas have seeped into America's mainstream political discourse, with some examples of politicians who traffic in this language. It then discusses ways to combat the spread of white nationalism in U.S. politics. This report is meant to help readers recognize and call out attempts to smuggle white supremacy into everyday politics and to support civic leaders of all political persuasions who stand up to this poison….the fear and hatred of others, be they of a different race, religion, or ethnicity, leads directly to cruel, xenophobic policies….Most politicians know that being directly associated with white nationalism harms their reputation, so they use dog whistles, or euphemisms….")

Asian American Conservatives Have Become Key Allies of White Supremacy

("…These Asian Americans are those who feel most at ease with the paradigm that Claire Jean Kim observes in her theory of "racial triangulation," which characterizes how Asian Americans have long been recruited into functioning as a "model minority" to reinforce the structural oppression of Black people and the privilege of white people. Despite the fact that they cannot fully assimilate into Whiteness, certain Asian Americans do enjoy privileges in Kim's framework. Indeed, as she wrote

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

in The Nation, "It is the convergence of this nascent, conservative Chinese immigrant nationalism with an older, conservative white nationalism that is driving anti–[Black] politics today."….This disturbing alliance has only grown in strength in recent years, finding a common cause in the safeguarding of [perverse iteration of] capitalism and anti-Blackness……

….Unpacking how these prejudices serve as powerful allies to [W]hite supremacy entails refusing that [W]hite supremacy can completely explain how Asian American conservative politics emerges. Indeed, as Adrian De Leon and Jane Hong write, "Asian American conservatism is not just about claiming [W]hiteness, even though these alignments are indelibly forged from the politics of [W]hite supremacy."….For one, Kun Huang identifies contemporary anti-Black racism in China with a long history of "Chinese racial nationalism" constructed from anxieties that intermixing between Chinese and Africans would disrupt the coherence of "Chineseness."   …White supremacy gains strength not because it supersedes the distinct histories and practices of other reactionary ideologies, but because it pluralistically maintains these long-standing forms of cultural reaction that are able to persuasively mobilize other communities of color in a common cause. To truly understand how Asian American conservatives serve white supremacy, in other words, requires exploring the distinct cultural politics that make [White Supremacy] persuasive to those communities in their own right."…)

[The alt-right likes Asian American women. We shouldn't be surprised. - The Washington Post](**"…**Along with being stereotyped as hypersexual and submissive, Asian women are also presumed to be aggressive when it comes to propagating family success, which may ultimately be an attractive combination of stereotypes for some white supremacists…..These days, many people want a meme rather than the real, and for some white supremacist men who are ultimately concerned with their survival and power, the tiger mom may be just the thing…..The tiger mom, a trope popularized by scholar Amy Chua, is a variation of the model minority, which mythologizes the role of parenting, family structure, family values, and ethnic pride as the primary determinants of minorities succeeding in a competitive and hostile society. As a model minority type, the tiger mom is demanding, has extremely high expectations of her children, and—relevant to white supremacist anxiety of self-protection—ethnocentric…..Ethnocentrism can be important to white nationalists in their quests for survival…… The manifesto reportedly written by Dylann Roof exemplifies this. While Lim notes that the manifesto said Asians would make "great allies of the White race," she doesn't mention what preceded this point:  "I have great respect (sic) for the East Asian races," Roof wrote. "Even if we were to go extinct they could carry something on. They are by nature very racist and could be great allies of the White race.….'

; [White supremacists who stormed US Capitol are only the most visible product of racism](White supremacy, then and now … As an ideology, White supremacy is the belief that white people are inherently superior to people of color. It relies on the notion that distinct races of people exist, and ranks those categorized as "white" at the top of the racial hierarchy.……For hundreds of years, American leaders overtly embraced White supremacy. It was used to rationalize the genocide of Native Americans and the enslavement of Africans and their descendants from the Colonial period to the 19th century.……After abolition in 1865, White supremacy continued in official and unofficial ways. It drove the legal racial segregation of Jim Crow and the banking practice of redlining, which robbed Black families of the loans necessary to buy homes in certain neighborhoods. White supremacy also underlay the forced assimilation and killing of Native Americans………Boarding schools for Native American youths, like Montana's Fort Shaw, cut students off from their culture and taught them that white values, practices and dress were American culture….Outright racist policies were banned after the civil rights era of the 1960s. But systemic racism remained. Today's well-documented inequalities between Black and white Americans in savings, longevity, home ownership and health are directly related to the white supremacist hierarchy created centuries ago…..White people need not endorse white supremacy to benefit from this hierarchy. As psychologist Beverly Tatum has explained, the privileges afforded to whiteness are so much a part of the structure of U.S. society that many white people don't even notice them.")

; [Why 'White' supremacists are not always White | The Far Right | Al Jazeera](….That mix of anger and disbelief was recently repeated when 19-year-old Sai Varshith Kandula was arrested after crashing a U-Haul van into a barrier near the White House while carrying a Nazi flag. Kandula, an Indian American man from Missouri, later discussed with authorities his plan to attack President Biden, and his admiration for Hitler. Add to these incidents a variety of cases that range from Enrique Tarrio…In addition to the allure of white supremacy, many non-white people are being drawn into racist movements through shared antipathy for groups placed at the bottom of the social ladder. Nick Fuentes, a 24-year-old Holocaust denier and purveyor of white superiority who has dined with former President Trump …. is a useful case in point. Much of Fuentes' pro-white belief system appears to be rooted in anti-Black prejudice instilled in him by his parents. His white American mother and his father, of mixed American and Mexican descent, still publicly support him and his racist views….The processes of radicalisation – from Fox News to online message boards – has ensnared a growing variety of people, mostly disaffected men, not only by touting their own superiority but, more potently, by pointing out to them who they should hate or disdain. These recruits – again, mostly men, usually young –
unite over a shared hatred for marginal groups: immigrants, working and poor classes, Black people…")




**17 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



14.    These powerful false "Black Inferiority" stereotypes that Georgetown *uses* to

denigrate, and defraud, Mr. Austin were used to fuel the recruitment of <u>4.5 million</u>

<u>or so Whites, and the rise of the Klu Klux Klan</u>, (i.e. Birth of a Nation), even when

these derogatory stereotypes were played by a White, or Jewish, actor in Blackface.

[The Birth of a Nation | Cast, Plot, Summary, & Facts | Britannica](#)

("...The Birth of a Nation, landmark silent film starring Lillian Gish, released in 1915, that was the first blockbuster Hollywood hit. It was the longest and most-profitable film then produced and the most artistically advanced film of its day. It secured both the future of feature-length films and the reception of film as a serious medium. An epic about the American Civil War (1861–65) and the Reconstruction era that followed….the movie's overt racism outraged African Americans and civil rights advocates. Blacks, particularly in the film's second part dramatizing Reconstruction, are portrayed as the root of all evil and unworthy of freedom and voting rights. In addition, male African Americans are depicted as always lusting after white women. In contrast, the KKK is portrayed in a heroic light as a healing force restoring order to the chaos and lawlessness of Reconstruction……..Protests against the film accompanied its premiere in Los Angeles in February 1915 and continued when the movie debuted in New York City the following month. But it was in Boston, where the film opened in April, that Griffith faced the most intense and protracted opposition. William Monroe Trotter—a civil rights leader and editor of a radical Boston weekly newspaper, The Guardian—teamed up with the local branch of the National Association for the Advancement of Colored People (NAACP) in a bid to ban the film. Throughout the spring of 1915, Trotter, an 1895 graduate of Harvard and the college's first black member of Phi Beta Kappa, was at the forefront of the protests, which included mass rallies at which thousands of demonstrators were confronted by a small army of Boston police. Foreshadowing the direct-action civil rights strategies of the 1960s, the demonstrations, which sometimes turned violent, played out in every venue imaginable: city hall, the streets, the courts, and the Massachusetts state legislature…")

[https://www.jta.org/2019/02/06/ny/Jews-and-Blackface-its-complicated](https://www.jta.org/2019/02/06/ny/Jews-and-Blackface-its-complicated)

("...When it comes to the Jewish experience with Blackface, the picture is, well, not so black and white….For Jews, the controversy surrounding Virginia Gov. Ralph Northam suggests a complicated history that runs from Al Jolson to Eddie Cantor to former Brooklyn Assemblyman Dov Hikind….Northam's political career is foundering because his 1984 medical school yearbook page featured a photograph of two white people, one in blackface, the other in a KKK costume. (He denies being in the photo or even knowing it was on his page, but admits he darkened his skin to look like Michael Jackson for a 1984 talent show.)….Northam is walking in the footsteps of Al Jolson, born Asa Yoelson in Lithuania to Jewish parents who immigrated to the United States; the actor-singer known at the height of his popularity as "The World's Greatest Entertainer" often performed in blackface…..Then came "The Jazz Singer," which took blackface to a wider, national audience. In addition to Jolson, leading Jewish entertainers who also performed in blackface included such prominent names as Eddie Cantor, George Burns, George Jessel and Sophie Tucker…..Jews then played a disproportionate role in the entertainment industry…..."Jews performed this kind of minstrelsy in the 1910s and 1920s better and more than any other group in America. Jewish faces covered in cork were ubiquitous," Michael Alexander, University of California religious studies professor, wrote in "Jazz Age Jews" (University of Princeton Press, 2003)…."In actuality," wrote film scholar Lester Friedman in "Hollywood's Image of the Jew" (Ungar Publishing Co., 1982), "many Jewish performers gained early and continued success using [blackface] … Indeed, it is too easy to ignore the derogatory aspects of such activities, the unconscious racism accepted and nourished by such cruel parodies, by citing historical contexts….."The undisguised elements of ridicule in such blackface portrayals by Jews mimicking the outlandish stereotypes of blacks," he continued, "now looks suspiciously like one group's desperate need to assert its own superiority by mimicking another."...)

