Case No. **24-6943**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————————————

### GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

### GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: **53-0196603***)

———————————————————————

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

———————————————————————

## MR. AUSTIN'S (APPELLANT'S) EXCERPTS OF RECORD
## VOLUME 5 of 9

———————————————————————

Mr. George Jarvis Austin,

Plaintiff-Appellant (Self-represented)

2107 Montauban Ct., Stockton, CA

209.915.6304,

gaustin07@berkeley.edu

*presumptions], evaluating their thoughts and efforts -their very worth as citizens-*

*according to a criterion barred to the Government by history and the Constitution."*

*…. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is

Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people

[i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a.*

*Georgetown operates on the premise Black men are inferior to Whites and thus*

*Georgetown does not need to respect either their 1. 1981 rights to mandatory written*

*media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be*

*excluded from Campus Activity, or core programs like Campus Complaint*

*Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is*

*Black during the admissions process (i.e. Georgetown student ID, and usage of Mr.*

*Austin's image and likeness for commercial gain, marketing exploitation in*

*Georgetown advertisement, etc.) "<u>ergo</u>" c. Georgetown assumes anti-Black derogatory*

*stereotype applies to Mr. Austin's mandatory written media contract (and thus does*

*not make contract offer on same basis as Whites) and based on that flawed logic,*

*non-sequitur illogic, & <u>per se illegal racist presumption</u>, thus Georgetown willfully*

*ignores documentation-direct evidence, and continues to 1. refuse to make a*

*mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2*

*illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate,*

*correct Georgetown's per se illegal conduct, because he is Black, on the same basis as*

*Whites (whereas their rights in both areas are respected, and exercised)*].  Per the

2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows*

*of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are*

*infirm for a second reason as well: They require[d] stereotyping [*Mr. Austin by the

way they operate .. assuming " ess worthy", and "Inferiority"] *].. the very thing*

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.      Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

5.      Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr.*

**7 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."* This *"adult rather than a childhood disease"* demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White* Georgetown *students]."*

### Georgetown violates Mr. Austin's 1981 rights

6.    Mr. Austin cites to world renown <u>Thelton E. Henderson</u>, for the 1981 legal standard.  Because legendary Judge <u>Henderson</u> has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary <u>Judge Thelton Henderson</u>, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a keynote

speech at his home in Berkeley, has extra credibility of analysis (provided his depth

of personal experience with racism as a Black man, despite his accomplishments),

his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE:
THELTON HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when
> Medgar Evers was assassinated and when four little girls were killed in the Birmingham
> church bombing. In his role at the Justice Department, Henderson embodied the tension
> described by Andrew Young as being an "arm of the law in a sometimes lawless society."*)

7.     As an interesting aside, presiding Judge Judge Breyer's and Magistrate

Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

Questions for the record *"6…to faithfully and impartially apply the law in every*

*case, without regard to the type of matter or the identity of the parties … 7. …*

*treating every person who comes into the courtroom, whether they are litigants,*

*counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy.*

*The judge also must ensure that all parties in a case receive the opportunity to have*

*their arguments heard and fairly considered…The citizens of our country entrust*

*federal judges to dispense 'equal' justice under the law, and to decide cases by*

*applying controlling precedent to the facts of the cases before them, without regard to*

*any other considerations (including race)..."* also reflects the principle, and creed, of

*'Equal Opportunity'* which is not only central to the doctrine of equality as embodied

42 USC 1981, but which defendant Georgetown fundamentally, & egregiously,

violated (producing Mr. Austin's complaints) and violates in an ongoing manner.

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.      Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the process which deprived Mr. Austin's contract rights.   Mr. Austin is a high performing, accomplished, highly recruited, and high potential admitted Georgetown student who has 1981 right to contract, and Title VI Equal Protection rights just like everyone else, and fully expects to be treated on the same basis as Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to attend, as well as its own promulgated mandatory policies, and instructions demonstrates it knew better, but willfully, intentionally, intended to deprive Mr. Austin's mandated written media contract, and failed to correct once Mr. Austin made formal complaints, and excluded Mr. Austin's violating his Equal Protection rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.      Mr. Austin learned to perceive discriminatory animus, and embody "Equal Opportunity" non-discriminatory service attitude, through experience.  There are several ways to ascertain racial discriminatory animus.  Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or

**10 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service from the use of 'blind' or 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates) as well as how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

11.    When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: 1. with respect to their persons, as human beings, (and provided a head-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes), whereas they disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image,

**11 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

and likeness, was being used for commercial-marketing purposes because he is Black 2. knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black 3. Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black 4. An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity from Mr. Austin because he is Black 5. An opportunity to review the written contract offer before making the decision 6. An opportunity to agree to the terms of the contract offer 7. An opportunity to provide a counteroffer if terms were not acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

12.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.

**12 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact). Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.     Georgetown admits, *publicly,* that a student, or *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")*" can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

14.     When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook.georgetown.edu/ section4/a/)**  per

Georgetown written policy **"Procedures for Processing Grievances"** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3. IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

15      Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as

**14 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

all the previous steps in the process, because he is a Black Complainant  6.  The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

16.     Moreover, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr.

**15 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Austin (and completely excluded him from this Equal Protection required
procedure, and policy) because he is Black 12. The opportunity, and right, to have
complaint substance and evidence evaluated and ascertained by IDEAA's experts
for violations (and remedies), where IDEAA shall maintain documentation to
support the findings in its report, including, as applicable, written findings of fact,
transcripts, and audio recordings whereas  defendant Georgetown deprived that
opportunity for Mr. Austin (and completely excluded him from this Equal Protection
required procedure, and policy) because he is Black 13. The opportunity, and right,
to receive written notice from IDEAA as to their findings within thirty days of the
conclusion of the investigation for Whites,  whereas  defendant Georgetown
deprived that opportunity for Mr. Austin (and completely excluded him from this
Equal Protection required procedure, and policy) because he is Black.

17.　　Lastly, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are
provided: 14.  The opportunity, and right, to receive written notice from IDEAA of
not only the findings of the investigation, but instructions on next steps whether
those are appeal (if more information is needed) or corrective action if the
Investigation found violations of law and policy in accord with the complaint for
Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin
(and completely excluded him from this Equal Protection required procedure, and
policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward
its report findings to the Respondent's Executive Vice President or Senior Vice
President, or his or her designee, or other University officials (or their superiors if
they are the violators) consistent with the above provisions addressing
confidentiality to direct that prompt remedial action be taken to correct the

**16 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

situation for Whites , whereas  defendant Georgetown deprived that opportunity for

Mr. Austin (and completely excluded him from this Equal Protection required

procedure, and policy) because he is Black 16. The opportunity, and right, for

corrective actions to be imposed on Respondents, where IDEAA shall monitor their

implementation (and additional legal action outside of campus is still able to be

pursued especially when the limits of internal corrective measures do not remedy

the violations by Respondents), whereas  defendant Georgetown deprived that

opportunity for Mr. Austin (and completely excluded him from this Equal Protection

required procedure, and policy) because he is Black.

18.     Mr. Austin had no complaints against him, he simply inquired, and

complained as to why Georgetown 1. Violated school policy 2. Violated his

Constitutional rights to contract and 3. Why he was illegally excluded from

essential campus procedures for *"Any applicant for employment or admission,*

*current or former employee or student, or third party"* similarly situated Whites, or

Non-Black males, they provided Whites a set of mandatory steps **([faculty](#)**

**[handbook.georgetown.edu/ section4/a/](#))**  per Georgetown written policy

***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal

Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

19.     As Legendary Judge [Henderson](#) explains in *Walker v. Contra Costa County: a*

*"refusal to enter into … contract [on the same basis as Whites] is actionable under §*

*1981. In making this determination, a lower court should give a fair and natural*

*reading to the statutory phrase ` the same right[s] . . .[in "making, performance,*

*modification, and termination of contracts, and the enjoyment of all benefits,*

*privileges, terms, and conditions of the contractual relationship"], and should not*

**17 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*strain in an undue manner the language of § 1981…..."* Walker v. Contra Costa

County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in

*Walker v. Contra Costa County* Judge Henderson expounds on the elements, and

standards of proof, to survive Summary Judgment for a 1981 claim (at later stages

in the litigation process):

> *"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

20.    Mr. Austin 1. Is an African American or Black man who is  high achieving,

highly recruited, accomplished, high potential, and an admitted Georgetown

student (protected group[s]) 2. was & is qualified to make the contract (of sound

mind, admitted student, Georgetown took photo and sought to economically exploit

photo, and Georgetown already demonstrated it understood how to properly engage

in written contract when Mr. Austin deferred for a year to participate in Capital

Fellows, Senate Fellows Program *[with a written contract similarly required]* and

$400 consideration exchanged to solidify that contract) 3. Suffered adverse actions

(Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without

telling Mr. Austin, and when he confronted them on their violation still continued to

refuse to make a contract on the same basis as Whites because of Mr. Austin's race

or derogatory racial stereotypes presuming "inferiority" or "less worthy" by complet-

ely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to

contract remains open, and Mr. Austin has continued to follow up on the issue.

Further, per the fourth or fifth element, Whites, or non-Black admitted students,

**18 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (see para. 11-19; see attached; dckt. 75)

21.  In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly situated Whites, or Non-Black males, are provided via a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

22.     Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

**19 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*because he is an [African-American], the same opportunity to enter into contracts."*
Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016
(2020): Georgetown is a private offeror Mr. Austin is a private offeree, admitted
student (*who expects to be treated on the same basis as White, non-Black, admitted*
*students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th,*
*15th Amendments, and Civil Rights of 1964*). The only requirements for making a
Georgetown media contract, as an admitted student, is to a. Be an admitted student
on campus, & b. Have an organization desire to use your image, or likeness, to
market or economically exploit their product-service for their benefit. Unbeknownst
to Mr. Austin, Georgetown went out of its way to take and use his image and
likeness while he was an admitted student on campus to market or economically
exploit their product-service for their benefit, and thus fulfills all requirements "to
make" a contract. However, despite meeting all requirements, and following up to
make a contract, get an explanation as to why they violated the law, and school
policy in the first place, Georgetow illegally refuses to make a contract with Mr.
Austin because of his race, or derogatory racial stereotypes (as Georgetown
explicitly admits to Mr. Austin in both word, and deed). Georgetown violated
existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights
when it completely excluded Mr. Austin from essential campus IDEAA
services-procedures, illegally because Mr. Austin is a Black man.

### Georgetown violates Mr. Austin's Equal Protection

23. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494*
*(1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard*
*Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School*

**20 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

24.      Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-

**21 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the

contract offer process and 2. The IDEAA complaint process should be the same for

regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the*

*disfavored group as innately inferior and therefore as less worthy"—certainly may*

*confer Article III standing in discrimination cases."*

25.    Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290*

*(1998)* Georgetown's conduct provides for Equal Protection

*"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause".*

26.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25,*

*2023)* when a student is experiencing a violation of school policy and reports that

conduct to the appropriate University body, especially when the violation was by

someone or something under University control, then it's a violation of Equal

Protection to deny that student investigatory, or enforcement, services as a victim,

or survivor, of the violation whereas Plaintiff

*"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

### Mr. Austin's other claims are substantive

27.    Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3.

Georgetown induced contract formation with Mr. Austin as a student through

actual fraud, misstatements on its commitment to follow the law, misstatements

regarding its contract, misstatements regarding its own policies, and continues its

deceitful pattern in its ongoing pattern of *still* omitting material information after

**22 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

admitting its violations of its own policy, contract, and the law. 4. Georgetown

breached its duties of care toward an admitted Black male student and is negligent

in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating

conduct and b. Managing, correcting, or controlling their illegal, Equal Protection,

policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to

Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully

harmful conduct it could have easily avoided, and by its own policies were

mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's

cases (including this one) are neither meritless, nor groundless, and in fact are

rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California

Supreme Court Jurisprudence (and standards for factual pleading).

> "The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
> -   **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

> "We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
> -   **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)  Cited 304 times**

## <u>Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata</u>

28.     It is well settled law per the Supreme Court that ongoing conduct, which

cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George

Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without

Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING*

*MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135]*

*Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is

**23 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

the presumption).  The Notice terminated the case, its operative complaint, Mr.

Austin's First Amended Complaint **(FAC;**Dckt. 14**),** without need of court order

upon receipt.   Plaintiff's notice is controlling under Rule 41 of FRCP without need

of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice').  Finding that it is

"beyond debate that a dismissal under Rule 41 is effective on filing, no court order is

required, the parties are left as though no action had been brought, the defendant

can't complain, and the district court lacks jurisdiction to do anything about it"  See

e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)

This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard

causes of action.  Mr. Austin voluntarily withdrew or voluntarily (dismissed)

because of documented Due Process, Equal Protection non-judicial act violations

(without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR]  under Rule

41 of FRCP without need of Judicial Order.  Under Supreme Court's *Cooter Gel,*

provided these facts, *Defendant's motion shouldn't even be considered.*

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III,
Supreme Court recognized, well settled, discrete adverse, new, legal harms

29.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e.

Civ. Code 3344, privacy), nor did he refile the same exact case which causes of

action terminated with the 7.14.21 judgment-disposition per lack of diversity

jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown

University to an admitted Black male student *after 7.15.21*  to the present.  Neither

Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action

(outside of context setting up for the current, and ongoing, causes of action *after*

disposition of the previous case).  Mr. Austin has never been disciplined or in any

**24 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward). See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts,Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law (Alternatively, it is the right thing to do).  Thus, Mr. Austin should not be sanctioned.

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*
**s/ George Jarvis Austin          11.13.24**

---

**25 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**TOA - RULE 59 Motion on Judge CRB's Order**

Good Faith Complaint, Substantive Issues, Facts, Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do). **AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964,Title VI,**
**Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu, generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

## Table of Authorities

1.  *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) ("Rule 59(e) allows a litigant to file a "motion to alter or amend a judgment." The time for doing .. is … 28 days from entry of the judgment")

2.  *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times  "when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.   An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

3.  14th Amend. (Equal Protection Clause); Title VI of the Civil Rights Act of 1964, 42 USC 1981, FERPA, etc.

4.  *Brown v. Board of Education, 347 U.S. 483, 494 (1954),*

5.  *How the Nazis Were Inspired by Jim Crow | HISTORY;*

6.  *How American Racism Influenced Hitler | The New Yorker ;*

7.  *What America Taught the Nazis in the 1930s - The Atlantic;*

8.  *The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -Holocaust Museum)*

9.  Slavery archive. georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.*).

10. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)  "....The words of the amendment,.[that].. contain …the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

11. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens- according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."*

12. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [*Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] *].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

**2 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

13. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)

14. *NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge

   Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.

15. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

16. *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971)*"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."*

17. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*] refuses to extend to [an African-American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White* Georgetown *students]."*

   **Georgetown violates Mr. Austin's 1981 rights**

18. Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal standard.  Because legendary Judge Henderson has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts.  Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a

**3 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society.*")

19.  As an interesting aside, presiding Judge Judge Breyer's and Magistrate Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

20.  Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

21.  (dckt. 76).

22.  (dckt. 80).

23.  (dckt. 81).

24.  (dckt. 79).

25.  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020), …"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

26.  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr.

**4 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.  Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights. Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).

27.  Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

28.   Georgetown admits, *publicly,* that a student, or  *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")*" can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook. georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

29.  When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(facultyhandbook. georgetown.edu/ section4/a/)**  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or

non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3. IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

30. Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant 6. The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7. The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9. The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

31 Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

32.  Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15. The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

33.  Mr. Austin had no complaints against him, he simply inquired, and

**7 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

34.  As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase `the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."

35.  dckt. 75)

36.  **(faculty handbook.georgetown.edu/ section4/a/)**

37.  Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the *"private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):  Georgetown is a private offeror  Mr. Austin is a private offeree,

**8 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*). The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.  However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed). Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

## Georgetown violates Mr. Austin's Equal Protection

38. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

39. Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's)*

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

40. Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

41. Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that*

*required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## Mr. Austin's other claims are substantive

42. **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**
"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")

43. **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)  Cited 304 times**
"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"

## Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata

44. It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata. **Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption).  The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint **(FAC;**Dckt. 14)**,** without need of court order upon receipt. Plaintiff's notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice').

45. Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it"  See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)  This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard causes of action. Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR] under Rule 41 of FRCP without need of Judicial Order.  Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

**11 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete adverse, new, legal harms

46.  Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction. Instead, Mr. Austin filed a new case, with new Defendant harms of ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present.

47.  Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case). Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward). See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.

48.  Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

49.  Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts,Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law (Alternatively, it is the right thing to do). Thus, Mr. Austin should not be sanctioned.

### Signed, Under Penalty of Perjury.

*"I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin        11.11.24**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ), | **Proposed Order: RULE 59 Motion on Judge CRB's Order**<br><br>Good Faith Complaint, Substantive Issues, Facts, Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do).<br>**AMENDED (FAC) COMPLAINT**<br>**In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence. |
| v. | |
| GEORGETOWN UNIVERSITY, et. al. Defendants. (*Federal Tax Identification Number: 53-0196603*) | |

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

Proposed Order:  Rule 59 Motion per Judge Breyer's Order on Defendant's Motion

1.    The Court grants Mr. Austin's Rule 59 Motion to Amend, Alter or Reconsider

Judge Breyer's order regarding Defendant's Sanctions Motion under the Supreme

Court's *Banister v. Davis, 140 S. Ct. 1698, 1703 (2020)* which *"allows a litigant to*

*file a "motion to alter or amend a judgment." [in] ... 28 days from entry of the*

*judgment"*   Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384*

*(1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be sanctioned, *at all*, as he properly

withdrew, or voluntarily dismissed the underlying substantive, complaint and

"*when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a*

*collateral proceeding to examine whether the complaint is well grounded will stretch*

*out the matter long beyond the time in which either the plaintiff or the defendant*

*would otherwise want to litigate the merits of the claim.   An interpretation that can*

*only have the unfortunate consequences of encouraging the filing of sanction motions*

*and discouraging voluntary dismissals cannot be a sensible interpretation of Rules*

*that are designed "to secure the just, speedy, and inexpensive determination of every action."*

*Fed. Rule Civ. Proc. 1"*

2.    Mr. Austin demonstrates that he acts in good faith, follows well settled and

2023 Supreme Court's precedent, as well as Georgetown's own school policy with

this complaint whereas Mr. Austin documents, substantiates, and pleads that

Georgetown continues to violate the Equal Protection Clause, Title VI of the Civil

Rights Act of 1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21

to present.  Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),*

Georgetown's, use of the precise *"less worthy"* or *"inferior"* derogatory racist

stereotypes, against Mr. Austin, "*implying inferiority in civil society"* originate from

**2 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and the

staunchest Jim Crow segregationist who inspired the Nazi's Third Reich *(How the*

*Nazis Were Inspired by Jim Crow | HISTORY;   How American Racism Influenced*

*Hitler | The New Yorker ; What America Taught the Nazis in the 1930s - The*

*Atlantic;   The Impact Of Racist Ideologies: Jim Crow And The Nuremberg Laws -*

*Holocaust Museum)*

Georgetown admits it took active part, in the horrific crimes of enslavement of

Black Peoples, as part of the Black Holocaust, as an institution: Slavery archive.

