Case No. **24-6943**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————————————

GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: **53-0196603***)

———————————————————————

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

———————————————————————

**MR. AUSTIN'S (APPELLANT'S) EXCERPTS OF RECORD
VOLUME 7 of 9**

———————————————————————

Mr. George Jarvis Austin,

Plaintiff-Appellant (Self-represented)

2107 Montauban Ct., Stockton, CA

209.915.6304,

gaustin07@berkeley.edu



Find a Therapist (City or Zip)

Verified by **Psychology Today**



**Sherry Hamby Ph.D.**
The Web of Violence

EMPATHY

# What Is Dehumanization, Anyway?

Dehumanization has been in the news a lot—understand it and how to fight it.

Posted June 21, 2018

    Reviewed by Jessica Schrader

   

When you see the president or other politicians use terms like "animals" or, even worse, "infestation" (a term usually reserved for insects), they are engaging in *dehumanization*. People use dehumanization to justify greed, violence, and abuse. Although dehumanization is most associated with right-wing nationalism, others sometimes use dehumanizing language, too.

*Dehumanization* is one of **eight forms** of "moral disengagement" described by the psychologist Albert Bandura. Humans are capable of terrible crimes, and civilization has developed ways to inhibit aggression. However, we have not eliminated violence, in part because of **techniques** for creating (false) excuses and justifications for immoral behavior. All

ognize as unethical and unfair. For example, assuming most people are not big fans of child abuse, dehumanization and other moral disengagement strategies are used to trick people into accepting abuse of some children. The manipulators do it to secure power or financial gain.

*Dehumanization* involves redefining the targets of prejudice and violence by making them seem less human (that is, less civilized or less sentient) than other people. The classic strategy for this is to use terms like "animals" and "vermin." Referring to people as "illegals" is also dehumanizing. You'll see dehumanization at work in most **large-scale atrocities or genocides** committed by governments, armies, or terrorists. The main purpose is to get people to accept or even engage in behaviors that they know are wrong.

Dehumanization is not limited to political issues, however. Any time someone reduces a human being to **a single characteristic**, especially a negative one, they are dehumanizing. "Alcoholic," "addict," "diabetic," and "schizophrenic" all rob people of the full complexity of their lives and reduce them to a symptom or disorder. Even many self-professed humanitarians used dehumanizing (and inaccurate) terms like "superpredator" in the **crime scare of the 1990s**. All slurs (insults based on race, gender, sexual orientation, health status or other characteristic) are also dehumanizing.

## Other Moral Disengagement Strategies

**Victim-blaming** ("You made me do it!") is a favorite strategy of many perpetrators. Like dehumanization, *victim-blaming* works by trying to taint and diminish the target of the vio-

US

Some moral disengagement techniques involve pretending that immoral acts are not really bad. *Euphemistic labeling* is popular with governments, such as when they refer to "collateral damage" instead of the slaughter of civilians, or "tender age shelters" for imprisoning infants and toddlers. *Moral justification* tries to re-frame the action as a moral good (such as, "The ends justified the means"), while *advantageous comparison* introduces a moral relativism where you don't have to meet your own standards of goodness, you only have to be better than your enemy ("What they do is much worse"). This latter one has sometimes led people to fight violence with violence, but nonviolent resistance is not only more ethical but also **more successful**. *Distortion of consequences* denies that the actions were harmful. For example, when infants and children were taken from their parents, some officials pretended that this was not harmful **as long as they were being fed**. Just because people survive mistreatment does not mean they were not harmed by it.

ARTICLE CONTINUES AFTER ADVERTISEMENT

people justify their actions by saying other people do it too, are forms of moral disengagement designed to minimize personal responsibility for immoral actions. Mob behavior is partly caused by these forces, for example when normally law-abiding people loot stores after blackouts or natural disasters. However, the most problematic versions of this are when soldiers, law enforcement officers, or other authority figures use their legal authority to abuse the public.



Source: Pixabay

## The Golden Rule: The Opposite of Dehumanization

The opposite of dehumanization is empathy and respect, as perhaps best expressed by the Golden Rule, "Do unto others as you would have them do unto you." Some version of that belief is found in virtually all world religions. The Golden Rule is as humanizing as it gets, by calling for everyone to give others the same treatment that you would like to get yourself. The Golden Rule means that there should be no us-them thinking—that all humans, or in some philosophies all living beings, are part of "us."

| THE BASICS |
| --- |
| The Importance of Empathy |
| Take our Empathy Test |
| Find a therapist near me |

US

There's less research on the causes of moral disengagement (versus how moral disengagement is a cause of violence and prejudice), but there are some well-established pathways.

The first is manipulation, political or otherwise. In some circumstances, it does not take much to tip people into us-versus-them **tribalism**.

ARTICLE CONTINUES AFTER ADVERTISEMENT

Second, dehumanization is a component of narcissistic and antisocial personality disorders. Many people with these personality disorders cannot appreciate that other people have inner lives like their own. *They are the stars in their own movie, and the rest of us are just props*. Fortunately, these cases are relatively rare, they can be dangerous if they get a platform to manipulate others.

**EMPATHY ESSENTIAL READS**



**The Value of an Empathy Walk**

**Empathy in Teens: Unraveling the Adolescent**

US

Dehumanization can also be part of the **cycle of violence**. People who were mistreated as children can wall themselves off as a defense against that pain (physical and psychological). Sometimes, what helps abuse victims survive childhood becomes a handicap when they reach adulthood. They may be afraid of experiencing feelings about other victims because that could open the floodgates to all of their bottled-up feelings.

## How Can Dehumanization Be Prevented or Reduced?

Another way of thinking about dehumanization is that some people have under-developed skills of empathy and perspective taking, and when you think about it that way, it suggests solutions.

Most of us can become more empathic. For children, many **programs** improve social and emotional learning (SEL). We now recognize the value of "**emotional intelligence**" for adults too, and that emotional intelligence can be learned **later in life**.

In cases related to PTSD, interventions such as cognitive-behavioral therapy or mindfulness can help people handle their feelings and create more space for empathy.

**Milgram's famous study on obedience** also suggests ways to weaken the diffusion of responsibility. Although many participants could be compelled to give high electrical shocks to a "student" (actually a confederate who was not really getting

on the victim, or only had indirect exposure to the authority figure (such as receiving instructions over a phone or inter-com), these factors greatly reduced their obedience. This is one reason why journalism is so important, because it helps people see what is really going on.

Most importantly, as Martin Luther King Jr. said, "Hate cannot drive out hate; only love can do that."

## You can't fight dehumanization with dehumanization.

For those of you who are horrified by the dehumanization that has led to children being kept in cages at the border or terrorists mowing down civil rights advocates, it is important to not let that horror slip into dehumanization. For example, some elements of the Antifa movement are also using moral disengagement to justify harassing people. The border pa-trol agents who are ripping children from parents and the neo-Nazi sympathizers who are advocating for racism are hu-man, too. We can call out their behaviors without calling them "monsters." Their actions might be hateful, greedy, violent, or maybe even monstrous, but they are actions that are being committed by people. Some of them may be victims them-selves, others may have grown up in families where they were taught to hate. There are ways to make a bigot, but they are still people, and recognizing their humanity will be essen-tial to reducing dehumanization. If we want a more humane society, we cannot engage in violence and harassment ourselves.

ARTICLE CONTINUES AFTER ADVERTISEMENT

## What Can You Do?

There are many specific action steps that can help you become a humanizing force in your community.

**1) Do not use dehumanizing language** when you criticize others, including people with loathsome political views or who perpetrate terrible crimes. In this article, I made sure that I refer to loathsome views or hateful behaviors and do not call people "monsters" or "Neanderthals" or other terms that suggest they are not human.

**2) Use questions or statements to draw out empathic responses**. Except for a few people with extreme narcissism or sociopathy, most people are capable of empathy. Try statements such as, "I can only imagine how I'd feel if those were my children," or "Would you be able to rip a screaming child from her mother?" Some all-purpose statements for promoting empathy include "I try to imagine what it would be like to walk a mile in their shoes," or "I always try to find common ground with others," or "I think we all want the same basic things in life." You may get some defensive instead of empathic responses, but if you can get even one person to recognize others' humanity, that would be an important accomplishment.

step process. First, validate the person (not the attitude or be-havior), or, in other words, humanize them. Second, name the issue and express some curiosity about the other person's thinking on the issue. Third, tell a personal story about how you developed your own (loving and respectful) position.

**3) Avoid posting unfiltered clips of people making dehu-manizing claims**. Several of my friends have posted clips on social media from dehumanizing pundits with comments such as "Can you believe this???" or "This is insane!!!" It is good to share and post analyses of events on social media, but it is problematic to re-post clips directly from racist or misogynis-tic sources. You do not want to support these websites with advertising income from clicking and sharing.

Also, not everyone views these clips through the same lens, and you may be inadvertently creating a "backlash" by show-ing people achieving national media coverage by espousing dehumanizing ideas. This is the same kind of contagion that can lead to increases in school shootings and suicides after media coverage.

ARTICLE CONTINUES AFTER ADVERTISEMENT

easily accessed online, we all need to learn how to cope.

**4) Remember that the only true way to raise yourself up is by lifting up others**, not running them down. Most people recognize the neediness and insecurity behind negative comments that range from petty to fully dehumanizing. Strong people do not need to "punch down" to feel good about themselves. Attacking infants and children is always punching down for adults, but so is attacking anyone who is less privileged than you are. The more authority and power you have, the more care you need to exercise in criticizing others.

**5) Be aware of—and speak up about—hidden biases in your work or other settings**. Are you and your colleagues modeling inclusiveness? For example, I recently attended a research conference on families where every single invited speaker was white. As a result, there was little consideration of social and cultural differences in families, such as the importance of extended family and the percentage of multi-generational households. We need to do more to be sure that the full spectrum of humanity is represented in all settings.

I mentioned this afterward to the conference organizers, and admittedly that was kind of a tense interaction, but one awkward interaction is a small price to pay for less dehumanization. It also made me realize that I should have done more homework to learn about the program before agreeing to be a speaker.

These are just a few ideas. If you have others, please leave them in the comments! Sometimes, the world can seem overwhelming, but there are ways to counteract dehumanizing

US

© 2018 Sherry Hamby. All rights reserved.

If you want to learn more about strengths-based approaches to dealing with adversity, come to *ResilienceCon*.

   

ADVERTISEMENT

## About the Author



**Sherry Hamby, Ph.D.**, is a research professor of psychology at Sewanee, the University of the South.

**Online:** Life Paths, LinkedIn

## More from Sherry Hamby Ph.D.

US



**RESILIENCE**          5 MIN READ

# Embracing Resilience This Holiday Season

Self-compassion, radical self-care, and compassion in challenging times.



**BIAS**          5 MIN READ

# Hate Crimes Are More Common Than You Think

Recent data suggests 3 in 5 young people experience bias-motivated attacks.



**CORONAVIRUS DISEASE 2019**          4 MIN READ

# How to Shelter in Place with a Child with Special Needs

5 steps for staying sane during challenging times with challenged kids.



**STRESS**          4 MIN READ

# 3 Ways to Keep Calm During Quarantine

How to stay calm and cope with stress while maintaining social distancing.

## More from Psychology Today

US



**EMPATHY**                    5 MIN READ

## 5 Keys to Helping Your Partner Feel Heard

People can build strong relationships by becoming better listeners and improving communication.



**EMPATHY**                    5 MIN READ

## When Someone Won't Own Up to Their Bad Behavior

What's the best way to approach a person who reacts poorly to criticism?



**SELF TESTS**                    3 MIN

## Visionary Leadership Test

Do You Have Visionary Leadership Skills?



**EMPATHY**                    2 MIN READ

## The One Crucial Thing to Do When Your Partner Is Upset

Your first response should be neither a defense nor an attack.

US



**EMPATHY**                4 MIN READ

## Why the True Crime Audience Is Predominantly Female

Many female true crime fans identify and empathize with female victims.



**EMPATHY**                3 MIN READ

## The Difference Between Empathy and Sympathy

Sympathy is a reaction to the plight of others.



**EMPATHY**                3 MIN READ

## 10 Traits Empathic People Share

An empath feels and absorbs other people's emotions and/or physical symptoms. They have a hard time intellectualizing their feelings.



**EMPATHY**                4 MIN READ

## How Children Develop Empathy

Empathy is a work-in-progress throughout childhood and adolescence.

Find a Therapist

US

City or Zip



**Cities:**

| | |
|---|---|
| Atlanta, GA | Memphis, TN |
| Austin, TX | Miami, FL |
| Baltimore, MD | Milwaukee, WI |
| Boston, MA | Minneapolis, MN |
| Brooklyn, NY | Nashville, TN |
| Charlotte, NC | New York, NY |
| Chicago, IL | Oakland, CA |
| Columbus, OH | Omaha, NE |
| Dallas, TX | Philadelphia, PA |
| Denver, CO | Phoenix, AZ |
| Detroit, MI | Pittsburgh, PA |
| Houston, TX | Portland, OR |
| Indianapolis, IN | Raleigh, NC |
| Jacksonville, FL | Sacramento, CA |
| Las Vegas, NV | Saint Louis, MO |
| Los Angeles, CA | San Antonio, TX |
| Louisville, KY | San Diego, CA |

US

Seattle, WA

Are you a Therapist? **Get Listed Today**



Subscribe Today

About          Editorial Process          Privacy          Terms          Accessibility

Do Not Sell Or Share My Personal Information

US

Psychology Today © 2025 Sussex Publishers, LLC

 **ALJAZEERA**

 **LIVE**    

**Donald Trump**   Live updates   Trump-Zelenskyy fiery meeting: Key takeaways   Why did Mexico extradite drug cartel leaders to US?   Worl   >

OPINION

Opinions | Racism

# White supremacy's inferiority complex

*White supremacy has been a useful tool to control the anger of the poor and vulnerable.*

 **Khaled Diab**
Khaled Diab is an award-winning journalist, writer and blogger.

30 Nov 2016

    |  



When frustrations threaten to bubble over, the illusion of superiority helps to channel anger away from the real authors of white underprivilege towards softer targets, writes Diab [EPA]

"Hail Trump". "Lugenpresse". Nazi salutes. The United States and the wider world reacted with shock when [footage emerged](#) of a fascist speech by the poster boy of the so-called "alt-right" movement, Richard Spencer, given right in the heart of Washington, DC.

**You rely on Al Jazeera for truth and transparency**

We use cookies and other tracking technologies to deliver and personalize ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

Allow all      Do not sell my personal information

Activism for profit: America's 'anti-affirmative action' industry

US: Are 'anti-Sharia' bills legalising Islamophobia?

Conviction: Free after 25 years of unjust imprisonment

Elon Musk believes he got Trump elected. Now he's coming for Europe

---

In his rhetoric, he echoed "manifest destiny", a 19th-century belief justifying the white European conquest of America. "We are the pioneers of the world; the advance-guard, sent on through the wilderness of untried things, to break a new path in the New World that is ours," Herman Melville, the author of Moby Dick, wrote in White Jacket.

But today's white nationalism is unlike the cocky white supremacy of the 19th century, when the West pretty much ruled large swaths of the world and required an ideology to justify its global dominance. In place of the white man's burden of yore, many whites, especially men, now feel they are regarded as the burden.

Advertisement

## Adopting the language of the oppressed

Sign up for Al Jazeera

## Americas Coverage Newsletter

US politics, Canada's multiculturalism, South America's geopolitical rise—we bring you the stories that matter.

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

By signing up, you agree to our **Privacy Policy**

protected by reCAPTCHA

[US elections: 'Alt-right' group celebrates Trump's win](#)

Behind the veneer of entitlement and thin crust lies a serious inferiority complex. "No one mourns the great crimes committed against us. For us, it is conquer or die," Spencer lamented, echoing the Islamic extremists the Christian right so despises. "We are not meant to live in shame and weakness and disgrace."

And Spencer is not alone. In a recent tweet, David Duke, the former Imperial Wizard of the Ku Klux Klan [demanded](#) that the Senate "stop the massive institutional race discrimination against whites".

The far-right movement in the US and Europe, as well as mainstream conservatism – to a lesser degree, seems to have appropriated the language of oppression and subjugation more common among the formerly enslaved and segregated African-Americans, or subject populations who lived under colonial rule, uncommon among a cultural collective still perched at the top of the human power hierarchy.

In societies whose superior technologies have for centuries visited mass slaughter upon weaker populations across the planet, there is now talk of a "white genocide" – a paranoid theory that there is a conspiracy to wipe out the white race through immigration and multiculturalism.

A [recent variation](#) on this is the conspiracy theory that the refugees flooding into Europe are not desperate civilians fleeing war, but part of an invading army bent on the destruction of Western civilisation. This supposed phenomenon has been called "[jihad by emigration](#)" – a term coined by the creator of the far-right Jihad Watch, Robert Spencer.

*But beyond the white privilege of the 'old boy' network, there is the aspirational privilege of under-privileged whites. Like the patriarchy and the class system, race primarily serves the top dogs, not the lower classes.*

But what is driving this sense of victimhood among white extremists? After all, objectively speaking, whites remain dominant within their own societies and their countries still exercise a huge amount of global hegemony, especially the US.

"White supremacy is still dealing with the aftermath of the anti-racist struggles of the 1950s, 1960s and 1970s, spearheaded by the black liberation movement, as well as the anti-colonial and anti-imperialist struggles across the global south," [Matthew Lyons](#), an independent researcher into fascism, told me.

Advertisement

**You rely on Al Jazeera for truth and transparency**

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**



"Most lynchings in the US in the 19th and 20th centuries took place [when] white privilege and power was being eroded," Barry Van Driel, vice-president of the International Association for Intercultural Education, explained to me. "That leads to identifying with an authoritarian and strong white leader to protect white interests."

### 'Whitelash'

Known popularly as a "whitelash", this phenomenon saw the US swing from electing its first African American president, the most visible symbol of the advance of civil rights, to electing arguably its most unqualified white candidate ever.

Donald Trump epitomises the truism that hell hath no fury like a middle-aged white man scorned. Raised with a diamond-encrusted golden spoon in his mouth, Trump believes it is his inalienable right to be a master of the world; he is less neo-Nazi, more neo-narcissist.

OPINION: Donald Trump as a monkey wrench

Imagine how galling and frustrating it must have been for Trump that an unknown black senator became president before him – and to the adulation of the liberals, to which Trump had once belonged, who sang Obama's praises at a rock concert.

Even now that he is president-elect, Trump cannot emerge from under the shadow of his rock star predecessor, whom the liberals regard as a mixture of cool intelligence and vision.

But beyond the white privilege of the "old boy" network, there is the aspirational privilege of underprivileged whites. Like the patriarchy and the class system, race primarily serves the top dogs, not the lower classes. In fact, racial supremacy has been used since its invention to control the anger and frustration of ordinary and poor whites in two ways.

The Listening Post: Normalising Trump – The US media whitewash

Firstly, although many whites have always been almost as economically disadvantaged as other "inferior" groups, their sense of belonging to the "superior" group helps distort their subordinate reality and absorb their frustrations.

Secondly, when these frustrations threaten to bubble over, this illusion of superiority helps to channel anger away from the real authors

You rely on Al Jazeera for truth and transparency

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

As unchecked neoliberal economics creates a growing underclass of unemployed whites in the US and many parts of Europe [with no prospects](), the conditions are ripe for the rise of a similarly delusional and destructive white nationalism that can potentially wipe out everything multicultural progressives hold dear and lead to large scale conflict.

*Khaled Diab is an award-winning Egyptian Belgian journalist, writer and blogger. He is the author of Intimate Enemies: Living with Israelis and Palestinians in the Holy Land. He blogs at www.chronikler.com.*

*The views expressed in this article are the author's own and do not necessarily reflect Al Jazeera's editorial policy.*

**About** ⌄

**Connect** ⌄

**Our Channels** ⌄

**Our Network** ⌄

Follow Al Jazeera English:

    



© 2025 Al Jazeera Media Network

**You rely on Al Jazeera for truth and transparency**

We use cookies and other tracking technologies to deliver and personalize content and ads, enable features, measure site performance, and enable social media sharing. You can choose to customize your preferences. **Learn more about our Cookie Policy.**

UNCOMMON COMPASSION

 **VCU**Health

# News Center

All   Latest News   In The Media   Inspiring Stories   News Releases   Health and Wellness   Community Impact

Removing obstacles facing our community

Creating opportunities in our workforce

Research on health disparities

For Journalists   Search Our News

Back to previous page

## Loving Yourself and Others: The Impact of Compassion on Mental Health and Wellness

### Cultivating compassion for yourself and others can lead to healthier relationships.

February 07, 2023



*A VCU expert shares how we can engage in self-care activities on a day-to-day basis to improve our wellbeing. (Getty Images)*

By Dina Weinstein

Love isn't easy. Sometimes it's hard.

### Related Articles



**Take charge of your heart health**

February 27, 2025



**'Knowledge can be power': Medical student's research driven by childhood diagnosis**

February 24, 2025

Taylor Crouch, a licensed clinical psychologist and assistant professor in the Department of Psychiatry at Virginia Commonwealth University School of Medicine, is an expert on how physical pain affects emotional pain. Oftentimes when these issues manifest, Crouch's work shows it can lead to someone feeling full of criticism toward themselves, disconnected or lonely in their relationships. Crouch focuses on boosting patients' connections to facilitate healing from feelings of detachment and isolation. That includes having more positive connections to themselves.

"Sometimes patients can be concerned that self-compassion is going to make them lazy or self-indulgent, but self-compassion is very different from being self-indulgent. It's really having an attitude of wanting to be as healthy as you can be and live the best life you can by making changes from a place of self-care and self-love," Crouch said.

**Crouch spoke with VCU Health News about how compassion, mental health and wellness can all connect to strengthen our self-image and relationships with others - and what we can do to love ourselves and others more.**



### How quitting smoking boosts your heart health

February 24, 2025

## What does it mean to have a self-love practice? And what does this look like in someone's daily life?

There can be a more formal practice of self-love and then there are more informal day-to-day habits that allow us to love ourselves. A more formal practice of self-compassion might be taking some time out of the day to practice types of meditation focused on cultivating loving-kindness, also called metta meditation, as well as other exercises to build daily mindfulness practices. We can practice paying attention to the inner critic in our thoughts and replacing that harsh inner voice with kinder, more compassionate words.

On a day-to-day basis, we can engage in self-care activities rather than just focusing on taking care of other people, our jobs and responsibilities. We can take some time out of our day to do small things just because we like to do them, whether that's going for a walk, listening to our favorite music or taking a longer bath than is necessary.

Self-love can also be self-advocacy such as speaking up for ourselves, advocating for our needs and wants in personal and professional relationships, which can be difficult and vulnerable.

## How does having a loving and/or positive relationship with yourself help your mental health and well-being?

There is a large body of psychological research that shows self-compassion and self-love do have a strong impact on our mental health and our emotional state, both in terms of decreasing anxiety, depression, anger and loneliness and also increasing support and encouragement for ourselves.

Our positive state can increase feelings of happiness, gratitude and connectedness to other people. That self-compassion allows us to calm down our nervous system and turn down the self-critical voices, which allows us to engage more with our world and with other people. Self-compassion helps us feel more connected to other people because the more self-compassionate we are, the more we're able to be compassionate toward others and connect with others. So self-compassion can also increase our motivation and energy to do things that are important to us.

## Whether platonic or romantic, how can a self-love practice also build stronger or more loving relationships?

When we can be compassionate toward ourselves, it opens the door for us to be accepting and loving toward other people. When we're stuck in a negative state in our mind - even if it is just toward ourselves and not toward others - the emotional impacts can close us off from connecting to other people. One of the main components of self-compassion is keeping in mind

the common humanity and awareness that your experiences are connected to other people's experiences. Everyone suffers, which allows us to be more empathetic and compassionate with ourselves as well as other people. This is good for friendships and relationships.

Humans are wired for connection with other people whether through words, spending time together or physical touch. We need to be connected to others and that degree of connection directly impacts our mental health.

There's an epidemic of loneliness in our society right now. Even though we have other ways of connecting now through technology and social media, more people report feeling lonely than ever before. And that is related to things like depression, anxiety, physical health problems, and our emotional well-being.

### How can people build more loving and stronger relationships while also maintaining a practice of self-love?

When we are working on our relationship with ourselves, by being kinder and more compassionate with ourselves, what is likely happening is that you're also building feelings of love and compassion toward other people and vice versa.

Now, most of us are better at being kind and loving toward other people than we are to ourselves.

If you're struggling with how you're supposed to be kind toward yourself, you may ask: "What does that even look like? What does that sound like?" Often people have a hard time coming up with an answer to that.

But if you are someone who is caring and loving toward other people, you can ask yourself: "How would I talk to my best friend right now? What would I tell my partner if they were struggling with this? What kind of tone of voice would I use if I was speaking to someone else who was suffering? How would I show up for someone else?"

Flipping your inner dialogue to explore how to help another person can be used as a tool to find ways to better support yourself.

**Sign Up for E-Newsletter**

# Justice Thurgood Marshall Profile - Brown v. Board of Education Re-enactment

As a lawyer and judge, Thurgood Marshall strived to protect the rights of all citizens. His legacy earned him the nickname "Mr. Civil Rights."

**Activity Resources**

## Brown v. Board of Education Re-enactment

Re-enactment Script - Brown v. Board of Education Re-enactment

Justice Thurgood Marshall Profile - Brown v. Board of Education Re-enactment

History - Brown v. Board of Education Re-enactment



Thurgood Marshall was born Thoroughgood Marshall on June 2, 1908 in Baltimore, Maryland. Tired of having his friends poke fun at his first name, he decided to try to improve the situation and, at the age of six, legally changed it to Thurgood. As a young man, perhaps the person who had the most influence on him was his father, a man who always told his son to stand up for his beliefs. His father's influence was so strong that, later in life, Marshall once said that his father "never told me to become a lawyer, he turned me into one."

# Early Life

Arguably, Marshall's introduction to law came in high school when, as a punishment for a prank he had pulled, the school's principal made him read the U.S. Constitution. Marshall immediately liked the document and set about memorizing various parts of it. He took special interest in Article III and the Bill of Rights. Article III establishes the judicial branch of government and the Bill of Rights lists the rights that all American citizens are supposed to enjoy. Growing up in an era when Jim Crow laws still permeated much of the country, Marshall knew that many African-Americans were not enjoying all of their constitutional rights. From an early age, Marshall was aware of racial injustices in America, and he decided to do something about them. Moreover, he also knew that the courts might be the best means for doing so.

# Education

Marshall attended the all-black Lincoln University (the oldest African-American institution of higher education in the country) and, after being rejected from the University of Maryland

School of Law because of his race, went on to attend law school at Howard University and graduated first in his class. It was at Howard University that Marshall met Charles Hamilton Houston, the vice-dean of the law school. In 1935, Houston directed the NAACP Legal Defense and Education Fund, and Marshall was his right-hand man.

It was during this time that Marshall realized that the holding in *Plessy* was inherently flawed, for "separate" could never be "equal." Marshall had always felt that the only way for African-Americans, or anyone for that matter, to succeed was to receive an education. Yet, the discrepancy in the caliber of education for whites and blacks was made all too apparent to him when, one day while traveling with Houston, Marshall witnessed a black child biting into an orange. He had received such a poor education that he neither knew what it was nor how to properly eat it. From this point on, Marshall and Houston were dedicated to a strategy which aimed at ending segregation.

# Legal Career

Together with Houston, Marshall participated in the cases *Murray v. Maryland* (1936) and *Missouri ex rel Gaines v. Canada* (1938). When Houston returned to private practice in 1938, Marshall took over the NAACP Legal Defense and Education Fund and argued *Sweat v. Painter* (1950) and *McLaurin v. Oklahoma Board of Regents of Higher Education* (1950). Having won these cases, and thus, establishing precedents for chipping away Jim Crow laws in higher education, Marshall succeeded in having the Supreme Court declare segregated public schools unconstitutional in *Brown v. Board of Education* (1954).

After Brown, Marshall argued many more court cases in support of civil rights. His zeal for ensuring the rights of all citizens regardless of race caught the attention of President John F. Kennedy, who appointed him to the U.S. Court of Appeals. In 1965, Lyndon Johnson appointed him to the post of Solicitor General (this person argues cases on behalf of the U.S. government before the Supreme Court; it is the third highest office in the Justice Department). Finally, in 1967, President Johnson appointed him to the U.S. Supreme Court. Until his retirement from the Court in 1991, Marshall continued to strive to protect the rights of all citizens. Thurgood Marshall died in 1993, leaving behind a legacy that earned him the nickname "Mr. Civil Rights." Before his funeral, his flag-draped casket was laid in state in the Great Hall of the Supreme Court. He was only the second justice to be given this honor.

Activity Download



Download Activity Package
312.58 KB

## Related Links

[Brown: A Landmark Case](#)

[Mendez v. Westminster Re-Enactment](#)

[Brown v. Board of Education Podcast](#)

**DISCLAIMER:** *These resources are created by the Administrative Office of the U.S. Courts for educational purposes only. They may not reflect the current state of the law, and are not intended to provide legal advice, guidance on litigation, or commentary on any pending case or legislation.*



**WIKIPEDIA**
The Free Encyclopedia

**WIKIPEDIA**

# Lynching of African-American veterans after World War I

After young African-American men volunteered to fight against the Central Powers, during World War I, many of them returned home but instead of being rewarded for their military service, they were subjected to discrimination, racism and lynchings by the citizens and the government.[1] Labor shortages in essential industries caused a massive migration of southern African-Americans to northern cities leading to a wide-spread emergency of segregation in the north and the regeneration of the Ku Klux Klan.[2] For many African-American veterans, as well as the majority of the African-Americans in the United States, the times which followed the war were fraught with challenges similar to those they faced overseas.[3] Discrimination and segregation were at the forefront of everyday life, but most prevalent in schools, public revenues, and housing. Although members of different races who had fought in World War I believed that military service was a price which was worth paying in exchange for equal citizenship, this was not the case for African-Americans.[2] The decades which followed World War I included blatant acts of racism and nationally recognized events which conveyed American society's portrayal of African-Americans as 2nd class citizens. Although the United States had just won The Great War in 1918, the national fight for equal rights was just beginning.



Soldiers of the 369th (15th N.Y.) who won the Croix de guerre for gallantry in action, 1919



Colonel Hayward's "Hell Fighters" in parade

## Background

### World War I

World War I began with the assassination of Austrian Archduke Franz Ferdinand on June 28, 1914 and it ended with the signing of the Armistice of November 11, 1918.[1] Though the fighting stopped, the war's potential to resume still existed and peace was only reached when representatives of Germany signed the Treaty of Versailles on June 28, 1919, exactly five years after the assassination of Archduke Franz Ferdinand.[1] On April 2, 1917, President Woodrow Wilson declared war on Germany after Germany resumed its submarine attacks on merchant and passenger ships.[1] When the United States sent men to the fronts of Europe, the United States Armed Forces remained segregated, with all-black and all-white units. Despite the



Black veteran L. B. Reed was suspected of having a relationship with a white woman and hanged over the Sunflower River Bridge, Clarksdale, Mississippi

segregation and the mistreatment which they were constantly being subjected to by everyday society, many African Americans volunteered to join the Allied war effort. By the time of the signing of the armistice with Germany, more than 350,000 African Americans had joined the military and served with the American Expeditionary Forces (AEF) on the Western Front.[1] Around 50,000 of those 350,000 experienced combat and a total of 770 African-Americans who fought for their country paid with their lives.[3] On top of that, during the course of World War 1, over 400,000 black citizens who were searching for defense jobs migrated from the rural south to the urban north in order to fill the need for laborers which existed in essential industries.[3] Although this provided new opportunities for many African American, it would go on to encourage widespread segregation and discrimination in the north after the war was over.[3]

## Reaction to returning veterans

Historically, when a war is over, those who served are lauded for their heroism and patriotism.[4] However, that has not always been the case for American soldiers of African descent. African American soldiers who served in World War 1 were treated worse before, during, and after the war than any other group of American soldiers.[4]

During a homecoming celebration for African-American veterans of World War I in Norfolk, Virginia a race riot broke out on July 21, 1919. At least two people were killed and three others were injured. City officials had to call in the Marines and Navy personnel to restore order.[5]

On August 16, 1917, Senator James K. Vardaman of Mississippi spoke of his fear of black veterans returning to the South, as he viewed that it would "inevitably lead to disaster."[6] To the American South, the use of black soldiers in the military was a threat, not a virtue. "Impress the negro with the fact that he is defending the flag, inflate his untutored soul with military airs, teach him that it is his duty to keep the emblem of the Nation flying triumphantly in the air," and, the senator cautioned, "it is but a short step to the conclusion that his political rights must be respected."[6]

Often violence broke out between serving members of the military. In both the Bisbee Riot (July 3, 1919) and the New London riots of 1919 active African-American service members were attacked by white mobs or white military units.

Many black soldiers in the years after the war were threatened with violence if they were caught wearing their uniform.[6] Many others were even physically attacked, sometimes barely escaping with their lives. During an April 5, 1919, market day in Sylvester, Georgia, black veteran Daniel Mack was walking through a busy street and brushed against a white man. The white man was offended that Mack did not show the proper amount of respect and the two got in a scuffle; police came on the scene and promptly arrested Mack for assault. He was sentenced to 30 days in prison. A few days into his sentence, on April 14, a white mob broke into the prison, took him out into the wilderness and lynched Mack; he survived by playing dead.[7] No arrests were ever made.[8] Elisha Harper, 25 years old, was the son of the Rev. T. F. Harper, a respectable and "well-behaved preacher" living in Helena.[9] He fought in the army during World War I and just returned from Europe. On July 24, 1919, while walking the streets of Newberry, South Carolina, he allegedly insulted a 14-year-old girl, who promptly reported him to the authorities. Harper was arrested and thrown in jail. Soon a white mob had gathered and would have lynched Harper if it was not for the local Sheriff who hid him away.[10]

Military service provided by African-Americans overseas and at home made little difference in citizenship for African-Americans. American society still perceived African Americans the same after the war as they did before the war.[3]

## Lynched African-American veterans

The following is an incomplete list of African Americans who had served in the military during WWI and were killed by white mobs with no trials for alleged crimes. Lynching is embedded deep in America's racial psyche.[2] By 1919, lynching had developed into a programmatic ritual of torture and empowerment to the white race.[2] The accurate number of African American veterans lynched in military uniform is unknown, but there were several cases of beatings and lynchings for the refusal to remove a military uniform, most notably the lynching of Wilbur Little in the spring of 1919.[2] Apparent from the table, the vast majority of lynchings took place in the southeast region of the United States. The three states with the largest number of African American lynchings from 1850 - 1929 were Georgia, Mississippi and Texas.[11]

| Name | City | County or parish | State | Date | Accusation | Lynching | Ref |
|------|------|------------------|-------|------|------------|----------|-----|
| Unknown | Pine Bluff | Jefferson | Arkansas | | Insult of white woman – refused to move off a sidewalk for a white woman | Tied to a tree with tire chains, and shot as many as 50 times | [6] |
| Private Charles Lewis | Tyler Station (near Hickman) | Fulton | Kentucky | December 16, 1918 | Alleged robbery | Masked men stormed the jail, smashed the locks with a sledgehammer, and hanged him from a tree | [6] [12] |
| Black vet and a black woman | Pickens | Holmes | Mississippi | May 5, 1919 | Insult of white woman – black woman wrote an "improper note" to a young white woman | | [6] |
| Sgt. Maj. John Green | Birmingham | Jefferson | Alabama | June 12, 1919 | Asking for change from a conductor aboard a segregated outbound Pratt-Endsley streetcar to Dozier Park | Shot three times in the head | [13] |
| Robert Truett | Louise | Humphreys | Mississippi | July 15, 1919 | Insult of white woman – alleged indecent proposal to a white woman | Hanged Robert Truett, a veteran who was 18 years old | [6] [14] |
| Clinton Briggs | Lincoln | Washington | Arkansas | August 3, 1919 | Insult of white woman – moved too slowly out of white woman's way | Chained to a tree, shot till dead | [6] [15] |
| L. B. Reed | Clarksdale | Coahoma | Mississippi | September 10, 1919 | Suspected of having a relationship with a white woman | Hanged from the bridge across the Sunflower River | [6] [16] |
| Robert Crosky | Montgomery | Montgomery | Alabama | September 29, 1919 | Alleged assault of a white woman | Shot by a mob | [17] |

| Name | City | County or parish | State | Date | Accusation | Lynching | Ref |
|---|---|---|---|---|---|---|---|
| Miles Phifer | Montgomery | Montgomery | Alabama | September 29, 1919 | Alleged assault of a white woman | Shot by a mob | [17] |
| Frank Livingston | El Dorado | Union | Arkansas | May 21, 1919 | Alleged murder | 100 people gathered to burn Mr. Livingston alive | [6] [18] |
| Bud Johnson | Pace | Santa Rosa | Florida | March 12, 1919 | Alleged assault of a white woman | Chained to a stake, burnt alive, his skull was split with a hatchet and pieces given to onlookers as souvenirs | [6] [19] |
| Lucius McCarty | Bogalusa | Washington | Louisiana | August 31, 1919 | Alleged attempted assault of a white woman | Mob dragged his body behind a car killing him before burning his corpse in a bonfire | [6] [16] |
| Powell Green | | Franklin | North Carolina | December 27, 1919 | Allegedly shot R. M. Brown, the white owner of a movie theater in Franklinton | Rope tied around neck, dragged for 2 miles (3.2 km) behind an automobile, then hanged from a pine sapling | [6] [20] |
| Herman Arthur | Paris | Lamar | Texas | July 6, 1920 | Alleged fatal shootout with sharecropper landlord and son over a dispute | Herman and his little brother, Ervie, tied to a stake and burnt alive | [21] [22] [23] [24] |
| Wilbur Little | Blakely | Early | Georgia | Spring 1919 | Refusal to remove military uniform | Beaten to death in uniform by a mob | [25] |
| Leroy Johnston | Helena | Phillips | Arkansas | October 1, 1919 | Was killed by a mob during the Elaine massacre, after the mob claimed they fired first. | He, along with his three brothers, were pulled off a train by a group of white men. All were shot several times and killed during a | [26] |

| Name | City | County or parish | State | Date | Accusation | Lynching | Ref |
|------|------|------------------|-------|------|------------|----------|-----|
|  |  |  |  |  |  | scuffle. Leroy was a bugler in the Harlem Hellfighters. |  |

# Contrast to White Veterans

The return home was not perfect for any one group of people leading to the development of the Bonus Army and many other displays of displeasement. A majority of World War I veterans believed that they had not been compensated enough for their service and they should have been taken better care of, especially in hospitals.[27] However, there was still a major contrast in the treatment received from white and black veterans after World War 1, leading to public unrest and loss of life.

White veterans received far more recognition from a national level for their bravery and sacrifice in the war. This included radio appearances, national headlines, and statues honoring their sacrifice.[4] The population of the United states in 1919 was over 85% white and almost all major media organizations were run by white males leading to a disparity in the media attention for the entire African-American population. A monopolized media industry and racial prejudice from white Americans led to the unwillingness to consistently recognize the efforts and sacrifices of African-American veterans. In fact, out of the nearly 400,000 African Americans who served in World War I not one was rewarded with the Medal of Honor until 1991.[4]

When veterans came back home, there were various victory parades thrown in their honor in major cities. However, because segregation was still in place there were separate parades thrown for African-American soldiers at a smaller scale.[28] During these parades there would be several examples of civil unrest, most notable during a victory parade in Norfolk, Virginia a race riot broke out on July 21, 1919. It was not just notoriety and praise that African-American veterans were lacking. The greatest gap between white and black veterans could be seen when examining financial stability and socioeconomic status.[2] On average, white Americans had far more resources and privileges to live at a higher quality of life.[29]

# Aftermath

These lynchings were among several incidents of civil unrest that are now known as the American Red Summer of 1919. Attacks on black communities and white oppression spread to more than three dozen cities and counties. In most cases, white mobs attacked African American neighborhoods. In some cases, black community groups resisted the attacks, especially in Chicago and Washington, D.C. Most deaths occurred in rural areas during events like the Elaine massacre in Arkansas, where an estimated 100 to 240 blacks and 5 whites were killed. Other major events of Red Summer were the Chicago race riot and Washington D.C. race riot, which caused 38 and 39 deaths, respectively. Both riots had many more non-fatal injuries and extensive property damage reaching up into the millions of dollars.[30]

African-Americans were not only plagued with racism upon return but the rising flu pandemic of 1918 as well.[31] Due to the statically lower socioeconomic status held by many African-Americans they were more likely to contract the flu and once contracted they were worse off fighting it. Therefore, the flu pandemic

devastated the African-American community and left their overall health and financial well being in shambles.[31] This would then cause African American World War 1 veterans to communicate directly with policymakers and bureaucrats to push professional and public health advancement in the 1920s and 1930s for all black Americans.[27]

Prior to World War I, most African Americans did not challenge the racial status quo.[3] However, these events and unequal treatment following World War I did lead to a spark in the African American community. Following the war, emboldened by their military service and their support of the war at home through defense jobs, African Americans were determined to fight for equality.[3] Racism and segregation are issues which plagued the African-American community for too long and they were now willing to fight against it.[2] In fact, during the war the African American community hosted protests against segregation and discrimination, but lacked the ignition to cause real change.[32] This change would be called the "New Negro Movement" and could be described as the radical political movement toward civil rights following World War I.[2] Emphasized in W.E.B. Du Bois's May 1919 Crisis editorial, "Returning Soldiers," in which he famously proclaimed, "We return. We return from fighting. We return fighting." .[33] The combination of the New Negro Movement and the Harlem Renaissance allowed African American intellectuals to secure social equality through literature.[34] This allowed major groups, such as the NAACP, to lobby for bills which pursued equality for African Americans.[35] Most notable was the Dyer Anti-Lynching Bill, intended to prevent lynchings in the United States, but did not pass.[2]

Although, post World War 1 could be defined as the spark that initiated the fight against the status quo and the emergence of the New Negro Movement.[2] The fight for equality and civil rights in the United States would become a centuries-long battle which is still taking place today.[3] Due to this reason, similar racial violence and lynchings occurred again after African-American troops returned from service in World War 2[28] and African American veterans of the Cold War[36]

## See also

- Mass racial violence in the United States
- List of lynching victims in the United States
- List of incidents of civil unrest in the United States
- Sétif and Guelma massacre

## Bibliography

### Notes

1. Dell, Pamela (2014). *A World War I Timeline*.
2. Davis, David (2008). "Not Only War Is Hell: World War I and African American Lynching Narratives". *African American Review*. **42**: 477–491.
3. Nina, Mjagkij (2014). *Loyalty in Time of Trial*.
4. LaRue, Paul (2017). "Unsung African American World War I Soldiers". *Black History Bulletin*. **2**.
5. Vooga, Jan. *Race Riots & Resistance: The Red Summer of 1919*.
6. Equal Justice Initiative 2019.
7. James 2013, p. 79.
8. *The Chicago Defender,* May 10, 1919.

9. *The Bamberg Herald* 1919, p. 1.

10. *The Herald and News* 1919, p. 1.

11. Reed, John. "Percent Black and Lynching: A Test of Blalock's Theory". *Social Forces*.

12. Williams 2010, pp. 223–234.

13. *Phoenix Tribune*, July 12, 1919, p. 1.

14. Clark 2016.

15. Griffith 2018.

16. Whitaker 2009, p. 54.

17. Associated Press 1919, p. 1.

18. Griffith 2014.

19. Stevenson 2017.

20. *The News Scimitar,* December 29, 1919, p. 1.

21. "Veterans Administration Master Index" (re: "Coggins").

22. "Texas, World War I Records".

23. "Lists of Incoming Passengers," "Herman Arthur," 1919.

24. *New York Age*, September 4, 1920, front page.

25. *The Chicago Defender,* April 5, 1919, p. 1.

26. Williams 2010, pp. 235.

27. Alder, Jessica (2017). "The Service I Rendered Was Just as True': African American Soldiers and Veterans as Activist Patients". *American Journal of Public Health*. **105**: 675–683.

28. "Fighting together in Korea" (https://www.bbc.co.uk/programmes/p08wf803). *BBC World Service*. 25 October 2020. Retrieved 29 October 2020. "The Documentary Podcast How the Korean War forced the US military to desegregate."

29. Papadogiannis, Nikolaos. (2013). "A Breath of Freedom: The Civil Rights Struggle and African American GIs". *European Review*.

30. *New York Times,* October 5, 1919.

31. Helene, Okland. "Race and 1918 Influenza Pandemic in the United States: A Review of the Literature". *Environmental Research and Public Health*.

32. Jordan, William (1995). " "The Damnable Dilemma": African-American Accommodation and Protest during World War I". *Journal of American History*. **81** (4): 1562–1583. doi:10.2307/2081649 (https://doi.org/10.2307%2F2081649). JSTOR 2081649 (https://www.jstor.org/stable/2081649). S2CID 159842561 (https://api.semanticscholar.org/CorpusID:159842561).

33. Williams, Chad (2007). "Vanguards of the New Negro: African American Veterans and Post-World War I Racial Militancy". *The Journal of African American History*. **92** (3): 347–370. doi:10.1086/JAAHv92n3p347 (https://doi.org/10.1086%2FJAAHv92n3p347). S2CID 141434030 (https://api.semanticscholar.org/CorpusID:141434030).

34. Fisher, Jane (2020). "African American World War I Soldiers, Claude McKay, and the Harlem Renaissance". *Afro-Americans in New York Life and History*.

35. Mikkelsen, Vincent (2009). "Fighting for Sergeant Caldwell: The Naacp Campaign Against "Legal" Lynching After World War I". *The Journal of African American History*. **94** (4): 464–486. doi:10.1086/JAAHv94n4p464 (https://doi.org/10.1086%2FJAAHv94n4p464). S2CID 141481751 (https://api.semanticscholar.org/CorpusID:141481751).

36. Dudziak, Mary (2011). *Cold War Civil Rights: Race and the Image of American Democracy*.

## References

- The Bamberg Herald (July 31, 1919). "Newberry Negro Sought by Crowd" (https://chroniclingamerica.loc.gov/lccn/sn86063790/1919-07-31/ed-1/seq-1/#). *The Bamberg Herald*. Bamberg, South Carolina: Henry S. Hartzog. pp. 1–8. ISSN 2379-4984 (https://search.worldcat.org/issn/2379-4984). OCLC 13608693 (https://search.worldcat.org/oclc/13608693). Retrieved July 21, 2019.

- "Soldier in Uniform is Beaten in Georgia Town". *The Chicago Defender*. Chicago. May 10, 1919. ISSN 0745-7014 (https://search.worldcat.org/issn/0745-7014).

- "Army Uniform Cost Soldier His Life". *The Chicago Defender*. (Big Weekend Edition). April 5, 1919. p. 1. ProQuest 493381239 (https://www.proquest.com/docview/493381239).

- Clark, James (December 9, 2016). "The Tragic And Ignored History Of Black Veterans" (https://web.archive.org/web/20200105161055/https://taskandpurpose.com/tragic-ignored-history-black-veterans). *Task & Purpose*. Archived from the original (https://taskandpurpose.com/tragic-ignored-history-black-veterans) on January 5, 2020. Retrieved September 10, 2019.

- Griffith, Nancy Snell (February 21, 2018). "Clinton Briggs (Lynching of)" (https://encyclopediaofarkansas.net/entries/clinton-briggs-8254/). *Encyclopedia of Arkansas History & Culture*. Retrieved September 10, 2019.

- Griffith, Nancy Snell (November 13, 2014). "Frank Livingston (Lynching of)" (https://encyclopediaofarkansas.net/entries/frank-livingston-8283/). *Encyclopedia of Arkansas History & Culture*. Retrieved September 10, 2019.

- Equal Justice Initiative (2019). "Lynching in America: Targeting Black Veterans" (https://eji.org/reports/online/lynching-in-america-targeting-black-veterans). Equal Justice Initiative. Retrieved September 10, 2019.

- Associated Press (September 30, 1919). "Three Negroes Are Lynched in Montgomery" (https://www.newspapers.com/clip/19303269/phifer_croskey_temple/). *The Gadsden Daily Times-News*. Gadsden, Alabama: Times-News Print. Co. OCLC 12760995 (https://search.worldcat.org/oclc/12760995). Retrieved September 11, 2019.

- Gilmore, Gerry J. (February 2, 2007). "African-Americans Continue Tradition of Distinguished Service" (https://www.army.mil/article/1681/african_americans_continue_tradition_of_distinguished_service). United States Army. Retrieved July 5, 2019.

- The Herald and News (July 29, 1919). "Negro ex-soldier insults little white girl" (https://chroniclingamerica.loc.gov/lccn/sn86063758/1919-07-29/ed-1/seq-1/#). *The Herald and News*. Vol. LV, no. 60. Newberry, South Carolina: E.H. Aull. pp. 1–8. ISSN 2333-2786 (https://search.worldcat.org/issn/2333-2786). OCLC 13640295 (https://search.worldcat.org/oclc/13640295). Retrieved July 21, 2019.

- James, Rawn Jr. (2013). *The Double V: How Wars, Protest, and Harry Truman Desegregated America's Military*. Bloomsbury Publishing USA. ISBN 978-1-60819-617-3. – Total pages: 336

- "Colored Soldier Brutally Murdered in Birmingham, Alabama" (https://chroniclingamerica.loc.gov/lccn/sn96060881/1919-07-12/ed-1/seq-1/#). *Phoenix Tribune*. Phoenix, Arizona: Tribune Pub. Co. July 12, 1919. p. 4. OCLC 35642959 (https://search.worldcat.org/oclc/35642959). Retrieved July 14, 2020.

- The News Scimitar (December 29, 1919). "Will offer $400 each for lynchers of Negro" (https://chroniclingamerica.loc.gov/lccn/sn98069867/1919-12-29/ed-1/seq-1/#). *The News Scimitar*. Vol. 39, no. 311 (4th ed.). Memphis, Tennessee: Gilbert D. Raine. pp. 1–16. ISSN 2473-3199 (https://search.worldcat.org/issn/2473-3199). OCLC 39898320 (https://search.worldcat.org/oclc/39898320). Retrieved September 10, 2019.

- "For Action on Race Riot Peril" (https://www.nytimes.com/1919/10/05/archives/for-action-on-race-riot-peril-radical-propaganda-among-negroes.html). *New York Times*. October 5, 1919. ISSN 1553-8095 (https://search.worldcat.org/issn/1553-8095). OCLC 1645522 (https://search.worldcat.org/oclc/1645522). Retrieved July 5, 2019.

- Whitaker, Robert (2009). *On the Laps of Gods: The Red Summer of 1919 and the Struggle for Justice That Remade a Nation*. Three Rivers Press. ISBN 978-0-307-33983-6. – Total pages: 386

- Stevenson, Bryan (November 10, 2017). "Bryan Stevenson: An Unspoken History of Lynching African-American Veterans" (http://www.milwaukeeindependent.com/featured/bryan-stevenson-unspoken-history-lynching-african-american-veterans/). Milwaukee Independent. Retrieved September 10, 2019.

- Williams, Chad L. (2010). *Torchbearers of Democracy: African American Soldiers in the World War I Era*. University of North Carolina Press. ISBN 978-0-8078-9935-9. – Total pages: 472

- "Veterans Administration Master Index, 1917–1940" (https://familysearch.org/ark:/61903/1:1:QPV5-Y545). FamilySearch (free database with images). Searching: "Ernest Lee Coggins," August 24, 1918; citing Military Service, NARA microfilm publication 761939 (St. Louis: National Archives and Records Administration, 1985); Affiliate Film No. 41A; Digital Folder No. 105157995; Image No. 06489.

- "Texas, World War I Records, 1917–1920" (https://familysearch.org/ark:/61903/1:1:QV18-8L51). FamilySearch (free database with images). Searching: "Herman Arther" (sic), April 29, 1918; citing Military Service, Mount Pleasant, Texas, Texas Military Forces Museum, Austin. OCLC 946607820 (https://search.worldcat.org/oclc/946607820).

- "Lists of Incoming Passengers, 1917–1938" (https://www.ancestry.com). (searching: "Herman Arthur") (textual records, 360 Boxes. National Archives Index "NAI:" 6234465). Records of the Office of the Quartermaster General, 1774–1985, Record Group 92. National Archives at College Park. Lists of Outgoing Passengers, 1917–1938. Textual records. 255 Boxes. NAI: 6234477. Records of the Office of the Quartermaster General, 1774–1985, Record Group 92. National Archives at College Park. (accessible via Ancestry.com, Army Transport Service, Passenger Lists, 1910–1939 [online]. Lehi, Utah).

- "How Arthur Boys Were Lynched and Three Young Sisters Raped" (https://fultonhistory.com/Newspaper%2011/New%20York%20NY%20Age/New%20York%20NY%20Age%201919-1921%20%20Grayscale/New%20York%20NY%20Age%201919-1921%20%20Grayscale%20-%200703.pdf) (PDF). *New York Age*. New York City. September 4, 1920. OCLC 9274417 (https://search.worldcat.org/oclc/9274417). Retrieved July 15, 2020 – via fultonhistory.com.

---

Retrieved from "https://en.wikipedia.org/w/index.php?title=Lynching_of_African-American_veterans_after_World_War_I&oldid=1274012167"

# courier journal

---

**OPINION**  *This piece expresses the views of its author(s), separate from those of this publication.*

# Where's the outrage over the FBI's report on the rise in anti-Black hate in America?

**Ricky L. Jones** Opinion Contributor

Published 5:35 a.m. ET Feb. 7, 2024 | **Updated 9:55 a.m. ET Feb. 7, 2024**

A first of its kind longitudinal report on hate crimes in America from 2018 to 2022 was recently released and there were a few disturbing takeaways. Hate crimes are on the rise the United States. One in ten hate crimes occurred in American educational institutions, from primary schools to universities. That's statistically significant and scary.

Many may be surprised that the most common victims weren't Jewish, Hispanic, Asian, Native-American or LGBTQ children. Conservative dilettantes will take umbrage at the fact that white children, who are supposedly continuously and permanently traumatized by critical race theory and diversity efforts, weren't the most targeted either. No, the report found the largest number of hate-fueled offenses across the board, including in schools, were "motivated by anti-Black bias."

## Hate crimes mostly against Black people

Before launching into the normal insane arguments that this is more Black "excuse-making" and "race-baiting," please know this report didn't come from scholars at Morehouse, Spelman, Howard or Simmons College. It didn't come from a Black think tank, the NAACP, Urban League or the National Action Network. It came from the FBI and Department of Justice.

The damning study states, "From 2018 through 2022, the most common bias type of reported hate crime offenses at schools was Anti-Black or African American, with 1,690 reported hate crime offenses involving this bias type during the observed five years, followed by Anti-Jewish (745 offenses), and Anti-Lesbian, Gay, Bisexual, or Transgender (Mixed Group) (342 offenses)."

**Need a break?** Play the USA TODAY Daily Crossword Puzzle.

**More Ricky Jones:** Kentucky needs more exceptional Black leaders like J. Michael Brown and Ben Richmond

## The level of anti-Black animus in America is high

Those are staggering numbers that show the level of anti-Black animus in America is high. Predictably, this hasn't been talked about very much. You probably haven't even heard of the report. Why? Why wasn't it a bigger story and where's the outrage?

Where are the television commercials with little black boxes telling you about the disproportionate amount of anti-Black hate crimes in America? Why aren't you being encouraged to show Black people your support and stand up against anti-Black hate?

## Where is the outrage?

Why aren't penny-ante, backwoods politicians like Max Wise down in good old Kentucky who pushed a bill that proclaimed blaming racial inequities on America's history of racism is "destructive to the unification of our nation" apologizing? Why isn't he admitting anti-Black racism wasn't just a part of the country's past, but is alive and well in its present?

Where are the mea culpas from Wise's small-time and small-minded Kentucky confederates like Reps. Matt Lockett and Jennifer Decker who masked their anti-Blackness in an ill-conceived legislative war to kill CRT and all its progeny? They and others falsely claimed CRT was pervasively taught in schools. They lied and said it was destroying the minds of children, and engendering divisiveness and hate.

If they had an ounce of decency they'd say, "We were wrong. We lied. We can't continue to push for white supremacy in American education anymore. It's dangerous. Black children are under attack in this country's schools simply because they're Black and it's getting worse. We need to teach more about how racism got us here, not less. We must protect these kids."

**Laws are attacking diversity efforts:** Maybe it's time for Black people to just leave.

Where are the congressional hearings in D.C.? Why aren't school system superintendents from around the country being called on the carpet before incensed politicians? Whey aren't college presidents from the Ivy League on down being roasted by lovers of children like the honorable Elise Stefanik (R-New York) and told, "We will not stand for this hate!"?

Why isn't Ms. Stefanik asking college presidents yes-or-no questions about their failure to protect Black students or sufficiently address this issue? Why isn't she calling for their jobs and affirming that their "forced resignations are the bare minimum of what is required."?

Where are the rich donors threatening to pull their money from universities if they don't do something to address all the anti-Blackness at their schools?  Why isn't Congresswoman Julia Letlow (R-Louisiana) so bothered by this pervasive and escalating anti-Black hate that she's proclaiming, "I have always defended higher education, but today I am embarrassed."?

Alas, there's no outrage from them or others. Politicians continue their racist attacks cloaked in anti-DEI legislation. Many predominantly white university presidents either agree with the politicians or fear them, for they are largely silent.  From sea to shining sea, all of these people, through their callousness or cowardice, are making it more and more acceptable to attack Black men, women and children educationally, politically, psychically and physically.

So yes — anti-Black hate is the most common hate in America, even in its schools. It is real, on the rise . . . and very few people seem to care.

*Dr. Ricky L. Jones is the Baldwin-King Scholar-in-Residence at the Christina Lee Brown Envirome Institute and Professor of Pan-African Studies, University of Louisville. His column appears bi-weekly in the Courier-Journal. Follow him on Facebook, LinkedIn, Threads, and X.*

# TIME

U.S.    CRIME

# Anti-Black Violence Has Long Been the Most Common American Hate Crime—And We Still Don't Know the Full Extent

**11 MINUTE READ**



A memorial across the street from Tops Friendly Market at Jefferson Avenue and Riley Street on May 18, 2022, in Buffalo, N.Y. The Supermarket was the site of a fatal shooting of 10 people at a grocery store in a historically Black neighborhood of Buffalo. *Kent Nishimura—Los Angeles Times via Getty Images*

BY **JANELL ROSS**

UPDATED: MAY 19, 2022 3:47 PM EDT | ORIGINALLY PUBLISHED: MAY 19, 2022 9:00 AM EDT

W hen a gunman opened fire at a supermarket in Buffalo, N.Y., on Saturday, killing 10 people and wounding three more, the violence was shocking in its magnitude.

But to express shock about whom the shooter targeted—Black people living in one of Buffalo's blackest communities—during his briefly livestreamed rampage, or why, would be to ignore an often dismissed but largely consistent fact of American life. One pattern has remained consistent since the FBI began tracking and reporting hate crime in 1991: Black Americans have been its most frequent victims.

"The pattern is absolutely clear, absolutely overwhelming. And in [June] 2020—that's the last year we have [numbers from] right now—the FBI data showed we had the worst [month] ever for anti-Black hate crime," says Brian Levin, a criminologist and civil rights attorney at California State University San Bernardino's Center for the Study of Hate and Extremism. Levin leads a team of researchers exploring multiple aspects of hate crime, and the language he uses to describe recent patterns is alarming. "Just like people with cameras getting the hurricane coming in, we're getting the data on it and it's severe."

**Read more:** *The Buffalo Shooter Targeted a City Haunted by Segregation*

As the country publicly declared itself to be in the midst of a racial reckoning, it turns out Black Americans were being hunted and hurt at a level unmatched since 2008—the year that saw the election of the first Black president and an attendant, hate-fueled backlash. In 2020, the most recent year for which the FBI has gathered and reported nationwide hate crime data, 2,871 Black Americans became victims of hate crimes. The number represents nearly 35% of all hate crime reported to the FBI that year. What's more, systems for reporting hate crime have long been flawed and limited in ways known to

researchers, suggesting that 2020's already high numbers fail to capture the full picture.

## Tracking a crisis

Prosecutors have not yet indicated whether they will pursue a hate-crime sentencing enhancement if and when the Buffalo suspect—Payton Gendron, an 18-year-old white man who has pleaded not guilty to murder—goes to trial. But the violence follows a years-long increase in hate-motivated crime within the United States. Hate crimes reported to the FBI grew overall in seven of the last 10 years. During that time, hate crimes perpetrated against Black victims have made up the largest portion of this activity. And since 2018, white supremacists have killed more people in the United States than any other group of extremists.

## In 2020, there were more anti-Black hate crimes in the U.S. in any year since 2008

Black Americans made up 13.4% of the U.S. population in 2020 yet nearly 35% of all hate crime victims. The same disparity has persisted for years

| | Anti-Black hate crimes | All other hate crimes |
|---|---|---|
| 2020 | 2,871 | 5,392 |
| 2019 | 1,972 | 5,315 |
| 2018 | 1,942 | 5,149 |
| 2017 | 2,059 | 5,262 |
| 2016 | 1,771 | 4,505 |
| 2015 | 1,756 | 4,115 |
| 2014 | 1,647 | 3,952 |
| 2013 | 1,908 | 4,136 |
| 2012 | 2,059 | 4,532 |
| 2011 | 2,099 | 4,200 |
| 2010 | 2,202 | 4,431 |
| 2009 | 2,297 | 4,316 |
| 2008 | 2,951 | 5,088 |
| 2007 | 2,671 | 4,952 |

Source: Federal Bureau of Investigation

TIME

Hate crime began to grow long before the pandemic, Levin explains, though the situation has gotten worse during the COVID-19 years. In 2021, when Levin and his research team analyzed hate crimes reported to police in the nation's 10 largest cities, residents had suffered through a nearly 55% collective increase in hate crimes overall compared to the previous year. Similar, if smaller-scale, trends were seen in smaller cities, too.

In Philadelphia, home to about 1.5 million people, hate crimes involving all sorts of victims grew more than any other major city. In the city of brotherly love, the home of the Liberty Bell, and the city where the U.S. Constitution was

drafted, hate crime grew by 230%, from 44 incidents in 2020 to 145 in 2021, according to data gathered and analyzed by Levin's team. A significant portion of the growth stemmed from a surge in anti-Asian hate crime in early 2020 and again in the first few months of 2021. But the remainder of both years left Black Americans—sometimes targeted for multiple reasons such as sexuality or religion, on top of race—the most frequent victims of hate crime. The FBI's 2021 data will become public late this summer and its 2022 analysis remains more than a year away. But information gathered for this year thus far from major cities shows that hate-crimes reporting has continued to rise in New York, Los Angeles, Philadelphia, and Chicago.

**Read more:** *She Coined the Term 'Intersectionality' Over 30 Years Ago. Here's What It Means to Her Today*

And yet, for several years in the last decade, states with large Black populations, such as Mississippi and Alabama, have reported hate-crime numbers in the single digits or low dozens. Major cities in Alabama and Florida have reported zero for multiple years. And, in 2020, like most years, the vast majority of law enforcement agencies across the United States reported no hate crimes at all.

That doesn't mean the crimes aren't happening. In 2018, BuzzFeed News published the results of an investigation into the 10 largest cities that reported zero hate crimes to the FBI. Reporters found 15 incident reports where descriptions of the crime or events written by police officers included strong indications that the incident might have qualified as a hate crime. In 2017, a ProPublica investigation found "evidence suggests that many police agencies across the country are not working very hard to count hate crimes."

And Black Americans may be particularly likely to have their suffering go uncounted. For the first time, in an analysis examining the period from 2015 to 2019, more than half—54%—of all hate crimes were believed to have been reported to police, a Bureau of Justice Statistics survey found. However, by a June 2020 PBS News Hour/ NPR/ Marist poll found that almost as many Black American adults—48%—doubt police treat them the same way that they do white Americans.

Meanwhile, the number of the nation's nearly 19,000 policing organizations that even participated at all in FBI hate-crime reporting fell from 15,772 in 2019 to 15,138 the next year. In addition, many cities do not have access to or are not prepared to use a new crime-reporting system required by the FBI—an infrastructure problem that Levin foresees affecting the accuracy of crime data for at least the next few years.

# Number of anti-Black hate crimes recorded in some of the largest U.S. cities,* in 2020 and 2021

**New York, N.Y.**

2020    37

2021    33

**Los Angeles, Calif.**

2020    77

2021    148

**Chicago, Ill.**

2020    23

2021    21

**Phoenix, Ariz.**

2020    94

2021    69

**San Francisco, Calif.**

2020    11

2021    14

**San Diego, Calif.**

2020    3

2021    8

**San Antonio, Texas**

2020    12

2021    24

**Houston, Texas**

2020    15

2021    15

**San Jose, Calif.**

2020    36

2021    36

2021    30

**Indianapolis, Ind.**

2020    5

2021    9

**Columbus, Ohio**

2020    12

2021    24

**Seattle, Wash.**

2020    41

2021    46

**Denver, Colo.**

2020    22

2021    17

**Boston, Mass**

2020    64

2021    46

**Las Vegas, Nev.**

2020    22

2021    33

**Washington, D.C.**

2020    28

2021    35

**Portland, Ore.**

2020    18

2021    14

**Pittsburgh, Pa.**

2020    2

2021    13

*The researchers looked at cities that gather their hate crimes data in a way that makes comparison across cities*

*The researchers looked at cities that gather their hate-crimes data in a way that makes comparison across cities possible; those cities have, over time, proved to be predictive of national trends*

Source: The Center For Hate and Extremism at California State University–San Bernardino

TIME

**Read more:** *Why the FBI Won't Release Quarterly Crime Stats for 2021*

There are signs that some law-enforcement agencies are taking necessary steps to improve the situation: Some police forces work with community and advocacy organizations, which serve as a first point of contact, to encourage more victims of crime to feel comfortable reporting their experiences. There are no national rules governing how hate crimes should be handled, but there have been efforts to develop gold-standard practices in some states. And some forces, particularly in big cities, have developed teams with special training to investigate and handle hate crimes.

But much remains to be done. Many municipalities rely on officers with no such training—some of whom are themselves people who post racist memes online or minimize the impact of bigotry in American life, Levin says.

"If you're in a large city it's probably better," Levin says. "The training standards are a lot better. But we have many departments where there are racist cops. And even beyond that, never underestimate ineptitude."

Levin believes every police agency should be required to report hate crimes in order to remain eligible for federal funding. That would be just one step in figuring out how to keep track of hate in America—but, at this moment when the potential consequences of hate have once again become so tragically clear, understanding those numbers is perhaps more important than ever.

## Behind the hate

The ideas that appear to be behind the violence in Buffalo aren't new. Versions of the conspiracy theory known as the "Great Replacement" theory—the claim that the white population is at risk of falling victim to a concerted effort to numerically, politically, and socially dominate them—have animated nationalist politics around the world, says Michael Goldfield, a labor historian and professor emeritus at Wayne State University who wrote the books *The*

*Southern Key* and *The Color of Politics.* The modern American version of the idea was outlined in a 1947 book by the extreme segregationist former Mississippi Governor and Senator Theodore Bilbo.

**Read more:** *How the 'Great Replacement Theory' Has Fueled Racist Violence*

And in today's United States, the language and the focus of that theory has shifted slightly, Goldfield explains, with greater focus on the idea that white Americans are losing their influence in politics and even elements of pop culture and social norms. And, as in Bilbo's time, the sense that white Americans no longer have sole access to the best paying jobs and life opportunities has helped the idea grow. In Bilbo's time, white Mississippi residents, a numerical minority, were keen on maintaining what Goldfield describes as an almost feudal economy. And, because African Americans at the time made up the majority of the state's population, particularly inhumane and brutal tactics were used to enforce it; Bilbo was a vocal advocate of lynching. Today, a deep reserve of white grievance, resentment, and victimhood seems to be contributing to the spread of the theory, Goldfield says—and he believes that a growing group of people isn't ashamed to repeat it, espouse it, or at least operate as if it is legitimate.

"The claim today regarding the great replacement theory is not just racial but cultural," Goldfield says. "Today the America we know and love is disappearing —you know, that sort of thing."

A December 2021 Associated Press/ National Opinion Research Center (AP/ NORC) poll found that about 20% of Americans believe there are active efforts to "discriminate" against white voters or limit their influence. About 33% of all Americans—over 20% of Democrats and nearly 50% of Republicans—now believe in elements of the so-called "Great Replacement" theory.

And, crucially, "Bilbo was regarded as an embarrassment by other white supremacists who wanted to present themselves as more genteel," Goldfield says, and was eventually pushed out of office. To Goldfield, the strong indication of embarrassment is missing in many quarters today, as politicians and pundits freely make use of similar talking points. And indeed, Biblo's death

was also marked in the pages of TIME magazine under the headline '"He Died A Martyr'"—a quote from a preacher's comments at Bilbo's funeral—along with a prediction that, "His work is finished, but his ideals will live on."

Levin, the California criminologist, echoes Goldfield's concern about the ubiquity of the theory—and sees additional patterns behind the rising hate-crimes numbers.

"We can't talk about any issue today, whether it's COVID, immigration or anything else, without it reverting back to a common denominator of this eliminationist type of rhetoric," Levin says. "The conditions are perfect for it to be wide-ranging but also elevated. The fire season is all year long now."

What might those conditions be?

There are the social and socioeconomic conditions of 2022, but there's also the constant availability of conspiracy rhetoric on the Internet. And many Americans see violence as a legitimate tool to resolve political disputes: The equivalent of 1 in 10 Americans (and 1 in 5 Republican men) said as much in a January 2022 poll conducted by The COVID States Project.

There's also a relationship confirmed by Levin's research, between acts of violence and public rhetoric about catalyzing news events; it's no coincidence, he says, that one of the worst days for anti-Black hate crime in American history came on June 1, 2020—as Black Lives Matter demonstrations grew in cities around the country in the wake of George Floyd's murder, and President Donald Trump and his aides ordered peaceful protesters tear forced out of a park near the White House. That month—June 2020—generated the largest number of hate crimes overall since national tracking began in 1991.

And, underneath it all, there are four centuries of history during which Black people have found themselves positioned—never exclusively, but always in a uniquely inescapable way—as the people who are targeted when white American hate boils over.

"Many people swim in this elastic, amorphous reservoir of grievance, where a constellation of new targets are identified all the time," Levin says. "But African Americans remain."

**Correction, May 19:** *The original version of this story misstated whether anti-Black hate crime hit record levels in 2020. The month of June was the worst month ever for anti-Black hate crime; the year 2020 was not the worst year ever. It also mischaracterized the findings of a Bureau of Justice Statistics survey. The survey considered all hate crimes in the years 2015-2019, not anti-Black hate crimes in 2019.*

## MORE MUST-READS FROM TIME

- Inside **Elon Musk's War** on Washington
- Meet the **2025 Women of the Year**
- The Harsh Truth About **Disability Inclusion**
- Why Do More **Young Adults Have Cancer?**
- **Colman Domingo** Leads With Radical Love
- How to Get Better at **Doing Things Alone**
- **Cecily Strong** on Goober the Clown
- Column: The Rise of **America's Broligarchy**

**CONTACT US AT** LETTERS@TIME.COM

Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack

**Online Shopping Tools** | Sponsored

See Why Women Are Raving About This Jawline Sculpting Tool

**tryrenewa** | Sponsored

Learn More

## South Korean Actor Kim Sae-ron Dies Age 24

The 24-year-old actress' death has triggered calls for change to the way South Korean celebrities are treated in the public arena and on social media.

**TIME**

## Amazon Is Losing Money as Shoppers Are Cancelling Prime For This Clever Hack

**Online Shopping Tools** | Sponsored

## People in Stockton are Loving Martha Stewart's Meal Kit

**Martha Stewart & Marley Spoon** | Sponsored

## Forget Furosemide, Use This Household Item To Help Drain Edema Fluid

**WellnessGuide** | Sponsored

Learn more

## New Electric Cars Come With Tiny Price Tags (Take A Look)

**FrequentSearches** | **Search Ads** | Sponsored

## Seniors Can Now Fly Business Class For the Price Of Economy

**Airlines** | **Search Ads** | Sponsored

## Japanese Endocrinologists Warn Reason Behind High Glucose Levels i US

**Sugar Reverse** | Sponsored

Learn More

## What to Know About the Circumstances of Gene Hackman's Death

The actor's wife and one of their dogs were also found dead at their Santa Fe home, discovered after some time by a maintenance worker.

TIME

## 7 Things Trump Plans To Do for Seniors On SS In 2025

**Super Saving Online** | Sponsored

## She Ate Oats Like THIS... And Watched 103 Pounds Vanish Fast!

**homeofdreams** | Sponsored

Learn More

## 2025's Most Realistic Bunny Toy

**Realistic Bunny Toy** | Sponsored

Read More

## Michelle Trachtenberg Dies at 39

The actor starred in Harriet the Spy as well as later stints on Buffy the Vampire Slayer and Gossip Girl.

TIME

## Flight Attendant Reveals How To Fly Business Class For The Price of Economy

**The Travel Experts** | Sponsored



Home

U.S.

Politics

Entertainment

Ideas

Science

World

Health

Business

Tech

Personal Finance by TIME Stamped

Shopping by TIME Stamped

Future of Work by Charter

TIME Edge

Video

Masthead

Newsletters

Subscribe

Digital Magazine

Give a Gift

Shop the TIME Store

Careers

Modern Slavery Statement

History

Sports

Magazine

The TIME Vault

TIME For Kids

TIMECO2

Coupons

Press Room

TIME Studios

U.S. & Canada Customer Care

Global Help Center

Contact the Editors

Reprints and Permissions

Site Map

Media Kit

Supplied Partner Content

About Us

© 2024 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our Terms of Service, Privacy Policy (Your Privacy Rights) and Do Not Sell or Share My Personal Information.

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.





# FBI: Blacks most often targeted in hate crimes

Jun 20, 2015 6:04 PM EST

An estimated 260,000 suspected hate crimes happen in the U.S. every year. More than 50 out of every 1 million black citizens was the victim of a racially motivated hate crime in 2012, the highest of any group, according to FBI data. Washington Post reporter Christopher Ingraham joins Hari Sreenivasan from Baltimore to put this week's attack in perspective.

# Read the Full Transcript

*Notice: Transcripts are machine and human generated and lightly edited for accuracy. They may contain errors.*

---

**HARI SREENIVASAN, PBS NEWSHOUR WEEKEND ANCHOR:**

Wednesday's massacre draws attention to the estimated 260,000 suspected hate crimes that happened in America every year, according to the Department of Justice's Bureau of Statistics.

Helping to put this week's attack into perspective is "Washington Post" reporter Christopher Ingraham, joining me from Baltimore.

So, according to the FBI, violent crime numbers have steadily been declining over the last two decades. But what about hate crimes?

---

**CHRISTOPHER INGRAHAM, THE WASHINGTON POST:**

Hate crimes are basically flat, and that's kind of an interesting — it's an interesting slice of data. Basically, there are numbers from both the FBI and the Bureau of Justice Statistics. They show that — the Bureau of Justice Statistics shows there are about 300,000 hate crimes each year. And that's been pretty steady going all the way back to 2004.

And one of the really interesting things is that this number has held steady, even as the number of active hate groups in the United States has decreased, according to the Southern Poverty Law Center. And one thing that a lot of people think is happening is it points to a rise so-called lone wolf actors, like potentially the situation in Charleston. And that's a concerning development for law enforcement officials.

---

**HARI SREENIVASAN:**

So, are the targets still the same people, whether they're from hate groups or lone wolves?

---

**CHRISTOPHER INGRAHAM:**

Yes. So, you know, the numbers and the rates seem to be pretty steady. Among racial groups, African-Americans experience the most hate crime. They're the ones most likely to be targeted. They're basically — their like chances of being target forward a hate attack are roughly double any other group and it's more than 10 times that for white people.

So, among racial groups, blacks are definitely the most targeted. You also see a fair amount of attacks based on gender towards gay men, and also a fair amount of attacks based on religion, towards Jewish people primarily.

**HARI SREENIVASAN:**

And what about the veracity of the numbers? Is there a possibility for undercounting? You said there are multiple agencies that track this.

**CHRISTOPHER INGRAHAM:**

Absolutely. So, the FBI's numbers, they provide the best breakdowns of individual racial and religious groups. But in terms of the actual numbers that they track, everyone agrees that those are pretty much a very serious undercount because the FBI only tracks crimes that are specifically categorized as a hate crime by them. And so, that means that they have to have specific concrete evidence of a racial bias.

Now, the interesting thing if you look at the Bureau of Justice Statistics numbers, they show about five times more racially biased attacks than the FBI does. And the way they do that is they just go out and they interview victims of all crimes and they ask the victims, "Do you feel you were targeted based on your race or your religion?"

And so, basically, what you get is the FBI numbers show about 6,000 hate crimes per year, while the Bureau of Justice Statistics numbers show close to 300,000 hate crimes a year, which is just a huge order of magnitude difference, and that difference is because they're interviewing people, they are asking them, "Do you feel like you were targeted because of your race or your identity or who you are?"

**HARI SREENIVASAN:**

And then, what about all of the different jurisdictions? Are they all required to report every crime potentially a hate crime or not, to either the FBI or the other bureau?

**CHRISTOPHER INGRAHAM:**

Yes, so that's been a big problem with the FBI's numbers and you see this in a lot of things. You see this with police-involved shootings. You see this in all sorts of areas. The FBI's numbers — basically, local jurisdictions report them voluntarily, so they're not mandated to do so by any means, and that can be a real issue. And so, some states do a much better job of this than other ones do.

So, that's why if you're looking to get a really good count of the overall magnitude of these incidents around the U.S., it's good to rely on the Bureau of Justice Statistics, and they — their sample, it's a national probability sample of criminal — of crime victims. And so, they paint a more accurate picture of the overall magnitude.

The tradeoff there is they don't have quite as detailed breakdowns of who the victims are or of what the motivations are as the FBI does.

---

**HARI SREENIVASAN:**

Christopher Ingraham of "The Washington Post" — thanks so much for joining us.

---

**CHRISTOPHER INGRAHAM:**

No problem. Thanks for having me.

---

*By* —  PBS News Hour



HOME    LATEST    ENTERTAINMENT    THE CULTURE    NEWS    BLACK HISTORY MONTH    BEAUTY + STYLE    OPINION    🌐 EDITIONS ⌄

s with a Whole Lotta Attitude

Home    Latest    Entertainment    The Culture    News    Black History Month    Beauty + Style    Opinion

---

THE ROOT INSTITUTE

# Take One Guess Who's The Most Targeted Group For Hate Crimes

A report sheds light on a disturbing trend in the wake of the Jacksonville massacre.

**By Noah A. McGee** Published August 31, 2023

    



Photo: Saul Martinez for The Washington Post (Getty Images)

*This article is part of* <u>*The Root Institute 2023*</u> *pre-event coverage.*

Every time I write a story where I share that another Black person was a victim of a hate crime I get a comment that accuses me of being a "reverse racist" or someone that acts like hate crimes only happen against Black people.

**Suggested Reading**

**A List Of Companies That Continue To Support DEI**

**The Evolution of Kanye West [UPDATED]**

**Why Costco, Unlike McDonald's and Walmart, Is Not Chickening Out By Rolling Back It's DEI Initiatives**

**Watch: Bakari Sellers Reveals Advice He Received From His Famous Father Civil Rights Leader, Dr. Cleveland Sellers**

**Suggested Reading**

**A List Of Companies That Continue To Support DEI**

**The Evolution of Kanye West [UPDATED]**

**Why Costco, Unlike McDonald's and Walmart, Is Not Chickening Out By Rolling Back It's DEI Initiatives**

**Bakari Sellers Reveals Advice He Received From His Famous Father Civil Rights Leader, Dr. Cleveland Sellers**

Firstly, "reverse racism" is a myth. Secondly, while I don't believe that hate crimes only happen to Black people, I do believe that they happen to them more than any other group, and I have the numbers to support that claim.

ADVERTISEMENT

RELATED CONTENT

> **Police Are Looking for a Racist Vandal Who Won't Leave This Black Family Alone**

> **The Disturbing Details Of A Reported Alabama Hate Crime**

RELATED CONTENT

> **Police Are Looking for a Racist Vandal Who Won't Leave This Black Family Alone**

> **The Disturbing Details Of A Reported Alabama Hate Crime**

On Tuesday, a report released by the Center for the Study of Hate and Extremism at California State University San Bernardino discovered that Black people were targets of 22% of all hate crimes reported in major U.S. cities in the last year, the most of any other demographic in the country.

ADVERTISEMENT

So while that is a decrease from last year when Black people were targets of 31% of all hate crimes reported, I'm not lying when I say, "Black people have the largest targets on their backs."

ADVERTISEMENT

This comes as the whole country has had its eyes focused on the Jacksonville shooting, where a White man, 21-year-old Ryan Palmeter, shot three innocent Black victims at a Dollar General. It's currently being investigated as a hate crime considering he had a swastika-emblazoned assault rifle and yelled racial slurs at the victims before fatally shooting them.

While the overall average of hate crimes against Black people in the country has fallen by an average of 6%, many major U.S. cities showed a significant increase, including New York City, Los Angeles, Austin, and Sacramento.

ADVERTISEMENT

When it comes to states, five (New Jersey, Colorado, Texas, Utah, and Ohio) broke state records for hate crimes against Black people.

For those who question, "Is this a trend over the last few years?" No, it's not.

According to Brian Levin, the director of the Center for the Study of Hate and Extremism, "Blacks remain the most frequent target not only for these extremist killers but have been the most frequent target for overall hate crime for every year since data has been collected, right up through our partial 2023 totals."

ADVERTISEMENT

So when *The Root* publishes all these stories about Black people being harassed, assaulted, and murdered simply because of the color of their skin, we're not making this shit up. This is how it really is.



# 2020 FBI Hate Crimes Statistics

In August 2021, the Federal Bureau of Investigation (FBI) released Hate Crime Statistics 2020, an annual compilation of bias-motivated incidents in the United States. Though the number of reporting agencies decreased by 452 since 2019, the overall number of reported incidents increased by 949, contributing to a total of 8,263 hate crime incidents against 11,126 victims in 2020. While annual law enforcement agency participation may fluctuate, the statistics indicate that hate crimes remain a concern for communities across the country.

According to this year's data, 62% of victims were targeted because of the offenders' bias toward race/ethnicity/ancestry, which continues to be the largest bias motivation category. Participating agencies reported 5,227 race/ethnicity/ancestry-based incidents in 2020, a 32% increase from 2019. Anti-Black or African American hate crimes continue to be the largest bias incident victim category, with 2,871 incidents in 2020, a 49% increase since 2019. Additionally, there were 279 anti-Asian incidents reported in 2020, a 77% increase since 2019. The other largest categories of hate crimes include anti-Hispanic or Latino incidents, with 517, and anti-White incidents, with 869 in total.



Incidents related to religion decreased 18% from 2019, with 1,244 total incidents reported. The largest category included:

- 683 anti-Jewish incidents, down 28% since 2019;

- 110 anti-Muslim incidents, down 38%;

- 15 anti-Buddhist incidents, up 200%; and

- 89 anti-Sikh incidents, up 82%.

Incidents related to disability decreased 17% from 2019, with 130 total incidents reported. By category:

- Anti-mental disability incidents decreased by 29% since 2019, and

- Anti-physical disability incidents increased by 8%.

Incidents related to gender and gender identity increased since 2019 with increases in gender-related incidents by 9% and gender identity-related incidents by 34%. There were:

- 50 anti-female incidents, a decrease of 4% since 2019;

- 25 anti-male incidents, an increase of 47%;

- 213 anti-transgender incidents, an increase of 41%; and

- 53 anti-gender non-conforming incidents, an increase of 13%.



See the Hate Crimes website for more highlights from the data. The full data set can be found on the FBI's Crime Data Explorer website.

The FBI Hate Crime Statistics is an annual compilation of bias-motivated incidents in the United States. For the purpose of the report, a hate crime is defined as a criminal offense which is motivated, in whole or in part, by the offender's bias(es) against a person based on race, ethnicity, ancestry, religion, sexual orientation, disability, gender, and gender identity. The 2020 data provides information voluntarily submitted from 15,136 of 18,623 law enforcement agencies around the country on offenses, victims, offenders, and locations of hate crimes.

For more information on CRS services and programs related to preventing and responding to hate crimes, view Our Work page or CRS's Programs and Services brochure for an overview of offerings.

*Updated April 4, 2023*

askcrs@usdoj.gov

202.305.2935



# Hate Crimes Case Examples

Español

Subscribe for Email Updates

Below is a selection of representative federal hate crimes case summaries. Each includes a link to a DOJ press release, with additional information.

**New Jersey | July 23, 2024 | Religion**

**New Jersey Man Sentenced for Violent Attacks Against Members of the Orthodox Jewish Community**

**Washington | June 25, 2024 | Race**

**Washington Man Pleads Guilty to Threatening Federal Worker Because of the Worker's Race**

**Colorado | June 18, 2024 | Gender Identity, Sexual Orientation**

**Colorado Resident Sentenced in Club Q Mass Shooting**

**Massachusetts | June 10, 2024 | Race**

**Massachusetts Man Sentenced to More Than Seven Years in Prison for Threatening and Harassing Interracial Couple Online**    ◯

**Texas | June 5, 2024 | Race, Religion, National Origin**

**Texas Man Charged with Hate Crime for Threatening Employees of a Sikh Organization**    ◯

**Michigan | June 4, 2024 | Race, Religion**

**White Supremacist Sentenced for Federal Hate Crimes for Conspiracy Targeting Black and Jewish People and Vandalizing Michigan Synagogue**    ◯

**California | May 29, 2024 | Race, National Origin**

**California Man Charged for Attacking Asian American Woman While Hurling Racial Slurs**    ◯

**California | May 24, 2024 | Religion**

**California Woman Sentenced to Prison for Repeatedly Threatening and Harassing Jewish Family**    ◯

**California | May 24, 2024 | Religion**

**California Man Arrested for Making Violent Threats Against North Carolinians**

**Maryland | May 14, 2024 | Race**

**Maryland Woman Pleads Guilty to Conspiring to Destroy the Baltimore Region Power Grid**

**California | May 14, 2024 | Religion**

**California Man Pleads Guilty to Shooting Two Jewish Men Leaving L.A. Synagogues**

**New Jersey | May 13, 2024 | Race**

**New Jersey Man Charged with Communicating Threats to Attack White People**

**California | May 6, 2024 | Race, National Origin**

**California Man Sentenced to One Year in Federal Prison for Driving His Car Through Demonstrators at 'Stop Asian Hate' Rally**

**North Carolina | May 2, 2024 | Race, National Origin**

**North Carolina Man Sentenced for Hate Crimes Against Black and Hispanic Men**

**North Carolina | May 2, 2024 | Religion**

> **North Carolina Man Charged with Mailing Antisemitic Threat Targeting Georgia Rabbi**

**South Carolina | May 2, 2024 | Race, Gender Identity**

> **South Carolina Man Found Guilty in the Murder of Black Transgender Woman in Allendale**

**North Carolina | May 1, 2024 | Religion, National Origin**

> **North Carolina Man Sentenced for Sending Threats to Jewish Organization**

**Florida | April 25, 2024 | Race**

> **Florida Man Sentenced for Racially Motivated Attacks on Two Black Women**

**Texas | April 23, 2024 | Religion**

> **Texas Man Sentenced to 27 Months in Prison for Sending Antisemitic Death Threats**

**New Jersey | April 22, 2024 | Religion**

**New Jersey Man Charged with Federal Hate Crime for Breaking into Center for Islamic Life at Rutgers University and Destroying Property** ○

**California | April 19, 2024 | Race, Religion**

**California Man in White Supremacist Group Sentenced to Federal Prison for Illegally Possessing Ammunition and Machine Guns** ○

**Pennsylvania | April 19, 2024 | Disability**

**Former Employee of Pennsylvania Health Care Facility Sentenced to 10 Years in Prison for Assaulting Disabled Residents** ○

**New York | April 19, 2024 | Race**

**White Supremacist Leader Sentenced to 44 Months in Prison for Making Death Threats Against Brooklyn Journalist** ○

**Maine | April 18, 2024 | Religion**

**Maine Man Sentenced for Posting Death Threats Against the Jewish Community** ○

**California | April 15, 2024 | Race, Religion, Sexual Orientation**

**Former Marine Sentenced for Molotov Cocktail Attack Against Planned Parenthood Clinic** ◯

New York | April 10, 2024 | Religion

**Former Cornell Student Pleads Guilty to Posting Online Threats Against Jewish Students on Campus** ◯

Florida | April 5, 2024 | Religion, National Origin

**Florida Man Pleads Guilty to Assaulting a Federal Employee for Her Muslim Faith** ◯

Texas | April 3, 2024 | Religion

**Texas Man Sentenced for Hate Crimes Following Mass Shooting Targeting Muslims at Car Repair Shop** ◯

Massachusetts | April 3, 2024 | Race, National Origin

**Massachusetts Man Pleads Guilty to Hate Crime Against Asian American Man** ◯

Michigan | March 27, 2024 | Religion

**Michigan Man Charged for Defacing Religious Property with Nazi Symbols** ◯

**Mississippi | March 21, 2024 | Race**

**Six Former Mississippi Law Enforcement Officers Sentenced for Torturing and Abusing Two Black Men**

**Maine | March 18, 2024 | Race**

**Maine Man Pleads Guilty to Sending Racist Death Threats Against Black Family in His Apartment Complex**

**Florida | March 14, 2024 | Race, Religion, National Origin**

**Florida Man Sentenced to Federal Prison for Leaving Threatening Voicemail Targeted at Jewish Organization**

**California | March 13, 2024 | Race, National Origin**

**Former California Rideshare Driver Charged for Antisemitic Attack on Passenger**

**Michigan | March 13, 2024 | Race, Religion**

**Michigan Man Charged for Defacing Predominantly Black Church and Public Park Bathroom**

**Oregon | March 7, 2024 | Religion**

**Oregon Man Charged with Hate Crimes for Targeting Jewish Synagogue with Graffiti**

○

**Florida | March 5, 2024 | Religion, National Origin**

**Florida Man Charged for Sending Death Threats to Council on American Islamic Relations Michigan Chapter**

○

**Michigan | March 4, 2024 | Religion**

**Michigan Man Sentenced to One Year in Prison for Violent Antisemitic Threats**

○

**Ohio | February 29, 2024 | Gender**

**Ohio Man Sentenced to Over Six Years in Prison for Plotting Mass Shooting of Women on College Campus**

○

**Ohio | February 28, 2024 | Race**

**Ohio Man Pleads Guilty to Racially Motivated Assault of Asian American Student**

○

**Texas | February 22, 2024 | Gender Identity**

**Texas Man Who Threatened Doctor Serving Transgender Patients Sentenced**

○

**New York | February 6, 2024 | Religion**

> **New York Man Sentenced to Prison for Selling a Gun to Two Men for a Mass Shooting**    ◯

**Ohio | January 30, 2024 | Sexual Orientation, Religion**

> **Ohio Man Sentenced for Firebombing a Church that Planned to Host Drag Show Events**    ◯

**Massachusetts | January 29, 2024 | Religion**

> **Massachusetts Man Charged for Sending Antisemitic Death Threats and Bomb Threats to Local Synagogue**    ◯

**Maryland | January 11, 2024 | Sexual Orientation, Gender Identity**

> **Maryland Man Sentenced for Issuing Death Threats to LGBTQI+ Advocacy Group**    ◯

**Oklahoma | December 28, 2023 | Sexual Orientation**

> **Oklahoma Man Sentenced for Throwing Molotov Cocktail at Donut Shop**    ◯

**New Mexico, Texas | December 21, 2023 | Gender Identity**

New Mexico Man Sentenced to 1 Year in Prison for Threatening U.S. Congresswoman

**West Virginia | December 20, 2023 | Religion**

West Virginia Man Sentenced for Obstructing Tree of Life Trial

**Ohio | December 6, 2023 | National Origin**

Ohio Man Sentenced to 20 Years in Prison for Federal Hate Crimes Against Haitian Nationals

**Texas | November 29, 2023 | Religion**

Texas Man Sentenced for Antisemitic Hate Crime After Seeking to Burn Down Synagogue

**Puerto Rico | November 15, 2023 | Gender Identity**

Two Puerto Rican Men Sentenced for Attack on Transgender Woman

**New Jersey | November 14, 2023 | Religion**

New Jersey Man Sentenced to 15 Months in Prison for Threatening to Attack Synagogue

**Oregon | November 2, 2023 | Sexual Orientation, Gender**

**Oregon Man Sentenced for Assaulting LGBTQI+ People**

**Montana | October 20, 2023 | Race**

**Montana Man Sentenced to 18 months in Prison for Making Racially-Motivated Harassing calls to African American Woman**

**Florida | October 19, 2023 | Race**

**Florida Man Sentenced for Racially-Motivated Attack Against Six Black Men Near 1923 Rosewood Massacre Site**

**Washington | October 16, 2023 | Race**

**Washington Man Charged with Hate Crime for Threatening Federal Worker due to Worker's Race**

**Indiana | October 6, 2023 | Religion**

**Indiana Man Indicted for Sending Violent, Antisemitic Threats to Four Offices of the Anti-Defamation League**

**Washington | October 3, 2023 | Sexual Orientation**

**Washington Man Sentenced for Hate Crime Targeting LGBTQI+ Community at Seattle Nightclub**

**Maryland | August 30, 2023 | Sexual Orientation, Gender Identity**

**Maryland Man Pleads Guilty to Issuing Threats of Violence to an LGBTQI+ Advocacy Group**

**South Carolina | August 23, 2023 | National Origin, Race**

**South Carolina Man and Woman Plead Guilty to Hate Crime and Conspiracy for Bias-Motivated Armed Robberies Targeting Hispanic Victims**

**Oklahoma | August 16, 2023 | Race**

**Two Oklahoma Men Sentenced to Prison for Attacks on a Black Man**

**Utah | August 8, 2023 | Race, National Origin**

**Utah Man Sentenced for Hate-Motivated Attack on Three Men with a Metal Pole**

**Pennsylvania | August 2, 2023 | Religion**

**Shooter Receives Death Sentence for Attack on the Tree of Life Synagogue**

**Missouri | August 2, 2023 | Religion**

> **Missouri Man Sentenced for Setting Fire to Islamic Center**    ○

**Florida | July 27, 2023 | Race**

> **Florida Man Found Guilty in Racially Motivated Attack Near 1923 Rosewood Massacre Site**    ○

**Kentucky | July 27, 2023 | Race**

> **Kentucky Woman Sentenced for Mailing Threats to Neighbors Because of Their Race**    ○

**Alaska | July 25, 2023 | Sexual Orientation**

> **Alaska Man Sentenced to 18 Months for Hate Crimes, Drug Trafficking**    ○

**Wisconsin | July 24, 2023 | Race**

> **Wisconsin Man Sentenced for Making Racially Charged Threats Against Black Neighbors**    ○

**Texas | July 7, 2023 | Race, Ethnicity, National Origin**

Texas Man Sentenced for 2019 Mass Shooting in El Paso, Texas

**Kansas, Tennessee | June 20, 2023 | Sexual Orientation**

Kansas Man Charged with Threatening Violence Against Nashville Pride Event

**Idaho, Oregon | June 15, 2023 | Sexual Orientation, Gender Identity**

Oregon Man Pleads Guilty for Attacks on Local LBGTQI+ Community

**Montana | June 14, 2023 | Sexual Orientation**

Montana Man Sentenced for Attacks on Local LGBTQI+ Community

**Kansas | May 30, 2023 | Race**

Kansas Man Charged for Using Guns, Death Threats, and Racial Slurs to Intimidate Black People

**Nevada | May 11, 2023 | National Origin, Religion**

Nevada Man Charged with Federal Hate Crimes for Irvine Taiwanese Presbyterian Church Shooting

**Minnesota | May 5, 2023 | Religion**

**Minnesota Man Charged in Mosque Arson** ⬤

**Colorado | May 4, 2023 | Religion**

**Colorado Man Pleads Guilty to Church Arson** ⬤

**Ohio | April 26, 2023 | Religion**

**Ohio Man Pleads Guilty to Setting Fire to a Church** ⬤

**Ohio | April 24, 2023 | Religion, Sexual Orientation**

**Ohio Man Charged for Attempting to Burn Down a Church that Planned to Host Drag Shows** ⬤

**Indiana | April 20, 2023 | Race, National Origin**

**Indiana Woman Charged in Racially Motivated Attack** ⬤

**Missouri | April 20, 2023 | Sexual Orientation**

**Missouri Man Sentenced for Hate Crime in Attempted Murder of Teen** ⬤

**California, Massachusetts, New York | April 14, 2023 | Sexual Orientation, Gender Identity**

**California Man Sentenced for Threatening Merriam-Webster with Anti-LGBTQ Violence**

**Texas | April 7, 2023 | Religion**

**Texas Man Pleads Guilty to Hate Crime and Arson for Setting Fire to Synagogue**

**Maryland | April 4, 2023 | Sexual Orientation**

**Howard County Man Facing Charges for Allegedly Threatening an LGBTQI+ Advocacy Group**

**Georgia | March 16, 2023 | Race, National Origin**

**Georgia White Supremacist Sentenced for Federal Racially Motivated Shootings**

**Michigan, Texas | March 9, 2023 | Religion**

**Michigan Man Charged With Threatening to Kill Jewish Government Officials**

**Mississippi | March 9, 2023 | Religion**

Mississippi Man Sentenced for Cross Burning

**New York | March 3, 2023 | Religion, National Origin**

New York Man Sentenced For Antisemitic Hate Crimes

**Hawaii | March 3, 2023 | Race**

Two Maui Men Sentenced for Racially Motivated Attack on White Man

**District of Columbia | February 2, 2023 | Race, Gender**

District Man Found Guilty of Hate Crime in Bias-Related Assault

**New Jersey | February 1, 2023 | Religion**

Passaic County Man Arrested for Attempt to Firebomb Synagogue

**Idaho, Oregon, Washington | January 30, 2023 | Race, Ethnicity**

Four Men Sentenced for Hate Crime and False Statement Charges After Racially-Motivated Assault

**Louisiana | January 25, 2023 | Sexual Orientation**

**Louisiana Man Sentenced to 45 Years for Kidnapping and Attempting to Murder a Gay Man**

○

**Florida | January 25, 2023 | Race**

**Two Florida Men Sentenced for Hate Crime Following Racially-Motivated Assault**

○

**Idaho | January 12, 2023 | Sexual Orientation**

**Idaho Man Indicted for Federal Hate Crime Against LGBTQ Residents of Boise**

○

**Case Examples from 2022-2019**

○

*Updated January 31, 2025*

✉ **U.S. Department of Justice**
950 Pennsylvania Avenue NW
Washington DC 20530

📞 Contact the Department
Phone: 202-514-2000
TTY/TDD: 800-877-8339

An official website of the United States government. Here's how you know

Home • Hate Crime • 2017 • Topic Pages • Victims



Criminal Justice Information Services Division    Feedback | Contact Us | Data Quality Guidelines | UCR Home

Home    Incidents and Offenses    Victims    Offenders    Location Type    Hate Crime by Jurisdiction    About Hate Crime Statistics

## Victims

Download Printable Document

In the Uniform Crime Reporting (UCR) Program, the victim of a hate crime may be an individual, a business/financial institution, a government entity, a religious organization, or society/public as a whole. In 2017, the nation's law enforcement agencies reported that there were 8,828 victims of hate crimes. Of these victims, 335 were victimized in separate multiple-bias incidents.

The Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, 18 U.S.C. §249 required the FBI to collect data concerning hate crimes committed by or directed against juveniles. Beginning in 2013, law enforcement began reporting the number of victims who are 18 years of age or older, the number of victims under the age of 18, and the number of individual victims. Of the 5,803 individuals for which victim age data were reported in 2017, 5,125 hate crime victims were adults, and 678 hate crime victims were juveniles.

In 2013, the national UCR Program began collecting revised race and ethnicity data in accordance with a directive from the U.S. Government's Office of Management and Budget. The race categories were expanded from four (White, Black or African American, American Indian or Alaska Native, and Asian or Other Pacific Islander) to five (White, Black or African American, American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander). The ethnicity categories changed from "Hispanic" and "Non-Hispanic" to "Hispanic or Latino" and "Not Hispanic or Latino." (See the Methodology for more information about this program change as well as others.)

### By bias motivation (Based on Table 1.)

An analysis of data for victims of single-bias hate crime incidents showed that:

- 59.6 percent of the victims were targeted because of the offenders' bias against race/ethnicity/ancestry.

- 20.6 percent were victimized because of bias against religion.

- 15.8 percent were targeted because of bias against sexual orientation.

- 1.9 percent were targeted because of bias against disability.

- 1.6 percent were victims of gender-identity bias.

- 0.6 percent (54 individuals) were victims of gender bias.

Further examination of these bias categories showed the following details:

### *Racial/ethnicity/ancestry bias* (Based on Table 1.)

Among single-bias hate crime incidents in 2017, there were 5,060 victims of race/ethnicity/ancestry motivated hate crime.

- 48.6 percent were victims of crimes motivated by their offenders' anti-Black or African American bias.

- 17.1 percent were victims of anti-White bias.

- 10.9 percent were victims of anti-Hispanic or Latino bias.

- 6.3 percent were victims of anti-American Indian or Alaska Native bias.

- 4.5 percent were victims of bias against a group of individuals in which more than one race was represented (anti-multiple races, group).

- 3.3 percent were victims of anti-Asian bias.

- 2.6 percent were victims of anti-Arab bias.

- 0.4 percent (18 individuals) were victims of anti-Native Hawaiian or Other Pacific Islander bias.

- 6.4 percent were victims of anti-Other Race/Ethnicity/Ancestry bias.

### *Religious bias* (Based on Table 1.)

Of the 1,749 victims of anti-religious hate crimes:

- 58.1 percent were victims of crimes motivated by their offenders' anti-Jewish bias.

- 18.6 percent were victims of anti-Islamic (Muslim) bias.

- 4.3 percent were victims of anti-Catholic bias.

- 3.3 percent were victims of bias against groups of individuals of varying religions (anti-multiple religions, group).

- 2.3 percent were victims of anti-Protestant bias.

- 1.8 percent were victims of anti-Other Christian bias.

- 1.5 percent were victims of anti-Eastern Orthodox (Russian, Greek, Other) bias.

- 1.5 percent were victims of anti-Sikh bias.

- 0.9 percent (15 individuals) were victims of anti-Hindu bias.

- 0.9 percent (15 individuals) were victims of anti-Mormon bias.

- 0.7 percent (13 individuals) were victims of anti-Jehovah's Witness bias.

- 0.7 percent (12 individuals) were victims of anti-Buddhist bias.

- 0.5 percent (8 individuals) were victims of anti-Atheist/Agnostic bias.

- 4.9 percent were victims of bias against other religions (anti-other religion).

### *Sexual-orientation bias* (Based on Table 1.)

Of the 1,338 victims targeted due to sexual-orientation bias:

- 57.8 percent were victims of crimes motivated by their offenders' anti-gay (male) bias.

- 24.9 percent were victims of anti-lesbian, gay, bisexual, or transgender (mixed group) bias.

**Resources**

Methodology
Hate Crime Statistics Act
UCR Statistics: Their Proper Use
Tables by Title
About UCR
FBI UCR Contacts
State UCR Contacts
Downloadable Files
Feedback

**Data Tables**

Roll over table numbers for table titles.

Participation Table
Table 1
Table 2
Table 3
Table 4
Table 5
Table 6
Table 7
Table 8
Table 9
Table 10
Table 11
Table 12
Table 13
Table 14

- 12.3 percent were victims of anti-lesbian bias.

- 2.8 percent were victims of anti-heterosexual bias.

- 2.2 percent were victims of anti-bisexual bias.

**Disability bias** (See Table 1.)

Of the 160 victims of hate crimes due to the offenders' biases against disabilities:

- 123 were targets of anti-mental disability bias.

- 37 were victims of anti-physical disability bias.

**Gender-identity bias** (See Table 1.)

Of the 132 victims of gender-identity bias:

- 119 were victims of anti-transgender bias.

- 13 were victims of anti-gender non-conforming bias.

**Gender bias** (See Table 1.)

Of the 54 victims of hate crime motivated by offenders' biases toward gender:

- 28 were categorized as anti-female.

- 26 were anti-male.

**By crime category** (Based on Table 2.)

Of the 8,828 victims of hate crime, 57.6 percent were victims of crimes against persons, and 39.7 percent were victims of crimes against property. The remaining 2.7 percent were victims of crimes against society.

**By offense type**

**Crimes against persons** (Based on Table 2.)

In 2017, 5,084 victims of hate crimes were victims of crimes against persons. Regarding these victims and the crimes committed against them:

- 44.9 percent of the victims were intimidated.

- 34.3 percent were victims of simple assault.

- 19.5 percent were victims of aggravated assault.

- 0.5 percent (23) were victims of rape.

- 0.3 percent (15) were murdered.

- 1 individual was a victim of human trafficking, commercial sex acts.

- 0.5 percent (27) were victims of other types of offenses, which are collected only in the National Incident-Based Reporting System (NIBRS).

**Crimes against property** (Based on Table 2.)

In 2017, 3,506 victims of hate crimes were victims of crimes against property. Of these:

- 73.7 percent were victims of destruction/damage/vandalism.

- 10.8 percent were victims of larceny-theft.

- 5.3 percent were victims of burglary.

- 4.9 percent were victims of robbery.

- 1.7 percent were victims of arson.

- 1.3 percent (44) were victims of motor vehicle theft.

- 2.4 percent were victims of other types of hate crime offenses, which are collected only in NIBRS.

**Crimes against society** (See Table 2.)

There were 238 victims of hate crimes categorized as crimes against society. Crimes against society (e.g., weapon law violations, drug/narcotic offenses, gambling offenses) represent society's prohibition against engaging in certain types of activity; they are typically victimless crimes in which property is not the object.

| Most Wanted | News | What We Investigate | Services | Additional Resources |
|---|---|---|---|---|
| Ten Most Wanted | Stories | Terrorism | CJIS | Accessibility |
| Fugitives | Videos | Counterintelligence | CIRG | eRulemaking |
| Terrorism | Press Release | Cyber Crime | Laboratory Services | Freedom of Information / Privacy Act |
| Kidnappings / Missing Persons | Speeches | Public Corruption | Training Academy | Legal Notices |
| Seeking Information | Testimony | Civil Rights | Operational Technology | Legal Policies & Disclaimers |
| Bank Robbers | Podcasts and Radio | Organized Crime | Information Management | Privacy Policy |
| ECAP | Photos | White-Collar Crime | | USA.gov |
| ViCAP | Español | Violent Crime | **FBI Jobs** | White House |
| | Apps | WMD | Submit a Tip | No FEAR Act |
| **About** | | | Crime Statistics | Equal Opportunity |
| Mission & Priorities | **Resources** | **Contact Us** | History | |
| Leadership & Structure | Law Enforcement | Field Offices | FOIPA | |
| Partnerships | Businesses | FBI Headquarters | Scams & Safety | |
| Community Outreach | Victim Assistance | Visit the FBI Experience | FBI Kids | |
| FAQs | Reports & Publications | Overseas Offices | | |



FBI FEDERAL BUREAU OF INVESTIGATION



**FBI.gov Contact Center**
Email updates



# Report: African Americans Remain Top Target of Hate Crimes

August 30, 2023 9:00 AM    By Masood Farivar



This video grab shows police cars on the site of a shooting in Jacksonville, Florida, August 26, 2023.

The recent killing of three Black people in Jacksonville, Florida, has drawn attention to a grim reality that researchers have long documented: Black Americans are the most frequent victims of racially motivated hate crimes in the United States.

A new report released Tuesday confirms the trend, showing that Black people were the targets of more than one-fifth of all hate crimes reported in major U.S. cities last year, the highest share of any group.

The report, based on police data analyzed by the Center for the Study of Hate and Extremism at California State University San Bernardino, found that hate crimes targeting Black people fell by an average of 6% last year, after surging in the previous two years.

But the trend was not uniform across the country, and many cities and states reported their worst numbers ever.

Out of 42 cities surveyed by the center, more than half showed an increase in anti-Black hate crimes, with some reaching historic highs. New York City, Los Angeles, Austin, Texas, and Sacramento, California, all set modern records.

Five states — Colorado, New Jersey, Ohio, Texas and Utah — also broke their records for anti-Black hate crimes, while incidents in California and New York state — both with large Black populations — surged by more than 20%, according to the report.

Historically, African Americans have been the most frequent victims of hate crimes in the U.S., and that did not change last year.

The report found they were the targets of 22% of all hate crimes in 2022, the highest share of any group. In 2021, the share was as high as 31%.

Jews came in second last year, with 16% of all hate incidents, followed by gay men, with 12%, and white people, with 8.5%, according to the report.

Overall, hate crimes reported to police in the 42 U.S. cities rose 10% in 2022. That's on top of a nationwide increase of nearly 31% seen in 2021.

## Frequent targets of hate crime

The report comes just days after a white gunman killed two Black men and a Black woman at a Florida variety store in a hate-fueled rampage.

The 21-year-old shooter, who took his own life after the killings, left behind a racist screed in which he expressed hatred for Black people. One firearm he used in the attack had swastikas drawn on it.

"Blacks remain the most frequent target not only for these extremist killers but have been the most frequent target for overall hate crime for every year since data has been collected, right up through our partial

2023 totals," said Brian Levin, director of the Center for the Study of Hate and Extremism and the lead author of the report.

The FBI, which has been collecting hate crime data since 1991, said it was investigating the Jacksonville shooting as an anti-Black hate crime.

"From everything we know now, this was a targeted attack — a hate crime that was racially motivated," FBI Director Christopher Wray said Monday during a call with civil rights leaders and law enforcement officials.

This video grab shows police cars on the site of a shooting in Jacksonville, Florida, August 26, 2023.

The shooting was not the first of its kind in Jacksonville this year.

In May, three white men were charged in connection with the shooting death of a 39-year-old Black man in downtown Jacksonville.

## 'Replacement' theory

Levin said the vast majority of racially motivated homicides over the past five years have been carried out by white supremacists and right-wing ideologues.

The cycle is being repeated this year, he said.

"We expect this killing cycle to continue, especially as we enter a volatile election season," Levin said. "These atrocities are often carried out by angry young adult males who make recent weapon acquisitions, act within their home state, and who reference the 'replacement' doctrine statements of previous killers."

The replacement theory, which asserts that non-white immigrants are being brought into the U.S. to "replace" white people, inspired a white gunman to shoot and kill 10 Black people in May 2022 at a supermarket in Buffalo, New York.

While the total number of extremist-motivated homicides fell last year, the figures "ignore the numerous plots and thwarted attacks which unfortunately could have driven the death count substantially higher," Levin said.

He attributed the surge in hate crimes to several factors, including the proliferation of online and political rhetoric that promotes bigotry, stereotypes and conspiracy theories.

"The ubiquity and seepage of hateful rhetoric of various depths now in the mainstream of sociopolitical discourse demonizes whole groups of people and creates a deep well," Levin said.

## Related

White Shooter Kills 3 Black People in Florida Hate Crime as Washington Celebrates King's Dream

North Korea Says US Soldier Wants Refuge From Racism in US Army

Chinese Social Media Platforms Fail to Control Racism Against Black People:

**FOLLOW US**

UNITED STATES

| US NEWS |
| ALL ABOUT AMERICA |

WORLD

| AFRICA |
| THE AMERICAS |
| EAST ASIA PACIFIC |
| EUROPE |
| MIDDLE EAST |
| SOUTH & CENTRAL ASIA |

SECTIONS

| VOA PROGRAMS |
| SPECIAL PROJECTS |
| DAY IN PHOTOS |

VOA NEWS ON IRAN

VOA NEWS ON CHINA

52 DOCUMENTARY

VIDEOS

MORE FROM VOA

VOAAFRICA.COM PROGRAMS

VOA LEARNING ENGLISH

EDITORIALS

ABOUT THIS SITE

TERMS OF USE & PRIVACY NOTICE

ABOUT VOA

GET VOA+

VOA AROUND THE WORLD

CONTACT VOA

MEDIA RELATIONS

USAGE REQUESTS

VOA PRONUNCIATION GUIDE

U.S.

# TONI MORRISON: The Pain Of Being Black

**13 MINUTE READ**

BONNIE ANGELO AND TONI MORRISON

MAY 22, 1989 12:00 AM EDT

Q. In your contemporary novels you portray harsh confrontation between black and white. In Tar Baby a character says, "White folks and black folks should not sit down and eat together or do any of those personal things in life." It seems hopeless if we can't bridge the abysses you see between sexes, classes, races.

A. I feel personally sorrowful about black-white relations a lot of the time because black people have always been used as a buffer in this country between powers to prevent class war, to prevent other kinds of real conflagrations.

have done everywhere else. But in becoming an American, from Europe, what one has in common with that other immigrant is contempt for me — it's nothing else but color. Wherever they were from, they would stand together. They could all say, "I am not that." So in that sense, becoming an American is based on an attitude: an exclusion of me.

It wasn't negative to them — it was unifying. When they got off the boat, the second word they learned was "nigger." Ask them — I grew up with them. I remember in the fifth grade a smart little boy who had just arrived and didn't speak any English. He sat next to me. I read well, and I taught him to read just by doing it. I remember the moment he found out that I was black — a nigger. It took him six months; he was told. And that's the moment when he belonged, that was his entrance. Every immigrant knew he would not come as the very bottom. He had to come above at least one group — and that was us.



**PAID CONTENT**

**7 Things Trump Plans To Do for Seniors On SS In 2025 (#2 Is Perfect for Those On...**

BY SUPER SAVING ONLINE

Q. When you think about what the Jews did as leaders in the civil rights movement, in the forefront of trying to break the barriers, how do you account for the abrasiveness between blacks and Jews now?

A. For a long time I was convinced that the conflict between Jewish people and black people in this country was a media event. But everywhere I went in the world where there were black people, somebody said, What about the blacks and Asians? What do you think about the blacks and the Mexicans? Or, in New York at one time, blacks and Puerto Ricans? The only common denominator is blacks.

I thought, Something is disguised, what is it? What I find is a lot of black people who believe that Jews in this country, by and large, have become white. They behave like white people rather than Jewish people.

Q. Hasn't the rift been brought about partly by the anti-Semitic rhetoric of black Muslims like Louis Farrakhan?

A. Farrakhan is one person, one black person. Why is it that no black person seems to be rabid about Meir Kahane? Farrakhan is rejected by a lot of black people who wouldn't go near that man. It's not an equal standard — one black person is all black people.

Q. But sometimes whites feel that all white people are being similarly equated, when in fact attitudes among whites range from the Ku Klux Klan right over to the saints.

A. Black people have always known that. We've had to distinguish among you because our lives depended on it. I'm always annoyed about why black people have to bear the brunt of everybody else's contempt. If we are not totally understanding and smiling, suddenly we're demons.

Q. You've said that you didn't like the idea of writing about slavery. Yet Beloved, your most celebrated book, is set in slavery and its aftermath.

A. I had this terrible reluctance about dwelling on that era. Then I realized I didn't know anything about it, really. And I was overwhelmed by how long it was. Suddenly the time — 300 years — began to drown me.

Three hundred years — think about that. Now, that's not a war, that's generation after generation. And they were expendable. True, they had the status of good horses, and nobody wanted to kill their stock. And, of course, they had the advantage of reproducing without cost.

Q. Beloved is dedicated to the 60 million who died as a result of slavery. A staggering number — is this proved historically?

A. Some historians told me 200 million died. The smallest number I got from anybody was 60 million. There were travel accounts of people who were in the Congo — that's a wide river — saying, "We could not get the boat through the river, it was choked with bodies." That's like a logjam. A lot of people died. Half of them died in those ships.

Slave trade was like cocaine is now — even though it was against the law, that didn't stop anybody. Imagine getting $1,000 for a human being. That's a lot of money. There are fortunes in this country that were made that way.

I thought this has got to be the least read of all the books I'd written because it is about something that the characters don't want to remember, I don't want to remember, black people don't want to remember, white people don't want to remember. I mean, it's national amnesia.

Q. You gave new insight into the daily struggle of slaves.

A. I was trying to make it a personal experience. The book was not about the institution — Slavery with a capital S. It was about these anonymous people called slaves. What they do to keep on, how they make a life, what they're willing to risk, however long it lasts, in order to relate to one another — that was incredible to me.

For me, the torturous restraining devices became a hook on which to say what it was like in personal terms. I knew about them because slaves who wrote about their lives mentioned them, and white people wrote about them. There's a wonderful diary of the Burr family in which he talks about his daily life and says, "Put the bit on Jenny today." He says that about 19 times in six months — and he was presumably an enlightened slave owner. Slave-ship captains also wrote a lot of memoirs, so it's heavily documented.

There was a description of a woman who had to wear a bell contraption so when she moved they always knew where she was. There were masks slaves wore when they cut cane. They had holes in them, but it was so hot inside that when they took them off, the skin would come off. Presumably, these things were to keep them from eating the sugar cane. What is interesting is that these

things were not restraining tools, like in the torture chamber. They were things you wore while you were doing the work. Amazing. It seemed to me that the humiliation was the key to what the experience was like.

There was this ad hoc nature of everyday life. For black people, anybody ! might do anything at any moment. Two miles in any direction, you may run into Quakers who feed you or Klansmen who kill you — you don't know. When you leave the plantation, you are leaving not only what you know, you are leaving your family.

Q. Have you any specific proposals for improving the present-day racial climate in America?

A. It is a question of education, because racism is a scholarly pursuit. It's all over the world, I am convinced. But that's not the way people were born to live. I'm talking about racism that is taught, institutionalized. Everybody remembers the first time they were taught that part of the human race was Other. That's a trauma. It's as though I told you that your left hand is not part of your body.

How to breach those things? There is a very, very serious problem of education and leadership. But we don't have the structure for the education we need. Nobody has done it. Black literature is taught as sociology, as tolerance, not as a serious, rigorous art form.

I saw on television some black children screaming and crying about the violence in their school. But what do we do about that?

Q. But there is violence in schools that are all black, black against black.

A. Black people are victims of an enormous amount of violence. I don't have any answers other than what to do about violence generally. None of those things can take place, you know, without the complicity of the people who run the schools and the city.

Q. That's a strong condemnation. Complicity suggests that these conditions are seen as O.K.

A. Human beings can change things. Schools must stop being holding pens to keep energetic young people off the job market and off the streets. They are real threats because they may know more, they may have more energy, and they may take your job. So we stretch puberty out a long, long time.

There is nothing of any consequence in education, in the economy, in city planning, in social policy that does not concern black people. That's where the problem is. Are you going to build a city to accommodate more black people? Why? They don't pay taxes. Are you going to build a school system to accommodate the children of poor black people? Why? They'll want your job. They don't pay taxes.

Q. Many people are deeply concerned that these young black students are dropping out.

A. They don't care about these kids. I don't mean that there are not people ; who care. But when this wonderful "they" we always blame for anything say we've got to fix the schools, or we have got to legalize drugs, what they care about is their personal well-being: Am I going to get mugged? Are the homeless going to be in my neighborhood?

Q. You don't think there is great concern out there that American society has things seriously wrong with it? Not just because "I can't walk down the street"?

A. Yes, but I do not see vigorous attack on the wrongness. I see what I call comic-book solutions to really major problems. Of course, a new President can make a difference — he can reassemble the legislation of the past 20 years that has been taken apart and put it back. They said it didn't work. It's like building a bridge a quarter of the way across the river and saying, "You can't get there from here." Twenty years! It never had a generation to complete the work. Somebody has to take responsibility for being a leader.

Q. In one of your books you described young black men who say, "We have found the whole business of being black and men at the same time too

difficult." You said that they then turned their interest to flashy clothing and to being hip and abandoned the responsibility of trying to be black and male.

A. I said they took their testicles and put them on their chest. I don't know what their responsibility is anymore. They're not given the opportunity to choose what their responsibilities are. There's 60% unemployment for black teenagers in this city. What kind of choice is that?

Q. This leads to the problem of the depressingly large number of single-parent households and the crisis in unwed teenage pregnancies. Do you see a way out of that set of worsening circumstances and statistics?

A. Well, neither of those things seems to me a debility. I don't think a female running a house is a problem, a broken family. It's perceived as one because of the notion that a head is a man.

Two parents can't raise a child any more than one. You need a whole community — everybody — to raise a child. The notion that the head is the one who brings in the most money is a patriarchal notion, that a woman — and I have raised two children, alone — is somehow lesser than a male head. Or that I am incomplete without the male. This is not true. And the little nuclear family is a paradigm that just doesn't work. It doesn't work for white people or for black people. Why we are hanging onto it, I don't know. It isolates people into little units — people need a larger unit.

Q. And teenage pregnancies?

A. Everybody's grandmother was a teenager when they got pregnant. Whether they were 15 or 16, they ran a house, a farm, they went to work, they raised their children.

Q. But everybody's grandmother didn't have the potential for living a different kind of life. These teenagers — 16, 15 — haven't had time to find out if they have special abilities, talents. They're babies having babies.

A. The child's not going to hurt them. Of course, it is absolutely time consuming. But who cares about the schedule? What is this business that you have to finish school at 18? They're not babies. We have decided that puberty extends to what — 30? When do people stop being kids? The body is ready to have babies, that's why they are in a passion to do it. Nature wants it done then, when the body can handle it, not after 40, when the income can handle it.

Q. You don't feel that these girls will never know whether they could have been teachers, or whatever?

A. They can be teachers. They can be brain surgeons. We have to help them become brain surgeons. That's my job. I want to take them all in my arms and say, "Your baby is beautiful and so are you and, honey, you can do it. And when you want to be a brain surgeon, call me — I will take care of your baby." That's the attitude you have to have about human life. But we don't want to pay for it.

I don't think anybody cares about unwed mothers unless they're black — or poor. The question is not morality, the question is money. That's what we're upset about. We don't care whether they have babies or not.

Q. How do you break the cycle of poverty? You can't just hand out money.

A. Why not? Everybody gets everything handed to them. The rich get it handed — they inherit it. I don't mean just inheritance of money. I mean what people take for granted among the middle and upper classes, which is nepotism, the old-boy network. That's shared bounty of class.

## MORE MUST-READS FROM TIME

- Inside **Elon Musk's War** on Washington
- Meet the **2025 Women of the Year**
- The Harsh Truth About **Disability Inclusion**
- Why Do More **Young Adults Have Cancer?**
- **Colman Domingo** Leads With Radical Love
- How to Get Better at **Doing Things Alone**
- **Cecily Strong** on Goober the Clown

- Column: The Rise of **America's Broligarchy**

**CONTACT US AT** LETTERS@TIME.COM

## Japanese Endocrinologists Warn Reason Behind High Glucose Levels in US

**Sugar Reverse** | Sponsored

Learn More

## Forget Furosemide, Use This Household Item To Help Drain Edema Fluid

**WellnessGuide** | Sponsored

Learn more

## South Korean Actor Kim Sae-ron Dies Age 24

The 24-year-old actress' death has triggered calls for change to the way South Korean celebrities are treated in the public arena and on social media.

**TIME**

## People in Chico are Loving Martha Stewart's Meal Kit

**Martha Stewart & Marley Spoon** | Sponsored

## Jackpot! Chico Women Won a Record Bonus On an Online Slot Machine

**McLuck** | **Play Now** | Sponsored

Install Now

## 7 Things Trump Plans To Do for Seniors On SS In 2025

**Super Saving Online** | Sponsored

## Rebuilding Nerves? Nightly Habit to Tackle Neuropathy's Root Cause

**Health Insights Journal** | Sponsored

Learn More

## Chico: Three Banks Introduce 5% Interest Rates on Savings

**Savings Accounts | Top Search Now** | Sponsored

Learn More

## Flight Attendant Reveals How To Fly Business Class For The Price of Economy

**Travel Savings Tools** | Sponsored

## The Meaning Behind Serena Williams' Super Bowl Cameo

The tennis champion did a crip walk dance as Kendrick Lamar performed his Drake diss track "Not Like Us."

**TIME**

## Plastic Surgeon Tells: If You Have Wrinkles, Do This Immediately (It's Genius!)

**Beverly Hills MD** | Sponsored

Learn more

## 2024 Senior SUV Is A True Head Turner (You'll Love The Price)

**SUVs | Top Searcher Now** | Sponsored

Learn More

## New Electric Cars Come With Tiny Price Tags (Take A Look)

**FrequentSearches | Search Ads** | Sponsored

## What to Know About the Circumstances of Gene Hackman's Death

The actor's wife and one of their dogs were also found dead at their Santa Fe home, discovered after some time by a maintenance worker.

**TIME**

Legend who's seen 9 recessions calls exact month stocks will crash

**Chaikin Analytics** | Sponsored

# TIME

   

| | |
|---|---|
| Home | Entertainment |
| U.S. | Ideas |
| Politics | Science |
| World | History |
| Health | Sports |
| Business | Magazine |
| Tech | The TIME Vault |
| Personal Finance by TIME Stamped | TIME For Kids |
| Shopping by TIME Stamped | TIMECO2 |
| Future of Work by Charter | Coupons |

TIME Edge

Video

Masthead

Newsletters

Subscribe

Digital Magazine

Give a Gift

Shop the TIME Store

Careers

Modern Slavery Statement

Press Room

TIME Studios

U.S. & Canada Customer Care

Global Help Center

Contact the Editors

Reprints and Permissions

Site Map

Media Kit

Supplied Partner Content

About Us

© 2024 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our Terms of Service, Privacy Policy (Your Privacy Rights) and Do Not Sell or Share My Personal Information.

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.

Politics, Law & Government › Law, Crime & Punishment › Crime & Anti-Crime

# Revival of the Ku Klux Klan

↳ in **Ku Klux Klan**

[ Ask the Chatbot a Question ]    [ ⋮ More Actions ]

*Also known as: KKK*
Written and fact-checked by The Editors of Encyclopaedia Britannica
Last Updated: Jan 27, 2025 • Article History

≡ Table of Contents

The 20th-century Klan had its roots more directly in the American nativist tradition. It was organized in 1915 near Atlanta, Georgia, by Col. William J. Simmons, a preacher and promoter of fraternal orders who had been inspired by Thomas Dixon's book *The Clansman* (1905) and D.W. Griffith's film *The Birth of a Nation* (1915). The new organization remained small until Edward Y. Clarke and Elizabeth Tyler brought to it their talents as publicity agents and fund raisers. The revived Klan was fueled partly by patriotism and partly by a romantic nostalgia for the old South, but, more importantly, it expressed the defensive reaction of white Protestants in small-town America who felt threatened by the Bolshevik revolution in Russia and by the large-scale immigration of the previous decades that had changed the ethnic character of American society.

This second Klan peaked in the 1920s, when its membership exceeded 4,000,000 nationally, and profits rolled in from the sale of its memberships, regalia, costumes, publications, and rituals. A burning cross became the symbol of the new organization, and white-robed Klansmen participated in marches, parades, and nighttime cross burnings all over the country. To the old Klan's hostility toward Blacks the new Klan—which was strong in the Midwest as well as in the South—added bias against Roman Catholics, Jews, foreigners, and organized labour. The Klan enjoyed a last spurt of growth in 1928, when Alfred E. Smith, a Catholic, received the Democratic presidential nomination.

During the Great Depression of the 1930s the Klan's membership dropped drastically, and the last remnants of the organization temporarily disbanded in 1944. For the next 20 years the Klan was quiescent, but it had a resurgence in some Southern states during the 1960s as civil-rights workers attempted to force Southern communities' compliance with the Civil Rights Act of 1964. There were numerous instances of bombings, whippings, and shootings in

**Quick Facts**

**Date:** 1915 - present • 1866 - *c.* 1870

**Areas Of Involvement:** terrorism • white supremacy • hate crime

**Related People:** Nathan Bedford Forrest • Hugo Black

See all related content



**D.W. Griffith: *The Birth of a Nation*** A scene from the film *The Birth of a Nation* (1915), directed by D.W. Griffith.



**Ku Klux Klan: meeting** A Ku Klux Klan meeting, 1920s.

1 of 2

Southern communities, carried out in secret but apparently the work of Klansmen. Pres. Lyndon B. Johnson publicly denounced the organization in a nationwide television address announcing the arrest of four Klansmen in connection with the slaying of a civil-rights worker, a white woman, in Alabama.



**Ku Klux Klan: initiation ceremony** Ku Klux Klan members holding an initiation ceremony near Milwaukee, Wisconsin.

In 1991 former Ku Klux Klan grand wizard David Duke ran for governor of Louisiana and finished ahead of incumbent Gov. Buddy Roemer in the gubernatorial primary election, a stunning upset that garnered international attention. The possibility that a former grand wizard might be elected governor created a media firestorm and made the 1991 Louisiana gubernatorial election the most closely watched in the country. Duke's campaign lost steam when advocacy groups such as the National Association for the Advancement of Colored People (NAACP) and major corporations threatened to respond to a Duke victory by mounting an economic boycott of Louisiana, whose economy depended on tourism. As a result, former governor Edwin Edwards defeated Duke by a margin of 61 percent to 39 percent, though Duke won slightly over 50 percent of the white vote.

Despite the persistence of racism, the Klan largely failed to stem the growth of racial tolerance in the South in the late 20th century. Though the organization continued some of its surreptitious activities into the early 21st century, cases of Klan violence became more isolated, and its membership had declined to a few thousand. The Klan became a chronically fragmented mélange made up of several separate and competing groups, some of which occasionally entered into alliances with neo-Nazi and other right-wing extremist groups, as was the case at a demonstration in Charlottesville, Virginia, in August 2017 that erupted in violence, resulting in the death of a counterdemonstrator.

> *The Editors of Encyclopaedia Britannica*

> *This article was most recently revised and updated by Jeff Wallenfeldt.*

Politics, Law & Government  ›  Law, Crime & Punishment

# Jim Crow law

United States [1877-1954]

Ask the Chatbot a Question      ⋮ **More Actions**



Written by Melvin I. Urofsky

Fact-checked by The Editors of Encyclopaedia Britannica

Last Updated: Feb 14, 2025 • Article History

☰ **Table of Contents**

**Top Questions**

What were Jim Crow laws?                            ⌄

How did Jim Crow laws get their name?          ⌄

How were Jim Crow laws used?          ⌄

⌄ Show more

**Jim Crow segregation**  A sign at a bus station in Rome, Georgia, in 1943, indicating a separate waiting area for Black peop...(more)

**Jim Crow law**, in U.S. history, any of the laws that enforced racial segregation in the South between the end of Reconstruction in 1877 and the beginning of the civil rights movement in the 1950s. *Jim Crow* was the name of a minstrel routine (actually *Jump Jim Crow*) performed beginning in 1828 by its author, Thomas Dartmouth ("Daddy") Rice, and by many imitators, including actor Joseph Jefferson. The term came to be a derogatory epithet for African Americans and a designation for their segregated life.

From the late 1870s, Southern state legislatures, no longer controlled by so-called carpetbaggers and freedmen, passed laws requiring the separation of whites from "persons of colour" in public transportation and schools. Generally, anyone of ascertainable or strongly suspected Black ancestry in any degree was for that purpose a "person of colour"; the pre-Civil War distinction favouring those whose ancestry was known to be mixed—particularly the half-French "free persons of colour" in Louisiana—was abandoned. The segregation principle was extended to parks, cemeteries, theatres, and restaurants in an effort to prevent any contact between Blacks and whites as equals. It was codified on local and state levels and most famously with the "separate but equal" decision of the U.S. Supreme Court in *Plessy v. Ferguson* (1896).

In 1954 the Supreme Court reversed *Plessy* in *Brown v. Board of Education of Topeka*. It declared segregation in public schools unconstitutional, and, by extension, that ruling was applied to other public facilities. In the years following, subsequent decisions struck down similar kinds of Jim Crow legislation. *See also* Black code; racial segregation.

## Origins

Prior to the Civil War the inferior status of slaves had made it unnecessary to pass laws segregating them from white people. Both races could work side by side so long as the slave recognized his subordinate place. In the cities, where most free African Americans lived, rudimentary forms of segregation existed prior to 1860, but no uniform pattern emerged. In the North free Blacks also laboured under harsh restrictions and often found an even more-rigid segregation than in the South.

### Quick Facts

**Date:** *c.* 1877 - *c.* 1950

**Context:** separate but equal • Separate Car Act • Jim Crow

**Key People:** Mary Eliza Church Terrell • Ben Tillman • Homer Plessy

See all related content



**Jim Crow Jubilee** *Jim Crow Jubilee* (1847), sheet music cover illustrated with caricatures of African American... ...(more)



**What were Jim Crow laws?** Overview of the history of Jim Crow laws, which discriminated against African America...(more)

See all videos for this article

One might have expected the Southern states to have created a segregation system immediately after the war, but that did not happen. In some states the legislatures imposed rigid separation, but only in certain areas; Texas, for example, required that every train have one car in which all people of colour had to sit. The South had had no real system of public education prior to the Civil War, and as the postwar Reconstruction governments created public schools, those were as often as not segregated by race. Nonetheless, New Orleans had fully integrated schools until 1877, and in North Carolina former slaves routinely sat on juries alongside whites.


Britannica Quiz
**American History and Politics Quiz**

In 1877 the Supreme Court ruled in *Hall* v. *DeCuir* that states could not prohibit segregation on common carriers such as railroads, streetcars, or riverboats. In the Civil Rights Cases of 1883, the court overturned key elements of the Civil Rights Act of 1875, thereby sanctioning the notion of "separate but equal" facilities and transportation for the races (though it did not use the term *separate but equal*). Seven years later the court approved a Mississippi statute requiring segregation on intrastate carriers in *Louisville, New Orleans & Texas Railway* v. *Mississippi* (1890). As those cases demonstrated, the court essentially acquiesced in the South's "solution" to the problems of race relations.

From 1887 to 1892 nine states, including Louisiana, passed laws requiring separation on public conveyances, such as streetcars and railroads. Though they differed in detail, most of those statutes required equal accommodations for Black passengers and imposed fines and even jail terms on railroad employees who did not enforce them. Five of the states also provided criminal fines or imprisonment for passengers who tried to sit in cars from which their race excluded them. The Louisiana Separate Car Act passed in July 1890. In order to "promote the comfort of passengers," railroads had to provide "equal but separate accommodations for the white and colored races" on lines running in the state.


**segregated water cooler** An African American man drinking at a water cooler for "colored" people at a streetcar termina...(more)


**Are you a student?**
Get a special academic rate on Britannica Premium.

[Subscribe]

## Challenging the Separate Car Act

The Louisiana Separate Car Act marked a dramatic and humiliating reversal of fortune for the Black and mixed-race citizens of Louisiana. Although a slave state, Louisiana in general and New Orleans in particular had always had, because of their French origins, a more-tolerant attitude toward people of colour than did other Deep South states. In addition to the usual demarcation between Black and white, since the 1700s New Orleans had acknowledged a third class, free people of colour (in French, *gens de couleur libres*), sometimes called Creoles, the freed descendants of European fathers and African mothers who had enjoyed a great deal of autonomy. Although Louisiana, like most Southern states, had laws against marriage between slaves, it did allow free

people of colour, whites, and the *gens de couleur* to marry, testify in court against whites, and in some cases inherit property from their fathers. Some became slaveowners themselves, and apparently many of them accumulated significant property. Their social standing, especially in New Orleans, had insulated them from some of the white reaction following the war. But when whites regained power after the end of Reconstruction, they saw only two races, and the privileged position of the *gens de couleur* evaporated; from then on they were Black as far as the law was concerned.

*Gens de couleur* helped form the American Citizens Equal Rights Association when the Separate Car bill was introduced, and they pledged to fight it. Among the members of the committee was Louis A. Martinet, a Creole attorney and doctor who had also founded the *Daily Crusader*, and he and his newspaper became the leading opponents of the law. After its passage his paper called for both a legal challenge and a boycott of those railroads that had segregated cars. Martinet received the help of Albion W. Tourgée, a white lawyer, who had fought for the North, and served as a lawyer and judge in North Carolina.

A citizens' committee (the Citizens' Committee to Test the Constitutionality of the Separate Car Law), drawn primarily from the Creole community, raised $3,000 to fund a lawsuit, and Tourgée agreed to be lead counsel in the case. But they also needed a local lawyer, since the challenge to the law would have to go through state courts before it could be appealed to the federal system. A white lawyer, James Walker, finally agreed to take the case in December 1891. Martinet did not consider any of the Black lawyers in New Orleans competent to raise a constitutional question, since, as he explained, they practiced almost entirely in the police courts.

Tourgée and Martinet considered several possibilities. They could have a Black passenger buy a ticket outside Louisiana and then travel into the state, thus raising a challenge to the law under the commerce clause. They might have a fair-skinned person of mixed race attempt to enter the ladies' car, but there they ran into the problem, as Martinet noted, that she might not be refused admission. In New Orleans, he wrote to Tourgée, "people of tolerably fair complexion, even if unmistakably colored, enjoy here a large degree of immunity from the accursed prejudice."

But Tourgée wanted someone who was an octoroon, a person who was "of not more than one eighth colored blood," because he believed the winning strategy would be to expose the ambiguities in the definition of race. How did the law, or a train conductor, determine the race of a passenger? "It is a question," Tourgée told his colleague, that the Supreme Court "may as well take up, if for nothing else, to let the court sharpen its wits on." Martinet agreed, and in New Orleans he began talking to sympathetic railroad officials who wanted the law overturned for their own financial reasons. It would not do if their test passenger was merely excluded from boarding or even thrown off the train; he would have to be arrested so that a real case existed and he could claim injury in federal court. One railway informed him that it did not enforce the law, while another said that though it opposed the statute as too costly, it did not want to go against it publicly. Then the Louisville & Nashville line agreed to a test case. As it happened, for reasons neither Martinet nor Tourgée expected, their test case fizzled.

On February 24, 1892, 21-year-old Daniel Desdunes purchased a first-class ticket on the Louisville & Nashville from New Orleans to Mobile, Alabama, and took a seat in the whites-only car. He was arrested according to the plan and charged with a criminal violation of the Separate Car Act. Tourgée, Martinet, and the local attorney, James Walker, filed a "plea of jurisdiction," arguing that since Desdunes was a passenger in interstate commerce, he had the right and privilege to travel free from any governmental regulation save that of the

Congress. Tourgée also introduced his claim that the determination of race was a complex question of both science and law and so could not be delegated to a train official. The lawyers assumed that their plea would be denied, Desdunes would be convicted, and then they would appeal. Then, on April 19, 1892, the presiding judge, Robert Marr, suddenly disappeared, and no one knew what had happened to him.

While Desdunes's attorney tried to figure out what to do next, on May 25 the Louisiana Supreme Court handed down its decision in *Louisiana ex rel. Abbott* v. *Hicks*. A train conductor on the Texas and Pacific Railway had been prosecuted for seating a Black passenger in a white car, and the railway argued that since the passenger was traveling between two states, either the Louisiana law did not apply to interstate travel or, if it did, then it was unconstitutional under the commerce clause. Much to everyone's surprise, the Louisiana high court agreed that regulations of the Separate Car Act could not apply to interstate passengers. Given that development, the new judge in Desdunes's case, John Ferguson, dismissed the case.

A CRITIC AT LARGE

# HOW AMERICAN RACISM INFLUENCED HITLER

*Scholars are mapping the international precursors of Nazism.*

**By Alex Ross**

April 23, 2018



⊕⁺ Save this story

"History teaches, but has no pupils," the Marxist philosopher Antonio Gramsci wrote. That line comes to mind when I browse in the history section of a bookstore. An adage in publishing is that you can never go wrong with books about Lincoln, Hitler, and dogs; an alternative version names golfing, Nazis, and cats. In Germany, it's said that the only surefire magazine covers are ones that feature Hitler or sex. Whatever the formula, Hitler and Nazism prop up the publishing business: hundreds of titles appear each year, and the total number runs well into the tens of thousands. On store shelves, they stare out at you by the dozens, their spines steeped in the black-white-and-red of the Nazi flag, their titles barking in Gothic type, their covers studded with swastikas. The back catalogue includes "I Was Hitler's Pilot," "I Was Hitler's Chauffeur," "I Was Hitler's Doctor," "Hitler, My Neighbor," "Hitler Was My Friend," "He Was My Chief," and "Hitler Is No Fool." Books have been written about Hitler's youth, his years in Vienna and Munich, his service in the First World War, his assumption of power, his library, his taste in art, his love of film, his relations with women, and his predilections in interior design ("Hitler at Home").

Why do these books pile up in such unreadable numbers? This may seem a perverse question. The Holocaust is the greatest crime in history, one that people remain desperate to understand. Germany's plunge from the heights of civilization to the depths of barbarism is an everlasting shock. Still, these swastika covers trade all too frankly on Hitler's undeniable flair for graphic design. (The Nazi flag was apparently his creation—finalized after "innumerable attempts," according to

"<u>Mein Kampf.</u>") Susan Sontag, in her 1975 essay "<u>Fascinating Fascism</u>," declared that the appeal of Nazi iconography had become erotic, not only in S & M circles but also in the wider culture. It was, Sontag wrote, a "response to an oppressive freedom of choice in sex (and, possibly, in other matters), to an unbearable degree of individuality." Neo-Nazi movements have almost certainly fed on the perpetuation of Hitler's negative mystique.

Americans have an especially insatiable appetite for Nazi-themed books, films, television shows, documentaries, video games, and comic books. Stories of the Second World War console us with memories of the days before Vietnam, Cambodia, and Iraq, when the United States was the world's good-hearted superpower, riding to the rescue of a Europe paralyzed by totalitarianism and appeasement. Yet an eerie continuity became visible in the postwar years, as German scientists were imported to America and began working for their former enemies; the resulting technologies of mass destruction exceeded Hitler's darkest imaginings. The Nazis idolized many aspects of American society: the cult of sport, Hollywood production values, the mythology of the frontier. From boyhood on, Hitler devoured the Westerns of the popular German novelist <u>Karl May</u>. In 1928, Hitler remarked, approvingly, that white settlers in America had "gunned down the millions of redskins to a few hundred thousand." When he spoke of *Lebensraum*, the German drive for "living space" in Eastern Europe, he often had America in mind.

---

Get *The New Yorker's* daily newsletter

Keep up with everything we offer, plus exclusives available only to newsletter readers, directly in your in-box.

By signing up, you agree to our <u>User Agreement</u> and <u>Privacy Policy & Cookie Statement</u>. This site is protected by reCAPTCHA and the Google <u>Privacy Policy</u> and <u>Terms of Service</u> apply.

Among recent books on Nazism, the one that may prove most disquieting for American readers is James Q. Whitman's "<u>Hitler's American Model: The United States and the Making of Nazi Race Law</u>" (Princeton). On the cover, the inevitable swastika is flanked by two red stars. Whitman methodically explores how the Nazis took inspiration from American racism of the late nineteenth and early twentieth centuries. He notes that, in "Mein Kampf," Hitler praises America as the one state that has made progress toward a primarily racial conception of citizenship, by "excluding certain races from naturalization." Whitman writes that the discussion of such influences is almost taboo, because the crimes of the Third Reich are commonly defined as "the *nefandum*, the unspeakable descent into what we often call 'radical evil.' " But the kind of genocidal hatred that erupted in Germany had been seen before and has been seen since. Only by stripping away its national regalia and comprehending its essential human form do we have any hope of vanquishing it.

The vast literature on Hitler and Nazism keeps circling around a few enduring questions. The first is biographical: How did an Austrian watercolor painter turned military orderly emerge as a far-right German rabble-rouser after the First World War? The second is sociopolitical: How did a civilized society come to embrace Hitler's extreme ideas? The third has to do with the intersection of man and regime: To what extent was Hitler in control of the apparatus of the Third Reich? All these questions point to the central enigma of the Holocaust, which has variously been interpreted as a premeditated action and as a barbaric improvisation. In our current age of unapologetic racism and resurgent authoritarianism, the mechanics of Hitler's rise are a particularly pressing matter. For dismantlers of democracy, there is no better exemplar.

Since 1945, the historiography of Nazism has undergone several broad transformations, reflecting political pressures both within Germany and abroad. In the early Cold War period, the emergence of West Germany as a bulwark against

the Soviet menace tended to discourage a closer interrogation of German cultural values. The first big postwar biography of Hitler, by the British historian Alan Bullock, published in 1952, depicted him as a charlatan, a manipulator, an "opportunist entirely without principle." German thinkers often skirted the issue of Hitler, preferring systemic explanations. Hannah Arendt's "The Origins of Totalitarianism" suggested that dictatorial energies draw on the loneliness of the modern subject.

In the sixties and seventies, as Cold War Realpolitik receded and the full horror of the Holocaust sank in, many historians adopted what is known as the *Sonderweg* thesis—the idea that Germany had followed a "special path" in the nineteenth and early twentieth centuries, different from that of other Western nations. In this reading, the Germany of the Wilhelmine period had failed to develop along healthy liberal-democratic lines; the inability to modernize politically prepared the ground for Nazism. In Germany, left-oriented scholars like Hans Mommsen used this concept to call for a greater sense of collective responsibility; to focus on Hitler was an evasion, the argument went, implying that Nazism was something that *he* did to *us*. Mommsen outlined a "cumulative radicalization" of the Nazi state in which Hitler functioned as a "weak dictator," ceding policy-making to competing bureaucratic agencies. Abroad, the *Sonderweg* theory took on a punitive edge, indicting all of German history and culture. William Manchester's 1968 book, "The Arms of Krupp," ends with a lurid image of "the first grim Aryan savage crouched in his garment of coarse skins, his crude javelin poised, tense and alert, cloaked by night and fog, ready; waiting; and waiting."

The *Sonderweg* argument was attacked on multiple fronts. In what became known as the *Historikerstreit* ("Historians' Dispute"), right-wing scholars in Germany proposed that the nation end its ritual self-flagellation: they reframed Nazism as a reaction to Bolshevism and recast the Holocaust as one genocide among many. Joachim Fest, who had published the first big German-language biography of Hitler, also stood apart from the *Sonderweg* school. By portraying the Führer as an

all-dominating, quasi-demonic figure, Fest effectively placed less blame on the Weimar Republic conservatives who put Hitler in office. More dubious readings presented Hitlerism as an experiment that modernized Germany and then went awry. Such ideas have lost ground in Germany, at least for now: in mainstream discourse there, it is axiomatic to accept responsibility for the Nazi terror.

Outside Germany, many critiques of the *Sonderweg* thesis came from the left. The British scholars Geoff Eley and David Blackbourn, in their 1984 book "The Peculiarities of German History," questioned the "tyranny of hindsight"—the lordly perspective that reduces a complex, contingent sequence of events to an irreversible progression. In the allegedly backward Kaiserreich, Eley and Blackbourn saw various liberalizing forces in motion: housing reform, public-health initiatives, an emboldened press. It was a society riddled with anti-Semitism, yet it witnessed no upheaval on the scale of the Dreyfus Affair or the Tiszaeszlár blood-libel affair in Hungary. Eley and Blackbourn also questioned whether élitist, imperialist Britain should be held up as the modern paragon. The *Sonderweg* narrative could become an exculpatory fairy tale for other nations: we may make mistakes, but we will never be as bad as the Germans.

Ian Kershaw's monumental two-volume biography (1998-2000) found a plausible middle ground between "strong" and "weak" images of Hitler in power. With his nocturnal schedule, his dislike of paperwork, and his aversion to dialogue, Hitler was an eccentric executive, to say the least. To make sense of a dictatorship in which the dictator was intermittently absent, Kershaw expounded the concept of "working towards the Führer": when explicit direction from Hitler was lacking,

Nazi functionaries guessed at what he wanted, and often further radicalized his policies. Even as debates about the nature of Hitler's leadership go back and forth, scholars largely agree that his ideology was more or less fixed from the mid-twenties onward. His two abiding obsessions were violent anti-Semitism and *Lebensraum*. As early as 1921, he spoke of confining Jews to concentration camps, and in 1923 he contemplated—and, for the moment, rejected—the idea of killing the entire Jewish population. The Holocaust was the result of a hideous syllogism: if Germany were to expand into the East, where millions of Jews lived, those Jews would have to vanish, because Germans could not coexist with them.

People have been trying to fathom Hitler's psyche for nearly a century. Ron Rosenbaum, in his 1998 book "Explaining Hitler," gives a tour of the more outré theories. It has been suggested, variously, that the key to understanding Hitler is the fact that he had an abusive father; that he was too close to his mother; that he had a Jewish grandfather; that he had encephalitis; that he contracted syphilis from a Jewish prostitute; that he blamed a Jewish doctor for his mother's death; that he was missing a testicle; that he underwent a wayward hypnosis treatment; that he was gay; that he harbored coprophilic fantasies about his niece; that he was addled by drugs; or—a personal favorite—that his anti-Semitism was triggered by briefly attending school with Ludwig Wittgenstein, in Linz. At the root of this speculative mania is what Rosenbaum calls the "lost safe-deposit box" mentality: with sufficient sleuthing, the mystery can be solved in one Sherlockian stroke.

Academic historians, by contrast, often portray Hitler as a cipher, a nobody. Kershaw has called him a "man without qualities." Volker Ullrich, a German author and journalist long associated with the weekly *Die Zeit*, felt the need for a biography that paid more heed to Hitler's private life. The first volume, "Hitler: Ascent 1889–1939," was published by Knopf in 2016, in a fluid translation by Jefferson Chase. Ullrich's Hitler is no tyrant-sorcerer who leads an innocent

Germany astray; he is a chameleon, acutely conscious of the image he projects. "The putative void was part of Hitler's persona, a means of concealing his personal life and presenting himself as a politician who completely identified with his role as leader," Ullrich writes. Hitler could pose as a cultured gentleman at Munich salons, as a pistol-waving thug at the beer hall, and as a bohemian in the company of singers and actors. He had an exceptional memory that allowed him to assume an air of superficial mastery. His certitude faltered, however, in the presence of women: Ullrich depicts Hitler's love life as a series of largely unfulfilled fixations. It goes without saying that he was an extreme narcissist lacking in empathy. Much has been made of his love of dogs, but he was cruel to them.

From adolescence onward, Hitler was a dreamer and a loner. Averse to joining groups, much less leading them, he immersed himself in books, music, and art. His ambition to become a painter was hampered by a limited technique and by a telling want of feeling for human figures. When he moved to Vienna, in 1908, he slipped toward the social margins, residing briefly in a homeless shelter and then in a men's home. In Munich, where he moved in 1913, he eked out a living as an artist and otherwise spent his days in museums and his nights at the opera. He was steeped in Wagner, though he had little apparent grasp of the composer's psychological intricacies and ambiguities. A sharp portrait of the young Hitler can be found in Thomas Mann's startling essay "Bruder Hitler," the English version of which appeared in *Esquire* in 1939, under the title "That Man Is My Brother." Aligning Hitler's experience with his own, Mann wrote of a "basic arrogance, the basic feeling of being too good for any reasonable, honorable activity—based on what? A vague notion of being reserved for something else, something quite indeterminate, which, if it were named, would cause people to break out laughing."

The claims of "Mein Kampf" notwithstanding, there is no clear evidence that Hitler harbored strongly anti-Semitic views in his youth or in early adulthood. Indeed, he seems to have had friendly relations with several Jews in Vienna and

Munich. This does not mean that he was free of commonplace anti-Jewish prejudice. Certainly, he was a fervent German nationalist. When the First World War commenced, in 1914, he volunteered for the German Army, and acquitted himself well as a soldier. For most of the war, he served as a dispatch runner for his regiment's commanders. The first trace of a swing to the right comes in a letter from 1915, in which Hitler expressed the hope that the war would bring an end to Germany's "inner internationalism."

The historian Thomas Weber, who recounted Hitler's soldier years in the 2010 book "Hitler's First War," has now written "Becoming Hitler: The Making of a Nazi" (Basic), a study of the postwar metamorphosis. Significantly, Hitler remained in the Army after the Armistice; disgruntled nationalist soldiers tended to join paramilitary groups. Because the Social Democratic parties were dominant at the founding of the Weimar Republic, Hitler was representing a leftist government. He even served the short-lived Bavarian Soviet Republic. It is doubtful, though, that he had active sympathies for the left; he probably stayed in the Army because, as Weber writes, it "provided a raison d'être for his existence." As late as his thirtieth birthday, in April, 1919, there was no sign of the Führer-to-be.

The unprecedented anarchy of postwar Bavaria helps explain what happened next. Street killings were routine; politicians were assassinated on an almost weekly basis. The left was blamed for the chaos, and anti-Semitism escalated for the same reason: several prominent leaders of the left were Jewish. Then came the Treaty of Versailles, which was signed in June, 1919. Robert Gerwarth, in "The Vanquished: Why the First World War Failed to End" (Farrar, Straus & Giroux), emphasizes the whiplash effect that the treaty had on the defeated Central Powers. As Gerwarth writes, German and Austrian politicians believed that they had "broken with the autocratic traditions of the past, thus fulfilling the key criteria of Wilson's Fourteen Points for a 'just peace.' " The harshness of the terms of Versailles belied that idealistic rhetoric.

The day after Germany ratified the treaty, Hitler began attending Army propaganda classes aimed at repressing revolutionary tendencies. These infused him with hard-core anti-capitalist and anti-Semitic ideas. The officer in charge of the program was a tragic figure named Karl Mayr, who later forsook the right wing for the left; he died in Buchenwald, in 1945. Mayr described Hitler as a "tired stray dog looking for a master." Having noticed Hitler's gift for public speaking, Mayr installed him as a lecturer and sent him out to observe political activities in Munich. In September, 1919, Hitler came across the German Workers' Party, a tiny fringe faction. He spoke up at one of its meetings and joined its ranks. Within a few months, he had become the leading orator of the group, which was renamed the National Socialist German Workers' Party.

If Hitler's radicalization occurred as rapidly as this—and not all historians agree that it did—the progression bears an unsettling resemblance to stories that we now read routinely in the news, of harmless-seeming, cat-loving suburbanites who watch white-nationalist videos on YouTube and then join a neo-Nazi group on Facebook. But Hitler's embrace of belligerent nationalism and murderous anti-Semitism is not in itself historically significant; what mattered was his gift for injecting that rhetoric into mainstream discourse. Peter Longerich's "Hitler: Biographie," a thirteen-hundred-page tome that appeared in Germany in 2015, gives a potent picture of Hitler's skills as a speaker, organizer, and propagandist. Even those who found his words repulsive were mesmerized by him. He would begin quietly, almost haltingly, testing out his audience and creating suspense. He amused the crowd with sardonic asides and actorly impersonations. The musical structure was one of crescendo toward triumphant rage. Longerich writes, "It was this eccentric style, almost pitiable, unhinged, obviously not well trained, at the same time ecstatically over-the-top, that evidently conveyed to his audience the idea of uniqueness and authenticity."

Above all, Hitler knew how to project himself through the mass media, honing his messages so that they would penetrate the white noise of politics. He fostered the production of catchy graphics, posters, and slogans; in time, he mastered radio and film. Meanwhile, squads of Brown Shirts brutalized and murdered opponents, heightening the very disorder that Hitler had proposed to cure. His most adroit feat came after the failed Beer Hall Putsch, in 1923, which should have ended his political career. At the trial that followed, Hitler polished his personal narrative, that of a simple soldier who had heard the call of destiny. In prison, he wrote the first part of "Mein Kampf," in which he completed the construction of his world view.

To many liberal-minded Germans of the twenties, Hitler was a scary but ludicrous figure who did not seem to represent a serious threat. The Weimar Republic stabilized somewhat in the middle of the decade, and the Nazi share of the vote languished in the low single-digit figures. The economic misery of the late twenties and early thirties provided another opportunity, which Hitler seized. Benjamin Carter Hett deftly summarizes this dismal period in "The Death of Democracy: Hitler's Rise to Power and the Downfall of the Weimar Republic" (Henry Holt). Conservatives made the gargantuan mistake of seeing Hitler as a useful tool for rousing the populace. They also undermined parliamentary democracy, flouted regional governments, and otherwise set the stage for the Nazi state. The left, meanwhile, was divided against itself. At Stalin's urging, many Communists viewed the Social Democrats, not the Nazis, as the real enemy—the "social fascists." The media got caught up in pop-culture distractions; traditional liberal newspapers were losing circulation. Valiant journalists like Konrad Heiden tried to correct the barrage of Nazi propaganda but found the effort futile, because, as Heiden wrote, "the refutation would be heard, perhaps believed, and definitely forgotten again."

Hett refrains from poking the reader with too many obvious contemporary parallels, but he knew what he was doing when he left the word "German" out of

his title. On the book's final page, he lays his cards on the table: "Thinking about the end of Weimar democracy in this way—as the result of a large protest movement colliding with complex patterns of elite self-interest, in a culture increasingly prone to aggressive mythmaking and irrationality—strips away the exotic and foreign look of swastika banners and goose-stepping Stormtroopers. Suddenly, the whole thing looks close and familiar." Yes, it does.

What set Hitler apart from most authoritarian figures in history was his conception of himself as an artist-genius who used politics as his métier. It is a mistake to call him a failed artist; for him, politics and war were a continuation of art by other means. This is the focus of Wolfram Pyta's "Hitler: Der Künstler als Politiker und Feldherr" ("The Artist as Politician and Commander"), one of the most striking recent additions to the literature. Although the aestheticizing of politics is hardly a new topic—Walter Benjamin discussed it in the nineteen-thirties, as did Mann—Pyta pursues the theme at magisterial length, showing how Hitler debased the Romantic cult of genius to incarnate himself as a transcendent leader hovering above the fray. Goebbels's propaganda harped on this motif; his diaries imply that he believed it. "Adolf Hitler, I love you because you are both great and simple," he wrote.

The true artist does not compromise. Defying skeptics and mockers, he imagines the impossible. Such is the tenor of Hitler's infamous "prophecy" of the destruction of the European Jews, in 1939: "I have often been a prophet, and have generally been laughed at. . . . I believe that the formerly resounding laughter of Jewry in Germany has now choked up in its throat. Today, I want to be a prophet again—if the international Jewish financiers inside and outside Europe should succeed in plunging the nations once more into a world war, then the result will not be the Bolshevization of the earth, and thus the victory of Jewry, but the annihilation of the Jewish race in Europe." Scholars have long debated when the decision to carry out the Final Solution was made. Most now believe that the Holocaust was an escalating series of actions, driven by pressure both from above

and from below. Yet no order was really necessary. Hitler's "prophecy" was itself an oblique command. In the summer of 1941, as hundreds of thousands of Jews and Slavs were being killed during the invasion of the Soviet Union, Goebbels recalled Hitler remarking that the prophecy was being fulfilled in an "almost uncanny" fashion. This is the language of a connoisseur admiring a masterpiece. Such intellectual atrocities led Theodor W. Adorno to declare that, after Auschwitz, to write poetry is barbaric.

Hitler and Goebbels were the first relativizers of the Holocaust, the first purveyors of false equivalence. "Concentration camps were not invented in Germany," Hitler said in 1941. "It is the English who are their inventors, using this institution to gradually break the backs of other nations." The British had operated camps in South Africa, the Nazis pointed out. Party propagandists similarly highlighted the sufferings of Native Americans and Stalin's slaughter in the Soviet Union. In 1943, Goebbels triumphantly broadcast news of the Katyn Forest massacre, in the course of which the Soviet secret police killed more than twenty thousand Poles. (Goebbels wanted to show footage of the mass graves, but generals overruled him.) Nazi sympathizers carry on this project today, alternately denying the Holocaust and explaining it away.

The magnitude of the abomination almost forbids that it be mentioned in the same breath as any other horror. Yet the Holocaust has unavoidable international dimensions—lines of influence, circles of complicity, moments of congruence. Hitler's "scientific anti-Semitism," as he called it, echoed the French racial theorist Arthur de Gobineau and anti-Semitic intellectuals who normalized venomous language during the Dreyfus Affair. The British Empire was Hitler's ideal image of a master race in dominant repose. "The Protocols of the Elders of Zion," a Russian forgery from around 1900, fuelled the Nazis' paranoia. The Armenian genocide of 1915-16 encouraged the belief that the world community would care little about the fate of the Jews. Just before the outbreak of the Second World

War, Hitler spoke of the planned mass murder of Poles and asked, "Who, after all, is today speaking about the destruction of the Armenians?" The Nazis found collaborators in almost every country that they invaded. In one Lithuanian town, a crowd cheered while a local man clubbed dozens of Jewish people to death. He then stood atop the corpses and played the Lithuanian anthem on an accordion. German soldiers looked on, taking photographs.

The mass killings by Stalin and Hitler existed in an almost symbiotic relationship, the one giving license to the other, in remorseless cycles of revenge. Large-scale deportations of Jews from the countries of the Third Reich followed upon Stalin's deportation of the Volga Germans. Reinhard Heydrich, one of the chief planners of the Holocaust, thought that, once the Soviet Union had been defeated, the Jews of Europe could be left to die in the Gulag. The most dangerous claim made by right-wing historians during the *Historikerstreit* was that Nazi terror was a response to Bolshevik terror, and was therefore to some degree excusable. One can, however, keep the entire monstrous landscape in view without minimizing the culpability of perpetrators on either side. This was the achievement of Timothy Snyder's profoundly disturbing 2010 book, "Bloodlands," which seems to fix cameras in spots across Eastern Europe, recording wave upon wave of slaughter. As for Hitler and America, the issue goes beyond such obvious suspects as Henry Ford and Charles Lindbergh. Whitman's "Hitler's American Model," with its comparative analysis of American and Nazi race law, joins such previous studies as Carroll Kakel's "The American West and the Nazi East," a side-by-side discussion of Manifest Destiny and *Lebensraum;* and Stefan Kühl's "The Nazi Connection," which describes the impact of the American eugenics movement on Nazi thinking. This literature is provocative in tone and, at times, tendentious, but it

engages in a necessary act of self-examination, of a kind that modern Germany has exemplified.

The Nazis were not wrong to cite American precedents. Enslavement of African-Americans was written into the U.S. Constitution. Thomas Jefferson spoke of the need to "eliminate" or "extirpate" Native Americans. In 1856, an Oregonian settler wrote, "Extermination, however unchristianlike it may appear, seems to be the only resort left for the protection of life and property." General Philip Sheridan spoke of "annihilation, obliteration, and complete destruction." To be sure, others promoted more peaceful—albeit still repressive—policies. The historian Edward B. Westermann, in "Hitler's Ostkrieg and the Indian Wars" (Oklahoma), concludes that, because federal policy never officially mandated the "physical annihilation of the Native populations on racial grounds or characteristics," this was not a genocide on the order of the Shoah. The fact remains that between 1500 and 1900 the Native population of U.S. territories dropped from many millions to around two hundred thousand.

America's knack for maintaining an air of robust innocence in the wake of mass death struck Hitler as an example to be emulated. He made frequent mention of the American West in the early months of the Soviet invasion. The Volga would be "our Mississippi," he said. "Europe—and not America—will be the land of unlimited possibilities." Poland, Belarus, and Ukraine would be populated by pioneer farmer-soldier families. Autobahns would cut through fields of grain. The present occupants of those lands—tens of millions of them—would be starved to death. At the same time, and with no sense of contradiction, the Nazis partook of a long-standing German romanticization of Native Americans. One of Goebbels's less propitious schemes was to confer honorary Aryan status on Native American tribes, in the hope that they would rise up against their oppressors.

Jim Crow laws in the American South served as a precedent in a stricter legal sense. Scholars have long been aware that Hitler's regime expressed admiration for American race law, but they have tended to see this as a public-relations strategy

—an "everybody does it" justification for Nazi policies. Whitman, however, points out that if these comparisons had been intended solely for a foreign audience they would not have been buried in hefty tomes in Fraktur type. "Race Law in the United States," a 1936 study by the German lawyer Heinrich Krieger, attempts to sort out inconsistencies in the legal status of nonwhite Americans. Krieger concludes that the entire apparatus is hopelessly opaque, concealing racist aims behind contorted justifications. Why not simply say what one means? This was a major difference between American and German racism.

American eugenicists made no secret of their racist objectives, and their views were prevalent enough that F. Scott Fitzgerald featured them in "The Great Gatsby." (The cloddish Tom Buchanan, having evidently read Lothrop Stoddard's 1920 tract "The Rising Tide of Color Against White World-Supremacy," says, "The idea is if we don't look out the white race will be—will be utterly submerged.") California's sterilization program directly inspired the Nazi sterilization law of 1934. There are also sinister, if mostly coincidental, similarities between American and German technologies of death. In 1924, the first execution by gas chamber took place, in Nevada. In a history of the American gas chamber, Scott Christianson states that the fumigating agent Zyklon-B, which was licensed to American Cyanamid by the German company I. G. Farben, was considered as a lethal agent but found to be impractical. Zyklon-B was, however, used to disinfect immigrants as they crossed the border at El Paso—a practice that did not go unnoticed by Gerhard Peters, the chemist who supplied a modified version of Zyklon-B to Auschwitz. Later, American gas chambers were outfitted with a chute down which poison pellets were dropped. Earl Liston, the inventor of the device, explained, "Pulling a lever to kill a man is hard work. Pouring acid down a tube is easier on the nerves, more like watering flowers." Much the same method was introduced at Auschwitz, to relieve stress on S.S. guards.

When Hitler praised American restrictions on naturalization, he had in mind the Immigration Act of 1924, which imposed national quotas and barred most Asian

people altogether. For Nazi observers, this was evidence that America was evolving in the right direction, despite its specious rhetoric about equality. The Immigration Act, too, played a facilitating role in the Holocaust, because the quotas prevented thousands of Jews, including Anne Frank and her family, from reaching America. In 1938, President Roosevelt called for an international conference on the plight of European refugees; this was held in Évian-les-Bains, France, but no substantive change resulted. The German Foreign Office, in a sardonic reply, found it "astounding" that other countries would decry Germany's treatment of Jews and then decline to admit them.

Hundreds of thousands of Americans died fighting Nazi Germany. Still, bigotry toward Jews persisted, even toward Holocaust survivors. General George Patton criticized do-gooders who "believe that the Displaced person is a human being, which he is not, and this applies particularly to the Jews who are lower than animals." Leading Nazi scientists had it better. Brian Crim's "<u>Our Germans: Project Paperclip and the National Security State</u>" (Johns Hopkins) reviews the shady history of Wernher von Braun and his colleagues from the V-2 program. When Braun was captured, in 1945, he realized that the Soviets would become the next archenemy of the American military-industrial complex, and cannily promoted the idea of a high-tech weapons program to ward off the Bolshevik menace. He was able to reconstitute most of his operation Stateside, minus the slave labor. Records were airbrushed; de-Nazification procedures were bypassed (they were considered "demoralizing"); immigration was expedited. J. Edgar Hoover became concerned that Jewish obstructionists in the State Department were asking too many questions about the scientists' backgrounds. Senator Styles Bridges proposed that the State Department needed a "first-class cyanide fumigating job."

These chilling points of contact are little more than footnotes to the history of Nazism. But they tell us rather more about modern America. Like a colored dye coursing through the bloodstream, they expose vulnerabilities in the national

consciousness. The spread of white-supremacist propaganda on the Internet is the latest chapter. As Zeynep Tufekci recently observed, in the *Times*, YouTube is a superb vehicle for the circulation of such content, its algorithms guiding users toward ever more inflammatory material. She writes, "Given its billion or so users, YouTube may be one of the most powerful radicalizing instruments of the 21st century." When I did a search for "Hitler" on YouTube the other day, I was first shown a video labelled "Best Hitler Documentary in COLOR!"—the British production "Hitler in Color." A pro-Hitler remark was featured atop the comments, and soon, thanks to Autoplay, I was viewing contributions from such users as CelticAngloPress and SoldatdesReiches.

In 1990, *Vanity Fair* reported that Donald Trump once kept a book of Hitler's speeches by his bed. When Trump was asked about it, he said, "If I had these speeches, and I am not saying that I do, I would never read them." Since Trump entered politics, he has repeatedly been compared to Hitler, not least by neo-Nazis. Although some resemblances can be found—at times, Trump appears to be emulating Hitler's strategy of cultivating rivalries among those under him, and his rallies are cathartic rituals of racism, xenophobia, and self-regard—the differences are obvious and stark. For one thing, Hitler had more discipline. What is worth pondering is how a demagogue of Hitler's malign skill might more effectively exploit flaws in American democracy. He would certainly have at his disposal craven right-wing politicians who are worthy heirs to Hindenburg, Brüning, Papen, and Schleicher. He would also have millions of citizens who acquiesce in inconceivably potent networks of corporate surveillance and control.

The artist-politician of the future will not bask in the antique aura of Wagner and Nietzsche. He is more likely to take inspiration from the newly minted myths of popular culture. The archetype of the ordinary kid who discovers that he has extraordinary powers is a familiar one from comic books and superhero movies, which play on the adolescent feeling that something is profoundly wrong with the world and that a magic weapon might banish the spell. With one stroke, the

inconspicuous outsider assumes a position of supremacy, on a battlefield of pure good against pure evil. For most people, such stories remain fantasy, a means of embellishing everyday life. One day, though, a ruthless dreamer, a loner who has a "vague notion of being reserved for something else," may attempt to turn metaphor into reality. He might be out there now, cloaked by the blue light of a computer screen, ready, waiting. ♦

*Published in the print edition of the <u>April 30, 2018</u>, issue, with the headline "The Hitler Vortex."*

---



<u>*Alex Ross*</u> *has been The New Yorker's music critic since 1996. He is the author of* "<u>*Wagnerism: Art and Politics in the Shadow of Music*</u>."

**More:**   **Adolf Hitler**      **Germany**

**"Hitler's American Model: The United States and the Making of Nazi Race Laws"**

**"Becoming Hitler: The Making of a Nazi"**      **"The Vanquished: Why the First World War Failed to End"**

**"The Death of Democracy: Hitler's Rise to Power"**

**"Hitler: Der Kunstler als Politiker und Feldherr" ("The Artist as Politician and Commander")**

**"Hitler's Ostkrieg and the Indian Wars"**      **"Our Germans: Project Paperclip and the National Security State"**

**Histories**      **Historiography**      **Nazis**      **Books**

---

# Get *The New Yorker's* daily newsletter

Keep up with everything we offer, plus exclusives available only to newsletter readers, directly in your in-box.

**Sign up**

By signing up, you agree to our **user agreement** (including **class action waiver and arbitration provisions**), and acknowledge our **privacy policy**.

---

# READ MORE

BOOKS

## The System

**By Adam Kirsch**

BOOKS

## Blood and Soil

**By Adam Gopnik**

COMMENT

## Trump's Disgrace

While F.D.R. set a modern standard for the revitalization of a society, Trump seems determined to prove how quickly he can spark its undoing.

**By David Remnick**

Ad

THE POLITICAL SCENE PODCAST

## Trump's Putin-Like Cull of the White House Press Pool

"It's something that is at the top of the authoritarian playbook list," the staff writer Susan B. Glasser says. "You know, go after the independent press."

THE WEEKEND ESSAY

## The Imperialist Philosopher Who Demanded the Ukraine War

For decades, Alexander Dugin argued that Russia had a messianic mission, and that destroying an independent Ukraine was necessary to fulfilling it.

**By James Verini**

CRITIC'S NOTEBOOK

## "Paradise" Is Manna for the Moment

The clanking didacticism of Dan Fogelman's new Hulu series, which involves climate disaster, nuclear war, and the insurgency of the billionaire class in politics, is deeply satisfying.

**By Doreen St. Félix**

FICTION PODCAST

## Paul Theroux Reads V. S. Pritchett

The author joins Deborah Treisman to read and discuss "The Necklace," which was published in *The New Yorker* in 1958.

THE NEW YORKER RADIO HOUR

## Alan Cumming on "The Traitors" and His Brush with Reality Television

The actor talks with Emily Nussbaum about his role on "The Traitors," why he had always been "judgy" toward reality shows, and the perils of fame.

THE NEW YORKER RADIO HOUR

## Does Tim Walz Have Any Regrets?

The Minnesota governor, who was Kamala Harris's running mate, on what went wrong for the Democrats in 2024, and what they should do now that Donald Trump is back in the White House.

DAILY CARTOON

## Daily Cartoon: Friday, February 28th

"What's wrong? If I order it today, with one-day shipping, I'll get it the day *after* the boycott!"

**By Ellen Liebenthal**

THE CURRENT CINEMA

## "Mickey 17" Is a Science-Fiction Adventure of Multiple Unwieldy Thrills

In Bong Joon-ho's latest film, Robert Pattinson plays a space traveller facing a succession of death sentences.

**By Justin Chang**



 Your Privacy Choices

*The Atlantic*

Sign In     Subscribe

**November 2017 Issue**

EXPLORE

CULTURE

# What America Taught the Nazis

In the 1930s, the Germans were fascinated by the global leader in codified racism—the United States.

By Ira Katznelson



Oliver Munday

TO READ THIS STORY, **SIGN IN** OR **START A FREE TRIAL.**     ✕

T HERE WAS NO more extravagant site for Third Reich political theater than the spectacular parade grounds, two large stadiums, and congress hall in Nuremberg, a project masterminded by Albert Speer. From 1933 to 1938, he choreographed massive rallies associated with the annual conference of the Nazi Party, assemblies made famous by Leni Riefenstahl's stunning documentaries of 1933 and 1935, *The Victory of Faith* and *Triumph of the Will*. Nuremberg was the setting for the September 1935 "Party Rally of Freedom," at which a special session of the Reichstag passed, by acclamation, legislation that disqualified Jews as Reich citizens with political rights, forbade them to marry or have sex with persons identified as racial Germans, and prohibited any display by Jews of national colors or the new national flag, a banner with a swastika.

TO READ THIS STORY, **SIGN IN** OR **START A FREE TRIAL.**     ✕

NEVER MISS A STORY. START YOUR FREE TRIAL.

Support independent journalism when it's needed most. Become an *Atlantic* subscriber for less than $2 a week.

GET STARTED

ALREADY HAVE AN ACCOUNT? SIGN IN

---

*When you buy a book using a link on this page, we receive a commission. Thank you for supporting The Atlantic.*

## ABOUT THE AUTHOR

TO READ THIS STORY, **SIGN IN** OR **START A FREE TRIAL.**    ✕

**Ira Katznelson**

<u>Ira Katznelson</u> is a professor of political science and history at Columbia University. He is the author of <u>*Fear Itself: The New Deal and the Origins of Our Time*</u>.

TO READ THIS STORY, **SIGN IN** OR **START A FREE TRIAL.**    ✕

EXHIBITIONS

# The Impact of Racist Ideologies: Jim Crow and the Nuremberg Laws



In April 1933, the Nazis organized a boycott of German Jewish businesses. This woman is reading a sign that explains th In April 1933, the Nazis organized a boycott of German Jewish businesses. This woman is reading a sign that explains the Nazi point of view. (Courtesy, United States Holocaust Memorial Museum, courtesy of National Archives and Records Administration, College Park, MD.)

Contrary to common belief, Nazi Germany  s legal assault on the Jews between 1933 and 1945 was not unique in its racial character nor its segregationist aims. There are remarkable similarities between Americas own Jim Crow laws and those in Nazi Germany. As with many Nazi attacks against the Jews, the Nazis took ideas and practices that were common in their own and other cultures and radicalized them to suit their needs. This exhibit will examine the Jim Crow laws   with examples from Houston  s segregationist past   and the Nuremberg laws.

The exhibit opens Aug. 5, 2011 and runs through July 22, 2012 in Holocaust Museum Houstons Central Gallery in the Morgan Family Center, 5401 Caroline St., in Houston  s Museum District.

Custom and law are closely linked systems that affect how people act toward each other. In both the post-Civil War United States and in Nazi Germany, the freedoms and rights of some groups of people were limited. Each country developed a system of racially based laws influenced by past customs and beliefs. These systems would dramatically shape history.

Under each system, groups were targeted. They lost important political, economic and social rights. African Americans were the primary target under the U.S. system of Jim Crow laws, named after a song-and-dance caricature of African

| TICKETS | 📞 (713) 942-8000 |
|---|---|

Nazi Germany.

These laws, based on racial privilege, led to violence in both countries. Jim Crow laws varied widely across regions in the United States. Therefore, violent actions tended to be localized. The Nuremberg Laws were national in scope, laying the groundwork for the murder of more than two-thirds of the Jewish population of Europe.

Using images and first-person accounts, this exhibition permits visitors to consider the Jim Crow and Nuremberg laws and to examine their effects on daily life. Incorporating Houstons history with Jim Crow and the civil rights movement, the exhibition invites visitors to think about the impact of the laws of Jim Crow and Nuremberg both at the time of their implementation and today. Ultimately, the exhibit challenges guests to consider what each individual must do to lessen the impact of racist ideologies.

The exhibit explores the history of racism and eugenics, past separate-but-equal doctrines and how racially based laws were used to define individuals and to restrict marriage rights, school privileges and other opportunities.

The public is invited to a free preview reception from 6 to 8 p.m. Thursday, Aug. 4, 2011. Admission is free, but advance registration is required for this reception. Visit http://www.hmh.org/RegisterEvent.aspx to RSVP online. For more information, call <u>713-942-8000 (tel:7139428000)</u> or e-mail <u>exhibits@hmh.org (mailto:exhibits@hmh.org)</u>.

---

**August 5, 2011 - August 19, 2012**

**Central Gallery**

---

A SPECIAL THANKS TO OUR SPONSORS

Three Brothers Bakery
Marathon Oil Corporation
Frost

Special Thanks to



---



**Contact Info**

Lester and Sue Smith Campus
5401 Caroline
Houston, TX , 77004

<u>(713) 942-8000 (tel:7139428000)</u>

<u>info@hmh.org (mailto:info@hmh.org)</u>

<u>(713) 527-1652 (fax:7135271652)</u>

| TICKETS | 📞 (713) 942-8000 |
|---|---|

**Hours of Operation**

M: Closed
T-Sa: 10 am to 5 pm
Su: Noon to 5 pm

 

**Quick Links**

Give

About HMH

Venue Rentals (/venue-rental/)

Volunteer

Careers (/careers/)

Press Room/Media Kit (/press-room/)

---

© Copyright 2025 | Holocaust Museum Houston All Rights Reserved
| Website by ASTOUNDZ An SEO Company | Sitemap (/sitemap/)

TICKETS                              📞 (713) 942-8000

# Real Talk. Real Issues. No Apathy

Silence won't stop injustice. *Apathy is Not an Option* is a powerful podcast exposing the fight for racial and economic justice in the South. We tackle issues like confronting hate and extremism, protecting voting rights, and advancing economic equity. Through real stories and bold conversations, we shine a light on the urgent battles shaping our communities. **New episodes drop monthly.**

## Listen to the Trailer 



Explore Our Sites

Donate

Learning for Justice

Civil Rights Memorial Center

Report

# The Biggest Lie in the White Supremacist Propaganda Playbook: Unraveling the Truth About 'Black-on-White Crime'

June 14, 2018

Share



**The idea that black people are wantonly attacking white people in some sort of quiet race war is an untruthful and damaging narrative with a very long history in America.**

# Executive Summary

On a Wednesday night in June 2015, a 21-year-old white man walked into a black church in Charleston, South Carolina, and gunned down nine black parishioners taking part in a weekly Bible study group. Dylann Storm Roof sat quietly with the group for about an hour before taking out his Glock pistol and firing 70 rounds, stopping five times to reload. Court testimony revealed that during the shooting Roof said, "Y'all are raping our white women. Y'all are taking over the world."

How this horrific violence came to take place traces back to a particularly destructive idea, one as old as the United States itself and rooted in the country's white supremacy: that black men are a physical threat to white people. The narrative that black men are inherently violent and prone to rape white women, as Roof said during his rampage, has been prevalent for centuries. This idea has served as the primary justification for the need to oppress black people to protect the common — meaning white — good.

Roof saw himself as a victim standing up for oppressed whites, not as an aggressor. He had a racist "awakening" spurred by online research he did about the 2012 murder of the black high-school student Trayvon Martin. As he wrote in his manifesto, the Martin killing **"prompted me to type in the words 'black on white crime' into Google, and I have never been the same since that day."**

Roof's internet search quickly led him to the website of the white supremacist Council of Conservative Citizens, a group that claims to document an ignored war against whites being waged by violent black people. Google led Roof down a rabbit hole of hate, leaping from one hate site to the next, many filled with "evidence" that black people are pillaging, raping and murdering white people.



The Miseducation of Dylann Roof

"There were pages and pages of these brutal black on White murders," Roof wrote in his manifesto. "I was in disbelief. At this moment I realized that something was very wrong.

How could the news be blowing up the Trayvon Martin case while hundreds of these black on White murders got ignored."

It's not surprising that a fragile-minded young man who swallowed hate material whole came to see this so-called problem of black-on-white crime as something he had to personally confront. But the resonance of these ideas goes much deeper, infecting the thinking of many prominent people, including public policymakers to this day.

Take then-Presidential Candidate Donald Trump, who in November 2015 tweeted an image that originated from a neo-Nazi account that made exactly the same point as the hate sites Roof was reading. Filled with bogus crime statistics, the graphic Trump tweeted supposedly showed that black people are uniquely violent. *The Washington Post* found that the data in Trump's tweet to be false. One of the most exaggerated statistics was about the number of white people killed by other white people. Trump's tweet claimed the number was 16 percent, while the FBI's data shows it is 82 percent. The tweet also asserted that 81 percent of whites are killed by black people; the FBI number is 15 percent. As the *Post* concluded, "Trump cast blacks as the primary killers of whites, but the exact opposite is true. By overwhelming percentages, whites tend to kill other whites. Similarly, blacks tend to kill other blacks. These trends have been observed for decades."

It's not just Trump. The far-right ecosystem repeats versions of these ideas *ad nauseum*. Relying on "statistics" found in a white supremacist tract, the paleoconservative one-time presidential candidate Pat Buchanan wrote in 2007: "The real repository of racism in America — manifest in violent interracial assault, rape and murder — is to be found not in the white community, but the African-American community." Until very recently, Breitbart news used a "black crime" story tag.



This image, tweeted by then-Presidential Candidate Donald Trump on Nov. 22, 2015, originated from a neo-Nazi account. It displays bogus crime statistics.

Misrepresented crime statistics are a main propaganda point of America's hate movement, and a pillar of white supremacist thinking in the United States. Stormfront, the oldest hate site on the internet, has thousands of pages devoted to the "issue" of black-on-white crime.

The idea that black people are wantonly attacking white people in some sort of quiet race war is an untruthful and damaging narrative with a very long history in America. White Americans' unsubstantiated views about the potential of violence from black people was the number one excuse they used to justify slavery, lynching, Jim Crow and various forms of mass incarceration. Never was Klan violence or the lynching of black people by white people ascribed to an inherent white trait. Without the ability to claim oppression of black people as a form of self-defense, racial segregation and white supremacy would be seen for what they are: rank oppression of other people for financial or other benefit.

The maze of online white supremacist propaganda that Roof entered into is largely no more. Google cleaned up its search results after the Southern Poverty Law Center publicly exposed the problem in a January 2017 video. When black on white crime is typed into a Google search now, the results return legitimate sources of information, such as the FBI's crime statistics, mainstream news and academic research.



When black on white crime is typed into a Google search now, the results return legitimate sources of information, such as the FBI's crime statistics, mainstream news and academic research.

But the idea of out-of-control black violence continues to motivate white supremacist propagandists and remains a main recruiting tool for the hate movement and its wish for a genetically pure white ethnostate. Because this narrative of black criminality is so central to American history — the foundation upon which discrimination has long been justified — it persists as white supremacy's enduring siren song.

This report examines the origins and evolution of this propaganda from the mid-1800s to the current day.

Dylann Roof claimed he had a racist "awakening" spurred by online research he did about the 2012 murder of the black high-school student Trayvon Martin.

# From antebellum America to the roaring twenties: Making the "scientific" case for controlling inherent black violence

Emancipation brought freedom to four million enslaved men and women, dismantling the codified racial hierarchy that much of white society believed to be natural. Most Southerners saw chattel slavery as rational, often drawing on the Old Testament to justify the institution. With its abolishment in 1865, white Americans had to adapt their ideas to the new legal regime and created new means of reinforcing the racial hierarchy where they sat at the top.

# An early attempt to use "science" to preserve white supremacy

Attempting to address what came to be known as the "Negro Problem," American scientists and other intellectuals created a new body of knowledge that they could use to justify white supremacy by scientifically "proving" black inferiority. Men like Samuel George Morton (1799 -1851), who is considered the originator of scientific racism, relied on anecdotal observations and physical measurements.



Morton built on a racial classification system first created by the Swedish botanist Carolus Linnaeus, which placed people in one of four groups:

- *Americanus*,

- *Asiaticus*,

- *Africanus* and

- *Europeaeus*.

In Linnaeus' original work, Americanus were "obstinate, merry, free" and "regulated by customs," while Africanus

were "crafty, indolent, negligent" and "governed by caprice."[1] Rather than simply ascribing characteristics to each race, Morton added a physiological layer to this racial taxonomy by measuring cranial capacity — studies he conducted using his personal collection of skulls, which was reputedly the world's largest.[2]

Using buckshot and peppercorns to measure the volume of the skulls in his possession, Morton argued that Caucasians had the largest skulls and were, therefore, the most intelligent race.[3] Other thinkers ran with Morton's ideas, especially after Charles Darwin's theory of natural selection gained widespread attention with its publication in 1859. Alabama physician Josiah Nott (1804 -1873), for instance, drew on patient observations and religious theory to argue that blacks and whites were, in fact, different species.[4]

# From pseudo-science to lying with statistics

Craniometry was eventually replaced by a different kind of "proof" of black inferiority: crime statistics. Whereas the idea of racial difference was once perpetuated by pseudo-biological evidence, by the late-1800s new forms of statistical data — including datasets with a nationwide scope and new sampling techniques – became widely available. This new statistically based brand of social science seemed to provide a way to objectively measure how well black people had adjusted to life outside of slavery. The numbers showing that African Americans committed a disproportionate number of crimes appeared to affirm what many social scientists already believed to be true.

In his book *The Condemnation of Blackness*, historian Khalil Gibran Muhammad argues that this "racial data revolution" created a permanent linkage between blackness and criminality.[5] The myth that black people possessed a unique proclivity for violence became the most enduring way of communicating black inferiority and justifying continued discrimination.

The influential German-born statistician Frederick L. Hoffman, who would go on to serve as president of the American Statistical Association in 1911, played a crucial role in embedding the narrative of black criminality when he published the first book-length study of racial crime statistics. Hoffman trained in the American South and thoroughly absorbed the deeply racist culture that surrounded him. His interest in statistics developed as he read literature on "black disappearance" — the idea that the black race, through their own self-destructive behavior, would eventually vanish.

The release of the 1890 census afforded him the opportunity to test his theory that black people's violent proclivities were contributing to high rates of black mortality. The census data he used in _Race Traits and the Tendencies of the American Negro_ came 25 years after the end of slavery — enough time, Hoffman believed, that the conditions under which black people lived reflected only on black people themselves.[6]



Frederick L. Hoffman

Of course, black people at the turn of the century did not live under the same conditions as people who were white. After the Civil War, southern states were able to perpetuate the racial hierarchy and coerced labor that existed under slavery by making them central features of their judicial systems. As Douglas Blackmon documents in _Slavery by Another Name,_ statutes criminalizing minor and subjective crimes allowed law enforcement to easily arrest black men, who were then leased to farmers and private industry as laborers to the financial benefit of the state.

For example, among the county convicts working in the Pratt Mines of Birmingham, Alabama in 1890:

- 24 men were incarcerated for using "obscene language,"

- Another 24 for "false pretense" — a statute used to punish black men who changed employers before the end of the farming season, and

- Seven for vagrancy, another ill-defined charge that left any unemployed black person vulnerable to arrest.[7]

In Alabama, the convict-leasing system remained on the books until 1928.

This context mattered little to Hoffman, who took crime statistics at face value, insisting they showed "without exception that the criminality of the negro exceeds that of other races of any numerical importance in this country."[8] Environmental factors — including access to the most low-paying and dangerous jobs, segregation, exclusion from unions, discriminatory policing and other social and economic factors that might influence crime rates — were brushed aside. "It is not at all 'the conditions of life,'" he wrote.[9]

Additionally, the fact that Irish and Italian immigrants also had disproportionately high crime rates received little notice. Hoffman quoted an academic who praised these immigrants for their ability to "melt like sugar in a cup of tea" when they came to the United

States, while criticizing black people for remaining "distinctly African in their physical and mental characteristics."[10] Like the other social scientists of his day, he wrote off higher crime rates among immigrant groups as a passing consequence of adjusting to the industrial city. In other words, it was temporary and environmental — an interpretation not afforded to African Americans.

The power of Hoffman's interpretation lay in the fact that he argued with "data and reason, rather than passion and emotion," giving a scientific veneer to racist ideas. Relying on dry and seemingly objective government reports, rather than the usual racist tropes, helped obscure the fact that his narrative was crafted to discredit claims of black equality. Hoffman's "innovative and enduring significance," Muhammad argued, "was not only in presenting the data for the first time, but also in setting the terms and shaping the frame of analysis."[11]

By the turn of the century, the "Negro Problem" was a crime problem.

## The real threat at the time: White on black crime

If anything, white people represented a far larger threat to black people than the reverse, and whites frequently employed the myth of black criminality to justify their own violence. The Klan represented an especial threat, and in their campaign of terror against newly freed African Americans they beat, whipped, kidnapped, and even killed men and women they believed had transgressed racial boundaries.

Often, it was the supposed sexual threat that black men posed to white women that elicited a violent response. Whites, especially in the South, cited rape and an alleged need to protect white women as a chief justification for the thousands of lynchings perpetrated against African Americans between Reconstruction and the Second World War.

Alleged sexual violence also sparked outbreaks of mass violence against black communities, including the 1908 Springfield, Illinois race riot and the 1921 Tulsa, Oklahoma race riot. Even the most well-to-do whites rationalized their own violence as necessary in order to defend their own racial purity and protect themselves against black barbarism.

At the turn of the century, a cohort of black academics and activist journalists pushed back against the accusations that black people were uniquely criminal and their culture

hopelessly dysfunctional. Most prominent among them were the sociologist W. E. B. Du Bois and investigative journalist Ida B. Wells.

In both his works *The Philadelphia Negro* (1899) and *The Health and Physique of the Negro American* (1906), Du Bois recontextualized statistical data to show that social and economic conditions were responsible for higher rates of black crime, disease and morbidity.

For her part, <u>Wells disproved</u> the widely accepted belief that lynching occurred in response to sexual violence committed by black men. Instead, she showed, lynching was a strategy for whites to maintain social control of black people through fear. She also cast white men as the perpetrators of sexual violence, describing the very real threat they posed

Ida B. Wells

to black women who had essentially no access to social or legal recourse.[12] The public failed to take the intellectual work of black men and women seriously, and it would be decades before their research reached the mainstream.

# The post-war years: The Pioneer Fund fuels race science

White supremacy is stubbornly resistant and adaptable. Indisputable racial progress was made during the mid-twentieth century, yet racists found new strategies to justify their ideology, defend racist policies and blame racial inequality on black pathology.

During the most active years of the Civil Rights Movement — as white supremacists watched their efforts to maintain segregation fail with the Supreme Court's 1954 *Brown* v. *Board of Education* decision, the passage of the Civil Rights Act in 1964 and Voting Rights Acts in 1965 — they found a new way to demonstrate that black people were, in fact, inferior: the language of genetics.

W. E. B. Du Bois

"Advances in genetics, particularly the discovery of the double helix [structure of DNA] in 1953, confirmed the complexity of human heredity and continued to undercut the simplistic theories of eugenicists and other racial scientists who advanced the idea of a fixed racial taxonomy," Michael Yudell, a scholar of bioethics and public health, explained in 2011. Yet, he continued, it also introduced language and methodology that could be "exploited and manipulated" by racists.[13]

Genetics provided white supremacists with a potent tool to argue that racial differences were scientifically based, inherited and thus immutable. Factors as far ranging as intelligence, health, impulsivity and criminality, racist academics argued, were based on genetic markers that varied by race.

# The Pioneer Fund's destructive enterprise

Academic racism in this vein was largely sustained by a single institution: The Pioneer Fund. According to William H. Tucker — whose 2002 book *The Funding of Scientific Racism* remains the definitive history of the organization — Pioneer bankrolled "almost every social scientist who has concluded that Blacks are genetically less intelligent than Whites."[14]

The Fund's overarching goal was to finance research that proved black genetic inferiority, which could then be cited as evidence that the low economic and social status of black Americans was "natural." By extension, policy interventions — in the form of welfare or affirmative action, for example — could be written off as impotent and unnecessary.

These studies existed well outside of the scientific mainstream.

By 1972 leading genetic scholar Richard Lewontin concluded that race had "virtually no genetic...significance."[15] Nevertheless, scientists funded by Pioneer — nearly all of whom were in fields other than the biological sciences — used the language of genetics to help maintain a biological argument for white supremacy, repackaging old white nationalist ideas in order to lend them a respectable and scholarly edge.

Founded in 1937 by Wickliffe Draper, a Massachusetts textile magnate who used his multimillion-dollar fortune to endow the project, the Pioneer Fund aimed to ensure "race betterment" through "study and research into the problems of heredity and genetics."[16] It came into being when eugenic-thought was still prominent in American culture (the 1930s saw more legal sterilizations committed for eugenic purposes than any other decade), and when many Americans connected societal problems stemming from the Great Depression to genetic factors and cultural "disease."[17]

# The politics of the Pioneer Fund

Draper's fervent belief in eugenics was matched by those of the Fund's first president, Harry Laughlin, a legal scholar whose work inspired Nazi sterilization programs.[18]

Though Harry F. Weyher, Jr., a New York attorney who became the Pioneer Fund's president in 1958, claimed the fund's "sole activity" was to conduct disinterested scholarly research, it was a political project from the outset.[19]

After the *Brown v. Board of Education* decision outlawed school segregation, Draper began quietly funding efforts to fight subsequent civil rights legislation. By 1964, he anonymously donated nearly $215,000 (more than $1.7 million in 2018 dollars) to the Mississippi State Sovereignty Commission, a state-run agency created to oppose federal civil rights legislation, counter the work of anti-racist activists and preserve segregation.[20]

From the Sovereignty Commission, Draper's donations were moved into the coffers of the Coordinating Committee for Fundamental American Freedoms, a nationwide initiative aimed at countering federal civil rights initiatives, which it called "$100 Billion Blackjack" in one newspaper ad.[21] Media campaigns were needed, Pioneer Fund associate John Satterfield explained, to demonstrate that African Americans' position in society was due to genetic inferiority and not "environmental factors, particularly to mistreatment and 'discrimination.'"[22] By the late 1970s, the Pioneer Fund was financing symposiums aimed at dismantling busing programs designed to desegregate schools.[23]

An ad run by the Coordinating Committee for Fundamental American Freedoms, a nationwide initiative aimed at countering federal civil rights initiatives, in the Canyon News on April 30, 1964.

# Funding racism through scholarship

While the Pioneer Fund was privately operating in the political realm, its main project was to support the work of academics who focused on the intersection of race, genetics and public policy. The fund's academic recipients worked in some of the nation's premier research universities. Many of the main purveyors of racism in America were not men in hoods or mobs of angry Southerners blocking the entrances to schools, but well-educated professionals who were the epitome of middle-class respectability.

One of those men was Stanford professor William Shockley, who received the Nobel Prize in Physics in 1956 for his work on the transistor only to later become an ardent and outspoken eugenicist.



William Shockley

Shockley began his descent into scientific racism in 1965 with a lecture at that year's Nobel conference on "Genetics and the Future of Man," which argued that black Americans were suffering from "dysgenesis" — the theory that reproduction among those with substandard genetic makeup would eventually lead to the cognitive decline of an entire population.

Two years later he supplied a glowing review of a book called *Race and Reality,* which argued that allowing universal suffrage "to states or communities with high percentages of a retarded race is suicidal."[24] Between 1968 and 1976 The Pioneer Fund granted Shockley the equivalent of nearly $1.5 million in 2018 dollars. With little to no training in biology or genetics Shockley never conducted original studies on intelligence, but still felt qualified to argue in 1980 that "The major cause of the US negro's intellectual and social deficits are hereditary and racially genetic in origin and thus not remediable to a major degree by any practical improvements in environment."[25]

Shockley spent most of his "research" money on a pseudo-academic, pro-eugenics media campaign, mailing lawmakers, writers, scientists and journalists bulging packets containing articles and his own racist dispatches.[26]

Shockley also made his own public policy proposals. His main target was welfare programs, which had grown in the 1960s thanks to a movement — led predominantly by black women — to organize the urban poor around the issues of public assistance. But their progress also brought increased scrutiny, especially toward black female welfare recipients.

These women, Shockley insisted, were having too many children and burdening society with an increasing number of genetically undesirable individuals. Welfare, he proposed in 1973, should be replaced by a "Voluntary Sterilization Bonus Plan" wherein women could elect to undergo sterilization and, for every point their IQ fell below the white mean of 100, they would receive $1,000.[27]

Other Pioneer recipients, like Johns Hopkins University sociology professor Robert Gordon, supported similar policies well into the 1990s. When a Columbia University student asked him whether black people should electively undergo sterilization, he replied: "If they care about the future of their race, they might be willing to go to some trouble to accomplish that. I think it's right to give them the proper information in order for them to do that."[28]

Shockley's biggest public relations campaign was not based on his own work, but that of his protégé Arthur Jensen, an education psychology professor at the University of California, Berkeley, whose infamous 1969 article in the *Harvard Educational Review* argued that black children were not genetically equipped to learn the same abstract concepts as white children.

The policy implications were clear, he insisted: social programs meant to improve the educational outlook for black students — specifically War on Poverty programs like Head Start — were useless and should be replaced by those with "eugenic foresight" like vocational training.

The article was roundly criticized by the emerging group of black activist-academics, including Angela Davis, but their critiques were drowned out by Shockley's determined effort to spread Jensen's findings to the media. Publications responded with dramatic headlines, like one in *Newsweek* that read "Born Dumb?"[29] Even the Regents at the University of California issued support for Jensen when they cited Davis's criticisms of his article as one of the reasons she was fired from her post at UCLA.[30]

Two of the men who would eventually serve as presidents of the Pioneer Fund produced some of its most outlandish research. Psychologist J. Philippe Rushton, who managed the Fund between 2002 and 2012, argued in his work that black men had smaller brains, which was inversely correlated with the size of their genitals (his department at the University of Western Ontario reprimanded him in 1988 for conducting a survey in which he asked 150 men questions like "How large is your penis?" and "How far can you ejaculate?" at a shopping mall).[31]

Richard Lynn, a professor at the University of Ulster in Northern Ireland who took over the Pioneer Fund after Rushton's death, wrote in 1974 that "If the evolutionary process is to bring its benefits, it has to be allowed to operate effectively. This means that incompetent societies have to be allowed to go to the wall… What is called for here is not genocide, the killing off of the populations of incompetent cultures. But we do need to think realistically in terms of 'phasing out' of such peoples."[32]

The Pioneer Fund also bankrolled *Mankind Quarterly,* a pseudo-academic journal established by anthropologists in 1961 to promote studies exploring racial dissimilarities. Its founders included a proponent of South African apartheid, a Columbia professor who defended segregation in expert testimony for *Brown v. Board of Education* and a pro-Mussolini Italian eugenicist.[33] Between 1978 and 2015, the journal was published by the Pioneer-funded Institute for the Study of Man, founded by British anthropologist Richard Pearson, who in his own work warned that race mixing amounted to "racial suicide."[34]

*Mankind Quarterly* took eugenicist thinking and flavored it with academic jargon to provide a veneer of legitimacy. This helped to enforce a self-referential "scientific" community among academic racists: they had a platform for their more outlandish work and could cite one another to create the appearance of scholarly consensus. Nevermind that the journal's articles on the inherited mental capacities of different races were far outside the scientific mainstream.

# The Bell Curve and the mainstreaming of race science

The publication of political scientist Charles Murray and psychologist Richard J. Herrnstein's bestselling book *The Bell Curve* in 1994 took the ideas about the genetics of race, intelligence, behavior and crime held by Pioneer Fund recipients and *Mankind Quarterly* contributors from the outskirts of public debate to the mainstream.

The nearly 1,000-page tome — built on the scholarship of race scientists supported by the Pioneer Fund — introduced the broader public to the ideas circulating in racist academic circles. And, because they presented their work as mainstream scientific consensus, the book lent white supremacists a hand in their quest to change the way Americans discussed the issue of race.

In *The Bell Curve,* Herrnstein, a Harvard professor who first broached the issue of race and IQ in a 1971 article in *The Atlantic*, teamed up with Murray, a fellow at the conservative American Enterprise Institute, to examine racial and social stratification in America. The two social scientists argued that those who made up the American "underclass" were there not because of racial or socioeconomic disadvantage, but because of genetic deficiencies passed down through generations. The gap between the underclass and the "cognitive elite," they insisted, was growing, and soon the problems posed by those who occupied the bottom of the intellectual ladder would worsen because "addiction, violence, unavailability of work, child abuse, and family disorganization will keep most members of the underclass from fending for themselves."[35]

Who made up this underclass? The unemployed, welfare dependents, and, most controversially, African Americans who, due to a mix of genetic and environmental factors,

had an average IQ 15 points lower than that of whites, the authors claimed.[36] Poor black people, they argued, fell into their low social and economic position because of differences in IQ.

All of this rested on scientifically questionable research. As Charles Lane pointed out in his critique of *The Bell Curve* for *The New York Review of Books,* "No fewer than seventeen researchers cited in the bibliography of *The Bell Curve* have contributed to *Mankind Quarterly.*"[37] In all, 13 scholars cited in the book received support from the Pioneer Fund, including Rushton, Lynn, Gordon and Jensen. It was thus, unsurprisingly, welcomed warmly by academic racists. Linda Gottfredson — a Pioneer Fund recipient cited by Herrnstein and Murray whose work on race and intelligence won praise from David Duke's National Association for the Advancement of White People — penned a statement in support of the two social scientists in *The Wall Street Journal.* "We'd have funded Murray at the drop of a hat. But he never asked," Pioneer Fund president Harry Weyher told *GQ.*[38]

Scholarly reviews of *The Bell Curve* were overwhelmingly negative. One critique, from three researchers at Carnegie Mellon University, plainly pointed to its central flaw: "Herrnstein and Murray give the impression that IQ is highly 'heritable,' but it is not."[39] Instead, as researchers explained, IQ is not solely or even predominantly biologically determined, but shaped by a number of variables including education and environment. Critics noted that the book failed to mention the contextual factors that contributed to the growing ranks of the black underclass, including deindustrialization and the flight of jobs from American cities, the quality of education and the lack of wealth and resources black parents could pass on to their children.[40]

## *The Bell Curve's* Political Impact

Despite its negative reception among scholars, *The Bell Curve* had enormous political implications. At the time of its publication, reforming the welfare system had become a top priority for lawmakers across the political spectrum — a movement to which Murray himself provided fuel. His earlier work, the 1984 book *Losing Ground: American Social Policy, 1950-1980* argued that the welfare state bred dependency and crime and, in fact, harmed the poor by disincentivizing work. If you pay people not to work, he insisted, they will logically elect to stay unemployed and draw on as many benefits as are available. Though Murray's assertion that welfare dependence was growing proved false (since 1975, the number of recipients had grown at roughly the same rate as the population), the book provided

grounding for conservative politicians looking to justify reducing the social safety net.
[41] *The New York Times* even called it the "budget-cutters' Bible."[42]

The public tended to blame women, and particularly mythical black "welfare queens" who committed fraud or had multiple out-of-wedlock births, for abusing the welfare system to gain generous government benefits. This belief was also reflected in the policy recommendations made in *The Bell Curve.* Echoing an idea frequently touted by eugenicist and Pioneer Fund recipient William Shockley, Herrnstein and Murray argued that welfare effectively "subsidize[d] births among poor women," in effect increasing "dysgenic pressure" on American society. In other words, "unmarried mothers who are below average in intelligence" were having too many children, and thus lowering the nation's intellectual potential, producing children with behavioral problems, and increasing the criminal population[43]

In testimony to the Senate Finance Committee in 1995, Murray drew on his research to urge lawmakers to make the "necessary brutal calculation" to reform welfare — something they would do the following year with a dramatic cut to the availability of cash benefits.[44]

Murray provided ideological underpinnings for welfare reform and helped elevate eugenicist thought into the world of mainstream political debate. His work helped the efforts racist academics had been pushing for decades: gutting government programs that, if properly funded and managed, promised to erode some of America's steep racial inequality.

## White nationalists become the main purveyors of the black on white crime myth

As *The Bell Curve* was making its way through the nation's political circles, it was also making waves in the white nationalist movement. Members of the movement saw it as a legitimation of their long-held ideas. They took the reception of Murray and Herrnstein's research as a cue that they could safely broach the topic of genetic differences in order to change public discussion of race. As Leonard Zeskind, an expert on white nationalism, recounts in his book *Blood and Politics,* the longtime Ku Klux Klan leader David Duke openly celebrated the ideas contained in *The Bell Curve*. The "scientific community is moving in our direction," he told a room of white nationalists in 1994, "The ideas of *The Bell Curve* can't be suppressed anymore."[45]

Murray also received praise from *American Renaissance* (AR), a publication and website supported by the self-styled think tank the New Century Foundation. According to *American Renaissance* editor Jared Taylor, *The Bell Curve* said "something AR has been saying for years: The races do not have the same average intelligence." "[T]he rules of dialogue in America may have finally changed," he wrote hopefully. Maybe, people could now openly admit to their neighbors, "No, I don't want blacks moving into the neighborhood because they are not like us." The book, he concluded, had "done the country an enormous service."[46]

## The problematic publication *American Renaissance*

Taylor founded *American Renaissance* and the New Century Foundation in 1990, two years before the Yale-educated writer began to make a name for himself in conservative circles with the publication of his book *Paved with Good Intentions: The Failure of Race Relations in Contemporary America*. At the time, conservative consensus assumed that the problems plaguing many black communities in American stemmed from a dysfunctional black culture, but Taylor echoed the biological frame by placing the blame squarely on black people themselves. He laid out his argument in a debate about the "black-crime problem" in a 1994 issue of *National Review*: "the United States has neither a unique 'culture of violence' nor inadequate gun laws," he concluded simply, "It has a high rate of violent crime because it has a large number of violent black criminals."[47]

While the book earned him space in the foundational publication of conservative thought, Taylor turned his attention more fully toward *American Renaissance*, which promised to be a "literate, undeceived journal of race, immigration, and the decline of civility." With the help of a large cadre of racist intellectuals, the publication presented white nationalist ideas in a disinterested, journalistic style, and no idea received more space on its pages than black crime.

*American Renaissance's* inaugural issue warned white people not to be "silent accomplices" to their own "dispossession." He told readers that white people should not be ashamed to discuss their group interests. "Others—sincere, thoughtful, concerned Americans—have been convinced that it is improper, even immoral, for white people to think of themselves as a group or to speak out as white people," Taylor wrote, "We believe that in the pages of *American Renaissance* these people will find reasons to think that it is not only moral but necessary." He included a note of caution:

"If we continue to permit the erosion of the essential conditions of nationhood, and indeed, of any healthy sense of neighborhood and community, the frictions that torment us today will be as nothing compared to the chaos that will come. The squalor of Detroit, the violence of Washington (DC), and the savagery of New York City must not mark the way to the future."[48]

The list of contributors at *American Renaissance* overlapped considerably with that of *Mankind Quarterly*, and both publications contained many of the same "race realist" arguments. Richard Lynn, for instance, wrote a 2002 cover story arguing that black people were "more psychopathic than whites," rendering them unable to control their own impulses. As a result, African Americans engaged in reckless sexual behavior, had unstable relationships, committed more crimes and had lower credit scores.[49]

Taylor's cohort of professional racists repeated these same fallacies at *American Renaissance* conferences, faux-academic affairs held biannually beginning in 1994 that have attracted a wide variety of characters from the racist far right. At a 1998 meeting, Glayde Whitney, a behavioral psychologist at Florida State University, gave a presentation in which he argued that black women developed larger buttocks — the "human equivalent of a camel's hump" — to survive in harsh African climates. He also stated that black people possess an innate tribal tendency, and that the "many rapes of white women by blacks is a typical expression of dominance."[50]

## *American Renaissance* uses Hurricane Katrina to push its narrative

Hurricane Katrina, which decimated the majority-black city of New Orleans in 2005, seemed to confirm all that *American Renaissance* had purported to be true about African Americans, namely that they would resort to "barbaric behavior" if removed from the protective rails of white society.

In his longform essay "Africa in Our Midst," Taylor described the city as a "jungle." "[T]he most serious damage," he wrote, "was done not by nature but by man." The hurricane provided an excuse for the city's black residents to "loot, rob, rape and kill" — alleged actions he described in graphic detail. The lesson? "Blacks and whites are different. When blacks are left entirely to their own devices, Western Civilization—any kind of civilization— disappears."[51]

Taylor's accounting of events turned out to be false. "It now appears that press reports on the aftermath of Hurricane Katrina exaggerated the mayhem in the New Orleans Convention Center and at the Superdome," he conceded in a second piece. He nevertheless defended his original conclusions, insisting that the chaos he described easily could have taken place. News outlets reported gruesome accounts because they seemed "entirely plausible." "In their bones, even writers for the New York Times believe crowds of blacks can easily descend into anarchy," Taylor wrote.[52]

Taylor's pieces on Katrina were emblematic of the way his outlet discussed the issue of black crime. But perhaps no other *American Renaissance* contributor and conference mainstay more fully explored the issue of race and criminality than Michael Levin, a philosophy professor at City University of New York since 1969. While his early work focused on the philosophy of mathematics, by the 1980s he was predominantly interested in writing philosophical critiques of feminism and affirmative action (he argued in an Australian publication that the most troubling aspect of the American educational system was "the staggering energy expended to bring American Negroes into the educational mainstream"). [53]

The question of race and intelligence came to dominate his work, leading to widely publicized showdowns between Levin and his university and, eventually, to CUNY offering students alternatives to Levin's classes.[54]

# Michael Levin, with Pioneer Fund backing, pushes his ideas on race

In 1997, with the financial support of the Pioneer Fund, Levin published *Why Race Matters*, a treatise against government efforts to remedy racial inequality. Levin argued that "race differences, far from being neutral, undermine almost everything that has been said about race for the past 60 years, and the many policies based on this conventional wisdom." Whites, he insisted, "owe blacks no compensation in any form because the limitations of blacks are byproducts of genetic differences, not injuries done by whites." Even vastly higher rates of black infant mortality, Levin wrote, could be explained as a biological phenomenon. [55]

A great percentage of the material appearing in *Why Race Matters* was recycled from other Pioneer Fund grantees, including Richard Lynn and J. Philippe Rushton. However, Levin's condemnations of black character, morality and values were considerably more overt, and

he linked these shortcomings to a propensity to commit crime. White people, he argued, were wasting energy on "white guilt" over social conditions that could not be remedied and should forgive themselves for harboring a "rational" fear of black violence.[56]

Through statistics and lists of crimes, Levin insisted that whites should be "alarmed not only by the frequency of black crime, but by the extremes of depravity and indifference to human life." As a remedy, he proposed harsher systems of punishment — corporal punishment, the death penalty and chain gangs — as well as race-conscious policing and the use of technology that could identify potential criminals.[57]

The book sold poorly in its first printing, but Taylor swooped in to improve its sales, republishing it in 2005. Taylor, Jensen and Rushton supplied blurbs on the book's back cover to give it the appearance of scholastic respectability and support.[58]

With its scientific jargon and lengthy footnotes, Levin's book provided scholarly heft to the racist argument that black people were natural-born criminals. It was, however, an unwieldy volume for the average reader to wade through.

## Spinning crime statistics

To reach a wider audience, Taylor produced *The Color of Crime: Race, Crime and Violence in America,* a brief 1999 report that relied on a sloppy interpretation of crime statistics linking race and IQ, and thus claiming that crime has a racial and biological basis. It purported to provide indisputable proof that not only did black people commit more crimes, but also that there was an epidemic of black-on-white violent crime that went unreported.

The findings of the report drew on an authoritative source: the "1994 Crime Victimization Survey" released by the U.S. Department of Justice's Bureau of Justice Statistics. While Taylor's reporting of the statistics was accurate — there were, in fact, higher rates of violent crime committed by black people, and crimes committed by blacks against whites than the reverse — his interpretation of the data was flawed.

By taking crime statistics at face value, Taylor made the same mistake Frederick Hoffman did in 1896: blaming higher rates of black crime on an innate black criminality, when in fact those disproportionate crime rates could be explained by poverty and related structural disadvantages. On average, African Americans were — and remain — far poorer and more likely to live in disadvantaged neighborhoods than whites. Concentrated poverty has a

criminogenic effect: lack of access to jobs, increased idle time and poorer educational opportunities all increase one's chances of engaging in criminal behavior, and the effect is the same for black and white people. One study, released three years before *The Color of Crime*, found that when sociologists controlled for structural disadvantages, there were no significant differences between crime rates in black and white communities.[59]

A 2014 Bureau of Justice Statistics study showed that persons from poor households experienced the highest rates of violent victimization, and that rates were consistent for both blacks and whites.[60] When sociologists asked "Is Poverty's Detrimental Effect Race-Specific?" they found the answer was no: policies aimed at reducing poverty effectively reduced violent crime and the crime reduction rates were similar in both black and white neighborhoods, meaning it was poverty — rather than race — that contributed to the violent crime rate in the first place.[61]

Taylor's claim that blacks consciously targeted whites and were, in fact, committing "hate crimes," presupposed that all interracial crimes were acts of racial malice. While Taylor suggested interracial crime was a rampant problem, the vast majority of violent crimes are intraracial, meaning victims and perpetrators are far likelier to be of the same race. According to the Bureau of Justice Statistics report from 2000, among white victims of violent crime, 73 percent were attacked by other whites. Among black victims, 80 percent were victimized at the hands of another black person.

The argument that black people who commit crimes are specifically seeking out white victims is simply not true. In an article in the *American Journal of Sociology,* for example, sociologist Robert M. O'Brien pointed out that population size and the impact of segregation help explain why overall rates of black-on-white crimes are higher than white-on-black crimes. Essentially, black people are far more likely to come into contact with white people in the course of their daily life than the other way around.[62]

Despite its many methodological errors, Taylor released updated versions of *The Color of Crime* in 2005 and 2016, which feature new sections on discriminatory policing. It continues to be a standard text within white nationalist circles.

# Modern white supremacy and the black-on-white crime narrative

Like many budding white supremacists, Dylann Roof immersed himself in black-on-white crime propaganda before unleashing his anger on innocent black people in a Charleston church in 2015. Roof's heinous act was just one flashpoint in a long history of white supremacy, scientific racism and the demonization of black people as biologically criminal. Ideas that the Pioneer Fund lent scientific credence to and *American Renaissance* helped propagate were absorbed by racist organizations like the Council of Conservative Citizens (CCC), and the internet made their ideas accessible to anyone with access to the internet. Roof's blatant racism was at once outmoded and entirely present: Its roots lie centuries in the past, but its main thrust has been carried through with the help of patrons and propagandists.

The CCC, which played a decisive role in Roof's radicalization, originated in the Jim Crow South. It is the modern reincarnation of the White Citizens' Council, an organization that formed in southern states following the Supreme Court's 1954 *Brown* v. *Board of Education* expressly to oppose desegregation. Local Councils tended to be populated by business elites, bankers and the well-to-do. Historian Charles Payne described them as "pursuing the agenda of the Klan with the demeanor of the Rotary Club."[63]

Though membership in the CCC declined in the decades following the passage of federal civil rights legislation, it was revived in 1985 by Gordon Baum, a workers' compensation attorney who used the old Citizens' Council mailing list to recruit members. Scandal erupted in 1998 when it was revealed that former Congressman Bob Barr (R-Ga.) and then-Senate Majority Leader Trent Lott (R-Miss.) had ties to the hate group. Barr had spoken at that the CCC's convention that year, and Lott had addressed the group on five separate occasions.[64]

They were not alone: a 2004 *Intelligence Report* investigation revealed that, between 2000 and 2004, 38 U.S. elected officials who were then in office had attended CCC events.[65] After Roof's actions brought renewed scrutiny to the CCC in 2015, *The Guardian* reported that the white supremacist organization was still making large contributions to top Republican officeholders like Texas Senator Ted Cruz, who promised to return the donation after the news outlet approached him with questions.[66]

# The CCC and like groups rely on the web to spread dangerous ideas

Since its height in the late 1990s, the CCC has abandoned much of its respectable veneer and, at the same time, moved its presence predominantly into online spaces. Its website now exists to "educate" white Americans about the dangers of black criminality and, at the time Roof came across it, the CCC hosted what it called a "memorial wall" to white victims of black criminals whose deaths went "unnoticed by the national media."

New Nation, the first website devoted entirely to the issue of black-on-white crime, is organized similarly. Headlines like "(White) North Fort Myers man hospitalized after group beating at party by pack of savage jungle blacks" dominate the page, alongside mugshots and depictions of African Americans as apes. Like Taylor in *The Color of Crime*, many of these kinds of websites explicitly refer to interracial crimes as "hate crimes," but few would meet the FBI's hate crime definition of an "offense against a person or property motivated in whole or in part by an offender's bias against a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity."[67]

Included in the CCC list, for instance, is the 2014 death of Anita Walters of Vancouver, Washington, a white woman killed in a hit-and-run by Matthew Purifoy, a black man who had a long history of reckless driving.[68] There is no evidence to suggest the vehicular homicide was motivated by hate. Many of the crimes listed on CCC's list are domestic disputes, home invasions and robberies. While these crimes are often brutal, there is no evidence to suggest offenders targeted their victims because of their race and the "hate crime" designation is merely used to perpetuate the myth that black people pose a particular threat to white Americans.

After Roof's manifesto was made public, even the CCC's president, Earl P. Holt III, conceded that he was unsurprised to see his organization cited. "The CofCC is one of perhaps three websites in the world that accurately and honestly report black-on-white violent crime, and

John Hill, with the South Carolina Council of Conservative Citizens, speaks during a news conference in Columbia, S.C. regarding the flying of the Confederate flag on state grounds. The CCC played a decisive role in Dylann Roof's radicalization. // AP Photo/Mary Ann Chastain

in particular, the seemingly endless incidents involving black-on-white murder," he said in a statement. He noted that they should not be held responsible for a "deranged individual" gaining "accurate information from our website."[69]

The prosecutors in Roof's case claimed that he "self-radicalized," but this phrase fails to capture the online milieu in which Roof developed his views — where those who hold white supremacist beliefs are constantly trying to convert others.[70]

"The internet gives millions access to the truth that many didn't even know existed," David Duke observed in 2007. "Never in the history of man can powerful information travel so fast and so far. I believe that the Internet will begin a chain reaction of racial enlightenment that will shake the world by the speed of its intellectual conquest."[71]

The internet has made it immeasurably easier for white nationalists to gather, publish articles, discuss ideas and reach out to those like Roof who might be amenable to their messages. Their methods might be new, but the arguments they make with the hopes of perpetuating and codifying racial oppression have thrived for centuries.

# Sources

[1] Audrey Smedley and Brian D. Smedley, *Race in North America: Origin and Evolution of a Worldview*, 4 th ed. (Philadelphia: Westview Press, 2012), 218-219. Back to report.

[2] Ann Fabian, *The Skull Collectors: Race, Science, and America's Unburied Dead* (Chicago: University of Chicago Press, 2010), 1. Back to report.

[3] Ibid., 15-16. Back to report.

[4] Khalil Gibran Muhammad, *The Condemnation of Blackness: Race, Crime, and the Making of Modern Urban America* (Cambridge: Harvard University Press, 2010), 22-23. Back to report.

[5] Ibid., 33. Back to report.

[6] Ibid., 32-37. Back to report.

[7] Douglas Blackmon, *Slavery by Another Name: The Reenslavement of Black Americans from the Civil War to World War Two* (New York: Anchor Books, 2008), 99-100. Back to report.

[8] Frederick L. Hoffman, *Race Traits and the Tendencies of the American Negro* (New York: American Economic Association, 1896), 228. Back to report.

[9] Ibid., 224. Back to report.

[10] Ibid., 195. Back to report.

[11] Muhammad, 53, 51. Back to report.

[12] Ida B. Wells, "Southern Horrors: Lynch Law in All Its Phases," 1892. Back to report.

[13] Michael Yudell, "A Short History of the Race Concept," in *Race and the Genetic Revolution: Science, Myth, and Culture*, eds. Sheldon Krimsky and Kathleen Sloan (New York: Columbia University Press, 2011), 20-21. Back to report.

[14] William H. Tucker, "To Win the War: Racial Research and the Pioneer Fund," in *White Logic, White Methods: Racism and Methodology*, eds. Tukufu Zuberi and Eduardo Bonilla-Silva (New York: Rowman & Littlefield, 2008), 285-286. Back to report.

[15] Quoted in Yudell, "A Short History of the Race Concept," 23. Back to report.

[16] Tucker, *The Funding of Scientific Racism: Wickliffe Draper and the Pioneer Fund* (Chicago: University of Illinois Press, 2002), 6-7. Back to report.

[17] Susan Currell and Christina Cogdell, eds., *Popular Eugenics: National Efficiency and American Mass Culture in the 1930s* (Athens, OH: Ohio University Press, 2006), 1-3. Back to report.

[18] Adam Miller, "The Pioneer Fund: Bankrolling the Professors of Hate," *The Journal of Blacks in Higher Education*, no, 6, (Winter 1994-1995): 58. Back to report.

[19] Tucker, "To Win the War," 286. Back to report.

[20] Tucker, *The Funding of Scientific Racism*, 122-123. Back to report.

[21] Joseph Crespino, *In Search of Another Country: Mississippi and the Conservative Counterrevolution* (Princeton, NJ: Princeton University Press, 2007), 93. Back to report.

[22] Tucker, "To Win the War," 290. Back to report.

[23] Dick Kaukas, "Fund Aids Race-Based Intelligence Studies, Busing Foes," *The Courier-Journal*, October 16, 1977. Back to report.

[24] Tucker, *The Funding of Scientific Racism*, 140-142. Back to report.

[25] Ibid., 144-145; "Playboy Interview: William Shockley," *Playboy Magazine*, April 1980, 69. Back to report.

[26] Tucker, *The Funding of Scientific Racism*, 147. Back to report.

[27] Ibid,, 145-146. Back to report.

[28] "The Racial Genetics of Intelligence: The *Gadfly* Interview with Dr. Robert Gordon," *The Gadfly*, n.d. [1995?], http://psych.utoronto.ca/users/reingold/courses/intelligence/cache/eugenics2.html (accessed May 24, 2018). Back to report.

[29] Tucker, *The Funding of Scientific Racism*, 148-149. Back to report.

[30] Ibram X. Kendi, *Stamped from the Beginning: The Definitive History of Racist Ideas in America* (New York: Nation Books, 2016), 412. Back to report.

[31] Extremist profile: Jean-Phillipe Rushton, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/individual/jean-philippe-rushton , accessed May 16, 2018; Miller, "The Pioneer Fund," 60. Back to report.

[32] Barry Mehler, "Academia at Forefront of Racist Ideals, White Supremacy," *The Intelligence Report*. March 15, 1999. Back to report.

[33] Charles Lane, "The Tainted Sources of the Bell Curve," *The New York Review of Books,* December 1, 1994. Back to report.

[34] Roger Pearson, *Eugenics and Race* (London: Clair Press, 1966), 26. Back to report.

[35] Richard J. Herrnstein and Charles Murray, *The Bell Curve: Intelligence and Class Structure in American Life* (New York: Free Press, 1994), 523. Back to report.

[36] Ibid., 308. Back to report.

[37] Lane, "Tainted Sources." Back to report.

[38] Miller, "The Pioneer Fund," 61; "Mainstream Science on Intelligence," *The Wall Street Journal,* December 13, 1994. Back to report.

[39] Quoted by Nicholas Lemann, "The Bell Curve Flattened," *Slate,* January 18, 1997. Back to report.

[40] See Nina J. Easton, "Book That Links Low IQ to Race, Poverty Fuels Debate," *L.A. Times,* October 30, 1994. For a robust analysis of the black "underclass," see William Julius Wilson, *When Work Disappears: The World of the New Urban Poor* (New York: Vintage Books, 1996). Back to report.

[41] Edward Mattison, "Stop Making Sense: Charles Murray and the Reagan Perspective on Social Welfare Policy and the Poor," *Yale Law & Policy Review,* Vol. 4, no 4 (1985), 94; For a comprehensive critique, see Sara McLanahan et al., "Are We Losing Ground?" *Focus* 8, no. 3 (1985), http://www.irp.wisc.edu/publications/focus/pdfs/foc83a.pdf (accessed May 25, 2018). Back to report.

[42] "Losing More Ground," *The New York Times,* February 3, 1985. Back to report.

[43] Herrnstein and Murray, *The Bell Curve,* 548, 519. Back to report.

[44] Judith Havemann, "Bell Curve Author Addresses Welfare," *The Washington Post,* April 28, 1995. Back to report.

[45] Leonard Zeskind, *Blood and Politics: The History of the White Nationalist Movement from the Margins to the Mainstream* (New York: Farrar, Straus and Giroux, 2009), 395. Back to report.

[46] "O Tempora, O Mores! Breakthrough on Race?" *American Renaissance,* December 1994. Back to report.

[47] Jared Taylor, response to "Blacks, Jews, Liberals, and Crime," *National Review,* May 16, 1994, 45. Back to report.

[48] "Who Speaks For Us?" *American Renaissance,* November 1990. Back to report.

[49] Richard Lynn, "Race and the Psychopathic Personality," *American Renaissance,* July 2002. Back to report.

[50] "The Tenures Professor Who Teaches Black Biological Inferiority at Florida State University," *The Journal of Blacks in Higher Education,* no. 24 (1999), 84-85. Back to report.

[51] Taylor, "Africa in Our Midst," *American Renaissance,* vol. 16, no. 10, October 2005. Back to report.

[52] Taylor, "Postscript on Katrina," December 2005. Back to report.

[53] Joseph Berger, "Professors' Theories on Race Stir Turmoil at City College," April 20, 1990; quoted in Richard Brookhiser, "Fear and Loathing at City College," *National Review,* June 11, 1990, 21. Back to report.

[54] Extremist profile: Michael Levin, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/individual/michael-levin (accessed May 26, 2018). Back to report.

[55] Michael Levin, *Why Race Matters: Race Differences and What They Mean* (Santa Barbara, CA: Praeger Publishers, 1997; reprint, New Century Foundation, 2005), 2, 10, 13. Back to report.

# Get the latest updates from Southern Poverty Law Center.

**Your Email Address**

Subscribe

Racial Justice Issues

Find Resources

State Support

Support Us

Careers

Class Action Lawsuits

Press Center

Contact Us

Member Center

The Civil Rights Memorial Center

Learning for Justice

SPLC is a nonprofit, tax-exempt 501(c)(3) organization (EIN: 63-0598743)

The Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

Privacy & Terms     Accessibility Statement     © Copyright 2025 SPLC. All Rights Reserved.







# Check out Vault's 2013 Pro Bono Guide!

**By:** Rachel Marx Boufford

Published:  Feb 07, 2013

**Topics:** Job Search      Law



The 2013 edition of the *Vault Guide to Law Firm Pro Bono Programs* is now available! The guide features detailed information about the pro bono work that 126 top law firms across the country have engaged in over the past few years.

In many ways, the firms featured in the guide couldn't be more different: they include international behemoths with offices across the globe and smaller boutiques with just one office; firms headquartered from New York to Texas to California; firms with over a century of history to their names and firms that were created in the new millennium.

Still, each of these firms shares a fundamental commitment to pro bono work. Many of the firms featured in the guide have devoted considerable resources to the fascinating—and often ground-breaking—work they have taken on. In so doing, these firms have created a culture of public service, in which great numbers of attorneys of all levels devote significant time to pro bono projects.

The *Vault Guide to Law Firm Pro Bono Programs* was developed to provide law students and lawyers with the information necessary to make an informed evaluation of firms' pro bono cultures and activities. Pro bono coordinators and partners from each firm provided structural overviews, statistical data and substantive descriptions of their unique pro bono programs.

Below, you'll find a few fascinating pro bono cases from some of the featured firms:

- Mayer Brown's 7th Circuit Project is its signature pro bono appellate project, and since the project's inception in spring 1999, the firm has accepted appointments in over 130 cases in such areas as habeas corpus, prisoner's rights, and immigration. The firm also has an extensive pro bono Supreme Court practice and, in 2006, started a Supreme Court Advocacy Clinic at Yale Law School.

- In *Golinski v. Office of Personnel Management*, a team from Morrison & Foerster won a federal district court ruling that Section 3 of the federal Defense of Marriage Act (DOMA), which prohibits federal recognition of same sex marriages, violates the equal protection clause of the U.S. Constitution. The court held that the long history of discrimination on the basis of sexual orientation required applying heightened scrutiny to DOMA, which the statute failed, and further, that Section 3's differential treatment of same-sex and opposite-sex married couples failed rational basis scrutiny. The ruling secured health benefits for the wife of Karen Golinski, a federal employee and client of Morrison & Foerster since 2008. The U.S. Department of Justice has asked the Supreme Court to bypass circuit court review of this and a second ruling on DOMA and decide the appeals directly.

- Teams of Orrick lawyers provided legal and technical assistance to the Public International Law & Policy Group, which supported government officials, policymakers and key stakeholders in Egypt to assist the client in furthering the democratic nation building in Egypt. PILPG began providing legal advice to civil society groups in Egypt soon after the 2011 uprising, which toppled the government of Hosni Mubarak. Mubarak was known for his corrupt abuse of power, a leading factor in dissatisfaction among Egyptians. Initially, a senior Orrick team, led by two partners, prepared analysis on how the Egyptian Constitution could become more democratic, and later in the year, a team assisted PILPG in addressing problems with corruption and bribery in various sectors of governance and private sector activity through analysis regarding the international standards for anticorruption measures and how other states have implemented these standards into anticorruption legislation.

- Paul Hastings advised the Intrepid Museum Foundation in its acquisition of Space Shuttle Enterprise from the National Aeronautics and Space Administration. It was critical to learn NASA's procedures and language, as well as the regulatory restrictions applicable to the transaction, in order to represent

Intrepid effectively. The transaction was unique in that NASA is not in the business of de-accessioning its property. In addition to the legal landscape, the firm's attorneys had to be sensitive to NASA's emotional ties to its shuttles and the shuttle program with which many people have been involved for much or all of their careers. The attorneys also traveled with Intrepid to Florida to represent senior management in direct discussions with NASA and the other three shuttle recipients. After the discussions were concluded, the shuttle was flown to JFK airport on the back of NASA's specially outfitted 747 aircraft, and then barged up the Hudson River to its new permanent home at the museum.

- Together with the ACLU, Public Counsel and other pro bono organizations, Sullivan & Cromwell is actively litigating a class action on behalf of individuals, suffering from serious mental disabilities, who are detained by the Department of Homeland Security as part of their immigration proceedings, but are being compelled to represent themselves in their immigration proceedings, even after immigration court findings that these individuals are mentally incompetent.

Want to learn more about the pro bono programs at these and over one hundred other firms? Check out the Guide to Law Firm Pro Bono Programs!

*Note: If your school has access to Career Insider, you can download the guide free of charge through your school's Career Insider site.*

\* \* \*

# Related Content





 Article

### The Perks of Small Companies: Why Bigger Isn't Always Better for Your Career

When job seekers picture their dream career, many imagine working for a big-name company like a Fortune 500 firm with thousands of employees, a sleek office, and global recognition. While large corporations offer prestige and stability, working for a small company comes with its own set of huge advantages—ones that can fast-track career growth, build versatile skills, and lead to greater job satisfaction.



 Article

### New Collar Jobs: V
Students Need to I
Competitive

In recent years, largely advancements in gener been increasingly priori education. This shift ha called new collar jobs, p skills, certifications, anc





**WE SERVE**

Employers

Schools

Insiders

**KNOW HOW**

Careers

Blog

Vault Law

**OUR BUSINESS**

Contact Us

Help Center



Terms of service

Privacy policy

Cookie Policy

© Vault 2025

MENU

MOFO NEWS ITEM

## Morrison Foerster Recognized by *Vault Law 100* 2025

25 Jun 2024

Keep up with the latest legal and industry insights, news, and events from MoFo 

SIGN UP

 

*Vault* has recognized Morrison Foerster as among the top 25 most prestigious law firms in its national rankings. The firm has consistently appeared among the top firms nationally since the inception of *Vault's* rankings in 1997. MoFo was also highly successful in the Best Law Firms by Region rankings, where it was ranked #1 in Northern California and listed among the top 25 in Boston, Mountain States, New York, Southern California, and Washington, D.C.

In total, MoFo was recognized in the top 30 across nine practice areas, notably achieving top 10 rankings in Privacy and Data Security, Intellectual Property, and Emerging Companies & Venture Capital. Additionally, the firm earned further recognition in the overall Best for Diversity and Best Summer Associate Programs categories.

Rankings in the *Vault Top 100 Law Guides* are based on the assessments of lawyers at peer firms and are derived from *Vault's Annual Associate Survey*. This year, more than 20,000 associates rated the reputations of firms other than their own. View the **full list of Morrison Foerster rankings.**

EVENTS

# CALIFORNIAMUSEUM

VISIT

CALIFORNIA HALL OF FAME

EXHIBITIONS

FOR EDUCATORS

JOIN & GIVE

ABOUT

1020 O St., Sacramento, CA 95814

(916) 653-7524

**museuminfo@californiamuseum.org**

EVENTS

# CALIFORNIAMUSEUM

VISIT

CALIFORNIA HALL OF FAME

EXHIBITIONS

FOR EDUCATORS

JOIN & GIVE

ABOUT

1020 O St., Sacramento, CA 95814

(916) 653-7524

**museuminfo@californiamuseum.org**

EVENTS

# CALIFORNIAMUSEUM

VISIT

CALIFORNIA HALL OF FAME

EXHIBITIONS

FOR EDUCATORS

JOIN & GIVE

ABOUT

1020 O St., Sacramento, CA 95814

(916) 653-7524

**museuminfo@californiamuseum.org**

EVENTS

**CALIFORNI|AMUSEUM**

ABOUT    CAREERS    PRESS ROOM    RENTALS    PRIVACY & COOKIES    CONTACT    E-NEWS

© 2025 CALIFORNIA MUSEUM. ALL RIGHTS RESERVED.

Powered by Google Translate

**Senator Grassley**
**Questions for the Record**

**Haywood S. Gilliam, Jr.**
**Nominee, U.S. District Judge for the Northern District of California**

1.     Can you describe your role with the NAACP in the San Francisco case involving race quotas in high schools? What legal positions were at issue and what legal arguments were you presenting?

Response:  My former law firm, McCutchen, Doyle, Brown & Enersen (now known as Bingham McCutchen), began serving as co-counsel for the San Francisco NAACP ("SFNAACP") in approximately 1979 in connection with a class-action desegregation lawsuit against the San Francisco Unified School District ("SFUSD") (the "SFNAACP Action").  The SFNAACP Action alleged that the SFUSD "engage[d] in discriminatory practices and maintain[ed] a segregated school system in the City and County of San Francisco" in violation of the federal and California constitutions.  *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 576 F.Supp. 34, 36 (N.D. Cal. 1983).  In 1983, the district court approved a consent decree to resolve the SFNAACP Action that included racial and ethnic guidelines regarding the assignment of students to the schools of the SFUSD.

In 1994, a group of students of Chinese descent filed a lawsuit, *Ho v. San Francisco Unified School District et al.* (the "*Ho* Action"), challenging the student assignment plan under the Equal Protection Clause and seeking dissolution of the consent decree.  *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F.Supp.2d 1021, 1024 (N.D. Cal. 1999).  The SFNAACP was added as a defendant in the *Ho* Action in January 1995.

I joined McCutchen as an associate in November 1995, and was asked to assist lead counsel in representing the interests of our client SFNAACP.  In 1996, the *Ho* plaintiffs moved for summary judgment.  The SFNAACP opposed the motion for summary judgment on the basis that disputed issues of fact existed regarding whether a compelling state interest justified the provisions of the consent decree and whether the decree was narrowly tailored to achieve that interest.  I assisted in preparing the SFNAACP's opposition brief, and argued the SFNAACP's position at the hearing on the motion for summary judgment.  The district court denied the motion for summary judgment, finding that disputed issues of fact existed as to each of these factors.  *Ho v. San Francisco Unified Sch. Dist.*, 965 F.Supp. 1316, 1323-26 (N.D. Cal. 1997).

The *Ho* plaintiffs appealed, and I assisted in preparing the SFNAACP's appellate brief, and argued the SFNAACP's position at oral argument.  The Ninth Circuit dismissed the appeal for lack of jurisdiction and remanded the case.  *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854 (9th Cir. 1998).  Following remand (and after I left McCutchen in November 1998 to take a position at the United States Attorney's Office), the case ultimately settled.

2.    **How would you approach a qui tam case if it came before your court, if you are confirmed?**

Response:  Title 31, Section 3730 of the United States Code describes a number of specific responsibilities that district judges have in matters brought under the *qui tam* provisions of the False Claims Act.  If confirmed, I would follow the procedures set out in section 3730, as well as any applicable Supreme Court and Ninth Circuit precedent.  In all other regards, I would approach a *qui tam* case in the same manner that I would approach any civil case before me:  I would come to the matter without prejudgment, identify the controlling legal authority, and apply it neutrally to the facts of the case.

3.    **In 1986, I authored an update of the Federal False Claims Act which reinvigorated the qui tam provisions and has helped recover over $30 billion in taxpayer dollars.**

  a.    **Could you please briefly describe your experience with the False Claims Act, in general, and specifically any work you did with qui tam whistleblowers?**

Response:  I have represented clients in a number of False Claims Act matters, assisting them in responding to requests for documents and witnesses, and discussing substantive and procedural issues with opposing counsel.  In most of these cases, the clients have been companies and organizations in various industries who have been involved in investigations by the Civil Division of the Department of Justice.  The majority of these investigations have stemmed from underlying *qui tam* lawsuits brought by relators, with the remainder involving investigations initiated independently by the Department of Justice.  In two instances, a *qui tam* relator elected to pursue a False Claims Act action against a client after the Department of Justice declined to intervene, and I am part of the teams defending these cases.

  b.    **What is your view regarding the constitutionality of the False Claims Act and its qui tam provisions?**

Response:  In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 778 & n.8 (2000), the Supreme Court found "no room for doubt that a *qui tam* relator under the [False Claims Act] has Article III standing," but noted that "[i]n so concluding, we express no view on the question whether *qui tam* suits violate Article II, in particular the Appointments Clause of § 2 and the 'take Care' Clause of § 3."  In *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 760 (9th Cir. 1993), the Ninth Circuit "conclude[d] that the *qui tam* provisions of the False Claims Act do not conflict with Article III of the Constitution, nor violate the principle of separation of powers, the Appointments Clause, or the Due Process Clause."

More generally, a statute passed by Congress is presumed to be constitutional.  A federal court should only reach the question of a statute's constitutionality if the case cannot be resolved on other grounds.  If it is necessary to reach the constitutional question, a court may only declare a statute unconstitutional if the statute clearly conflicts with Supreme Court precedent interpreting the Constitution, or if Congress

clearly exceeded its constitutional authority. If confirmed and called upon to address this question, I would apply the above precedent and principles, as well as all other applicable Supreme Court and Ninth Circuit precedent.

**4.    What factors should a judge consider when determining whether or not to award a portion of the government's recovery to qui tam whistleblowers, or determining the amount to award?**

Response:  Section 3730 of Title 31 of the United States Code sets forth the principles governing when a *qui tam* relator is entitled to receive an award, and the method of calculating the percentage range of the award. *See United States ex rel. Sharma v. Univ. of Southern Calif.*, 217 F.3d 1141 (9th Cir. 2000) (reviewing district court's application of 31 U.S.C. § 3730).  If confirmed, I would apply the factors in section 3730, as well as any applicable Supreme Court and Ninth Circuit precedent, in deciding these issues.

**5.    If confirmed, will you ensure that qui tam whistleblowers are afforded all the rights and privileges authorized by the False Claims Act?**

Response:  Yes.

**6.    What is the most important attribute of a judge, and do you possess it?**

Response:  I believe that the most important attribute of a judge is the commitment to faithfully and impartially apply the law in every case, without regard to the type of matter or the identity of the parties.  I do possess this attribute.

**7.    Please explain your view of the appropriate temperament of a judge.  What elements of judicial temperament do you consider the most important, and do you meet that standard?**

Response:  In my view, the most important element of judicial temperament is treating every person who comes into the courtroom, whether they are litigants, counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy.  The judge also must ensure that all parties in a case receive the opportunity to have their arguments heard and fairly considered, and should then render decisions in a timely manner.  To carry out these responsibilities, a judge should maintain a calm yet firm demeanor, be an attentive and careful listener and work diligently to promptly reach a decision.  I do meet these standards, and am deeply committed to upholding these principles.

**8.    In general, Supreme Court precedents are binding on all lower federal courts and Circuit Court precedents are binding on the district courts within the particular circuit.  Please describe your commitment to following the precedents of higher courts faithfully and giving them full force and effect, even if you personally disagree with such precedents?**

Response:  If confirmed as a district judge, I would be fully committed to following the precedents of higher courts faithfully and giving them full force and effect, without regard to whether I personally agreed or disagreed with those precedents.

9.   **At times, judges are faced with cases of first impression. If there were no controlling precedent that was dispositive on an issue with which you were presented, to what sources would you turn for persuasive authority?  What principles will guide you, or what methods will you employ, in deciding cases of first impression?**

Response:  In a case of first impression, I would look first to the text of the statute or regulatory provision at issue.  I anticipate that in most cases, applying the plain language of the provision to the facts of the case would permit me to resolve the matter.  If the language of the provision was ambiguous or unclear so as to require additional analysis, I would next look to Supreme Court and Ninth Circuit precedent involving analogous circumstances.  If no such precedent existed, I would consider persuasive authorities from other circuits and district courts.  Finally, where appropriate and as permitted by binding precedent, I would examine the history of the applicable provision.

10.   **What would you do if you believed the Supreme Court or the Court of Appeals had seriously erred in rendering a decision?  Would you apply that decision or would you use your best judgment of the merits to decide the case?**

Response:  I would faithfully apply controlling precedent of the Supreme Court and the Ninth Circuit Court of Appeals, whether or not I believed the court's ruling was in error.

11.   **Under what circumstances do you believe it appropriate for a federal court to declare a statute enacted by Congress unconstitutional?**

Response:  A statute passed by Congress is presumed to be constitutional.  A federal court should only reach the question of a statute's constitutionality if the case cannot be resolved on other grounds.  If it is necessary to reach the constitutional question, the court may only declare a statute unconstitutional if the statute clearly conflicts with Supreme Court precedent interpreting the Constitution, or if Congress clearly exceeded its constitutional authority.

12.   **In your view, is it ever proper for judges to rely on foreign law, or the views of the "world community", in determining the meaning of the Constitution? Please explain.**

Response:  No.

13.   **What assurances or evidence can you give this Committee that, if confirmed, your decisions will remain grounded in precedent and the text of the law rather than any underlying political ideology or motivation?**

Response:  I believe that there is no greater honor, or greater responsibility, than serving as a district judge.  The citizens of our country entrust federal judges to dispense equal justice under the law, and to decide cases by applying controlling precedent to the facts of the

cases before them, without regard to any other considerations. I had the privilege of beginning my career as a district court law clerk to the Honorable Thelton E. Henderson, and I have served as a federal prosecutor, a defense lawyer and counsel for clients in a range of civil matters. I have never viewed my legal practice as ideological, and I can assure the Committee that if confirmed as a district judge, I would base my decisions solely on the facts of each case and the applicable precedent, without regard to any political ideology or motivation.

**14.  What assurances or evidence can you give the Committee and future litigants that you will put aside any personal views and be fair to all who appear before you, if confirmed?**

Response: Over the course of my career as a prosecutor and defense counsel, I believe that I have earned a reputation with the bench and bar as an advocate who takes well-reasoned positions, gives thoughtful and respectful consideration to the positions of other parties, and assesses the strengths and weaknesses of a case based on the facts and the law rather than my personal views. I can assure the Committee and future litigants that if confirmed as a district judge, I would be fully committed to treating everyone who appeared before me fairly, and that any personal views would not interfere in any way with my ability to neutrally apply the law.

**15.  If confirmed, how do you intend to manage your caseload?**

Response: If confirmed, I plan to manage my caseload by scheduling case management conferences shortly after matters are filed, setting a reasonable schedule as early as possible in a matter, directing the parties to meet and confer to resolve and narrow issues to the fullest extent possible without court intervention, and remaining actively engaged over the course of a matter to ensure steady progress toward resolution.

**16.  Do you believe that judges have a role in controlling the pace and conduct of litigation and, if confirmed, what specific steps would you take to control your docket?**

Response: I do believe that judges have an important role in controlling the pace and conduct of litigation. If confirmed, I would take the steps described above to control my docket. In addition, I would encourage counsel appearing before me to adhere to the highest standards of civility and professionalism while representing their clients, consistent with the Northern District of California's Guidelines for Professional Conduct.

**17.  You have spent your entire legal career as an advocate for your clients. As a judge, you will have a very different role. Please describe how you will reach a decision in cases that come before you and to what sources of information you will look for guidance. What do you expect to be most difficult part of this transition for you?**

Response: If confirmed, I would decide cases by applying applicable Supreme Court and Ninth Circuit precedent to the facts before me. I understand that the judge's role differs from the advocate's role, and I would not have any difficulty neutrally and impartially deciding cases. In making this transition, I understand that I will need to learn areas of

substantive law beyond those that I have handled in my practice, and I am committed to working hard to familiarize myself with these areas of the law.

**18. President Obama said that deciding the "truly difficult" cases requires applying "one's deepest values, one's core concerns, one's broader perspectives on how the world works, and the depth and breadth of one's empathy . . . the critical ingredient is supplied by what is in the judge's heart."  Do you agree with this statement?**

Response:  I am not aware of the context of this quote, but I believe that all cases can be decided by applying controlling precedent to the facts of the case.  I also believe that it is incumbent on a judge to treat all parties fairly and respectfully, and to be committed to hearing and understanding each party's position before arriving at a ruling.

**19. Every nominee who comes before this Committee assures me that he or she will follow all applicable precedent and give them full force and effect, regardless of whether he or she personally agrees or disagrees with that precedent. With this in mind, I have several questions regarding your commitment to the precedent established in *United States v. Windsor*. Please take any time you need to familiarize yourself with the case before providing your answers. Please provide separate answers to each subpart.**

    **a. In the penultimate sentence of the Court's opinion, Justice Kennedy wrote, "This opinion and its holding are confined to those lawful marriages."[1]**

        **i. Do you understand this statement to be part of the holding in *Windsor*? If not, please explain.**

        Response:  Yes.

        **ii. What is your understanding of the set of marriages to which Justice Kennedy refers when he writes "lawful marriages"?**

        Response:  I understand this phrase to refer to same-sex marriages made lawful by a State.

        **iii. Is it your understanding that this holding and precedent is limited only to those circumstances in which states have legalized or permitted same-sex marriage?**

        Response:  Yes.

        **iv. Are you committed to upholding this precedent?**

        Response:  Yes.  If confirmed I would be committed to following this and all other Supreme Court precedent.

---

[1] *United States v. Windsor*, 133 S.Ct. 2675 at 2696.

b.  Throughout the Majority opinion, Justice Kennedy went to great lengths to recite the history and precedent establishing the authority of the separate States to regulate marriage. For instance, near the beginning, he wrote, "By history and tradition the definition and regulation of marriage, as will be discussed in more detail, has been treated as being within the authority and realm of the separate States."[2]

    i.  Do you understand this portion of the Court's opinion to be binding Supreme Court precedent entitled to full force and effect by the lower courts? If not, please explain.

    Response:  Yes.

    ii.  Will you commit to give this portion of the Court's opinion full force and effect?

    Response:  Yes.  If confirmed I would be committed to following this and all other Supreme Court precedent.

c.  Justice Kennedy also wrote, "The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens."[3]

    i.  Do you understand this portion of the Court's opinion to be binding Supreme Court precedent entitled to full force and effect by the lower courts? If not, please explain.

    Response:  Yes.

    ii.  Will you commit to give this portion of the Court's opinion full force and effect?

    Response:  Yes.  If confirmed I would be committed to following this and all other Supreme Court precedent.

d.  Justice Kennedy wrote, "The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'"[4]

    i.  Do you understand this portion of the Court's opinion to be binding Supreme Court precedent entitled to full force and effect by the lower courts? If not, please explain.

---

[2] *Id.* 2689-2690.
[3] *Id.* 2691.
[4] *Id.* (internal citations omitted).

Response:  Yes.

    **ii.  Will you commit to give this portion of the Court's opinion full force and effect?**

Response:  Yes.  If confirmed I would be committed to following this and all other Supreme Court precedent.

**e.  Justice Kennedy wrote, "The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for 'when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States.'"[5]**

    **i.  Do you understand this portion of the Court's opinion to be binding Supreme Court precedent entitled to full force and effect by the lower courts? If not, please explain.**

Response:  Yes.

    **ii.  Will you commit to give this portion of the Court's opinion full force and effect?**

Response:  Yes.  If confirmed I would be committed to following this and all other Supreme Court precedent.

**20.  According to the website of American Association for Justice (AAJ), it has established a Judicial Task Force, with the stated goals including the following: "To increase the number of pro-civil justice federal judges, increase the level of professional diversity of federal judicial nominees, identify nominees that may have an anti-civil justice bias, increase the number of trial lawyers serving on individual Senator's judicial selection committees".**

**a.  Have you had any contact with the AAJ, the AAJ Judicial Task Force, or any individual or group associated with AAJ regarding your nomination? If yes, please detail what individuals you had contact with, the dates of the contacts, and the subject matter of the communications.**

Response:  No.

**b.  Are you aware of any endorsements or promised endorsements by AAJ, the AAJ Judicial Task Force, or any individual or group associated with AAJ made to the White House or the Department of Justice regarding your nomination? If yes,**

---

[5] *Id.* (internal citations omitted).

**please detail what individuals or groups made the endorsements, when the endorsements were made, and to whom the endorsements were made.**

Response:  No.

**21.  Please describe with particularity the process by which these questions were answered.**

Response:  I received these questions from the Office of Legal Policy at the Department of Justice on September 24, 2014.  I reviewed the questions and personally prepared answers to them.  I submitted my answers to the Office of Legal Policy and received comments, after which I finalized my responses.  I then authorized the Office of Legal Policy to submit these responses on my behalf.

**22.  Do these answers reflect your true and personal views?**

Response:  Yes.

**Questions for the Record**
**Senator Ted Cruz**

**Haywood S. Gilliam, Jr.**
**Nominee:  United States District Court for the Northern District of California**


**Describe how you would characterize your judicial philosophy, and identify which U.S. Supreme Court Justice's judicial philosophy from the Warren, Burger, or Rehnquist Courts is most analogous with yours.**

Response:  As a district judge, I would approach every case before me without prejudgment, identify controlling precedent and neutrally apply it, and resolve issues before me on the narrowest basis possible.  I also believe that it is critical for a judge to treat all participants in the judicial system, including litigants, counsel, jurors, witnesses and court staff, with respect and courtesy, and to ensure that all parties in a case have the opportunity to have their arguments heard and considered fully and fairly.  Because I have not studied the judicial philosophies of the members of the Warren, Burger and Rehnquist Courts, I cannot say which of the Justices' philosophies is most analogous to the approach I would take if confirmed, as described above.

**Do you believe originalism should be used to interpret the Constitution?  If so, how and in what form (i.e., original intent, original public meaning, or some other form)?**

Response:  The Supreme Court has used originalism to interpret the Constitution in certain instances.  For example, in *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008), the Supreme Court considered the meaning "known to ordinary citizens in the founding generation" in interpreting the Second Amendment.  If confirmed, I would follow this and all applicable Supreme Court and Ninth Circuit precedent in interpreting the Constitution.

**If a decision is precedent today while you're going through the confirmation process, under what circumstance would you overrule that precedent as a judge?**

Response:  If confirmed as a district judge, I would not have the power to overrule precedent under any circumstances.

**Explain whether you agree that "State sovereign interests . . . are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power."  *Garcia v. San Antonio Metro Transit Auth.*, 469 U.S. 528, 552 (1985).**

Response:  If confirmed, I would be bound to follow *Garcia* and all other precedent of the Supreme Court.

**Do you believe that Congress' Commerce Clause power, in conjunction with its Necessary and Proper Clause power, extends to non-economic activity?**

Response:  In *United States v. Lopez*, 514 U.S. 549, 558 (1995), the Supreme Court described "three broad categories of activity that Congress may regulate under its commerce power." Under *Lopez*, Congress (1) "may regulate the use of the channels of interstate commerce"; (2) may "regulate and protect the instrumentalities of interstate commerce, or persons and things in interstate commerce"; and (3) may "regulate those activities having a substantial relation to interstate commerce." *Id.* at 558-59.  The Court has held that "when a general regulatory statute bears a substantial relation to commerce, the *de mimimis* character of individual instances arising under that statute is of no consequence." *Gonzales v. Raich*, 545 U.S. 1, 17 (internal quotations and citations omitted).  Justice Scalia's concurrence in *Raich* posited that "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce." *Id.* at 37 (Scalia, J., concurring).  If confirmed, I would follow this and all other applicable Supreme Court and Ninth Circuit precedent in cases involving the Commerce Clause.

**What are the judicially enforceable limits on the President's ability to issue executive orders or executive actions?**

Response:  In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), the Supreme Court held that the President's authority to issue an executive order or take executive action "must stem from either an act of Congress or from the Constitution itself."  If confirmed, I would follow this and all other applicable Supreme Court and Ninth Circuit precedent in cases involving this issue.

**When do you believe a right is "fundamental" for purposes of the substantive due process doctrine?**

Response:  The Supreme Court has found rights to be "fundamental" for purposes of the substantive due process doctrine when they are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations and quotations omitted).  If confirmed, I would follow this and all other applicable Supreme Court and Ninth Circuit precedent in cases involving this issue.

**When should a classification be subjected to heightened scrutiny under the Equal Protection Clause?**

Response:  The Supreme Court has applied heightened scrutiny under the Equal Protection Clause to classifications based on factors such as race, alienage, national origin, gender or illegitimacy. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985).  If confirmed, I would follow this and all other applicable Supreme Court and Ninth Circuit precedent in deciding cases involving this issue.

**Do you "expect that [15] years from now, the use of racial preferences will no longer be necessary" in public higher education?  *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003).**

Response:  The Supreme Court has addressed the use of racial preferences in public higher education in cases such as *Grutter* and *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411 (2013).

If confirmed, I would follow this and all other applicable Supreme Court and Ninth Circuit precedent in cases involving this issue, without regard to any personal views or expectations I might have.



# nigger *noun*

nig·ger   ˈni-gər 🔊

**plural  niggers**

**1**    **offensive; see usage paragraph below**  → used as an insulting and contemptuous term for a Black person

**2**    **offensive; see usage paragraph below**  → used as an insulting and contemptuous term for a member of any dark-skinned race (see RACE entry 1 sense 1a)

**3**    **now often offensive; see usage paragraph below**  **:** a member of a class or group of people who are systematically subjected to discrimination and unfair treatment

it's time for somebody to lead all of America's *niggers* ... all the people who feel left out of the political process
— Ron Dellums

## ⚠️ Usage of *Nigger*

*Nigger* is an infamous word in current English, so much so that when people are called upon to discuss it, they more often than not refer to it euphemistically as "the N-word." In senses 1 and 2, the word ranks as almost certainly the most offensive and inflammatory racial slur in English, a term expressive of hatred and bigotry. Sense 3 is also now rarely used and is often considered offensive. The word's self-referential uses by and among Black people are not always intended or taken as offensive (although many object to those uses as well), but its use by a person who is not Black to refer to a Black person can only be regarded as a deliberate expression of contemptuous racism.

<

|              Dictionary              |              Thesaurus              |

**Did the definition of *nigger* change?**

There is a widespread belief that the original meaning of *nigger*, as defined in dictionaries, was "an ignorant person," and a related belief that current dictionary definitions describing its use as a hateful, racist epithet are a recent change. We do not know the source of those beliefs, but they are not accurate. The word was first included in a Merriam-Webster dictionary in 1864, at which time it was defined as a synonym of *Negro*, with a note indicating that it was used "in derision or depreciation." There has never been a definition like "an ignorant person" for this word in any subsequent dictionary published by this company. Nor do we know of such a definition in any earlier dictionary.

## Etymology

alteration of earlier *neger*, from Middle French *negre*, from Spanish or Portuguese *negro*, from *negro* black, from Latin *niger*

## First Known Use

circa 1775, in the meaning defined at sense 1

## Time Traveler

**The first known use of *nigger* was circa 1775**

See more words from the same year

<  Dictionary                    Thesaurus

**Style**   | MLA |

"Nigger." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/nigger. Accessed 1 Mar. 2025.

⧉ Copy Citation

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

Dictionary    Thesaurus



Can you solve 4 words at once?

Play



WORD OF THE DAY

factoid

See Definitions and Examples »

Get Word of the Day daily email!

Your email addre    SUBSCRIBE

Dictionary                                    Thesaurus

**How to Use Em Dashes (—), En Dashes (–) , and Hyphens (-)**

**'In Vino Veritas' and Other Latin Phrases to Live By**

**Even More Words That Sound Like Insults But Aren't**

**See More**

Dictionary | Thesaurus



## Quordle
Can you solve 4 words at once?

**Play**

## Blossom Word Game
Pick the best words!

**Play**

## Missing Letter
A daily crossword with a twist

**Play**

## Hollywood Lingo Quiz
Are you a showbiz whiz?

**Take the quiz**

**See All**

**Learn a new word every day.**
**Delivered to your inbox!**

Your email address    SUBSCRIBE

Dictionary                                Thesaurus

© 2025 Merriam-Webster, Incorporated

Resources (https://www.abhmuseum.org/resources/)

English

Click for new, virtual gallery: Risking Everything (https://www.abhmuseum.org/risking-everything-gallery/)

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

# ABHM (https://www.abhmuseum.org/)

## America's Black Holocaust Museum

### Bringing Our History to Light

Search

# What Is The Black Holocaust In America?

## What is a Holocaust?

"Holocaust" comes from a Greek word meaning "burnt offering." The term was first used to describe the massacres of Armenians in the 1890s. It was used again in the 1950s to describe the mass destruction of European Jewish communities by the Nazis, also known by the Hebrew word "Shoah."

Appallingly, in the last hundred years, the world has witnessed many such atrocities, such as the 1975-79 Cambodian Killing Fields, the 1994 Rwandan Genocide, and the 1995 Srebrenica Genocide.

For this reason, the word "holocaust" has come to mean a series of atrocities organized by one social group against another.

    

## Similarities Between the Black Holocaust and Other Holocausts

The four hundred-year history of captured Africans and their descendants shares many features with the Holocaust experiences of European Jews – and the victims of other mass atrocities.

These include:

- Dehumanization and vilification
- Forced marches and migrations
- Slave (forced, unpaid) labor
- Stolen property
- Mass incarceration
- Torture
- Medical experimentation
- Discrimination in law and custom
- Ethnic cleansing (race riots, pogroms)
- Lynchings and other forms of terrorism
- Mass murder
- Long-lasting psychological effects (Post-Traumatic Stress Disorder) on survivors – and their descendants.

## How ABHM Got Its Name – and Why

Dr. James Cameron (https://www.abhmuseum.org/about/dr-cameron-founder-and-lynching-survivor/) founded this museum about the Black Holocaust in America after visiting Yad VaShem, the Holocaust Memorial Museum in Jerusalem, Israel. He saw the many similarities between the experiences of the Jewish people and African Americans.

He also admired how Jewish people value their history. To prevent atrocities like the Shoah (Nazi Holocaust) from happening again, they teach their children and other groups about it. Dr. Cameron saw how this truth-telling gave Jewish communities strength and hope and wanted the same for African American communities.

Dr. Cameron wanted museum visitors to understand this: The Black Holocaust in America began hundreds of years ago, but its effects – and sadly many of its practices – continue in our country today.[2] Tragically, this prevents our nation from living up to the promises of its founding documents, which promised "liberty and justice for all." Our founder dreamed of our country as "one whole and sacred nationality." He hoped his museum would help all Americans to honestly acknowledge our past in order to heal our future.

## There at the Start

The Black Holocaust in America began in the 1600s in the first settlements in Virginia. Colonial lawmakers enslaved only black people – slaves for life.

Slavery and segregation have since become illegal, but the Black Holocaust has had far-reaching effects on our entire society and on generations of our citizens – black and nonblack.

About (https://www.abhmuseum.org/category/about-abhm/)

Plan Your Visit (https://www.abhmuseum.org/visit/)

(https://www.abhmuseum.org/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/make-a-gift/)

Contact (https://www.abhmuseum.org/contact-abhm/)

## Some Facts about the Black Holocaust

- From 10 to 12 million African men, women and children were **kidnapped** from their homes.[3] They were **forced to march** as much as 1000 miles to the sea. There they were **held in underground dungeons** for up to a year.

- The kidnapped people were **packed below decks as cargo** on 54,000 slave ship voyages to the Americas. They were usually **shackled and unable to move**. They lay in each other's feces, urine and vomit during the 60 to 120 day trip. These trips, called "The Middle Passage, (https://abhmuseum.org/category/galleries/the-middle-passage/)" made up **one of the largest forced migrations** in world history.[4]

- When they arrived in America, men, women, and children – even infants – were put on the **auction block** at slave markets. They were **handled by the buyers as if they were cattle**. The buyers poked and prodded and pulled the Africans' mouths open. Some buyers forced the captives to remove all their clothes in public, so they could be examined for defects. Children were **often sold away** from their parents, and husbands from their wives.[5]

- Our original colonies passed slave codes.[6] These laws **reserved slavery for people of African descent** only – and made them **slaves for life.** There were also **fugitive slave laws**[7] that made it easier for slave owners to capture runaways – and even force free blacks into slavery.

- By the time of our country's Civil War in 1861, **eight generations of black children were born, grew up, toiled, and died as the property of white adults and children**. Slaves worked at **hard labor**, from sun up to sun down, for no pay, six or seven days a week. They were frequently whipped or suffered other **cruel punishments at the owner's whim**. They were **not allowed to learn** reading, writing or arithmetic. They were **poorly fed, housed and clothed**. Many of their daughters, sisters, and wives were **raped**. Many saw their children, spouses, parents, siblings, and friends **sold away**. For 246 years, there was **no hope of an end to their suffering**.

- **The 13th Amendment (https://www.archives.gov/historical-docs/13th-amendment) to our Constitution outlawed slavery**. But many of the four million former slaves were **forced back into unpaid labor**. They became **sharecroppers** on their old plantations. If a white man said a black man was "shiftless," that black man could be **arrested and forced to work** without pay in a mine, factory, or farm. **"Convict leasing" was slavery by another name.**[8]

- After emancipation came the **"separate and unequal" system of Jim Crow (https://abhmuseum.org/category/galleries/one-hundred-years-of-jim-crow/)** in the South.   This made it **legal to racially segregate** public schools, buses, restaurants, movie theaters, and occupations. Under Jim Crow, **black lives were cheap**. Over five thousand African Americans were strung up, shot, tortured, mutilated, and burned to death during those one hundred years. Most **lynchings** occurred in the South, but many took place in the North and West as well.[9]

- The **Civil Rights Movement of the 1950s, 60s, and 70s** challenged Jim Crow. The Jim Crow era is said to have ended when Congress passed the **Civil Rights Act of 1964 (https://www.archives.gov/education/lessons/civil-rights-act/)**, the Voting Act in 1965, and Federal Fair Housing Act in 1968. However, **white Americans found ways around** many of the gains African Americans made. In **"white flight,"** white parents moved to the suburbs or put their children in private schools. White neighbors signed **"covenants"** not to sell their homes to black families. White unions made it difficult for black workers to become members and advance themselves in the skilled trades. Many African Americans became **trapped in poverty**.[10]

- **The effects of slavery and Jim Crow continue today.** The **net worth** of White families is 10 times the net worth of Black families.[11] Since the 1970s, the **unemployment rate** for African Americans has been double the national average. Most **white Americans live to be over 78** years old; most **Black Americans  die shortly after their 73rd birthday**. Three times more Black babies **die at birth** than White babies. Half of the people we send to **prison** are Black, even though African Americans are only 13 percent of our country's population. The journey seeking justice continues....

About (https://www.abhmuseum.org/category/about-abhm/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

## Holocaust Memorials and Museums (https://www.abhmuseum.org/)

Today there are many museums that help people understand and cope with various holocausts around the world. America's Black Holocaust Museum is one of these.



## Endnotes

[1] https://dictionary.reference.com/browse/holocaust (https://dictionary.reference.com/browse/holocaust)

[2] See Breaking News (https://www.abhmuseum.org/category/breaking-news/)

[3] See Estimates from *Voyages: (https://www.slavevoyages.org/) The Trans-Atlantic Slave Trade*

[4] Africans in America, Part I. (https://www.pbs.org/wgbh/aia/part1/1narr4.html)https://www.pbs.org/wgbh/aia/part1/1narr4.html

[5] American Abolitionist, Indiana University (https://libraries.indiana.edu/slavery-abolition-and-social-justice)

[6] American History (https://www.ushistory.org/us/27b.asp)

[7] Fugitive Slave Act of 1850 (https://en.wikipedia.org/wiki/Fugitive_Slave_Act_of_1850)

[8] Slavery By Another Name: The Film (https://www.slaverybyanothername.com/pbs-film/)

[9] What Was Jim Crow? (https://www.ferris.edu/jimcrow/what.htm)

[10] White Flight (https://en.wikipedia.org/wiki/White_flight)

[11] WealthGaps Rise to Record Highs (https://www.pewsocialtrends.org/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/)

---

## Share

(https://www.facebook.com/sharer/sharer.php?u=https%3A%2F%2Fwww.abhmuseum.org%2Fabout%2Fwhat-is-the-black-holocaust%2F)

(http://twitter.com/intent/tweet?text=What%20is%20the%20Black%20Holocaust%3F&url=https%3A%2F is-the-black-holocaust%2F)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/exhibit-galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

---

## About ABHM

Our Mission and Vision (https://www.abhmuseum.org/about/our-mission/)

What is the Black Holocaust? (https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

Our Four Themes: Remembrance, Resistance, Redemption, Reconciliation (https://www.abhmuseum.org/about/our-four-themes/)

Dr. Cameron: Founder, Lynching Survivor (https://www.abhmuseum.org/about/dr-cameron-founder-lynching-survivor/)

ABHM's History and Impact (https://www.abhmuseum.org/about/black-holocaust-museum-history-impact/)

What is a Griot? (https://www.abhmuseum.org/about/what-is-griot/)

Who We Are (https://www.abhmuseum.org/about/who-we-are/)

Comment Policies (https://www.abhmuseum.org/about/comment-policies/)

## Explore Our Galleries

(https://www.abhmuseum.org/some-exhibits-to-come-three-centuries-of-slavery/)

(https://www.abhmuseum.org/bibliography-three-centuries-of-enslavement/)



(https://www.abhmuseum.org/a-1859-slave-auction-in-savannah...)

Biblia Exhibits: The Concentric Circles Of Enslavement
A 1859 Slave Auction In Savannah, As Reported By The New York Tribune

(https://www.abhmuseum.org/how-slavery-became-legal-for-blacks-only/)

How Slavery Became The Law Of The Land "For Blacks Only"

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

(https://www.abhmuseum.org/frederick-douglass-the-meaning-of-july-fourth-for-the-negro/)

Frederick Douglass: "The Meaning Of July Fourth For The Negro"

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

(https://www.abhmuseum.org/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

(https://www.abhmuseum.org/the-scourged-back-how-runaway-slave-and-soldier-private-gordon-changed-history/)

The Scourged Back: How Runaway Slave And Soldier Private Gordon Changed History

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

(https://www.abhmuseum.org/the-freedmen-of-wisconsin/)

The Freedmen Of Wisconsin



(https://www.abhmuseum.org/nat-turners-rebellion-horrific-or-heroic/)

Nat Turner's Rebellion: Horrific Or Heroic?

(https://www.abhmuseum.org/traces-of-the-trade-the-norths-complicity-in-slavery/)

Traces Of The Trade: The North's Complicity In Slavery



(https://www.abhmuseum.org/galleries/african-peoples-before-captivity-exhibits/)

(https://www.abhmuseum.org/the-middle-passage/)

Kidnapped People Sold Captivity



(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/2/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/3/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/2/)

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

(https://www.abhmuseum.org/)

## Ways To Support ABHM?

Click Here (https://www.abhmuseum.org/donate/contribute/)

**ABHM On-Line**
**virtual.museum@abhmuseum.org**
**(mailto:virtual.museum@abhmuseum.org)**

**ABHM On-Site**
401 W. North Avenue
Milwaukee, Wisconsin 53212  USA
Phone: (414) 209-3640
**Contact (https://www.abhmuseum.org/contact-abhm/)**

(https://www.facebook.com/pages/Americas-Black-Holocaust-Museum/264755283560445)

(https://www.instagram.com/abhmuseum)

ABHM Hours Of Operation

| | |
|---|---|
| Tuesday - Thursday | 10:00 AM – 5:00 PM |
| Friday - Saturday | 10:00 AM – 3:00 PM |
| Sunday - Monday | Closed |

*\* For the safety of our guests and staff members, please reschedule your visit if you are not feeling well. Mask-wearing is not required but is welcomed.*

**ABHM builds public awareness of the harmful legacies of slavery and Jim Crow in America and promotes racial repair, reconciliation, and healing.**

Member of

(https://www.abhmuseum.org/) 🏛

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

Resources (https://www.abhmuseum.org/resources/)

Contribute (https://www.abhmuseum.org/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

© 2024 – All Rights Reserved.



# Browse the Constitution Annotated

## Thirteenth Amendment  Abolition of Slavery

Amdt13.1 Overview of the Thirteenth Amendment, Abolition of Slavery

Amdt13.2 Slavery and Civil War

Amdt13.3 Drafting of Thirteenth Amendment

Amdt13.4 Ratification of Thirteenth Amendment

### Section 1 Prohibition on Slavery and Involuntary Servitude

Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Amdt13.S1.1 Prohibition Clause

Amdt13.S1.2 Defining Badges and Incidents of Slavery

Amdt13.S1.3 Defining Involuntary Servitude

Amdt13.S1.3.1 Scope of the Prohibition

Amdt13.S1.3.2 Historical Exceptions

Amdt13.S1.4 Exceptions Clause

### Section 2 Enforcement

Congress shall have power to enforce this article by appropriate legislation.

Amdt13.S2.1 Overview of Enforcement Clause of Thirteenth Amendment

Amdt13.S2.2 Early Doctrine on Enforcement Clause of Thirteenth Amendment

Amdt13.S2.3 Scope of Enforcement Clause of Thirteenth Amendment

Amdt13.S2.4 Use of Enforcement Clause Power Beyond Harms of Racial Discrimination

EoR - 1763 of 2347

LII  > U.S. Code  > Title 42  > CHAPTER 21  > SUBCHAPTER I  **> § 1981**

Quick search by citation:

**Title**

> enter title

**Section**

> section

Go!

# 42 U.S. Code § 1981 - Equal rights under the law

U.S. Code     Notes

**(a) STATEMENT OF EQUAL RIGHTS**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "MAKE AND ENFORCE CONTRACTS" DEFINED**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship.

**(c) P**ROTECTION AGAINST IMPAIRMENT

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

(R.S. § 1977; Pub. L. 102–166, title I, § 101, Nov. 21, 1991, 105 Stat. 1071.)

💼 U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > U.S. Constitution  > **14th Amendment**

# 14th Amendment

The Fourteenth Amendment addresses many aspects of citizenship and the rights of citizens. The most commonly used -- and frequently litigated -- phrase in the amendment is "equal protection of the laws", which figures prominently in a wide variety of landmark cases, including Brown v. Board of Education (racial discrimination), Roe v. Wade (reproductive rights), Bush v. Gore (election recounts), Reed v. Reed (gender discrimination), and University of California v. Bakke (racial quotas in education). See more...

Amendment XIV

## Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way

abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

## Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

## Section 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

## Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

wex resources

Section 1.

Privileges and Immunities Clause

Civil Rights

Slaughterhouse Cases

Due Process

Substantive Due Process

Right of Privacy: Personal Autonomy

Territorial Jurisdiction

Equal Protection

Plessy v. Ferguson (1896)

Plyer v. Doe (1982)

Section 4.

Debt

Section 5.

Enforcement Power

Commerce Clause

‹ 13th Amendment  up  15th Amendment ›

💼 U.S. Constitution Toolbox

- Explanation of the Constitution - from the Congressional Research Service

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > Wex  > **equal protection**

# equal protection

## Overview

Equal Protection refers to the idea that a governmental body may not deny people equal protection of its governing laws . The governing body state must treat an individual in the same manner as others in similar conditions and circumstances.

## Permissible Discrimination

It is important to acknowledge that a government is allowed to discriminate against individuals, as long as the discrimination satisfies the equal protection analysis outlined below, and described in full detail in this Santa Clara Law Review article .

## U.S. Constitution

The Fifth Amendment 's Due Process Clause requires the United States government to practice equal protection. The Fourteenth Amendment's Equal Protection Clause requires states to practice equal protection.

Equal protection forces a state to govern impartially—not draw distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective. Thus, the equal protection clause is crucial to the protection of civil rights .

## Equal Protection Analysis

When an individual believes that either the federal government or a state government has violated their guaranteed equal rights , that individual is able to bring a lawsuit against that governmental body for relief .

Based on the type of discrimination alleged, the individual will first need to prove that the governing body actually discriminated against the individual. The individual will need to prove that the governing body's action resulted in actual harm to them. After proving this, the court

will typically scrutinize the governmental action in one of several three ways to determine whether the governmental body's action is permissible: these three methods are referred to as strict scrutiny , intermediate scrutiny , and rational basis scrutiny. The court will determine which scrutiny the individual will be subject to, relying on legal precedent to determine which level of scrutiny to use. It is important to note that courts have combined elements of two of the three tests to create an ad hoc test.

## Further Reading

For more on equal protection, see this Harvard Law Review article , this University of Pennsylvania Law Review article , and this Columbia University Law Review article .

[Last reviewed in November of 2022 by the Wex Definitions Team ]

**Keywords**

- equal protection
- equal protection clause
- VOTING RIGHTS
- voting rights act
- civil rights
- Fourteenth Amendment
- constitutional law
- constitutional amendment
- U.S. CONSTITUTION
- strict scrutiny
- INTERMEDIATE SCRUTINY
- rational basis review

**Wex**

- ACADEMIC TOPICS
- legal history
- CIVICS
- civil rights
- the Constitution
- courts
- legal practice/ethics
- wex articles
- constitutional law
- government
- group rights
- legal education and practice

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

🇺🇸 An official website of the United States government    Here's how you know

U.S. Department of Education

HOME  /  LAWS AND POLICY  /  CIVIL RIGHTS LAWS  /  RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION

# Education and Title VI

**EDUCATION AND TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**Title VI and Race, Color or National Origin Discrimination**

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance. Title VI states that:

The Title VI implementing regulations (Volume 34, Code of Federal Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.

**The Office for Civil Rights Enforces Title VI**

The U.S. Department of Education's (ED) Office for Civil Rights (OCR), with 12 regional offices and a headquarters office in Washington, D.C., enforces Title VI as it applies to programs or activities that receive financial assistance from ED.

OCR's mandate to ensure that recipients of financial assistance from ED comply with Title VI covers pre-K through grade 12 public schools, including charter schools; state educational agencies; local educational agencies; colleges and universities, including proprietary schools and community colleges; state vocational rehabilitation agencies and their subrecipients; and other institutions that receive ED financial assistance, such as libraries, museums, and correctional institutions.

Covered programs and activities may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, and housing.

Title VI prohibits a recipient from intimidating, threatening, coercing, or retaliating against any person because they made a complaint; testified, assisted, or participated in any manner in an investigation, proceeding, or hearing; or opposed an unlawful educational practice or policy. 34 C.F.R. § 100.7(e).

OCR's Race, Color, or National Origin Discrimination Overview webpage provides a list of issues under Title VI that OCR frequently addresses.

## The Office for Civil Rights Provides Technical Assistance and Policy Guidance About Title VI

OCR is available to assist school and college communities in complying with Title VI obligations by providing technical assistance, including responding to telephone and email inquiries and presenting at trainings, conferences, and community meetings. To request technical assistance, you may contact the OCR regional office that serves your geographic area by phone, email, or mail. You can identify the appropriate OCR regional office through the Contact OCR webpage. The addresses, telephone numbers, emails, and designated geographic areas of each OCR regional office are also listed here.

OCR also provides policy guidance and other resources to inform and remind schools of their obligation to comply with Title VI, and inform beneficiaries, such as students and applicants for admission to academic programs, of their rights under Title VI. A few examples of these resources are below.

*Harassment*

OCR also issued a resource PDF (2025) (408K) that assists school communities in understanding their obligations under Title VI and discusses some considerations for schools when taking action to remediate a hostile environment under Title VI. The existence of a hostile environment based on race, color, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a school can

constitute discrimination in violation of Title VI. When a school is taking action to remediate a hostile environment, just as when taking any other action, Title VI prohibits the school from discriminating against students on the basis of race, color, or national origin.

OCR issued a fact sheet PDF (2024) (427K) that describes how OCR determines the existence of a hostile environment and details schools' obligations to address and remedy a hostile environment. The fact sheet also provides hypothetical examples to help schools assess their Title VI obligations, including the requirement to promptly and effectively address alleged acts of discrimination, including harassment.

### _Students Who Are English Learners and Parents and Guardians Who Have Limited English Proficiency_

OCR and DOJ jointly published a Dear Colleague Letter: English Learner Students and Limited English Proficient Parents (2015) PDF (523K) that reminds states, school districts, and schools of their obligations under federal law to ensure that students who are English learners have equal access to a high-quality education and the opportunity to achieve their full academic potential. In addition to the guidance, OCR has developed tools and resources to help schools in serving English learner students and parents who have limited English proficiency, including:

- A fact sheet in English PDF (557K) and in other languages about schools' obligations under federal law to ensure that students who are English learners can participate meaningfully and equally in school.
- A fact sheet in English PDF (450K) and in other languages about schools' obligations to communicate information to parents and guardians who have limited English proficiency in a language they can understand.
- A fact sheet in English PDF (542K) and other languages discussing access to specialized or advanced educational programs and services for students who are English learners.

OCR and DOJ together published a Dear Colleague Letter: School Enrollment Procedures PDF (233K) that explains that under federal law, states, school districts, and public schools are required to provide all children with equal access to public education at the elementary and secondary level.

OCR and DOJ have also developed fact sheets to assist school communities:

- A fact sheet on Confronting Discrimination Based on National Origin and Immigration Status (2021) PDF (533K) that reiterates that under federal law, *all* children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents immigration status. The fact is also available in other languages.
- Fact sheets on Protecting Access to Education for Migratory Children (2023) PDF (257K) and Protecting Access to Education for Unaccompanied Children (2023) PDF (236K) that discuss specific challenges some migratory children and unaccompanied children may face while accessing public education, remind public schools of their responsibilities to migratory and unaccompanied children under federal civil rights laws, and explain where families can seek help. The fact sheets are also available in other languages.

Additional resources regarding students who are English learners and parents and guardians who have limited English proficiency are available on OCR's Equal Educational Opportunities for English Learners webpage.

*Discrimination Based on Race, Color, or National Origin, including Shared Ancestry or Ethnic Characteristics*

OCR issued a Dear Colleague Letter (2023) PDF (332K) and a fact sheet (2023) PDF (267K) that describe how Title VI protection covers students who are or are perceived to be Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or other groups that are or are perceived to: 1) share ancestry or ethnic characteristics; or 2) have citizenship or residency in a country with a dominant religion or distinct religious identity.

Title VI prohibits discrimination based on race, color, or national origin against students of any religion when the discrimination, for example:

- involves racial, ethnic, or ancestral slurs or stereotypes;
- is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; or is based on the country or region where a student is from or is perceived to have come from, including, for example, discrimination based on a student's accent or name, a student's limited English proficiency, or a student speaking a language other than English.

Additional resources regarding Title VI protection relating to shared ancestry or ethnic characteristics is available on OCR's Shared Ancestry or Ethnic Characteristics webpage.

*Racial Discrimination in School Discipline*

OCR and DOJ released a Resource PDF (1.2M) on Confronting Racial Discrimination in Student Discipline (2023). The Resource describes how the Departments resolved investigations of 14 school districts in 10 states nationwide under Title VI and Title IV of the Civil Rights Act of 1964, during the current and previous two presidential administrations. The investigations involved concerns about discrimination in schools' use of out-of-school suspensions, expulsions, school-based arrests, referrals to law enforcement, involuntary discipline transfers, informal removals, and other disciplinary actions for a number of disciplinary infractions, including dress code violations.

*Artificial Intelligence*

OCR issued a Resource to assist school communities with ensuring that artificial intelligence (AI) is used in a nondiscriminatory manner in the nation's elementary and secondary schools and institutions of higher education consistent with federal civil rights laws. The resource makes clear that AI technologies have the potential to enhance opportunities and increase educational equity for all students, but that at the same time, the growing use of AI in schools, including for instructional and school safety purposes, and AI's ability to operate on a mass scale can create or contribute to discrimination. The resource provides information on the legal analyses that OCR uses to determine whether discrimination exists, and provides examples of conduct that could, depending on facts and circumstances, present OCR with sufficient reason to open an investigation.

*Resource Comparability*

OCR issued a Dear Colleague Letter (2014) PDF (478K) explaining that Title VI prohibits discrimination on the basis of race in the allocation of school resources such as courses, academic programs, extracurricular activities, teachers, leadership, student support, school facilities, instructional materials, and access to technology and digital opportunities.

OCR issued a fact sheet (2024) PDF (105K) highlighting that in 1954 in *Brown v. Board of Education*, the U.S. Supreme Court unanimously held that legally mandated racial segregation of children in public schools is unconstitutional.The fact sheet explains that student access to education and to educational resources differs by race, color, and national origin in schools across the United States and summarizes resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

Additional resources regarding resource comparability are available on OCR's Resource Comparability webpage.

*Race Discrimination in Special Education*

OCR issued a Dear Colleague Letter (2016) PDF (470K) explaining that states, districts, and public schools cannot discriminate on the basis of race, color, or national origin in the administration of special education or related aids and services. This resource addresses overrepresentation, underrepresentation, and misrepresentation of students of color as students with disabilities. Title VI requires that students of all races, colors, and national origins have equal access to general education interventions and to a timely referral for an evaluation for disability and special education and/or related aids and services under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973. Title VI also requires that students of all races, colors, and national origins are treated equitably in the evaluation process, in the quality of special education services and supports they receive, and in the degree of restrictiveness of their educational environment. Additional resources are available on OCR's Race Discrimination in Special Education webpage.

*Retaliation*

OCR issued a resource, Civil Rights Protections Against Retaliation, (2024) PDF (105K) which reminds school communities that all of the federal civil rights laws enforced by OCR prohibit retaliation. The resource explains the key elements of retaliation, outlines how OCR assesses retaliation claims, and provides examples that depending on the facts and circumstances, could raise concerns of unlawful retaliation. Additional resources regarding retaliation are available on OCR's Retaliation webpage.

## How to File a Discrimination Complaint with OCR

Anyone who believes that a recipient of federal financial assistance has discriminated against any person on the basis of race, color, or national origin may file a complaint with OCR under Title VI. The person or organization filing the complaint need not be a victim of the alleged discrimination and may complain on behalf of another person or group.

You may file a complaint with OCR using OCR's electronic complaint form at the following website: https://ocrcas.ed.gov/. A complaint may also be sent to the OCR regional office that serves the state in which the alleged discrimination occurred. A complaint must be filed within 180 days of the date of the alleged discrimination unless OCR grants a waiver of the 180-day filing requirement. If you have also filed a complaint under an institutional grievance process, a complaint with OCR must be filed within 60 days of the completion of the institutional grievance process.

Additional information about how to file an OCR complaint and OCR's complaint process is available within resources on OCR's website, including: How to File a Discrimination Complaint With the Office for Civil Rights; PDF (177K) OCR Complaint Processing Procedures; PDF (201K) Questions and Answers on OCR's Complaint Process; and OCR Case Processing Manual. PDF (709K)

Top

**Office for Civil Rights (OCR)**

Page Last Reviewed: January 23, 2025

Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

Site Notices and Privacy Policies

Accessibility Support

**ED Archive**

# U.S. Department of Education

     
ES

## Contact Us
### 1-800-USA-LEARN

  www.ed.gov
**An official website of the Department of Education**

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

**64-PAGE AMENDED (FAC) COMPLAINT**
**In Honor of the Civil Rights Act of 1964, Title VI,**
**Excluding Roman Numeral pages (**full filing
fee paid on site); Hyperlinked with
Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-DMR**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).

Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu,  generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit

NOTE: Mr. Austin's (Plaintiff's, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

## TABLE OF CONTENTS

Argument Summary                                                        **i.**

Introduction                                                           **ii.**

Intro; Photo Affidavits                                               **iii.**

Procedural History; Facts                                             **1.**

Complies with Rule 8; 'Original' Jurisdiction                         **31.**

Argument Summary (Causes of Action)

1. Georgetown (in concert with Yvonne Gonzales Rogers) is currently violating Mr. Austin's rights, as a Black man and an admitted student, to Equal Protection under the 14th Amendment and Title VI by impermissibly using race (and perhaps gender), as a Black man, to his detriment, and treating him as an inferior due to his race, compared to similarly situated non-Black male admitted students, repeatedly (refusing, and violating the basic, and foundational tenets, duties and rights Georgetown publicly espouses for ALL students, staff, professors, and third party community members).

2. Georgetown (in concert with Yvonne Gonzales Rogers)is currently violating Mr. Austin's rights, as an admitted student and Black man, to contract per 42 USC 1981, and 42 USC 1985, under 13th Amendment.

3. Georgetown made false promises to induce contract formation, and is still materially omitting, overtly deceiving, and misrepresenting in an *ongoing* malicious pattern of deceit to illegally deprive Mr. Austin.

4. Georgetown is currently negligent in violation of multiple duties owed Mr. Austin

5. Georgetown is currently acting in Bad Faith violating multiple duties to deprive of valuable, hard fought, and essential, fundamental rights extraneous to frustrated fruits (benefits) of contract.

Relief : **$10- $15 Million** *Minimum* Demand, as well as Injunctive (and other relief).

i.

"**Cinque** : Ens. : [ Covey translating for Cinque in Mende]  You are a chief.

**President John Quincy Adams** : I was a chief. Yes….

**Cinque** : [in Mende]  Is he going to help? He has far many more questions than answers….

**President John Quincy Adams**: Cinque, look. *I'm being honest with you. Anything less would be disrespectful*…

**Cinque**: (speaking in Mende / Ens. Covey translating) We won't be going in there alone.

**President John Quincy Adams**: Alone? Indeed not. We have right at our side. We have righteousness at our side. We have Mr Baldwin over there.

**Cinque**: (speaking in Mende / Ens. Covey translating) I meant my ancestors. I will call into the past, far back to the beginning of time….. I will reach back and draw them into me. And they must come, for at this moment, I am the whole reason they have existed at all."
https://m.youtube.com/watch?v=y8Jkls3xgvg
- **Cinque (Djimon Hounsou) and President John Quincy Adams (Anthony Hopkins) conversation before winning Supreme Court Argument, and Case:** *The United States v. the Amistad, 40 U.S. 518 (1841), Amistad*, Movie by Steven Spielberg

"Freeing yourself was one thing, claiming ownership of that freed self was another….To the sixty million or more, …Beloved"
- **Toni Morrison**

"I come as one, but I stand as 10000 to the 10th power!"
- (*I, George Jarvis Austin, happened to be sitting next to both Oprah and Gayle —front row next to Gayle in red, Myself in the gray suit—, before and after she gave this speech and spoke with her during commercial breaks on the depth of meaning for that particular award, and context for that speech and after learning, and listening, a bit more adopted that wisdom within myself*).
https://m.youtube.com/watch?v=wqJ7hmYhBMg
- **Oprah Winfrey, Hall of Fame Acceptance Speech,** *36th Annual NAACP Image Awards*, 2005

**Maya Angelou to Tupac**: "May I speak with you?....Do you know how important you are?  Did you know You're the best we have, and We need you desperately? Did you know that our people (*fought and*) stood on auction blocks for you?  Did you know we got up before sunrise, and slept after sunset so you could be alive this day?   Did you know our ancestors decided they would stay alive despite all this? Did you know they laid in their own, and others, excrement, urine, menstrual flow, feces, and filthy hatches of slave ships to stay alive for you?  When was the last time someone reminded you're more valuable than you can imagine?".....
("... *I talked to him and he calmed down. Later, when he wept, I wiped his face with my hands because I didn't have a napkin or handkerchief. Then we turned back to our location. I went to my trailer and Janet Jackson came*")
**Janet Jackson with Maya Angelou**, "Dr. Angelou, I can't believe you actually spoke to Tupac Shakur." I said, "Who is that?" I didn't know six pack or eight pack…. I didn't know who he was because in my age group his name didn't register"
- **Maya Angelou, with Tupac Shakur, then with Janet Jackson, on set of** *Poetic Justice*, **directed by John Singleton , Classic, 1993** https://m.youtube.com/watch?v=rye1jb98LSA httpsm.youtube.com/watch?v=gCDm6UGQSBU

4:7 Wisdom is the principal thing; therefore get wisdom:
and with all thy getting get understanding.
3:13 Blessed are those who find wisdom,  those who gain understanding,
3:14 for she is more profitable than silver and yields better returns than gold.
- **Proverbs, 4:7, 3:13-14**

ii.

"You Know, Kindergarten Is Like The Ocean. You Don't Want To Turn Your Back On It."
**- Ms. Joyce (Penelope Ann Miller) to Mr. Kimble (Arnold Swarzenegger), Kindergarten Cop, 1990**

"It doesn't matter what you say you believe - it only matters what you do."
**- Robert Fulghum, All I Really Need to Know I Learned in Kindergarten**





iii.



iv.

**See [Supplement Intro VI-XXVI](#)** *(hereafter referred to a S-Intro, S-1, etc.)*





v.

# FACTS

"Courage must come from the soul within,
The man must furnish the will to win,
So figure it out for yourself, my lad,
You were born with all that the great have had,
With your equipment they all began.
Get hold of yourself, and say: "I can."   -S-1.

- **George Washington Carver, famous Black inventor read Mr. Guest's poem; "EQUIPMENT"
during his commencement address at *Selma* University, *Selma Alabama* on May 27, 1942.**

1.      Approximately 23 years before Selma, Alabama's 'Bloody Sunday' a pivotal

moment in the Civil Rights Movement, George Washington Carver, one of our

country's and the world's most brilliant-creative minds, reminded Selma's future

leadership of its ability to overcome *any* challenge while reading Mr. Guest's poem;

"EQUIPMENT" (*whether that challenge is facing inward, or heading outward,*

*including the evils of racial anti-Black segregation, anti-Black subordination,*

*anti-Black degradation, and infliction of Black inferiority throughout all strains of*

*society*).  See also e.g. (*in the Court's 237 page opinion*) Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 104 (U.S.

Jun. 29, 2023) ("In fact, [truly] meritocratic systems have long refuted bigoted

misperceptions of what [B]lack students [men, and people] can accomplish.").  It's

important to note that Dr. Carver did so at an historically Black college, at a time

when Black history, and Black identity (even at HBCU's), was highly suppressed

and oppressed (*with America's own Nazification, or 'Gleichschaltung,' victimizing*

*Black people with overlapping totalitarian control mechanisms, and extra-legal*

*torture in Jim Crow era*). Moreover, it was taught in a way to ultimately fuel notions

of Black inhumanity, or Black inferiority, that Dr. Carter G. Woodson (*founder of*

*Black History Month; which 'should' be celebrated throughout the year, not just*

*February*) articulated so brilliantly, and poignantly, in the 'Mis-Education of the [so

called] Negro' (*originally published 9 years before Dr. Carver's Speech*).See S-1

1

2.    Dr. Carver reminds us all, as he reminded that specific portion of leadership, and survivors of the *Black American Holocaust,* through a message of self development, edification, self knowledge, and self confidence that "I can."  I, George Jarvis Austin, am an autodidact, and developing polymath like a. Frederick Augustus Washington Bailey Douglass, abolitionist Lion of Anacostia against anti-Black racism, racial abuse in its many iterations, and American Chattel enslavement (the most brutal, damaging), and b. Abraham Lincoln, Eagle and President of the United States of America, who learned the law, and practiced, through self-teaching, and self edification.  Lincoln, as a store clerk rising from rural poverty, had a uniquely autodidactic, interesting, path to the bar, and Presidency at a time in the U.S. when one could practice law and legally advocate for others in the Courts, *if considered a White man in America's racial caste system (at the time),* without attending law school, passing the bar, or getting bar certified (or licensed) in the ways and means now mandatory.  See S-2

3.    Of course, A Party can legally represent (*and advocate for*) themselves even under current law with the ways and means now mandatory, but cannot act as an attorney 'for another' until bar certified in the respective State, or Jurisdiction.  See 28 U.S.C. § 1654.  Like Mr. Curt Flood in 1956, Mr. Austin, 56 years later, began his professional process and consummated with $400 consideration for Georgetown's student contract without the aid of an attorney.  Mr. Austin is recovering from severe injuries causing temporary physical disability both in the workplace at Tesla, and a separate car accident creating strains on every part of life, study (Straight A's, and A+'s last nine semesters), healing process and employment (working more than full time while representing himself (self-represented), and notes in advance his

EoR - 1791 of 2347

likely need for physical ADA Accommodation(s) until fully healed.  Contextually, it's

important to note *Mr. Austin is still healing from ongoing severe physical injuries*

*that have been very slow to recover due to the unanticipated severity of his soft tissue*

*injuries*).  *Mr. Austin also reminds to be mindful of Erickson v. Pardus mandate(s),*

*especially in this context.*  See S-3

4.      Mr. Austin, who is self represented, is not a juris-doctor (JD) nor has *ever*

taken the bar, has a pristine, clean and clear background, with great and strong

character (eligible for any employment, or position, including President of the

United States).  Although not a licensed attorney, Mr. Austin is empowered to

represent himself *legally*, has good credit, is a good person, is a member of protected

classes (*Black man, recovering from temporary disability*.)  See S-4

5.      In the Supreme Court's 237 page opinion they remind of how Black students,

and people, have long befuddled bigotry and run circles around racism (*especially*

*when there is a meritocratic system*).  Mr. Austin is previously identified as top 5%

out of 20,000+ students, accepted to 100% of top tier colleges applied to including

UCLA and Berkeley, graduated and did well at Berkeley (#1 in major, public, [&

overall per Forbes www.forbes.com/sites/madisonfernandez/2021/09/08/why

-berkeley-is-number-one/?sh=2bbb1b7a47e0 ]).  See e.g. Students for Fair

Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 202 (U.S.

Jun. 29, 2023) ("California amended its State Constitution to prohibit

race-conscious college admissions in 1996…University of California, Berkeley, a top

public university not just in California but also nationally…For example, the

University of California purportedly recently admitted its "most diverse

undergraduate class ever," despite California's ban on racial preferences. … UC

**3 ; Opening Complaint**

Admits Largest, Most Diverse Class Ever, But It Was Harder To Get Accepted, L. A.

Times, July 20, 2021,,") Mr. Austin had already scored in LSAT's top 1% of Black

students... (top 5-10% overall world- wide; & *several* timed *perfect scores, can easily*

*score ..higher*). See S-5

6.     Mr. Austin Won (along with 17 others) a top 10 out of 820+, elite, uber-

competitive Senate fellowship (1 of 64 Capital Fellowship winners; *CA Senate*) See

e.g. www.senate.ca.gov/media/20130814_267/video





**4 ; Opening Complaint**

As articulated above, Mr. Austin Won a Fellowship in the top 10 out of 820+ (in CA

Senate; most competitive entry less than 4% acceptance rate, my year, for that

program, 1 of 18 selected winners (1 of 2 *winners* out of that area)

www.recordnet.com/story/news/2012/09/08/ just-one-fellows/49419856007/ was

unavailable for press interview at the time but celebrated and honored publicly in

the piece of over 400 elite competitors nationwide, declined automatic job offer as I

gave my word to another commitment and already deferred for a year), accepted

into multiple top tier law schools (including T-14), offered highest scholarship award

honors from VP Kamala Harris' alma mater (in San Francisco), more recently

chosen as most outstanding student, as well as top ten business student ever

(selected by professor with over 20 years experience).  Yet, Mr. Austin, an admitted

Black male student, following Georgetown's publicly outlined policies, *even after*

*Georgetown's written admission to him that they violated their own written*

*authorization agreement policy, and the law*, was outright intentionally, facially, and

repeatedly discriminated against in violation of Equal Protection, 42 USC 1981,

13th, 14th Amend. and (Title VI, on which Title IX was based). See S-6

7.     This case is not about admissions, although Mr. Austin, as a Black man, and

person, is aware (as is the Country) of the recent rulings with *Harvard*, and *UNC*

(California, previously, had a similar change in *1996*, with the passage of

Proposition 209).  Although the 237 page opinion *Students for Fair Admissions, Inc.*

*v. President & Fellows of Harvard Coll*. argues heavily in favor (both majority and

dissent) for Georgetown's legal liability to Mr. Austin; Liability emerges outside of

the admissions context as Georgetown has impermissibly used race, or derogatory

racial stereotypes, repeatedly against Mr. Austin to his detriment to exclude and

EoR - 1794 of 2347

deprive him.  Instead, this case is about respecting the human being, *admitted student*, and their respective [Equal protection], and [42 USC 1981], rights along with their rights not be negligently-maliciously failed duties owed.. nor deceived or defrauded (i.e. fundamental privacy, and publicity rights; *which are very similar to trademarks foundational concepts as applied to human beings*).  Georgetown decided to repeatedly, and ongoing *treat him as an inferior*, because he is a Black male, regardless of him being an admitted student, once Mr. Austin entered in contract with Georgetown (*see affidavits embedded above including precise moment when consideration was given and offer accepted*).   Georgetown keeps attempting to mark him with a badge of inferiority repeatedly and ongoing, to completely disregard and disrespect his personhood and fundamental rights.  [Georgetown], and the [US Dept. of Ed.] *admits, and knows,* [Georgetown is covered by Title VI, Equal Protection], as a recipient of Federal funds.  [See S-7]

### Georgetown's Admissions of Fact as of November 2023

8.      Prior to 2019, A fellow student of University of California Berkeley discovered, and alerted Mr. Austin that his image and likeness was being used for commercial purposes by Georgetown, in California as 1 of its top recruiting markets; It was more recently revealed it was likely with thousands of physical brochures, and an interactive website, both with his close up, readily identifiable, photo (*to help Georgetown generate Billions of dollars in annual revenue.  The fellow student alerted his photo was being used to promote, market, or sell Georgetown without his knowledge, nor consent (Commercial Use) to violate his privacy, publicity and other rights.  Mr. Austin is a human being, a citizen, and an admitted student at Georgetown University, and other elite institutions of law, with active

EoR - 1795 of 2347

and ongoing rights to 1. Equal Protection, 14th Amend, Title VI, 2. 42 USC 1981, 13th Amend. 3. not be deceived or defrauded (out of privacy, publicity., property, 1981, or others rights), 4 & 5. not have duties breached or violated maliciously through bad faith or negligently as a person or human being. See S-8

9.     Georgetown never informed, nor obtained written, or *any*, authorization from Mr. Austin.  Outside of a litigation context, Mr. Austin thereafter followed up with Georgetown to which they initially denied use of his image or likeness was true. Mr. Austin sought verification of violations and had no way of knowing if true or authentic (as several organizations he initially reached out to verify would not confirm, nor deny). However, they later admitted their violations by sending him the same physical copies, to California, already discovered by a fellow UC Berkeley student, with a letter by Georgetown leadership admitting their violations in 2019. From the date of that letter till now, quickly approaching 5 years, Mr. Austin has diligently followed up with Georgetown leadership, with over 300+ witnesses, and 100+ formal complaints made to Georgetown's appropriate divisions, (*IDEAA, President Office, etc.*) outside of the litigation context, to proactively address and solve the issues at hand (including getting the specific numbers of physical commercial brochures sent, where, and to whom).  Specifically, Mr. Austin emailed and faxed IDEAA complaints, with other leadership cc'd,.  Mr. Austin formally complained. Georgetown leadership violated school policies, standards of care, statutes, customs, and laws. Mr. Austin had no idea, nor anyway to predict, they would continually conduct themselves in this illegal manner up to the present, 2024 (and would have preferred to solve outside of a litigation context) Georgetown has *not* responded, *or* acknowledged complaint(s) *but made several admissions of fact*:

**7 ; Opening Complaint**

10.    Georgetown admits, *publicly,* they owed duty to notify Mr. Austin prior to filming him as part of Georgetown's *standard of care* to an admitted student (*as reflected in policies, statutes (which Georgetown's policies cross reference), common law, agency regulations and..common practice*) See S-10

11.    Georgetown admits, *publicly,* that they owed Mr. Austin the duty to obtain his *written* authorization *prior* to taking, or using, his photograph for Georgetown Business or commercial purposes (as part of their owed standard of care).See S-11

12.    Georgetown admits, and knows, *publicly,* that a written authorization form to agree to business use of a photo is a contract, or contractual agreement (*between the person whose picture is being taken and the person or organization who is taking the picture for commercial purposes*). Georgetown requires *prior* approval of this contract by Georgetown's General Counsel, requires signed written authorization, (contract), *prior* to business use or it violates their privacy, publicity, and 1981 right to contract (when facially discriminatory; i.e. one policy for Black male students, and one for similarly situated non-Black male students).  See S-12

13.    Georgetown admits, *publicly,* this specific duty owed is part of Georgetown's *standard of care* to an admitted student; (obtain *prior* written consent*)* of person being photographed for Georgetown business is reflected in 1. Georgetown's privacy policy as part of the student contract, and 2. Georgetown's Media policy).

14.    Georgetown admits, *publicly,* that information regarding the breach or violation of the aforementioned duties is material to the person who was filmed or recorded; Georgetown admits this through its emphasis, explanation, and admissions of the current law's legal requirements that inform, guide, and direct,

**8 ; Opening Complaint**

their publicly stated policy (*as well as their argument in what is considered the Court of second highest prestige under the Supreme Court of the United States;* S-14.

15.     Further, Georgetown admits, *publicly,* that the 'commercial purpose' of the filming adds extra legal barriers, and creates additional material information for the person being filmed for business purposes (which would need to be included in the written authorization, and notice, *prior* to the filming or recording).

16.     Georgetown admits that it commenced or consummated its contractual relationship with Mr. George Jarvis Austin, as an admitted student, with $400 payment from Mr. Austin and both parties', to the contract, agreement to the terms and conditions of Georgetown's standard contract with admitted students; S-16

17.     Georgetown admits, *publicly,* that as part of student contract, their mandatory policies (privacy, media, IDEAA, etc.)  and procedures must be followed by Georgetown or they in fact break the law, and incur legal liability.

18.     Georgetown admits, *publicly,* that *a material* part of their advertising *to induce* contract formation with incoming students is their commitment to follow the law, their policies, and their consummated student contracts. See S-18

19.     Georgetown admits, *publicly,* through their own publications and protections of privacy, publicity, and other rights that these rights are in fact not only valuable, but essential in the modern interconnected world we live in. See S-19

20.     Georgetown *knew* it had a duty to inform Mr. Austin of the precise usage of his photo *prior* to using for business purposes which includes where they will be sent, how many, and how else may be utilized (I.e. websites, interactive forums etc.) so informed written consent, and mutual assent for contract, can be made.

**9 ; Opening Complaint**

21.    Georgetown itself admits, *publicly, (in its .. filming required steps ..)*, that it

holds itself to the same standards for students, faculty and staff.

> *"too often they have stimulated their prejudices by referring to the [so called Negro; Black people] as **unworthy of consideration**….."*
>     -    **Carter Godwin Woodson, 1933, The Mis-Education of the Negro.**

22.    Georgetown itself admits, *publicly,* that not only must written authorization,

as a contractual agreement, be signed by the student *prior* to use, but that the form

itself 'must' include certain information, (*including acknowledgement of*

*'consideration' per contract law;*) to be valid, and enforceable (and even includes an

example photographic/ videographic release form for students in their continuing

education programs; Georgetown's neighbor George Washington University publicly

provides a comparative example for its own students). See S-22;

23.    Georgetown admits they at least twice used Mr. Austin's photo for

business purposes without obtaining written consent, nor 'Consideration,' nor notice

provision in violation of student contract, the law, and *publicly* stated policies.

> "Looky here, America, What you done done-
> Let things drift, Until the riots come.
>
> Now your policemen, Let your mobs run free.
> I reckon you don't care, Nothing about me.
>
> You tell me that hitler, Is a mighty bad man.
> I guess he took lessons, From the ku klux klan.
>
> You tell me mussolini's, Got an evil heart
> Well, it mus-a-been in Beaumont, That he had his start-
>
> Cause everything that hitler, And Mussolini do,
> Negroes get the same, Treatment from you.
>
> You jim crowed me, Before hitler rose to power-
> And you're STILL jim crowing me, Right now, this very hour.
>
> Yet you say we're fighting, For democracy
> Then why don't democracy, Include me?
>
> I ask you this question, Cause I want to know
> How long I got to fight, BOTH HITLER – AND JIM CROW "
>     -    **Langston Hughes; Beaumont to Detroit: 1943**

24.    Georgetown admits they in fact never disclosed, notified, nor obtained

written consent from Mr. Austin, *ever*;  Georgetown knows Mr. Austin Identifies as

Black-African American, and takes pride,& joy, in his heritage. See S-24

EoR - 1799 of 2347

25.    Georgetown knows, and admits, *publicly,* that when an organization *refuses* to contract in facially discriminatory manner, when they are obligated to contract under the circumstances (i.e. *when exploiting a Black male admitted student's picture for business purposes as Georgetown did without Mr. Austin's written authorization*), they are liable under 42 USC 1981 See S-25

26.    Georgetown *publicly* admits that enslavement of Black people in this country, which Georgetown partook in, was in part exploitation of Black people *without even considering* Black people's rights or needs; This is a similar pattern to how Georgetown behaved in exploiting Mr. Austin's right to contract (i.e. violated written authorization agreement requirements in reference to his person, privacy, publicity, etc.); 42 USC 1981 had to explicitly state Black men, and people, have the "same right to contract as a White man" because racism, & discrimination built in the assumption of inferiority and presumed it could take from Black people without 'consideration,' nor 'mutual assent,' but instead by force. See S-26

27.    Georgetown *publicly* admits written authorization requires Mr. Austin's *prior* a.notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. & Georgetown General Counsel approval of form and f. his signature consenting to it *prior* to its use.  Georgetown *admits* it had none of the above (as *first* acknowledgement of its use was in the 2019 letter *after the fact).*

28.    Georgetown admits, *publicly,* that a student, or "Any applicant.., current or former employee or student, or third party ( "Complainant")" can make a complaint via email… and is encouraged to do so; See S-28

29.    Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its own policies or the law that informs and undergirds IDEAA**; See S-29**

30.    Georgetown admits, *publicly,* that discriminatory conduct by leadership, faculty or staff to student's detriment, particularly a Black male student, is especially concerning; According to their policy is of the highest priority; Yet, Georgetown themselves discriminated by not even taking a first step to acknow- -ledge, nor investigate or correct an administrators written admission of serious school policy, & legal violations to the immediate detriment of an admitted Black male student showing discriminatory animus towards him. ; See S-30

31.    Georgetown *admits* that they *never* provided this fraudulently omitted material information per Mitch Bailin's, and Georgetown's President's Office, Vice President's Office, General Counsel's Office, and other leadership's, *lack of response nor answers*, despite over 100+ formal written complaints in front of over 300+ separate witnesses (including other Georgetown leadership who could chime in).

32.    Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+ witnesses, as its failure to correct, nor provide the materially omitted information, was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial use,* of how important that information is in regards to privacy, publicity, and contract rights (as well as its own policies requiring disclosure of these material facts to Mr. Austin, especially after already violating his rights).

33.    Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to a different filming (for business purposes) policy than similarly situated non-Black

EoR - 1801 of 2347

male admitted students, faculty, staff, is treating him in an inferior manner; shows..

they intended to facially discriminate against him. See S-33

34.    Georgetown admits, *publicly,* subjecting a Black male student (Mr. Austin) to

a different IDEAA complainant policy than similarly situated non-Black male adm-

-itted students, faculty, staff, or even third parties, is treating him in an inferior

manner; Refusing to even acknowledge his complaint, nor investigate, escalate, or

correct, *as guaranteed*, shows intent to facially discriminate against him; See S-34

35.    Georgetown admits, *publicly,* in subjecting a Black male student (Mr. Austin)

to..a different privacy policy than similarly situated non-Black male admitted

students, faculty, staff, and policy it publicly advocated for in *GEORGETOWN*

*COLLEGE v. D.C. BRD., ZONING ADJ,* when being 'forced' to disclose, not

voluntarily or willfully violate (*as they did to Mr. Austin*), is treating him in an

inferior (facially discriminatory) manner. See S-35

36.    Georgetown *publicly* admits that it takes written authorization forms seri-

-ously for both medical and student privacy protected information, and that should

define an admitted Georgetown student's reasonable expectation of privacy.See S-36

37.    Georgetown *admits in writing and conduct,* that under no circumstances

should medical information or a photo be released or commercially used (photo)

without the student's written authorization agreement (contract); Georgetown

advocates this position so strongly (*despite California's CMIA, or US Statute's*

*HIPAA  all that's required is oral, or written patient request*) that they refused to

release Mr. Austin's own medical records *to himself* without signed written

authorization (*but ironically commercially used his photo without his a. knowledge,*

*b. consent, nor c. written authorization in violation of their mandatory policy*).  See

**13 ; Opening Complaint**

S-37  To illustrate the irony, and misplaced priorities, when Mr. Austin has repeatedly requested in writing, and orally (via phone), his Georgetown medical records, as an admitted student, they have refused to provide his own required information (*per California's CMIA, or US Statute's HIPAA  all that's required is oral or written request*), and mandated multiple steps of unrequired verification to get *his own medical information.*  Yet, in opposition to the legal, contractual, and policy standards Georgetown itself has enshrined, and argued, use of his close up Photo for commercial advertising purposes, that would require my authorization (*I.e. signed form, written consent, notice, etc.*), they completely ignored those legal necessities and violated his privacy, and publicity rights throughout CA forum state (and subsequently his Equal Protection, Due Process, 42 USC 1981, duties against deceit, negligence and bad faith, rights also).  Georgetown completely inverted their responsibility and refused what they are obligated to provide, and went out of their way to exploit, and violate, Mr. Austin's privacy and publicity rights that they have an admitted, publicly proclaimed, and publicly advocated, obligation to protect; S-37

38.      Georgetown admits, *through its conduct in front of 300+ witnesses,* that it a. intended to violate Mr. Austin's right to privacy, publicity, Equal Protection, and 1981 right to contract b. intended to fraudulently omit material information, and mis-state its commitment to the law to induce contract with Mr. Austin c. intended to do so *maliciously, knowingly, and egregiously,* as they never apologized, investigated, nor corrected, even while admitting their violations in writing and to date have never presented a written authorization for Mr. Austin to sign as mandated in accord with Federal, State laws. See S-38

EoR - 1803 of 2347

39.     Georgetown admits, as Courts have repeatedly held, that an organization's failure to follow its own policies can support a discriminatory pretext, as George--town *knowingly, willfully, and maliciously did,* without apology, investigation, correction, nor disclosed material information to cause *ongoing* harm.

40.     Georgetown *admits its own* impermissible use of race, or derogatory racial stereotypes to harm, Mr. Austin a Black male admitted student, *through their words, and conduct*, as the June 29, 2023, 237 page Supreme Court opinion in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* repeatedly highlighted as illegal (in violation of students.. Equal Protection); Georgetown repeatedly chooses to presume an admitted Black male student, Black men, and Black people as *"inferior,"* and *"unworthy of consideration"* habitually refusing basic, required *publicly admitted* steps for essential policy, practices, programs/activities that non-Black male admitted students are granted providing unfair advantage to them, and stigma, over 100+ discrete adverse acts creating immediate, and ongoing, detriment to Mr. Austin (as *none of publicly listed **IDEAA steps I-V** were even attempted*, nor were.. complaints acknowledged conveying, re-inforcing, *derogatory racist stereotypes, presumptive inferiority);* Dckt S-40;

41.     Georgetown admits impermissible use of race or racial stereotypes, through explicit conduct over 100+ times, and explicit classification (conditions participation in student activities/programs) on race, while excluding a Black male admitted student, or students, from programs, etc in an organization receiving federal funds.

42.     Georgetown admits decision making by derogatory racial stereotypes is absolutely prohibited especially when used to exclude an admitted Black student from essential programs and activities receiving federal funds to operate.

EoR - 1804 of 2347

43.     Georgetown admits, *publicly,* that it has a history of specifically depriving Black persons rights, even in the most brutal expression of enslavement. S-43

44.     Georgetown *publicly admits* that it literally deprived Mr. Austin's right to make a contract; Because Georgetown authorization agreements are *mandatory* contracts of adhesion when Georgetown uses an admitted students', or other person's, image for business purposes per their own policy (and the law), their choice to purposefully violate their own mandate, and preemptively deprive the making of that contract violates 42 USC 1981 by refusing to offer a Black man, admitted student, the same contract it is a. legally mandated to do for *all* students and b. it would offer a White, or non-Black male, offeree (*as 1981 protects would-be contract makers in the contract making process as well as those violated in the broad language of rights, enjoyment of benefit, or enforcement process*);See S-44

45.     Georgetown *admits, publicly,* excluding Mr. Austin because he is a Black male admitted student from essential Georgetown activities/programs violates the *essence,* Originalist purpose, and Legislative *intent of* Title VI ; See S-45

46.     Georgetown *admits*, with over 300+ witnesses, it had actual notice of policy violative, discriminatory, conduct, refused to take action, and failed to correct; *on--going* violations (i.e. extreme deliberate indifference.);See S-46

47.     Mr. Austin documented all of Georgetown's previous admissions (paragraphs 7-46 above) with over 300+ witnesses, providing *direct evidence*: See S-47

48.     On June 8, 2023, Justice Kagan delivered the unanimous opinion for the Supreme Court of the United States who unanimously sided with Jack Daniel's and overturned the Ninth Circuit in a trademark infringement and dilution case stemming from VIP Products' "Bad Spaniels," a novelty dog toy that intentionally

EoR - 1805 of 2347

parodied Jack Daniel's iconic 'Tennessee whiskey' bottle and label elements. The decision clarifies that when a parody of another's trademark is used as a trademark, the … use does not qualify as "noncommercial." Georgetown has already *publicly* admitted the inherent harms of their conduct in violation of their media, privacy (publicity) and written authorization policy, but the Supreme Court highlights a 'smooth' analogy to a person's right of publicity, as a trademark is "any word, name, symbol, or device, or any combination thereof" used to "identify and distinguish" one's goods-service (*shows harm in purely legal context*); See S-48

49.    Also, similar to the right of publicity, trademarks perform a key function of identifying the source of a product, thus enabling businesses (or person, in context of publicity rights) to build goodwill and consumer recognition with high quality products and are an essential tool in any businesses' intellectual property arsenal. Analogous to violations of right of publicity, a Trademark infringement is the unauthorized use of a trademark. As The Court, per Justice Kavanaugh, articulated in *TransUnion LLC v. Ramirez* "a plaintiff searching for a "common-law analogue for their asserted injury" need not identify "an exact duplicate." TransUnion, 141 S. Ct. at 2204. But the plaintiff's alleged injury must still have a "close relationship" to a traditionally recognized harm."   Mr. Austin's right of publicity (and privacy) is a close analogue, in this case statutory (and common law), a similar harm, to Jack Daniels *'Tennessee Whiskey."*

"Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University.…..**Georgetown complains** that … requiring it to report …. **forces the University to violate the Federal Educational Rights and Privacy Act (*i.e. reasonable expectation of privacy*)** of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. ….FERPA protects students ' privacy interests by withholding federal financial assistance to educational institutions that …release .. educational records" ….. Georgetown first raised its FERPA-based objections to the reporting obligations" - **GEORGETOWN COLLEGE v. D.C. BRD., ZONING ADJ, 837 A.2d 58, 79 n.21 (D.C. 2003)**

"As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is:  (1) directly related to a student; and (2) maintained by an educational agency

**17 ; Opening Complaint**

or institution or by a party acting for the agency or institution (*i.e. explaining commonly understood reasonable expectation of privacy*). …. If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo" - studentprivacy.ed.gov/faq/faqs-photos-and-videos-under-ferpa

"**NOT "permitting** the release of education records . . . of students without the[ir] written consent (*i.e. reasonable expectation of privacy*)" - Crockett v. Dist. of Columbia, Civil Action No. 16-1357 (RDM), at *8 (D.D.C. Apr. 10, 2020)

https://publicaffairs.georgetown.edu/communications/policies/policy-for-filming-at-georgetown-university/ ("You may not film a person in an identifiable manner unless you first have obtained that person's *express consent. If the person is a Georgetown student, you must use a written consent form* that has been approved in advance by the Office of the General Counsel.")

https://library.georgetown.edu/copyright/images-publications ("If you have a photograph with people in it, there may be privacy or publicity rights(https:// www.publicdomainsherpa.com/rights-of-publicity-and-privacy.html) that need to be addressed…. **The right to privacy**; The gist of the privacy right is that you get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The right to privacy is invaded by:

- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

**The right of publicity;** A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:

- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

*Make sure you have permission before using a person's image or likeness*….."
- **Georgetown University Library**

The broad, but specific, categories of privacy violations that Georgetown themselves help to articulate as part of a reasonable expectation of privacy for students illus-

-trate at least two ways that Georgetown specifically violated Mr. Austin's privacy,

and publicity rights (*as well as Equal Protection , 42 USC 1981, Duties to not violate Deceit, Negligence and Bad Faith rights*); See S-49

50.    Georgetown *knows* both DC's and California's jurisdictions affirm that

Georgetown's conduct using an up close photo without his consent, nor knowledge,

nor written agreement, was violative of Mr. Austin's privacy, publicity, 1981 rights.

The Supreme Court repeatedly reaffirmed this position; See S-50

EoR - 1807 of 2347

51.     Not only was Georgetown aware, but *admits,* and it is commonly understood that their conduct violated his reasonable expectation of privacy, especially as an admitted student in the forum state of California. See S-51

52.     Nationally, it is clear,(codified in various forms), that Georgetown's conduct violates privacy, publicity, 1981 rights for admitted students; See  S-52

53.     Georgetown already *publicly* admits it; Yet, another way to ascertain common understandings of a reasonable expectation of privacy is a comparative approach perusing similar privacy protected information, in similar contextual frameworks, to discern the metes & bounds of our zones of protected information; See S-53

54.     As Georgetown *publicly admits* privacy violations, when combined with commercial use, heighten liability, even when exceptions for similar non-commercial purposes may be acceptable; See S-54

55.     Georgetown not only violated privacy, publicity, 1981 rights of Mr. Austin, but purposefully availed under *Mavrix Photo v. Brand Techs* when it a. specifically targeted Mr. Austin's forum state of California (utilizing his up close photo without his consent, nor knowledge b. Did "something more" including multiple mailed physical copies, *likely thousands,* of advertisements to forum state, and presented physical copies including said privacy, 1981(contract) violating photo of Mr. Austin, and separately maintained interactive website for advertising, commercial, purpose of a multi-billion dollar organization; See S-55

56.     A typical Georgetown media (film) policy, and business use process, for similarly situated non-Black male admitted students would entail 1. Providing notice of the photo(s) being taken *prior to business use* 2. Providing notice of potential uses of photo *prior to use* (as outlined in agreement) 3. Presenting subject

**19 ; Opening Complaint**

of photo(s) with contract for purpose of obtaining informed consent 4. Presenting subject of photo(s) contract with 'consideration' defined-included as required per contract law 5. Obtaining written authorization *prior to business use.*; S-56

> "Yeah? You sure look like the man to me.....See that? I like that.
> He's straight out the gut.  It's like none of this sh*t impresses him.  I like that, homeboy."
> - **Above the Rim, Birdie (Tupac Shakur) to Kyle Watson (Dwayne Martin)**
>
> **"**Yeah? You gon make it?"
> - **He Got Game, *A Spike Lee Joint*, Big Time (Roger Guenveur Smith) to Jesus Shuttlesworth (Ray Allen)**

57.   Georgetown is well aware of its admitted student's role in helping shape the future of our Nation, and the World, in the Public Sector, *and elsewhere*, as one of a very few schools with at least (one) 1, and perhaps (two) 2, US President(s) (POTUS) listed as alumni, or previous students, and the second highest feeder to members of the United States Legislature, behind Harvard, as well as Private Sector, NGOs, etc.  The rigorous, scrutinizing, and elite admissions process fills its student body with high potential leaders who in fact, not just theory, fundamentally impact World, Domestic, State, and Local affairs in all sectors of our Economy. Principally because of this key developmental-exploratory period in a person's, admitted students', life and every admitted student's high potential for positive impact, it is essential to protect not only their privacy, and publicity rights, but Equal Protection and 13th Amend., or 1981 rights to contract as students do not "shed their constitutional rights .. at the schoolhouse gate" per *Tinker*. ; See S-57

> "Specifics, Bob {change scene}.......What I'm talking about is the *human spirit*. That's the challenge, that's the voyage, that's the expedition...."
> - **Phenomenon (1996) - George Malley (John Travolta), portion of scene at University of California, Berkeley**

58.   As soon as a Georgetown Leadership admitted in writing to using my photo to market the school without asking permission, notifying, nor getting written consent, Mr. Austin immediately began a series of questions, formal complaints, to figure out why they chose to "impermissibly use race" (*and perhaps gender*) to treat,

a Black man, and admitted student with less respect, less rights, and in an inferior manner than other similarly situated admitted students with use of material misrepresentations, omissions and deceit (with malice) to deprive (*in direct violation of their explicitly stated contract, and policy terms*). See S-58

59.    Over four years later, Mr. Austin made over 100+ formal complaints of intentional discrimination per Georgetown's exhibited inferior treatment (*combined with other enumerated causes of action*) to IDEAA (*the investigative, and enforcement body tasked with correcting these issues for admitted students, staff, and members of the public: third parties*), since Georgetown's initial admission of violative use of my image.  Georgetown has not yet taken even a mandatory perfunctory, or performative, first step towards *any* investigation, let alone any substantive investigation, correction or enforcement, whatsoever (despite the fact that is precisely what Georgetown's agreement-contract mandates once complaint is made by students, staff, or third party community members). See S-59

60.    However, when Georgetown leadership got caught exploiting Mr. Austin's photo for business purposes (*without **mandatory** written authorization, knowledge, nor consent*), and thus depriving Mr. Austin to his right to contract, they did not self correct, Georgetown instead made clear through admissions and conduct that they *intended* to impermissibly use race to discriminate against him and "stamp him with a badge of inferiority," even after the fact when they already partially admitted their mistakes.   Georgetown treated Mr. Austin in an inferior manner, under 1981 by a. Subjecting him to a facially discriminatory policy for Black admitted male students that is inherently inferior (*by not even considering his person, nor right to contract*) to the separate policy for non-Black admitted male  students b. Refusal to

EoR - 1810 of 2347

even offer a contract to Mr. Austin, at all, let alone on non-discriminatory terms as compared to non-Black male admitted similarly students.   This test to ascertain straightforward racial discrimination also applies to having different media policies, privacy policies and written authorization policies for Black male admitted students vs. non Black male similarly situated admitted students to deprive Mr. Austin's 1981 rights producing promising section 1981 claim(s); See S-60



**William Forrester (Sean Connery)** "You don't know what to do right now…If you tell me what you really want to tell me I may not read any more…, but if you let me run you down with this racist bullshit what does that make you?"

**Jamal Wallace (Rob Brown)** "I'm not playing this game…"

**William Forrester (Sean Connery)** "I'd say you are playing it, expression is worth a thousand words…perhaps in your case … just two" (scene change)

**Jamal Wallace (Rob Brown)** "…See, you have to know the rules to play the game…"

**William Forrester (Sean Connery)** "It was written by a writer you've never heard of…."Thy duty, winged flame of spring "is but to love and fly "and sing" He was writing about the song of the tanager.  A song about new seasons, new life."

**Jamal Wallace (Rob Brown)** "That's James Lowell, man. I know who he is….  I'll stay with "Poor Assumptions" for $800, Alex."
- **Finding Forrester**

61.    After admissions of their violated policy, Georgetown Leadership showed repeated *deliberate indifference,* and *malice,* over 100+ times, when they failed to correct their displayed discriminatory animus, as well as their material omissions, misstatements and ongoing pattern of fraud to deprive Mr. Austin of rights, opportunity, and spent Capital.  Despite their admitted duties to correct, George-town over 100+ times in over 4 years displayed disparate treatment compared to similarly situated non-Black male admitted students by employing one IDEAA

EoR - 1811 of 2347

policy for Black male admitted students to their immediate detriment, and one for non-Black male admitted students to non-Black male unfair advantage.  The first *publicly defined mandatory* step for Georgetown's IDEAA policy (regardless of perceived merit, race or gender) is defined as acknowledgement and receipt (as applied for non-Black male admitted students).  However, in practice, Georgetown's conduct *admits* they not only continually refuse the first step, but all of the following mandated steps, with regard to Black male admitted students, and subject Black male Complainants to an inherently inferior IDEAA policy to their detriment, as applied. Georgetown's different privacy, and complaint. policy for Black men, and in this case facially discriminatory privacy, and complaint, policy based on impermissible use of race, or derogatory racial stereotypes, for Black male admitted students vs. similarly situated non-Black male admitted students highlights this very straightforward, and promising, section 1981 claim.  See S-61

62.    Georgetown *knows and admits* use of derogatory stereotypes constitutes discrimination and is an impermissible use of race; See S-62

63.    Georgetown *admits,* that use of derogatory racial stereotyping evidenced by words, or conduct (*including exclusion or disparate treatment*) is illegal, and against its own policy; Yet, Georgetown *admits, and evidences* this illegal conduct to "mark with a badge of inferiority" *intentionally,* and *deliberately*; See S-63

64.    Georgetown *admits* use of derogatory stereotypes illegally creates stigma whether in a forced '*De Jure*' segregation context like *Brown v. Board of Ed.* or an integrated, but *De Facto discriminatory* context toward protected groups, especially those historically racially oppressed, victimized, or excluded vis a vis enslavement, debt peonage, torture, and many other nefarious mechanisms. See S-64

Better is a dinner of vegetables and herbs where love is present Than a fattened ox served with hatred.
- **Proverbs 15:17**

65.    *Any* of the Leadership of Georgetown could have, and according to their policy *should* have spoken up, or themselves investigated; O*ngoing* disparate treatment of Mr. Austin was documented on display, in front of them, but they instead chose *deliberate indifference* furthering their discriminatory animus, conduct, and malice; Georgetown's IDEAA policy is designed to mandate Georgetown stakeholders (*especially Administrative Leadership*) to "Lift Every Voice" against anti-Black discriminatory conduct as James Weldon Johnson (*from Duval County, Jacksonville Florida*), the first self identified Black man (Negro) barred attorney in the State of Florida *after* the Civil War, & Reconstruction, brilliantly wrote; See S-65

66.    Before the 1960s Civil Rights Acts, corrective measures to combat centuries of degradation, humiliation, oppression against Black people, as well as unfair advantages for *non-Black* people, and Educational Racial Equality Accountability Advancements therewith, Dr. Dubois and Dr. Carter penned the penetratingly pithy articulate analysis of their first person *direct experience* of racism, disparate treatment, in integrated elite schools: ""Admitted and tolerated; but …. not educated; they are crucified… cannot get fair recognition….on campus…or in human common courtesy…. Admitted, but not welcomed…"  Here Georgetown, approximately 90 years after Dr. W.E.B. Dubious and Dr. Carter G. Woodson (the 1st and 2nd self identified Black Harvard PhDs, respectively) penned those words about their own, and other Black students' direct experience in then *integrated* elite schools, *mirrors* Georgetown's *illegal conduct* and intentional discri- -mination to Mr. Austin's detriment; They treat Mr. Austin in an inferior manner with "impermissible use of race" or derogatory racial stereotypes in at least three

24 ; Opening Complaint

separate essential policy processes, with one process for Black male admitted students whereas to their detriment no Georgetown duties/policies/laws publicly stated are followed, and another for non-Black male admitted students who benefit from unjust advantage provided by Georgetown's one-sided system: 1. privacy policy process 2. contract formation process specifically with photo (I.e. written consent required), 3. Contract enforcement (etc. right privileges etc.) of contract already entered into with consideration provided (I.e. Ashley Jennings email); See S-66

67.     Georgetown *admits,* that a "thumb on the scale" to *reinforce*, not correct "the badges and incidents" of anti-Black slavery and oppression through "impermissible use of race" or derogatory racial stereotypes to exclude Black male admitted students from essential programs-activities not only creates stigma, but gives unfair advantage to non-Black male admitted students; perverts outcomes in a (regarded) "zero sum game" detrimental to Black male admitted students; See S-67

68.     Georgetown *admits,* that the enslavement period, as well as the 'badges and incidents' of that period, (*that are still reflected in US society today in anti-Black discriminatory conduct*) was not just a bad chapter in US history, but a fundamental *theft* of Black men's, and Black people's, rights, history, language, culture, personhood, life, liberty, land, & property resulting in massive wealth redistribution (from Black people via theft) with resulting *ongoing* inequality *still* to the detriment of African-American, Black men, and people, today in 2024; See S-68

69.     Because a significant proportion of Black Wealth is generated from earned income, often directly connected to educational opportunities for white collar or professional workers, the nexus between Black educational development, Wealth creation, (Mr. Austin's) Constitutional economic contract rights (with property,

EoR - 1814 of 2347

privacy and publicity mandating a written authorization agreement) Georgetown's discriminatory illegal conduct is similar pattern of theft; See S-69

70.     Given the history, and present reality, of Racial Abuse in this country, the Judicial Branches complicit, or explicit, refusal to enforce anti-Black anti-discrimination laws as it relates to Black People especially magnifies the impact of racism, discrimination, and widens the wealth gap. Non-enforcement of Black People's rights, *currently in 2024,* is part and parcel of why the Black White Wealth Gap remains a constant *ongoing* issue;(*Georgetown's disparate treatment per mandatory policies, to Black male admitted student illustrates*):See S-70

71.     Georgetown's deprivation of Mr. Austin's Constitutional economic rights to contract, as a Black male admitted student, reflects the long ugly history in the United States of America regarding the intersection of Intellectual Property, which rights of publicity is a part of (as a subsect of privacy), with use of derogatory racial stereotypes, racial oppression, and *theft* of Black wealth-economic rights; S-71

72.     Georgetown is aware that their impermissible use of race, and discriminatory conduct, is rooted in ugliest parts of American history, and racist jurisprudence; Georgetown's intent to deprive Mr. Austin's rights, despite knowing his rights as Black admitted student are guaranteed under 1981, Equal Protection, 13th, and 14th Amendments show animus.   The Reconstruction Civil Rights Amendments, along with the Civil War, overturned the most racist, and embarrassing Dred Scott decision, so racist in its complete, and utter, disrespect for ALL Black Life, and Black Persons rights that it delegitimized  the US Supreme Court of its day: triggering Civil War: Apr 12, 1861 – Apr 9, 1865  (no matter enslaved or free, as it presumed inferiority and assumed Black People did no Rights.)See S-72

73.     Georgetown knows Black people fought in the Revolutionary war, yet the one drop rule for Black exploitation-subordination, purposes still became law, & custom, based on the same racist thought patterns reflecting (deep hypocrisy) Georgetown's current disparate treatment, impermissible-derogatory use of race; See S-73

74.     Taking persons, or human beings, without consent is kidnapping, or enslavement.  See e.g. Amistad (written decades before the 13th, 14th or 15th Amendments' Constitutional enshrinement, 16 years before Dred Scott [most racist opinion which helped directly spark the Civil War within 5 years of its ruling,] argued by 1 of 2 non-slave holding ex-Presidents of the United States, at the time, already recognizing the personhood, and fundamental rights of Black men and persons, including the right to self defense, even against White Corporate for-profit enslavers per La Amistad) The United States v. the Amistad, 40 U.S. 518 (1841) See S-74 Stripping rights, or reducing a human being to anything less than a full human being, with all rights and privileges is enslavement; barbarity.  Sex without consent is rape. Taking another's Property without consent is theft or conversion.

75.     Under current law these are principles commonly understood, as is the legal, and moral, liability of a world renowned university, in the business of teaching law, admitting it is illegal to take-exploit an up close photo without *prior written author--ization agreement,* and consent, of an admitted student See S-75

76.     Georgetown made this argument in Federal Court (*in D.C. Circuit; status and prestige among American federal courts generally considered second only to the U.S. Supreme Court*): See S-76; Use of Mr. Austin's close up photo to publicize, market, for pecuniary gain heightens illegality-liability (privacy; publicity, 1981 rights). Yet, Georgetown did so willfully (despite their own Federal Court arguments against

EoR - 1816 of 2347

being *forced* to disclose); They admit violation(s), but still proceed, to date, in a pattern of 1. Equal Protection, 2. 1981 3. Deceit 4. Negligence and 5. Bad Faith to Mr. Austin's detriment (without repentance, nor correction to Mr. Austin's ongoing legal injuries proximately caused by Georgetown);

77.     Unfortunately, for Georgetown, they have chosen to treat Mr. Austin, an admitted student, Black man, person, and human being, in an inferior manner as compared to similarly situated non-Black male admitted students, *repeatedly and ongoingly*, to (attempt) stamp or mark him with a badge of inferiority with multiple 1.Equal Protection, 2. 1981, 3. negligence, 4. bad faith  5. deceit violations to his detriment creating immediate and *ongoing*  harms (& Georgetown'  legal liability).

78.     Georgetown *intentionally* chose to "go astray" without fear the ones they teach, and lead, will "go the self-same way" (*teaching, and modeling illegal conduct*):

### A Little Fellow Follows Me

A careful man I ought to be, A little fellow follows me.
I dare not go astray, For fear he'll go the self-same way.
I cannot once escape his eyes, Whatever he see me do, he tries.

Like me, he says, he's going to be, The little chap who follows me.
He thinks that I am good and fine, Believes in every word of mine.
The base in me he must not see, That little fellow who follows me.

I must remember as I go, Thru summers' sun and winters' snow.
I am building for the years to be, This little chap who follows me.

*[Mindfully, I ponder each step I take; Knowing the path chosen they'll too partake*
*With each bit of wisdom I learn and share; So they are wise as the tortoise and swift as the hare*
*Though some may not care, excellence is aimed to be; So as the little chap looks in the mirror to see*
*True greatness shall be reflected in their own identity*

*A careful man I choose to be ; Because the day will come, eventually*
*When roles reverse, little seeds become strong trees; And, the little chap that follows me*
*Is now the one empowered, and shall be; The who is teaching, and caring for me]*

- by Rev. Claude Wisdom White, Sr (Quoted by John Wooden, of UCLA, one of the greatest (and winningest), basketball coaches in NCAA history, establishing an NCAA men's basketball record winning streak of 88 games and four perfect 30–0 seasons, and John C. Maxwell *Developing the Leader Within*, with an original added stanza, or two, at the end by me, George Jarvis Austin, Self Represented Autodidact, and Developing Polymath).

Georgetown, in its role of teaching future leaders of our world, especially in the legal realm, in walking distance from many of our nation's citadels of power, knew, admitted, and publicly details per its own contractual, and policy, stated minimum requirements its obligation-duties, to admitted student's written authorization

EoR - 1817 of 2347

agreement (contract; 1981), privacy, and by extension publicity (as part of the 4-part privacy matrix). Unlike *Rev. White's 'Little Fellow'* Georgetown demonstrates conduct that should not be followed, & induces legal liability for those who would; S-78

79. Because Mr. Austin is early on in his career, and still in development, the improper use violations triggering Constitutional, statutory, and common law liability (*particularly by an institution charged with the public and private trust, receiving federal funds, to educate our populace in the law*) is particularly disturbing and violative of Mr. Austin's rights. Georgetown's conduct toward Mr. Austin more resembles *Rev. Thomas Mulledy as they totally ignored Mr. Austin's Constitutional rights, enshrined after the Civil War, to eradicate all of the badges and vestiges of the enslavement period because he is a Black man*; See S-79

80. Georgetown's illegal, facially discriminatory, and *extremely* hypocritical conduct toward Mr. Austin intends to "mark with inferiority." Georgetown's conduct in *direct opposition* to their own policy, and own arguments (*in the second (2nd) most prestigious US Court, outside of Supreme Court*), against *forced* privacy disclosures on the precise issue whereas they *knowingly, willingly, illegally* and *egregiously* violated-deprived, Mr. Austin's Constitutional rights to "stamp with inferiority" is akin to, but worse than the Letters of Recommendations in Ralph Ellison's *Invisible Man (used to mark the central character, a Black man, as inferior unbeknownst to him).* Here Georgetown went out of its way to a. disrespect,& show disrespect toward Mr. Austin b. violate the law c. violate its own policy d. violate a student's Constitutional rights while teaching them the law, and modeling illegal conduct e. violate the law to oppress, racially abuse, facially discriminate and exploit a Black male admitted student using race, or racially derogatory stereotypes, to exclude from programs and activities and to ultimately mark with a

badge of inferiority.   Georgetown's choice to go out of its way to disrespect Mr.

Austin's fundamental rights, person, and have over 100+ opportunities to

self-correct, but refuse was Georgetown, repeatedly, telling me, Mr. Austin, exactly

who they are.   Georgetown was being clear that they in fact *intended* to mark with

badge of inferiority not just in the present, but wherever I would use Georgetown as

a starting point for my formal legal career similar to the Letters of Recommendation

in *Ellison's Invisible Man*.   Because I believe Georgetown when they told me who

they are, and made clear that they *intended* to "run me down with this racist

b*llsh*t," as Sean Connery's character in *Finding Forrester* so aptly put it,

Georgetown's conduct is completely unacceptable.   Old habits appear to die hard;

Georgetown's conduct and communications, even Georgetown's letter admitting its

violations in 2019, seems to be asking the unstated question of *"But, if you let me*

*run you down with this racist bullshit….what does that make you?";* See S-80

81.     Georgetown owes duties to serve its Black male admitted students, and to not

violate their Black male admitted student's 1. Equal Protection 2. 1981 3. Due care

duties 4. Good faith duties 5. Non-deceit Duties (*defrauded out of above enumerated*

*rights, or privacy, or publicity rights, or Capital expended-committed by Mr. Austin*

*including $400.00 Consideration paid to consummate student contract with*

*Georgetown, and over $100,000+ committed thereafter; Mr. Austin can generate and*

*disclose more precise numbers when time for discovery, or settlement negotiations*).

### FAC COMPLIES WITH FRCP RULE 8, 15; 'ORIGINAL' JURISDICTION

82.     It is well established, a complaint's length does not violate Rule 8 when

intelligible, organized, and provides fair notice of claims.   There are no page number

limits.   Mr. Austin's 64-page Amended Complaint, 17 pages less than *Hearns* in the

abundance of caution meets Rule 8 pleading standards under Ninth Circuit's

*Hearns.* See e.g.  Hearns v. San Bernardino, 530 F.3d 1124, 1127 (9th Cir. 2008)

("81-page complaint alleging discrimination by an African American police officer …

meets Rule 8 standards). "Original," Federal Question, Jurisdiction exists per 28

U.S.C. 1331; See S-82

# ARGUMENT

It has also been observed that the "truth rarely catches up with a lie."
- **Gertz, 418 U.S. at 344 n.9, 94 S.Ct. 2997**

If you can wait and not be tired by waiting,
   Or being lied about, don't deal in lies,
Or being hated, don't give way to hating,
   And yet don't look too good, nor talk too wise
(*Proverbs warns of winks, their smiles hide the lies*
   *Let your yay be yay, then no need to surmise*
*Deceit seduces with sweet, but ends in its own demise*
   *For a loaf of broad, a whorish soul is fed*
*The wicked act as friends, but work as spies*
   *Siblings born for adversity, friends love at all times*

*How Devious to violate student's privacy, 13th, & 14th rights using lies*
   *Malicious harm when failing duties to investigate; pecuniary gain publicized*
*Violating Equal Protection, Due Process, Disparate Treatment, standardized*
   *When Georgetown's violations are clear; black letter law, no need to improvise*
*Dishonest scales, Detested, pride's avarice, lust of the eyes*
   *Bold as a lion, Just, Goliath cut down to size*
*To keep one's peace in the midst of deceit, is a secret of the wise*
   *Seek first to Understand, Myopic Egotism makes hard to compromise*
*Wisdom is Better Than Strength, although the wise & poor maybe despised*
   *Ecclesiates, Better than shouts of rulers of fools, are quiet words of the wise*
*Devil's Advocate "Vanity is my favorite sin" because its ability to hypnotize -*
   *www.forbes.com/sites/luisromero/2021/06/21/vanity-the-devils-favorite-sin-and-leaderships-worst-enemy/?sh=2*
   *4a1b05d114f*

   *Vain is a net in sight of any bird, traps hide from the eyes*
*I know why the caged bird sings, doubtless dreams materialize*
   *Body locked but can't trap my mind, in darkness see via mind's eyes*
*David in sheep dung, Joseph in the pit, leadership not yet fully realized*
   *Speak up for those who cannot, while seeing through a child's eyes*
*Jesus asked did you feed, clothe, visit, those in need?; He didn't hypothesize*
   *Separate the wheat; chaff, judge by Corinth or Galatia fruit, not criticize*
*Samson lusted for trust, Delilah pretended to empathize*

   *Joseph; Job, shined in adversity, disciplined mind, tongue, single eyes*
*Full of light, who they were in secret set them apart among the wise*
   *Honorable leadership listens for the oppressed or poor's cries*
*Deliberate indifference toward disparate treatment equals same shoe; same size*
   *Run down shoes, worn with scorn, malice cannot hide from Justice's eyes*
*A haughty look, gossip, lies are Vehemently despised*
   *Begin with end in mind, holes lead to ships capsized*
*Pride precedes a fall, Titanic didn't sink because iceberg unrecognized*
   *Humility before honor, integrity, Character is the prize*
*Be wise, A wolf is still a wolf even in a sheep's disguise*)
- **Kipling, IF (*with extra stanza by me, George Jarvis Austin*)**

**A.      Georgetown (in concert with YGR) impermissibly used race, or racial
stereotypes, to violate Mr. Austin's Equal Protection, as an admitted Black
male student, (after violating foundational school policies).  Georgetown**

EoR - 1820 of 2347

**impermissibly used race, or racial stereotypes to a. exclude (*from essential Georgetown controlled programs or activities*), b. create stigma, and c. stamp or mark with a badge of inferiority in as a recipient of federal funds *despite over 100+ opportunities for it to self correct after Georgetown's own admission(s) of guilt or liability.***

<u>Georgetown with YGR impermissibly used race to deprive Mr. Austin's rights.</u>

83.     Georgetown impermissibly used race to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from essential programs or activities because he is a Black male admitted student in violation of his Equal protection, violating the <u>face of the statute</u>, and Constitutional Jurisprudence (*after exploiting his image; violating his right to contract.*)  See <u>S-83</u>; para 8-81: Georgetown chose to exploit Mr. Austin's image, rights for business purpose, without consideration of his personhood, nor rights (*including contract*) under sec. 1981 because he is a Black man (*echoing the pattern of the enslavement period toward Black people*). See para.8-81;44; <u>S-83</u>

84.     Georgetown admits to violating Mr. Austin's rights to contract, privacy, and publicity, in a racially intentionally discriminatory manner, in violation of its mandatory written authorization agreement policy (with an 'evil eye and unequal hand" to his detriment) that marks Mr. Austin with a badge of inferiority. The badg--es of inferiority violate Mr. Austin's equal protection and reflects "badges and incid--ents of slavery," as Black persons' contract, and other rights were routinely racially abused, or ignored altogether during <u>enslavement</u> to connote presumed "inferiority" via disparate treatment)  See para. 8-81; <u>S-84</u>

<u>Georgetown, a recipient of Federal Funds, impermissibly used race, or derogatory racial stereotypes, to exclude Mr. Austin from essential programs and activities</u>

85.     After Georgetown admitted this first violation they 'should have' taken initiative, disclosed materially omitted information, and proactively investigated

EoR - 1821 of 2347

why they went out of their way to treat Mr. Austin in an inferior manner (to correct disparate treatment), but did not. See Facts para 8-81;57: See S-85

86.     Instead, Mr. Austin had to formally complain to an essential program or activity of Georgetown, IDEAA, about Georgetown's leadership's actions to violate their own policies (*at least 3 separate essential Georgetown violated policies by Georgetown*) in a discriminatory manner using "race…. as a negative" to deprive Mr. Austin.  See para. 8-81;  The Originalist prohibition on Anti-Black intentional discrimination in sec. 1981, and 13th Amend., is coextensive with Equal Protection and sheds light on Georgetown's precise use of anti-Black derogatory treatment based explicitly on race, or racial stereotypes to both a. illegally give similarly situated non-Black male admitted students unfair advantage in resolving comp--laints throughout their educational process and b. intentionally disadvantage Mr. Austin, a Black or African-American male admitted student, preemptively depriv--ing of opportunity (right to make,  enforce, etc., a contract); See S-86

87.     Georgetown's actions toward Mr. Austin thereafter show their true racially discriminatory intent, upholding notions of "White Supremacy," enforcing stigma, "Black [Male] Inferiority" as they refused to even acknowledge Mr Austin's 100+ complaints (*despite him following their written policy*), *after* already admitting the violations, let alone actually doing their mandated duties.  When Mr. Austin, (*who per their express policy, and Title VI , is entitled to the essential "program or activity" of Georgetown,*) followed their directions to participate for the purpose of correction of their admitted wrongs; he was excluded based on race, or racial stereotypes, in a facially discriminatory manner. See para. 8-81; See S-87

EoR - 1822 of 2347

88.     The Ninth Circuit recently ruled, when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when violation is by someone-something under University control, then it's a violation of Equal Protection to deny the student investigatory-enforcement, services as a victim, or survivor, of the violation. See para. 8-81; S-88

89.     In *Brown v. Arizona* the alleged violator was a fellow student in an area of University control; the liability-violation.. heightens when the University, or Administrators, itself is violator (as is the case here when Mitch Bailin *admits violations*). See para 8-81  In fact, Georgetown's policy explicitly says they themselves heighten the liability when there is a power imbalance or abuse of power between a student (experiencing the violations) and professor or adminis- -trator (violators). See para. 8-81**;** 58-59; See S-89

Georgetown's display of discriminatory animus is heightened by the violator's (University leadership's) relationship to the violated (student), and the subsequent 100+ discrete adverse (non)acts ..showing deliberate indifference (discrimination)

90.     Once the University has notice of the violation, and has notice of the complaint by the student, a failure to act is in itself deliberate indifference and disparate treatment (discrimination) of that complainant or student entitling, the student, to damages in private suit. See para. 8-81; See S-90

91.     Both action, and inaction when duty arises, can constitute discrete acts of adverse actions (non-actions) and thus disparate treatment and violations of policy, law and the Constitution.; See para. 8-81; See S-91

92.     Georgetown knew its own policies, the overarching law, and willfully violated privacy, publicity, 1981 contract rights.  And, was put on notice school wide, once Mitch Bailin admitted 1981, privacy, violations in writing (*but, still did not disclose*

EoR - 1823 of 2347

materially omitted, or misstated facts to Mr. Austin i.e. how many brochures, where exactly mailed to or utilized, exactly when was photo exploited, etc.), but made no apology for violating Georgetown Media Policy, Privacy Policies, and the surrounding law they are based on (including sec.1981).  Further, when Mr. Austin publicly, with over 300+ witnesses, made over 100+ complaints, and inquiries, in a span of 4+ years to the designated body under the Universities control (IDEAA) designed to investigate-correct discriminatory violations of school policy, George--town showed deliberate indifference animus & malice (*going out of its way to be facially discriminatory to Mr. Austin's 100+ complaints, zero acknowledged, followed up on, let alone escalated for investigation; remedy*); See S-92

93.     Mr. Austin's notice [report] provision more than meets *Brown v. Arizona* standards, as Mr. Austin followed University policy, and recommended guidelines on over 100+ instances, with over 300+ witnesses, for quickly approaching 5 years, to complain (providing 'notice') to IDEAA regarding violation of his rights and school policy *(as instructed by Georgetown policy; despite explicit admissions of violation of University policy in 2019 (after the fact), extreme departures of ordinary standards of care, violations of Mr. Austin's rights to contract in a facially discriminatory manner)*. See para. 8-81 ; See S-93

94.     Georgetown impermissibly used Mr. Austin's race (and perhaps gender, too) to his repeated detriment, as an admitted student, and Black man to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin.  Georgetown willfully violates its explicitly stated duties to "provide a mechanism for … a prompt, fair, and impartial investigation and resolution of grievances" or *ANY* first step to an investigation (let alone

EoR - 1824 of 2347

correction-resolution), at all per Georgetown's explicit standards. Georgetown's discriminatory conduct is highlighted in its *publicly stated policy* that every "faculty, staff, students, third parties and applicants for employment and admission" are entitled to receive a prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation," but *intentionally excluded* Mr. Austin, preemptively because he is a Black man admitted student. Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident & seek redress through IDEAA's Grievance Procedures, but excluded Mr. Austin who reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981, privacy, publicity rights* and have not received even one follow up email to begin process (*let alone resolution*). S-94

95.     Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of Georgetown policy, (*after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown controlled area program or activity; for business purposes*) is the essence of Equal Protection violations; See S-95

96.     Beyond Georgetown's exclusion, 'deliberate indifference' to that discrimination also highlights their animus (as they internally already knew they violated Mr. Austin's 1981 rights, *discriminatorily*, but continued to exclude from 'program(s) to correct Georgetown's previous violations*). See S-96

EoR - 1825 of 2347

97.    Calling a Black man a n*gg*r is perhaps the most obvious racial slur, or

derogatory stereotype (*imbedded in the definition of the word* www.merriam

-webster.com/dictionary/n*gg*r*)*, but is clearly not the only one, and the same

message can be communicated verbally, or with Conduct.  Treating someone as an

"n-word" without actually saying the word, especially via disparate treatment to

exclude and to "mark with a badge of inferiority," is just as illegal and damaging to

that person as Georgetown did here (presumed "unworthy of consideration"), unapo-

logetically, repeatedly, *ongoingly* violate their policies, & the law. See  S-97

98.    Georgetown's Equal Protection violations were evident in Georgetown's

repeated refusal to investigate, at all (*after they admitted 1981, privacy, publicly,

and media policy violations in writing,)* as Mr. Austin reported, inquired, & formally

complained (to the President's office, and other Georgetown leadership).  Mr. Austin

sought to find out what was going on in the first place, and have subsequent

investigation and correction to the victim or survivor of the discriminatory conduct

by the university (i.e. the one being wronged; George Jarvis Austin), but

Georgetown's continued displaying discriminatory intent…in refusing to investigate

[discriminatory, illegal, violative] acts against a victim."; See S-98

99.    Mr. Austin was completely excluded-blackballed creating "stigma' .. outlined

in *Brown v. Board of Education*; Georgetown refused..take the first *mandated*

step-action, for an admitted Black male student, that they would take *even* for a non

student 3rd party complainant per their own policy (displaying even more disparate

treatment; discriminatory animus), let alone similarly situated non-Black, or White,

similarly situated students. See para. 8-81; 63-66; See S-99

100.   It is well established that facially discriminatory rule application, as Georgetown is doing, *even on* facially neutral laws-policy offends the Constitution. Any statute-policy which classifies people 'may' be irrational (or facially discrimin--atory) as applied in particular cases.  Unequal application of law-policy, only to Mr. Austin's detriment, disrespecting his personhood, or rights because he is a Black man, student, & person equates to Equal Protection violations (i.e. when simultan--eous unfair benefits to similarly situated others while depriving him); S-100

101.   Georgetown's choices to create stigma with unequal treatment, attempt to mark Mr. Austin with a badge of inferiority by repeatedly, over and over again treating Mr. Austin in an inferior manner highlights Georgetown's commitment to violating Mr. Austin's right to Equal Protection.  See S-101

102.   Mr. Austin provided Georgetown over 100+ opportunities for self correction, with over 300+ witnesses; They refused to provide even a *veneer* of following the law & violate Mr. Austin's Equal Protection by exclusionary conduct (I.e. **IDEAA steps I-V**).  See para. 8-81; 28-29 ("Requirements for Filing Grievances" ideaa@george town.edu; "Procedures for Processing Grievances" IDEAA steps I-V beginning with intake - none which were complied with by Georgetown); S-102

   Georgetown's initial violations of law and policy, to deprive Mr. Austin's  rights, combined with subsequent discrete, repeated, overt, and extreme deprivation along with Georgetown's impermissible use of race, or derogatory racial stereotype, made clear Georgetown intended to mark [Mr. Austin] with a badge of inferiority.

103.   To avoid the stigma of disparate treatment (via separate and unequal treatment and application of policies) as *Brown v. Board* articulates Georgetown's application of law and school policy toward him should not presume 'inferiority' for Black male admitted students, as compared to similarly situated non-Black male, or White, admitted students (but it was, and continues to be). See S-103

EoR - 1827 of 2347

104.     Georgetown chose to make clear their *intent* to facially discriminate based on race, or derogatory racial stereotypes. See para. 8-81; 40-47. Georgetown didn't acknowledge Mr. Austin's complaints (as mandated), let alone take *any required* steps on his formal complaints (i.e. excluding him) as compared to similarly situated non-Black male, or White, admitted students. See para. 8-81:  S-104

105.     Georgetown's impermissible use of race, or derogatory racial stereotype(s) of Black males to convey assumptions of inferiority, preemptively excludes a Black male admitted student from essential Georgetown 'program(s)-activity' based on express classification identified through Georgetown's conduct toward Mr. Austin (*and violates Equal Protection as Georgetown engaged in official adverse decision making by derogatory racial stereotypes*). See para. 6-81; S-105

106.     The combination of initial violations in total disregard of Mr. Austin's rights as a Black male admitted student, admitting violations only *after* getting caught, refusal to apologize for violating 1981 rights-Georgetown's (written authorization agreement policy), with anti-Black male exclusionary policy-practices, demonstrate Georgetown's *repeated* choices to "mark with a badge of inferiority" because of Mr. Austin race, or derogatory racial stereotypes.  See para. 8-81  If Mr. Austin had any doubt before hand, Georgetown made clear after that they absolutely *intended* to discriminate because of Mr. Austin's race; See para 8-81; S-106;  Ms. Gonzalez Rogers previously has demonstrated extreme incompetence, ultimate repeated disrespect, & anti-Black male discriminatory animus, toward Mr. Austin.  Ms. Gonzalez Rogers demonstrates an ongoing propensity to interfere with Mr. Austin's legal exercise of his rights (*including rights to Equal Protection under the law, Privacy, 42 USC 1981, Due Process, and other Constitutional Rights*).  Ms. Gonzalez

EoR - 1828 of 2347

Rogers has gone out of her way to, making overt administrative acts, show a disrespect of the Federal Rules of Civil Procedure, or extreme incompetence of them, with discriminatory animus toward Mr. Austin (i.e. not understanding service of process by the ECF system, nor Amending Complaints). Mr. Austin adds YGR as a Defendant not for liability in the damages portion of the Demand, but simply as the Supreme Court, Ninth Circuit, and California Supreme Court explicitly provides for injunctive relief to prevent her *ongoing* negative, administrative, & discriminatory interference with Mr. Austin's exercise of his Constitutional Rights to Due Process, Equal Protection, & other fundamental rights, creating both conspiratorial criminal, & civil injunctive, liability for Ms. YGR. See e.g. 18 USC §241, 242. See Dckt 15-16

**B. Georgetown (with YGR) violates 42 USC 1981 by a. literally depriving Mr. Austin's rights to contract before and after exploitation of his image or likeness for business purposes in refusing to even offer a contract, *as mandated* (written authorization agreement) in the same way similarly situated non-Black male admitted students are offered, in violation of their own *publicly* stated filming policy, b. Subjecting Mr. Austin to separate, facially discriminatory, unequal student contract policy conduct for Black male admitted students to their detriment.**

Georgetown impermissibly used race to deprive Mr. Austin's 42 USC 1981 rights.

107.   Georgetown impermissibly used race to deprive Mr. Austin's section 1981 contract rights making clear Georgetown employs one set of essential policies for Black male admitted students, to their detriment, and another for non-Black male, or White, admitted students to their unfair advantage; See S-107 ;

108.   Georgetown's different 1981, privacy, publicity, media and complaint policies for Black men, and facially discriminatory policies based on impermissible use of race, or derogatory racial stereotypes, for Black male admitted students vs.similarly situated non-Black male admitted students highlights this very straightforward, and promising, section 1981 claim.See para. 8-81; 12-..15,56; S-108

EoR - 1829 of 2347

109.    Georgetown's violation of sec.1981 right "to make" contracts (*written auth-*
*-orization agreement; required*) is such a blatant violation that the more limited
1981 language would encapsulate this scenario as Georgetown's conduct deprived
Mr. Austin's contract rights even prior to 1991 Congressional expansive language
clarification expressed in *Patterson v. McLean Cred.Union;* See S-109

110.    Georgetown admits, *publicly,* that when an organization *refuses* to contract in
facially discriminatory manner, (i.e. obligated to contract)  they violate 1981 even
prior to Congress' more expansive language beyond just "make and enforce"
terminology. (i.e. *when exploiting a student's picture for business purposes as George-*
*-town did without Mr. Austin's written authorization*); See S-110

111.    Georgetown *publicly* admits, that written authorization requires Mr. Austin's
*prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business
use, d. presentation of written contractual agreement to consent to business use, e.
with General Counsel approval of form f. signature consenting *prior* to use.  George-
*-town admits* it had none of the above.  Georgetown's first acknowledgement of
business use was *after* Georgetown's exploitation without consent (*after* lying to Mr.
Austin).See S-111 No offer, acceptance, consideration, or signature (per required
written authorization), then no contract; thus Georgetown's violation;

112.    Georgetown went out of its way to violate every related Georgetown *publicly*
*listed* policy-law (i.e. mandatory written authorization agreement) while exploiting
Mr. Austin's image, for business purposes to *intentionally*-literally deprive Mr.
Austin's 1981 right to contract because he is a Black man and admitted student,
while providing unfair advantages with limited resources to similarly situated
non-Black male, or White, students.  See para. 8-81; 20-25; See S-112

EoR - 1830 of 2347

113.   Georgetown violates 1981, in one of the most "blatant deprivations of civil rights," by refusing to offer Mr. Austin a contract because he is a Black male stud-ent, on the same basis as non-Black male, or White, similarly situated offerrees ( admits-exploiting image for pecuniary gain; no consent); See S-113

114.   Because both the law, and Georgetown's own explicitly stated policy requires notice to Mr. Austin, disclosure to Mr. Austin of possible usage for mutual assent, offer or presentation of contract (written authorization), and contract signature, *prior to* Georgetown's business usage of Mr. Austin's likeness or photo they literally deprived his right to contract by not doing the required process, or steps.  See para. 8-81  Further, because those steps are the steps a non-Black, or White, similarly situated student would be offered, and Georgetown chose to employ a separate and unequal process, or policy, for Mr. Austin to his detriment, Georgetown discrimin--ated against him. See para. 8-81   Moreover, because they continue to employ this facially discriminatory policy to date, despite having numerous opportunities to correct Georgetown made clear their intent to discriminate, and  "but for" Mr. Austin's race he would have been offered a contract the same way non-Black, or White, similarly situated offerees would be offered.  See para. 8-81

Georgetown's 42 USC 1981 contract violations are not just similarly situated would-be offerees, but disparate treatment in the existing consummated student contract.

115.   Georgetown violates 42 USC 1981 by treating Mr. Austin in an inferior manner in violation of its consummate student contractual mandates, its own privacy, IDEAA, and other policies, as compared to similarly situated non-Black male students.  The Originalist prohibition on Anti-Black intentional discrimination in sec.1981, and 13th Amend.., is coextensive with Equal Protection and sheds light on Georgetown's precise use of anti-Black derogatory treatment based explicitly on

EoR - 1831 of 2347

race, or racial stereotypes to both a. illegally give similarly situated non-Black male admitted students unfair advantage in resolving their complaints throughout their educational process and b. intentionally disadvantage Mr. Austin, a Black or African-American male admitted student, preemptively depriving Mr. Austin of, opportunity, right to make and enforce, etc., a contract; See S-115

116.    Georgetown chose to exploit Mr. Austin's image and rights for commercial or business purpose without consideration of his personhood, nor rights (*including contract*) under sec. 1981 because he is a Black man (*echoing the pattern of the enslavement period toward Black people*).  See para. 8-81;44; See S-116

117.    Georgetown's written admitted choice, in 2019, to violate Mr. Austin's rights to contract, privacy, and publicity, in a racially intentionally discriminatory manner, in violation of its mandatory written authorization agreement policy (with an 'evil eye and unequal hand" to his detriment) already marked Mr. Austin with a badge of inferiority.; The badge of inferiority violating Mr. Austin's right to contract is part of the "badges and incidents of slavery" because Black persons' contract, and other rights were routinely racially abused, or ignored altogether during the enslavement period (to connote presumed "inferiority.") See para. 8-81;16-17 See S-117

118.    Georgetown's discriminatory animus is not just shown in failing to 'make' a contract when required to do so with written authorization agreement (before *and* after *already* exploiting Mr. Austin's image for commercial gain, or business purposes), but in the discriminatory or disparate treatment after consummating the student contract by depriving essential benefits of the agreement, and subjecting to different, facially discriminatory policy as compared to similarly situated non-Black, or White, students. See para. 8-81**;** 27-35,52-59; See S-118

43 ; Opening Complaint

119.   Georgetown's conduct toward Mr. Austin violates multiple sections of the broad definition of 42 USC 1981 with its disparate privacy, publicity, contract, IDEAA (anti-discrimination), policies.   See S-119

120.   Georgetown's deprivation of rights to contract toward Mr. Austin, as a student, is highlighted in Georgetown's refusal to follow its own policies *(in the full language of 'make and enforce contracts' including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.")*   Thus, the Court should consider whether Defendant failed to follow its own privacy, media, contract, publicity, IDEAA, etc. policies as evidence of discriminatory intent can be inferred from an organization's failure to follow its own policy.; See S-120

121.   One of the more obvious failures to follow their own policy, showing discriminatory animus or intent, is Georgetown's abject failure to abide by *any*  of their **mandatory** steps in IDEAA conflict resolution policy (I-V).   Georgetown admits, *publicly,* that a student, or  "Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")" can make a complaint via email or in person, and is encouraged to do so;  Further, Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did, a set of mandatory steps *must* be done by IDEAA to avoid violating its own policies or the law that informs and undergirds IDEAA; S-121

122.   Georgetown admits, *publicly,* that facially discriminatory conduct, by administrators, faculty or staff to the detriment of a student, particularly a Black male student in this case, is especially concerning and according to their policy is of the highest priority, yet they themselves discriminated by not even taking a first

EoR - 1833 of 2347

step to acknowledge, let alone investigate and correct an administrators written admission of serious, illegal, school policy, and legal violations, of an admitted Black male student  showing discriminatory animus towards him.; See para.  8-81; S-122

123.    Georgetown admits, per Mitch Bailin's, and Georgetown's President's Office, Vice President's Office, General Counsel's Office, and other leadership's *lack of response nor answers*, despite over 100+ formal written complaints in front of over 300+ separate witnesses (including other Georgetown leadership who could also chime in), that they *never* provided this fraudulently omitted material information. Further, Georgetown *admits by virtue of its conduct* malice, in front of 300+ witnesses, as its failure to correct, nor provide the materially omitted information, was *willfully done* to harm Mr. Austin with foreknowledge, *prior to its commercial use,* of how important that information is in regards to privacy, publicity, and contract rights (as well as policies requiring disclosure of these material facts to Mr. Austin,having violated his rights).  See para. 8-81;33-37; See S-123

124.    Georgetown *publicly* admits that it takes written authorization forms seriously for both medical and student privacy protected information, and that should define an admitted Georgetown student's reasonable expectation of privacy See para. 8-81  Georgetown *demonstrates, and admits in writing and via conduct,* that under no circumstances should medical information or a photo be released or commercially used (photo) without the student's written authorization agreement (contract); Georgetown advocates this position so strongly (*despite California's CMIA, or HIPAA requiring only patient request*) that they refused to release Mr. Austin's own medical records *to himself* without signed written authorization (*but

*ironically commercially used his photo without his a. knowledge, b. consent, nor c.*

*written authorization in violation of policy mandate).* See S-124

125.    The expansive language of sec.1981 covers a. Georgetown's failure to make a

contract per mandatory written authorization agreement-contract b. Georgetown's

disparate treatment within contractual relationships depriving Mr. Austin of the

"performance, benefits, privileges, terms, and conditions" of the admitted student

"contractual relationship" to his detriment. See S-125

126.    Mr. Austin is a Black or African-American man (protected category), whose

economic contract IP (intellectual property; likeness; publicity) rights were

non-consensually commercially exploited by Georgetown.  Georgetown preemptively

violated 1981 rights (created mandate for Georgetown to attempt contract; denied

contract rights).   Mr. Austin repeatedly complained to get facially discriminatory

("but for"; "because of") violations corrected-investigated per consummated student

contract's privacy, publicity, media, contract, and IDEAA mandatory policies, but

was denied over 100+ instances (repeated denials of contract rights; inferior

treatment); Constitutes a 1981 prima facie case, & more.  See S-126

127.    Georgetown's display of discriminatory animus toward Mr. Austin is

transparent enough to even pierce the veil of a public official's qualified immunity

under the Ninth Circuit's *Yoshikawa v. Seguirant;* Georgetown a. made the initial

technical and substantive violations (sec.1981) to Mr. Austin's detriment b. admits

the violations in writing c. continued the discriminatory pattern of conduct by not

taking required non-prompted corrective measures to make right with Mr. Austin

(after taking something they did not own nor were entitled to) d. refused

appropriate investigative, or corrective action after Mr. Austin made over 100+

EoR - 1835 of 2347

formal complaints and e. has no explanation, nor justification, (to date) for why they

behaved in that manner and felt entitled to take economic rights that did not belong

to them (outside of discriminatory animus). Georgetown' discriminatory conduct

trumps *Yoshikawa v. Seguirant as they* first made the errors, and then continued

discriminating whereas in *Yoshikawa* defendant's asserted reason was plaintiffs

technical violation which still didn't justify their discriminatory application of law

or policy *(Georgetown did the technical and substantive violations with the lower*

*threshold of liability for a private actor receiving federal funds, making an even*

*more obvious finding of discriminatory intent-animus).* See S-127

  Georgetown stole, converted, or took valuable property-economic rights that belong
to Mr. Austin that they are not entitled to without his express written authorization
  agreement (*which they did not obtain*), and thus violated his sec. 1981 rights.

128.   Georgetown knows, and publicly admits, the rights they stole, converted, or

took without authorization do not belong to them, nor are they entitled to those

rights.  See para. 8-81; 68-71; See  S-128

129.   Georgetown admits, the rights they stole.. took without authorization are

valuable-important, even for persons without an easily definable-referenced, pre-set

commercial value.  See para. 8-81;19,48-49; See S-129

130.   Georgetown admits, *publicly, (in its description of the required pre, and post,*

*photo or filming required steps for outside photographers*), that it holds itself to the

same standards for students, faculty and staff;  Georgetown also admits, *publicly,*

that not only must the written authorization, as a contractual agreement, be signed

by the student *prior* to use, but that the form itself 'must' include certain

information to be valid, and enforceable (and even includes an example

photographic/ videographic release form for students in their continuing education

EoR - 1836 of 2347

programs; Georgetown's neighbor George Washington University publicly provides a comparative example for its own students ).; See S-130

131.    Georgetown also knows its students are hand selected, go through an elite screening process, and very high potential, with at least two past US Presidents, 2nd highest feeder to US Legislature and world leaders in a variety of spheres; Of course, privacy is extremely important in the USA's physical locale with the highest concentration of espionage (D.C.) especially at a vulnerable, impressionable and developing point in a person's life. See Facts sec. para. 8-81 ; See S-131

Georgetown took what wasn't theirs, impermissibly used race, & disparately treated a Black male admitted student; they openly *intended* to mark him with a badge of inferiority 'stigma' echoing in *Brown v. Board. See para. 40,80* See S-131

132.    Georgetown's impermissibly use of race, & derogatory racial stereotypes, to mark Mr. Austin with a badge of inferiority through disparate treatment has a long, ugly, history in Education (i.e. *Brown v. Board)* See.para. 8-81; See S-132

133.    Georgetown's 1981 violations attempt to mark Mr. Austin with a "badge of inferiority"(*overt disparate treatment*; stigma). See para. 63-73; See S-133

134.    Georgetown, with YGR, went out of their way (repeatedly breaking normal policy, protocol and process) to demonstrate they *internally* 'possessed' no intention (despite outward proclamation, written policy, the law and Constitution) on treating him equally to similarly situated non-Black male students, but instead bent on promulgating  facially discriminatory, separate and unequal policies toward Mr. Austin in violation of *Brown v. Board*.; See S-134 ; See para.106 (YGR)

Georgetown's conduct mirrors that of an 'enslaver' to a Free Black man imposing the "badges and incidents of enslavement"  irregardless of his rights, needs, concerns, questions, complaints or objections to Mr. Austin's detriment.

135.    Because Georgetown knew, on the front end, that these rights did not belong to them, nor were they entitled, and according to their own *publicly admitted*

EoR - 1837 of 2347

explicit written text required written authorization from Mr. Austin, their conduct toward Mr. Austin is extremely telling of their own racist presumption(s), resembling an "enslaver" as they felt entitled to just take without informing, asking, nor receiving permission or authorization in any form whatsoever. ; See S-135

136.   As articulated above in paragraph 74:

> "Taking persons, or human beings, without consent is kidnapping, or enslavement.  See e.g. (written decades before the *13th, 14th or 15th* Amendments' Constitutional enshrinement, 16 years before *Dred Scott* [most racist opinion which helped directly spark the Civil War within 5 years of its ruling,] argued by 1 of 2 non-slave holding ex-Presidents of the United States, at the time, already recognizing the personhood, and fundamental rights of Black men and persons, including the right to self defense, even against White Corporate for-profit enslavers per *La Amistad*) The United States v. the Amistad, 40 U.S. 518 (1841); Stripping rights, and reducing a human being to anything less than a full human being, with all the rights and privileges is enslavement, and barbarity.  Sex without consent is rape.   Taking Property of another without consent is theft or conversion.  Under current law these are principles commonly understood, as is the legal, and moral, liability of a world renowned university, in the business of teaching law, knowing  that it is illegal to take, and make public, an up close photo without prior written authorization agreement, and consent, of an admitted student:(by its own written admissions"

See paragraphs 8-81; See S-136

137.   Georgetown admits, *publicly,* that it has a history of depriving Black persons rights, even in the most brutal expression of enslavement.  S  Georgetown *publicly admits* that it literally deprived Mr. Austin right to make a contract because authorization agreements are mandatory contracts of adhesion when Georgetown uses admitted students, or other persons, image for business purposes; their choice to purposefully violate their own mandate, and preemptively deprive the making of that contract violates 42 USC 1981 (*as 1981 protects would-be contract makers in the contract making process as well as those violated in the broad language of rights, enjoyment of benefit, or enforcement process*). See S-137

138.   Georgetown *publicly* admits that enslavement of Black people in this country, which Georgetown personally partook in, was in part exploitation of Black people *without even considering* Black people's rights or needs, (*and including rights of recognized personhood, citizenship, "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the*

EoR - 1838 of 2347

*security of persons and property as is enjoyed by White citizens*," etc.) and ironically

is a similar pattern to which Georgetown behaved in exploiting Mr. Austin's right to

contract (i.e. written authorization agreement in reference to his person, privacy,

publicity, etc.); this is why 1981 had to explicitly state Black men, and people, have

the "same right to contract as a White man" because racism, and discrimination

built in assumptions of inferiority & presumed it could take from Black people with-

-out 'consideration,' or 'mutual assent,' but instead by force;  See S-138

**C.     Georgetown induced contract formation with Mr. Austin as a student through actual fraud, misstatements on its commitment to follow the law, misstatements regarding its contract, misstatements regarding its own policies, and continues its deceitful pattern in its ongoing pattern of *still* omitting material information after admitting its violations of its own policy, contract, and the law.**

> "look. I'm being honest with you. Anything less  would be disrespectful…"
> -     **President John Quincy Adams** with **Cinque** (pre-trial dialogue before winning in the Supreme Court of the United States)

Georgetown made false promises of fact to induce student contract formation.

139.    As President John Quincy Adams articulated to Joseph Cinque, while

representing him before the Supreme Court of the United States, galvanizing the

abolitionist movement, "Anything less (than honesty) would be disrespectful."

However, in choosing the *disrespectful and deceitful* path, Georgetown made several

false promises to induce contract formation with Mr. Austin as an admitted student,

that their subsequent, and *ongoing,* conduct (*and admissions of fact*) demonstrate

they had no intention of ever following through on like Ninth Circuits *City*

*Solutions, Inc. v. Clear Channel*, upholding 2004 $9,800,000 million fraud

judgments (*approx. $16,000,000 million adjusted for 2023*)];  See S-139

140.    Specifically, Georgetown promised to be a law abiding university that seeks

justice, and an organization that 1. holds themselves accountable, 2. responds to

EoR - 1839 of 2347

student needs, 3. follows privacy, publicity, media, commercial usage, and contract (1981) best practices (and at minimum a written authorization agreement before commercial usage), 4. is committed to students' Equal protection and anti-discrimination, etc. to induce contract formation, but went out of their way to violate these provisions. See para. 1-81; 18; See S-140:

141.    Georgetown then went out of their way not to correct their conduct (while alerting me that they knew it was wrong in 2019, and did it *anyway)*, just to show they had no *intent* on ever fulfilling their promises. See para. 8-81  However, this is not their only fraud; Georgetown is *continuing in a pattern of deceit,* as they continue to omit material information *after* already violating Mr. Austin's 13th, 14th, Equal Protection, 42 USC 1981, and Title VI rights, and choose to "remain quiet when they have a duty to speak." See S-141

142.    Georgetown's ongoing pattern of deceit, false promises, misrepresentations, omissions, from the time Georgetown sought to enter into student contract,has continued until the present. Georgetown's pattern of deception by virtue of an offer they made to induce contract with a series of false promises (written), material omissions, and affirmative misstatements (*admitted publicly)* that to date continue to deprive or harm Mr. Austin. See  para.. 8-81;17-35;  See S-142

143.    All of Georgetown's highlighted above conduct (para. 17-35) violates their promises to induce student contract formation with Mr. Austin.  Mr. Austin is aware (and includes the required facts) for the precision of pleading required for fraud per FRCP 9b, and is also aware of the exceptions whereas Georgetown and Georgetown only would have access to those facts (Mr. Austin motions for missing materially omitted facts causing *ongoing* harm). Georgetown has purposely refused over 100+

EoR - 1840 of 2347

times to provide the required materially omitted information, and failed to correct

conduct showing material misstatements & false promises. See S-143

144.  *Gilbert v. Minnesota's* quoted Army recruiter handbook's statement applies to

Georgetown's conduct."All progress and success rests fundamentally on truth....

Hence never resort to indirection or misrepresentation or suppression … of the

facts."  Because of the significant amount of sacrifice, and delayed gratification

involved in the choice of which law school an admitted student chooses, when

weighing the options, truth is essential and fraud (especially by an Organization,

like Georgeown, held in the public trust) is disastrous. See S-144

     Georgetown induced Mr. Austin to leave his state of residence, job offer
accompanying winning Elite fellowship, other business opportunities, other top tier
law school offers with false promise of a law, policy, and promise abiding University.
145.   Mr. Austin reasonably or justifiably relied on Georgetown's false promises;

See para. 16; See; S-145

146.   If Georgetown had not made misrepresentations to Mr. Austin then he would

not have entered their student contract (shows reliance).See S-146

147.   Georgetown defrauded out of initial $400 consideration, and thousands more

thereafter, as well as missed opportunities; Mr. Austin had guaranteed job as part of

winning elite, uber-competitive, fellowship that I turned down based on giving my

word, other employment or business opportunities (outside of that context), as well

as time, frustration, and energy expended holding Georgetown accountable for their

illegal conduct when they should be the one teaching me in word & deed (modeling

good behavior for their students, and future leaders). See S-147

     Georgetown's fraud includes material omissions, misrepresentations, and false
promises violating 1981 and refused to disclose materially omitted information.

148.   Georgetown made material representations (material statements of fact) to induce consummating a contract between University and student (Mr. Austin). Georgetown promised to be a law abiding university that seeks justice, and an organization that 1. holds themselves accountable, 2. responds to student needs, 3. follows privacy, publicity, media, commercial usage, and contract (1981) best practices (and at minimum a written authorization agreement before commercial usage), 4. is committed to students Equal protection and anti-discrimination as well as others  to induce contract formation, but then went out of their way to violate these provisions with regard to Mr. Austin.  See para. 8-81  All of these statements, and promises, are material as they were designed to "influence" Mr. Austin's decision to enter into contract, and in fact did. See S-148

149.   Georgetown admits, it induced Mr. Austin with "material" false promises of its fundamental, and guiding, *principles* (policies, and law) *publicly espoused* while doing opposite toward Mr. Austin as a Black male admitted student (explicit *publicly stated* privacy policy; *IDEAA policy* to address and eradicate *violations of school policy especially by administrators or school leadership, themselves ; written authorization policy whereas Mr. Austin could and should feel safe without worry of unreasonable intrusion on his privacy, publicity or contract rights without foreknowledge or written consent authorization contract)*; See S-149

150.   Georgetown continues to omit material information, despite .. admitting their violations, and without regard or consideration to Mr. Austin's privacy, publicity, nor 1981 rights violations, as well as 100+ complaints, in the following approx- -imately 5 years, with over 300+ witnesses (in writing). Georgetown's overall conduct establishes a pattern-practice of deceitful conduct that harms Mr. Austin.

EoR - 1842 of 2347

University leadership's 1.compliance (or non-compliance) or 2.conduct following (or violating) the law-policies (especially when precisely written) is foundational and material to admitted students, as well as the government; See S-150

151.   Outright false statements, silence when duty calls to speak, omissions, false reasons, specific promises of future conduct, are material, repetition of the fraud or materially omitted information is not necessary for materiality, but can add to liability (as Georgetown continues its material omissions).See S-151

152.   Comparing to criminal liability's higher threshold helps to show how illegal, Georgetown's conduct actually is.See para. 8-81; 54-61; See  S-152

### Georgetown displays *sciener and intent to deceive* as it continues in an *ongoing pattern of 'material' deceit, misrepresentation and omissions.*

153.   Georgetown's conduct (para. 54-61) displays scienter-intent to deceive as they continue to evidence an ongoing pattern of 'material' deceit, omissions & misrepres--entation .See para.8-81  Georgetown's *ongoing* conduct shows scienter, pattern, direct evidence it never intended to follow through; See S-153

154.   Georgetown's representations were false; Georgetown is still showing, four years after already admitting falsehoods, (& violations) they had no intention of 1. them being true 2.correcting 3.apologizing for violations.  See S-154

155.   When made, Georgetown knew the statements were false (as they have shown no *intent* on correcting even after admission of violation) and engaged in reckless, willful, malicious conduct that knowingly violates previous promissory inducements, and even more have continue to omit material information (which should have been included in the letter from Georgetown admitting their violations); Similar to *Andrade's Locke v. Warner Bros.* analysis, Here Georgetown admits, and continually demonstrates, Georgetown's unwillingness to not only

EoR - 1843 of 2347