Case No. **24-6943**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————————————

GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: 53-0196603*)

———————————————————————

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

———————————————————————

**MR. AUSTIN'S (APPELLANT'S) EXCERPTS OF RECORD
VOLUME 8 of 9**

———————————————————————

Mr. George Jarvis Austin,
Plaintiff-Appellant (Self-represented)
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu

follow its policy, but absolute unwillingness to even give the 'facade' of its minimum
standard of care (*including its self defined legally required steps collaboratively with
Mr. Austin*) to resolve why they chose to break the law in the first place.  Also
similar to *Andrade's Locke v. Warner Bros.* analysis, Georgetown's direct evidentiary
conduct with over 300+ witnesses shows they "never intended to give …a good faith
evaluation," or even an acknowledgement of receipt, before intake, a pre-1st step, to
Mr. Austin's 100+ formal complaints. See  S-155

156.    Georgetown intended Mr. Austin to rely on Georgetown's representations of
fact ("knowingly made false promises") as they continually advertise with the same
principles, policies, and laws they have deceived Mr. Austin with (and continue to
knowingly and willfully omit material information).See S-156

  Georgetown defrauded Mr. Austin of opportunity, time, money (and other harms).
157.    Mr. Austin did in fact rely on Georgetown's promissory inducements, and
material representations of fact (misrepresentations) as he consummated contract
with the University based on those promises; In fact, had he known Georgetown
would violate those sacred, enshrined Constitutional, statutory, policy and moral
laws and rules he would not have accepted the contractual offer.  Mr. Austin has
suffered a variety of damages directly from relying on the representations; Further,
Mr. Austin continues to suffer from the *ongoing* material omissions which despite
repeated complaints, inquiry and other efforts to get Georgetown to take ownership
of their unforced lies, errors, legal violations.  Mr. Austin would not have
consummated the contract with Georgetown, but for their false promises to induce
contract, and materially omitted information, which caused direct *ongoing* harm to
Mr. Austin.   See para. 8-81; 80-81; See S-157

EoR - 1844 of 2347

**D. Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct to Mr. Austin's detriment in the extreme.**

<u>Georgetown admits breach of its *minimum* duties of care *(in the extreme).*</u>

158. Georgetown's *willful, malicious* conduct falls so far below the standard of care owed (perhaps *recklessly)* to an admitted student that Georgetown's ongoing conduct constitutes negligence on its face (*especially toward admitted Black male students under these facts-context*) in regard to the specifically plead privacy, publicity, media, contract (42 USC 1981), and IDEAA (anti- discrimination) violations.;See para. 8-81 ; See (in-depth) paragraphs 10-17; <u>See S-158</u>

159. Georgetown's actions, or inactions, both constitute negligence (*especially when Georgetown's deliberately indifferent inactions to their mandatory policies and required action; due care*). See para. 20-22, 27-31; <u>See S-159</u>

160. Georgetown's *ongoing* extreme departure from "ordinary standard of care" it *publicly* promulgates-*admits*, while repeatedly ignoring a.the well known risks to an admitted Black male student, b.repeated formal complaints, c.repeated inquiry- requests d.state, federal, administrative, policy and custom specific commands constitutes negligence (gross) towards Mr. Austin as they repeatedly demonstrated "a want of even scant care" (and deliberate indifference);<u>See S-160</u>

<u>The *minimum* Standard of Care is unanimously articulated and owed to students from Universities per Statute, Common law, California Constitution, Georgetown's own *publicly admitted* policies, instructions, and custom.</u>

161. At minimum, Georgetown was required to obtain Mr. Austin's written authorization *prior* to exploitation of his image for business use (which they did not). See para. 8-81. This standard, for this type of photo, is unanimously

EoR - 1845 of 2347

articulated inside and outside of a School or University context. See S-161

162.    One policy, manual, procedure by itself may or may not be dispositive in determining the appropriate standard of care for Georgetown in regard to its admitted Black male students;  But, the combination of statutes (in Federal and State jurisdictions), judicial common law, legislatively delegated administrative agency rules, regulations, and guidance, school policy based on statute, law and administrative agency, provide a vivid, and precise, standard that Georgetown themselves *publicly admit (as a minimum standard of Defendant Georgetown conduct),* especially when unanimously reinforcing another. See S-162

163.    Georgetown's policies, as they reflect custom, statute, and common law requirements (i.e. written authorization agreement mandate), may be used to inform their *publicly* admitted standard of care. See S-163

164.    Organizations in highly regulated areas (.precisely defined standards.) who do not follow those precisely defined standards of care, (due care). are negligent *(i.e. medical procedures, privacy or education;Georgetown* );See S-164

165.    Federal statute, including FERPA, as part of the regulatory-statutory framework may be used to inform standard of care.  Other related statutes, including Ca Civ. Code 3344, Federal, California, or DC law, common law as part of the relevant legal, common law, regulatory or statutory framework may also be used to inform their standard of care. See para. 8-81; See S-165

Georgetown's conduct would have breached the *general reasonable person standard,* but is made worse as Universities have a special relationship of trust with students.
166.    Georgetown owes duties to protect students from foreseeable harm that their policy, law, expressly outlaw.  Georgetown has duty to not itself be the party who

harms its own students in violation of publicly stated policies (duty to refrain from act causing harm with which party has special relationship) See S-166

167.   Georgetown owes a duty to correct their violations of due care once already taking, and admitting, actions that caused Mr. Austin harm (i.e. duty to act to stop-prevent further harm after initial Georgetown harms);See S-167

168.   Georgetown's failure to correct, or investigate, their own admitted violations of mandatory school policies-law, doesn't just fall on Mitch Bailin (letter admitting violations), nor only the IDEAA personnel who received all 100+ complaints, but everyone from the President's Office down. They could have, and according to Georgetown policy, should have stepped in to formally complain-ed about "deliberate indifference" displayed.  This pattern of conduct illustrates negligent training, or control-supervision as multiple GU leadership, tasked with this responsibility, failed essential duties, and continue to do so with the express purpose of depriving essential rights to Mr. Austin as an admitted student.; See S-168

169.   Georgetown operated extremely below its duty of care for a reasonable law abiding University towards an admitted student by flaunting its violations of well-known, and self promulgated policies, laws, statutes and Constitutional requirements (the height of hypocrisy).  Georgetown was negligent in its written authorization policy, privacy policy, IDEAA policy, and obligation to not fraudulently deceive or omit 'material' information to its admitted students.  Georgetown is negligent in its obligation to the US Constitution under 13th, and 14th Amend., Equal Protection, Civil Rights Act of 1964 (Title IV), as well as 42 USC 1981. Georgetown's negligence shows in failing its duty to not discriminate against Black male admitted students to their detriment, and providing unfair advantages, or

EoR - 1847 of 2347

protections, to non-Black male admitted students while depriving his Constitutional

enshrined protections to eradicate all "badges and incidents" of enslavement for

Black men after the Civil War, and passage of Civil Rights Amendments and Acts.

See Facts;paragraphs 8-81; See S-169

**Adherence to, or following, industry custom, _alone_, does not immunize Georgetown from liability as a defendant; However, Georgetown didn't even attempt that baseline which willfully violates the _minimum_ Standard of Care.**

170.   Georgetown's conduct is negligent on its face, as it doesn't conform to

industry custom, nor their own specifically outlined _publicly admitted_ standards of

care.  It is well established that industry custom _usually provides_ a baseline of

reasonable standard of care (i.e. written authorization agreement), but still doesn't

immunize, nor ensure that following that _minimum standard_ actually is due care or

_minimum standard of care_ for that organization; See S-170

171.   The standard of care required in a particular circumstance may be based on a

statute or the custom and practice (as defined by policy statement) in the relevant

community.  While Georgetown's custom in the community does not necessarily

establish how a reasonable person must act, it is evidence to be considered in

determining the proper standard of care for Georgetown (partially based on their

own policy statements as "they can be more reliable reflections of that standard

than, for example, the declarations of expert witnesses").See S-171

**'But for' Georgetown's negligent conduct Mr. Austin would not have been injured; The policies were designed to protect against the admitted injuries Georgetown inflicted (violation of privacy, publicity, contract, and anti-discrimination).**

172.   Georgetown's failure to follow policy (_along with law, statute, custom and_

_constitution_), or failure to properly or take reasonable steps to train its employees in

policy(ies), when that policy is designed to prevent the foreseeable harm suffered, is

the proximate harm of the injury.; See S-172

173.    Mr. Austin was injured; The proximate cause of injuries (*as admitted in Georgetown's policies*) are the violations of the policies, and laws they are based on (*i.e. violated privacy, publicity, media, contract, anti-discrimination and the damages of realizing Mr. Austin was being taught law by an institution who went out of its way to disrespect-violate his rights most fundamental ways*).  Mr. Austin reasonably or justifiably relied on Georgetown's false promises, but they grossly negligently (willfully) defrauded him compounding harm. See S-173

174.    Georgetown defrauded out of initial $400 consideration, and thousands more thereafter, as well as missed opportunities of choosing them when already had guaranteed job as part of winning elite fellowship that I turned down based on giving my word, other employment or business opportunities (outside of that context), as well as time, frustration, and energy expended holding Georgetown accountable for their illegal conduct when they should be the one teaching me both in word, and deed (modeling good behavior for their students, and future leaders).

Georgetown's conduct by University leadership, *post admitted breach*, shows
wilful-ness, recklessness, and malice (along with disparate treatment).

175.    Georgetown's conduct, post written admittance of breach of duty in 2019 (*to obtain written authorization agreement prior to exploitation of Mr. Austin's photo*), demonstrates willfulness, recklessness, and malicious intent as it completely disregarded the rights-needs of an admitted Black male student over 100+ times *after they admit exploited him*.  See para. 8-81; See S-175

Mr. Austin is harmed; the way statutes, school policy, public policy, common law
design, and articulate the harm(s), & is the class of person intended for protection.

176.    Mr. Austin is the class of person intended for privacy, publicity, media, anti-discrimination, and other essential statutes, law and policies that shape the standard of care.  Mr. Austin also suffered the type of harm these standards of care,

defined through statute, law, and policy specified as the type of harm they tried to

protect. See para. 8-81; See S-176

**E.    Georgetown exhibits extreme bad faith to Mr. Austin's detriment
with unconstitutional, malicious, intentional, willfully harmful conduct it
could have easily avoided, and by its own policies were mandated to do the
exact opposite of what Georgetown in fact did; Moreover, Georgetown's
repeated refusal to correct, and attempt to make right the harm already
done, with full knowledge it *already* caused harm exemplifies *malicious*
intent, discriminatory animus, and the essence of bad faith.**

Georgetown exhibits bad faith conduct external to the student contract.

177.    Georgetown's repeated, intentional and egregious conduct to expressly violate

their own policies, the law, and overarching purpose of the contract to frustrate the

benefits or fruits of the contract constitutes bad faith (*i.e. the purpose of the agree-*

*-ment is to learn the law in a safe environment; for an admitted student to grow*

*protected from privacy, publicity, Equal Protection, 1981, violations; especially by*

*Georgetown as violator*).  Georgetown's conduct cuts to the very heart of the agree-

-ment, frustrating-depriving essential contract fruits, benefits, and rights that adm-

-itted White, or non-Black male students take for granted; See S-177

178.    Georgetown's conduct was not only objectively unreasonable, violating

standards of good faith and displaying bad faith, but also the subjective standards

of dishonesty, lack of integrity, and refusal to present even the facade of following

their own mandatory policies based on current law.  Here, Georgetown themselves,

with specificity, outlined their various duties toward Mr. Austin, as *publicly*

detailed, which they themselves also acknowledge violation; See S-178

179.    Georgetown's conduct triggers bad faith claims and liability because they

continue to act in an unethical or deceptive manner in violation of specific

provisions, and the spirit of the agreement itself.  Georgetown's unreasonable

EoR - 1850 of 2347

actions are inclusive of, but not limited to, dishonesty as their conduct is intentional and crosses the bad faith spectrum to frustrate, destroy, or injure Mr. Austin from enjoying the benefits-fruits of contract constitute bad faith; See S-179

180.    Georgetown's failed duties operating extremely below their requisite standard of care, deceit (fraud), intentional discriminatory conduct, and other extraneous malicious conduct to frustrate contract is Bad Faith (to an admitted Black student ).  Mr. Austin took requisite action to consummate and solidify contract (including initial $400 consideration), and performance (including making required complaints and other policy steps as Georgetown contract instructs), yet Georgetown still unfairly interfered with Mr. Austin's rights to receive benefits of contract and harmed Mr. Austin in the process; See S-180.

181.    Georgetown repeatedly exhibits deceit, discriminatory and unfair conduct to take advantage of an admitted Black male student maliciously, which breaches the duty of good faith required in student contracts; See S-181

<u>Georgetown's discriminatory conduct constitutes bad faith.</u>

182.    To begin, Georgetown's choice to take and exploit fundamental commercial rights that they were not entitled to not only violated 1981 (contract) but constitutes bad faith.  See para. 8-81.  The fact that Mr. Austin is smiling in the picture (*unaware he is currently being exploited as eyes and smile are away from the camera*), and the fact that Georgetown's presentation itself may be seen as "polite" does nothing to excuse the overtly racist manner his rights to contract were violated, and him discriminated against.  Bad Faith is shown by Georgetown's discriminatory animus toward Mr. Austin, violating both Equal Protection, and 1981.  See Sections A; B (Equal Protection; 1981) para. 83-138; See S-182

183.    Georgetown's discriminatory conduct, providing a presumption of bad faith, is not a normal part of the student contract, is extraneous to contract, and is absolutely unreasonable conduct constituting bad faith.   Mr. Austin, an admitted Black male student, following Georgetown's publicly outlined policies, *even after Georgetown's written admission to him that they violated their own written authorization agreement policy, and the law*, was outright facially, and repeatedly, discriminated against in violation of Equal Protection, 1981, 13th, 14th Amend and Civil rights Acts (Title VI, on which Title IV was based); See S-183

184.    Although, anti-Black discriminatory animus is far too common, it is illegal, and not an expected part of the bargain or contract (especially not a student contract), and thus extraneous.;In fact, discrimination is so much not an expected nor normal condition of a student contract that is expressly prohibited, and expressly commandated or encouraged to report with precisely defined steps; expected prompt action (*partially based on the premise that it is abhorrent, abnormal-immoral conduct*). Georgetown deceit, misrepresentations, omissions constitute bad faith;  See S-184

185.    Georgetown's initial and *ongoing* fraudulent conduct constitutes bad faith. See Sections C (Deceit; Fraud) paragraphs 139-157; See S-185

186. When Georgetown, or other organizations, enter into contracts, they have an implied duty to act honestly, in good faith, and fairly. When they do not, they can be sued for a breach of this duty whether conduct is objectively or subjectively unreasonable regardless of motive.;  Bad Faith is shown by Georgetown's initial fraudulent inducement, and ongoing fraudulent omissions of material information

EoR - 1852 of 2347

despite Mr. Austin making Georgetown aware and attempted over 100+ times, through formal complaints and direct inquiry to obtain the materially omitted information.  See Sections C (Deceit; Fraud) para.139-157; See S-186

   <u>Georgetown's grossly negligent conduct, to take unfair advantage, is bad faith.</u>
187.   Georgetown's willful breach of statute, law, policy (defining due care) displays Georgetown's willingness to "take grossly unfair advantage of other[s]" in this case a Black male admitted student, by operating extremely below a University *minimum* standards of care.  See Sections D (Negligence; Gross Negligence; Malice-Willfulness) para. 158-176 ;Willful misconduct is a form of subjective bad faith. It is action or failure to act despite a duty to do so, in full appreciation of the consequences (intending them or indifference);  See S-187

188.   Georgetown's repeated willful utter disregard of Mr. Austin's rights, and well-being when they had over 100+ opportunities in over 4 years *after* admitting 42 USC 1981, policy and other violations *in writing* is malicious, tantamount bad faith. Georgetown's Bad Faith is shown through Georgetown's *demonstrated malice*, highlighted not only in repeated willful policy violations, non-correction and non-explanation for previous violations, but ongoing intentional and deliberate indifference to ongoing violations of Mr. Austin Constitutional, and other rights with over 100+ opportunities and quickly approaching 5 years to self correct; See para. 8-81; 80-81; See S-188

**RELIEF.**     Mr. Austin *never* gave Georgetown consent to exploit his image-likeness violating §1981, 13th, 14th Amend. and Equal Protection (Title VI) producing $15 Million Minimum Demand, as well as Injunctive *[i.e.YGR]*  (and other relief including production of *ongoing* materially omitted to Mr. Austin).

**Thus, Mr. Austin sued with demand for Jury Trial.  s/ George Jarvis Austin**

EoR - 1853 of 2347

OCTOBER TERM, 2022                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 22–148.   Argued March 22, 2023—Decided June 8, 2023

The Lanham Act, the core federal trademark statute, defines a trademark by its primary function: identifying a product's source and distinguishing that source from others.  In serving that function, trademarks help consumers select the products they want to purchase (or avoid) and help producers reap the financial rewards associated with a product's good reputation.  To help protect trademarks, the Lanham Act creates federal causes of action for trademark infringement and trademark dilution.  In a typical infringement case, the question is whether the defendant's use of a mark is "likely to cause confusion, or to cause mistake, or to deceive."   15 U. S. C. §§1114(1)(A), 1125(a)(1)(A).  In a typical dilution case, the question is whether the defendant "harm[ed] the reputation" of a famous trademark. §§1125(c)(2)(A), (C).

Respondent VIP Products makes a squeaky, chewable dog toy designed to look like a bottle of Jack Daniel's whiskey.  But not entirely. On the toy, for example, the words "Jack Daniel's" become "Bad Spaniels."  And "Old No. 7 Brand Tennessee Sour Mash Whiskey" turns into "The Old No. 2 On Your Tennessee Carpet."  These jokes did not impress petitioner Jack Daniel's Properties, which owns trademarks in the distinctive Jack Daniel's bottle and in many of the words and graphics on its label.

Soon after the Bad Spaniels toy hit the market, Jack Daniel's demanded that VIP stop selling it.  VIP filed suit, seeking a declaratory judgment that Bad Spaniels neither infringed nor diluted Jack Daniel's trademarks.  Jack Daniel's counterclaimed for infringement and dilution.  At summary judgment, VIP argued that Jack Daniel's infringement claim failed under the so-called *Rogers* test—a threshold

Syllabus

test developed by the Second Circuit and designed to protect First Amendment interests in the trademark context. See *Rogers* v. *Grimaldi*, 875 F. 2d 994. When "expressive works" are involved, VIP contended, that test requires dismissal of an infringement claim at the outset unless the complainant can show either (1) that the challenged use of a mark "has no artistic relevance to the underlying work" or (2) that it "explicitly misleads as to the source or the content of the work." *Id.,* at 999. Because Jack Daniel's could not make that showing, VIP claimed, the Lanham Act's statutory "likelihood of confusion" standard became irrelevant. And as for the dilution claim, VIP urged that Jack Daniel's could not succeed because Bad Spaniels was a parody of Jack Daniel's and therefore made "fair use" of its famous marks. §1125(c)(3)(A)(ii).

The District Court rejected both of VIP's contentions for a common reason: because VIP had used the cribbed Jack Daniel's features as trademarks—*i.e.,* to identify the source of its own products. As the District Court saw it, when another's trademark is used for "source identification," *Rogers* does not apply, and instead the infringement suit turns on likelihood of confusion. The court likewise rejected VIP's invocation of the fair-use exclusion, holding that parodies fall within that exclusion only when they do not use a famous mark to identify the source of the alleged diluter's product. The case proceeded to a bench trial, where the District Court found that consumers were likely to be confused about the source of the Bad Spaniels toy and that the toy's negative associations with dog excrement (*e.g.,* "The Old No. 2") would harm Jack Daniel's reputation. The Ninth Circuit reversed. Finding the infringement claim subject to the threshold *Rogers* test, the Court of Appeals remanded the case to the District Court to decide whether Jack Daniel's could satisfy either prong of that test. And the Court of Appeals awarded judgment on the dilution claim to VIP, holding that because Bad Spaniels parodies Jack Daniel's, it falls under the "noncommercial use" exclusion. §1125(c)(3)(C). On remand, the District Court found that Jack Daniel's could not satisfy either prong of *Rogers,* and so granted summary judgment to VIP on infringement. The Court of Appeals summarily affirmed.

*Held*:

1. When an alleged infringer uses a trademark as a designation of source for the infringer's own goods, the *Rogers* test does not apply. Pp. 10–19.

(a) The Second Circuit created the *Rogers* test for titles of "artistic works" based on its view that such titles have an "expressive element" implicating "First Amendment values" and carry only a "slight risk" of confusing consumers about the "source or content" of the underlying work. 875 F. 2d, at 998–1000. Over the decades, lower courts adopting

Syllabus

*Rogers* have confined it to similar cases, in which a trademark is used not to designate a work's source, but solely to perform some other expressive function. See, *e.g., Mattel, Inc.* v. *MCA Records, Inc.*, 296 F. 3d 894, 901 (use of the Barbie name in band's song "Barbie Girl" was "not [as] a source identifier"). The same courts, though, routinely conduct likelihood-of-confusion analysis in cases where trademarks are used as trademarks—*i.e.*, to designate source. See, *e.g., Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 414–415 (parodic pet perfumes did not trigger *Rogers* because defendant's use of Tommy Hilfiger's mark was "at least in part" for "source identification"). Thus, whatever *Rogers*' merit—an issue on which this Court takes no position—it has always been a cabined doctrine: It has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks.

That conclusion fits trademark law, and reflects its primary mission. Consumer confusion about source—trademark law's cardinal sin—is most likely to arise when someone uses another's trademark as a trademark. In such cases, *Rogers* has no proper application. Nor does that result change because the use of a mark has other expressive content. Under the Ninth Circuit's approach, Bad Spaniels was automatically entitled to *Rogers*' protection because it "communicate[d] a humorous message." 953 F. 3d 1170, 1175. On that view, few trademark cases would ever get to the likelihood-of-confusion analysis. And the Ninth Circuit was mistaken to believe that the First Amendment demanded such a result. When a mark is used as a source identifier, the First Amendment does not demand a threshold inquiry. Pp. 10–17.

(b) In this case, VIP conceded that it used the Bad Spaniels trademark and trade dress as source identifiers. And VIP has said and done more in the same direction with respect to Bad Spaniels and other similar products. The only question remaining is whether the Bad Spaniels trademarks are likely to cause confusion. Although VIP's effort to parody Jack Daniel's does not justify use of the *Rogers* test, it may make a difference in the standard trademark analysis. This Court remands that issue to the courts below. Pp. 17–19.

2. The Lanham Act's exclusion from dilution liability for "[a]ny noncommercial use of a mark," §1125(c)(3)(C), does not shield parody, criticism, or commentary when an alleged diluter uses a mark as a designation of source for its own goods. The Ninth Circuit's holding to the contrary puts the noncommercial exclusion in conflict with the statute's fair-use exclusion. The latter exclusion specifically covers uses "parodying, criticizing, or commenting upon" a famous mark owner, §1125(c)(3)(A)(ii), but does not apply when the use is "as a designation of source for the person's own goods or services," §1125(c)(3)(A). Given

4    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Syllabus

that carve-out, parody is exempt from liability only if *not* used to designate source.  The Ninth Circuit's expansive view of the noncommercial use exclusion—that parody is always exempt, regardless whether it designates source—effectively nullifies Congress's express limit on the fair-use exclusion for parody.  Pp. 19–20.

953 F. 3d 1170, vacated and remanded.

KAGAN, J., delivered the opinion for a unanimous Court.  SOTOMAYOR, J., filed a concurring opinion, in which ALITO, J., joined.  GORSUCH, J., filed a concurring opinion, in which THOMAS and BARRETT, JJ., joined.

Cite as: 599 U. S. ____ (2023)            1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–148
_____

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE KAGAN delivered the opinion of the Court.

This case is about dog toys and whiskey, two items seldom appearing in the same sentence. Respondent VIP Products makes a squeaky, chewable dog toy designed to look like a bottle of Jack Daniel's whiskey. Though not entirely. On the toy, for example, the words "Jack Daniel's" become "Bad Spaniels." And the descriptive phrase "Old No. 7 Brand Tennessee Sour Mash Whiskey" turns into "The Old No. 2 On Your Tennessee Carpet." The jokes did not impress petitioner Jack Daniel's Properties. It owns trademarks in the distinctive Jack Daniel's bottle and in many of the words and graphics on the label. And it believed Bad Spaniels had both infringed and diluted those trademarks. Bad Spaniels had infringed the marks, the argument ran, by leading consumers to think that Jack Daniel's had created, or was otherwise responsible for, the dog toy. And Bad Spaniels had diluted the marks, the argument went on, by associating the famed whiskey with, well, dog excrement.

The Court of Appeals, in the decision we review, saw things differently. Though the federal trademark statute

Opinion of the Court

makes infringement turn on the likelihood of consumer confusion, the Court of Appeals never got to that issue. On the court's view, the First Amendment compels a stringent threshold test when an infringement suit challenges a so-called expressive work—here (so said the court), the Bad Spaniels toy. And that test knocked out Jack Daniel's claim, whatever the likelihood of confusion. Likewise, Jack's dilution claim failed—though on that issue the problem was statutory. The trademark law provides that the "noncommercial" use of a mark cannot count as dilution. 15 U. S. C. §1125(c)(3)(C). The Bad Spaniels marks, the court held, fell within that exemption because the toy communicated a message—a kind of parody—about Jack Daniel's.

Today, we reject both conclusions. The infringement issue is the more substantial. In addressing it, we do not decide whether the threshold inquiry applied in the Court of Appeals is ever warranted. We hold only that it is not appropriate when the accused infringer has used a trademark to designate the source of its own goods—in other words, has used a trademark as a trademark. That kind of use falls within the heartland of trademark law, and does not receive special First Amendment protection. The dilution issue is more simply addressed. The use of a mark does not count as noncommercial just because it parodies, or otherwise comments on, another's products.

I

A

Start at square 1, with what a trademark is and does. The Lanham Act, the core federal trademark statute, defines a trademark as follows: "[A]ny word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." §1127. The first part of that definition, identifying the kind of things covered, is broad: It encompasses

Opinion of the Court

words (think "Google"), graphic designs (Nike's swoosh), and so-called trade dress, the overall appearance of a product and its packaging (a Hershey's Kiss, in its silver wrapper). See *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U. S. 205, 209–210 (2000). The second part of the definition describes every trademark's "primary" function: "to identify the origin or ownership of the article to which it is affixed." *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 412 (1916). Trademarks can of course do other things: catch a consumer's eye, appeal to his fancies, and convey every manner of message. But whatever else it may do, a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand). See generally 1 J. McCarthy, Trademarks and Unfair Competition §3:1 (5th ed. 2023). In other words, a mark tells the public who is responsible for a product.

In serving that function, trademarks benefit consumers and producers alike. A source-identifying mark enables customers to select "the goods and services that they wish to purchase, as well as those they want to avoid." *Matal* v. *Tam*, 582 U. S. 218, 224 (2017). The mark "quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co.* v. *Jacobson Products Co.*, 514 U. S. 159, 164 (1995). And because that is so, the producer of a quality product may derive significant value from its marks. They ensure that the producer itself—and not some "imitating competitor"—will reap the financial rewards associated with the product's good reputation. *Ibid.*

To help protect marks, the Lanham Act sets up a voluntary registration system. Any mark owner may apply to the Patent and Trademark Office to get its mark placed on a federal register. Consistent with trademark law's basic purpose, the lead criterion for registration is that the mark

Opinion of the Court

"in fact serve as a 'trademark' to identify and distinguish goods." 3 McCarthy §19:10 (listing the principal register's eligibility standards). If it does, and the statute's other criteria also are met, the registering trademark owner receives certain benefits, useful in infringement litigation. See, *e.g.*, *Iancu* v. *Brunetti*, 588 U. S. ___, ___ (2019) (slip op., at 2) (noting that "registration constitutes 'prima facie evidence' of the mark's validity"). But the owner of even an unregistered trademark can "use [the mark] in commerce and enforce it against infringers." *Ibid.*

The Lanham Act also creates a federal cause of action for trademark infringement. In the typical case, the owner of a mark sues someone using a mark that closely resembles its own. The court must decide whether the defendant's use is "likely to cause confusion, or to cause mistake, or to deceive." §§1114(1)(A), 1125(a)(1)(A). The "keystone" in that statutory standard is "likelihood of confusion." See 4 McCarthy §23:1. And the single type of confusion most commonly in trademark law's sights is confusion "about the source of a product or service." *Moseley* v. *V Secret Catalogue, Inc.*, 537 U. S. 418, 428 (2003); see 4 McCarthy §23:5. Confusion as to source is the bête noire of trademark law—the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will.

Finally, the Lanham Act creates a cause of action for the dilution of famous marks, which can succeed without likelihood of confusion. See §1125(c); *Moseley*, 537 U. S., at 431. A famous mark is one "widely recognized" by the public as "designati[ng the] source" of the mark owner's goods. §1125(c)(2)(A). Dilution of such a mark can occur "by tarnishment" (as well as by "blurring," not relevant here). §1125(c)(1). As the statute describes the idea, an "association arising from the similarity between" two marks—one of them famous—may "harm[] the reputation of the famous mark," and thus make the other mark's owner liable.

§1125(c)(2)(C). But there are "[e]xclusions"—categories of activity not "actionable as dilution." §1125(c)(3). One exclusion protects any "noncommercial use of a mark." §1125(c)(3)(C). Another protects a "fair use" of a mark "in connection with . . . parodying, criticizing, or commenting upon the famous mark owner or [its] goods." §1125(c)(3)(A)(ii). The fair-use exclusion, though, comes with a caveat. A defendant cannot get its benefit—even if engaging in parody, criticism, or commentary—when using the similar-looking mark "as a designation of source for the [defendant's] own goods." §1125(c)(3)(A). In other words, the exclusion does not apply if the defendant uses the similar mark as a mark.

### B

A bottle of Jack Daniel's—no, Jack Daniel's Old No. 7 Tennessee Sour Mash Whiskey—boasts a fair number of trademarks. Recall what the bottle looks like (or better yet, retrieve a bottle from wherever you keep liquor; it's probably there):



"Jack Daniel's" is a registered trademark, as is "Old No. 7." So too the arched Jack Daniel's logo. And the stylized label

6    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Opinion of the Court

with filigree (*i.e.*, twirling white lines). Finally, what might be thought of as the platform for all those marks—the whiskey's distinctive square bottle—is itself registered.

VIP is a dog toy company, making and selling a product line of chewable rubber toys that it calls "Silly Squeakers." (Yes, they squeak when bitten.) Most of the toys in the line are designed to look like—and to parody—popular beverage brands. There are, to take a sampling, Dos Perros (cf. Dos Equis), Smella Arpaw (cf. Stella Artois), and Doggie Walker (cf. Johnnie Walker). VIP has registered trademarks in all those names, as in the umbrella term "Silly Squeakers."

In 2014, VIP added the Bad Spaniels toy to the line. VIP did not apply to register the name, or any other feature of, Bad Spaniels. But according to its complaint (further addressed below), VIP both "own[s]" and "use[s]" the "'Bad Spaniels' trademark and trade dress." App. 3, 11; see *infra*, at 8, 17. And Bad Spaniels' trade dress, like the dress of many Silly Squeakers toys, is designed to evoke a distinctive beverage bottle-with-label. Even if you didn't already know, you'd probably not have much trouble identifying which one.



Bad Spaniels is about the same size and shape as an ordinary bottle of Jack Daniel's. The faux bottle, like the original, has a black label with stylized white text and a white filigreed border. The words "Bad Spaniels" replace "Jack Daniel's" in a like font and arch. Above the arch is an image of a spaniel. (This is a dog toy, after all.) Below the arch, "The Old No. 2 On Your Tennessee Carpet" replaces "Old No. 7 Tennessee Sour Mash Whiskey" in similar graphic form. The small print at the bottom substitutes "43% poo by vol." and "100% smelly" for "40% alc. by vol. (80 proof)."

The toy is packaged for sale with a cardboard hangtag (so it can be hung on store shelves). Here is the back of the hangtag:



At the bottom is a disclaimer: "This product is not affiliated with Jack Daniel Distillery." In the middle are some warnings and guarantees. And at the top, most relevant here, are two product logos—on the left for the Silly Squeakers line, and on the right for the Bad Spaniels toy.

Opinion of the Court

Soon after Bad Spaniels hit the market, Jack Daniel's sent VIP a letter demanding that it stop selling the product. VIP responded by bringing this suit, seeking a declaratory judgment that Bad Spaniels neither infringed nor diluted Jack Daniel's trademarks. The complaint alleged, among other things, that VIP is "the owner of all rights in its 'Bad Spaniels' trademark and trade dress for its durable rubber squeaky novelty dog toy." App. 3; see *supra*, at 6. Jack Daniel's counterclaimed under the Lanham Act for both trademark infringement and trademark dilution by tarnishment.

VIP moved for summary judgment on both claims. First, VIP argued that Jack Daniel's infringement claim failed under a threshold test derived from the First Amendment to protect "expressive works"—like (VIP said) the Bad Spaniels toy. When those works are involved, VIP contended, the so-called *Rogers* test requires dismissal of an infringement claim at the outset unless the complainant can show one of two things: that the challenged use of a mark "has no artistic relevance to the underlying work" or that it "explicitly misleads as to the source or the content of the work." *Rogers* v. *Grimaldi*, 875 F. 2d 994, 999 (CA2 1989) (Newman, J.). Because Jack Daniel's could make neither showing, VIP argued, the likelihood-of-confusion issue became irrelevant. Second, VIP urged that Jack Daniel's could not succeed on a dilution claim because Bad Spaniels was a "parody[]" of Jack Daniel's, and therefore made "fair use" of its famous marks. §1125(c)(3)(A)(ii).

The District Court rejected both contentions for a common reason: because VIP had used the cribbed Jack Daniel's features as trademarks—that is, to identify the source of its own products. In the court's view, when "another's trademark is used for source identification"—as the court thought was true here—the threshold *Rogers* test does not apply. App. to Pet. for Cert. 89a. Instead, the suit must address the "standard" infringement question: whether the

Opinion of the Court

use is "likely to cause consumer confusion." *Ibid.* And like-wise, VIP could not invoke the dilution provision's fair-use exclusion. Parodies fall within that exclusion, the court explained, only when the uses they make of famous marks do not serve as "a designation of source for the [alleged di-luter's] own goods." *Id.*, at 104a (quoting §1125(c)(3)(A)).

The case thus proceeded to a bench trial, where Jack Daniel's prevailed. The District Court found, based largely on survey evidence, that consumers were likely to be con-fused about the source of the Bad Spaniels toy. See 291 F. Supp. 3d 891, 906–911 (D Ariz. 2018). And the court thought that the toy, by creating "negative associations" with "canine excrement," would cause Jack Daniel's "repu-tational harm." *Id.*, at 903, 905.

But the Court of Appeals for the Ninth Circuit reversed, ruling that the District Court had gotten the pretrial legal issues wrong. In the Ninth Circuit's view, the infringement claim was subject to the threshold *Rogers* test because Bad Spaniels is an "expressive work": Although just a dog toy, and "surely not the equivalent of the *Mona Lisa*," it "com-municates a humorous message." 953 F. 3d 1170, 1175 (2020) (internal quotation marks omitted). The Court of Appeals therefore returned the case to the District Court to decide whether Jack Daniel's could satisfy either of *Rogers*' two prongs. And the Ninth Circuit awarded judgment on the dilution claim to VIP. The court did not address the statutory exclusion for parody and other fair use, as the Dis-trict Court had. Instead, the Court of Appeals held that the exclusion for "noncommercial use" shielded VIP from liabil-ity. §1125(c)(3)(C). The "use of a mark may be 'noncom-mercial,'" the court reasoned, "even if used to sell a prod-uct." 953 F. 3d, at 1176 (internal quotation marks omitted). And here it was so, the court found, because it "parodies" and "comments humorously" on Jack Daniel's. *Id.*, at 1175; see *id.*, at 1176.

On remand, the District Court found that Jack Daniel's

Opinion of the Court

could not satisfy either prong of *Rogers*, and so granted summary judgment to VIP on infringement. Jack Daniel's appealed, and the Ninth Circuit summarily affirmed.

We then granted certiorari to consider the Court of Appeals' rulings on both infringement and dilution. 598 U. S. ___ (2022).

## II

Our first and more substantial question concerns Jack Daniel's infringement claim: Should the company have had to satisfy the *Rogers* threshold test before the case could proceed to the Lanham Act's likelihood-of-confusion inquiry?[1] The parties address that issue in the broadest possible way, either attacking or defending *Rogers* in all its possible applications. Today, we choose a narrower path. Without deciding whether *Rogers* has merit in other contexts, we hold that it does not when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods. See §1127; *supra*, at 2–3. VIP used the marks derived from Jack Daniel's in that way, so the infringement claim here rises or falls on likelihood of confusion. But that inquiry is not blind to the expressive aspect of the Bad Spaniels toy that the Ninth Circuit highlighted. Beyond source designation, VIP uses the marks at issue in an effort to "parody" or "make fun" of Jack Daniel's. Tr. of Oral Arg. 58, 66. And that kind of message matters in assessing confusion because consumers are not so likely to think that the maker of a mocked product is itself doing the mocking.

### A

To see why the *Rogers* test does not apply here, first consider the case from which it emerged. The defendants there

---

[1] To be clear, when we refer to "the *Rogers* threshold test," we mean any threshold First Amendment filter.

Opinion of the Court

had produced and distributed a film by Federico Fellini ti-
tled "Ginger and Fred" about two fictional Italian cabaret
dancers (Pippo and Amelia) who imitated Ginger Rogers
and Fred Astaire. When the film was released in the United
States, Ginger Rogers objected under the Lanham Act to
the use of her name. The Second Circuit rejected the claim.
It reasoned that the titles of "artistic works," like the works
themselves, have an "expressive element" implicating
"First Amendment values." 875 F. 2d, at 998. And at the
same time, such names posed only a "slight risk" of confus-
ing consumers about either "the source or the content of the
work." *Id.*, at 999–1000. So, the court concluded, a thresh-
old filter was appropriate. When a title "with at least some
artistic relevance" was not "explicitly misleading as to
source or content," the claim could not go forward. *Ibid.*
But the court made clear that it was not announcing a gen-
eral rule. In the typical case, the court thought, the name
of a product was more likely to indicate its source, and to be
taken by consumers in just that way. See *id.*, at 1000.

Over the decades, the lower courts adopting *Rogers* have
confined it to similar cases, in which a trademark is used
not to designate a work's source, but solely to perform some
other expressive function. So, for example, when the
toymaker Mattel sued a band over the song "Barbie Girl"—
with lyrics including "Life in plastic, it's fantastic" and "I'm
a blond bimbo girl, in a fantasy world"—the Ninth Circuit
applied *Rogers*. *Mattel, Inc.* v. *MCA Records, Inc.*, 296 F. 3d
894, 901 (2002). That was because, the court reasoned, the
band's use of the Barbie name was "not [as] a source iden-
tifier": The use did not "speak[] to [the song's] origin." *Id.*,
at 900, 902; see *id.*, at 902 (a consumer would no more think
that the song was "produced by Mattel" than would, "upon
hearing Janis Joplin croon 'Oh Lord, won't you buy me a
Mercedes Benz?,' . . . suspect that she and the carmaker
had entered into a joint venture"). Similarly, the Eleventh
Circuit dismissed a suit under *Rogers* when a sports artist

12   JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Opinion of the Court

depicted the Crimson Tide's trademarked football uniforms solely to "memorialize" a notable event in "football history." *University of Ala. Bd. of Trustees* v. *New Life Art, Inc.*, 683 F. 3d 1266, 1279 (2012). And when Louis Vuitton sued because a character in the film The Hangover: Part II described his luggage as a "Louis Vuitton" (though pronouncing it *Lewis*), a district court dismissed the complaint under *Rogers*. See *Louis Vuitton Mallatier S. A.* v. *Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172 (SDNY 2012). All parties agreed that the film was not using the Louis Vuitton mark as its "own identifying trademark." *Id.*, at 180 (internal quotation marks omitted). When that is so, the court reasoned, "confusion will usually be unlikely," and the "interest in free expression" counsels in favor of avoiding the standard Lanham Act test. *Ibid.*

The same courts, though, routinely conduct likelihood-of-confusion analysis, without mentioning *Rogers*, when trademarks are used as trademarks—*i.e.*, to designate source. See, *e.g.*, *JL Beverage Co., LLC* v. *Jim Beam Brands Co.*, 828 F. 3d 1098, 1102–1103, 1106 (CA9 2016); *PlayNation Play Systems, Inc.* v. *Velex Corp.*, 924 F. 3d 1159, 1164–1165 (CA11 2019). And the Second Circuit—*Rogers*' home court—has made especially clear that *Rogers* does not apply in that context. For example, that court held that an offshoot political group's use of the trademark "United We Stand America" got no *Rogers* help because the use was as a source identifier. See *United We Stand Am., Inc.* v. *United We Stand, Am. New York, Inc.*, 128 F. 3d 86, 93 (1997). True, that slogan had expressive content. But the defendant group, the court reasoned, was using it "as a mark," to suggest the "same source identification" as the original "political movement." *Ibid.* And similarly, the Second Circuit (indeed, the judge who authored *Rogers*) rejected a motorcycle mechanic's view that his modified version of Harley Davidson's bar-and-shield logo was an

Opinion of the Court

expressive parody entitled to *Rogers*' protection. See *Harley-Davidson, Inc.* v. *Grottanelli*, 164 F. 3d 806, 812–813 (1999). The court acknowledged that the mechanic's adapted logo conveyed a "somewhat humorous[]" message. *Id.*, at 813. But his use of the logo was a quintessential "trademark use": to brand his "repair and parts business"— through signage, a newsletter, and T-shirts—with images "similar" to Harley-Davidson's. *Id.*, at 809, 812–813.

The point is that whatever you make of *Rogers*—and again, we take no position on that issue—it has always been a cabined doctrine. If we put this case to the side, the *Rogers* test has applied only to cases involving "non-trademark uses"—or otherwise said, cases in which "the defendant has used the mark" at issue in a "non-source-identifying way." S. Dogan & M. Lemley, Grounding Trademark Law Through Trademark Use, 92 Iowa L. Rev. 1669, 1684 (2007); see *id.*, at 1683–1684, and n. 58. The test has not insulated from ordinary trademark scrutiny the use of trademarks as trademarks, "to identify or brand [a defendant's] goods or services." *Id.*, at 1683.

We offer as one last example of that limitation a case with a striking resemblance to this one. It too involved dog products, though perfumes rather than toys. Yes, the defendant sold "a line of pet perfumes whose names parody elegant brands sold for human consumption." *Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 412 (SDNY 2002) (Mukasey, J.). The product at issue was named Timmy Holedigger—which Tommy Hilfiger didn't much like. The defendant asked for application of *Rogers*. The court declined it, relying on *Harley-Davidson*. See 221 F. Supp. 2d, at 414. *Rogers*, the court explained, kicks in when a suit involves solely "nontrademark uses of [a] mark—that is, where the trademark is not being used to indicate the source or origin" of a product, but only to convey a different kind of message. 221 F. Supp. 2d, at 414.

14    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Opinion of the Court

When, instead, the use is "at least in part" for "source identification"—when the defendant may be "trading on the good will of the trademark owner to market its own goods"—*Rogers* has no proper role. 221 F. Supp. 2d, at 414–415. And that is so, the court continued, even if the defendant is *also* "making an expressive comment," including a parody of a different product. *Id.*, at 415. The defendant is still "mak[ing] trademark use of another's mark," and must meet an infringement claim on the usual battleground of "likelihood of confusion." *Id.*, at 416.

That conclusion fits trademark law, and reflects its primary mission. From its definition of "trademark" onward, the Lanham Act views marks as source identifiers—as things that function to "indicate the source" of goods, and so to "distinguish" them from ones "manufactured or sold by others." §1127; see *supra*, at 2–3. The cardinal sin under the law, as described earlier, is to undermine that function. See *supra*, at 3. It is to confuse consumers about source— to make (some of) them think that one producer's products are another's. And that kind of confusion is most likely to arise when someone uses another's trademark as a trademark—meaning, again, as a source identifier—rather than for some other expressive function. To adapt one of the cases noted above: Suppose a filmmaker uses a Louis Vuitton suitcase to convey something about a character (he is the kind of person who wants to be seen with the product but doesn't know how to pronounce its name). See *supra*, at 12. Now think about a different scenario: A luggage manufacturer uses an ever-so-slightly modified LV logo to make inroads in the suitcase market. The greater likelihood of confusion inheres in the latter use, because it is the one conveying information (or misinformation) about who is responsible for a product. That kind of use "implicate[s] the core concerns of trademark law" and creates "the paradigmatic infringement case." G. Dinwoodie & M. Janis, Confusion Over Use: Contextualism in Trademark Law, 92

Opinion of the Court

Iowa L. Rev. 1597, 1636 (2007). So the *Rogers* test—which offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal—has no proper application.[2]

Nor does that result change because the use of a mark has other expressive content—*i.e.*, because it conveys some message on top of source. Here is where we most dramatically part ways with the Ninth Circuit, which thought that because Bad Spaniels "communicates a humorous message," it is automatically entitled to *Rogers*' protection. 953 F. 3d, at 1175 (internal quotation marks omitted). On that view, *Rogers* might take over much of the world. For trademarks are often expressive, in any number of ways. Consider how one liqueur brand's trade dress (beyond identifying source) tells a story, with a bottle in the shape of a friar's habit connoting the product's olden monastic roots:



_____

[2]That is not to say (far from it) that every infringement case involving a source-identifying use requires full-scale litigation. Some of those uses will not present any plausible likelihood of confusion—because of dissimilarity in the marks or various contextual considerations. And if, in a given case, a plaintiff fails to plausibly allege a likelihood of confusion, the district court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). See 6 McCarthy §32:121.75 (providing examples).

Opinion of the Court

Or take a band name that "not only identifies the band but expresses a view about social issues." *Tam*, 582 U. S., at 245 (opinion of ALITO, J.) (discussing "The Slants"). Or note how a mark can both function as a mark and have parodic content—as the court found in the Hilfiger/Holedigger litigation. See *supra*, at 13–14. The examples could go on and on. As a leading treatise puts the point, the Ninth Circuit's expansion of *Rogers* "potentially encompasses just about everything" because names, phrases, symbols, designs, and their varied combinations often "contain some 'expressive' message" unrelated to source. 6 McCarthy §31:144.50. That message may well be relevant in assessing the likelihood of confusion between two marks, as we address below. See *infra*, at 18–19. But few cases would even get to the likelihood-of-confusion inquiry if all expressive content triggered the *Rogers* filter. In that event, the *Rogers* exception would become the general rule, in conflict with courts' longstanding view of trademark law.

The Ninth Circuit was mistaken to believe that the First Amendment demanded such a result. The court thought that trademark law would otherwise "fail[] to account for the full weight of the public's interest in free expression." 953 F. 3d, at 1174. But as the *Mattel* (*i.e.*, Barbie) court noted, when a challenged trademark use functions as "source-identifying," trademark rights "play well with the First Amendment": "Whatever first amendment rights you may have in calling the brew you make in your bathtub 'Pepsi'" are "outweighed by the buyer's interest in not being fooled into buying it." 296 F. 3d, at 900. Or in less colorful terms: "[T]o the extent a trademark is confusing" as to a product's source "the law can protect consumers and trademark owners." *Tam*, 582 U. S., at 252 (Kennedy, J., concurring in part and concurring in judgment); see *Friedman* v. *Rogers*, 440 U. S. 1, 15 (1979) (rejecting a First Amendment challenge to a law restricting trade names because of the "substantial" interest in "protecting the public from [their]

Opinion of the Court

deceptive and misleading use"). Or yet again, in an espe-
cially clear rendering: "[T]he trademark law generally pre-
vails over the First Amendment" when "another's trade-
mark (or a confusingly similar mark) is used without
permission" as a means of "source identification." *Yankee
Publishing Inc.* v. *News Am. Publishing Inc.*, 809 F. Supp.
267, 276 (SDNY 1992) (Leval, J.) (emphasis deleted). So for
those uses, the First Amendment does not demand a
threshold inquiry like the *Rogers* test. When a mark is used
as a mark (except, potentially, in rare situations), the like-
lihood-of-confusion inquiry does enough work to account for
the interest in free expression.

                            B

    Here, the District Court correctly held that "VIP uses its
Bad Spaniels trademark and trade dress as source identifi-
ers of its dog toy." See App. to Pet. for Cert. 105a. In fact,
VIP conceded that point below. In its complaint, VIP al-
leged that it both "own[s] and use[s]" the "'Bad Spaniels'
trademark and trade dress for its durable rubber squeaky
novelty dog toy." App. 3, 11. The company thus represented
in this very suit that the mark and dress, although not reg-
istered, are used to "identify and distinguish [VIP's] goods"
and to "indicate [their] source." §1127. (Registration of
marks, you'll recall, is optional. See *supra*, at 3–4.)
    In this Court, VIP says the complaint was a mere "form
allegation"—a matter of "rote." Tr. of Oral Arg. 73. But
even if we knew what that meant, VIP has said and done
more in the same direction. First, there is the way the prod-
uct is marketed. On the hangtag, the Bad Spaniels logo sits
opposite the concededly trademarked Silly Squeakers logo,
with both appearing to serve the same source-identifying
function. See *supra*, at 7. And second, there is VIP's prac-
tice as to other products in the Silly Squeakers line. The
company has consistently argued in court that it owns,
though has never registered, the trademark and trade dress

Opinion of the Court

in dog toys like "Jose Perro" (cf. Jose Cuervo) and "HeinieSniff'n" (cf. Heineken).[3]   And it has chosen to register the names of still other dog toys, including Dos Perros (#6176781), Smella Arpaw (#6262975), and Doggie Walker (#6213816).   See *supra*, at 6.   Put all that together, and more than "form" or "rote" emerges: VIP's conduct is its own admission that it is using the Bad Spaniels (née Jack Daniel's) trademarks as trademarks, to identify product source.

Because that is so, the only question in this suit going forward is whether the Bad Spaniels marks are likely to cause confusion.   There is no threshold test working to kick out all cases involving "expressive works."   But a trademark's expressive message—particularly a parodic one, as VIP asserts—may properly figure in assessing the likelihood of confusion.   See, *e.g.*, *Louis Vuitton Malletier S. A.* v. *Haute Diggity Dog, LLC*, 507 F. 3d 252, 265 (CA4 2007) (Parody "influences the way in which the [likelihood-of-confusion] factors are applied"); Brief for United States as *Amicus Curiae* 17–22 (same).   A parody must "conjure up" "enough of [an] original to make the object of its critical wit recognizable."   *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U. S. 569, 588 (1994) (internal quotation marks omitted).   Yet to succeed, the parody must also create contrasts, so that its message of ridicule or pointed humor comes clear.   And once that is done (*if* that is done), a parody is not often likely to create confusion.   Self-deprecation is one thing; self-mockery far less ordinary.   So although VIP's effort to ridicule Jack Daniel's does not justify use of the *Rogers* test,

_____

[3]See, *e.g.*, *VIP Products, LLC* v. *Tequila Cuervo La Rojena, S. A. de C. V.*, No. 20–cv–0319 (D Ariz., Feb. 11, 2020), ECF Doc. 1, p. 3 ("Jose Perro"); *VIP Products, LLC* v. *Heineken USA, Inc.*, No. 13–cv–0319 (D Ariz., Feb. 13, 2013), ECF Doc. 1, pp. 3–4 ("HeinieSniff'n"); *VIP Products, LLC* v. *Pabst Brewing Co.*, No. 14–cv–2084 (D Ariz., Sept. 19, 2014), ECF Doc. 1, pp. 3–4 ("Blue Cats Trippin") (cf. Pabst Blue Ribbon); *VIP Products, LLC* v. *Champagne Louis Roederer, S. A.*, No. 13–cv–2365 (D Ariz., Nov. 18, 2013), ECF Doc. 1, pp. 3–4 ("Crispaw") (cf. Cristal).

Opinion of the Court

it may make a difference in the standard trademark analysis. Consistent with our ordinary practice, we remand that issue to the courts below. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) (noting that this Court is generally "a court of review, not of first view").

III

Our second question, more easily dispatched, concerns Jack Daniel's claim of dilution by tarnishment (for the linkage of its whiskey to less savory substances). Recall that the Ninth Circuit dismissed that claim based on one of the Lanham Act's "[e]xclusions" from dilution liability—for "[a]ny noncommercial use of a mark." §1125(c)(3)(C); see *supra*, at 9. On the court's view, the "use of a mark may be 'noncommercial' even if used to sell a product." 953 F. 3d, at 1176 (internal quotation marks omitted). And VIP's use is so, the court continued, because it "parodies" and "convey[s] a humorous message" about Jack Daniel's. *Id.*, at 1175–1176. We need not express a view on the first step of that reasoning because we think the second step wrong. However wide the scope of the "noncommercial use" exclusion, it cannot include, as the Ninth Circuit thought, every parody or humorous commentary.

To begin to see why, consider the scope of another of the Lanham Act's exclusions—this one for "[a]ny fair use." As described earlier, the "fair use" exclusion specifically covers uses "parodying, criticizing, or commenting upon" a famous mark owner. §1125(c)(3)(A)(ii); see *supra*, at 5. But not in every circumstance. Critically, the fair-use exclusion has its own exclusion: It does not apply when the use is "as a designation of source for the person's own goods or services." §1125(c)(3)(A). In that event, no parody, criticism, or commentary will rescue the alleged dilutor. It will be subject to liability regardless.

The problem with the Ninth Circuit's approach is that it

20   JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

Opinion of the Court

reverses that statutorily directed result, as this case illustrates. Given the fair-use provision's carve-out, parody (and criticism and commentary, humorous or otherwise) is exempt from liability only if *not* used to designate source. Whereas on the Ninth Circuit's view, parody (and so forth) is exempt always—regardless whether it designates source. The expansive view of the "noncommercial use" exclusion effectively nullifies Congress's express limit on the fair-use exclusion for parody, etc. Just consider how the Ninth Circuit's construction played out here. The District Court had rightly concluded that because VIP used the challenged marks as source identifiers, it could not benefit from the fair-use exclusion for parody. See App. to Pet. for Cert. 105a; *supra*, at 8–9, 17–18. The Ninth Circuit took no issue with that ruling. But it shielded VIP's parodic uses anyway. In doing so, the court negated Congress's judgment about when—and when not—parody (and criticism and commentary) is excluded from dilution liability.

IV

Today's opinion is narrow. We do not decide whether the *Rogers* test is ever appropriate, or how far the "noncommercial use" exclusion goes. On infringement, we hold only that *Rogers* does not apply when the challenged use of a mark is as a mark. On dilution, we hold only that the noncommercial exclusion does not shield parody or other commentary when its use of a mark is similarly source-identifying. It is no coincidence that both our holdings turn on whether the use of a mark is serving a source-designation function. The Lanham Act makes that fact crucial, in its effort to ensure that consumers can tell where goods come from.

For the reasons stated, we vacate the judgment below and remand for further proceedings consistent with this opinion.

*It is so ordered.*

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–148

_____

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE ALITO joins, concurring.

I join the Court's opinion in full. I write separately to emphasize that in the context of parodies and potentially other uses implicating First Amendment concerns, courts should treat the results of surveys with particular caution. As petitioner did here, plaintiffs in trademark infringement cases often commission surveys that purport to show that consumers are likely to be confused by an allegedly infringing product. Like any other evidence, surveys should be understood as merely one piece of the multifaceted likelihood of confusion analysis. See, *e.g.*, *Uncommon, LLC* v. *Spigen, Inc.*, 926 F. 3d 409, 425 (CA7 2019). Courts should also carefully assess the methodology and representativeness of surveys, as many lower courts already do. See, *e.g.*, *Water Pik, Inc.* v. *Med-Systems, Inc.*, 726 F. 3d 1136, 1144–1150 (CA10 2013); *Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*, 588 F. 3d 97, 117 (CA2 2009).

When an alleged trademark infringement involves a parody, however, there is particular risk in giving uncritical or undue weight to surveys. Survey answers may reflect a mistaken belief among some survey respondents that all parodies require permission from the owner of the parodied mark. Some of the answers to the survey in this case illustrate this potential. See App. 81–82, n. 25 ("'I'm sure the

2    JACK DANIEL'S PROPERTIES, INC. *v.* VIP PRODUCTS LLC

SOTOMAYOR, J., concurring

dog toy company that made this toy had to get [Jack Daniel's] permission and legal rights to essentially copy the[ir] product in dog toy form'"); *ibid.* ("'The bottle is mimicked after the Jack Daniel BBQ sauce. So they would hold the patent therefore you would have to ask permission to use the image'"); see also *Anheuser-Busch, Inc.* v. *Balducci Publications*, 28 F. 3d 769, 772–773, 775 (CA8 1994) (describing a similar situation). Plaintiffs can point to this misunderstanding of the legal framework as evidence of consumer confusion. Cleverly designed surveys could also prompt such confusion by making consumers think about complex legal questions around permission that would not have arisen organically out in the world.

Allowing such survey results to drive the infringement analysis would risk silencing a great many parodies, even ones that by other metrics are unlikely to result in the confusion about sourcing that is the core concern of the Lanham Act. See *ante*, at 4, 10, 14. Well-heeled brands with the resources to commission surveys would be handed an effective veto over mockery. After all, "[n]o one likes to be the butt of a joke, not even a trademark." 6 J. McCarthy, Trademarks and Unfair Competition §31:153 (5th ed. 2023). This would upset the Lanham Act's careful balancing of "the needs of merchants for identification as the provider of goods with the needs of society for free communication and discussion." P. Leval, Trademark: Champion of Free Speech, 27 Colum. J. L. & Arts 187, 210 (2004). Courts should thus ensure surveys do not completely displace other likelihood-of-confusion factors, which may more accurately track the experiences of actual consumers in the marketplace. Courts should also be attentive to ways in which surveys may artificially prompt such confusion about the law or fail to sufficiently control for it.

Cite as: 599 U. S. ____ (2023)    1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 22–148

———————

## JACK DANIEL'S PROPERTIES, INC., PETITIONER *v.* VIP PRODUCTS LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2023]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE BARRETT join, concurring.

I am pleased to join the Court's opinion. I write separately only to underscore that lower courts should handle *Rogers* v. *Grimaldi*, 875 F. 2d 994 (CA2 1989), with care. Today, the Court rightly concludes that, even taken on its own terms, *Rogers* does not apply to cases like the one before us. But in doing so, we necessarily leave much about *Rogers* unaddressed. For example, it is not entirely clear where the *Rogers* test comes from—is it commanded by the First Amendment, or is it merely gloss on the Lanham Act, perhaps inspired by constitutional-avoidance doctrine? *Id.*, at 998. For another thing, it is not obvious that *Rogers* is correct in all its particulars—certainly, the Solicitor General raises serious questions about the decision. See Brief for United States as *Amicus Curiae* 23–28. All this remains for resolution another day, *ante*, at 13, and lower courts should be attuned to that fact.

Georgetown Receives Afkhami Collection, An Extraordinary Treasure of Iranian
Pre-Revolution Historical Documents



Copyright Home

Introduction to Copyright

Course Materials

Fair Use

Using Others' Works

Public Domain

Creative Commons

Copyright & Multimedia

Open Access



Scholarly Communication



DigitalGeorgetown

If you have any questions about creating or using copyrighted material
at Georgetown, please contact librarycopyright@georgetown.edu.

## *Using Images in Publications*

# Overview

Many scholarly publications are enhanced with images, ranging from reproductions of fine art to graphs showing the results of scientific research. Including images in books and articles can complement the text, visually demonstrate the author's analysis, and engage the reader. Using images in publications, however, raises copyright issues, which can be complex, time-consuming, and expensive. To help authors navigate this process, publishers often provide specific guidance, including what rights must be requested, acceptable file formats, image resolution, etc. See Requesting 3rd party Permissions from Oxford Journals or Image Guidelines from Johns Hopkins University Press as examples.

The primary issues that you need to aware of when incorporating images in your publication are:

## Permission

The right to publish a copyrighted image is controlled by the copyright owner, so each copyrighted image that you use must have permission or fall within an exception to the general copyright statue, such as public domain, fair use, or open access. Copyright permission fees are sometimes waived or reduced for scholarly publications; if not, however, they can be quite expensive as well as time-consuming to obtain. We recommend that you begin the permissions process early to avoid any last-minute complications that may delay publication of your work. In addition to copyright permission, some museums and other providers of images charge a fee for the production or use of a digital image from their collections, even if the underlying work is in the public domain. Like permissions fees, use fees are sometimes waived or reduced for scholarly publications.

## High resolution images

Publishers will require a high resolution image for publication (usually at least 300 ppi). These may come from museums, archives, other collections, your own work, or suppliers of stock photos. There may be a fee assessed for use, the amount of which can vary significantly depending on who is supplying the image and how you are using it.

## Printing costs

The cost of printing images can be substantial for the publisher, so be sure to discuss with your editor how many images they will publish, whether they will be in color, and whether a subvention will be required if the manuscript contains a large number of images.

## Privacy and publicity rights

If you have a photograph with people in it, there may be privacy or publicity rights that need to be addressed.

## Read more

- Susan Bielstein, Copyright Clearance: A Publisher's Perspective (2005) (article begins on page 19)
- Susan Bielstein, Permissions, A Survival Guide: Blunt Talk about Art as Intellectual Property (2006) (ebook - Georgetown NetID required for off-campus access)
- Lois Farfel Stark, Obtaining Image Permissions for Your Book: An Author's Perspective (2018)

# Copyright Principles

## Public domain

If you can find a usable image in a book or journal article published before 1927, it will be in the public domain, and therefore free of any copyright restrictions. Certain images published between 1927 and 1989 may also be in the public domain, depending on if they were published with a copyright notice and if the copyright was renewed. For more information, use this public domain chart or contact librarycopyright@georgetown.edu.

Works of the United States government are also in the public domain and may be used freely.

Some museums, libraries, and archives make public domain images freely available with few or no restrictions. Read more in the Finding Images section.

## Open Access / Creative Commons

Wikimedia Commons has a large collection of images that are licensed using the Creative Commons licensing system. Restrictions, if any, are listed with the image. It is important to recognize that if you use Wikimedia, you are relying on copyright information provided by the person uploading the image. You should review the copyright information carefully to be sure it appears to be accurate.

Many of the licenses in Wikimedia permit noncommercial uses only. The definition of noncommercial for purposes of the CC BY-NC license is, *"NonCommercial means not primarily intended for or directed towards commercial advantage or monetary compensation."* Creative Commons provides some further guidance on how to interpret the NC license.

## Fair use

Under certain circumstances, publishers may be comfortable with relying on fair use when publishing images accompanying scholarly works.

The guidelines in the College Art Association's Code of Best Practices in Fair Use for the Visual Arts set out the fair use arguments for using art for educational purposes:

> **PRINCIPLE** *In their analytic writing about art, scholars and other writers (and, by extension, their publishers) may invoke fair use to quote, excerpt, or reproduce copyrighted works, subject to certain limitations:*
>
> **Limitations**
>
> - *The writer's use of the work, whether in part or in whole, should be justified by the analytic objective, and the user should be prepared to articulate that justification.*
> - *The writer's analytic objective should predominate over that of merely representing the work or works used.*
> - *The amount and kind of material used and (where images are concerned) the size and resolution of the published reproduction should not exceed that appropriate to the analytic objective.*
> - *Justifications for use and the amount used should be considered especially carefully in connection with digital-format reproductions*

*of born-digital works, where there is a heightened risk that reproductions may function as substitutes for the originals.*

- *Reproductions of works should represent the original works as accurately as can be achieved under the circumstances.*
- *The writing should provide attribution of the original work as is customary in the field, to the extent possible.*

## Your own work

If you have your own high resolution photograph, you may use it freely since you own the copyright in your photograph. If, however, your photograph is of a copyrighted work of art, permission of the artist will be required unless it is a fair use. Note that many museums do not allow photography of works in their collections, so obtaining your own image of a work of art may not be an option. While architectural works are subject to copyright protection, photographs of publicly viewable buildings may be used. 17 U.S.C. § 120(a).

## Permission

If your image does not fall into any of the above categories, you will need to request permission from the copyright holder for use of the image. You may be able to obtain permission from one of the sites listed in the next section, or you may need to request permission from the artists or their representatives. The Artists Rights Society represents the intellectual property rights interests of visual artists and their estates worldwide and covers works in private collections as well as museums and galleries. ARS has a request form for permissions requests. Note that ARS handles permission requests only and does not supply images of the works.

For more general information on requesting permission, visit our Requesting Permission page.

# Finding Images

## Museums, libraries, and archives

Some museums, libraries, and archives have collections of public domain images available for use in scholarly publications. The content of the collections and the permitted uses vary among institutions. Many

do not allow images to be used as cover art since that is usually considered to be a commercial use, and some limit use to print publications. Below is a list of libraries and museums that make works available with few or no restrictions.

- British Library - The British Library's collection on flickr allows access to millions of public domain images from the Library's collections. Higher quality images, if required, are available for purchase through the British Library. For more information, visit the Library's Images Online page.
- J. Paul Getty Museum - The Getty makes available, without charge, all available digital images to which the Getty holds the rights or that are in the public domain to be used for any purpose. More information about the content of the collections is available on their Open Content Program page.
- Library of Congress - Prints and Photographs - This collection has over 1,200,000 digitized images from the Library's collections. Rights information is available for each image - look for the field marked "Rights Advisory." Many collections have no known restrictions on use. For further information about using the collection, read the Copyright and Other Restrictions That Apply to Publication/Distribution of Images. Information on restrictions on use by collection is also available.
- National Gallery of Art - NGA Images is a repository of images presumed to be in the public domain from the collections of the National Gallery of Art. Users may download— free of charge and without seeking authorization from the Gallery— any image of a work in the Gallery's collection that the Gallery believes is in the public domain and is free of other known restrictions.
- New York Public Library - This collection contains more than 180,000 photographs, postcards, maps and other public-domain items from the library's special collections in downloadable high-resolution files. High resolutions downloads are available with no permission required and no restrictions on use.
- Victoria & Albert Museum - These images of art from the collections of the V&A are available for academic publishing with some limitations (print runs up to 4,000 copies or 5 years online use). Read the full terms and conditions to see if your use qualifies.

## Stock image sites

There are many companies that provide both a high quality image for publication and a license for publication. These sites usually have good selection of images, the images are high quality, and the search features are sophisticated. Licensing fees vary considerably and can be high, though you may be able to negotiate a discount for use in a scholarly publication.

For some of the sites listed below, the price will vary depending on which rights you need for publication: print/electronic, region of the world, number of languages, number of books, where the image will be placed (inside/cover), and size of the image. After entering that information, a license fee will display based on your use. The license fee is not automatically available for some images; for those, you will usually receive an email message after submitting your request. You should consult with your editor when selecting options to be sure you have selected the appropriate options for your book or article.

- Art Resource (license fee based on rights needed)
- Bridgeman Images (license fee based on rights needed)
- Getty Images (license fee based on rights needed)
- iStock (flat fee)
- Shutterstock (flat fee)

## JSTOR Images Search

JSTOR Images Search (Georgetown NetID required for off-campus access) is a subscription database that includes some images specifically licensed for academic publishing. These images are identified with "IAP" (Images for Academic Publishing) under the thumbnail image in your search results. Details of the use, including size of print run and credit line, vary among IAP images. You can view these by clicking on the IAP icon under the thumbnail image. The Terms and Conditions agreement displays when you download the image. Most JSTOR images, however, are not in the IAP program and are not licensed for use in scholarly publishing. To use a non-IAP image in a book or article, you will usually need to request permission or go through a fee-based stock photo archive, often Art Resource, for a license. JSTOR provides contact information for permissions in the "Rights Notes" section of image information page.

You may also find usable images for publication on the sites listed on.

## Additional options

- College Art Association's list of [image sources](#)
- Georgetown Library's [Copyright and Multimedia: Images](#) page
- Georgetown Library's [Images](#) LibGuide

# Specific Uses

## Cover images

Images that appear on the cover of a book often require specific permission for that use and a higher fee.

## Film frames

The Association of University Presses has this statement on fair use and film frames in their [Permissions FAQ](#):

> You may use frame enlargements and publicity stills (both from films and from television shows) when you can justify their inclusion in the work under fair use guidelines—for example, when it can be argued that the illustration serves as a quote from the filmic "text" to illustrate a point. Be conservative in selecting material—if the still or frame illuminates a point you are making or is specifically discussed, then the use may qualify as fair use. Where possible, limit the number of frames reprinted from any one film and from different films that represent the subject of your work. If your use is decorative, you must seek permission from the rightsholder to include it. When purchasing material from a photo agency, read the conditions stated on the agreement and on the back of the photo very carefully (particularly the fine print). In all cases, acknowledge the original copyright holder. For a more in-depth analysis of fair use as related to stills and frame enlargements, the [fair use section of the Society for Cinema and Media Studies website](#) offers a number of policy statements and disciplinary guidelines that may be useful.

If your use goes beyond fair use, or if your publisher has a more restrictive policy, you will need to get permission from the copyright owner. Most major film studios have a licensing division where you can

submit a request – MGM, Sony, Warner Brothers, Paramount Pictures, Universal, and Walt Disney Studios, for example. For smaller producers, you will need to contact them directly with your request.

## Charts, graphs, and figures

There are differences among publishers with respect to what permissions they require for graphs, so a good first step is to consult with your editor on their policies. A few sample policies are:

- Princeton University Press - "Where a chart, graph, or table is being reproduced in a critical study of the work or to buttress an argument of the writer, no permission is needed. Data is not copyrightable. Unless there is a creative element to data depiction that is being reproduced without alteration, fair use can be asserted, with attribution."
- Harvard University Press - "Data is not protected by copyright. However, graphics like tables and charts are copyright protected if the data is organized or presented in a unique way or if the graphic provides interpretation of the data. If you plan to reprint a graphic from another source that is protected by copyright, please clear permission. If you plan to reprint existing tables and charts, adapt existing tables and charts, or create your own tables and charts that will not be subject to copyright protection, please refer to the following guidelines for credit: The standard way to credit tables and charts you are reprinting is: Source: Credit."
- Oxford University Press - "As a guide, you should always seek permission for: . . . Pictures (paintings, drawings, charts, engravings, photographs, cartoons, and so on); Figures and maps; Tables."

There are permissions guidelines that many STM publishers use in setting policies for the reuse of images from their publications. The guidelines include gratis permission for the use of limited numbers of figures/tables/images from journal articles or books, though note that not all members have adopted policies exactly as written in the guidelines.

Many publishers who follow the STM guidelines, or who have similar policies, provide free permissions through the Copyright Clearance Center's Marketplace so those requests are usually quick, easy, and

free. The Marketplace system requires information about your publication and exactly what rights you are seeking. For charts, graphs, or figures that fall outside the guidelines, the license fees are often in the $20-$50 range, although that depends on many factors and could be higher or lower.

If you have questions about using images in a scholarly publication, please email librarycopyright@georgetown.edu.

This work is licensed under a Creative Commons Attribution NonCommercial 4.0 International License. | Details of our policy

**Public Domain** Sherpa

# The rights of publicity and privacy

This info about the rights of publicity and privacy will apply to you if you intend to make **commercial use** of any public domain material having a recognizable person as its subject.

Once you determine that a work is in the public domain, can you use it any way you want? Generally, yes — for copyright purposes. Meaning that you may make and distribute copies of the work (and even sell them), adapt or recast it, perform it, or display it.

But **if the subject of the work is a recognizable person** *and* you want to use the work in a **commercial manner** (in an advertisement, say, or on the cover of a book you're selling) ... you must make sure that you don't infringe that person's **publicity or privacy rights**.



President Richard Nixon and Elvis Presley, 1970.
(National Archives and Records Administration)

For example, this photo of Richard Nixon and Elvis Presley was taken by a White House photographer and is in the public domain. However, Nixon's and Presley's estates may claim rights in their likenesses and images, and commercial use of these photographs may be subject to those claims.

Anyone who wants to use this photo commercially would be well advised to first contact the appropriate representatives of former President Nixon or Mr. Presley or consult with her own legal counsel.

## What do these rights protect against?

The rights of publicity and privacy are **separate from copyright**. While copyright protects a copyright holder's *property* rights in their work, privacy and publicity rights protect *personal interests* of the people who are represented in, or by, the work.

Publicity and privacy issues will almost certainly crop up when you make commercial use of a person's writings, or recordings of their voice, or photos or other pictures of them ... so, it's a good idea to know a bit about what personal interests these rights protect.

### The right to privacy

The gist of the privacy right is that *you* get to control information about you. At its heart is what Louis Brandeis (with coauthor Samuel Warren) summed up, way back in 1890 before he was a Supreme Court Justice, as "the right to be left alone." (I'm paraphrasing there.) The **right to privacy** is invaded by:

- unreasonable intrusion upon the seclusion of another (for example, photographing someone through the window of their house, unbeknownst to them); or
- appropriation of another's name or likeness; or
- unreasonable publicity given to another's private life; or
- publicity that unreasonably places another in a false light before the public.

(*See* Restatement (Second) of Torts § 652 for more information.)

**Example:** An advertiser wants to use a photograph of a woman for a billboard supporting a controversial political cause. The advertiser negotiates a license to use the photo with the photographer, who holds the copyright. If the photographer doesn't have a release from the woman in the photo (permitting the photographer to license all uses of the photo, or otherwise waiving her rights), then the advertiser must get permission from the woman before using her photo on the billboard.

**If there was no release, the woman has kept both privacy and publicity rights in the use of her likeness**. And, depending on how she feels about the political cause for which her image is used ... she could claim she was portrayed in a false light, as well claiming unlawful commercial appropriation of her likeness.

## The right of publicity

A person's right of publicity is the right to protect his or her name or likeness from being commercially exploited without consent and, potentially, compensation. In one sense the right is treated like a property right (the right to profit from the use of one's own image or identity). In another sense it's treated like a privacy right (protection from unjustified intrusion and exploitation).

To avoid violating someone's right of publicity you must be careful about using their:

- image (photos, videos, film);
- likeness (drawings, paintings, prints, etc.);
- name (this includes nicknames and former names);
- voice; or
- signature.

Make sure you **have permission** before using a person's image or likeness, or their voice or signature, in connection with

- advertising for products or services;
- product packaging; or
- on any merchandise that you sell.

**Example:** A company films an instructional video of a man installing an acrylic bathtub liner and distributes the video to its customers. (The man agreed to be filmed for the video.) The company then hires a production company to make a TV commercial for them. The production company uses footage of the man in the commercial. He did not consent to *that use* of his image. The man sues both companies for unlawful appropriation and, depending on the state law applied, damages could be based on the infringers' profits and/or emotional distress.

## The rights of publicity and privacy are matters of state law

While copyright is a federally protected right under title 17 of the United States Code, neither privacy nor publicity rights are the subject of federal law. Publicity and privacy rights are the subject of state laws, and the laws vary from state to state.

While many states have privacy and/or publicity laws, others don't recognize these rights, or they recognize them under other state laws or common law legal theories such as misappropriation and false representation. What may be permitted in one state may not be permitted in another.

Note also that while fair use is a defense to copyright infringement, fair use is *not* a defense to claims of invasion of privacy or violation of publicity rights. So, your best strategy is to **get permission** or consult an attorney before you make commercial use of material with a recognizable person as the subject.

# The right of publicity may survive a person's death

While a person's right to privacy generally ends when he or she dies, **publicity rights may continue after death**. Currently, twelve states have statutes where the right of publicity survives death ... and they vary in how long the right survives — some states say 10 years, some say 100. (One, Tennessee, says indefinitely as long as the right is being exercised.) This generally applies to celebrities only.

Many estates or representatives of famous authors, musicians, actors, photographers, politicians, sports figures, and other public figures do indeed continue to control and license the uses of those figures' names, likenesses, voices, etc. So ... whether or not you believe that Elvis is dead, you can be sure his right of publicity is alive and kicking.

(As previously mentioned, Tennessee is one of the states where the right survives death. And, honestly, it wouldn't matter if it wasn't, because the Presley estate's lawyers could probably convince the court that another state's law applied anyway. Especially if your commercial use was on the Web.)

# What if the right of publicity isn't recognized in my state?

Even if you use a person's name, image, or likeness in a state where the right of publicity isn't recognized, you still could find yourself in hot water. Why? You could also be sued under the federal Lanham Act, 15 USC § 1125(a), for unauthorized uses of a person's identity in order to create a false endorsement. So ... it really doesn't matter that not all states recognize the right, you see. Unfair competition law also provides protection if you use a person's identity to falsely advertise a product.

# What if my use is not commercial?

The right of publicity *doesn't* protect informational or editorial uses. Although the risks for making editorial use of a person's image or likeness may be less than for using it in advertising or for other commercial purposes, you would still run a risk if you held the depicted person up to ridicule or presented that person in a libelous manner. So, um, don't.

# The bottom line

Privacy and publicity issues must be dealt with separate from, and in addition to, copyright. If you intend to use a person's image, likeness, voice or signature **commercially**, make sure you get permission first.

# contents

- [Copyright Basics](Copyright Basics)
- [Copyright Calculator](Copyright Calculator)

- [Copyright Diagram](#)
- [10 Misconceptions](#)
- [Copyfraud](#)
- [Books](#)
- [Maps](#)
- [Photos](#)
- [Sheet Music](#)
- [Sound Recordings](#)
- [Site Search](#)

[Disclaimer](#) | [Privacy Policy](#) | [Site Map](#) | [Back to top](#)

© 2025 www.publicdomainsherpa.com | * legal information is not legal advice *

 Except where otherwise noted, the content of this web site is licensed under a [Creative Commons License](#).

We and our partners share information on your use of this website to help improve your experience.

DO NOT SELL MY INFO          I CONSENT


Office of Communications and Marketing

Home ▸ Multimedia ▸ Photo & Video Recording Release

# Photo & Video Recording Release

This release and authorization agreement ("Agreement") shall confirm that I, (***insert full name in form below***), (hereafter "I" or "Student"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, grant permission to the George Washington University ("GW" or "University") and its licensees, assignees, and other successors-in-interest all rights whatsoever in perpetuity in and to my performance, appearance, voice, and other reproductions of my likeness, name, and/or material ("Appearance") taken in conjunction with (***insert name of event or photo/video project below***), and to use the same or portions thereof, including making and using derivative works thereof in any medium, including without limitation, videos, online broadcasts and brochures (collectively the "Works"), for any university purpose.

I further grant to GW all rights of every kind and nature in the results and proceeds of my Appearance. I acknowledge that GW shall be the sole and exclusive owner of all rights in and to the Works, including, without limitation, the copyright therein and all of the results and proceeds of my Appearance hereunder and shall have the right to exploit any or all of the foregoing in any manner and in any media, whether now known or hereafter devised in perpetuity.

I agree that GW shall have sole editing discretion in determining the extent and manner of use of my Appearance. Nothing herein will be deemed to obligate GW to use my Appearance or the results and proceeds thereof, in the Work or otherwise, or to produce, release or distribute the Works, or to otherwise exploit any rights granted to GW hereunder. GW shall have the right to assign this Agreement (or any of its rights hereunder) to any person, firm, partnership or corporation for any reason and without notice to Student.

I hereby voluntarily assume any and all risks, known or unknown, associated with my Appearance. I and my heirs, executors, administrators and assigns, hereby voluntarily release, discharge, waive and relinquish any and all claims, complaints, liabilities, actions and causes of actions ("Claims") against GW. I agree to defend, indemnify (including any and all attorney's fees) and hold harmless GW in the event of any and all Claims, by whomever or wherever asserted.

I have read, understand and agree to the above terms and conditions. I warrant that I have the right and power to enter into and fully perform this Agreement and to grant GW the rights herein granted. I am over the age of 18 years of age, or I have the approval of my parent or legal guardian if I am under the age of 18. I understand that this contains the entire understanding of the parties relating to the subject matter and cannot be changed or terminated without the written consent of both parties. The provisions shall be binding upon me and my heirs, executors, administrators and successors. All rights, licenses and privileges herein granted are irrevocable and not subject to rescission, restraint or injunction under any circumstances.

**Name**

**Event Name or Photo/Video Project Title**

**Date**

mm/dd/yyyy

**Student Address**

**Email Address**

**Signature**

| Reset |
|---|

Sign above

***If Student is under 18:***

**Student's Parent or Guardian Name**

**Date**

mm/dd/yyyy

**Student's Parent or Guardian Address**

**Signature of Student's Parent or Guardian**

Reset

Sign above

# CAPTCHA

I'm not a robot

reCAPTCHA
Privacy - Terms

Submit

## Office of Communications and Marketing

GW Today

GW Magazine

Editorial Style Guide

Project Requests

Campus Advisories

EO/Nondiscrimination Policy

Website Privacy Notice

Contact GW

Accessibility

Terms of Use

Copyright

Report a Barrier to Accessibility

EoR - 1898 of 2347

ADVERTISEMENT



LEADERSHIP  >  LEADERSHIP STRATEGY

# Vanity, The Devil's Favorite Sin And Leadership's Worst Enemy

By Luis E. Romero, Contributor. Luis E. Romero is an entrepreneur, author, and...

Follow Author

Jun 21, 2021, 01:28pm EDT



Save Article

🕐 This article is more than 3 years old.



Subscribe: Less than $1.50/wk          Sign In



Vanity mirror.   GETTY

*"Vanity… Definitely, my favorite sin,"* said the Devil, played by Al Pacino, right after Keanu Reeves' character starts buying into the idea that he is an undefeatable attorney in the movie *The Devil's Advocate*. Ontologically, it makes sense that the Devil has a predilection for vanity, for it can poison and derail even the most potentially beneficial of feats.

Vanity can very easily be mistaken for self-confidence, especially when it is accompanied by charm, thus becoming very difficult to diagnose for both the person who embodies it and those who witness it. As a result, it can undermine work teams, social groups, political parties, and whole nations silently for years.

The challenge, then, lies in distinguishing between vanity (including all of its expressions, such as narcissism, shallowness, conceit, etc.) and self-confidence (including all of its expressions, such as assertiveness, self-awareness, self-esteem, etc.). The good news is that, in theory, it is very easy to make such a distinction. Whenever people act out of respect for the self and others, most behaviors of protagonism are the result of self-confidence. Yet, in the absence of respect, most behaviors of protagonism are the result of vanity. In practice, though, making this distinction is quite a complex task. Since most vane people are skilled liars and liaison very well with their own kind, the process of spotting them out and weeding them out is uphill.

And let us make no mistake. Every human has an ego as part of their personality structure; hence, we all have a streak of vanity in our behavior. The key is whether we are aware of it and keep it under control, or we are oblivious to it and become its pet. Especially in today's society, so focused on appearances both physical and attitudinal, we are all permanently subjected to the temptation of developing a public persona mainly fueled by vanity, where substance takes a back seat to form.

## Vanity and Leadership

Put simply, leadership is a social phenomenon that happens in the context of teamwork, whereby one person helps guide others in achieving a goal of collective impact by working together. Ideally, the leader should be a person who displays the type of personality traits and technical skills that help align the team toward a shared goal and seize synergies more effectively to that end. Thus, in theory, a sense of service to others and problem-solving skills should be the two main legitimizers of leadership.

MORE FOR YOU

Today's NYT Mini Crossword Clues And Answers For Sunday, March 2nd

WWE Elimination Chamber 2025 Results: Jade Cargill Returns, Bianca Belair Wins

Let us put this into perspective by asking obvious questions. Why would others follow and support you if not to help you solve a problem that affects them; or to provide them with a service they need? Put differently, why would people follow and support you if you are only trying to solve a personal problem; or only servicing yourself? The intuitive answer is, there is no reason. Yet we see plenty of situations where people follow and support so-called leaders that are only servicing themselves. Why does this happen? There are only two possible reasons: 1) people are fearful of the consequences, whatever they may be, if they unfollow the so-called leader; or 2) they are being flat out played, hustled, or defrauded by the so-called leader. In other words, people follow phony leaders out of fear or gullibility.

**CEO: C-suite news, analysis, and advice for top decision makers right to your inbox.**

| Email address | Sign Up |

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

That is why, in the real world, vanity and leadership positions often go hand in hand. Businesses and governments are packed with people in leadership positions servicing themselves while they scheme with others of the same kind for protection. This is the dark side of power, which brings up one of humanity's oldest challenges—choosing the right leaders. Since election-based government systems were first established in human history (i.e., elders' councils, plutocracies, constitutional monarchies, democracies, etc.), people (even if just a few in some cases and many in others) have had the all-too-important responsibility to distinguish between self-declared public servants who only want to serve

themselves, and real leaders driven by a real call to serve as selflessly as possible. As history proves, we have not always made the right decisions. Yet the main requirement to make the correct choice has always been the same: knowledge.



00:00                                                                                                                    03:12

Uninformed people are usually easy to intimidate and/or defraud. Therefore, they tend to choose the wrong leaders. This is so in business and politics. A board of shareholders is as likely to appoint the wrong CEO as a country is to elect the wrong president when they are easily charmed by charlatans and/or easily frightened by dogma. In either case, they end up appointing or electing those set to abuse them. Again, the solution is knowledge, both in the human realm (learning to be a good judge of character) and in the technical realm (knowing the true nature of the problems at hand, and the most likely places where to find the solutions, which more often than not lie in science, objectivity, critical thinking, and empathy).

**Leadership Is About Wanting to Be Useful to Others**

Leadership should not be a goal in itself. True, functional leadership is the byproduct of passionately pursuing a goal of positive collective impact. When a group of people witnesses a particular person passionately pursing a goal that incorporates the group's long-held aspirations and long-awaited vindications, the leadership phenomenon will start to occur as a catalyst for the whole group to achieve their goals. This, of course, bestows a newfound power upon the rising leader, who will then have to choose whether to succumb to the seductive, vane feelings that come with power and influence, or to remain faithful to her/his initial goals and the loyalties that ensued along the way. If the latter is the case, all the people involved will experience the best kind of synergy, which results from people working together based on shared interests and mutual trust. However, if the former scenario prevails, a power dynamic will ensue whereby the rising star will become the nightmare the rest had never imagined.

As you read this post, you may wonder whether people like Adolf Hitler, Kim Jong-il, or Fidel Castro were true leaders. The one and only answer is an absolute NO. Whenever the people around a so-called leader choose not to speak their minds and to repress their will out of fear of being killed, imprisoned, exiled, or subjected to some other form of abuse, we are talking about coercion, not leadership. The same is true in business, family, religion, etc. As stated earlier, leadership is earned, not taken. Leadership is built based on trust, not imposed based on fear. No dictator is a leader, no despotic boss is a leader, no abusive authority figure is a leader.

Every organization wanting to benefit from real leadership must forgo leadership as a standalone slogan. Rather, they should develop a culture based on service, hard work, excellence, innovation, respect, and zero tolerance for mediocrity. Only in such an environment can true examples of leadership flourish, contributing to the organic evolution of the organization towards better performance and climate.

*Follow me on Twitter or LinkedIn. Check out my website or some of my other work.*

Editorial Standards        Forbes Accolades

ADVERTISEMENT

**RELATED TOPICS**

**SEE ALSO**

# Forbes

© 2025 Forbes Media LLC. All Rights Reserved.

AdChoices    Privacy Statement    Do Not Sell or Share My Personal Information
Limit the Use of My Sensitive Personal Information    Privacy Preferences    Digital Terms of Sale    Terms of Service
Contact Us    Send Us Feedback    Report a Security Issue    Jobs At Forbes    Reprints & Permissions
Forbes Press Room    Advertise

1. Skip to main content



*GEORGETOWN UNIVERSITY*

1.



Search this Site [        ] Search

The Office of Public Affairs

1. Strategic Communications
   1. Media Relations
      1. Press Center
      2. Policy for Filming at Georgetown University
      3. On-Campus Media Policy
      4. Marineau Broadcast Studio
   2. Internal Communications
   3. Creative Services
      1. Multimedia Production
      2. Art & Graphic Design
   4. Editorial Services
   5. Social Media
      1. Social Media Working Group
   6. Policies
2. Business Policy
   1. Advisory Committee on Business Practices
      1. Just Employment Policy for Georgetown University
      2. Just Employment Reporting
   2. Licensing Oversight Committee
      1. Code of Conduct for Georgetown University Licensees
   3. Committee on Investments and Social Responsibility
      1. Socially Responsible Investing Policy
3. Protocol & Events
4. Visual Identity
5. Athletics
6. Public Safety
   1. Georgetown University Police Department
   2. Office of Emergency Management
7. Staff

The Office of Public Affairs

1. Strategic Communications
   1. Media Relations

1. Press Center
2. Policy for Filming at Georgetown University
3. On-Campus Media Policy
4. Marineau Broadcast Studio

2. Internal Communications
3. Creative Services 〉〉
    1. Multimedia Production
    2. Art & Graphic Design
4. Editorial Services
5. Social Media 〉〉
    1. Social Media Working Group
6. Policies

2. Business Policy 〉〉
    1. Advisory Committee on Business Practices 〉〉
        1. Just Employment Policy for Georgetown University
        2. Just Employment Reporting
    2. Licensing Oversight Committee 〉〉
        1. Code of Conduct for Georgetown University Licensees
    3. Committee on Investments and Social Responsibility 〉〉
        1. Socially Responsible Investing Policy
3. Protocol & Events
4. Visual Identity
5. Athletics ↗
6. Public Safety 〉〉
    1. Georgetown University Police Department
    2. Office of Emergency Management
7. Staff

1.

🔍

Search this Site [                    ] [ Search ]

✕

1. Home
2. Office of Strategic Communications
3. Policies

# Policies

1. Skip in-page jump links and go directly to main content



1. Georgetown Name Usage and Vendor PR Policy
2. Filming on Georgetown University's Campus
3. On-Campus Media Policy

1. Georgetown Name Usage and Vendor PR Policy
2. Filming on Georgetown University's Campus
3. On-Campus Media Policy

# Georgetown Name Usage and Vendor PR Policy

Georgetown does not provide endorsements of products or vendors or contribute to vendor case studies. Upon approval from the Office of Communications, a vendor may utilize Georgetown's name in a text list of customers or clients, or in a work portfolio. Any logo or likeness usage must be approved by the Georgetown Visual Identity Group.

Georgetown does not generally issue joint press releases with vendors or outside organizations, and press releases using the Georgetown University name must be approved by Georgetown's Office of Communications. Releases must be factual and may not include vendor promotion, including quotes from university representatives that may imply endorsement.

Read the Full Name Usage and Vendor PR Policy

# Filming on Georgetown University's Campus

Georgetown University's campuses, including their grounds, buildings, classrooms, and dormitories, are private property. Except as permitted by and in compliance with this Policy, you may not shoot film, photos, or video, or make audio recordings (all of which, for convenience, are referred to in this Policy as "filming") on campus. The University's Office of Strategic Communications (OCOMM), in consultation with other University stakeholders, is responsible for granting or denying requests to film on campus.

Read the Full Filming Policy

# On-Campus Media Policy

Georgetown's campus is private property and written permission from the Office of Strategic Communications is required before external filming or photography can take place in exterior or interior spaces on-campus.

The Office of Strategic Communications is available to assist news media with shooting stills, video and film on campus, including setting up locations and gaining access to restricted areas after permission has been granted. Generally, filming is not allowed in classrooms or student residences.

Read the Full On-Campus Media Policy

The Office of Public Affairs    *GEORGETOWN UNIVERSITY*

1. Facebook↗
2. Twitter↗
3. Instagram↗
4. LinkedIn↗
5. YouTube↗

*37th and O Streets, N.W.*
*Washington DC*

1. Privacy Policy

2. [Copyright](#)
3. [Accessibility](#)
4. [Notice of Non-Discrimination](#)

© 2025 The Office of Public Affairs

1. [Facebook](#) ↗
2. [Twitter](#) ↗
3. [Instagram](#) ↗
4. [LinkedIn](#) ↗
5. [YouTube](#) ↗

[The Office of Public Affairs](#)  *GEORGETOWN UNIVERSITY*

*37th and O Streets, N.W.*
*Washington DC*

1. [Privacy Policy](#)
2. [Copyright](#)
3. [Accessibility](#)
4. [Notice of Non-Discrimination](#)

© 2025 The Office of Public Affairs

(https://www.georgetown.edu)

Home (https://www.georgetown.edu/)     Georgetown Reflects on Slavery, Memory, and
/                                       Reconciliation

# Georgetown Reflects on Slavery, Memory, and Reconciliation

Georgetown is engaged in a long-term and ongoing process to more deeply understand and respond to the university's role in the injustice of slavery and the legacies of enslavement and segregation in our nation. Through engagement with the members of the Descendant community, collaborative projects and new initiatives and learning and research, the university pursues a path of memorialization and reconciliation in our present day.

**Quick Links**

*For Descendants (https://www.georgetown.edu/slavery/descendants/)*

*History (https://www.georgetown.edu/slavery/history/)*

*News and Events (https://www.georgetown.edu/slavery/news/)*

EoR - 1909 of 2347



GEORGETOWN
UNIVERSITY
(https://www.georgetown.edu)

# Reconciliation Fund

The Reconciliation Fund, inspired by a 2019 student referendum, awards $400,000 annually to community-based projects that have direct impact on Descendant communities whose ancestors were once enslaved on the Maryland Jesuit plantations. Fall 2022 Applications for the Reconciliation Fund are now being accepted.

**More About the Fund  >  (https://www.georgetown.edu/slavery/reconciliation-fund/)**



## Georgetown Forms 5-Year Partnership with the Southern University System

Georgetown has signed a memorandum of understanding with the Southern University System, the only historically Black university system in the U.S., to partner on interdisciplinary programming, research and training over the next five years.

More About the Partnership  ›
(https://www.georgetown.edu/news/georgetown-forms-5-year-partnership-with-the-southern-university-system/)

EoR - 1911 of 2347



*GEORGETOWN UNIVERSITY*
(https://www.georgetown.edu)

## Continuing the Support

With the ongoing support and active participation of Georgetown, the Jesuits and Descendants of the 272 enslaved individuals sold in 1838 by the Maryland Province of Jesuits establish a new charitable foundation focused on racial healing and educational advancement.

**More about the foundation and work  >**
**(https://www.georgetown.edu/news/georgetown-continues-support-as-jesuits-descendants-of-enslaved-form-foundation/)**

*Slavery, Memory, & Reconciliation Focus Areas*



## Engaging Descendants

**Learn more about Descendant Community Engagement** ›
(https://www.georgetown.edu/slavery/focus-areas/)



GEORGETOWN
UNIVERSITY
(https://www.georgetown.edu)

## Public History and Memorialization

Major improvements to the historic cemetery that includes many unmarked graves for enslaved Black people as well as marked graves of free Black people, including family members of the pioneering DC educator Anne Marie Becraft, have now been completed by Georgetown and Holy Trinity Church.

**Learn more about public history** ⟩ (https://www.georgetown.edu/slavery/focus-areas/#public-history)

(https://www.georgetown.edu)



## Academic Initiatives

**Learn more about Academics and Research** ⟩ (https://www.georgetown.edu/slavery/focus-areas/#academic-and-research-initiatives)

*More News*     ([https://www.georgetown.edu](https://www.georgetown.edu))

**More stories on the legacy of slavery   ⟩**
**([https://www.georgetown.edu/news/tag/slavery-memory-and-reconciliation/](https://www.georgetown.edu/news/tag/slavery-memory-and-reconciliation/))**



Georgetown Community Marks 160th Emancipation Day
Anniversary (/news/georgetown-community-marks-160th-
emancipation-day-anniversary/)



Black Georgetown Rediscovered: Students Help Preserve History at Underground Railroad Hideout (/news/black-georgetown-rediscovered-students-help-preserve-history-at-underground-railroad-hideout/)

Students in the Black Georgetown Rediscovered course toured the Mount Zion – Female Union Band Society cemeteries and helped document the estimated 9,000 Black residents of Georgetown buried at the site.



Georgetown Preserves Memory, Charts Path for Lasting Change at Emancipation Day Conference on Legacies of Enslavement (/news/georgetown-preserves-memory-charts-path-for-lasting-change-at-emancipation-day-conference-on-legacies-of-enslavement/)

This year's Universities Studying Slavery Conference examined recent efforts to trace historical and contemporary legacies of enslavement and implement lasting change.

## Discovery and Making an Impact

Read More Reflections     (https://www.georgetown.edu/slavery-memory-and-reconciliation-reflections/)



"In order for us to grow as a society, we need to acknowledge and right the wrongs of the past," he said. "I am privileged in my ability to be a Ph.D student at Georgetown University, but I believe it is my duty as a leader to make sure that Georgetown fulfills its promise to the Descendants of the slaves that the school exploited in its past."

Zac's Reflection      (https://www.georgetown.edu/news/georgetown-launches-400000-annual-fund-to-support-descendants-of-the-enslaved/)



GEORGETOWN
UNIVERSITY
(https://www.georgetown.edu)

"Studying abroad in Scotland solidified my passion for history. I received a Penner Family Experiences Grant during my junior year and completed an independent research project on the Trans-Atlantic activism of Frederick Douglass and Ida B. Wells-Barnett."

Tianna's Reflection     (https://college.georgetown.edu/news-story/masters-student-examines-effects-of-slavery-in-history-of-the-white-house-through-fellowship/#)



*GEORGETOWN*
*UNIVERSITY*
(https://www.georgetown.edu)

"The Georgetown Slavery Archive stands out as one of the most extensive and accessible digital repository of archival material documenting any school's history. It also provides an unmatched window into the entanglement of religion and slavery."

Professor Rothman's Reflection        (https://www.georgetown.edu/news/adam-rothman/)



*GEORGETOWN*
*UNIVERSITY*
([https://www.georgetown.edu](https://www.georgetown.edu))

"It is important to deal with things in present and to choose specific issues to dive into deeply. For me, it's … figuring out what racial reconciliation looks like."

Miles' Reflection        (https://college.georgetown.edu/news-story/junior-in-college-one-of-23-selected-for-the-congressional-hispanic-caucus-undergraduate-fellows-program/#)



GEORGETOWN
UNIVERSITY
(https://www.georgetown.edu)

"Uncovering the stories and history of the people the Jesuits enslaved is necessary and a step in the right direction to repairing a broken and whitewashed historical narrative."

Paul's Reflection        (https://www.georgetown.edu/news/transcription-event-for-georgetown-slavery-archive-honors-dc-emancipation-day/)

Quick Links
(https://www.georgetown.edu)

*Slavery, Memory, and Reconciliation Library Collections*
*(https://www.library.georgetown.edu/news/grant-supports-*
*slavery-memory-and-reconciliation-collections)*

*Joseph P. Mobberly, S.J. Papers on Jesuit Slaveholding*
*(DigitalGeorgetown)*
*(https://repository.library.georgetown.edu/handle/10822/1060285)*

*Maryland Province Archives*
*(https://www.library.georgetown.edu/special-*
*collections/maryland-province-archives)*

Georgetown Slavery Archive (https://www.georgetown.edu/slavery/georgetown-slavery-archive/)

Honoring
Juneteenth (https://www.georgetown.edu/juneteenth/)
(https://www.georgetown.edu)

Contact Us
(https://www.georgetown.edu/contact/)

Directory (http://contact.georgetown.edu/)

Visit (https://www.georgetown.edu/plan-
your-visit/)

Maps (https://maps.georgetown.edu)

About
(https://www.georgetown.edu/about/)

Academic Calendar
(https://registrar.georgetown.edu/academic-
calendar)

Careers (https://careers.georgetown.edu/)

Media Resources
(https://www.georgetown.edu/media-
resources/)

Instagram (https://www.instagram.com/georgetownuniversity/)

LinkedIn (https://www.linkedin.com/school/georgetown-university/)

TikTok (https://www.tiktok.com/@georgetownu?lang=en)

X (https://twitter.com/georgetown)

Facebook (https://www.facebook.com/georgetownuniv)

Threads (https://www.threads.net/@georgetownuniversity)

YouTube (https://www.youtube.com/georgetownuniversity)

*Georgetown University*

*37th and O Streets, N.W.*

*Washington, D.C. 20057*

*P. 202–687–0100 (tel:+12026870100)*

(/)                                    ([https://www.georgetown.edu](https://www.georgetown.edu))

Privacy Policy (https://www.georgetown.edu/privacy-policy/)

Copyright (https://www.library.georgetown.edu/copyright)          Accessibility (https://accessibility.georgetown.edu/)

Notice of Non-Discrimination (https://ideaa.georgetown.edu/notice-of-non-discrimination/)

© 2025 Georgetown University



nigger

Dictionary        Thesaurus

# nigger noun

nig·ger    ˈni-gər 

**plural niggers**

**1**    **offensive; see usage paragraph below** → used as an insulting and contemptuous term for a Black person

**2**    **offensive; see usage paragraph below** → used as an insulting and contemptuous term for a member of any dark-skinned race (see RACE entry 1 sense 1a)

**3**    **now often offensive; see usage paragraph below** : a member of a class or group of people who are systematically subjected to discrimination and unfair treatment

   it's time for somebody to lead all of America's *niggers* ... all the people who feel left out of the political process
   — Ron Dellums

## ⚠️ Usage of *Nigger*

*Nigger* is an infamous word in current English, so much so that when people are called upon to discuss it, they more often than not refer to it euphemistically as "the N-word." In senses 1 and 2, the word ranks as almost certainly the most offensive and inflammatory racial slur in English, a term expressive of hatred and bigotry. Sense 3 is also now rarely used and is often considered offensive. The word's self-referential uses by and among Black people are not always intended or taken as offensive (although many object to those uses as well), but its use by a person who is not Black to refer to a Black person can only be regarded as a deliberate expression of contemptuous racism.

<

|        Dictionary        |        Thesaurus        |
|:-------------------------|:------------------------|

**Did the definition of *nigger* change?**

There is a widespread belief that the original meaning of *nigger*, as defined in dictionaries, was "an ignorant person," and a related belief that current dictionary definitions describing its use as a hateful, racist epithet are a recent change. We do not know the source of those beliefs, but they are not accurate. The word was first included in a Merriam-Webster dictionary in 1864, at which time it was defined as a synonym of *Negro*, with a note indicating that it was used "in derision or depreciation." There has never been a definition like "an ignorant person" for this word in any subsequent dictionary published by this company. Nor do we know of such a definition in any earlier dictionary.

## Etymology

alteration of earlier *neger*, from Middle French *negre*, from Spanish or Portuguese *negro*, from *negro* black, from Latin *niger*

## First Known Use

circa 1775, in the meaning defined at sense 1

## Time Traveler

**The first known use of *nigger* was circa 1775**

See more words from the same year

Dictionary                                    Thesaurus

**Style**    MLA

"Nigger." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/nigger. Accessed 1 Mar. 2025.

⧉ Copy Citation

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

Dictionary | Thesaurus



Can you solve 4 words at once?

Play



WORD OF THE DAY

**factoid**

See Definitions and Examples »

Get Word of the Day daily email!

Your email addre | SUBSCRIBE

Dictionary                                          Thesaurus

**How to Use Em Dashes (—), En Dashes (–) , and Hyphens (-)**

**'In Vino Veritas' and Other Latin Phrases to Live By**

**Even More Words That Sound Like Insults But Aren't**

**See More**

Dictionary | Thesaurus



## Quordle
Can you solve 4 words at once?

**Play**

## Blossom Word Game
Pick the best words!

**Play**

## Missing Letter
A daily crossword with a twist

**Play**

## Hollywood Lingo Quiz
Are you a showbiz whiz?

**Take the quiz**

**See All**

Learn a new word every day.
Delivered to your inbox!

Your email address        SUBSCRIBE

Dictionary                              Thesaurus

© 2025 Merriam-Webster, Incorporated

# FAQs on Photos and Videos under FERPA

## 1. When is a photo or video of a student an education record under FERPA?

As with any other "education record," a photo or video of a student is an education record, subject to specific exclusions, when the photo or video is: (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution. (20 U.S.C. 1232g(a)(4)(A); 34 CFR § 99.3 "Education Record")[1]

Directly Related to a Student:

FERPA regulations do not define what it means for a record to be "directly related" to a student. In the context of photos and videos, determining if a visual representation of a student is *directly* related to a student (rather than just incidentally related to him or her) is often context-specific, and educational agencies and institutions should examine certain types of photos and videos on a case by case basis to determine if they directly relate to any of the students depicted therein. Among the factors that may help determine if a photo or video should be considered "directly related" to a student are the following:

- The educational agency or institution uses the photo or video for disciplinary action (or other official purposes) involving the student (including the victim of any such disciplinary incident);
- The photo or video contains a depiction of an activity:
  - that resulted in an educational agency or institution's use of the photo or video for disciplinary action (or other official purposes) involving a student (or, if disciplinary action is pending or has not yet been taken, that would reasonably result in use of the photo or video for disciplinary action involving a student);
  - that shows a student in violation of local, state, or federal law;
  - that shows a student getting injured, attacked, victimized, ill, or having a health emergency;
- The person or entity taking the photo or video intends to make a specific student the focus of the photo or video (e.g., ID photos, or a recording of a student presentation); or
- The audio or visual content of the photo or video otherwise contains personally identifiable information contained in a student's education record.

A photo or video should not be considered directly related to a student in the absence of these factors and if the student's image is incidental or captured only as part of the background, or if a student is shown participating in school activities that are open to the public and without a specific focus on any individual.

Examples of situations that may cause a video to be an education record:

- A school surveillance video showing two students fighting in a hallway, used as part of a disciplinary action, is directly related to the students fighting.
- A classroom video that shows a student having a seizure is directly related to that student because the depicted health emergency becomes the focus of the video.
- If a school maintains a close-up photo of two or three students playing basketball with a general view of student spectators in the background, the photo is directly related to the basketball players because they are the focus of the photo, but it is not directly related to the students pictured in the background. Schools often designate photos or videos of students participating in public events (e.g., sporting events, concerts, theater performances, etc.) as directory information and/or obtain consent from the parents or eligible students to publicly disclose photos or videos from these events.
- A video recording of a faculty meeting during which a specific student's grades are being discussed is directly related to that student because the discussion contains PII from the student's education record.

Maintained by an educational agency or institution:

To be considered an education record under FERPA, an educational agency or institution, or a party acting for the agency or institution, also must maintain the record. Thus, a photo taken by a parent at a school football game would not be considered an education record, even if it is directly related to a particular student, because it is not being maintained by the school or on the school's behalf. If, however, the parent's photo shows two students fighting at the game, and the parent provides a copy of the photo to the school, which then maintains the photo in the students' disciplinary records, then the copy of the photo being maintained by the school is an education record.

Exclusion for Law Enforcement Unit Records

The FERPA statute and regulations (20 U.S.C. 1232g(a)(4)(B)(ii) and 34 CFR §§ 99.3 and 99.8) exclude from the definition of education records those records created and maintained by a law enforcement unit of an educational agency or institution for a law enforcement purpose. Thus, if a law enforcement unit of an educational agency or institution creates and maintains the school's surveillance videos for a law enforcement purpose, then any such videos would not be considered to be education records. If the law enforcement unit provides a copy of the video to another component within the educational agency or institution (for example, to maintain the record in connection with a disciplinary action), then the copy of the video may become an education record of the student(s) involved if the video is not subject to any other exclusion from the definition of "education records" and the video is: (1) directly related to a student; and (2) maintained by an educational agency or institution or by a party acting for the agency or institution.

## 2. Can the same recorded image be the education record of more than one student under FERPA?

Yes. For example, a surveillance video that shows two students fighting on a school bus that the school uses and maintains to discipline the two students, would be "directly related to" and, therefore, the education record of both students.

## 3. If a video is an education record for multiple students, can a parent of one of the students or the eligible student view the video?

When a video is an education record of multiple students, in general, FERPA requires an educational agency or institution to allow an individual parent of a student (or the student if the student is an eligible student) to whom the video directly relates to inspect and review, or "be informed of" the content of the video, consistent with the FERPA statutory provisions in 20 U.S.C. § 1232g(a)(1)(A) and regulatory provisions at 34 CFR § 99.12(a). FERPA generally does not require the educational agency or institution to release copies of the video to the parent or eligible student.

In providing access to the video, the educational agency or institution must provide the parent of the student (or the student if the student is an eligible student) with the opportunity to inspect and review or "be informed of" the content of the video. If the educational agency or institution can reasonably redact or segregate out the portions of the video directly related to other students, without destroying the meaning of the record, then the educational agency or institution would be required to do so prior to providing the parent or eligible student with access. On the other hand, if redaction or segregation of the video cannot reasonably be accomplished, or if doing so would destroy the meaning of the record, then the parents of each student to whom the video directly relates (or the students themselves if they are eligible students) would have a right under FERPA to inspect and review or "be informed of" the entire record even though it also directly relates to other students.

For a fuller legal analysis and explanation of this issue, please see the 2017 Letter to Wachter (http://studentprivacy.ed.gov/sites/default/files/resource_document/file/Letter%20to%20Wachter%20%28Surveillance%20Video%20of%20Multiple%20Students%29_0.p

## 4. If a video is an education record for multiple students, can the parent of one of the students (or the eligible student) receive a copy of the video?

While we do not advise on an educational agency's or institution's obligations under any state open records laws that may apply, we note that FERPA does not generally require an educational agency or institution to provide copies of education records to parents and eligible students[2]. That said, it would not violate FERPA for an educational agency or institution to non-consensually disclose to an eligible student or to his or her parents copies of education records that the eligible student or his or her parents otherwise would have the right to inspect and review under FERPA.

For a fuller legal analysis and explanation of this issue, please see the 2017 Letter to Wachter (https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Letter%20to%20Wachter%20%28Surveillance%20Video%20of%20Multiple%20Students%29_0.

## 5. If redaction or segregation of an education record of multiple students can be reasonably accomplished without destroying the meaning of the education record, can educational agencies and institutions charge parents or eligible students for the costs of the redaction or segregation?

No. FERPA provides parents and eligible students with the right to inspect and review the student's education records, and nothing in the FERPA statute or regulations permits educational agencies and institutions to charge parents or eligible students for fees or costs associated with exercising that right.

If a school elects to provide a parent or eligible student with a copy of the education records, then the FERPA regulations (34 CFR § 99.11(a)) generally permit (with the exception noted below) the school to charge for the costs required to make the copy. FERPA regulations (34 CFR § 99.11(b)) also provide that the school may not charge a parent or eligible student for the costs to search for or retrieve the education records. We view the costs, if any, to the school of redacting, or segregating, education records of multiple students as being like the costs of search and retrieval that may not be charged to parents or eligible students, rather than like the costs for copies that generally may be charged to parents and eligible students. As noted above, if an educational agency or institution can reasonably redact or segregate out portions of an education record that is directly related to other students, without destroying the meaning of the record, then the educational agency or institution must do so and therefore cannot charge parents or eligible students for the costs associated with exercising their right to inspect and review such education records.

In contrast, parents and eligible students generally may be charged for the costs of making copies of education records precisely because FERPA generally does not require the school to provide them with such copies. Thus, where the redaction or segregation of education records of multiple students can be reasonably accomplished without destroying the meaning of the education records, nothing in FERPA permits educational agencies or institutions to charge parents or eligible students for the costs of making the required redactions or segregation. Please note that the FERPA regulations (34 CFR § 99.11(a)) similarly provide that if a fee for copies effectively prevents a parent or an eligible student from exercising the right to inspect and review his or her education records, an educational agency or institution would be required to provide copies without payment. Such cases would be limited to a parent or an eligible student providing evidence of the inability to pay for the copies due to financial hardship.

## 6. Does FERPA permit legal representatives of parents or eligible students to inspect and review videos with the parent or eligible student?

Yes. FERPA permits legal representatives of a parent or an eligible student to inspect and review videos with the parent or eligible student. While FERPA does not require educational agencies and institutions to allow parents or eligible students to bring their attorney or other legal representative with them when they exercise their right to inspect and review the student's education records, nothing in FERPA prevents educational agencies and institutions from allowing parents or eligible students to bring their attorney or other legal representative with them when they exercise their right to inspect and review the student's education records under FERPA.

## 7. Does FERPA permit educational agencies and institutions turn over videos to the police upon request or following an incident that may warrant police involvement?

If the law enforcement unit of an educational agency or institution creates and maintains videos for a law enforcement purpose, then the videos would not be education records and FERPA would not prohibit the law enforcement unit of an educational agency or institution from disclosing the videos to the police. If the videos are education records, however, educational agencies and institutions may not turn over videos to the police upon request without having first either obtained the written consent of the parent or eligible student or determined that the conditions of an exception to the general requirement of consent have been met, such as if the disclosure is made in connection with a health or safety emergency (20 U.S.C. 1232g(b)(1)(I) and 34 CFR §§ 99.31(a)(10) and 99.36) or the law enforcement officer has presented the educational agency or institution with a judicial order or a lawfully issued subpoena (20 U.S.C. 1232g(b)(1)(J) and (b)(2) and 34 CFR § 99.31(a)(9)).

[1] The Individuals with Disabilities Education Act (IDEA) also contains privacy protections that apply to children with disabilities. 20 U.S.C. 1417(c) and 34 CFR §§ 300.610-300.626 and 34 CFR §§ 303.401-303.416. Under the IDEA, participating agencies must protect the personally identifiable information (PII), data, or records that are collected, maintained, or used by the participating agency. While the definition of "education record" under Part B of the IDEA cross-references the FERPA definition in 34 CFR § 99.3, the application of IDEA requirements may raise different questions.

[2] If circumstances effectively prevent the parent or eligible student from otherwise exercising their right to inspect and review the student's education records (e.g., if the parent lives outside of commuting distance to the school), then the educational agency or institution would be required to either provide a copy of the records or to make other arrangements for the parent or eligible student to inspect and review the records. 34 CFR § 99.10(d)

**Audience**
K-12 School Officials
Parents and Students
Postsecondary School Officials

**Topics**
Photos and Videos under FERPA

FEATURED RESOURCES

## A Parent Guide to the Family Educational Rights and Privacy Act (FERPA) (/resources/parent-guide-family-educational-rights-and-privacy-act-ferpa)

The Family Educational Rights and Privacy Act or FERPA provides certain rights for parents regarding their children's education records. This guide provides general information on a parent's rights under FERPA.

## An Eligible Student Guide to the Family Educational Rights and Privacy Act (FERPA) (/resources/eligible-student-guide-family-educational-rights-and-privacy-act-ferpa)

The Family Educational Rights and Privacy Act or FERPA provides certain rights for parents regarding their children's education records. When a student reaches 18 years of age or attends an institution of postsecondary education at any age, the student becomes an "eligible student," and all rights under FERPA transfer from the parent to the student. This guide provides general information on an eligible student's rights under FERPA.

## Protection of Pupil Rights Amendment (PPRA) General Guidance (/resources/protection-pupil-rights-amendment-ppra-general-guidance)

This guidance document reviews parents' rights under the PPRA and education officials' obligations in implementing the PPRA.  The PPRA applies to the programs and activities of a State educational agency (SEA), local educational agency (LEA), or other recipient of funds under any program funded by the U.S. Department of Education. (20 U.S.C. § 1232h, 34 CFR Part 98)

RESOURCES

Family Educational Rights and Privacy Act (FERPA) (/ferpa)

Legal Basics (/legal-basics)

Security Best Practices (/topic/security-best-practices)

Glossary (/glossary)

Letters of Importance (/topic/letters-importance)

Historic Findings Letters (/historical-archive-issued-letters)

**TRAINING**

Online Training Modules (/content/online-training-modules)

Guidance Videos (/content/videos)

Recorded Webinars (/content/recorded-webinars)

**BROWSE BY AUDIENCE**

School Officials K-12 (/audience/school-officials-k-12)

Parents & Students (/audience/parents-and-students)

Postsecondary School Officials (/audience/school-officials-post-secondary)

Early Childhood Educators (/audience/early-childhood-educators)

Vendors (/audience/education-technology-vendors)

Researchers (/audience/researchers)

**OTHER**

FAQs (/frequently-asked-questions)

Legal Basics (/legal-basics)

Contact (/contact)

Subscribe to the Student Privacy Newsletter (/subscribe-student-privacy-newsletter)

Request PTAC Training or Technical Assistance (/request-ptac-training-or-technical-assistance)

Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)

*The Georgetown Slavery Archive*

Home | Items | Collections | Gallery | Multimedia | Map | Descendants | Further reading | For Teachers | About | Contact



The Georgetown Slavery Archive is a repository of materials relating to the Maryland Jesuits, Georgetown University, and slavery. This project was initiated in February 2016 by the Archives Subgroup of the Georgetown University Working Group on Slavery, Memory, and Reconciliation and is part of Georgetown University's Slavery, Memory, and Reconciliation initiative. Our research is ongoing.

Follow us on Twitter at @GUSlavery for news and updates.

## FEATURED ITEM

### The *Margaret*, 1718



Records of the slave ship Margaret out of London, which transported more than 100 captive Africans from Bunce Island to Annapolis in 1718. (Click here…

## FEATURED COLLECTION

### Sale of Maryland Jesuit enslaved community to Louisiana in 1838



These archival materials relate to the sale of 272 men, women, and children by Rev. Thomas Mulledy in 1838.

## FEATURED EXHIBIT

### Gallery



A selection of items from the Georgetown Slavery Archive.

## RECENTLY ADDED ITEMS

### John Ashton places a runaway advertisement for Tom, June 15, 1775



Rev. John Ashton, a Jesuit priest in Maryland, places an advertisement in the Maryland Gazette for a man named Tom in 1775. Rev. Ashton was a Jesuit…

### Interview with Kyla Matthews (L'25), March 19, 2023

An interview with Georgetown Law Center student and GU272 descendant Kyla Matthews (L'25) conducted by Lady Nwadike for We Are Georgetown: Celebrating…

### Andrew Bordea, An interview with Henrietta Pike, May 4, 2023



Interview with Henrietta Pike, a descendant of Louisa Mahoney Mason, conducted on May 4, 2023 by Georgetown student Andrew Bordea (GU'26). A…

### William Gaston & Slavery: A Conversation between Professor John Mikhail and Professor Adam Rothman



Audio recording and transcript of a conversation between Georgetown Law Center's Professor John Mikhail and Georgetown University historian Professor…

### Runaway Ad for Nicholas, *Southern Sentinel*, April 12, 1856



A runaway advertisement for Nicholas, who said he was owned by Henry Johnson. The ad was placed by jailor Theodore Blanchard in the Plaquemine,…

View All Items

Home · Items · Collections · Gallery · Multimedia · Map · Descendants · Further reading · For Teachers · About · Contact   Proudly powered by Omeka.

 (http://www.georgetown.edu/)

 (http://www.georgetown.edu/)

Student Health Services (https://studenthealth.georgetown.edu)

# Medical Records Request

Requests for medical records from the Student Health Center should be submitted using a Medical Records Request Form (https://georgetown.box.com/s/dohcx2edtfqzbsco9k5k). Once completed please send the form through your MyMedStar Patient Portal account (https://www.mymedstar.org/) or fax the form to (877) 346-1469. If you have any questions about requesting your medical records or how to complete and return the request form, please call us at (202) 687-2200.



### Student Health Services

37th and O Streets, N.W.
Washington DC

 (http://www.georgetown.edu/)
Human Resources Policy Manual (https://policymanual.hr.georgetown.edu)

# 1004: Policy Statement on Harassment

## Policy Statement on Harassment
## (Relating to Protected Categories)

Harassment is a form of discrimination prohibited by law. It is the policy of Georgetown University to prohibit harassment on the basis of age, color, disability, family responsibilities, gender identity and expression, genetic information, marital status, national origin and accent, personal appearance, political affiliation, pregnancy, race, religion, sex, sexual orientation, source of income, veteran's status or other factors prohibited by federal and/or District of Columbia law ("Protected Categories").Sexual harassment is addressed under the University's Policy Statement on Sexual Misconduct.

Harassment is verbal or physical conduct that denigrates or shows hostility or aversion to an individual because of a Protected Category as specified above, when such conduct has the purpose or effect of: unreasonably interfering with an individual or third party's academic or work performance; creating an intimidating, hostile, or offensive educational or work environment; or otherwise adversely affecting an individual or third party's academic or employment opportunities.[1]

Harassment may include, but is not limited to: verbal abuse or ridicule, including slurs, epithets, and stereotyping; offensive jokes and comments; threatening, intimidating, or hostile acts, and displaying or distributing offensive materials, writings, graffiti, or pictures. Harassment may include conduct carried out through the internet, email, social media, or other electronic means.

*Interpretive guidance:*

- A hostile, intimidating, or offensive environment exists when conduct is severe or pervasive.  Factors to be considered in determining whether conduct is severe or pervasive include the nature, scope, frequency, and duration of the conduct and the number of persons involved. Simple teasing, offhand comments, or isolated incidents that are not severe or pervasive do not create a hostile or offensive environment.
- If an issue of harassment is raised in strictly academic areas, such as coursework, the matter will be handled in consultation and coordination between IDEAA and the Executive Vice President or Dean of the faculty member's school because such matters may also concern issues of academic freedom.
- To constitute harassment, the conduct in question must be objectively intimidating, hostile or offensive, and must interfere with a person's ability to participate in employment or educational programs or activities of the University. The injured party's perception of the offensiveness of the alleged conduct, standing alone, is not sufficient by itself to constitute harassment.

---

[1] This policy does not apply to conduct that is unrelated to a Protected Category.

- Harassment is especially serious when it occurs between teachers and students or supervisors and subordinates. In such situations, harassment unfairly exploits the power inherent in a faculty member's or supervisor's position. Although harassment often occurs when one person takes advantage of a position of authority over another, the University recognizes that harassment may also occur between people of equivalent status. This includes peer harassment.

This policy applies to any allegations of harassment against an employee (including faculty and staff) or student of Georgetown University or a Georgetown University operated program, regardless of where the alleged conduct occurred.

This Policy Statement on Harassment will be widely disseminated to members of the University community, and will be consistently enforced. The policy will be reexamined, updated as appropriate, and distributed regularly to all students, faculty, and staff.

Training will be provided to employees and students for the purpose of preventing harassment and promoting a respectful community. All employees are responsible for completing training identified as mandatory.

**Reporting Obligations for Faculty and Staff**

The University recognizes that supervisors (including those who supervise employees and those who supervise students) bear a particularly important responsibility to deter harassment. Any faculty or staff member (other than those who are statutorily prohibited from reporting) who learns of conduct that may violate this policy must contact the Office of Institutional Diversity, Equity, and Affirmative Action (IDEAA) at 202-687-4798, within 24 hours, or as soon as possible. If in doubt as to whether certain conduct violates this policy, or if you have any questions about this policy or its application, call IDEAA for a consultation.

**Procedure for Filing Complaints**

Any member of the University community who believes conduct that violates this policy has occurred, or who has questions concerning this policy, is encouraged to contact IDEAA at 202-687-4798. This Office is staffed with trained individuals, and administers both a confidential mediation process and a confidential grievance procedure. A full description of the IDEAA Grievance Procedures to Investigate Allegations of Discrimination and Harassment may be obtained from IDEAA and is also located on IDEAA's website.

Allegations against students are handled under the following disciplinary procedures:

- Code of Student Conduct (for students in the College of Arts and Sciences, the Business School, the School of Foreign Service, the School 3 of Nursing and Health Sciences, Biomedical Graduate Education, and the School of Continuing Studies).
- Law Center Student Disciplinary Code (for students at the Law Center)
- School of Medicine Student Code of Professionalism (for students in the School of Medicine)

Where an accused individual is both a student and employee of the University, the procedures that apply will depend on the status of the individual during the alleged incident. If there is ambiguity regarding which procedures shall apply, the Vice President of Institutional Diversity and Equity shall decide.

**Bias Reporting**

Any member of the University community can make a report about a possible bias incident or hate crime through the Bias Reporting System. For more information go to http://studentaffairs.georgetown.edu/biasreporting/. Making a report through the Bias Reporting System is not the same as filing a complaint under the grievance

procedures described above.  The Bias Reporting System allows the University to track and review bias-related incidents, offer supportive counseling services and other resources, and may lead to an investigation under which the accused may be held accountable for his or her acts. Anonymous reports are permitted under the Bias Reporting System.

**Other Reporting Avenues**

Complainants are encouraged to exhaust internal procedures established to enforce this policy before pursuing administrative remedies outside the University.  However, the University acknowledges the rights of complainants to seek redress from any external enforcement agency, including the District of Columbia Office of Human Rights, the Equal Employment Opportunity Commission, and the Office of Civil Rights of the United States Department of Education.

**Retaliation Prohibited**

This policy prohibits retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or otherwise exercising rights protected by law. It also prohibits taking any adverse academic or employment related action against an individual based on an unsubstantiated allegation or rumor of harassment. Retaliation should be reported promptly to IDEAA and may result in disciplinary action up to and including dismissal.

---



## Human Resources Policy Manual

2115 Wisconsin Avenue, NW, 6th Floor
Washington DC 20007
Phone: 202-687-2500

- 📘 (https://www.facebook.com/georgetownuniv/)
- 📷 (http://www.flickr.com/photos/georgetownuniversity)
- ▶️ (https://www.youtube.com/user/GeorgetownUniversity)
- ✖️ (https://twitter.com/Georgetown)
- 💼 (https://www.linkedin.com/company/georgetown-university)



Georgetown University
School of Continuing Studies
Summer Programs for High School Students
3307 M St. NW, Suite 202
Washington, DC 20057
Phone: (202) 687-7087
Fax:  (202) 687-8710
Contact Email: highschool@georgetown.edu
Submit your forms online at http://summer.georgetown.edu/forms

**Release Form**

For good and valuable Consideration herein acknowledged as received, and by signing this release, I hereby give the Photographers/Filmmakers and Assigns my permission to use the Recording, and to license the Recording for use by others, in any media (including digital, electronic, print, television, film and other media now known or to be invented) in perpetuity for all commercial and non-commercial purposes. I agree that the Recording may be combined with other images, text and graphics, and cropped, altered or modified.

I agree that I have no rights in or to the Recording, and all rights to the Recording belong to the Photographer/Filmmaker and Assigns. I acknowledge and agree that I have no further right to additional consideration or accounting, and that I will make no further claim for any reason to Photographer/Filmmaker and/or Assigns. I hereby release Georgetown University, and its assignees and designees, from any and all claims and demands arising out of or in connection with the use of the Recording, including but not limited to any claims for copyright infringement, defamation, invasion of privacy, or right of publicity. I acknowledge and agree that this release is binding upon my heirs and assigns. I agree that this release is irrevocable, worldwide and perpetual.

**Releasor Information**

Name (print) _____
                                          (print name)
Address _____

City _____ State _____ Zip Code _____

Country _____ Phone _____

Email _____ Date of Birth _____

Signature _____ Date _____

**Parent(s) or Guardian(s) Information** (if person is a minor or lacks capacity in the jurisdiction of residence)

Parent warrants and represents that Parent is the custodial parent or legal guardian of the Releasor, and has the full legal capacity to consent to the Recording and to execute this release of all of the Releasor's rights in the Recording.

Name (print) _____
                                          (print name)
Address _____

City _____ State _____ Zip Code _____

Country _____ Phone _____

Email _____ Date of Birth _____

Signature _____ Date _____

1. [Skip to main content](#)



1.

Search this Site [_____] [Search]

[X]

[The Office of Public Affairs](#)

1. [Strategic Communications](#) [> >]
   1. [Media Relations](#) [>]
      1. [Press Center](#)
      2. [Policy for Filming at Georgetown University](#)
      3. [On-Campus Media Policy](#)
      4. [Marineau Broadcast Studio](#)
   2. [Internal Communications](#)
   3. [Creative Services](#) [>]
      1. [Multimedia Production](#)
      2. [Art & Graphic Design](#)
   4. [Editorial Services](#)
   5. [Social Media](#) [>]
      1. [Social Media Working Group](#)
   6. [Policies](#)
2. [Business Policy](#) [> >]
   1. [Advisory Committee on Business Practices](#) [>]
      1. [Just Employment Policy for Georgetown University](#)
      2. [Just Employment Reporting](#)
   2. [Licensing Oversight Committee](#) [>]
      1. [Code of Conduct for Georgetown University Licensees](#)
   3. [Committee on Investments and Social Responsibility](#) [>]
      1. [Socially Responsible Investing Policy](#)
3. [Protocol & Events](#)
4. [Visual Identity](#)
5. [Athletics](#)
6. [Public Safety](#) [> >]
   1. [Georgetown University Police Department](#)
   2. [Office of Emergency Management](#)
7. [Staff](#)



[The Office of Public Affairs](#)

1. [Strategic Communications](#) [> >]
   1. [Media Relations](#) [> >]

1. [Press Center](#)
2. [Policy for Filming at Georgetown University](#)
3. [On-Campus Media Policy](#)
4. [Marineau Broadcast Studio](#)

2. [Internal Communications](#)
3. [Creative Services](#) >>
   1. [Multimedia Production](#)
   2. [Art & Graphic Design](#)
4. [Editorial Services](#)
5. [Social Media](#) >>
   1. [Social Media Working Group](#)
6. [Policies](#)

2. [Business Policy](#) >>
   1. [Advisory Committee on Business Practices](#) >>
      1. [Just Employment Policy for Georgetown University](#)
      2. [Just Employment Reporting](#)
   2. [Licensing Oversight Committee](#) >>
      1. [Code of Conduct for Georgetown University Licensees](#)
   3. [Committee on Investments and Social Responsibility](#) >>
      1. [Socially Responsible Investing Policy](#)
3. [Protocol & Events](#)
4. [Visual Identity](#)
5. [Athletics](#)↗
6. [Public Safety](#) >>
   1. [Georgetown University Police Department](#)
   2. [Office of Emergency Management](#)
7. [Staff](#)

1.

🔍

Search this Site [_____] [Search]

✕

1. [Home](#)
2. [Office of Strategic Communications](#)
3. [Policies](#)
4. Policy for Filming at Georgetown University

# Policy for Filming at Georgetown University

1. [Skip in-page jump links and go directly to main content](#)



Jump to... ☰

1. [Personal, Non-Commercial Use](#)
2. [Press and News Media](#)

3. University Business
4. Academic and Scholarly Work
5. All Other Filming
6. Filming Requests

1. Personal, Non-Commercial Use
2. Press and News Media
3. University Business
4. Academic and Scholarly Work
5. All Other Filming
6. Filming Requests

Georgetown University's campuses, including their grounds, buildings, classrooms, and dormitories, are private property. Except as permitted by and in compliance with this Policy, you may not shoot film, photos, or video, or make audio recordings (all of which, for convenience, are referred to in this Policy as "filming") on campus.

The University's Office of Strategic Communications (OCOMM), in consultation with other University stakeholders, is responsible for granting or denying requests to film on campus. The University reserves the right to deny approval of any filming for any reason. When filming is approved, OCOMM will coordinate the University's support for the project, including required supervision. Approval by the University may be revoked at any time if the University concludes that the filming interferes with University operations, is disruptive to faculty, students, staff, or visitors, or otherwise is not in the best interests of the University. All persons who are permitted to film on campus pursuant to this Policy are required to follow current Georgetown Public Health and Guest policies.

# Personal, Non-Commercial Use

Students, parents, faculty, staff, alumni, and other campus visitors are free to film on campus for their own personal, non-commercial use, provided that the filming poses no risk to public safety and does not disrupt University faculty, students, staff, or visitors. This photography and/or filming is limited to hand-held and tripod photography. Formal approval or supervision by OCOMM is not required.

# Press and News Media

Members of the press and news media who wish to access campus to film interviews or b-roll should email OCOMM at media@georgetown.edu for permission. Please provide your name and outlet, and specify the nature of your request.

# University Business

Administrative staff members of the University's schools, departments, and business units who are engaged in official business on behalf of the University may film on campus for purposes of creating materials for use by the particular school, department, or business unit, such as marketing and promotional materials. Relevant model/image releases must be signed by all identifiable subjects.

# Academic and Scholarly Work

University students and faculty may film on campus solely for academic purposes, including teaching, coursework, research, and scholarly work, in each case subject to reasonable restrictions imposed by the University to ensure public safety, to protect persons and property, to avoid interference with University activities and operations, and to comply with statutory, contractual, and other legal obligations. Additionally, students and faculty must notify their

school's communications office about any such filming and comply with any reasonable restrictions imposed by that office. Students and faculty may not film on campus for any commercial purpose.

# All Other Filming

All other individuals, organizations, non-profits, corporations, and other entities that wish to request permission to film on campus must complete and submit the University's Request for Permission to Film form (see below). As a prominent research University whose campus and buildings are devoted to instruction, research, and public service, the University ordinarily does not permit filming on campus for commercial or other for-profit purposes. Similarly, the University does not permit filming on campus of any commercials, advertisements, or other forms of endorsement. All filming on campus must comply with the reasonable directions and guidance of OCOMM, and must conform to the following requirements:

- You must complete and submit the University's Request for Permission to Film (see below) *at least two weeks* prior to your proposed filming date.
- You must sign Georgetown University's standard Location Agreement. The University will not sign any other location agreement. Requests for changes to the Location Agreement will be submitted for review by the Office of the General Counsel, which may significantly delay the process.
- You may not film inside classrooms, residential buildings, dining facilities, athletics facilities, or other indoor community spaces or places where public access is limited for reasons of safety, security, or privacy.
- You may not film a person in an identifiable manner unless you first have obtained that person's express consent. If the person is a Georgetown student, you must use a written consent form that has been approved in advance by the Office of the General Counsel.
- You may not use the University's names, logos, trademarks, or identity, including recognizable University locations, imagery, and prominent community members, unless such use has been specifically approved in writing by the University. Requests for any such approval should be submitted to the University's Visual Identity staff by emailing visualidentity@georgetown.edu.
- If you are requesting that the University permit you to film on campus for commercial or other for-profit purposes, you must submit, in addition to the Request for Permission to Film form, a written description or synopsis of the production, the final script, and any treatments, storyboards, or other production-related materials, all of which must provide a detailed, accurate, and complete description of the production.
- Any requests for Athletics filming should be directed to Georgetown Athletic Communications.

# Filming Requests

# Georgetown University Filming Request Form

To request filming or photography permission, please complete and submit the Request for Permission to Film form (see below) at least two weeks prior to your proposed filming date. Incomplete information may result in delays.

* Indicates required question

Email *

Your email

Full Name *

Your answer

Phone Number

Your answer

Company/Organization *

Your answer

Organization Website

Your answer

Desired Filming Location (if applicable)

Your answer

Desired Date of Filming  (if applicable)

Date

mm/dd/yyyy

Length of Time Needed for Filming *

Your answer

Crew Member Information (Please list full crew size and roles) *

Your answer

Description of Filming Project *

Your answer

Why Are You Looking to Film at Georgetown? *

Your answer

Will the film be used for commercial or other for-profit purposes? Please provide details on how you intend to use the film. *

Your answer

Do you intend to use the University's name or film any University logos, trademarks, or recognizable locations? *

Your answer

◯ Send me a copy of my responses.

Submit                                                                    Clear form

Never submit passwords through Google Forms.

GoogleForms                          reCAPTCHA
                                     Privacy Terms                          ⋮

This form was created inside of Georgetown University.

The Office of Public Affairs        *GEORGETOWN UNIVERSITY*

1. Facebook ↗
2. Twitter ↗
3. Instagram ↗
4. LinkedIn ↗
5. YouTube ↗

*37th and O Streets, N.W.*
*Washington DC*

1. [Privacy Policy](#)
2. [Copyright](#)
3. [Accessibility](#)
4. [Notice of Non-Discrimination](#)

© 2025 The Office of Public Affairs

1. [Facebook](#) ↗
2. [Twitter](#) ↗
3. [Instagram](#) ↗
4. [LinkedIn](#) ↗
5. [YouTube](#) ↗

[The Office of Public Affairs](#)   *GEORGETOWN UNIVERSITY*

*37th and O Streets, N.W.*
*Washington DC*

1. [Privacy Policy](#)
2. [Copyright](#)
3. [Accessibility](#)
4. [Notice of Non-Discrimination](#)

© 2025 The Office of Public Affairs

(https://www.georgetown.edu)

# Privacy Policy

In keeping with state and federal legislation, the University safeguards the privacy of patients, students, employees, University business, and other matters by protecting electronic records classified as confidential information. Unauthorized accessing and/or disclosure of confidential information by University employees is prohibited and may result in legal penalties. This policy applies to records maintained in any type of electronic record: computer, voice, or video. It also applies to records created via the Georgetown University website.

## Definitions

**Electronic Records:** Electronic transmissions or messages created, sent, forwarded, replied to, transmitted, distributed, broadcast, stored, held, copied, downloaded, displayed, viewed, read, or printed by one or several electronic systems or services. This definition of electronic records applies equally to the contents of such records, attachments to such records, and transactional information associated with such records.

**University Administrative Record:** A University Record (see definition below) that is directly related to the conduct of the University's administrative business.

**University Record:** By law, University records are any papers, books, photographs, tapes, films, recordings, or other documentary materials, or any copies thereof, regardless of physical form or characteristics, made, produced, executed, or received by any department or office of the University or by any academic or administrative staff member in connection with the transaction of University business, and retained by that agency or its successor as evidence of its activities or functions because of the information contained therein.

**University Electronic Record:** A University Record in the form of an electronic record, whether or not any of the electronic communications resources utilized to create, send, forward, reply to, transmit, store, hold, copy, download, display, view, read, or print the

electronic communications record are owned by the University. This implies that the location of the record, or the location of its creation or use, does not change its nature as a University electronic record for purposes of this other University policy.(https://www.university.edu)

Until determined otherwise or unless it is clear from the context, any electronic record residing on university-owned or controlled telecommunications, video, audio, and computing facilities will be deemed to be a University electronic record for purposes of this Policy.

## Principles

**Notification** Users should be notified that information is being collected and they should be informed of their rights. (e.g., all Web pages that collect personally identifiable information should include a privacy notice that specifies how the information will be used.)

**Minimization** The institution should gather as little information as possible for legitimate purposes and delete information when it is no longer needed or no longer required by law to be retained. (e.g., library records need not be kept for more than a certain limited period of time.)

**Secondary** Use Information should be used only for the purposes for which it was collected unless the individual gives additional consent. (e.g., a department should not share information with an administrative office for a separate purpose without the individual's knowledge and consent.)

**Nondisclosure and Consent** Information should not be released to third parties external to the University without consent. (e.g., vendors, business, etc.)

**Need to Know** Only those with legitimate, official needs should have access to information. (e.g., a person's position of authority in the University does not necessarily mean that they should be able to access information.)

**Data Accuracy, Inspection, and Review** Information must be accurate, and individuals should have the right to examine information about themselves and request changes. (e.g., employees should be able to review their records and make changes or follow a standard process for any information that is disputed.)

**Information Security, Integrity, and Accountability** Information should be secure and not vulnerable to unauthorized modification, and the handling of the data must be subject to accountability. (e.g., it should always be known who has access to information and changes to information should be documented.)

**Education** The University has the responsibility to educate its constituents concerning privacy rights and the proper handling of information. (e.g., all constituents should know whom to consult about these matters and all employees should understand their responsibilities for abiding by policies for information handling.)

# Record Classification

The Data Stewards in consultation with the Office of University Counsel determine the confidentiality of the data. Data Stewards are representatives of the University who are assigned responsibility to serve as a steward of University data in a particular area. They are responsible for developing procedures for creating, maintaining, and using University data, based on University policy and applicable state and federal laws.

The classification Confidential Information covers sensitive information about individuals, including information identified in the Human Resources Manual, and sensitive information about the University. Information receiving this classification requires a high level of protection against unauthorized disclosure, modification, destruction, and use. Specific categories of confidential information include information about:

- Current and former students (protected under the Family Educational Rights and Privacy Act (FERPA) of 1974), including student academic, disciplinary, and financial records and student works such as homework, term papers, and exams; and prospective students, including information submitted by student applicants to the University.
- Medical Center patients (protected under the Health Insurance Portability and Accountability Act (HIPAA of 1996), Law Center clients, library patrons, and donors and potential donors.
- Current, former, and prospective employees, including employment, pay, health, and insurance data, and other personnel information.
- Research, including information related to a forthcoming or pending patent application (patents must be filed within a year of publication), and information related to human subjects.

- Certain University business operations, finances, legal matters, or other operations of a particularly sensitive nature.
- Information security data, including passwords (https://www.georgetown.edu)

**Determining authorizations.** Only those with legitimate, official need have the access to these classified electronic records. Data Stewards determine who is authorized to have access to their information. They should make sure that those with access have a need to know the information and know the security requirements for that information. For Confidential Information, they should also make sure that those given access have a need to know and have signed a confidentiality agreement that covers the information.

Contact Us (https://www.georgetown.edu/contact/)

Directory (http://contact.georgetown.edu/)

Visit (https://www.georgetown.edu/plan-your-visit/)

Maps (https://maps.georgetown.edu)

About (https://www.georgetown.edu/about/)

Academic Calendar (https://registrar.georgetown.edu/academic-calendar)

Careers (https://careers.georgetown.edu/)

Media Resources (https://www.georgetown.edu/media-resources/)

Instagram (https://www.instagram.com/georgetownuniversity/)

LinkedIn (https://www.linkedin.com/school/georgetown-university/)

TikTok (https://www.tiktok.com/@georgetownu?lang=en)

X (https://twitter.com/georgetown)

Facebook (https://www.facebook.com/georgetownuniv)

Threads (https://www.threads.net/@georgetownuniversity)

YouTube (https://www.youtube.com/georgetownuniversity)

*Georgetown University*
*37th and O Streets, N.W.*
*Washington, D.C. 20057*          (https://www.georgetown.edu)
*P. 202–687–0100 (tel:+12026870100)*

(/)

Privacy Policy (https://www.georgetown.edu/privacy-policy/)

Copyright (https://www.library.georgetown.edu/copyright)     Accessibility (https://accessibility.georgetown.edu/)

Notice of Non-Discrimination (https://ideaa.georgetown.edu/notice-of-non-discrimination/)

*© 2025 Georgetown University*

(http://www.georgetown.edu/)

(http://www.georgetown.edu/)

Faculty Handbook (https://facultyhandbook.georgetown.edu)

# A. Institutional Diversity, Equity, and Affirmative Action: Grievance Procedures to Investigate Allegations of Discrimination and Harassment

## Introduction

Georgetown University complies with federal laws and regulations and the District of Columbia Human Rights Act and acts in accordance with the University's Affirmative Action Plan. Therefore, the University has established these grievance procedures for the Office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA") to review, investigate, and resolve alleged violations of the University's Equal Opportunity and Non-Discrimination in Employment and Non-Discrimination in Education Policies, Affirmative Action Policy, the Policy Statement on Harassment, and the Policy on Sexual Misconduct.[1]

The procedures outlined below cover allegations of unlawful discrimination and harassment in employment or education on the basis of age, color, disability, family responsibilities, gender identity and expression, genetic information, marital status, matriculation, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, veteran status and other factors prohibited by law.

These internal Grievance Procedures to Investigate Allegations of Discrimination and Harassment provide a mechanism for faculty, staff, students, third parties and applicants for employment and admission to receive a prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation.

The University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident and seek redress through IDEAA's Grievance Procedures. The University will provide a prompt investigation as well as a thorough and careful resolution. Individuals may use these procedures to address off-campus behaviors, which may violate the policies on harassment and discrimination as they relate to educational and employment opportunities. Individuals with questions about these grievance procedures may reach out to IDEAA at ideaa@georgetown.edu or (202) 687-4798.

Sexual Misconduct is a specific type of unlawful discrimination based on sex.  Consistent with the University's Policy on Sexual Misconduct, certain procedural adjustments will be applied to grievance procedures in cases alleging Sexual Misconduct.  Specifically:

- For cases alleging Sexual Misconduct that could constitute "Title IX Sexual Harassment," as defined in the Policy on Sexual Misconduct, the grievance procedures outlined in Appendix A of these procedures shall apply.
- For all other cases alleging Sexual Misconduct (i.e., cases alleging "Non-Title IX Sexual Misconduct," as defined in the Policy on Sexual Misconduct), the procedures outlined below will apply.

To the extent there is any conflict between these Grievance Procedures to Investigate Allegations of Discrimination and Harassment and the Policy on Sexual Misconduct with respect to cases alleging Sexual Misconduct, the Policy on Sexual Misconduct shall govern.

Proceedings involving grievances of Sexual Misconduct shall be conducted by officials who have received training on issues related to sexual harassment, sexual assault, domestic violence, dating violence and stalking and how to conduct a grievance process that protects the safety of all parties involved and promotes accountability. With respect to allegations of Sexual Misconduct, these procedures apply to situations in which a faculty or staff member is the Respondent. A Respondent is an individual alleged to have engaged in conduct prohibited by a policy covered by these Grievance Procedures. Students may also use these procedures to address off-campus behaviors, which may violate the policies on harassment and discrimination as they relate to educational and employment opportunities. If a student is the Respondent, the disciplinary codes of conduct of each of the campuses shall govern. If an outside third party is the Respondent, IDEAA may refer the grievance to an appropriate authority for resolution and coordinate necessary corrective actions. A Complainant may report a violation of the Policy on Sexual Misconduct to any Title IX Coordinator, regardless of the identity of the Respondent or the place of occurrence of the alleged conduct. The University's Title IX Coordinators are identified in Appendix B.

Complainants are encouraged to exhaust these procedures with regard to any grievance before pursuing remedies outside the University. However, the University acknowledges the rights of Complainants to seek redress from any external enforcement agency including the District of Columbia Office of Human Rights, the Equal Employment Opportunity Commission, the Office for Civil Rights of the United States Department of Education and the United States Department of Labor's Office of Federal Contract Compliance Programs. Complainants may also file a criminal complaint with the Metropolitan Police Department. The filing of an external complaint or investigation will not preclude the University from investigating and addressing issues or concerns raised to the University, nor will it preclude any individual alleging to have experienced Sexual Misconduct from receiving Supportive Measures.

It is a violation of this policy to file a discrimination or harassment complaint for the purpose of injuring the reputation of, or causing harm to, another person. Without minimizing the injury that can be suffered by the victim of discrimination or harassment, the University also recognizes that the filing of a discrimination or harassment complaint can have serious consequences for the person accused. That person, too, has rights that the policies on discrimination and harassment must preserve and protect. Therefore, any person who abuses this policy by knowingly filing a false complaint will be subject to discipline if IDEAA determines that the complaint was filed in bad faith. This provision is not meant in any way to discourage legitimate complaints. All complaints will be treated as confidential, as described further below.

# Confidentiality

IDEAA requires Complainants, Respondents, and witnesses who participate in this process to maintain confidentiality due to the sensitive nature of grievances, consistent with applicable legal requirements. This expectation of confidentiality is not intended to preclude parties from speaking with an advisor or to restrict the ability of parties to gather and present relevant evidence. IDEAA will preserve the confidentiality of information provided in connection with a grievance to the extent possible, consistent with the goals of a prompt and thorough investigation and resolution as well as compliance with the law, including the Family Educational Rights & Privacy Act (FERPA) and Health Insurance Portability and Accountability Act (HIPAA), at all times in the course of investigations. All publicly available records required to be maintained by law will omit the names and other personally identifiable information about complainants and others who choose not to file a grievance, to the extent permissible by law.

The Policy on Sexual Misconduct sets forth the confidentiality procedures applicable to Sexual Misconduct matters.

# Requirements for Filing Grievances

1. Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant") of Georgetown University may file a discrimination or harassment complaint with IDEAA. Complaints of Sexual Misconduct must be filed with the Title IX Coordinator, in accordance with the Policy on Sexual Misconduct.   The Policy on Sexual Misconduct sets forth additional requirements and definitions related to Complainants and Complaints, including Title IX Complaints.

2. Complainants must file a grievance in writing within 180 days following the alleged act of discrimination, harassment, or related retaliation or the date on which the Complainant knew or reasonably should have known of the act. Nevertheless, individuals are encouraged to report acts immediately in order to maximize the University's ability to obtain evidence, and conduct a thorough, impartial investigation. Failure to report promptly may impair the University's ability to enforce its policies. IDEAA may, in its sole discretion, review grievances filed after one year under special circumstances.

3. A grievance must be filed in writing with IDEAA at M-36 Darnall Hall, electronically at ideaa@georgetown.edu, or by fax at (202) 687-7778.  Complaints of Sexual Misconduct must be filed with the Title IX Coordinator.

# Provisions on Time Limits

All of the time limits contained within these grievance procedures may be extended solely at the discretion of IDEAA. Any party requesting an extension must do so in writing. In cases of Sexual Misconduct, IDEAA will make every effort to be reasonably prompt in investigating and resolving complaints and will address such complaints consistent with the Policy on Sexual Misconduct. A typical investigation will conclude within ninety days from receipt of the grievance. IDEAA's investigation may be temporarily delayed while criminal investigators gather evidence. In the event any time frames need to be extended, IDEAA will inform both parties.

# Retaliation Prohibited

University policies prohibit retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment/discrimination or otherwise exercising rights protected by law. University policies further prohibit taking any adverse academic or employment related action against an individual based on an unsubstantiated allegation or rumor of conduct prohibited by policies covered under these Grievance Procedures. Retaliation should be reported promptly to IDEAA or, in connection with Sexual Misconduct, the Title IX Coordinator, and if proven, may result in disciplinary action up to and including dismissal. The University encourages individuals to make good faith reports.

# Administrative Review

IDEAA has the authority to initiate an administrative review at any time when, in the judgment of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, such action is warranted. A department head or other University official may also request that IDEAA conduct an administrative review, if this official becomes aware of alleged discrimination, harassment, or related retaliation. In cases where IDEAA conducts an

administrative review and a respondent is identified, IDEAA will proceed to Step II of the Procedures for Processing Grievances below.  The Policy on Sexual Misconduct describes Administrative Action that may be taken in cases in which an individual impacted by Sexual Misconduct declines to file a Complaint.

# Conflict of Interest

If there is a conflict of interest between the fact-finder or decision-maker and the Complainant or the Respondent, the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance will designate an alternate fact-finder or decision-maker. If the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance has a conflict of interest, the Vice President of Diversity, Equity and Inclusion will designate an alternate fact-finder or decision-maker. If the Vice President of Diversity, Equity and Inclusion has an actual conflict of interest, the matter shall be referred to the Office of the President, which will designate an alternate fact-finder or decision-maker.

# Revocation by Operation of Law

In the event that any provision of the Title IX Final Rule, 85 Fed. Reg. 30026 (May 19, 2020) is modified, invalidated, or stayed by federal law (including any federal statute, administrative rule or regulation, direction from the Department of Education, executive order, or controlling judicial order), any related provision in these procedures will be modified or deemed inoperative consistent with that change in federal law for all pending or new proceedings covered by these procedures as of the effective date of the change in law.

Should the entire "Appendix A: IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment" be invalidated, any conduct that would otherwise be covered under Appendix A shall be investigated and adjudicated under other University conduct policies and procedures as appropriate.

# Procedures for Processing Grievances

## Intake

1. IDEAA staff shall schedule intake meetings with Complainants and Respondents in order to provide a general understanding of the relevant policy and this grievance procedure, as well as University support resources, as appropriate. The intake meeting may also involve a discussion of any interim or supportive measures that may be appropriate concerning the individual's academic, University housing, and/or University employment arrangements.

2. At the request of the Complainant, IDEAA staff shall proceed to Step I Informal Resolution, or the Step II Investigation process detailed below. Pursuant to the Policy on Sexual Misconduct, Informal Resolution will not be used to resolve allegations of Title IX Sexual Harassment made by a student against an employee. If the Complainant wishes to proceed with Step I Informal Resolution or Step II Investigation, then IDEAA staff will meet with the Respondent to provide the Respondent a general understanding of the relevant policy and procedure.

3. In the event the Respondent is a member of a collective bargaining unit, IDEAA will coordinate with Human Resources or the appropriate administrative unit to ensure that any required notices are provided to the union. Questioning of a witness or party who is a member of a collective bargaining unit will proceed in accordance with applicable law, policies, and collective bargaining agreements.

# Step I.  Informal Resolution

1. Unless otherwise prohibited by University policy, IDEAA shall propose voluntary informal resolution, including mediation, to a Complainant desiring to resolve a dispute with a potential Respondent. If the Complainant agrees to informal resolution, the potential Respondent will be informed about the allegations and the informal resolution process, and offered an opportunity to participate in informal resolution. If both parties do not voluntarily agree to participate in the informal resolution process, the Complainant may proceed to Step II. In cases where Title IX Sexual Harassment is alleged by a student against an employee, IDEAA will not offer Informal Resolution to resolve the Complainant's allegations; in instances of alleged sexual harassment where both the Complainant and the Respondent request to mediate, the Complainant will not be asked to resolve his/her/their concerns directly with the Respondent.

2. If both parties agree to informal resolution, IDEAA's staff or a representative chosen by IDEAA will conduct the informal resolution within a prompt and reasonable time frame.

3. If a mutually acceptable resolution is achieved through informal resolution, a written agreement between the parties will reflect the resolution and shall be signed and dated by the parties. Copies will be provided to both parties and IDEAA will monitor compliance with the terms of the agreement by both parties. The case will then be closed.

4. If informal resolution fails, IDEAA will inform the Complainant about the option to proceed to Step II.

5. All Complainants and Respondents have a right to end the informal resolution process at any time and can ask in writing for IDEAA to begin a Step II Investigation.

6. The process for informal resolution of Title IX Sexual Harassment matters is described in Appendix A.

# Step II. Investigation by IDEAA

1. An individual or group of individuals may initiate a formal Complaint by providing IDEAA a written and signed statement and any supporting documentation detailing the allegations of discrimination, harassment or related retaliation and identifying the individuals who engaged in the alleged conduct (the Respondent(s)).

2. IDEAA shall provide the Respondent and the Respondent's supervisor, if applicable, a copy of the formal complaint and its supporting documents. The Respondent shall have an opportunity to submit a written response to the allegations and any supporting documents within twenty (20) days of receipt of the formal complaint and its supporting documents. The Complainant will be provided a copy of this response and given the opportunity to submit a written rebuttal to Respondent's statement within ten (10) days of receipt of the response. Respondent will be given a final opportunity to respond in writing to Complainant's written rebuttal within ten (10) days of receipt of the rebuttal. Both Complainant and Respondent may present evidence and identify witnesses who can provide information relevant to the allegations.

3. IDEAA shall within a prompt and reasonable time frame investigate the Complaint and shall have access to all necessary information to do so and the opportunity to interview witnesses, as well as Complainant and Respondent.

4. Upon completion of the investigation, IDEAA shall prepare a written report. IDEAA uses the standard of preponderance of the evidence to ascertain if the University's policies have been violated. IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, and at the discretion of IDEAA, transcripts, and audio recordings.

# Step III. Notification

1. When IDEAA finds that no violation of policies governing harassment or discrimination has occurred, IDEAA will provide notice of the results to the parties on the same day, which shall be within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in Step V.

2. When IDEAA finds that a violation of policies governing harassment or discrimination has occurred, IDEAA will:
   a. Provide written notice of the results to the parties on the same day, to the extent consistent with the confidentiality accorded to University personnel actions, and within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in Step V.
   b. Forward its report to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality.
   c. Direct that prompt remedial action be taken to correct the situation. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

## Step IV. Corrective Action

If corrective actions are imposed, IDEAA shall monitor their implementation. In Title IX Sexual Harassment matters, the Title IX Coordinator will monitor implementation of corrective actions. The appropriate Executive Vice President, Chief Operating Officer or Senior Vice President shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions related to the allegations resulting in the corrective actions.

## Step V. Appeal

Where IDEAA finds a violation of the Policy on Sexual Misconduct, IDEAA may notify the Complainant of the sanction or remedial action imposed on the Respondent where the sanction or remedial action relates to the Complainant.

For purposes of these procedures, if the Executive Vice President or Senior Vice President is a party to the matter, the President will be informed of the results and take the required actions.

An appeal may be made by Complainant or Respondent within 14 business days of IDEAA's notification of the results. The appeal process for Title IX Sexual Harassment matters is set forth in Appendix A.

1. **Grounds for Appeal**

   There are certain limited circumstances under which a case may be appealed. For non-Title IX Sexual Harassment matters, the appellant must demonstrate:
   a. A material failure to follow these Grievance Procedures during the investigation.
   b. Significant evidence was not considered, which would have altered the outcome of the investigation.

The other party (ies) will be given a chance to respond to the request for an appeal within five (5) business days. The Vice President for Institutional Diversity & Equity, or her/his designee, will determine whether the request for an appeal is warranted. The parties will be informed of the decision within ten business days of receiving the request for appeal.

2. **Appeal Procedures**

a. If the request for an appeal is granted, IDEAA shall notify the appropriate Vice President, Executive Vice President or Chief Operating Officer. This notification shall include a copy of the formal complaint naming the Complainant and Respondent and will explain the grounds on which the appeal was granted.

b. IDEAA shall then initiate the selection procedures to form a three member Grievance Panel selected from the Equal Opportunity Examining Board made up of Georgetown University administrators, faculty and staff. Grievances involving discriminatory denials of tenure, promotion or reappointment of faculty members shall be heard by panels composed of faculty or academic administrators only. The three member Grievance Panel to serve on an appeal shall be selected in the following manner:

  i. Within five days from the date of IDEAA's decision to grant an appeal, the Complainant shall select one member of the Equal Opportunity Examining Board, and the Respondent shall select another.

  ii. IDEAA shall promptly convene a meeting of these two selected panelists who shall choose the third member from the Equal Opportunity Examining Board to form the Grievance Panel.

c. A member of IDEAA's staff shall present information about the complaint to the panel members who shall recuse themselves if they have prior knowledge of the complaint, the circumstances surrounding the incidents, or any other reason which might prevent them from rendering an impartial decision. If the panelist selected by the Complainant is recused, then Complainant shall select another panelist. If the panelist selected by Respondent is recused, then Respondent shall select another panelist. If the panelist selected by the two selected panelists is recused, then the two selected panelists shall select another panelist.

d. The Grievance Panel is charged with reviewing IDEAA's investigation and determining whether the procedures were properly followed and that significant evidence was properly considered and weighed.

e. The Grievance Panel shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the IDEAA investigator(s), Complainant, and Respondent separately.

f. The information presented to the Grievance Panel and its deliberations are confidential.

g. Each party may choose an Advisor to accompany him/her to meet with the Grievance Panel. The Advisor may not speak on behalf of the party or otherwise represent the party, but may provide support and consult with the party outside of the presence of the Grievance Panel. Any party who will be accompanied by an Advisor who is an attorney must notify the Grievance Panel at least three business days prior to the meeting, so that arrangements may be made for the University's attorney to attend.

h. The Grievance Panel shall by majority vote reach one of the following results:

  i. support the full results of IDEAA's investigation;

  ii. support the results but recommend different corrective actions than those recommended by IDEAA; or

  iii. reach different results and, if necessary, recommend different corrective actions than those recommended by IDEAA.

i. Within 45 business days from its formation, the Grievance Panel shall submit a report of its results to the Vice President for Diversity, Equity and Inclusion, or his/her designee, who will forward it with his or her approval and/or comments (if, for example, the Panel has not supported the full results of IDEAA's investigation) to the appropriate Executive Vice President or Chief Operating Officer. The

appropriate Executive Officer may accept the Panel's recommendations or may reasonably modify the results with the concurrence of the Vice President for Diversity, Equity and Inclusion, or his/her designee. This official's decision is final and will be made within ten business days of receipt of the Grievance Panel's report. IDEAA shall provide notice on the same day to the Complainant, Respondent, and his/her supervisor, if applicable, of the final result. Faculty members who are subject to sanctions under these procedures will receive the procedural protections set forth in the Faculty Handbook.

j. If corrective actions are imposed, IDEAA shall monitor their implementation. The appropriate Executive Vice President or Chief Operating Officer shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions relating to the appeal or the underlying investigation or allegations.

# Appendix A

## IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment

IDEAA's Grievance Procedures provide for the prompt, fair, and impartial resolution of all Complaints of discrimination and harassment. In addition, the U.S. Department of Education's regulations implementing Title IX prescribe specific Grievance Procedures that must be applied to a narrow subset of Sexual Misconduct defined as "Title IX Sexual Harassment" in the Policy on Sexual Misconduct. As such, IDEAA has developed specific Grievance Procedures for Complaints of Title IX Sexual Harassment, which apply to that subset of conduct.

Complaints of Title IX Sexual Harassment against faculty, staff, and AAPs will be addressed under this Appendix. Complaints of Title IX Sexual Harassment against third parties will be referred by the Title IX Coordinator to an appropriate authority for resolution, as specified in the Policy on Sexual Misconduct.

In the event of a conflict between IDEAA's grievance procedures and the Policy on Sexual Misconduct, the Policy on Sexual Misconduct will govern. Relevant definitions are set forth in the Policy on Sexual Misconduct.

  I. **Intake**
   a. **Filing a Title IX Complaint**

   To initiate a formal complaint of Title IX Sexual Harassment, a Title IX Complaint must be filed with the Title IX Coordinator (contact information for coordinators may be found in Appendix B to these procedures). A Title IX Complaint is a document filed by a Complainant or signed by the Title IX Coordinator alleging Title IX Sexual Harassment against a Respondent and requesting that the University investigate the allegation of Title IX Sexual Harassment.

   i. A Title IX Complaint may be filed with the Title IX Coordinator in person, by mail, by electronic mail, or by any other means designated by the University. As used in this paragraph, the phrase "document filed by a Complainant" means a document or electronic submission that contains the Complainant's physical or digital signature, or otherwise indicates that the Complainant is the person filing the Title IX Complaint.

   ii. Where a Title IX Coordinator signs a Title IX Complaint, the Title IX Coordinator is not a Complainant or otherwise a party. The Title IX Coordinator may sign a Title IX Complaint in circumstances where a Complainant declines to file a Title IX Complaint and, in the Title IX Coordinator's discretion, the allegations indicate a possible safety concern for the campus community or another circumstance exists that reasonably would warrant an investigation.

   b. **Meeting with Complainant**

Within five (5) days of the filing of a Complaint, a Title IX Coordinator, or designee, shall schedule an individual meeting with the Complainant to provide a general understanding of the Policy on Sexual Misconduct and this grievance procedure, as well as Supportive Measures that may be appropriate, including concerning the individual's academic, University housing, and/or University employment arrangements.

 i. Prior to the intake meeting, the Title IX Coordinator, or designee, will provide the Complainant with written notice of the date, time, location, participants, and purpose of the meeting.

 ii. Supportive Measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

c. **Title IX Coordinator's Response to Title IX Complaint**

 1. **Decision Regarding Title IX Jurisdiction**

Within ten (10) days of the filing of the Complaint, the Title IX Coordinator will review the Title IX Complaint to determine whether the alleged conduct, if proved, could constitute Title IX Sexual Harassment. If the alleged conduct would not constitute Title IX Sexual Harassment, even if proved, the Title IX Coordinator will dismiss the Title IX Complaint.

Where there are multiple Complainants or Respondents arising out of the same incident, the Title IX Coordinator has the discretion to determine whether the allegations warrant consolidated, parallel, or sequential processing.

Where a Complaint includes both allegations of Title IX Sexual Harassment and other Sexual Misconduct, discrimination, or harassment based on a protected characteristic, the allegation of Title IX Sexual Harassment will be addressed under IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment. The other allegation(s) of discrimination or harassment may be handled under IDEAA's Grievance Procedures to Investigate Allegations of Discrimination and Harassment or IDEAA's Grievance Procedures for Title IX Sexual Harassment, at the discretion of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, except that the Title IX Coordinator will determine the appropriate procedures for allegations of sex-based discrimination, including Sexual Misconduct.

Where a Complaint includes allegations of Title IX Sexual Harassment and violations of University policies that are not within IDEAA's jurisdiction, the other University office or committee with jurisdiction over the remaining allegations that arise shall consult with the Title IX Coordinator and IDEAA to determine the order of proceedings to ensure compliance with best practices and applicable legal standards.

 2. **Notices to Parties**

Within ten (10) days of the decision that the Title IX grievance procedures apply, a Title IX Coordinator will provide the following written notice to the parties identified in the Title IX Complaint:

  1. Notice of the University's grievance procedures, including informal resolution process.

  2. Notice of the allegations of Title IX Sexual Harassment, including sufficient details known at the time and with sufficient time to prepare a response before any initial

interview. Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting Title IX Sexual Harassment, and the date and location of the alleged incident, if known.

3. Notice that the Respondent is not treated as responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process.

4. Notice to the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, and may inspect and review evidence.

5. Notice of the provision in the Policy on Sexual Misconduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

IDEAA also will provide to the Respondent a copy of the Title IX Complaint and supporting documents.

If, in the course of an investigation, IDEAA decides to investigate allegations about the Complainant or Respondent that were not included in the original notice provided to the parties, or remove charges that were included in the original notice, a Title IX Coordinator will provide an amended notice of the allegations to the parties identified in the Title IX Complaint.

3. **Meeting with Respondent**

Within five (5) days of the date of the written notice of the Title IX Complaint, a Title IX Coordinator, or designee, shall schedule an individual meeting with the Respondent(s) in order to provide a general understanding of the Policy on Sexual Misconduct and this grievance procedure, as well as Supportive Measures that may be appropriate, including concerning the individual's academic, University housing, and/or University employment arrangements.

   i. Prior to the intake meeting, the Title IX Coordinator, or designee, will provide the Respondent with written notice of the date, time, location, participants, and purpose of the meeting.

   ii. Supportive Measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

4. **Dismissal of Title IX Complaint**

Where within the Title IX Coordinator's reasonable discretion, it is determined that the conduct alleged in the Title IX Complaint would not constitute Title IX Sexual Harassment, even if proved, the Title IX Complaint will be dismissed within five (5) days of the Title IX Coordinator's determination and referred to IDEAA to be addressed under IDEAA's Grievance Procedures. The Title IX Coordinator, with reasonable discretion, may also dismiss an allegation of Title IX Sexual Harassment if at any time during the investigation or hearing:

   a. a Complainant notifies the Title IX Coordinator in writing that the Complainant would like to withdraw the Title IX Complaint or any allegations therein;

   b. the Respondent is no longer employed by the University;

   c. specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Title IX Complaint or allegations therein; or

d. the Complainant is no longer participating in or attempting to participate in the Education Program or Activity of the University, as defined under the Policy on Sexual Misconduct.

Within five (5) days of the dismissal decision, the Title IX Coordinator will send simultaneously to the parties written notice of the dismissal, the reason(s) for dismissal, and the appeal procedure. Information about the process for appealing the Title IX Coordinator's dismissal decision is described in Section IV.

Should the Title IX Coordinator determine that dismissal of Title IX Sexual Harassment allegations is appropriate, the Title IX Coordinator also will determine whether the allegations should be referred to another University department or office to be addressed under other procedures. The Title IX Coordinator also will assess whether it is appropriate to offer Supportive Measures to impacted individuals.

## II. Informal Resolution

With the exception of a matter involving an Employee alleged to have engaged in Title IX Sexual Harassment against a Student, IDEAA may, at the request of either party, at any time prior to the determination regarding responsibility after the filing of a Title IX Complaint, facilitate a voluntary, informal resolution process, such as mediation, provided that the following conditions are met:

a. <u>Notice</u>.  The University will provide to the parties a written notice disclosing: the allegations; the requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a Title IX Complaint arising from the same allegations; the right of any party to withdraw from the informal resolution process and resume the grievance process with respect to the Title IX Complaint prior to agreeing to a resolution; and any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared;

b. <u>Voluntary Consent</u>.  The University will obtain the parties' voluntary, written consent to the informal resolution process.

c. <u>Timeframe</u>.  Informal Resolution will be completed within approximately 45 calendar days of the parties' agreement to participate in Informal Resolution, but IDEAA may extend the timeframe for good cause. During the Informal Resolution process, all deadlines in these procedures will be held in abeyance.

## III. Investigation

### a. Referral of Title IX Complaint to Investigator

If the conduct alleged in the Title IX Complaint could constitute Title IX Sexual Harassment, within fifteen (15) days of the date the Title IX Complaint was filed or at the completion of any appeal made regarding a dismissal decision, the Title IX Coordinator will assign the Title IX Complaint to IDEAA for investigation under IDEAA's Grievance Procedures for Title IX Sexual Harassment.

### b. Opportunity to Respond to Complaint

After receiving written notice of the allegations as outlined in Section I.(c) above, the Respondent shall have an opportunity to submit a written response (hereinafter "Response") to the Complaint, including its allegations and any supporting Complaint documents, within ten (10) days of receipt of the formal Complaint and its supporting documents.

### c. Fact-Gathering

IDEAA shall, within a prompt and reasonable time frame, investigate the Title IX Complaint and shall have access to all available information to do so, including the opportunity to interview witnesses, as well as the Complainant and Respondent.

Prior to an investigative interview of a party (Complainant or Respondent), the investigator will provide that party with written notice of the date, time, location, participants, and purpose of the investigative interview.

Both the Complainant and Respondent will have an equal opportunity to identify witnesses and provide inculpatory and exculpatory evidence.

d. **Opportunity to Review Evidence**

IDEAA will provide both parties an equal opportunity to review and inspect any evidence obtained as part of the investigation that is directly related to the allegations raised in the Title IX Complaint. This includes the evidence upon which the University does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. Prior to completion of the investigative report, the University will make available to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, at IDEAA's discretion. The parties will have at least ten (10) days to submit a written response, which the investigator will consider prior to completion of the investigative report.

e. **Investigative Report**

Upon completion of the investigation, the investigator shall prepare a written report that fairly summarizes relevant evidence. The investigator will send to the Title IX Coordinator the investigative report, relevant evidence gathered during the investigation, and all evidence made available to the parties for review and inspection prior to the conclusion of the investigation.

At least ten (10) days prior to a hearing, the Title IX Coordinator will send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response. Written responses will be provided to the Title IX Coordinator within the ten (10) day period.

IV. **Hearing Process**

a. **Notice of Hearing Process**

At least fifteen (15) days prior to a hearing, the Title IX Coordinator will send to each party and the party's advisor, if any, a notice and description of IDEAA's hearing process and the expected timeframe for the process.

b. **Standard of Evidence**

The standard of evidence for all cases of Title IX Sexual Harassment is preponderance of the evidence, which means that the decision-maker must determine based on the evidence whether it is more likely than not that Title IX Sexual Harassment occurred.

c. **Production of Evidence**

All evidence subject to the parties' inspection and review at the conclusion of the investigation will be available at any hearing to give each party an equal opportunity to refer to such evidence during the hearing, including for purposes of questioning the other party by an advisor.

d. **Hearing**

A Title IX Sexual Harassment Hearing Panel ("Hearing Panel") will be assembled to review the investigative report and supporting evidence, conduct a live hearing, and determine whether the Respondent is responsible for the conduct alleged in the notice of Complaint.

1. **Composition of the Hearing Panel**

   The Hearing Panel shall be composed of three members, each of whom shall be a decision-maker, as defined in the Policy on Sexual Misconduct. At least two of the three Hearing Panel members will be selected from a pool of trained administrators, faculty, and staff. A trained external consultant also may serve as a Hearing Panel member. IDEAA shall select the Hearing Panel members and designate one Hearing Panel member to be the Chair. The Hearing Panel Chair will make decisions about relevance during the hearing.

   Where the Respondent is a faculty member, at least two of the three Hearing Panel members shall be faculty members or academic administrators.

   Where the Respondent is a staff member or AAP, at least two of the three Hearing Panel members shall be staff or AAPs.

   Parties who believe there exists a conflict of interest with regard to a panel member must notify the Title IX Coordinator, or designee, as described in Section VIII.

2. **Pre-Hearing Process**

   At least ten (10) days prior to the hearing, each party must submit to the Title IX Coordinator a list of relevant witnesses who they request to be called as witnesses during the hearing.

   At least seven (7) days prior to the hearing, IDEAA will provide the Complainant and Respondent with written notice of the date, time, location, participants, and purpose of the hearing.

3. **Hearing Process**
   i. Location. The hearing will take place in-person or remotely using technology, at the discretion of IDEAA. At the request of either party, IDEAA will provide for the live hearing to occur with the parties in separate locations. In such a case, IDEAA will provide technology enabling the Hearing Panel members and parties to simultaneously see and hear the party or the witness answering questions.
   ii. Interviews of Parties. During the hearing, the Hearing Panel will conduct separate interviews of the Complainant and Respondent regarding the information in the investigative report and supporting documentation.
   iii. Questioning by Advisors. The Hearing Panel Chair will permit each party's advisor to ask the other party and any witnesses identified in section IV.(d)(2) above relevant questions and follow-up questions, as may be determined by the Hearing Panel Chair, including those challenging the credibility of each party or witness. Such questions at the live hearing will be asked directly, orally, and in real time by the party's advisor and never by a party personally, notwithstanding the discretion of the University to otherwise restrict the extent to which advisors may participate in the proceedings. Advisors must comply with any rules of decorum set forth by the University.

Hearing Panel members cannot draw an inference relevant to the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer questions.

iv. <u>Provision of Advisors to Conduct Interviews During Hearing</u>. If a party does not have an advisor present at the live hearing, the University will provide without fee or charge to that party, an advisor of the University's choice, who may be, but is not required to be, an attorney, to conduct an interview of the other party during the hearing. Parties are requested to notify the University ten (10) days in advance of the hearing if they will not have an advisor present at the hearing.

v. <u>Relevance Determinations</u>.  Only relevant questions may be asked of a party or witness. Before a Complainant, Respondent, or witness answers a question, the Hearing Panel Chair will first determine whether the question is relevant and explain any decision to exclude a question as not relevant.  Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant, unless (1) such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent engaged in the conduct alleged by the Complainant, or (2) the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

vi. <u>Recording</u>.  At its discretion, IDEAA may make an audio or audiovisual recording, or transcript, of any live hearing and IDEAA may make such available to the parties for inspection and review, upon request.  No other recording of the hearing is permitted. The recording may be used in deliberations by the hearing panel or decision-makers. Parties' access to the recording typically will occur in-person at a location of IDEAA's choosing; however, in exceptional circumstances, review and inspection may be permitted remotely with protective measures instituted to maintain the confidentiality of the recording. Recording of the hearing is governed by the confidentiality requirements of these procedures and the Policy on Sexual Misconduct. Such recording will be maintained in accordance with the record-keeping requirements set forth in the Policy on Sexual Misconduct. No other unauthorized recording or use of any technology during interviews and/or meetings with IDEAA is permitted by the Complainant, Respondent, witnesses, and/or advisors.

vii. <u>Determination of Finding(s)</u>. A finding of responsibility must be determined by a majority vote of the Hearing Panel.

**4. Sanctions and Educational Remedies**

a. For faculty, notice of the Hearing Panel's determination of responsibility will be provided to the Executive Vice President for the Campus, consistent with the Faculty Handbook, to determine the appropriate sanction.  Faculty members who are subject to sanctions under these procedures will receive the procedural protections set forth in the Faculty Handbook.

b. For staff and AAPs, notice of the Hearing Panel's determination of responsibility will be provided to the Executive Vice President for the Campus or COO, as appropriate, and the Department of Human Resources to determine appropriate sanctions.

c. The following apply to faculty, staff, and AAPs unless otherwise specified below:

i. When a Hearing Panel finds that Title IX Sexual Harassment has occurred, IDEAA will forward the investigative report and decision of the Hearing Panel to the Respondent's Executive Vice President or COO, or designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality. For purposes of these procedures, if the Executive Vice President or

COO is a party to the matter, the President or President's designee will be informed of the results and take the required actions.

    ii. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

    iii. Sanctions and/or remedies for Faculty under the Faculty Responsibilities Code (https://facultyhandbook.georgetown.edu/section3/g/) include but are not limited to: training, coursework, mentoring, participation in workshops or support groups, monitoring, written apology, a course of counseling, letter of reprimand, loss of faculty privileges (including removal from office, project, or home unit; loss of office space; research funding; access to Teaching Assistants or Research Assistants; attendance at faculty meetings; and voting rights), probation, denial of a salary increase, bonus, or other remuneration, reduction of salary, unpaid suspension from work for a stated period of time, removal of duties, with commensurate reduction in pay, reduction in rank; termination of employment; revocation of tenure; or any other sanction that is determined by the decisionmaker to be fair and proportionate to the violation.

    iv. Sanctions and/or remedies for staff and AAPs include:  restitution; training; counseling, written warning, reduction in salary; demotion; disciplinary suspension; termination of employment; or any other sanction that is determined by the decisionmaker to be fair and proportionate to the violation.

    v. Remedies will be designed to restore or preserve equal access to the Education Program or Activity. Such remedies may include Supportive Measures, but may also be disciplinary or punitive.

    vi. The Title IX Coordinator is responsible for effective implementation of any sanctions and remedies.  Failure to comply may lead to additional sanctions.

5. **Written Determination**

Within forty-five (45) days of the date the live hearing concludes, the Hearing Panel will issue a written determination regarding responsibility, using the preponderance of the evidence standard. IDEAA will provide the written determination to the parties simultaneously. If an appeal is filed, the determination regarding responsibility becomes final on the date the written determination of the result of the appeal is provided to the parties.  If an appeal is not filed, the determination regarding responsibility becomes final on the date on which an appeal would no longer be considered timely. The written determination will include:

    i. Identification of the allegations potentially constituting Title IX Sexual Harassment;

    ii. A description of the procedural steps taken from the receipt of the Title IX Complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

    iii. Findings of fact supporting the determination;

    iv. Conclusions regarding the application of the Policy and other University policies, as applicable, to the facts;

    v. A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the University will impose on the

Respondent, and whether remedies designed to restore or preserve equal access to the Education Program or Activity will be provided by the University to the Complainant;

vi. The procedures and permissible bases for the Complainant and Respondent to appeal.

The determination regarding responsibility will be final unless either party appeals the Hearing Panel's finding, as outlined in Section IV.

If a Respondent is found responsible for Title IX Sexual Harassment, the sanctioning decision will take place after the expiration of the time period for filing an appeal, or at the conclusion of the appeal process, whichever is later.

## V. Appeal

### a. Appeal of Dismissal Decision

An appeal of the Title IX Coordinator's dismissal decision (see Section I.(c)1.) may be made by Complainant or Respondent to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, within five (5) days of the date of the Title IX Coordinator's written notification to the parties. Within two (2) days following the expiration of the time frame for filing an appeal, the Title IX Coordinator or IDEAA will notify the other party in writing if an appeal is filed and, if so, implement appeal procedures equally for both parties.

#### 1. Grounds for Appeal

There are certain limited circumstances under which a dismissal decision may be appealed. The appellant must demonstrate:

i. A material failure to follow these procedures or a procedural irregularity that affected the outcome of the matter;

ii. Significant evidence was not considered, which would have altered the outcome, or new evidence that was not reasonably available at the time the determination regarding dismissal was made that could affect the outcome; or

iii. That the Title IX Coordinator(s), investigator(s), or decision-maker(s) had a conflict of interest or bias that affected the outcome of the matter.

#### 2. Appeal Procedures

Both parties will have a reasonable and equal opportunity to submit a written statement in support of, or challenging, the outcome. Each party who did not file the appeal will be given a chance to respond to the request for an appeal within five (5) days.

The Associate Vice President for Equal Opportunity, Affirmative Action and Compliance (AVP), or designee, will determine whether the request for an appeal is warranted.

If an appeal is not warranted, the AVP will uphold the Title IX Coordinator's dismissal decision.

If an appeal is warranted, the AVP, or designee, shall review the Title IX Coordinator's dismissal decision. During this review, the AVP, or designee, shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the investigator(s), Complainant, and Respondent separately, as applicable and appropriate depending on when the dismissal decision is made.

The AVP, or designee, may determine that the matter should be dismissed, returned to the Title IX Coordinator for investigation, or referred to another University department or office to be addressed. The decision of the AVP, or designee, is final.

Within fifteen (15) days of the date the appeal was filed, the parties will be informed of the AVP's determination. The written determination will describe the result of the appeal and the rationale for the result, and the written determination will be provided simultaneously to both parties.

b. **Appeals of Hearing Panel Determination**

An appeal may be made by Complainant or Respondent to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, within fourteen (14) days of the date of the Hearing Panel's written notification of the determination to the parties. Within two (2) days following the expiration of the time frame for filing an appeal, the Title IX Coordinator or IDEAA will notify the other party in writing if an appeal is filed and, if so, implement appeal procedures equally for both parties.

1. **Grounds for Appeal**

   There are certain limited circumstances under which a hearing panel determination may be appealed. The appellant must demonstrate:

   i. A material failure to follow these procedures or a procedural irregularity that affected the outcome of the matter;
   ii. Significant evidence was not considered, which would have altered the outcome, or new evidence that was not reasonably available at the time the determination regarding dismissal was made that could affect the outcome; or
   iii. That the Title IX Coordinator(s), investigator(s), or decision-maker(s) had a conflict of interest or bias that affected the outcome of the matter.

   The other party or parties will be given a chance to respond to the request for an appeal within fourteen (14) days. Both parties will have a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome.

   The Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, will determine whether the request for an appeal is warranted. The parties will be informed of the decision within ten (10) days of IDEAA receiving the request for appeal. The written determination will describe the result of the AVP's determination and the rationale for the result, and the written outcome will be provided simultaneously to both parties.

2. **Appeal Procedures**
   i. If the request for an appeal is granted, IDEAA shall notify the appropriate Vice President, Executive Vice President or COO at the same time the parties are notified of the decision to grant the appeal. This notification shall include a copy of the Title IX Complaint naming the Complainant and Respondent and will explain the grounds on which the appeal was granted.
   ii. IDEAA shall then initiate the selection procedures to form a three-member Grievance Panel selected from the Equal Opportunity Examining Board made up of Georgetown University administrators, faculty and staff. Grievances involving discriminatory denials

of tenure, promotion or reappointment of faculty members shall be heard by panels composed of faculty or academic administrators only. Panel members must be free of conflict of interest or bias and will receive training as decision-makers. The three-member Grievance Panel to serve on an appeal shall be selected in the following manner:

    a. Within five (5) days from the date of IDEAA's decision to grant an appeal, the Complainant shall select one member of the Equal Opportunity Examining Board, and the Respondent shall select another.

    b. IDEAA shall promptly convene a meeting of these two selected panelists who shall choose the third member from the Equal Opportunity Examining Board to form the Grievance Panel.

iii. A member of IDEAA's staff shall present information about the case to the panel members, who shall recuse themselves if they have prior knowledge of the Complaint, the circumstances surrounding the incidents, or any other reason which might prevent them from rendering an impartial decision. If the panelist selected by the Complainant is recused, then Complainant shall select another panelist. If the panelist selected by Respondent is recused, then Respondent shall select another panelist. If the panelist selected by the two selected panelists is recused, then the two selected panelists shall select another panelist.

iv. The Grievance Panel is charged with reviewing the written determination of responsibility and the ground(s) on which the appeal was granted.

v. The Grievance Panel shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the investigator(s), Complainant, and Respondent separately.

vi. The information presented to the Grievance Panel and its deliberations is confidential.

vii. Each party may choose an Advisor to accompany the party to meet with the Grievance Panel. The Advisor may not speak on behalf of the party or otherwise represent the party, but may provide support and consult with the party outside of the presence of the Grievance Panel. Any party who will be accompanied by an Advisor who is an attorney must notify the Grievance Panel at least three (3) days prior to the meeting, so that arrangements may be made for the University's attorney to attend.

viii. The Grievance Panel shall by majority vote reach one of the following results:

    a. support the determination of responsibility; or

    b. reach a different determination regarding responsibility.

ix. Within forty-five (45) days from its formation, the Grievance Panel shall submit a report of its results to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance (AVP), or designee. The written report of the Grievance Panel will describe the result of the appeal and the rationale for the result, and the written report will be provided simultaneously to both parties.

The AVP will forward the results with the AVP's approval and/or comments (if, for example, the Panel has not supported the full results) to the appropriate Executive Vice President or COO. The appropriate Executive Officer may accept the Panel's recommendations or may reasonably modify the results with the concurrence of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee. This official's decision is final and will be made within ten (10) days of receipt of the Grievance Panel's report. IDEAA shall provide notice on the same day to the Complainant, Respondent, and the Respondent's supervisor, if applicable, of the final result.

x. If corrective actions are imposed, the Title IX Coordinator shall monitor their implementation. The appropriate Executive Vice President or COO also shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions relating to the appeal or the underlying investigation or allegations.

## VI. Confidentiality

Complaints and investigations under this policy are treated as confidential by the University. The University complies with the Family Educational Rights & Privacy Act (FERPA) and other applicable privacy laws at all times in the course of investigations. The University will keep confidential the identity of any individual who has made a Report or Complaint of Sexual Misconduct, any Complainant, any individual who has been reported to be the perpetrator of sexual misconduct, any Respondent, and any witness, except as may be permitted by FERPA, or as required by law, or in order to conduct any investigation, hearing, or judicial proceeding arising from this Policy. The University complies with the Jeanne Clery Disclosure of Campus Security Police and Campus Crime Statistics Act and the Violence Against Women Act with respect to reporting and disclosure of campus security information. The University will not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence, as long as such conduct is not harassing or retaliatory. The investigation, investigation report, and proceedings are considered confidential.

## VII. False Information

Knowingly making a materially false statement or submitting false information in bad faith during the grievance process is prohibited. However, a determination regarding responsibility, alone, is not sufficient to conclude that any party made a materially false statement in bad faith.

## VIII. Training

Title IX Coordinator(s), investigator(s), decision-maker(s), and any person who facilitates an informal resolution process, will receive training on the definitions of terms used in the Policy on Sexual Misconduct, the scope of the University's Education Program or Activity, how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. The University also will ensure that investigators receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence. Hearing Panel members will receive training on any technology to be used at a live hearing, as applicable, and on issues of relevance of questions and evidence, including when questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant. Any materials used to train Title IX Coordinator(s), investigator(s), decision-maker(s), and any person who facilitates an informal resolution process, will not rely on sex or gender stereotypes and will promote impartial investigations and adjudications of Complaints of Title IX Sexual Harassment.

## IX. Conflicts of Interest

Any individual designated as an investigator, decision-maker, or any person designated to facilitate an informal resolution process, may not have a conflict of interest or bias for or against Complainants or Respondents generally or an individual Complainant or Respondent. The parties are required to raise any concerns related to conflicts of interest or bias in writing to the Title IX Coordinator(s) (or to the Vice

President of Diversity, Equity, and Inclusion and Chief Diversity Officer, if the Title IX Coordinator(s) has a conflict of interest) within 5 days of the alleged conflict of interest or bias arising. The Title IX Coordinator(s) will perform their duties without conflict of interest or bias.

X. **Administrative Leave**

Human Resources Policy #305 (https://policymanual.hr.georgetown.edu/300-employee-relations/305-suspension-for-investigation/) and the Faculty Responsibilities Code (https://facultyhandbook.georgetown.edu/section3/g/) of the Faculty Handbook provide procedures for placing an employee on administrative leave during the pendency of an investigation or grievance process.

XI. **Notice of Meetings and Timeframes**

IDEAA will provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate.

At the discretion of the Title IX Coordinator(s), the grievance process may be temporarily delayed and limited extensions of time frames may be granted for good cause shown with written notice to the Complainant and the Respondent of the delay or extension and the reasons for the action. Good cause may include, but is not limited to, considerations such as the absence of a party, advisor, or a witness; concurrent law enforcement activity; the need for language assistance or accommodation of disabilities; exam periods; or breaks in the University's calendar. No party may unreasonably delay the grievance process due to unavailability of an advisor.

At the discretion of the Title IX Coordinator(s), the grievance process also may be temporarily delayed during the dismissal and informal resolution processes, including appeals of dismissal decisions, to permit the conclusion of these processes prior to the commencement of the investigation or hearing.

XII. **Supportive Measures and Resources**

Supportive Measures are available to individuals who are alleged to have experienced Sexual Misconduct and those accused of Sexual Misconduct on an equitable basis. Individuals impacted by Sexual Misconduct are encouraged to seek confidential counseling and other support resources offered by the University and by off-campus providers. Individuals are encouraged not to wait to seek confidential counseling, and University counselors can take proactive steps to assist concerned individuals. A description of these resources is available on the University's website at: https://sexualassault.georgetown.edu/resourcecenter (https://sexualassault.georgetown.edu/resourcecenter). In addition, a description of the Faculty and Staff Assistance Program is available at: http://hr.georgetown.edu/fsap/ (http://hr.georgetown.edu/fsap/).

# Appendix B

## Notice of Non-Discrimination

Georgetown University is committed to providing equal educational and employment opportunities and embraces the diversity of its faculty, staff, and students. The University does not discriminate on the basis of age, color, disability, family responsibilities, familial status, gender identity or expression, genetic information, marital status, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, source of income, veteran's status or any other factor prohibited by law in its educational programs and activities or in employment.

The following person has been designated to handle questions regarding Georgetown's non-discrimination and affirmative action policies:

Associate Vice President for Equal Opportunity, Affirmative Action & Compliance
Office of Institutional Diversity, Equity, and Affirmative Action
M-36 Darnall Hall
37th & O Streets NW
Washington, DC 20057
Phone: (202) 687-4798
Fax: (202) 687-7778
Email: ideaa@georgetown.edu

The following person has been designated to handle questions regarding Georgetown's Title IX policy:

University Title IX Coordinator
Office of Institutional Diversity, Equity, and Affirmative Action
M-36 Darnall Hall
37th & O Streets NW
Washington, DC 20057
Phone: (202) 687-4798
Fax: (202) 687-7778
Email: titleixideaa@georgetown.edu

The University has designated Deputy Title IX Coordinators for each of the following:  undergraduate students; Main Campus Graduate Students (including Biomedical Graduate Education students), the School of Medicine; the Law Center; the School of Continuing Studies; Georgetown University in Qatar; and Faculty and Staff.

A list of Deputy Title IX Coordinators is available on the University's website at on the Title IX contacts page (https://titleix.georgetown.edu/title-ix-contacts).

We encourage individuals with inquiries regarding these policies to first contact the staff persons listed above. Inquiries about the application of this Policy or Title IX to the University may be referred to the University's Title IX Coordinator(s), to the Assistant Secretary of the U.S. Department of Education, or both.

# Appendix C

## Changes and Updates to IDEAA's Grievance Procedures to Investigate Allegations of Discrimination and Harassment as required by the Revocation by Operation of Law Provision

1. Effective October 7, 2021, the following statement was removed from Appendix B, Section 12(d)(i) of this Policy: 2. On November 16, 2021, the definition of "Sexual Assault" was updated in Appendix A of this Policy to reflect the changes made to the Federal Bureau of Investigation's uniform crime reporting system, as required by 34 CFR 106.30.

If a party or witness does not submit to cross-examination at the live hearing, the Decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility.

*Approved: February 3, 2022*

# Footnotes

[1] Georgetown University publishes and widely disseminates these policies, including on IDEAA's website (https://ideaa.georgetown.edu/policies/); on the website of the Department of Human Resources (https://policymanual.hr.georgetown.edu/1000-university-policies/); and in the Faculty Handbook (https://facultyhandbook.georgetown.edu/section4/).

---



**Faculty Handbook**

37th and O Streets, N.W.
Washington DC



**Georgetown University**
**Institutional Diversity, Equity, and Affirmative Action**
**Grievance Procedures to Investigate Allegations of Discrimination and Harassment**

### Introduction

Georgetown University complies with federal laws and regulations and the District of Columbia Human Rights Act and acts in accordance with the University's Affirmative Action Plan. Therefore, the University has established these grievance procedures for the Office of Institutional Diversity, Equity, and Affirmative Action ("IDEAA") to review, investigate, and resolve alleged violations of the University's Equal Opportunity and Non-Discrimination in Employment and Non-Discrimination in Education Policies, Affirmative Action Policy, the Policy Statement on Harassment, and the Policy on Sexual Misconduct.[1]

The procedures outlined below cover allegations of unlawful discrimination and harassment in employment or education on the basis of age, color, disability, family responsibilities, gender identity and expression, genetic information, marital status, matriculation, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, veteran status and other factors prohibited by law.

These internal Grievance Procedures to Investigate Allegations of Discrimination and Harassment provide a mechanism for faculty, staff, students, third parties and applicants for employment and admission to receive a prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation.

The University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incident and seek redress through IDEAA's Grievance Procedures. The University will provide a prompt investigation as well as a thorough and careful resolution. Individuals may use these procedures to address off-campus behaviors, which may violate the policies on harassment and discrimination as they relate to educational and employment opportunities. Individuals with questions about these grievance procedures may reach out to IDEAA at ideaa@georgetown.edu or (202) 687-4798.

---

[1] Georgetown University publishes and widely disseminates these policies, including on IDEAA's website at https://ideaa.georgetown.edu/policies/; on the website of the Department of Human Resources at https://policymanual.hr.georgetown.edu/1000-university-policies/; and in the Faculty Handbook at https://facultyhandbook.georgetown.edu/section4/.

EoR - 1980 of 2347

Sexual Misconduct is a specific type of unlawful discrimination based on sex. Consistent with the University's Policy on Sexual Misconduct, certain procedural adjustments will be applied to grievance procedures in cases alleging Sexual Misconduct. Specifically:

- For cases alleging Sexual Misconduct that could constitute "Title IX Sexual Harassment," as defined in the Policy on Sexual Misconduct, the grievance procedures outlined in Appendix A of these procedures shall apply.
- For all other cases alleging Sexual Misconduct (i.e., cases alleging "Non-Title IX Sexual Misconduct," as defined in the Policy on Sexual Misconduct), the procedures outlined below will apply.

To the extent there is any conflict between these Grievance Procedures to Investigate Allegations of Discrimination and Harassment and the Policy on Sexual Misconduct with respect to cases alleging Sexual Misconduct, the Policy on Sexual Misconduct shall govern.

Proceedings involving grievances of Sexual Misconduct shall be conducted by officials who have received training on issues related to sexual harassment, sexual assault, domestic violence, dating violence and stalking and how to conduct a grievance process that protects the safety of all parties involved and promotes accountability. With respect to allegations of Sexual Misconduct, these procedures apply to situations in which a faculty or staff member is the Respondent. A Respondent is an individual alleged to have engaged in conduct prohibited by a policy covered by these Grievance Procedures. Students may also use these procedures to address off-campus behaviors, which may violate the policies on harassment and discrimination as they relate to educational and employment opportunities. If a student is the Respondent, the disciplinary codes of conduct of each of the campuses shall govern. If an outside third party is the Respondent, IDEAA may refer the grievance to an appropriate authority for resolution and coordinate necessary corrective actions. A Complainant may report a violation of the Policy on Sexual Misconduct to any Title IX Coordinator, regardless of the identity of the Respondent or the place of occurrence of the alleged conduct. The University's Title IX Coordinators are identified in Appendix B.

Complainants are encouraged to exhaust these procedures with regard to any grievance before pursuing remedies outside the University. However, the University acknowledges the rights of Complainants to seek redress from any external enforcement agency including the District of Columbia Office of Human Rights, the Equal Employment Opportunity Commission, the Office for Civil Rights of the United States Department of Education and the United States Department of Labor's Office of Federal Contract Compliance Programs. Complainants may also file a criminal complaint with the Metropolitan Police Department. The filing of an external complaint or investigation will not preclude the University from investigating and addressing issues or concerns raised to the University, nor will it preclude any individual alleging to have experienced Sexual Misconduct from receiving Supportive Measures.

It is a violation of this policy to file a discrimination or harassment complaint for the purpose of injuring the reputation of, or causing harm to, another person. Without minimizing the injury that can be suffered by the victim of discrimination or harassment, the University also recognizes that the filing of a discrimination or harassment complaint can have serious consequences for the person accused. That person, too, has rights that the policies on discrimination and harassment

2

must preserve and protect. Therefore, any person who abuses this policy by knowingly filing a false complaint will be subject to discipline if IDEAA determines that the complaint was filed in bad faith. This provision is not meant in any way to discourage legitimate complaints. All complaints will be treated as confidential, as described further below.

**Confidentiality**

IDEAA requires Complainants, Respondents, and witnesses who participate in this process to maintain confidentiality due to the sensitive nature of grievances, consistent with applicable legal requirements. This expectation of confidentiality is not intended to preclude parties from speaking with an advisor or to restrict the ability of parties to gather and present relevant evidence. IDEAA will preserve the confidentiality of information provided in connection with a grievance to the extent possible, consistent with the goals of a prompt and thorough investigation and resolution as well as compliance with the law, including the Family Educational Rights & Privacy Act (FERPA) and Health Insurance Portability and Accountability Act (HIPAA), at all times in the course of investigations. All publicly available records required to be maintained by law will omit the names and other personally identifiable information about complainants and others who choose not to file a grievance, to the extent permissible by law.

The Policy on Sexual Misconduct sets forth the confidentiality procedures applicable to Sexual Misconduct matters.

**Requirements for Filing Grievances**

1.  Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant") of Georgetown University may file a discrimination or harassment complaint with IDEAA. Complaints of Sexual Misconduct must be filed with the Title IX Coordinator, in accordance with the Policy on Sexual Misconduct. The Policy on Sexual Misconduct sets forth additional requirements and definitions related to Complainants and Complaints, including Title IX Complaints.

2.  Complainants must file a grievance in writing within 180 days following the alleged act of discrimination, harassment, or related retaliation or the date on which the Complainant knew or reasonably should have known of the act. Nevertheless, individuals are encouraged to report acts immediately in order to maximize the University's ability to obtain evidence, and conduct a thorough, impartial investigation. Failure to report promptly may impair the University's ability to enforce its policies. IDEAA may, in its sole discretion, review grievances filed after one year under special circumstances.

3.  A grievance must be filed in writing with IDEAA at M-36 Darnall Hall, electronically at ideaa@georgetown.edu, or by fax at (202) 687-7778. Complaints of Sexual Misconduct must be filed with the Title IX Coordinator.

**Provisions on Time Limits**

 All of the time limits contained within these grievance procedures may be extended solely at the discretion of IDEAA. Any party requesting an extension must do so in writing. In cases of Sexual Misconduct, IDEAA will make every effort to be reasonably prompt in investigating and resolving complaints and will address such complaints consistent with the Policy on Sexual Misconduct. A

3

typical investigation will conclude within ninety days from receipt of the grievance. IDEAA's investigation may be temporarily delayed while criminal investigators gather evidence. In the event any time frames need to be extended, IDEAA will inform both parties.

**Retaliation Prohibited**

University policies prohibit retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment/discrimination or otherwise exercising rights protected by law. University policies further prohibit taking any adverse academic or employment related action against an individual based on an unsubstantiated allegation or rumor of conduct prohibited by policies covered under these Grievance Procedures. Retaliation should be reported promptly to IDEAA or, in connection with Sexual Misconduct, the Title IX Coordinator, and if proven, may result in disciplinary action up to and including dismissal. The University encourages individuals to make good faith reports.

**Administrative Review**

IDEAA has the authority to initiate an administrative review at any time when, in the judgment of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, such action is warranted. A department head or other University official may also request that IDEAA conduct an administrative review, if this official becomes aware of alleged discrimination, harassment, or related retaliation. In cases where IDEAA conducts an administrative review and a respondent is identified, IDEAA will proceed to Step II of the Procedures for Processing Grievances below. The Policy on Sexual Misconduct describes Administrative Action that may be taken in cases in which an individual impacted by Sexual Misconduct declines to file a Complaint.

**Conflict of Interest**

If there is a conflict of interest between the fact-finder or decision-maker and the Complainant or the Respondent, the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance will designate an alternate fact-finder or decision-maker. If the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance has a conflict of interest, the Vice President of Diversity, Equity and Inclusion will designate an alternate fact-finder or decision-maker. If the Vice President of Diversity, Equity and Inclusion has an actual conflict of interest, the matter shall be referred to the Office of the President, which will designate an alternate fact-finder or decision-maker.

**Revocation by Operation of Law**

In the event that any provision of the Title IX Final Rule, 85 Fed. Reg. 30026 (May 19, 2020) is modified, invalidated, or stayed by federal law (including any federal statute, administrative rule or regulation, direction from the Department of Education, executive order, or controlling judicial order), any related provision in these procedures will be modified or deemed inoperative consistent with that change in federal law for all pending or new proceedings covered by these procedures as of the effective date of the change in law.

4

Should the entire "Appendix A: IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment" be invalidated, any conduct that would otherwise be covered under Appendix A shall be investigated and adjudicated under other University conduct policies and procedures as appropriate.

5

## Procedures for Processing Grievances

**Intake**

1. IDEAA staff shall schedule intake meetings with Complainants and Respondents in order to provide a general understanding of the relevant policy and this grievance procedure, as well as University support resources, as appropriate. The intake meeting may also involve a discussion of any interim or supportive measures that may be appropriate concerning the individual's academic, University housing, and/or University employment arrangements.

2. At the request of the Complainant, IDEAA staff shall proceed to Step I Informal Resolution, or the Step II Investigation process detailed below. Pursuant to the Policy on Sexual Misconduct, Informal Resolution will not be used to resolve allegations of Title IX Sexual Harassment made by a student against an employee. If the Complainant wishes to proceed with Step I Informal Resolution or Step II Investigation, then IDEAA staff will meet with the Respondent to provide the Respondent a general understanding of the relevant policy and procedure.

3. In the event the Respondent is a member of a collective bargaining unit, IDEAA will coordinate with Human Resources or the appropriate administrative unit to ensure that any required notices are provided to the union. Questioning of a witness or party who is a member of a collective bargaining unit will proceed in accordance with applicable law, policies, and collective bargaining agreements.

## Step I. Informal Resolution

1. Unless otherwise prohibited by University policy, IDEAA shall propose voluntary informal resolution, including mediation, to a Complainant desiring to resolve a dispute with a potential Respondent. If the Complainant agrees to informal resolution, the potential Respondent will be informed about the allegations and the informal resolution process, and offered an opportunity to participate in informal resolution. If both parties do not voluntarily agree to participate in the informal resolution process, the Complainant may proceed to Step II. In cases where Title IX Sexual Harassment is alleged by a student against an employee, IDEAA will not offer Informal Resolution to resolve the Complainant's allegations; in instances of alleged sexual harassment where both the Complainant and the Respondent request to mediate, the Complainant will not be asked to resolve his/her/their concerns directly with the Respondent.

2. If both parties agree to informal resolution, IDEAA's staff or a representative chosen by IDEAA will conduct the informal resolution within a prompt and reasonable time frame.

3. If a mutually acceptable resolution is achieved through informal resolution, a written agreement between the parties will reflect the resolution and shall be signed and dated by the parties. Copies will be provided to both parties and IDEAA will monitor compliance with the terms of the agreement by both parties. The case will then be closed.

4. If informal resolution fails, IDEAA will inform the Complainant about the option to proceed to Step II.

EoR - 1985 of 2347

5. All Complainants and Respondents have a right to end the informal resolution process at any time and can ask in writing for IDEAA to begin a Step II Investigation.

6. The process for informal resolution of Title IX Sexual Harassment matters is described in Appendix A.

## Step II. Investigation by IDEAA

1. An individual or group of individuals may initiate a formal Complaint by providing IDEAA a written and signed statement and any supporting documentation detailing the allegations of discrimination, harassment or related retaliation and identifying the individuals who engaged in the alleged conduct (the Respondent(s)).

2. IDEAA shall provide the Respondent and the Respondent's supervisor, if applicable, a copy of the formal complaint and its supporting documents. The Respondent shall have an opportunity to submit a written response to the allegations and any supporting documents within twenty (20) days of receipt of the formal complaint and its supporting documents. The Complainant will be provided a copy of this response and given the opportunity to submit a written rebuttal to Respondent's statement within ten (10) days of receipt of the response. Respondent will be given a final opportunity to respond in writing to Complainant's written rebuttal within ten (10) days of receipt of the rebuttal. Both Complainant and Respondent may present evidence and identify witnesses who can provide information relevant to the allegations.

3. IDEAA shall within a prompt and reasonable time frame investigate the Complaint and shall have access to all necessary information to do so and the opportunity to interview witnesses, as well as Complainant and Respondent.

4. Upon completion of the investigation, IDEAA shall prepare a written report. IDEAA uses the standard of preponderance of the evidence to ascertain if the University's policies have been violated. IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, and at the discretion of IDEAA, transcripts, and audio recordings.

## Step III. Notification

1. When IDEAA finds that no violation of policies governing harassment or discrimination has occurred, IDEAA will provide notice of the results to the parties on the same day, which shall be within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in Step V.

EoR - 1986 of 2347

2.  When IDEAA finds that a violation of policies governing harassment or discrimination has occurred, IDEAA will:

    a)    Provide written notice of the results to the parties on the same day, to the extent consistent with the confidentiality accorded to University personnel actions, and within thirty days of the conclusion of its investigation. Such notification will include an explanation of the appeal procedures in Step V.

    b)    Forward its report to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials on a need-to-know basis, consistent with the above provisions addressing confidentiality.

    c)    Direct that prompt remedial action be taken to correct the situation. Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

## Step IV. Corrective Action

If corrective actions are imposed, IDEAA shall monitor their implementation. In Title IX Sexual Harassment matters, the Title IX Coordinator will monitor implementation of corrective actions. The appropriate Executive Vice President, Chief Operating Officer or Senior Vice President shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions related to the allegations resulting in the corrective actions.

## Step V. Appeal

Where IDEAA finds a violation of the Policy on Sexual Misconduct, IDEAA may notify the Complainant of the sanction or remedial action imposed on the Respondent where the sanction or remedial action relates to the Complainant.

For purposes of these procedures, if the Executive Vice President or Senior Vice President is a party to the matter, the President will be informed of the results and take the required actions.

An appeal may be made by Complainant or Respondent within 14 business days of IDEAA's notification of the results. The appeal process for Title IX Sexual Harassment matters is set forth in Appendix A.

## 1)      Grounds for Appeal

There are certain limited circumstances under which a case may be appealed. For non-Title IX Sexual Harassment matters, the appellant must demonstrate:

a)      A material failure to follow these Grievance Procedures during the investigation.

EoR - 1987 of 2347

b)      Significant evidence was not considered, which would have altered the outcome of the investigation.

The other party (ies) will be given a chance to respond to the request for an appeal within five (5) business days. The Vice President for Institutional Diversity & Equity, or her/his designee, will determine whether the request for an appeal is warranted. The parties will be informed of the decision within ten business days of receiving the request for appeal.

**2)      Appeal Procedures**

a)      If the request for an appeal is granted, IDEAA shall notify the appropriate Vice President, Executive Vice President or Chief Operating Officer. This notification shall include a copy of the formal complaint naming the Complainant and Respondent and will explain the grounds on which the appeal was granted.

b)      IDEAA shall then initiate the selection procedures to form a three member Grievance Panel selected from the Equal Opportunity Examining Board made up of Georgetown University administrators, faculty and staff. Grievances involving discriminatory denials of tenure, promotion or reappointment of faculty members shall be heard by panels composed of faculty or academic administrators only. The three member Grievance Panel to serve on an appeal shall be selected in the following manner:

   i)      Within five days from the date of IDEAA's decision to grant an appeal, the Complainant shall select one member of the Equal Opportunity Examining Board, and the Respondent shall select another.

   ii)     IDEAA shall promptly convene a meeting of these two selected panelists who shall choose the third member from the Equal Opportunity Examining Board to form the Grievance Panel.

c)      A member of IDEAA's staff shall present information about the complaint to the panel members who shall recuse themselves if they have prior knowledge of the complaint, the circumstances surrounding the incidents, or any other reason which might prevent them from rendering an impartial decision. If the panelist selected by the Complainant is recused, then Complainant shall select another panelist. If the panelist selected by Respondent is recused, then Respondent shall select another panelist. If the panelist selected by the two selected panelists is recused, then the two selected panelists shall select another panelist.

d)      The Grievance Panel is charged with reviewing IDEAA's investigation and determining whether the procedures were properly followed and that significant evidence was properly considered and weighed.

e)      The Grievance Panel shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the IDEAA investigator(s), Complainant, and Respondent separately.

EoR - 1988 of 2347

f)      The information presented to the Grievance Panel and its deliberations are confidential.

g)      Each party may choose an Advisor to accompany him/her to meet with the Grievance Panel. The Advisor may not speak on behalf of the party or otherwise represent the party, but may provide support and consult with the party outside of the presence of the Grievance Panel. Any party who will be accompanied by an Advisor who is an attorney must notify the Grievance Panel at least three business days prior to the meeting, so that arrangements may be made for the University's attorney to attend.

h)      The Grievance Panel shall by majority vote reach one of the following results:

      i)      support the full results of IDEAA's investigation;

      ii)     support the results but recommend different corrective actions than those recommended by IDEAA; or

      iii)    reach different results and, if necessary, recommend different corrective actions than those recommended by IDEAA.

i)      Within 45 business days from its formation, the Grievance Panel shall submit a report of its results to the Vice President for Diversity, Equity and Inclusion, or his/her designee, who will forward it with his or her approval and/or comments (if, for example, the Panel has not supported the full results of IDEAA's investigation) to the appropriate Executive Vice President or Chief Operating Officer. The appropriate Executive Officer may accept the Panel's recommendations or may reasonably modify the results with the concurrence of the Vice President for Diversity, Equity and Inclusion, or his/her designee. This official's decision is final and will be made within ten business days of receipt of the Grievance Panel's report. IDEAA shall provide notice on the same day to the Complainant, Respondent, and his/her supervisor, if applicable, of the final result. Faculty members who are subject to sanctions under these procedures will receive the procedural protections set forth in the Faculty Handbook.

j)      If corrective actions are imposed, IDEAA shall monitor their implementation. The appropriate Executive Vice President or Chief Operating Officer shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions relating to the appeal or the underlying investigation or allegations.

EoR - 1989 of 2347

**Appendix A**

**IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment**

IDEAA's Grievance Procedures provide for the prompt, fair, and impartial resolution of all Complaints of discrimination and harassment. In addition, the U.S. Department of Education's regulations implementing Title IX prescribe specific Grievance Procedures that must be applied to a narrow subset of Sexual Misconduct defined as "Title IX Sexual Harassment" in the Policy on Sexual Misconduct. As such, IDEAA has developed specific Grievance Procedures for Complaints of Title IX Sexual Harassment, which apply to that subset of conduct.

Complaints of Title IX Sexual Harassment against faculty, staff, and AAPs will be addressed under this Appendix. Complaints of Title IX Sexual Harassment against third parties will be referred by the Title IX Coordinator to an appropriate authority for resolution, as specified in the Policy on Sexual Misconduct.

In the event of a conflict between IDEAA's grievance procedures and the Policy on Sexual Misconduct, the Policy on Sexual Misconduct will govern. Relevant definitions are set forth in the Policy on Sexual Misconduct.

**I.       Intake**

**(a) Filing a Title IX Complaint**

To initiate a formal complaint of Title IX Sexual Harassment, a Title IX Complaint must be filed with the Title IX Coordinator (contact information for coordinators may be found in Appendix B to these procedures). A Title IX Complaint is a document filed by a Complainant or signed by the Title IX Coordinator alleging Title IX Sexual Harassment against a Respondent and requesting that the University investigate the allegation of Title IX Sexual Harassment.

>    i.  A Title IX Complaint may be filed with the Title IX Coordinator in person, by mail, by electronic mail, or by any other means designated by the University. As used in this paragraph, the phrase "document filed by a Complainant" means a document or electronic submission that contains the Complainant's physical or digital signature, or otherwise indicates that the Complainant is the person filing the Title IX Complaint.

>    ii. Where a Title IX Coordinator signs a Title IX Complaint, the Title IX Coordinator is not a Complainant or otherwise a party. The Title IX Coordinator may sign a Title IX Complaint in circumstances where a Complainant declines to file a Title IX Complaint and, in the Title IX Coordinator's discretion, the allegations indicate a possible safety concern for the campus community or another circumstance exists that reasonably would warrant an investigation.

**(b) Meeting with Complainant**

Within five (5) days of the filing of a Complaint, a Title IX Coordinator, or designee, shall schedule an individual meeting with the Complainant to provide a general understanding of the Policy on

EoR - 1990 of 2347

Sexual Misconduct and this grievance procedure, as well as Supportive Measures that may be appropriate, including concerning the individual's academic, University housing, and/or University employment arrangements.

    i. Prior to the intake meeting, the Title IX Coordinator, or designee, will provide the Complainant with written notice of the date, time, location, participants, and purpose of the meeting.

    ii. Supportive Measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

**(c) Title IX Coordinator's Response to Title IX Complaint**

### 1. Decision Regarding Title IX Jurisdiction

Within ten (10) days of the filing of the Complaint, the Title IX Coordinator will review the Title IX Complaint to determine whether the alleged conduct, if proved, could constitute Title IX Sexual Harassment. If the alleged conduct would not constitute Title IX Sexual Harassment, even if proved, the Title IX Coordinator will dismiss the Title IX Complaint.

Where there are multiple Complainants or Respondents arising out of the same incident, the Title IX Coordinator has the discretion to determine whether the allegations warrant consolidated, parallel, or sequential processing.

Where a Complaint includes both allegations of Title IX Sexual Harassment and other Sexual Misconduct, discrimination, or harassment based on a protected characteristic, the allegation of Title IX Sexual Harassment will be addressed under IDEAA's Grievance Procedures for Complaints of Title IX Sexual Harassment. The other allegation(s) of discrimination or harassment may be handled under IDEAA's Grievance Procedures to Investigate Allegations of Discrimination and Harassment or IDEAA's Grievance Procedures for Title IX Sexual Harassment, at the discretion of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, except that the Title IX Coordinator will determine the appropriate procedures for allegations of sex-based discrimination, including Sexual Misconduct.

Where a Complaint includes allegations of Title IX Sexual Harassment and violations of University policies that are not within IDEAA's jurisdiction, the other University office or committee with jurisdiction over the remaining allegations that arise shall consult with the Title IX Coordinator and IDEAA to determine the order of proceedings to ensure compliance with best practices and applicable legal standards.

### 2. Notices to Parties

Within ten (10) days of the decision that the Title IX grievance procedures apply, a Title IX Coordinator will provide the following written notice to the parties identified in the Title IX Complaint:

1. Notice of the University's grievance procedures, including informal resolution process.
2. Notice of the allegations of Title IX Sexual Harassment, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting Title IX Sexual Harassment, and the date and location of the alleged incident, if known.
3. Notice that the Respondent is not treated as responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process.
4. Notice to the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, and may inspect and review evidence.
5. Notice of the provision in the Policy on Sexual Misconduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

IDEAA also will provide to the Respondent a copy of the Title IX Complaint and supporting documents.

If, in the course of an investigation, IDEAA decides to investigate allegations about the Complainant or Respondent that were not included in the original notice provided to the parties, or remove charges that were included in the original notice, a Title IX Coordinator will provide an amended notice of the allegations to the parties identified in the Title IX Complaint.

### 3. Meeting with Respondent

Within five (5) days of the date of the written notice of the Title IX Complaint, a Title IX Coordinator, or designee, shall schedule an individual meeting with the Respondent(s) in order to provide a general understanding of the Policy on Sexual Misconduct and this grievance procedure, as well as Supportive Measures that may be appropriate, including concerning the individual's academic, University housing, and/or University employment arrangements.

> i. Prior to the intake meeting, the Title IX Coordinator, or designee, will provide the Respondent with written notice of the date, time, location, participants, and purpose of the meeting.

> ii. Supportive Measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

EoR - 1992 of 2347

### 4. Dismissal of Title IX Complaint

Where within the Title IX Coordinator's reasonable discretion, it is determined that the conduct alleged in the Title IX Complaint would not constitute Title IX Sexual Harassment, even if proved, the Title IX Complaint will be dismissed within five (5) days of the Title IX Coordinator's determination and referred to IDEAA to be addressed under IDEAA's Grievance Procedures. The Title IX Coordinator, with reasonable discretion, may also dismiss an allegation of Title IX Sexual Harassment if at any time during the investigation or hearing:

    a. a Complainant notifies the Title IX Coordinator in writing that the Complainant would like to withdraw the Title IX Complaint or any allegations therein;

    b. the Respondent is no longer employed by the University;

    c. specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Title IX Complaint or allegations therein; or

    d. the Complainant is no longer participating in or attempting to participate in the Education Program or Activity of the University, as defined under the Policy on Sexual Misconduct.

Within five (5) days of the dismissal decision, the Title IX Coordinator will send simultaneously to the parties written notice of the dismissal, the reason(s) for dismissal, and the appeal procedure. Information about the process for appealing the Title IX Coordinator's dismissal decision is described in Section IV.

Should the Title IX Coordinator determine that dismissal of Title IX Sexual Harassment allegations is appropriate, the Title IX Coordinator also will determine whether the allegations should be referred to another University department or office to be addressed under other procedures. The Title IX Coordinator also will assess whether it is appropriate to offer Supportive Measures to impacted individuals.

## II.    Informal Resolution

With the exception of a matter involving an Employee alleged to have engaged in Title IX Sexual Harassment against a Student, IDEAA may, at the request of either party, at any time prior to the determination regarding responsibility after the filing of a Title IX Complaint, facilitate a voluntary, informal resolution process, such as mediation, provided that the following conditions are met:

a. <u>Notice</u>. The University will provide to the parties a written notice disclosing: the allegations; the requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a Title IX Complaint arising from the same allegations; the right of any party to withdraw from the informal resolution process and resume the grievance process with respect to the Title IX Complaint prior to agreeing to a resolution; and any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared;

14

b.  <u>Voluntary Consent</u>. The University will obtain the parties' voluntary, written consent to the informal resolution process.

c.  <u>Timeframe</u>.  Informal Resolution will be completed within approximately 45 calendar days of the parties' agreement to participate in Informal Resolution, but IDEAA may extend the timeframe for good cause. During the Informal Resolution process, all deadlines in these procedures will be held in abeyance.

## III.  Investigation

### (a) Referral of Title IX Complaint to Investigator

If the conduct alleged in the Title IX Complaint could constitute Title IX Sexual Harassment, within fifteen (15) days of the date the Title IX Complaint was filed or at the completion of any appeal made regarding a dismissal decision, the Title IX Coordinator will assign the Title IX Complaint to IDEAA for investigation under IDEAA's Grievance Procedures for Title IX Sexual Harassment.

### (b) Opportunity to Respond to Complaint

After receiving written notice of the allegations as outlined in Section I.(c) above, the Respondent shall have an opportunity to submit a written response (hereinafter "Response") to the Complaint, including its allegations and any supporting Complaint documents, within ten (10) days of receipt of the formal Complaint and its supporting documents.

### (c) Fact-Gathering

IDEAA shall, within a prompt and reasonable time frame, investigate the Title IX Complaint and shall have access to all available information to do so, including the opportunity to interview witnesses, as well as the Complainant and Respondent.

Prior to an investigative interview of a party (Complainant or Respondent), the investigator will provide that party with written notice of the date, time, location, participants, and purpose of the investigative interview.

Both the Complainant and Respondent will have an equal opportunity to identify witnesses and provide inculpatory and exculpatory evidence.

### (d) Opportunity to Review Evidence

IDEAA will provide both parties an equal opportunity to review and inspect any evidence obtained as part of the investigation that is directly related to the allegations raised in the Title IX Complaint. This includes the evidence upon which the University does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to

EoR - 1994 of 2347

conclusion of the investigation. Prior to completion of the investigative report, the University will make available to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, at IDEAA's discretion. The parties will have at least ten (10) days to submit a written response, which the investigator will consider prior to completion of the investigative report.

**(e) Investigative Report**

Upon completion of the investigation, the investigator shall prepare a written report that fairly summarizes relevant evidence. The investigator will send to the Title IX Coordinator the investigative report, relevant evidence gathered during the investigation, and all evidence made available to the parties for review and inspection prior to the conclusion of the investigation.

At least ten (10) days prior to a hearing, the Title IX Coordinator will send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response. Written responses will be provided to the Title IX Coordinator within the ten (10) day period.

**IV.    Hearing Process**

**(a) Notice of Hearing Process**

At least fifteen (15) days prior to a hearing, the Title IX Coordinator will send to each party and the party's advisor, if any, a notice and description of IDEAA's hearing process and the expected timeframe for the process.

**(b) Standard of Evidence**

The standard of evidence for all cases of Title IX Sexual Harassment is preponderance of the evidence, which means that the decision-maker must determine based on the evidence whether it is more likely than not that Title IX Sexual Harassment occurred.

**(c) Production of Evidence**

All evidence subject to the parties' inspection and review at the conclusion of the investigation will be available at any hearing to give each party an equal opportunity to refer to such evidence during the hearing, including for purposes of questioning the other party by an advisor.

**(d) Hearing**

A Title IX Sexual Harassment Hearing Panel ("Hearing Panel") will be assembled to review the investigative report and supporting evidence, conduct a live hearing, and determine whether the Respondent is responsible for the conduct alleged in the notice of Complaint.

**1.    Composition of the Hearing Panel**

The Hearing Panel shall be composed of three members, each of whom shall be a decision-maker,

EoR - 1995 of 2347

as defined in the Policy on Sexual Misconduct. At least two of the three Hearing Panel members will be selected from a pool of trained administrators, faculty, and staff. A trained external consultant also may serve as a Hearing Panel member. IDEAA shall select the Hearing Panel members and designate one Hearing Panel member to be the Chair. The Hearing Panel Chair will make decisions about relevance during the hearing.

Where the Respondent is a faculty member, at least two of the three Hearing Panel members shall be faculty members or academic administrators.

Where the Respondent is a staff member or AAP, at least two of the three Hearing Panel members shall be staff or AAPs.

Parties who believe there exists a conflict of interest with regard to a panel member must notify the Title IX Coordinator, or designee, as described in Section VIII.

**2.      Pre-Hearing Process**

At least ten (10) days prior to the hearing, each party must submit to the Title IX Coordinator a list of relevant witnesses who they request to be called as witnesses during the hearing.

At least seven (7) days prior to the hearing, IDEAA will provide the Complainant and Respondent with written notice of the date, time, location, participants, and purpose of the hearing.

**3.      Hearing Process**

(i) <u>Location</u>. The hearing will take place in-person or remotely using technology, at the discretion of IDEAA. At the request of either party, IDEAA will provide for the live hearing to occur with the parties in separate locations. In such a case, IDEAA will provide technology enabling the Hearing Panel members and parties to simultaneously see and hear the party or the witness answering questions.

(ii)  <u>Interviews of Parties</u>. During the hearing, the Hearing Panel will conduct separate interviews of the Complainant and Respondent regarding the information in the investigative report and supporting documentation.

(iii)  <u>Questioning by Advisors</u>. The Hearing Panel Chair will permit each party's advisor to ask the other party and any witnesses identified in section IV.(d)(2) above relevant questions and follow-up questions, as may be determined by the Hearing Panel Chair, including those challenging the credibility of each party or witness. Such questions at the live hearing will be asked directly, orally, and in real time by the party's advisor and never by a party personally, notwithstanding the discretion of the University to otherwise restrict the extent to which advisors may participate in the proceedings. Advisors must comply with any rules of decorum set forth by the University.

Hearing Panel members cannot draw an inference relevant to the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer questions.

EoR - 1996 of 2347

(iv)  <u>Provision of Advisors to Conduct Interviews During Hearing</u>. If a party does not have an advisor present at the live hearing, the University will provide without fee or charge to that party, an advisor of the University's choice, who may be, but is not required to be, an attorney, to conduct an interview of the other party during the hearing. Parties are requested to notify the University ten (10) days in advance of the hearing if they will not have an advisor present at the hearing.

(v)  <u>Relevance Determinations</u>. Only relevant questions may be asked of a party or witness. Before a Complainant, Respondent, or witness answers a question, the Hearing Panel Chair will first determine whether the question is relevant and explain any decision to exclude a question as not relevant. Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant, unless (1) such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent engaged in the conduct alleged by the Complainant, or (2) the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

(vi)  <u>Recording</u>. At its discretion, IDEAA may make an audio or audiovisual recording, or transcript, of any live hearing and IDEAA may make such available to the parties for inspection and review, upon request. No other recording of the hearing is permitted. The recording may be used in deliberations by the hearing panel or decision-makers. Parties' access to the recording typically will occur in-person at a location of IDEAA's choosing; however, in exceptional circumstances, review and inspection may be permitted remotely with protective measures instituted to maintain the confidentiality of the recording. Recording of the hearing is governed by the confidentiality requirements of these procedures and the Policy on Sexual Misconduct. Such recording will be maintained in accordance with the record-keeping requirements set forth in the Policy on Sexual Misconduct. No other unauthorized recording or use of any technology during interviews and/or meetings with IDEAA is permitted by the Complainant, Respondent, witnesses, and/or advisors.

(vii)  <u>Determination of Finding(s)</u>. A finding of responsibility must be determined by a majority vote of the Hearing Panel.

**4.    Sanctions and Educational Remedies**

a.    For faculty, notice of the Hearing Panel's determination of responsibility will be provided to the Executive Vice President for the Campus, consistent with the Faculty Handbook, to determine the appropriate sanction. Faculty members who are subject to sanctions under these procedures will receive the procedural protections set forth in the Faculty Handbook.

b.    For staff and AAPs, notice of the Hearing Panel's determination of responsibility will be provided to the Executive Vice President for the Campus or COO, as appropriate, and the Department of Human Resources to determine appropriate sanctions.

c.    The following apply to faculty, staff, and AAPs unless otherwise specified below:

(i)    When a Hearing Panel finds that Title IX Sexual Harassment has occurred, IDEAA will forward the investigative report and decision of the Hearing Panel to the Respondent's Executive Vice President or COO, or designee, or other University

18

officials on a need-to-know basis, consistent with the above provisions addressing confidentiality. For purposes of these procedures, if the Executive Vice President or COO is a party to the matter, the President or President's designee will be informed of the results and take the required actions.

(ii)     Any sanction that is fair and proportionate to the violation may be imposed. In determining an appropriate sanction, any record of past violations of University policies, as well as the nature and severity of such past violations, may be considered. Sanctions will be determined with consideration given to applicable University policies.

(iii)    Sanctions and/or remedies for Faculty under the Faculty Responsibilities Code include but are not limited to: training, coursework, mentoring, participation in workshops or support groups, monitoring, written apology, a course of counseling, letter of reprimand, loss of faculty privileges (including removal from office, project, or home unit; loss of office space; research funding; access to Teaching Assistants or Research Assistants; attendance at faculty meetings; and voting rights), probation, denial of a salary increase, bonus, or other remuneration, reduction of salary, unpaid suspension from work for a stated period of time, removal of duties, with commensurate reduction in pay, reduction in rank; termination of employment; revocation of tenure; or any other sanction that is determined by the decisionmaker to be fair and proportionate to the violation.

(iv)    Sanctions and/or remedies for staff and AAPs include: restitution; training; counseling, written warning, reduction in salary; demotion; disciplinary suspension; termination of employment; or any other sanction that is determined by the decisionmaker to be fair and proportionate to the violation.

(v)     Remedies will be designed to restore or preserve equal access to the Education Program or Activity. Such remedies may include Supportive Measures, but may also be disciplinary or punitive.

(vi)    The Title IX Coordinator is responsible for effective implementation of any sanctions and remedies. Failure to comply may lead to additional sanctions.

## 5.    Written Determination

Within forty-five (45) days of the date the live hearing concludes, the Hearing Panel will issue a written determination regarding responsibility, using the preponderance of the evidence standard. IDEAA will provide the written determination to the parties simultaneously. If an appeal is filed, the determination regarding responsibility becomes final on the date the written determination of the result of the appeal is provided to the parties. If an appeal is not filed, the determination regarding responsibility becomes final on the date on which an appeal would no longer be considered timely. The written determination will include:

(i)  Identification of the allegations potentially constituting Title IX Sexual Harassment;

19

(ii) A description of the procedural steps taken from the receipt of the Title IX Complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(iii) Findings of fact supporting the determination;

(iv) Conclusions regarding the application of the Policy and other University policies, as applicable, to the facts;

(v) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the University will impose on the Respondent, and whether remedies designed to restore or preserve equal access to the Education Program or Activity will be provided by the University to the Complainant;

(vii) The procedures and permissible bases for the Complainant and Respondent to appeal.

The determination regarding responsibility will be final unless either party appeals the Hearing Panel's finding, as outlined in Section IV.

If a Respondent is found responsible for Title IX Sexual Harassment, the sanctioning decision will take place after the expiration of the time period for filing an appeal, or at the conclusion of the appeal process, whichever is later.

## V.      Appeal

### (a) Appeal of Dismissal Decision

An appeal of the Title IX Coordinator's dismissal decision (see Section I.(c)1.) may be made by Complainant or Respondent to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, within five (5) days of the date of the Title IX Coordinator's written notification to the parties. Within two (2) days following the expiration of the time frame for filing an appeal, the Title IX Coordinator or IDEAA will notify the other party in writing if an appeal is filed and, if so, implement appeal procedures equally for both parties.

### 1.      Grounds for Appeal

There are certain limited circumstances under which a dismissal decision may be appealed. The appellant must demonstrate:

(i)  A material failure to follow these procedures or a procedural irregularity that affected the outcome of the matter;

(ii) Significant evidence was not considered, which would have altered the outcome, or new evidence that was not reasonably available at the time the determination regarding dismissal was made that could affect the outcome; or

(iii) That the Title IX Coordinator(s), investigator(s), or decision-maker(s) had a conflict of interest or bias that affected the outcome of the matter.

20

### 2. Appeal Procedures

Both parties will have a reasonable and equal opportunity to submit a written statement in support of, or challenging, the outcome. Each party who did not file the appeal will be given a chance to respond to the request for an appeal within five (5) days.

The Associate Vice President for Equal Opportunity, Affirmative Action and Compliance (AVP), or designee, will determine whether the request for an appeal is warranted.

If an appeal is not warranted, the AVP will uphold the Title IX Coordinator's dismissal decision.

If an appeal is warranted, the AVP, or designee, shall review the Title IX Coordinator's dismissal decision. During this review, the AVP, or designee, shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the investigator(s), Complainant, and Respondent separately, as applicable and appropriate depending on when the dismissal decision is made.

The AVP, or designee, may determine that the matter should be dismissed, returned to the Title IX Coordinator for investigation, or referred to another University department or office to be addressed. The decision of the AVP, or designee, is final.

Within fifteen (15) days of the date the appeal was filed, the parties will be informed of the AVP's determination. The written determination will describe the result of the appeal and the rationale for the result, and the written determination will be provided simultaneously to both parties.

### (b) Appeals of Hearing Panel Determination

An appeal may be made by Complainant or Respondent to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, within fourteen (14) days of the date of the Hearing Panel's written notification of the determination to the parties. Within two (2) days following the expiration of the time frame for filing an appeal, the Title IX Coordinator or IDEAA will notify the other party in writing if an appeal is filed and, if so, implement appeal procedures equally for both parties.

### 1. Grounds for Appeal

There are certain limited circumstances under which a hearing panel determination may be appealed. The appellant must demonstrate:

    (i)    A material failure to follow these procedures or a procedural irregularity that affected the outcome of the matter;

    (ii)    Significant evidence was not considered, which would have altered the outcome, or new evidence that was not reasonably available at the time the determination regarding dismissal was made that could affect the outcome; or

    (iii)    That the Title IX Coordinator(s), investigator(s), or decision-maker(s) had a conflict of interest or bias that affected the outcome of the matter.

EoR - 2000 of 2347

The other party or parties will be given a chance to respond to the request for an appeal within fourteen (14) days. Both parties will have a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome.

The Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee, will determine whether the request for an appeal is warranted. The parties will be informed of the decision within ten (10) days of IDEAA receiving the request for appeal. The written determination will describe the result of the AVP's determination and the rationale for the result, and the written outcome will be provided simultaneously to both parties.

## 2.    Appeal Procedures

(i)    If the request for an appeal is granted, IDEAA shall notify the appropriate Vice President, Executive Vice President or COO at the same time the parties are notified of the decision to grant the appeal. This notification shall include a copy of the Title IX Complaint naming the Complainant and Respondent and will explain the grounds on which the appeal was granted.

(ii)    IDEAA shall then initiate the selection procedures to form a three-member Grievance Panel selected from the Equal Opportunity Examining Board made up of Georgetown University administrators, faculty and staff. Grievances involving discriminatory denials of tenure, promotion or reappointment of faculty members shall be heard by panels composed of faculty or academic administrators only. Panel members must be free of conflict of interest or bias and will receive training as decision-makers. The three-member Grievance Panel to serve on an appeal shall be selected in the following manner:

   a)    Within five (5) days from the date of IDEAA's decision to grant an appeal, the Complainant shall select one member of the Equal Opportunity Examining Board, and the Respondent shall select another.

   b)    IDEAA shall promptly convene a meeting of these two selected panelists who shall choose the third member from the Equal Opportunity Examining Board to form the Grievance Panel.

(iii)    A member of IDEAA's staff shall present information about the case to the panel members, who shall recuse themselves if they have prior knowledge of the Complaint, the circumstances surrounding the incidents, or any other reason which might prevent them from rendering an impartial decision. If the panelist selected by the Complainant is recused, then Complainant shall select another panelist. If the panelist selected by Respondent is recused, then Respondent shall select another panelist. If the panelist selected by the two selected panelists is recused, then the two selected panelists shall select another panelist.

(iv)    The Grievance Panel is charged with reviewing the written determination of responsibility and the ground(s) on which the appeal was granted.

EoR - 2001 of 2347

(v)     The Grievance Panel shall have access to all relevant information and the opportunity to interview witnesses, including the opportunity to interview the investigator(s), Complainant, and Respondent separately.

(vi)    The information presented to the Grievance Panel and its deliberations is confidential.

(vii)   Each party may choose an Advisor to accompany the party to meet with the Grievance Panel. The Advisor may not speak on behalf of the party or otherwise represent the party, but may provide support and consult with the party outside of the presence of the Grievance Panel. Any party who will be accompanied by an Advisor who is an attorney must notify the Grievance Panel at least three (3) days prior to the meeting, so that arrangements may be made for the University's attorney to attend.

(viii)  The Grievance Panel shall by majority vote reach one of the following results:

   a)      support the determination of responsibility; or

   b)      reach a different determination regarding responsibility.

(ix)    Within forty-five (45) days from its formation, the Grievance Panel shall submit a report of its results to the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance (AVP), or designee. The written report of the Grievance Panel will describe the result of the appeal and the rationale for the result, and the written report will be provided simultaneously to both parties.

   The AVP will forward the results with the AVP's approval and/or comments (if, for example, the Panel has not supported the full results) to the appropriate Executive Vice President or COO. The appropriate Executive Officer may accept the Panel's recommendations or may reasonably modify the results with the concurrence of the Associate Vice President for Equal Opportunity, Affirmative Action and Compliance, or designee. This official's decision is final and will be made within ten (10) days of receipt of the Grievance Panel's report. IDEAA shall provide notice on the same day to the Complainant, Respondent, and the Respondent's supervisor, if applicable, of the final result.

(x)     If corrective actions are imposed, the Title IX Coordinator shall monitor their implementation. The appropriate Executive Vice President or COO also shall ensure that the approved corrective actions are smoothly implemented and take measures to protect against retaliatory actions relating to the appeal or the underlying investigation or allegations.

## VI.     Confidentiality

Complaints and investigations under this policy are treated as confidential by the University. The University complies with the Family Educational Rights & Privacy Act (FERPA) and other applicable privacy laws at all times in the course of investigations. The University will keep confidential the identity of any individual who has made a Report or Complaint of Sexual Misconduct, any Complainant, any individual who has been reported to be the perpetrator of sexual

23

misconduct, any Respondent, and any witness, except as may be permitted by FERPA, or as required by law, or in order to conduct any investigation, hearing, or judicial proceeding arising from this Policy. The University complies with the Jeanne Clery Disclosure of Campus Security Police and Campus Crime Statistics Act and the Violence Against Women Act with respect to reporting and disclosure of campus security information. The University will not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence, as long as such conduct is not harassing or retaliatory. The investigation, investigation report, and proceedings are considered confidential.

## VII.    False Information

Knowingly making a materially false statement or submitting false information in bad faith during the grievance process is prohibited. However, a determination regarding responsibility, alone, is not sufficient to conclude that any party made a materially false statement in bad faith.

## VIII.    Training

Title IX Coordinator(s), investigator(s), decision-maker(s), and any person who facilitates an informal resolution process, will receive training on the definitions of terms used in the Policy on Sexual Misconduct, the scope of the University's Education Program or Activity, how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. The University also will ensure that investigators receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence. Hearing Panel members will receive training on any technology to be used at a live hearing, as applicable, and on issues of relevance of questions and evidence, including when questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant. Any materials used to train Title IX Coordinator(s), investigator(s), decision-maker(s), and any person who facilitates an informal resolution process, will not rely on sex or gender stereotypes and will promote impartial investigations and adjudications of Complaints of Title IX Sexual Harassment.

## IX.    Conflicts of Interest

Any individual designated as an investigator, decision-maker, or any person designated to facilitate an informal resolution process, may not have a conflict of interest or bias for or against Complainants or Respondents generally or an individual Complainant or Respondent. The parties are required to raise any concerns related to conflicts of interest or bias in writing to the Title IX Coordinator(s) (or to the Vice President of Diversity, Equity, and Inclusion and Chief Diversity Officer, if the Title IX Coordinator(s) has a conflict of interest) within 5 days of the alleged conflict of interest or bias arising. The Title IX Coordinator(s) will perform their duties without conflict of interest or bias.

## X.    Administrative Leave

Human Resources Policy #305 and the Faculty Responsibilities Code of the Faculty Handbook provide procedures for placing an employee on administrative leave during the pendency of an investigation or grievance process.

24

## XI.    Notice of Meetings and Timeframes

IDEAA will provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate.

At the discretion of the Title IX Coordinator(s), the grievance process may be temporarily delayed and limited extensions of time frames may be granted for good cause shown with written notice to the Complainant and the Respondent of the delay or extension and the reasons for the action.  Good cause may include, but is not limited to, considerations such as the absence of a party, advisor, or a witness; concurrent law enforcement activity; the need for language assistance or accommodation of disabilities; exam periods; or breaks in the University's calendar. No party may unreasonably delay the grievance process due to unavailability of an advisor.

At the discretion of the Title IX Coordinator(s), the grievance process also may be temporarily delayed during the dismissal and informal resolution processes, including appeals of dismissal decisions, to permit the conclusion of these processes prior to the commencement of the investigation or hearing.

## XII.    Supportive Measures and Resources

Supportive Measures are available to individuals who are alleged to have experienced Sexual Misconduct and those accused of Sexual Misconduct on an equitable basis. Individuals impacted by Sexual Misconduct are encouraged to seek confidential counseling and other support resources offered by the University and by off-campus providers. Individuals are encouraged not to wait to seek confidential counseling, and University counselors can take proactive steps to assist concerned individuals. A description of these resources is available on the University's website at: https://sexualassault.georgetown.edu/resourcecenter. In addition, a description of the Faculty and Staff Assistance Program is available at: http://hr.georgetown.edu/fsap/.

EoR - 2004 of 2347

**Appendix B**
**Notice of Non-Discrimination**

Georgetown University is committed to providing equal educational and employment opportunities and embraces the diversity of its faculty, staff, and students. The University does not discriminate on the basis of age, color, disability, family responsibilities, familial status, gender identity or expression, genetic information, marital status, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, source of income, veteran's status or any other factor prohibited by law in its educational programs and activities or in employment.
The following person has been designated to handle questions regarding Georgetown's non-discrimination and affirmative action policies:

        Associate Vice President for Equal Opportunity, Affirmative Action & Compliance
        Office of Institutional Diversity, Equity, and Affirmative Action
        M-36 Darnall Hall
        37th & O Streets NW
        Washington, DC 20057
        Phone: (202) 687-4798
        Fax: (202) 687-7778
        Email: ideaa@georgetown.edu

The following person has been designated to handle questions regarding Georgetown's Title IX policy:

        University Title IX Coordinator
        Office of Institutional Diversity, Equity, and Affirmative Action
        M-36 Darnall Hall
        37th & O Streets NW
        Washington, DC 20057
        Phone: (202) 687-4798
        Fax: (202) 687-7778
        Email: titleixideaa@georgetown.edu

The University has designated Deputy Title IX Coordinators for each of the following: undergraduate students; Main Campus Graduate Students (including Biomedical Graduate Education students), the School of Medicine; the Law Center; the School of Continuing Studies; Georgetown University in Qatar; and Faculty and Staff.

A list of Deputy Title IX Coordinators is available on the University's website at
https://titleix.georgetown.edu/title-ix-contacts.

We encourage individuals with inquiries regarding these policies to first contact the staff persons listed above. Inquiries about the application of this Policy or Title IX to the University may be referred to the University's Title IX Coordinator(s), to the Assistant Secretary of the U.S. Department of Education, or both.

EoR - 2005 of 2347

**Appendix C**
**Changes and Updates to IDEAA's Grievance Procedures to Investigate Allegations of Discrimination and Harassment as required by the Revocation by Operation of Law Provision**

1. Effective October 7, 2021, the following statement was removed from Appendix B, Section 12(d)(i) of this Policy: 2. On November 16, 2021, the definition of "Sexual Assault" was updated in Appendix A of this Policy to reflect the changes made to the Federal Bureau of Investigation's uniform crime reporting system, as required by 34 CFR 106.30.

If a party or witness does not submit to cross-examination at the live hearing, the Decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility.

*Approved: February 3, 2022*

EoR - 2006 of 2347

(http://www.georgetown.edu/)

(http://www.georgetown.edu/)

Institutional Diversity, Equity & Affirmative Action (https://ideaa.georgetown.edu)

# How to File a Discrimination Complaint with IDEAA

IDEAA reviews, investigates, and resolves alleged violations of the University's Equal Opportunity and Non-Discrimination in Employment and Non-Discrimination in Education Policies, Affirmative Action Policy, the Policy Statement on Harassment, the Policy on Sexual Misconduct, and the Policy on Consensual Sexual or Romantic Relationships.

If you believe you have experienced discrimination in violation of one of these policies, or are aware of discrimination occurring in a Georgetown University program or activity, you may choose to file a complaint with IDEAA. To review the University's Grievance Procedure or file a discrimination complaint with IDEAA, please refer to the Grievance Procedures ↗ (https://georgetown.box.com/s/29f9p6fi9yhktuf2a1mdgduqirvsd5tz) and the Discrimination Complaint Form ↗ (https://gu-pass.georgetown.edu/p/IDEAA). Additional information about IDEAA's complaint investigation and administrative review processes is available in IDEAA's Frequently Asked Questions (https://georgetown.box.com/s/1x74f6jxjtzmugi6bgojsnh79godvde6) document.

Applicants or Employees who believe they have been denied a job or an equal opportunity to apply for a job based on a disability, covered medical condition, or religion, refused a request for reasonable accommodation, or have been asked illegal medical questions or have been required to take an illegal medical examination may contact IDEAA at (202) 687-4798, fax at (202) 687-7778, through our confidential email service at ideaa@georgetown.edu, or may choose to file a complaint with IDEAA. Our office is located at 37th & O Streets, NW, M36 Darnall Hall, Washington, DC 20057.

---



### Institutional Diversity, Equity & Affirmative Action

Office of Institutional Diversity, Equity and Affirmative Action
37th and O Streets, N.W.
Washington DC
Phone: 202-687-4798
Fax: 202-687-7778

 (http://www.georgetown.edu/)

 (http://www.georgetown.edu/)

Institutional Diversity, Equity & Affirmative Action (https://ideaa.georgetown.edu)

# Protected Bases

**Protection against Discrimination, Harassment, and Retaliation**

Georgetown University is committed to providing equal educational and employment opportunities and embraces the diversity of its faculty, staff, and students. Georgetown prohibits discrimination or harassment on the basis of any protected characteristic, as outlined below.

*Non-Discrimination in Education*

Georgetown University provides educational opportunities without regard to, and does not discriminate on the basis of, age, color, disability, family responsibilities, familial status, gender identity or expression, genetic information, marital status, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, source of income, veteran's status or any other factor prohibited by law in its educational programs and activities.

*Non-Discrimination in Employment*

Georgetown University provides equal opportunity in employment for all persons, and prohibits unlawful discrimination and harassment in all aspects of employment because of age, color, disability, family responsibilities, gender identity or expression, genetic information, marital status, matriculation, national origin, personal appearance, political affiliation, race, religion, sex, sexual orientation, veteran's status or any other factor prohibited by law.

*Prohibition against Retaliation*

Georgetown University prohibits retaliation, harassment, or other adverse action against an individual for making a complaint in good faith, assisting in an investigation, opposing harassment or otherwise exercising rights protected by law. It also prohibits taking any adverse academic or employment related action against an individual based on an unsubstantiated allegation or rumor of harassment. Retaliation should be reported promptly to the Office of Institutional Diversity, Equity, and Affirmative Action and may result in disciplinary action up to and including dismissal.

- *Guidance on Non-Retaliation (https://georgetown.box.com/s/aonwtuca8453lwmev2jia1boiv17amst)*

**Interpretive Guidance (including regarding Antisemitism, Caste-Based Discrimination, and Islamophobia)**

Georgetown University interprets its non-discrimination and anti-harassment policies to prohibit discrimination, including harassment, based on actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity. This protection against discrimination includes antisemitism, caste-based discrimination, and Islamophobia.

Covered discrimination based on race, color, national origin, and/or religion may include, for example, discrimination involving: racial, ethnic, or ancestral slurs or stereotypes; an accent or name commonly associated with particular shared ancestry or ethnic characteristics; and personal appearance, including skin color, physical features, or style of dress that reflects both ethnic and religious traditions.

Individuals who wish to file a formal complaint under the University's non-discrimination and/or anti-harassment policies may do so by accessing IDEAA's online complaint portal (https://gu-pass.georgetown.edu/p/IDEAA) or emailing ideaa@georgetown.edu. Individuals also may file a bias report through the University's Bias Reporting System (https://biasreporting.georgetown.edu/).

---



**Institutional Diversity, Equity & Affirmative Action**

Office of Institutional Diversity, Equity and Affirmative Action
37th and O Streets, N.W.
Washington DC
Phone: 202-687-4798
Fax: 202-687-7778

🇺🇸 An official website of the United States government    Here's how you know

U.S. Department of Education

HOME / LAWS AND POLICY / CIVIL RIGHTS LAWS / RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION

# Education and Title VI

**EDUCATION AND TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**Title VI and Race, Color or National Origin Discrimination**

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance. Title VI states that:

The Title VI implementing regulations (Volume 34, Code of Federal Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.

**The Office for Civil Rights Enforces Title VI**

The U.S. Department of Education's (ED) Office for Civil Rights (OCR), with 12 regional offices and a headquarters office in Washington, D.C., enforces Title VI as it applies to programs or activities that receive financial assistance from ED.

OCR's mandate to ensure that recipients of financial assistance from ED comply with Title VI covers pre-K through grade 12 public schools, including charter schools; state educational agencies; local educational agencies; colleges and universities, including proprietary schools and community colleges; state vocational rehabilitation agencies and their subrecipients; and other institutions that receive ED financial assistance, such as libraries, museums, and correctional institutions.

Covered programs and activities may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, and housing.

Title VI prohibits a recipient from intimidating, threatening, coercing, or retaliating against any person because they made a complaint; testified, assisted, or participated in any manner in an investigation, proceeding, or hearing; or opposed an unlawful educational practice or policy. 34 C.F.R. § 100.7(e).

OCR's Race, Color, or National Origin Discrimination Overview webpage provides a list of issues under Title VI that OCR frequently addresses.

## The Office for Civil Rights Provides Technical Assistance and Policy Guidance About Title VI

OCR is available to assist school and college communities in complying with Title VI obligations by providing technical assistance, including responding to telephone and email inquiries and presenting at trainings, conferences, and community meetings. To request technical assistance, you may contact the OCR regional office that serves your geographic area by phone, email, or mail. You can identify the appropriate OCR regional office through the Contact OCR webpage. The addresses, telephone numbers, emails, and designated geographic areas of each OCR regional office are also listed here.

OCR also provides policy guidance and other resources to inform and remind schools of their obligation to comply with Title VI, and inform beneficiaries, such as students and applicants for admission to academic programs, of their rights under Title VI. A few examples of these resources are below.

*Harassment*

OCR also issued a resource PDF (2025) (408K) that assists school communities in understanding their obligations under Title VI and discusses some considerations for schools when taking action to remediate a hostile environment under Title VI. The existence of a hostile environment based on race, color, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a school can

constitute discrimination in violation of Title VI. When a school is taking action to remediate a hostile environment, just as when taking any other action, Title VI prohibits the school from discriminating against students on the basis of race, color, or national origin.

OCR issued a fact sheet PDF (2024) (427K) that describes how OCR determines the existence of a hostile environment and details schools' obligations to address and remedy a hostile environment. The fact sheet also provides hypothetical examples to help schools assess their Title VI obligations, including the requirement to promptly and effectively address alleged acts of discrimination, including harassment.

### _Students Who Are English Learners and Parents and Guardians Who Have Limited English Proficiency_

OCR and DOJ jointly published a Dear Colleague Letter: English Learner Students and Limited English Proficient Parents (2015) PDF (523K) that reminds states, school districts, and schools of their obligations under federal law to ensure that students who are English learners have equal access to a high-quality education and the opportunity to achieve their full academic potential. In addition to the guidance, OCR has developed tools and resources to help schools in serving English learner students and parents who have limited English proficiency, including:

- A fact sheet in English PDF (557K) and in other languages about schools' obligations under federal law to ensure that students who are English learners can participate meaningfully and equally in school.
- A fact sheet in English PDF (450K) and in other languages about schools' obligations to communicate information to parents and guardians who have limited English proficiency in a language they can understand.
- A fact sheet in English PDF (542K) and other languages discussing access to specialized or advanced educational programs and services for students who are English learners.

OCR and DOJ together published a Dear Colleague Letter: School Enrollment Procedures PDF (233K) that explains that under federal law, states, school districts, and public schools are required to provide all children with equal access to public education at the elementary and secondary level.

OCR and DOJ have also developed fact sheets to assist school communities:

- A fact sheet on Confronting Discrimination Based on National Origin and Immigration Status (2021) PDF (533K) that reiterates that under federal law, *all* children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents immigration status. The fact is also available in other languages.
- Fact sheets on Protecting Access to Education for Migratory Children (2023) PDF (257K) and Protecting Access to Education for Unaccompanied Children (2023) PDF (236K) that discuss specific challenges some migratory children and unaccompanied children may face while accessing public education, remind public schools of their responsibilities to migratory and unaccompanied children under federal civil rights laws, and explain where families can seek help. The fact sheets are also available in other languages.

Additional resources regarding students who are English learners and parents and guardians who have limited English proficiency are available on OCR's Equal Educational Opportunities for English Learners webpage.

*Discrimination Based on Race, Color, or National Origin, including Shared Ancestry or Ethnic Characteristics*

OCR issued a Dear Colleague Letter (2023) PDF (332K) and a fact sheet (2023) PDF (267K) that describe how Title VI protection covers students who are or are perceived to be Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or other groups that are or are perceived to: 1) share ancestry or ethnic characteristics; or 2) have citizenship or residency in a country with a dominant religion or distinct religious identity.

Title VI prohibits discrimination based on race, color, or national origin against students of any religion when the discrimination, for example:

- involves racial, ethnic, or ancestral slurs or stereotypes;
- is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; or is based on the country or region where a student is from or is perceived to have come from, including, for example, discrimination based on a student's accent or name, a student's limited English proficiency, or a student speaking a language other than English.

Additional resources regarding Title VI protection relating to shared ancestry or ethnic characteristics is available on OCR's Shared Ancestry or Ethnic Characteristics webpage.

*Racial Discrimination in School Discipline*

OCR and DOJ released a Resource PDF (1.2M) on Confronting Racial Discrimination in Student Discipline (2023). The Resource describes how the Departments resolved investigations of 14 school districts in 10 states nationwide under Title VI and Title IV of the Civil Rights Act of 1964, during the current and previous two presidential administrations. The investigations involved concerns about discrimination in schools' use of out-of-school suspensions, expulsions, school-based arrests, referrals to law enforcement, involuntary discipline transfers, informal removals, and other disciplinary actions for a number of disciplinary infractions, including dress code violations.

*Artificial Intelligence*

OCR issued a Resource to assist school communities with ensuring that artificial intelligence (AI) is used in a nondiscriminatory manner in the nation's elementary and secondary schools and institutions of higher education consistent with federal civil rights laws. The resource makes clear that AI technologies have the potential to enhance opportunities and increase educational equity for all students, but that at the same time, the growing use of AI in schools, including for instructional and school safety purposes, and AI's ability to operate on a mass scale can create or contribute to discrimination. The resource provides information on the legal analyses that OCR uses to determine whether discrimination exists, and provides examples of conduct that could, depending on facts and circumstances, present OCR with sufficient reason to open an investigation.

*Resource Comparability*

OCR issued a Dear Colleague Letter (2014) PDF (478K) explaining that Title VI prohibits discrimination on the basis of race in the allocation of school resources such as courses, academic programs, extracurricular activities, teachers, leadership, student support, school facilities, instructional materials, and access to technology and digital opportunities.

OCR issued a fact sheet (2024) PDF (105K) highlighting that in 1954 in *Brown v. Board of Education*, the U.S. Supreme Court unanimously held that legally mandated racial segregation of children in public schools is unconstitutional.The fact sheet explains that student access to education and to educational resources differs by race, color, and national origin in schools across the United States and summarizes resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

Additional resources regarding resource comparability are available on OCR's Resource Comparability webpage.

*Race Discrimination in Special Education*

OCR issued a Dear Colleague Letter (2016) PDF (470K) explaining that states, districts, and public schools cannot discriminate on the basis of race, color, or national origin in the administration of special education or related aids and services. This resource addresses overrepresentation, underrepresentation, and misrepresentation of students of color as students with disabilities. Title VI requires that students of all races, colors, and national origins have equal access to general education interventions and to a timely referral for an evaluation for disability and special education and/or related aids and services under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973. Title VI also requires that students of all races, colors, and national origins are treated equitably in the evaluation process, in the quality of special education services and supports they receive, and in the degree of restrictiveness of their educational environment. Additional resources are available on OCR's Race Discrimination in Special Education webpage.

*Retaliation*

OCR issued a resource, Civil Rights Protections Against Retaliation, (2024) PDF (105K) which reminds school communities that all of the federal civil rights laws enforced by OCR prohibit retaliation. The resource explains the key elements of retaliation, outlines how OCR assesses retaliation claims, and provides examples that depending on the facts and circumstances, could raise concerns of unlawful retaliation. Additional resources regarding retaliation are available on OCR's Retaliation webpage.

## How to File a Discrimination Complaint with OCR

Anyone who believes that a recipient of federal financial assistance has discriminated against any person on the basis of race, color, or national origin may file a complaint with OCR under Title VI. The person or organization filing the complaint need not be a victim of the alleged discrimination and may complain on behalf of another person or group.

You may file a complaint with OCR using OCR's electronic complaint form at the following website: https://ocrcas.ed.gov/. A complaint may also be sent to the OCR regional office that serves the state in which the alleged discrimination occurred. A complaint must be filed within 180 days of the date of the alleged discrimination unless OCR grants a waiver of the 180-day filing requirement. If you have also filed a complaint under an institutional grievance process, a complaint with OCR must be filed within 60 days of the completion of the institutional grievance process.

Additional information about how to file an OCR complaint and OCR's complaint process is available within resources on OCR's website, including: How to File a Discrimination Complaint With the Office for Civil Rights; PDF (177K) OCR Complaint Processing Procedures; PDF (201K) Questions and Answers on OCR's Complaint Process; and OCR Case Processing Manual. PDF (709K)

Top

**Office for Civil Rights (OCR)**

Page Last Reviewed: January 23, 2025

Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

Site Notices and Privacy Policies

Accessibility Support

**ED Archive**

# U.S. Department of Education

 
ES
   

Contact Us
1-800-USA-LEARN


www.ed.gov
**An official website of the Department of Education**

About Dept of Education          Accessibility Support          No FEAR Act data

Office of the Inspector General          Performance reports          FOIA          Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

LII  > Wex  > **consideration**

# consideration

Consideration is a promise , performance, or forbearance bargained by a promisor in exchange for their promise. Consideration is the main element of a contract . Without consideration by both parties, a contract cannot be enforceable. For instance, if a person used the money to purchase an apple, the apple is the merchant's consideration, and the money is the person's consideration.

Types:

- Consideration could be a promise, performance, forbearance, or property with legal value, but the economic benefit is not required.
- A gift or gratuitous promise cannot be a consideration for they have no bargaining. The past performance also cannot be a consideration as there is no exchange.

Substitute for consideration:

- A contract without consideration could be enforceable if it has a substitute. Substitutes are promissory estoppel or detrimental reliance under Restatement (Second) of Contracts , or good faith modification under UCC .
    - Promissory estoppel /detrimental reliance: A contract without consideration is enforceable if the nonperformance of the promisor will cause injustice. Elements of promissory estoppel are (i) the promise has reasonable, foreseeable, and detrimental reliance on the promisor, and (ii) the enforcement of the promise is necessary to avoid injustice.
    - Good faith modification: A modified contract is a kind of new agreement, which changes parties' obligations and then requires new consideration. But contract modification made in good faith under UCC is enforceable even without consideration.

[Last reviewed in July of 2022 by the Wex Definitions Team ]

**Wex**

- COMMERCE
- commercial activities
- business law
- contracts
- wex definitions
- business sectors
- commercial transactions
- legal education and practice

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

🇺🇸 English

Click for new, virtual gallery: Risking Everything (https://www.abhmuseum.org/risking-everything-gallery/)

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

# ABHM (https://www.abhmuseum.org/) 🏛️

## America's Black Holocaust Museum

**Bringing Our History to Light**

Search 🔍

# What Is The Black Holocaust In America?

## What is a Holocaust?

"Holocaust" comes from a Greek word meaning "burnt offering." The term was first used to describe the massacres of Armenians in the 1890s. It was used again in the 1950s to describe the mass destruction of European Jewish communities by the Nazis, also known by the Hebrew word "Shoah."

Appallingly, in the last hundred years, the world has witnessed many such atrocities, such as the 1975–79 Cambodian Killing Fields, the 1994 Rwandan Genocide, and the 1995 Srebrenica Genocide.

For this reason, the word "holocaust" has come to mean a series of atrocities organized by one social group against another.

     

## Similarities Between the Black Holocaust and Other Holocausts

The four hundred-year history of captured Africans and their descendants shares many features with the Holocaust experiences of European Jews – and the victims of other mass atrocities.

These include:

- Dehumanization and vilification
- Forced marches and migrations
- Slave (forced, unpaid) labor
- Stolen property
- Mass incarceration
- Torture
- Medical experimentation
- Discrimination in law and custom
- Ethnic cleansing (race riots, pogroms)
- Lynchings and other forms of terrorism
- Mass murder
- Long-lasting psychological effects (Post-Traumatic Stress Disorder) on survivors – and their descendants.

## How ABHM Got Its Name – and Why

Dr. James Cameron (https://www.abhmuseum.org/about/dr-cameron-founder-and-lynching-survivor/) founded this museum about the Black Holocaust in America after visiting Yad VaShem, the Holocaust Memorial Museum in Jerusalem, Israel. He saw the many similarities between the experiences of the Jewish people and African Americans.

He also admired how Jewish people value their history. To prevent atrocities like the Shoah (Nazi Holocaust) from happening again, they teach their children and other groups about it. Dr. Cameron saw how this truth-telling gave Jewish communities strength and hope and wanted the same for African American communities.

Dr. Cameron wanted museum visitors to understand this: The Black Holocaust in America began hundreds of years ago, but its effects – and sadly many of its practices – continue in our country today.[2] Tragically, this prevents our nation from truly living up to our founding documents, which promised "liberty and justice for all." Our founder dreamed of our country as "one whole and sacred nationality." He hoped his museum would help all Americans to honestly acknowledge our past in order to heal our future.

## There at the Start

The Black Holocaust in America began in the 1600s in the first settlements in Virginia. The colonists passed laws making black people – and only black people – slaves for life.

Slavery and segregation have since become illegal, but the Black Holocaust has had far-reaching effects on our entire society and on generations of our citizens – black and nonblack.

About (https://www.abhmuseum.org/category/about-abhm/)

Plan Your Visit (https://www.abhmuseum.org/visit/)

Home (https://www.abhmuseum.org/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

## Some Facts about the Black Holocaust

- From 10 to 12 million African men, women and children were **kidnapped** from their homes.[3] They were **forced to march** as much as 1000 miles to the sea. There they were **held in underground dungeons** for up to a year.

- The kidnapped people were **packed below decks as cargo** on 54,000 slave ship voyages to the Americas. They were usually **shackled and unable to move**. They lay in each other's feces, urine and vomit during the 60 to 120 day trip. These trips, called "The Middle Passage, (https://abhmuseum.org/category/galleries/the-middle-passage/)" made up **one of the largest forced migrations** in world history.[4]

- When they arrived in America, men, women, and children – even infants – were put on the **auction block** at slave markets. They were **handled by the buyers as if they were cattle**. The buyers poked and prodded and pulled the Africans' mouths open. Some buyers forced the captives to remove all their clothes in public, so they could be examined for defects. Children were **often sold away** from their parents, and husbands from their wives.[5]

- Our original colonies passed slave codes.[6] These laws **reserved slavery for people of African descent** only – and made them *slaves for life*. There were also **fugitive slave laws**[7] that made it easier for slave owners to capture runaways – and even force free blacks into slavery.

- By the time of our country's Civil War in 1861, **eight generations of black children were born, grew up, toiled, and died as the property of white adults and children**. Slaves worked at **hard labor**, from sun up to sun down, for no pay, six or seven days a week. They were frequently whipped or suffered other **cruel punishments at the owner's whim**. They were **not allowed to learn** reading, writing or arithmetic. They were **poorly fed, housed and clothed**. Many of their daughters, sisters, and wives were **raped**. Many saw their children, spouses, parents, siblings, and friends **sold away**. For 246 years, there was **no hope of an end to their suffering**.

- **The 13th Amendment (https://www.archives.gov/historical-docs/13th-amendment) to our Constitution outlawed slavery**. But many of the four million former slaves were **forced back into unpaid labor**. They became **sharecroppers** on their old plantations. If a white man said a black man was "shiftless," that black man could be **arrested and forced to work** without pay in a mine, factory, or farm. **"Convict leasing" was slavery by another name.**[8]

- After emancipation came the **"separate and unequal" system of Jim Crow (https://abhmuseum.org/category/galleries/one-hundred-years-of-jim-crow/)** in the South.   This made it **legal to racially segregate** public schools, buses, restaurants, movie theaters, and occupations. Under Jim Crow, **black lives were cheap**. Over five thousand African Americans were strung up, shot, tortured, mutilated, and burned to death during those one hundred years. Most **lynchings** occurred in the South, but many took place in the North and West as well.[9]

- The **Civil Rights Movement of the 1950s, 60s, and 70s** challenged Jim Crow. The Jim Crow era is said to have ended when Congress passed the **Civil Rights Act of 1964 (https://www.archives.gov/education/lessons/civil-rights-act/)**, the Voting Act in 1965, and Federal Fair Housing Act in 1968. However, **white Americans found ways around** many of the gains African Americans made. In **"white flight,"** white parents moved to the suburbs or put their children in private schools. White neighbors signed **"covenants"** not to sell their homes to black families. White unions made it difficult for black workers to become members and advance themselves in the skilled trades. Many African Americans became **trapped in poverty**.[10]

- **The effects of slavery and Jim Crow continue today.** The **net worth** of White families is 10 times the net worth of Black families.[11] Since the 1970s, the **unemployment rate** for African Americans has been double the national average. Most **white Americans live to be over 78** years old; most **Black Americans  die shortly after their 73rd birthday**. Three times more Black babies die at birth than White babies. Half of the people we send to **prison** are Black, even though African Americans are only 13 percent of our country's population. The journey seeking justice continues....

## Holocaust Memorials and Museums (https://www.abhmuseum.org/) 

Today there are many museums that help people understand and cope with various holocausts around the world. America's Black Holocaust Museum is one of these.

About (https://www.abhmuseum.org/category/about-abhm/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

## Endnotes

[1] https://dictionary.reference.com/browse/holocaust (https://dictionary.reference.com/browse/holocaust)

[2] See Breaking News (https://www.abhmuseum.org/category/breaking-news/)

[3] See Estimates from *Voyages: (https://www.slavevoyages.org/) The Trans-Atlantic Slave Trade*

[4] Africans in America, Part I. (https://www.pbs.org/wgbh/aia/part1/1narr4.html)https://www.pbs.org/wgbh/aia/part1/1narr4.html

[5] American Abolitionist, Indiana University (https://libraries.indiana.edu/slavery-abolition-and-social-justice)

[6] American History (https://www.ushistory.org/us/27b.asp)

[7] Fugitive Slave Act of 1850 (https://en.wikipedia.org/wiki/Fugitive_Slave_Act_of_1850)

[8] Slavery By Another Name: The Film (https://www.slaverybyanothername.com/pbs-film/)

[9] What Was Jim Crow? (https://www.ferris.edu/jimcrow/what.htm)

[10] White Flight (https://en.wikipedia.org/wiki/White_flight)

[11] WealthGaps Rise to Record Highs (https://www.pewsocialtrends.org/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/)

---

Share

(https://www.facebook.com/sharer/sharer.php?
u=https%3A%2F%2Fwww.abhmuseum.org%2Fabout%2Fwhat-is-the-black-holocaust%2F)

(http://twitter.com/intent/tweet?
text=What%20is%20the%20Black%20Holocaust%3F&url=https%3A%2F
is-the-black-holocaust%2F)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

About
(https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries
(https://www.abhmuseum.org/category/exhibit-galleries/)

Breaking News
(https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute
(https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

---

## About ABHM

Our Mission and Vision (https://www.abhmuseum.org/about/our-mission/)

What is the Black Holocaust? (https://www.abhmuseum.org/about/what-is-the-black-holocaust/)

Our Four Themes: Remembrance, Resistance, Redemption, Reconciliation (https://www.abhmuseum.org/about/our-four-themes/)

Dr. Cameron: Founder, Lynching Survivor (https://www.abhmuseum.org/about/dr-cameron-founder-lynching-survivor/)

ABHM's History and Impact (https://www.abhmuseum.org/about/black-holocaust-museum-history-impact/)

What is a Griot? (https://www.abhmuseum.org/about/what-is-griot/)

Who We Are (https://www.abhmuseum.org/about/who-we-are/)

Comment Policies (https://www.abhmuseum.org/about/comment-policies/)

## Explore Our Galleries

(https://www.abhmuseum.org/some-exhibits-to-come-three-centuries-of-slavery/)

(https://www.abhmuseum.org/bibliography-three-centuries-of-enslavement/)

(https://www.abhmuseum.org/a-1859-slave-auction-in-savannah-as-reported-by-the-new-york-tribune/)

Biological-traits-Three-Centuries-Of-Institution-Of-Enslavement A 1859 Slave Auction In Savannah, As Reported By The New York Tribune

(https://www.abhmuseum.org/how-slavery-became-legal-for-blacks-only/)

How Slavery Became The Law Of The Land "For Blacks Only"

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

(https://www.abhmuseum.org/frederick-douglass-the-meaning-of-july-fourth-for-the-negro/)

Frederick Douglass: "The Meaning Of July Fourth For The Negro"

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

(https://www.abhmuseum.org/the-scourged-back-how-runaway-slave-and-soldier-private-gordon-changed-history/)

The Scourged Back: How Runaway Slave And Soldier Private Gordon Changed History

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

(https://www.abhmuseum.org/the-freedmen-of-wisconsin/)

The Freedmen Of Wisconsin

(https://www.abhmuseum.org/nat-turners-rebellion-horrific-or-heroic/)

Nat Turner's Rebellion: Horrific Or Heroic?

(https://www.abhmuseum.org/traces-of-the-trade-the-norths-complicity-in-slavery/)

Traces Of The Trade: The North's Complicity In Slavery



(https://www.abhmuseum.org/galleries/african-peoples-before-captivity-exhibits/)

(https://www.abhmuseum.org/the-middle-passage/)

Kidnapped People Sold into Captivity



(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/2/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/3/)

(https://www.abhmuseum.org/about/what-is-the-black-holocaust/page/2/)

About (https://www.abhmuseum.org/category/about-abhm/)

ers in the Black and mainstream media

Visit (https://www.abhmuseum.org/visit/)

ng-news/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

(https://www.abhmuseum.org/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

## Ways To Support ABHM?

Events (https://www.abhmuseum.org/events-calendar/)

Click Here (https://www.abhmuseum.org/donate/contribute/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

**ABHM On-Line**
**virtual.museum@abhmuseum.org**
**(mailto:virtual.museum@abhmuseum.org)**

**ABHM On-Site**
401 W. North Avenue
Milwaukee, Wisconsin 53212  USA
Phone: (414) 209-3640
**Contact (https://www.abhmuseum.org/contact-abhm/)**

(https://www.facebook.com/pages/Americas-Black-Holocaust-Museum/264755283560445)

(https://www.instagram.com/abhmmuseum/)

(https://www.youtube.com/user/BlackHolocaustMuseum)

ABHM Hours Of Operation

| | |
|---|---|
| Tuesday - Thursday | 10:00 AM – 5:00 PM |
| Friday - Saturday | 10:00 AM – 3:00 PM |
| Sunday - Monday | Closed |

*\* For the safety of our guests and staff members, please reschedule your visit if you are not feeling well. Mask-wearing is not required but is welcomed.*

**ABHM builds public awareness of the harmful legacies of slavery and Jim Crow in America and promotes racial repair, reconciliation, and healing.**

Member of

(https://www.abhmuseum.org/)

About (https://www.abhmuseum.org/category/about-abhm/)

Visit (https://www.abhmuseum.org/visit/)

Exhibit Galleries (https://www.abhmuseum.org/category/galleries/)

Breaking News (https://www.abhmuseum.org/category/breaking-news/)

Events (https://www.abhmuseum.org/events-calendar/)

Contribute (https://www.abhmuseum.org/category/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

Resources (https://www.abhmuseum.org/resources/)

Contribute (https://www.abhmuseum.org/contribute/)

Contact (https://www.abhmuseum.org/contact-abhm/)

© 2024 – All Rights Reserved.

Science › Chemistry

# George Washington Carver

American agricultural chemist

[ Ask the Chatbot a Question ]   [ ⋮ More Actions ]

Written and fact-checked by The Editors of Encyclopaedia Britannica
Last Updated: Feb 18, 2025 • Article History

[ ☰ Table of Contents ]

## Top Questions

Who was George Washington Carver?   ⌄

What was George Washington Carver's childhood like?   ⌄

How was George Washington Carver educated?   ⌄

⌄ Show more



**George Washington Carver** This intellectual giant, born into slavery but later courted by presidents, lived by a guidi…(more)

### Quick Facts

**Born:** 1861?, near Diamond Grove, Missouri, U.S.

**Died:** January 5, 1943, Tuskegee, Alabama

**Subjects Of Study:** peanut • sweet potato • chemical product • food processing

See all related content

**George Washington Carver** (born 1861?, near Diamond Grove, Missouri, U.S.—died January 5, 1943, Tuskegee, Alabama) was a revolutionary American agricultural chemist, agronomist, and experimenter who was born into slavery and sought to uplift Black farmers through the development of new products derived from peanuts, sweet potatoes, and soybeans. His work helped transform the stagnant agricultural economy of the South after the American Civil War. For most of his career he taught and conducted research at the Tuskegee Normal and Industrial Institute (now Tuskegee University) in Tuskegee, Alabama.

Carver was the son of an enslaved woman named Mary, who was owned by Moses Carver; his father was killed in an accident before he was born. Of his early life,

Carver wrote, "I was born in Diamond Grove, Missouri, about the close of the great Civil War, in a little one-roomed log shanty, on the home of Mr. Moses Carver, a German by birth and the owner of my mother, my father being the property of Mr. Grant, who owned the adjoining plantation." During the turbulence of the Civil War, the Carver farm was raided, and infant George and his mother were kidnapped and taken to Arkansas to be sold. Moses Carver was eventually able to track down young George but was unable to find Mary. Frail and sick, the orphaned child was returned to the Carver plantation and nursed back to health.

With the abolition of slavery in the United States in 1865, George was no longer enslaved. He remained with the Carvers until he was about 10 or 12 years old, when he left to acquire an education. He traveled 8 miles (13 km) to the county seat of Neosho, Missouri, where he found room and board with Mariah and Andrew Watkins, an African American couple. He briefly attended a school for Black children but quickly moved beyond the basic literacy offered by the schoolmaster, who himself had a limited education. Carver then spent some time wandering about, working with his hands and developing his keen interest in plants and animals. Both Susan Carver —the wife of his former owner—and Mariah Watkins had taught him about gardening and medicinal herbs, and he continued to grow his botanical knowledge. He also learned to draw, and later in life he devoted considerable time to painting flowers, plants, and landscapes.



Britannica Quiz

**Faces of Science**

By both books—including *Webster's Elementary Spelling Book*, which he learned nearly by heart—and experience, young George acquired a fragmentary education while doing whatever work came to hand in order to subsist. He supported himself by varied occupations that included general household worker, hotel cook, laundryman, farm laborer, and homesteader. In his late 20s he obtained a high-school education in Minneapolis, Kansas, while working as a farmhand. He applied and was accepted to Highland College in Kansas, but, when he appeared in person to register, the school refused to admit him because he was Black. Pained by that rejection, he continued to

travel the country and eventually landed in Iowa, where he met the white Milhollands sometime in the late 1800s. The couple befriended him and urged Carver to enroll in nearby Simpson College in Indianola; he would later credit them for his continued pursuit of higher education. Carver studied piano and art at Simpson before transferring to Iowa State Agricultural College (later Iowa State University), where he received a bachelor's degree in agricultural science in 1894 and a Master of Science degree in 1896.

Carver left Iowa for Alabama in the fall of 1896 to direct the newly organized department of agriculture at the Tuskegee Normal and Industrial Institute, a school headed by noted African American educator Booker T. Washington. Given that Carver was the only African American in the United States with a graduate degree in agricultural science, Washington aggressively pursued him for the all-Black faculty of the school. In accepting the position, Carver wrote:



> *It has always been the one great ideal of my life to be of the greatest good to the greatest number of 'my people' possible and to this end I have been preparing myself these many years; feeling as I do that this line of education is the key to unlock the golden door of freedom to our people.*

**George Washington Carver** George Washington Carver at the Tuskegee Normal and Industrial Institute in Tuskegee,.....(more)

Indeed, at Tuskegee, Washington sought to improve the lot of African Americans through education and the acquisition of useful skills rather than through political agitation, and he stressed conciliation and compromise. Carver complemented those aims in his desire to help Black farmers rise above sharecropping and saw economic development as a path for Black advancement in American society. Despite many offers elsewhere, Carver remained at Tuskegee for the rest of his life.



**Are you a student?**
Get a special academic rate on Britannica Premium.

Subscribe

After becoming the institute's director of agricultural research in 1896, Carver devoted his time to research projects aimed at helping Southern agriculture, demonstrating ways in which farmers could improve their economic situation. He conducted experiments in soil management and crop production and directed an experimental farm. At this time, agriculture in the Deep South was in steep decline because the unremitting single-crop cultivation of cotton had left the soil of many fields exhausted and worthless, and erosion had then taken its toll on areas that could no longer sustain any plant cover. As a remedy, Carver urged Southern farmers to plant peanuts (*Arachis hypogaea*) and soybeans



**George Washington Carver** George Washington Carver holding a piece of soil in a field, 1906.

(*Glycine max*). As members of the legume family (Fabaceae), these plants could restore nitrogen to the soil while also providing the protein so badly needed in the diet of many Southerners.

Carver found that Alabama's soils were particularly well suited to growing peanuts and sweet potatoes (*Ipomoea batatas*), but, when the state's farmers began cultivating these crops instead of cotton, they found little demand for them on the market. In response to this problem, Carver set about enlarging the commercial possibilities of the peanut and sweet potato through a long and ingenious program of laboratory research. He ultimately developed 300 derivative products from peanuts— among them milk, flour, ink, dyes, plastics, wood stains, soap, linoleum, medicinal oils, and cosmetics—and 118 from sweet potatoes, including flour, vinegar, molasses,

ink, a synthetic rubber, and postage stamp glue. In helping farmers, particularly Black sharecroppers, find a market for their crops and increase the productivity of their farms by protecting and regenerating the soil, Carver hoped to bring them closer to financial security and liberation.

In 1914, at a time when the boll weevil had almost ruined cotton growers, Carver revealed his experiments to the public, and increasing numbers of the South's farmers began to turn to peanuts, sweet potatoes, and their derivatives for income. Much exhausted land was renewed, and the South became a major new supplier of agricultural products. When Carver arrived at Tuskegee in 1896, the peanut had not even been recognized as a crop, but within the next half century it became one of the six leading crops throughout the United States and, in the South, the second cash crop (after cotton) by 1940. In 1942 the U.S. government allotted 2,023,428 hectares (5,000,000 acres) of peanuts to farmers. Carver's efforts had finally helped liberate the South from its excessive dependence on cotton.

Among Carver's many honors were his election to Britain's Society for the Encouragement of Arts, Manufactures, and Commerce (London) in 1916 and his receipt of the Spingarn Medal in 1923. Late in his career he declined an invitation to work for Thomas Edison at a salary of more than $100,000 a year. U.S. Presidents Calvin Coolidge and Franklin D. Roosevelt visited him, and his friends included Henry Ford and Mahatma Gandhi. Foreign governments requested his counsel on agricultural matters: Joseph Stalin, for example, in 1931 invited him to manage cotton plantations in southern Russia and to make a tour of the Soviet Union, but Carver refused.

In 1940 Carver donated his life savings to the establishment of the Carver Research Foundation at Tuskegee for continuing research in agriculture. During World War II he worked to replace the textile dyes formerly imported from Europe, and in all he produced dyes of 500 shades.



Many scientists thought of Carver more as a concoctionist than as a contributor to scientific knowledge. Many of his fellow African Americans were critical of what they

**George Washington Carver** George Washington Carver in a laboratory at the Tuskegee Institute, Alabama, in 1938.

regarded as his subservience. Certainly, this small, mild, soft-spoken, innately modest man, eccentric in dress and mannerism, seemed unbelievably heedless of the conventional pleasures and rewards of this life. But these qualities endeared Carver to many whites, who were almost invariably charmed by his humble demeanor and his quiet work in self-imposed segregation at Tuskegee. As a result of his accommodation to the mores of the South, many whites came to regard him with a sort of patronizing adulation.

Carver thus, for much of white America, increasingly came to stand as a kind of saintly and comfortable symbol of the intellectual achievements of African Americans. Carver was evidently uninterested in the role his image played in the racial politics of the time. His great desire in later life was simply to serve humanity, and his work, which began for the sake of the poorest of the Black sharecroppers, paved the way for a better life for the entire South. On the importance of leaving a legacy, he famously quipped, "No individual has any right to come into the world and go out of it without leaving behind him distinct and legitimate reasons for having passed through it." His efforts brought about a significant advance in agricultural training in an era when agriculture was the largest single occupation of Americans, and he extended Tuskegee's influence throughout the South by encouraging improved

Entertainment & Pop Culture  ›  Food

# peanut

plant and legume

| Ask the Chatbot a Question | ⋮ More Actions |

*Also known as: Arachis hypogaea, earthnut, goober, groundnut*

Written and fact-checked by The Editors of Encyclopaedia Britannica

Last Updated: Feb 13, 2025 • Article History

☰ **Table of Contents**

**peanut**, (*Arachis hypogaea*), legume of the pea family (Fabaceae), grown for its edible seeds. Native to tropical South America, the peanut was at an early time introduced to the Old World tropics. The seeds are a nutritionally dense food, rich in protein and fat. Despite its several common names, the peanut is not a true nut. As with other legumes, the plant adds nitrogen to the soil by means of nitrogen-fixing bacteria and is thus particularly valuable as a soil-enriching crop.



Peanut (*Arachis hypogaea*)

The peanut is an annual and can either be an erect shrubby plant, 45–60 cm (18–24 inches) high with short branches, or have a spreading form, 30–45 cm (12–18 inches) high with long branches that lie close to the soil. The stems are sturdy and hairy and bear pinnately compound leaves with two pairs of leaflets. The flowers are borne in the axils of the leaves and feature golden-yellow petals about 10 mm (0.4 inch) across. The oblong pods have rounded ends and are most commonly 25–50 mm (1–2 inches) long with two or three seeds; the pods are contracted between the seeds and have a thin, netted, spongy shell. The seeds vary from oblong to nearly round and have a papery seed coat that ranges in colour from whitish to dark purple.

**Also called:** groundnut, earthnut, or goober

**Key People:** Billy Carter • George Washington Carver

**Related Topics:** legume • mafé • peanut oil • geocarpy • peanut butter

See all related content

Peanut legumes have the peculiar habit of ripening underground, a phenomenon known as geocarpy. After pollination and the withering of the flower, an unusual stalklike structure called a peg grows from the base of the flower toward the soil. The fertilized ovules are carried downward in the sturdy tip of the peg until the tip is well below the soil



**peanut plant** Uprooted peanut plant (*Arachis hypogaea*) with mature legumes.

surface, at which point the peg tip starts to develop into the characteristic pod. The pegs sometimes reach down 10 cm (4 inches) or more before their tips can develop fruits. These unusual fruits appear to function as roots to some degree, absorbing mineral nutrients directly from the soil. The pods may not develop properly unless the soil around them is well supplied with available calcium, regardless of the nutrients available to the roots.


Britannica Quiz

**Baking and Baked Goods Quiz**

Peanut growing requires at least five months of warm weather with rainfall (or irrigation equivalent) of 60 cm (24 inches) or more during the growing season. The best soils are well-drained sandy loams underlain by deep friable (easily crumbled) loam subsoils. At harvest the entire plant, except the deeper roots, is removed from the soil. The pods are often cured by allowing the harvested plants to wilt for a day, then placing them for four to six weeks in stacks built around a sturdy stake driven upright into the soil. The pods are placed toward the inside of each stack to protect them from weather.

Peanuts are sold boiled or roasted and are commonly used to produce an edible oil with a high smoke point. In the United States the seeds are also ground into peanut butter and widely used in candy and bakery products. The peanut is used extensively as feed for livestock in some places; the tops of the plants, after the pods are removed, usually are fed as hay, although the entire plant may be so used. The development of some 300 derivative products from peanuts—including flour, soaps, and plastics—stems mainly from research conducted in the early 20th century by George Washington Carver.

*This article was most recently revised and updated by Melissa Petruzzello.*

 **Education**    DONATE    


Menu

**HISTORIC ARTICLE**


35

# Mar 7, 1965 CE: Civil Rights' 'Bloody Sunday'

On March 7, 1965, police and a citizen "posse" attacked marchers attempting to cross the Edmund Pettus Bridge in Selma, Alabama, United States, an event that galvanized the Civil Rights Movement as "Bloody Sunday."

**GRADES**

5 - 11

**SUBJECTS**

Social Studies, U.S. History



PHOTOGRAPH

# Marchers

The famous "Selma-to-Montgomery March," the pivotal moment in the American civil rights movement, was actually three marches. Marchers were violently supressed on "Bloody Sunday" (March 7, 1965). Two days later, marchers were again violently rebuffed by law enforcement and armed citizens on "Turnaround Tuesday." Finally, a successful march (in which these men participated) started March 21 and ended peacefully in Montgomery on March 25. The Voting Rights Act of 1965 followed the marchers in August.

PHOTOGRAPH BY PETER PETTUS, COURTESY U.S.

LIBRARY OF CONGRESS

      

**OVERVIEW**       **VOCABULARY**

On March 7, 1965, police, state troopers, and a citizen "posse" violently attacked civil rights marchers attempting to cross the Edmund Pettus Bridge in Selma, Alabama, United States. More than 15 marchers were hospitalized for injuries suffered in an event known as "Bloody Sunday."

The marchers, organized by the Southern Christian Leadership Conference (SCLC) and the Student Nonviolent Coordinating Committee (SNCC), attempted to walk from Selma to Montgomery, Alabama's capital. The Selma-to-Montgomery march was intended to draw attention to the violations of civil and voting rights in Alabama and throughout the South.

Across the nation, people watched footage of peaceful protesters beaten until they were bloody, injured, and, as was the case of legendary SNCC

activist John Lewis, suffered concussions. Days later, after a second attempted march ("Turnaround Tuesday"), a white minister died from injuries suffered. This media attention galvanized the civil rights movement in the U.S.

A third march, led by Lewis, Ralph Abernathy, and Martin Luther King, Jr., reached Montgomery on March 25, 1965. The Voting Rights Act of 1965 was passed five months later. Lewis remembers, "President [Lyndon] Johnson signed that Act, but it was written by the people of Selma."

| Credits | ⌄ |
| --- | --- |
| User Permissions | ⌄ |

# RELATED RESOURCES

National Geographic Headquarters
1145 17th Street NW
Washington, DC 20036

**ABOUT**

National Geographic Society

NatGeo.com

News and Impact

Contact Us

### EXPLORE

Our Explorers

Our Programs

Education

Nat Geo Live

Storytellers Collective

Traveling Exhibitions

### JOIN US

Ways to Give

Apply for a Grant

Careers

DONATE

GET UPDATES

### CONNECT



National Geographic Society is a 501 (c)(3) organization. © 1996 - 2025 National Geographic Society. All rights reserved.

Code of Ethics | State Disclosures | Terms of Service | Privacy Notice | Your Privacy Choices



**CONSTITUTION** ANNOTATED
Analysis and Interpretation of the U.S. Constitution

# Browse the Constitution Annotated

## Thirteenth Amendment  Abolition of Slavery

Amdt13.1 Overview of the Thirteenth Amendment, Abolition of Slavery

Amdt13.2 Slavery and Civil War

Amdt13.3 Drafting of Thirteenth Amendment

Amdt13.4 Ratification of Thirteenth Amendment

**Section 1 Prohibition on Slavery and Involuntary Servitude**

Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Amdt13.S1.1 Prohibition Clause

Amdt13.S1.2 Defining Badges and Incidents of Slavery

Amdt13.S1.3 Defining Involuntary Servitude

    Amdt13.S1.3.1 Scope of the Prohibition

    Amdt13.S1.3.2 Historical Exceptions

Amdt13.S1.4 Exceptions Clause

**Section 2 Enforcement**

Congress shall have power to enforce this article by appropriate legislation.

Amdt13.S2.1 Overview of Enforcement Clause of Thirteenth Amendment

Amdt13.S2.2 Early Doctrine on Enforcement Clause of Thirteenth Amendment

Amdt13.S2.3 Scope of Enforcement Clause of Thirteenth Amendment

Amdt13.S2.4 Use of Enforcement Clause Power Beyond Harms of Racial Discrimination

LII  > U.S. Code  > Title 42  > CHAPTER 21  > SUBCHAPTER I  **> § 1981**

Quick search by citation:

**Title**

<div style="border:1px solid #ccc; padding:8px;">enter title</div>

**Section**

<div style="border:1px solid #ccc; padding:8px;">section</div>

<div style="border:1px solid #a00; padding:8px; display:inline-block;">Go!</div>

# 42 U.S. Code § 1981 - Equal rights under the law

**U.S. Code**    Notes

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship.

**(c) Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

(R.S. §1977; Pub. L. 102–166, title I, §101, Nov. 21, 1991, 105 Stat. 1071.)



💼 U.S. Code Toolbox

Law about... Articles from Wex
Table of Popular Names
Parallel Table of Authorities
How current is this?

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > U.S. Constitution  > **14th Amendment**

# 14th Amendment

The Fourteenth Amendment addresses many aspects of citizenship and the rights of citizens. The most commonly used -- and frequently litigated -- phrase in the amendment is "equal protection of the laws", which figures prominently in a wide variety of landmark cases, including Brown v. Board of Education (racial discrimination), Roe v. Wade (reproductive rights), Bush v. Gore (election recounts), Reed v. Reed (gender discrimination), and University of California v. Bakke (racial quotas in education). See more...

Amendment XIV

Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way

abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

## Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

## Section 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

## Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

wex resources

Section 1.

Privileges and Immunities Clause

Civil Rights

Slaughterhouse Cases

Due Process

Substantive Due Process

Right of Privacy: Personal Autonomy

Territorial Jurisdiction

Equal Protection

Plessy v. Ferguson (1896)

Plyer v. Doe (1982)

Section 4.

Debt

Section 5.

Enforcement Power

Commerce Clause

‹ 13th Amendment  up  15th Amendment ›

💼 U.S. Constitution Toolbox

- Explanation of the Constitution - from the Congressional Research Service

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

LII  > Wex  **> equal protection**

# equal protection

## Overview

Equal Protection refers to the idea that a governmental body may not deny people equal protection of its governing laws . The governing body state must treat an individual in the same manner as others in similar conditions and circumstances.

## Permissible Discrimination

It is important to acknowledge that a government is allowed to discriminate against individuals, as long as the discrimination satisfies the equal protection analysis outlined below, and described in full detail in this Santa Clara Law Review article .

## U.S. Constitution

The Fifth Amendment 's Due Process Clause requires the United States government to practice equal protection. The Fourteenth Amendment's Equal Protection Clause requires states to practice equal protection.

Equal protection forces a state to govern impartially—not draw distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective. Thus, the equal protection clause is crucial to the protection of civil rights .

## Equal Protection Analysis

When an individual believes that either the federal government or a state government has violated their guaranteed equal rights , that individual is able to bring a lawsuit against that governmental body for relief .

Based on the type of discrimination alleged, the individual will first need to prove that the governing body actually discriminated against the individual. The individual will need to prove that the governing body's action resulted in actual harm to them. After proving this, the court

will typically scrutinize the governmental action in one of several three ways to determine whether the governmental body's action is permissible: these three methods are referred to as strict scrutiny , intermediate scrutiny , and rational basis scrutiny. The court will determine which scrutiny the individual will be subject to, relying on legal precedent to determine which level of scrutiny to use. It is important to note that courts have combined elements of two of the three tests to create an ad hoc test.

## Further Reading

For more on equal protection, see this Harvard Law Review article , this University of Pennsylvania Law Review article , and this Columbia University Law Review article .

[Last reviewed in November of 2022 by the Wex Definitions Team ]

**Keywords**

- equal protection
- equal protection clause
- VOTING RIGHTS
- voting rights act
- civil rights
- Fourteenth Amendment
- constitutional law
- constitutional amendment
- U.S. CONSTITUTION
- strict scrutiny
- INTERMEDIATE SCRUTINY
- rational basis review

**Wex**

- ACADEMIC TOPICS
- legal history
- CIVICS
- civil rights
- the Constitution
- courts
- legal practice/ethics
- wex articles
- constitutional law
- government
- group rights
- legal education and practice

💼 Wex Toolbox

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

(http://www.georgetown.edu/)

(http://www.georgetown.edu/)
Office of Compliance and Ethics (https://compliance.georgetown.edu)

# Georgetown University's Whistleblower Protection Policy

Georgetown University strives to operate in an ethical, honest and lawful manner and expects its faculty, administrators, staff and students to conduct their activities in accordance with University policies and applicable law. The University strongly encourages all faculty, administrators, staff and students to report suspected or actual wrongful conduct by Georgetown employees through channels that the University establishes for such reporting. No University faculty member, administrator, staff member or student may interfere with the good faith reporting of suspected or actual wrongful conduct; no individual who makes such a good faith report shall be subject to retaliation, including harassment or any adverse employment, academic or educational consequence, as a result of making a report. The University will take whatever action is necessary and appropriate to address a violation of this policy.

---

**Code of Ethical Conduct**



1789
GEORGETOWN
Institutional Compliance
and Ethics Program
Code of Ethical Conduct
Georgetown University
Excellence through Integrity
(https://georgetown.box.com/v/2024CodeofEthicalConduct)

View the Code of Ethical Conduct (https://georgetow

**Georgetown University Compliance Helpline**

 (https://secure.ethicspoint.com/domain/media/en/gui/17731/index.html)

T
h
e
G
e
o
r
g
et
o
w
n
U
ni
v
er
si
ty
C
o
m
pl
ia
n
c
e
H
el
pl
in
e
is
a
s
af

e,
a
n
d
a
n
o
n
y
m
o
u
s
if
d
e
si
re
d,
w
a
y
to
re
p
o
rt
p
r
o
bl
e
m
s
o
r
ra
is
e
q
u
e
st
io
n
s
o
r
c

oncerns. To access the Helpline, click on Jack or call 888-239-9181



## Office of Compliance and Ethics

305 Gervase
37th and O Streets, N.W.
Washington DC
Phone: 202-687-6493

An official website of the United States government   Here's how you know

U.S. Department of Education

HOME / LAWS AND POLICY / CIVIL RIGHTS LAWS / RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION

# Education and Title VI

**EDUCATION AND TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**Title VI and Race, Color or National Origin Discrimination**

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance. Title VI states that:

The Title VI implementing regulations (Volume 34, Code of Federal Regulations, Part 100) provide a detailed discussion of discrimination prohibited by Title VI.

**The Office for Civil Rights Enforces Title VI**

The U.S. Department of Education's (ED) Office for Civil Rights (OCR), with 12 regional offices and a headquarters office in Washington, D.C., enforces Title VI as it applies to programs or activities that receive financial assistance from ED.

OCR's mandate to ensure that recipients of financial assistance from ED comply with Title VI covers pre-K through grade 12 public schools, including charter schools; state educational agencies; local educational agencies; colleges and universities, including proprietary schools and community colleges; state vocational rehabilitation agencies and their subrecipients; and other institutions that receive ED financial assistance, such as libraries, museums, and correctional institutions.

Covered programs and activities may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, and housing.

Title VI prohibits a recipient from intimidating, threatening, coercing, or retaliating against any person because they made a complaint; testified, assisted, or participated in any manner in an investigation, proceeding, or hearing; or opposed an unlawful educational practice or policy. 34 C.F.R. § 100.7(e).

OCR's Race, Color, or National Origin Discrimination Overview webpage provides a list of issues under Title VI that OCR frequently addresses.

## The Office for Civil Rights Provides Technical Assistance and Policy Guidance About Title VI

OCR is available to assist school and college communities in complying with Title VI obligations by providing technical assistance, including responding to telephone and email inquiries and presenting at trainings, conferences, and community meetings. To request technical assistance, you may contact the OCR regional office that serves your geographic area by phone, email, or mail. You can identify the appropriate OCR regional office through the Contact OCR webpage. The addresses, telephone numbers, emails, and designated geographic areas of each OCR regional office are also listed here.

OCR also provides policy guidance and other resources to inform and remind schools of their obligation to comply with Title VI, and inform beneficiaries, such as students and applicants for admission to academic programs, of their rights under Title VI. A few examples of these resources are below.

*Harassment*

OCR also issued a resource PDF (2025) (408K) that assists school communities in understanding their obligations under Title VI and discusses some considerations for schools when taking action to remediate a hostile environment under Title VI. The existence of a hostile environment based on race, color, or national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a school can

constitute discrimination in violation of Title VI. When a school is taking action to remediate a hostile environment, just as when taking any other action, Title VI prohibits the school from discriminating against students on the basis of race, color, or national origin.

OCR issued a fact sheet PDF (2024) (427K) that describes how OCR determines the existence of a hostile environment and details schools' obligations to address and remedy a hostile environment. The fact sheet also provides hypothetical examples to help schools assess their Title VI obligations, including the requirement to promptly and effectively address alleged acts of discrimination, including harassment.

_Students Who Are English Learners and Parents and Guardians Who Have Limited English Proficiency_

OCR and DOJ jointly published a Dear Colleague Letter: English Learner Students and Limited English Proficient Parents (2015) PDF (523K) that reminds states, school districts, and schools of their obligations under federal law to ensure that students who are English learners have equal access to a high-quality education and the opportunity to achieve their full academic potential. In addition to the guidance, OCR has developed tools and resources to help schools in serving English learner students and parents who have limited English proficiency, including:

- A fact sheet in English PDF (557K) and in other languages about schools' obligations under federal law to ensure that students who are English learners can participate meaningfully and equally in school.
- A fact sheet in English PDF (450K) and in other languages about schools' obligations to communicate information to parents and guardians who have limited English proficiency in a language they can understand.
- A fact sheet in English PDF (542K) and other languages discussing access to specialized or advanced educational programs and services for students who are English learners.

OCR and DOJ together published a Dear Colleague Letter: School Enrollment Procedures PDF (233K) that explains that under federal law, states, school districts, and public schools are required to provide all children with equal access to public education at the elementary and secondary level.

OCR and DOJ have also developed fact sheets to assist school communities:

- A fact sheet on Confronting Discrimination Based on National Origin and Immigration Status (2021) PDF (533K) that reiterates that under federal law, *all* children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents immigration status. The fact is also available in other languages.
- Fact sheets on Protecting Access to Education for Migratory Children (2023) PDF (257K) and Protecting Access to Education for Unaccompanied Children (2023) PDF (236K) that discuss specific challenges some migratory children and unaccompanied children may face while accessing public education, remind public schools of their responsibilities to migratory and unaccompanied children under federal civil rights laws, and explain where families can seek help. The fact sheets are also available in other languages.

Additional resources regarding students who are English learners and parents and guardians who have limited English proficiency are available on OCR's Equal Educational Opportunities for English Learners webpage.

*Discrimination Based on Race, Color, or National Origin, including Shared Ancestry or Ethnic Characteristics*

OCR issued a Dear Colleague Letter (2023) PDF (332K) and a fact sheet (2023) PDF (267K) that describe how Title VI protection covers students who are or are perceived to be Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or other groups that are or are perceived to: 1) share ancestry or ethnic characteristics; or 2) have citizenship or residency in a country with a dominant religion or distinct religious identity.

Title VI prohibits discrimination based on race, color, or national origin against students of any religion when the discrimination, for example:

- involves racial, ethnic, or ancestral slurs or stereotypes;
- is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; or is based on the country or region where a student is from or is perceived to have come from, including, for example, discrimination based on a student's accent or name, a student's limited English proficiency, or a student speaking a language other than English.

Additional resources regarding Title VI protection relating to shared ancestry or ethnic characteristics is available on OCR's Shared Ancestry or Ethnic Characteristics webpage.

*Racial Discrimination in School Discipline*

OCR and DOJ released a Resource PDF (1.2M) on Confronting Racial Discrimination in Student Discipline (2023). The Resource describes how the Departments resolved investigations of 14 school districts in 10 states nationwide under Title VI and Title IV of the Civil Rights Act of 1964, during the current and previous two presidential administrations. The investigations involved concerns about discrimination in schools' use of out-of-school suspensions, expulsions, school-based arrests, referrals to law enforcement, involuntary discipline transfers, informal removals, and other disciplinary actions for a number of disciplinary infractions, including dress code violations.

*Artificial Intelligence*

OCR issued a Resource to assist school communities with ensuring that artificial intelligence (AI) is used in a nondiscriminatory manner in the nation's elementary and secondary schools and institutions of higher education consistent with federal civil rights laws. The resource makes clear that AI technologies have the potential to enhance opportunities and increase educational equity for all students, but that at the same time, the growing use of AI in schools, including for instructional and school safety purposes, and AI's ability to operate on a mass scale can create or contribute to discrimination. The resource provides information on the legal analyses that OCR uses to determine whether discrimination exists, and provides examples of conduct that could, depending on facts and circumstances, present OCR with sufficient reason to open an investigation.

*Resource Comparability*

OCR issued a Dear Colleague Letter (2014) PDF (478K) explaining that Title VI prohibits discrimination on the basis of race in the allocation of school resources such as courses, academic programs, extracurricular activities, teachers, leadership, student support, school facilities, instructional materials, and access to technology and digital opportunities.

OCR issued a fact sheet (2024) PDF (105K) highlighting that in 1954 in *Brown v. Board of Education*, the U.S. Supreme Court unanimously held that legally mandated racial segregation of children in public schools is unconstitutional.The fact sheet explains that student access to education and to educational resources differs by race, color, and national origin in schools across the United States and summarizes resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

Additional resources regarding resource comparability are available on OCR's Resource Comparability webpage.

*Race Discrimination in Special Education*

OCR issued a Dear Colleague Letter (2016) PDF (470K) explaining that states, districts, and public schools cannot discriminate on the basis of race, color, or national origin in the administration of special education or related aids and services. This resource addresses overrepresentation, underrepresentation, and misrepresentation of students of color as students with disabilities. Title VI requires that students of all races, colors, and national origins have equal access to general education interventions and to a timely referral for an evaluation for disability and special education and/or related aids and services under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1973. Title VI also requires that students of all races, colors, and national origins are treated equitably in the evaluation process, in the quality of special education services and supports they receive, and in the degree of restrictiveness of their educational environment. Additional resources are available on OCR's Race Discrimination in Special Education webpage.

*Retaliation*

OCR issued a resource, Civil Rights Protections Against Retaliation, (2024) PDF (105K) which reminds school communities that all of the federal civil rights laws enforced by OCR prohibit retaliation. The resource explains the key elements of retaliation, outlines how OCR assesses retaliation claims, and provides examples that depending on the facts and circumstances, could raise concerns of unlawful retaliation. Additional resources regarding retaliation are available on OCR's Retaliation webpage.

## How to File a Discrimination Complaint with OCR

Anyone who believes that a recipient of federal financial assistance has discriminated against any person on the basis of race, color, or national origin may file a complaint with OCR under Title VI. The person or organization filing the complaint need not be a victim of the alleged discrimination and may complain on behalf of another person or group.

You may file a complaint with OCR using OCR's electronic complaint form at the following website: https://ocrcas.ed.gov/. A complaint may also be sent to the OCR regional office that serves the state in which the alleged discrimination occurred. A complaint must be filed within 180 days of the date of the alleged discrimination unless OCR grants a waiver of the 180-day filing requirement. If you have also filed a complaint under an institutional grievance process, a complaint with OCR must be filed within 60 days of the completion of the institutional grievance process.

Additional information about how to file an OCR complaint and OCR's complaint process is available within resources on OCR's website, including: How to File a Discrimination Complaint With the Office for Civil Rights; PDF (177K) OCR Complaint Processing Procedures; PDF (201K) Questions and Answers on OCR's Complaint Process; and OCR Case Processing Manual. PDF (709K)

Top

**Office for Civil Rights (OCR)**

Page Last Reviewed: January 23, 2025

Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

 
ES
    

## Contact Us
### 1-800-USA-LEARN

 www.ed.gov

**An official website of the Department of Education**

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

(Slip Opinion)          OCTOBER TERM, 2022          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT AND FELLOWS OF HARVARD COLLEGE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–1199.   Argued October 31, 2022—Decided June 29, 2023*

Harvard College and the University of North Carolina (UNC) are two of the oldest institutions of higher learning in the United States. Every year, tens of thousands of students apply to each school; many fewer are admitted. Both Harvard and UNC employ a highly selective admissions process to make their decisions. Admission to each school can depend on a student's grades, recommendation letters, or extracurricular involvement. It can also depend on their race. The question presented is whether the admissions systems used by Harvard College and UNC are lawful under the Equal Protection Clause of the Fourteenth Amendment.

At Harvard, each application for admission is initially screened by a "first reader," who assigns a numerical score in each of six categories: academic, extracurricular, athletic, school support, personal, and overall. For the "overall" category—a composite of the five other ratings—a first reader can and does consider the applicant's race. Harvard's admissions subcommittees then review all applications from a particular geographic area. These regional subcommittees make recommendations to the full admissions committee, and they take an applicant's race into account. When the 40-member full admissions committee begins its deliberations, it discusses the relative breakdown of applicants by race. The goal of the process, according to Harvard's director of admissions, is ensuring there is no "dramatic drop-off" in minority admissions from the prior class. An applicant receiving a majority of

——————

*Together with No. 21–707, *Students for Fair Admissions, Inc.* v. *University of North Carolina et al.*, on certiorari before judgment to the United States Court of Appeals for the Fourth Circuit.

Syllabus

the full committee's votes is tentatively accepted for admission. At the end of this process, the racial composition of the tentative applicant pool is disclosed to the committee. The last stage of Harvard's admissions process, called the "lop," winnows the list of tentatively admitted students to arrive at the final class. Applicants that Harvard considers cutting at this stage are placed on the "lop list," which contains only four pieces of information: legacy status, recruited athlete status, financial aid eligibility, and race. In the Harvard admissions process, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants."

UNC has a similar admissions process. Every application is reviewed first by an admissions office reader, who assigns a numerical rating to each of several categories. Readers are required to consider the applicant's race as a factor in their review. Readers then make a written recommendation on each assigned application, and they may provide an applicant a substantial "plus" depending on the applicant's race. At this stage, most recommendations are provisionally final. A committee of experienced staff members then conducts a "school group review" of every initial decision made by a reader and either approves or rejects the recommendation. In making those decisions, the committee may consider the applicant's race.

Petitioner, Students for Fair Admissions (SFFA), is a nonprofit organization whose stated purpose is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law." SFFA filed separate lawsuits against Harvard and UNC, arguing that their race-based admissions programs violate, respectively, Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. After separate bench trials, both admissions programs were found permissible under the Equal Protection Clause and this Court's precedents. In the Harvard case, the First Circuit affirmed, and this Court granted certiorari. In the UNC case, this Court granted certiorari before judgment.

*Held*: Harvard's and UNC's admissions programs violate the Equal Protection Clause of the Fourteenth Amendment. Pp. 6–40.

   (a) Because SFFA complies with the standing requirements for organizational plaintiffs articulated by this Court in *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, SFFA's obligations under Article III are satisfied, and this Court has jurisdiction to consider the merits of SFFA's claims.

   The Court rejects UNC's argument that SFFA lacks standing because it is not a "genuine" membership organization. An organizational plaintiff can satisfy Article III jurisdiction in two ways, one of which is to assert "standing solely as the representative of its mem-

Syllabus

bers," *Warth* v. *Seldin,* 422 U. S. 490, 511, an approach known as representational or organizational standing. To invoke it, an organization must satisfy the three-part test in *Hunt*. Respondents do not suggest that SFFA fails *Hunt*'s test for organizational standing. They argue instead that SFFA cannot invoke organizational standing at all because SFFA was not a genuine membership organization at the time it filed suit. Respondents maintain that, under *Hunt*, a group qualifies as a genuine membership organization only if it is controlled and funded by its members. In *Hunt*, this Court determined that a state agency with no traditional members could still qualify as a genuine membership organization in substance because the agency represented the interests of individuals and otherwise satisfied *Hunt*'s three-part test for organizational standing. See 432 U. S., at 342. *Hunt*'s "indicia of membership" analysis, however, has no applicability here. As the courts below found, SFFA is indisputably a voluntary membership organization with identifiable members who support its mission and whom SFFA represents in good faith. SFFA is thus entitled to rely on the organizational standing doctrine as articulated in *Hunt*. Pp. 6–9.

(b) Proposed by Congress and ratified by the States in the wake of the Civil War, the Fourteenth Amendment provides that no State shall "deny to any person . . . the equal protection of the laws." Proponents of the Equal Protection Clause described its "foundation[al] principle" as "not permit[ing] any distinctions of law based on race or color." Any "law which operates upon one man," they maintained, should "operate equally upon all." Accordingly, as this Court's early decisions interpreting the Equal Protection Clause explained, the Fourteenth Amendment guaranteed "that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States."

Despite the early recognition of the broad sweep of the Equal Protection Clause, the Court—alongside the country—quickly failed to live up to the Clause's core commitments. For almost a century after the Civil War, state-mandated segregation was in many parts of the Nation a regrettable norm. This Court played its own role in that ignoble history, allowing in *Plessy* v. *Ferguson* the separate but equal regime that would come to deface much of America. 163 U. S. 537.

After *Plessy*, "American courts . . . labored with the doctrine [of separate but equal] for over half a century." *Brown* v. *Board of Education*, 347 U. S. 483, 491. Some cases in this period attempted to curtail the perniciousness of the doctrine by emphasizing that it required States to provide black students educational opportunities equal to—even if formally separate from—those enjoyed by white students. See, *e.g.*, *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337, 349–350. But the

inherent folly of that approach—of trying to derive equality from ine-
quality—soon became apparent. As the Court subsequently recog-
nized, even racial distinctions that were argued to have no palpable
effect worked to subordinate the afflicted students. See, *e.g.*, *McLau-
rin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637, 640–642.
By 1950, the inevitable truth of the Fourteenth Amendment had thus
begun to reemerge: Separate cannot be equal.

The culmination of this approach came finally in *Brown* v. *Board of
Education,* 347 U. S. 483. There, the Court overturned the separate
but equal regime established in *Plessy* and began on the path of inval-
idating all *de jure* racial discrimination by the States and Federal Gov-
ernment. The conclusion reached by the *Brown* Court was unmistak-
ably clear: the right to a public education "must be made available to
all on equal terms." 347 U. S., at 493. The Court reiterated that rule
just one year later, holding that "full compliance" with *Brown* required
schools to admit students "on a racially nondiscriminatory basis."
*Brown* v. *Board of Education,* 349 U. S. 294, 300–301.

In the years that followed, *Brown*'s "fundamental principle that ra-
cial discrimination in public education is unconstitutional," *id.,* at 298,
reached other areas of life—for example, state and local laws requiring
segregation in busing, *Gayle* v. *Browder*, 352 U. S. 903 (*per curiam*);
racial segregation in the enjoyment of public beaches and bathhouses
*Mayor and City Council of Baltimore* v. *Dawson*, 350 U. S. 877 (*per cu-
riam*); and antimiscegenation laws, *Loving* v. *Virginia,* 388 U. S. 1.
These decisions, and others like them, reflect the "core purpose" of the
Equal Protection Clause: "do[ing] away with all governmentally im-
posed discrimination based on race." *Palmore* v. *Sidoti*, 466 U. S. 429,
432.

Eliminating racial discrimination means eliminating all of it. Ac-
cordingly, the Court has held that the Equal Protection Clause applies
"without regard to any differences of race, of color, or of nationality"—
it is "universal in [its] application." *Yick Wo* v. *Hopkins*, 118 U. S. 356,
369. For "[t]he guarantee of equal protection cannot mean one thing
when applied to one individual and something else when applied to a
person of another color." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S.
265, 289–290.

Any exceptions to the Equal Protection Clause's guarantee must
survive a daunting two-step examination known as "strict scrutiny,"
*Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227, which asks
first whether the racial classification is used to "further compelling
governmental interests," *Grutter* v. *Bollinger,* 539 U. S. 306, 326, and
second whether the government's use of race is "narrowly tailored,"
*i.e.*, "necessary," to achieve that interest, *Fisher* v. *University of Tex. at
Austin,* 570 U. S. 297, 311–312. Acceptance of race-based state action

Syllabus

is rare for a reason: "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice* v. *Cayetano,* 528 U. S. 495, 517. Pp. 9–16.

(c) This Court first considered whether a university may make race-based admissions decisions in *Bakke,* 438 U. S. 265. In a deeply splintered decision that produced six different opinions, Justice Powell's opinion for himself alone would eventually come to "serv[e] as the touchstone for constitutional analysis of race-conscious admissions policies." *Grutter,* 539 U. S., at 323. After rejecting three of the University's four justifications as not sufficiently compelling, Justice Powell turned to its last interest asserted to be compelling—obtaining the educational benefits that flow from a racially diverse student body. Justice Powell found that interest to be "a constitutionally permissible goal for an institution of higher education," which was entitled as a matter of academic freedom "to make its own judgments as to . . . the selection of its student body." 438 U. S., at 311–312. But a university's freedom was not unlimited—"[r]acial and ethnic distinctions of any sort are inherently suspect," Justice Powell explained, and antipathy toward them was deeply "rooted in our Nation's constitutional and demographic history." *Id.,* at 291. Accordingly, a university could not employ a two-track quota system with a specific number of seats reserved for individuals from a preferred ethnic group. *Id.,* at 315. Neither still could a university use race to foreclose an individual from all consideration. *Id.,* at 318. Race could only operate as "a 'plus' in a particular applicant's file," and even then it had to be weighed in a manner "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.,* at 317. Pp. 16–19.

(d) For years following *Bakke,* lower courts struggled to determine whether Justice Powell's decision was "binding precedent." *Grutter,* 539 U. S., at 325. Then, in *Grutter* v. *Bollinger,* the Court for the first time "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Ibid.* The *Grutter* majority's analysis tracked Justice Powell's in many respects, including its insistence on limits on how universities may consider race in their admissions programs. Those limits, *Grutter* explained, were intended to guard against two dangers that all race-based government action portends. The first is the risk that the use of race will devolve into "illegitimate . . . stereotyp[ing]." *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 493 (plurality opinion). Admissions programs could thus not operate on the "belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." *Grutter,* 539 U. S., at 333 (internal

quotation marks omitted). The second risk is that race would be used not as a plus, but as a negative—to discriminate *against* those racial groups that were not the beneficiaries of the race-based preference. A university's use of race, accordingly, could not occur in a manner that "unduly harm[ed] nonminority applicants." *Id.*, at 341.

To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs: At some point, the Court held, they must end. *Id.,* at 342. Recognizing that "[e]nshrining a permanent justification for racial preferences would offend" the Constitution's unambiguous guarantee of equal protection, the Court expressed its expectation that, in 25 years, "the use of racial preferences will no longer be necessary to further the interest approved today." *Id.,* at 343. Pp. 19–21.

(e) Twenty years have passed since *Grutter*, with no end to race-based college admissions in sight. But the Court has permitted race-based college admissions only within the confines of narrow restrictions: such admissions programs must comply with strict scrutiny, may never use race as a stereotype or negative, and must—at some point—end. Respondents' admissions systems fail each of these criteria and must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment. Pp. 21–34.

(1) Respondents fail to operate their race-based admissions programs in a manner that is "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny. *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 381. First, the interests that respondents view as compelling cannot be subjected to meaningful judicial review. Those interests include training future leaders, acquiring new knowledge based on diverse outlooks, promoting a robust marketplace of ideas, and preparing engaged and productive citizens. While these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny. It is unclear how courts are supposed to measure any of these goals, or if they could, to know when they have been reached so that racial preferences can end. The elusiveness of respondents' asserted goals is further illustrated by comparing them to recognized compelling interests. For example, courts can discern whether the temporary racial segregation of inmates will prevent harm to those in the prison, see *Johnson* v. *California,* 543 U. S. 499, 512–513, but the question whether a particular mix of minority students produces "engaged and productive citizens" or effectively "train[s] future leaders" is standardless.

Second, respondents' admissions programs fail to articulate a meaningful connection between the means they employ and the goals they pursue. To achieve the educational benefits of diversity, respondents measure the racial composition of their classes using racial categories

Cite as: 600 U. S. ____ (2023)          7

Syllabus

that are plainly overbroad (expressing, for example, no concern whether *South* Asian or *East* Asian students are adequately represented as "Asian"); arbitrary or undefined (the use of the category "Hispanic"); or underinclusive (no category at all for Middle Eastern students). The unclear connection between the goals that respondents seek and the means they employ preclude courts from meaningfully scrutinizing respondents' admissions programs.

The universities' main response to these criticisms is "trust us." They assert that universities are owed deference when using race to benefit some applicants but not others. While this Court has recognized a "tradition of giving a degree of deference to a university's academic decisions," it has made clear that deference must exist "within constitutionally prescribed limits." *Grutter*, 539 U. S., at 328. Respondents have failed to present an exceedingly persuasive justification for separating students on the basis of race that is measurable and concrete enough to permit judicial review, as the Equal Protection Clause requires. Pp. 22–26.

(2) Respondents' race-based admissions systems also fail to comply with the Equal Protection Clause's twin commands that race may never be used as a "negative" and that it may not operate as a stereotype. The First Circuit found that Harvard's consideration of race has resulted in fewer admissions of Asian-American students. Respondents' assertion that race is never a negative factor in their admissions programs cannot withstand scrutiny. College admissions are zero-sum, and a benefit provided to some applicants but not to others necessarily advantages the former at the expense of the latter.

Respondents admissions programs are infirm for a second reason as well: They require stereotyping—the very thing *Grutter* foreswore. When a university admits students "on the basis of race, it engages in the offensive and demeaning assumption that [students] of a particular race, because of their race, think alike." *Miller* v. *Johnson*, 515 U. S. 900, 911–912. Such stereotyping is contrary to the "core purpose" of the Equal Protection Clause. *Palmore*, 466 U. S., at 432. Pp. 26–29.

(3) Respondents' admissions programs also lack a "logical end point" as *Grutter* required. 539 U. S., at 342. Respondents suggest that the end of race-based admissions programs will occur once meaningful representation and diversity are achieved on college campuses. Such measures of success amount to little more than comparing the racial breakdown of the incoming class and comparing it to some other metric, such as the racial makeup of the previous incoming class or the population in general, to see whether some proportional goal has been reached. The problem with this approach is well established: "[O]utright racial balancing" is "patently unconstitutional." *Fisher,*

Syllabus

570 U. S., at 311. Respondents' second proffered end point—when students receive the educational benefits of diversity—fares no better. As explained, it is unclear how a court is supposed to determine if or when such goals would be adequately met. Third, respondents suggest the 25-year expectation in *Grutter* means that race-based preferences must be allowed to continue until at least 2028. The Court's statement in *Grutter*, however, reflected only that Court's expectation that race-based preferences would, by 2028, be unnecessary in the context of racial diversity on college campuses. Finally, respondents argue that the frequent reviews they conduct to determine whether racial preferences are still necessary obviates the need for an end point. But *Grutter* never suggested that periodic review can make unconstitutional conduct constitutional. Pp. 29–34.

   (f) Because Harvard's and UNC's admissions programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points, those admissions programs cannot be reconciled with the guarantees of the Equal Protection Clause. At the same time, nothing prohibits universities from considering an applicant's discussion of how race affected the applicant's life, so long as that discussion is concretely tied to a quality of character or unique ability that the particular applicant can contribute to the university. Many universities have for too long wrongly concluded that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned, but the color of their skin. This Nation's constitutional history does not tolerate that choice. Pp. 39–40.

No. 20–1199, 980 F. 3d 157; No. 21–707, 567 F. Supp. 3d 580, reversed.

   ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. KAVANAUGH, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN, J., joined, and in which JACKSON, J., joined as it applies to No. 21–707. JACKSON, J., filed a dissenting opinion in No. 21–707, in which SOTOMAYOR and KAGAN, JJ., joined. JACKSON, J., took no part in the consideration or decision of the case in No. 20–1199.

Cite as: 600 U. S. ____ (2023)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 20–1199 and 21–707

———————

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

20–1199            *v.*
PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

21–707            *v.*
UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

In these cases we consider whether the admissions sys-
tems used by Harvard College and the University of North
Carolina, two of the oldest institutions of higher learning in
the United States, are lawful under the Equal Protection
Clause of the Fourteenth Amendment.

I

A

Founded in 1636, Harvard College has one of the most

2    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
Opinion of the Court

selective application processes in the country.  Over 60,000 people applied to the school last year; fewer than 2,000 were admitted.  Gaining admission to Harvard is thus no easy feat.  It can depend on having excellent grades, glowing recommendation letters, or overcoming significant adversity.  See 980 F. 3d 157, 166–169 (CA1 2020).  It can also depend on your race.

The admissions process at Harvard works as follows.  Every application is initially screened by a "first reader," who assigns scores in six categories: academic, extracurricular, athletic, school support, personal, and overall.  *Ibid.* A rating of "1" is the best; a rating of "6" the worst.  *Ibid.*  In the academic category, for example, a "1" signifies "near-perfect standardized test scores and grades"; in the extracurricular category, it indicates "truly unusual achievement"; and in the personal category, it denotes "outstanding" attributes like maturity, integrity, leadership, kindness, and courage.  *Id.*, at 167–168.  A score of "1" on the overall rating—a composite of the five other ratings— "signifies an exceptional candidate with >90% chance of admission."  *Id.*, at 169 (internal quotation marks omitted).  In assigning the overall rating, the first readers "can and do take an applicant's race into account."  *Ibid.*

Once the first read process is complete, Harvard convenes admissions subcommittees.  *Ibid.*  Each subcommittee meets for three to five days and evaluates all applicants from a particular geographic area.  *Ibid.*  The subcommittees are responsible for making recommendations to the full admissions committee.  *Id.*, at 169–170.  The subcommittees can and do take an applicant's race into account when making their recommendations.  *Id.*, at 170.

The next step of the Harvard process is the full committee meeting.  The committee has 40 members, and its discussion centers around the applicants who have been recommended by the regional subcommittees.  *Ibid.*  At the beginning of the meeting, the committee discusses the relative

Opinion of the Court

breakdown of applicants by race. The "goal," according to Harvard's director of admissions, "is to make sure that [Harvard does] not hav[e] a dramatic drop-off" in minority admissions from the prior class. 2 App. in No. 20–1199, pp. 744, 747–748. Each applicant considered by the full committee is discussed one by one, and every member of the committee must vote on admission. 980 F. 3d, at 170. Only when an applicant secures a majority of the full committee's votes is he or she tentatively accepted for admission. *Ibid.* At the end of the full committee meeting, the racial composition of the pool of tentatively admitted students is disclosed to the committee. *Ibid.*; 2 App. in No. 20–1199, at 861.

The final stage of Harvard's process is called the "lop," during which the list of tentatively admitted students is winnowed further to arrive at the final class. Any applicants that Harvard considers cutting at this stage are placed on a "lop list," which contains only four pieces of information: legacy status, recruited athlete status, financial aid eligibility, and race. 980 F. 3d, at 170. The full committee decides as a group which students to lop. 397 F. Supp. 3d 126, 144 (Mass. 2019). In doing so, the committee can and does take race into account. *Ibid.* Once the lop process is complete, Harvard's admitted class is set. *Ibid.* In the Harvard admissions process, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants." *Id.*, at 178.

B

Founded shortly after the Constitution was ratified, the University of North Carolina (UNC) prides itself on being the "nation's first public university." 567 F. Supp. 3d 580, 588 (MDNC 2021). Like Harvard, UNC's "admissions process is highly selective": In a typical year, the school "receives approximately 43,500 applications for

4      STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
Opinion of the Court

its freshman class of 4,200." *Id.*, at 595.

Every application the University receives is initially reviewed by one of approximately 40 admissions office readers, each of whom reviews roughly five applications per hour. *Id.*, at 596, 598. Readers are required to consider "[r]ace and ethnicity . . . as one factor" in their review. *Id.*, at 597 (internal quotation marks omitted). Other factors include academic performance and rigor, standardized testing results, extracurricular involvement, essay quality, personal factors, and student background. *Id.*, at 600. Readers are responsible for providing numerical ratings for the academic, extracurricular, personal, and essay categories. *Ibid.* During the years at issue in this litigation, underrepresented minority students were "more likely to score [highly] on their personal ratings than their white and Asian American peers," but were more likely to be "rated lower by UNC readers on their academic program, academic performance, . . . extracurricular activities," and essays. *Id.*, at 616–617.

After assessing an applicant's materials along these lines, the reader "formulates an opinion about whether the student should be offered admission" and then "writes a comment defending his or her recommended decision." *Id.*, at 598 (internal quotation marks omitted). In making that decision, readers may offer students a "plus" based on their race, which "may be significant in an individual case." *Id.*, at 601 (internal quotation marks omitted). The admissions decisions made by the first readers are, in most cases, "provisionally final." *Students for Fair Admissions, Inc.* v. *University of N. C. at Chapel Hill*, No. 1:14–cv–954 (MDNC, Nov. 9, 2020), ECF Doc. 225, p. 7, ¶52.

Following the first read process, "applications then go to a process called 'school group review' . . . where a committee composed of experienced staff members reviews every [initial] decision." 567 F. Supp. 3d, at 599. The review committee receives a report on each student which contains,

among other things, their "class rank, GPA, and test scores; the ratings assigned to them by their initial readers; and their status as residents, legacies, or special recruits." *Ibid.* (footnote omitted). The review committee either approves or rejects each admission recommendation made by the first reader, after which the admissions decisions are finalized. *Ibid.* In making those decisions, the review committee may also consider the applicant's race. *Id.*, at 607; 2 App. in No. 21–707, p. 407.[1]

## C

Petitioner, Students for Fair Admissions (SFFA), is a

———————

[1] JUSTICE JACKSON attempts to minimize the role that race plays in UNC's admissions process by noting that, from 2016–2021, the school accepted a lower "percentage of the most academically excellent in-state Black candidates"—that is, 65 out of 67 such applicants (97.01%)—than it did similarly situated Asian applicants—that is, 1118 out of 1139 such applicants (98.16%). *Post*, at 20 (dissenting opinion); see also 3 App. in No. 21–707, pp. 1078–1080. It is not clear how the rejection of just two black applicants over five years could be "indicative of a genuinely holistic [admissions] process," as JUSTICE JACKSON contends. *Post*, at 20–21. And indeed it cannot be, as the *overall* acceptance rates of academically excellent applicants to UNC illustrates full well. According to SFFA's expert, over 80% of all black applicants in the top academic decile were admitted to UNC, while under 70% of white and Asian applicants in that decile were admitted. 3 App. in No. 21–707, at 1078–1083. In the second highest academic decile, the disparity is even starker: 83% of black applicants were admitted, while 58% of white applicants and 47% of Asian applicants were admitted. *Ibid.* And in the third highest decile, 77% of black applicants were admitted, compared to 48% of white applicants and 34% of Asian applicants. *Ibid.* The dissent does not dispute the accuracy of these figures. See *post*, at 20, n. 94 (opinion of JACKSON, J.). And its contention that white and Asian students "receive a diversity plus" in UNC's race-based admissions system blinks reality. *Post*, at 18.

The same is true at Harvard. See Brief for Petitioner 24 ("[A]n African American [student] in [the fourth lowest academic] decile has a higher chance of admission (12.8%) than an Asian American in the *top* decile (12.7%)." (emphasis added)); see also 4 App. in No. 20–1199, p. 1793 (black applicants in the top four academic deciles are between four and ten times more likely to be admitted to Harvard than Asian applicants in those deciles).

nonprofit organization founded in 2014 whose purpose is "to
defend human and civil rights secured by law, including the
right of individuals to equal protection under the law." 980
F. 3d, at 164 (internal quotation marks omitted). In No-
vember 2014, SFFA filed separate lawsuits against Har-
vard College and the University of North Carolina, arguing
that their race-based admissions programs violated, respec-
tively, Title VI of the Civil Rights Act of 1964, 78 Stat. 252,
42 U. S. C. §2000d *et seq.*, and the Equal Protection Clause
of the Fourteenth Amendment.[2]  See 397 F. Supp. 3d, at
131–132; 567 F. Supp. 3d, at 585–586. The District Courts
in both cases held bench trials to evaluate SFFA's claims.
See 980 F. 3d, at 179; 567 F. Supp. 3d, at 588. Trial in the
Harvard case lasted 15 days and included testimony from
30 witnesses, after which the Court concluded that Har-
vard's admissions program comported with our precedents
on the use of race in college admissions. See 397
F. Supp. 3d, at 132, 183. The First Circuit affirmed that
determination. See 980 F. 3d, at 204. Similarly, in the
UNC case, the District Court concluded after an eight-day
trial that UNC's admissions program was permissible un-
der the Equal Protection Clause. 567 F. Supp. 3d, at 588,
666.

We granted certiorari in the Harvard case and certiorari
before judgment in the UNC case. 595 U. S. ___ (2022).

——————

[2]Title VI provides that "[n]o person in the United States shall, on the
ground of race, color, or national origin, be excluded from participation
in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance." 42 U. S. C.
§2000d. "We have explained that discrimination that violates the Equal
Protection Clause of the Fourteenth Amendment committed by an insti-
tution that accepts federal funds also constitutes a violation of Title VI."
*Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23 (2003). Although JUSTICE
GORSUCH questions that proposition, no party asks us to reconsider it.
We accordingly evaluate Harvard's admissions program under the stand-
ards of the Equal Protection Clause itself.

Opinion of the Court

## II

Before turning to the merits, we must assure ourselves of our jurisdiction. See *Summers* v. *Earth Island Institute*, 555 U. S. 488, 499 (2009). UNC argues that SFFA lacks standing to bring its claims because it is not a "genuine" membership organization. Brief for University Respondents in No. 21–707, pp. 23–26. Every court to have considered this argument has rejected it, and so do we. See *Students for Fair Admissions, Inc.* v. *University of Tex. at Austin*, 37 F. 4th 1078, 1084–1086, and n. 8 (CA5 2022) (collecting cases).

Article III of the Constitution limits "[t]he judicial power of the United States" to "cases" or "controversies," ensuring that federal courts act only "as a necessity in the determination of real, earnest and vital" disputes. *Muskrat* v. *United States*, 219 U. S. 346, 351, 359 (1911) (internal quotation marks omitted). "To state a case or controversy under Article III, a plaintiff must establish standing." *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. 125, 133 (2011). That, in turn, requires a plaintiff to demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 338 (2016).

In cases like these, where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert "standing solely as the representative of its members." *Warth* v. *Seldin*, 422 U. S. 490, 511 (1975). The latter approach is known as representational or organizational standing. *Ibid.*; *Summers*, 555 U. S., at 497–498. To invoke it, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).

Respondents do not contest that SFFA satisfies the three-part test for organizational standing articulated in *Hunt*, and like the courts below, we find no basis in the record to conclude otherwise.   See 980 F. 3d, at 182–184; 397 F. Supp. 3d, at 183–184; No. 1:14–cv–954 (MDNC, Sept. 29, 2018), App. D to Pet. for Cert. in No. 21–707, pp. 237–245 (2018 DC Opinion).  Respondents instead argue that SFFA was not a "genuine 'membership organization'" when it filed suit, and thus that it could not invoke the doctrine of organizational standing in the first place.  Brief for University Respondents in No. 21–707, at 24.  According to respondents, our decision in *Hunt* established that groups qualify as genuine membership organizations only if they are controlled and funded by their members.  And because SFFA's members did neither at the time this litigation commenced, respondents' argument goes, SFFA could not represent its members for purposes of Article III standing.  Brief for University Respondents in No. 21–707, at 24 (citing *Hunt*, 432 U. S., at 343).

*Hunt* involved the Washington State Apple Advertising Commission, a state agency whose purpose was to protect the local apple industry.  The Commission brought suit challenging a North Carolina statute that imposed a labeling requirement on containers of apples sold in that State. The Commission argued that it had standing to challenge the requirement on behalf of Washington's apple industry. See *id.*, at 336–341.  We recognized, however, that as a state agency, "the Commission [wa]s not a traditional voluntary membership organization . . . , for it ha[d] no members at all."  *Id.*, at 342.  As a result, we could not easily apply the three-part test for organizational standing, which asks

Opinion of the Court

whether an organization's *members* have standing. We nevertheless concluded that the Commission had standing because the apple growers and dealers it represented were *effectively* members of the Commission. *Id.*, at 344. The growers and dealers "alone elect[ed] the members of the Commission," "alone . . . serve[d] on the Commission," and "alone finance[d] its activities"—they possessed, in other words, "all of the indicia of membership." *Ibid.* The Commission was therefore a genuine membership organization in substance, if not in form. And it was "clearly" entitled to rely on the doctrine of organizational standing under the three-part test recounted above. *Id.*, at 343.

The indicia of membership analysis employed in *Hunt* has no applicability in these cases. Here, SFFA *is* indisputably a voluntary membership organization with identifiable members—it is not, as in *Hunt*, a state agency that concededly has no members. See 2018 DC Opinion 241–242. As the First Circuit in the Harvard litigation observed, at the time SFFA filed suit, it was "a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission." 980 F. 3d, at 184. Meanwhile in the UNC litigation, SFFA represented four members in particular—high school graduates who were denied admission to UNC. See 2018 DC Opinion 234. Those members filed declarations with the District Court stating "that they have voluntarily joined SFFA; they support its mission; they receive updates about the status of the case from SFFA's President; and they have had the opportunity to have input and direction on SFFA's case." *Id.*, at 234–235 (internal quotation marks omitted). Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates. Because SFFA complies with the standing requirements demanded of organizational plaintiffs in *Hunt*, its obligations under Article III are satisfied.

### III

### A

In the wake of the Civil War, Congress proposed and the States ratified the Fourteenth Amendment, providing that no State shall "deny to any person . . . the equal protection of the laws." Amdt. 14, §1. To its proponents, the Equal Protection Clause represented a "foundation[al] principle"—"the absolute equality of all citizens of the United States politically and civilly before their own laws." Cong. Globe, 39th Cong., 1st Sess., 431 (1866) (statement of Rep. Bingham) (Cong. Globe). The Constitution, they were determined, "should not permit any distinctions of law based on race or color," Supp. Brief for United States on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1 etc., p. 41 (detailing the history of the adoption of the Equal Protection Clause), because any "law which operates upon one man [should] operate *equally* upon all," Cong. Globe 2459 (statement of Rep. Stevens). As soon-to-be President James Garfield observed, the Fourteenth Amendment would hold "over every American citizen, without regard to color, the protecting shield of law." *Id.*, at 2462. And in doing so, said Senator Jacob Howard of Michigan, the Amendment would give "to the humblest, the poorest, the most despised of the race the same rights and the same protection before the law as it gives to the most powerful, the most wealthy, or the most haughty." *Id.*, at 2766. For "[w]ithout this principle of equal justice," Howard continued, "there is no republican government and none that is really worth maintaining." *Ibid.*

At first, this Court embraced the transcendent aims of the Equal Protection Clause. "What is this," we said of the Clause in 1880, "but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States?" *Strauder* v. *West Virginia*, 100 U. S. 303, 307–309. "[T]he broad and benign provisions of the

Opinion of the Court

Fourteenth Amendment" apply "to all persons," we unanimously declared six years later; it is "hostility to . . . race and nationality" "which in the eye of the law is not justified." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 368–369, 373–374 (1886); see also *id.*, at 368 (applying the Clause to "aliens and subjects of the Emperor of China"); *Truax* v. *Raich*, 239 U. S. 33, 36 (1915) ("a native of Austria"); semble *Strauder*, 100 U. S., at 308–309 ("Celtic Irishmen") (dictum).

Despite our early recognition of the broad sweep of the Equal Protection Clause, this Court—alongside the country—quickly failed to live up to the Clause's core commitments. For almost a century after the Civil War, state-mandated segregation was in many parts of the Nation a regrettable norm. This Court played its own role in that ignoble history, allowing in *Plessy* v. *Ferguson* the separate but equal regime that would come to deface much of America. 163 U. S. 537 (1896). The aspirations of the framers of the Equal Protection Clause, "[v]irtually strangled in [their] infancy," would remain for too long only that—aspirations. J. Tussman & J. tenBroek, The Equal Protection of the Laws, 37 Cal. L. Rev. 341, 381 (1949).

After *Plessy*, "American courts . . . labored with the doctrine [of separate but equal] for over half a century." *Brown* v. *Board of Education*, 347 U. S. 483, 491 (1954). Some cases in this period attempted to curtail the perniciousness of the doctrine by emphasizing that it required States to provide black students educational opportunities equal to—even if formally separate from—those enjoyed by white students. See, *e.g.*, *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337, 349–350 (1938) ("The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups . . . ."). But the inherent folly of that approach—of trying to derive equality from inequality—soon became apparent. As the Court subse-

EoR - 2088 of 2347

quently recognized, even racial distinctions that were argued to have no palpable effect worked to subordinate the afflicted students. See, *e.g.*, *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637, 640–642 (1950) ("It is said that the separations imposed by the State in this case are in form merely nominal. . . . But they signify that the State . . . sets [petitioner] apart from the other students."). By 1950, the inevitable truth of the Fourteenth Amendment had thus begun to reemerge: Separate cannot be equal.

The culmination of this approach came finally in *Brown* v. *Board of Education*. In that seminal decision, we overturned *Plessy* for good and set firmly on the path of invalidating all *de jure* racial discrimination by the States and Federal Government. 347 U. S., at 494–495. *Brown* concerned the permissibility of racial segregation in public schools. The school district maintained that such segregation was lawful because the schools provided to black students and white students were of roughly the same quality. But we held such segregation impermissible "*even though* the physical facilities and other 'tangible' factors may be equal." *Id.*, at 493 (emphasis added). The mere act of separating "children . . . because of their race," we explained, itself "generate[d] a feeling of inferiority." *Id.*, at 494.

The conclusion reached by the *Brown* Court was thus unmistakably clear: the right to a public education "must be made available to all on equal terms." *Id.*, at 493. As the plaintiffs had argued, "no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." Tr. of Oral Arg. in *Brown I*, O. T. 1952, No. 8, p. 7 (Robert L. Carter, Dec. 9, 1952); see also Supp. Brief for Appellants on Reargument in Nos. 1, 2, and 4, and for Respondents in No. 10, in *Brown* v. *Board of Education*, O. T. 1953, p. 65 ("That the Constitution is color blind is our

Opinion of the Court

dedicated belief."); *post*, at 39, n. 7 (THOMAS, J., concurring). The Court reiterated that rule just one year later, holding that "full compliance" with *Brown* required schools to admit students "on a racially nondiscriminatory basis." *Brown* v. *Board of Education*, 349 U. S. 294, 300–301 (1955). The time for making distinctions based on race had passed. *Brown*, the Court observed, "declar[ed] the fundamental principle that racial discrimination in public education is unconstitutional." *Id.*, at 298.

So too in other areas of life. Immediately after *Brown*, we began routinely affirming lower court decisions that invalidated all manner of race-based state action. In *Gayle* v. *Browder*, for example, we summarily affirmed a decision invalidating state and local laws that required segregation in busing. 352 U. S. 903 (1956) (*per curiam*). As the lower court explained, "[t]he equal protection clause requires equality of treatment before the law for all persons without regard to race or color." *Browder* v. *Gayle*, 142 F. Supp. 707, 715 (MD Ala. 1956). And in *Mayor and City Council of Baltimore* v. *Dawson*, we summarily affirmed a decision striking down racial segregation at public beaches and bathhouses maintained by the State of Maryland and the city of Baltimore. 350 U. S. 877 (1955) (*per curiam*). "It is obvious that racial segregation in recreational activities can no longer be sustained," the lower court observed. *Dawson* v. *Mayor and City Council of Baltimore*, 220 F. 2d 386, 387 (CA4 1955) (*per curiam*). "[T]he ideal of equality before the law which characterizes our institutions" demanded as much. *Ibid.*

In the decades that followed, this Court continued to vindicate the Constitution's pledge of racial equality. Laws dividing parks and golf courses; neighborhoods and businesses; buses and trains; schools and juries were undone, all by a transformative promise "stemming from our American ideal of fairness": "'the Constitution . . . forbids . . . discrimination by the General Government, or by the States,

against any citizen because of his race.'" *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954) (quoting *Gibson* v. *Mississippi*, 162 U. S. 565, 591 (1896) (Harlan, J., for the Court)). As we recounted in striking down the State of Virginia's ban on interracial marriage 13 years after *Brown*, the Fourteenth Amendment "proscri[bes] . . . all invidious racial discriminations." *Loving* v. *Virginia*, 388 U. S. 1, 8 (1967). Our cases had thus "consistently denied the constitutionality of measures which restrict the rights of citizens on account of race." *Id.*, at 11–12; *see also Yick Wo*, 118 U. S., at 373–375 (commercial property); *Shelley* v. *Kraemer*, 334 U. S. 1 (1948) (housing covenants); *Hernandez* v. *Texas*, 347 U. S. 475 (1954) (composition of juries); *Dawson*, 350 U. S., at 877 (beaches and bathhouses); *Holmes* v. *Atlanta*, 350 U. S. 879 (1955) (*per curiam*) (golf courses); *Browder*, 352 U. S., at 903 (busing); *New Orleans City Park Improvement Assn.* v. *Detiege*, 358 U. S. 54 (1958) (*per curiam*) (public parks); *Bailey* v. *Patterson*, 369 U. S. 31 (1962) (*per curiam*) (transportation facilities); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971) (education); *Batson* v. *Kentucky*, 476 U. S. 79 (1986) (peremptory jury strikes).

These decisions reflect the "core purpose" of the Equal Protection Clause: "do[ing] away with all governmentally imposed discrimination based on race." *Palmore* v. *Sidoti*, 466 U. S. 429, 432 (1984) (footnote omitted). We have recognized that repeatedly. "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving*, 388 U. S., at 10; see also *Washington* v. *Davis*, 426 U. S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964) ("[T]he historical fact [is] that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination.").

Opinion of the Court

Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies "without regard to any differences of race, of color, or of nationality"—it is "universal in [its] application." *Yick Wo*, 118 U. S., at 369. For "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 289–290 (1978) (opinion of Powell, J.). "If both are not accorded the same protection, then it is not equal." *Id.*, at 290.

Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as "strict scrutiny." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995). Under that standard we ask, first, whether the racial classification is used to "further compelling governmental interests." *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003). Second, if so, we ask whether the government's use of race is "narrowly tailored"—meaning "necessary"—to achieve that interest. *Fisher* v. *University of Tex. at Austin*, 570 U. S. 297, 311–312 (2013) (*Fisher I*) (internal quotation marks omitted).

Outside the circumstances of these cases, our precedents have identified only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute. See, *e.g.*, *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 720 (2007); *Shaw* v. *Hunt*, 517 U. S. 899, 909–910 (1996); *post*, at 19–20, 30–31 (opinion of THOMAS, J.). The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot. See *Johnson* v. *California*, 543 U. S. 499, 512–513 (2005).[3]

───────────

[3] The first time we determined that a governmental racial classification satisfied "the most rigid scrutiny" was 10 years before *Brown* v.

Our acceptance of race-based state action has been rare for a reason. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000) (quoting *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943)). That principle cannot be overridden except in the most extraordinary case.

### B

These cases involve whether a university may make admissions decisions that turn on an applicant's race. Our Court first considered that issue in *Regents of University of California* v. *Bakke*, which involved a set-aside admissions program used by the University of California, Davis, medical school. 438 U. S., at 272–276. Each year, the school held 16 of its 100 seats open for members of certain minority groups, who were reviewed on a special admissions track separate from those in the main admissions pool. *Id.*, at

_____

*Board of Education*, 347 U. S. 483 (1954), in the infamous case *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944). There, the Court upheld the internment of "all persons of Japanese ancestry in prescribed West Coast . . . areas" during World War II because "the military urgency of the situation demanded" it. *Id.*, at 217, 223. We have since overruled *Korematsu*, recognizing that it was "gravely wrong the day it was decided." *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (slip op., at 38). The Court's decision in *Korematsu* nevertheless "demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification" and that "[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 236 (1995) (internal quotation marks omitted).

The principal dissent, for its part, claims that the Court has also permitted "the use of race when that use burdens minority populations." *Post*, at 38–39 (opinion of SOTOMAYOR, J.). In support of that claim, the dissent cites two cases that have nothing to do with the Equal Protection Clause. See *ibid.* (citing *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975) (Fourth Amendment case), and *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976) (another Fourth Amendment case)).

Opinion of the Court

272–275. The plaintiff, Allan Bakke, was denied admission two years in a row, despite the admission of minority applicants with lower grade point averages and MCAT scores. *Id.*, at 276–277. Bakke subsequently sued the school, arguing that its set-aside program violated the Equal Protection Clause.

In a deeply splintered decision that produced six different opinions—none of which commanded a majority of the Court—we ultimately ruled in part in favor of the school and in part in favor of Bakke. Justice Powell announced the Court's judgment, and his opinion—though written for himself alone—would eventually come to "serv[e] as the touchstone for constitutional analysis of race-conscious admissions policies." *Grutter*, 539 U. S., at 323.

Justice Powell began by finding three of the school's four justifications for its policy not sufficiently compelling. The school's first justification of "reducing the historic deficit of traditionally disfavored minorities in medical schools," he wrote, was akin to "[p]referring members of any one group for no reason other than race or ethnic origin." *Bakke*, 438 U. S., at 306–307 (internal quotation marks omitted). Yet that was "discrimination for its own sake," which "the Constitution forbids." *Id.*, at 307 (citing, *inter alia*, *Loving*, 388 U. S., at 11). Justice Powell next observed that the goal of "remedying . . . the effects of 'societal discrimination'" was also insufficient because it was "an amorphous concept of injury that may be ageless in its reach into the past." *Bakke*, 438 U. S., at 307. Finally, Justice Powell found there was "virtually no evidence in the record indicating that [the school's] special admissions program" would, as the school had argued, increase the number of doctors working in underserved areas. *Id.*, at 310.

Justice Powell then turned to the school's last interest asserted to be compelling—obtaining the educational benefits that flow from a racially diverse student body. That interest, in his view, was "a constitutionally permissible goal for

an institution of higher education." *Id.*, at 311–312. And
that was so, he opined, because a university was entitled as
a matter of academic freedom "to make its own judgments
as to . . . the selection of its student body." *Id.*, at 312.

But a university's freedom was not unlimited. "Racial
and ethnic distinctions of any sort are inherently suspect,"
Justice Powell explained, and antipathy toward them was
deeply "rooted in our Nation's constitutional and demo-
graphic history." *Id.*, at 291. A university could not employ
a quota system, for example, reserving "a specified number
of seats in each class for individuals from the preferred eth-
nic groups." *Id.*, at 315. Nor could it impose a "multitrack
program with a prescribed number of seats set aside for
each identifiable category of applicants." *Ibid.* And neither
still could it use race to foreclose an individual "from all
consideration . . . simply because he was not the right
color." *Id.*, at 318.

The role of race had to be cabined. It could operate only
as "a 'plus' in a particular applicant's file." *Id.*, at 317. And
even then, race was to be weighed in a manner "flexible
enough to consider all pertinent elements of diversity in
light of the particular qualifications of each applicant."
*Ibid.* Justice Powell derived this approach from what he
called the "illuminating example" of the admissions system
then used by Harvard College. *Id.*, at 316. Under that sys-
tem, as described by Harvard in a brief it had filed with the
Court, "the race of an applicant may tip the balance in his
favor just as geographic origin or a life [experience] may tip
the balance in other candidates' cases." *Ibid.* (internal quo-
tation marks omitted). Harvard continued: "A farm boy
from Idaho can bring something to Harvard College that a
Bostonian cannot offer. Similarly, a black student can usu-
ally bring something that a white person cannot offer."
*Ibid.* (internal quotation marks omitted). The result, Har-
vard proclaimed, was that "race has been"—and should
be—"a factor in some admission decisions." *Ibid.* (internal

Opinion of the Court

quotation marks omitted).

No other Member of the Court joined Justice Powell's opinion.  Four Justices instead would have held that the government may use race for the purpose of "remedying the effects of past societal discrimination."  *Id.*, at 362 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part).  Four other Justices, meanwhile, would have struck down the Davis program as violative of Title VI.  In their view, it "seem[ed] clear that the proponents of Title VI assumed that the Constitution itself required a colorblind standard on the part of government."  *Id.*, at 416 (Stevens, J., joined by Burger, C. J., and Stewart and Rehnquist, JJ., concurring in judgment in part and dissenting in part).  The Davis program therefore flatly contravened a core "principle imbedded in the constitutional *and* moral understanding of the times": the prohibition against "racial discrimination." *Id.*, at 418, n. 21 (internal quotation marks omitted).

## C

In the years that followed our "fractured decision in *Bakke*," lower courts "struggled to discern whether Justice Powell's" opinion constituted "binding precedent."  *Grutter*, 539 U. S., at 325.  We accordingly took up the matter again in 2003, in the case *Grutter* v. *Bollinger*, which concerned the admissions system used by the University of Michigan law school.  *Id.*, at 311.  There, in another sharply divided decision, the Court for the first time "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions."  *Id.*, at 325.

The Court's analysis tracked Justice Powell's in many respects.  As for compelling interest, the Court held that "[t]he Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer."  *Id.*, at 328.  In achieving that goal, however, the Court

20    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

Opinion of the Court

made clear—just as Justice Powell had—that the law
school was limited in the means that it could pursue. The
school could not "establish quotas for members of certain
racial groups or put members of those groups on separate
admissions tracks." *Id.*, at 334. Neither could it "insulate
applicants who belong to certain racial or ethnic groups
from the competition for admission." *Ibid.* Nor still could
it desire "some specified percentage of a particular group
merely because of its race or ethnic origin." *Id.*, at 329–330
(quoting *Bakke*, 438 U. S., at 307 (opinion of Powell, J.)).

These limits, *Grutter* explained, were intended to guard
against two dangers that all race-based government action
portends. The first is the risk that the use of race will de-
volve into "illegitimate . . . stereotyp[ing]." *Richmond* v. *J.
A. Croson Co.*, 488 U. S. 469, 493 (1989) (plurality opinion).
Universities were thus not permitted to operate their ad-
missions programs on the "belief that minority students al-
ways (or even consistently) express some characteristic mi-
nority viewpoint on any issue." *Grutter*, 539 U. S., at 333
(internal quotation marks omitted). The second risk is that
race would be used not as a plus, but as a negative—to dis-
criminate *against* those racial groups that were not the ben-
eficiaries of the race-based preference. A university's use
of race, accordingly, could not occur in a manner that "unduly
harm[ed] nonminority applicants." *Id.*, at 341.

But even with these constraints in place, *Grutter* ex-
pressed marked discomfort with the use of race in college
admissions. The Court stressed the fundamental principle
that "there are serious problems of justice connected with
the idea of [racial] preference itself." *Ibid.* (quoting *Bakke*,
438 U. S., at 298 (opinion of Powell, J.)). It observed that
all "racial classifications, however compelling their goals,"
were "dangerous." *Grutter*, 539 U. S., at 342. And it cau-
tioned that all "race-based governmental action" should "re-
mai[n] subject to continuing oversight to assure that it will

Opinion of the Court

work the least harm possible to other innocent persons competing for the benefit." *Id.*, at 341 (internal quotation marks omitted).

To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs. At some point, the Court held, they must end. *Id.*, at 342. This requirement was critical, and *Grutter* emphasized it repeatedly. "[A]ll race-conscious admissions programs [must] have a termination point"; they "must have reasonable durational limits"; they "must be limited in time"; they must have "sunset provisions"; they "must have a logical end point"; their "deviation from the norm of equal treatment" must be "a temporary matter." *Ibid.* (internal quotation marks omitted). The importance of an end point was not just a matter of repetition. It was the reason the Court was willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection. The Court recognized as much: "[e]nshrining a permanent justification for racial preferences," the Court explained, "would offend this fundamental equal protection principle." *Ibid.*; see also *id.,* at 342–343 (quoting N. Nathanson & C. Bartnik, The Constitutionality of Preferential Treatment for Minority Applicants to Professional Schools, 58 Chi. Bar Rec. 282, 293 (May–June 1977), for the proposition that "[i]t would be a sad day indeed, were America to become a quota-ridden society, with each identifiable minority assigned proportional representation in every desirable walk of life").

*Grutter* thus concluded with the following caution: "It has been 25 years since Justice Powell first approved the use of race to further an interest in student body diversity in the context of public higher education. . . . We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." 539 U. S., at 343.

### IV

Twenty years later, no end is in sight. "Harvard's view about when [race-based admissions will end] doesn't have a date on it." Tr. of Oral Arg. in No. 20–1199, p. 85; Brief for Respondent in No. 20–1199, p. 52. Neither does UNC's. 567 F. Supp. 3d, at 612. Yet both insist that the use of race in their admissions programs must continue.

But we have permitted race-based admissions only within the confines of narrow restrictions. University programs must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end. Respondents' admissions systems—however well intentioned and implemented in good faith—fail each of these criteria. They must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment.[4]

### A

Because "[r]acial discrimination [is] invidious in all contexts," *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 619 (1991), we have required that universities operate their race-based admissions programs in a manner that is "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny, *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 381 (2016) (*Fisher II*). "Classifying and assigning" students based on their race "requires more than . . . an amorphous end to justify it." *Parents Involved*, 551 U. S., at 735.

Respondents have fallen short of satisfying that burden.

---

[4]The United States as *amicus curiae* contends that race-based admissions programs further compelling interests at our Nation's military academies. No military academy is a party to these cases, however, and none of the courts below addressed the propriety of race-based admissions systems in that context. This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present.

Cite as: 600 U. S. ____ (2023)          23

Opinion of the Court

First, the interests they view as compelling cannot be subjected to meaningful judicial review. Harvard identifies the following educational benefits that it is pursuing: (1) "training future leaders in the public and private sectors"; (2) preparing graduates to "adapt to an increasingly pluralistic society"; (3) "better educating its students through diversity"; and (4) "producing new knowledge stemming from diverse outlooks." 980 F. 3d, at 173–174. UNC points to similar benefits, namely, "(1) promoting the robust exchange of ideas; (2) broadening and refining understanding; (3) fostering innovation and problem-solving; (4) preparing engaged and productive citizens and leaders; [and] (5) enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." 567 F. Supp. 3d, at 656.

Although these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny. At the outset, it is unclear how courts are supposed to measure any of these goals. How is a court to know whether leaders have been adequately "train[ed]"; whether the exchange of ideas is "robust"; or whether "new knowledge" is being developed? *Ibid.*; 980 F. 3d, at 173–174. Even if these goals could somehow be measured, moreover, how is a court to know when they have been reached, and when the perilous remedy of racial preferences may cease? There is no particular point at which there exists sufficient "innovation and problem-solving," or students who are appropriately "engaged and productive." 567 F. Supp. 3d, at 656. Finally, the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders Harvard would create without racial preferences, or how much poorer the education at Harvard would be, are inquiries no court could resolve.

Comparing respondents' asserted goals to interests we have recognized as compelling further illustrates their elusive nature. In the context of racial violence in a prison, for

example, courts can ask whether temporary racial segrega-
tion of inmates will prevent harm to those in the prison.
See *Johnson*, 543 U. S., at 512–513. When it comes to work-
place discrimination, courts can ask whether a race-based
benefit makes members of the discriminated class "whole
for [the] injuries [they] suffered." *Franks* v. *Bowman
Transp. Co.*, 424 U. S. 747, 763 (1976) (internal quotation
marks omitted). And in school segregation cases, courts can
determine whether any race-based remedial action pro-
duces a distribution of students "compar[able] to what it
would have been in the absence of such constitutional vio-
lations." *Dayton Bd. of Ed.* v. *Brinkman*, 433 U. S. 406, 420
(1977).

Nothing like that is possible when it comes to evaluating
the interests respondents assert here. Unlike discerning
whether a prisoner will be injured or whether an employee
should receive backpay, the question whether a particular
mix of minority students produces "engaged and productive
citizens," sufficiently "enhance[s] appreciation, respect, and
empathy," or effectively "train[s] future leaders" is stand-
ardless. 567 F. Supp. 3d, at 656; 980 F. 3d, at 173–174. The
interests that respondents seek, though plainly worthy, are
inescapably imponderable.

Second, respondents' admissions programs fail to articu-
late a meaningful connection between the means they em-
ploy and the goals they pursue. To achieve the educational
benefits of diversity, UNC works to avoid the underrepre-
sentation of minority groups, 567 F. Supp. 3d, at 591–592,
and n. 7, while Harvard likewise "guard[s] against inad-
vertent drop-offs in representation" of certain minority
groups from year to year, Brief for Respondent in No. 20–
1199, at 16. To accomplish both of those goals, in turn, the
universities measure the racial composition of their classes
using the following categories: (1) Asian; (2) Native Hawai-
ian or Pacific Islander; (3) Hispanic; (4) White; (5) African-
American; and (6) Native American. See, *e.g.*, 397

Opinion of the Court

F. Supp. 3d, at 137, 178; 3 App. in No. 20–1199, at 1278, 1280–1283; 3 App. in No. 21–707, at 1234–1241. It is far from evident, though, how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue.

For starters, the categories are themselves imprecise in many ways. Some of them are plainly overbroad: by grouping together all Asian students, for instance, respondents are apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other. Meanwhile other racial categories, such as "Hispanic," are arbitrary or undefined. See, *e.g.*, M. Lopez, J. Krogstad, & J. Passel, Pew Research Center, Who is Hispanic? (Sept. 15, 2022) (referencing the "long history of changing labels [and] shifting categories . . . reflect[ing] evolving cultural norms about what it means to be Hispanic or Latino in the U. S. today"). And still other categories are underinclusive. When asked at oral argument "how are applicants from Middle Eastern countries classified, [such as] Jordan, Iraq, Iran, [and] Egypt," UNC's counsel responded, "[I] do not know the answer to that question." Tr. of Oral Arg. in No. 21–707, p. 107; cf. *post*, at 6–7 (GORSUCH, J., concurring) (detailing the "incoherent" and "irrational stereotypes" that these racial categories further).

Indeed, the use of these opaque racial categories undermines, instead of promotes, respondents' goals. By focusing on underrepresentation, respondents would apparently prefer a class with 15% of students from Mexico over a class with 10% of students from several Latin American countries, simply because the former contains more Hispanic students than the latter. Yet "[i]t is hard to understand how a plan that could allow these results can be viewed as being concerned with achieving enrollment that is 'broadly

diverse.'" *Parents Involved*, 551 U. S., at 724 (quoting *Grutter*, 539 U. S., at 329). And given the mismatch between the means respondents employ and the goals they seek, it is especially hard to understand how courts are supposed to scrutinize the admissions programs that respondents use.

The universities' main response to these criticisms is, essentially, "trust us." None of the questions recited above need answering, they say, because universities are "owed deference" when using race to benefit some applicants but not others. Brief for University Respondents in No. 21–707, at 39 (internal quotation marks omitted). It is true that our cases have recognized a "tradition of giving a degree of deference to a university's academic decisions." *Grutter*, 539 U. S., at 328. But we have been unmistakably clear that any deference must exist "within constitutionally prescribed limits," *ibid.*, and that "deference does not imply abandonment or abdication of judicial review," *Miller–El* v. *Cockrell*, 537 U. S. 322, 340 (2003). Universities may define their missions as they see fit. The Constitution defines ours. Courts may not license separating students on the basis of race without an exceedingly persuasive justification that is measurable and concrete enough to permit judicial review. As this Court has repeatedly reaffirmed, "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) (internal quotation marks omitted). The programs at issue here do not satisfy that standard.[5]

––––––––––––

[5] For that reason, one dissent candidly advocates abandoning the demands of strict scrutiny. See *post*, at 24, 26–28 (opinion of JACKSON, J.) (arguing the Court must "get out of the way," "leav[e] well enough alone," and defer to universities and "experts" in determining who should be discriminated against). An opinion professing fidelity to history (to say nothing of the law) should surely see the folly in that approach.

Opinion of the Court

### B

The race-based admissions systems that respondents employ also fail to comply with the twin commands of the Equal Protection Clause that race may never be used as a "negative" and that it may not operate as a stereotype.

First, our cases have stressed that an individual's race may never be used against him in the admissions process. Here, however, the First Circuit found that Harvard's consideration of race has led to an 11.1% decrease in the number of Asian-Americans admitted to Harvard. 980 F. 3d, at 170, n. 29. And the District Court observed that Harvard's "policy of considering applicants' race . . . overall results in fewer Asian American and white students being admitted." 397 F. Supp. 3d, at 178.

Respondents nonetheless contend that an individual's race is never a negative factor in their admissions programs, but that assertion cannot withstand scrutiny. Harvard, for example, draws an analogy between race and other factors it considers in admission. "[W]hile admissions officers may give a preference to applicants likely to excel in the Harvard-Radcliffe Orchestra," Harvard explains, "that does not mean it is a 'negative' not to excel at a musical instrument." Brief for Respondent in No. 20–1199, at 51. But on Harvard's logic, while it gives preferences to applicants with high grades and test scores, "that does not mean it is a 'negative'" to be a student with lower grades and lower test scores. *Ibid.* This understanding of the admissions process is hard to take seriously. College admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter.

Respondents also suggest that race is not a negative factor because it does not impact many admissions decisions. See *id.*, at 49; Brief for University Respondents in No. 21–707, at 2. Yet, at the same time, respondents also maintain that the demographics of their admitted classes would

meaningfully change if race-based admissions were abandoned.  And they acknowledge that race is determinative for at least some—if not many—of the students they admit.  See, *e.g.*, Tr. of Oral Arg. in No. 20–1199, at 67; 567 F. Supp. 3d, at 633.  How else but "negative" can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?  The "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley*, 334 U. S., at 22.[6]

Respondents' admissions programs are infirm for a second reason as well.  We have long held that universities may not operate their admissions programs on the "belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." *Grutter*, 539 U. S., at 333 (internal quotation marks omitted).  That requirement is found throughout our Equal Protection Clause jurisprudence more generally.  See, *e.g.*, *Schuette* v. *BAMN*, 572 U. S. 291, 308 (2014) (plurality opinion) ("In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike . . . .'" (quoting *Shaw* v. *Reno*, 509 U. S.

—————

[6]JUSTICE JACKSON contends that race does not play a "determinative role for applicants" to UNC.  *Post*, at 24.  But even the principal dissent acknowledges that race—and race alone—explains the admissions decisions for hundreds if not thousands of applicants to UNC each year.  *Post*, at 33, n. 28 (opinion of SOTOMAYOR, J.); see also *Students for Fair Admissions, Inc.* v. *University of N. C. at Chapel Hill*, No. 1:14–cv–954 (MDNC, Dec. 21, 2020), ECF Doc. 233, at 23–27 (UNC expert testifying that race explains 1.2% of in state and 5.1% of out of state admissions decisions); 3 App. in No. 21–707, at 1069 (observing that UNC evaluated 57,225 in state applicants and 105,632 out of state applicants from 2016–2021).  The suggestion by the principal dissent that our analysis relies on extra-record materials, see *post*, at 29–30, n. 25 (opinion of SOTOMAYOR, J.), is simply mistaken.

Opinion of the Court

630, 647 (1993))).

Yet by accepting race-based admissions programs in which some students may obtain preferences on the basis of race alone, respondents' programs tolerate the very thing that *Grutter* foreswore: stereotyping. The point of respondents' admissions programs is that there is an inherent benefit in race *qua* race—in race for race's sake. Respondents admit as much. Harvard's admissions process rests on the pernicious stereotype that "a black student can usually bring something that a white person cannot offer." *Bakke*, 438 U. S., at 316 (opinion of Powell, J.) (internal quotation marks omitted); see also Tr. of Oral Arg. in No. 20–1199, at 92. UNC is much the same. It argues that race in itself "says [something] about who you are." Tr. of Oral Arg. in No. 21–707, at 97; see also *id.*, at 96 (analogizing being of a certain race to being from a rural area).

We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those "who may have little in common with one another but the color of their skin." *Shaw*, 509 U. S., at 647. The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well.

"One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice*, 528 U. S., at 517. But when a university admits students "on the basis of race, it engages in the offensive and demeaning assumption that [students] of a particular race, because of their race, think alike," *Miller* v. *Johnson*, 515 U. S. 900, 911–912 (1995) (internal quotation marks omitted)—at the very least alike in the sense of being different from nonminority students. In

doing so, the university furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Id.*, at 912 (internal quotation marks omitted). Such stereotyping can only "cause[] continued hurt and injury," *Edmonson*, 500 U. S., at 631, contrary as it is to the "core purpose" of the Equal Protection Clause, *Palmore*, 466 U. S., at 432.

### C

If all this were not enough, respondents' admissions programs also lack a "logical end point." *Grutter*, 539 U. S., at 342.

Respondents and the Government first suggest that respondents' race-based admissions programs will end when, in their absence, there is "meaningful representation and meaningful diversity" on college campuses. Tr. of Oral Arg. in No. 21–707, at 167. The metric of meaningful representation, respondents assert, does not involve any "strict numerical benchmark," *id.*, at 86; or "precise number or percentage," *id.*, at 167; or "specified percentage," Brief for Respondent in No. 20–1199, at 38 (internal quotation marks omitted). So what does it involve?

Numbers all the same. At Harvard, each full committee meeting begins with a discussion of "how the breakdown of the class compares to the prior year in terms of racial identities." 397 F. Supp. 3d, at 146. And "if at some point in the admissions process it appears that a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the Admissions Committee may decide to give additional attention to applications from students within that group." *Ibid.*; see also *id.*, at 147 (District Court finding that Harvard uses race to "trac[k] how each class is shaping up relative to previous years with an eye towards achieving a level of racial diversity"); 2 App. in No. 20–1199,

Opinion of the Court

at 821–822.

The results of the Harvard admissions process reflect this numerical commitment. For the admitted classes of 2009 to 2018, black students represented a tight band of 10.0%–11.7% of the admitted pool. The same theme held true for other minority groups:

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

Brief for Petitioner in No. 20–1199 etc., p. 23. Harvard's focus on numbers is obvious.[7]

———————
[7]The principal dissent claims that "[t]he fact that Harvard's racial shares of admitted applicants varies relatively little . . . is unsurprising and reflects the fact that the racial makeup of Harvard's applicant pool also varies very little over this period." *Post*, at 35 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted). But that is exactly the point: Harvard must use precise racial preferences year in and year out to maintain the unyielding demographic composition of its class. The dissent is thus left to attack the numbers themselves, arguing they were "handpicked" "from a truncated period." *Ibid.*, n. 29 (opinion of SOTOMAYOR, J.). As supposed proof, the dissent notes that the share of

UNC's admissions program operates similarly. The University frames the challenge it faces as "the admission and enrollment of underrepresented minorities," Brief for University Respondents in No. 21–707, at 7, a metric that turns solely on whether a group's "percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina," 567 F. Supp. 3d, at 591, n. 7; see also Tr. of Oral Arg. in No. 21–707, at 79. The University "has not yet fully achieved its diversity-related educational goals," it explains, in part due to its failure to obtain closer to proportional representation. Brief for University Respondents in No. 21–707, at 7; see also 567 F. Supp. 3d, at 594.

The problem with these approaches is well established. "[O]utright racial balancing" is "patently unconstitutional." *Fisher I*, 570 U. S., at 311 (internal quotation marks omitted). That is so, we have repeatedly explained, because "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller,* 515 U. S., at 911 (internal quotation marks omitted). By promising to terminate their use of race only when some rough percentage of various racial groups is admitted, respondents turn that principle on its head. Their admissions programs "effectively assure[] that race will always be relevant . . . and that the ultimate goal of eliminating" race as a criterion "will never be achieved." *Croson*, 488 U. S., at 495 (internal

---

Asian students at Harvard varied significantly from 1980 to 1994—a 14-year period that ended nearly three decades ago. 4 App. in No. 20–1199, at 1770. But the relevance of that observation—handpicked and truncated as it is—is lost on us. And the dissent does not and cannot dispute that the share of black and Hispanic students at Harvard—"the primary beneficiaries" of its race-based admissions policy—has remained consistent for decades. 397 F. Supp. 3d, at 178; 4 App. in No. 20–1199, at 1770. For all the talk of holistic and contextual judgments, the racial preferences at issue here in fact operate like clockwork.

Opinion of the Court

quotation marks omitted).

Respondents' second proffered end point fares no better. Respondents assert that universities will no longer need to engage in race-based admissions when, in their absence, students nevertheless receive the educational benefits of diversity. But as we have already explained, it is not clear how a court is supposed to determine when stereotypes have broken down or "productive citizens and leaders" have been created. 567 F. Supp. 3d, at 656. Nor is there any way to know whether those goals would adequately be met in the absence of a race-based admissions program. As UNC itself acknowledges, these "qualitative standard[s]" are "difficult to measure." Tr. of Oral Arg. in No. 21–707, at 78; but see *Fisher II*, 579 U. S., at 381 (requiring race-based admissions programs to operate in a manner that is "sufficiently measurable").

Third, respondents suggest that race-based preferences must be allowed to continue for at least five more years, based on the Court's statement in *Grutter* that it "expect[ed] that 25 years from now, the use of racial preferences will no longer be necessary." 539 U. S., at 343. The 25-year mark articulated in *Grutter*, however, reflected only that Court's view that race-based preferences would, by 2028, be unnecessary to ensure a requisite level of racial diversity on college campuses. *Ibid.* That expectation was oversold. Neither Harvard nor UNC believes that race-based admissions will in fact be unnecessary in five years, and both universities thus expect to continue using race as a criterion well beyond the time limit that *Grutter* suggested. See Tr. of Oral Arg. in No. 20–1199, at 84–85; Tr. of Oral Arg. in No. 21–707, at 85–86. Indeed, the high school applicants that Harvard and UNC will evaluate this fall using their race-based admissions systems are expected to graduate in 2028—25 years after *Grutter* was decided.

Finally, respondents argue that their programs need not have an end point at all because they frequently review

them to determine whether they remain necessary. See Brief for Respondent in No. 20–1199, at 52; Brief for University Respondents in No. 21–707, at 58–59. Respondents point to language in *Grutter* that, they contend, permits "the durational requirement [to] be met" with "periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." 539 U. S., at 342. But *Grutter* never suggested that periodic review could make unconstitutional conduct constitutional. To the contrary, the Court made clear that race-based admissions programs eventually had to end—despite whatever periodic review universities conducted. *Ibid.*; see also *supra*, at 18.

Here, however, Harvard concedes that its race-based admissions program has no end point. Brief for Respondent in No. 20–1199, at 52 (Harvard "has not set a sunset date" for its program (internal quotation marks omitted)). And it acknowledges that the way it thinks about the use of race in its admissions process "is the same now as it was" nearly 50 years ago. Tr. of Oral Arg. in No. 20–1199, at 91. UNC's race-based admissions program is likewise not set to expire any time soon—nor, indeed, any time at all. The University admits that it "has not set forth a proposed time period in which it believes it can end all race-conscious admissions practices." 567 F. Supp. 3d, at 612. And UNC suggests that it might soon use race to a *greater* extent than it currently does. See Brief for University Respondents in No. 21–707, at 57. In short, there is no reason to believe that respondents will—even acting in good faith—comply with the Equal Protection Clause any time soon.

## V

The dissenting opinions resist these conclusions. They would instead uphold respondents' admissions programs based on their view that the Fourteenth Amendment permits state actors to remedy the effects of societal discrimination through explicitly race-based measures. Although

Opinion of the Court

both opinions are thorough and thoughtful in many respects, this Court has long rejected their core thesis.

The dissents' interpretation of the Equal Protection Clause is not new. In *Bakke*, four Justices would have permitted race-based admissions programs to remedy the effects of societal discrimination. 438 U. S., at 362 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). But that minority view was just that—a minority view. Justice Powell, who provided the fifth vote and controlling opinion in *Bakke*, firmly rejected the notion that societal discrimination constituted a compelling interest. Such an interest presents "an amorphous concept of injury that may be ageless in its reach into the past," he explained. *Id.*, at 307. It cannot "justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries of the [race-based] admissions program are thought to have suffered." *Id.*, at 310.

The Court soon adopted Justice Powell's analysis as its own. In the years after *Bakke*, the Court repeatedly held that ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action. "[A]n effort to alleviate the effects of societal discrimination is not a compelling interest," we said plainly in *Hunt*, a 1996 case about the Voting Rights Act. 517 U. S., at 909–910. We reached the same conclusion in *Croson*, a case that concerned a preferential government contracting program. Permitting "past societal discrimination" to "serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group." 488 U. S., at 505. Opening that door would shutter another—"[t]he dream of a Nation of equal citizens . . . would be lost," we observed, "in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Id.*, at 505–506. "[S]uch a result would be contrary to both the letter and spirit of a

36    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
Opinion of the Court

constitutional provision whose central command is equal-
ity." *Id.*, at 506.

The dissents here do not acknowledge any of this. They
fail to cite *Hunt*. They fail to cite *Croson*. They fail to men-
tion that the entirety of their analysis of the Equal Protec-
tion Clause—the statistics, the cases, the history—has been
considered and rejected before. There is a reason the prin-
cipal dissent must invoke Justice Marshall's partial dissent
in *Bakke* nearly a dozen times while mentioning Justice
Powell's controlling opinion barely once (JUSTICE
JACKSON's opinion ignores Justice Powell altogether). For
what one dissent denigrates as "rhetorical flourishes about
colorblindness," *post*, at 14 (opinion of SOTOMAYOR, J.), are
in fact the proud pronouncements of cases like *Loving* and
*Yick Wo*, like *Shelley* and *Bolling*—they are defining state-
ments of law. We understand the dissents want that law to
be different. They are entitled to that desire. But they
surely cannot claim the mantle of *stare decisis* while pursu-
ing it.[8]

The dissents are no more faithful to our precedent on
race-based admissions. To hear the principal dissent tell it,
*Grutter* blessed such programs indefinitely, until "racial in-
equality will end." *Post*, at 54 (opinion of SOTOMAYOR, J.).
But *Grutter* did no such thing. It emphasized—not once or
twice, but at least six separate times—that race-based ad-

───────────

[8] Perhaps recognizing as much, the principal dissent at one point at-
tempts to press a different remedial rationale altogether, stating that
both respondents "have sordid legacies of racial exclusion." *Post*, at 21
(opinion of SOTOMAYOR, J.). Such institutions should perhaps be the very
*last* ones to be allowed to make race-based decisions, let alone be ac-
corded deference in doing so. In any event, neither university defends
its admissions system as a remedy for past discrimination—their own or
anyone else's. See Tr. of Oral Arg. in No. 21–707, at 90 ("[W]e're not
pursuing any sort of remedial justification for our policy."). Nor has any
decision of ours permitted a remedial justification for race-based college
admissions. Cf. *Bakke*, 438 U. S., at 307 (opinion of Powell, J.).

Opinion of the Court

missions programs "must have reasonable durational lim-
its" and that their "deviation from the norm of equal treat-
ment" must be "a temporary matter." 539 U. S., at 342. The
Court also disclaimed "[e]nshrining a permanent justifica-
tion for racial preferences." *Ibid.* Yet the justification for
race-based admissions that the dissent latches on to is just
that—unceasing.

The principal dissent's reliance on *Fisher II* is similarly
mistaken. There, by a 4-to-3 vote, the Court upheld a "*sui
generis*" race-based admissions program used by the Uni-
versity of Texas, 579 U. S., at 377, whose "goal" it was to
enroll a "critical mass" of certain minority students, *Fisher
I*, 570 U. S., at 297. But neither Harvard nor UNC claims
to be using the critical mass concept—indeed, the universi-
ties admit they do not even know what it means. See 1 App.
in No. 21–707, at 402 ("[N]o one has directed anybody to
achieve a critical mass, and I'm not even sure we would
know what it is." (testimony of UNC administrator)); 3 App.
in No. 20–1199, at 1137–1138 (similar testimony from Har-
vard administrator).

*Fisher II* also recognized the "enduring challenge" that
race-based admissions systems place on "the constitutional
promise of equal treatment." 579 U. S., at 388. The Court
thus reaffirmed the "continuing obligation" of universities
"to satisfy the burden of strict scrutiny." *Id.*, at 379. To
drive the point home, *Fisher II* limited itself just as *Grutter*
had—in duration. The Court stressed that its decision did
"*not* necessarily mean the University may rely on the same
policy" going forward. 579 U. S., at 388 (emphasis added);
see also *Fisher I*, 570 U. S., at 313 (recognizing that "*Grut-
ter* . . . approved the plan at issue upon concluding that it
. . . was limited in time"). And the Court openly acknowl-

edged that its decision offered limited "prospective guidance." *Fisher II*, 579 U. S., at 379.[9]

The principal dissent wrenches our case law from its context, going to lengths to ignore the parts of that law it does not like. The serious reservations that *Bakke*, *Grutter*, and *Fisher* had about racial preferences go unrecognized. The unambiguous requirements of the Equal Protection Clause—"the most rigid," "searching" scrutiny it entails—go without note. *Fisher I*, 570 U. S., at 310. And the repeated demands that race-based admissions programs must end go overlooked—contorted, worse still, into a demand that such programs never stop.

Most troubling of all is what the dissent must make these omissions to defend: a judiciary that picks winners and losers based on the color of their skin. While the dissent would certainly not permit university programs that discriminated *against* black and Latino applicants, it is perfectly willing to let the programs here continue. In its view, this Court is supposed to tell state actors when they have picked the right races to benefit. Separate but equal is "*inherently* unequal," said *Brown*. 347 U. S., at 495 (emphasis added). It depends, says the dissent.

---

[9]The principal dissent rebukes the Court for not considering adequately the reliance interests respondents and other universities had in *Grutter*. But as we have explained, *Grutter* itself limited the reliance that could be placed upon it by insisting, over and over again, that race-based admissions programs be limited in time. See *supra*, at 20. *Grutter* indeed went so far as to suggest a specific period of reliance—25 years—precluding the indefinite reliance interests that the dissent articulates. Cf. *post*, at 2–4 (KAVANAUGH, J., concurring). Those interests are, moreover, vastly overstated on their own terms. Three out of every five American universities do *not* consider race in their admissions decisions. See Brief for Respondent in No. 20–1199, p. 40. And several States—including some of the most populous (California, Florida, and Michigan)—have prohibited race-based admissions outright. See Brief for Oklahoma et al. as *Amici Curiae* 9, n. 6.

Opinion of the Court

That is a remarkable view of the judicial role—remarkably wrong. Lost in the false pretense of judicial humility that the dissent espouses is a claim to power so radical, so destructive, that it required a Second Founding to undo. "Justice Harlan knew better," one of the dissents decrees. *Post*, at 5 (opinion of JACKSON, J.). Indeed he did:

> "[I]n view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

## VI

For the reasons provided above, the Harvard and UNC admissions programs cannot be reconciled with the guarantees of the Equal Protection Clause. Both programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points. We have never permitted admissions programs to work in that way, and we will not do so today.

At the same time, as all parties agree, nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise. See, *e.g.*, 4 App. in No. 21–707, at 1725–1726, 1741; Tr. of Oral Arg. in No. 20–1199, at 10. But, despite the dissent's assertion to the contrary, universities may not simply establish through application essays or other means the regime we hold unlawful today. (A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion.) "[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows," and the prohibition against racial discrimination is "levelled at the thing,

not the name." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867). A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race.

Many universities have for too long done just the opposite. And in doing so, they have concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin. Our constitutional history does not tolerate that choice.

The judgments of the Court of Appeals for the First Circuit and of the District Court for the Middle District of North Carolina are reversed.

*It is so ordered.*

JUSTICE JACKSON took no part in the consideration or decision of the case in No. 20–1199.

Cite as: 600 U. S. ____ (2023)    1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

Nos. 20–1199 and 21–707

————

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

20–1199      *v.*

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT


STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

21–707      *v.*

UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE THOMAS, concurring.

In the wake of the Civil War, the country focused its attention on restoring the Union and establishing the legal status of newly freed slaves. The Constitution was amended to abolish slavery and proclaim that all persons born in the United States are citizens, entitled to the privileges or immunities of citizenship and the equal protection of the laws. Amdts. 13, 14. Because of that second founding, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting).

This Court's commitment to that equality principle has ebbed and flowed over time. After forsaking the principle for decades, offering a judicial *imprimatur* to segregation

and ushering in the Jim Crow era, the Court finally corrected course in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), announcing that primary schools must either desegregate with all deliberate speed or else close their doors. See also *Brown* v. *Board of Education*, 349 U. S. 294 (1955) (*Brown II*). It then pulled back in *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), permitting universities to discriminate based on race in their admissions process (though only temporarily) in order to achieve alleged "educational benefits of diversity." *Id.*, at 319. Yet, the Constitution continues to embody a simple truth: Two discriminatory wrongs cannot make a right.

I wrote separately in *Grutter*, explaining that the use of race in higher education admissions decisions—regardless of whether intended to help or to hurt—violates the Fourteenth Amendment. *Id.*, at 351 (opinion concurring in part and dissenting in part). In the decades since, I have repeatedly stated that *Grutter* was wrongly decided and should be overruled. *Fisher* v. *University of Tex. at Austin*, 570 U. S. 297, 315, 328 (2013) (concurring opinion) (*Fisher I*); *Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 389 (2016) (dissenting opinion). Today, and despite a lengthy interregnum, the Constitution prevails.

Because the Court today applies genuine strict scrutiny to the race-conscious admissions policies employed at Harvard and the University of North Carolina (UNC) and finds that they fail that searching review, I join the majority opinion in full. I write separately to offer an originalist defense of the colorblind Constitution; to explain further the flaws of the Court's *Grutter* jurisprudence; to clarify that all forms of discrimination based on race—including so-called affirmative action—are prohibited under the Constitution; and to emphasize the pernicious effects of all such discrimination.

Cite as: 600 U. S. ____ (2023)            3

THOMAS, J., concurring

I

In the 1860s, Congress proposed and the States ratified the Thirteenth and Fourteenth Amendments. And, with the authority conferred by these Amendments, Congress passed two landmark Civil Rights Acts. Throughout the debates on each of these measures, their proponents repeatedly affirmed their view of equal citizenship and the racial equality that flows from it. In fact, they held this principle so deeply that their crowning accomplishment—the Fourteenth Amendment—ensures racial equality *with no textual reference to race whatsoever*. The history of these measures' enactment renders their motivating principle as clear as their text: All citizens of the United States, regardless of skin color, are equal before the law.

I do not contend that all of the individuals who put forth and ratified the Fourteenth Amendment universally believed this to be true. Some Members of the proposing Congress, for example, opposed the Amendment. And, the historical record—particularly with respect to the debates on ratification in the States—is sparse. Nonetheless, substantial evidence suggests that the Fourteenth Amendment was passed to "establis[h] the broad constitutional principle of full and complete equality of all persons under the law," forbidding "all legal distinctions based on race or color." Supp. Brief for United States on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1 etc., p. 115 (U. S. *Brown* Reargument Brief).

This was Justice Harlan's view in his lone dissent in *Plessy*, where he observed that "[o]ur Constitution is colorblind." 163 U. S., at 559. It was the view of the Court in *Brown*, which rejected "'any authority . . . to use race as a factor in affording educational opportunities.'" *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 747 (2007). And, it is the view adopted in the Court's opinion today, requiring "the absolute equality of all citizens" under the law. *Ante*, at 10 (internal quotation

THOMAS, J., concurring

marks omitted).

### A

In its 1864 election platform, the Republican Party pledged to amend the Constitution to accomplish the "utter and complete extirpation" of slavery from "the soil of the Republic." 2 A. Schlesinger, History of U. S. Political Parties 1860–1910, p. 1303 (1973). After their landslide victory, Republicans quickly moved to make good on that promise. Congress proposed what would become the Thirteenth Amendment to the States in January 1865, and it was ratified as part of the Constitution later that year. The new Amendment stated that "[n]either slavery nor involuntary servitude . . . shall exist" in the United States "except as a punishment for crime whereof the party shall have been duly convicted." §1. It thus not only prohibited States from themselves enslaving persons, but also obligated them to end enslavement by private individuals within their borders. Its Framers viewed the text broadly, arguing that it "allowed Congress to legislate not merely against slavery itself, but against all the badges and relics of a slave system." A. Amar, America's Constitution: A Biography 362 (2005) (internal quotation marks omitted). The Amendment also authorized "Congress . . . to enforce" its terms "by appropriate legislation"—authority not granted in any prior Amendment. §2. Proponents believed this enforcement clause permitted legislative measures designed to accomplish the Amendment's broader goal of equality for the freedmen.

It quickly became clear, however, that further amendment would be necessary to safeguard that goal. Soon after the Thirteenth Amendment's adoption, the reconstructed Southern States began to enact "Black Codes," which circumscribed the newly won freedoms of blacks. The Black Code of Mississippi, for example, "imposed all sorts of disabilities" on blacks, "including limiting their freedom of

Cite as: 600 U. S. ____ (2023)          5

THOMAS, J., concurring

movement and barring them from following certain occupa-
tions, owning firearms, serving on juries, testifying in cases
involving whites, or voting." E. Foner, The Second Found-
ing 48 (2019).

Congress responded with the landmark Civil Rights Act
of 1866, 14 Stat. 27, in an attempt to pre-empt the Black
Codes. The 1866 Act promised such a sweeping form of
equality that it would lead many to say that it exceeded the
scope of Congress' authority under the Thirteenth Amend-
ment. As enacted, it stated:

> "*Be it enacted by the Senate and House of Represent-
> atives of the United States of America in Congress as-
> sembled*, That all persons born in the United States
> and not subject to any foreign power, excluding Indians
> not taxed, are hereby declared to be citizens of the
> United States; and such citizens, of every race and
> color, without regard to any previous condition of slav-
> ery or involuntary servitude, except as a punishment
> for crime whereof the party shall have been duly con-
> victed, shall have the same right, in every State and
> Territory in the United States, to make and enforce
> contracts, to sue, be parties, and give evidence, to in-
> herit, purchase, lease, sell, hold, and convey real and
> personal property, and to full and equal benefit of all
> laws and proceedings for the security of person and
> property, as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, and penalties, and to
> none other, any law, statute, ordinance, regulation, or
> custom, to the contrary notwithstanding."

The text of the provision left no doubt as to its aim: All per-
sons born in the United States were equal citizens entitled
to the same rights and subject to the same penalties as
white citizens in the categories enumerated. See M.
McConnell, Originalism and the Desegregation Decisions,
81 Va. L. Rev. 947, 958 (1995) ("Note that the bill neither

2123 of 2347

forbade racial discrimination generally nor did it guarantee particular rights to all persons. Rather, it required an equality in certain specific rights"). And, while the 1866 Act used the rights of "white citizens" as a benchmark, its rule was decidedly colorblind, safeguarding legal equality for *all* citizens "of every race and color" and providing the same rights to all.

The 1866 Act's evolution further highlights its rule of equality. To start, *Dred Scott* v. *Sandford*, 19 How. 393 (1857), had previously held that blacks "were not regarded as a portion of the people or citizens of the Government" and "had no rights which the white man was bound to respect." *Id.*, at 407, 411. The Act, however, would effectively overrule *Dred Scott* and ensure the equality that had been promised to blacks. But the Act went further still. On January 29, 1866, Senator Lyman Trumbull, the bill's principal sponsor in the Senate, proposed text stating that "all persons of African descent born in the United States are hereby declared to be citizens." Cong. Globe, 39th Cong., 1st Sess., 474. The following day, Trumbull revised his proposal, removing the reference to "African descent" and declaring more broadly that "all persons born in the United States, and not subject to any foreign Power," are "citizens of the United States." *Id.*, at 498.

"In the years before the Fourteenth Amendment's adoption, jurists and legislators often connected citizenship with equality," where "the absence or presence of one entailed the absence or presence of the other." *United States* v. *Vaello Madero*, 596 U. S. ___, ___ (2022) (THOMAS, J., concurring) (slip op., at 6). The addition of a citizenship guarantee thus evidenced an intent to broaden the provision, extending beyond recently freed blacks and incorporating a more general view of equality for *all* Americans. Indeed, the drafters later included a specific carveout for "Indians not taxed," demonstrating the breadth of the bill's other-

THOMAS, J., concurring

wise general citizenship language. 14 Stat. 27.[1] As Trumbull explained, the provision created a bond between all Americans; "any statute which is not equal to *all*, and which deprives any citizen of civil rights which are secured to other citizens," was "an unjust encroachment upon his liberty" and a "badge of servitude" prohibited by the Constitution. Cong. Globe, 39th Cong., 1st Sess., at 474 (emphasis added).

Trumbull and most of the Act's other supporters identified the Thirteenth Amendment as a principal source of constitutional authority for the Act's nondiscrimination provisions. See, *e.g.*, *id.*, at 475 (statement of Sen. Trumbull); *id.*, at 1152 (statement of Rep. Thayer); *id.*, at 503–504 (statement of Sen. Howard). In particular, they explained that the Thirteenth Amendment allowed Congress not merely to legislate against slavery itself, but also to counter measures "which depriv[e] any citizen of civil rights which are secured to other citizens." *Id.*, at 474.

But opponents argued that Congress' authority did not sweep so broadly. President Andrew Johnson, for example, contended that Congress lacked authority to pass the measure, seizing on the breadth of the citizenship text and emphasizing state authority over matters of state citizenship. See S. Doc. No. 31, 39th Cong., 1st Sess., 1, 6 (1866) (Johnson veto message). Consequently, "doubts about the constitutional authority conferred by that measure led supporters to supplement their Thirteenth Amendment arguments with other sources of constitutional authority." R. Williams, Originalism and the Other Desegregation Decision, 99 Va. L. Rev. 493, 532–533 (2013) (describing appeals to the naturalization power and the inherent power to protect

_____

[1] In fact, Indians would not be considered citizens until several decades later. Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (declaring that all Indians born in the United States are citizens).

the rights of citizens).  As debates continued, it became increasingly apparent that safeguarding the 1866 Act, including its promise of black citizenship and the equal rights that citizenship entailed, would require further submission to the people of the United States in the form of a proposed constitutional amendment.  See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 498 (statement of Sen. Van Winkle).

                                        B

    Critically, many of those who believed that Congress lacked the authority to enact the 1866 Act also supported the principle of racial equality.  So, almost immediately following the ratification of the Thirteenth Amendment, several proposals for further amendments were submitted in Congress.  One such proposal, approved by the Joint Committee on Reconstruction and then submitted to the House of Representatives on February 26, 1866, would have declared that "[t]he Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property."  *Id.*, at 1033–1034.  Representative John Bingham, its drafter, was among those who believed Congress lacked the power to enact the 1866 Act.  See *id.*, at 1291.  Specifically, he believed the "very letter of the Constitution" already required equality, but the enforcement of that requirement "is of the reserved powers of the States."  Cong. Globe, 39th Cong., 1st Sess., at 1034, 1291 (statement of Rep. Bingham).  His proposed constitutional amendment accordingly would provide a clear constitutional basis for the 1866 Act and ensure that future Congresses would be unable to repeal it.  See W. Nelson, The Fourteenth Amendment 48–49 (1988).

    Discussion of Bingham's initial draft was later postponed in the House, but the Joint Committee on Reconstruction

continued its work. See 2 K. Lash, The Reconstruction Amendments 8 (2021). In April, Representative Thaddeus Stevens proposed to the Joint Committee an amendment that began, "[n]o discrimination shall be made by any State nor by the United States as to the civil rights of persons because of race, color, or previous condition of servitude." S. Doc. No. 711, 63d Cong., 1st Sess., 31–32 (1915) (reprinting the Journal of the Joint Committee on Reconstruction for the Thirty-Ninth Congress). Stevens' proposal was later revised to read as follows: "'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'" *Id.*, at 39. This revised text was submitted to the full House on April 30, 1866. Cong. Globe, 39th Cong., 1st Sess., at 2286–2287. Like the eventual first section of the Fourteenth Amendment, this proposal embodied the familiar Privileges or Immunities, Due Process, and Equal Protection Clauses. And, importantly, it also featured an enforcement clause—with text borrowed from the Thirteenth Amendment—conferring upon Congress the power to enforce its provisions. *Ibid.*

Stevens explained that the draft was intended to "allo[w] Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate *equally* upon all." *Id.*, at 2459. Moreover, Stevens' later statements indicate that he did not believe there was a difference "in substance between the new proposal and" earlier measures calling for impartial and equal treatment without regard to race. U. S. *Brown* Reargument Brief 44 (noting a distinction only with respect to a suffrage provision). And, Bingham argued that the need for the proposed text was "one of the lessons that have been taught . . . by the history of the past four years of terrific conflict" during the Civil War. Cong. Globe, 39th Cong., 1st Sess., at 2542.

The proposal passed the House by a vote of 128 to 37. *Id.*, at 2545.

Senator Jacob Howard introduced the proposed Amendment in the Senate, powerfully asking, "Ought not the time to be now passed when one measure of justice is to be meted out to a member of one caste while another and a different measure is meted out to the member of another caste, both castes being alike citizens of the United States, both bound to obey the same laws, to sustain the burdens of the same Government, and both equally responsible to justice and to God for the deeds done in the body?" *Id.*, at 2766. In keeping with this view, he proposed an introductory sentence, declaring that "'all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside.'" *Id.*, at 2869. This text, the Citizenship Clause, was the final missing element of what would ultimately become §1 of the Fourteenth Amendment. Howard's draft for the proposed citizenship text was modeled on the Civil Rights Act of 1866's text, and he suggested the alternative language to "remov[e] all doubt as to what persons are or are not citizens of the United States," a question which had "long been a great desideratum in the jurisprudence and legislation of this country." *Id.*, at 2890. He further characterized the addition as "simply declaratory of what I regard as the law of the land already." *Ibid.*

The proposal was approved in the Senate by a vote of 33 to 11. *Id.*, at 3042. The House then reconciled differences between the two measures, approving the Senate's changes by a vote of 120 to 32. See *id.*, at 3149. And, in June 1866, the amendment was submitted to the States for their consideration and ratification. Two years later, it was ratified by the requisite number of States and became the Fourteenth Amendment to the United States Constitution. See 15 Stat. 706–707; *id.*, at 709–711. Its opening words instilled in our Nation's Constitution a new birth of freedom:

THOMAS, J., concurring

   "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." §1.

   As enacted, the text of the Fourteenth Amendment provides a firm statement of equality before the law.  It begins by guaranteeing citizenship status, invoking the "longstanding political and legal tradition that closely associated the status of citizenship with the entitlement to legal equality." *Vaello Madero*, 596 U. S., at ___ (THOMAS, J., concurring) (slip op., at 6) (internal quotation marks omitted).  It then confirms that States may not "abridge the rights of national citizenship, including whatever civil equality is guaranteed to 'citizens' under the Citizenship Clause." *Id.*, at ___, n. 3 (slip op., at 13, n. 3).  Finally, it pledges that even noncitizens must be treated equally "as individuals, and not as members of racial, ethnic, or religious groups." *Missouri* v. *Jenkins*, 515 U. S. 70, 120–121 (1995) (THOMAS, J., concurring).

   The drafters and ratifiers of the Fourteenth Amendment focused on this broad equality idea, offering surprisingly little explanation of which term was intended to accomplish which part of the Amendment's overall goal.  "The available materials . . . show," however, "that there were widespread expressions of a general understanding of the broad scope of the Amendment similar to that abundantly demonstrated in the Congressional debates, namely, that the first section of the Amendment would establish the full constitutional right of all persons to equality before the law and would prohibit legal distinctions based on race or color."

U. S. *Brown* Reargument Brief 65 (citation omitted).  For example, the Pennsylvania debate suggests that the Fourteenth Amendment was understood to make the law "what justice is represented to be, blind" to the "color of [one's] skin."  App. to Pa. Leg. Record XLVIII (1867) (Rep. Mann).

The most commonly held view today—consistent with the rationale repeatedly invoked during the congressional debates, see, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., at 2458–2469—is that the Amendment was designed to remove any doubts regarding Congress' authority to enact the Civil Rights Act of 1866 and to establish a nondiscrimination rule that could not be repealed by future Congresses.  See, *e.g.*, J. Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L. J. 1385, 1388 (1992) (noting that the "primary purpose" of the Fourteenth Amendment "was to mandate certain rules of racial equality, especially those contained in Section 1 of the Civil Rights Act of 1866").[2]  The Amendment's phrasing supports this view, and there does not appear to have been any argument to the contrary predating *Brown*.

Consistent with the Civil Rights Act of 1866's aim, the Amendment definitively overruled Chief Justice Taney's opinion in *Dred Scott* that blacks "were not regarded as a portion of the people or citizens of the Government" and "had no rights which the white man was bound to respect." 19 How., at 407, 411.  And, like the 1866 Act, the Amendment also clarified that American citizenship conferred

---

[2]There is "some support" in the history of enactment for at least "four interpretations of the first section of the proposed amendment, and in particular of its Privileges [or] Immunities Clause: it would authorize Congress to enforce the Privileges and Immunities Clause of Article IV; it would forbid discrimination between citizens with respect to fundamental rights; it would establish a set of basic rights that all citizens must enjoy; and it would make the Bill of Rights applicable to the states." D. Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406 (2008) (citing sources).  Notably, those four interpretations are all color-blind.

THOMAS, J., concurring

rights not just against the Federal Government but also the government of the citizen's State of residence. Unlike the Civil Rights Act, however, the Amendment employed a wholly race-neutral text, extending privileges or immunities to all "citizens"—even if its practical effect was to provide all citizens with the same privileges then enjoyed by whites. That citizenship guarantee was often linked with the concept of equality. *Vaello Madero*, 596 U. S., at ___ (THOMAS, J., concurring) (slip op., at 10). Combining the citizenship guarantee with the Privileges or Immunities Clause and the Equal Protection Clause, the Fourteenth Amendment ensures protection for all equal citizens of the Nation without regard to race. Put succinctly, "[o]ur Constitution is color-blind." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

<div align="center">C</div>

In the period closely following the Fourteenth Amendment's ratification, Congress passed several statutes designed to enforce its terms, eliminating government-based Black Codes—systems of government-imposed segregation—and criminalizing racially motivated violence. The marquee legislation was the Civil Rights Act of 1875, ch. 114, 18 Stat. 335–337, and the justifications offered by proponents of that measure are further evidence for the color-blind view of the Fourteenth Amendment.

The Civil Rights Act of 1875 sought to counteract the systems of racial segregation that had arisen in the wake of the Reconstruction era. Advocates of so-called separate-but-equal systems, which allowed segregated facilities for blacks and whites, had argued that laws permitting or requiring such segregation treated members of both races precisely alike: Blacks could not attend a white school, but symmetrically, whites could not attend a black school. See *Plessy*, 163 U. S., at 544 (arguing that, in light of the social

circumstances at the time, racial segregation did not "necessarily imply the inferiority of either race to the other"). Congress was not persuaded. Supporters of the soon-to-be 1875 Act successfully countered that symmetrical restrictions did not constitute equality, and they did so on colorblind terms.

For example, they asserted that "free government demands the abolition of all distinctions founded on color and race." 2 Cong. Rec. 4083 (1874). And, they submitted that "[t]he time has come when all distinctions that grew out of slavery ought to disappear." Cong. Globe, 42d Cong., 2d Sess., 3193 (1872) ("[A]s long as you have distinctions and discriminations between white and black in the enjoyment of legal rights and privileges[,] you will have discontent and parties divided between black and white"). Leading Republican Senator Charles Sumner compellingly argued that "any rule excluding a man on account of his color is an indignity, an insult, and a wrong." *Id.*, at 242; see also *ibid.* ("I insist that by the law of the land all persons without distinction of color shall be equal before the law"). Far from conceding that segregation would be perceived as inoffensive if race roles were reversed, he declared that "[t]his is plain oppression, which you . . . would feel keenly were it directed against you or your child." *Id.*, at 384. He went on to paraphrase the English common-law rule to which he subscribed: "[The law] makes no discrimination on account of color." *Id.*, at 385.

Others echoed this view. Representative John Lynch declared that "[t]he duty of the law-maker is to know no race, no color, no religion, no nationality, except to prevent distinctions on any of these grounds, so far as the law is concerned." 3 Cong. Rec. 945 (1875). Senator John Sherman believed that the route to peace was to "[w]ipe out all legal discriminations between white and black [and] make no distinction between black and white." Cong. Globe, 42d Cong., 2d Sess., at 3193. And, Senator Henry Wilson

Thomas, J., concurring

sought to "make illegal all distinctions on account of color" because "there should be no distinction recognized by the laws of the land." *Id.*, at 819; see also 3 Cong. Rec., at 956 (statement of Rep. Cain) ("[M]en [are] formed of God equally . . . . The civil-rights bill simply declares this: that there shall be no discriminations between citizens of this land so far as the laws of the land are concerned"). The view of the Legislature was clear: The Constitution "neither knows nor tolerates classes among citizens." *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting).

### D

The earliest Supreme Court opinions to interpret the Fourteenth Amendment did so in colorblind terms. Their statements characterizing the Amendment evidence its commitment to equal rights for all citizens, regardless of the color of their skin. See *ante*, at 10–11.

In the *Slaughter-House Cases*, 16 Wall. 36 (1873), the Court identified the "pervading purpose" of the Reconstruction Amendments as "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Id.*, at 67–72. Yet, the Court quickly acknowledged that the language of the Amendments did not suggest "that no one else but the negro can share in this protection." *Id.*, at 72. Rather, "[i]f Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, [the Thirteenth Amendment] may safely be trusted to make it void." *Ibid.* And, similarly, "if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be of African descent." *Ibid.*

The Court thus made clear that the Fourteenth Amendment's equality guarantee applied to members of *all* races, including Asian Americans, ensuring all citizens equal treatment under law.

Seven years later, the Court relied on the *Slaughter-House* view to conclude that "[t]he words of the [Fourteenth A]mendment . . . contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored." *Strauder* v. *West Virginia*, 100 U. S. 303, 307–308 (1880). The Court thus found that the Fourteenth Amendment banned "expres[s]" racial classifications, no matter the race affected, because these classifications are "a stimulant to . . . race prejudice." *Id.*, at 308. See also *ante*, at 10–11. Similar statements appeared in other cases decided around that time. See *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880) ("The plain object of these statutes [enacted to enforce the Fourteenth Amendment], as of the Constitution which authorized them, was to place the colored race, in respect of civil rights, upon a level with whites. They made the rights and responsibilities, civil and criminal, of the two races exactly the same"); *Ex parte Virginia*, 100 U. S. 339, 344–345 (1880) ("One great purpose of [the Thirteenth and Fourteenth Amendments] was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States").

This Court's view of the Fourteenth Amendment reached its nadir in *Plessy*, infamously concluding that the Fourteenth Amendment "could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either." 163 U. S., at 544. That holding stood in sharp contrast to the Court's earlier embrace of the Fourteenth Amendment's equality

THOMAS, J., concurring

ideal, as Justice Harlan emphasized in dissent: The Recon-
struction Amendments had aimed to remove "the race line
from our systems of governments." *Id.*, at 563. For Justice
Harlan, the Constitution was colorblind and categorically
rejected laws designed to protect "a dominant race—a supe-
rior class of citizens," while imposing a "badge of servitude"
on others. *Id.*, at 560–562.

History has vindicated Justice Harlan's view, and this
Court recently acknowledged that *Plessy* should have been
overruled immediately because it "betrayed our commit-
ment to 'equality before the law.'" *Dobbs* v. *Jackson
Women's Health Organization*, 597 U. S. ___, ___ (2022)
(slip op., at 44). Nonetheless, and despite Justice Harlan's
efforts, the era of state-sanctioned segregation persisted for
more than a half century.

E

Despite the extensive evidence favoring the colorblind
view, as detailed above, it appears increasingly in vogue to
embrace an "antisubordination" view of the Fourteenth
Amendment: that the Amendment forbids only laws that
hurt, but not help, blacks. Such a theory lacks any basis in
the original meaning of the Fourteenth Amendment. Re-
spondents cite a smattering of federal and state statutes
passed during the years surrounding the ratification of the
Fourteenth Amendment. And, JUSTICE SOTOMAYOR's dis-
sent argues that several of these statutes evidence the rat-
ifiers' understanding that the Equal Protection Clause "per-
mits consideration of race to achieve its goal." *Post*, at 6.
Upon examination, however, it is clear that these statutes
are fully consistent with the colorblind view.

Start with the 1865 Freedmen's Bureau Act. That Act
established the Freedmen's Bureau to issue "provisions,
clothing, and fuel . . . needful for the immediate and tempo-
rary shelter and supply of destitute and suffering refugees
and freedmen and their wives and children" and the setting

"apart, for the use of loyal refugees and freedmen," abandoned, confiscated, or purchased lands, and assigning "to every male citizen, whether refugee or freedman, . . . not more than forty acres of such land." Ch. 90, §§2, 4, 13 Stat. 507. The 1866 Freedmen's Bureau Act then expanded upon the prior year's law, authorizing the Bureau to care for all loyal refugees and freedmen. Ch. 200, 14 Stat. 173–174. Importantly, however, the Acts applied to *freedmen* (and refugees), a formally race-neutral category, not blacks writ large. And, because "not all blacks in the United States were former slaves," "'freedman'" was a decidedly under-inclusive proxy for race. M. Rappaport, Originalism and the Colorblind Constitution, 89 Notre Dame L. Rev. 71, 98 (2013) (Rappaport). Moreover, the Freedmen's Bureau served newly freed slaves alongside white refugees. P. Moreno, Racial Classifications and Reconstruction Legislation, 61 J. So. Hist. 271, 276–277 (1995); R. Barnett & E. Bernick, The Original Meaning of the Fourteenth Amendment 119 (2021). And, advocates of the law explicitly disclaimed any view rooted in modern conceptions of antisubordination. To the contrary, they explicitly clarified that the equality sought by the law was not one in which all men shall be "six feet high"; rather, it strove to ensure that freedmen enjoy "equal rights before the law" such that "each man shall have the right to pursue in his own way life, liberty, and happiness." Cong. Globe, 39th Cong., 1st Sess., at 322, 342.

Several additional federal laws cited by respondents appear to classify based on race, rather than previous condition of servitude. For example, an 1866 law adopted special rules and procedures for the payment of "colored" servicemen in the Union Army to agents who helped them secure bounties, pensions, and other payments that they were due. 14 Stat. 367–368. At the time, however, Congress believed that many "black servicemen were significantly overpaying for these agents' services in part because [the servicemen]

Thomas, J., concurring

did not understand how the payment system operated." Rappaport 110; see also S. Siegel, The Federal Government's Power To Enact Color-Conscious Laws: An Originalist Inquiry, 92 Nw. U. L. Rev. 477, 561 (1998). Thus, while this legislation appears to have provided a discrete race-based benefit, its aim—to prohibit race-based exploitation—may not have been possible at the time without using a racial screen. In other words, the statute's racial classifications may well have survived strict scrutiny. See Rappaport 111–112. Another law, passed in 1867, provided funds for "freedmen or destitute colored people" in the District of Columbia. Res. of Mar. 16, 1867, No. 4, 15 Stat. 20. However, when a prior version of this law targeting only blacks was criticized for being racially discriminatory, "it was defended on the grounds that there were various places in the city where former slaves . . . lived in densely populated shantytowns." Rappaport 104–105 (citing Cong. Globe, 39th Cong., 1st Sess., at 1507). Congress thus may have enacted the measure not because of race, but rather to address a special problem in shantytowns in the District where blacks lived.

These laws—even if targeting race as such—likely were also constitutionally permissible examples of Government action "undo[ing] the effects of past discrimination in [a way] that do[es] not involve classification by race," even though they had "a racially disproportionate impact." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 526 (1989) (Scalia, J., concurring in judgment) (internal quotation marks omitted). The government can plainly remedy a race-based injury that it has inflicted—though such remedies must be meant to further a colorblind government, not perpetuate racial consciousness. See *id.*, at 505 (majority opinion). In that way, "[r]ace-based government measures during the 1860's and 1870's to remedy *state-enforced slavery* were . . . not inconsistent with the colorblind Constitution." *Parents Involved*, 551 U. S., at 772, n. 19 (Thomas, J., concurring).

Moreover, the very same Congress passed both these laws *and* the unambiguously worded Civil Rights Act of 1866 that clearly prohibited discrimination on the basis of race.[3] And, as noted above, the proponents of these laws explicitly sought equal rights without regard to race while disavowing any antisubordination view.

JUSTICE SOTOMAYOR argues otherwise, pointing to "a number of race-conscious" federal laws passed around the time of the Fourteenth Amendment's enactment. *Post*, at 6 (dissenting opinion). She identifies the Freedmen's Bureau Act of 1865, already discussed above, as one such law, but she admits that the programs did not benefit blacks exclusively. She also does not dispute that legislation targeting the needs of newly freed blacks in 1865 could be understood as directly remedial. Even today, nothing prevents the States from according an admissions preference to identified victims of discrimination. See *Croson*, 488 U. S., at 526 (opinion of Scalia, J.) ("While most of the beneficiaries might be black, neither the beneficiaries nor those disadvantaged by the preference would be identified *on the basis of their race*" (emphasis in original)); see also *ante*, at 39.

JUSTICE SOTOMAYOR points also to the Civil Rights Act of 1866, which as discussed above, mandated that all citizens have the same rights as those "enjoyed by white citizens." 14 Stat. 27. But these references to the station of white citizens do not refute the view that the Fourteenth Amendment is colorblind. Rather, they specify that, in meeting the Amendment's goal of equal citizenship, States must level up. The Act did not single out a group of citizens for

---

[3] UNC asserts that the Freedmen's Bureau gave money to Berea College at a time when the school sought to achieve a 50–50 ratio of black to white students. Brief for University Respondents in No. 21–707, p. 32. But, evidence suggests that, at the relevant time, Berea conducted its admissions without distinction by race. S. Wilson, Berea College: An Illustrated History 2 (2006) (quoting Berea's first president's statement that the school "would welcome 'all races of men, without distinction'").

THOMAS, J., concurring

special treatment—rather, all citizens were meant to be treated the same as those who, at the time, had the full rights of citizenship. Other provisions of the 1866 Act reinforce this view, providing for equality in civil rights. See Rappaport 97. Most notably, §14 stated that the basic civil rights of citizenship shall be secured "without respect to race or color." 14 Stat. 176–177. And, §8 required that funds from land sales must be used to support schools "without distinction of color or race, . . . in the parishes of" the area where the land had been sold. *Id.*, at 175.

In addition to these federal laws, Harvard also points to two state laws: a South Carolina statute that placed the burden of proof on the defendant when a "colored or black" plaintiff claimed a violation, 1870 S. C. Acts pp. 387–388, and Kentucky legislation that authorized a county superintendent to aid "negro paupers" in Mercer County, 1871 Ky. Acts pp. 273–274. Even if these statutes provided race-based benefits, they do not support respondents' and JUSTICE SOTOMAYOR's view that the Fourteenth Amendment was contemporaneously understood to permit differential treatment based on race, prohibiting only caste legislation while authorizing antisubordination measures. Cf., *e.g.*, O. Fiss, Groups and the Equal Protection Clause, 5 Philos. & Pub. Aff. 107, 147 (1976) (articulating the antisubordination view); R. Siegel, Equality Talk: Antisubordination and Anticlassification Values in Constitutional Struggles Over *Brown*, 117 Harv. L. Rev. 1470, 1473, n. 8 (2004) (collecting scholarship). At most, these laws would support the kinds of discrete remedial measures that our precedents have permitted.

If services had been given only to white persons up to the Fourteenth Amendment's adoption, then providing those same services only to previously excluded black persons would work to equalize treatment against a concrete baseline of government-imposed inequality. It thus may have been the case that Kentucky's county-specific, race-based

public aid law was necessary because that particular county
was not providing certain services to local poor blacks. Sim-
ilarly, South Carolina's burden-shifting framework (where
the substantive rule being applied remained notably race
neutral) may have been necessary to streamline litigation
around the most commonly litigated type of case: a lawsuit
seeking to remedy discrimination against a member of the
large population of recently freed black Americans. See
1870 S. C. Acts, at 386 (documenting "persist[ent]" racial
discrimination by state-licensed entities).

Most importantly, however, there was a wide range of
federal and state statutes enacted at the time of the Four-
teenth Amendment's adoption and during the period there-
after that explicitly sought to discriminate *against* blacks
on the basis of race or a proxy for race. See Rappaport 113–
115. These laws, hallmarks of the race-conscious Jim Crow
era, are precisely the sort of enactments that the Framers
of the Fourteenth Amendment sought to eradicate. Yet,
proponents of an antisubordination view necessarily do not
take those laws as evidence of the Fourteenth Amendment's
true meaning. And rightly so. Neither those laws, nor a
small number of laws that appear to target blacks for pre-
ferred treatment, displace the equality vision reflected in
the history of the Fourteenth Amendment's enactment.
This is particularly true in light of the clear equality re-
quirements present in the Fourteenth Amendment's text.
See *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597
U. S. ___, ___–___ (2022) (slip op., at 26–27) (noting that
text controls over inconsistent postratification history).

## II

Properly understood, our precedents have largely ad-
hered to the Fourteenth Amendment's demand for color-
blind laws.[4] That is why, for example, courts "must subject

─────────

[4] The Court has remarked that Title VI is coextensive with the Equal
Protection Clause. See *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23

all racial classifications to the strictest of scrutiny." *Jenkins*, 515 U. S., at 121 (Thomas, J., concurring); see also *ante*, at 15, n. 4 (emphasizing the consequences of an insufficiently searching inquiry). And, in case after case, we have employed strict scrutiny vigorously to reject various forms of racial discrimination as unconstitutional. See *Fisher I*, 570 U. S., at 317–318 (Thomas, J., concurring). The Court today rightly upholds that tradition and acknowledges the consequences that have flowed from *Grutter*'s contrary approach.

Three aspects of today's decision warrant comment: First, to satisfy strict scrutiny, universities must be able to establish an actual link between racial discrimination and educational benefits. Second, those engaged in racial discrimination do not deserve deference with respect to their reasons for discriminating. Third, attempts to remedy past governmental discrimination must be closely tailored to address *that* particular past governmental discrimination.

### A

To satisfy strict scrutiny, universities must be able to establish a compelling reason to racially discriminate. *Grutter* recognized "only one" interest sufficiently compelling to justify race-conscious admissions programs: the "educational benefits of a diverse student body." 539 U. S., at 328,

———————

(2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI"); *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause"). As Justice Gorsuch points out, the language of Title VI makes no allowance for racial considerations in university admissions. See *post*, at 2–3 (concurring opinion). Though I continue to adhere to my view in *Bostock* v. *Clayton County*, 590 U. S. ___, ___–___ (2020) (Alito, J., dissenting) (slip op., at 1–54), I agree with Justice Gorsuch's concurrence in this case. The plain text of Title VI reinforces the colorblind view of the Fourteenth Amendment.

333.  Expanding on this theme, Harvard and UNC have of-
fered a grab bag of interests to justify their programs, span-
ning from "'training future leaders in the public and private
sectors'" to "'enhancing appreciation, respect, and empa-
thy,'" with references to "'better educating [their] students
through diversity'" in between.  *Ante*, at 22–23.  The Court
today finds that each of these interests are too vague and
immeasurable to suffice, *ibid.*, and I agree.

Even in *Grutter*, the Court failed to clearly define "the ed-
ucational benefits of a diverse student body."  539 U. S., at
333.  Thus, in the years since *Grutter*, I have sought to un-
derstand exactly how racial diversity yields *educational*
benefits.  With nearly 50 years to develop their arguments,
neither Harvard nor UNC—two of the foremost research in-
stitutions in the world—nor any of their *amici* can explain
that critical link.

Harvard, for example, offers a report finding that mean-
ingful representation of racial minorities promotes several
goals.  Only one of those goals—"producing new knowledge
stemming from diverse outlooks," 980 F. 3d 157, 174 (CA1
2020)—bears any possible relationship to educational ben-
efits.  Yet, it too is extremely vague and offers no indication
that, for example, student test scores increased as a result
of Harvard's efforts toward racial diversity.

More fundamentally, it is not clear how racial diversity,
as opposed to other forms of diversity, uniquely and inde-
pendently advances Harvard's goal.  This is particularly
true because Harvard blinds itself to other forms of appli-
cant diversity, such as religion.  See 2 App. in No. 20–1199,
pp. 734–743.  It may be the case that exposure to different
perspectives and thoughts can foster debate, sharpen young
minds, and hone students' reasoning skills.  But, it is not
clear how diversity with respect to race, *qua* race, furthers
this goal.  Two white students, one from rural Appalachia
and one from a wealthy San Francisco suburb, may well

THOMAS, J., concurring

have more diverse outlooks on this metric than two stu-
dents from Manhattan's Upper East Side attending its most
elite schools, one of whom is white and other of whom is
black. If Harvard cannot even *explain* the link between ra-
cial diversity and education, then surely its interest in ra-
cial diversity cannot be compelling enough to overcome the
constitutional limits on race consciousness.

UNC fares no better. It asserts, for example, an interest
in training students to "live together in a diverse society."
Brief for University Respondents in No. 21–707, p. 39. This
may well be important to a university experience, but it is
a *social* goal, not an educational one. See *Grutter*, 539 U. S.,
at 347–348 (Scalia, J., concurring in part and dissenting in
part) (criticizing similar rationales as divorced from educa-
tional goals). And, again, UNC offers no reason why seek-
ing a diverse society would not be equally supported by ad-
mitting individuals with diverse perspectives and
backgrounds, rather than varying skin pigmentation.

Nor have *amici* pointed to any concrete and quantifiable
*educational* benefits of racial diversity. The United States
focuses on alleged civic benefits, including "increasing tol-
erance and decreasing racial prejudice." Brief for United
States as *Amicus Curiae* 21–22. Yet, when it comes to edu-
cational benefits, the Government offers only one study
purportedly showing that "college diversity experiences are
significantly and positively related to cognitive develop-
ment" and that "interpersonal interactions with racial di-
versity are the most strongly related to cognitive develop-
ment." N. Bowman, College Diversity Experiences and
Cognitive Development: A Meta-Analysis, 80 Rev. Educ.
Research 4, 20 (2010). Here again, the link is, at best, ten-
uous, unspecific, and stereotypical. Other *amici* assert that
diversity (generally) fosters the even-more nebulous values
of "creativity" and "innovation," particularly in graduates'
future workplaces. See, *e.g.*, Brief for Major American Busi-