**18 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## As American as the Blues: Lynching in Film and TV | PBS

(In D.W. Griffith's Birth of a Nation (1916), a sexually rapacious Black captain Gus ("played by a White actor in blackface) is lynched by the Klan after trying to marry a White woman named Flora, who would rather plunge to her death than elope with him. Griffith casts the Klan as heroes and Blacks, including Black soldiers and statesmen during Reconstruction, as the villains. On the heels of the film, the KKK resurged and along with it, racial terror inflicted upon Black Americans. National membership in the Klan peaked at about 4.5 million a few years later. However, even back then, there was pushback against the film, with the NAACP attempting to ban it….")

- www.washingtonpost.com/posteverything/wp/2015/03/03/the-birth-of-a-nation
- nmaahc.si.edu/explore/stories/blackface-birth-american-stereotype
- www.history.com/news/blackface-history-racism-origins
- nmaahc.si.edu/explore/stories/blackface-birth-american-stereotype
- www.shogafilms.com/jews-in-blackface
- amp.cnn.com/cnn/2019/02/02/us/racist-origins-of-blackface
- en.wikipedia.org/wiki/Blackface
- Deride the lightning: assessing The Birth of a Nation 100 years on | Movies | The Guardian

15.     The irony is the derogatory stereotypes, & propaganda, that was used to fuel

a rise in the Klu Klux Klan domestically, with assistance from some Jewish

American Actors via Blackface, and US racial Apartheid during Jim Crow as part of

the Black Holocaust (", was expropriated and utilized against German Jews

in the German Holocaust.  What is the Black Holocaust? - America's Black

Holocaust Museum

("…Similarities Between the Black Holocaust and Other Holocausts… The four hundred-year history of captured Africans and their descendants shares many features with the Holocaust experiences of European Jews – and the victims of other mass atrocities….These include: Dehumanization and vilification, Forced marches and migrations, [En-]Slave (forced, unpaid) labor, Stolen property, Mass incarceration, Torture, Medical experimentation, Discrimination in law and custom, Ethnic cleansing (race riots, pogroms), Lynchings and other forms of terrorism, Mass murder, Long-lasting psychological effects (Post-Traumatic Stress Disorder) on survivors – and their descendants….")

16.     As articulated above the "Black Inferior" or "less worthy" racist derogatory

stereotype a. fueled Lynching in America (in the Black Holocaust): Confronting ..

Legacy of Racial Terror b. Inspired the Third Reich, and Nazi's racial legal regime

(www.history. com/news/how-the- Nazis-were-inspired-by-Jim-Crow) and c. Runs

deep in the American Consciousness, championed by White Supremacist, especially

post Reconstruction and served to ease the consciousness of crimes done by White

People to Black Victims.  What Georgetown engages in is more than lies, deceit,

fraud (out of 1981 rights to contract, a law abiding University as advertised (and

money expended), or Equal Protection rights violated) or surface level

discriminatory animus;  Georgetown actually takes part in attempting to

dehumanize Mr. Austin through use of knowingly false derogatory

**19 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

anti-Black racist stereotypes in the same way Jim Crow White Supremacist, Ku

Klux Klan, powerbrokers did to alienate and oppress Black people in such a

stunning, and evil way, that they inspired The Third Reich (Nazi Germany).

17.    Georgetown's free wheeling use of knowingly false derogatory stereotypes

without consequences (*despite Mr. Austin's persistent communications,*

*documentation, follow up, formal complaints, etc.*) combined with segregationist,

Klu Klux Klan, enslaver like conduct of racial apartheid anti-Black policies toward

Mr. Austin (*to openly deprive his right to contract because of his race utilizing a per*

*se illegal facially discriminatory racial exclusion structure*), is not an accident but a

series of concerted choices by Georgetown's leadership-management;  When

combined with purposeful *'dog whistle'* labeling of honest, upstanding, intelligent,

hard working, law abiding Black male students like Mr. Austin, with the"Black

Inferiority" or "less worthy" racist derogatory stereotype (*that fueled Lynching in*

*America: .. Racial Terror* ) for purposes of inflicting harm, and creating adverse

actions (*and concealing racist motive through pretext*) Georgetown's conduct exhibits

its translucent desire to dehumanize, delegitimize, and disrespect (as well

as literally steal valuable rights from) Mr. Austin.  See e.g.:How White Supremacy

Returned to Mainstream Politics - Center for American Progress (As psychologist Albert
Bandura explains,28 dehumanization is a form of moral disengagement that allows people to abandon normal human
sympathies toward oppressed minorities. Dehumanization allows politicians and the public to excuse abuses .... and it
mobilizes voters through fear....)

What Is Dehumanization, Anyway? | Psychology Today

(When you see the president or other politicians use terms like "animals" or, even worse, "infestation" (a term usually
reserved for insects), they are engaging in dehumanization. People use dehumanization to justify greed, violence, and abuse.
Although dehumanization is most associated with right-wing nationalism, others sometimes use dehumanizing language,
too....Dehumanization is one of eight forms of "moral disengagement" described by the psychologist Albert Bandura. Humans
are capable of terrible crimes, and civilization has developed ways to inhibit aggression. However, we have not eliminated
violence, in part because of techniques for creating (false) excuses and justifications for immoral behavior. All moral
disengagement techniques are tricks to get people to accept behaviors that they would otherwise immediately recognize as
unethical and unfair....Dehumanization is not limited to political issues, however. Any time someone reduces a human being
to a single characteristic, especially a negative one, they are dehumanizing. Terms like ["Black criminal"].... rob people of the
full complexity of their lives and reduce them to a symptom or disorder....All slurs (insults based on race, gender, sexual
orientation, health status or other characteristic) are ... dehumanizing.")

**20 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

G-town's use of derogatory Jim Crow racist stereotypes is dehumanizing-harmful

18.     Mr. Austin does not demean himself, or others different from him &

appreciates his own appearance, history, and culture.  Mr. Austin loves being Black,

knows Black is beautiful (as well as other shades of the rainbow), enjoys his racial

self identification, and expects his personhood, and rights, to be respected just like

Whites.  He takes cultural pride in his heritage-history which is healthy (*and helps*

*explain Georgetown's racist conduct toward him as a Black man*).  See e.g. Students

for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 104

(U.S. Jun. 29, 2023) ("*In fact, [truly] meritocratic systems have long refuted bigoted*

*misperceptions of what [B]lack students [men, and people] can accomplish.*")

Because Mr. Austin loves himself, he has no need to demean either himself or

anyone else, as self hate is what produces the need to make others feel 'less than' or

inferior. Loving Yourself and Others The Impact of Compassion on Mental Health

and Wellness | VCU Health

("….When we can be compassionate toward ourselves, it opens the door for us to be accepting and loving toward other people. When we're stuck in a negative state in our mind – even if it is just toward ourselves and not toward others – the emotional impacts can close us off from connecting to other people. One of the main components of self-compassion is keeping in mind the common humanity and awareness that your experiences are connected to other people's experiences….")

The Power of Self-Love | Psychology Today

("…The Importance of Self-Love…Self-love lays the foundation for assertiveness, establishing boundaries, nurturing healthy relationships, practicing self-care, pursuing personal interests and goals, and feeling pride in one's identity….")

Racial derogatory stereotypes really stem from the inferiority complexes of those

who engage in trafficking, and promulgating the derogatory stereotypes and serve

as defense mechanisms, often projected on the victims of racial violence, to

assuage guilty consciousnesses of Racial abusers own behaviors.   White

supremacy's inferiority complex | Racism | Al Jazeera ; Chapter 42: The Traumatic

Impact of Racism and Discrimination on Young People and How to Talk About It ;

People With Low Self-Esteem Show More Signs of Prejudice – Association for

Psychological Science – APS ;

19.     Per the Ninth Circuit's *Jinro America Inc.,* Georgetown's use of derogatory

racist anti-Black man 'Black inferiority" or "less worthy" stereotypes not only

sought to harm, demean, degrade, dehumanize, and disrespect, Mr. Austin, but is

**21 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

now using that to *"[invite] the [fact finder] to distrust [Mr. Austin] by invoking [a racist] stereotype"* that is prejudicial, and harmful.  See Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1008 (9th Cir 2001)

> ("We do not suggest that expert testimony relating to certain aspects of a defendant's race, ethnicity or nationality can never be admissible. Testimony about cultural traits or behavior, for instance, is not inherently prejudicial. The cases we have just reviewed acknowledge as much. But as reflected in these decisions, the risk of racial or ethnic stereotyping is substantial, appealing to bias, guilt by association and even xenophobia. That is why Pelham's testimony — his ethnic syllogism — was fatally flawed here. It invited the jury to distrust Jinro by invoking an ethnic, national stereotype.")