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838.  These archival materials relate to the sale of 272 men, women, and children*

*by Rev. Thomas Mulledy in 1838.*).  See attached.  Georgetown's precise derogatory

stereotype usage is similar to defendant *Board of Education's* usage against

plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*

whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts

(expressly promulgated as mandatory under Georgetown's policies), and not be

treated in an inferior manner in civil society (creating Stigma) while doing so, in the

context of higher education, whereas Georgetown violates *"....The words of the*

*amendment,.[that].. contain …the right to exemption..from legal discriminations,*

*implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th,

14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023)* use of

derogatory stereotypes is <u>per se illegal</u> in a. business, b. the entire contractual

relationship (*i.e. "to make or enforce a contract"*), c. education (& d. other areas of

society), because it *"furthers "stereotypes that treat individuals as the product of*

**3 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*their race, evaluating their thoughts and efforts -their very worth as Citizens- according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [<u>co-extensive with sec. 1981</u>]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making with Mr. Austin and 2. complaint procedures with Mr. Austin b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial "*"stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens- according to a criterion barred to the Government by history and the Constitution." …. only "caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in*

**4 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*Georgetown advertisement, etc.) "<u>ergo</u>" c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & <u>per se illegal racist presumption</u>, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights, as Whites, in both areas are respected, and exercised)*].
Per the 2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [*Mr. Austin by the way they operate .. assuming " less worthy", and "Inferiority"] *].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.    Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague <u>Judge Haywood Gilliam</u> (although the order cited above spelled his name wrong) clerked for the <u>Legendary Judge Thelton Henderson</u>,; .<u>Gilliam Responses 9-17-14.pdf</u>.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still

**5 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding are legion. They have been handed down, not only by the Supreme Court of the United States, but, … throughout the nation."*

5.      Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.* Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr. Austin] fosters false concepts of racial [White] superiority and of racial [Black] inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather than a childhood disease."* This *"adult rather than a childhood disease"* demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White  Georgetown students]."*

## Georgetown violates Mr. Austin's 1981 rights

**6 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

6.      Mr. Austin cites to world renown Thelton E. Henderson, for the 1981 legal

standard.  Because legendary Judge Henderson has a particularly unique insight to

1981's operation, and personal understanding of how anti-Black racial animus

operates regardless of status or position in society (*as he experienced both subtle,*

*and not so subtle forms of anti-Black discriminatory animus even after his ascension*

*and success*) his analysis is particularly valuable under these facts.  Mr. Austin was

blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote

speakers to raise school funds for students in need (Mr. Austin had no personal gain

in the efforts, and was happy to share and help others):  Judge Henderson was

impressed after Mr. Austin's speech, and thereafter invited Mr. Austin back to his

home for a bit of Tea, Mentorship, and Wisdom.   Legendary Judge Thelton

Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin

gave a keynote speech at his home in Berkeley, has extra credibility of analysis

(provided his depth of personal experience with racism as a Black man, despite his

accomplishments), his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate.  California Newsreel - SOUL OF JUSTICE:

THELTON HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when*
> *Medgar Evers was assassinated and when four little girls were killed in the Birmingham*
> *church bombing. In his role at the Justice Department, Henderson embodied the tension*
> *described by Andrew Young as being an "arm of the law in a sometimes lawless society."*")

7.      As an interesting aside, presiding Judge Judge Breyer's and Magistrate

Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

**7 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

Questions for the record *"6…to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties … 7. … treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy. The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered…The citizens of our country entrust federal judges to dispense 'equal' justice under the law, and to decide cases by applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.      Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the process which deprived Mr. Austin's contract rights.   Mr. Austin is a high performing, accomplished, highly recruited, and high potential admitted Georgetown student who has 1981 right to contract, and Title VI Equal Protection rights just like everyone else, and fully expects to be treated on the same basis as Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to attend, as well as its own promulgated mandatory policies, and instructions demonstrates it knew better, but willfully, intentionally, intended to deprive Mr. Austin's mandated written media contract, and failed to correct once Mr. Austin

**8 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

made formal complaints, and excluded Mr. Austin, violating his Equal Protection rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.      Mr. Austin learned to perceive discriminatory animus, and embody "Equal Opportunity" non-discriminatory service attitude, through experience.  There are several ways to ascertain racial discriminatory animus.  Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service, from the use of 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates) as well as how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.     Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S.*

**9 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981,
Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and
engaged in a *"blatant deprivation of civil rights such as where a private offeror [in
this case Georgetown] refuses to extend to [an African- American, in this case Mr.
Austin], because he is an [African-American], the same opportunity to enter into
contracts he extends to White offerees [in this case White admitted students]."*

11.     When Defendant Georgetown made White, or Non-Black male, students
contract offers, they provided Whites: 1. with respect to their persons, as human
beings, (and provided a heads-up, or forewarning, that Georgetown desired to take a
photo of them and use it for commercial, marketing, purposes), whereas they
disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted,
and defrauded out of economic contract rights, or even knowledge that his image,
and likeness, was being used for commercial-marketing purposes because he is
Black 2. knowledge of what the photo was used for (and where it may be sent for
marketing purposes) for Whites, but hid knowledge, and fact photo was being used
at all (after already stealing rights from him) for Mr. Austin because he is Black 3.
Pre-approval of use of the photo by the non-Black male, or White students whereas
they didn't even think to ask Mr. Austin in disrespect of his overall person, and
rights to not give pre-approval because he is Black 4. An opportunity to accept or
decline the offer itself for Whites, whereas they stole the opportunity to make his
own choice, decline or accept, after already stealing economic-IP-rights of publicity
from Mr. Austin because he is Black 5. An opportunity to review the written
contract offer before making the decision 6. An opportunity to agree to the terms of
the contract offer 7. An opportunity to provide a counteroffer if terms were not

**10 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

12.    Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.    Georgetown admits, *publicly,* that a student, or  *"Any applicant for*

**11 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*employment or admission, current or former employee or student, or third party*

*(hereinafter referred to as "Complainant")*" can make a complaint via email or in

person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/**

Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin

did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981,

a set of mandatory steps *must* be done by IDEAA to avoid violating its own

Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook.**

**georgetown.edu/section4/a/**

14.     When Defendant Georgetown receives a complaint via email made by *"Any*

*applicant for employment or admission, current or former employee or student, or*

*third party"* similarly situated Whites, or Non-Black males, they provided Whites a

set of mandatory steps **(facultyhandbook.georgetown.edu/ section4/a/)**  per

Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be

done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI)

coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement

of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's

IDEAA needs more information to proceed through the Complaint process, whereas

they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is

Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black

males, but not only did not schedule an intake meeting for Mr. Austin, but failed to

even acknowledge the first step of complaint because Mr. Austin is Black

(demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any*

*applicant for employment or admission, current or former employee or student, or*

*third party"*  or human being) 3.  IDEAA staff provides a general understanding of

**12 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

the relevant policy and this grievance procedure as a normal part of intake for

Whites whereas they refuse to answer any questions about relevant policy or

procedure, and fail to provide any relevant information to Mr. Austin because he is

Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to

proceed either with an Informal Resolution or an Investigation of the responded for

Whites, whereas they failed to provide Mr. Austin with either opportunity, and

failed at the very beginning to acknowledge his humanity (by refusing to even

acknowledge his complaint to begin the process) because he is Black.

15      Further, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are

provided: 5. The opportunity at any time, even if informal resolution was initially

chosen, to request in writing to alternatively proceed to Investigation for Whites,

whereas this opportunity was deprived and not provided for Mr. Austin, as well as

all the previous steps in the process, because he is a Black Complainant  6.  The

opportunity to initiate a formal Complaint by providing a written signed statement

(via email) for Whites whereas they deprived this opportunity for Mr. Austin (and

all other steps because he is Black) 7.  The opportunity to provide any supporting

documentation, or evidence, to substantiate a formal Complaint (via email) for

Whites whereas they deprived this opportunity for Mr. Austin (and all other steps

because he is Black) 8. The opportunity to receive a written response from the

Respondent in 20 days or less after filing complaint, if they have one, as to why they

conducted themselves in that manner, violating the law or policy, for Whites,

whereas they deprived that opportunity for Mr. Austin (and completely excluded

him from this Equal Protection required procedure, and policy) because he is Black

9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10

**13 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

days, after receiving Respondent's response to the initial complaint for Whites, whereas whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

16.    Moreover, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

14 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion

17.     Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

18.     Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from

**15 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**faculty handbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

19.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981….."* Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005).  Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

"*E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract].*"

20.    Mr. Austin 1. Is an African American or Black man who is  high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound

**16 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required]* and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by completely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue. Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (see para. 11-19; see attached; dckt. [75])

21.  In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, … and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly

17 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion

situated Whites, or Non-Black males, are provided via a set of mandatory steps

**(faculty handbook.georgetown.edu/ section4/a/)** per Georgetown written

policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with

Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC

1981.

22.    Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined

with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant

Georgetown's conduct is "blatantly" racist whereas similarly situated White, or

non-Black, student offerees are made offers by Georgetown, respecting their person,

and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil*

*rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts."*

Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016

(2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted

student (*who expects to be treated on the same basis as White, non-Black, admitted*

*students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th,*

*15th Amendments, and Civil Rights of 1964*).   The only requirements for making a

Georgetown media contract, as an admitted student, is to a. Be an admitted student

on campus, & b. Have an organization desire to use your image, or likeness, to

market or economically exploit their product-service for their benefit.  Unbeknownst

to Mr. Austin, Georgetown went out of its way to take and use his image and

likeness while he was an admitted student on campus to market or economically

exploit their product-service for their benefit, and thus fulfills all requirements "to

**18 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

make" a contract. However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetow illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed). Georgetown violated existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA services-procedures, illegally because Mr. Austin is a Black man.

## <u>Georgetown violates Mr. Austin's Equal Protection</u>

23.     Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights when it completely excluded Mr. Austin from essential campus IDEAA to treat an admitted student, and Black man, in a derogatory manner to "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

24.     Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites, or

**19 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their rights to contract)* is doubly offensive to the Constitution of the United States because *"[Georgetown's customer service of process] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"* Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)* Georgetown confers their own perceived-presumed inferiority (or "stigma") of admitted Black (male) students (as both 1. the contract offer process and 2. The IDEAA complaint process should be the same for regardless of race) to create *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

25.     Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection *"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a*

**20 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

*…. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

26.     Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control, then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas Plaintiff *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## Mr. Austin's other claims are substantive

21 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion

27.     Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3.

Georgetown induced contract formation with Mr. Austin as a student through

actual fraud, misstatements on its commitment to follow the law, misstatements

regarding its contract, misstatements regarding its own policies, and continues its

deceitful pattern in its ongoing pattern of *still* omitting material information after

admitting its violations of its own policy, contract, and the law. 4. Georgetown

breached its duties of care toward an admitted Black male student and is negligent

in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating

conduct and b. Managing, correcting, or controlling their illegal, Equal Protection,

policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to

Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully

harmful conduct it could have easily avoided, and by its own policies were

mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's

cases (including this one) are neither meritless, nor groundless, and in fact are

rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California

Supreme Court Jurisprudence (and standards for factual pleading).

> "The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See
> Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there
> must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law");
> Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11
> sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument
> to extend, modify or reverse the law as it stands")
> -    **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

> "We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the
> contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's
> determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a
> plausible view of the law.'") (quoting comment to 1983 amendments"
> -    **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)  Cited 304 times**

## **Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata**

28.     It is well settled law per the Supreme Court that ongoing conduct, which

cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**22 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

**Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal (Without Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is the presumption). The Notice terminated the case, its operative complaint, Mr. Austin's First Amended Complaint **(FAC;**Dckt. 14)**,** without need of court order upon receipt. Plaintiff's notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice'). Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard causes of action. Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of documented Due Process, Equal Protection non-judicial act violations (without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR] under Rule 41 of FRCP without need of Judicial Order. Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't even be considered.*

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete adverse, new, legal harms
29. Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction. Instead, Mr. Austin filed a new case, with new Defendant harms of

23 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present.  Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case).  Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward).  See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*See attached*), and the process which deprived Mr. Austin's contract rights.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

30.    Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts, Direct evidence, per 2023 Supreme Court, and is experiencing facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) and is not vexatious per Supreme Court's *Cootergel* or any other controlling law. Alternatively, this action is the right thing to do.  Thus, Mr. Austin should not be sanctioned, and the Court grants Mr. Austin's Rule 59 Motion

**24 ; Rule 59 Motion in Accord with Judge Breyer's Order per Sanctions Motion**

to Amend, Alter or Reconsider Judge Breyer's order regarding Defendant's
Sanctions Motion under the Supreme Court's *Banister v. Davis, 140 S. Ct. 1698,
1703 (2020)* which *"allows a litigant to file a "motion to alter or amend a judgment."
[in] … 28 days from entry of the judgment"*  Per the Supreme Court's *Cooter Gell v.
Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115 times*  Mr. Austin <u>should not</u> be
sanctioned, *at all*, as he properly withdrew, or voluntarily dismissed the underlying
substantive, complaint and "*when a plaintiff has voluntarily dismissed a complaint
pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint
is well grounded will stretch out the matter long beyond the time in which either the
plaintiff or the defendant would otherwise want to litigate the merits of the claim.
An interpretation that can only have the unfortunate consequences of encouraging
the filing of sanction motions and discouraging voluntary dismissals cannot be a
sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive
determination of every action." Fed. Rule Civ. Proc. 1"* the Court grants Mr. Austin's
Rule 59 Motion.

**Judge Charles Breyer**  _____

**Date**  _____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GEORGE JARVIS AUSTIN, Plaintiff (*Admitted Student* ),

**Corporate Disclosures as of February 2025;  relevant entered Settlement per US Dept. of Education Owes Georgetown nothing In Honor of the** Civil Rights Act of 1964,Title VI, **Excluding Roman Numeral pages** (full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: **53-0196603***)

District Case No. **4:24-cv-00260-CRB (DMR)**
Appeal Case No. **24-6943**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an** *admitted* **Georgetown student, filing complaint(s) about Georgetown's** *ongoing* **1.** Equal Protection **2.** 42 USC 1981 **3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (***and other enumerated duties***) throughout the litigation, or settlement, phases of this legal process with** *$10 - $15* **million** *minimum* **Demand depending on structure, context and timing).**

**Mr. Austin is a** whistleblower**; As part of providing 'notice' of documented formal complaints to Georgetown** ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, **(showing** *"deliberate indifference; discriminatory animus"***)" included 50+ outside expert 'witnesses' including** ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, **and** whistleblowercoordinator.oig@ed.gov, **in real time.  See** Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

**Corporate Disclosure (*although Not Required for Self Represented*).**

A.      Mr. George Jarvis Austin discloses his relationship to Georgetown as an injured Black male admitted student, person.  Mr. Austin is a victim-survivor of Georgetown's ongoing per se illegal, facially discriminatory, racially exclusionary, Equal Protect- -ion (Title VI) violating, and derogatory disparate treatment (based on derogatory stereotypes).  See Operative Complaint dckt.14  Although, George--town has a history of enslavement of Black men, and people, Mr. Austin was not, and is not enslaved to anybody, nor any institution & definitely not Georgetown. Although Georgetown's behavior suggests that they believed they could expressly, and explicitly, violate Mr. Austin's 1981, Title VI, and Equal Protection rights as if he was enslaved to them on account of Mr. Austin's race, and perhaps sex too as a Black man, *(as compared to other non-Black, or White, admitted students*) even though this explicitly violates the US Constitution, Federal, State and District laws. See Operative Complaint dckt.14.  For Georgetown it appears old habits die hard, or not at all, slaveryarchive .georgetown.edu/

> (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 [Black; enslaved] men, women, and children by Rev. Thomas Mulledy in 1838.*).

See Operative Complaint dckt.14.  See also 42 U.S.C. § 1981

> ("(a) Statement of equal rights - All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by [W]hite citizens"...."make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.....(c) Protection against impairment....The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law...)

As a reminder here are some other key facts, and disclosures, as of February 2025.

## 1. Mr. Austin entered 2025 Settlement for Georgetown's illegal conduct

1.      The US Department of Education Independently Confirms & Verifies the Substance & Seriousness of Georgetown's violations as of February 2025.  The US Department of Education has declared Mr. Austin owes Georgetown University nothing based upon their conduct as reported to the Department of Education on or

EoR - 1005 of 2347

prior to 2022, offered Mr. Austin the opportunity to refuse, and Mr. Austin already

accepted, and entered into a Settlement contract.  The United States Department of

Education was made aware of Georgetown's initially known violations on or before

2022 and contacted Mr. Austin on, or before, January 2025.  I, Mr. Austin, declare

under penalty of perjury that based on just those underlying violations as shared

with the Department of Education at that time, alone (let alone the ongoing

violations included here, in this action) ***the Department of Education has***

***determined Georgetown's conduct is so egregious that anything owed them***

***by Mr. Austin, the student, is no longer owed as of January 2025 per their***

***official communication(s)***. The Department of Education not only affirms the

substance, seriousness, and illegality of Georgetown's conduct but further shows

through the cancellation of any, and all, debts owed by Mr. Austin, the student, the

very serious, and egregious, level of violations they, Georgetown, engaged in.

## 2.  U.S. Department of Education finds Georgetown's conduct egregious

2.    The U.S. Department of Education alerted Mr. Austin that based on

Georgetown's pre-2022 wrongs, illegal conduct, (including privacy, publicity, overall

context, etc.) as known, & shared, with US Department of Education, pre-2022,

found Georgetown's conduct so egregious that all, and any, debts owed Georgetown

(by student George Jarvis Austin) are erased, completely.  This conduct was not

simply an error here or there, but illustrates (as plead in this action) an overall

systemic failure by Georgetown on the front end (prior to violations), & backend,

self corrections (once violations were discovered, alerted of, complained about).

3 ; Corporate Disclosures as of February 2025.



"What law school in the country is better positioned to deal with the way the profession is going than Georgetown? We have connections to the corporate bar and criminal justice, and we have extensive clinics. We have been oriented to government and politics for decades. Wherever the legal market is going, what law school has more benchheads there than we do? This is a good place to be."

Daniel R. Ernst, Professor of Law.

# unique

## GEORGETOWN LAW

Combining a world-renowned faculty, a dedication to intellectual stimulation and community, and a location in the heart of the nation's capital, Georgetown is a **unique** place to study law.

### Legal Education in its Fullest Sense

Georgetown Law seeks not only to impart the tools of the lawyer's trade, but also to foster reflection and inquiry into the nature of law and the role and responsibility of lawyers in a global society. The goal is education in its fullest sense — not only mastery of "black letter law," but a sense of the philosophical, political, social and ethical dimensions of law, the awakening of an abiding curiosity about its nature and purposes, and the instilling of a sense of responsibility for its development and direction.

### A Dynamic Intellectual Community

Georgetown nurtures the very highest standards of scholarly inquiry, intellectual rigor and ethical behavior in a way that respects each student's individuality and fosters his or her particular interests and career goals. The result is a dynamic intellectual community, in which students have an unprecedented range of academic opportunities both inside and outside the classroom.

### An Unparalleled Vantage Point

Located in Washington, D.C., within blocks of the U.S. Congress that enacts laws, the Supreme Court that interprets them, and the administrative agencies that enforce them, Georgetown provides an unparalleled vantage point from which its faculty and students explore the dynamic legal processes of our nation and world.

**4 ; Corporate Disclosures as of February 2025.**



**GEORGETOWN UNIVERSITY LAW CENTER**

*Office of the Dean of Students*

February 28, 2019

George Austin
CA

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW   Washington DC 20001-2075
(202) 662-4066

**5 ; Corporate Disclosures as of February 2025.**

**3. Based on Georgetown's conduct Mr. Austin owes nothing per US Department of Education**

3.    It is worthwhile to restate that Georgetown's reported, and documented, conduct was so clearly illegal, based on the pre-2022 reported-known conduct (*let alone the ongoing violations included here, in this action*) that **the Department of Education has determined that anything owed them by Mr. Austin, the student, is no longer owed as of January 2025 per their official communication(s)**. This is valued at over $100,000+ per laws within the US Department of Education's wheelhouse.

**4. This is significant as the findings were based on substantiation of Mr. Austin's legal claims, factual description, and context (*as made aware to US ED prior to 2022*) and Demonstrates not only substance, but significance (*over 100K+ in value per laws in their wheelhouse*)**

4.    In these US Government findings, action, offer, and settlement agreement, the Department of Education is not only affirming the substance, seriousness, and illegality of Georgetown's conduct but further shows through the cancellation of any, and all, debts owed by Mr. Austin, the student, the very serious, and egregious, level of violations they, Georgetown, engaged (*and are engaging*) in. This is not only relevant to the pre-2022 conduct, as known then and reported to US Department of Education, but also shows the level of illegality, egregiousness, and wrongfulness of *ongoing* Georgetown conduct violating Mr. Austin's Constitutional, Federal, and State, rights in an *ongoing* manner (as plead in this action). Because the US Department of Education took these actions, not in a vacuum, but with access to tremendous amounts of Georgetown data-information, as well as Mr. Austin's information-data, in context of the pleadings, reports, etc. these US Government findings, action, offer, and settlement agreement, the Department of Education is not only an independent, informed, expert affirming the substance, seriousness, and

illegality of Georgetown's conduct but also showing they understand the value of the violations (*over $100,000+ just with regard to value per the laws directly in their wheelhouse*).

**5. Mr. Austin was not made aware of this settlement development prior to filing the case or it would have been included in the pleadings.**

5.     Mr. Austin was not aware of this settlement development until after already having filed this case.  Had he known he would have included this development into the pleadings, and evidence, on the front end.  However, Mr. Austin did alert Breyer, presiding judge, of this development within R.59 motion after Ryu, previous judge, recused herself.

**6. Mr. Austin is a high performing, accomplished, highly sought student**

6a.     Mr. Austin is a high achieving, highly recruited, accomplished, high potential, admitted Georgetown student who happens to be a Black man.  Mr. Austin is a person of great character, pristine, clean and clear background, identified as top 5% out of over 20,000 competitive students, admitted to 100% of all top tier undergraduate schools (including UCLA and Berkeley he applied to), did well at Berkeley, which he selected, and graduated. www.forbes.com/sites/madison fernandez/2021/09/08/why- berkeley-is -number-one/ ?sh=2bbb1b7a47e0 ]).  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023) ("*California amended its State Constitution to prohibit race-conscious college admissions in 1996…University of California, Berkeley, a top public university not just in California but also nationally…For example, the University of California purportedly recently admitted its "most diverse undergraduate class ever," despite California's ban on racial preferences. … UC Admits Largest, Most Diverse Class Ever, But It Was Harder To Get Accepted, L. A.*

*Times, July 20, 2021*") (FAC para.5).  Mr. Austin has straight As, & A+'s the last

nine semesters  (FAC para.5).  Mr. Austin regularly scores in the top 1% of

standardized testing for multiple exams, above 99% of test takers, (including the

LSAT) (FAC).  Mr. Austin is highly recruited for both professional and law schools.

6b.     Mr. Austin was awarded highest scholarship honors in multiple top tier

institutions as incentives for enrollment, as well as free application offers to nearly

every T-14 institution, by those institutions, due solely to Mr. Austin's proven,

documented, successful academic & professional track record, and accomplishments.