20.     Per *Jinro America Inc. v. Secure Investments, Inc, United States v. Doe, United States v. Vue, United States v. Socony-Vacuum Oil Co., Inc.*, Georgetown knows a. they were wrong, b. they have no legitimate reasons for their initial, nor *ongoing,* discrete, adverse, facially discriminatory conduct, and c. they even admitted to utilizing and relying on derogatory racist stereotypes against Mr. Austin via their conduct (as compared to their promulgated policies) and attempted to use a derogatory racist stereotype of somehow "less worthy" or "inferior" to steal mandatory 1. Rights to written media contract and 2. Mandatory Equal Protection rights not be excluded in campus services including IDEAA complaint required steps with *"a blatant appeal to racism and xenophobia"*).  See

Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1007 (9th Cir. 2001):

("Analyzing Brooks' references to "Cubans" under the conventional standards of relevance and prejudice, as dictated by Fed.R.Evid. §§ 401 and 403, we held that his testimony was largely irrelevant, but in any event was unfairly prejudicial under Rule 403. "[I]t was unnecessary to inject [defendants'] national origin into the trial." Id. at 596. Highlighting the ethnicity of other Cuban drug dealers under investigation "merely made it seem more likely in the eyes of the jury that [defendants] were drug dealers because of their ethnicity." Id. In sum, Detective Brooks' "repeated references to their Cuban origin and his generalizations about the Cuban community prejudiced [the defendants] in the eyes of the jury." Id."....

…"Our sister circuits, too, have condemned the inappropriate injection of race or ethnicity into a trial. The Eighth Circuit, for example, in United States v. Vue, 13 F.3d 1206 (8th Cir. 1994), held it was error to admit the testimony of a customs officer that suggested persons of Hmong descent were likely to be involved in opium smuggling. After noting such evidence was either irrelevant or, if arguably relevant, unfairly prejudicial, the court concluded that "the introduction of such evidence is highly improper." Id. at 1213. "....

"The Second Circuit addressed this issue in United States v. Cruz, 981 F.2d 659 (2nd Cir. 1992). That case involved a drug prosecution where the principals were all Hispanic and the defendant was repeatedly referred to as "the Dominican." The government's expert witness described the area of Manhattan in which the alleged drug transactions took place as has having "a very high Hispanic population," including "Dominicans." The court held such testimony was highly improper and prejudicial. "Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." Id. at 663-64;

see also United States v. Doe, 903 F.2d 16, 20-21 (D.C. Cir. 1990) (holding that expert's testimony that the retail crack and cocaine market in Washington, D.C. "has been taken over basically by Jamaicans" was unfairly prejudicial under Rule 403, because it "strongly suggested that appellants were guilty because two of them are Jamaican"); cf. United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (noting that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them")")

**22 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

21.     Per 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President*

*& Fellows of Harvard Coll.* use of derogatory racist stereotypes in business, or

contracts, or education or other areas of society is wrong, & per se illegal under

1981 (and other laws) as *" Such stereotyping can only "cause[] continued hurt and*

*injury," … contrary… to the "core purpose".. Equal Protection ..(co-extensive with*

*1981)."*  Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,

No. 20-1199, 38 (U.S. Jun. 29, 2023)

> ("furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their
> very worth as citizens-according to a criterion barred to the Government by history and the Constitution." …. Such
> stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S., at 631, contrary as it is to the "core
> purpose" of the Equal Protection Clause (*co-extensive with sec. 1981*), Palmore, 466 U.S., at 432.")



**24 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

## s/ George Jarvis Austin          11.11.24

**25 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE MR. AUSTIN IS HIGH ACHIEVING, HIGHLY RECRUITED, ACCOMPLISHED, HIGH POTENTIAL ADMITTED GEORGETOWN STUDENT.
**AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons. As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower**; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

EoR - 896 of 2347

**DECLARATION UNDER PENALTY OF PERJURY:** DIRECT EVIDENCE MR. AUSTIN IS HIGH ACHIEVING, HIGHLY RECRUITED, ACCOMPLISHED, HIGH POTENTIAL ADMITTED GEORGETOWN STUDENT.

1.      Mr. George Jarvis Austin DECLARES UNDER PENALTY OF PERJURY

that Mr. Austin shall file direct evidence, declarations, signed under penalty of

perjury to reinforce, and help further substantiate, the plead facts prior to FRCP 59

Motion.   **Fact 1:**   Mr. Austin is a high achieving, highly recruited, accomplished,

high potential, admitted Georgetown student.  Mr. Austin is a  person of great

character, pristine, clean and clear background, identified as top 5% out of over

20,000 competitive students, admitted to 100% of all top tier undergraduate schools

(including UCLA and Berkeley he applied to), did well at Berkeley, which he

selected, and graduated. www.forbes.com/sites/madisonfernandez/2021/09/08/why-

berkeley-is -number-one/ ?sh=2bbb1b7a47e0 ]).  See e.g. Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S.

Jun. 29, 2023) ("*California amended its State Constitution to prohibit race-conscious*

*college admissions in 1996…University of California, Berkeley, a top public*

*university not just in California but also nationally…For example, the University of*

*California purportedly recently admitted its "most diverse undergraduate class ever,"*

*despite California's ban on racial preferences. … UC Admits Largest, Most Diverse*

*Class Ever, But It Was Harder To Get Accepted, L. A. Times, July 20, 2021*") (FAC

para.5)      **Fact 2:** Mr. Austin has straight As, & A+'s the last nine semesters

(FAC para.5).        **Fact 3:**  Mr. Austin regularly scores in the top 1% of

standardized testing for multiple exams, above 99% of test takers, (including the

LSAT) (FAC para.5).         Mr. Austin is highly recruited for both professional and

law schools.

**2 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

2.    **Fact 4:** Mr. Austin was awarded highest scholarship honors in multiple top tier institutions as incentives for enrollment, as well as free application offers to nearly every T-14 institution, by those institutions, due solely to Mr. Austin's proven, documented, successful academic & professional track record, and accomplishments. **Fact 5:** Georgetown was only one of many top tier options with whom Mr. Austin was made offers to attend;  Because of Mr. Austin's already established built-in network in DC, and surrounding locations, it became one of the more attractive East Coast offers made to Mr. Austin, but still only one of many. **Fact 6:** Separate from earning acceptance to a variety of top tier schools, Mr. Austin also simultaneously earned highly coveted spots in a variety of professional development programs, and top 10 paid fellowships (*based on his demonstrated leadership, work experience, and academic excellence*).  For example, Mr. Austin Won (along with 17 others) a top 10 out of 820+, elite, uber- competitive Senate fellowship (1 of 64 Capital Fellowship winners; *CA Senate*):

> "The now-25-year-old, along with fellow Stockton native George Austin, is receiving the opportunity to be at the forefront of state politics for 11 months starting in October after being chosen to be among 18 Senate Fellows as part of the state's Capital Fellows Program….. But being chosen for the program is no easy task…..The Capital Fellows program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing out of 821 internship programs, bases its high-ranking selections on the all-around experience interns receive…."It's a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship, they're also taking graduate courses."…There were more than 1,300 applications for the program each of the past two years. Only 64 people are chosen for the entire program."
>
> - **www.recordnet.com/story/news/2012/09/08/just-one-fellows/ 49419856007/**



**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



3.  **Fact 7:** As articulated above, Mr. Austin Earned, and Won in a  top 10 out of

820+ paid Fellowships per Vault and Forbes, in the CA Senate with the most

competitive entry *(less than 4% acceptance rate nationwide, my year, for that program)*, as 1 of 18 selected winners (and 1 of 2 *winners* out of that area) www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/ Although, Mr. Austin was unavailable for press interview at the time he was still publicly celebrated and honored in the piece of over 400 elite competitors nationwide, and Mr. Austin declined automatic job offer as part of the elite program selectin process as I had already given my word to another commitment for which I already deferred for an additional year. **Fact 8:** As stated above Mr. Austin was accepted into multiple top tier law schools (including T-14), offered highest scholarship award honors from a variety of schools including VP Kamala Harris' alma mater (in San Francisco), and more recently was chosen as most outstanding student, as well as top ten business student ever (selected by professor with over 20 years experience).

3.   **Fact 9:** For additional context in this complaint, Mr. Austin is self represented, is not a juris-doctor (JD), nor has *ever* taken the bar, and is a severely injured worker *still* recovering from temporary disability, and is a member of protected classes (*Black man, recovering from temporary disability from car accident, and injury working at Tesla*) with pristine, clean and clear background. See above and below embedded exhibits (all authentic representations under signed penalty of perjury helping to substantiate, and provide some examples of statements under penalty of perjury).

"From: Ashley L Jennings <alb225@law.georgetown.edu>
To: "gaustin07"
Sent: Thursday, May 31, 2012 at 09:27:12 AM PDT
Subject: RE: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi George,

This e-mail serves as official notification that your request to defer admissions to Georgetown University Law Center until Fall 2013 has been granted, and Dean Cornblatt looks forward to welcoming you to the full-time program next fall.  As mentioned in our previous correspondence, your deferment is binding and you should begin withdrawing all other pending law school applications.  Please note it is your responsibility to notify us, in writing, of any change of address during your deferment period so that we may forward future correspondence to you.

Our records indicate that your first tuition deposit (totaling $400) has been received.  This deposit is non-refundable and will be credited toward the tuition for your first year.

Your second tuition deposit will be due in June 2013.  You'll be able to find more information once we launch next year's admitted student website.

Please let me know if you have any questions, and best of luck to you in the coming year!

Warm regards,

Ashley Jennings

Assistant Manager, Office of Admissions
Georgetown University Law Center
600 New Jersey Ave., NW, Room 589
Washington, DC 20001
202.662.9010 Phone
202.662.9439 Fax


From: George Austin [mailto:gaustin07]
Sent: Wednesday, May 30, 2012 2:52 PM
To: Ashley L Jennings
Cc: Admitted Student Hotline
Subject: 1-year Deferral Request for Capital Fellows Program- George Austin

Hi Ashley,

I sent this a few days back, but I just saw in my email that there was an error while trying to send.

So I am resending just in case it was not received.  Please let me know you have received this request.