Georgetown was only one of many top tier options with whom Mr. Austin was made

offers to attend;  Because of Mr. Austin's already established built-in network in

DC, and surrounding locations, it became one of the more attractive East Coast

offers made to Mr. Austin, but still only one of many.  Separate from earning

acceptance to a variety of top tier schools, Mr. Austin also simultaneously earned

highly coveted spots in a variety of professional development programs, and top 10

paid fellowships (*based on his demonstrated leadership, work experience, and

academic excellence*).  For example, Mr. Austin Won (along with 17 others) a top 10

out of 820+, elite, uber- competitive Senate fellowship (1 of 64 Capital Fellowship

winners; *CA Senate*):

> "The now-25-year-old, along with fellow Stockton native George Austin, is receiving the opportunity to be at the
> forefront of state politics for 11 months starting in October after being chosen to be among 18 Senate Fellows as part
> of the state's Capital Fellows Program….. But being chosen for the program is no easy task…..The Capital Fellows
> program has twice been named one of the top 10 best internships alongside the likes of NASA, the Smithsonian
> Institution and Google Inc. Vault.com, a career-planning website that gave the Capital Fellows that top 10 placing
> out of 821 internship programs, bases its high-ranking selections on the all-around experience interns receive…."It's
> a rigorous program," Bunch said. "It's like a yearlong training for them, but they're not only doing an internship,
> they're also taking graduate courses."...There were more than 1,300 applications for the program each of the past
> two years. Only 64 people are chosen for the entire program."
>
> -   [www.recordnet.com/story/news/2012/09/08/just-one-fellows/ 49419856007/](http://www.recordnet.com/story/news/2012/09/08/just-one-fellows/49419856007/)






**9 ; Corporate Disclosures as of February 2025.**

6c.     As articulated above, Mr. Austin Earned, and Won in a  top 10 out of 820+ paid Fellowships per Vault and Forbes, in the CA Senate with the most competitive entry *(less than 4% acceptance rate nationwide, my year, for that program)*, as 1 of 18 selected winners (and 1 of 2 *winners* out of that area) www.recordnet.com/story/ news/2012/09/08/ just-one-fellows/49419856007/  Although, Mr. Austin was unavailable for press interview at the time he was still publicly celebrated and honored in the piece of over 400 elite competitors nation- wide, and Mr. Austin declined automatic job offer as part of the elite program selection process as I had already given my word to another commitment for which I  already deferred for an additional year.  As stated above Mr. Austin was accepted into multiple top tier law schools (including T-14), offered highest scholarship award honors from a variety of schools including, previous VP, Kamala Harris' alma mater (in San Francisco), and more recently was chosen as most outstanding student, as well as top ten business student ever (selected by professor with over 20 years experience).  Yet, Mr. Austin, (*an admitted Black male student, following Georgetown's publicly outlined policies, even after Georgetown's written admission to him that they violated their own written authorization agreement policy, and the law*) was outright intentionally, facially, and repeatedly, discriminated against by Georgetown in violation of Equal Protection, 42 USC 1981, 13th, 14th Amend. and (Title VI, on which Title IX was based).  See S-6

### 7. Georgetown made initial admitted student contract offer

7.     As mentioned, Georgetown is one of many elite schools that Mr. Austin earned admission, was offered admissions contracts, as well as scholarships, into a variety of schools (including the highest, or largest, available scholarships to

EoR - 1013 of 2347

a variety of schools). Georgetown made an initial contract offer to Mr. Austin.

**8. Georgetown advertises it follows the law, seeks the higher good for its admitted students (and others), & abides by its own policies**

8.      Prior to, and during, the student admissions, and scholarship, Georgetown contract offer process, Georgetown made several representations of fact to Mr. Austin to induce contract formation. Georgetown advertised in its brochures, its policies, and its websites (as well through its admissions representatives-recruiters) that a. It meticulously follows the law b. It meticulously follows its own policies c. It teaches, and models, great behavior and is an open environment to feedback, learning, and growth.   d. It follows, and seeks, the path to the higher good (as a parochial school of Catholic, Jesuit, principles) for its admitted students, its professionals, its surrounding environment, and community in light of being good stewards, teachers, and practitioners of the law. *As a practicing Christian, who loves everyone, and seeks to live my values not just on the Sabbath, but everyday, in all areas of my life, this was particularly important for me in their advertisements.*

**9. Georgetown advertised to induce making contract with Mr. Austin**

9a.      Georgetown's advertisements were specific, precise, and detailed to induce contract making with admitted high potential incoming students: specifically in this case, Mr. Austin. Georgetown's offer, and entire multi-year contract making process, itself was riddled with these advertisements. Mr. Austin began his student contract making process with Georgetown, after they made the initial advertise--ments, and contract offer, and consummated with $400 consideration for Georgetown's student contract. Mr. Austin entered into contract with $400 consideration based on Georgetown's promises, policies, and advertisements (including policies-law- advertisement that Georgetown explicitly requires a

separate written contract for any commercial use of a picture of an admitted

Georgetown student).  Mr. Austin did not choose Georgetown based simply on

ranking, historicity (est. 1789: *13 years after Founding of the US, at the hub*), or

prestige. He looked for the best opportunity to grow, learn, develop, be taught as a

man, human being, a Christian, & Black person as he already had tremendous

opportunities for financial gain, & material 'worldly' success, *without Georgetown.*

> "One thing I have asked of the LORD, that I will seek after, that I may dwell in the house of the LORD all the days of my life, to see the beauty of the LORD, and to inquire, in His temple."
> - **Psalms 27:4, attributed to David son of Jesse**
>    **(the Shepherd, like a Goatherd, who later became King).**

> " The words of the Preacher, the son of David, king in Jerusalem.
> 2 Vanity of vanities, saith the Preacher, vanity of vanities; all is vanity.
> 3 What profit hath a man of all his labour which he taketh under the sun?
>
> 4 One generation passeth away, and another generation cometh: but the earth abideth for ever…..
>
> 8 All things are full of labour; man cannot utter it: the eye is not satisfied with seeing, nor the ear filled with hearing.
> 9 The thing that hath been, it is that which shall be; and that which is done is that which shall be done: and there is no new thing under the sun…..
>
> 11 There is no remembrance of former things; neither shall there be any remembrance of things that are to come with those that shall come after.
> 12 I the Preacher was king over Israel in Jerusalem.
> 13 And I gave my heart to seek and search out by wisdom concerning all things that are done under heaven: this sore travail hath God given to the sons of man to be exercised therewith.
> 14 I have seen all the works that are done under the sun; and, behold, all is vanity and vexation of spirit."
> - **Psalms 27:4, attributed to Solomon, son of David, grandson of Jesse**
>    **(considered the wisest King who ruled through peace, not war & death).**

9b.    Mr. Austin seeks simply to Love the Lord with all his heart, mind, soul and

energy and Love his neighbors (as he Loves himself).  He doesn't worship money, or

the things money can buy for all flows from the Most High.  He does not worship

things that flow from the lust of the flesh, the lust of the eye, or the pride of life.  He

does not worship power, prestige, position, the false idol of White Supremacy, Racial

Bigotry, or Hate, nor anything man made, temporal, or non-eternal.  For Mr. Austin

knows we all have only feet of clay, and thus he seeks the One who formed the clay.

Mr. Austin knows to keep his eye on the Final Hour, as human life and all the

trinkets of money, prestige, power, on this side of Eternity, is fleeting, as the

*Psalmist* hymns like 'grass' or a 'flower of the field.'  Mr. Austin chose Georgetown to

grow, learn, develop, be taught as a man, human being, a Christian, & Black

person; not to be unknowingly exploited, discriminated against, and deceived.

9c.     However, despite Georgetown's explicit promises, they broke them, and the

laws their policies-promises were based upon.  Moreover, the underlying promise,

and associated feeling of an opportunity to grow, learn, enjoy the life of the mind,

with academic freedom, in private, (prior to practice) in a marketed controlled

environment that would not only accurately teach the law, but model good behavior

embodying those laws was completely broken.  Georgetown violated this promise,

and many other laws, policies, and advertised promises, not even to help Mr.

Austin, but to violate, or to harm, Mr. Austin (an admitted student) to his detri-

-ment, and disrespect.  Georgetown's *ongoing* Abuse of power against Mr. Austin,

and the typical communication style, or non-communication, that accompanies

typical abusers of power, highlight or better *'Spotlight'* Georgetown's illegal habit

pattern.  But for Georgetown's advertisements, policies, & promises Mr. Austin

would not have entered into a student contract with Georgetown.

**10. One particular set of contract promises, policies, and set of laws promulgated by GU is that any photography or recording of a GU student used for commercial purposes must be separately contracted for with students foreknowledge, consent, and written contract.**

10a.     Georgetown's  written contract mandate for all commercial or business use of

Media policy is one set of contract promises, express policies-law, that Georgetown

advertises, and admits, *publicly,* they owe duties to all admitted students regardless

of race.  Georgetown specifies that it owes the duty notify Mr. Austin prior to

filming or photographing him (for marketing or commercial purpose publicaffairs.

georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university

/ ) as part of Georgetown's *standard of care* to an admitted student (*as reflected in*

**13 ; Corporate Disclosures as of February 2025.**

*policies, statutes (which Georgetown's policies cross reference), common law, agency regulations and..common practice)* See S-10  With this explicit detailed policy, and publicly advertised promise, Georgetown admits, *publicly,* that they owed Mr. Austin the duty to obtain his *written* authorization *prior* to taking, or using, his photograph for Georgetown Business or commercial purposes (as part of their owed standard of care). See S-11

10b.    Georgetown admits, and knows, *publicly,* that a written authorization form to agree to business use of a photo is a contract, or contractual agreement (*between the person whose picture is being taken and the person or organization who is taking the picture for commercial purposes*). Georgetown requires *prior* approval of this contract by Georgetown's General Counsel, requires signed written authorization, (contract), *prior* to business use or it violates their privacy, publicity, and 1981 right to contract (when facially discriminatory; i.e. one policy for Black male students, and one for similarly situated non-Black male students).  See S-12  Georgetown admits, *publicly,* that this specific duty owed is part of Georgetown's *standard of care* to an admitted student; Georgetown must obtain *prior* written consent *from* the person being photographed for Georgetown business or commercial purpose. These set of promises, and policies, are reflected in 1. Georgetown's privacy policy as part of the student contract, and 2. Georgetown's Media policy.

10c.    Georgetown admits, *publicly,* that information regarding the breach or violation of the aforementioned duties is material to the person who was filmed or recorded; Georgetown admits this through its emphasis, explanation, and admissions of the current law's legal requirements that inform, guide, and direct, their publicly stated policy (*as well as Georgetown's own argument in what is*

**14 ; Corporate Disclosures as of February 2025.**

*considered the Court of second highest prestige under the Supreme Court of the United States;* S-14.. Further, Georgetown admits, *publicly,* that the 'commercial purpose' of the filming adds extra legal barriers, and creates additional material information needs for meeting of the minds, and written consent, with the person being filmed for business purposes (which would need to be included in the written authorization, and notice, *prior* to the filming or recording).

10d.   Georgetown admits that it commenced or consummated its admitted student contractual relationship with Mr. George Jarvis Austin, as an admitted student, with $400 payment from Mr. Austin and both parties', to the contract, agreement to the terms and conditions of Georgetown's standard contract with admitted students; S-16. Also, Georgetown admits, *publicly,* that as part of student contract, their mandatory policies (privacy, media, IDEAA, etc.)  and procedures must be followed by Georgetown or they in fact break the law, and incur legal liability (according to their own public declarations-admissions of fact).  Further, Georgetown admits, *publicly,* that *a material* part of their advertising *to induce* contract formation with incoming students is their commitment to follow the law, their own policies, and their own consummated student contracts. See S-18  Georgetown admits, *publicly,* through their own publications and protections of privacy, publicity, and other rights that these rights are in fact not only valuable, but essential, in the modern interconnected world we live in (and outline the precise steps needed regardless of race of person, or student, on their own websites, and informational resources).See S-19 Moreover, Georgetown *knew* it had a duty to inform Mr. Austin of the precise usage of his photo *prior* to using for business purposes which includes where they will be sent, how many, and how else may be utilized (I.e. websites, interactive

**15 ; Corporate Disclosures as of February 2025.**

forums etc.) so informed written consent, and mutual assent for contract, can be made.  Despite all of these promises, Georgetown broke them, purposefully, and continually fails to correct or take action as itself mandates in their *ongoing* wrongs.

## 11. **This mandatory contract is a separate written contract from the initial school and student contract for an admitted student**

11a.    Georgetown publicly specifies that methodology, and requirements, of their written authorization contract as a mandatory prerequisite to commercial or business usage of an admitted student's image (or likeness, etc.) See Operative Complaint dckt.14.  Georgetown itself admits, *publicly,* that not only must written authorization, as a contractual agreement, be signed by the student *prior* to use, but that the form itself *'must'* include certain information, (*including acknowledgement of 'consideration' per contract law;*) to be valid, and enforceable (and even includes an example photographic/ videographic release form for students in their continuing education programs; Georgetown's neighbor George Washington University publicly provides a comparative example for its own students). See S-22;   Georgetown itself admits, *publicly, (in its .. filming required steps ..*), that it holds itself to the same standards for students, faculty and staff.

*"too often they have stimulated their prejudices by referring to the [so called Negro; Black people] as **unworthy of consideration…..**"*

- **Carter Godwin Woodson, <u>1933</u>, The Mis-Education of the Negro.**

## 12. Georgetown takes time, <u>publicly advocates</u>, & expresses in writing how important, and valuable, these policies & laws are, in practice, not just theory (Georgetown outlines precise steps that must be taken, everytime, with every student).

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University……**<u>Georgetown complains that</u>** … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" …..

<u>Georgetown first raised its FERPA-based objections to the reporting obligations</u>"

- **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo"

- [studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa](studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa)

"**NOT "**permitting the release of education records . . . of students without the[ir] written consent (*i.e. reasonable expectation of privacy*)"

- **Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8** (D.D.C. Apr. 10, 2020)

[https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/](https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/) ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

[https://library.georgetown.edu/copyright/images-publications](https://library.georgetown.edu/copyright/images-publications) ("If you have a photograph with people in it, there may be [privacy or publicity rights](https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) ([https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html](https://www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html)) that need to be addressed…. '**The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:

- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:

- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

***<u>Make sure you have permission before using a person's image or likeness</u>**…..*"

- **Georgetown University Library**

## 12a.   Including some of the examples above, Georgetown themselves precisely outline, express, and advocate for, the importance, and (written) requirements for

**17 ; Corporate Disclosures as of February 2025.**

these rights, laws, and policies. The broad, but specific, categories of privacy violations that Georgetown themselves help to articulate as part of a reasonable expectation of privacy for students illustrate at least two ways that Georgetown specifically violated Mr. Austin's privacy, and publicity rights (*as well as Equal Protection , 42 USC 1981, Duties to not violate Deceit, Negligence and Bad Faith rights*); See S-49  Georgetown *knows* both DC's and California's jurisdictions affirm that Georgetown's conduct using an up close photo without his consent, nor knowledge, nor written agreement, was violative of Mr. Austin's privacy, media-commercial use, publicity, 1981 rights.  The Supreme Court repeatedly reaffirmed this position; See S-50.  Not only was Georgetown aware, but *admits*, and it is commonly understood that their conduct violated his reasonable expectation of privacy, especially as an admitted student in the forum state of California. See S-51

12b.    Nationally, it is clear,(codified in various forms), that Georgetown's conduct violates privacy, publicity, 1981 rights for admitted students; See  S-52  Georgetown already *publicly* admits it; Yet, another way to ascertain common understandings of a reasonable expectation of privacy is a comparative approach perusing similar privacy protected information, in similar contextual frameworks, to discern the metes & bounds of our zones of protected information; See S-53  As Georgetown *publicly admits* privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable; See S-54  Georgetown not only violated privacy, publicity, 1981 rights of Mr. Austin, but also purposefully availed (again without Mr. Austin's knowledge, nor consent) under *Mavrix Photo v. Brand Techs* when it a. specifically targeted Mr.

Austin's forum state of California (utilizing his up close photo without his consent,

nor knowledge b. Did "something more" including multiple mailed physical copies,

*likely thousands*, of advertisements to forum state, and presented physical copies

including said privacy, 1981(contract) violating photo of Mr. Austin, and separately

maintained interactive website for advertising, commercial, purpose of a multi-

billion dollar organization; See S-55**.**  Georgetown knew what it was doing to

purposefully violate Mr. Austin, and his rights as a Black person, human being, and

admitted student in nearly every way they possibly could (shows repeated animus).

13. **These rights are so important that the 2023 Supreme Court unanim-**
    **-ously overturned the 9th Circuit in favor of the plaintiff whose com-**
    **-mercial use rights, analogous to rights of publicity, were violated.**

13a.    These rights are so important the 2023 Supreme Court unanimously

overturned the Ninth Circuit in favor of a plaintiff whose commercial image-

likeness rights, analogous to rights of publicity, were being violated: On June 8,

2023, Justice Kagan delivered the unanimous opinion for the Supreme Court of the

United States who unanimously sided with Jack Daniel's and overturned the Ninth

Circuit in a trademark infringement and dilution case stemming from VIP Products'

"Bad Spaniels," a novelty dog toy that intentionally parodied Jack Daniel's iconic

'Tennessee whiskey' bottle and label elements.  See Jack Daniel's Props. v. VIP

Prods., 143 S. Ct. 1578, 216 L. Ed. 2d 161 (2023)  The decision clarifies that when a

parody of another's trademark is used as a trademark, the use does not qualify as

"noncommercial." Georgetown has already *publicly* admitted the inherent harms of

their conduct in violation of their media, privacy (publicity) and written

authorization policy, and the Supreme Court highlights a 'smooth' analogy to a

person's right of publicity, as a trademark is "any word, name, symbol, or device, or

any combination thereof" used to "identify and dis -tinguish" one's goods-service (*shows harm in purely legal context*); See S-48.  Georgetown also specifies and acknowledges that it is commercial business usage, and even includes a price-cost on the brochure for the brochure itself (outside of the product-service being sold).

13b.   Also, similar to the right of publicity, trademarks perform a key function of identifying the source of a product, thus enabling businesses (or person, in context of publicity rights) to build goodwill and consumer recognition with high quality products and are an essential tool in any businesses' intellectual property arsenal. Analogous to violations of right of publicity, a Trademark infringement is the unauthorized use of a trademark.  As The Court, per Justice Kavanaugh, articulated in *TransUnion LLC v. Ramirez* "a plaintiff searching for a "common-law analogue for their asserted injury" need not identify "an exact duplicate." TransUnion, 141 S. Ct. at 2204. But the plaintiff's alleged injury must still have a "close relationship" to a traditionally recognized harm."   Mr. Austin's right of publicity (and privacy) is a close analogue, in this case statutory (and common law), a similar harm, to Jack Daniels *'Tennessee Whiskey."*

## 14. Georgetown takes pains not only to outline the policy itself, per its own website, and materials, but traces the legal requirements to Federal, State, and District of Columbia laws, and precedent.

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:

- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or

**20 ; Corporate Disclosures as of February 2025.**

- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:

- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

***Make sure you have permission before using a person's image or likeness*** *....."*

- **Georgetown University Library**

14.     Per Georgetown, (i.e. FAC para.111.), <u>written authorization requires</u> Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with <u>General Counsel</u> approval of form f. signature consenting *prior* to use (and this is regardless of the race of the person's whose picture is being taken).  Per Georgetown, <u>written authorization requires</u> a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use.  <u>Policy for Filming at Georgetown University | The Office of Public Affairs | Georgetown University</u>

**(...***University …. marketing and promotional materials. Relevant model/image releases* <u>***must be signed by all identifiable subjects***</u>*….You* <u>***may not film a person in an identifiable manner unless you first have obtained that person's express consent. If the person is a Georgetown student, you***</u> <u>***must use a written consent form***</u> *that has been approved in advance by the Office of the General Counsel.)*

15. **Georgetown, not only did not get Mr. Austin's consent, Georgetown <u>didn't even have the decency to tell him</u> of their violations, nor to self correct;  Someone outside of Georgetown had to alert me, then GU admitted violations, but still failed to correct ongoing violations.**

15a.     Georgetown did not have the decency to tell Mr. Austin of their violations, and would not have told him had it not been for a UC Berkeley student who let mr. Austin know:  Prior to 2019, A fellow student of University of California Berkeley

**21 ; Corporate Disclosures as of February 2025.**

discovered, and alerted Mr. Austin that his image and likeness was being used for commercial purposes by Georgetown, in California as 1 of its top recruiting markets.  It was more recently revealed it was likely with thousands of physical brochures, and an interactive website, both with his close up, readily identifiable, photo (*to help Georgetown generate Billions of dollars in annual revenue*.  The fellow student alerted his photo was being used to promote, market, or sell Georgetown without his knowledge, nor consent (Commercial Use) to violate his privacy, publicity and other rights.  Mr. Austin is a human being, a citizen, and an admitted student at Georgetown University, and other elite institutions of law, with active and ongoing rights to 1. Equal Protection, 14th Amend, Title VI, 2. 42 USC 1981, 13th Amend. 3. not be deceived or defrauded (out of privacy, publicity., property, 1981, or others rights), 4 & 5. not have duties breached or violated maliciously through bad faith or negligently as a person or human being. See S-8

15b.    Georgetown never informed, nor obtained written, or *any*, authorization from Mr. Austin.  Outside of a litigation context, Mr. Austin thereafter followed up with Georgetown to which they initially denied use of his image or likeness was true. Mr. Austin sought verification of violations and had no way of knowing if true or authentic (as several organizations he initially reached out to verify would not confirm, nor deny). However, they later admitted their violations by sending him the same physical copies, to California, already discovered by a fellow UC Berkeley student, with a letter by Georgetown leadership admitting their violations in 2019. From the date of that letter till now, quickly approaching 5 years, Mr. Austin has diligently followed up with Georgetown leadership, with over 300+ witnesses, and 100+ formal complaints made to Georgetown's appropriate divisions, (*IDEAA,*

*President Office, etc.*) outside of the litigation context, to proactively address and solve the issues at hand (including getting the specific numbers of physical commercial brochures sent, where, and to whom).  Specifically, Mr. Austin emailed and faxed IDEAA complaints, with other leadership cc'd,.  Mr. Austin formally complained. Georgetown leadership violated school policies, standards of care, statutes, customs, and laws. Mr. Austin had no idea, nor anyway to predict, they would continually conduct themselves in this illegal manner up to the present, 2025 (and would have preferred to solve outside of a litigation context) Georgetown has *not* responded, *or* acknowledged complaint(s) *but made several admissions of fact.* Georgetown admits they at least twice used Mr. Austin's photo for business purposes without obtaining written consent, nor 'Consideration,' nor notice provision in violation of student contract, the law, and *publicly* stated policies.  Also, Georgetown admits they in fact never disclosed, notified, nor obtained written consent from Mr. Austin, *ever*;  Georgetown knows Mr. Austin Identifies as Black-African American, takes pride,& joy, in his heritage, and respects himself, as well as his rights to contract. See S-24 ;  But, Georgetown showed disrespect in that they did not tell Mr. Austin of their violations, until after, & did not self correct.