Thank you very much for your previous follow up and the guidelines you provided.

I was recently accepted into the Capital Fellows Program and would like to request a 1-year deferral.

Below is my formal request based on those guidelines.


**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Please let me know if anything else is needed for a successful request.

Thank you,

George

Dear Dean Cornblatt and Members of the Admissions Committee,

I am extremely excited about attending Georgetown Law School.

I look forward to the wonderful learning environment and the opportunity to grow with my classmates.

I plan to be one of the best Georgetown students and alumni in the history of the school.  To achieve this goal I want to maximize key opportunities to expand my understanding of the law, its context and its application.

One great opportunity for me to grow toward my goal is as a Capital Fellow (http://www.forbes.com/sites/susanadams/2011/03/09/the-best-internships-for-2011/).

I have been selected as 1 of 18 Senate Fellows nationally within the Capital Fellows program.  As a top 10 fellowship according to Vault & Forbes this provides a benefit both pre and post law school.  The opportunity to help draft state law and get a truly hands-on feel for one aspect of the legal and political system will be beneficial to my understanding.  It will also help provide an additional depth of experience to add value to classroom discussions.  From my research on the program, I am convinced it will be a net positive experience and a value add for Georgetown, myself and my classmates.

The Capital Fellows is an efficient 10 month paid program that would require only a year deferral to participate.

I formally request a one year deferral to grow my legal understanding through participation in the Capital Fellows Program.

I understand that deferment is binding and conditioned upon me not pursuing admissions, holding deferral, or attending another law school prior to matriculating at Georgetown Law.

I fully agree with those terms.

I am excited to be a GULC student and look forward to being able to add increased value to Georgetown, my peers and myself through participation in the Capital Fellows Program.

I have included key portions of the Senate Fellows Acceptance Letter below.

Please let me know your decision.

Thank you again for the wonderful opportunity to attend Georgetown and I look forward contributing to Georgetown's exceptional legacy.

George Austin

--------------Senate Fellows Acceptance Letter-------------------------------------------------

May 15, 2012

Dear George Austin,

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

Congratulations! On behalf of the California State Senate and the Center for California Studies at Sacramento State University, it is my pleasure to offer you a position as a 2012-2013 California Senate Fellow. You are an outstanding applicant, and the selection committee believes you will have much to contribute to—and benefit from—the Senate Fellowship program. We strive to provide Fellows with a comprehensive, experiential learning opportunity that is professionally and personally fulfilling.

As is the case every year, our offer, including benefits and a number of graduate units, is contingent on final adoption and approval of funding in the state budget. The Legislature and Governor Jerry Brown are very supportive of the program, and we are very confident in being able to fund a full class of 18 Fellows.

Senate Fellows receive a monthly stipend of $1,972 plus comprehensive health coverage and visual and dental benefits. If you have pending student loans, repayment can be deferred during your fellowship year. The Senate program pays the tuition, books, and fees required to register as a graduate student at the California State University of Sacramento and you can earn up to 6 units of graduate student university credit.

We want to inform you of the availability of the Timothy A. Hodson Capital Fellows Assistance Fund for fellows accepted into the program. There will be one or more awards not to exceed a grand total of $5,000. For additional information see attachment.

We look forward to working with you this year. Should you have any additional questions, concerns, or would just like to talk, please don't hesitate to contact us. You can contact David Pacheco at (916) 278-5408 or on his cell at (916) ███████. You may also reach me at (916) 278-4874.

Congratulations and best wishes!

Sincerely,

Jennifer Calbonero


Jennifer Calbonero, Program Assistant
California Senate Fellows"

**8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**



9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order





suministrarle a un consumidor que trate de obtener una copia de un informe o
solicite revisar un archivo una notificación por escrito en inglés y español lisos y
llanos, en la que se establezcan los términos y las condiciones de su dere~~~
recibir toda la información, como se dispone en la Sección 1786.26.

**2 of 2**

**Report Summary**

| SSN Trace | May 12, 2022 | Complete |
| Sex Offender Search | May 12, 2022 | Clear |
| Global Watchlist Search | May 12, 2022 | Clear |
| National Search | May 12, 2022 | Complete |
| County Searches | May 25, 2022 | Clear |

**Report Information** — Clear

| First name | Middle name | Last name | Date of birth |
| George | Jarvis | Austin | |
| Phone number | Zipcode 95210 | Email gaustin07@berkeley.edu | Social Security Number XXX-XX |
| Driver license (CA) | Previous driver licenses | Custom 70 hjt3sOMTL8fZuyjnyim6 gKuDyrx1 | |
| Created at May 11, 2022 11:58 PM UTC | Completed at May 25, 2022 5:27 PM UTC | | |

**SSN Trace** — Complete

**Sex Offender Search** — Clear

**Global Watchlist Search** — Clear

**National Search** — Complete

**County Searches** — Clear

San Joaquin, CA — Clear

Alameda, CA — Clear

**Checkr**

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com – (844) 824-5257

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

**Fact 1:**    Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*see below*), and the process which deprived Mr. Austin's contract rights.    **Fact 2:**    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."* See e.g. Comcast Corp.

v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):
("in General Building Contractors Assn., Inc. v. Pennsylvania , 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a private offeror refuse[d] to extend to [an African-American], ... because he is [an African-American], the same opportunity to enter into contracts as he extends to [W]hite offerees." Id. , at 388, 102 S.Ct. 3141").

2.    **Fact 3:**    Non-Black male, or White, students were made contract offers, and provided: 1. with respect to their persons, as human beings, (and provided a head-ups, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) 3. Pre-approval of use of the photo by the non-Black male, or White students 4. An opportunity to accept or decline the offer itself 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7.

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 4:**    Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.    **Fact 5:**  Per Georgetown, (i.e. FAC para.111.), <u>written authorization requires</u> Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with <u>General Counsel</u> approval of form f. signature consenting *prior* to use.

3.    **Fact 6:**    Per Georgetown, <u>written authorization requires</u> is a contract.

**Fact 7:**    Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.  **Fact 8:**  Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).<u>See S-111</u>

**Fact 5:**  Georgetown admits there was No offer, acceptance, consideration, or signature (per required <u>written authorization</u>), no contract and thus Georgetown's 'blatant' violations of Mr. Austin's rights under 42 USC 1981. See e.g. Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):







GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin

CA.

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW    Washington DC 20001-2075
(202) 662-4066

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**DECLARATION UNDER PENALTY OF
PERJURY:  shall cite to world renowned Thelton E.
Henderson, for the 1981 legal standard as he has a
particularly unique insight to its operation, and personal
understanding of how anti-Black racial animus operates
regardless of status or position in Society Judge Breyer's
And Magistrate Judge Ryu's (who recused herself)
colleague Judge Haywood Gilliam , clerked for the
Legendary Judge Thelton Henderson;  In Honor of the
Civil Rights Act of 1964,Title VI, (**full filing fee paid on
site); Hyperlinked with Affidavits, Supplements, & Direct
Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**George Jarvis Austin, Plaintiff (Self-represented)
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's
*ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and
Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental
violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over
50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as
well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or
settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure,
context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown
ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu,
media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents
@georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*) included 50+ outside expert
'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and
whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff"s, self-represented with limited resources) technology is not currently allowing the
showing of line numbering although he has repeatedly attempted to correct the technological issue (it is
unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se
complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

<u>DECLARATION UNDER PENALTY OF PERJURY: 1981, Animus, Legal Standards</u>
<u>per Legendary Judge Thelton Henderson</u>

1.     **Fact 1:** Mr. George Jarvis Austin DECLARES UNDER PENALTY OF

PERJURY that in Mr. Austin's forthcoming FRCP 59 Motion, Mr. Austin shall cite

to world renown <u>Thelton E. Henderson</u>, for the 1981 legal standard.  **Fact 2 :**

Because legendary Judge <u>Henderson</u> has a particularly unique insight to 1981's

operation, and personal understanding of how anti-Black racial animus operates

regardless of status or position in society (*as he experienced both subtle, and not so*

*subtle forms of anti-Black discriminatory animus even after his ascension and*

*success*) his analysis is particularly valuable under these facts.  **Fact 3 :** Mr. Austin

was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote

speakers to raise school funds for students in need (Mr. Austin had no personal gain

in the efforts, and was happy to share and help others):  Judge Henderson was

impressed after my speech, and thereafter invited Mr. Austin back to his home for a

bit of Tea, Mentorship, and Wisdom.  **Fact 4:** Legendary <u>Judge Thelton Henderson</u>,

who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a

keynote speech at his home in Berkeley, has extra credibility of analysis (provided

his depth of personal experience with racism as a Black man, despite his

accomplishments), his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate.  <u>California Newsreel - SOUL OF JUSTICE:</u>
<u>THELTON HENDERSON'S AMERICAN JOURNEY</u>

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when*
> *Medgar Evers was assassinated and when four little girls were killed in the Birmingham*
> *church bombing. In his role at the Justice Department, Henderson embodied the tension*
> *described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

2.     **Fact 5:** As an interesting aside, presiding Judge Judge Breyer's

and Magistrate Judge Ryu's (who recused herself) colleague <u>Judge Haywood Gilliam</u>

clerked for the <u>Legendary Judge Thelton Henderson</u>, and represented the *NAACP*

**2 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)…"* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

(6. What is the most important attribute of a judge, and do you possess it?

Response: I believe that the most important attribute of a judge is the commitment to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties. I do possess this attribute.

7. Please explain your view of the appropriate temperament of a judge. What elements of judicial temperament do you consider the most important, and do you meet that standard?