### 16. The mandatory written contract requires Georgetown to abide by 42 USC 1981 standards for non-discriminatory contract making

16a.   Georgetown *publicly* admits written authorization requires Mr. Austin's *prior* a. notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. & Georgetown General Counsel approval of form and f. his signature consenting to it *prior* to its use.  Georgetown *admits* it had none of the above (as *first* acknowledgement of its use was in the 2019 letter *after the fact).*  Per *42 U.S.C. §*

*1981 (EFFECTIVE DATE OF 1991 AMENDMENT Pub. L. 102-166, §402, 105 Stat. 1099)*, the entire contract formation, and making, process (i.e. "make and enforce contracts:" *"making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"*) is secured by 42 USC 1981, and protected against discriminatory Georgetown conduct harming Mr. Austin on the front end of the spectrum in the "making." See 42 U.S.C. § 1981.  Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African-American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*  Because Georgetown deviated from the standard, explicitly stated, steps for 'making' a mandatory written contract with all admitted students whose image or likeness is used for commercial or business purposes, and deviated in the negative on account of Mr. Austin's race, they showed Mr. Austin racial animus by their conduct.

16b.    In fact, Georgetown knows, and admits, *publicly,* that they are liable under 42 USC 1981 because as an organization they continue to *refuse* to contract in facially discriminatory manner, when they are obligated to contract under the circumstances (i.e. *when exploiting a Black male admitted student's picture for business purposes as Georgetown did without Mr. Austin's written authorization*) See

S-25.  Georgetown *publicly* admits that enslavement of Black people in this country,

which Georgetown personally partook in, was in part exploitation of Black people

*without even considering* Black people's rights or needs; This is a similar pattern to

how Georgetown behaved in exploiting Mr. Austin's right to contract (i.e. violated

written authorization agreement requirements in reference to his person, privacy,

publicity, etc.) with absolutely no consideration of his rights (as Georgetown

explicitly outlines, defines, and explains), his needs, his understand or meeting of

the minds, and definitely not his written authorization and contract; 42 USC 1981

had to explicitly state Black men, and people, have the same right to contract as a

White man (or "White citizens" to be precise) because racism, & discrimination built

in the assumption of inferiority and presumed it could take from Black people

without 'consideration,' nor 'mutual assent,' but instead by force.

See S-26  See also 42 U.S.C. § 1981

> ("(a) Statement of equal rights - All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by [W]hite citizens"…."make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship…..(c) Protection against impairment….The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law…)

## 17. Georgetown's standard for White, or non-Black, admitted students

17a.  As stated above, and in the Operative Complaint, A typical Georgetown

media (film) policy, and business use process, for similarly situated non-Black male

admitted students would entail 1. Providing notice of the photo(s) being taken *prior

to business use* 2. Providing notice of potential uses of photo *prior to use* (as outlined

in agreement) 3. Presenting subject of photo(s) with contract for purpose of

obtaining informed consent 4. Presenting subject of photo(s) contract with

'consideration' defined-included as required per contract law 5. Obtaining written

**25 ; Corporate Disclosures as of February 2025.**

authorization *prior to business use.*; S-56; See Operative Complaint dckt.14.

17b.    Georgetown is well aware of its admitted student's role in helping shape the

future of our Nation, and the World, in the Public Sector, *and elsewhere*, as one of a

very few schools with at least (one) 1, and perhaps (two) 2, US President(s)

(POTUS) listed as alumni, or previous students, and the second highest feeder to

members of the United States Legislature, behind Harvard, as well as Private

Sector, NGOs, etc.  The rigorous, scrutinizing, and elite admissions process fills its

student body with high potential leaders who in fact, not just theory, fundamentally

impact World, Domestic, State, and Local affairs in all sectors of our Economy.

Principally because of this key developmental-exploratory period in a person's,

admitted students', life and every admitted student's high potential for positive

impact, it is essential to protect not only their privacy, and publicity rights, but

Equal Protection and 13th Amend., or 1981 rights to contract as students do not

"shed their constitutional rights .. at the schoolhouse gate" per *Tinker*. ; See S-57;

Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969);

## 18. Per 42 USC 1981 Georgetown may not deviate from its standard on account of, because of, due to, race, and definitely not in the negative

18a.    The 2023 US Supreme made clear, and explicit, that no institution may

subject one student of one race to a different, policy, process, or set of exclusions

than another of a different race.  Per *Students for Fair Admissions, Inc. v. President*

*& Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's

conduct which admits, explicitly, to both a. treating Black men as 'inferior' or 'less

worthy' (*presuming derogatory stereotype to deprive making a contract, at all, when*

*required, let alone in the same manner as 'white [admitted student] citizens'* ), or b.

Treating Whites, or non-Black men, as 'superior' or more worthy (*ensuring Whites*

*had opportunity to review, decline, counteroffer, or accept proposed Georgetown*

*contract offer, let alone not presuming derogatory stereotypes to deprive Whites their*

*rights to contract)* is doubly offensive to the US Constitution because:

> "[Georgetown's complaint & contract making] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's] twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype.... [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"

Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)*

Georgetown confers their own perceived- presumed inferiority (or "stigma") of

admitted Black (male) students (as both 1. the contract offer process and 2. The

IDEAA complaint process should be the same for regardless of race) to create

> *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

18b.    Mr. Austin is the Black person, admitted student, and offeree whose

economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by

Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the

process which deprived Mr. Austin's contract rights.   Mr. Austin is a high

performing, accomplished, highly recruited, and high potential admitted

Georgetown student who has 1981 right to contract, and Title VI Equal Protection

rights just like everyone else, and fully expects to be treated on the same basis as

'Whites' or "White citizens", but was not (dckt. 76).  See attached  Georgetown's

initial written offer to attend, as well as its own promulgated mandatory policies,

and instructions demonstrates it knew better, but willfully, intentionally, intended

to deprive Mr. Austin's mandated written media contract, and failed to correct once

Mr. Austin made formal complaints, and excluded Mr. Austin from essential campus

resources available to other non-Black, or White, admitted students of other races,

violating his Equal Protection rights (showing deliberate indifference; dckt. 80). See

attached.   Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

18c.   Mr. Austin learned to perceive discriminatory animus, and embody "Equal Opportunity" non-discriminatory service attitude, through experience.   There are several ways to ascertain racial discriminatory animus.  Some of the ways applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior, or superior policies, to certain groups because of, due to, or on account of race (*i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy*) c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereotypes (*both offensive to the Constitution*) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (*in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context*) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service from personal 4 year experience (in his first W-2, stock awarding, job) with their use of 'blind' or 'volunteer' testers (like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service including non-discriminatory mandates);  He also learned how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

18d.   Per US Supreme Court's *General Building Contractors Assn., Inc. v.*

EoR - 1031 of 2347

*Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."* Georgetown violates 42 USC 1981 by a. literally depriving Mr. Austin's rights to contract before and after exploitation of his image or likeness for business purposes in refusing to even offer a contract, *as mandated* (written authorization agreement) in the same way similarly situated non-Black male admitted students are offered, in violation of their own *publicly* stated filming policy, b. Subjecting Mr. Austin to separate, facially discriminatory, unequal student contract policy conduct for Black male admitted students to their detriment.

18e.   Georgetown's blatant violations of 1981 by failing to offer mandatory contract, per Georgetown themselves, in the same way as for "Whites" impermissibly used race to deprive Mr. Austin's 42 USC 1981 rights because he is Black.  Further, Georgetown impermissibly used race to deprive Mr. Austin's section 1981 contract rights making clear Georgetown employs one set of essential policies for Black male admitted students, to their detriment, and another for non-Black male, or White, admitted students to their unfair advantage; See S-107 *;* Also, Georgetown's different 1981, privacy, publicity, media and complaint policies for Black men, and facially discriminatory policies based on impermissible use of race, or derogatory racial stereotypes, for Black male admitted students vs.similarly

situated non-Black male admitted students highlights this very straightforward, and promising, section 1981 claim.See para. 8-81; 12-..15,56; S-108

18f.    Georgetown's violation of sec.1981 right "to make" contracts (*written auth--orization agreement; required*) is such a blatant violation that the more limited 1981 language would encapsulate this scenario as Georgetown's conduct deprived Mr. Austin's contract rights even prior to 1991 Congressional expansive language clarification expressed in *Patterson v. McLean Cred.Union;* See S-109  Georgetown admits, *publicly,* that when an organization *refuses* to contract in facially discriminatory manner, (i.e. obligated to contract)  they violate 1981 even prior to Congress' more expansive language beyond just "make and enforce" terminology. (i.e. *when exploiting a student's picture for business purposes as Georgetown did without Mr. Austin's written authorization*); See S-110  Georgetown *publicly* admits, that written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  George- -town *admits* it had none of the above.  Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin).See S-111 No offer, no acceptance, no consideration, nor signature (per required written authorization), then no contract and thus Georgetown's absolutely clear, and 'blatant' violation(s);

18g.    Georgetown went out of its way to violate every related Georgetown *publicly listed* policy-law (i.e. mandatory written authorization agreement) while exploiting Mr. Austin's image, for business purposes to *intentionally*-literally deprive Mr. Austin's 1981 right to contract because he is a Black man and admitted student,

while providing unfair advantages with limited resources to similarly situated non-Black male, or White, students.  See para. 8-81; 20-25; See S-112;  Georgetown violates 1981, in one of the most *"blatant deprivations of civil rights,"* by refusing to offer Mr. Austin a contract because he is a Black male student, on the same basis as non-Black male, or White, similarly situated offerrees (while Georgetown admits-exploiting Mr. Austin's image for pecuniary gain without his knowledge, nor consent as Georgetown themselves, and the law publicly mandates); See S-113 Because both the law, and Georgetown's own explicitly stated policy requires notice to Mr. Austin, disclosure to Mr. Austin of possible usage for mutual assent, offer or presentation of contract (written authorization), and contract signature, *prior to* Georgetown's business usage of Mr. Austin's likeness or photo they literally deprived his right to contract (in the most 'blatant' or obvious way possible) by not doing the required process, or steps (nor obtaining written consent-contract agreement).  See Operative Complaint (FAC;Dckt. 14)  Further, because those steps are the steps a non-Black, or White, similarly situated student would be offered, and Georgetown chose to employ a separate and unequal process, or policy, for Mr. Austin to his detriment, Georgetown discriminated against him. See Operative Complaint (FAC;Dckt. 14) Moreover, because they continue to employ this facially discriminatory policy to date, despite having numerous opportunities to self correct Georgetown made clear their intent to discriminate, and  "but for" Mr. Austin's race he would have been offered a contract the same way non-Black, or White, similarly situated offerees would be offered.  See Operative Complaint (FAC;Dckt. 14)

**19. Georgetown's 42 USC 1981 contract violations are 1. in prospective media publicity rights contract by not making offers to similarly situated would- be offeree, Mr. Austin, because he is Black & 2. disparate treatment in the existing consummated student contract.**

19a.  Georgetown violates 42 USC 1981 by treating Mr. Austin in an inferior

manner in violation of a. its consummated student contractual mandates, b. its own

privacy, IDEAA, and c. other policies, as compared to similarly situated non-Black

male students.  The Originalist prohibition on Anti-Black intentional discrimination

in sec.1981, and 13th Amend.., is coextensive with Equal Protection per 2023

Supreme Court, and sheds light on Georgetown's precise use of anti-Black

derogatory treatment based explicitly on race, or racial stereotypes to both a.

illegally give similarly situated non-Black male admitted students unfair advantage

in resolving their complaints throughout their educational process and b.

intentionally disadvantage Mr. Austin, a Black or African-American male admitted

student, preemptively depriving Mr. Austin of, opportunity, right to make and

enforce, etc., a contract; See S-115  Georgetown chose to exploit Mr. Austin's image

and rights for commercial or business purpose without consideration of his

personhood, nor rights (*including contract*) under sec. 1981 because he is a Black

man (*echoing the pattern of the enslavement period toward Black people*). See

Operative Complaint (FAC;Dckt. 14); See S-116

19b.  Georgetown's written admitted choice, in 2019, to violate Mr. Austin's rights

to contract, privacy, and publicity, in a racially intentionally discriminatory manner,

in violation of its mandatory written authorization agreement policy  already

marked Mr. Austin with a badge of inferiority (w*ith an 'evil eye and unequal hand"*

*to his detriment despite having a state sanctioned obligation to teach, model, and be*

*good stewards of the law, not to illegal exploit students, on account of race, for*

*commercial gain without their knowledge*).; The badge of inferiority violating Mr.

Austin's right to contract is part of the *"badges and incidents of slavery"* with

Georgetown taking the role as attempted enslaver, or presumed enslaver, because

Black persons' contract, and other rights were routinely racially abused, or ignored

altogether during the enslave -ment period (to connote presumed "inferiority") in

the same manner, and pattern Georgetown shows. See (FAC;Dckt. 14) See S-117

Georgetown's discriminatory animus is not just shown in *failing to 'make' a contract*

*when required to do so* with written authorization agreement (*before and after*

*already exploiting Mr. Austin's image for commercial gain, or business purposes*), but

in the discriminatory or disparate treatment after consummating the student

contract by depriving essential benefits of the agreement, and subjecting to

different, facially discriminatory policy as compared to similarly situated non-Black,

or White, students. See Operative Complaint (FAC;Dckt. 14); See S-118

19c.     Georgetown's conduct toward Mr. Austin violates multiple sections of the

broad definition of 42 USC 1981 with its disparate privacy, publicity, contract,

IDEAA (anti-discrimination), policies.  See S-119   Georgetown's deprivation of

rights to contract toward Mr. Austin, as a student, is highlighted in Georgetown's

refusal to follow its own policies *(in the full language of 'make and enforce contracts'*

*including the making, performance, modification, and termination of contracts, and*

*the enjoyment of all benefits, privileges, terms, and conditions of the contractual*

*relationship.")*  Thus, the Court note, and cite, as evidence of evidence the fact that

Defendant repeatedly failed, and fails, to follow its own privacy, media, contract,

publicity, IDEAA, etc. policies as direct evidence of discriminatory intent can be

inferred from an organization's failure to follow its own policy.; See S-120; See

Operative Complaint (FAC;Dckt. 14)  One of the more obvious failures to follow

their own policy, showing discriminatory animus or intent, is Georgetown's abject

failure to abide by *any* of their **mandatory** steps in IDEAA conflict resolution

policy (I-V).  Georgetown admits, *publicly,* that a student, or *"Any applicant for*

*employment or admission, current or former employee or student, or third party*

*(hereinafter referred to as "Complainant")"* can make a complaint via email or in

person, and is encouraged to do so;  Further, Georgetown admits, *publicly,* that once

complaint is made via email, as Mr. Austin did, a set of mandatory steps *must* be

done by IDEAA to avoid violating its own policies or the law that informs and

undergirds IDEAA; S-121; See Operative Complaint (FAC;Dckt. 14)

19d.    Georgetown admits, *publicly,* that facially discriminatory conduct, by

administrators, faculty or staff to the detriment of a student, particularly a Black

male student in this case, is especially concerning and according to their policy is of

the highest priority, yet they themselves discriminated by not even taking a first

step to acknowledge, let alone investigate and correct an administrators written

admission of serious, illegal, school policy, and legal violations, which harmed, and

continues to harm, an admitted Black male student showing discriminatory animus

towards him.; See Operative Complaint (FAC;Dckt. 14); S-122  Georgetown admits,

per Mitch Bailin's, and Georgetown's President's Office, Vice President's Office,

General Counsel's Office, and other leadership's *lack of response nor answers,*

despite over 100+ formal written complaints in front of over 300+ separate

witnesses (including other Georgetown leadership who could also chime in), that

they *never* provided this fraudulently omitted material information, never took

required corrective action, and never took even the first step in investigation (nor

apology along with other remedies).  Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+ witnesses, as its failure to correct, nor provide the materially omitted information, was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial use,* of how important that information is in regards to privacy, publicity, and contract rights (as well as policies requiring disclosure of these material facts to Mr. Austin,having violated his rights).  See Operative Complaint ([FAC];Dckt. [14]); [See S-123]  Georgetown *publicly* admits that it takes written authorization forms seriously for both medical and student privacy protected information, and that should define an admitted Georgetown student's reasonable expectation of privacy.  See Operative Complaint ([FAC];Dckt. [14])

Georgetown *demonstrates, and admits in writing and via conduct,* that under no circumstances should medical information or a photo be released or commercially used (photo) without the student's written authorization agreement (contract); Georgetown advocates this position so strongly (*despite California's CMIA, or HIPAA requiring only patient request*) that they refused to release Mr. Austin's own medical records *to himself* without signed written authorization (*but ironically commercially used his photo without his a. knowledge, b. consent, nor c. written authorization in violation of policy mandate, and the law* ). [See S-124]

19e.   The 1991 clarified expansive language of sec.1981 covers a. Georgetown's failure to make a contract per mandatory written authorization agreement-contract b. Georgetown's disparate treatment within contractual relationships depriving Mr. Austin of the "performance, benefits, privileges, terms, and conditions" of the admitted student "contractual relationship" to his detriment. See Operative Complaint ([FAC];Dckt. [14]); [S-125]  Mr. Austin is a Black or African-American man

(protected category), whose economic contract IP (intellectual property; likeness; publicity) rights were non-consensually commercially exploited by Georgetown. Georgetown preemptively violated 1981 rights (created mandate for Georgetown to attempt contract; denied contract rights).   Mr. Austin repeatedly complained to get facially discriminatory ("but for"; "because of") violations corrected-investigated per consummated student contract's privacy, publicity, media, contract, and IDEAA mandatory policies, but was denied over 100+ instances (repeated denials of contract rights; inferior treatment); Constitutes a 1981 prima facie case, & more. See S-126.