Response: In my view, the most important element of judicial temperament is treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered, and should then render decisions in a timely manner. To carry out these responsibilities, a judge should maintain a calm yet firm demeanor, be an attentive and careful listener and work diligently to promptly reach a decision. I do meet these standards, and am deeply committed to upholding these principles.

13. What assurances or evidence can you give this Committee that, if confirmed, your decisions will remain grounded in precedent and the text of the law rather than any underlying political ideology or motivation?

Response: I believe that there is no greater honor, or greater responsibility, than serving as a district judge. The citizens of our country entrust federal judges to dispense equal justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations. I had the privilege of beginning my career as a district court law clerk to the Honorable Thelton E. Henderson, and I have served as a federal prosecutor, a defense lawyer and counsel for clients in a range of civil matters. I have never viewed my legal practice as ideological, and I can assure the Committee that if confirmed as a district judge, I would base my decisions solely on the facts of each case and the applicable precedent, without regard to any political

ideology or motivation…..)

**3 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

3.    **Fact 6:**    Mr. Austin is the person, admitted student, and offeree whose

economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by

Georgetown, private offeror, in the following picture [image, likeness, etc.] (*page 4:*

*see below*), and the process which deprived Mr. Austin's contract rights.    **Fact 7:**

Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009,*

*1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown

purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a

*"blatant deprivation of civil rights such as where a private offeror [in this case*

*Georgetown] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts he*

*extends to White offerees [in this case non-Black, or White admitted students]."*

4.    **Fact 8:**    When Defendant Georgetown made White, or Non-Black male,

students contract offers, they provided Whites: 1. with respect to their persons, as

human beings, (and provided a head-up, or forewarning, that Georgetown desired to

take a photo of them and use it for commercial, marketing, purposes), whereas they

disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted,

and defrauded out of economic contract rights, or even knowledge that his image,

and likeness, was being used for commercial-marketing purposes because he is

Black 2. knowledge of what the photo was used for (and where it may be sent for

marketing purposes) for Whites, but hid knowledge, and fact photo was being used

at all (after already stealing rights from him) for Mr. Austin because he is Black 3.

Pre-approval of use of the photo by the non-Black male, or White students whereas

they didn't even think to ask Mr. Austin in disrespect of his overall person, and

**4 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship. **Fact 9:**        Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.        **Fact 10:**    Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.

5.        **Fact 11:**      Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. **Fact 12:**      Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. **Fact 13:**        Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of

**5 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

his rights without asking, or attempting to engage in making a contact).   **Fact 14:**

Georgetown admits there was No offer, acceptance, consideration, or signature (per

required <u>written authorization</u>), and thus no contract was made with Mr. Austin

because he is Black, in the same way as similarly situated Whites, with George-

town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast*

*Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

28.    **Fact 15:**  Georgetown admits, *publicly,* that a student, or  *"Any applicant for*

*employment or admission, current or former employee or student, or third party*

*(hereinafter referred to as "Complainant")*" can make a complaint via email or in

person, and is encouraged to do so; :

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Requirements for Filing Grievances**
> Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant") of Georgetown University may file a discrimination or harassment complaint with IDEAA....
>
> A grievance must be filed in writing with IDEAA at M-36 Darnall Hall, electronically at ideaa@georgetown.edu, or by fax at (202) 687-7778."

6.    **Fact 16:**  Georgetown admits, *publicly,* that once complaint is made via

email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to

contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid

violating its own Georgetown policies or the law that informs-undergirds IDEAA

> **https://facultyhandbook.georgetown.edu/section4/a/**
> **"Procedures for Processing Grievances**
>
> **Intake**
> IDEAA staff shall schedule intake meetings with Complainants and Respondents in order to provide a general understanding of the relevant policy and this grievance procedure, as well as University support resources, as appropriate. The intake meeting may also involve a discussion of any interim or supportive measures that may be appropriate concerning the individual's academic, University housing, and/or University employment arrangements. At the request of the Complainant, IDEAA staff shall proceed to Step I Informal Resolution, or the Step II Investigation process detailed below. Pursuant to the Policy on Sexual Misconduct, Informal Resolution will not be used to resolve allegations of Title IX Sexual Harassment made by a student against an employee. If the Complainant wishes to proceed with Step I Informal Resolution or Step II Investigation, then IDEAA staff will meet with the Respondent to provide the Respondent a general understanding of the relevant policy and procedure. In the event the Respondent is a member of a collective bargaining unit, IDEAA will coordinate with Human Resources or the appropriate administrative unit to ensure that any required notices are provided to the union. Questioning of a witness or party who is a member of a collective bargaining unit will proceed in accordance with applicable law, policies, and collective bargaining agreements.

**6 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

**Step I. Informal Resolution**

Unless otherwise prohibited by University policy, IDEAA shall propose voluntary informal resolution, including mediation, to a Complainant desiring to resolve a dispute with a potential Respondent. If the Complainant agrees to informal resolution, the potential Respondent will be informed about the allegations and the informal resolution process, and offered an opportunity to participate in informal resolution. If both parties do not voluntarily agree to participate in the informal resolution process, the Complainant may proceed to Step II. In cases where Title IX Sexual Harassment is alleged by a student against an employee, IDEAA will not offer Informal Resolution to resolve the Complainant's allegations; in instances of alleged sexual harassment where both the Complainant and the Respondent request to mediate, the Complainant will not be asked to resolve his/her/their concerns directly with the Respondent.

If both parties agree to informal resolution, IDEAA's staff or a representative chosen by IDEAA will conduct the informal resolution within a prompt and reasonable time frame.If a mutually acceptable resolution is achieved through informal resolution, a written agreement between the parties will reflect the resolution and shall be signed and dated by the parties. Copies will be provided to both parties and IDEAA will monitor compliance with the terms of the agreement by both parties. The case will then be closed.

If informal resolution fails, IDEAA will inform the Complainant about the option to proceed to Step II. All Complainants and Respondents have a right to end the informal resolution process at any time and can ask in writing for IDEAA to begin a Step II Investigation.

The process for informal resolution of Title IX Sexual Harassment matters is described in Appendix A.

**Step II. Investigation by IDEAA**

An individual or group of individuals may initiate a formal Complaint by providing IDEAA a written and signed statement and any supporting documentation detailing the allegations of discrimination, harassment or related retaliation and identifying the individuals who engaged in the alleged conduct (the Respondent(s)).

IDEAA shall provide the Respondent and the Respondent's supervisor, if applicable, a copy of the formal complaint and its supporting documents. The Respondent shall have an opportunity to submit a written response to the allegations and any supporting documents within twenty (20) days of receipt of the formal complaint and its supporting documents. The Complainant will be provided a copy of this response and given the opportunity to submit a written rebuttal to Respondent's statement within ten (10) days of receipt of the response. Respondent will be given a final opportunity to respond in writing to Complainant's written rebuttal within ten (10) days of receipt of the rebuttal. Both Complainant and Respondent may present evidence and identify witnesses who can provide information relevant to the allegations.

IDEAA shall within a prompt and reasonable time frame investigate the Complaint and shall have access to all necessary information to do so and the opportunity to interview witnesses, as well as Complainant and Respondent. Upon completion of the investigation, IDEAA shall prepare a written report. IDEAA uses the standard of preponderance of the evidence to ascertain if the University's policies have been violated. IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, and at the discretion of IDEAA, transcripts, and audio recordings.

**Step III. Notification**

When IDEAA finds that no violation of policies governing harassment or discrimination has occurred, IDEAA will provide notice of the results to the parties on the same day, which shall be within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**

When IDEAA finds that a violation of policies governing harassment or discrimination has occurred, IDEAA will: Provide written notice of the results to the parties on the same day, to the extent consistent with the confidentiality accorded to University personnel actions, and within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in

**Step V.**

Forward its report to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality. Direct that prompt remedial action be taken to correct the situation. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

**Step IV. Corrective Action**

If corrective actions are imposed, IDEAA shall monitor their implementation. In Title IX Sexual Harassment matters, the Title IX Coordinator will monitor implementation of corrective actions. The appropriate Executive Vice

**7 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

President, Chief Operating Officer or Senior Vice President shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions related to the allegations resulting in the corrective actions.

**Step V. Appeal**
Where IDEAA finds a violation of the Policy on Sexual Misconduct, IDEAA may notify the Complainant of the sanction or remedial action imposed on the Respondent where the sanction or remedial action relates to the Complainant."

7.    **Fact 17:** When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3.  IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an

8 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order

Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

8.    **Fact 18:**  Further, When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook.georgetown .edu/section4/a/)**  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant  6.  The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection

**9 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

required procedure, and policy) because he is Black 9.  The opportunity provide

rebuttal to Respondent's statement, if needed, within 10 days, after receiving

Respondent's response to the initial complaint for Whites, whereas whereas they

deprived that opportunity for Mr. Austin (and completely excluded him from this

Equal Protection required procedure, and policy) because he is Black.