19f.     Georgetown's display of discriminatory animus toward Mr. Austin is transparent enough to even pierce the veil of a public official's qualified immunity under the Ninth Circuit's *Yoshikawa v. Seguirant;* Georgetown a. made the initial technical and substantive violations (sec.1981) to Mr. Austin's detriment b. admits the violations in writing c. continued the discriminatory pattern of conduct by not taking required non-prompted corrective measures to make right with Mr. Austin (after taking something they did not own nor were entitled to) d. refused appropriate investigative, or corrective action after Mr. Austin made over 100+ formal complaints and e. has no explanation, nor justification, (to date) for why they behaved in that manner and felt entitled to take economic rights that did not belong to them (outside of discriminatory animus).   Georgetown' discriminatory conduct trumps *Yoshikawa v. Seguirant as they* first made the errors, and then continued discriminating whereas in *Yoshikawa* defendant's asserted reason was plaintiffs technical violation which still didn't justify their discriminatory application of law or policy *(Georgetown did the technical and substantive violations with the lower*

*threshold of liability for a private actor receiving federal funds, making an even*

*more obvious finding of discriminatory intent-animus).* See S-127

**20. Georgetown stole, converted, or took valuable property-economic rights that belong to Mr. Austin that they are not entitled to without his express written authorization agreement as with 'Whites' (which they did not obtain), and thus violated his sec. 1981 rights.**

20a.     Georgetown knows, and publicly admits, the rights they stole, converted, or

took without authorization do not belong to them, nor are they entitled to those

rights.  See Operative Complaint (FAC;Dckt. 14); S-128  Georgetown admits, the

rights they stole.. took without authorization are valuable-important, even for

persons without an easily definable-referenced, pre-set commercial value.  See

Operative Complaint (FAC;Dckt. 14); S-129; Georgetown admits, *publicly, (in its*

*description of the required pre, and post, photo or filming required steps for outside*

*photographers*), that it holds itself to the same standards for students, faculty and

staff;  Georgetown also admits, *publicly,* that not only must the written authoriz-

-ation, as a contractual agreement, be signed by the student *prior* to use, but that

the form itself 'must' include certain information to be valid, and enforceable (and

even includes an example photographic/ videographic release form for students in

their continuing education programs; Georgetown's neighbor George Washington

University publicly provides a comparative example for its own students ).; See

Operative Complaint (FAC;Dckt. 14); See S-130

20b.    Georgetown also knows its students are hand selected, go through an elite

screening process, and very high potential, with at least two past US Presidents,

2nd highest feeder to US Legislature and world leaders in a variety of spheres; Of

course, privacy is extremely important in the USA's physical locale with the highest

concentration of espionage (D.C.) especially at a vulnerable, impressionable and

developing point in a person's life. See Operative Complaint (FAC;Dckt. 14) ; See S-131 Georgetown took what wasn't theirs, impermissibly used race, & disparately treated a Black male admitted student; they openly *intended* to mark him with a badge of inferiority 'stigma' echoing in *Brown v. Board*. See Operative Complaint (FAC;Dckt. 14); S-131   Georgetown's impermissible use of race, & derogatory racial stereotypes, to mark Mr. Austin with a badge of inferiority through disparate treatment has a long,  ugly, history in Education (i.e. *Brown v. Board)* See Operative Complaint (FAC;Dckt. 14); See S-132;  Georgetown's 1981 violations attempt to mark Mr. Austin with a "badge of inferiority"(*overt disparate treatment*; stigma). See Operative Complaint (FAC;Dckt. 14) ; See S-133 Georgetown went out of their way (repeatedly breaking normal policy, protocol & process) to demonstrate they *internally* 'possessed' no intention (despite outward proclamation, written policy, the law and Constitution) on treating him equally to similarly situated non-Black male students, but instead bent on promulgating  facially discriminatory, separate and unequal policies toward Mr. Austin in violation of *Brown v. Board*.; See Operative Complaint (FAC;Dckt. 14) S-134

20c.   Outside of being racist, and facially discriminatory, more generally, Georgetown's is even more insidious as its conduct mirrors that of an 'enslaver' attempting to reduce a Free Black man to the status of the enslaved by way of imposing the "badges and incidents of enslavement"  irregardless of his rights, needs, concerns, questions, complaints or objections to Mr. Austin's detriment.  See Operative Complaint (FAC;Dckt. 14)  Because Georgetown knew, on the front end, that these media-publicity, contract, and other, rights did not belong to them, nor were they entitled to them, and according to their own *publicly admitted* explicit

written text-policy-promises are required to obtain written authorization from Mr.

Austin, their conduct toward Mr. Austin is extremely telling of their own racist

presumption(s).   Resembling the mindset of an "enslaver," Georgetown felt entitled

to just take without informing, asking, nor receiving permission or authorization in

any form whatsoever (let alone the mandatory written contract). ; See S-135

20d.   Georgetown admits, *publicly,* that it has a history of depriving Black persons

rights, even in the most brutal expression of enslavement.  For Georgetown it

appears old habits die hard, or not at all, slaveryarchive .georgetown.edu/

> (...*Sale of Maryland Jesuit's enslaved community to Louisiana in 1838.  These archival materials relate to the sale of 272 [Black; enslaved] men, women, and children by Rev. Thomas Mulledy in 1838.*).

See Operative Complaint dckt.14.  See also 42 U.S.C. § 1981

> ("(a) Statement of equal rights - All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by [W]hite citizens"...."make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.....(c) Protection against impairment....The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law...)

Georgetown *publicly admits* that it literally deprived Mr. Austin's right to make a

contract because authorization agreements are typically mandatory contracts of

adhesion when Georgetown uses admitted students, or other persons, image for

business purposes. Their choice to purposefully violate their own mandate, and

preemptively deprive the making of that contract is both 1. Telling and 2. Violates

42 USC 1981 (*as 1981 protects would-be contract makers in the contract making

process as well as those violated in the broad language of rights, enjoyment of

benefit, or enforcement process*). See S-137  Georgetown *publicly* admits that

enslavement of Black people in this country, which Georgetown personally partook

in, was in part exploitation of Black people *without even considering* Black people's

rights or needs, (*and including rights of recognized personhood, citizenship, "to

make and enforce contracts, to sue, be parties, give evidence, and to the full and

equal benefit of all laws and proceedings for the security of persons and property as*

*is enjoyed by White citizens,*" etc.) and ironically is a similar pattern to which Georgetown behaved in exploiting Mr. Austin's right to contract (i.e. written authorization agreement in reference to his person, privacy, publicity, etc.); this is why 1981 had to explicitly state Black men, and people, have the "same right to contract as a White man" because racism, and discrimination built in assumptions of inferiority & presumed it could take from Black people with--out 'consideration,' or 'mutual assent,' but instead by force;  See S-138

**21. Georgetown not only deviated because Mr. Austin is a Black, or African American, male admitted student, but failed every express standard that they themselves go out of their way to require.**

21a.    When Defendant Georgetown made White, or Non-Black male, students contract offers, they provided Whites: **1. -** with respect to their persons, as human beings, (*and provided a heads-up, or forewarning, that Georgetown desired to take a photo of them and use it for commercial, marketing, purposes*), whereas they instead disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted, and defrauded out of economic contract rights, or even knowledge that his image, and likeness, was being used for commercial-marketing purposes because he is Black **2. -** knowledge of what the photo was used for (and where it may be sent for marketing purposes) for Whites, but hid knowledge, and fact photo was being used at all (after already stealing rights from him) for Mr. Austin because he is Black **3. -** Pre-approval of use of the photo by the non-Black male, or White students whereas they didn't even think to ask Mr. Austin in disrespect of his overall person, and rights to not give pre-approval because he is Black **4. -** An opportunity to accept or decline the offer itself for Whites, whereas they stole the opportunity to make his own choice, decline or accept, after already stealing economic-IP-rights of publicity

from Mr. Austin because he is Black **5.** - An opportunity to review the written contract offer before making the decision **6.** - An opportunity to agree to the terms of the contract offer **7.** - An opportunity to provide a counteroffer if terms were not acceptable and **8.** - An opportunity to have a meeting of the minds **9.** - Enjoy consideration and performance of the contract's obligation as well as other benefits, privileges, rights provided in a contractual relationship.

21b.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner because he is a Black male admitted student compared to similarly situated White, or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin (because he is Black), in the same way as similarly situated Whites, with Georgetown's 'blatant' violations of Mr.

**41 ; Corporate Disclosures as of February 2025.**

Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African*

*Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

22. **Georgetown treated, and continues, to treat Mr. Austin in an inferior manner (disparate treatment) as compared to admitted Whites, or non-Blacks, because he is a Black male admitted student.**

22a.    Georgetown violates Mr. Austin's 1981 rights because he is Black as compared to Whites.  Mr. Austin cites to world renown <u>Thelton E. Henderson</u>, for the 1981 legal standard.  Because legendary Judge <u>Henderson</u> has a particularly unique insight to 1981's operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (*as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success*) his analysis is particularly valuable under these facts. Mr. Austin was blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote speakers to raise school funds for students in need (Mr. Austin had no personal gain in the efforts, and was happy to share and help others):  Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom.   Legendary <u>Judge Thelton Henderson</u>, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate.  <u>California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY</u>

(" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society.*")

22b.    As an interesting aside, presiding Judge Judge Breyer's and Magistrate Judge Ryu's (who recused herself) colleague <u>Judge Haywood Gilliam</u> clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

Questions for the record *"6…to faithfully and impartially apply the law in every*

*case, without regard to the type of matter or the identity of the parties … 7. …*

*treating every person who comes into the courtroom, whether they are litigants,*

*counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy.*

*The judge also must ensure that all parties in a case receive the opportunity to have*

*their arguments heard and fairly considered…The citizens of our country entrust*

*federal judges to dispense 'equal' justice under the law, and to decide cases by*

*applying controlling precedent to the facts of the cases before them, without regard to*

*any other considerations (including race)…"* also reflects the principle, and creed, of

*'Equal Opportunity'* which is not only central to the doctrine of equality as embodied

42 USC 1981, but which defendant Georgetown fundamentally, & egregiously,

violated (producing Mr. Austin's complaints) and violates in an ongoing manner.

www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

22c.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a*

*"refusal to enter into … contract [on the same basis as Whites] is actionable under §*

*1981. In making this determination, a lower court should give a fair and natural*

*reading to the statutory phrase ` the same right[s] . . .[in "making, performance,*

*modification, and termination of contracts, and the enjoyment of all benefits,*

*privileges, terms, and conditions of the contractual relationship"], and should not*

*strain in an undue manner the language of § 1981….."* Walker v. Contra Costa

County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). Further down in *Walker v. Contra Costa County* Judge <u>Henderson</u> expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

> *"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

22d.    Mr. Austin 1. Is an African American or Black man who is high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required]* and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by complet-ely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue. Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated

EoR - 1047 of 2347

demonstrably better, and Mr. Austin was treated demonstrably in an inferior

manner (see para. 11-19; see attached; dckt. 75)

22e.   In addition to violating Mr. Austin's right to make media contract, as

mandated per Georgetown's own policies, Georgetown simultaneously violated Mr.

Austin's rights in existing contract per *"performance, modification, … and the*

*enjoyment of all benefits, privileges, terms, and conditions of the contractual*

*relationship"* as well Equal Protection per Title VI of the Civil Rights Act of 1964.

Georgetown did so when it completely excluded Mr. Austin on the basis of race,

derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and

illegally excluded from essential campus services-procedures for *"Any applicant for*

*employment or admission, current or former employee or student, or third party"*

that similarly situated Whites, or Non-Black males, are provided via a set of

mandatory steps **(faculty handbook.georgetown.edu/ section4/a/)**  per

Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be

done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI)

coexistent with 42 USC 1981.

22f.     Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined

with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,*

and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant

Georgetown's conduct is "blatantly" racist whereas similarly situated White, or

non-Black, student offerees are made offers by Georgetown, respecting their person,

and rights (economic and otherwise) the *"private offeror [who blatantly violates Civil*

*rights when it] refuses to extend to [an African- American, in this case Mr. Austin],*

*because he is an [African-American], the same opportunity to enter into contracts."*

**45 ; Corporate Disclosures as of February 2025.**

Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016

(2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted

student (*who expects to be treated on the same basis as White, non-Black, admitted*

*students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th,*

*15th Amendments, and Civil Rights of 1964*).   The only requirements for making a

Georgetown media contract, as an admitted student, is to a. Be an admitted student

on campus, & b. Have an organization desire to use your image, or likeness, to

market or economically exploit their product-service for their benefit.  Unbeknownst

to Mr. Austin, Georgetown went out of its way to take and use his image and

likeness while he was an admitted student on campus to market or economically

exploit their product-service for their benefit, and thus fulfills all requirements "to

make" a contract.   However, despite meeting all requirements, and following up to

make a contract, get an explanation as to why they violated the law, and school

policy in the first place, Georgetown illegally refuses to make a contract with Mr.

Austin because of his race, or derogatory racial stereotypes (as Georgetown

explicitly admits to Mr. Austin in both word, and deed).  Georgetown violated

existing contract, and simultaneously Mr. Austin's Title VI Equal Protection rights

when it completely excluded Mr. Austin from essential campus IDEAA services-

procedures, illegally because Mr. Austin is a Black man.

### 23. Georgetown has internal IDEAA complaint structure whose express tasks is to acknowledge, respond to, and correct complaints from student, faculty, and even non-affiliated community members

23a.    Georgetown admits, *publicly,* that a student, or  *"Any applicant for*

*employment or admission, current or former employee or student, or third party*

*(hereinafter referred to as "Complainant")*" can make a complaint via email or in

person, and is encouraged to do so.  See S-28; facultyhandbook.georgetown.edu/section4/a/ Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**. Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

23b.    Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its own policies or the law that informs and undergirds IDEAA**;** See S-29   Georgetown admits, *publicly,* that discriminatory conduct by leadership, faculty or staff to student's detriment, particularly a Black male student, is especially concerning; According to their policy is of the highest priority; See policymanual.hr. georgetown.edu/1000-university-policies/ 1004- policy-statement-on-harassment/

Yet, Georgetown themselves discriminated by *not even taking a first step to acknowledge, nor investigate or correct an administrators written admission of serious school policy, & legal violations* to the immediate detriment of an admitted

Black male student, Mr. Austin, whereas they would have, and do, utilize their standard very detailed operating procedure, and methodology, for Whites, or non-Blacks, showing discriminatory animus towards him. ; See S-30

23c.    Georgetown *admits* that they *never* provided this fraudulently omitted material information (which itself is a violation of the law, school policy, and written contract mandates) per Mitch Bailin's, and Georgetown's President's Office, Vice President's Office, General Counsel's Office, and other leadership's, *lack of response nor answers*, despite over 100+ formal written complaints in front of over 300+ separate witnesses (including other Georgetown leadership who could chime in, and help solve the issue immediately).  Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+ witnesses, as its failure to correct, nor provide the materially omitted information, was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial use,* of how important that information is in regards to privacy, publicity, and contract rights (as well as its own policies requiring disclosure of these material facts to Mr. Austin, especially after already violating his rights).  Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to a different filming (for business purposes) policy than similarly situated non-Black male admitted students, faculty, staff, (by purposefully not following standard contract procedure as with Whites) is treating him in an inferior manner & shows they intended to facially discriminate against him. See S-33

23d.    Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to a different IDEAA complainant policy than similarly situated non-Black male adm--itted students, faculty, staff, or even third parties, is treating him in an inferior manner; Refusing to even acknowledge his complaint, nor investigate, escalate, or

correct, *as guaranteed*, shows intent to facially discriminate against him; See S-34 Georgetown admits, *publicly,* in subjecting a Black male student (Mr. Austin) to..a different privacy policy than similarly situated non-Black male admitted students, faculty, staff, and policy it publicly advocated for in *GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ,* when being 'forced' to disclose, not voluntarily or willfully violate (*as they did to Mr. Austin*), is treating him in an inferior (facially discriminatory) manner. See S-35; Georgetown *publicly* admits that it takes written authorization forms very seriously for both medical and student privacy protected information, and that should define an admitted Georgetown student's reasonable expectation of privacy.See S-36.   Georgetown *admits in writing and conduct,* that under no circumstances should medical information or a photo be released or commercially used (photo) without the student's written authorization agreement (contract); Georgetown advocates this position so strongly (*despite California's CMIA, or US Statute's HIPAA  all that's required is oral, or written patient request*) that they refused to release Mr. Austin's own medical records *to himself* without signed written authorization (*but ironically commercially used his photo without his a. knowledge, b. consent, nor c. written authorization in violation of their mandatory policy*). See S-37

23e.   To illustrate the irony, and misplaced priorities, when Mr. Austin has repeatedly requested in writing, and orally (via phone), his Georgetown medical records, as an admitted student, they have refused to provide his own required information (*per California's CMIA, or US Statute's HIPAA  all that's required is oral or written request*), and mandated multiple steps of unrequired verification to get *his own medical information.*  Yet, in opposition to the legal, contractual, and

**49 ; Corporate Disclosures as of February 2025.**

policy standards Georgetown itself has enshrined, and argued in most prestigious

Court outside of the Supreme Court, Georgetown chose to just use of his close up

Photo for commercial advertising purposes, without any of the mandatory

prerequisites including the required written authorization from Mr. Austin (*I.e.

signed form, written consent, notice, etc.*).  Georgetowwn completely ignored those

legal necessities and violated his privacy, and publicity, rights throughout CA forum

state (and subsequently his Equal Protection, Due Process, 42 USC 1981, duties

against deceit, negligence and bad faith, rights also).  Georgetown completely

inverted their responsibility and refused to do what they are obligated to do or

provide.  Georgetown went out of their way to exploit, and violate, Mr. Austin's

privacy and publicity rights that they have an admitted, publicly proclaimed, and

publicly advocated, legal obligation to protect; S-37   Georgetown admits, *through

its conduct in front of 300+ witnesses,* that it a. intended to violate Mr. Austin's right

to privacy, publicity, Equal Protection, and 1981 right to contract b. intended to

fraudulently omit material information, and mis-state its commitment to the law to

induce contract with Mr. Austin c. intended to do so *maliciously, knowingly, and

egregiously,* as they never apologized, investigated, nor corrected, even while

admitting their violations in writing and to date have never presented a written

authorization for Mr. Austin to sign as mandated in accord with Federal, State

laws. See S-38

24. **Georgetown's IDEAA complaint resolution standards, and process,
for White, or non-Black, admitted studentsGeorgetown not only
demonstrates, through conduct, that it deviates because Mr. Austin
is a Black, or African American, male admitted student, but failed
every express IDEAA complaint resolution standards, and process
that they themselves go out of their way to require, advertise, and
precisely define as the standard operation.**

**50 ; Corporate Disclosures as of February 2025.**

24a.    In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
*No. 20-1199, 7 (U.S. Jun. 29, 2023)* it was alleged that student applicants of
different races were treated differently, derogatorily differently, because of race in
the application process.  Similarly, Mr. Austin, after earning admission, was then
unknowingly exploited in violation of Georgetown school policy, Constitutional and
Federal law, treated derogatorily differently by Georgetown, based on derogatory
racial stereotypes, in the mandatory written contract making process for
commercial, or business use.  Georgetown then treated Mr. Austin derogatorily
differently, repeatedly, based on derogatory racial stereotypes to exclude from the
very campus mechanism, and organization, designed to correct, and remedy these
types of violations without need for litigation, or outside legal action.  Georgetown's
conduct in essence enforced either racial oppression per 42 USC 1981, and 13th,
14th Amendment, or forced an admitted student to sue the institution they are
supposed to be learning from (*an even more extreme exploitation of power, and*
*impermissible use of race*).

24b.    When Defendant Georgetown receives a complaint via email made by *"Any*
*applicant for employment or admission, current or former employee or student, or*
*third party"* similarly situated Whites, or Non-Black males, they provided Whites a
set of mandatory steps (facultyhandbook.georgetown.edu/ section4/a/)  per George-
-town written policy **"Procedures for Processing Grievances"** that *must* be done
in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent
with 42 USC 1981 including: **1. -** IDEAA staff shall send acknowledgement of
complaint receipt for Whites, even if the acknowledgment is to say Georgetown's
IDEAA needs more information to proceed through the Complaint process, whereas

they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black **2. -** IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) **3. -** IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black **4. -** IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

24c.    Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: **5. -** The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant **6. -** The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) **7. -** The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for

Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) **8.** - The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black

**9.** - The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas they deprived that opportunity for Mr. Austin (completely excludes him from this Equal Protection required procedure, and policy) because he is Black.

24d.    Moreover, per **facultyhandbook.georgetown .edu/section4/a/**  Whites are provided : **10.** - The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black

**11.** - The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black **12.** - The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that

**53 ; Corporate Disclosures as of February 2025.**

opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black **13. -** The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

24e.    Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: **14. -** The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black **15. -** The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black **16. -** The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy

**54 ; Corporate Disclosures as of February 2025.**

the violations by Respondents), whereas  defendant Georgetown deprived that
opportunity for Mr. Austin (and completely excluded him from this Equal Protection
required procedure, and policy) because he is Black.

24f.    Mr. Austin had no complaints against him, he simply inquired, and
complained as to why Georgetown 1. Violated school policy 2. Violated his
Constitutional rights to contract and 3. Why he was illegally excluded from
essential campus procedures for *"Any applicant for employment or admission,*
*current or former employee or student, or third party"* that Georgetown provides for
similarly situated Whites, or Non-Black males (*including providing Whites a set of*
*mandatory steps* **(*faculty handbook.georgetown.edu/ section4/a/*)**  per
Georgetown written policy ***"Procedures for Processing Grievances"*** *that must be*
*done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI)*
*coexistent with 42 USC 1981).*  Georgetown impermissibly used Mr. Austin's race
(and perhaps gender, too) to his repeated detriment, as an admitted student, and
Black man to treat derogatorily differently, "deny, restrict, separate, segregate (in
application of policy)," and exclude Mr. Austin.  See eCFR :: 34 CFR Part 100 --
Nondiscrimination Under Programs Receiving Federal Assistance Through the
Department of Education Effectuation of Title VI of the Civil Rights Act of 1964
Georgetown willfully violates its explicitly stated duties to "provide a mechanism for
… a prompt, fair, and impartial investigation and resolution of grievances" or *ANY*
first step to an investigation (let alone correction-resolution),at all per Georgetown's
explicit standards.

24g.    Georgetown's discriminatory conduct is highlighted in its *publicly stated*
*policy* that every *"faculty, staff, students, third parties and applicants for employ-*

-ment and admission" are entitled to receive a "*prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation,*" but <u>intentionally excluded</u> Mr. Austin, preemptively because he is a Black man admitted student (who they already admitting exploiting in violation of Georgetown's policy, and the law). Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants" (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident & seek redress through IDEAA's Grievance Procedures, but <u>excluded</u> Mr. Austin who reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981,privacy, publicity rights* and have not received even one follow up email to begin process (*let alone resolution*). <u>S-94</u>  It is of note that Mr. Austin started off very patiently, and just sought information, and clarification, before even contemplating escalating to formal internal complaints.  Mr. Austin would have preferred to resolve informally, but Georgetown's conduct, and abuse of power style of communication literally forced Mr. Austin to sue to attempt any type of resolution, solution or remedy as Georgetown failed every express duty that they themselves say they owe admitted students.