9.    **Fact 19:**  Moreover, When Defendant Georgetown receives a complaint via

email made by *"Any applicant for employment or admission, current or former*

*employee or student, or third party"* similarly situated Whites, or Non-Black males,

they provided Whites a set of mandatory steps **(facultyhandbook.georgetown.**

**edu/section4/a/)**  per Georgetown written policy ***"Procedures for Processing***

***Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights

Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 10. The opportunity,

or right, to present additional evidence, identify witnesses, and cross examine

opposing witnesses in per the Complaint for Whites whereas they deprived that

opportunity for Mr. Austin (and completely excluded him from this Equal Protection

required procedure, and policy) because he is Black 11. The opportunity, and right,

to receive IDEAA's investigation, interviewing of witnesses, complainant and

respondent(s), of complaint, within a prompt and reasonable time frame, for Whites,

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black

12. The opportunity, and right, to have complaint substance and evidence evaluated

and ascertained by IDEAA's experts for violations (and remedies), where IDEAA

shall maintain documentation to support the findings in its report, including, as

applicable, written findings of fact, transcripts, and audio recordings whereas

**10 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

defendant Georgetown deprived that opportunity for Mr. Austin (and completely

excluded him from this Equal Protection required procedure, and policy) because he

is Black 13. The opportunity, and right, to receive written notice from IDEAA as to

their findings within thirty days of the conclusion of the investigation for Whites,

whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and

completely excluded him from this Equal Protection required procedure, and policy)

because he is Black.

10.     **Fact 20:**  Lastly, When Defendant Georgetown receives a complaint via email

made by *"Any applicant for employment or admission, current or former employee or*

*student, or third party"* similarly situated Whites, or Non-Black males, they

provided Whites a set of mandatory steps **(facultyhandbook.georgetown.edu/**

**section4/a/)**  per Georgetown written policy ***"Procedures for Processing***

***Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights

Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 14.  The opportunity,

and right, to receive written notice from IDEAA of not only the findings of the

investigation, but instructions on next steps whether those are appeal (if more

information is needed) or corrective action if the Investigation found violations of

law and policy in accord with the complaint for Whites, whereas  defendant

Georgetown deprived that opportunity for Mr. Austin (and completely excluded him

from this Equal Protection required procedure, and policy) because he is Black  15.

The opportunity, and right, for IDEAA to forward its report findings to the

Respondent's Executive Vice President or Senior Vice President, or his or her

designee, or other University officials (or their superiors if they are the violators)

consistent with the above provisions addressing confidentiality to direct that

**11 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

prompt remedial action be taken to correct the situation for Whites , whereas

defendant Georgetown deprived that opportunity for Mr. Austin (and completely

excluded him from this Equal Protection required procedure, and policy) because he

is Black 16. The opportunity, and right, for corrective actions to be imposed on

Respondents, where IDEAA shall monitor their implementation (and additional

legal action outside of campus is still able to be pursued especially when the limits

of internal corrective measures do not remedy the violations by Respondents),

whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and

completely excluded him from this Equal Protection required procedure, and policy)

because he is Black.

11.    **Fact 21:**  Mr. Austin had no complaints against him, he simply inquired, and

complained as to why Georgetown 1. Violated school policy 2. Violated his

Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission,*

*current or former employee or student, or third party"* similarly situated Whites, or

Non-Black males, they provided Whites a set of mandatory steps **([faculty](faculty)**

**[handbook.georgetown.edu/ section4/a/](handbook.georgetown.edu/section4/a/))**  per Georgetown written policy

***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal

Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

12.    **Fact 22:** As Legendary Judge [Henderson](Henderson) explains in *Walker v. Contra Costa*

*County: a "refusal to enter into … contract [on the same basis as Whites] is*

*actionable under § 1981. In making this determination, a lower court should give a*

*fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making,*

*performance, modification, and termination of contracts, and the enjoyment of all*

**12 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*benefits, privileges, terms, and conditions of the contractual relationship"], and*

*should not strain in an undue manner the language of § 1981….."* Walker v. Contra

Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further

down in *Walker v. Contra Costa County* Judge Henderson expounds on the

elements, and standards of proof, to survive Summary Judgment for a 1981 claim

(at later stages in the litigation process):

> "E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."

13.     **Fact 24 :** Mr. Austin 1. Is an African American or Black man who is high

achieving, highly recruited, accomplished, high potential, and an admitted

Georgetown student (protected group[s]) 2. was & is qualified to make the contract

(of sound mind, admitted student, Georgetown took photo and sought to

economically exploit photo, and Georgetown already demonstrated it understood

how to properly engage in written contract when Mr. Austin deferred for a year to

participate in Capital Fellows, Senate Fellows Program *[with a written contract*

*similarly required*] and $400 consideration exchanged to solidify that contract) 3.

Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of

publicity-Privacy without telling Mr. Austin, and when he confronted them on their

violation still continued to refuse to make a contract on the same basis as Whites

because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority"

or "less worthy" by completely disrespecting Mr. Austin's Constitutional rights to

contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue.

14.     **Fact 25:** Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (i.e. Whites were treated 1. with respect to their persons, as human beings, (and provided a head-ups, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, humanness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.)

15. **Fact 26:**  In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well Equal Protection per Title VI of the Civil Rights Act of 1964. **Fact 27:**  Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly situated Whites, or Non-Black males, are provided via a set of mandatory steps **([faculty handbook.georgetown.edu/ section4/a/](faculty handbook.georgetown.edu/ section4/a/))**  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

16.    **Fact 28:** Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into*

**15 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020): **Fact 29:** Georgetown is a private offeror   **Fact 30**: Mr. Austin is a private offeree, admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*).   **Fact 31**: The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.   **Fact 32:**  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.   **Fact 33:** However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed).  **Fact 34:**  Further Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

17.    **Fact 35 :** Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating

**16 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

EoR - 927 of 2347

Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* **Fact 36:** Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived- presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

<u>Mr. Civil Rights Justice Thurgood Marshall's combined with  Legendary Judge Thelton Henderson's guiding analysis on demonstrated pretext & racial animus</u>

18.     **Fact 37:**     Per the <u>United States Courts</u> Justice Thurgood Marshall, nicknamed <u>Mr. Civil Rights</u>, by the Supreme Court, (the first Black, non-White) Supreme Court Justice, was only the second Supreme Court justice to have his <u>casket laid in state in the Great Hall of the Supreme Court</u> before his funeral.



**Fact 38:**        Per the <u>United States Court</u> Thurgood Marshall's analysis both as a

litigator, and as a Supreme Justice serve as guiding 'Eastern Stars' to discern, and

correct, per se illegal discriminatory conduct (especially anti-Black discriminatory

conduct), as early as 1938, when Thurgood Marshall, as a litigator, took over the

NAACP Legal Defense and Education Fund and argued *Sweat v. Painter (1950)* and

*McLaurin v. Oklahoma Board of Regents of Higher Education (1950)* as well *Brown

v. Board of Education (1954).*  As the legendary Civil Rights activist, and American

Hero (thinker, and entertainer) <u>Harry Belafonte</u> so eloquently sung *"There's a star

in the east … Rise up shepherd and follow." <u>Harry Belafonte, 96, Dies; Barrier-

Breaking Singer, Actor and Activist - The New York Times</u>* (..In the 1950s, when

segregation was still widespread, his ascent to the upper echelon of show business

was historic. But his *primary focus was Civil Rights*….)



19.    **Fact 39:** Two Thurgood Marshall cases, 1. *Brown v. Board* (keying in on *anti-Black Stigma*) as a Litigator, and 2 *MacDonald* as Supreme Court Justice writing the majority opinion *(keying in on the application of the precise mandate under anti-discrimination Statutes including 1981's requirement to apply policies equally to Blacks, and non-Blacks, without regard to race*) are particularly helpful Eastern stars, in this case. Georgetown's Constitutionally offending conduct "*implying inferiority in civil society*" toward a law abiding Black Citizen, and admitted Georgetown student, Mr. Austin is similar to Oliver Brown in *Brown v. Board of Education*. **Fact 40:** Mr. Austin seeks to exercise & enforce his Federal rights to not be treated in an inferior manner in civil society (creating Stigma), in the context of Higher Education, and making contracts per Georgetown's own express policies (in accord with 42 USC 1981, and other laws), as a law abiding Black male student, because he is a Black man, from 7.15.21 and continue into the present, violating Mr. Austin's Federal Rights that are reflected in "*....The words of*

*the amendment ,.[which].. contain …the right to exemption … from legal discriminations, implying inferiority in civil society….."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.)  See Brown v. Board of Education, 347 U.S. 483, 494 (1954)

20.   **Fact 41:**   Georgetown's Constitutionally offending conduct *"implying inferiority in civil society"* seeks to a. <u>harm Mr. Austin's dignity interest</u> (as 2023 US Supreme Court's <u>303 Creative LLC, v. Elenis et. al.,</u> highlights to *"vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." Heart of Atlanta Motel, Inc."*), b. <u>stigmatize Mr. Austin</u> (as US Supreme Court's <u>Brown v. Board of Education</u> highlights *"the policy of separating the races is usually interpreted as denoting the inferiority of the [N]egro group… [conveying] a sense of inferiority… has a tendency to [retard] the ….. development of [N]egro [people] and to deprive them of some of the benefits they would receive in a racial[ly] integrated [civil society]." …, in regard to the [C]olored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them"*), c. <u>utilize knowingly false anti-Black male racist derogatory stereotypes</u> against Mr. Austin (as 2023 US Supreme Court's <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard College</u>….. Highlights "" *[Forbids] from intentionally treating one person worse than another similarly situated person because of his race, [or derogatory racial stereotypes]"…"In cautioning against 'impermissible racial stereotypes,' …"the Court's Equal Protection Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory] stereotyping"…."furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their very worth as citizens-according to a*

*criterion barred to the Government by history and the Constitution." Id., at 912 ….*

*Such stereotyping can only "cause[] continued hurt and injury"* ), and d. to <u>explicitly deprive his Federal 1981, Constitutional, right to contract</u> (outright) per US Supreme Court's <u>Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media</u>, to guide the analysis of Georgetown's admitted, willing, facially discriminatory, per se illegal *"blatant deprivation of [Mr. Austin's] civil rights … where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African- American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White litigants, customers, business invitees]."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):

21.    **Fact 42:** Mr Austin a. has a pristine, clean & clear background b. with great and strong character (*eligible for any employment, or position, including President of the United States*), c. has good credit, d. timely pays his debts, e. is a good person, f. is a Straight A student (the last 9 semesters), g. is a member of protected classes (*Black man, recovering from temporary disability from car accident, and injury working at Tesla*).