24h.   Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of Georgetown policy  is the essence of Equal Protection violations (*after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown*

*controlled area program or activity; for business purposes*); See S-95.  Beyond

Georgetown's exclusion, 'deliberate indifference' to that discrimination also

highlights their animus (as they internally already knew they violated Mr. Austin's

1981 rights, *discriminatorily*, but continued to exclude from 'program(s) to correct

Georgetown's previous violations*).*  See S-96    Calling a Black man a n\*gg\*r is

perhaps the most obvious racial slur, or derogatory stereotype (*imbedded in the*

*definition of the word* _www.merriam -webster.com/dictionary/n\*gg\*r_), but is clearly

not the only one, and the same message can be communicated verbally, or with

non-verbal Conduct.  Treating someone as an "n-word" without actually saying the

word, especially via disparate treatment to exclude and to "mark with a badge of

inferiority," while literally taking actions as if one is an 'enslaver' is just as illegal

and damaging to that person as Georgetown did here (presumed "unworthy of

consideration"), unapologetically, repeatedly, *ongoingly* violate their policies, & the

law. See  S-97

24i.    Georgetown's Equal Protection violations were evident in Georgetown's

repeated refusal to investigate, at all (*after they admitted 1981, privacy, publicly,*

*and media policy violations in writing,)* as Mr. Austin reported, inquired, & formally

complained (*to the President's office, and other Georgetown leadership*).  Mr. Austin

sought to find out what was going on in the first place, and have subsequent

investigation and correction to the victim or survivor of the discrimin- -atory

conduct by the university (i.e. the one being wronged; Mr. George Jarvis Austin),

but Georgetown's continued displaying discriminatory intent…in refusing to

investigate [discriminatory, illegal, violative] acts against a victim."; See S-98  Mr.

Austin was completely excluded-blackballed, when it was Georgetown's duty to

include per the Supreme Court, in comparison to similarly situated Whites creating *"stigma'* .. as outlined originally in *Brown v. Board of Education I & II,* and more recently in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)*; Georgetown refused to take the first *mandated* step-action, for an admitted Black male student, that they would take *even* for a non student 3rd party complainant per their own policy (displaying even more disparate treatment; discriminatory animus), let alone similarly situated non-Black, or White, similarly situated students. See Operative Complaint (FAC;Dckt. 14) ; See S-99   It is well established that facially discriminatory rule application, as Georgetown is doing, *even on* facially neutral laws-policy offends the Constitution.  Any statute-policy which classifies people 'may' be irrational (or facially discriminatory) as applied in particular cases.  Unequal application of law-policy, only to Mr. Austin's detriment, disrespecting his personhood, or rights because he is a Black man, student, & person equates to Equal Protection violations (i.e. when simultaneous unfair benefits to similarly situated others while depriving him); S-100; See Operative Complaint (FAC;Dckt. 14)

24j.    Georgetown's choices to create stigma with unequal treatment, attempt to mark Mr. Austin with a badge of inferiority by repeatedly, over and over again treating Mr. Austin in an inferior manner highlights Georgetown's commitment to violating Mr. Austin's right to Equal Protection. See S-101 ; See Operative Complaint (FAC;Dckt. 14)  Mr. Austin provided Georgetown over 100+ opportunities for self correction, with over 300+ witnesses; They refused to provide even a *veneer* of following the law & violate Mr. Austin's Equal Protection by exclusionary conduct (I.e. **IDEAA steps I-V**).  See para. 8-81; 28-29 ("Requirements for Filing

Grievances" ideaa@george town.edu; "Procedures for Processing Grievances" IDEAA

steps I-V beginning with intake - none which were complied with by Georgetown);

S-102 **;** See Operative Complaint (FAC;Dckt. 14)

25. **Per 42 USC 1981 Georgetown may not deviate from its standard on account of, because of, due to, race, and definitely not in the negative**

25a.    Georgetown deviates from its standard operating, or contract making

procedures, for Whites, or non-Blacks in the negative, and to the detriment of Mr.

Austin because he is Black.  Georgetown's initial violations of law and policy, to

deprive Mr. Austin's  rights, combined with subsequent discrete, repeated, overt,

and extreme deprivation along with Georgetown's impermissible use of race, or

derogatory racial stereotype, made clear Georgetown intended to mark [Mr. Austin]

with a badge of inferiority.  See Operative Complaint (FAC;Dckt. 14) To avoid the

stigma of disparate treatment (via separate and unequal treatment and application

of policies) as *Brown v. Board* articulates Georgetown's application of law and school

policy toward him should not presume 'inferiority' for Black male admitted

students, as compared to similarly situated non-Black male, or White, admitted

students (but it was, and continues to be). See S-103 **;** See Operative Complaint

(FAC;Dckt. 14)

25b.    Georgetown chose to make clear their *intent* to facially discriminate based on

race, or derogatory racial stereotypes. See Operative Complaint (FAC;Dckt. 14).

Georgetown didn't acknowledge Mr. Austin's complaints (as mandated), let alone

take *any required* steps on his formal complaints (i.e. excluding him) as compared to

similarly situated non-Black male, or White, admitted students. See Operative

Complaint (FAC;Dckt. 14) :  S-104 ; Georgetown's impermissible use of race, or

derogatory racial stereo- -type(s) of Black males to convey assumptions of inferiority,

EoR - 1062 of 2347

preemptively excludes a Black male admitted student from essential Georgetown

'program(s)-activity' based on express classification identified through Georgetown's

conduct toward Mr. Austin  (*and violates Equal Protection as Georgetown engaged*

*in official adverse decision making by derogatory racial stereotypes*). See Operative

Complaint (FAC;Dckt. 14) ; S-105  The combination of initial violations in total

disregard of Mr. Austin's rights as a Black male admitted student, admitting

violations only *after* getting caught, refusal to apologize for violating 1981

rights-Georgetown's (written authorization agreement policy), with anti-Black male

exclusionary policy-practices, demonstrate Georgetown's *repeated* choices to "mark

with a badge of inferiority" because of Mr. Austin race, or derogatory racial

stereotypes.  See Operative Complaint (FAC;Dckt. 14)   If Mr. Austin had any doubt

before hand, Georgetown made clear after that they absolutely *intended* to

discriminate because of Mr. Austin's race; See Operative

Complaint (FAC;Dckt. 14) ; S-106:

26. **Per Equal Protection clause, Title VI of the Civil Rights Act of 1964, and standards as re-articulated in 2023 Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* Georgetown must not deviate from their standard on account of, because of, due to, race, or derogatory racial stereotypes, and definitely not in the negative.**

26a.    Georgetown violates Mr. Austin's Equal Protection:  Per the Supreme Court's

1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair*

*Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun.*

*29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas*

*539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or

derogatory anti-Black racist stereotypes.  Georgetown simultaneously violated Mr.

Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI

Equal Protection rights when it completely excluded Mr. Austin from essential

campus IDEAA to treat an admitted student, and Black man, in a derogatory

manner to *"deny, restrict, separate, segregate (in application of policy),"* and exclude

Mr. Austin from services-procedures, illegally because Mr. Austin is a Black man.

Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No.*

*20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct is doubly offensive to the

Constitution of the United States because Georgetown admits, explicitly, to both a.

treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to*

*deprive making a contract*), or b. Treating Whites, or non-Black men, as 'superior' or

more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or*

*accept proposed Georgetown contract offer, let alone not presuming derogatory*

*stereotypes to deprive Whites their rights to contract*):

> *"[Georgetown's complaint & contract making] systems also fail to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's] twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men]."*)*
> - **Students for Fair Admis., Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)**

26b.    Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)*

Georgetown confers their own perceived- presumed inferiority (or "stigma") of

admitted Black (male) students (as both 1. the contract offer process and 2. The

IDEAA complaint process should be the same for regardless of race) to create

> *"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

Georgetown repeated deliberate indifference and failure to correct adds additional

context.  Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290*

*(1998)* Georgetown's conduct provides for Equal Protection "damages remedy":

> *"[ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference."* Per *General Building*

**61 ; Corporate Disclosures as of February 2025.**

*Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

26c.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control (as is Georgetown's IDEAA campus resource), then it's a violation of Equal Protection to deny that student investigatory, or enforcement, services as a victim, or survivor, of the violation whereas the Plaintiff *in Brown v. Arizona:*

> *"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;..Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

Georgetown treats Mr. Austin in an inferior manner with *"impermissible use of race"* or derogatory racial stereotypes in at least three separate essential policy processes, with one process for Black male admitted students whereas to their detriment whereas no Georgetown duties/policies/laws publicly stated are followed, and another for non-Black male admitted students who benefit from unjust advantage provided by Georgetown's one-sided system: 1. privacy policy process 2. contract formation process specifically with photo (I.e. written consent required), 3. Contract enforcement (etc. right privileges etc.) of contract already entered into with consideration provided (I.e. Ashley Jennings email); See S-66

26d.    Georgetown understood, and understands, clearly (while it was doing so) that it is illegal to take-exploit an up close photo without *prior written authorization agreement,* and consent, of an admitted student, under current law, and is in violation of the very precise policies, promises, Georgetown themselves advertises

See S-75        Georgetown made this argument in Federal Court (*in D.C. Circuit;*

**62 ; Corporate Disclosures as of February 2025.**

*status and prestige among American federal courts generally considered second only to the U.S. Supreme Court*): See S-76; Use of Mr. Austin's close up photo to publicize, market, for pecuniary gain heightens illegality-liability (privacy; publicity, 1981 rights). Yet, Georgetown did so willfully (despite their own Federal Court arguments against being *forced* to disclose); They admit violation(s), but still proceed, to date, in a pattern of 1. Equal Protection, 2. 1981 3. Deceit 4. Negligence and 5. Bad Faith to Mr. Austin's detriment (*without repentance, nor correction to Mr. Austin's ongoing legal injuries proximately caused by Georgetown*)

**27. Georgetown treated, and continues, to treat Mr. Austin in an inferior manner (disparate treatment) as compared to admitted Whites, or non-Blacks, because he is a Black male admitted student violating Equal Protection, and Title VI of the Civil Rights Act of 1964.**

27a.    This case is not about admissions, although Mr. Austin, as a Black man, and person, is aware (as is the Country) of the 2023 rulings with *Harvard*, and *UNC* (California, previously, had a similar change in *1996*, with the passage of Proposition 209).  Although the 237 page opinion *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*. argues heavily in favor (both majority and dissent) for Georgetown's legal liability to Mr. Austin; Liability emerges outside of the admissions context as Georgetown has impermissibly used race, or derogatory racial stereotypes, repeatedly against Mr. Austin to his detriment to exclude and deprive him.  Instead, this case is about respecting the human being, *admitted student*, and their respective Equal protection, and 42 USC 1981, rights along with their rights not be negligently-maliciously failed duties owed.. nor deceived or defrauded (i.e. fundamental privacy, and publicity rights; *which are very similar to trademarks foundational concepts as applied to human beings*).  Georgetown decided to repeatedly, and ongoing *treat him as an inferior*, because he is a Black male,

regardless of him being an admitted student, once Mr. Austin entered in contract with Georgetown (*see affidavits embedded above including precise moment when consideration was given and offer accepted*).   Georgetown keeps attempting to mark him with a badge of inferiority (repeatedly and ongoing) to completely disregard and disrespect his personhood and fundamental rights.  Georgetown, and the US Dept. of Ed. *admits, and knows,* Georgetown is covered by Title VI, Equal Protection, as a recipient of Federal funds.  See S-7

27b.    Georgetown admits, as Courts have repeatedly held, that an organization's failure to follow its own policies can support a discriminatory pretext, as George--town *knowingly, willfully, and maliciously did,* without apology, investigation, correction, nor disclosed material information to cause *ongoing* harm.   Georgetown *admits its own* impermissible use of race, or derogatory racial stereotypes to harm, Mr. Austin a Black male admitted student, *through their words, and conduct,* as the June 29, 2023, 237 page Supreme Court opinion in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* repeatedly highlights as illegal (in violation of students.. Equal Protection); Georgetown repeatedly chooses to presume an admitted Black male student, Black men, and Black people as "*inferior,*" and "*unworthy of consideration*" habitually refusing basic, required *publicly admitted* steps for essential policy, practices, programs/activities that non-Black male admitted students are granted providing unfair advantage to them, and stigma, over 100+ discrete adverse acts creating immediate, and ongoing, detriment to Mr. Austin (as *none of publicly listed **IDEAA steps I-V** were even attempted*, nor were.. complaints acknowledged conveying, reinforcing, *derogatory racist stereotypes, presumptive inferiority);* Dckt S-40;

**64 ; Corporate Disclosures as of February 2025.**

27c.    Georgetown admits impermissible use of race or racial stereotypes, through
explicit conduct over 100+ times, and explicit classification (conditions participation
in student activities/programs) on race, while excluding a Black male admitted
student, or students, from programs, etc in an organization receiving federal funds.
Georgetown admits decision making by derogatory racial stereotypes is absolutely
prohibited especially when used to exclude an admitted Black student from
essential programs and activities receiving federal funds to operate.  Georgetown
admits, *publicly,* that it has a history of specifically depriving Black persons rights,
even in the most brutal expression of enslavement. S-43  Georgetown *publicly
admits* that it literally deprived Mr. Austin's right to make a contract; Because
Georgetown authorization agreements are *mandatory* contracts of adhesion when
Georgetown uses an admitted students', or other person's, image for business
purposes per their own policy (and the law), their choice to purposefully violate
their own mandate, and preemptively deprive the making of that contract violates
42 USC 1981 by refusing to offer a Black man, admitted student, the same contract
it is a. legally mandated to do for *all* students and b. it would offer a White, or
non-Black male, offeree (*as 1981 protects would-be contract makers in the contract
making process as well as those violated in the broad language of rights, enjoyment
of benefit, or enforcement process*); See S-44

27d.    Georgetown *admits, publicly,* excluding Mr. Austin because he is a Black
male admitted student from essential Georgetown activities/programs violates the
*essence,* Originalist purpose, and Legislative *intent of* Title VI ; See S-45
Georgetown *admits*, with over 300+ witnesses, it had actual notice of policy
violative, discriminatory, conduct, refused to take action, and failed to correct; *on-*

EoR - 1068 of 2347

*-going* violations (i.e. extreme deliberate indifference.);See S-46  Mr. Austin

documented all of Georgetown's previous admissions with over 300+ witnesses,

providing *direct evidence*: See S-47  As soon as a Georgetown Leadership admitted

in writing to using my photo to market the school without asking permission,

notifying, nor getting written consent, Mr. Austin immediately began a series of

questions, formal complaints, to figure out why they chose to "impermissibly use

race" (*and perhaps gender*) to treat, a Black man, and admitted student with less

respect, less rights, and in an inferior manner than other similarly situated

admitted White, or non-Black, students with use of material misrepresentations,

omissions and deceit (with malice) to deprive (*in direct violation of their explicitly

stated contract, and policy terms*).  See S-58

27e.    Over four years later, Mr. Austin made over 100+ formal complaints of

intentional discrimination per Georgetown's exhibited inferior treatment (*combined

with other enumerated causes of action*) to IDEAA (*the investigative, and

enforcement body tasked with correcting these issues for admitted students, staff,

and members of the public: third parties*), since Georgetown's initial admission of

violative use of my image.  Georgetown has not yet taken even a mandatory

perfunctory, or performative, first step towards *any* investigation, let alone any

substantive investigation, correction or enforcement, whatsoever (despite the fact

that is precisely what Georgetown's agreement-contract mandates once complaint is

made by students, staff, or third party community members). See S-59.  After

admissions of their violated policy, Georgetown Leadership showed repeated

*deliberate indifference,* and *malice,* over 100+ times, when they failed to correct

their displayed discriminatory animus, as well as their material omissions,

EoR - 1069 of 2347

misstatements and ongoing pattern of fraud to deprive Mr. Austin of rights, opportunity, and spent Capital. Despite their admitted duties to correct, Georgetown over 100+ times in over 4 years displayed disparate treatment compared to similarly situated non-Black male admitted students by employing one IDEAA policy for Black male admitted students to their immediate detriment, and one for non-Black male admitted students to non-Black male unfair advantage. The first *publicly defined mandatory* step for Georgetown's IDEAA policy (regardless of perceived merit, race or gender) is defined as acknowledgement and receipt (as applied for non-Black male admitted students).

27f.    However, in practice, Georgetown's conduct *admits* they not only continually refuse the first step, but all of the following mandated steps, with regard to Black male admitted students, and subject Black male Complainants to an inherently inferior IDEAA policy to their detriment, as applied. Georgetown's different privacy, and complaint. policy for Black men, and in this case facially discriminatory privacy, and complaint, policy based on impermissible use of race, or derogatory racial stereotypes, for Black male admitted students vs. similarly situated non-Black male admitted students highlights this very straightforward, and promising, section 1981 claim. See S-61 Georgetown *knows and admits* use of derogatory stereotypes constitutes discrimination and is an impermissible use of race; See S-62 ; Georgetown *admits,* that use of derogatory racial stereotyping evidenced by words, or conduct (*including exclusion or disparate treatment*) is illegal, and against its own policy; Yet, Georgetown *admits, and evidences* this illegal conduct to "mark with a badge of inferiority" *intentionally,* and *deliberately*; See S-63 *Any* of the Leadership of Georgetown could have, and according to their policy *should* have

spoken up, or themselves investigated; O*ngoing* disparate treatment of Mr. Austin

was documented on display, in front of them, but they instead chose *deliberate*

*indifference* furthering their discriminatory animus, conduct, and malice;

Georgetown's IDEAA policy is designed to mandate Georgetown stakeholders

(*especially Administrative Leadership*) to "Lift Every Voice" against anti-Black

discriminatory conduct as James Weldon Johnson (*from Duval County, Jacksonville*

*Florida*), the first self identified Black man (Negro) barred attorney in the State of

Florida *after* the Civil War, & Reconstruction, brilliantly wrote; See S-65 ;

Georgetown impermissibly used race, or racial stereotypes to a. exclude (*from*

*essential Georgetown controlled programs or activities*), b. create stigma, and c.

stamp or mark with a badge of inferiority in as a recipient of federal funds *despite*

*over 100+ opportunities for it to self correct after*

*Georgetown's own admission(s) of guilt or liability*.

### 28. <u>Mr. Austin's other claims are substantive</u>.

28.    Mr. Austin's other claims (beyond **1.** 1981 and **2.** Equal Protection), prior to

any discovery, or disclosure, include: **3.** - Georgetown fraudulently induced contract

formation with Mr. Austin as a student through actual fraud, misstatements on its

commitment to follow the law, misstatements regarding its contract, misstatements

regarding its own policies, and continues its deceitful pattern in its ongoing pattern

of *still* omitting material information after admitting its violations of its own policy,

contract, and the law. **4. -** Georgetown breached its duties of care toward an

admitted Black male student and is negligent in a. monitoring its leadership's

illegal, Equal Protection, policy-contract violating conduct and b. Managing,

correcting, or controlling their illegal, Equal Protection, policy and contract

violating conduct **5. -** Georgetown exhibits extreme bad faith to Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.

> "The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
> - **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**
>
> "We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
> - **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

Mr. Austin's cases are neither meritless, nor groundless, and in fact are rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California Supreme Court Jurisprudence (and standards for factual pleading).  Mr. Austin's case against Georgetown is the opposite of frivolity, and is literally anchored and built on the essential substantive points from well settled Supreme Court jurisprudence working backwards from 2023.  If one believes in the rule of law, applies precedent to these plead facts, and direct evidence, there is not only no way for frivolity to enter the conversation, but *Mr. Austin wins the entire case*.

### 29. Mr. Austin's claims from 7.15.21-now are not barred by Res Judicata

29a.   It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata. Mr. Austin documents that his *legal injuries* as plead in the complaint are a. new causes of action, b. impossible to foresee, and c. never before plead, or experienced, nor litigated, (*with additional parties, harms beginning after disposition of a separate, unrelated, case which is now closed, and was disposed of*). Per the

**69 ; Corporate Disclosures as of February 2025.**

Supreme Court's *Lawlor v. Nat'l Screen Serv,* The Ninth Circuit's *Eichman v. Fotomat Corp.,* & *Clark v. Yosemite Community College Dist.,* Res Judicata is inapplicable to ongoing Defendant Georgetown conduct as previous case *"cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon…" … "The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered…. "When other facts or conditions intervene, forming a new basis for a claim, the issues are no longer the same and res judicata does not apply..."* See e.g. Lawlor v. Nat'l Screen Serv., 349 U.S. 322, 328 (1955) ; ;Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985) Clark v. Yosemite Community College Dist, 785 F.2d 781, 789 (9th Cir. 1986)

> ("While the 1943 judgment precludes recovery on claims arising prior to its entry, <u>it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case</u>. In the interim, moreover, there was a substantial change in the scope of the defendants' alleged monopoly; five other producers had granted exclusive licenses to National Screen, with the result that the defendants' control over the market for standard accessories had increased to nearly 100%. Under these circumstances, whether the defendants' conduct regarded as a series of individual torts <u>or as one continuing tort, the 1943 judgment does not constitute a bar to the instant suit.</u>")

;Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985)

29b.    In fact, the Ninth Circuit's *Eichman v. Fotomat Corp.* makes clear citing the Supreme Court's *Lawlor v. National Screen Service Corp.,* that a previous action does not bar future actions for conduct that had not yet happened at the time of the previous action.  As applied to *Eichman* the Court ruled  *"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct…. [applying the rule] ..  a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case…. [and thus] …  the judgment cannot bar suit brought on post-September 7, 1977 conduct.."*  Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985)

("The judgment in Eichman I does not immunize Fotomat from liability for all future conduct. Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at 616. See also Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). California courts follow the approach taken by the Supreme Court in Lawlor v. National Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), that a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.' " Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at 615 (quoting Lawlor, 349 U.S. at 328, 75 S.Ct. at 868). Thus, because Eichman I was settled on September 7, 1977 and judgment was entered as of that date, the causes of action disposed of in Eichman I were for pre-September 7, 1977 conduct and the judgment cannot bar suit brought on post-September 7, 1977 conduct. See Los Angeles Branch NAACP v. Los Angeles Unified School District, 750 F.2d 731-39 (9th Cir. 1985).... Eichman I, therefore, does not preclude the pendent state claims in Eichman III insofar as the latter alleges wrongful conduct occurring after the settlement date of the former.")