22.    **Fact 43:** Justice Thurgood Marshall, who argued against *ongoing* facially discriminatory conduct before becoming a US Justice in *Brown I, & II (when the discriminatory conduct continued),* makes clear in *McDonald v. Santa Fe Trail Transp. Co.* that in an employment context, even when a worker has engaged in *"serious misconduct or crime directed against the employer [i.e. where a worker was "arrested, convicted, and fined"*] sec. 1981 (or Title VII) "*prohibits all racial discrimination*" whereas adverse action must be refrained from or applied *"only if …*

**21 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

*criterion is applied alike to members of all races,*" uniformly without regard to race. Per 1981, coextensive with Equal Protection (under Civil Rights Act of 1964, Title VI), this model of uniform treatment without regard to race is directly applicable to Georgetown's ongoing violations of Mr. Austin's rights.

23.  **Fact 44:**  Unlike the *McDonald v. Santa Fe Trail Transp. Co.* **WHITE Criminal Plaintiffs** (*who engaged in, and admitted, illegal conduct against a company, and were arrested, fined, for that illegal conduct*) in Justice Marshall's majority opinion in *McDonald v. Santa Fe Trail Transp. Co.* Mr. Austin (is Black or African American and) was 1. Not engaged in illegal conduct, *at all,* nor against Georgetown as an admitted student and thus was not "*arrested, convicted, and fined*" for non-existent conduct against Georgetown as an admitted student exercising his 1981, 2. Instead, a law abiding admitted student who reported Georgetown's per se illegal *ongoing* conduct against Mr. Austin (as the victim of discriminatory conduct whereas his 1981 rights to contract, Title VI, and Equal Protection rights per Georgetown's own express policies was, and is, violated) 3. Denied right to make contracts, in an ongoing manner for valuable rights that were stolen without notice from Mr. Austin by Georgetown, and then violating Title VI, and Equal Protection rights on several occasions with Georgetown using derogatory racial stereotypes, with a false anti-Black male racist stereotype (*as pretext to cover up Georgetown's invidious racist motivations*).

24.  **Fact 45:**  Similar to the *McDonald* plaintiffs (creating liability for defendants) Georgetown applies racially motivated different standards, or policies (*one for non-Black, or White, admitted students, and a different inferior policy toward Black male admitted students, like Mr. Austin*) whereas 1. Mr. Austin

suffered repeated discrete adverse harms despite reporting Georgetown's harms 2. Whites were treated with respect to their persons, as human beings, (and provided a head-ups, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, humanness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black 3. Whites were treated provided knowledge of what the photo was used for (and where it may be sent for marketing purposes), but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 4. Whites were provided with Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 5. Whites were treated with an opportunity to accept or decline the offer itself, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. Whites were treated with an opportunity to review the written contract offer before making the decision 6. Whites were treated with An opportunity to agree to the terms of the contract offer 7. Whites were treated with An opportunity to provide a counteroffer if terms were not acceptable 8. Whites were treated with An opportunity to have a meeting of the minds and 9. Whites were treated with opportunity to Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.)

25. **Fact 46:** In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. **Fact 47:** Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for **([faculty handbook.georgetown.edu/ section4/a/](faculty handbook.georgetown.edu/ section4/a/))**. Per Justice Marshall's majority opinion in *McDonald*, combined with the more recent *Cbocs West, Inc's* analysis, this is a "*promising….straight- forward [1981] claim of racial discrimination"*, with use of false, derogatory, racist pretext ("inferiority," "less worthy" applying one policy to Mr. Austin because he is Black man refusing to even offer the ability to enter into a mandatory media contract that Georgetown themselves mandate when exploiting a students image, or likeness, overtly treating him as an inferior, and utilizing a different policy for Whites, non-Blacks, where their rights to contract, and complaint policy Equal Protection under Title VI rights are fully respected.

26. **Fact 48:** Combining Justice Marshall's analysis in *McDonald v. Santa Fe Trail Transp. Co.* with Judge Henderson in *Walker v. Contra Costa County* Georgetown's a. Racial Animus and b. Pretext becomes crystal clear as their actions present no explanation, and conduct is not worthy of credence, nor do they even make sense with typical media contract making process (and complaint process), shows extreme animus toward Mr. Austin as compared to Whites, or non-Blacks. Similar to defendants in *Walker v. Contra Costa County* Georgetown shows animus

through a. disregard-violation of Court Mandates (in this case Supreme Court's per

se standards for private offerors) b. False, & Baseless use of derogatory stereotypes

(with no real goal but discriminating, and ignoring legal requirements that they

themselves promulgate) c. strategic segregationists, racial caste, tactics to block

Blacks, particularly Black males d. Use of racial bans or exclusion from required

services to deter making contracts, and block-stall proactive resolution of the

Georgetown created violations of law (whereas they violate their own mandatory

policies, and laws).  See Walker v. Contra Costa County, No. C03-3723 TEH, 7-9

(N.D. Cal. Sep. 6, 2005)

> ("1. <u>Racial Animus</u>
>
> Plaintiff alleges that Richter demonstrated a racially discriminatory animus, particularly through his opposition to a court mandated obligation to ensure equal employment opportunity. Some of the incidents that would support this notion include: (a) In 1998, Defendant Richter launched an investigation into alleged cheating by African American fire fighters and refused to release the findings (Walker Decl. 8:24-9:10); (b) since Defendant Richter became Fire Chief, recruiting and outreach for minority candidates virtually ceased (Price Decl., Ex. K 50:10-17); (c) in 2000, in a meeting with the Black Firefighters Association representatives to discuss the group's concerns regarding racial and gender bias in the hiring of an all-white male firefighter paramedic class, Defendant Richter stated "I don't hire by the consent decree" (Walker Decl. 15:2; see also Price Decl. Ex. L 42:1-49:25, 55:1-25); (d) in November 2002, Defendant Richter banned the Croskrey Consent Decree Board from using the District training center, and there is some question as to whether other groups were permitted to use the facility (Walker Decl. 15:20-16:1).

27.    **Facts 49:** Similar to defendants in *Walker v. Contra Costa County*

Georgetown shows pretext through a. Both false and subjective criteria (in that 1.

Whites contract rights are respected (on the front end), and 2. Whites are not

blocked and provided multiple opportunities later in the process to add additional

information, if needed to substantiate Investigatory) whereas *"the Ninth Circuit has*

*held that "subjective practices are particularly susceptible to discriminatory abuse*

*and should be closely scrutinized"*  b. Skewing the interactions to prejudice a

negative outcome (purposefully avoiding Georgetown's publicly promulgated duties,

violating requirement to make a contract for economic-IP-publicly-privacy rights

already stolen without consent, and going to extreme measures like illegally

excluding from mandatory campus services in violation of Equal Protection, Title VI

**25 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

) c.  Shifting the goal post only for Blacks, whereas Whites are not subjected to this

two tiered contract making, and complaint process,  to make it harder and harder

for a fair shake (with no intent on making a contract in the first place to

demonstrate that Georgetown's racist attitudes towards Blacks has not change

since they were admitted, vile, enslavers).   See Walker v. Contra Costa County, No.

C03-3723 TEH, 7-9 (N.D. Cal. Sep. 6, 2005)

> (2. Pretext
> There is a genuine issue of material fact as to whether Defendants' stated reasons for the decisions made in 2003 are
> pretextual. …the Ninth Circuit has held that "subjective practices are particularly susceptible to discriminatory
> abuse and should be closely scrutinized." Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1481 (9th Cir. 1987).
> Many of the criteria chosen, as well as aspects of the decision-making process, for selecting candidates for the two
> Assistant Fire Chief positions in 2003 were subjective. Plaintiff identifies a number of changes to the hiring process
> that could be pretexts for selecting another candidate. The 2003 Assistant Fire Chief Position openings were the first
> time that the position was opened to candidates from outside the Department. (Walker Decl. 16:10). Defendant
> Richter also asserted that the two vacant positions were interchangeable, necessitating that both needed a
> background in Support Services, while Plaintiff's primary area of expertise is operations. (Walker Decl. 17:25-17:27).
> Further, the examination was skewed to addressing administrative support concern — 11 of the 14 questions dealt
> with support services. Additionally, after Plaintiff finished as one of the top candidates under the initial panel,
> Defendant Richter convened a second panel; this was an unprecedented move in the hiring process. (Walker Decl.
> 16:13-14). One of the members of this second panel had been involved in the issues that led to Plaintiff's first suit
> against the County in 1985. (Walker Decl. 16:20-28; Price Decl. Ex. J 57:5-9). Richter also asked a question
> regarding lateral hiring that was not on the standard list of questions and that was a "hot button issue which the
> Black Firefighters Association had opposed [because] lateral hiring . . . would provide for an all white recruitment
> pool." (Walker Decl. 10:11-17. 10:22-23). Further, Plaintiff alleges that Defendant Richter scored the candidates
> before the final interview for the position had taken place. (Price Decl. 84:5-85:20; Ex. B290:16-291:13; Ex. N 4; Ex.
> 120). Many of the factors that Plaintiff scored lower on were highly subjective, such as inter-personal skills. (Richter
> Decl. Ex. 123). Thus, there are genuine issues of material fact compelling the Court to deny summary adjudication
> on this claim. ")

28.    **Facts 50:**  Mr. Austin shall cite to world renown Thelton E. Henderson, for

the 1981 legal standard in Mr. Austin's forthcoming FRCP 59 Motion, because

legendary Judge Henderson has a particularly unique insight to 1981's operation,

and personal understanding of how anti-Black racial animus operates regardless of

status or position in society (*as he experienced both subtle, and not so subtle forms of*

*anti-Black discriminatory animus even after his ascension and success*) his analysis

is particularly valuable under these facts.  **Fact 51 :**  Mr. Austin was blessed to be

invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise

school funds for students in need (Mr. Austin had no personal gain in the efforts,

and was happy to share and help others):  Judge Henderson was impressed after my

speech, and thereafter invited Mr. Austin back to his home for a bit of Tea,

Mentorship, and Wisdom.  **Fact 52:** Legendary Judge Thelton Henderson, who Mr.