29c.    The Ninth Circuit's *Clark v. Yosemite Community College Dist* further clarifies that *"The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered…. "When other facts or conditions intervene, forming a new basis for a claim, the issues are no longer the same and res judicata does not apply…"* Clark v. Yosemite Community College Dist, 785 F.2d 781, 789 (9th Cir. 1986)

("The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered, and to the legal rights and relations of the parties as fixed by the facts determined in the judgment. Colvig v. RKO General, Inc., 232 Cal.App.2d 56, 42 Cal.Rptr. 473, 485 (1965). When other facts or conditions intervene, forming a new basis for a claim, the issues are no longer the same and res judicata does not apply….")

Per United States v. Felix *"Conspiracy is a distinct offense from the completed object of the conspiracy"); cf. id., at 793 ("[I]t does not violate the Double Jeopardy Clause . . . to prosecute [a continuing criminal enterprise] offense after a prior conviction for one of the predicate offenses."*    This exception to Res Judicata, in the civil context, is analogous to Double Jeopardy exceptions in criminal law context whereas the Double Jeopardy Clause, which protects against being punished twice for the same offense, does not apply when a defendant commits multiple "discrete [adverse ongoing] acts" that violate the same statute (i.e. continuing conduct).    Per the Supreme Court's *United States v. Felix* this is true even if they are part of the same criminal episode, as long as these acts are sufficiently separated by time or space, making them distinct from each other, or if intervening conduct occurs like conspiracy, versus individual actors…).See e.g. United States v. Felix, 503 U.S. 378, 390 (1992):

**71 ; Corporate Disclosures as of February 2025.**

("In language applicable here, we pointedly stated that "the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself." Ibid.; see also Pinkerton v. United States, 328 U.S. 640, 643 (1946) ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses, . . . [a]nd the plea of double jeopardy is no defense to a conviction for both offenses"). We have continued to recognize this principle over the years. See Iannelli v. United States, 420 U.S. 770, 777-779 (1975); Garrett v. United States, 471 U.S. 773, 778 (1985) ("[C]onspiracy is a distinct offense from the completed object of the conspiracy"); cf. id., at 793 ("[I]t does not violate the Double Jeopardy Clause . . . to prosecute [a continuing criminal enterprise] offense after a prior conviction for one of the predicate offenses").")

### 30. Mr. Austin's cases are not repetitive refilings, but reflect independent Article III, Supreme Court recognized, well settled, discrete, new, legal harms

30a.  Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he refile the same exact case which causes of action terminated with the 7.14.21 judgment-disposition per lack of diversity jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of ongoing discriminatory conduct never before plead, nor experienced, by Georgetown University to an admitted Black male student *after 7.15.21* to the present.  Neither Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action (outside of context setting up for the current, and ongoing, causes of action *after* disposition of the previous case).  Mr. Austin has never been disciplined or in any trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward).  See Dckt. 14; FAC

30b.  Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.   Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and

engaged in a *"blatant deprivation of civil rights"* :

> *"such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."*

Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts, Direct

evidence per the 2023 Supreme Court.

> "But when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.
>
> An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the <u>just, speedy, and inexpensive determination of every action</u>." Fed. Rule Civ. Proc. 1"
>
> -      **Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)   <u>Cited 4,115 times</u>**
>                                                           -

Georgetown's facially discriminatory ongoing conduct from 7.15.21 to present

(Which has not had opportunity to be heard), is not vexatious per Supreme Court's

*Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)* or any other controlling law

(Alternatively, it is the right thing to do).


### 31. <u>Mr. Austin's declined consent to Magistrate Ryu</u>.

31.    Some of the early issues, once this case was filed, began when Mr. Austin said

'no' and did not provide consent to Magistrate Ryu.  He did intend to say yes to ADR

possibility (as he remains open to non-litigious resolution of these issues and

previously dealt directly with Magistrate Ryu for ADR in an IRS refund owed Mr.

Austin case negotiation).  However, Mr. Austin did not trust this increasingly

politicized case, after Defendant YGR's previous conduct to disrupt fair hearing and

completely ignore Mr. Austin's pleading, and cover sheet, in the Magistrate system.

Strangely, even when Mr. Austin made clear that he said "no" and did not provide

consent; it became a strange sticking point creating its own set of separate issues.

Ryu, previous presiding Judge recused, only after Mr. Austin already having

motioned for re-assignment, or recusal, and after Mr. Austin had already

voluntarily withdrawn the case.  Strangely, after not recusing, or facilitating a new

presiding judge so the case could actually be heard, at all, Ryu, previous judge

recused after the case was already withdrawn, but she did not dispose of the the

meritless sanctions motion, and instead recused for another judge to have a

separate judgment on just that issue.  Thus, the case was sent, or re-assigned to

Breyer, presiding judge, after Ryu recusal solely for Sanctions motion

### 32. **Mr. Austin withdrew or voluntarily dismissed per FRCP 41**

32a.    On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin,

provided notice of Voluntary Withdrawal or Dismissal  (Without Prejudice) of this

entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE

CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in

its entirety under FRCP Rule 41 (without prejudice as is the presumption).  The

Notice terminated the case, its operative complaint, Mr. Austin's First Amended

Complaint **(FAC;**Dckt. 14)**,** without need of court order upon receipt.   Plaintiff's

notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule

41 of FRCP(A)(1)(A)(i - 'notice').  Finding that it is "beyond debate that a dismissal

under Rule 41 is effective on filing, no court order is required, the parties are left as

though no action had been brought, the defendant can't complain, and the district

court lacks jurisdiction to do anything about it"  See e.g. Commercial Space

Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)  This is a new,

unrelated, unheard case, Dckt. 137 with new defendants, never heard causes of

action.  Mr. Austin voluntarily withdrew or voluntarily (dismissed) because of

documented Due Process, Equal Protection non-judicial act violations (without

prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR] under Rule 41 of FRCP without need of Judicial Order.  Under Supreme Court's *Cooter Gel,* provided these facts, *Defendant's motion shouldn't have even be considered in the first place.*

32b.    Although Mr. Austin was straightforward from the beginning based on the limited information, and communications, available with him (as he was attempting to communicate with an abuser of power), Georgetown was not and had ulterior motive from the start.   It is important to note that Mr. Austin did not actually want to sue Georgetown, and simply wanted to understand why did they behave in the manner they did, break the laws they did (once discovered), and then make the appropriate corrections according to the law, policies, and promises promulgated by Georgetown.  But, that would be too much like right.  Georgetown was committed to wrong, and racialized, wrong in their dealings with Mr. Austin.  Here, despite all on Mr. Austin's efforts up to this point to find some way to resolve proactively, Defendant Georgetown decided to utilize procedural trickery "interposition and nullification" type strategies to short circuit Due Process, Equal Protection and the guarantees of the 13,14, and 15 Amend., & 1981, 1985  (*These case are not related: & No means No - Mr. Austin did not give consent to Magistrate*)

32c.    Mr. Austin alerted the Court when filing that cases were not related (by leaving blank as civil form expressly instructs) because of completely different causes of action, and different temporal legal injuries.  In response Defendant sneakily used "interposition and nullification" deceptive tactics, while knowing these cases are completely separate cases, and causes of action, yet made deceitful motion, on original cases docket, explicitly lying that the causes of action are identical (when they are not substantively, temporarily, or continuously via ongoing

conduct).  Defendant Gonzales Rogers either didn't read the complaint, at even a cursory level, or chose to join in the deceit either way violating Mr. Austin's Due Process.  Defendant Georgetown made a motion on technical, not substantive, grounds so Mr. Austin proactively, in abundance of caution, shortened the operative complaint knowing Defendant's Gonzales Rogers preference, and bias against longer complaints (to a length well within Ninth Circuits documented allowable lengths). When Defendant Gonzales Rogers struck the amended complaint, in violation of the FRCP and controlling precedent guiding principles, Defendant YGR's bias, and Due Process violations became more overt.   Mr. Austin withdrew.  32d.       Mr. Austin updated the complaint, again, filed the new unheard causes of action and added Defendant Gonzales Rogers to prevent the same due process, equal protection, and other non-judicial act violations as described.  Because Mr. Austin observed the previous complaint taken from Magistrate Judge, Mr. Austin decided to not consent to Magistrate Jurisdiction as the issues appear a bit too politicized inspiring reactionary behaviors by stakeholders.  The second time Defendant made the underhanded motion, on the original docket, Mr. Austin went out of his way to make clear that this is a separate, distinct, unrelated case and Defendant Gonzales Rogers concurred. See dckt. 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*).  However, as soon as ruled as non-related cases, the Defendant Georgetown went into propaganda mode and actually began ignoring the ruling, spinning the information in dishonest ways, still tried every way possible to undercut a fair hearing on the merits (including the Sanctions motion).

**76 ; Corporate Disclosures as of February 2025.**

32e.    Mr. Austin added Defendant Gonzalez Rogers as a defendant based on her conduct, and willingness to join an active conspiracy violating Mr. Austin's Constitutional rights as she previously has demonstrated extreme incompetence, ultimate repeated disrespect, & anti-Black male discriminatory animus, toward Mr. Austin.  Ms. Gonzalez Rogers demonstrates an ongoing propensity to interfere with Mr. Austin's legal exercise of his rights (*including rights to Equal Protection under the law, Privacy, 42 USC 1981, Due Process, and other Constitutional Rights*).  Ms. Gonzalez Rogers has gone out of her way to, making overt administrative acts, show a disrespect of the Federal Rules of Civil Procedure, or extreme incompetence of them, with discriminatory animus toward Mr. Austin (i.e. not understanding service of process by the ECF system, nor Amending Complaints).  Mr. Austin added YGR as a Defendant not for liability in the damages portion of the Demand, but simply as the Supreme Court, Ninth Circuit, and California Supreme Court explicitly provides for injunctive relief to prevent her *ongoing* negative, administrative, & discriminatory interference with Mr. Austin's exercise of his Constitutional Rights to Due Process, Equal Protection, & other fundamental rights, creating both conspiratorial criminal, & civil injunctive, liability for Ms. YGR.  See e.g. 18 USC §241, 242.  See Dckt 15-16

## 33. FAC Complies with FRCP RULE 8, 15; Original Jurisdiction

33.    Mr. Austin's complaint more than complies with Rule 8, and 15.  It is well established, a complaint's length does not violate Rule 8 when intelligible, organized, and provides fair notice of claims.  There are no page number limits.  Mr. Austin's 64-page Amended Complaint, 17 pages less than *Hearns* in the abundance of caution meets Rule 8 pleading standards under Ninth Circuit's *Hearns*. See e.g.

Hearns v. San Bernardino, 530 F.3d 1124, 1127 (9th Cir. 2008) (*"81-page complaint alleging discrimination by an African American police officer ... meets Rule 8 standards*). "Original," Federal Question, Jurisdiction exists per 28 U.S.C. 1331; See S-82

### 34. Complaint is Substantive, Heavy in Good Faith: opposite of frivolity

"But when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.

An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"

-      **Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)    Cited 4,115 times**
-

34a.    Under Supreme Court's *Cooter Gel (*even the consideration of) Defendant Georgetown's *deceptive* motion for *any* sanction, under these set of facts (as explained above), *"when plaintiff has voluntarily dismissed a complaint"* should have been considered a waste of judicial, and plaintiff, resources, and antagonistic to FRCP Rule 1, *(and the guiding principles of the entire Rules of Civil Procedure which are designed)* "to secure the just, speedy, and inexpensive determination of every action." It is Defendant Georgetown, *(not Plaintiff)*, going out of their way to *evade* a trial on the merits of still unheard issues, using " interposition and nullification" tactics employed by White Supremacist anti-Black segregationists opposed to 1954 *Brown v. Board of Education.*  There should be No Sanctions, and no consideration of Sanctions on the plaintiff, *whatsoever.*

34b.    Mr. Austin's cases have Merit, & are firmly rooted in well settled US, and California Supreme Court, Ninth Circuit, jurisprudence & factual pleading standards.    One of Mr. Austin's *ongoing* cases, 3:23-cv-00067-AGT, based on well-settled Supreme Court, Ninth Circuit, and California Supreme Court law, is currently, and already, completed the discovery stage of its own, valuable, and

important, multi-million dollar legal proceeding with an overabundance of Defendant disclosed, *and admitted*, (as well as public) direct evidence proving every cause of action Mr. Austin plead.  That case has already twice defeated motions to dismiss, and has defendant producing over 3,000+ pages of discovery admitting, and directly proving, each element of every cause of action.  Mr. Austin's cases are neither meritless, nor groundless, and in fact are rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California Supreme Court Jurisprudence (and standards for factual pleading).

"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
-    **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
-    **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

34c.   When illegal conduct occurs 1. temporally *after* disposition of previous case, or 2. In an *ongoing* manner in violation of the law, Res judicata does not apply (even to identical causes of action like in *Brown I,* and *Brown II* ; whereas obtaining non-facially discriminatory education systems, in the South, as standard operating procedure required additional litigation from which the first Black, non-White, Supreme Court Justice, Thurgood Marshall was instrumental).  See e.g. www. uscourts.gov/educational-resources/educational-activities/justice-thurgood-marshall-profile-brown-v-board

"Marshall took over the NAACP Legal Defense and Education Fund and argued Sweat v. Painter (1950) and McLaurin v. Oklahoma Board of Regents of Higher Education (1950). Having won these cases, and thus, establishing precedents for chipping away Jim Crow laws in higher education, Marshall succeeded in having the Supreme Court declare segregated public schools unconstitutional in Brown v. Board of Education (1954).

After Brown, Marshall argued many more court cases in support of civil rights. His zeal for ensuring the rights of all citizens regardless of race caught the attention of President John F. Kennedy, who appointed him to the U.S. Court of Appeals. In 1965, Lyndon Johnson appointed him to the post of Solicitor General (this person argues cases on behalf of the U.S. government before the Supreme Court; it is the third highest office in the Justice Department). Finally, in 1967, President Johnson appointed him to the U.S. Supreme Court. Until his retirement from the Court in 1991, Marshall continued to strive to protect the rights of all citizens. Thurgood Marshall died in 1993, leaving

**79 ; Corporate Disclosures as of February 2025.**

behind a legacy that earned him the nickname "Mr. Civil Rights." Before his funeral, his flag-draped casket was laid in state in the Great Hall of the Supreme Court. He was only the second justice to be given this honor."

34d.    Oliver Brown v. Board of Education II (often called Brown II) was a Supreme Court case decided in 1955. The year before, 1954, the Supreme Court had decided Brown v. Board of Education (Brown I), which made racial segregation in schools illegal.  However, many all-white schools in the United States had not followed this ruling and still had not integrated their schools (*choosing to buck the law, enforcing an inferiority complex in Black children based on derogatory racial stereotypes*).  See e.g. Brown v. Board of Education, 347 U.S. 483, 494 (1954)

("To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. .. "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority.. all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race, — the right to exemption from unfriendly legislation against them distinctively as colored, — exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." ..Virginia v. Rives, 100 U.S (1880); Ex parte Virginia.. (1880).")

34e.    In Brown II, because of the *ongoing* discriminatory conduct, despite the previous disposition of the case, it was not barred by Res Judicata, as a separate, unrelated case, and instead the Court ordered them to integrate their schools "with all deliberate speed."  The Court espoused principles in *Brown I & II* were later codified in Title VI of the Civil Rights of Act of 1964 tying any recipient of Federal Funds (directly or indirectly) to this anti-discriminatory mandate (including Georgetown just like *Harvard or UNC*).   See also e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 109 (U.S. Jun. 29, 2023):

(" [Forbids] from intentionally treating one person worse than another similarly situated person because of his race,[or derogatory racial stereotypes]"..."In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial group-regardless of their age, education, economic status, or the community in which they live-think [or presumptively act] alike '" (quoting Shaw v. Reno, 509 U.S. 630, 647 (1993))..."the Court's Equal Protection Clause ("coextensive" with sec. 1981) jurisprudence forbids such [derogatory] stereotyping"...."furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 .... Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S., at 631, contrary as it is to the "core purpose" of the Equal Protection Clause, Palmore, 466 U.S., at 432."..."tremendous harm inflicted [by use of derogatory racial stereotyping].... See Cooper v. Aaron, 358 U.S. 1, 16 (1958) (following Brown, "law and order are not here to be preserved by depriving the [so-called Negro; Black or African American people] of their constitutional rights"). of their constitutional rights"). As the Court's opinions in these cases make clear, … racial stereotypes harm and demean individuals.")

**80 ; Corporate Disclosures as of February 2025.**

34f.    Mr. Austin's cases not only have Merit, but are not barred by res judicata, nor double jeopardy (for 18 USC 241, 242 Defendant violations under investigation), as they are 1. temporally *after* disposition of previous case, and 2. based on *ongoing* violations.  The highlighted principle is that the first illegal discriminatory act, after disposing of that case, Brown I (no matter in whose party favor) does not eliminate the Article III recognized harm of *continued* discriminatory conduct (even under the precisely same cause of action).  Mr. Austin's cases are completely distinct and separate (Diversity Jurisdiction causes of action terminating on 7.14.21 vs. Original Jurisdiction causes of action which began 7.15.21 and continue to the present).  Mr. Austin did not bring the same cause of action.  The first case, pre-July 14 2021 hinged primarily on applicability of California law in Federal Court through diversity jurisdiction of Civil code 3344, which Defendant characterized as a long arm statute, as Georgetown exploited Mr. Austin's image, in California, without Mr. Austin's knowledge, nor consent.  The Court ruled there was not enough 'minimum contacts' for diversity jurisdiction and thus the entire case was dismissed on 7.14.21.  The court did not exercise jurisdiction and did not rule on the substance of the California state privacy nor publicly violations as it ruled it had no authority to because it lacked diversity jurisdiction.  However, that has no impact on the causes of action stemming from Defendant's conduct *after* disposition of that first diversity jurisdiction based case.

34g.    Like Defendant's Board of Education II, Defendant Georgetown's "interposition and nullification," of now well settled law, against anti-Black derogatory stereotypes depriving education access, inclusion, or respect of rights (like right to contract under 1981) is telling as to what is in Georgetown's heart of

EoR - 1084 of 2347

hearts, and motives.  As soon as filed Defendant Georgetown, like Defendant Board

of Education in Brown II not only flaunts bucking the law (as they themselves

voluntarily publicly explain it), but attempt to utilize underhanded, nefarious, bad

faith, and knowingly false-deceitful tactics to obstruct a fair hearing of the issues on

the merits, and surely show no interests in alternative dispute resolution.

Georgetown makes clear their intent: in fact they don't hide it.  They are facially

discriminatory, just like the Board of Education in Brown II (based on derogatory

racial stereotypes), and moreover like reactionary, anti-Black pre-desegregation,

Jim Crow upholding, southern state legislatures who took immediate action of

"interposition and nullification" to impose sanctions on those who operated

according to Supreme Court law against US racial apartheid. See e.g. bluetiger

commons.lincolnu.edu/lgaines_sec6/10/#:~:text=State%20legislatures%20in

%20Alabama%2C%20Georgia,anyone%20who%20implemented%20desegregation%2

C%20and:

> "State legislatures in Alabama, Georgia, Mississippi, South Carolina, and Virginia adopted resolutions of
> "interposition and nullification" that declared the Court's decision to be "null, void, and no effect." Various southern
> legislatures passed laws that **imposed sanctions on anyone who implemented desegregation** enacted school
> closing plans that authorized the suspension of public education, and the disbursement of public funds to parents to
> send their children to private schools."

34h.   Georgetown knows what the law says they have to do, they even explicitly list

what the law says the have to do (*including disclosure of materially omitted facts*

*after they've already violated someone's rights*), but when it comes to Black males,

they feel entitled to say the "hell with the law (no matter what we write, what our

publicly documented policies are based on the law), and the hell with Black men," in

facially (on its face) violative manner just like *Brown II*.  Mr. Austin's cases are not

repetitive refilings, but reflect independent Article III, Supreme Court recognized,

well settled, discrete adverse, new, legal harms.  Mr. Austin did not replead the

previously plead harms from 2019-2020 (i.e. Civ. Code 3344, privacy), nor did he

refile the same exact case which causes of action terminated with the 7.14.21

judgment-disposition per lack of diversity jurisdiction.  Instead, Mr. Austin filed a

new case, with new Defendant harms of ongoing discriminatory conduct never

before plead, nor experienced, by Georgetown University to an admitted Black male

student *after 7.15.21* to the present.  Neither Civil Code 3344, nor privacy, nor

Diversity Jurisdiction are part of this action (outside of context setting up for the

current, and ongoing, causes of action *after* disposition of the previous case).  Mr.