Austin had the pleasure of meeting personally after Mr. Austin gave a keynote

speech at his home in Berkeley, has extra credibility of analysis (provided his depth

of personal experience with racism as a Black man, despite his accomplishments),

his knowledge of how the Klu Klux Klan (and other proponents of White

Supremacy) operate.  California Newsreel - SOUL OF JUSTICE: THELTON
HENDERSON'S AMERICAN JOURNEY

> ("*He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when
> Medgar Evers was assassinated and when four little girls were killed in the Birmingham
> church bombing. In his role at the Justice Department, Henderson embodied the tension
> described by Andrew Young as being an "arm of the law in a sometimes lawless society.*")

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United
States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross
referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          11.11.24**

**27 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**





GEORGETOWN UNIVERSITY LAW CENTER

*Office of the Dean of Students*

February 28, 2019

George Austin
CA

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

*600 New Jersey Avenue NW   Washington DC 20001-2075*
*(202) 662-9066*

**29 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

## Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          10.16.24**

**30 ; Signed DECLARATION (direct evidence) in Accord with Judge Breyer's Order**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ), | Judicial Notice per **RULE 59 Motion on Judge CRB's Order**  Good Faith Complaint, Substantive Issues, Facts, evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do).**AMENDED (FAC) COMPLAINT** **In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence. |

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

## Notice: 2.7.25 at 10a.m. via Zoom

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**1**

Judicial Notice per Rule 59 Motion per Judge Breyer's Order on Defendant's Motion

## Table of Contents

| | |
|---|---|
| Intro | 2 |
| Georgetown violates Mr. Austin's 1981 rights | 6 |
| Georgetown violates Mr. Austin's Equal Protection | 19 |
| Mr. Austin's other claims are substantive | 22 |
| Mr. Austin's claims are new harms not barred by Res Judicata | 24 |
| Mr. Austin's should not be sanctioned per Supreme Court | 25 |

1.       Mr. Austin provides Judicial Notice that Judge Breyer makes 3 stunning errors in his first order on the Rule 59 Motion a. Mr. Austin *only pleads conduct from 7.15.21 to present* which has never had the opportunity to be heard on the merits, and began after termination of the first case b. Per the Supreme Court ongoing, future, conduct cannot be preemptively assumed, nor litigated, and is *not barred by Res Judiciata* ergo Mr. Austin *could not have failed to plead something that had not yet happened* c. Mr. Austin sought to prevent administrative, non-judicial, illegal interference from pre-determining outcome of cases (which is not allowable, and not vexatious, either).    Mr. Austin notices the **Friday, 2.7.25, at 10a.m. via Zoom** civil hearing for Rule 59 Motion to Amend, Alter or Reconsider within 28 days of Judge Breyer's order per Sanctions Motion under the Supreme Court's *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) ("Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing .. is … 28 days from entry of the judgment")

2.  Per the Supreme Court, and Ninth Circuit, there are at least 9 exceptions to judicial immunity (some of which create criminal liability as well as injunctive civil liability) 1. Non-judicial acts, generally 2.  Where a judge connives with one of the parties to predetermine the outcome of a judicial proceeding 3. Where a judge makes a vexatious litigant prefiling order 4. Where anyone including a judge

**2 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

engages in criminal activity like obstruction of justice, or accepting bribes 5. Where anyone including a judge violates a Citizen's, particularly a Black Citizen's ("whom are the targets of the amendments per *Brown v. Board*"), 14th (and 5th) Amendment rights to Due Process and Equal Protection which at minimum provides "a guarantee of fair procedure" and "equal protection of the laws." U.S. Const. amend. XIV, § 1 6. Where a Judge attempts to declare a Black person enslaved in violation of the thirteenth Amend- ment (or any of the rights enshrined therein) 7. Where a judge rapes a litigant (or other like harms) in violation of penal or civil code (and the Constitution) 8. Where a judge tortures, attempts to murder, or actually murders a litigant alone or in conspiracy with the Klu Klux Klan or other like domestic White Supremacist terrorist in violation of civil or penal code, 18 USC 241, 242, 245, etc. (and the Constitution) 9. Where a judge chooses to disregard the Constitution and become unfaithful to the oath and trust provided to them by the Citizenry._Per the US Supreme Court's *Pierson v. Ray 386 U.S. 547 (1967) "a judge who excluded*" Black People, or African Americans from Juries (and subsequently Due Process or Equal Protection of the laws) can be held liable under the Civil Rights Law meant to protect from that very behavior.   Typically judicial liability ensues only when the act is outside of what the Ninth Circuit's *Beard v. Udall* calls "a judicial act" (i.e. an administrative act) however (as noted above), the

US Supreme Court's *Pierson v. Ray* cautions:

> "a judge who excluded Negroes from juries [or like offenses to the Constitution] …. would be liable under the statute even if his actions were judicial."  Importantly, the Ninth Circuit's *Beard v. Udall 648 F.2d 1264 (9th Cir. 1981)* makes clear *"[I]f a judge connives with one of the parties to predetermine the outcome of a judicial proceeding, the other parties' expectations are frustrated. Id. Moreover, the court noted, an agreement by a judge to predetermine the outcome of a proceeding is "not a function normally performed by a judge."*

Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990) Cited 4,115 times*  Mr. Austin <u>should not</u> be sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying substantive, complaint and

**3 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*"when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.  An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

See also e.g.Wolfe v. Strankman, 392 F.3d 358, 367 (9th Cir. 2004) (*"complete relief is*

*available in an action against Chief Justice George in his administrative capacity*

*and Ms. Silva. We reverse the dismissal of Chief Justice George in his administrative*

*capacity and Ms. Silva, and we remand to the district court for further proceedings."*)

2.       Mr. Austin acts in good faith, follows well settled and 2023 Supreme Court's

precedent, and Georgetown school policy with this complaint as Georgetown

continues to violate the Equal Protection Clause, Title VI of the Civil Rights Act of

1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21 to present.

Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use of the

precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr. Austin,

"*implying inferiority in civil society"* originate from anti-Black propaganda of the

vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow

segregationist who inspired the Nazi's Third Reich (*How the Nazis Were Inspired by*
*Jim Crow | HISTORY; How American Racism Influenced Hitler | The New Yorker*
*; What America Taught the Nazis in the 1930s - The Atlantic;       The Impact Of*
*Racist Ideologies: Jim Crow And The Nuremberg Laws - Holocaust Museum)*

for  which Georgetown admits it took active part as an institution: Slavery archive.

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838.  These archival materials relate to the sale of 272 men, women, and children*

*by Rev. Thomas Mulledy in 1838*.).  See attached.  Georgetown's precise derogatory

stereotype usage is similar to defendant *Board of Education's* usage against

plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*

whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts

**4 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

(expressly promulgated as mandatory under Georgetown's policies), and not be treated in an inferior manner in civil society (creating Stigma) while doing so, in the context of higher education, whereas Georgetown violates *"....The words of the amendment,.[that].. contain …the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) use of derogatory stereotypes is per se illegal in a. business, b. the entire contractual relationship (*i.e. "to make or enforce a contract*), c. education (& d. other areas of society), because it *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making and 2. complaint procedures b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial *""stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist*

**5 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*presumptions], evaluating their thoughts and efforts -their very worth as citizens-*

*according to a criterion barred to the Government by history and the Constitution."*

*…. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is

Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people

[i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a.*

*Georgetown operates on the premise Black men are inferior to Whites and thus*

*Georgetown does not need to respect either their 1. 1981 rights to mandatory written*

*media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be*

*excluded from Campus Activity, or core programs like Campus Complaint*

*Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is*

*Black during the admissions process (i.e. Georgetown student ID, and usage of Mr.*

*Austin's image and likeness for commercial gain, marketing exploitation in*

*Georgetown advertisement, etc.) "ergo" c. Georgetown assumes anti-Black derogatory*

*stereotype applies to Mr. Austin's mandatory written media contract (and thus does*

*not make contract offer on same basis as Whites) and based on that flawed logic,*

*non-sequitur illogic, & per se illegal racist presumption, thus Georgetown willfully*

*ignores documentation-direct evidence, and continues to 1. refuse to make a*

*mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2*

*illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate,*

*correct Georgetown's per se illegal conduct, because he is Black, on the same basis as*

*Whites (whereas their rights in both areas are respected, and exercised)*].  Per the

2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows*

*of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are*

*infirm for a second reason as well: They require[d] stereotyping [*Mr. Austin by the

way they operate .. assuming " ess worthy", and "Inferiority"] *].. the very thing*

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**