Austin has never been disciplined or in any trouble with any institution of higher

education, *ever*, has straight A's the last nine semesters, is a good student, good

person, and good citizen (attentive, conscientious and straightforward). Dckt. 14;

### 35.  Magistrate Judge Ryu is privy to two of Mr. Austin's cases demonstrating Merit, and defeating Defendant's motion to dismiss.

35a.  Magistrate Judge Ryu was previously privy to two of Mr. Austin's cases which

went beyond the motion to dismiss, demonstrating factual grounding above

heightened pleading standard post *Iqbal and Twombly*, and repeatedly

demonstrated Merit, for trial proceedings (*both cases in privity defeating Defendant*

*motions to dismiss, going through initial case management, trial scheduling,*

*preparation, and discovery, etc.*).  It is important to note this was done with Mr.

Austin seeking, but being denied, help from the Pro Se Center on both procedural

and substantive issues, while working full time, remaining a Straight A student,

keeping his credit score up (i.e. timely paying bills, and effective money

management), while being severely injured, and tending to the myriad of other

outside responsibilities.  Mr. Austin still pushed through to follow the law, and

stand up for the rule of law, as a limited resourced self represented Black man.  Mr.

Austin did so while facing discrimination by White very well resourced, and

connected (with undue influence) 'Goliath' (bullying) law breakers (who already have a huge unfair advantage) like in *Brown I, and Brown II.*

35b.    Mr. Austin is decisive, and utilizes judicial resources as they were intended to be used, in the interest of justice, fairness, and for the rule of law *(not bullying White, anti-Black, "Goliaths" imposing their will on those with less material resources).*  One case, of the two, Magistrate Judge Ryu was privy to was against the IRS for failing to provide owed overpayment of taxes while Mr. Austin worked full time at Tesla Motors, Inc.  Embodying the *Cooter Gell, FRCP Rule 1,* principle "*to secure the just, speedy, and inexpensive determination of every action,"*  Mr. Austin ended up withdrawing, or voluntarily dismissing, and not refiling, as the costs of trial itself, to Mr. Austin (*while mindful of judicial resources*), would outweigh any benefit of winning the less than $10,000 amount owed for non-paid tax refund by the IRS.  When speaking with Magistrate Judge Ryu during the ADR proceeding he followed all instructions, including an email with the specific 'minimum' amount he would accept for settlement to [dmrsettlement@cand.uscourts.gov](mailto:dmrsettlement@cand.uscourts.gov)  (as a demonstration of Mr. Austin's good faith, and intent to "*to secure the just, speedy, and inexpensive determination of every action."*)

---------- Forwarded message ---------
From: **George Austin** <gaustin07@berkeley.edu>
Date: Thu, Mar 9, 2023 at 9:30 PM
Subject: Settlement Offer Per Dckt#121 (and Settlement Conference Call)
To: Yost, Landon M. (TAX) <landon.m.yost@usdoj.gov>, western.taxcivil_usdoj.gov <western.taxcivil@usdoj.gov>
Cc: <DMRsettlement@cand.uscourts>

Good Evening, Judge Ryu and Mr. Yost

Per the settlement conference call I am following up with a settlement Demand or Offer that I would consider.  I (Mr. George Jarvis Austin) would consider a settlement offer in the range of ██████████████ to avoid further unnecessary delays, and litigation costs.

The original costs, refund amount owed Mr. Austin, is ██████. I'd be willing to consider an **offer in the range of** ██████████████ to encourage prompt resolution of this matter going on three years in September-October (when payment should have been made in 2020).

Are you amenable to this offer, Mr. Yost ?

Thank you,

George Jarvis Austin
Self Represented, Pro Se

**84 ; Corporate Disclosures as of February 2025.**

---------- Forwarded message ----------
From: **George Austin** <gaustin07@berkeley.edu>
Date: Thu, Apr 6, 2023 at 1:16 AM
Subject: Pre-Settlement Follow Up
To: <dmrsettlement@cand.uscourts.gov>

Good Evening, Hon. Ryu

Attached is my pre-settlement follow up.

Thank you,

George Jarvis Austin
Self Represented, Pro Se
---------- Forwarded message ----------
From: **DMR Settlement** <DMRsettlement@cand.uscourts.gov>
Date: Tue, Apr 11, 2023 at 4:03 PM
Subject: RE: Pre-Settlement Follow Up
To: George Austin <gaustin07@berkeley.edu>

Hi Mr. Austin –

I reviewed the "Pre-Settlement Follow Up" note that you emailed to me on 4/6/23. I am not sure what it means. Are you planning on dismissing your case? Your settlement papers were due yesterday for our 4/18/23 settlement conference but I didn't receive them.


Thank you,
Judge Ryu




**Donna M. Ryu**

Chief Magistrate Judge

United States District Court

Northern District of California

https://cand.uscourts.gov/dmr

Pronouns: She/her

---------- Forwarded message ----------
From: **George Austin** <gaustin07@berkeley.edu>
Date: Wed, Apr 12, 2023 at 3:41 PM
Subject: Re: Pre-Settlement Follow Up
To: DMR Settlement <dmrsettlement@cand.uscourts.gov>

Good afternoon, Happy April 12th, Judge Ryu

Indeed, I just put a motion to 'withdraw' the case as the costs, at this point, far outweigh any potential (nominal) benefit on this case.

Thank you for the question prompt regarding costs as that helped me prioritize this appropriately.

Thank you,

George Jarvis Austin
Self Represented, Pro Se

35c.    Mr. Austin was owed the entire overpayment amount plead (tax refund), but in good faith sent a lower amount, based on the Court's, and Magistrate Judge Ryu's instructions of how good faith negotiations can typically help settlement matters to be expedited. However, the offer from the IRS's end, although significant, was still an insult based on the amount of due diligence, documented direct evidence, follow

**85 ; Corporate Disclosures as of February 2025.**

up, energy, and attempts to solve before ever even considering a lawsuit (for an

*already* <u>IRS</u> *approved* tax refund).

36d.   Although, the IRS offered a settlement amount it was too low with

Magistrate Judge Ryu, as the judge convening the ADR settlement conversation

after defeating the IRS's motion to dismiss demonstrating merit, to be considered in

good faith, and thus Mr. Austin withdrew (and has not refiled the case).  Of note,

the amount of earned income wages was not in question.  The promulgated concern

was the business related expenses for an ongoing side business which Mr. Austin

had very detailed receipts, invoices, documentation, and direct evidence, but was

insulted (that after all the time, effort, diligence, and energy on the front end to

proactively communicate, and provide any needed information with the IRS - phone,

email, mail, etc. they would still try and pro-long healthy resolution just to drag it

out). The did so knowing winning at trial would still be less than 10K (for the owed

tax refund the extent of allowed IRS liability in that context).   Austin v. Tesla

Motors, Inc. 3:23-cv-00067-AGT is *ongoing*, with demonstrated merit, with Tesla

Court ordered to produce materially omitted information of 3,000 pages of

disclosures, *only after* Mr. Austin's granted motion to for Tesla to produce

information they owed, and continued to owe each time Mr. Austin requested, post

separation  (despite the legal requirement to do so in 30 days or less after request

from an employer or joint employer, even 3 years *after* separation) substantiating

every one of Mr. Austin's plead causes of action defeating publicly traded,

multi-billion dollar "Goliath" Defendant Tesla Motor Inc.'s motion to dismiss

3:23-cv-00067-AGT.

**86 ; Corporate Disclosures as of February 2025.**

36e.   The 3,000+ pages defendant Tesla Motors, Inc. produced to Mr. Austin of initial discovery per General Order 71 (Employment Disclosure Protocols), highlight & substantiate All of the precisely factually plead, publicly documented, racially anti-Black hostile work environment (By California Supreme Court Writ, California Attorney General, Diaz v. Tesla Motors Jury Award, a separate 500 page sworn affidavit of over 100+ Black Tesla Workers attesting to past, and *ongoing,* horrendous racially discriminatory conduct, and countless articles), which Mr. Austin also personally experienced because he is a Black man, as well as other facially discriminatory conduct, California and Federal Labor Code record-keeping, and production, violations, as well as other legal violations.  Because of the different scenario Tesla Motors, Inc. case was wise to move forward, after doing a cost benefit analysis: both instances display correct use of judicial, *and* plaintiff resources. Many people, knowing they are right, and are admittedly owed money by the IRS or other entity, would just go for it without mindfulness of the material, and non-material costs and strain on judicial resources; But, Mr. Austin did (even while knowing he would win, as he was already offered settlement, and knowing he was right).  Mr. Austin utilizes judicial resources as they were intended and according to guiding principles in FRCP Rule 1, and undergirding all FRCP Rules.

## 36.  Mr. Austin is a conscientious, diligent, thoughtful, engaged, Citizen who exercises his God given rights as the Constitution intended (per controlling precedent).

36a.   Mr. Austin's well researched cases, and causes of action, following well settled Supreme Court precedent, honest, fact intensive, detailed (without outside help although he sought the aid of Pro Se Clinic) are part of civic engagement & education process for a pro se litigant and engaged citizen. See www.cand.

uscourts.gov/ community-outreach/.

> "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers."
>    -    **Erickson v. Pardus, 551 U.S. 89, 94 (2007)**

In light of the Supreme Court's *Erickson v. Pardus* mandate for pro se litigants to be held to less stringent standards (as they do not have the same luxuries, nor professional resources, guidance, training, etc. as formal bar certified attorneys) this mean spirited, and underhanded, wasteful of resources under *Cooter Gel*, motion must be placed in proper context.  This is especially true under Supreme Court's *Griffin v. Breckenridge* per the US African American or Black American experience as the 13th, 14th, and 15th Amendments were brought forth to explicitly protect Black people's rights, under the circumstances Mr. Austin's pleadings directly address. See Griffin v. Breckenridge 403 U.S. 88 (1971) Cited 4,194 times:

> "And surely there has never been any doubt of the power of Congress to impose liability on private persons under § 2 of that amendment, "for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." Civil Rights Cases, 109 U.S. 3, 20. See also id., at 23; Clyatt v. United States, 197 U.S. 207, 216, 218; Jones v. Alfred H. Mayer Co., 392 U.S., at 437-440. Not only may Congress impose such liability, but the varieties of private conduct that it may make criminally punishable or civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude. By the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free. To keep that promise, "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." Jones v. Alfred H. Mayer Co., supra, at 440. We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men."

36b.    Mr. Austin did nothing wrong, and in fact did what the law provides for what a Black person, and Black male admitted student, should do under the circumstances he is experiencing.  When Mr. Austin was made aware of any issues, he adjusted and changed per the requests or orders presented. Mr. Austin has already applied the lessons from this scenario to other new *ongoing* cases, with never heard issues.  Mr. Austin filed this separate, unlitigated, case with *ongoing* discrete adverse unconstitutional actions in ***good faith*** seeking relief from *ongoing* anti-Black racism akin to Oliver Brown (II) v. Board of Education whereas his

**88 ; Corporate Disclosures as of February 2025.**

federal right to non-discriminatory education is being infringed, trampled upon or murdered.

36c.    At present, Mr. Austin has no plans on re-filing this separate, unrelated case, either, although the issues have not been litigated, at all (i.e. Notice Clarification without prejudice).  Mr. Austin's intent, *after* Georgetown's Article III legal harms materialized fully, was to give Georgetown a good faith opportunity to correct their ongoing pattern of facially discriminatory conduct toward a highly recruited, admitted Black student (whom they owe certain duties under Federal and California law).  Mr. Austin never wanted, nor does he want, to sue Georgetown (or anyone for that matter).  Mr. Austin never intended to be involved in litigation (not even in a professional capacity), and instead was interested in the collaborative aspects of business and entrepreneurial law (helping to to design win-win scenarios for all stakeholders).  Georgetown's illegal conduct, *ongoing* and *unrepentant,* is what triggered litigation.  However, in seeing the counsel's attitude, reflecting Defendant's direction, toward ADR they have made clear their *intent*, & thought pattern toward Black male students.   Counsel's attitude toward having a basic conversation within the realm of their professional capacity about Plaintiff proactively obtaining materially omitted information to try and work out a mutually beneficial solution outside of a litigation context (in context to the long anti-Black history of that particular institution), *after* they violated his rights, and *continue* to violate his rights further highlight or 'Spotlight' defendant Georgetown's abusive posture and mindset: <u>*who seeks to harm their own admitted students?*</u>

**37.  Mr. Austin's cases honor the legacy of 'Mr. Civil Rights' the first Black, non-White, Supreme Court Justice Marshall in the subject matter, specific parties (i.e. Black student(s); Powerful White educational institution), context, and principles.**

37a.   Mr. Austin's diligent, conscientious, courageous, tireless, and autodidact efforts, and cases, should be celebrated, and encouraged, as they stand up for the rule of law.  Not the rule of bullying White Goliath defendants who feel entitled to take whatever they want without consequences.  This should be celebrated, encouraged, and supported (even by Georgetown themselves as this goes to the heart of their advertised principles), not retaliated against with *any* sort of sanctions (as it cemented from the foundation of the founding of the United States. See Dckt. 44.  Beyond *any* sanctions, this honorable conduct by an engaged citizen standing up for his rights, to a "Goliath" bully, based on factually pled, precedent based, well settled, grounded lawsuits should be applauded, encouraged, and supported (by both the Judiciary, and Law Schools like Defendant as this is what they publicly promote, and is foundational to our legal system).  See e.g.

www.uscourts.gov/educational-resources/educational-activities/justice-thurgood-marshall-profile-brown-v-board

"chipping away [at] Jim Crow ...in higher education, Marshall succeeded in having the Supreme Court declare segregated public schools unconstitutional in Brown v. Board of Education (1954).

After Brown, Marshall argued many more court cases in support of civil rights. His zeal for ensuring the rights of all citizens regardless of race"

37b.   Like Justice Marshall, eradicating this illegal Jim Crow like conduct is what Mr. Austin is doing (on a smaller scale as a Self Represented litigant who is personally experiencing Jim Crow (or worse its Enslaver predecessor era) like facially discriminatory conduct from the White, 'Goliath' Defendants he is suing). Mr. Austn most definitely should not be met with an extreme measure designed to

discourage endless baseless lawsuits, not grounded in fact, nor law, nor precedent (*as that is the opposite of what Mr. Austin is doing*).    Equal Protection per 1. the current Supreme Court's factual pleading standards, 2. framework of analysis, 3. actual cited to specific examples for application, and 4. instructions on Equal Protection violations applied directly to Mr. Austin's experience with Georgetown is not frivolous, nor baseless, *at all,* (it is the opposite).  Coextensive 42 USC 1981 violations per the current Supreme Court's 1. factual pleading standards, 2. framework of analysis, 3. actual cited to examples for application, and 4. instructions on Equal Protection violations applied directly to Mr. Austin's experience with Georgetown is not frivolous, nor baseless, *at all,* (it is the opposite).

> "Frivolous filings are "those that are both baseless and made without a reasonable and competent inquiry." Buster v. Greisen, 104 F.3d 1186, 1190 (9th Cir. 1997)

This is a form of individual liberty, the heights of political participation and citizenship as well as foundational self defense against racial abuse (especially for a Black man)  right up there with the 1st and 2nd Amendment.

> ""The first amendment is first for a reason.. The second amendment is just in case the first doesn't work out."
> - **Dave Chappelle**

37c.    Because Mr. Austin's cases or causes of action 1. have merit, 2. are not barred by res judicata, and 3. honors the legacy of only the second Justice to be provided the honor of "his flag-draped casket … laid in state in the Great Hall of the Supreme Court," they cannot be frivolous, and are in fact the opposite as his pleadings address facially violative conduct of Title VI, Equal Protection, 42 USC 1981, and other fundamental laws (providing *more than* a 'plausible' view of the law) under the 2023 Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard* no sanction should even be considered.  Mr. Austin's case(s) or still unheard on the merits causes of action are based precisely on the

Supreme Court's most on point recent ruling on the very topic displaying an overabundance of Merit, and facially discriminatory prima facie case Defendant conduct.  See e.g. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. No. 20-1199 (U.S. Jun. 29, 2023):

> (For present purposes, it is significant that, in so excluding Black people, government policies affirmatively operated…., affirmatively acted-to dole out preferences [creating unfair advantage for centuries] to those who ….were not Black [,helping to create massive racial wealth inequality and other societal racial markers of inequity; injustice))
>
> ("[Georgetown's privacy, and internal complaint or conflict resolution] systems also fail to comply with the Equal Protection Clause's [co-existent with section 1981's] twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…. [Georgetown's structures] are zerosum, and a benefit provided to some [students] but not to others necessarily advantages the former at the expense of the latter.")")
>
> ("[Georgetown's privacy, and complaint structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way the operated]-the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s] …. Such stereotyping is contrary to the "core purpose" of the Equal Protection Clause. Palmore, 466 U.S., at 432. Pp. 2629.")

As part of his duties to report wrongdoing, when initially uncorrected, Mr. Austin is a Federal whistleblower, and admitted student (with *ongoing* simultaneous investigations) protected by whistleblower statutes per OIG, DOE, DOJ, etc., regarding good faith formal complaint(s) of Defendant Georgetown illegal, fraudulent, facially discriminatory, Equal Protection violating *ongoing* conduct.

37d.   Mr. Austin made formal complaints and provided notice to key decision makers of all stakeholder of Georgetown's *ongoing* illegal conduct.  Mr. Austin alerted Defendant Georgetown and Magistrate Judge Ryu (and other witnesses) in real time that he is a whistleblower and protected by Federal Whistleblower statutes.  In response Defendant Georgetown, and their counsel, notably did not correct their ongoing violations of Federal, DC, and California law, but furthered their illegal conduct through additional illegal discriminatory and retaliatory conduct (like this motion) designed to intimidate, unjustly attack Mr. Austin's person, intelligence, and character, and suppress Constitutionally protected activity (that he legally engages in conscientiously, thoughtfully and mindfully).

37e.    Defendant's motion violates Due Process, is dishonest, in bad faith, and retaliatory meant to harass, discourage civic engagement, and continue a transparently discriminatory "interposition and nullification" White Supremacist pattern and should have never even been considered.  Defendant's sanctions motion is knowingly-willfully dishonest to violate Due Process.  See e.g.  Fjelstad v. American Honda Motor Co.762 F.2d 1334 (9th Cir. 1985) Cited 317 times:

> (682 F.2d 802 (9th Cir. 1982). Due process limits the imposition of the severe sanctions of dismissal or default to "extreme circumstances" in which "the deception relates to the matters in controversy" and prevents their imposition "merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." Wyle, 709 F.2d at 589, 591.)

Defendant knows they are acting in bad faith by "going to extraordinary measures to [hide or] destroy evidence," pervert justice, and *evade* a fair hearing on the merits of the still unheard claims.  See e.g. Haeger v. Goodyear Tire & Rubber Co., 793 F.3d 1122, 1133 (9th Cir. 2015):

> ("Leon, 464 F.3d at 961 (plaintiff demonstrated bad faith by going to extraordinary measures to destroy evidence. Actions constituting a fraud upon the court or actions that cause "the very temple of justice [to be] defiled" are also sufficient to support a bad faith finding. Chambers, 501 U.S. at 46, 111 S.Ct. 2123. For example, in Pumphrey v. K.W. Thompson Tool Company, the decedent's family brought a wrongful death action against a gun manufacturer after the decedent dropped the manufacturer's gun with the safety devices engaged and it fired, killing the decedent. 62 F.3d 1128, 1130 (9th Cir.1995). During trial, the manufacturer introduced tests showing that when the gun was dropped, the safeties performed as designed and the gun never fired. Id. After the trial concluded, Plaintiffs' attorney learned that in a subsequent, unrelated lawsuit, the manufacturer had produced tests during which the gun had fired when dropped. Id. These tests had not been produced during Plaintiffs' litigation even though they were available two months before trial, and despite the manufacturer's assurance that gun tests would be made available upon their discovery. Id. at 1131. The manufacturer also affirmatively mischaracterized the nature of these tests during later discovery, and introduced testimony during trial that it had never seen the gun fire when dropped. Id. at 1132. Plaintiffs moved to set aside the trial verdict, pursuant to Federal Rule of Civil Procedure 60(b). Id. at 1130. We upheld the district court's grant of a new trial finding that the manufacturer had "engaged in a scheme to defraud the jury, the court, and [the Plaintiffs], through the use of misleading, inaccurate, and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct the false impressions created...." Id. at 1132. We further held that the "end result of the scheme was to undermine the judicial process, which amounts to fraud upon the court." Id. (citing Hazel–Atlas Glass Co. v. Hartford–Empire Co., 322 U.S. 238, 245–46, 250, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (deliberately planned scheme to present fraudulent evidence constitutes fraud upon the court); Abatti v. C.I.R., 859 F.2d 115, 118 (9th Cir.1988) (fraud upon the court involves unconscionable plan or scheme to influence the court improperly)). While the procedural posture of Pumphrey differs from the one in this case, the similarities with this case support the conclusion that the district court did not abuse its discretion in concluding that Sanctionees engaged in fraud upon the court in their scheme to avoid their discovery obligations.")

Defendant counsel knows these are new, never heard, substantive issues, and causes of action (both in substance and temporally) which is why he used procedural manipulation tactics to avoid a hearing on the merits. Defendant descended into underhanded maneuvers to discredit, and baseless ad hominem attacks to distract from justice, not in pursuit of it (while distracting from the very real phenomena of Defendant's purpose of hiding or destroying material evidence).

**93 ; Corporate Disclosures as of February 2025.**