Case No. **24-6943**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————————————

GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: 53-0196603*)

———————————————————

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

———————————————————

**MR. AUSTIN'S (APPELLANT'S) EXCERPTS OF RECORD**
**VOLUME 9 of 9**

———————————————————

Mr. George Jarvis Austin,
Plaintiff-Appellant (Self-represented)
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu

ness Enterprises as *Amici Curiae* 7–9; Brief for Massachusetts Institute of Technology et al. as *Amici Curiae* 16–17 (describing experience at IBM). Yet, none of those assertions deals exclusively with *racial* diversity—as opposed to cultural or ideological diversity. And, none of those *amici* demonstrate measurable or concrete benefits that have resulted from universities' race-conscious admissions programs.

Of course, even if these universities had shown that racial diversity yielded any concrete or measurable benefits, they would still face a very high bar to show that their interest is compelling. To survive strict scrutiny, any such benefits would have to outweigh the tremendous harm inflicted by sorting individuals on the basis of race. See *Cooper* v. *Aaron*, 358 U. S. 1, 16 (1958) (following *Brown*, "law and order are not here to be preserved by depriving the Negro children of their constitutional rights"). As the Court's opinions in these cases make clear, all racial stereotypes harm and demean individuals. That is why "only those measures the State must take to provide a bulwark against anarchy, or to prevent violence, will constitute a pressing public necessity" sufficient to satisfy strict scrutiny today. *Grutter*, 539 U. S., at 353 (opinion of THOMAS, J.) (internal quotations marks omitted). Cf. *Lee* v. *Washington*, 390 U. S. 333, 334 (1968) (Black, J., concurring) (protecting prisoners from violence might justify narrowly tailored discrimination); *Croson*, 488 U. S., at 521 (opinion of Scalia, J.) ("At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb . . . can justify [racial discrimination]"). For this reason, "just as the alleged educational benefits of segregation were insufficient to justify racial discrimination [in the 1950s], see *Brown* v. *Board of Education*, the alleged educational benefits of diversity cannot justify racial discrimination today." *Fisher I*, 570 U. S., at 320 (THOMAS, J., concurring) (citation omitted).

THOMAS, J., concurring

## B

The Court also correctly refuses to defer to the universities' own assessments that the alleged benefits of race-conscious admissions programs are compelling. It instead demands that the "interests [universities] view as compelling" must be capable of being "subjected to meaningful judicial review." *Ante*, at 22. In other words, a court must be able to measure the goals asserted and determine when they have been reached. *Ante*, at 22–24. The Court's opinion today further insists that universities must be able to "articulate a meaningful connection between the means they employ and the goals they pursue." *Ante*, at 24. Again, I agree. Universities' self-proclaimed righteousness does not afford them license to discriminate on the basis of race.

In fact, it is error for a court to defer to the views of an alleged discriminator while assessing claims of racial discrimination. See *Grutter*, 539 U. S., at 362–364 (opinion of THOMAS, J.); see also *Fisher I*, 570 U. S., at 318–319 (THOMAS, J., concurring); *United States* v. *Virginia*, 518 U. S. 515, 551, n. 19 (1996) (refusing to defer to the Virginia Military Institute's judgment that the changes necessary to accommodate the admission of women would be too great and characterizing the necessary changes as "manageable"). We would not offer such deference in any other context. In employment discrimination lawsuits under Title VII of the Civil Rights Act, for example, courts require only a minimal prima facie showing by a complainant before shifting the burden onto the shoulders of the alleged-discriminator employer. See *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 803–805 (1973). And, Congress has passed numerous laws—such as the Civil Rights Act of 1875—under its authority to enforce the Fourteenth Amendment, each designed to counter discrimination and each relying on courts to bring a skeptical eye to alleged discriminators.

This judicial skepticism is vital. History has repeatedly

shown that purportedly benign discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct. Take, for example, the university respondents here. Harvard's "holistic" admissions policy began in the 1920s when it was developed to exclude Jews. See M. Synnott, The Half-Opened Door: Discrimination and Admission at Harvard, Yale, and Princeton, 1900–1970, pp. 58–59, 61, 69, 73–74 (2010). Based on *de facto* quotas that Harvard quietly implemented, the proportion of Jews in Harvard's freshman class declined from 28% as late as 1925 to just 12% by 1933. J. Karabel, The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton 172 (2005). During this same period, Harvard played a prominent role in the eugenics movement. According to then-President Abbott Lawrence Lowell, excluding Jews from Harvard would help maintain admissions opportunities for Gentiles and perpetuate the purity of the Brahmin race—New England's white, Protestant upper crust. See D. Okrent, The Guarded Gate 309, and n. * (2019).

UNC also has a checkered history, dating back to its time as a segregated university. It admitted its first black undergraduate students in 1955—but only after being ordered to do so by a court, following a long legal battle in which UNC sought to keep its segregated status. Even then, UNC did not turn on a dime: The first three black students admitted as undergraduates enrolled at UNC but ultimately earned their bachelor's degrees elsewhere. See M. Beauregard, Column: The Desegregation of UNC, The Daily Tar Heel, Feb. 16, 2022. To the extent past is prologue, the university respondents' histories hardly recommend them as trustworthy arbiters of whether racial discrimination is necessary to achieve educational goals.

Of course, none of this should matter in any event; courts have an independent duty to interpret and uphold the Constitution that no university's claimed interest may override.

THOMAS, J., concurring

See *ante*, at 26, n. 5. The Court today makes clear that, in the future, universities wishing to discriminate based on race in admissions must articulate and justify a compelling and measurable state interest based on concrete evidence. Given the strictures set out by the Court, I highly doubt any will be able to do so.

## C

In an effort to salvage their patently unconstitutional programs, the universities and their *amici* pivot to argue that the Fourteenth Amendment permits the use of race to benefit only certain racial groups—rather than applicants writ large. Yet, this is just the latest disguise for discrimination. The sudden narrative shift is not surprising, as it has long been apparent that "'diversity [was] merely the current rationale of convenience'" to support racially discriminatory admissions programs. *Grutter*, 539 U. S., at 393 (Kennedy, J., dissenting). Under our precedents, this new rationale is also lacking.

To start, the case for affirmative action has emphasized a number of rationales over the years, including: (1) restitution to compensate those who have been victimized by past discrimination, (2) fostering "diversity," (3) facilitating "integration" and the destruction of perceived racial castes, and (4) countering longstanding and diffuse racial prejudice. See R. Kennedy, For Discrimination: Race, Affirmative Action, and the Law 78 (2013); see also P. Schuck, Affirmative Action: Past, Present, and Future, 20 Yale L. & Pol'y Rev. 1, 22–46 (2002). Again, this Court has only recognized one interest as compelling: the educational benefits of diversity embraced in *Grutter*. Yet, as the universities define the "diversity" that they practice, it encompasses social and aesthetic goals far afield from the education-based interest discussed in *Grutter*. See *supra*, at 23. The dissents too attempt to stretch the diversity rationale, suggesting that it supports broad remedial interests. See, *e.g.*, *post*,

at 23, 43, 67 (opinion of SOTOMAYOR, J.) (noting that UNC's black admissions percentages "do not reflect the diversity of the State"; equating the diversity interest under the Court's precedents with a goal of "integration in higher education" more broadly; and warning of "the dangerous consequences of an America where its leadership does not reflect the diversity of the People"); *post*, at 23 (opinion of JACKSON, J.) (explaining that diversity programs close wealth gaps). But language—particularly the language of controlling opinions of this Court—is not so elastic. See J. Pieper, Abuse of Language—Abuse of Power 23 (L. Krauth transl. 1992) (explaining that propaganda, "in contradiction to the nature of language, intends not to communicate but to manipulate" and becomes an "[i]nstrument of power" (emphasis deleted)).

The Court refuses to engage in this lexicographic drift, seeing these arguments for what they are: a remedial rationale in disguise. See *ante*, at 34–35. As the Court points out, the interest for which respondents advocate has been presented to and rejected by this Court many times before. In *Regents of University of California* v. *Bakke*, 438 U. S. 265 (1978), the University of California made clear its rationale for the quota system it had established: It wished to "counteract effects of generations of pervasive discrimination" against certain minority groups. Brief for Petitioner, O. T. 1977, No. 76–811, p. 2. But, the Court rejected this distinctly remedial rationale, with Justice Powell adopting in its place the familiar "diversity" interest that appeared later in *Grutter*. See *Bakke*, 438 U. S., at 306 (plurality opinion). The Court similarly did not adopt the broad remedial rationale in *Grutter*; and it rejects it again today. Newly and often minted theories cannot be said to be commanded by our precedents.

Indeed, our precedents have repeatedly and soundly distinguished between programs designed to compensate vic-

THOMAS, J., concurring

tims of past governmental discrimination from so-called benign race-conscious measures, such as affirmative action. *Croson*, 488 U. S., at 504–505; *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 226–227 (1995). To enforce that distinction, our precedents explicitly require that any attempt to compensate victims of past governmental discrimination must be concrete and traceable to the *de jure* segregated system, which must have some discrete and continuing discriminatory effect that warrants a present remedy. See *United States* v. *Fordice*, 505 U. S. 717, 731 (1992). Today's opinion for the Court reaffirms the need for such a close remedial fit, hewing to the same line we have consistently drawn. *Ante*, at 24–25.

Without such guardrails, the Fourteenth Amendment would become self-defeating, promising a Nation based on the equality ideal but yielding a quota- and caste-ridden society steeped in race-based discrimination. Even *Grutter* itself could not tolerate this outcome. It accordingly imposed a time limit for its race-based regime, observing that "'a core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race.'" 539 U. S., at 341–342 (quoting *Palmore* v. *Sidoti*, 466 U. S. 429, 432 (1984); alterations omitted).

The Court today enforces those limits. And rightly so. As noted above, both Harvard and UNC have a history of racial discrimination. But, neither have even attempted to explain how their current racially discriminatory programs are even remotely traceable to their past discriminatory conduct. Nor could they; the current race-conscious admissions programs take no account of ancestry and, at least for Harvard, likely have the effect of discriminating against some of the very same ethnic groups against which Harvard previously discriminated (*i.e.*, Jews and those who are not part of the white elite). All the while, Harvard and UNC ask us to blind ourselves to the burdens imposed on the millions of innocent applicants denied admission because of

their membership in a currently disfavored race.

The Constitution neither commands nor permits such a result. "Purchased at the price of immeasurable human suffering," the Fourteenth Amendment recognizes that classifications based on race lead to ruinous consequences for individuals and the Nation. *Adarand Constructors, Inc.*, 515 U. S., at 240 (THOMAS, J., concurring in part and concurring in judgment). Consequently, "*all*" racial classifications are "inherently suspect," *id.*, at 223–224 (majority opinion) (emphasis added; internal quotation marks omitted), and must be subjected to the searching inquiry conducted by the Court, *ante*, at 21–34.

### III

Both experience and logic have vindicated the Constitution's colorblind rule and confirmed that the universities' new narrative cannot stand. Despite the Court's hope in *Grutter* that universities would voluntarily end their race-conscious programs and further the goal of racial equality, the opposite appears increasingly true. Harvard and UNC now forthrightly state that they racially discriminate when it comes to admitting students, arguing that such discrimination is consistent with this Court's precedents. And they, along with today's dissenters, defend that discrimination as *good*. More broadly, it is becoming increasingly clear that discrimination on the basis of race—often packaged as "affirmative action" or "equity" programs—are based on the benighted notion "that it is possible to tell when discrimination helps, rather than hurts, racial minorities." *Fisher I*, 570 U. S., at 328 (THOMAS, J., concurring).

We cannot be guided by those who would desire less in our Constitution, or by those who would desire more. "The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and

makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, 539 U. S., at 353 (opinion of THOMAS, J.).

## A

The Constitution's colorblind rule reflects one of the core principles upon which our Nation was founded: that "all men are created equal." Those words featured prominently in our Declaration of Independence and were inspired by a rich tradition of political thinkers, from Locke to Montesquieu, who considered equality to be the foundation of a just government. See, *e.g.*, J. Locke, Second Treatise of Civil Government 48 (J. Gough ed. 1948); T. Hobbes, Leviathan 98 (M. Oakeshott ed. 1962); 1 B. Montesquieu, The Spirit of Laws 121 (T. Nugent transl., J. Prichard ed. 1914). Several Constitutions enacted by the newly independent States at the founding reflected this principle. For example, the Virginia Bill of Rights of 1776 explicitly affirmed "[t]hat all men are by nature equally free and independent, and have certain inherent rights." Ch. 1, §1. The State Constitutions of Massachusetts, Pennsylvania, and New Hampshire adopted similar language. Pa. Const., Art. I (1776), in 2 Federal and State Constitutions 1541 (P. Poore ed. 1877); Mass. Const., Art. I (1780), in 1 *id.*, at 957; N. H. Const., Art. I (1784), in 2 *id.*, at 1280.[5] And, prominent Founders

––––––––––

[5] In fact, the Massachusetts Supreme Court in 1783 declared that slavery was abolished in Massachusetts by virtue of the newly enacted Constitution's provision of equality under the law. See *The Quock Walker Case*, in 1 H. Commager, Documents of American History 110 (9th ed. 1973) (Cushing, C. J.) ("[W]hatever sentiments have formerly prevailed in this particular or slid in upon us by the example of others, a different idea has taken place with the people of America, more favorable to the natural rights of mankind, and to that natural, innate desire of Liberty . . . . And upon this ground our Constitution of Government . . . sets out with declaring that all men are born free and equal . . . and in short is totally repugnant to the idea of being born slaves").

publicly mused about the need for equality as the foundation for government. *E.g.*, 1 Cong. Register 430 (T. Lloyd ed. 1789) (Madison, J.); 1 Letters and Other Writings of James Madison 164 (J. Lippincott ed. 1867); N. Webster, The Revolution in France, in 2 Political Sermons of the Founding Era, 1730–1805, pp. 1236–1299 (1998). As Jefferson declared in his first inaugural address, "the minority possess their equal rights, which equal law must protect." First Inaugural Address (Mar. 4, 1801), in 8 The Writings of Thomas Jefferson 4 (Washington ed. 1854).

Our Nation did not initially live up to the equality principle. The institution of slavery persisted for nearly a century, and the United States Constitution itself included several provisions acknowledging the practice. The period leading up to our second founding brought these flaws into bold relief and encouraged the Nation to finally make good on the equality promise. As Lincoln recognized, the promise of equality extended to *all people*—including immigrants and blacks whose ancestors had taken no part in the original founding. See Speech at Chicago, Ill. (July 10, 1858), in 2 The Collected Works of Abraham Lincoln 488–489, 499 (R. Basler ed. 1953). Thus, in Lincoln's view, "'the natural rights enumerated in the Declaration of Independence'" extended to blacks as his "'equal,'" and "'the equal of every living man.'" The Lincoln-Douglas Debates 285 (H. Holzer ed. 1993).

As discussed above, the Fourteenth Amendment reflected that vision, affirming that equality and racial discrimination cannot coexist. Under that Amendment, the color of a person's skin is irrelevant to that individual's equal status as a citizen of this Nation. To treat him differently on the basis of such a legally irrelevant trait is therefore a deviation from the equality principle and a constitutional injury.

Of course, even the promise of the second founding took time to materialize. Seeking to perpetuate a segregationist

THOMAS, J., concurring

system in the wake of the Fourteenth Amendment's ratification, proponents urged a "separate but equal" regime. They met with initial success, ossifying the segregationist view for over a half century. As this Court said in *Plessy*:

> "A statute which implies merely a legal distinction between the white and colored races—a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color—has no tendency to destroy the legal equality of the two races, or reestablish a state of involuntary servitude." 163 U. S., at 543.

Such a statement, of course, is precisely antithetical to the notion that all men, regardless of the color of their skin, are born equal and must be treated equally under the law. Only one Member of the Court adhered to the equality principle; Justice Harlan, standing alone in dissent, wrote: "Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law." *Id.*, at 559. Though Justice Harlan rightly predicted that *Plessy* would, "in time, prove to be quite as pernicious as the decision made . . . in the *Dred Scott* case," the *Plessy* rule persisted for over a half century. *Ibid.* While it remained in force, Jim Crow laws prohibiting blacks from entering or utilizing public facilities such as schools, libraries, restaurants, and theaters sprang up across the South.

This Court rightly reversed course in *Brown* v. *Board of Education*. The *Brown* appellants—those challenging segregated schools—embraced the equality principle, arguing that "[a] racial criterion is a constitutional irrelevance, and is not saved from condemnation even though dictated by a sincere desire to avoid the possibility of violence or race friction." Brief for Appellants in *Brown* v. *Board of Education*,

O. T. 1952, No. 1, p. 7 (citation omitted).[6]  Embracing that
view, the Court held that "in the field of public education
the doctrine of 'separate but equal' has no place" and
"[s]eparate educational facilities are inherently unequal."
*Brown*, 347 U. S., at 493, 495.  Importantly, in reaching this
conclusion, *Brown* did not rely on the particular qualities of
the Kansas schools.  The mere separation of students on the
basis of race—the "*segregation* complained of," *id.*, at 495
(emphasis added)—constituted a constitutional injury.  See
*ante*, at 12 ("Separate cannot be equal").

Just a few years later, the Court's application of *Brown*
made explicit what was already forcefully implied: "[O]ur
decisions have foreclosed any possible contention that . . . a
statute or regulation" fostering segregation in public facili-
ties "may stand consistently with the Fourteenth Amend-
ment."  *Turner* v. *Memphis*, 369 U. S. 350, 353 (1962) (*per
curiam*); cf. A. Blaustein & C. Ferguson, Desegregation and
the Law: The Meaning and Effect of the School Segregation
Cases 145 (rev. 2d ed. 1962) (arguing that the Court in
*Brown* had "adopt[ed] a constitutional standard" declaring
"that all classification by race is unconstitutional *per se*").

Today, our precedents place this principle beyond ques-
tion.  In assessing racial segregation during a race-
motivated prison riot, for example, this Court applied strict
scrutiny without requiring an allegation of unequal treat-
ment among the segregated facilities.  *Johnson* v. *Califor-
nia*, 543 U. S. 499, 505–506 (2005).  The Court today reaf-
firms the rule, stating that, following *Brown*, "[t]he time for

---

[6] Briefing in a case consolidated with *Brown* stated the colorblind posi-
tion forthrightly: Classifications "[b]ased [s]olely on [r]ace or [c]olor" "can
never be" constitutional. Juris. Statement in *Briggs* v. *Elliott*, O. T. 1951,
No. 273, pp. 20–21, 25, 29; see also Juris. Statement in *Davis* v. *County
School Bd. of Prince Edward Cty.*, O. T. 1952, No. 191, p. 8 ("Indeed, we
take the unqualified position that the Fourteenth Amendment has to-
tally stripped the state of power to make race and color the basis for gov-
ernmental action. . . .  For this reason alone, we submit, the state sepa-
rate school laws in this case must fall").

THOMAS, J., concurring

making distinctions based on race had passed." *Ante*, at 13. "What was wrong" when the Court decided *Brown* "in 1954 cannot be right today." *Parents Involved*, 551 U. S., at 778 (THOMAS, J., concurring). Rather, we must adhere to the promise of equality under the law declared by the Declaration of Independence and codified by the Fourteenth Amendment.

## B

Respondents and the dissents argue that the universities' race-conscious admissions programs ought to be permitted because they accomplish positive social goals. I would have thought that history had by now taught a "greater humility" when attempting to "distinguish good from harmful uses of racial criteria." *Id.*, at 742 (plurality opinion). From the Black Codes, to discriminatory and destructive social welfare programs, to discrimination by individual government actors, bigotry has reared its ugly head time and again. Anyone who today thinks that some form of racial discrimination will prove "helpful" should thus tread cautiously, lest racial discriminators succeed (as they once did) in using such language to disguise more invidious motives.

Arguments for the benefits of race-based solutions have proved pernicious in segregationist circles. Segregated universities once argued that race-based discrimination was needed "to preserve harmony and peace and at the same time furnish equal education to both groups." Brief for Respondents in *Sweatt* v. *Painter*, O. T. 1949, No. 44, p. 94; see also *id.*, at 79 ("'[T]he *mores* of racial relationships are such as to rule out, for the present at least, any possibility of admitting white persons and Negroes to the same institutions'"). And, parties consistently attempted to convince the Court that the time was not right to disrupt segregationist systems. See Brief for Appellees in *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, O. T. 1949, No. 34, p. 12 (claiming that a holding rejecting separate but equal

would "necessarily result . . . [i]n the *abandoning* of many of the state's existing educational establishments" and the "*crowding* of other such establishments"); Brief for State of Kansas on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1, p. 56 ("We grant that segregation may not be the ethical or political ideal. At the same time we recognize that practical considerations may prevent realization of the ideal"); Tr. of Oral Arg. in *Davis* v. *School Bd. of Prince Edward Cty.*, O. T. 1954, No. 3, p. 208 ("We are up against the proposition: What does the Negro profit if he procures an immediate detailed decree from this Court now and then impairs or mars or destroys the public school system in Prince Edward County"). Litigants have even gone so far as to offer straight-faced arguments that segregation has practical benefits. Brief for Respondents in *Sweatt* v. *Painter*, at 77–78 (requesting deference to a state law, observing that "'the necessity for such separation [of the races] still exists in the interest of public welfare, safety, harmony, health, and recreation . . .'" and remarking on the reasonableness of the position); Brief for Appellees in *Davis* v. *County School Bd. of Prince Edward Cty.*, O. T. 1952, No. 3, p. 17 ("Virginia has established segregation in certain fields as a part of her public policy to prevent violence and reduce resentment. The result, in the view of an overwhelming Virginia majority, has been to improve the relationship between the different races"); *id.*, at 25 ("If segregation be stricken down, the general welfare will be definitely harmed . . . there would be more friction developed" (internal quotation marks omitted)). In fact, slaveholders once "argued that slavery was a 'positive good' that civilized blacks and elevated them in every dimension of life," and "segregationists similarly asserted that segregation was not only benign, but good for black students." *Fisher I*, 570 U. S., at 328–329 (THOMAS, J., concurring).

"Indeed, if our history has taught us anything, it has

taught us to beware of elites bearing racial theories." *Parents Involved*, 551 U. S., at 780–781 (THOMAS, J., concurring). We cannot now blink reality to pretend, as the dissents urge, that affirmative action should be legally permissible merely because the experts assure us that it is "good" for black students. Though I do not doubt the sincerity of my dissenting colleagues' beliefs, experts and elites have been wrong before—and they may prove to be wrong again. In part for this reason, the Fourteenth Amendment outlaws government-sanctioned racial discrimination of all types. The stakes are simply too high to gamble.[7] Then, as now, the views that motivated *Dred Scott* and *Plessy* have not been confined to the past, and we must remain ever vigilant against *all* forms of racial discrimination.

## C

Even taking the desire to help on its face, what initially seems like aid may in reality be a burden, including for the very people it seeks to assist. Take, for example, the college admissions policies here. "Affirmative action" policies do nothing to increase the overall number of blacks and Hispanics able to access a college education. Rather, those racial policies simply redistribute individuals among institutions of higher learning, placing some into more competitive institutions than they otherwise would have attended. See

---

[7] Indeed, the lawyers who litigated *Brown* were unwilling to take this bet, insisting on a colorblind legal rule. See, *e.g.*, Supp. Brief for Appellants on Reargument in Nos. 1, 2, and 4, and for Respondents in No. 10, in *Brown* v. *Board of Education*, O. T. 1953, p. 65 ("That the Constitution is color blind is our dedicated belief"); Brief for Appellants in *Brown* v. *Board of Education*, O. T. 1952, No. 1, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone"). In fact, Justice Marshall viewed Justice Harlan's *Plessy* dissent as "a 'Bible' to which he turned during his most depressed moments"; no opinion "buoyed Marshall more in his pre-*Brown* days." In Memoriam: Honorable Thurgood Marshall, Proceedings of the Bar and Officers of the Supreme Court of the United States, p. X (1993) (remarks of Judge Motley).

T. Sowell, Affirmative Action Around the World 145–146 (2004). In doing so, those policies sort at least some blacks and Hispanics into environments where they are less likely to succeed academically relative to their peers. *Ibid.* The resulting mismatch places "many blacks and Hispanics who likely would have excelled at less elite schools . . . in a position where underperformance is all but inevitable because they are less academically prepared than the white and Asian students with whom they must compete." *Fisher I*, 570 U. S., at 332 (THOMAS, J., concurring).

It is self-evident why that is so. As anyone who has labored over an algebra textbook has undoubtedly discovered, academic advancement results from hard work and practice, not mere declaration. Simply treating students as though their grades put them at the top of their high school classes does nothing to enhance the performance level of those students or otherwise prepare them for competitive college environments. In fact, studies suggest that large racial preferences for black and Hispanic applicants have led to a disproportionately large share of those students receiving mediocre or poor grades once they arrive in competitive collegiate environments. See, *e.g.*, R. Sander, A Systemic Analysis of Affirmative Action in American Law Schools, 57 Stan. L. Rev. 367, 371–372 (2004); see also R. Sander & R. Steinbuch, Mismatch and Bar Passage: A School-Specific Analysis (Oct. 6, 2017), https://ssrn.com/abstract=3054208. Take science, technology, engineering, and mathematics (STEM) fields, for example. Those students who receive a large admissions preference are more likely to drop out of STEM fields than similarly situated students who did not receive such a preference. F. Smith & J. McArdle, Ethnic and Gender Differences in Science Graduation at Selective Colleges With Implications for Admission Policy and College Choice, 45 Research in Higher Ed. 353 (2004). "Even if most minority students are able to meet the normal standards at the 'average' range of colleges

THOMAS, J., concurring

and universities, the systematic mismatching of minority students begun at the top can mean that such students are generally overmatched throughout all levels of higher education." T. Sowell, Race and Culture 176–177 (1994).[8]

These policies may harm even those who succeed academically. I have long believed that large racial preferences in college admissions "stamp [blacks and Hispanics] with a badge of inferiority." *Adarand*, 515 U. S., at 241 (opinion of THOMAS, J.). They thus "tain[t] the accomplishments of all those who are admitted as a result of racial discrimination" as well as "all those who are the same race as those admitted as a result of racial discrimination" because "no one can distinguish those students from the ones whose race played a role in their admission." *Fisher I*, 570 U. S., at 333 (opinion of THOMAS, J.). Consequently, "[w]hen blacks" and, now, Hispanics "take positions in the highest places of government, industry, or academia, it is an open question . . . whether their skin color played a part in their advancement." *Grutter*, 539 U. S., at 373 (THOMAS, J., concurring). "The question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those . . . who would succeed without discrimination." *Ibid.*

––––––––––

[8] JUSTICE SOTOMAYOR rejects this mismatch theory as "debunked long ago," citing an *amicus* brief. *Post*, at 56. But, in 2016, the Journal of Economic Literature published a review of mismatch literature—coauthored by a critic and a defender of affirmative action—which concluded that the evidence for mismatch was "fairly convincing." P. Arcidiacono & M. Lovenheim, Affirmative Action and the Quality-Fit Tradeoff, 54 J. Econ. Lit. 3, 20 (Arcidiacono & Lovenheim). And, of course, if universities wish to refute the mismatch theory, they need only release the data necessary to test its accuracy. See Brief for Richard Sander as *Amicus Curiae* 16–19 (noting that universities have been unwilling to provide the necessary data concerning student admissions and outcomes); accord, Arcidiacono & Lovenheim 20 ("Our hope is that better datasets soon will become available").

Yet, in the face of those problems, it seems increasingly clear that universities are focused on "aesthetic" solutions unlikely to help deserving members of minority groups. In fact, universities' affirmative action programs are a particularly poor use of such resources. To start, these programs are overinclusive, providing the same admissions bump to a wealthy black applicant given every advantage in life as to a black applicant from a poor family with seemingly insurmountable barriers to overcome. In doing so, the programs may wind up helping the most well-off members of minority races without meaningfully assisting those who struggle with real hardship. Simultaneously, the programs risk continuing to ignore the academic underperformance of "the purported 'beneficiaries'" of racial preferences and the racial stigma that those preferences generate. *Grutter*, 539 U. S., at 371 (opinion of THOMAS, J.). Rather than performing their academic mission, universities thus may "see[k] only a facade—it is sufficient that the class looks right, even if it does not perform right." *Id.*, at 372.

## D

Finally, it is not even theoretically possible to "help" a certain racial group without causing harm to members of other racial groups. "It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others." *Adarand*, 515 U. S., at 241, n. * (opinion of THOMAS, J.). And, even purportedly benign race-based discrimination has secondary effects on members of other races. The antisubordination view thus has never guided the Court's analysis because "whether a law relying upon racial taxonomy is 'benign' or 'malign' either turns on 'whose ox is gored' or on distinctions found only in the eye of the beholder." *Ibid.* (citations and some internal quotation marks omitted). Courts are not suited to the impossible task of determining which racially discriminatory programs are helping which members of which races—and

THOMAS, J., concurring

whether those benefits outweigh the burdens thrust onto other racial groups.

As the Court's opinion today explains, the zero-sum nature of college admissions—where students compete for a finite number of seats in each school's entering class—aptly demonstrates the point. *Ante*, at 27.[9] Petitioner here represents Asian Americans who allege that, at the margins, Asian applicants were denied admission because of their race. Yet, Asian Americans can hardly be described as the beneficiaries of historical racial advantages. To the contrary, our Nation's first immigration ban targeted the Chinese, in part, based on "worker resentment of the low wage rates accepted by Chinese workers." U. S. Commission on Civil Rights, Civil Rights Issues Facing Asian Americans in the 1990s, p. 3 (1992) (Civil Rights Issues); Act of May 6, 1882, ch. 126, 22 Stat. 58–59.

In subsequent years, "strong anti-Asian sentiments in the Western States led to the adoption of many discriminatory laws at the State and local levels, similar to those aimed at blacks in the South," and "segregation in public facilities, including schools, was quite common until after the Second World War." Civil Rights Issues 7; see also S. Hinnershitz, A Different Shade of Justice: Asian American

---

[9] JUSTICE SOTOMAYOR apparently believes that race-conscious admission programs can somehow increase the chances that members of certain races (blacks and Hispanics) are admitted without decreasing the chances of admission for members of other races (Asians). See *post*, at 58–59. This simply defies mathematics. In a zero-sum game like college admissions, any sorting mechanism that takes race into account in any way, see *post*, at 27 (opinion of JACKSON, J.) (defending such a system), has discriminated based on race to the benefit of some races and the detriment of others. And, the universities here admit that race is determinative in at least some of their admissions decisions. See, *e.g.*, Tr. of Oral Arg. in No. 20–1199, at 67; 567 F. Supp. 3d 580, 633 (MDNC 2021); see also 397 F. Supp. 3d 126, 178 (Mass. 2019) (noting that, for Harvard, "race is a determinative tip for" a significant percentage "of all admitted African American and Hispanic applicants"); *ante*, at 5, n. 1 (describing the role that race plays in the universities' admissions processes).

Civil Rights in the South 21 (2017) (explaining that while
both Asians and blacks have at times fought "against simi-
lar forms of discrimination," "[t]he issues of citizenship and
immigrant status often defined Asian American battles for
civil rights and separated them from African American le-
gal battles"). Indeed, this Court even sanctioned this seg-
regation—in the context of schools, no less. In *Gong Lum*
v. *Rice*, 275 U. S. 78, 81–82, 85–87 (1927), the Court held
that a 9-year-old Chinese-American girl could be denied en-
try to a "white" school because she was "a member of the
Mongolian or yellow race."

Also, following the Japanese attack on the U. S. Navy
base at Pearl Harbor, Japanese Americans in the American
West were evacuated and interned in relocation camps. See
Exec. Order No. 9066, 3 CFR 1092 (1943). Over 120,000
were removed to camps beginning in 1942, and the last
camp that held Japanese Americans did not close until
1948. National Park Service, Japanese American Life Dur-
ing Internment, www.nps.gov/articles/japanese-american-
internment-archeology.htm. In the interim, this Court en-
dorsed the practice. *Korematsu* v. *United States*, 323 U. S.
214 (1944).

Given the history of discrimination against Asian Ameri-
cans, especially their history with segregated schools, it
seems particularly incongruous to suggest that a past his-
tory of segregationist policies toward blacks should be rem-
edied at the expense of Asian American college applicants.[10]
But this problem is not limited to Asian Americans; more

_____

[10] Even beyond Asian Americans, it is abundantly clear that the uni-
versity respondents' racial categories are vastly oversimplistic, as the
opinion of the Court and JUSTICE GORSUCH's concurrence make clear. See
*ante*, at 24–25; *post*, at 5–7 (opinion of GORSUCH, J.). Their "affirmative
action" programs do not help Jewish, Irish, Polish, or other "white"
ethnic groups whose ancestors faced discrimination upon arrival in
America, any more than they help the descendants of those Japanese-
American citizens interned during World War II.

Thomas, J., concurring

broadly, universities' discriminatory policies burden millions of applicants who are not responsible for the racial discrimination that sullied our Nation's past. That is why, "[i]n the absence of special circumstances, the remedy for *de jure* segregation ordinarily should not include educational programs for students who were not in school (or even alive) during the period of segregation." *Jenkins*, 515 U. S., at 137 (Thomas, J., concurring). Today's 17-year-olds, after all, did not live through the Jim Crow era, enact or enforce segregation laws, or take any action to oppress or enslave the victims of the past. Whatever their skin color, today's youth simply are not responsible for instituting the segregation of the 20th century, and they do not shoulder the moral debts of their ancestors. Our Nation should not punish today's youth for the sins of the past.

## IV

Far from advancing the cause of improved race relations in our Nation, affirmative action highlights our racial differences with pernicious effect. In fact, recent history reveals a disturbing pattern: Affirmative action policies appear to have prolonged the asserted need for racial discrimination. Parties and *amici* in these cases report that, in the nearly 50 years since *Bakke*, 438 U. S. 265, racial progress on campuses adopting affirmative action admissions policies has stagnated, including making no meaningful progress toward a colorblind goal since *Grutter*. See *ante*, at 21–22. Rather, the legacy of *Grutter* appears to be ever increasing and strident demands for *yet more* racially oriented solutions.

## A

It has become clear that sorting by race does not stop at the admissions office. In his *Grutter* opinion, Justice Scalia criticized universities for "talk[ing] of multiculturalism and

racial diversity," but supporting "tribalism and racial seg-
regation on their campuses," including through "minority
only student organizations, separate minority housing op-
portunities, separate minority student centers, even sepa-
rate minority-only graduation ceremonies." 539 U. S., at
349 (opinion concurring in part and dissenting in part).
This trend has hardly abated with time, and today, such
programs are commonplace. See Brief for Gail Heriot et al.
as *Amici Curiae* 9. In fact, a recent study considering 173
schools found that 43% of colleges offered segregated hous-
ing to students of different races, 46% offered segregated
orientation programs, and 72% sponsored segregated grad-
uation ceremonies. D. Pierre & P. Wood, Neo-Segregation
at Yale 16–17 (2019); see also D. Pierre, Demands for Seg-
regated Housing at Williams College Are Not News, Nat.
Rev., May 8, 2019. In addition to contradicting the univer-
sities' claims regarding the need for interracial interaction,
see Brief for National Association of Scholars as *Amicus Cu-
riae* 4–12, these trends increasingly encourage our Nation's
youth to view racial differences as important and segrega-
tion as routine.

Meanwhile, these discriminatory policies risk creating
new prejudices and allowing old ones to fester. I previously
observed that "[t]here can be no doubt" that discriminatory
affirmative action policies "injur[e] white and Asian appli-
cants who are denied admission because of their race."
*Fisher I*, 570 U. S., at 331 (concurring opinion). Petitioner
here clearly demonstrates this fact. Moreover, "no social
science has disproved the notion that this discrimination
'engenders attitudes of superiority or, alternatively, pro-
vokes resentment among those who believe that they have
been wronged by the government's use of race.'" *Grutter*,
539 U. S., at 373 (opinion of THOMAS, J.) (quoting *Adarand*,
515 U. S., at 241 (opinion of THOMAS, J.) (alterations omit-
ted)). Applicants denied admission to certain colleges may

THOMAS, J., concurring

come to believe—accurately or not—that their race was re-
sponsible for their failure to attain a life-long dream. These
individuals, and others who wished for their success, may
resent members of what they perceive to be favored races,
believing that the successes of those individuals are un-
earned.

What, then, would be the endpoint of these affirmative
action policies? Not racial harmony, integration, or equal-
ity under the law. Rather, these policies appear to be lead-
ing to a world in which everyone is defined by their skin
color, demanding ever-increasing entitlements and prefer-
ences on that basis. Not only is that *exactly* the kind of fac-
tionalism that the Constitution was meant to safeguard
against, see The Federalist No. 10 (J. Madison), but it is a
factionalism based on ever-shifting sands.

That is because race is a social construct; we may each
identify as members of particular races for any number of
reasons, having to do with our skin color, our heritage, or
our cultural identity. And, over time, these ephemeral, so-
cially constructed categories have often shifted. For exam-
ple, whereas universities today would group all white ap-
plicants together, white elites previously sought to exclude
Jews and other white immigrant groups from higher edu-
cation. In fact, it is impossible to look at an individual and
know definitively his or her race; some who would consider
themselves black, for example, may be quite fair skinned.
Yet, university admissions policies ask individuals to iden-
tify themselves as belonging to one of only a few reduction-
ist racial groups. With boxes for only "black," "white," "His-
panic," "Asian," or the ambiguous "other," how is a Middle
Eastern person to choose? Someone from the Philippines?
See *post*, at 5–7 (GORSUCH, J., concurring). Whichever
choice he makes (in the event he chooses to report a race at
all), the form silos him into an artificial category. Worse, it
sends a clear signal that the category matters.

But, under our Constitution, race is irrelevant, as the

Court acknowledges.  In fact, all racial categories are little more than stereotypes, suggesting that immutable characteristics somehow conclusively determine a person's ideology, beliefs, and abilities.  Of course, that is false.  See *ante*, at 28–30 (noting that the Court's Equal Protection Clause jurisprudence forbids such stereotyping).  Members of the same race do not all share the exact same experiences and viewpoints; far from it.  A black person from rural Alabama surely has different experiences than a black person from Manhattan or a black first-generation immigrant from Nigeria, in the same way that a white person from rural Vermont has a different perspective than a white person from Houston, Texas.  Yet, universities' racial policies suggest that racial identity "*alone constitutes the being* of the race or the man." J. Barzun, Race: A Study in Modern Superstition 114 (1937).  That is the same naked racism upon which segregation itself was built.  Small wonder, then, that these policies are leading to increasing racial polarization and friction.  This kind of reductionist logic leads directly to the "disregard for what does not jibe with preconceived theory," providing a "cloa[k] to conceal complexity, argumen[t] to the crown for praising or damning without the trouble of going into details"—such as details about an individual's ideas or unique background.  *Ibid.*  Rather than forming a more pluralistic society, these policies thus strip us of our individuality and undermine the very diversity of thought that universities purport to seek.

The solution to our Nation's racial problems thus cannot come from policies grounded in affirmative action or some other conception of equity.  Racialism simply cannot be undone by different or more racialism.  Instead, the solution announced in the second founding is incorporated in our Constitution: that we are all equal, and should be treated equally before the law without regard to our race.  Only that promise can allow us to look past our differing skin colors

THOMAS, J., concurring

and identities and see each other for what we truly are: individuals with unique thoughts, perspectives, and goals, but with equal dignity and equal rights under the law.

## B

JUSTICE JACKSON has a different view. Rather than focusing on individuals as individuals, her dissent focuses on the historical subjugation of black Americans, invoking statistical racial gaps to argue in favor of defining and categorizing individuals by their race. As she sees things, we are all inexorably trapped in a fundamentally racist society, with the original sin of slavery and the historical subjugation of black Americans still determining our lives today. *Post*, at 1–26 (dissenting opinion). The panacea, she counsels, is to unquestioningly accede to the view of elite experts and reallocate society's riches by racial means as necessary to "level the playing field," all as judged by racial metrics. *Post*, at 26. I strongly disagree.

First, as stated above, any statistical gaps between the average wealth of black and white Americans is constitutionally irrelevant. I, of course, agree that our society is not, and has never been, colorblind. *Post*, at 2 (JACKSON, J., dissenting); see also *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting). People discriminate against one another for a whole host of reasons. But, under the Fourteenth Amendment, the law must disregard all racial distinctions:

> "[I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." *Ibid.*

With the passage of the Fourteenth Amendment, the people of our Nation proclaimed that the law may not sort citizens based on race.  It is this principle that the Framers of the Fourteenth Amendment adopted in the wake of the Civil War to fulfill the promise of equality under the law.  And it is this principle that has guaranteed a Nation of equal citizens the privileges or immunities of citizenship and the equal protection of the laws.  To now dismiss it as "two-dimensional flatness," *post*, at 25 (JACKSON, J., dissenting), is to abdicate a sacred trust to ensure that our "honored dead . . . shall not have died in vain."  A. Lincoln, Gettysburg Address (1863).

Yet, JUSTICE JACKSON would replace the second Founders' vision with an organizing principle based on race.  In fact, on her view, almost all of life's outcomes may be unhesitatingly ascribed to race.  *Post*, at 24–26.  This is so, she writes, because of statistical disparities among different racial groups.  See *post*, at 11–14.  Even if some whites have a lower household net worth than some blacks, what matters to JUSTICE JACKSON is that the *average* white household has more wealth than the *average* black household.  *Post*, at 11.

This lore is not and has never been true.  Even in the segregated South where I grew up, individuals were not the sum of their skin color.  Then as now, not all disparities are based on race; not all people are racist; and not all differences between individuals are ascribable to race.  Put simply, "the fate of abstract categories of wealth statistics is not the same as the fate of a given set of flesh-and-blood human beings."  T. Sowell, Wealth, Poverty and Politics 333 (2016).  Worse still, JUSTICE JACKSON uses her broad observations about statistical relationships between race and select measures of health, wealth, and well-being to label all blacks as victims.  Her desire to do so is unfathomable to me.  I cannot deny the great accomplishments of black Americans, including those who succeeded despite long

THOMAS, J., concurring

odds.

Nor do JUSTICE JACKSON's statistics regarding a correlation between levels of health, wealth, and well-being between selected racial groups prove anything. Of course, none of those statistics are capable of drawing a direct causal link between race—rather than socioeconomic status or any other factor—and individual outcomes. So JUSTICE JACKSON supplies the link herself: the legacy of slavery and the nature of inherited wealth. This, she claims, locks blacks into a seemingly perpetual inferior caste. Such a view is irrational; it is an insult to individual achievement and cancerous to young minds seeking to push through barriers, rather than consign themselves to permanent victimhood. If an applicant has less financial means (because of generational inheritance or otherwise), then surely a university may take that into account. If an applicant has medical struggles or a family member with medical concerns, a university may consider that too. What it cannot do is use the applicant's skin color as a heuristic, assuming that because the applicant checks the box for "black" he therefore conforms to the university's monolithic and reductionist view of an abstract, average black person.

Accordingly, JUSTICE JACKSON's race-infused world view falls flat at each step. Individuals are the sum of their unique experiences, challenges, and accomplishments. What matters is not the barriers they face, but how they choose to confront them. And their race is not to blame for everything—good or bad—that happens in their lives. A contrary, myopic world view based on individuals' skin color to the total exclusion of their personal choices is nothing short of racial determinism.

JUSTICE JACKSON then builds from her faulty premise to call for action, arguing that courts should defer to "experts" and allow institutions to discriminate on the basis of race. Make no mistake: Her dissent is not a vanguard of the in-

nocent and helpless. It is instead a call to empower privi-
leged elites, who will "tell us [what] is required to level the
playing field" among castes and classifications that they
alone can divine. *Post*, at 26; see also *post*, at 5–7
(GORSUCH, J., concurring) (explaining the arbitrariness of
these classifications). Then, after siloing us all into racial
castes and pitting those castes against each other, the dis-
sent somehow believes that we will be able—at some unde-
fined point—to "march forward together" into some utopian
vision. *Post*, at 26 (opinion of JACKSON, J.). Social move-
ments that invoke these sorts of rallying cries, historically,
have ended disastrously.

Unsurprisingly, this tried-and-failed system defies both
law and reason. Start with the obvious: If social reorgani-
zation in the name of equality may be justified by the mere
fact of statistical disparities among racial groups, then that
reorganization must continue until these disparities are
fully eliminated, regardless of the reasons for the dispari-
ties and the cost of their elimination. If blacks fail a test at
higher rates than their white counterparts (regardless of
whether the reason for the disparity has anything at all to
do with race), the only solution will be race-focused
measures. If those measures were to result in blacks failing
at yet higher rates, the only solution would be to double
down. In fact, there would seem to be no logical limit to
what the government may do to level the racial playing
field—outright wealth transfers, quota systems, and racial
preferences would all seem permissible. In such a system,
it would not matter how many innocents suffer race-based
injuries; all that would matter is reaching the race-based
goal.

Worse, the classifications that JUSTICE JACKSON draws
are themselves race-based stereotypes. She focuses on two
hypothetical applicants, John and James, competing for ad-
mission to UNC. John is a white, seventh-generation leg-
acy at the school, while James is black and would be the

THOMAS, J., concurring

first in his family to attend UNC. *Post*, at 3. JUSTICE JACKSON argues that race-conscious admission programs are necessary to adequately compare the two applicants. As an initial matter, it is not clear why James's race is the only factor that could encourage UNC to admit him; his status as a first-generation college applicant seems to contextualize his application. But, setting that aside, why is it that John should be judged based on the actions of his great-great-great-grandparents? And what would JUSTICE JACKSON say to John when deeming him not as worthy of admission: Some statistically significant number of white people had advantages in college admissions seven generations ago, and you have inherited their incurable sin?

Nor should we accept that John or James represent all members of their respective races. All racial groups are heterogeneous, and blacks are no exception—encompassing northerners and southerners, rich and poor, and recent immigrants and descendants of slaves. See, *e.g.*, T. Sowell, Ethnic America 220 (1981) (noting that the great success of West Indian immigrants to the United States—disproportionate among blacks more broadly—"seriously undermines the proposition that color is a fatal handicap in the American economy"). Eschewing the complexity that comes with individuality may make for an uncomplicated narrative, but lumping people together and judging them based on assumed inherited or ancestral traits is nothing but stereotyping.[11]

To further illustrate, let's expand the applicant pool beyond John and James. Consider Jack, a black applicant and the son of a multimillionaire industrialist. In a world of race-based preferences, James' seat could very well go to

—————————

[11] Again, universities may offer admissions preferences to students from disadvantaged backgrounds, and they need not withhold those preferences from students who happen to be members of racial minorities. Universities may not, however, assume that all members of certain racial minorities are disadvantaged.

Jack rather than John—both are black, after all.  And what about members of the numerous other racial and ethnic groups in our Nation?  What about Anne, the child of Chinese immigrants?  Jacob, the grandchild of Holocaust survivors who escaped to this Nation with nothing and faced discrimination upon arrival?  Or Thomas, the great-grandchild of Irish immigrants escaping famine?  While articulating her black and white world (literally), JUSTICE JACKSON ignores the experiences of other immigrant groups (like Asians, see *supra*, at 43–44) and white communities that have faced historic barriers.

Though JUSTICE JACKSON seems to think that her race-based theory can somehow benefit everyone, it is an immutable fact that "every time the government uses racial criteria to 'bring the races together,' someone gets excluded, and the person excluded suffers an injury solely because of his or her race."  *Parents Involved*, 551 U. S., at 759 (THOMAS, J., concurring) (citation omitted).    Indeed, JUSTICE JACKSON seems to have no response—no explanation at all—for the people who will shoulder that burden.  How, for example, would JUSTICE JACKSON explain the need for race-based preferences to the Chinese student who has worked hard his whole life, only to be denied college admission in part because of his skin color?  If such a burden would seem difficult to impose on a bright-eyed young person, that's because it should be. History has taught us to abhor theories that call for elites to pick racial winners and losers in the name of sociological experimentation.

Nor is it clear what another few generations of race-conscious college admissions may be expected to accomplish.  Even today, affirmative action programs that offer an admissions boost to black and Hispanic students discriminate against those who identify themselves as members of other races that do not receive such preferential treatment.  Must others in the future make sacrifices to re-

THOMAS, J., concurring

level the playing field for this new phase of racial subordi-
nation?  And then, out of whose lives should the debt owed
to those further victims be repaid?  This vision of meeting
social racism with government-imposed racism is thus self-
defeating, resulting in a never-ending cycle of victimization.
There is no reason to continue down that path.  In the wake
of the Civil War, the Framers of the Fourteenth Amend-
ment charted a way out: a colorblind Constitution that re-
quires the government to, at long last, put aside its citizens'
skin color and focus on their individual achievements.

## C

Universities' recent experiences confirm the efficacy of a
colorblind rule.  To start, universities prohibited from en-
gaging in racial discrimination by state law continue to en-
roll racially diverse classes by race-neutral means.  For ex-
ample, the University of California purportedly recently
admitted its "most diverse undergraduate class ever," de-
spite California's ban on racial preferences.  T. Watanabe,
UC Admits Largest, Most Diverse Class Ever, But It Was
Harder To Get Accepted, L. A. Times, July 20, 2021, p. A1.
Similarly, the University of Michigan's 2021 incoming class
was "among the university's most racially and ethnically di-
verse classes, with 37% of first-year students identifying as
persons of color."  S. Dodge, Largest Ever Student Body at
University of Michigan This Fall, Officials Say, MLive.com
(Oct. 22, 2021), https://www.mlive.com/news/ann-arbor/
2021/10/largest-ever-student-body-at-university-of-michigan-
this-fall-officials-say.html.  In fact, at least one set of stud-
ies suggests that, "when we consider the higher education
system as a whole, it is clear that the vast majority of
schools would be as racially integrated, or more racially in-
tegrated, under a system of no preferences than under a
system of large preferences."  Brief for Richard Sander as
*Amicus Curiae* 26.  Race-neutral policies may thus achieve
the same benefits of racial harmony and equality without

any of the burdens and strife generated by affirmative action policies.

In fact, meritocratic systems have long refuted bigoted misperceptions of what black students can accomplish. I have always viewed "higher education's purpose as imparting knowledge and skills to students, rather than a communal, rubber-stamp, credentialing process." *Grutter*, 539 U. S., at 371–372 (opinion concurring in part and dissenting in part). And, I continue to strongly believe (and have never doubted) that "blacks can achieve in every avenue of American life without the meddling of university administrators." *Id.*, at 350. Meritocratic systems, with objective grading scales, are critical to that belief. Such scales have always been a great equalizer—offering a metric for achievement that bigotry could not alter. Racial preferences take away this benefit, eliminating the very metric by which those who have the most to prove can clearly demonstrate their accomplishments—both to themselves and to others.

Schools' successes, like students' grades, also provide objective proof of ability. Historically Black Colleges and Universities (HBCUs) do not have a large amount of racial diversity, but they demonstrate a marked ability to improve the lives of their students. To this day, they have proved "to be extremely effective in educating Black students, particularly in STEM," where "HBCUs represent seven of the top eight institutions that graduate the highest number of Black undergraduate students who go on to earn [science and engineering] doctorates." W. Wondwossen, The Science Behind HBCU Success, Nat. Science Foundation (Sept. 24, 2020), https://beta.nsf.gov/science-matters/science-behind-hbcu-success. "HBCUs have produced 40% of all Black engineers." Presidential Proclamation No. 10451, 87 Fed. Reg. 57567 (2022). And, they "account for 80% of Black judges, 50% of Black doctors, and 50% of Black lawyers."

THOMAS, J., concurring

M. Hammond, L. Owens, & B. Gulko, Social Mobility Outcomes for HBCU Alumni, United Negro College Fund 4 (2021) (Hammond), https://cdn.uncf.org/wp-content/uploads/ Social-Mobility-Report-FINAL.pdf; see also 87 Fed. Reg. 57567 (placing the percentage of black doctors even higher, at 70%). In fact, Xavier University, an HBCU with only a small percentage of white students, has had better success at helping its low-income students move into the middle class than Harvard has. See Hammond 14; see also Brief for Oklahoma et al. as *Amici Curiae* 18. And, each of the top 10 HBCUs have a success rate above the national average. Hammond 14.[12]

Why, then, would this Court need to allow other universities to racially discriminate? Not for the betterment of those black students, it would seem. The hard work of HBCUs and their students demonstrate that "black schools can function as the center and symbol of black communities, and provide examples of independent black leadership, success, and achievement." *Jenkins*, 515 U. S., at 122

_____

[12] Such black achievement in "racially isolated" environments is neither new nor isolated to higher education. See T. Sowell, Education: Assumptions Versus History 7–38 (1986). As I have previously observed, in the years preceding *Brown*, the "most prominent example of an exemplary black school was Dunbar High School," America's first public high school for black students. *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 763 (2007) (concurring opinion). Known for its academics, the school attracted black students from across the Washington, D. C., area. "[I]n the period 1918–1923, Dunbar graduates earned fifteen degrees from Ivy League colleges, and ten degrees from Amherst, Williams, and Wesleyan." Sowell, Education: Assumptions Versus History, at 29. Dunbar produced the first black General in the U. S. Army, the first black Federal Court Judge, and the first black Presidential Cabinet member. A. Stewart, First Class: The Legacy of Dunbar 2 (2013). Indeed, efforts towards racial integration ultimately precipitated the school's decline. When the D. C. schools moved to a neighborhood-based admissions model, Dunbar was no longer able to maintain its prior admissions policies—and "[m]ore than 80 years of quality education came to an abrupt end." T. Sowell, Wealth, Poverty and Politics 194 (2016).

(THOMAS, J., concurring) (citing *Fordice*, 505 U. S., at 748
(THOMAS, J., concurring)).  And, because race-conscious col-
lege admissions are plainly not necessary to serve even the
interests of blacks, there is no justification to compel such
programs more broadly.  See *Parents Involved*, 551 U. S., at
765 (THOMAS, J., concurring).

\*    \*    \*

The great failure of this country was slavery and its prog-
eny.  And, the tragic failure of this Court was its misinter-
pretation of the Reconstruction Amendments, as Justice
Harlan predicted in *Plessy*.  We should not repeat this mis-
take merely because we think, as our predecessors thought,
that the present arrangements are superior to the Consti-
tution.

The Court's opinion rightly makes clear that *Grutter* is,
for all intents and purposes, overruled.  And, it sees the uni-
versities' admissions policies for what they are: rudderless,
race-based preferences designed to ensure a particular ra-
cial mix in their entering classes.  Those policies fly in the
face of our colorblind Constitution and our Nation's equality
ideal.  In short, they are plainly—and boldly—unconstitu-
tional.  See *Brown II*, 349 U. S., at 298 (noting that the
*Brown* case one year earlier had "declare[d] the fundamen-
tal principle that racial discrimination in public education
is unconstitutional").

While I am painfully aware of the social and economic
ravages which have befallen my race and all who suffer dis-
crimination, I hold out enduring hope that this country will
live up to its principles so clearly enunciated in the Decla-
ration of Independence and the Constitution of the United
States: that all men are created equal, are equal citizens,
and must be treated equally before the law.

Cite as: 600 U. S. ____ (2023)    1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 20–1199 and 21–707

————————

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

20–1199    *v.*

## PRESIDENT AND FELLOWS OF HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

21–707    *v.*

## UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

For many students, an acceptance letter from Harvard or the University of North Carolina is a ticket to a brighter future. Tens of thousands of applicants compete for a small number of coveted spots. For some time, both universities have decided which applicants to admit or reject based in part on race. Today, the Court holds that the Equal Protection Clause of the Fourteenth Amendment does not tolerate this practice. I write to emphasize that Title VI of the Civil Rights Act of 1964 does not either.

I

"[F]ew pieces of federal legislation rank in significance

GORSUCH, J., concurring

with the Civil Rights Act of 1964." *Bostock* v. *Clayton County*, 590 U. S. ___, ___ (2020) (slip op., at 2). Title VI of that law contains terms as powerful as they are easy to understand: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. §2000d. The message for these cases is unmistakable. Students for Fair Admissions (SFFA) brought claims against Harvard and UNC under Title VI. That law applies to both institutions, as they elect to receive millions of dollars of federal assistance annually. And the trial records reveal that both schools routinely discriminate on the basis of race when choosing new students—exactly what the law forbids.

## A

When a party seeks relief under a statute, our task is to apply the law's terms as a reasonable reader would have understood them at the time Congress enacted them. "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 590 U. S., at ___ (slip op., at 4).

The key phrases in Title VI at issue here are "subjected to discrimination" and "on the ground of." Begin with the first. To "discriminate" against a person meant in 1964 what it means today: to "trea[t] that individual worse than others who are similarly situated." *Id.*, at ___ (slip op., at 7); see also Webster's New International Dictionary 745 (2d ed. 1954) ("[t]o make a distinction" or "[t]o make a difference in treatment or favor (of one as compared with others)"); Webster's Third New International Dictionary 648 (1961) ("to make a difference in treatment or favor on a class or categorical basis"). The provision of Title VI before us, this Court has also held, "prohibits only intentional discrimination." *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001).

GORSUCH, J., concurring

From this, we can safely say that Title VI forbids a recipient of federal funds from intentionally treating one person worse than another similarly situated person on the ground of race, color, or national origin.

What does the statute's second critical phrase—"on the ground of"—mean? Again, the answer is uncomplicated: It means "because of." See, *e.g.,* Webster's New World Dictionary 640 (1960) ("because of"); Webster's Third New International Dictionary, at 1002 (defining "grounds" as "a logical condition, physical cause, or metaphysical basis"). "Because of" is a familiar phrase in the law, one we often apply in cases arising under the Civil Rights Act of 1964, and one that we usually understand to invoke "the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U. S., at ___ (slip op., at 5) (quoting *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 346, 360 (2013); some internal quotation marks omitted). The but-for-causation standard is a "sweeping" one too. *Bostock*, 590 U. S., at ___ (slip op., at 5). A defendant's actions need not be the primary or proximate cause of the plaintiff's injury to qualify. Nor may a defendant avoid liability "just by citing some *other* factor that contributed to" the plaintiff's loss. *Id.,* at ___ (slip op., at 6). All that matters is that the plaintiff's injury would not have happened *but for* the defendant's conduct. *Ibid.*

Now put these pieces back together and a clear rule emerges. Title VI prohibits a recipient of federal funds from intentionally treating one person worse than another similarly situated person because of his race, color, or national origin. It does not matter if the recipient can point to "some other . . . factor" that contributed to its decision to disfavor that individual. *Id.,* at ___–___ (slip op., at 14–15). It does not matter if the recipient discriminates in order to advance some further benign "intention" or "motivation." *Id.,* at ___ (slip op., at 13); see also *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187, 199 (1991) ("the absence of a

malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect" or "alter [its] intentionally discriminatory character"). Nor does it matter if the recipient discriminates against an individual member of a protected class with the idea that doing so might "favor" the interests of that "class" as a whole or otherwise "promot[e] equality at the group level." *Bostock*, 590 U. S., at ___, ___ (slip op., at 13, 15). Title VI prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert. Without question, Congress in 1964 could have taken the law in various directions. But to safeguard the civil rights of all Americans, Congress chose a simple and profound rule. One holding that a recipient of federal funds may never discriminate based on race, color, or national origin—period.

If this exposition of Title VI sounds familiar, it should. Just next door, in Title VII, Congress made it "unlawful . . . for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." §2000e–2(a)(1). Appreciating the breadth of this provision, just three years ago this Court read its essentially identical terms the same way. See *Bostock*, 590 U. S., at ___–___ (slip op., at 4–9). This Court has long recognized, too, that when Congress uses the same terms in the same statute, we should presume they "have the same meaning." *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34 (2005). And that presumption surely makes sense here, for as Justice Stevens recognized years ago, "[b]oth Title VI and Title VII" codify a categorical rule of "individual equality, without regard to race." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 416, n. 19 (1978) (opinion concurring in judgment in part and dissenting in part) (emphasis deleted).

GORSUCH, J., concurring

### B

Applying Title VI to the cases now before us, the result is plain. The parties debate certain details of Harvard's and UNC's admissions practices. But no one disputes that both universities operate "program[s] or activit[ies] receiving Federal financial assistance." §2000d. No one questions that both institutions consult race when making their admissions decisions. And no one can doubt that both schools intentionally treat some applicants worse than others at least in part because of their race.

### 1

Start with how Harvard and UNC use race. Like many colleges and universities, those schools invite interested students to complete the Common Application. As part of that process, the trial records show, applicants are prompted to tick one or more boxes to explain "how you identify yourself." 4 App. in No. 21–707, p. 1732. The available choices are American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander; Hispanic or Latino; or White. Applicants can write in further details if they choose. *Ibid.*; see also 397 F. Supp. 3d 126, 137 (Mass. 2019); 567 F. Supp. 3d 580, 596 (MDNC 2021).

Where do these boxes come from? Bureaucrats. A federal interagency commission devised this scheme of classifications in the 1970s to facilitate data collection. See D. Bernstein, The Modern American Law of Race, 94 S. Cal. L. Rev. 171, 196–202 (2021); see also 43 Fed. Reg. 19269 (1978). That commission acted "without any input from anthropologists, sociologists, ethnologists, or other experts." Brief for David E. Bernstein as *Amicus Curiae* 3 (Bernstein *Amicus* Brief). Recognizing the limitations of their work, federal regulators cautioned that their classifications "should not be interpreted as being scientific or anthropological in nature, *nor should they be viewed as determinants of eligibility*

*for participation in any Federal program*." 43 Fed. Reg.
19269 (emphasis added).  Despite that warning, others
eventually used this classification system for that very pur-
pose—to "sor[t] out winners and losers in a process that, by
the end of the century, would grant preference[s] in jobs . . .
and university admissions." H. Graham, The Origins of Of-
ficial Minority Designation, in The New Race Question:
How the Census Counts Multiracial Individuals 289
(J. Perlmann & M. Waters eds. 2002).

These classifications rest on incoherent stereotypes.
Take the "Asian" category.  It sweeps into one pile East
Asians (*e.g.,* Chinese, Korean, Japanese) and South Asians
(*e.g.,* Indian, Pakistani, Bangladeshi), even though together
they constitute about 60% of the world's population.  Bern-
stein *Amicus* Brief 2, 5.  This agglomeration of so many peo-
ples paves over countless differences in "language," "cul-
ture," and historical experience. *Id.*, at 5–6.  It does so even
though few would suggest that all such persons share "sim-
ilar backgrounds and similar ideas and experiences."
*Fisher* v. *University of Tex. at Austin*, 579 U. S. 365, 414
(2016) (ALITO, J., dissenting).  Consider, as well, the devel-
opment of a separate category for "Native Hawaiian or
Other Pacific Islander."  It seems federal officials disaggre-
gated these groups from the "Asian" category only in the
1990s and only "in response to political lobbying."  Bern-
stein *Amicus* Brief 9–10.  And even that category contains
its curiosities.  It appears, for example, that Filipino Amer-
icans remain classified as "Asian" rather than "Other Pa-
cific Islander."  See 4 App. in No. 21–707, at 1732.

The remaining classifications depend just as much on ir-
rational stereotypes.  The "Hispanic" category covers those
whose ancestral language is Spanish, Basque, or Catalan—
but it also covers individuals of Mayan, Mixtec, or Zapotec
descent who do not speak any of those languages and whose
ancestry does not trace to the Iberian Peninsula but bears
deep ties to the Americas.  See Bernstein *Amicus* Brief 10–

GORSUCH, J., concurring

11. The "White" category sweeps in anyone from "Europe, Asia west of India, and North Africa." *Id.*, at 14. That includes those of Welsh, Norwegian, Greek, Italian, Moroccan, Lebanese, Turkish, or Iranian descent. It embraces an Iraqi or Ukrainian refugee as much as a member of the British royal family. Meanwhile, "Black or African American" covers everyone from a descendant of enslaved persons who grew up poor in the rural South, to a first-generation child of wealthy Nigerian immigrants, to a Black-identifying applicant with multiracial ancestry whose family lives in a typical American suburb. See *id.,* at 15–16.

If anything, attempts to divide us all up into a handful of groups have become only more incoherent with time. American families have become increasingly multicultural, a fact that has led to unseemly disputes about whether someone is *really* a member of a certain racial or ethnic group. There are decisions denying Hispanic status to someone of Italian-Argentine descent, *Marinelli Constr. Corp.* v. *New York*, 200 App. Div. 2d 294, 296–297, 613 N. Y. S. 2d 1000, 1002 (1994), as well as someone with one Mexican grandparent, *Major Concrete Constr., Inc.* v. *Erie County*, 134 App. Div. 2d 872, 873, 521 N. Y. S. 2d 959, 960 (1987). Yet there are also decisions granting Hispanic status to a Sephardic Jew whose ancestors fled Spain centuries ago, *In re Rothschild-Lynn Legal & Fin. Servs.*, SBA No. 499, 1995 WL 542398, \*2–\*4 (Apr. 12, 1995), and bestowing a "sort of Hispanic" status on a person with one Cuban grandparent, Bernstein, 94 S. Cal. L. Rev., at 232 (discussing *In re Kist Corp.*, 99 F. C. C. 2d 173, 193 (1984)).

Given all this, is it any surprise that members of certain groups sometimes try to conceal their race or ethnicity? Or that a cottage industry has sprung up to help college applicants do so? We are told, for example, that one effect of lumping so many people of so many disparate backgrounds into the "Asian" category is that many colleges consider "Asians" to be "overrepresented" in their admission pools.

Brief for Asian American Coalition for Education et al. as
*Amici Curiae* 12–14, 18–19.  Paid advisors, in turn, tell high
school students of Asian descent to downplay their heritage
to maximize their odds of admission.  "'We will make them
appear less Asian when they apply,'" one promises.  *Id.,* at
16.  "'If you're given an option, don't attach a photograph to
your application,'" another instructs.  *Ibid.*[1]  It is difficult
to imagine those who receive this advice would find comfort
in a bald (and mistaken) assurance that "race-conscious ad-
missions benefit . . . the Asian American community," *post*,
at 60 (SOTOMAYOR, J., dissenting).  See 397 F. Supp. 3d, at
178 (district court finding that "overall" Harvard's race-con-
scious admissions policy "results in fewer Asian Ameri-
can[s]" being admitted).  And it is hard not to wonder
whether those left paying the steepest price are those least
able to afford it—children of families with no chance of hir-
ing the kind of consultants who know how to play this
game.[2]

2

Just as there is no question Harvard and UNC consider
race in their admissions processes, there is no question both
schools intentionally treat some applicants worse than oth-
ers because of their race.  Both schools frequently choose to

──────────

[1] See also A. Qin, Aiming for an Ivy and Trying to Seem 'Less Asian,'
N. Y. Times, Dec. 3, 2022, p. A18, col. 1 ("[T]he rumor that students can
appear 'too Asian' has hardened into a kind of received wisdom within
many Asian American communities," and "college admissions consult-
ants [have] spoke[n] about trying to steer their Asian American clients
away from so-called typically Asian activities such as Chinese language
school, piano and Indian classical instruments.").

[2] Though the matter did not receive much attention in the proceedings
below, it appears that the Common Application has evolved in recent
years to allow applicants to choose among more options to describe their
backgrounds.  The decisions below do not disclose how much Harvard or
UNC made use of this further information (or whether they make use of
it now).  But neither does it make a difference.  Title VI no more tolerates
discrimination based on 60 racial categories than it does 6.

GORSUCH, J., concurring

award a "tip" or a "plus" to applicants from certain racial groups but not others. These tips or plusses are just what they sound like—"factors that might tip an applicant into [an] admitted class." 980 F. 3d 157, 170 (CA1 2020). And in a process where applicants compete for a limited pool of spots, "[a] tip for one race" necessarily works as "a penalty against other races." Brief for Economists as *Amici Curiae* 20. As the trial court in the Harvard case put it: "Race conscious admissions will always penalize to some extent the groups that are not being advantaged by the process." 397 F. Supp. 3d, at 202–203.

Consider how this plays out at Harvard. In a given year, the university's undergraduate program may receive 60,000 applications for roughly 1,600 spots. Tr. of Oral Arg. in No. 20–1199, p. 60. Admissions officers read each application and rate students across several categories: academic, extracurricular, athletic, school support, personal, and overall. 980 F. 3d, at 167. Harvard says its admissions officers "should not" consider race or ethnicity when assigning the "personal" rating. *Id.,* at 169 (internal quotation marks omitted). But Harvard did not make this instruction explicit until *after* SFFA filed this suit. *Ibid.* And, in any event, Harvard concedes that its admissions officers "*can* and *do* take an applicant's race into account when assigning an *overall* rating." *Ibid.* (emphasis added). At that stage, the lower courts found, applicants of certain races may receive a "tip" in their favor. *Ibid.*

The next step in the process is committee review. Regional subcommittees may consider an applicant's race when deciding whether to recommend admission. *Id.,* at 169–170. So, too, may the full admissions committee. *Ibid.* As the Court explains, that latter committee "discusses the relative breakdown of applicants by race." *Ante,* at 2–3. And "if at some point in the admissions process it appears that a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the [committee]

may decide to give additional attention to applications from students within that group." 397 F. Supp. 3d, at 146.

The last step is "lopping," where the admissions committee trims the list of "prospective admits" before settling on a final class. *Id.,* at 144 (internal quotation marks omitted). At this stage, again, the committee considers the "characteristics of the admitted class," including its "racial composition." *Ibid.* Once more, too, the committee may consider each applicant's race in deciding whom to "lop off." *Ibid.*

All told, the district court made a number of findings about Harvard's use of race-based tips. For example: "[T]he tip[s] given for race impac[t] who among the highly-qualified students in the applicant pool will be selected for admission." *Id.,* at 178. "At least 10% of Harvard's admitted class . . . would most likely not be admitted in the absence of Harvard's race-conscious admissions process." *Ibid.* Race-based tips are "determinative" in securing favorable decisions for a significant percentage of "African American and Hispanic applicants," the "primary beneficiaries" of this system. *Ibid.* There are clear losers too. "[W]hite and Asian American applicants are unlikely to receive a meaningful race-based tip," *id.,* at 190, n. 56, and "overall" the school's race-based practices "resul[t] in fewer Asian American and white students being admitted," *id.,* at 178. For these reasons and others still, the district court concluded that "Harvard's admissions process is not facially neutral" with respect to race. *Id.,* at 189–190; see also *id.,* at 190, n. 56 ("The policy cannot . . . be considered facially neutral from a Title VI perspective.").

Things work similarly at UNC. In a typical year, about 44,000 applicants vie for 4,200 spots. 567 F. Supp. 3d, at 595. Admissions officers read each application and rate prospective students along eight dimensions: academic programming, academic performance, standardized tests, extracurriculars, special talents, essays, background, and personal. *Id.,* at 600. The district court found that "UNC's

GORSUCH, J., concurring

admissions policies mandate that race is taken into consideration" in this process as a "'plus' facto[r]." *Id.,* at 594–595. It is a plus that is "sometimes" awarded to "underrepresented minority" or "URM" candidates—a group UNC defines to include "'those students identifying themselves as African American or [B]lack; American Indian or Alaska Native; or Hispanic, Latino, or Latina,'" but not Asian or white students. *Id.,* at 591–592, n. 7, 601.

At UNC, the admissions officers' decisions to admit or deny are "'provisionally final.'" *Ante,* at 4 (opinion for the Court). The decisions become truly final only after a committee approves or rejects them. 567 F. Supp. 3d, at 599. That committee may consider an applicant's race too. *Id.,* at 607. In the end, the district court found that "race plays a role"—perhaps even "a determinative role"—in the decision to admit or deny some "URM students." *Id.,* at 634; see also *id.,* at 662 ("race may tip the scale"). Nor is this an accident. As at Harvard, officials at UNC have made a "deliberate decision" to employ race-conscious admissions practices. *Id.,* at 588–589.

While the district courts' findings tell the full story, one can also get a glimpse from aggregate statistics. Consider the chart in the Court's opinion collecting Harvard's data for the period 2009 to 2018. *Ante,* at 31. The racial composition of each incoming class remained steady over that time—remarkably so. The proportion of African Americans hovered between 10% and 12%; the proportion of Hispanics between 8% and 12%; and the proportion of Asian Americans between 17% and 20%. *Ibid.* Might this merely reflect the demographics of the school's applicant pool? Cf. *post,* at 35 (opinion of SOTOMAYOR, J.). Perhaps—at least assuming the applicant pool looks much the same each year and the school rather mechanically admits applicants based on objective criteria. But the possibility that it instead betrays the school's persistent focus on numbers of this race and numbers of that race is entirely consistent with the findings

recounted above.  See, *e.g.,* 397 F. Supp. 3d, at 146 ("if at
some point in the admissions process it appears that a
group is notably underrepresented or has suffered a dra-
matic drop off relative to the prior year, the [committee]
may decide to give additional attention to applications from
students within that group"); cf. *ante,* at 31–32, n. 7 (opin-
ion for the Court).

## C

Throughout this litigation, the parties have spent less
time contesting these facts than debating other matters.

For example, the parties debate *how much* of a role race
plays in admissions at Harvard and UNC.  Both schools in-
sist that they consider race as just one of many factors when
making admissions decisions in their self-described "holis-
tic" review of each applicant.  SFFA responds with trial ev-
idence showing that, whatever label the universities use to
describe their processes, they intentionally consult race
and, by design, their race-based tips and plusses benefit ap-
plicants of certain groups to the detriment of others.  See
Brief for Petitioner 20–35, 40–45.

The parties also debate the *reasons* both schools consult
race.  SFFA observes that, in the 1920s, Harvard began
moving away from "test scores" and toward "plac[ing]
greater emphasis on character, fitness, and other subjective
criteria."  *Id.,* at 12–13 (internal quotation marks omitted).
Harvard made this move, SFFA asserts, because President
A. Lawrence Lowell and other university leaders had be-
come "alarmed by the growing number of Jewish students
who were testing in," and they sought some way to cap the
number of Jewish students without "'stat[ing] frankly'"
that they were "'directly excluding all [Jews] beyond a cer-
tain percentage.'"  *Id.,* at 12; see also 3 App. in No. 20–1199,
pp. 1131–1133.  SFFA contends that Harvard's current "ho-
listic" approach to admissions works similarly to disguise

GORSUCH, J., concurring

the school's efforts to assemble classes with a particular racial composition—and, in particular, to limit the number of Asian Americans it admits. Brief for Petitioner 12–14, 25–32. For its part, Harvard expresses regret for its past practices while denying that they resemble its current ones. Tr. of Oral Arg. in No. 20–1199, at 51. And both schools insist that their student bodies would lack sufficient diversity without race-conscious admissions. Brief for Respondent in No. 20–1199, pp. 52–54; Brief for University Respondents in No. 21–707, pp. 54–59.

When it comes to defining and measuring diversity, the parties spar too. SFFA observes that the racial categories the universities employ in the name of diversity do not begin to reflect the differences that exist within each group. See Part I–B–1, *supra*. Instead, they lump together white and Asian students from privileged backgrounds with "Jewish, Irish, Polish, or other 'white' ethnic groups whose ancestors faced discrimination" and "descendants of those Japanese-American citizens interned during World War II." *Ante*, at 45, n. 10 (THOMAS, J., concurring). Even putting all that aside, SFFA stresses that neither Harvard nor UNC is willing to quantify how much racial and ethnic diversity they think sufficient. And, SFFA contends, the universities may not wish to do so because their stated goal implies a desire to admit some fixed number (or quota) of students from each racial group. See Brief for Petitioner 77, 80; Tr. of Oral Arg. in No. 21–707, p. 180. Besides, SFFA asks, if it is diversity the schools are after, why do they exhibit so little interest in other (non-racial) markers of it? See Brief for Petitioner 78, 83–86. While Harvard professes interest in socioeconomic diversity, for example, SFFA points to trial testimony that there are "23 times as many rich kids on campus as poor kids." 2 App. in No. 20–1199,

14    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

GORSUCH, J., concurring

p. 756.[3]

Even beyond all this, the parties debate the availability of alternatives. SFFA contends that both Harvard and UNC could obtain significant racial diversity without resorting to race-based admissions practices. Many other universities across the country, SFFA points out, have sought to do just that by reducing legacy preferences, increasing financial aid, and the like. Brief for Petitioner 85–86; see also Brief for Oklahoma et al. as *Amici Curiae* 9–19.[4] As part of its affirmative case, SFFA also submitted evidence that Harvard could nearly replicate the current racial composition of its student body without resorting to race-based practices if it: (1) provided socioeconomically

————————

[3] See also E. Bazelon, Why Is Affirmative Action in Peril? One Man's Decision, N. Y. Times Magazine, Feb. 15, 2023, p. 41 ("In the Ivy League, children whose parents are in the top 1 percent of the income distribution are 77 times as likely to attend as those whose parents are in the bottom 20 percent of the income bracket."); *ibid.* ("[A] common critique . . . is that schools have made a bargain with economic elites of all races, with the exception of Asian Americans, who are underrepresented compared with their level of academic achievement.").

[4] The principal dissent chides me for "reach[ing] beyond the factfinding below" by acknowledging SFFA's argument that other universities have employed various race-neutral tools. *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.). Contrary to the dissent's suggestion, however, I do not purport to find facts about those practices; all I do here is recount what SFFA has argued every step of the way. See, *e.g.,* Brief for Petitioner 55, 66–67; 1 App. in No. 20–1199, pp. 415–416, 440; 2 App. in No. 21–707, pp. 551–552. Nor, of course, is it somehow remarkable to acknowledge the parties' arguments. The principal dissent itself recites SFFA's arguments about Harvard's and other universities' practices too. See, *e.g., post,* at 30–31, 50 (opinion of SOTOMAYOR, J.). In truth, it is the dissent that reaches beyond the factfinding below when it argues from studies recited in a dissenting opinion in a different case decided almost a decade ago. *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.); see also *post,* at 18–21 (opinion of SOTOMAYOR, J.) (further venturing beyond the trial records to discuss data about employment, income, wealth, home ownership, and healthcare).

GORSUCH, J., concurring

disadvantaged applicants just *half* of the tip it gives re-
cruited athletes; and (2) eliminated tips for the children of
donors, alumni, and faculty.  Brief for Petitioner 33–34, 81;
see 2 App. in No. 20–1199, at 763–765, 774–775.  Doing
these two things would barely affect the academic creden-
tials of each incoming class.  Brief for Petitioner 33–34.  And
it would not require Harvard to end tips for recruited ath-
letes, who as a group are much weaker academically than
non-athletes.[5]

At trial, however, Harvard resisted this proposal.  Its
preferences for the children of donors, alumni, and faculty
are no help to applicants who cannot boast of their parents'
good fortune or trips to the alumni tent all their lives.
While race-neutral on their face, too, these preferences un-
doubtedly benefit white and wealthy applicants the most.
See 980 F. 3d, at 171.  Still, Harvard stands by them.  See
Brief for Respondent in No. 20–1199, at 52–54; Tr. of Oral
Arg. in No. 21–1199, at 48–49.  As a result, athletes and the
children of donors, alumni, and faculty—groups that to-
gether "make up less than 5% of applicants to Harvard"—
constitute "around 30% of the applicants admitted each
year."  980 F. 3d, at 171.

To be sure, the parties' debates raise some hard-to-an-
swer questions.  Just how many admissions decisions turn
on race?  And what really motivates the universities' race-
conscious admissions policies and their refusal to modify
other preferential practices?  Fortunately, Title VI does not
require an answer to any of these questions.  It does not ask

———————

[5] See Brief for Defense of Freedom Institute for Policy Studies as *Ami-
cus Curiae* 11 (recruited athletes make up less than 1% of Harvard's ap-
plicant pool but represent more than 10% of the admitted class); P. Arci-
diacono, J. Kinsler, & T. Ransom, Legacy and Athlete Preferences at
Harvard, 40 J. Lab. Econ. 133, 141, n. 17 (2021) (recruited athletes were
the only applicants admitted with the lowest possible academic rating
and 79% of recruited athletes with the next lowest rating were admitted
compared to 0.02% of other applicants with the same rating).

how much a recipient of federal funds discriminates. It does
not scrutinize a recipient's reasons or motives for discrimi-
nating. Instead, the law prohibits covered institutions from
intentionally treating *any* individual worse even *in part* be-
cause of race. So yes, of course, the universities consider
many non-racial factors in their admissions processes too.
And perhaps they mean well when they favor certain can-
didates over others based on the color of their skin. But
even if all that is true, their conduct violates Title VI just
the same. See Part I–A, *supra*; see also *Bostock*, 590 U. S.,
at ___, ___–___ (slip op., at 6, 12–15).

## D

The principal dissent contends that this understanding of
Title VI is contrary to precedent. *Post*, at 26–27, n. 21 (opin-
ion of SOTOMAYOR, J.). But the dissent does not dispute
that everything said here about the meaning of Title VI
tracks this Court's precedent in *Bostock* interpreting mate-
rially identical language in Title VII. That raises two ques-
tions: Do the dissenters think *Bostock* wrongly decided? Or
do they read the same words in neighboring provisions of
the same statute—enacted at the same time by the same
Congress—to mean different things? Apparently, the fed-
eral government takes the latter view. The Solicitor Gen-
eral insists that there is "ambiguity in the term 'discrimi-
nation'" in Title VI but no ambiguity in the term
"discriminate" in Title VII. Tr. of Oral Arg. in No. 21–707,
at 164. Respectfully, I do not see it. The words of the Civil
Rights Act of 1964 are not like mood rings; they do not
change their message from one moment to the next.

Rather than engage with the statutory text or our prece-
dent in *Bostock*, the principal dissent seeks to sow confusion
about the facts. It insists that all applicants to Harvard
and UNC are "eligible" to receive a race-based tip. *Post*, at
32, n. 27 (opinion of SOTOMAYOR, J.); cf. *post*, at 17
(JACKSON, J., dissenting). But the question in these cases

is not who could *hypothetically* receive a race-based tip. It is who *actually* receives one. And on that score the lower courts left no doubt. The district court in the Harvard case found that the school's admissions policy "cannot . . . be considered facially neutral from a Title VI perspective given that admissions officers provide [race-based] tips to African American and Hispanic applicants, while white and Asian American applicants are unlikely to receive a meaningful race-based tip." 397 F. Supp. 3d, at 190, n. 56; see also *id.,* at 189–190 ("Harvard's admissions process is not facially neutral."). Likewise, the district court in the UNC case found that admissions officers "sometimes" award race-based plusses to URM candidates—a category that excludes Asian American and white students. 567 F. Supp. 3d, at 591–592, n. 7, 601.[6]

Nor could anyone doubt that these cases are about intentional discrimination just because Harvard in particular "'does not *explicitly* prioritize any particular racial group over any other.'" *Post,* at 32, n. 27 (opinion of SOTOMAYOR, J.) (emphasis added). Forget for a moment the universities' concessions about how they deliberately consult race when deciding whom to admit. See *supra,* at 12–13.[7] Look past

_____

[6]The principal dissent suggests "some Asian American applicants are actually advantaged by Harvard's use of race." *Post,* at 60 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted). What is the dissent's basis for that claim? The district court's finding that "considering applicants' race *may* improve the admission chances of *some* Asian Americans *who connect their racial identities with particularly compelling narratives.*" 397 F. Supp. 3d, at 178 (emphasis added). The dissent neglects to mention those key qualifications. Worse, it ignores completely the district court's further finding that "*overall*" Harvard's race-conscious admissions policy "results in fewer Asian American[s] . . . being admitted." *Ibid.* (emphasis added). So much for affording the district court's "careful factfinding" the "deference it [is] owe[d]." *Post,* at 29–30, n. 25 (opinion of SOTOMAYOR, J.).

[7]See also, *e.g.,* Tr. of Oral Arg. in No. 20–1199, at 67, 84, 91; Tr. of Oral Arg. in No. 21–707, at 70–71, 81, 84, 91–92, 110.

the lower courts' findings recounted above about how the universities intentionally give tips to students of some races and not others. See *supra,* at 8–12, 16–17.  Put to the side telling evidence that came out in discovery.[8]  Ignore, too, our many precedents holding that it does not matter how a defendant "label[s]" its practices, *Bostock*, 590 U. S., at ___ (slip op., at 14); that intentional discrimination between individuals is unlawful whether "motivated by a wish to achieve classwide equality" or any other purpose, *id.,* at ___ (slip op., at 13); and that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a [merely] discriminatory effect," *Johnson Controls*, 499 U. S., at 199.  Consider just the dissents in these cases.  From start to finish and over the course of nearly 100 pages, they defend the universities' purposeful discrimination between applicants based on race.  "[N]eutrality," they insist, is not enough.  *Post,* at 12, 68 (opinion of SOTOMAYOR, J.); cf. *post*, at 21 (opinion of JACKSON, J.).  "[T]he use of race," they stress, "is critical."  *Post,* at 59–60 (opinion of SOTOMAYOR, J.); see *id.,* at 2, 33, 39, 43–45; cf. *post,* at 2, 26 (opinion of JACKSON, J.).  Plainly, Harvard and UNC choose to treat some students worse than others in part because of race.  To suggest otherwise—or to cling to the fact that the schools do not always say the quiet part aloud—is to deny reality.[9]

───────────

[8]Messages among UNC admissions officers included statements such as these:  "[P]erfect 2400 SAT All 5 on AP one B in 11th [grade]." "Brown?!"  "Heck no. Asian."  "Of course.  Still impressive.";  "If it[']s brown and above a 1300 [SAT] put them in for [the] merit/Excel [scholarship].";  "I just opened a brown girl who's an 810 [SAT].";  "I'm going through this trouble because this is a bi-racial (black/white) male.";  "[S]tellar academics for a Native Amer[ican]/African Amer[ican] kid."  3 App. in No. 21–707, pp. 1242–1251.

[9]Left with no reply on the statute or its application to the facts, the principal dissent suggests that it violates "principles of party presentation" and abandons "judicial restraint" even to look at the text of Title VI.

GORSUCH, J., concurring

## II

So far, we have seen that Title VI prohibits a recipient of federal funds from discriminating against individuals even in part because of race.  We have seen, too, that Harvard and UNC do just what the law forbids.  One might wonder, then, why the parties have devoted years and fortunes litigating other matters, like how much the universities discriminate and why they do so.  The answer lies in *Bakke*.

### A

*Bakke* concerned admissions to the medical school at the University of California, Davis.  That school set aside a certain number of spots in each class for minority applicants. See 438 U. S., at 272–276 (opinion of Powell, J.).  Allan Bakke argued that the school's policy violated Title VI and the Equal Protection Clause of the Fourteenth Amendment. *Id.,* at 270.  The Court agreed with Mr. Bakke.  In a fractured decision that yielded six opinions, a majority of the Court held that the school's set-aside system went too far. At the same time, however, a different coalition of five Justices ventured beyond the facts of the case to suggest that, in other circumstances not at issue, universities may sometimes permissibly use race in their admissions processes. See *ante,* at 16–19 (opinion for the Court).

As important as these conclusions were some of the interpretive moves made along the way.  Justice Powell (writing only for himself ) and Justice Brennan (writing for himself

_____

*Post,* at 26–27, n. 21 (opinion of SOTOMAYOR, J.).  It is a bewildering suggestion.  SFFA sued Harvard and UNC under Title VI.  And when a party seeks relief under a statute, our task is to apply the law's terms as a reasonable reader would have understood them when Congress enacted them.  *Bostock* v. *Clayton County,* 590 U. S. ___, ___ (2020) (slip op., at 4).  To be sure, parties are free to frame their arguments.  But they are not free to stipulate to a statute's meaning and no party may "waiv[e]" the proper interpretation of the law by "fail[ing] to invoke it."  *EEOC* v. *FLRA,* 476 U. S. 19, 23 (1986) (*per curiam*) (internal quotation marks omitted); see also *Young* v. *United States,* 315 U. S. 257, 258–259 (1942).

and three others) argued that Title VI is coterminous with
the Equal Protection Clause. Put differently, they read Ti-
tle VI to prohibit recipients of federal funds from doing
whatever the Equal Protection Clause prohibits States from
doing. Justice Powell and Justice Brennan then proceeded
to evaluate racial preferences in higher education directly
under the Equal Protection Clause. From there, however,
their paths diverged. Justice Powell thought some racial
preferences might be permissible but that the admissions
program at issue violated the promise of equal protection.
438 U. S., at 315–320. Justice Brennan would have given a
wider berth to racial preferences and allowed the chal-
lenged program to proceed. *Id.*, at 355–379.

Justice Stevens (also writing for himself and three oth-
ers) took an altogether different approach. He began by
noting the Court's "settled practice" of "avoid[ing] the deci-
sion of a constitutional issue if a case can be fairly decided
on a statutory ground." *Id.*, at 411. He then turned to the
"broad prohibition" of Title VI, *id.*, at 413, and summarized
his views this way: "The University . . . excluded Bakke
from participation in its program of medical education be-
cause of his race. The University also acknowledges that it
was, and still is, receiving federal financial assistance. The
plain language of the statute therefore requires" finding a
Title VI violation. *Id.*, at 412 (footnote omitted).

In the years following *Bakke*, this Court hewed to Justice
Powell's and Justice Brennan's shared premise that Title
VI and the Equal Protection Clause mean the same thing.
See *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23 (2003);
*Grutter* v. *Bollinger*, 539 U. S. 306, 343 (2003). Justice Ste-
vens's statute-focused approach receded from view. As a
result, for over four decades, every case about racial prefer-
ences in school admissions under Title VI has turned into a
case about the meaning of the Fourteenth Amendment.

And what a confused body of constitutional law followed.
For years, this Court has said that the Equal Protection

GORSUCH, J., concurring

Clause requires any consideration of race to satisfy "strict scrutiny," meaning it must be "narrowly tailored to further compelling governmental interests." *Grutter*, 539 U. S., at 326 (internal quotation marks omitted). Outside the context of higher education, "our precedents have identified only two" interests that meet this demanding standard: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and "avoiding imminent and serious risks to human safety in prisons." *Ante,* at 15 (opinion for the Court).

Within higher education, however, an entirely distinct set of rules emerged. Following *Bakke*, this Court declared that judges may simply "defer" to a school's assertion that "diversity is essential" to its "educational mission." *Grutter*, 539 U. S., at 328. Not all schools, though—elementary and secondary schools apparently do not qualify for this deference. See *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 724–725 (2007). Only colleges and universities, the Court explained, "occupy a special niche in our constitutional tradition." *Grutter*, 539 U. S., at 329. Yet even they (wielding their "special niche" authority) cannot simply assert an interest in diversity and discriminate as they please. *Fisher*, 579 U. S., at 381. Instead, they may consider race only as a "plus" factor for the purpose of "attaining a critical mass of underrepresented minority students" or "a diverse student body." *Grutter*, 539 U. S., at 335–336 (internal quotation marks omitted). At the same time, the Court cautioned, this practice "must have a logical end point." *Id.,* at 342. And in the meantime, "outright racial balancing" and "quota system[s]" remain "patently unconstitutional." *Id.*, at 330, 334. Nor may a college or university ever provide "mechanical, predetermined diversity bonuses." *Id.*, at 337 (internal quotation marks omitted). Only a "tip" or "plus" is constitutionally tolerable, and only for a limited time. *Id.*, at 338–339, 341.

If you cannot follow all these twists and turns, you are

not alone. See, *e.g., Fisher*, 579 U. S., at 401–437 (ALITO, J., dissenting); *Grutter*, 539 U. S., at 346–349 (Scalia, J., joined by THOMAS, J., concurring in part and dissenting in part); 1 App. in No. 21–707, pp. 401–402 (testimony from UNC administrator: "[M]y understanding of the term 'critical mass' is that it's a . . . I'm trying to decide if it's an analogy or a metaphor[.]  I think it's an analogy. . . .  I'm not even sure we would know what it is."); 3 App. in No. 20–1199, at 1137–1138 (similar testimony from a Harvard administrator).  If the Court's post-*Bakke* higher-education precedents ever made sense, they are by now incoherent.

Recognizing as much, the Court today cuts through the kudzu.  It ends university exceptionalism and returns this Court to the traditional rule that the Equal Protection Clause forbids the use of race in distinguishing between persons unless strict scrutiny's demanding standards can be met.  In that way, today's decision wakes the echoes of Justice John Marshall Harlan:  "The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (dissenting opinion).

## B

If *Bakke* led to errors in interpreting the Equal Protection Clause, its first mistake was to take us there.  These cases arise under Title VI and that statute is "more than a simple paraphrasing" of the Equal Protection Clause.  438 U. S., at 416 (opinion of Stevens, J.).  Title VI has "independent force, with language and emphasis in addition to that found in the Constitution." *Ibid.*  That law deserves our respect and its terms provide us with all the direction we need.

Put the two provisions side by side.  Title VI says:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

GORSUCH, J., concurring

under any program or activity receiving Federal financial assistance." §2000d. The Equal Protection Clause reads: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Amdt. 14, §1. That such differently worded provisions should mean the same thing is implausible on its face.

Consider just some of the obvious differences. The Equal Protection Clause operates on States. It does not purport to regulate the conduct of private parties. By contrast, Title VI applies to recipients of federal funds—covering not just many state actors, but many private actors too. In this way, Title VI reaches entities and organizations that the Equal Protection Clause does not.

In other respects, however, the relative scope of the two provisions is inverted. The Equal Protection Clause addresses all manner of distinctions between persons and this Court has held that it implies different degrees of judicial scrutiny for different kinds of classifications. So, for example, courts apply strict scrutiny for classifications based on race, color, and national origin; intermediate scrutiny for classifications based on sex; and rational-basis review for classifications based on more prosaic grounds. See, *e.g.*, *Fisher*, 579 U. S., at 376; *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493–495 (1989) (plurality opinion); *United States* v. *Virginia*, 518 U. S. 515, 555–556 (1996); *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 366–367 (2001). By contrast, Title VI targets only certain classifications—those based on race, color, or national origin. And that law does not direct courts to subject these classifications to one degree of scrutiny or another. Instead, as we have seen, its rule is as uncomplicated as it is momentous. Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin.

In truth, neither Justice Powell's nor Justice Brennan's opinion in *Bakke* focused on the text of Title VI. Instead,

both leapt almost immediately to its "voluminous legislative history," from which they proceeded to divine an implicit "congressional intent" to link the statute with the Equal Protection Clause. 438 U. S., at 284–285 (opinion of Powell, J.); *id.,* at 328–336 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ.). Along the way, as Justice Stevens documented, both opinions did more than a little cherry-picking from the legislative record. See *id.,* at 413–417. Justice Brennan went so far as to declare that "any claim that the use of racial criteria is barred by the plain language of the statute must fail in light of the remedial purpose of Title VI and its legislative history." *Id.,* at 340. And once liberated from the statute's firm rule against discrimination based on race, both opinions proceeded to devise their own and very different arrangements in the name of the Equal Protection Clause.

The moves made in *Bakke* were not statutory interpretation. They were judicial improvisation. Under our Constitution, judges have never been entitled to disregard the plain terms of a valid congressional enactment based on surmise about unenacted legislative intentions. Instead, it has always been this Court's duty "to give effect, if possible, to every clause and word of a statute," *Montclair* v. *Ramsdell*, 107 U. S. 147, 152 (1883), and of the Constitution itself, see *Knowlton* v. *Moore*, 178 U. S. 41, 87 (1900). In this country, "[o]nly the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U. S., at ___ (slip op., at 2). When judges disregard these principles and enforce rules "inspired only by extratextual sources and [their] own imaginations," they usurp a lawmaking function "reserved for the people's representatives." *Id.*, at ___ (slip op., at 4).

Today, the Court corrects course in its reading of the Equal Protection Clause. With that, courts should now also correct course in their treatment of Title VI. For years, they

GORSUCH, J., concurring

have read a solo opinion in *Bakke* like a statute while reading Title VI as a mere suggestion. A proper respect for the law demands the opposite. Title VI bears independent force beyond the Equal Protection Clause. Nothing in it grants special deference to university administrators. Nothing in it endorses racial discrimination to any degree or for any purpose. Title VI is more consequential than that.

*

In the aftermath of the Civil War, Congress took vital steps toward realizing the promise of equality under the law. As important as those initial efforts were, much work remained to be done—and much remains today. But by any measure, the Civil Rights Act of 1964 stands as a landmark on this journey and one of the Nation's great triumphs. We have no right to make a blank sheet of any of its provisions. And when we look to the clear and powerful command Congress set forth in that law, these cases all but resolve themselves. Under Title VI, it is never permissible "'to say "yes" to one person . . . but to say "no" to another person'" even in part "'because of the color of his skin.'" *Bakke*, 438 U. S., at 418 (opinion of Stevens, J.).

Cite as: 600 U. S. ____ (2023)          1

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

Nos. 20–1199 and 21–707

————

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

20–1199          *v.*

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
PETITIONER

21–707          *v.*

UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full. I add this concurring opinion to further explain why the Court's decision today is consistent with and follows from the Court's equal protection precedents, including the Court's precedents on race-based affirmative action in higher education.

Ratified in 1868 in the wake of the Civil War, the Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, §1. In accord with the Fourteenth Amendment's text and history, this Court considers all racial classifications to be constitutionally suspect. See *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003); *Strauder* v. *West Virginia*, 100 U. S. 303,

306–308 (1880). As a result, the Court has long held that racial classifications by the government, including race-based affirmative action programs, are subject to strict judicial scrutiny.

Under strict scrutiny, racial classifications are constitutionally prohibited unless they are narrowly tailored to further a compelling governmental interest. *Grutter*, 539 U. S., at 326–327. Narrow tailoring requires courts to examine, among other things, whether a racial classification is "necessary"—in other words, whether race-neutral alternatives could adequately achieve the governmental interest. *Id.,* at 327, 339–340; *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 507 (1989).

Importantly, even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest, a "deviation from the norm of equal treatment of all racial and ethnic groups" must be "a temporary matter"—or stated otherwise, must be "limited in time." *Id.,* at 510 (plurality opinion of O'Connor, J.); *Grutter*, 539 U. S., at 342.

In 1978, five Members of this Court held that race-based affirmative action in higher education did not violate the Equal Protection Clause or Title VI of the Civil Rights Act, so long as universities used race only as a factor in admissions decisions and did not employ quotas. See *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 325–326 (1978) (joint opinion of Brennan, White, Marshall, and Blackmun, JJ.); *id.,* at 287, 315–320 (opinion of Powell, J.). One Member of the Court's five-Justice majority, Justice Blackmun, added that race-based affirmative action should exist only as a temporary measure. He expressed hope that such programs would be "unnecessary" and a "relic of the past" by 1988—within 10 years "at the most," in his words—although he doubted that the goal could be achieved by then. *Id.,* at 403 (opinion of Blackmun, J.).

In 2003, 25 years after *Bakke*, five Members of this Court

KAVANAUGH, J., concurring

again held that race-based affirmative action in higher
education did not violate the Equal Protection Clause or
Title VI. *Grutter*, 539 U. S., at 343. This time, however, the
Court also specifically indicated—despite the reservations
of Justice Ginsburg and Justice Breyer—that race-based
affirmative action in higher education would *not* be
constitutionally justified after another 25 years, at least
absent something not "expect[ed]." *Ibid.* And various
Members of the Court wrote separate opinions explicitly
referencing the Court's 25-year limit.

- Justice O'Connor's opinion for the Court stated: "We
  expect that 25 years from now, the use of racial
  preferences will no longer be necessary to further
  the interest approved today." *Ibid.*

- JUSTICE THOMAS expressly concurred in "the Court's
  holding that racial discrimination in higher
  education admissions will be illegal in 25 years." *Id.,*
  at 351 (opinion concurring in part and dissenting in
  part).

- JUSTICE THOMAS, joined here by Justice Scalia,
  reiterated "the Court's holding" that race-based
  affirmative action in higher education "will be
  unconstitutional in 25 years" and "that in 25 years
  the practices of the Law School will be illegal," while
  also stating that "they are, for the reasons I have
  given, illegal now." *Id.,* at 375–376.

- Justice Kennedy referred to "the Court's
  pronouncement that race-conscious admissions
  programs will be unnecessary 25 years from now."
  *Id.,* at 394 (dissenting opinion).

- Justice Ginsburg, joined by Justice Breyer,
  acknowledged the Court's 25-year limit but
  questioned it, writing that "one may hope, but not
  firmly forecast, that over the next generation's span,
  progress toward nondiscrimination and genuinely

equal opportunity will make it safe to sunset affirmative action." *Id.,* at 346 (concurring opinion).

In allowing race-based affirmative action in higher education for another generation—and only for another generation—the Court in *Grutter* took into account competing considerations. The Court recognized the barriers that some minority applicants to universities still faced as of 2003, notwithstanding the progress made since *Bakke.* See *Grutter,* 539 U. S., at 343. The Court stressed, however, that "there are serious problems of justice connected with the idea of preference itself." *Id.,* at 341 (internal quotation marks omitted). And the Court added that a "core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race." *Ibid.* (internal quotation marks omitted).

The *Grutter* Court also emphasized the equal protection principle that racial classifications, even when otherwise permissible, must be a "'temporary matter,'" and "must be limited in time." *Id.,* at 342 (quoting *Croson,* 488 U. S., at 510 (plurality opinion of O'Connor, J.)). The requirement of a time limit "reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle." *Grutter,* 539 U. S., at 342.

Importantly, the *Grutter* Court saw "no reason to exempt race-conscious admissions programs from the requirement that all governmental use of race must have a logical end point." *Ibid.* The Court reasoned that the "requirement that all race-conscious admissions programs have a termination point assures all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." *Ibid.* (internal

KAVANAUGH, J., concurring

quotation marks and alteration omitted). The Court therefore concluded that race-based affirmative action programs in higher education, like other racial classifications, must be "limited in time." *Ibid.*

The *Grutter* Court's conclusion that race-based affirmative action in higher education must be limited in time followed not only from fundamental equal protection principles, but also from this Court's equal protection precedents applying those principles. Under those precedents, racial classifications may not continue indefinitely. For example, in the elementary and secondary school context after *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the Court authorized race-based student assignments for several decades—but not indefinitely into the future. See, *e.g.*, *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 247–248 (1991); *Pasadena City Bd. of Ed.* v. *Spangler*, 427 U. S. 424, 433–434, 436 (1976); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 31–32 (1971); cf. *McDaniel* v. *Barresi*, 402 U. S. 39, 41 (1971).

In those decisions, this Court ruled that the race-based "injunctions entered in school desegregation cases" could not "operate in perpetuity." *Dowell*, 498 U. S., at 248. Consistent with those decisions, the *Grutter* Court ruled that race-based affirmative action in higher education likewise could not operate in perpetuity.

As of 2003, when *Grutter* was decided, many race-based affirmative action programs in higher education had been operating for about 25 to 35 years. Pointing to the Court's precedents requiring that racial classifications be "temporary," *Croson*, 488 U. S., at 510 (plurality opinion of O'Connor, J.), the petitioner in *Grutter*, joined by the United States, argued that race-based affirmative action in higher education could continue no longer. See Brief for Petitioner 21–22, 30–31, 33, 42, Brief for United States 26–27, in *Grutter* v. *Bollinger*, O. T. 2002, No. 02–241.

The *Grutter* Court rejected those arguments for ending race-based affirmative action in higher education in 2003. But in doing so, the Court struck a careful balance. The Court ruled that narrowly tailored race-based affirmative action in higher education could continue for another generation. But the Court also explicitly rejected any "permanent justification for racial preferences," and therefore ruled that race-based affirmative action in higher education could continue *only* for another generation. 539 U. S., at 342–343.

Harvard and North Carolina would prefer that the Court now ignore or discard *Grutter*'s 25-year limit on race-based affirmative action in higher education, or treat it as a mere aspiration. But the 25-year limit constituted an important part of Justice O'Connor's nuanced opinion for the Court in *Grutter*. Indeed, four of the separate opinions in *Grutter* discussed the majority opinion's 25-year limit, which belies any suggestion that the Court's reference to it was insignificant or not carefully considered.

In short, the Court in *Grutter* expressly recognized the serious issues raised by racial classifications—particularly permanent or long-term racial classifications. And the Court "assure[d] all citizens" throughout America that "the deviation from the norm of equal treatment" in higher education could continue for another generation, and only for another generation. *Ibid.* (internal quotation marks omitted).

A generation has now passed since *Grutter*, and about 50 years have gone by since the era of *Bakke* and *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974), when race-based affirmative action programs in higher education largely began. In light of the Constitution's text, history, and precedent, the Court's decision today appropriately respects and abides by *Grutter*'s explicit temporal limit on the use of race-based affirmative action in higher

KAVANAUGH, J., concurring

education.[1]

JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON disagree with the Court's decision. I respect their views. They thoroughly recount the horrific history of slavery and Jim Crow in America, cf. *Bakke*, 438 U. S., at 395–402 (opinion of Marshall, J.), as well as the continuing effects of that history on African Americans today. And they are of course correct that for the last five decades, *Bakke* and *Grutter* have allowed narrowly tailored race-based affirmative action in higher education.

But I respectfully part ways with my dissenting colleagues on the question of whether, under this Court's precedents, race-based affirmative action in higher education may extend indefinitely into the future. The dissents suggest that the answer is yes. But this Court's precedents make clear that the answer is no. See *Grutter*, 539 U. S., at 342–343; *Dowell*, 498 U. S., at 247–248; *Croson*, 488 U. S., at 510 (plurality opinion of O'Connor, J.).

To reiterate: For about 50 years, many institutions of higher education have employed race-based affirmative action programs. In the abstract, it might have been debatable how long those race-based admissions programs could continue under the "temporary matter"/"limited in time" equal protection principle recognized and applied by this Court. *Grutter*, 539 U. S., at 342 (internal quotation marks omitted); cf. *Dowell*, 498 U. S., at 247–248. But in 2003, the *Grutter* Court applied that temporal equal

───────────

[1]The Court's decision will first apply to the admissions process for the college class of 2028, which is the next class to be admitted. Some might have debated how to calculate *Grutter*'s 25-year period—whether it ends with admissions for the college class of 2028 or instead for the college class of 2032. But neither Harvard nor North Carolina argued that *Grutter*'s 25-year period ends with the class of 2032 rather than the class of 2028. Indeed, notwithstanding the 25-year limit set forth in *Grutter*, neither university embraced *any* temporal limit on race-based affirmative action in higher education, or identified any end date for its continued use of race in admissions. *Ante,* at 30–34.

protection principle and resolved the debate:  The Court declared that race-based affirmative action in higher education could continue for another generation, and only for another generation, at least absent something unexpected. *Grutter*, 539 U. S., at 343.  As I have explained, the Court's pronouncement of a 25-year period—as both an extension of *and* an outer limit to race-based affirmative action in higher education—formed an important part of the carefully constructed *Grutter* decision.  I would abide by that temporal limit rather than discarding it, as today's dissents would do.

To be clear, although progress has been made since *Bakke* and *Grutter*, racial discrimination still occurs and the effects of past racial discrimination still persist.  Federal and state civil rights laws serve to deter and provide remedies for current acts of racial discrimination.  And governments and universities still "can, of course, act to undo the effects of past discrimination in many permissible ways that do not involve classification by race." *Croson*, 488 U. S., at 526 (Scalia, J., concurring in judgment) (internal quotation marks omitted); see *id.,* at 509 (plurality opinion of O'Connor, J.) ("the city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races"); *ante,* at 39–40; Brief for Petitioner 80–86; Reply Brief in No. 20–1199, pp. 25–26; Reply Brief in No. 21–707, pp. 23–26.

In sum, the Court's opinion today is consistent with and follows from the Court's equal protection precedents, and I join the Court's opinion in full.

Cite as: 600 U. S. ____ (2023)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 20–1199 and 21–707

_____

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

20–1199          *v.*

### PRESIDENT AND FELLOWS OF HARVARD COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

## STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER

21–707          *v.*

### UNIVERSITY OF NORTH CAROLINA, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 29, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join,* dissenting.

The Equal Protection Clause of the Fourteenth Amendment enshrines a guarantee of racial equality. The Court long ago concluded that this guarantee can be enforced through race-conscious means in a society that is not, and has never been, colorblind. In *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the Court recognized the constitutional necessity of racially integrated schools in light of the

_____

*JUSTICE JACKSON did not participate in the consideration or decision of the case in No. 20–1199 and joins this opinion only as it applies to the case in No. 21–707.

harm inflicted by segregation and the "importance of education to our democratic society." *Id.*, at 492–495. For 45 years, the Court extended *Brown*'s transformative legacy to the context of higher education, allowing colleges and universities to consider race in a limited way and for the limited purpose of promoting the important benefits of racial diversity. This limited use of race has helped equalize educational opportunities for all students of every race and background and has improved racial diversity on college campuses. Although progress has been slow and imperfect, race-conscious college admissions policies have advanced the Constitution's guarantee of equality and have promoted *Brown*'s vision of a Nation with more inclusive schools.

Today, this Court stands in the way and rolls back decades of precedent and momentous progress. It holds that race can no longer be used in a limited way in college admissions to achieve such critical benefits. In so holding, the Court cements a superficial rule of colorblindness as a constitutional principle in an endemically segregated society where race has always mattered and continues to matter. The Court subverts the constitutional guarantee of equal protection by further entrenching racial inequality in education, the very foundation of our democratic government and pluralistic society. Because the Court's opinion is not grounded in law or fact and contravenes the vision of equality embodied in the Fourteenth Amendment, I dissent.

## I

### A

Equal educational opportunity is a prerequisite to achieving racial equality in our Nation. From its founding, the United States was a new experiment in a republican form of government where democratic participation and the capacity to engage in self-rule were vital. At the same time, American society was structured around the profitable institution that was slavery, which the original Constitution

SOTOMAYOR, J., dissenting

protected.  The Constitution initially limited the power of Congress to restrict the slave trade, Art. I, §9, cl. 1, accorded Southern States additional electoral power by counting three-fifths of their enslaved population in apportioning congressional seats, §2, cl. 3, and gave enslavers the right to retrieve enslaved people who escaped to free States, Art. IV, §2, cl. 3.  Because a foundational pillar of slavery was the racist notion that Black people are a subordinate class with intellectual inferiority, Southern States sought to ensure slavery's longevity by prohibiting the education of Black people, whether enslaved or free.  See H. Williams, Self-Taught: African American Education in Slavery and Freedom 7, 203–213 (2005) (Self-Taught).  Thus, from this Nation's birth, the freedom to learn was neither colorblind nor equal.

With time, and at the tremendous cost of the Civil War, abolition came.  More than two centuries after the first African enslaved persons were forcibly brought to our shores, Congress adopted the Thirteenth Amendment to the Constitution, which abolished "slavery" and "involuntary servitude, except as a punishment for crime." §1.  "Like all great historical transformations," emancipation was a movement, "not a single event" owed to any single individual, institution, or political party.  E. Foner, The Second Founding 21, 51–54 (2019) (The Second Founding).

The fight for equal educational opportunity, however, was a key driver.  Literacy was an "instrument of resistance and liberation."  Self-Taught 8.  Education "provided the means to write a pass to freedom" and "to learn of abolitionist activities."  *Id.*, at 7.  It allowed enslaved Black people "to disturb the power relations between master and slave," which "fused their desire for literacy with their desire for freedom."  *Ibid.*  Put simply, "[t]he very feeling of inferiority which slavery forced upon [Black people] fathered an intense desire to rise out of their condition by means of education."  W. E. B. Du Bois, Black Reconstruction in America

1860–1880, p. 638 (1935); see J. Anderson, The Education
of Blacks in the South 1860–1935, p. 7 (1988).  Black Amer-
icans thus insisted, in the words of Frederick Douglass,
"that in a country governed by the people, like ours, educa-
tion of the youth of all classes is vital to its welfare, pros-
perity, and to its existence."  Address to the People of the
United States (1883), in 4 P. Foner, The Life and Writings
of Frederick Douglass 386 (1955).  Black people's yearning
for freedom of thought, and for a more perfect Union with
educational opportunity for all, played a crucial role during
the Reconstruction era.

Yet emancipation marked the beginning, not the end, of
that era.  Abolition alone could not repair centuries of racial
subjugation.  Following the Thirteenth Amendment's rati-
fication, the Southern States replaced slavery with "a sys-
tem of 'laws which imposed upon [Black people] onerous
disabilities and burdens, and curtailed their rights in the
pursuit of life, liberty, and property to such an extent that
their freedom was of little value.'"  *Regents of Univ. of Cal.*
v. *Bakke*, 438 U. S. 265, 390 (1978) (opinion of Marshall, J.)
(quoting *Slaughter-House Cases*, 16 Wall. 36, 70 (1873)).
Those so-called "Black Codes" discriminated against Black
people on the basis of race, regardless of whether they had
been previously enslaved.  See, *e.g.*, 1866 N. C. Sess. Laws
pp. 99, 102.

Moreover, the criminal punishment exception in the
Thirteenth Amendment facilitated the creation of a new
system of forced labor in the South.  Southern States ex-
panded their criminal laws, which in turn "permitted invol-
untary servitude as a punishment" for convicted Black per-
sons.  D. Blackmon, Slavery by Another Name: The Re-
Enslavement of Black Americans From the Civil War to
World War II, pp. 7, 53 (2009) (Slavery by Another Name).
States required, for example, that Black people "sign a la-
bor contract to work for a white employer or face prosecu-
tion for vagrancy."  The Second Founding 48.  State laws

SOTOMAYOR, J., dissenting

then forced Black convicted persons to labor in "plantations, mines, and industries in the South." *Id.*, at 50. This system of free forced labor provided tremendous benefits to Southern whites and was designed to intimidate, subjugate, and control newly emancipated Black people. See Slavery by Another Name 5–6, 53. The Thirteenth Amendment, without more, failed to equalize society.

Congress thus went further and embarked on months of deliberation about additional Reconstruction laws. Those efforts included the appointment of a Committee, the Joint Committee on Reconstruction, "to inquire into the condition of the Confederate States." Report of the Joint Committee on Reconstruction, S. Rep. No. 112, 39th Cong., 1st Sess., 1 (1866) (hereinafter Joint Comm. Rep.). Among other things, the Committee's Report to Congress documented the "deep-seated prejudice" against emancipated Black people in the Southern States and the lack of a "general disposition to place the colored race, constituting at least two-fifths of the population, upon terms even of civil equality." *Id.*, at 11. In light of its findings, the Committee proposed amending the Constitution to secure the equality of "rights, civil and political." *Id.*, at 7.

Congress acted on that recommendation and adopted the Fourteenth Amendment. Proponents of the Amendment declared that one of its key goals was to "protec[t] the black man in his fundamental rights as a citizen with the same shield which it throws over the white man." Cong. Globe, 39th Cong., 1st Sess., 2766 (1866) (Cong. Globe) (statement of Sen. Howard). That is, the Amendment sought "to secure to a race recently emancipated, a race that through many generations [was] held in slavery, all the civil rights that the superior race enjoy." *Plessy* v. *Ferguson*, 163 U. S. 537, 555–556 (1896) (Harlan, J., dissenting) (internal quotation marks omitted).

To promote this goal, Congress enshrined a broad guarantee of equality in the Equal Protection Clause of the

Amendment.  That Clause commands that "[n]o State shall
. . . deny to any person within its jurisdiction the equal pro-
tection of the laws."  Amdt. 14, §1.  Congress chose its words
carefully, opting for expansive language that focused on
equal protection and rejecting "proposals that would have
made the Constitution explicitly color-blind."  A. Kull, The
Color-Blind Constitution 69 (1992); see also, *e.g.*, Cong.
Globe 1287 (rejecting proposed language providing that "no
State . . . shall . . . recognize any distinction between citi-
zens . . . on account of race or color").  This choice makes it
clear that the Fourteenth Amendment does not impose a
blanket ban on race-conscious policies.

Simultaneously with the passage of the Fourteenth
Amendment, Congress enacted a number of race-conscious
laws to fulfill the Amendment's promise of equality, leav-
ing no doubt that the Equal Protection Clause permits
consideration of race to achieve its goal.  One such law was
the Freedmen's Bureau Act, enacted in 1865 and then ex-
panded in 1866, which established a federal agency to pro-
vide certain benefits to refugees and newly emancipated
freedmen.  See Act of Mar. 3, 1865, ch. 90, 13 Stat. 507; Act
of July 16, 1866, ch. 200, 14 Stat. 173.  For the Bureau, ed-
ucation "was the foundation upon which all efforts to assist
the freedmen rested."  E. Foner, Reconstruction: America's
Unfinished Revolution 1863–1877, p. 144 (1988).  Con-
sistent with that view, the Bureau provided essential "fund-
ing for black education during Reconstruction."  *Id.*, at 97.

Black people were the targeted beneficiaries of the Bu-
reau's programs, especially when it came to investments in
education in the wake of the Civil War.  Each year sur-
rounding the passage of the Fourteenth Amendment, the
Bureau "educated approximately 100,000 students, nearly
all of them black," and regardless of "degree of past disad-
vantage."  E. Schnapper, Affirmative Action and the Legis-
lative History of the Fourteenth Amendment, 71 Va. L. Rev.

SOTOMAYOR, J., dissenting

753, 781 (1985).  The Bureau also provided land and funding to establish some of our Nation's Historically Black Colleges and Universities (HBCUs).  *Ibid.*; see also Brief for HBCU Leaders et al. as *Amici Curiae* 13 (HBCU Brief ).  In 1867, for example, the Bureau provided Howard University tens of thousands of dollars to buy property and construct its campus in our Nation's capital.  2 O. Howard, Autobiography 397–401 (1907).  Howard University was designed to provide "special opportunities for a higher education to the newly enfranchised of the south," but it was available to all Black people, "whatever may have been their previous condition."  Bureau Refugees, Freedmen and Abandoned Lands, Sixth Semi-Annual Report on Schools for Freedmen 60 (July 1, 1868).[1]  The Bureau also "expended a total of $407,752.21 on black colleges, and only $3,000 on white colleges" from 1867 to 1870. Schnapper, 71 Va. L. Rev., at 798, n. 149.

Indeed, contemporaries understood that the Freedmen's Bureau Act benefited Black people.  Supporters defended the law by stressing its race-conscious approach.  See, *e.g.*, Cong. Globe 632 (statement of Rep. Moulton) ("[T]he true object of this bill is the amelioration of the condition of the colored people"); Joint Comm. Rep. 11 (reporting that "the Union men of the south" declared "with one voice" that the Bureau's efforts "protect[ed] the colored people").  Opponents argued that the Act created harmful racial classifications that favored Black people and disfavored white Americans.  See, *e.g.*, Cong. Globe 397 (statement of Sen. Willey) (the Act makes "a distinction on account of color between the two races"), 544 (statement of Rep. Taylor) (the Act is

_____

[1] As JUSTICE THOMAS acknowledges, the HBCUs, including Howard University, account for a high proportion of Black college graduates. *Ante*, at 56–57 (concurring opinion).  That reality cannot be divorced from the history of anti-Black discrimination that gave rise to the HBCUs and the targeted work of the Freedmen's Bureau to help Black people obtain a higher education.  See HBCU Brief 13–15.

"legislation for a particular class of the blacks to the exclusion of all whites"), App. to Cong. Globe, 39th Cong., 1st Sess., 69–70 (statement of Rep. Rousseau) ("You raise a spirit of antagonism between the black race and the white race in our country, and the law-abiding will be powerless to control it"). President Andrew Johnson vetoed the bill on the basis that it provided benefits "to a particular class of citizens," 6 Messages and Papers of the Presidents 1789–1897, p. 425 (J. Richardson ed. 1897) (Messages & Papers) (A. Johnson to House of Rep. July 16, 1866), but Congress overrode his veto. Cong. Globe 3849–3850. Thus, rejecting those opponents' objections, the same Reconstruction Congress that passed the Fourteenth Amendment eschewed the concept of colorblindness as sufficient to remedy inequality in education.

Congress also debated and passed the Civil Rights Act of 1866 contemporaneously with the Fourteenth Amendment. The goal of that Act was to eradicate the Black Codes enacted by Southern States following ratification of the Thirteenth Amendment. See *id.*, at 474. Because the Black Codes focused on race, not just slavery-related status, the Civil Rights Act explicitly recognized that white citizens enjoyed certain rights that non-white citizens did not. Section 1 of the Act provided that all persons "of every race and color . . . shall have the same right[s]" as those "enjoyed by white citizens." Act of Apr. 9, 1866, 14 Stat. 27. Similarly, Section 2 established criminal penalties for subjecting racial minorities to "different punishment . . . by reason of . . . color or race, than is prescribed for the punishment of white persons." *Ibid.* In other words, the Act was not colorblind. By using white citizens as a benchmark, the law classified by race and took account of the privileges enjoyed only by white people. As he did with the Freedmen's Bureau Act, President Johnson vetoed the Civil Rights Act in part because he viewed it as providing Black citizens with special treatment. See Messages and Papers 408, 413 (the Act is

SOTOMAYOR, J., dissenting

designed "to afford discriminating protection to colored persons," and its "distinction of race and color . . . operate[s] in favor of the colored and against the white race"). Again, Congress overrode his veto. Cong. Globe 1861. In fact, Congress reenacted race-conscious language in the Civil Rights Act of 1870, two years after ratification of the Fourteenth Amendment, see Act of May 31, 1870, §16, 16 Stat. 144, where it remains today, see 42 U. S. C. §§1981(a) and 1982 (Rev. Stat. §§1972, 1978).

Congress similarly appropriated federal dollars explicitly and solely for the benefit of racial minorities. For example, it appropriated money for "'the relief of destitute colored women and children,'" without regard to prior enslavement. Act of July 28, 1866, 14 Stat. 317. Several times during and after the passage of the Fourteenth Amendment, Congress also made special appropriations and adopted special protections for the bounty and prize money owed to "colored soldiers and sailors" of the Union Army. 14 Stat. 357, Res. No. 46, June 15, 1866; Act of Mar. 3, 1869, ch. 122, 15 Stat. 301; Act of Mar. 3, 1873, 17 Stat. 528. In doing so, it rebuffed objections to these measures as "class legislation" "applicable to colored people and not . . . to the white people." Cong. Globe, 40th Cong., 1st Sess., 79 (1867) (statement of Sen. Grimes). This history makes it "inconceivable" that race-conscious college admissions are unconstitutional. *Bakke*, 438 U. S., at 398 (opinion of Marshall, J.).[2]

——————

[2] By the time the Fourteenth Amendment was ratified by the States in 1868, "education had become a right of state citizenship in the constitution of every readmitted state," including in North Carolina. D. Black, The Fundamental Right to Education, 94 Notre Dame L. Rev. 1059, 1089 (2019); see also Brief for Black Women Scholars as *Amici Curiae* 9 ("The herculean efforts of Black reformers, activists, and lawmakers during the Reconstruction Era forever transformed State constitutional law; today, thanks to the impact of their work, every State constitution contains language guaranteeing the right to public education").

### B

The Reconstruction era marked a transformational point in the history of American democracy. Its vision of equal opportunity leading to an equal society "was short-lived," however, "with the assistance of this Court." *Id.*, at 391. In a series of decisions, the Court "sharply curtailed" the "substantive protections" of the Reconstruction Amendments and the Civil Rights Acts. *Id.*, at 391–392 (collecting cases). That endeavor culminated with the Court's shameful decision in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), which established that "equality of treatment" exists "when the races are provided substantially equal facilities, even though these facilities be separate." *Brown*, 347 U. S., at 488. Therefore, with this Court's approval, government-enforced segregation and its concomitant destruction of equal opportunity became the constitutional norm and infected every sector of our society, from bathrooms to military units and, crucially, schools. See *Bakke*, 438 U. S., at 393–394 (opinion of Marshall, J.); see also generally R. Rothstein, The Color of Law 17–176 (2017) (discussing various federal policies that promoted racial segregation).

In a powerful dissent, Justice Harlan explained in *Plessy* that the Louisiana law at issue, which authorized segregation in railway carriages, perpetuated a "caste" system. 163 U. S., at 559–560. Although the State argued that the law "prescribe[d] a rule applicable alike to white and colored citizens," all knew that the law's purpose was not "to exclude white persons from railroad cars occupied by blacks," but "to exclude colored people from coaches occupied by or assigned to white persons." *Id.*, at 557. That is, the law "proceed[ed] on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens." *Id.*, at 560. Although "[t]he white race deems itself to be the dominant race . . . in prestige, in achievements, in education, in wealth, and in power," Justice Harlan explained, there is "no superior,

SOTOMAYOR, J., dissenting

dominant, ruling class of citizens" in the eyes of the law. *Id.*, at 559. In that context, Justice Harlan thus announced his view that "[o]ur constitution is color-blind." *Ibid.*

It was not until half a century later, in *Brown*, that the Court honored the guarantee of equality in the Equal Protection Clause and Justice Harlan's vision of a Constitution that "neither knows nor tolerates classes among citizens." *Ibid.* Considering the "effect[s] of segregation" and the role of education "in the light of its full development and its present place in American life throughout the Nation," *Brown* overruled *Plessy*. 347 U. S., at 492–495. The *Brown* Court held that "[s]eparate educational facilities are inherently unequal," and that such racial segregation deprives Black students "of the equal protection of the laws guaranteed by the Fourteenth Amendment." *Id.*, at 494–495. The Court thus ordered segregated schools to transition to a racially integrated system of public education "with all deliberate speed," "ordering the immediate admission of [Black children] to schools previously attended only by white children." *Brown* v. *Board of Education*, 349 U. S. 294, 301 (1955).

*Brown* was a race-conscious decision that emphasized the importance of education in our society. Central to the Court's holding was the recognition that, as Justice Harlan emphasized in *Plessy*, segregation perpetuates a caste system wherein Black children receive inferior educational opportunities "solely because of their race," denoting "inferiority as to their status in the community." 347 U. S., at 494, and n. 10. Moreover, because education is "the very foundation of good citizenship," segregation in public education harms "our democratic society" more broadly as well. *Id.*, at 493. In light of the harmful effects of entrenched racial subordination on racial minorities and American democracy, *Brown* recognized the constitutional necessity of a racially integrated system of schools where education is "available to all on equal terms." *Ibid.*

The desegregation cases that followed *Brown* confirm that the ultimate goal of that seminal decision was to achieve a system of integrated schools that ensured racial equality of opportunity, not to impose a formalistic rule of race-blindness. In *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430 (1968), for example, the Court held that the New Kent County School Board's "freedom of choice" plan, which allegedly allowed "every student, regardless of race, . . . 'freely' [to] choose the school he [would] attend," was insufficient to effectuate "the command of [*Brown*]." *Id.*, at 437, 441–442. That command, the Court explained, was that schools dismantle "well-entrenched dual systems" and transition "to a unitary, nonracial system of public education." *Id.*, at 435–436. That the board "opened the doors of the former 'white' school to [Black] children and the ['Black'] school to white children" on a race-blind basis was not enough. *Id.*, at 437. Passively eliminating race classifications did not suffice when *de facto* segregation persisted. *Id.*, at 440–442 (noting that 85% of Black children in the school system were still attending an all-Black school). Instead, the board was "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.*, at 437–438. Affirmative steps, this Court held, are constitutionally necessary when mere formal neutrality cannot achieve *Brown*'s promise of racial equality. See *Green*, 391 U. S., at 440–442; see also *North Carolina Bd. of Ed.* v. *Swann*, 402 U. S. 43, 45–46 (1971) (holding that North Carolina statute that forbade the use of race in school busing "exploits an apparently neutral form to control school assignment plans by directing that they be 'colorblind'; that requirement, against the background of segregation, would render illusory the promise of *Brown*"); *Dayton Bd. of Ed.* v. *Brinkman*, 443 U. S. 526, 538 (1979) (school board "had to do more than abandon

SOTOMAYOR, J., dissenting

its prior discriminatory purpose"; it "had an affirmative responsibility" to integrate); *Keyes* v. *School Dist. No. 1, Denver*, 413 U. S. 189, 200 (1973) ("[T]he State automatically assumes an affirmative duty" under *Brown* to eliminate the vestiges of segregation).[3]

In so holding, this Court's post-*Brown* decisions rejected arguments advanced by opponents of integration suggesting that "restor[ing] race as a criterion in the operation of the public schools" was at odds with "the *Brown* decisions." Brief for Respondents in *Green* v. *School Bd. of New Kent Cty.*, O. T. 1967, No. 695, p. 6 (*Green* Brief). Those opponents argued that *Brown* only required the admission of Black students "to public schools on a racially nondiscriminatory basis." *Id.*, at 11 (emphasis deleted). Relying on Justice Harlan's dissent in *Plessy*, they argued that the use of race "is improper" because the "'Constitution is colorblind.'" *Green* Brief 6, n. 6 (quoting *Plessy*, 163 U. S., at 559 (Harlan, J., dissenting)). They also incorrectly claimed that their views aligned with those of the *Brown* litigators, arguing that the *Brown* plaintiffs "understood" that *Brown*'s "mandate" was colorblindness. *Green* Brief 17. This Court rejected that characterization of "the thrust of *Brown*." *Green*, 391 U. S., at 437. It made clear that indifference to race "is not an end in itself" under that watershed decision. *Id.*, at 440. The ultimate goal is racial equality of opportunity.

Those rejected arguments mirror the Court's opinion today. The Court claims that *Brown* requires that students

——————

[3]The majority suggests that "it required a Second Founding to undo" programs that help ensure racial integration and therefore greater equality in education. *Ante*, at 38. At the risk of stating the blindingly obvious, and as *Brown* recognized, the Fourteenth Amendment was intended to undo the effects of a world where laws systematically subordinated Black people and created a racial caste system. Cf. *Dred Scott* v. *Sandford*, 19 How. 393, 405 (1857). *Brown* and its progeny recognized the need to take affirmative, race-conscious steps to eliminate that system.

be admitted "'on a racially nondiscriminatory basis.'" *Ante*, at 13. It distorts the dissent in *Plessy* to advance a color-blindness theory. *Ante*, at 38–39; see also *ante*, at 22 (GORSUCH, J., concurring) ("[T]oday's decision wakes the echoes of Justice John Marshall Harlan [in *Plessy*]"); *ante*, at 3 (THOMAS, J., concurring) (same). The Court also invokes the *Brown* litigators, relying on what the *Brown* "plaintiffs had argued." *Ante*, at 12; *ante*, at 35–36, 39, n. 7 (opinion of THOMAS, J.).

If there was a Member of this Court who understood the *Brown* litigation, it was Justice Thurgood Marshall, who "led the litigation campaign" to dismantle segregation as a civil rights lawyer and "rejected the hollow, race-ignorant conception of equal protection" endorsed by the Court's ruling today. Brief for NAACP Legal Defense and Educational Fund, Inc., et al. as *Amici Curiae* 9. Justice Marshall joined the *Bakke* plurality and "applaud[ed] the judgment of the Court that a university may consider race in its admissions process." 438 U. S., at 400. In fact, Justice Marshall's view was that *Bakke*'s holding should have been even more protective of race-conscious college admissions programs in light of the remedial purpose of the Fourteenth Amendment and the legacy of racial inequality in our society. See *id.*, at 396–402 (arguing that "a class-based remedy" should be constitutionally permissible in light of the hundreds of "years of class-based discrimination against [Black Americans]"). The Court's recharacterization of *Brown* is nothing but revisionist history and an affront to the legendary life of Justice Marshall, a great jurist who was a champion of true equal opportunity, not rhetorical flourishes about colorblindness.

## C

Two decades after *Brown*, in *Bakke*, a plurality of the Court held that "the attainment of a diverse student body" is a "compelling" and "constitutionally permissible goal for

SOTOMAYOR, J., dissenting

an institution of higher education." 438 U. S., at 311–315. Race could be considered in the college admissions process in pursuit of this goal, the plurality explained, if it is one factor of many in an applicant's file, and each applicant receives individualized review as part of a holistic admissions process. *Id.*, at 316–318.

Since *Bakke*, the Court has reaffirmed numerous times the constitutionality of limited race-conscious college admissions. First, in *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), a majority of the Court endorsed the *Bakke* plurality's "view that student body diversity is a compelling state interest that can justify the use of race in university admissions," 539 U. S., at 325, and held that race may be used in a narrowly tailored manner to achieve this interest, *id.*, at 333–344; see also *Gratz* v. *Bollinger*, 539 U. S. 244, 268 (2003) ("for the reasons set forth [the same day] in *Grutter*," rejecting petitioners' arguments that race can only be considered in college admissions "to remedy identified discrimination" and that diversity is "'too open-ended, ill-defined, and indefinite to constitute a compelling interest'").

Later, in the *Fisher* litigation, the Court twice reaffirmed that a limited use of race in college admissions is constitutionally permissible if it satisfies strict scrutiny. In *Fisher* v. *University of Texas at Austin*, 570 U. S. 297 (2013) (*Fisher I*), seven Members of the Court concluded that the use of race in college admissions comports with the Fourteenth Amendment if it "is narrowly tailored to obtain the educational benefits of diversity." *Id.*, at 314, 337. Several years later, in *Fisher* v. *University of Texas at Austin*, 579 U. S. 365, 376 (2016) (*Fisher II*), the Court upheld the admissions program at the University of Texas under this framework. *Id.*, at 380–388.

*Bakke*, *Grutter*, and *Fisher* are an extension of *Brown*'s legacy. Those decisions recognize that "'experience lend[s] support to the view that the contribution of diversity is substantial.'" *Grutter*, 539 U. S., at 324 (quoting *Bakke*, 438

U. S., at 313).  Racially integrated schools improve cross-racial understanding, "break down racial stereotypes," and ensure that students obtain "the skills needed in today's increasingly global marketplace . . . through exposure to widely diverse people, cultures, ideas, and viewpoints." 539 U. S., at 330.  More broadly, inclusive institutions that are "visibly open to talented and qualified individuals of every race and ethnicity" instill public confidence in the "legitimacy" and "integrity" of those institutions and the diverse set of graduates that they cultivate.  *Id.*, at 332.  That is particularly true in the context of higher education, where colleges and universities play a critical role in "maintaining the fabric of society" and serve as "the training ground for a large number of our Nation's leaders." *Id.*, at 331–332.  It is thus an objective of the highest order, a "compelling interest" indeed, that universities pursue the benefits of racial diversity and ensure that "the diffusion of knowledge and opportunity" is available to students of all races. *Id.*, at 328–333.

This compelling interest in student body diversity is grounded not only in the Court's equal protection jurisprudence but also in principles of "academic freedom," which "'long [have] been viewed as a special concern of the First Amendment.'" *Id.*, at 324 (quoting *Bakke*, 438 U. S., at 312).  In light of "the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment," this Court's precedents recognize the imperative nature of diverse student bodies on American college campuses.  539 U. S., at 329.  Consistent with the First Amendment, student body diversity allows universities to promote "th[e] robust exchange of ideas which discovers truth out of a multitude of tongues [rather] than through any kind of authoritative selection." *Bakke*, 438 U. S., at 312 (internal quotation marks omitted).  Indeed, as the Court recently reaffirmed in another

SOTOMAYOR, J., dissenting

school case, "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society'" under our constitutional tradition. *Kennedy* v. *Bremerton School Dist.*, 597 U. S. ___, ___ (2022) (slip op., at 29); cf. *Khorrami* v. *Arizona*, 598 U. S. ___, ___ (2022) (GORSUCH, J., dissenting from denial of certiorari) (slip op., at 8) (collecting research showing that larger juries are more likely to be racially diverse and "deliberate longer, recall information better, and pay greater attention to dissenting voices").

In short, for more than four decades, it has been this Court's settled law that the Equal Protection Clause of the Fourteenth Amendment authorizes a limited use of race in college admissions in service of the educational benefits that flow from a diverse student body. From *Brown* to *Fisher*, this Court's cases have sought to equalize educational opportunity in a society structured by racial segregation and to advance the Fourteenth Amendment's vision of an America where racially integrated schools guarantee students of all races the equal protection of the laws.

### D

Today, the Court concludes that indifference to race is the only constitutionally permissible means to achieve racial equality in college admissions. That interpretation of the Fourteenth Amendment is not only contrary to precedent and the entire teachings of our history, see *supra*, at 2–17, but is also grounded in the illusion that racial inequality was a problem of a different generation. Entrenched racial inequality remains a reality today. That is true for society writ large and, more specifically, for Harvard and the University of North Carolina (UNC), two institutions with a long history of racial exclusion. Ignoring race will not equalize a society that is racially unequal. What was true in the 1860s, and again in 1954, is true today: Equality requires acknowledgment of inequality.

SOTOMAYOR, J., dissenting

1

After more than a century of government policies enforcing racial segregation by law, society remains highly segregated.  About half of all Latino and Black students attend a racially homogeneous school with at least 75% minority student enrollment.[4]  The share of intensely segregated minority schools (*i.e.*, schools that enroll 90% to 100% racial minorities) has sharply increased.[5]  To this day, the U. S. Department of Justice continues to enter into desegregation decrees with schools that have failed to "eliminat[e] the vestiges of *de jure* segregation."[6]

Moreover, underrepresented minority students are more likely to live in poverty and attend schools with a high concentration of poverty.[7]  When combined with residential segregation and school funding systems that rely heavily on local property taxes, this leads to racial minority students attending schools with fewer resources.  See *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 72–86 (1973) (Marshall, J., dissenting) (noting school funding disparities that result from local property taxation).[8]  In

––––––––––

[4] See GAO, Report to the Chairman, Committee on Education and Labor, House of Representatives, K–12 Education: Student Population Has Significantly Diversified, but Many Schools Remain Divided Along Racial, Ethnic, and Economic Lines 13 (GAO–22–104737, June 2022) (hereinafter GAO Report).

[5] G. Orfield, E. Frankenberg, & J. Ayscue, Harming Our Common Future: America's Segregated Schools 65 Years After *Brown* 21 (2019).

[6] *E.g.*, *Bennett* v. *Madison Cty. Bd. of Ed.*, No. 5:63–CV–613 (ND Ala., July 5, 2022), ECF Doc. 199, p. 19; *id.*, at 6 (requiring school district to ensure "the participation of black students" in advanced courses).

[7] GAO Report 6, 13 (noting that 80% of predominantly Black and Latino schools have at least 75% of their students eligible for free or reduced-price lunch—a proxy for poverty).

[8] See also L. Clark, Barbed Wire Fences: The Structural Violence of Education Law, 89 U. Chi. L. Rev. 499, 502, 512–517 (2022); Albert Shanker Institute, B. Baker, M. DiCarlo, & P. Greene, Segregation and

SOTOMAYOR, J., dissenting

turn, underrepresented minorities are more likely to attend schools with less qualified teachers, less challenging curricula, lower standardized test scores, and fewer extracurricular activities and advanced placement courses.[9]  It is thus unsurprising that there are achievement gaps along racial lines, even after controlling for income differences.[10]

Systemic inequities disadvantaging underrepresented racial minorities exist beyond school resources.  Students of color, particularly Black students, are disproportionately disciplined or suspended, interrupting their academic progress and increasing their risk of involvement with the criminal justice system.[11]  Underrepresented minorities are less likely to have parents with a postsecondary education who may be familiar with the college application process.[12]  Further, low-income children of color are less likely to attend preschool and other early childhood education programs that increase educational attainment.[13]  All of these

––––––––––

School Funding: How Housing Discrimination Reproduces Unequal Opportunity 17–19 (Apr. 2022).

[9] See Brief for 25 Harvard Student and Alumni Organizations as *Amici Curiae* 6–15 (collecting sources).

[10] GAO Report 7; see also Brief for Council of the Great City Schools as *Amicus Curiae* 11–14 (collecting sources).

[11] See J. Okonofua & J. Eberhardt, Two Strikes: Race and the Disciplining of Young Students, 26 Psychol. Sci. 617 (2015) (a national survey showed that "Black students are more than three times as likely to be suspended or expelled as their White peers"); Brief for Youth Advocates and Experts on Educational Access as *Amici Curiae* 14–15 (describing investigation in North Carolina of a public school district, which found that Black students were 6.1 times more likely to be suspended than white students).

[12] See, *e.g.*, Dept. of Education, National Center for Education Statistics, Digest of Education Statistics (2021) (Table 104.70) (showing that 59% of white students and 78% of Asian students have a parent with a bachelor's degree or higher, while the same is true for only 25% of Latino students and 33% of Black students).

[13] R. Crosnoe, K. Purtell, P. Davis-Kean, A. Ansari, & A. Benner, The Selection of Children From Low-Income Families into Preschool, 52 J.

interlocked factors place underrepresented minorities multiple steps behind the starting line in the race for college admissions.

In North Carolina, the home of UNC, racial inequality is deeply entrenched in K–12 education. State courts have consistently found that the State does not provide underrepresented racial minorities equal access to educational opportunities, and that racial disparities in public schooling have increased in recent years, in violation of the State Constitution. See, *e.g.*, *Hoke Cty. Bd. of Ed.* v. *State*, 2020 WL 13310241, *6, *13 (N. C. Super. Ct., Jan. 21, 2020); *Hoke Cty. Bd. of Ed.* v. *State*, 382 N. C. 386, 388–390, 879 S. E. 2d 193, 197–198 (2022).

These opportunity gaps "result in fewer students from underrepresented backgrounds even applying to" college, particularly elite universities. Brief for Massachusetts Institute of Technology et al. as *Amici Curiae* 32. "Because talent lives everywhere, but opportunity does not, there are undoubtedly talented students with great academic potential who have simply not had the opportunity to attain the traditional indicia of merit that provide a competitive edge in the admissions process." Brief for Harvard Student and Alumni Organizations as *Amici Curiae* 16. Consistent with this reality, Latino and Black students are less likely to enroll in institutions of higher education than their white peers.[14]

Given the central role that education plays in breaking the cycle of racial inequality, these structural barriers reinforce other forms of inequality in communities of color. See E. Wilson, Monopolizing Whiteness, 134 Harv. L. Rev.

_____

Developmental Psychology 11 (2016); A. Kenly & A. Klein, Early Childhood Experiences of Black Children in a Diverse Midwestern Suburb, 24 J. African American Studies 130, 136 (2020).

[14] Dept. of Education, National Center for Education, Institute of Educational Science, The Condition of Education 2022, p. 24 (2020) (fig. 16).

2382, 2416 (2021) ("[E]ducational opportunities . . . allow for social mobility, better life outcomes, and the ability to participate equally in the social and economic life of the democracy"). Stark racial disparities exist, for example, in unemployment rates,[15] income levels,[16] wealth and home-ownership,[17] and healthcare access.[18] See also *Schuette* v. *BAMN*, 572 U. S. 291, 380–381 (2014) (SOTOMAYOR, J., dissenting) (noting the "persistent racial inequality in society"); *Gratz*, 539 U. S., at 299–301 (Ginsburg, J., dissenting) (cataloging racial disparities in employment, poverty, healthcare, housing, consumer transactions, and education).

Put simply, society remains "inherently unequal." *Brown*, 347 U. S., at 495. Racial inequality runs deep to this very day. That is particularly true in education, the "'most vital civic institution for the preservation of a democratic system of government.'" *Plyler* v. *Doe*, 457 U. S. 202, 221, 223 (1982). As I have explained before, only with eyes open to this reality can the Court "carry out the guarantee of equal protection." *Schuette*, 572 U. S., at 381 (dissenting opinion).

### 2

Both UNC and Harvard have sordid legacies of racial exclusion. Because "[c]ontext matters" when reviewing race-conscious college admissions programs, *Grutter*, 539 U. S.,

———————

[15] ProQuest Statistical Abstract of the United States: 2023, p. 402 (Table 622) (noting Black and Latino adults are more likely to be unemployed).

[16] *Id.*, at 173 (Table 259).

[17] A. McCargo & J. Choi, Closing the Gaps: Building Black Wealth Through Homeownership (2020) (fig. 1).

[18] Dept. of Commerce, Census Bureau, Health Insurance Coverage in the United States: 2021, p. 9 (fig. 5); *id.*, at 29 (Table C–1), https://www.census.gov/library/publications/2022/demo/p60-278.html (noting racial minorities, particularly Latinos, are less likely to have health insurance coverage).

at 327, this reality informs the exigency of respondents' current admissions policies and their racial diversity goals.

i

For much of its history, UNC was a bastion of white supremacy. Its leadership included "slaveholders, the leaders of the Ku Klux Klan, the central figures in the white supremacy campaigns of 1898 and 1900, and many of the State's most ardent defenders of Jim Crow and race-based Social Darwinism in the twentieth century." 3 App. 1680. The university excluded all people of color from its faculty and student body, glorified the institution of slavery, enforced its own Jim Crow regulations, and punished any dissent from racial orthodoxy. *Id.*, at 1681–1683. It resisted racial integration after this Court's decision in *Brown*, and was forced to integrate by court order in 1955. 3 App. 1685. It took almost 10 more years for the first Black woman to enroll at the university in 1963. See Karen L. Parker Collection, 1963–1966, UNC Wilson Special Collections Library. Even then, the university admitted only a handful of underrepresented racial minorities, and those students suffered constant harassment, humiliation, and isolation. 3 App. 1685. UNC officials openly resisted racial integration well into the 1980s, years after the youngest Member of this Court was born.[19] *Id.*, at 1688–1690. During that period,

---

[19] In 1979, prompted by lawsuits filed by civil rights lawyers under Title VI, the U. S. Department of Health, Education, and Welfare "revoked UNC's federal funding for its continued noncompliance" with *Brown*. 3 App. 1688; see *Adams* v. *Richardson*, 351 F. Supp. 636, 637 (DC 1972); *Adams* v. *Califano*, 430 F. Supp. 118, 121 (DC 1977). North Carolina sued the Federal Government in response, and North Carolina Senator Jesse Helms introduced legislation to block federal desegregation efforts. 3 App. 1688. UNC praised those actions by North Carolina public officials. *Ibid.* The litigation ended in 1981, after the Reagan administration settled with the State. See *North Carolina* v. *Department of Education*, No. 79–217–CIV–5 (EDNC, July 17, 1981) (Consent Decree).

SOTOMAYOR, J., dissenting

Black students faced racial epithets and stereotypes, received hate mail, and encountered Ku Klux Klan rallies on campus. 2 *id.*, at 781–784; 3 *id.*, at 1689.

To this day, UNC's deep-seated legacy of racial subjugation continues to manifest itself in student life. Buildings on campus still bear the names of members of the Ku Klux Klan and other white supremacist leaders. *Id.*, at 1683. Students of color also continue to experience racial harassment, isolation, and tokenism.[20] Plus, the student body remains predominantly white: approximately 72% of UNC students identify as white, while only 8% identify as Black. *Id.*, at 1647. These numbers do not reflect the diversity of the State, particularly Black North Carolinians, who make up 22% of the population. *Id.*, at 1648.

ii

UNC is not alone. Harvard, like other Ivy League universities in our country, "stood beside church and state as the third pillar of a civilization built on bondage." C. Wilder, Ebony & Ivy: Race, Slavery, and the Troubled History of America's Universities 11 (2013). From Harvard's founding, slavery and racial subordination were integral parts of the institution's funding, intellectual production, and campus life. Harvard and its donors had extensive financial ties to, and profited from, the slave trade, the labor of enslaved people, and slavery-related investments. As Harvard now recognizes, the accumulation of this wealth was "vital to the University's growth" and establishment as an

—————

[20] See 1 App. 20–21 (campus climate survey showing *inter alia* that "91 percent of students heard insensitive or disparaging racial remarks made by other students"); 2 *id.*, at 1037 (Black student testifying that a white student called him "the N word" and, on a separate occasion at a fraternity party, he was "told that no slaves were allowed in"); *id.*, at 955 (student testifying that he was "the only African American student in the class," which discouraged him from speaking up about racially salient issues); *id.*, at 762–763 (student describing that being "the only Latina" made it "hard to speak up" and made her feel "foreign" and "an outsider").

24    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
SOTOMAYOR, J., dissenting

elite, national institution.  Harvard & the Legacy of Slavery, Report by the President and Fellows of Harvard College 7 (2022) (Harvard Report).  Harvard suppressed antislavery views, and enslaved persons "served Harvard presidents and professors and fed and cared for Harvard students" on campus.  *Id.*, at 7, 15.

Exclusion and discrimination continued to be a part of campus life well into the 20th century.  Harvard's leadership and prominent professors openly promoted "'race science,'" racist eugenics, and other theories rooted in racial hierarchy.  *Id.*, at 11.  Activities to advance these theories "took place on campus," including "intrusive physical examinations" and "photographing of unclothed" students.  *Ibid.*  The university also "prized the admission of academically able Anglo-Saxon students from elite backgrounds—including wealthy white sons of the South."  *Id.*, at 44.  By contrast, an average of three Black students enrolled at Harvard each year during the five decades between 1890 and 1940.  *Id.*, at 45.  Those Black students who managed to enroll at Harvard "excelled academically, earning equal or better academic records than most white students," but faced the challenges of the deeply rooted legacy of slavery and racism on campus.  *Ibid.*  Meanwhile, a few women of color attended Radcliffe College, a separate and overwhelmingly white "women's annex" where racial minorities were denied campus housing and scholarships.  *Id.*, at 51.  Women of color at Radcliffe were taught by Harvard professors, but "women did not receive Harvard degrees until 1963."  *Ibid.*; see also S. Bradley, Upending the Ivory Tower: Civil Rights, Black Power, and the Ivy League 17 (2018) (noting that the historical discussion of racial integration at the Ivy League "is necessarily male-centric," given the historical exclusion of women of color from these institutions).

Today, benefactors with ties to slavery and white supremacy continue to be memorialized across campus through "statues, buildings, professorships, student houses, and the

Cite as: 600 U. S. ____ (2023)              25

SOTOMAYOR, J., dissenting

like." Harvard Report 11. Black and Latino applicants account for only 20% of domestic applicants to Harvard each year. App. to Pet. for Cert. in No. 20–1199, p. 112. "Even those students of color who beat the odds and earn an offer of admission" continue to experience isolation and alienation on campus. Brief for 25 Harvard Student and Alumni Organizations as *Amici Curiae* 30–31; 2 App. 823, 961. For years, the university has reported that inequities on campus remain. See, *e.g.*, 4 App. 1564–1601. For example, Harvard has reported that "far too many black students at Harvard experience feelings of isolation and marginalization," 3 *id.*, at 1308, and that "student survey data show[ed] that only half of Harvard undergraduates believe that the housing system fosters exchanges between students of different backgrounds," *id.*, at 1309.

*      *      *

These may be uncomfortable truths to some, but they are truths nonetheless. "Institutions can and do change," however, as societal and legal changes force them "to live up to [their] highest ideals." Harvard Report 56. It is against this historical backdrop that Harvard and UNC have reckoned with their past and its lingering effects. Acknowledging the reality that race has always mattered and continues to matter, these universities have established institutional goals of diversity and inclusion. Consistent with equal protection principles and this Court's settled law, their policies use race in a limited way with the goal of recruiting, admitting, and enrolling underrepresented racial minorities to pursue the well-documented benefits of racial integration in education.

II

The Court today stands in the way of respondents' commendable undertaking and entrenches racial inequality in higher education. The majority opinion does so by turning

a blind eye to these truths and overruling decades of precedent, "content for now to disguise" its ruling as an application of "established law and move on." *Kennedy*, 597 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 29). As JUSTICE THOMAS puts it, "*Grutter* is, for all intents and purposes, overruled." *Ante*, at 58.

It is a disturbing feature of today's decision that the Court does not even attempt to make the extraordinary showing required by *stare decisis*. The Court simply moves the goalposts, upsetting settled expectations and throwing admissions programs nationwide into turmoil. In the end, however, it is clear why the Court is forced to change the rules of the game to reach its desired outcome: Under a faithful application of the Court's settled legal framework, Harvard and UNC's admissions programs are constitutional and comply with Title VI of the Civil Rights Act of 1964, 42 U. S. C. §2000d *et seq.*[21]

---

[21] The same standard that applies under the Equal Protection Clause guides the Court's review under Title VI, as the majority correctly recognizes. See *ante*, at 6, n. 2; see also *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 325 (1978) (Brennan, J., concurring). JUSTICE GORSUCH argues that "Title VI bears independent force" and holds universities to an even higher standard than the Equal Protection Clause. *Ante*, at 25. Because no party advances JUSTICE GORSUCH's argument, see *ante*, at 6, n. 2, the Court properly declines to address it under basic principles of party presentation. See *United States* v. *Sineneng-Smith*, 590 U. S. ___, ___ (2020) (slip op., at 3). Indeed, JUSTICE GORSUCH's approach calls for even more judicial restraint. If petitioner could prevail under JUSTICE GORSUCH's statutory analysis, there would be no reason for this Court to reach the constitutional question. See *Escambia County* v. *McMillan*, 466 U. S. 48, 51 (1984) (*per curiam*). In a statutory case, moreover, *stare decisis* carries "enhanced force," as it would be up to Congress to "correct any mistake it sees" with "our interpretive decisions." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015). JUSTICE GORSUCH wonders why the dissent, like the majority, does not "engage" with his statutory arguments. *Ante*, at 16. The answer is simple: This Court plays "the role of neutral arbiter of matters the parties present." *Greenlaw* v. *United States*, 554 U. S. 237, 243 (2008). Petitioner made a

SOTOMAYOR, J., dissenting

### A

Answering the question whether Harvard's and UNC's policies survive strict scrutiny under settled law is straightforward, both because of the procedural posture of these cases and because of the narrow scope of the issues presented by petitioner Students for Fair Admissions, Inc. (SFFA).[22]

These cases arrived at this Court after two lengthy trials. Harvard and UNC introduced dozens of fact witnesses, expert testimony, and documentary evidence in support of their admissions programs. Brief for Petitioner 20, 40. SFFA, by contrast, did not introduce a single fact witness and relied on the testimony of two experts. *Ibid.*

After making detailed findings of fact and conclusions of law, the District Courts entered judgment in favor of Harvard and UNC. See 397 F. Supp. 3d 126, 133–206 (Mass. 2019) (*Harvard I*); 567 F. Supp. 3d 580, 588–667 (MDNC 2021) (*UNC*). The First Circuit affirmed in the *Harvard* case, finding "no error" in the District Court's thorough opinion. 980 F. 3d 157, 204 (2020) (*Harvard II*). SFFA then filed petitions for a writ of certiorari in both cases, which the Court granted. 595 U. S. ___ (2022).[23]

The Court granted certiorari on three questions: (1) whether the Court should overrule *Bakke*, *Grutter*, and

---

strategic litigation choice, and in our adversarial system, it is not up to this Court to come up with "wrongs to right" on behalf of litigants. *Id.*, at 244 (internal quotation marks omitted).

[22] SFFA is a 501(c)(3) nonprofit organization founded after this Court's decision in *Fisher I*, 570 U. S. 297 (2013). App. to Pet. for Cert. in No. 20–1199, p. 10. Its original board of directors had three self-appointed members: Edward Blum, Abigail Fisher (the plaintiff in *Fisher*), and Richard Fisher. See *ibid.*

[23] Bypassing the Fourth Circuit's opportunity to review the District Court's opinion in the *UNC* case, SFFA sought certiorari before judgment, urging that, "[p]aired with *Harvard*," the *UNC* case would "allow the Court to resolve the ongoing validity of race-based admissions under both Title VI and the Constitution." Pet. for Cert. in No. 21–707, p. 27.

*Fisher*; or, alternatively, (2) whether UNC's admissions program is narrowly tailored, and (3) whether Harvard's admissions program is narrowly tailored. See Brief for Petitioner in No. 20–1199, p. i; Brief for Respondent in No. 20–1199, p. i; Brief for University Respondents in No. 21–707, p. i. Answering the last two questions, which call for application of settled law to the facts of these cases, is simple: Deferring to the lower courts' careful findings of fact and credibility determinations, Harvard's and UNC's policies are narrowly tailored.

B

1

As to narrow tailoring, the only issue SFFA raises in the *UNC* case is that the university cannot use race in its admissions process because race-neutral alternatives would promote UNC's diversity objectives. That issue is so easily resolved in favor of UNC that SFFA devoted only three pages to it at the end of its 87-page brief. Brief for Petitioner 83–86.

The use of race is narrowly tailored unless "workable" and "available" race-neutral approaches exist, meaning race-neutral alternatives promote the institution's diversity goals and do so at "'tolerable administrative expense.'" *Fisher I*, 570 U. S., at 312 (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 280, n. 6 (1986) (plurality opinion)). Narrow tailoring does not mean perfect tailoring. The Court's precedents make clear that "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Grutter*, 539 U. S., at 339. "Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Ibid.*

As the District Court found after considering extensive expert testimony, SFFA's proposed race-neutral alternatives do not meet those criteria. *UNC*, 567 F. Supp. 3d,

SOTOMAYOR, J., dissenting

at 648. All of SFFA's proposals are methodologically
flawed because they rest on "'terribly unrealistic'" assumptions about the applicant pools. *Id.*, at 643–645, 647. For
example, as to one set of proposals, SFFA's expert "unrealistically assumed" that "all of the top students in the candidate pools he use[d] would apply, be admitted, and enroll."
*Id.*, at 647. In addition, some of SFFA's proposals force
UNC to "abandon its holistic approach" to college admissions, *id.*, at 643–645, n. 43, a result "in deep tension with
the goal of educational diversity as this Court's cases have
defined it," *Fisher II*, 579 U. S., at 386–387. Others are
"largely impractical—not to mention unprecedented—in
higher education." 567 F. Supp. 3d, at 647. SFFA's proposed top percentage plans,[24] for example, are based on a
made-up and complicated admissions index that requires
UNC to "access . . . real-time data for all high school students." *Ibid.* UNC is then supposed to use that index,
which "would change every time any student took a standardized test," to rank students based on grades and test
scores. *Ibid.* One of SFFA's top percentage plans would
even "nearly erase the Native American incoming class" at
UNC. *Id.*, at 646. The courts below correctly concluded that
UNC is not required to adopt SFFA's unrealistic proposals
to satisfy strict scrutiny.[25]

———————

[24] Generally speaking, top percentage plans seek to enroll a percentage
of the graduating high school students with the highest academic credentials. See, *e.g.*, *Fisher II*, 579 U. S., at 373 (describing the University
of Texas' Top Ten Percent Plan).

[25] SFFA and JUSTICE GORSUCH reach beyond the factfinding below and
argue that universities in States that have banned the use of race in college admissions have achieved racial diversity through efforts such as
increasing socioeconomic preferences, so UNC could do the same. Brief
for Petitioner 85–86; *ante*, at 14. Data from those States disprove that
theory. Institutions in those States experienced "'an immediate and precipitous decline in the rates at which underrepresented-minority students applied . . . were admitted . . . and enrolled.'" *Schuette* v. *BAMN*,

SOTOMAYOR, J., dissenting

2

Harvard's admissions program is also narrowly tailored under settled law.  SFFA argues that Harvard's program is not narrowly tailored because the university "has workable race-neutral alternatives," "does not use race as a mere plus," and "engages in racial balancing."  Brief for Petitioner 75–83.  As the First Circuit concluded, there was "no error" in the District Court's findings on any of these issues.  *Harvard II*, 980 F. 3d, at 204.[26]

Like UNC, Harvard has already implemented many of SFFA's proposals, such as increasing recruitment efforts and financial aid for low-income students.  *Id.*, at 193.  Also like UNC, Harvard "carefully considered" other race-neutral ways to achieve its diversity goals, but none of them are "workable."  *Id.*, at 193–194.  SFFA's argument before this Court is that Harvard should adopt a plan designed by SFFA's expert for purposes of trial, which increases preferences for low-income applicants and eliminates the use of race and legacy preferences.  *Id.*, at 193; Brief for Petitioner

───────────

572 U. S. 291, 384–390 (2014) (SOTOMAYOR, J., dissenting); see *infra*, at 63–64.  In addition, UNC "already engages" in race-neutral efforts focused on socioeconomic status, including providing "exceptional levels of financial aid" and "increased and targeted recruiting."  *UNC*, 567 F. Supp. 3d, at 665.

JUSTICE GORSUCH argues that he is simply "recount[ing] what SFFA has argued."  *Ante*, at 14, n. 4.  That is precisely the point: SFFA's arguments were not credited by the court below.  "[W]e are a court of review, not of first view."  *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).  JUSTICE GORSUCH also suggests it is inappropriate for the dissent to respond to the majority by relying on materials beyond the findings of fact below.  *Ante*, at 14, n. 4.  There would be no need for the dissent to do that if the majority stuck to reviewing the District Court's careful fact-finding with the deference it owes to the trial court.  Because the majority has made a different choice, the dissent responds.

[26] SFFA also argues that Harvard discriminates against Asian American students.  Brief for Petitioner 72–75.  As explained below, this claim does not fit under *Grutter*'s strict scrutiny framework, and the courts below did not err in rejecting that claim.  See *infra*, at 59–60.

81. Under SFFA's model, however, Black representation
would plummet by about 32%, and the admitted share of
applicants with high academic ratings would decrease, as
would the share with high extracurricular and athletic rat-
ings. 980 F. 3d, at 194. SFFA's proposal, echoed by
JUSTICE GORSUCH, *ante*, at 14–15, requires Harvard to
"make sacrifices on almost every dimension important to its
admissions process," 980 F. 3d, at 194, and forces it "to
choose between a diverse student body and a reputation for
academic excellence," *Fisher II*, 579 U. S., at 385. Neither
this Court's precedents nor common sense impose that type
of burden on colleges and universities.

The courts below also properly rejected SFFA's argument
that Harvard does not use race in the limited way this
Court's precedents allow. The Court has explained that a
university can consider a student's race in its admissions
process so long as that use is "contextual and does not op-
erate as a mechanical plus factor." *Id.*, at 375. The Court
has also repeatedly held that race, when considered as one
factor of many in the context of holistic review, "can make
a difference to whether an application is accepted or re-
jected." *Ibid.* After all, race-conscious admissions seek to
improve racial diversity. Race cannot, however, be "'deci-
sive' for virtually every minimally qualified underrepresented
minority applicant." *Gratz*, 539 U. S., at 272 (quoting
*Bakke*, 438 U. S., at 317).

That is precisely how Harvard's program operates. In re-
cent years, Harvard has received about 35,000 applications
for a class with about 1,600 seats. 980 F. 3d, at 165. The
admissions process is exceedingly competitive; it involves
six different application components. Those components in-
clude interviews with alumni and admissions officers, as
well as consideration of a whole range of information, such
as grades, test scores, recommendation letters, and per-
sonal essays, by several committees. *Id.*, at 165–166. Con-
sistent with that "individualized, holistic review process,"

Sotomayor, J., dissenting

admissions officers may, but need not, consider a student's self-reported racial identity when assigning overall ratings. *Id.*, at 166, 169, 180. Even after so many layers of competitive review, Harvard typically ends up with about 2,000 tentative admits, more students than the 1,600 or so that the university can admit. *Id.*, at 170. To choose among those highly qualified candidates, Harvard considers "plus factors," which can help "tip an applicant into Harvard's admitted class." *Id.*, at 170, 191. To diversify its class, Harvard awards "tips" for a variety of reasons, including geographic factors, socioeconomic status, ethnicity, and race. *Ibid.*

There is "no evidence of any mechanical use of tips." *Id.*, at 180. Consistent with the Court's precedents, Harvard properly "considers race as part of a holistic review process," "values all types of diversity," "does not consider race exclusively," and "does not award a fixed amount of points to applicants because of their race." *Id.*, at 190.[27] Indeed, Harvard's admissions process is so competitive and the use of race is so limited and flexible that, as "SFFA's own expert's analysis" showed, "Harvard rejects more than two-thirds of Hispanic applicants and slightly less than half of all African-American applicants who are among the top 10% most academically promising applicants." *Id.*, at 191.

The courts below correctly rejected SFFA's view that Harvard's use of race is unconstitutional because it impacts overall Hispanic and Black student representation by 45%. See Brief for Petitioner 79. That 45% figure shows that

---

[27] JUSTICE GORSUCH suggests that only "applicants of certain races may receive a 'tip' in their favor." *Ante*, at 9. To the extent JUSTICE GORSUCH means that some races are not eligible to receive a tip based on their race, there is no evidence in the record to support this statement. Harvard "does not explicitly prioritize any particular racial group over any other and permits its admissions officers to evaluate the racial and ethnic identity of every student in the context of his or her background and circumstances." *Harvard I*, 397 F. Supp. 3d 126, 190, n. 56 (Mass. 2019).

SOTOMAYOR, J., dissenting

eliminating the use of race in admissions "would reduce African American representation . . . from 14% to 6% and Hispanic representation from 14% to 9%." *Harvard II*, 980 F. 3d, at 180, 191. Such impact of Harvard's limited use of race on the makeup of the class is less than this Court has previously upheld as narrowly tailored. In *Grutter*, for example, eliminating the use of race would have reduced the underrepresented minority population by 72%, a much greater effect. 539 U. S., at 320. And in *Fisher II*, the use of race helped increase Hispanic representation from 11% to 16.9% (a 54% increase) and African-American representation from 3.5% to 6.8% (a 94% increase). 579 U. S., at 384.[28]

_____

[28] Relying on a single footnote in the First Circuit's opinion, the Court claims that Harvard's program is unconstitutional because it "has led to an 11.1% decrease in the number of Asian-Americans admitted to Harvard." *Ante*, at 27. The Court of Appeals, however, merely noted that the United States, at the time represented by a different administration, argued that "absent the consideration of race, [Asian American] representation would increase from 24% to 27%," an 11% increase. *Harvard II*, 980 F. 3d, at 191, n. 29. Taking those calculations as correct, the Court of Appeals recognized that such an impact from the use of race on the overall makeup of the class is consistent with the impact that this Court's precedents have tolerated. *Ibid.*

The Court also notes that "race is determinative for at least some—if not many—of the students" admitted at UNC. *Ante*, at 27. The District Court in the *UNC* case found that "race plays a role in a very small percentage of decisions: 1.2% for in-state students and 5.1% for out-of-state students." 567 F. Supp. 3d 580, 634 (MDNC 2021). The limited use of race at UNC thus has a smaller effect than at Harvard and is also consistent with the Court's precedents. In addition, contrary to the majority's suggestion, such effect does not prove that "race alone . . . explains the admissions decisions for hundreds if not thousands of applicants to UNC each year." *Ante,* at 28, n. 6. As the District Court found, UNC (like Harvard) "engages a highly individualized, holistic review of each applicant's file, which considers race flexibly as a 'plus factor' as one among many factors in its individualized consideration of each and every applicant." 567 F. Supp. 3d, at 662; see *id.,* at 658 (finding that UNC "rewards different kinds of diversity, and evaluates a candidate within

Finally, the courts below correctly concluded that Harvard complies with this Court's repeated admonition that colleges and universities cannot define their diversity interest "as 'some specified percentage of a particular group merely because of its race or ethnic origin.'" *Fisher I*, 570 U. S., at 311 (quoting *Bakke*, 438 U. S., at 307). Harvard does not specify its diversity objectives in terms of racial quotas, and "SFFA did not offer expert testimony to support its racial balancing claim." *Harvard II*, 980 F. 3d, at 180, 186–187. Harvard's statistical evidence, by contrast, showed that the admitted classes across racial groups varied considerably year to year, a pattern "inconsistent with the imposition of a racial quota or racial balancing." *Harvard I*, 397 F. Supp. 3d, at 176–177; see *Harvard II*, 980 F. 3d, at 180, 188–189.

Similarly, Harvard's use of "one-pagers" containing "a snapshot of various demographic characteristics of Harvard's applicant pool" during the admissions review process is perfectly consistent with this Court's precedents. *Id.*, at 170–171, 189. Consultation of these reports, with no "specific number firmly in mind," "does not transform [Harvard's] program into a quota." *Grutter*, 539 U. S., at 335–336. Rather, Harvard's ongoing review complies with the Court's command that universities periodically review the necessity of the use of race in their admissions programs. *Id.*, at 342; *Fisher II*, 579 U. S., at 388.

The Court ignores these careful findings and concludes that Harvard engages in racial balancing because its "focus on numbers is obvious." *Ante*, at 31. Because SFFA failed to offer an expert and to prove its claim below, the majority

---

the context of their lived experience"); *id.*, at 659 ("The parties stipulated, and the evidence shows, that readers evaluate applicants by taking into consideration dozens of criteria," and even SFFA's expert "concede[d] that the University's admissions process is individualized and holistic"). Stated simply, race is not "a defining feature of any individual application." *Id.*, at 662; see also *infra*, at 48.

is forced to reconstruct the record and conduct its own factual analysis. It thus relies on a single chart from SFFA's brief that truncates relevant data in the record. Compare *ibid.* (citing Brief for Petitioner in No. 20–1199, p. 23) with 4 App. in No. 20–1199, p. 1770. That chart cannot displace the careful factfinding by the District Court, which the First Circuit upheld on appeal under clear error review. See *Harvard II*, 980 F. 3d, at 180–182, 188–189.

In any event, the chart is misleading and ignores "the broader context" of the underlying data that it purports to summarize. *Id.*, at 188. As the First Circuit concluded, what the data actually show is that admissions have increased for all racial minorities, including Asian American students, whose admissions numbers have "increased roughly five-fold since 1980 and roughly two-fold since 1990." *Id.*, at 180, 188. The data also show that the racial shares of admitted applicants fluctuate more than the corresponding racial shares of total applicants, which is "the opposite of what one would expect if Harvard imposed a quota." *Id.*, at 188. Even looking at the Court's truncated period for the classes of 2009 to 2018, "the same pattern holds." *Ibid.* The fact that Harvard's racial shares of admitted applicants "varies relatively little in absolute terms for [those classes] is unsurprising and reflects the fact that the racial makeup of Harvard's applicant pool also varies very little over this period." *Id.*, at 188–189. Thus, properly understood, the data show that Harvard "does not utilize quotas and does not engage in racial balancing." *Id.*, at 189.[29]

_____

[29]The majority does not dispute that it has handpicked data from a truncated period, ignoring the broader context of that data and what the data reflect. Instead, the majority insists that its selected data prove that Harvard's "precise racial preferences" "operate like clockwork." *Ante*, at 31–32, n. 7. The Court's conclusion that such racial preferences must be responsible for an "unyielding demographic composition of [the]

SOTOMAYOR, J., dissenting

### III

The Court concludes that Harvard's and UNC's policies are unconstitutional because they serve objectives that are insufficiently measurable, employ racial categories that are imprecise and overbroad, rely on racial stereotypes and disadvantage nonminority groups, and do not have an end point. *Ante*, at 21–34, 39. In reaching this conclusion, the Court claims those supposed issues with respondents' programs render the programs insufficiently "narrow" under the strict scrutiny framework that the Court's precedents command. *Ante*, at 22. In reality, however, "the Court today cuts through the kudzu" and overrules its "higher-education precedents" following *Bakke*. *Ante*, at 22 (GORSUCH, J., concurring).

There is no better evidence that the Court is overruling the Court's precedents than those precedents themselves. "Every one of the arguments made by the majority can be found in the dissenting opinions filed in [the] cases" the majority now overrules. *Payne* v. *Tennessee*, 501 U. S. 808, 846 (1991) (Marshall, J., dissenting); see, *e.g.*, *Grutter*, 539 U. S., at 354 (THOMAS, J., concurring in part and dissenting in part) ("Unlike the majority, I seek to define with precision the interest being asserted"); *Fisher II*, 579 U. S., at 389 (THOMAS, J., dissenting) (race-conscious admissions

---

class," *ibid.*, misunderstands basic principles of statistics. A number of factors (most notably, the demographic composition of the applicant pool) affect the demographic composition of the entering class. Assume, for example, that Harvard admitted students based solely on standardized test scores. If test scores followed a normal distribution (even with different averages by race) and were relatively constant over time, and if the racial shares of total applicants were also relatively constant over time, one would expect the same "unyielding demographic composition of [the] class." *Ibid.* That would be true even though, under that hypothetical scenario, Harvard does not consider race in admissions at all. In other words, the Court's inference that precise racial preferences must be the cause of relatively constant racial shares of admitted students is specious.

SOTOMAYOR, J., dissenting

programs "res[t] on pernicious assumptions about race"); *id.*, at 403 (ALITO, J., joined by ROBERTS, C. J., and THOMAS, J., dissenting) (diversity interests "are laudable goals, but they are not concrete or precise"); *id.*, at 413 (race-conscious college admissions plan "discriminates against Asian-American students"); *id.*, at 414 (race-conscious admissions plan is unconstitutional because it "does not specify what it means to be 'African-American,' 'Hispanic,' 'Asian American,' 'Native American,' or 'White'"); *id.*, at 419 (race-conscious college admissions policies rest on "pernicious stereotype[s]").

Lost arguments are not grounds to overrule a case. When proponents of those arguments, greater now in number on the Court, return to fight old battles anew, it betrays an unrestrained disregard for precedent. It fosters the People's suspicions that "bedrock principles are founded . . . in the proclivities of individuals" on this Court, not in the law, and it degrades "the integrity of our constitutional system of government." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). Nowhere is the damage greater than in cases like these that touch upon matters of representation and institutional legitimacy.

The Court offers no justification, much less "a 'special justification,'" for its costly endeavor. *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. ___, ___ (2022) (joint opinion of BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (slip op., at 31) (quoting *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (slip op., at 11)). Nor could it. There is no basis for overruling *Bakke*, *Grutter*, and *Fisher*. The Court's precedents were correctly decided, the opinion today is not workable and creates serious equal protection problems, important reliance interests favor respondents, and there are no legal or factual developments favoring the Court's reckless course. See 597 U. S., at ___ (joint opinion of BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting) (slip op., at 31); *id.*, at ___–___ (KAVANAUGH, J., concurring) (slip

op., at 6–7). At bottom, the six unelected members of today's majority upend the status quo based on their policy preferences about what race in America should be like, but is not, and their preferences for a veneer of colorblindness in a society where race has always mattered and continues to matter in fact and in law.

## A
### 1

A limited use of race in college admissions is consistent with the Fourteenth Amendment and this Court's broader equal protection jurisprudence. The text and history of the Fourteenth Amendment make clear that the Equal Protection Clause permits race-conscious measures. See *supra*, at 2–9. Consistent with that view, the Court has explicitly held that "race-based action" is sometimes "within constitutional constraints." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 237 (1995). The Court has thus upheld the use of race in a variety of contexts. See, *e.g.*, *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 737 (2007) ("[T]he obligation to disestablish a school system segregated by law can include race-conscious remedies—whether or not a court had issued an order to that effect"); *Johnson* v. *California*, 543 U. S. 499, 512 (2005) (use of race permissible to further prison's interest in "'security'" and "'discipline'"); *Cooper* v. *Harris*, 581 U. S. 285, 291–293 (2017) (use of race permissible when drawing voting districts in some circumstances).[30]

Tellingly, in sharp contrast with today's decision, the Court has allowed the use of race when that use burdens minority populations. In *United States* v. *Brignoni-Ponce*,

---

[30] In the context of policies that "benefit rather than burden the minority," the Court has adhered to a strict scrutiny framework despite multiple Members of this Court urging that "the mandate of the Equal Protection Clause" favors applying a less exacting standard of review. *Schuette*, 572 U. S., at 373–374 (SOTOMAYOR, J., dissenting) (collecting cases).

SOTOMAYOR, J., dissenting

422 U. S. 873 (1975), for example, the Court held that it is unconstitutional for border patrol agents to rely on a person's skin color as "a single factor" to justify a traffic stop based on reasonable suspicion, but it remarked that "Mexican appearance" could be "a relevant factor" out of many to justify such a stop "at the border and its functional equivalents." *Id.*, at 884–887; see also *id.*, at 882 (recognizing that "the border" includes entire metropolitan areas such as San Diego, El Paso, and the South Texas Rio Grande Valley).[31] The Court thus facilitated racial profiling of Latinos as a law enforcement tool and did not adopt a race-blind rule. The Court later extended this reasoning to border patrol agents selectively referring motorists for secondary inspection at a checkpoint, concluding that "even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry, [there is] no constitutional violation." *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 562–563 (1976) (footnote omitted).

The result of today's decision is that a person's skin color may play a role in assessing individualized suspicion, but it cannot play a role in assessing that person's individualized contributions to a diverse learning environment. That indefensible reading of the Constitution is not grounded in law and subverts the Fourteenth Amendment's guarantee of equal protection.

### 2

The majority does not dispute that some uses of race are constitutionally permissible. See *ante*, at 15. Indeed, it agrees that a limited use of race is permissible in some college admissions programs. In a footnote, the Court exempts military academies from its ruling in light of "the potentially distinct interests" they may present. *Ante*, at 22, n. 4.

---

[31] The Court's "dictum" that Mexican appearance can be one of many factors rested on now-outdated quantitative premises. *United States* v. *Montero-Camargo*, 208 F. 3d 1122, 1132 (CA9 2000).

To the extent the Court suggests national security interests are "distinct," those interests cannot explain the Court's narrow exemption, as national security interests are also implicated at civilian universities. See *infra*, at 64–65. The Court also attempts to justify its carveout based on the fact that "[n]o military academy is a party to these cases." *Ante*, at 22, n. 4. Yet the same can be said of many other institutions that are not parties here, including the religious universities supporting respondents, which the Court does not similarly exempt from its sweeping opinion. See Brief for Georgetown University et al. as *Amici Curiae* 18–29 (Georgetown Brief ) (Catholic colleges and universities noting that they rely on the use of race in their holistic admissions to further not just their academic goals, but also their religious missions); see also *Harvard II*, 980 F. 3d, at 187, n. 24 ("[S]chools that consider race are diverse on numerous dimensions, including in terms of religious affiliation, location, size, and courses of study offered"). The Court's carveout only highlights the arbitrariness of its decision and further proves that the Fourteenth Amendment does not categorically prohibit the use of race in college admissions.

The concurring opinions also agree that the Constitution tolerates some racial classifications. JUSTICE GORSUCH agrees with the majority's conclusion that racial classifications are constitutionally permissible if they advance a compelling interest in a narrowly tailored way. *Ante*, at 23. JUSTICE KAVANAUGH, too, agrees that the Constitution permits the use of race if it survives strict scrutiny. *Ante*, at 2.[32] JUSTICE THOMAS offers an "originalist defense of the

---

[32] JUSTICE KAVANAUGH agrees that the effects from the legacy of slavery and Jim Crow continue today, citing Justice Marshall's opinion in *Bakke*. *Ante*, at 7 (citing 438 U. S., at 395–402). As explained above, Justice Marshall's view was that *Bakke* covered only a portion of the Fourteenth Amendment's sweeping reach, such that the Court's higher education precedents must be expanded, not constricted. See 438 U. S.,

SOTOMAYOR, J., dissenting

colorblind Constitution," but his historical analysis leads to the inevitable conclusion that the Constitution is not, in fact, colorblind. *Ante*, at 2. Like the majority opinion, JUSTICE THOMAS agrees that race can be used to remedy past discrimination and "to equalize treatment against a concrete baseline of government-imposed inequality." *Ante*, at 18–21. He also argues that race can be used if it satisfies strict scrutiny more broadly, and he considers compelling interests those that prevent anarchy, curb violence, and segregate prisoners. *Ante*, at 26. Thus, although JUSTICE THOMAS at times suggests that the Constitution only permits "directly remedial" measures that benefit "identified victims of discrimination," *ante*, at 20, he agrees that the Constitution tolerates a much wider range of race-conscious measures.

In the end, when the Court speaks of a "colorblind" Constitution, it cannot really mean it, for it is faced with a body of law that recognizes that race-conscious measures are permissible under the Equal Protection Clause. Instead, what the Court actually lands on is an understanding of the Constitution that is "colorblind" *sometimes*, when the Court so chooses. Behind those choices lie the Court's own value judgments about what type of interests are sufficiently compelling to justify race-conscious measures.

Overruling decades of precedent, today's newly constituted Court singles out the limited use of race in holistic college admissions. It strikes at the heart of *Bakke*, *Grutter*, and *Fisher* by holding that racial diversity is an "inescapably imponderable" objective that cannot justify race-conscious affirmative action, *ante*, at 24, even though respondents' objectives simply "mirror the 'compelling interest' this Court

_____

at 395–402 (opinion dissenting in part). Justice Marshall's reading of the Fourteenth Amendment does not support JUSTICE KAVANAUGH'S and the majority's opinions.

has approved" many times in the past. *Fisher II*, 579 U. S., at 382; see, *e.g.*, *UNC*, 567 F. Supp. 3d, at 598 ("the [university's admissions policy] repeatedly cites Supreme Court precedent as guideposts").[33]  At bottom, without any new factual or legal justification, the Court overrides its longstanding holding that diversity in higher education is of compelling value.

To avoid public accountability for its choice, the Court seeks cover behind a unique measurability requirement of its own creation.  None of this Court's precedents, however, requires that a compelling interest meet some threshold level of precision to be deemed sufficiently compelling.  In fact, this Court has recognized as compelling plenty of interests that are equally or more amorphous, including the "intangible" interest in preserving "public confidence in judicial integrity," an interest that "does not easily reduce to precise definition."  *Williams-Yulee* v. *Florida Bar*, 575 U. S. 433, 447, 454 (2015) (ROBERTS, C. J., for the Court); see also, *e.g.*, *Ramirez* v. *Collier*, 595 U. S. ___, ___ (2022) (ROBERTS, C. J., for the Court) (slip op., at 18) ("[M]aintaining solemnity and decorum in the execution chamber" is a "compelling" interest); *United States* v. *Alvarez*, 567 U. S. 709, 725 (2012) (plurality opinion) ("[P]rotecting the integrity of the Medal of Honor" is a "compelling interes[t]"); *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989) ("[P]rotecting the physical and psychological well-being of minors" is a "compelling interest").  Thus, although

─────────

[33] There is no dispute that respondents' compelling diversity objectives are "substantial, long-standing, and well documented."  *UNC*, 567 F. Supp. 3d, at 655; *Harvard II*, 980 F. 3d, at 186–187.  SFFA did not dispute below that respondents have a compelling interest in diversity. See *id.*, at 185; *Harvard I*, 397 F. Supp. 3d, at 133; Tr. of Oral Arg. in No. 21–707, p. 121.  And its expert agreed that valuable educational benefits flow from diversity, including richer and deeper learning, reduced bias, and more creative problem solving. 2 App. in No. 21–707, p. 546.  SFFA's counsel also emphatically disclaimed the issue at trial.  2 App. in No. 20–1199, p. 548 ("Diversity and its benefits are not on trial here").

SOTOMAYOR, J., dissenting

the Members of this majority pay lip service to respondents' "commendable" and "worthy" racial diversity goals, *ante*, at 23–24, they make a clear value judgment today: Racial integration in higher education is not sufficiently important to them. "Today, the proclivities of individuals rule." *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 6).

The majority offers no response to any of this. Instead, it attacks a straw man, arguing that the Court's cases recognize that remedying the effects of "societal discrimination" does not constitute a compelling interest. *Ante*, at 34–35. Yet as the majority acknowledges, while *Bakke* rejected that interest as insufficiently compelling, it upheld a limited use of race in college admissions to promote the educational benefits that flow from diversity. 438 U. S., at 311–315. It is that narrower interest, which the Court has reaffirmed numerous times since *Bakke* and as recently as 2016 in *Fisher II*, see *supra*, at 14–15, that the Court overrules today.

### B

The Court's precedents authorizing a limited use of race in college admissions are not just workable—they have been working. Lower courts have consistently applied them without issue, as exemplified by the opinions below and SFFA's and the Court's inability to identify any split of authority. Today, the Court replaces this settled framework with a set of novel restraints that create troubling equal protection problems and share one common purpose: to make it impossible to use race in a holistic way in college admissions, where it is much needed.

### 1

The Court argues that Harvard's and UNC's programs must end because they unfairly disadvantage some racial groups. According to the Court, college admissions are a "zero-sum" game and respondents' use of race unfairly "ad-

vantages" underrepresented minority students "at the expense of" other students. *Ante*, at 27.

That is not the role race plays in holistic admissions. Consistent with the Court's precedents, respondents' holistic review policies consider race in a very limited way. Race is only one factor out of many. That type of system allows Harvard and UNC to assemble a diverse class on a multitude of dimensions. Respondents' policies allow them to select students with various unique attributes, including talented athletes, artists, scientists, and musicians. They also allow respondents to assemble a class with diverse viewpoints, including students who have different political ideologies and academic interests, who have struggled with different types of disabilities, who are from various socioeconomic backgrounds, who understand different ways of life in various parts of the country, and—yes—students who self-identify with various racial backgrounds and who can offer different perspectives because of that identity.

That type of multidimensional system benefits all students. In fact, racial groups that are not underrepresented tend to benefit disproportionately from such a system. Harvard's holistic system, for example, provides points to applicants who qualify as "ALDC," meaning "athletes, legacy applicants, applicants on the Dean's Interest List [primarily relatives of donors], and children of faculty or staff." *Harvard II*, 980 F. 3d, at 171 (noting also that "SFFA does not challenge the admission of this large group"). ALDC applicants are predominantly white: Around 67.8% are white, 11.4% are Asian American, 6% are Black, and 5.6% are Latino. *Ibid.* By contrast, only 40.3% of non-ALDC applicants are white, 28.3% are Asian American, 11% are Black, and 12.6% are Latino. *Ibid.* Although "ALDC applicants make up less than 5% of applicants to Harvard," they constitute "around 30% of the applicants admitted each year." *Ibid.* Similarly, because of achievement gaps that result from entrenched racial inequality in K–12 education, see *infra*, at

SOTOMAYOR, J., dissenting

18–21, a heavy emphasis on grades and standardized test scores disproportionately disadvantages underrepresented racial minorities.  Stated simply, race is one small piece of a much larger admissions puzzle where most of the pieces disfavor underrepresented racial minorities.  That is precisely why underrepresented racial minorities remain *underrepresented*.  The Court's suggestion that an already advantaged racial group is "disadvantaged" because of a limited use of race is a myth.

The majority's true objection appears to be that a limited use of race in college admissions does, in fact, achieve what it is designed to achieve: It helps equalize opportunity and advances respondents' objectives by increasing the number of underrepresented racial minorities on college campuses, particularly Black and Latino students.  This is unacceptable, the Court says, because racial groups that are not underrepresented "would be admitted in greater numbers" without these policies.  *Ante*, at 28.  Reduced to its simplest terms, the Court's conclusion is that an increase in the representation of racial minorities at institutions of higher learning that were historically reserved for white Americans is an unfair and repugnant outcome that offends the Equal Protection Clause.  It provides a license to discriminate against white Americans, the Court says, which requires the courts and state actors to "pic[k] the right races to benefit."  *Ante*, at 38.

Nothing in the Fourteenth Amendment or its history supports the Court's shocking proposition, which echoes arguments made by opponents of Reconstruction-era laws and this Court's decision in *Brown*.  *Supra*, at 2–17.  In a society where opportunity is dispensed along racial lines, racial equality cannot be achieved without making room for underrepresented groups that for far too long were denied admission through the force of law, including at Harvard and UNC.  Quite the opposite: A racially integrated vision of so-

ciety, in which institutions reflect all sectors of the American public and where "the sons of former slaves and the sons of former slave owners [are] able to sit down together at the table of brotherhood," is precisely what the Equal Protection Clause commands. Martin Luther King "I Have a Dream" Speech (Aug. 28, 1963). It is "essential if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U. S., at 332.[34]

By singling out race, the Court imposes a special burden on racial minorities for whom race is a crucial component of their identity. Holistic admissions require "truly individualized consideration" of the whole person. *Id.*, at 334. Yet, "by foreclosing racial considerations, colorblindness denies those who racially self-identify the full expression of their identity" and treats "racial identity as inferior" among all "other forms of social identity." E. Boddie, The Indignities of Colorblindness, 64 UCLA L. Rev. Discourse, 64, 67 (2016). The Court's approach thus turns the Fourteenth Amendment's equal protection guarantee on its head and creates an equal protection problem of its own.

There is no question that minority students will bear the burden of today's decision. Students of color testified at

---

[34] The Court suggests that promoting the Fourteenth Amendment's vision of equality is a "radical" claim of judicial power and the equivalent of "pick[ing] winners and losers based on the color of their skin." *Ante*, at 38. The law sometimes requires consideration of race to achieve racial equality. Just like drawing district lines that comply with the Voting Rights Act may require consideration of race along with other demographic factors, achieving racial diversity in higher education requires consideration of race along with "age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw* v. *Reno*, 509 U. S. 630, 646 (1993) ("[R]ace consciousness does not lead inevitably to impermissible race discrimination"). Moreover, in ordering the admission of Black children to all-white schools "with all deliberate speed" in *Brown* v. *Board of Education*, 349 U. S. 294, 301 (1955), this Court did not decide that the Black children should receive an "advantag[e] . . . at the expense of" white children. *Ante*, at 27. It simply enforced the Equal Protection Clause by leveling the playing field.

trial that racial self-identification was an important component of their application because without it they would not be able to present a full version of themselves. For example, Rimel Mwamba, a Black UNC alumna, testified that it was "really important" that UNC see who she is "holistically and how the color of [her] skin and the texture of [her] hair impacted [her] upbringing." 2 App. in No. 21–707, p. 1033. Itzel Vasquez-Rodriguez, who identifies as Mexican-American of Cora descent, testified that her ethnoracial identity is a "core piece" of who she is and has impacted "every experience" she has had, such that she could not explain her "potential contributions to Harvard without any reference" to it. 2 App. in No. 20–1199, at 906, 908. Sally Chen, a Harvard alumna who identifies as Chinese American, explained that being the child of Chinese immigrants was "really fundamental to explaining who" she is. *Id.*, at 968–969. Thang Diep, a Harvard alumnus, testified that his Vietnamese identity was "such a big part" of himself that he needed to discuss it in his application. *Id.*, at 949. And Sarah Cole, a Black Harvard alumna, emphasized that "[t]o try to not see [her] race is to try to not see [her] simply because there is no part of [her] experience, no part of [her] journey, no part of [her] life that has been untouched by [her] race." *Id.*, at 932.

In a single paragraph at the end of its lengthy opinion, the Court suggests that "nothing" in today's opinion prohibits universities from considering a student's essay that explains "how race affected [that student's] life." *Ante*, at 39. This supposed recognition that universities can, in some situations, consider race in application essays is nothing but an attempt to put lipstick on a pig. The Court's opinion circumscribes universities' ability to consider race in any form by meticulously gutting respondents' asserted diversity interests. See *supra*, at 41–43. Yet, because the Court cannot escape the inevitable truth that race matters in students' lives, it announces a false promise to save face and appear

attuned to reality. No one is fooled.

Further, the Court's demand that a student's discussion of racial self-identification be tied to individual qualities, such as "courage," "leadership," "unique ability," and "determination," only serves to perpetuate the false narrative that Harvard and UNC currently provide "preferences on the basis of race alone." *Ante*, at 28–29, 39; see also *ante*, at 28, n. 6 (claiming without support that "race alone . . . explains the admissions decisions for hundreds if not thousands of applicants"). The Court's precedents already require that universities take race into account holistically, in a limited way, and based on the type of "individualized" and "flexible" assessment that the Court purports to favor. *Grutter*, 539 U. S., at 334; see Brief for Students and Alumni of Harvard College as *Amici Curiae* 15–17 (Harvard College Brief) (describing how the dozens of application files in the record "uniformly show that, in line with Harvard's 'whole-person' admissions philosophy, Harvard's admissions officers engage in a highly nuanced assessment of each applicant's background and qualifications"). After extensive discovery and two lengthy trials, neither SFFA nor the majority can point to a single example of an underrepresented racial minority who was admitted to Harvard or UNC on the basis of "race alone."

In the end, the Court merely imposes its preferred college application format on the Nation, not acting as a court of law applying precedent but taking on the role of college administrators to decide what is better for society. The Court's course reflects its inability to recognize that racial identity informs some students' viewpoints and experiences in unique ways. The Court goes as far as to claim that *Bakke*'s recognition that Black Americans can offer different perspectives than white people amounts to a "stereotype." *Ante*, at 29.

It is not a stereotype to acknowledge the basic truth that

young people's experiences are shaded by a societal structure where race matters. Acknowledging that there is something special about a student of color who graduates valedictorian from a predominantly white school is not a stereotype. Nor is it a stereotype to acknowledge that race imposes certain burdens on students of color that it does not impose on white students. "For generations, black and brown parents have given their children 'the talk'—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them." *Utah* v. *Strieff*, 579 U. S. 232, 254 (2016) (SOTOMAYOR, J., dissenting). Those conversations occur regardless of socioeconomic background or any other aspect of a student's self-identification. They occur because of race. As Andrew Brennen, a UNC alumnus, testified, "running down the neighborhood . . . people don't see [him] as someone that is relatively affluent; they see [him] as a black man." 2 App. in No. 21–707, at 951–952.

The absence of racial diversity, by contrast, actually contributes to stereotyping. "[D]iminishing the force of such stereotypes is both a crucial part of [respondents'] mission, and one that [they] cannot accomplish with only token numbers of minority students." *Grutter*, 539 U. S., at 333. When there is an increase in underrepresented minority students on campus, "racial stereotypes lose their force" because diversity allows students to "learn there is no 'minority viewpoint' but rather a variety of viewpoints among minority students." *Id.*, at 319–320. By preventing respondents from achieving their diversity objectives, it is the Court's opinion that facilitates stereotyping on American college campuses.

To be clear, today's decision leaves intact holistic college admissions and recruitment efforts that seek to enroll diverse classes without using racial classifications. Universities should continue to use those tools as best they can to

recruit and admit students from different backgrounds based on all the other factors the Court's opinion does not, and cannot, touch.  Colleges and universities can continue to consider socioeconomic diversity and to recruit and enroll students who are first-generation college applicants or who speak multiple languages, for example.  Those factors are not "interchangeable" with race.  *UNC*, 567 F. Supp. 3d, at 643; see, *e.g.*, 2 App. in No. 21–707, at 975–976 (Laura Ornelas, a UNC alumna, testifying that her Latina identity, socioeconomic status, and first-generation college status are all important but different "parts to getting a full picture" of who she is and how she "see[s] the world").  At SFFA's own urging, those efforts remain constitutionally permissible.  See Brief for Petitioner 81–86 (emphasizing "race-neutral" alternatives that Harvard and UNC should implement, such as those that focus on socioeconomic and geographic diversity, percentage plans, plans that increase community college transfers, and plans that develop partnerships with disadvantaged high schools); see also *ante*, at 51, 53, 55–56 (THOMAS, J., concurring) (arguing universities can consider "[r]ace-neutral policies" similar to those adopted in States such as California and Michigan, and that universities can consider "status as a first-generation college applicant," "financial means," and "generational inheritance or otherwise"); *ante*, at 8 (KAVANAUGH, J., concurring) (citing SFFA's briefs and concluding that universities can use "race-neutral" means); *ante*, at 14, n. 4 (GORSUCH, J., concurring) ("recount[ing] what SFFA has argued every step of the way" as to "race-neutral tools").

The Court today also does not adopt SFFA's suggestion that college admissions should be a function of academic metrics alone.  Using class rank or standardized test scores as the only admissions criteria would severely undermine multidimensional diversity in higher education.  Such a system "would exclude the star athlete or musician whose grades suffered because of daily practices and training.  It

SOTOMAYOR, J., dissenting

would exclude a talented young biologist who struggled to maintain above-average grades in humanities classes. And it would exclude a student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school, only to find herself just outside of the top decile of her class." *Fisher II*, 579 U. S., at 386. A myopic focus on academic ratings "does not lead to a diverse student body." *Ibid.*[35]

2

As noted above, this Court suggests that the use of race in college admissions is unworkable because respondents' objectives are not sufficiently "measurable," "focused," "concrete," and "coherent." *Ante*, at 23, 26, 39. How much more precision is required or how universities are supposed to meet the Court's measurability requirement, the Court's opinion does not say. That is exactly the point. The Court is not interested in crafting a workable framework that promotes racial diversity on college campuses. Instead, it announces a requirement designed to ensure all race-conscious plans fail. Any increased level of precision runs the risk of violating the Court's admonition that colleges and universities operate their race-conscious admissions policies with no "'specified percentage[s]'" and no "specific number[s] firmly in mind." *Grutter*, 539 U. S., at 324, 335. Thus, the majority's holding puts schools in an untenable position. It creates a legal framework where race-conscious plans *must* be measured with precision but also *must not* be measured with precision. That holding is not meant to infuse clarity into the strict scrutiny framework; it is designed to render strict scrutiny "'fatal in fact.'" *Id.*, at 326 (quoting *Adarand*

────────────

[35]Today's decision is likely to generate a plethora of litigation by disappointed college applicants who think their credentials and personal qualities should have secured them admission. By inviting those challenges, the Court's opinion promotes chaos and incentivizes universities to convert their admissions programs into inflexible systems focused on mechanical factors, which will harm all students.

*Constructors, Inc.*, 515 U. S., at 237). Indeed, the Court gives the game away when it holds that, to the extent respondents are actually measuring their diversity objectives with any level of specificity (for example, with a "focus on numbers" or specific "numerical commitment"), their plans are unconstitutional. *Ante*, at 30–31; see also *ante*, at 29 (THOMAS, J., concurring) ("I highly doubt any [university] will be able to" show a "measurable state interest").

3

The Court also holds that Harvard's and UNC's race-conscious programs are unconstitutional because they rely on racial categories that are "imprecise," "opaque," and "arbitrary." *Ante*, at 25. To start, the racial categories that the Court finds troubling resemble those used across the Federal Government for data collection, compliance reporting, and program administration purposes, including, for example, by the U. S. Census Bureau. See, *e.g.*, 62 Fed. Reg. 58786–58790 (1997). Surely, not all "'federal grant-in-aid benefits, drafting of legislation, urban and regional planning, business planning, and academic and social studies'" that flow from census data collection, *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 2), are constitutionally suspect.

The majority presumes that it knows better and appoints itself as an expert on data collection methods, calling for a higher level of granularity to fix a supposed problem of overinclusiveness and underinclusiveness. Yet it does not identify a single instance where respondents' methodology has prevented any student from reporting their race with the level of detail they preferred. The record shows that it is up to students to choose whether to identify as one, multiple, or none of these categories. See *Harvard I*, 397 F. Supp. 3d, at 137; *UNC*, 567 F. Supp. 3d, at 596. To the extent students need to convey additional information, students can select subcategories or provide more detail in

SOTOMAYOR, J., dissenting

their personal statements or essays. See *Harvard I*, 397 F. Supp. 3d, at 137. Students often do so. See, *e.g.*, 2 App. in No. 20–1199, at 906–907 (student respondent discussing her Latina identity on her application); *id.*, at 949 (student respondent testifying he "wrote about [his] Vietnamese identity on [his] application"). Notwithstanding this Court's confusion about racial self-identification, neither students nor universities are confused. There is no evidence that the racial categories that respondents use are unworkable.[36]

4

Cherry-picking language from *Grutter*, the Court also holds that Harvard's and UNC's race-conscious programs are unconstitutional because they do not have a specific expiration date. *Ante*, at 30–34. This new durational requirement is also not grounded in law, facts, or common sense. *Grutter* simply announced a general "expect[ation]" that "the use of racial preferences [would] no longer be necessary" in the future. 539 U. S., at 343. As even SFFA acknowledges, those remarks were nothing but aspirational statements by the *Grutter* Court. Tr. of Oral Arg. in No. 21–707, p. 56.

Yet this Court suggests that everyone, including the Court itself, has been misreading *Grutter* for 20 years.

———————

[36]The Court suggests that the term "Asian American" was developed by respondents because they are "uninterested" in whether Asian American students "are adequately represented." *Ante*, at 25; see also *ante*, at 5 (GORSUCH, J., concurring) (suggesting that "[b]ureaucrats" devised a system that grouped all Asian Americans into a single racial category). That argument offends the history of that term. "The term 'Asian American' was coined in the late 1960s by Asian American activists—mostly college students—to unify Asian ethnic groups that shared common experiences of race-based violence and discrimination and to advocate for civil rights and visibility." Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* 9 (AALDEF Brief).

*Grutter*, according to the majority, requires that universities identify a specific "end point" for the use of race. *Ante*, at 33. JUSTICE KAVANAUGH, for his part, suggests that *Grutter* itself automatically expires in 25 years, after either "the college class of 2028" or "the college class of 2032." *Ante*, at 7, n. 1. A faithful reading of this Court's precedents reveals that *Grutter* held nothing of the sort.

True, *Grutter* referred to "25 years," but that arbitrary number simply reflected the time that had elapsed since the Court "first approved the use of race" in college admissions in *Bakke*. *Grutter*, 539 U. S., at 343. It is also true that *Grutter* remarked that "race-conscious admissions policies must be limited in time," but it did not do so in a vaccum, as the Court suggests. *Id.*, at 342. Rather than impose a fixed expiration date, the Court tasked universities with the responsibility of periodically assessing whether their race-conscious programs "are still necessary." *Ibid. Grutter* offered as examples sunset provisions, periodic reviews, and experimenting with "race-neutral alternatives as they develop." *Ibid.* That is precisely how this Court has previously interpreted *Grutter*'s command. See *Fisher II*, 579 U. S., at 388 ("It is the University's ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies").

*Grutter*'s requirement that universities engage in periodic reviews so the use of race can end "as soon as practicable" is well grounded in the need to ensure that race is "employed no more broadly than the interest demands." 539 U. S., at 343. That is, it is grounded in strict scrutiny. By contrast, the Court's holding is based on the fiction that racial inequality has a predictable cutoff date. Equality is an ongoing project in a society where racial inequality persists. See *supra*, at 17–25. A temporal requirement that rests on the fantasy that racial inequality will end at a predictable hour is illogical and unworkable. There is a sound reason

SOTOMAYOR, J., dissenting

why this Court's precedents have never imposed the majority's strict deadline: Institutions cannot predict the future. Speculating about a day when consideration of race will become unnecessary is arbitrary at best and frivolous at worst. There is no constitutional duty to engage in that type of shallow guesswork.[37]

Harvard and UNC engage in the ongoing review that the Court's precedents demand. They "use [their] data to scrutinize the fairness of [their] admissions program[s]; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures [they] dee[m] necessary." *Fisher II*, 579 U. S., at 388. The Court holds, however, that respondents' attention to numbers amounts to unconstitutional racial balancing. *Ante*, at 30–32. But "'[s]ome attention to numbers'" is both necessary and permissible. *Grutter*, 539 U. S., at 336 (quoting *Bakke*, 438 U. S., at 323). Universities cannot blindly operate their limited race-conscious programs without regard for any quantitative information. "Increasing minority enrollment [is] instrumental to th[e] educational benefits" that respondents seek to achieve, *Fisher II*, 579 U. S., at 381, and statistics, data, and numbers "have some value

_____

[37] JUSTICE KAVANAUGH's reading, in particular, is quite puzzling. Unlike the majority, which concludes that respondents' programs should have an end point, JUSTICE KAVANAUGH suggests that *Grutter* itself has an expiration date. He agrees that racial inequality persists, *ante*, at 7–8, but at the same time suggests that race-conscious affirmative action was only necessary in "another generation," *ante*, at 4. He attempts to analogize expiration dates of court-ordered injunctions in desegregation cases, *ante*, at 5, but an expiring injunction does not eliminate the underlying constitutional principle. His musings about different college classes, *ante*, at 7, n. 1, are also entirely beside the point. Nothing in *Grutter*'s analysis turned on whether someone was applying for the class of 2028 or 2032. That reading of *Grutter* trivializes the Court's precedent by reducing it to an exercise in managing academic calendars. *Grutter* is no such thing.

as a gauge of [respondents'] ability to enroll students who can offer underrepresented perspectives." *Id.*, at 383–384. By removing universities' ability to assess the success of their programs, the Court obstructs these institutions' ability to meet their diversity goals.

5

JUSTICE THOMAS, for his part, offers a multitude of arguments for why race-conscious college admissions policies supposedly "burden" racial minorities. *Ante*, at 39. None of them has any merit.

He first renews his argument that the use of race in holistic admissions leads to the "inevitable" "underperformance" by Black and Latino students at elite universities "because they are less academically prepared than the white and Asian students with whom they must compete." *Fisher I*, 570 U. S., at 332 (concurring opinion). JUSTICE THOMAS speaks only for himself. The Court previously declined to adopt this so-called "mismatch" hypothesis for good reason: It was debunked long ago. The decades-old "studies" advanced by the handful of authors upon whom JUSTICE THOMAS relies, *ante*, at 40–41, have "major methodological flaws," are based on unreliable data, and do not "meet the basic tenets of rigorous social science research." Brief for Empirical Scholars as *Amici Curiae* 3, 9–25. By contrast, "[m]any social scientists have studied the impact of elite educational institutions on student outcomes, and have found, among other things, that attending a more selective school is associated with higher graduation rates and higher earnings for [underrepresented minority] students—conclusions directly contrary to mismatch." *Id.*, at 7–9 (collecting studies). This extensive body of research is supported by the most obvious data point available to this institution today: The three Justices of color on this Court graduated from elite universities and law schools with race-

SOTOMAYOR, J., dissenting

conscious admissions programs, and achieved successful legal careers, despite having different educational backgrounds than their peers. A discredited hypothesis that the Court previously rejected is no reason to overrule precedent.

JUSTICE THOMAS claims that the weight of this evidence is overcome by a single more recent article published in 2016. *Ante*, at 41, n. 8. That article, however, explains that studies supporting the mismatch hypothesis "yield misleading conclusions," "overstate the amount of mismatch," "preclude one from drawing any concrete conclusions," and rely on methodologically flawed assumptions that "lea[d] to an upwardly-biased estimate of mismatch." P. Arcidiacono & M. Lovenheim, Affirmative Action and the Quality-Fit Trade-off, 54 J. Econ. Lit. 3, 17, 20 (2016); see *id.*, at 6 ("economists should be very skeptical of the mismatch hypothesis"). Notably, this refutation of the mismatch theory was coauthored by one of SFFA's experts, as JUSTICE THOMAS seems to recognize.

Citing nothing but his own long-held belief, JUSTICE THOMAS also equates affirmative action in higher education with segregation, arguing that "racial preferences in college admissions 'stamp [Black and Latino students] with a badge of inferiority.'" *Ante*, at 41 (quoting *Adarand*, 515 U. S., at 241 (THOMAS, J., concurring in part and concurring in judgment)). Studies disprove this sentiment, which echoes "tropes of stigma" that "were employed to oppose Reconstruction policies." A. Onwuachi-Willig, E. Houh, & M. Campbell, Cracking the Egg: Which Came First—Stigma or Affirmative Action? 96 Cal. L. Rev. 1299, 1323 (2008); see, *e.g.*, *id.*, at 1343–1344 (study of seven law schools showing that stigma results from "racial stereotypes that have attached historically to different groups, regardless of affirmative action's existence"). Indeed, equating state-sponsored segregation with race-conscious admissions policies that promote racial integration trivializes the harms of segregation and offends

*Brown*'s transformative legacy. School segregation "has a detrimental effect" on Black students by "denoting the inferiority" of "their status in the community" and by "'depriv[ing] them of some of the benefits they would receive in a racial[ly] integrated school system.'" 347 U. S., at 494. In sharp contrast, race-conscious college admissions ensure that higher education is "visibly open to" and "inclusive of talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U. S., at 332. These two uses of race are not created equal. They are not "equally objectionable." *Id.*, at 327.

Relatedly, JUSTICE THOMAS suggests that race-conscious college admissions policies harm racial minorities by increasing affinity-based activities on college campuses. *Ante*, at 46. Not only is there no evidence of a causal connection between the use of race in college admissions and the supposed rise of those activities, but JUSTICE THOMAS points to no evidence that affinity groups cause any harm. Affinity-based activities actually help racial minorities improve their visibility on college campuses and "decreas[e] racial stigma and vulnerability to stereotypes" caused by "conditions of racial isolation" and "tokenization." U. Jayakumar, Why Are All Black Students *Still* Sitting Together in the Proverbial College Cafeteria?, Higher Education Research Institute at UCLA (Oct. 2015); see also Brief for Respondent-Students in No. 21–707, p. 42 (collecting student testimony demonstrating that "affinity groups beget important academic and social benefits" for racial minorities); 4 App. in No. 20–1199, at 1591 (Harvard Working Group on Diversity and Inclusion Report) (noting that concerns "that culturally specific spaces or affinity-themed housing will isolate" student minorities are misguided because those spaces allow students "to come together . . . to deal with intellectual, emotional, and social challenges").

Citing no evidence, JUSTICE THOMAS also suggests that race-conscious admissions programs discriminate against

SOTOMAYOR, J., dissenting

Asian American students. *Ante*, at 43–44. It is true that SFFA "allege[d]" that Harvard discriminates against Asian American students. *Ante*, at 43. Specifically, SFFA argued that Harvard discriminates against Asian American applicants vis-à-vis white applicants through the use of the personal rating, an allegedly "highly subjective" component of the admissions process that is "susceptible to stereotyping and bias." *Harvard II*, 980 F. 3d, at 196; see Brief for Professors of Economics as *Amici Curiae* 24. It is also true, however, that there was a lengthy trial to test those allegations, which SFFA lost. JUSTICE THOMAS points to no legal or factual error below, precisely because there is none.

To begin, this part of SFFA's discrimination claim does not even fall under the strict scrutiny framework in *Grutter* and its progeny, which concerns the use of racial classifications. The personal rating is a facially race-*neutral* component of Harvard's admissions policy.[38] Therefore, even assuming for the sake of argument that Harvard engages in racial discrimination through the personal rating, there is no connection between that rating and the remedy that SFFA sought and that the majority grants today: ending the limited use of race in the entire admissions process. In any event, after assessing the credibility of fact witnesses and considering extensive documentary evidence and expert testimony, the courts below found "no discrimination against Asian Americans." *Harvard II*, 980 F. 3d, at 195, n. 34, 202; see *id.*, at 195–204.

There is no question that the Asian American community continues to struggle against potent and dehumanizing stereotypes in our society. It is precisely because racial discrimination persists in our society, however, that the use of

---

[38] Before 2018, Harvard's admissions procedures were silent on the use of race in connection with the personal rating. *Harvard II*, 980 F. 3d, at 169. Harvard later modified its instructions to say explicitly that "'an applicant's race or ethnicity should not be considered in assigning the personal rating.'" *Ibid.*

race in college admissions to achieve racially diverse classes is critical to improving cross-racial understanding and breaking down racial stereotypes. See *supra*, at 16. Indeed, the record shows that some Asian American applicants are actually "advantaged by Harvard's use of race," *Harvard II*, 980 F. 3d, at 191, and "eliminating consideration of race would significantly disadvantage at least some Asian American applicants," *Harvard I*, 397 F. Supp. 3d, at 194. Race-conscious holistic admissions that contextualize the racial identity of each individual allow Asian American applicants "who would be less likely to be admitted without a comprehensive understanding of their background" to explain "the value of their unique background, heritage, and perspective." *Id.*, at 195. Because the Asian American community is not a monolith, race-conscious holistic admissions allow colleges and universities to "consider the vast differences within [that] community." AALDEF Brief 4–14. Harvard's application files show that race-conscious holistic admissions allow Harvard to "valu[e] the diversity of Asian American applicants' experiences." Harvard College Brief 23.

Moreover, the admission rates of Asian Americans at institutions with race-conscious admissions policies, including at Harvard, have "been steadily increasing for decades." *Harvard II*, 980 F. 3d, at 198.[39] By contrast, Asian American enrollment declined at elite universities that are prohibited by state law from considering race. See AALDEF Brief 27; Brief for 25 Diverse, California-Focused Bar Associations et al. as *Amici Curiae* 19–20, 23. At bottom, race-conscious admissions benefit all students, including racial minorities. That includes the Asian American community.

Finally, JUSTICE THOMAS belies reality by suggesting that "experts and elites" with views similar to those "that

---

[39] At Harvard, "Asian American applicants are accepted at the same rate as other applicants and now make up more than 20% of Harvard's admitted classes," even though "only about 6% of the United States population is Asian American." *Harvard I*, 397 F. Supp. 3d, at 203.

motivated *Dred Scott* and *Plessy*" are the ones who support race conscious admissions. *Ante*, at 39. The plethora of young students of color who testified in favor of race-consciousness proves otherwise. See *supra*, at 46–47; see also *infra*, at 64–67 (discussing numerous *amici* from many sectors of society supporting respondents' policies). Not a single student—let alone any racial minority—affected by the Court's decision testified in favor of SFFA in these cases.

C

In its "radical claim to power," the Court does not even acknowledge the important reliance interests that this Court's precedents have generated. *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 53). Significant rights and expectations will be affected by today's decision nonetheless. Those interests supply "added force" in favor of *stare decisis*. *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991).

Students of all backgrounds have formed settled expectations that universities with race-conscious policies "will provide diverse, cross-cultural experiences that will better prepare them to excel in our increasingly diverse world." Brief for Respondent-Students in No. 21–707, at 45; see Harvard College Brief 6–11 (collecting student testimony).

Respondents and other colleges and universities with race-conscious admissions programs similarly have concrete reliance interests because they have spent significant resources in an effort to comply with this Court's precedents. "Universities have designed courses that draw on the benefits of a diverse student body," "hired faculty whose research is enriched by the diversity of the student body," and "promoted their learning environments to prospective students who have enrolled based on the understanding that they could obtain the benefits of diversity of all kinds." Brief for Respondent in No. 20–1199, at 40–41 (internal

quotation marks omitted). Universities also have "expended vast financial and other resources" in "training thousands of application readers on how to faithfully apply this Court's guardrails on the use of race in admissions." Brief for University Respondents in No. 21–707, p. 44. Yet today's decision abruptly forces them "to fundamentally alter their admissions practices." *Id.*, at 45; see also Brief for Massachusetts Institute of Technology et al. as *Amici Curiae* 25–26; Brief for Amherst College et al. as *Amici Curiae* 23–25 (Amherst Brief). As to Title VI in particular, colleges and universities have relied on *Grutter* for decades in accepting federal funds. See Brief for United States as *Amicus Curiae* in No. 20–1199, p. 25 (United States Brief); Georgetown Brief 16.

The Court's failure to weigh these reliance interests "is a stunning indictment of its decision." *Dobbs*, 597 U. S., at ___ (dissenting opinion) (slip op., at 55).

## IV

The use of race in college admissions has had profound consequences by increasing the enrollment of underrepresented minorities on college campuses. This Court presupposes that segregation is a sin of the past and that race-conscious college admissions have played no role in the progress society has made. The fact that affirmative action in higher education "has worked and is continuing to work" is no reason to abandon the practice today. *Shelby County* v. *Holder*, 570 U. S. 529, 590 (2013) (Ginsburg, J., dissenting) ("[It] is like throwing away your umbrella in a rainstorm because you are not getting wet").

Experience teaches that the consequences of today's decision will be destructive. The two lengthy trials below simply confirmed what we already knew: Superficial color-blindness in a society that systematically segregates opportunity will cause a sharp decline in the rates at which underrepresented minority students enroll in our Nation's

SOTOMAYOR, J., dissenting

colleges and universities, turning the clock back and undoing the slow yet significant progress already achieved. See *Schuette*, 572 U. S., at 384–390 (SOTOMAYOR, J., dissenting) (collecting statistics from States that have banned the use of race in college admissions); see also Amherst Brief 13 (noting that eliminating the use of race in college admissions will take Black student enrollment at elite universities back to levels this country saw in the early 1960s).

After California amended its State Constitution to prohibit race-conscious college admissions in 1996, for example, "freshmen enrollees from underrepresented minority groups dropped precipitously" in California public universities. Brief for President and Chancellors of the University of California as *Amici Curiae* 4, 9, 11–13. The decline was particularly devastating at California's most selective campuses, where the rates of admission of underrepresented groups "dropped by 50% or more." *Id.*, at 4, 12. At the University of California, Berkeley, a top public university not just in California but also nationally, the percentage of Black students in the freshman class dropped from 6.32% in 1995 to 3.37% in 1998. *Id.*, at 12–13. Latino representation similarly dropped from 15.57% to 7.28% during that period at Berkeley, even though Latinos represented 31% of California public high school graduates. *Id.*, at 13. To this day, the student population at California universities still "reflect[s] a persistent inability to increase opportunities" for all racial groups. *Id.*, at 23. For example, as of 2019, the proportion of Black freshmen at Berkeley was 2.76%, well below the pre-constitutional amendment level in 1996, which was 6.32%. *Ibid.* Latinos composed about 15% of freshmen students at Berkeley in 2019, despite making up 52% of all California public high school graduates. *Id.*, at 24; see also Brief for University of Michigan as *Amicus Curiae* 21–24 (noting similar trends at the University of Michigan from 2006, the last admissions cycle before Michigan's ban on race-conscious admissions took effect,

SOTOMAYOR, J., dissenting

through present); *id.*, at 24–25 (explaining that the university's "experience is largely consistent with other schools that do not consider race as a factor in admissions," including, for example, the University of Oklahoma's most prestigious campus).

The costly result of today's decision harms not just respondents and students but also our institutions and democratic society more broadly. Dozens of *amici* from nearly every sector of society agree that the absence of race-conscious college admissions will decrease the pipeline of racially diverse college graduates to crucial professions. Those *amici* include the United States, which emphasizes the need for diversity in the Nation's military, see United States Brief 12–18, and in the federal workforce more generally, *id.*, at 19–20 (discussing various federal agencies, including the Federal Bureau of Investigation and the Office of the Director of National Intelligence). The United States explains that "the Nation's military strength and readiness depend on a pipeline of officers who are both highly qualified and racially diverse—and who have been educated in diverse environments that prepare them to lead increasingly diverse forces." *Id.*, at 12. That is true not just at the military service academies but at "civilian universities, including Harvard, that host Reserve Officers' Training Corps (ROTC) programs and educate students who go on to become officers." *Ibid.* Top former military leaders agree. See Brief for Adm. Charles S. Abbot et al. as *Amici Curiae* 3 (noting that in *amici*'s "professional judgment, the status quo—which permits service academies and civilian universities to consider racial diversity as one factor among many in their admissions practices—is essential to the continued vitality of the U. S. military").

Indeed, history teaches that racial diversity is a national security imperative. During the Vietnam War, for example, lack of racial diversity "threatened the integrity and perfor-

SOTOMAYOR, J., dissenting

mance of the Nation's military" because it fueled "perceptions of racial/ethnic minorities serving as 'cannon fodder' for white military leaders."  Military Leadership Diversity Comm'n, From Representation to Inclusion: Diversity Leadership for the 21st-Century Military xvi, 15 (2011); see also, *e.g.*, R. Stillman, Racial Unrest in the Military: The Challenge and the Response, 34 Pub. Admin. Rev. 221, 221– 222 (1974) (discussing other examples of racial unrest). Based on "lessons from decades of battlefield experience," it has been the "longstanding military judgment" across administrations that racial diversity "is essential to achieving a mission-ready" military and to ensuring the Nation's "ability to compete, deter, and win in today's increasingly complex global security environment."  United States Brief 13 (internal quotation marks omitted).  The majority recognizes the compelling need for diversity in the military and the national security implications at stake, see *ante*, at 22, n. 4, but it ends race-conscious college admissions at civilian universities implicating those interests anyway.

*Amici* also tell the Court that race-conscious college admissions are critical for providing equitable and effective public services.  State and local governments require public servants educated in diverse environments who can "identify, understand, and respond to perspectives" in "our increasingly diverse communities."  Brief for Southern Governors as *Amici Curiae* 5–8 (Southern Governors Brief ). Likewise, increasing the number of students from underrepresented backgrounds who join "the ranks of medical professionals" improves "healthcare access and health outcomes in medically underserved communities."  Brief for Massachusetts et al. as *Amici Curiae* 10; see Brief for Association of American Medical Colleges et al. as *Amici Curiae* 5 (noting also that *all* physicians become better practitioners when they learn in a racially diverse environment).  So too, greater diversity within the teacher workforce improves student academic achievement in primary public

schools.  Brief for Massachusetts et al. as *Amici Curiae* 15–17; see Brief for American Federation of Teachers as *Amicus Curiae* 8 ("[T]here are few professions with broader social impact than teaching").  A diverse pipeline of college graduates also ensures a diverse legal profession, which demonstrates that "the justice system serves the public in a fair and inclusive manner."  Brief for American Bar Association as *Amicus Curiae* 18; see also Brief for Law Firm Antiracism Alliance as *Amicus Curiae* 1, 6 (more than 300 law firms in all 50 States supporting race-conscious college admissions in light of the "influence and power" that lawyers wield "in the American system of government").

Examples of other industries and professions that benefit from race-conscious college admissions abound.  American businesses emphasize that a diverse workforce improves business performance, better serves a diverse consumer marketplace, and strengthens the overall American economy.  Brief for Major American Business Enterprises as *Amici Curiae* 5–27.  A diverse pipeline of college graduates also improves research by reducing bias and increasing group collaboration.  Brief for Individual Scientists as *Amici Curiae* 13–14.  It creates a more equitable and inclusive media industry that communicates diverse viewpoints and perspectives.  Brief for Multicultural Media, Telecom and Internet Council, Inc., et al. as *Amici Curiae* 6.  It also drives innovation in an increasingly global science and technology industry.  Brief for Applied Materials, Inc., et al. as *Amici Curiae* 11–20.

Today's decision further entrenches racial inequality by making these pipelines to leadership roles less diverse.  A college degree, particularly from an elite institution, carries with it the benefit of powerful networks and the opportunity for socioeconomic mobility.  Admission to college is therefore often the entry ticket to top jobs in workplaces where important decisions are made.  The overwhelming majority

SOTOMAYOR, J., dissenting

of Members of Congress have a college degree.[40]  So do most business leaders.[41]  Indeed, many state and local leaders in North Carolina attended college in the UNC system.  See Southern Governors Brief 8.  More than half of judges on the North Carolina Supreme Court and Court of Appeals graduated from the UNC system, for example, and nearly a third of the Governor's cabinet attended UNC.  *Ibid.*  A less diverse pipeline to these top jobs accumulates wealth and power unequally across racial lines, exacerbating racial disparities in a society that already dispenses prestige and privilege based on race.

The Court ignores the dangerous consequences of an America where its leadership does not reflect the diversity of the People.  A system of government that visibly lacks a path to leadership open to every race cannot withstand scrutiny "in the eyes of the citizenry."  *Grutter*, 539 U. S., at 332.  "[G]ross disparity in representation" leads the public to wonder whether they can ever belong in our Nation's institutions, including this one, and whether those institutions work for them.  Tr. of Oral Arg. in No. 21–707, p. 171 ("The Court is going to hear from 27 advocates in this sitting of the oral argument calendar, and two are women, even though women today are 50 percent or more of law school graduates.  And I think it would be reasonable for a woman to look at that and wonder, is that a path that's open to me, to be a Supreme Court advocate?" (remarks of Solicitor General Elizabeth Prelogar)).[42]

────────────

[40] K. Schaeffer, Pew Research Center, The Changing Face of Congress in 8 Charts (Feb. 7, 2023).

[41] See J. Martelli & P. Abels, The Education of a Leader: Educational Credentials and Other Characteristics of Chief Executive Officers, J. of Educ. for Bus. 216 (2010); see also J. Moody, Where the Top Fortune 500 CEOs Attended College, U. S. News & World Report (June 16, 2021).

[42] Racial inequality in the pipeline to this institution, too, will deepen. See J. Fogel, M. Hoopes, & G. Liu, Law Clerk Selection and Diversity: Insights From Fifty Sitting Judges of the Federal Courts of Appeals 7–8

SOTOMAYOR, J., dissenting

By ending race-conscious college admissions, this Court closes the door of opportunity that the Court's precedents helped open to young students of every race. It creates a leadership pipeline that is less diverse than our increasingly diverse society, reserving "positions of influence, affluence, and prestige in America" for a predominantly white pool of college graduates. *Bakke*, 438 U. S., at 401 (opinion of Marshall, J.). At its core, today's decision exacerbates segregation and diminishes the inclusivity of our Nation's institutions in service of superficial neutrality that promotes indifference to inequality and ignores the reality of race.

*    *    *

True equality of educational opportunity in racially diverse schools is an essential component of the fabric of our democratic society. It is an interest of the highest order and a foundational requirement for the promotion of equal protection under the law. *Brown* recognized that passive race neutrality was inadequate to achieve the constitutional guarantee of racial equality in a Nation where the effects of segregation persist. In a society where race continues to matter, there is no constitutional requirement that institutions attempting to remedy their legacies of racial exclusion must operate with a blindfold.

Today, this Court overrules decades of precedent and imposes a superficial rule of race blindness on the Nation. The devastating impact of this decision cannot be overstated. The majority's vision of race neutrality will entrench racial

―――――――――
(2022) (noting that from 2005 to 2017, 85% of Supreme Court law clerks were white, 9% were Asian American, 4% were Black, and 1.5% were Latino, and about half of all clerks during that period graduated from two law schools: Harvard and Yale); Brief for American Bar Association as *Amicus Curiae* 25 (noting that more than 85% of lawyers, more than 70% of Article III judges, and more than 80% of state judges in the United States are white, even though white people represent about 60% of the population).

SOTOMAYOR, J., dissenting

segregation in higher education because racial inequality will persist so long as it is ignored.

Notwithstanding this Court's actions, however, society's progress toward equality cannot be permanently halted. Diversity is now a fundamental American value, housed in our varied and multicultural American community that only continues to grow. The pursuit of racial diversity will go on. Although the Court has stripped out almost all uses of race in college admissions, universities can and should continue to use all available tools to meet society's needs for diversity in education. Despite the Court's unjustified exercise of power, the opinion today will serve only to highlight the Court's own impotence in the face of an America whose cries for equality resound. As has been the case before in the history of American democracy, "the arc of the moral universe" will bend toward racial justice despite the Court's efforts today to impede its progress. Martin Luther King "Our God is Marching On!" Speech (Mar. 25, 1965).

Cite as: 600 U. S. ____ (2023)          1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 20–1199 and 21–707

————————

### STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER
20–1199          *v.*
### PRESIDENT AND FELLOWS OF HARVARD COLLEGE

**ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**


### STUDENTS FOR FAIR ADMISSIONS, INC., PETITIONER
21–707          *v.*
### UNIVERSITY OF NORTH CAROLINA, ET AL.

**ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

[June 29, 2023]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.*

Gulf-sized race-based gaps exist with respect to the health, wealth, and well-being of American citizens. They were created in the distant past, but have indisputably been passed down to the present day through the generations. Every moment these gaps persist is a moment in which this great country falls short of actualizing one of its foundational principles—the "self-evident" truth that all of us are created equal. Yet, today, the Court determines that

————————

*JUSTICE JACKSON did not participate in the consideration or decision of the case in No. 20–1199, and issues this opinion with respect to the case in No. 21–707.

holistic admissions programs like the one that the University of North Carolina (UNC) has operated, consistent with *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), are a problem with respect to achievement of that aspiration, rather than a viable solution (as has long been evident to historians, sociologists, and policymakers alike).

JUSTICE SOTOMAYOR has persuasively established that nothing in the Constitution or Title VI prohibits institutions from taking race into account to ensure the racial diversity of admits in higher education. I join her opinion without qualification. I write separately to expound upon the universal benefits of considering race in this context, in response to a suggestion that has permeated this legal action from the start. Students for Fair Admissions (SFFA) has maintained, both subtly and overtly, that it is *unfair* for a college's admissions process to consider race as one factor in a holistic review of its applicants. See, *e.g.*, Tr. of Oral Arg. 19.

This contention blinks both history and reality in ways too numerous to count. But the response is simple: Our country has never been colorblind. Given the lengthy history of state-sponsored race-based preferences in America, to say that anyone is now victimized if a college considers whether that legacy of discrimination has unequally advantaged its applicants fails to acknowledge the well-documented "intergenerational transmission of inequality" that still plagues our citizenry.[1]

It is *that* inequality that admissions programs such as UNC's help to address, to the benefit of us all. Because the majority's judgment stunts that progress without any basis in law, history, logic, or justice, I dissent.

---

[1] M. Oliver & T. Shapiro, Black Wealth/White Wealth: A New Perspective on Racial Inequality 128 (1997) (Oliver & Shapiro) (emphasis deleted).

JACKSON, J., dissenting

I

A

Imagine two college applicants from North Carolina, John and James. Both trace their family's North Carolina roots to the year of UNC's founding in 1789. Both love their State and want great things for its people. Both want to honor their family's legacy by attending the State's flagship educational institution. John, however, would be the seventh generation to graduate from UNC. He is White. James would be the first; he is Black. Does the race of these applicants properly play a role in UNC's holistic merits-based admissions process?

To answer that question, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921). Many chapters of America's history appear necessary, given the opinions that my colleagues in the majority have issued in this case.

Justice Thurgood Marshall recounted the genesis:

"Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave." *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 387–388 (1978).

Slavery should have been (and was to many) self-evidently dissonant with our avowed founding principles. When the time came to resolve that dissonance, eleven States chose slavery. With the Union's survival at stake, Frederick Douglass noted, Black Americans in the South "were almost the only reliable friends the nation had," and "but for their help . . . the Rebels might have succeeded in

breaking up the Union."[2] After the war, Senator John Sherman defended the proposed Fourteenth Amendment in a manner that encapsulated our Reconstruction Framers' highest sentiments: "We are bound by every obligation, by [Black Americans'] service on the battlefield, by their heroes who are buried in our cause, by their patriotism in the hours that tried our country, we are bound to protect them and all their natural rights."[3]

To uphold that promise, the Framers repudiated this Court's holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), by crafting Reconstruction Amendments (and associated legislation) that transformed our Constitution and society.[4] Even after this Second Founding—when the need to right historical wrongs should have been clear beyond cavil—opponents insisted that vindicating equality in this manner slighted White Americans. So, when the Reconstruction Congress passed a bill to secure all citizens "the same [civil] right[s]" as "enjoyed by white citizens," 14 Stat. 27, President Andrew Johnson vetoed it because it "discriminat[ed] . . . in favor of the negro."[5]

That attitude, and the Nation's associated retreat from Reconstruction, made prophesy out of Congressman Thaddeus Stevens's fear that "those States will all . . . keep up

--------

[2] An Appeal to Congress for Impartial Suffrage, Atlantic Monthly (Jan. 1867), in 2 The Reconstruction Amendments: The Essential Documents 324 (K. Lash ed. 2021) (Lash).

[3] Speech of Sen. John Sherman (Sept. 28, 1866) (Sherman), in *id.*, at 276; see also W. Du Bois, Black Reconstruction in America 162 (1998) (Du Bois).

[4] See Sherman 276; M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 48, 71–75, 91, 173 (1986).

[5] Message Accompanying Veto of the Civil Rights Bill (Mar. 27, 1866), in Lash 145.

JACKSON, J., dissenting

this discrimination, and crush to death the hated freed-men."[6] And this Court facilitated that retrenchment.[7] Not just in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), but "in al-most every instance, the Court chose to restrict the scope of the second founding."[8] Thus, thirteen years pre-*Plessy*, in the *Civil Rights Cases*, 109 U. S. 3 (1883), our predecessors on this Court invalidated Congress's attempt to enforce the Reconstruction Amendments via the Civil Rights Act of 1875, lecturing that "there must be some stage . . . when [Black Americans] tak[e] the rank of a mere citizen, and ceas[e] to be the special favorite of the laws." *Id.*, at 25. But Justice Harlan knew better. He responded: "What the na-tion, through Congress, has sought to accomplish in refer-ence to [Black people] is—what had already been done in every State of the Union for the white race—to secure and protect rights belonging to them as freemen and citizens; nothing more." *Id.*, at 61 (dissenting opinion).

Justice Harlan dissented alone. And the betrayal that this Court enabled had concrete effects. Enslaved Black people had built great wealth, but only for enslavers.[9] No surprise, then, that freedmen leapt at the chance to control their own labor and to build their own financial security.[10] Still, White southerners often "simply refused to sell land to blacks," even when not selling was economically foolish.[11] To bolster private exclusion, States sometimes passed laws forbidding such sales.[12] The inability to build wealth

---

[6] Speech Introducing the [Fourteenth] Amendment (May 8, 1866), in *id.*, at 159; see Du Bois 670–710.

[7] E. Foner, The Second Founding 125–167 (2019) (Foner).

[8] *Id.*, at 128.

[9] M. Baradaran, The Color of Money: Black Banks and the Racial Wealth Gap 9–11 (2017) (Baradaran).

[10] Foner 179; see also Baradaran 15–16; I. Wilkerson, The Warmth of Other Suns: The Epic Story of America's Great Migration 37 (2010) (Wilkerson).

[11] Baradaran 18.

[12] *Ibid.*

through that most American of means forced Black people into sharecropping roles, where they somehow always tended to find themselves in debt to the landowner when the growing season closed, with no hope of recourse against the ever-present cooking of the books.[13]

Sharecropping is but one example of race-linked obstacles that the law (and private parties) laid down to hinder the progress and prosperity of Black people. Vagrancy laws criminalized free Black men who failed to work for White landlords.[14] Many States barred freedmen from hunting or fishing to ensure that they could not live without entering *de facto* reenslavement as sharecroppers.[15] A cornucopia of laws (*e.g.*, banning hitchhiking, prohibiting encouraging a laborer to leave his employer, and penalizing those who prompted Black southerners to migrate northward) ensured that Black people could not freely seek better lives elsewhere.[16] And when statutes did not ensure compliance, state-sanctioned (and private) violence did.[17]

Thus emerged Jim Crow—a system that was, as much as anything else, a comprehensive scheme of economic exploitation to replace the Black Codes, which themselves had replaced slavery's form of comprehensive economic exploitation.[18]    Meanwhile, as Jim Crow ossified, the Federal

--------

[13] R. Rothstein, The Color of Law: A Forgotten History of How Our Government Segregated America 154 (2017) (Rothstein); Baradaran 33–34; Wilkerson 53–55.

[14] Baradaran 20–21; Du Bois 173–179, 694–696, 698–699; R. Goluboff, The Thirteenth Amendment and the Lost Origins of Civil Rights, 50 Duke L. J. 1609, 1656–1659 (2001) (Goluboff); Wilkerson 152 (noting persistence of this practice "well into the 1940s").

[15] Baradaran 20.

[16] Goluboff 1656–1659 (recounting presence of these practices well into the 20th century); Wilkerson 162–163.

[17] Rothstein 154.

[18] C. Black, The Lawfulness of the Segregation Decisions, 69 Yale L. J. 421, 424 (1960); Foner 47–48; Du Bois 179, 696; Baradaran 38–39.

JACKSON, J., dissenting

Government was "giving away land" on the western frontier, and with it "the opportunity for upward mobility and a more secure future," over the 1862 Homestead Act's three-quarter-century tenure.[19]  Black people were exceedingly unlikely to be allowed to share in those benefits, which by one calculation may have advantaged approximately 46 million Americans living today.[20]

Despite these barriers, Black people persisted.  Their so-called Great Migration northward accelerated during and after the First World War.[21]  Like clockwork, American cities responded with racially exclusionary zoning (and similar policies).[22]  As a result, Black migrants had to pay disproportionately high prices for disproportionately subpar housing.[23]  Nor did migration make it more likely for Black people to access home ownership, as banks would not lend to Black people, and in the rare cases banks would fund home loans, exorbitant interest rates were charged.[24]  With Black people still locked out of the Homestead Act giveaway, it is no surprise that, when the Great Depression arrived, race-based wealth, health, and opportunity gaps were the norm.[25]

Federal and State Governments' selective intervention further exacerbated the disparities.  Consider, for example,

———————

[19]T. Shanks, The Homestead Act: A Major Asset-Building Policy in American History, in Inclusion in the American Dream: Assets, Poverty, and Public Policy 23–25 (M. Sherraden ed. 2005) (Shanks); see also Baradaran 18.

[20]Shanks 32–37; Oliver & Shapiro 37–38.

[21]Wilkerson 8–10; Rothstein 155.

[22]*Id.*, at 43–50; Baradaran 90–92.

[23]*Ibid.*; Rothstein 172–173; Wilkerson 269–271.

[24]Baradaran 90.

[25]I. Katznelson, When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America 29–35 (2005) (Katznelson).

JACKSON, J., dissenting

the federal Home Owners' Loan Corporation (HOLC), created in 1933.[26]  HOLC purchased mortgages threatened with foreclosure and issued new, amortized mortgages in their place.[27]  Not only did this mean that recipients of these mortgages could gain equity while paying off the loan, successful full payment would make the recipient a homeowner.[28]  Ostensibly to identify (and avoid) the riskiest recipients, the HOLC "created color-coded maps of every metropolitan area in the nation."[29]  Green meant safe; red meant risky.  And, regardless of class, every neighborhood with Black people earned the red designation.[30]

Similarly, consider the Federal Housing Administration (FHA), created in 1934, which insured highly desirable bank mortgages.  Eligibility for this insurance required an FHA appraisal of the property to ensure a low default risk.[31]  But, nationwide, it was FHA's established policy to provide "no guarantees for mortgages to African Americans, or to whites who might lease to African Americans," irrespective of creditworthiness.[32]  No surprise, then, that "[b]etween 1934 and 1968, 98 percent of FHA loans went to white Americans," with whole cities (ones that had a disproportionately large number of Black people due to housing segregation) sometimes being deemed ineligible for FHA intervention on racial grounds.[33]  The Veterans Administration operated similarly.[34]

One more example: the Federal Home Loan Bank Board

––––––––––

[26] D. Massey & N. Denton, American Apartheid: Segregation and the Making of the Underclass 51–53 (1993); Oliver & Shapiro 16–18.
[27] Rothstein 63.
[28] *Id.*, at 63–64.
[29] *Id.*, at 64; see Oliver & Shapiro 16–18; Baradaran 105.
[30] Rothstein 64.
[31] *Ibid.*
[32] *Id.*, at 67.
[33] Baradaran 108; see Rothstein 69–75.
[34] *Id.*, at 9, 13, 70.

JACKSON, J., dissenting

"chartered, insured, and regulated savings and loan associations from the early years of the New Deal."[35]  But it did "not oppose the denial of mortgages to African Americans until 1961" (and even then opposed discrimination ineffectively).[36]

The upshot of all this is that, due to government policy choices, "[i]n the suburban-shaping years between 1930 and 1960, fewer than one percent of all mortgages in the nation were issued to African Americans."[37]  Thus, based on their race, Black people were "[l]ocked out of the greatest mass-based opportunity for wealth accumulation in American history."[38]

For present purposes, it is significant that, in so excluding Black people, government policies affirmatively operated—one could say, affirmatively acted—to dole out preferences to those who, if nothing else, were not Black.  Those past preferences carried forward and are reinforced today by (among other things) the benefits that flow to homeowners and to the holders of other forms of capital that are hard to obtain unless one already has assets.[39]

This discussion of how the existing gaps were formed is merely illustrative, not exhaustive.  I will pass over Congress's repeated crafting of family-, worker-, and retiree-protective legislation to channel benefits to White people, thereby excluding Black Americans from what was otherwise "a revolution in the status of most working Americans."[40]  I will also skip how the G. I. Bill's "creation of . . .

─────────────

[35] *Id.*, at 108.

[36] *Ibid.*

[37] R. Schragger, The Limits of Localism, 100 Mich. L. Rev. 371, 411, n. 144 (2001); see also Rothstein 182–183.

[38] Oliver & Shapiro 18.

[39] *Id.*, at 43–44; Baradaran 109, 253–254; A. Dickerson, Shining a Bright Light on the Color of Wealth, 120 Mich. L. Rev. 1085, 1100 (2022) (Dickerson).

[40] Katznelson 53; see *id.*, at 22, 29, 42–48, 53–61; Rothstein 31, 155–156.

middle-class America" (by giving $95 billion to veterans and their families between 1944 and 1971) was "deliberately designed to accommodate Jim Crow."[41]  So, too, will I bypass how Black people were prevented from partaking in the consumer credit market—a market that helped White people who could access it build and protect wealth.[42]  Nor will time and space permit my elaborating how local officials' racial hostility meant that even those benefits that Black people could formally obtain were unequally distributed along racial lines.[43]  And I could not possibly discuss every way in which, in light of this history, facially race-blind policies *still* work race-based harms today (*e.g.*, racially disparate tax-system treatment; the disproportionate location of toxic-waste facilities in Black communities; or the deliberate action of governments at all levels in designing interstate highways to bisect and segregate Black urban communities).[44]

The point is this: Given our history, the origin of persistent race-linked gaps should be no mystery.  It has never been a deficiency of Black Americans' desire or ability to, in Frederick Douglass's words, "stand on [their] own legs."[45]  Rather, it was always simply what Justice Harlan recognized 140 years ago—the persistent and pernicious denial of "what had already been done in every State of the Union for the white race."  *Civil Rights Cases*, 109 U. S., at 61 (dissenting opinion).

---

[41] Katznelson 113–114; see *id.*, at 113–141; see also, *e.g.*, *id.*, at 139–140 (Black veterans, North and South, were routinely denied loans that White veterans received); Rothstein 167.

[42] Baradaran 112–113.

[43] Katznelson 22–23; Rothstein 167.

[44] *Id.*, at 54–56, 65, 127–131, 217; Stanford Institute for Economic Policy Research, Measuring and Mitigating Disparities in Tax Audits 1–7 (2023); Dickerson 1096–1097.

[45] What the Black Man Wants: An Address Delivered in Boston, Massachusetts, on 26 January 1865, in 4 The Frederick Douglass Papers 68 (J. Blassingame & J. McKivigan eds. 1991).

JACKSON, J., dissenting

## B

History speaks. In some form, it can be heard forever. The race-based gaps that first developed centuries ago are echoes from the past that still exist today. By all accounts, they are still stark.

Start with wealth and income. Just four years ago, in 2019, Black families' median wealth was approximately $24,000.[46] For White families, that number was approximately eight times as much (about $188,000).[47] These wealth disparities "exis[t] at every income and education level," so, "[o]n average, white families with college degrees have over $300,000 more wealth than black families with college degrees."[48] This disparity has also accelerated over time—from a roughly $40,000 gap between White and Black household median net worth in 1993 to a roughly $135,000 gap in 2019.[49] Median income numbers from 2019 tell the same story: $76,057 for White households, $98,174 for Asian households, $56,113 for Latino households, and $45,438 for Black households.[50]

These financial gaps are unsurprising in light of the link

––––––––

[46] Dickerson 1086 (citing data from 2019 Federal Reserve Survey of Consumer Finances); see also Rothstein 184 (reporting, in 2017, even lower median-wealth number of $11,000).

[47] Dickerson 1086; see also Rothstein 184 (reporting even larger relative gap in 2017 of $134,000 to $11,000).

[48] Baradaran 249; see also Dickerson 1089–1090; Oliver & Shapiro 94–95, 100–101, 110–111, 197.

[49] See Brief for National Academy of Education as *Amicus Curiae* 14–15 (citing U. S. Census Bureau statistics).

[50] *Id.*, at 14 (citing U. S. Census Bureau statistics); Rothstein 184 (reporting similarly stark White/Black income gap numbers in 2017). Early returns suggest that the COVID–19 pandemic exacerbated these disparities. See E. Derenoncourt, C. Kim, M. Kuhn, & M. Schularick, Wealth of Two Nations: The U. S. Racial Wealth Gap, 1860–2020, p. 22 (Fed. Reserve Bank of Minneapolis, Opportunity & Inclusive Growth Inst., Working Paper No. 59, June 2022) (Wealth of Two Nations); L. Bollinger & G. Stone, A Legacy of Discrimination: The Essential Constitutionality of Affirmative Action 103 (2023) (Bollinger & Stone).

12    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

JACKSON, J., dissenting

between home ownership and wealth. Today, as was true 50 years ago, Black home ownership trails White home ownership by approximately 25 percentage points.[51] Moreover, Black Americans' homes (relative to White Americans') constitute a greater percentage of household wealth, yet tend to be worth less, are subject to higher effective property taxes, and generally lost more value in the Great Recession.[52]

From those markers of social and financial unwellness flow others. In most state flagship higher educational institutions, the percentage of Black undergraduates is lower than the percentage of Black high school graduates in that State.[53] Black Americans in their late twenties are about half as likely as their White counterparts to have college degrees.[54] And because lower family income and wealth force students to borrow more, those Black students who do graduate college find themselves four years out with about $50,000 in student debt—nearly twice as much as their White compatriots.[55]

As for postsecondary professional arenas, despite being about 13% of the population, Black people make up only about 5% of lawyers.[56] Such disparity also appears in the business realm: Of the roughly 1,800 chief executive officers to have appeared on the well-known Fortune 500 list, fewer than 25 have been Black (as of 2022, only six are Black).[57] Furthermore, as the COVID–19 pandemic raged, Black-owned small businesses failed at dramatically higher rates

---

[51] *Id.*, at 87; Wealth of Two Nations 77–79.

[52] *Id.*, at 78, 89; Bollinger & Stone 94–95; Dickerson 1101.

[53] Bollinger & Stone 99–100.

[54] *Id.*, at 99, and n. 58.

[55] Dickerson 1088; Bollinger & Stone 100, and n. 63.

[56] ABA, Profile of the Legal Profession 33 (2020).

[57] Bollinger & Stone 106; Brief for HR Policy Association as *Amicus Curiae* 18–19.

JACKSON, J., dissenting

than White-owned small businesses, partly due to the disproportionate denial of the forgivable loans needed to survive the economic downturn.[58]

Health gaps track financial ones.  When tested, Black children have blood lead levels that are twice the rate of White children—"irreversible" contamination working irremediable harm on developing brains.[59]  Black (and Latino) children with heart conditions are more likely to die than their White counterparts.[60]  Race-linked mortality-rate disparity has also persisted, and is highest among infants.[61]

So, too, for adults: Black men are twice as likely to die from prostate cancer as White men and have lower 5-year cancer survival rates.[62]  Uterine cancer has spiked in recent years among all women—but has spiked highest for Black women, who die of uterine cancer at nearly twice the rate of "any other racial or ethnic group."[63]  Black mothers are up to four times more likely than White mothers to die as a result of childbirth.[64]  And COVID killed Black Americans at higher rates than White Americans.[65]

"Across the board, Black Americans experience the highest rates of obesity, hypertension, maternal mortality, infant mortality, stroke, and asthma."[66]  These and other disparities—the predictable result of opportunity disparities—

––––––––––––

[58] Dickerson 1102.

[59] Rothstein 230.

[60] Brief for Association of American Medical Colleges et al. as *Amici Curiae* 8 (AMC Brief).

[61] C. Caraballo et al., Excess Mortality and Years of Potential Life Lost Among the Black Population in the U. S., 1999–2020, 329 JAMA 1662, 1663, 1667 (May 16, 2023) (Caraballo).

[62] Bollinger & Stone 101.

[63] S. Whetstone et al., Health Disparities in Uterine Cancer: Report From the Uterine Cancer Evidence Review Conference, 139 Obstetrics & Gynecology 645, 647–648 (2022).

[64] AMC Brief 8–9.

[65] Bollinger & Stone 101; Caraballo 1663–1665, 1668.

[66] Bollinger & Stone 101 (footnotes omitted).

lead to at least 50,000 excess deaths a year for Black Americans vis-à-vis White Americans.[67]  That is 80 million excess years of life lost from just 1999 through 2020.[68]

*Amici* tell us that "race-linked health inequities pervad[e] nearly every index of human health" resulting "in an overall reduced life expectancy for racial and ethnic minorities that cannot be explained by genetics."[69]  Meanwhile—tying health and wealth together—while she lays dying, the typical Black American "pay[s] more for medical care and incur[s] more medical debt."[70]

## C

We return to John and James now, with history in hand. It is hardly John's fault that he is the seventh generation to graduate from UNC.  UNC should permit him to honor that legacy.  Neither, however, was it James's (or his family's) fault that he would be the first.  And UNC ought to be able to consider why.

Most likely, seven generations ago, when John's family was building its knowledge base and wealth potential on the university's campus, James's family was enslaved and laboring in North Carolina's fields.  Six generations ago, the North Carolina "Redeemers" aimed to nullify the results of the Civil War through terror and violence, marauding in hopes of excluding all who looked like James from equal citizenship.[71]  Five generations ago, the North Carolina Red Shirts finished the job.[72]  Four (and three) generations ago, Jim Crow was so entrenched in the State of North Carolina

---

[67] Caraballo 1667.

[68] *Ibid.*

[69] AMC Brief 9.

[70] Bollinger & Stone 100.

[71] See Report on the Alleged Outrages in the Southern States, S. Rep. No. 1, 42d Cong., 1st Sess., I–XXXII (1871).

[72] See D. Tokaji, Realizing the Right To Vote: The Story of *Thornburg v. Gingles*, in Election Law Stories 133–139 (J. Douglas & E. Mazo eds. 2016); see Foner xxii.

JACKSON, J., dissenting

that UNC "enforced its own Jim Crow regulations."[73] Two generations ago, North Carolina's Governor still railed against "'integration for integration's sake'"—and UNC Black enrollment was minuscule.[74] So, at bare minimum, one generation ago, James's family was six generations behind because of their race, making John's six generations ahead.

These stories are not every student's story. But they are many students' stories. To demand that colleges ignore race in today's admissions practices—and thus disregard the fact that racial disparities may have mattered for where some applicants find themselves today—is not only an affront to the dignity of those students for whom race matters.[75] It also condemns our society to never escape the past that explains *how and why* race matters to the very concept of who "merits" admission.

Permitting (not requiring) colleges like UNC to assess merit fully, without blinders on, plainly advances (not thwarts) the Fourteenth Amendment's core promise. UNC considers race as one of many factors in order to best assess the entire unique import of John's and James's individual lives and inheritances *on an equal basis*. Doing so involves acknowledging (not ignoring) the seven generations' worth of historical privileges and disadvantages that each of these applicants was born with when his own life's journey started a mere 18 years ago.

## II

Recognizing all this, UNC has developed a holistic review process to evaluate applicants for admission. Students

———————

[73] 3 App. 1683.

[74] *Id.*, at 1687–1688.

[75] See O. James, Valuing Identity, 102 Minn. L. Rev. 127, 162 (2017); P. Karlan & D. Levinson, Why Voting Is Different, 84 Cal. L. Rev. 1201, 1217 (1996).

JACKSON, J., dissenting

must submit standardized test scores and other conventional information.[76]  But applicants are *not* required to submit demographic information like gender and race.[77] UNC considers whatever information each applicant submits using a nonexhaustive list of 40 criteria grouped into eight categories: "academic performance, academic program, standardized testing, extracurricular activity, special talent, essay criteria, background, and personal criteria."[78]

Drawing on those 40 criteria, a UNC staff member evaluating John and James would consider, with respect to each, his "engagement outside the classroom; persistence of commitment; demonstrated capacity for leadership; contributions to family, school, and community; work history; [and his] unique or unusual interests."[79]  Relevant, too, would be his "relative advantage or disadvantage, as indicated by family income level, education history of family members, impact of parents/guardians in the home, or formal education environment; experience of growing up in rural or center-city locations; [and his] status as child or stepchild of Carolina alumni."[80]  The list goes on.  The process is holistic, through and through.

So where does race come in?  According to UNC's admissions-policy document, reviewers may also consider "the race or ethnicity of any student" (if that information is provided) in light of UNC's interest in diversity.[81]  And, yes, "the race or ethnicity of *any* student may—or may not—receive a 'plus' in the evaluation process depending on the in-

_____

[76] 567 F. Supp. 3d 580, 595 (MDNC 2021).

[77] *Id.*, at 596; 1 App. 348; Decl. of J. Rosenberg in No. 1:14–cv–954 (MDNC, Jan. 18, 2019), ECF Doc. 154–7, ¶10 (Rosenberg).

[78] 1 App. 350; see also 3 *id.*, at 1414–1415.

[79] *Id.*, at 1414.

[80] *Id.*, at 1415.

[81] *Id.*, at 1416; see also 2 *id.*, at 706; Rosenberg ¶22.

Cite as: 600 U. S. ____ (2023)    17

JACKSON, J., dissenting

dividual circumstances revealed in the student's application."[82] Stephen Farmer, the head of UNC's Office of Undergraduate Admissions, confirmed at trial (under oath) that UNC's admissions process operates in this fashion.[83]

Thus, to be crystal clear: *Every* student who chooses to disclose his or her race is eligible for such a race-linked plus, just as any student who chooses to disclose his or her unusual interests can be credited for what those interests might add to UNC. The record supports no intimation to the contrary. Eligibility is just that; a plus is never automatically awarded, never considered in numerical terms, and never automatically results in an offer of admission.[84] There are no race-based quotas in UNC's holistic review process.[85] In fact, during the admissions cycle, the school prevents anyone who knows the overall racial makeup of the admitted-student pool from reading any applications.[86]

More than that, every applicant is also eligible for a diversity-linked plus (beyond race) more generally.[87] And, notably, UNC understands diversity broadly, including "socioeconomic status, first-generation college status . . . political beliefs, religious beliefs . . . diversity of thoughts, experiences, ideas, and talents."[88]

---

[82] 3 App. 1416 (emphasis added); see also 2 *id.*, at 631–639.

[83] 567 F. Supp. 3d, at 591, 595; 2 App. 638 (Farmer, when asked how race could "b[e] a potential plus" for "students other than underrepresented minority students," pointing to a North Carolinian applicant, originally from Vietnam, who identified as "Asian and Montagnard"); *id.*, at 639 (Farmer stating that "the whole of [that student's] background was appealing to us when we evaluated her applicatio[n]," and noting how her "story reveals sometimes how hard it is to separate race out from other things that we know about a student. That was integral to that student's story. It was part of our understanding of her, and it played a role in our deciding to admit her").

[84] 3 *id.*, at 1416; Rosenberg ¶25.

[85] 2 App. 631.

[86] *Id.*, at 636–637, 713.

[87] 3 *id.*, at 1416; 2 *id.*, at 699–700.

[88] *Id.*, at 699; see also Rosenberg ¶24.

A plus, by its nature, can certainly matter to an admissions case. But make no mistake: When an applicant chooses to disclose his or her race, UNC treats that aspect of identity on par with other aspects of applicants' identity that affect who they are (just like, say, where one grew up, or medical challenges one has faced).[89] And race is considered alongside any other factor that sheds light on what attributes applicants will bring to the campus and whether they are likely to excel once there.[90] A reader of today's majority opinion could be forgiven for misunderstanding how UNC's program really works, or for missing that, under UNC's holistic review process, a White student could receive a diversity plus while a Black student might not.[91]

UNC does not do all this to provide handouts to either John or James. It does this to ascertain who among its tens

---

[89] 2 App. 706, 708; 3 *id.*, at 1415–1416.

[90] 2 *id.*, at 706, 708; 3 *id.*, at 1415–1416.

[91] A reader might miss this because the majority does not bother to drill down on how UNC's holistic admissions process operates. Perhaps that explains its failure to apprehend (by reviewing the evidence presented at trial) that everyone, no matter their race, is eligible for a diversity-linked plus. Compare *ante*, at 5, and n. 1, with 3 App. 1416, and *supra*, at 17. The majority also repeatedly mischaracterizes UNC's holistic admissions-review process as a "race-based admissions system," and insists that UNC's program involves "separating students on the basis of race" and "pick[ing only certain] races to benefit." *Ante*, at 5, and n. 1, 26, 38. These claims would be concerning if they had any basis in the record. The majority appears to have misunderstood (or categorically rejected) the established fact that UNC treats race as merely one of the many aspects of an applicant that, in the real world, matter to understanding the whole person. Moreover, its holistic review process involves reviewing a wide variety of personal criteria, not just race. Every applicant competes against thousands of other applicants, each of whom has personal qualities that are taken into account and that other applicants do not—and could not—have. Thus, the elimination of the race-linked plus would *still* leave SFFA's members competing against thousands of other applicants to UNC, each of whom has potentially plus-conferring qualities that a given SFFA member does not.

JACKSON, J., dissenting

of thousands of applicants has the capacity to take full advantage of the opportunity to attend, and contribute to, this prestigious institution, and thus merits admission.[92]  And UNC has concluded that ferreting this out requires understanding the *full* person, which means taking seriously not just SAT scores or whether the applicant plays the trumpet, but also any way in which the applicant's race-linked experience bears on his capacity and merit.  In this way, UNC is able to value what it means for James, whose ancestors received no race-based advantages, to make himself competitive for admission to a flagship school nevertheless.  Moreover, recognizing this aspect of James's story does not preclude UNC from valuing John's legacy or any obstacles that his story reflects.

So, to repeat: UNC's program permits, but does not require, admissions officers to value both John's and James's love for their State, their high schools' rigor, and whether either has overcome obstacles that are indicative of their "persistence of commitment."[93]  It permits, but does not require, them to value John's identity as a child of UNC alumni (or, perhaps, if things had turned out differently, as a first-generation White student from Appalachia whose family struggled to make ends meet during the Great Recession).  And it permits, but does not require, them to value James's race—not in the abstract, but as an element of who he is, no less than his love for his State, his high school courses, and the obstacles he has overcome.

Understood properly, then, what SFFA caricatures as an unfair race-based preference cashes out, in a holistic system, to a personalized assessment of the advantages and disadvantages that every applicant might have received by accident of birth plus all that has happened to them since.  It ensures a full accounting of everything that bears on the

_____

[92] See 3 App. 1409, 1414, 1416.

[93] *Id.*, at 1414–1415.

individual's resilience and likelihood of enhancing the UNC campus. It also forecasts his potential for entering the wider world upon graduation and making a meaningful contribution to the larger, collective, societal goal that the Equal Protection Clause embodies (its guarantee that the United States of America offers genuinely equal treatment to every person, regardless of race).

Furthermore, and importantly, the fact that UNC's holistic process ensures a full accounting makes it far from clear that any particular applicant of color will finish ahead of any particular nonminority applicant. For example, as the District Court found, a higher percentage of the most academically excellent in-state Black candidates (as SFFA's expert defined academic excellence) were denied admission than similarly qualified White and Asian American applicants.[94] That, if nothing else, is indicative of a genuinely

---

[94] See 567 F. Supp. 3d, at 617, 619; 3 App. 1078–1080. The majority cannot deny this factual finding. Instead, it conducts its own back-of-the-envelope calculations (its numbers appear nowhere in the District Court's opinion) regarding "the *overall* acceptance rates of academically excellent applicants to UNC," in an effort to trivialize the District Court's conclusion. *Ante*, at 5, n. 1. I am inclined to stick with the District Court's findings over the majority's unauthenticated calculations. Even when the majority's ad hoc statistical analysis is taken at face value, it hardly supports what the majority wishes to intimate: that Black students are being admitted based on UNC's myopic focus on "race—and race alone." *Ante*, at 28, n. 6. As the District Court observed, if these Black students "were largely defined in the admissions process by their race, one would expect to find that *every*" such student "demonstrating academic excellence . . . would be admitted." 567 F. Supp. 3d, at 619 (emphasis added). Contrary to the majority's narrative, "race does not even act as a tipping point for some students with otherwise exceptional qualifications." *Ibid.* Moreover, as the District Court also found, UNC does not even use the bespoke "academic excellence" metric that SFFA's expert "'invented'" for this litigation. *Id.*, at 617, 619; see also *id.*, at 624–625. The majority's calculations of overall acceptance rates by race on *that* metric bear scant relationship to, and thus are no indictment of, how UNC's admissions process actually works (a recurring theme in its opinion).

JACKSON, J., dissenting

holistic process; it is evidence that, both in theory and in practice, UNC recognizes that race—like any other aspect of a person—may bear on where both John and James start the admissions relay, but will not fully determine whether either eventually crosses the finish line.

### III
### A

The majority seems to think that race blindness solves the problem of race-based disadvantage. But the irony is that requiring colleges to ignore the initial race-linked opportunity gap between applicants like John and James will inevitably widen that gap, not narrow it. It will delay the day that every American has an equal opportunity to thrive, regardless of race.

SFFA similarly asks us to consider how much longer UNC will be able to justify considering race in its admissions process. Whatever the answer to that question was yesterday, today's decision will undoubtedly extend the duration of our country's need for such race consciousness, because the justification for admissions programs that account for race is inseparable from the race-linked gaps in health, wealth, and well-being that still exist in our society (the closure of which today's decision will forestall).

To be sure, while the gaps are stubborn and pernicious, Black people, and other minorities, have generally been doing better.[95] But those improvements have only been made possible because institutions like UNC have been willing to grapple forthrightly with the burdens of history. SFFA's complaint about the "indefinite" use of race-conscious admissions programs, then, is a non sequitur. These programs respond to deep-rooted, objectively measurable problems; their definite end will be when we succeed, together, in solving those problems.

_____

[95] See Bollinger & Stone 86, 103.

Accordingly, while there are many perversities of today's judgment, the majority's failure to recognize that programs like UNC's carry with them the seeds of their own destruction is surely one of them. The ultimate goal of recognizing James's full story and (potentially) admitting him to UNC is to give him the necessary tools to contribute to closing the equity gaps discussed in Part I, *supra*, so that he, his progeny—and therefore all Americans—can compete without race mattering in the future. That intergenerational project is undeniably a worthy one.

In addition, and notably, that end is not fully achieved just because James is admitted. Schools properly care about preventing racial isolation on campus because research shows that it matters for students' ability to learn and succeed while in college if they live and work with at least some other people who look like them and are likely to have similar experiences related to that shared characteristic.[96] Equally critical, UNC's program ensures that students who don't share the same stories (like John and James) will interact in classes and on campus, and will thereby come to understand each other's stories, which *amici* tell us improves cognitive abilities and critical-thinking skills, reduces prejudice, and better prepares students for postgraduate life.[97]

Beyond campus, the diversity that UNC pursues for the betterment of its students and society is not a trendy slogan. It saves lives. For marginalized communities in North Carolina, it is critically important that UNC and other area institutions produce highly educated professionals of color. Research shows that Black physicians are more likely to accurately assess Black patients' pain tolerance and treat

_____

[96]See, *e.g.*, Brief for University of Michigan as *Amicus Curiae* 6, 24; Brief for President and Chancellors of University of California as *Amici Curiae* 20–29; Brief for American Psychological Association et al. as *Amici Curiae* 14–16, 21–23 (APA Brief).

[97]*Id.*, at 14–20, 23–27.

JACKSON, J., dissenting

them accordingly (including, for example, prescribing them appropriate amounts of pain medication).[98]  For high-risk Black newborns, having a Black physician more than doubles the likelihood that the baby will live, and not die.[99]  Studies also confirm what common sense counsels: Closing wealth disparities through programs like UNC's—which, beyond diversifying the medical profession, open doors to every sort of opportunity—helps address the aforementioned health disparities (in the long run) as well.[100]

Do not miss the point that ensuring a diverse student body in higher education helps *everyone*, not just those who, due to their race, have directly inherited distinct disadvantages with respect to their health, wealth, and wellbeing.  *Amici* explain that students of every race will come to have a greater appreciation and understanding of civic virtue, democratic values, and our country's commitment to equality.[101]  The larger economy benefits, too: When it comes down to the brass tacks of dollars and cents, ensuring diversity will, if permitted to work, help save hundreds of billions of dollars annually (by conservative estimates).[102]

Thus, we should be celebrating the fact that UNC, once a stronghold of Jim Crow, has now come to understand this.

———————

[98] AMC Brief 4, 14; see also Brief for American Federation of Teachers as *Amicus Curiae* 10 (AFT Brief) (collecting further studies on the "tangible benefits" of patients' access to doctors who look like them).

[99] AMC Brief 4.

[100] National Research Council, New Horizons in Health: An Integrative Approach 100–111 (2001); Pollack et al., Should Health Studies Measure Wealth? A Systematic Review, 33 Am. J. Preventative Med. 250, 252, 261–263 (2007); see also Part I–B, *supra*.

[101] See APA Brief 14–20, 23–27 (collecting studies); AFT Brief 11–12 (same); Brief for National School Boards Association et al. as *Amici Curiae* 6–11 (same); see also 567 F. Supp. 3d, at 592–593, 655–656 (factual findings in this case with respect to these benefits).

[102] LaVeist et al., The Economic Burden of Racial, Ethnic, and Educational Health Inequities in the U. S., 329 JAMA 1682, 1683–1684, 1689, 1691 (May 16, 2023).

The flagship educational institution of a former Confederate State has embraced its constitutional obligation to afford genuine equal protection to applicants, and, by extension, to the broader polity that its students will serve after graduation. Surely that is progress for a university that once engaged in the kind of patently offensive race-dominated admissions process that the majority decries.

With its holistic review process, UNC now treats race as merely one aspect of an applicant's life, when race played a totalizing, all-encompassing, and singularly determinative role for applicants like James for most of this country's history: No matter what else was true about him, being Black meant he had no shot at getting in (the ultimate race-linked uneven playing field). Holistic programs like UNC's reflect the reality that Black students have only relatively recently been permitted to get into the admissions game at all. Such programs also reflect universities' clear-eyed optimism that, one day, race *will* no longer matter.

So much upside. Universal benefits ensue from holistic admissions programs that allow consideration of *all* factors material to merit (including race), and that thereby facilitate diverse student populations. Once trained, those UNC students who have thrived in the university's diverse learning environment are well equipped to make lasting contributions in a variety of realms and with a variety of colleagues, which, in turn, will steadily decrease the salience of race for future generations. Fortunately, UNC and other institutions of higher learning are already on this beneficial path. In fact, all that they have needed to continue moving this country forward (toward full achievement of our Nation's founding promises) is for this Court to get out of the way and let them do their jobs. To our great detriment, the majority cannot bring itself to do so.

## B

The overarching reason the majority gives for becoming

JACKSON, J., dissenting

an impediment to racial progress—that its own conception of the Fourteenth Amendment's Equal Protection Clause leaves it no other option—has a wholly self-referential, two-dimensional flatness. The majority and concurring opinions rehearse this Court's idealistic vision of racial equality, from *Brown* forward, with appropriate lament for past indiscretions. See, *e.g.*, *ante*, at 11. But the race-linked gaps that the law (aided by this Court) previously founded and fostered—which indisputably define our present reality—are strangely absent and do not seem to matter.

With let-them-eat-cake obliviousness, today, the majority pulls the ripcord and announces "colorblindness for all" by legal fiat. But deeming race irrelevant in law does not make it so in life. And having so detached itself from this country's actual past and present experiences, the Court has now been lured into interfering with the crucial work that UNC and other institutions of higher learning are doing to solve America's real-world problems.

No one benefits from ignorance. Although formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways, and today's ruling makes things worse, not better. The best that can be said of the majority's perspective is that it proceeds (ostrich-like) from the hope that preventing consideration of race will end racism. But if that is its motivation, the majority proceeds in vain. If the colleges of this country are required to ignore a thing that matters, it will not just go away. It will take *longer* for racism to leave us. And, ultimately, ignoring race just makes it matter more.[103]

_____

[103] JUSTICE THOMAS's prolonged attack, *ante*, at 49–55 (concurring opinion), responds to a dissent I did not write in order to assail an admissions program that is not the one UNC has crafted. He does not dispute any historical or present fact about the origins and continued existence of race-based disparity (nor could he), yet is somehow persuaded that these realities have no bearing on a fair assessment of "individual achieve-

26    STUDENTS FOR FAIR ADMISSIONS, INC. *v.* PRESIDENT
AND FELLOWS OF HARVARD COLLEGE

JACKSON, J., dissenting

The only way out of this morass—for all of us—is to stare at racial disparity unblinkingly, and then do what evidence and experts tell us is required to level the playing field and march forward together, collectively striving to achieve true equality for all Americans. It is no small irony that the judgment the majority hands down today will forestall the end of race-based disparities in this country, making the colorblind world the majority wistfully touts much more difficult to accomplish.

\*    \*    \*

As the Civil War neared its conclusion, General William T. Sherman and Secretary of War Edwin Stanton convened a meeting of Black leaders in Savannah, Georgia. During the meeting, someone asked Garrison Frazier, the group's spokesperson, what "freedom" meant to him. He answered, "'placing us where we could reap the fruit of our own labor, and take care of ourselves . . . to have land, and turn it and

——————

ment," *ante*, at 51. JUSTICE THOMAS's opinion also demonstrates an obsession with race consciousness that far outstrips my or UNC's holistic understanding that race can be a factor that affects applicants' unique life experiences. How else can one explain his detection of "an organizing principle based on race," a claim that our society is "fundamentally racist," and a desire for Black "victimhood" or racial "silo[s]," *ante*, at 49–52, in this dissent's approval of an admissions program that advances all Americans' shared pursuit of true equality by treating race "on par with" other aspects of identity, *supra*, at 18? JUSTICE THOMAS ignites too many more straw men to list, or fully extinguish, here. The takeaway is that those who demand that no one think about race (a classic pink-elephant paradox) refuse to see, much less solve for, the elephant in the room— the race-linked disparities that continue to impede achievement of our great Nation's full potential. Worse still, by insisting that obvious truths be ignored, they prevent our problem-solving institutions from directly addressing the real import and impact of "social racism" and "government-imposed racism," *ante*, at 55 (THOMAS, J., concurring), thereby deterring our collective progression toward becoming a society where race no longer matters.

JACKSON, J., dissenting

till it by our own labor.'"[104]

Today's gaps exist because that freedom was denied far longer than it was ever afforded. Therefore, as JUSTICE SOTOMAYOR correctly and amply explains, UNC's holistic review program pursues a righteous end—legitimate "'because it is defined by the Constitution itself. The end is the maintenance of freedom.'" *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 443–444 (1968) (quoting Cong. Globe, 39th Cong., 1st Sess., 1118 (1866) (Rep. Wilson)).

Viewed from this perspective, beleaguered admissions programs such as UNC's are not pursuing a patently unfair, ends-justified ideal of a multiracial democracy at all. Instead, they are engaged in an earnest effort to secure a more functional one. The admissions rubrics they have constructed now recognize that an individual's "merit"—his ability to succeed in an institute of higher learning and ultimately contribute something to our society—cannot be fully determined without understanding that individual in full. There are no special favorites here.

UNC has thus built a review process that *more accurately* assesses merit than most of the admissions programs that have existed since this country's founding. Moreover, in so doing, universities like UNC create pathways to upward mobility for long excluded and historically disempowered racial groups. Our Nation's history more than justifies this course of action. And our present reality indisputably establishes that such programs are still needed—for the general public good—because after centuries of state-sanctioned (and enacted) race discrimination, the aforementioned intergenerational race-based gaps in health, wealth, and well-being stubbornly persist.

Rather than leaving well enough alone, today, the majority is having none of it. Turning back the clock (to a time before the legal arguments and evidence establishing the

—————

[104] Foner 179.

soundness of UNC's holistic admissions approach existed),
the Court indulges those who either do not know our Na-
tion's history or long to repeat it. Simply put, the race-blind
admissions stance the Court mandates from this day for-
ward is unmoored from critical real-life circumstances.
Thus, the Court's meddling not only arrests the noble gen-
erational project that America's universities are attempt-
ing, it also launches, in effect, a dismally misinformed soci-
ological experiment.

Time will reveal the results. Yet the Court's own mis-
steps are now both eternally memorialized and excruciat-
ingly plain. For one thing—based, apparently, on nothing
more than Justice Powell's initial say so—it drastically dis-
counts the primary reason that the racial-diversity objec-
tives it excoriates are needed, consigning race-related his-
torical happenings to the Court's own analytical dustbin.
Also, by latching onto arbitrary timelines and professing in-
security about missing metrics, the Court sidesteps unre-
futed proof of the compelling benefits of holistic admissions
programs that factor in race (hard to do, for there is plenty),
simply proceeding as if no such evidence exists. Then, ulti-
mately, the Court surges to vindicate equality, but Don
Quixote style—pitifully perceiving itself as the sole van-
guard of legal high ground when, in reality, its perspective
is not constitutionally compelled and will hamper the best
judgments of our world-class educational institutions about
who they need to bring onto their campuses right now to
benefit every American, no matter their race.[105]

_____

[105] JUSTICE SOTOMAYOR has fully explained why the majority's analysis
is legally erroneous and how UNC's holistic review program is entirely
consistent with the Fourteenth Amendment. My goal here has been to
highlight the interests at stake and to show that holistic admissions pro-
grams that factor in race are warranted, just, and universally beneficial.
All told, the Court's myopic misunderstanding of what the Constitution
permits will impede what experts and evidence tell us is required (as a
matter of social science) to solve for pernicious race-based inequities that
are themselves rooted in the persistent denial of equal protection. "[T]he

JACKSON, J., dissenting

The Court has come to rest on the bottom-line conclusion that racial diversity in higher education is only worth potentially preserving insofar as it might be needed to prepare Black Americans and other underrepresented minorities for success in the bunker, not the boardroom (a particularly awkward place to land, in light of the history the majority opts to ignore).[106]  It would be deeply unfortunate if the Equal Protection Clause actually demanded this perverse, ahistorical, and counterproductive outcome.  To impose this result in that Clause's name when it requires no such thing, and to thereby obstruct our collective progress toward the full realization of the Clause's promise, is truly a tragedy for us all.

---

potential consequences of the [majority's] approach, as measured against the Constitution's objectives . . . provides further reason to believe that the [majority's] approach is legally unsound."  *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 858 (2007) (Breyer, J., dissenting).  I fear that the Court's folly brings our Nation to the brink of coming "full circle" once again.  *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 402 (1978) (opinion of Marshall, J.).

[106]Compare *ante*, at 22, n. 4, with *ante*, at 22–30, and *supra*, at 3–4, and nn. 2–3.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GEORGE JARVIS AUSTIN, Plaintiff
(*Admitted Student* ),

Notice of Ninth Circuit Appeal: per Judge Breyer's Order on RULE 59 Order **(dckt. 85-86);** Due to at least 3 glaring, stunning errors ___ Good Faith Complaint, Substantive Issues, Facts, evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard) is not vexatious per Supreme Court's *Cootergel* or any other controlling law (it is the right thing to do).**AMENDED (FAC) COMPLAINT In Honor of the Civil Rights Act of 1964,Title VI, Excluding Roman Numeral pages (**full filing fee paid on site); Hyperlinked with Affidavits, Supplements, & Direct Evidence.

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.
(*Federal Tax Identification Number: 53-0196603*)

Case No. **4:24-cv-00260-CRB (DMR)**

**Notice: 2.7.25 at 10a.m. via Zoom**

**George Jarvis Austin, Plaintiff (Self-represented)**
**2107 Montauban Ct., Stockton, CA**
**209.915.6304,**
**gaustin07@berkeley.edu**

**Note:  Mr. George Jarvis Austin is an *admitted* Georgetown student, filing complaint(s) about Georgetown's *ongoing* 1. Equal Protection 2. 42 USC 1981 3. Deceit, False Promises, Misrepresentations, Omissions and Actual Fraud (with Malice) 4. Negligence and 5. Bad Faith violations of his rights (including fundamental violations of privacy, contract, and publicity rights as well as those enumerated above) as witnessed by over 50+ separate persons.  As a Pro Se Litigant, and individual person, Mr. Austin upholds, and reminds of, his as well as Georgetown's ongoing duty to privacy (*and other enumerated duties*) throughout the litigation, or settlement, phases of this legal process with *$10 - $15* million *minimum* Demand depending on structure, context and timing).**

**Mr. Austin is a whistleblower; As part of providing 'notice' of documented formal complaints to Georgetown ideaa@georgetown.edu, generalcounsel@georgetown.edu, presidentsoffice@georgetown.edu, media@georgetown.edu, privacy@georgetown.edu, visualidentity@georgetown.edu, lawdeanofstudents @georgetown.edu, (showing *"deliberate indifference; discriminatory animus"*)" included 50+ outside expert 'witnesses' including  ocr@ed.gov, privacyTA@ed.gov, studentaid@ed.gov, and whistleblowercoordinator.oig@ed.gov, in real time.  See Supplement-Affidavit**

NOTE: Mr. Austin's (Plaintiff, self-represented with limited resources) technology is not currently allowing the showing of line numbering although he has repeatedly attempted to correct the technological issue (it is unintentional, and *shall be corrected as soon as able*)  Erickson v. Pardus, 551 U.S. 89, 94 (2007)) "a pro se complaint, .. must be held to less stringent standards than formal pleadings drafted by lawyers.")

1

<u>Appeal Notice on Judge Breyer's Order per Rule 59 Motion</u>

<u>Table of Contents</u>

<u>Intro: Notice of Ninth Circuit Appeal</u>                                    2

<u>Georgetown violates Mr. Austin's 1981 rights</u>                       6

<u>Georgetown violates Mr. Austin's Equal Protection</u>            19

<u>Mr. Austin's other claims are substantive</u>                          22

<u>Mr. Austin's claims are new harms not barred by Res Judicata</u>   24

<u>Mr. Austin's should not be sanctioned per Supreme Court</u>     25

1.      Mr. Austin provides Notice of Appeal to the Ninth Circuit, within the 30 day timeframe for that order, regarding Judge Breyer's <u>3 stunning errors</u> in his order (*dckt. 85-86*) on the Rule 59 Motion under the Supreme Court's *Banister v. Davis 140 S. Ct. 1698, 1703 (2020),* a. Mr. Austin <u>*only pleads conduct from 7.15.21 to present*</u> which has never had the opportunity to be heard on the merits, and began after termination of the first case ending 7.14.21 b. Per the Supreme Courts *Lawlorv. Nat'l Screen Serv*, The Ninth Circuits *Eichman v. Fotomat Corp.*, & *Clark v. Yosemite Community College Dist.*, ongoing, future, conduct cannot be preemptively assumed, nor litigated, and is *not barred by Res Judiciata* <u>ergo</u> Mr. Austin <u>*could not have failed to plead something that had not yet happened*</u> c. Mr. Austin sought to prevent administrative, non-judicial, illegal interference from pre-determining outcome of cases (which is not allowable for judges (per se illegal), and not vexatious for litigants, either).   See Fed. R. App. P. 4 (*"(a) APPEAL IN A CIVIL CASE.(1)Time for Filing a Notice of Appeal.(A) …. must be filed with the district clerk within 30 days after entry of the judgment or order appealed from."*)

2.  Per the Supreme Court, and Ninth Circuit, there are at least 9 exceptions to

judicial immunity (some of which create criminal liability as well as injunctive civil liability) 1. Non-judicial acts, generally 2. Where a judge connives with one of the parties to predetermine the outcome of a judicial proceeding 3. Where a judge makes a vexatious litigant prefiling order 4. Where anyone including a judge engages in criminal activity like obstruction of justice, or accepting bribes 5. Where anyone including a judge violates a Citizen's, particularly a Black Citizen's ("whom are the targets of the amendments per *Brown v. Board*"), 14th (and 5th) Amendment rights to Due Process and Equal Protection which at minimum provides "a guarantee of fair procedure" and "equal protection of the laws." U.S. Const. amend. XIV, § 1 6. Where a Judge attempts to declare a Black person enslaved in violation of the thirteenth Amend- ment (or any of the rights enshrined therein) 7. Where a judge rapes a litigant (or other like harms) in violation of penal or civil code (and the Constitution) 8. Where a judge tortures, attempts to murder, or actually murders a litigant alone or in conspiracy with the Klu Klux Klan or other like domestic White Supremacist terrorist in violation of civil or penal code, 18 USC 241, 242, 245, etc. (and the Constitution) 9. Where a judge chooses to disregard the Constitution and become unfaithful to the oath and trust provided to them by the Citizenry._Per the US Supreme Court's *Pierson v. Ray 386 U.S. 547 (1967) "a judge who excluded*" Black People, or African Americans from Juries (and subsequently Due Process or Equal Protection of the laws) can be held liable under the Civil Rights Law meant to protect from that very behavior.   Typically judicial liability ensues only when the act is outside of what the Ninth Circuit's *Beard v. Udall* calls "a judicial act" (i.e. an administrative act) however (as noted above), the US Supreme Court's *Pierson v. Ray* cautions:

**3 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

*"a judge who excluded Negroes from juries [or like offenses to the Constitution] …. would be liable under the statute even if his actions were judicial."* Importantly, the Ninth Circuit's *Beard v. Udall 648 F.2d 1264 (9th Cir. 1981)* makes clear *"[I]f a judge connives with one of the parties to predetermine the outcome of a judicial proceeding, the other parties' expectations are frustrated. Id. Moreover, the court noted, an agreement by a judge to predetermine the outcome of a proceeding is "not a function normally performed by a judge."*

Per the Supreme Court's *Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990)  Cited 4,115*

*times*  Mr. Austin <u>should not</u> be sanctioned, *at all,* as he properly withdrew, or voluntarily

dismissed the underlying substantive, complaint and

*"when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim.   An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1"*

See also e.g.Wolfe v. Strankman, 392 F.3d 358, 367 (9th Cir. 2004) ("*<u>complete relief is</u>*

*<u>available in an action against Chief Justice George in his administrative capacity</u>*

*and Ms. Silva. We reverse the dismissal of Chief Justice George in his administrative*

*capacity and Ms. Silva, and we remand to the district court for further proceedings."*)

2.      Mr. Austin acts in good faith, follows well settled and 2023 Supreme Court's

precedent, and Georgetown school policy with this complaint as Georgetown

continues to violate the Equal Protection Clause, Title VI of the Civil Rights Act of

1964, 42 USC 1981, Federal Privacy Laws, and other law from 7.15.21 to present.

Per *Brown v. Board of Education, 347 U.S. 483, 494 (1954),* Georgetown's, use of the

precise *"less worthy"* or *"inferior"* derogatory racist stereotypes, against Mr. Austin,

*"implying inferiority in civil society"* originate from anti-Black propaganda of the

vilest Enslavers, Klu Klux Klan members, and the staunchest Jim Crow

segregationist who inspired the Nazi's Third Reich (*How the Nazis Were Inspired by*

*Jim Crow | HISTORY;   How American Racism Influenced Hitler | The New Yorker*

*; What America Taught the Nazis in the 1930s - The Atlantic;      The Impact Of*

*Racist Ideologies: Jim Crow And The Nuremberg Laws - Holocaust Museum)*

for  which Georgetown admits it took active part as an institution: Slavery archive.

georgetown.edu/ (...*Sale of Maryland Jesuit's enslaved community to Louisiana in*

*1838.  These archival materials relate to the sale of 272 men, women, and children*

**4 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

*by Rev. Thomas Mulledy in 1838*.).  See attached.  Georgetown's precise derogatory stereotype usage is similar to defendant *Board of Education's* usage against plaintiff Oliver *Brown* in *Brown v. Board of Education, 347 U.S. 483, 494 (1954)* whereas Mr. Austin seeks to exercise & enforce his Federal rights to make contracts (expressly promulgated as mandatory under Georgetown's policies), and not be treated in an inferior manner in civil society (creating Stigma) while doing so, in the context of higher education, whereas Georgetown violates *"....The words of the amendment,.[that].. contain ...the right to exemption..from legal discriminations, implying inferiority in civil society…."* (referring to Civil Rights Amendments 13th, 14th, 15th Amend.).

3.      Per the 2023 US Supreme Court's Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023) use of derogatory stereotypes is <u>per se illegal</u> in a. business, b. the entire contractual relationship (*i.e. "to make or enforce a contract*), c. education (& d. other areas of society), because it *"furthers "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts -their very worth as Citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912 ….Such stereotyping can only "cause[] continued hurt and injury," Edmonson, 500 U.S… contrary as it is to the "core purpose" of the Equal Protection Clause [co-extensive with sec. 1981]."* Georgetown's admission of a. Using race in the "negative" via both its 1. media contract making and 2. complaint procedures b. Considering Blacks 'inferior' or 'less worthy' in their 1. complaint procedures and 2. media contract offer process and c. providing Whites unfair advantage by alternatively considering them 'superior' or 'more worthy' constitutes this type of

derogatory use of stereotypes, and is per se illegal.

4.      Georgetown's, *ongoing,* well documented, conduct Highlights exactly how defendants engage in use of derogatory racial *""stereotypes that treat individuals [Mr. Austin] as the product of their race [or derogatory anti-Black racist presumptions], evaluating their thoughts and efforts -their very worth as citizens- according to a criterion barred to the Government by history and the Constitution."* …. only *"caus[ing] continued hurt and injury"* to harm Mr. Austin, because he is Black [i.e. race] or Georgetown's use of derogatory racist stereotypes of Black people [i.e. *Georgetown's conduct admits use of derogatory anti-Black stereotypes: a. Georgetown operates on the premise Black men are inferior to Whites and thus Georgetown does not need to respect either their 1. 1981 rights to mandatory written media contract and 2. Their Civil Rights Act of 1964 Title VI rights to not be excluded from Campus Activity, or core programs like Campus Complaint Procedures-Policy-Programs via IDEAA, b. Georgetown discovered Mr. Austin is Black during the admissions process (i.e. Georgetown student ID, and usage of Mr. Austin's image and likeness for commercial gain, marketing exploitation in Georgetown advertisement, etc.) "ergo" c. Georgetown assumes anti-Black derogatory stereotype applies to Mr. Austin's mandatory written media contract (and thus does not make contract offer on same basis as Whites) and based on that flawed logic, non-sequitur illogic, & per se illegal racist presumption, thus Georgetown willfully ignores documentation-direct evidence, and continues to 1. refuse to make a mandatory written media contract (per its own policy-terms) with Mr. Austin, and 2 illegally exclude Mr. Ausitn from IDEAA complaint process to resolve, investigate, correct Georgetown's per se illegal conduct, because he is Black, on the same basis as Whites (whereas their rights in both areas are respected, and exercised)].* Per the

**6 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

2023 US Supreme Court's *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023): "Georgetown's structures] are infirm for a second reason as well: They require[d] stereotyping [Mr. Austin by the way they operate .. assuming " ess worthy", and "Inferiority"] ].. the very thing Grutter foreswore….it engages in … offensive … demeaning [and derogatory] assumption[s]."*

5.    Georgetown's facially discriminatory anti-Black conduct reflects the pattern of behavior highlighted in Judge Weigel's ruling in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) cited to by Judge Orrick II in *San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021, 1023 (N.D. Cal. 1999),* with NAACP represented by Judge Breyer's colleague Judge Haywood Gilliam (although the order cited above spelled his name wrong) clerked for the Legendary Judge Thelton Henderson,; .Gilliam Responses 9-17-14.pdf.  The highlighted pattern in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315, 1317 (N.D. Cal. 1971) demonstrates willful racist conduct similar to Georgetown's toward Mr. Austin whereas a school district chooses to still engage in facially discriminatory, Dejure or Defacto Segregationist conduct (to isolate, confine, or refuse to equally serve or contract with Black students, Black Teachers, or Black Administrators in violation of Equal Protection Clause), despite knowing *"More than seventeen years ago [in 1971], a unanimous decision of the United States Supreme Court made it clear that racial discrimination in public education violates the [US]Constitution. Today it is established beyond all question that any law, ordinance or regulation of any governmental agency .. furthering such discrimination violates the Constitution of the United States. The cases so holding*

*are legion. They have been handed down, not only by the Supreme Court of the*

*United States, but, … throughout the nation."*

5.    Per Judge Weigel's wisdom in *Johnson v. San Francisco Unified School Dist.*

Georgetown's *"Opposition to desegregation [in serving or making contracts with Mr.*

*Austin] fosters false concepts of racial [White] superiority and of racial [Black]*

*inferiority….[and reflects Georgetown's] … Racial hatred [which] is an adult rather*

*than a childhood disease."* This *"adult rather than a childhood disease"*

demonstrated by the *"infirm"* Georgetown pattern of conduct toward Mr. Austin is

clear per the US Supreme Court's 1. *Runyon v. McCrary* 2. *General Building*

*Contractors Assn., Inc. v. Pennsylvania,* and 3. *Comcast Corp. v. Nat'l Ass'n of*

*African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* prohibits the *"blatant*

*deprivation of Civil Rights such as where a private offeror [in this case* Georgetown*]*

*refuses to extend to [an African- American, in this case Mr. Austin], because he is an*

*[African-American], the same opportunity to enter into contracts he extends to White*

*offerees [in this case non-Black, or White  Georgetown students]."*

### **Georgetown violates Mr. Austin's 1981 rights**

6.    Mr. Austin cites to world renown <u>Thelton E. Henderson</u>, for the 1981 legal

standard.  Because legendary Judge <u>Henderson</u> has a particularly unique insight to

1981's operation, and personal understanding of how anti-Black racial animus

operates regardless of status or position in society (*as he experienced both subtle,*

*and not so subtle forms of anti-Black discriminatory animus even after his ascension*

*and success*) his analysis is particularly valuable under these facts.  Mr. Austin was

blessed to be invited to Judge Henderson's home, in Berkeley, as 1 of 2 keynote

speakers to raise school funds for students in need (Mr. Austin had no personal gain

in the efforts, and was happy to share and help others): Judge Henderson was impressed after my speech, and thereafter invited Mr. Austin back to his home for a bit of Tea, Mentorship, and Wisdom. Legendary Judge Thelton Henderson, who Mr. Austin had the pleasure of meeting personally after Mr. Austin gave a keynote speech at his home in Berkeley, has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents

of White Supremacy) operate. California Newsreel - SOUL OF JUSTICE: THELTON HENDERSON'S AMERICAN JOURNEY

> (" *He was on the scene as James Meredith braved venomous mobs to integrate Ol' Miss, when Medgar Evers was assassinated and when four little girls were killed in the Birmingham church bombing. In his role at the Justice Department, Henderson embodied the tension described by Andrew Young as being an "arm of the law in a sometimes lawless society.*")

7.    As an interesting aside, presiding Judge Judge Breyer's and Magistrate

Judge Ryu's (who recused herself) colleague Judge Haywood Gilliam clerked for the

Legendary Judge Thelton Henderson, and represented the *NAACP* in the matter of

*San Francisco NAACP v. San Francisco Unified School Dist., 59 F. Supp. 2d 1021,*

*1023 (N.D. Cal. 1999)* presided over by Judge Orrick II, Judge Orrick III's father

Gilliam Responses 9-17-14.pdf; Judge Gilliam's responses to Senate Judiciary's

Questions for the record *"6…to faithfully and impartially apply the law in every*

*case, without regard to the type of matter or the identity of the parties … 7. …*

*treating every person who comes into the courtroom, whether they are litigants,*

*counsel, witnesses, jurors or court staff, with evenhandedness, respect, and courtesy.*

*The judge also must ensure that all parties in a case receive the opportunity to have*

*their arguments heard and fairly considered…The citizens of our country entrust*

*federal judges to dispense 'equal' justice under the law, and to decide cases by*

**9 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

*applying controlling precedent to the facts of the cases before them, without regard to any other considerations (including race)..."* also reflects the principle, and creed, of *'Equal Opportunity'* which is not only central to the doctrine of equality as embodied 42 USC 1981, but which defendant Georgetown fundamentally, & egregiously, violated (producing Mr. Austin's complaints) and violates in an ongoing manner. www.judiciary.senate.gov/imo/media/doc/ Gilliam%20Responses %209-17-14.pdf

8.     Mr. Austin is the person, admitted student, and offeree whose economic, IP-publicity, property, & 42 USC 1981 rights to contract were violated by Georgetown, private offeror, in the attached picture [image, likeness,etc.] and the process which deprived Mr. Austin's contract rights.   Mr. Austin is a high performing, accomplished, highly recruited, and high potential admitted Georgetown student who has 1981 right to contract, and Title VI Equal Protection rights just like everyone else, and fully expects to be treated on the same basis as Whites, but was not (dckt. 76).  See attached  Georgetown's initial written offer to attend, as well as its own promulgated mandatory policies, and instructions demonstrates it knew better, but willfully, intentionally, intended to deprive Mr. Austin's mandated written media contract, and failed to correct once Mr. Austin made formal complaints, and excluded Mr. Austin's violating his Equal Protection rights (showing deliberate indifference; dckt. 80). See attached.   Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austin's interest, and rights (dckt. 81). See attached.

9.     Mr. Austin learned to perceive discriminatory animus, and embody "Equal Opportunity" non-discriminatory service attitude, through experience.  There are several ways to ascertain racial discriminatory animus.  Some of the ways

applicable here include a. observation of different policies applied for different racial groups b. Admissions by the racial abusers or discriminator that they in fact discriminated with disparate treatment or application of inferior or superior policies to certain groups (i.e. admits to treating Blacks as 'inferior' or 'less worthy', or Whites as 'superior' or more worthy)  c. Admissions of fact by the racial abusers or their use of Racial slurs or Derogatory Racial stereo- types (both offensive to the Constitution) d. Admitted use of per se illegal segregationist, racial caste like, tactics that block or refuse to serve (in violation of 1981, and Equal Protection under Civil Rights Act 1964, Title VI, in an education context) certain persons based on race, or derogatory racial stereotypes and several other ways.   Mr. Austin learned the value of treating everyone equally well, non-discriminatory service from the use of 'blind' or 'volunteer' testers like DOJ or HUD uses for housing discrimination or 'mystery' or 'secret' shoppers that various retail industries use to evaluate the quality of service (including non-discriminatory mandates) as well as how to proactively respond to racist conduct once perceived (dckt. 79). See attached.

10.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a *"blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case White admitted students]."*

**11 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

11.    When Defendant Georgetown made White, or Non-Black male, students

contract offers, they provided Whites: 1. with respect to their persons, as human

beings, (and provided a head-up, or forewarning, that Georgetown desired to take a

photo of them and use it for commercial, marketing, purposes), whereas they

disrespected Mr. Austin's personhood, human-ness, and purposefully hid, omitted,

and defrauded out of economic contract rights, or even knowledge that his image,

and likeness, was being used for commercial-marketing purposes because he is

Black 2. knowledge of what the photo was used for (and where it may be sent for

marketing purposes) for Whites, but hid knowledge, and fact photo was being used

at all (after already stealing rights from him) for Mr. Austin because he is Black 3.

Pre-approval of use of the photo by the non-Black male, or White students whereas

they didn't even think to ask Mr. Austin in disrespect of his overall person, and

rights to not give pre-approval because he is Black 4. An opportunity to accept or

decline the offer itself for Whites, whereas they stole the opportunity to make his

own choice, decline or accept, after already stealing economic-IP-rights of publicity

from Mr. Austin because he is Black 5. An opportunity to review the written

contract offer before making the decision 6. An opportunity to agree to the terms of

the contract offer 7. An opportunity to provide a counteroffer if terms were not

acceptable and 8. An opportunity to have a meeting of the minds 9. Enjoy

consideration and performance of the contract's obligation as well as other benefits,

privileges, rights provided in a contractual relationship.

12.     Georgetown willfully chose to deprive Mr. Austin's rights in this manner

because he is a Black male admitted student compared to similarly situated White,

or non-Black students.  Per Georgetown, (i.e. FAC para.111.), written authorization

requires Mr. Austin's *prior a.* notice of his picture being taken, b. notice of purpose, c. notice of business use, d. presentation of written contractual agreement to consent to business use, e. with General Counsel approval of form f. signature consenting *prior* to use.  Per Georgetown, written authorization requires a written contract between the student and those utilizing the IP-Publicity Rights-Photo (including Georgetown themselves) for photos taken prior to commercial use. Georgetown *admits* it failed all of its duties in this regard, and violated Mr. Austin's right to contract explicitly, but never a. Apologizes b. Seeks to remedy or c. even explains why they violated his rights.   Georgetown's first acknowledgement of business use was *after* Georgetown's exploitation without consent (*after* lying to Mr. Austin in the first place denying that they stole some of his rights without asking, or attempting to engage in making a contact).   Georgetown admits there was No offer, acceptance, consideration, or signature (per required written authorization), and thus no contract was made with Mr. Austin because he is Black, in the same way as similarly situated Whites, with George- town's 'blatant' violations of Mr. Austin's rights under 42 USC 1981 per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020)*

13.    Georgetown admits, *publicly,* that a student, or  *"Any applicant for employment or admission, current or former employee or student, or third party (hereinafter referred to as "Complainant")"* can make a complaint via email or in person, and is encouraged to do so; :**https://facultyhandbook.georgetown.edu/section4/a/** Georgetown admits, *publicly,* that once complaint is made via email, as Mr. Austin did once Georgetown admitted it violated Mr. Austin's rights to contract under 1981, a set of mandatory steps *must* be done by IDEAA to avoid violating its own

**13 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

Georgetown policies or the law that informs-undergirds IDEAA **facultyhandbook. georgetown.edu/section4/a/**

14.    When Defendant Georgetown receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**facultyhandbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981 including: 1. IDEAA staff shall send acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black 2. IDEAA staff shall schedule intake meetings for Whites, or non-Black males, but not only did not schedule an intake meeting for Mr. Austin, but failed to even acknowledge the first step of complaint because Mr. Austin is Black (demonstrating extreme animus as if Mr. Austin is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being) 3.  IDEAA staff provides a general understanding of the relevant policy and this grievance procedure as a normal part of intake for Whites whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black 4. IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation of the responded for Whites, whereas they failed to provide Mr. Austin with either opportunity, and

**14 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black.

15       Further, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 5. The opportunity at any time, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation for Whites, whereas this opportunity was deprived and not provided for Mr. Austin, as well as all the previous steps in the process, because he is a Black Complainant  6.  The opportunity to initiate a formal Complaint by providing a written signed statement (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 7.  The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) for Whites whereas they deprived this opportunity for Mr. Austin (and all other steps because he is Black) 8. The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, if they have one, as to why they conducted themselves in that manner, violating the law or policy, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 9.  The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint for Whites, whereas they deprived that opportunity for Mr. Austin (completely excludes him from this Equal Protection required procedure, and policy) because he is Black.

16.       Moreover, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided : 10. The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites

**15 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 11. The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, for Whites, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 12. The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA shall maintain documentation to support the findings in its report, including, as applicable, written findings of fact, transcripts, and audio recordings whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 13. The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation for Whites,  whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

17.      Lastly, per **facultyhandbook.georgetown .edu/section4/a/** Whites are provided: 14.  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those are appeal (if more information is needed) or corrective action if the Investigation found violations of law and policy in accord with the complaint for Whites, whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and

policy) because he is Black  15.  The opportunity, and right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidentiality to direct that prompt remedial action be taken to correct the situation for Whites , whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black 16. The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued especially when the limits of internal corrective measures do not remedy the violations by Respondents), whereas  defendant Georgetown deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.

18.     Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, or Non-Black males, they provided Whites a set of mandatory steps (**faculty handbook.georgetown.edu/ section4/a/**)  per Georgetown written policy ***"Procedures for Processing Grievances"*** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

**17 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

19.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County: a "refusal to enter into … contract [on the same basis as Whites] is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase ` the same right[s] . . .[in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"], and should not strain in an undue manner the language of § 1981…..*" Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005). **Fact 23:** Further down in *Walker v. Contra Costa County* Judge Henderson expounds on the elements, and standards of proof, to survive Summary Judgment for a 1981 claim (at later stages in the litigation process):

> *"E. Disparate Treatment Claims Arising Out of [Defendant's refusal to make a contract] To survive summary judgment on a disparate treatment claim, a plaintiff must first state a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973). A plaintiff must show: (1) that he belongs to a protected group, (2) that he was qualified [to make the contract, if there are requirements], (3) that he suffered an adverse .. action [i.e. refusal to make a contract], and (4) the [opportunity to make contract] remained open or another [similarly situated person] was treated more favorably. Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109-1110 (9th Cir. 1991). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate "a legitimate non-discriminatory reason" for the challenged action. Id. at 1109. If the [organization who discriminated] does so, the burden shifts back to the plaintiff to show that the articulated reason is pretextual. Id. At the summary judgment stage, the plaintiff need only present "minimal" proof that "does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). Defendants stipulate for the purposes of this motion that Plaintiff has the evidence to make a prima facie case with respect to [failure to make a contract]."*

20.    Mr. Austin 1. Is an African American or Black man who is high achieving, highly recruited, accomplished, high potential, and an admitted Georgetown student (protected group[s]) 2. was & is qualified to make the contract (of sound mind, admitted student, Georgetown took photo and sought to economically exploit photo, and Georgetown already demonstrated it understood how to properly engage in written contract when Mr. Austin deferred for a year to participate in Capital Fellows, Senate Fellows Program *[with a written contract similarly required]* and $400 consideration exchanged to solidify that contract) 3. Suffered adverse actions (Georgetown stole, took, or defrauded out of IP-Rights of publicity-Privacy without

**18 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

telling Mr. Austin, and when he confronted them on their violation still continued to refuse to make a contract on the same basis as Whites because of Mr. Austin's race or derogatory racial stereotypes presuming "inferiority" or "less worthy" by completely disrespecting Mr. Austin's Constitutional rights to contract) 4. Opportunity to contract remains open, and Mr. Austin has continued to follow up on the issue. Further, per the fourth or fifth element, Whites, or non-Black admitted students, under this school policy (and Constitutional requirement) were treated demonstrably better, and Mr. Austin was treated demonstrably in an inferior manner (see para. 11-19; see attached; dckt. 75)

21.   In addition to violating Mr. Austin's right to make media contract, as mandated per Georgetown's own policies, Georgetown simultaneously violated Mr. Austin's rights in existing contract per *"performance, modification, ... and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"* as well as Equal Protection per Title VI of the Civil Rights Act of 1964. Georgetown did so when it completely excluded Mr. Austin on the basis of race, derogatory racial stereotypes, and sex, because Mr. Austin is a Black man and illegally excluded from essential campus services-procedures for *"Any applicant for employment or admission, current or former employee or student, or third party"* that similarly situated Whites, or Non-Black males, are provided via a set of mandatory steps (**faculty handbook.georgetown.edu/ section4/a/**)  per Georgetown written policy **"Procedures for Processing Grievances"** that *must* be done in accord with Equal Protection under Civil Rights Act of 1964 (Title VI) coexistent with 42 USC 1981.

**19 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

22.    Per Judge Henderson's analysis in *Walker v. Contra Costa County,* combined with US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* defendant Georgetown's conduct is "blatantly" racist whereas similarly situated White, or non-Black, student offerees are made offers by Georgetown, respecting their person, and rights (economic and otherwise) the "*private offeror [who blatantly violates Civil rights when it] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts."* Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020):  Georgetown is a private offeror  Mr. Austin is a private offeree, admitted student (*who expects to be treated on the same basis as White, non-Black, admitted students: anything else offends the Constitution, 1981, Equal Protection, 13th, 14th, 15th Amendments, and Civil Rights of 1964*).   The only requirements for making a Georgetown media contract, as an admitted student, is to a. Be an admitted student on campus, & b. Have an organization desire to use your image, or likeness, to market or economically exploit their product-service for their benefit.  Unbeknownst to Mr. Austin, Georgetown went out of its way to take and use his image and likeness while he was an admitted student on campus to market or economically exploit their product-service for their benefit, and thus fulfills all requirements "to make" a contract.   However, despite meeting all requirements, and following up to make a contract, get an explanation as to why they violated the law, and school policy in the first place, Georgetown illegally refuses to make a contract with Mr. Austin because of his race, or derogatory racial stereotypes (as Georgetown explicitly admits to Mr. Austin in both word, and deed).  Georgetown violated

existing contract, and simultaneously Mr. Austin Title VI Equal Protection rights

when it completely excluded Mr. Austin from essential campus IDEAA

services-procedures, illegally because Mr. Austin is a Black man.

## **Georgetown violates Mr. Austin's Equal Protection**

23. Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494*

*(1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard*

*Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School*

*District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used

Mr. Austin's race, or derogatory anti-Black racist stereotypes, simultaneously

violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's

Title VI Equal Protection rights when it completely excluded Mr. Austin from

essential campus IDEAA to treat an admitted student, and Black man, in a

derogatory manner to "deny, restrict, separate, segregate (in application of policy),"

and exclude Mr. Austin from services-procedures, illegally because Mr. Austin is a

Black man.

24.    Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard*

*Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct which admits,

explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming*

*derogatory stereotype to deprive making a contract*), or b. Treating Whites, or

non-Black men, as 'superior' or more worthy (*ensuring Whites had opportunity to*

*review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone*

*not presuming derogatory stereotypes to deprive Whites their rights to contract*) is

doubly offensive to the Constitution of the United States because

> "[Georgetown's complaint & contract making] systems also fail to comply with the Equal Protection Clause's
> [co-existent with 42 USC 1981's] twin commands that race may never be used as a "negative" and that it may not
> operate as a [derogatory] stereotype…. [Georgetown's structures] are zero-sum, and a benefit provided to some [Whites

**21 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

*as 'superior' or more worthy in a Higher Education environment designed to serve all people] but not to others necessarily advantages the former [Whites] at the expense of the latter [Blacks, particularly Black men].")"*

Per the US Supreme Court's *Heckler v. Mathews, 465 U.S. 728, 739 (1984)*

Georgetown confers their own perceived- presumed inferiority (or "stigma") of

admitted Black (male) students (as both 1. the contract offer process and 2. The

IDEAA complaint process should be the same for

regardless of race) to create

*"Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases."*

25.    Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290*

*(1998)* Georgetown's conduct provides for Equal Protection

*"damages remedy [ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond…..the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a …. violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference." Per General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 389-391 (1982)* Georgetown's violation of Mr. Austin's right to contract coincides, and overlaps with their Equal Protection violations because *"the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"*.

26.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25,*

*2023)* when a student is experiencing a violation of school policy and reports that

conduct to the appropriate University body, especially when the violation was by

someone or something under University control, then it's a violation of Equal

Protection to deny that student investigatory, or enforcement, services as a victim,

or survivor, of the violation whereas Plaintiff

*"presented sufficient evidence to allow a reasonable factfinder to conclude that a responsible university official exercised sufficient control over the "context" in which [University policy and the law was violated] to support liability…. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645 (1999). We further hold … presented sufficient evidence to allow a reasonable factfinder to conclude that the University had "actual knowledge" of facts that required an appropriate response, and that a university official's failure to escalate reports of [University policy and the law violative] actions was a "clearly unreasonable" response demonstrating the University's "deliberate indifference." Id. at 642–43, 648–49;.Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).*

## **Mr. Austin's other claims are substantive**

27.    Mr. Austin's other claims, prior to any discovery, or disclosure, include: 3.

Georgetown induced contract formation with Mr. Austin as a student through

actual fraud, misstatements on its commitment to follow the law, misstatements

regarding its contract, misstatements regarding its own policies, and continues its

**22 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

deceitful pattern in its ongoing pattern of *still* omitting material information after admitting its violations of its own policy, contract, and the law. 4. Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leadership's illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct  5. Georgetown exhibits extreme bad faith to Mr. Austin's detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.  Mr. Austin's cases (including this one) are neither meritless, nor groundless, and in fact are rooted in well settled, longstanding, Supreme Court, Ninth Circuit, and California Supreme Court Jurisprudence (and standards for factual pleading).

"The Court agrees that Riveredge's action was not "frivolous" as that term has been defined under Rule 11. See Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (to be frivolous there must be no legal basis for suit, and no argument "advocating a good faith extension or modification of current law"); Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990) ("to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands")
- **Riveredge Assoc. v. Metro. Life Ins. Co. 774 F. Supp. 897 (D.N.J. 1991)**

"We reversed the sanctions, stating that "[w]e believe a plausible, good faith argument can be made … to the contrary." Id. at 833; see also Davis v. Veslan Enterprises, 765 F.2d 494, 498 (5th Cir. 1985) ("the district court's determination to impose sanctions may depend on `whether the pleading, motion, or other paper was based on a plausible view of the law.'") (quoting comment to 1983 amendments"
- **Golden Eagle Distributing Corp. v. Burroughs 801 F.2d 1531 (9th Cir. 1986)   Cited 304 times**

## Mr. Austin's claims from 7.15.21 to present are not barred by Res Judicata

28.     It is well settled law per the Supreme Court that ongoing conduct, which cannot be foreseen (as Georgetown is engaged in), is not barred by Res Judicata.

**Relevant Background:** On 4/05/2024, 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal  (Without Prejudice) of this entire, unrelated case, 137 (*Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying [135] Administrative Motion*), in its entirety under FRCP Rule 41 (without prejudice as is

the presumption).  The Notice terminated the case, its operative complaint, Mr.

Austin's First Amended Complaint (**FAC;**Dckt. 14)**,** without need of court order

upon receipt.   Plaintiff's notice is controlling under Rule 41 of FRCP without need

of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - 'notice').  Finding that it is

"beyond debate that a dismissal under Rule 41 is effective on filing, no court order is

required, the parties are left as though no action had been brought, the defendant

can't complain, and the district court lacks jurisdiction to do anything about it"  See

e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999)

This is a new, unrelated, unheard case, Dckt. 137 with new defendants, never heard

causes of action.  Mr. Austin voluntarily withdrew or voluntarily (dismissed)

because of documented Due Process, Equal Protection non-judicial act violations

(without prejudice) this entire, unrelated, case 4:24-cv-00260-CRB [DMR]  under Rule

41 of FRCP without need of Judicial Order.  Under Supreme Court's *Cooter Gel,*

provided these facts, *Defendant's motion shouldn't even be considered*.

Mr. Austin's cases are not repetitive refilings, but reflect independent Article III,
Supreme Court recognized, well settled, discrete adverse, new, legal harms
29.    Mr. Austin did not replead the previously plead harms from 2019-2020 (i.e.

Civ. Code 3344, privacy), nor did he refile the same exact case which causes of

action terminated with the 7.14.21 judgment-disposition per lack of diversity

jurisdiction.  Instead, Mr. Austin filed a new case, with new Defendant harms of

ongoing discriminatory conduct never before plead, nor experienced, by Georgetown

University to an admitted Black male student *after 7.15.21* to the present.  Neither

Civil Code 3344, nor privacy, nor Diversity Jurisdiction are part of this action

(outside of context setting up for the current, and ongoing, causes of action *after*

disposition of the previous case).  Mr. Austin has never been disciplined or in any

trouble with any institution of higher education, *ever*, has straight A's the last nine semesters, is a good student, good person, and good citizen (attentive, conscientious and straightforward).  See Dckt. 14; FAC   Mr. Austin is the person whose economic, property, and 42 USC 1981 rights to contract were violated in the following picture (*page 4*), and the process which deprived Mr. Austin's contract rights.    Per US Supreme Court's *General Building Contractors Assn., Inc. v. Pennsylvania,* and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully, deprived Mr. Austin's rights to contract and engaged in a

> "blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an African- American, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]."

Mr. Austin's complaint is in Good Faith, with Substantive Issues, Facts, Direct evidence per 2023 Supreme Court, facially discriminatory ongoing conduct from 7.15.21 to present (Which has not had opportunity to be heard), is not vexatious per Supreme Court's *Cootergel* or any other controlling law (Alternatively, it is the right thing to do).  Thus, Mr. Austin should not be sanctioned & provides Appeal Notice, if needed.  Mr. Austin provides Judge Breyer one additional opportunity to self correct via  R.59 Motion as it appears he misread, and made 3 glaring errors in his order on the first.  The 30 day clock begins after order on this second opportunity for Judge Breyer, in good faith, to conserve judicial resources.  Fed. R. App. P. 4

("..(A) If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure…the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion: …(iv) to alter or amend the judgment under Rule 59;")

## Signed, Under Penalty of Perjury.

> "I, Mr. George Jarvis Austin, declare, certify, verify, or state, under penalty of perjury under the laws of the United States of America, and California, that the foregoing specific, numbered , declarations of precise facts, cross referenced with filings-documents on the record, are true and correct (and as I Mr. Austin personally experienced)."

s/ **George Jarvis Austin**          11.13.24

**25 ; Notice of 9th Circuit Appeal per Judge Breyer's Order per Rule 59 Motion**

-------------------------------- Case Name, Number, Status --------------------------------



3:24-cv-00260-CRB Austin v. Georgetown University CASE CLOSED on 04/10/2024

ADRMOP,APPEAL,CLOSED,E-ProSe,ProSe

----------------------------------------- Docket Text Begins Here -----------------------------------------

01/16/2024 1 COMPLAINT against Georgetown University, (Filing Fee: $405.00, receipt number 311167464). Filed by George Jarvis Austin. Consent/Declination due by 1/30/2024. (Attachments: #(1) Civil Cover Sheet, #(2) Filing Fee Receipt) (tn, COURT STAFF) (Fi led on 1/16/2024)

01/16/2024 2 **Initial Case Management Scheduling Order with ADR Deadlines: Joint Case Management Statement due by 4/10/2024. Initial Case Management Conference set for 4/17/2024 at 1:30 PM in Oakland, Courtroom 4, 3rd Floor. (Attachments: # 1 Judge' s Standing Orders) (tn, COURT STAFF) (Filed on 1/16/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

01/20/2024 3 CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by George Jarvis Austin.. (Austin, George) (Filed on 1/20/2024)

02/23/2024 4 Proposed Summons. (Austin, George) (Filed on 2/23/2024)

02/27/2024 Electronic filing error. Re: 4 Proposed Summons filed by George Jarvis Austin. This filing will not be processed by the clerks office. Defendant Georgetown University is not listed on the summons. Please re-file in its entirety. (tn, COURT STAFF) (Filed on 2/27/2024)

02/27/2024 5 Proposed Summons. (Attachments: # 1 Summons (Previously Proposed) without Requested Amended Addition of [Insert - Georgetown University's (FID#53-0196603) prior to each specific-precise Office and Address in lower section of Summons), # 2 Envelope Email with Clerk & CRD Re: Proposed Summons Inquiry (Lower Section Name Clarification) ; "Good afternoon, DMR CRD and Clerk of the Court.... Ensuring you saw Georgetowns name listed (with their Federal ID number) in the Defendant section of the proposed summons form. Are you saying you prefer the name Georgetown to be listed prior to the precise name of the Office of the President and Office of General Counsel with their precise addresses for legal service in the lower porti on of the proposed summons?")(Austin, George) (Filed on 2/27/2024)

02/28/2024 Electronic filing error. Incorrect PDF attached. [err201] Corrected by Clerk's Office. No further action is necessary. Re: 5 Proposed Summons, filed by George Jarvis Austin
**A summons must name the court and the parties. The proposed summons lists defendants not listed on the Complaint (see docket 1 , pages 77, and 78).**

**(wsn, COURT STAFF) (Filed on 2/28/2024)**

02/28/2024 6 **Erroneous Docket Entry - Please Disregard - Refer to Docket #10** - Summons Issued as to Georgetown University. (wsn, COURT STAFF) (Filed on 2/28/2024) Modified on 2/28/2024 (tn, COURT STAFF).

02/28/2024 7 Proposed Summons. (Attachments: # 1 Summons CLERK OFFICE ERROR INCORRECTLY DELETED GENERAL COUNSEL'S & VICE PRESIDENT's OFFICE AS THEY ACTUALLY RECEIVED LEGAL SERVICE IN THIS OFFICE (AND SERVE ESSENTIAL GU FUNCTION AS EXPRESSLY LISTED IN COMPLAINT))(Austin, George) (Filed on 2/28/2024)

02/28/2024 8 NOTICE by George Jarvis Austin re 5 Proposed Summons, Electronic Filing Error, 7 Proposed Summons, Electronic Filing Error, 4 Proposed Summons, 6 Summons Issued *CLERK'S OFFICE ERROR[S]* (Attachments: # 1 Envelope [emai l communication - NOTICE of Clerk Error and encouragement to reach out to Mr. Austin via email prior to any additional errors], # 2 Envelope [email communication from DMR CRD to 0docketing clerk, Clerks Office, to ensure correct prior to Clerk' ;s Office errant filing)(Austin, George) (Filed on 2/28/2024)

☐ 02/28/2024 9 AMENDED DOCUMENT by George Jarvis Austin. Amendment to 1 Complaint, *64 PAGE (70 PAGE with Roman Numeral intro pages) RE-ARRANGED DUE TO CLERK FILING ERROR - incorrectly filed supplements-standard forms in wrong location.* (Attachments: # 1 Civil Cover Sheet FILED and Court Stamped with Case Number 4:24-cv-00260-DMR & $15,000,000.00 Minimum Demand, # 2 Supplement FILED (and Court stamped dckt.1); Northern District Supplement-Standard-Form) (Austin, George) (Filed on 2/28/ 2024)

☐ 02/28/2024 10 Summons Re-issued as to Georgetown University (Correction to Docket #6). (tn, COURT STAFF) (Filed on 2/28/2024)

☐ 03/05/2024 11 SUPPLEMENT-AFFIDAVIT (S-1~S-188) *(FOR 64-Page Opening Complaint); Hyperlinked-cross referenced with Opening Complaint S1 - S188* by George Jarvis Austin. (Attachments: # 1 Signature Page (Declarations/Stipulations) Affidavit (signed-swo rn) per The Department of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit)(Austin, George) (Filed on 3/5/2024)

☐ 03/05/2024 12 AMENDED DOCUMENT by George Jarvis Austin. Amendment to 9 Amended Document,, 1 Complaint, *64 PAGE (70 PAGE with Roman Numeral intro pages) RE-ARRANGED DUE TO CLERK FILING ERROR - incorrectly filed supplements-standard forms in wrong loca tion. HYPERLINKED in Opening Complaint with Supplement-Affidavit.* (Attachments: # 1 Civil Cover Sheet FILED and Court Stamped with Case Number 4:24-cv-00260-DMR & $15,000,000.00 Minimum Demand, # 2 Supplement FILED (and Court stamped dckt.1); Northern District Supplement-Standard-Form, # 3 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit)(Austin, George) (Filed on 3/5/2024)

☐ 03/13/2024 13 Notice of Additional Parties: the following parties are listed on 1 Complaint, and have been added to this case: Yvonne Gonzales Rogers. (This is a text-only entry.) (Austin, George) (Filed on 3/13/2024)

☐ 03/13/2024 14 AMENDED COMPLAINT *FAC 64 PAGE (70 PAGE with Roman Numeral intro pages) with Added Defendant Ms. Yvonne Gonzales Rogers, acting in concert with Def. Georgetown; HYPERLINKED in (FAC) Amended Complaint with Supplement-Affidavit* against All Defe ndants. Filed by George Jarvis Austin. (Attachments: # 1 Civil Cover Sheet FILED and Court Stamped with Case Number 4:24-cv-00260-DMR & $15,000,000.00 Minimum Demand, # 2 Supplement FILED (and Court stamped dckt.1); Northern District Suppl ement-Standard-Form, # 3 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit)(Austin, George) (Filed on 3/13/2024)

☐ 03/13/2024 15 Proposed Summons. (Attachments: # 1 Summons Issued to Defendant Georgetown University's (FID#53-0196603) not yet including the second (Yvonne Gonzales Rogers) Defendant)(Austin, George) (Filed on 3/13/2024)

☐ 03/14/2024 16 NOTICE of Appearance by Henry Adam Platt *for Defendant Georgetown University* (Platt, Henry) (Filed on 3/14/2024)

☐ 03/14/2024 17 Corporate Disclosure Statement by Georgetown University *Civil L.R. 3-15 Disclosure* (Platt, Henry) (Filed on 3/14/2024)

☐ 03/17/2024 18 AFFIDAVIT of Service for Complaint; Summons; Affidavits; Civil Cover Sheet; Proof; Supplements; Standing Orders served on Georgetown University (General Counsel; Vice President Office) on March 12, 2024 at 10:48 am, filed by George Jarvi s Austin., CERTIFICATE OF SERVICE by George Jarvis Austin re 12 Amended Document, SUMMONS Returned Executed by George Jarvis Austin. Georgetown University served on 3/12/2024, answer due 4/2/2024. (Austin, George) (Filed on 3 /17/2024)

☐ 03/20/2024 19 **ORDER TO SHOW CAUSE. Show Cause Response due by 4/3/2024. Signed by Chief Magistrate Judge Donna M. Ryu on 3/20/2024. (dmrlc1, COURT STAFF) (Filed on 3/20/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 03/20/2024 20 RESPONSE re 19 Order to Show Cause, *US Supreme Court explicitly provides two applicable exceptions to cited rule with regard to 1 of 2 Defendants Ms. Gonzales Rogers, will spell out in depth by date Court*

*provides to respond to Inquiry-Order* by George Jarvis Austin. (Austin, George) (Filed on 3/20/2024)

☐ 03/20/2024 21 ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *Plaintiff George Jarvis Austin's Certification* (Attachments: # 1 Affidavit ADR CERTIFICATION Form, # 2 Certificate/Proof of Service Email with Defendant about ADR O ptions)(Austin, George) (Filed on 3/20/2024)

☐ 03/21/2024 22 CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by George Jarvis Austin.. (Attachments: # 1 Affidavit Declination of Magistrate Jurisdiction by Plaintiff; Defendant has not consented to Magistrate Jurisdiction, either. Re-assignment Order Forthcoming)(Austin, George) (Filed on 3/21/2024)

☐ 03/22/2024 23 AMENDED DOCUMENT by George Jarvis Austin. Amendment to 3 Consent/Declination to Proceed Before a US Magistrate Judge *as of 7:25pm PST on 3/21/2024.* (Attachments: # 1 Affidavit Declination of Magistrate Jurisdiction by Plaintiff; D efendant has not consented to Magistrate Jurisdiction, either. Reassignment Order Forthcoming (litigants control whether Magistrate have Jurisdiction).)(Austin, George) (Filed on 3/22/2024)

☐ 03/22/2024 24 Request for Judicial Notice re 23 Amended Document, 22 Consent/Declination to Proceed Before a US Magistrate Judge, *NO MAGISTRATE JUDGE JURISDICTION EXISTS* filed byGeorge Jarvis Austin. (Attachments: # 1 Exhibit Declination of M agistrate Jurisdiction by Plaintiff; Defendant has not consented to Magistrate Jurisdiction, either. Reassignment Order Forthcoming (litigants control whether Magistrate have Jurisdiction)., # 2 Certificate/Proof of Service email confirming receipt t with Docketing@cand.uscourts.gov, ECFHELPDESK <ecfhelpdesk@cand.uscourts.gov>, clerk_of_court@cand.uscourts.gov Cc: ADR_Attendance@cand.uscourts.gov, CAND 0Docketing <0Docketing@cand.uscourts.gov>, CAND-ADR < ADR@cand.uscourts.gov>, DMR CRD <dmrcrd@cand.uscourts.gov>, adr_rulesviolations@cand.uscourts.gov Bcc: dmrsettlement@cand.uscourts.gov "Hi ECFHELPDESK Excellent, but this is not a request. The litigants control wheither there is magistrate jurisdiction. If both litigants, or one litigant, do not expressly grant Magistrate Jurisdiction, then there is no Jurisdiction, and it is illegal to proceed under a Magistrate Judge (as a judge cannot rule outside of their jurisdiction). Here both litigants have not expressly granted Magistrate jurisdiction, or stated different neither have granted Magistrate jurisdiction, thus the case must be reassigned as the Magistrate no longer has jurisdiction. How long does re assignment typically take (24 hrs)? Best, George Jarvis Austin Self Represented")(Related document(s) 23 , 22 ) (Austin, George) (Filed on 3/22/2024)

☐ 03/22/2024 25 **ORDER re: Plaintiff's Consent to Magistrate Judge Jurisdiction. Signed by Chief Magistrate Judge Donna M. Ryu on 3/22/2024. (dmrlc1, COURT STAFF) (Filed on 3/22/2024)**

*Any non-CM/ECF Participants have been served by F irst Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 03/22/2024 26 CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Georgetown University.. (Platt, Henry) (Filed on 3/22/2024)

☐ 03/22/2024 27 ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Platt, Henry) (Filed on 3/22/2024)

☐ 03/25/2024 29 ***FILED IN ERROR. PLEASE SEE DOCKET NO. 30 ****

**ORDER Referring 28 Motion to Withdraw Consent filed by George Jarvis Austin. Signed by Chief Magistrate Judge Donna M. Ryu on 3/25/2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (dmrlc1, COURT STAFF) (Filed on 3/25/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*
**Modified on 3/25/2024 (dmrlc1, COURT STAFF).**

☐ 03/25/2024 30 **ORDER Referring 28 Motion to Withdraw Consent filed by George Jarvis Austin. Signed by Chief Magistrate Judge Donna M. Ryu on 3/25/2024. CORRECTION OF DOCKET NO. 29 (order was not attached). (dmrlc1, COURT STAFF) (Filed on 3/25/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 03/25/2024 31 RESPONSE re 30 Order, 28 MOTION to Reassign Case *Due to Lack of Magistrate Jurisdiction; There is no unambiguous written consent by both the plaintiff and defendant (either of them destroys jurisdiction) to the exercise of authority by a magistrate judge under 28 U.S.C. & MOTION to Amend/Correct 23 Amended Document, 22 Consent/Declination to Proceed Before a US Magistrate Judge, 14 Amended Complaint,, 25 Order, MOTION to Withdraw Wide Consent to Magis trate Judge, outside of narrow Defendant settlement ADR option (as mentioned in ADR Certification) CORRECTION MOTION IS TO RE-ASSIGN (See dckt 28), AMEND/CORRECT, & WITHDRAW by George Jarvis Austin. (Attachments: # 1 Exhibit, # 2 Affidavit, # 3 Affidavit, # 4 Affidavit, # 5 Proposed Order To RE-ASSIGN, AMEND CORRECT (to reflect Plaintiff's Intended Declination), WITHDRAW any wide Magistrate consent for this matter with the exception of only allowing for narrow ADR Settlement Consent Reflected in ADR Cert.)(Austin, George) (Filed on 3/25/2024)*

☐ 03/26/2024 32 OPPOSITION/RESPONSE (re 28 MOTION to Reassign Case *Due to Lack of Magistrate Jurisdiction; There is no unambiguous written consent by both the plaintiff and defendant (either of them destroys jurisdiction) to the exercise of authority by a magistrate judge under 28 U.S.C. & MOTION to Amend/Correct 23 Amended Document, 22 Consent/Declination to Proceed Before a US Magistrate Judge, 14 Amended Complaint, 25 Order, MOTION to Withdraw Wide Consent to Magistrate Judge, outside of narrow Defendant settlement ADR option (as mentioned in ADR Certification)) filed by Georgetown University. (Attachments: # 1 Proposed Order Proposed Order Denying Motion)(Platt, Henry) (Filed on 3/26/2024) Modified on 4/4 /2024 (dmrlc1, COURT STAFF).*

☐ 03/26/2024 33 AFFIDAVIT re 28 MOTION to Reassign Case *Due to Lack of Magistrate Jurisdiction; There is no unambiguous written consent by both the plaintiff and defendant (either of them destroys jurisdiction) to the exercise of authority by a magistrate judge under 28 U.S.C. & MOTION to Amend/Correct 23 Amended Document, 22 Consent/Declination to Proceed Before a US Magistrate Judge, 14 Amended Complaint,, 25 Order, MOTION to Withdraw Wide Consent to Magistrate Judge, outside of narrow Defendant settlement ADR option (as mentioned in ADR Certification) VERIFICATION OF PROPOSED ORDER & CLERK ORDER COMMUNICATION NEEDS by George Jarvis Austin. (Austin, George) (Filed on 3/26/2024)*

☐ 04/01/2024 34 Summons Issued as to Yvonne Gonzales Rogers. (tn, COURT STAFF) (Filed on 4/1/2024)

☐ 04/02/2024 36 AFFIDAVIT in Opposition re 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT DEFENDANT Georgetown APPARENTLY DID NOT READ FIRST AMENDED COMPLAINT ( FAC; NOT THIRD), Moreover, JUDGE GONZALES RODGERS Ruled UNRELATED Case[s] (Thus, ALL Defendant References To UNRELATED Cases Are MOOT; IN-APPOSITE); DEFENDANT Georgetown COMPLETELY IGNORES PLEADINGS In This FAC (and Separate Individual Case; DEFEND ANT GEORGETOWN'S VIOLATIONS ARE 'ONGOING' With Each Discrete Ongoing Adverse Action (ORIGINAL JURISDICTION) 1981, EQUAL PROTECTION, MATERIAL OMISSION, MIS-STATEMENT(S), etc. CREATING NEW CAUSES OF ACTION WITH Each Adverse Action, or Fa ilure to Act (when duty calls to act) STATUTE OF LIMITATIONS Have not begun as Violations are 'Ongoing'* filed byGeorge Jarvis Austin. (Related document(s) 35 ) (Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024 37 AFFIDAVIT in Opposition re 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Defendant Georgetown is either illiterate, foolhearty or willfully-pur posely EGREGIOUSLY IGNORANT-WRONG; JUDGE GONZALES RODGERS Ruled this 64-Page (FAC) Complaint based case is UNRELATED, Thus, ALL Defendant References To UNRELATED Cases Are MOOT; IN-APPOSITE) Defendant Georgetown's motion is misguided, moot, in accurate and in-apposite SEE ATTACHED* filed byGeorge Jarvis Austin. (Related document(s) 35 ) (Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024 38 Proposed Findings of Fact by George Jarvis Austin *DOCUMENTED COMMUNICATION with Defendant Counsel (with the Court) separating*

*FACT from FICTION (Wheat from Chaff) [ "---------- Forwarded message ---------- From: George <georgejarvisaustin @gmail.com> Date: Tue, Apr 2, 2024 at 3:33PM Subject: Would you like to be added to 'ongoing' communications regarding 'ongoing' Original Jurisdiction Def. violations? Are you aware your motion is misguided, moot, inaccura te and inapposite?: Activity in Case 4:24-cv-00260-DMR Austin v. Georgetown University Affidavit in Opposition to Motion To: <dianne.sobers@saul.com>, <henry.platt@saul.com>, <jennifer.hibner-spencer@saul.com> Cc: DMR CRD <dmrcrd@cand.uscourts.gov>, ECFHELPDESK <ecfhelpdesk@cand.uscourts.gov>, <clerk_of_court@cand.uscourts.gov>, <dmrsettlement@cand.uscourts.gov> Good afternoon, Henry Platt representing Defendant Georg etown (and Court ccd here) Are you aware your misguided, moot, inaccurate and in-apposite Motion is bereft of facts or arguments applicable to Defendant Georgetowns ONGOING (Original Jurisdiction) violations (I.e. Equal Protection, 1981, etc.) of Mr . Austins rights as plead in the 64 page First Amended Complaint? Is there a reason you completely ignored the Court ruling of unrelated cases? Are you aware each facially discriminatory adverse act by Defendant Georgetown creates its own cause of action, and resets the statute of limitations (when ongoing statute of limitations do not begin to accrue)? Are you aware Georgetowns facially discriminatory conduct is ongoing? As of 2024, I am still communicating with Georgetown and they continue to make discrete, adverse, actions (and inactions where duty calls to speak & act); would you like be included in those conversations in front of over 400+ witnesses (direct evidence under California and Federal law)? Best, George Jarvis Austin Self Represented (Plaintiff)"*. (Attachments: # 1 Exhibit Affidavit - FAC (First Amended Complaint; Dckt. 14), # 2 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Instit ute of Justice Standards & Legal Requirements of an Affidavit))(Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024    Electronic filing error. Re: 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT* filed by G eorgetown University. This filing will not be processed by the clerks office. Please re-file in its entirety with a notice of hearing (Motion Hearing: Provide the hearing date as instructed by the presiding judge on your case. For more information ab out scheduling a hearing, please consult the web page of the presiding judge at http://cand.uscourts.gov/judges) (tn, COURT STAFF) (Filed on 4/2/2024)

☐ 04/02/2024  40  AFFIDAVIT in Opposition re 39 MOTION to Dismiss , 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT ; DEFENDANT Georgetown APPARENTLY D ID NOT READ FIRST AMENDED COMPLAINT (FAC); (NOT THIRD - TAC), Moreover, JUDGE GONZALES RODGERS Ruled UNRELATED Case[s] (Thus, ALL Defendant References To UNRELATED Cases Are MOOT; IN-APPOSITE); DEFENDANT Georgetown COMPLETELY IGNORES PLEADINGS In Thi s FAC (and Separate Individual Case; DEFENDANT GEORGETOWN'S VIOLATIONS ARE 'ONGOING' With Each Discrete Ongoing Adverse Action (ORIGINAL JURISDICTION) 1981, EQUAL PROTECTION, MATERIAL OMISSION, MIS-STATEMENT(S), etc. CREATING NEW CAUSE S OF ACTION WITH Each Adverse Action, or Failure to Act (when duty calls to act) STATUTE OF LIMITATIONS Have not begun as Violations are 'Ongoing'* filed byGeorge Jarvis Austin. (Attachments: # 1 Signature Page (Declarations/Stipula tions) Affidavit (signed-sworn) per The Department of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit)(Related document(s) 39 , 35 ) (Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024  41  AFFIDAVIT in Opposition re 39 MOTION to Dismiss , 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT ; Defendant Georgetown is either il literate, fool-hardy or willfully-purposely EGREGIOUSLY IGNORANT-WRONG; JUDGE GONZALES RODGERS Ruled this 64-Page (FAC) Complaint based case is UNRELATED, Thus, ALL Defendant References To UNRELATED Cases Are MOOT; IN-APPOSITE) Defendant Georgetown&#039;s motion is misguided, moot, inaccurate and in-apposite SEE ATTACHED* filed

byGeorge Jarvis Austin. (Attachments: # 1 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Instit ute of Justice Standards & Legal Requirements of an Affidavit)(Related document(s) 39 , 35 ) (Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024 42 Proposed Findings of Fact by George Jarvis Austin *CONFIRMATION OF RECEIPT OF FORMAL COMPLAINTS (Yet, No Mandatory Action taken by Defendant, continuing 'ongoing' pattern of adverse non-actions, and actions as of April 2, 2024); Example from 1 of 150+ formal Complaints, Inquiry, as a Whistle-blower, confirmation from Georgetown Executive Leader-ship - Georgetown Dean (See attached)..* (Attachments: # 1 Certificate/Proof of Service Exhibit-Affidavit - DOCUMENTED COMMUNICATION with Defendant Counsel (with the Court) separating FACT from FICTION (Wheat from Chaff), # 2 Exhibit Affidavit - FAC (First Amended 'OPERATIVE' Complaint), # 3 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit))(Austin, George) (Filed on 4/2/2024)

☐ 04/02/2024 43 Proposed Findings of Fact by George Jarvis Austin *CONFIRMATION OF RECEIPT OF FORMAL COMPLAINTS on April 2, 2024 with Georgetown Tracking Number from Student Services); Example from 4/2/24 of (one) 1 of 150+ formal Complaints, Inquiry, as a Whistl e-blower (See attached)..* (Attachments: # 1 Exhibit -Exhibit; FAC (First Amended Complaint), # 2 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Department of Justice's National Institute of Justice Standar ds & Legal Requirements of an Affidavit))(Austin, George) (Filed on 4/2/2024)

☐ 04/03/2024 44 RESPONSE TO ORDER TO SHOW CAUSE by George Jarvis Austin *re: Dckt. 19.* (Attachments: # 1 Exhibit Affidavit - FAC (First Amended Operative Complaint), # 2 Signature Page (Declarations/Stipulations) Affidavit (signed-sworn) per The Departm ent of Justice's National Institute of Justice Standards & Legal Requirements of an Affidavit))(Austin, George) (Filed on 4/3/2024)

☐ 04/03/2024 45 **ORDER re: Plaintiff's Communications. Signed by Chief Magistrate Judge Donna M. Ryu on 4/3/2024. (dmrlc1, COURT STAFF) (Filed on 4/3/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addre sses of record listed on the Notice of Electronic Filing (NEF)*

☐ 04/03/2024 46 AFFIDAVIT re 45 Order, *In Accord with Magistrate Judge DMR's Order will file All Emails with the Court, on the Docket, for the Record (to reduce or eliminate unnecessary email communication needs; Appreciate Magistrate Judge DMR's acknowledgement that she saw those emails requesting materially omitted information, and making formal complaints for the Record. Will do so with all communications with Defendant counsel or Georgetown going forward to ensure all appropriately docu mented, on the docket, as direct evidence, instead of through email with drmsettlement@cand.uscourts.gov))* by George Jarvis Austin. (Austin, George) (Filed on 4/3/2024)

☐ 04/03/2024 47 Proposed Findings of Fact by George Jarvis Austin *Documented Communication(s) with Defendant Counsel & Defendant requesting 'ongoing' materially omitted information, and correction to 'ongoing' discrete, adverse action based o n derogatory anti-Black male racial stereotypes, or race as outlawed by well settled Supreme Court Jurisprudence including the more recent held Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 104 (U.S. Jun. 29 , 2023) referencing back to Brown v. Board of Education of Topeka, 347 U.S. 483 (1954).* (Austin, George) (Filed on 4/3/2024)

☐ 04/03/2024 48 SUMMONS Returned Executed by George Jarvis Austin. All Defendants. *(Courtesy Copy)*, CERTIFICATE OF SERVICE by George Jarvis Austin re 14 Amended Complaint,, , AFFIDAVIT of Service for Courtesty Copy to Criminal Civil Rights D ivision served on Criminal Civil Rights Division (Courtesy Copy on March 27, 2024, filed by George Jarvis Austin., ACKNOWLEDGEMENT OF SERVICE Executed Acknowledgement filed by George Jarvis Austin. (Attachments: # 1 Affida vit Service of Process to United States Department of Justice - Attn. Attorney General, Civil Rights Division, Federal Bureau of Investigation (FBI), Criminal Civil Rights Division, Civil Division,)(Austin, George) (Filed on 4/3/2024)

☐ 04/03/2024 49 SUMMONS Returned Executed by George Jarvis Austin. All Defendants. *(Courtesy Copy)*, AFFIDAVIT of Service for Courtesty Copy to United States

Department of Justice - Attn. Attorney General, Civil Division,
Federal Bureau of Investigat ion (FBI), Criminal Civil Rights Division, Civil
Division served on United States Department of Justice - Attn. Attorney
General, Civil Rights Division, Federal Bureau of Investigation (FBI),
Criminal Civil Rights Division, Civil Division on March 27, 2024, filed
by George Jarvis Austin., ACKNOWLEDGEMENT OF SERVICE Executed as
to 14 Amended Complaint,, Acknowledgement filed by George Jarvis
Austin.., CERTIFICATE OF SERVICE by George Jarvis Austin (Attachm
ents: # 1 Affidavit Service of Process to United States Department of Justice -
Attn. Attorney General, Civil Rights Division, Federal Bureau of
Investigation (FBI), Criminal Civil Rights Division, Civil Division)(Austin,
George) (Filed on 4/3/202 4)

☐ 04/05/2024 50 Proposed Findings of Fact by George Jarvis Austin *FORMAL PRE-
DISCOVERY DISCLOSURE REQUEST OF EXTREMELY PAST DUE
OWED, STATUTORILY, CONSTITUTIONALLY, AND GEORGETOWN
POLICY, PRESCRIBED INFORMATION-DUTIES to be produced by
Defendant Counsel to Mr. A ustin, and Mr. Austin alone within two weeks,
inclusive.* (Attachments: # 1 Affidavit FAC (First Amended Operating
Complaint) for ease of reference with Information Production Requests
'ongoing', # 2 Signature Page (Declarations/S tipulations) Affidavit (signed-
sworn) per The Department of Justice's National Institute of Justice Standards
& Legal Requirements of an Affidavit)(Austin, George) (Filed on 4/5/2024)

☐ 04/05/2024 52 NOTICE of Voluntary Dismissal *; VOLUNTARY WITHDRAWAL Mr. Austin
Self-Represented, Plaintiff, Pro Se, George Jarvis Austin provides notice of
withdrawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-
00260-DMR under Rule 41 of FRCP without need of Judicial Order per Rule
41 of FRCP(A)(1)(A)(i - notice); Mr. Austin cites Magistrate Judge Ryus lack
of Jurisdiction, demonstrated racial bias, or animus, (treating one litigants
interests in an inferior manner to the others) in refu sal to acknowledge Mr.
Austins well documented declination, as there is no unambiguous written
consent by Mr. George Jarvis Austin (either of them destroys jurisdiction) to
the exercise of authority by a magistrate judge under 28 U.S.C. § 636(c) , the
magistrate judge acts without jurisdiction." See Hajek v. Burlington N. R.R.
Co.,186 F.3d 1105, 1108 (9th Cir.1999); Williams v. King, 875 F.3d 500, (9th
Cir. 2017); See Kofoed v. Int'l Bhd. of Elec. Workers, Local 48,237 F.3d 1001,
1 005 (9th Cir.2001); See Nasca v. Peoplesoft (In re Marriage of Nasca),160
F.3d 578, 579 (9th Cir.1998). Instead there is unambiguous declination of
Plaintiff consent which is controlling, even above a Defendant party, as they
are the parties who deci de where to file the Civil Action. Yet, despite the
unambiguous declination of Magistrate Jurisdiction, by the Plaintiff party the
Court forced a motion to re-assign the case See Dckt. 28* by George Jarvis
Austin (Attachments: # 1 Proposed O rder ADMINISTRATIVELY CLOSE
CASE PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL
FOR REASONS CITED (INCLUDING LACK OF MAGISTRATE
JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED
ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS))(Austin
, George) (Filed on 4/5/2024)

☐ 04/05/2024 53 REPLY (re 28 MOTION to Reassign Case *Due to Lack of Magistrate
Jurisdiction; There is no unambiguous written consent by both the plaintiff
and defendant (either of them destroys jurisdiction) to the exercise of
authority by a magistrate jud ge under 28 U.S.C. & MOTION to
Amend/Correct 23 Amended Document, 22 Consent/Declination to Proceed
Before a US Magistrate Judge, 14 Amended Complaint,, 25 Order, MOTION
to Withdraw Wide Consent to Magistrate Judge, ou tside of narrow Defendant
settlement ADR option (as mentioned in ADR Certification) ) "INSTEAD OF
REPLY" - NOTICE OF ALREADY FILED Voluntary Dismissal ;
VOLUNTARY WITHDRAWAL Mr. Austin Self-Represented, Plaintiff, Pro Se,
George Jarv is Austin provides notice of withdrawal or voluntary dismissal of
this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP
without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice);
Notice of Electronic Filing The following transaction was entered on
4/5/2024 at 2:54 PM and filed on 4/5/2024 filed byGeorge Jarvis Austin.
(Attachments: # 1 Proposed Order ADMINISTRATIVELY CLOSE CASE PER
MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS
CITED (INCLUDIN G LACK OF MAGISTRATE JURISDICTION - DUE
PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE*

*DISRESPECT OF MR. AUSTIN'S RIGHTS))(Austin, George) (Filed on 4/5/2024)*

☐ 04/06/2024 **54** OPPOSITION/RESPONSE (re 39 MOTION to Dismiss , 51 MOTION for Sanctions *Notice of Motion and Motion for Sanctions*, 35 MOTION to Dismiss *NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF P OINTS AND AUTHORITIES IN SUPPORT ) "INSTEAD OF REPLY OR RESPONSE" - NOTICE OF ALREADY FILED Voluntary Dismissal ; VOLUNTARY WITHDRAWAL Mr. Austin Self-Represented, Plaintiff, Pro Se, George Jarvis Austin provides notice of withdrawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice); Notice of Electronic Filing The following transaction was entered on 4/5/2024 at 2:54 P m and filed on 4/5/2024* filed byGeorge Jarvis Austin. (Attachments: # 1 Proposed Order ADMINISTRATIVELY CLOSE CASE PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS CITED (INCLUDING LACK OF MAGISTRATE JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS))(Austin, George) (Filed on 4/6/2024)

☐ 04/06/2024 **55** Request for Judicial Notice re 52 Notice of Voluntary Dismissal,,,,,,, - *NOTICE OF ALREADY FILED (& CONTROLLING) Voluntary Dismissal ; VOLUNTARY WITHDRAWAL Mr. Austin Self-Represented, Plaintiff, Pro Se, George Jarvis Austin provides notice of withdrawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice); Notice of Electronic Filing (Which Constitutes Service via ECF Syste m) The following transaction was entered on 4/5/2024 at 2:54 PM and filed on 4/5/2024* filed byGeorge Jarvis Austin. (Attachments: # 1 Proposed Order ADMINISTRATIVELY CLOSE CASE PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS CITED (INCLUDING LACK OF MAGISTRATE JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS))(Related document(s) 52 ) (Austin, George) (Filed on 4/6/2024)

☐ 04/06/2024 **56** Declaration of Plaintiff, George Jarvis Austin, per Federal Rules of Civil Procedure (FRCP) Rule 41 in Support of 52 Notice of Voluntary Dismissal,,,,,,, *VOLUNTARY WITHDRAWAL* filed byGeorge Jarvis Austin. (Attachments: # 1 Propos ed Order to ADMINISTRATIVELY CLOSE CASE PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS CITED (INCLUDING LACK OF MAGISTRATE JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS; sent to dmrcrd@cand.uscourts.gov & dmrpo@cand.uscourts.gov as instructed and as Case is already over per Rule 41 provides notice of withdrawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP wi thout need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice); Notice of Electronic Filing The following transaction was entered on 4/5/2024 at 2:54 PM and filed on 4/5/2024)(Related document(s) 52 ) (Austin, George) (Filed on 4/6/2024)

☐ 04/09/2024 57 **ORDER re: 52 Plaintiff's Notice of Voluntary Dismissal: Defendant Georgetown University filed a motion for sanctions 51 in which it requests dismissal of Plaintiff's claims with prejudice, among other sanctions. The following day, P laintiff filed a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). The notice does not state whether the dismissal is with or without prejudice. By no later than 4/16/2024, Plaintiff shall file a one-page submis sion stating whether he voluntarily dismisses his claims with or without prejudice. Signed by Chief Magistrate Judge Donna M. Ryu on 4/9/2024.** *(This is a text-only entry generated by the court. There is no document associated with this entry.) (dmrlc1, COURT STAFF) (Filed on 4/9/2024)*

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 04/09/2024 **58 ORDER DENYING 28 MOTION TO WITHDRAW CONSENT TO MAGISTRATE JUDGE JURISDICTION. Signed by Judge Edward J. Davila on 4/9/2024.(ejdlc3, COURT STAFF) (Filed on 4/9/2024)**

☐ 04/09/2024 59 Response re 58 Order on Motion to Reassign Case, Order on Motion to Amend/Correct, Order on Motion to Withdraw, 52 Notice of Voluntary Dismissal, 57 Order, *On 4/05/2024, Dckt. 52, Self Represented Plaintiff, Mr. George Jarvis Austin, pro vided notice of Voluntary Withdrawal or Dismissal (Without Prejudice) of this entire, unrelated, case, 4:19-cv-05631-YGR Dckt.137 (Docket Text: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying 135 Administrative Motion), in its entirety under FRCP Rule 41 (without prejudice as is the presumption), which terminates the case upon receipt, without need of court order as Plaintiffs notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice). Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and th e district court lacks jurisdiction to do anything about it" See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) Because this is a new, unrelated, unheard case, Dckt. 137 with new defendants, causes of action, and because Mr. Austin voluntarily withdraws or voluntarily (dismisses) because of documented Jurisdiction, Due Process, Equal Protection non-judicial act violations Mr. Austin voluntarily withdraws or voluntary dismissal (without prejudice) this en tire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order* by George Jarvis Austin. (Austin, George) (Filed on 4/9/2024) Modified on 4/10/2024 (kmg, COURT STAFF)

☐ 04/09/2024 60 Response re 57 Order, *On 4/05/2024, Dckt. 52, Self Represented Plaintiff, Mr. George Jarvis Austin, provided notice of Voluntary Withdrawal or Dismissal (Without Prejudice) of this entire, unrelated, case, 4:19-cv-05631-YGR Dckt.137 (Docket Tex t: ORDER DENYING MOTION TO RELATE CASES by Judge Yvonne Gonzalez Rogers Denying 135 Administrative Motion), in its entirety under FRCP Rule 41 (without prejudice as is the presumption), which terminates the case upon receipt, without need of court order as Plaintiffs notice is controlling under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice). Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is r equired, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See e.g. Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) Because this is a new, unrelated, unheard case, Dckt. 137 with new defendants, causes of action, and because Mr. Austin voluntarily withdraws or voluntarily (dismisses) because of documented Jurisdiction, Due Process, Equal Protection non- judicial act violations Mr. Austin voluntarily withdraws or voluntary dismissal (without prejudice) this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order* by George Jarvis Austin. (Attachments: # (1 ) Standing Order Plaintiff Notice of Voluntary Withdrawal or Voluntary Dismissal (without prejudice of this new, unrelated, case), # 2 Proposed Order to ADMINISTRATIVELY CLOSE CASE PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS CI TED (INCLUDING LACK OF MAGISTRATE JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS; sent to dmrcrd@cand.uscourts.gov & dmrpo@cand.uscourts.gov as instructed and as Case is already o ver per Rule 41 provides notice of withdrawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice); Notice of Electronic Filing The foll owing transaction was entered on 4/5/2024 at 2:54 PM and filed on 4/5/2024)(Austin, George) (Filed on 4/9/2024)

☐ 04/10/2024 61 **ORDER re: Plaintiff's Voluntary Dismissal and Defendant Georgetown University's Pending Motion for Sanctions. Signed by Chief Magistrate Judge Donna M. Ryu on 4/10/2024. (dmrlc1, COURT STAFF) (Filed on 4/10/2024)**

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)

☐ 04/10/2024 62 RESPONSE re 52 Notice of Voluntary Dismissal,,,,,,, 61 Order,, Terminated Case,, Terminate Motions, *will add clarification response regarding rule of law, not rule of White, anti-Black male, Well resourced, well connected, 'Goliath&# 039; bullying defendants. Will do so on suggested date; Will add*

*clarification for the public and defense's understanding of US and California Supreme Court well settled, long standing precedent re: Demonstrated Meritorious, well grounded (on S upreme Court long standing legal precedent), of new, discrete never heard or previously unknown, causes of action (as they happened in the future, after previous, especially for well intended, conscientious, thoughtful, dilligent, proactive, law abid ing, precedent following, litigation party (as instructed.) Finding that it is* "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defe ndant can't complain, and the district court lacks jurisdiction to do anything about it" See Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999) by George Jarvis Austin. (Attachments: # 1 Exhibit Rule 41 Notice, # 2 Standing Order Proposed, Now Standing Order ADMINISTRATIVELY CLOSE CASE ON 4/10/24 PER MR. AUSTIN'S NOTICE OF VOLUNTARY WITHDRAWAL FOR REASONS CITED (INCLUDING LACK OF MAGISTRATE JURISDICTION - DUE PROCESS VIOLATIONS - DEMONSTRATED ANTI-BLACK MALE DISRESPECT OF MR. AUSTIN'S RIGHTS; sent to dmrcrd@cand.uscourts.gov & dmrpo@cand.uscourts.gov as instructed [removed dmrsettlement@cand.uscourts.gov and as Case is already over per Rule 41 provides notice of withd rawal or voluntary dismissal of this entire, unrelated, case 4:24-cv-00260-DMR under Rule 41 of FRCP without need of Judicial Order per Rule 41 of FRCP(A)(1)(A)(i - notice); Notice of Electronic Filing The following transaction was entered on 4/5/202 4 at 2:54 PM and filed on 4/5/2024)(Austin, George) (Filed on 4/10/2024)

☐ 04/19/2024 63 OPPOSITION/RESPONSE (re 51 MOTION for Sanctions *Notice of Motion and Motion for Sanctions* ) *62 RESPONSE re 52 Notice of Voluntary Dismissal,,,,,,, 61 Order,, Terminated Case,, Terminate Motions,* filed byGeorge Jarvis Austin. (At tachments: # 1 Certificate/Proof of Service, # 2 Standing Order, # 3 Affidavit, # 4 Proposed Order In Response to Defendant Motion (if it needs to be addressed, at all, under Cooter Gell v. Hartmarx Corp. "But when a plaintiff has volun tarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim. An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1) ; with additional clarification response regarding rule of law, not rule of White, anti-Black male, Well resourced, well connected, 'G oliath' bullying defendants per US and California Supreme Court well settled, long standing precedent re: Demonstrated Meritorious, well grounded (on Supreme Court long standing legal precedent), of new, discrete never heard or previously unknow n, causes of action (as they happened in the future, after previous, especially for well intended, conscientious, thoughtful, diligent, proactive, law abiding, precedent following, litigation party (as instructed.) Finding that it is "beyond deb ate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it&quo t; See Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999))(Austin, George) (Filed on 4/19/2024)

☐ 04/21/2024 64 RESPONSE re 52 Notice of Voluntary Dismissal, 62 Response ( Non Motion), *61 Order, Terminated Case, Terminate Motions* by George Jarvis Austin. (Attachments: # 1 Certificate/Proof of Service, # 2 Certificate/Proof of Service Rese nt. Saturday to ensure receipt (add pdf and word attached), # 3 Standing Order, # 4 Affidavit FAC (Operative - Complaint), # 5 Proposed Order In Response to Defendant Motion (if it needs to be addressed, at all, under Cooter Gell v. Hartmarx C orp. "But when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim. An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible inte rpretation of Rules that are designed "to secure the just, speedy, and

inexpensive determination of every action." Fed. Rule Civ. Proc. 1) ; with additional clarification response regarding rule of law, not rule of White, anti-Black male, W ell resourced, well connected, 'Goliath' bullying defendants per US and California Supreme Court well settled, long standing precedent re: Demonstrated Meritorious, well grounded (on Supreme Court long standing legal precedent), of new, dis crete never heard or previously unknown, causes of action (as they happened in the future, after previous, especially for well intended, conscientious, thoughtful, diligent, proactive, law abiding, precedent following, litigation party (as instructed .) Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought, the defendant can't complain, and the district court lacks ju risdiction to do anything about it" See Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999))(Austin, George) (Filed on 4/21/2024)

☐ 04/23/2024 65 REPLY (re 51 MOTION for Sanctions *Notice of Motion and Motion for Sanctions* ) filed byGeorgetown University. (Platt, Henry) (Filed on 4/23/2024)

☐ 04/23/2024 66 RESPONSE re 65 Reply to Opposition/Response, 52 Notice of Voluntary Dismissal, 62 Response (Non Motion), *(Non Motion), 61 Order, Terminated Case, Terminate Motions* by George Jarvis Austin. (Attachments: # 1 Certificate/Proof o f Service, # 2 Certificate/Proof of Service Resent. Saturday to ensure receipt (add pdf and word attached), # 3 Standing Order, # 4 Affidavit FAC (Operative - Complaint) with 5 never litigated claims, or causes of action, ever., # 5 Proposed Order In Response to Defendant Motion (if it needs to be addressed, at all, under Cooter Gell v. Hartmarx Corp. "But when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a) (1), a collateral proceeding to examine whether the complaint is well grounded will stretch out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim. An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction motions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Pro c. 1) ; with additional clarification response regarding rule of law, not rule of White, anti-Black male, Well resourced, well connected, 'Goliath' bullying defendants per US and California Supreme Court well settled, long standing preceden t re: Demonstrated Meritorious, well grounded (on Supreme Court long standing legal precedent), of new, discrete never heard or previously unknown, causes of action (as they happened in the future, after previous, especially for well intended, consci entious, thoughtful, diligent, proactive, law abiding, precedent following, litigation party (as instructed.) Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are le ft as though no action had been brought, the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999))(Austin, George) (Fil ed on 4/23/2024)

☐ 04/23/2024 67 RESPONSE re 52 Notice of Voluntary Dismissal, *61 Order, Terminated Case, Terminate Motions* by George Jarvis Austin. (Attachments: # 1 Certificate/Proof of Service Resent. Saturday to ensure receipt (add pdf and word attached) ensur ing Federal Whistle-blower notice, # 2 Certificate/Proof of Service, # 3 Standing Order, # 4 Affidavit FAC (Operative - Complaint) with 5 never litigated claims, or causes of action, ever., # 5 Proposed Order In Response to Defendant Motion ( if it needs to be addressed, at all, under Cooter Gell v. Hartmarx Corp. "But when a plaintiff has voluntarily dismissed a complaint pursuant to Rule 41(a)(1), a collateral proceeding to examine whether the complaint is well grounded will stretc h out the matter long beyond the time in which either the plaintiff or the defendant would otherwise want to litigate the merits of the claim. An interpretation that can only have the unfortunate consequences of encouraging the filing of sanction mot ions and discouraging voluntary dismissals cannot be a sensible interpretation of Rules that are designed "to secure the just, speedy, and inexpensive determination of every action." Fed. Rule Civ. Proc. 1) ; with additional clarification r esponse regarding rule of law, not rule of White, anti-Black male, Well resourced, well connected, 'Goliath' bullying defendants per US and California Supreme Court well settled, long standing precedent re: Demonstrated Meritorious, well gr ounded (on Supreme Court

long standing legal precedent), of new, discrete never heard or previously unknown, causes of action (as they happened in the future, after previous, especially for well intended, conscientious, thoughtful, diligent, proactive e, law abiding, precedent following, litigation party (as instructed.) Finding that it is "beyond debate that a dismissal under Rule 41 is effective on filing, no court order is required, the parties are left as though no action had been brought , the defendant can't complain, and the district court lacks jurisdiction to do anything about it" See Commercial Space Management Co. v. Boeing Co., 193 F.3d 1074 (9th Cir. 1999))(Austin, George) (Filed on 4/23/2024)

☐ 08/01/2024 **68 ORDER OF RECUSAL. Signed by Chief Justice Judge Donna M. Ryu on 8/1/2024. (dmrlc1, COURT STAFF) (Filed on 8/1/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 08/01/2024 **69 ORDER REASSIGNING CASE.Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Charles R. Breyer for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to case. Notice: T he assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by The Clerk on 08/01/2024. (Attachments: # 1 Notice of Eligibility for Video Recording)(kxo, COU RT STAFF) (Filed on 8/1/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)*

☐ 10/16/2024 **70 ORDER by Judge Charles R. Breyer granting 51 Motion for Sanctions. (crblc2, COURT STAFF) (Filed on 10/16/2024)**

*Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the N otice of Electronic Filing (NEF)*

☐ 10/16/2024 71 DECLARATION of Mr. George Jarvis Austin (signed under penalty of perjury) in Opposition to 70 Order on Motion for Sanctions, filed byGeorge Jarvis Austin. (Related document(s) 70 ) (Austin, George) (Filed on 10/16/2024)

☐ 10/16/2024 72 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury) in Support of 67 Response ( Non Motion ), 63 Opposition/Response to Motion, 14 Amended Complaint, 68 Order of Recusal filed by George Jarvis Austin. (A ttachments: # 1 Supplement Cover Page, # 2 Supplement FAC with 5 substantive, never before heard claims (admitted by Defendant Georgetown): Mr. Austins claim, prior to any discovery, or disclosure, include: 1. Georgetown (in concert with YGR) im permissibly used race, or racial stereotypes, to violate Mr. Austins Equal Protection, as an admitted Black male student, (after violating foundational school policies). 2. Georgetown impermissibly used race, or racial stereotypes to a. exclude (from essential Georgetown controlled programs or activities), b. create stigma, and c. stamp or mark with a badge of inferiority in as a recipient of federal funds despite over 100+ opportunities for it to self correct after Georgetowns own admission(s) of guilt or liability.Georgetown (with YGR) violates 42 USC 1981 by a. literally depriving Mr. Austins rights to contract before and after exploitation of his image or likeness for business purposes in refusing to even offer a contract, as mandated ( written authorization agreement) in the same way similarly situated non-Black male admitted students are offered, in violation of their own publicly stated filming policy, b. Subjecting Mr. Austin to separate, facially discriminatory, unequal student contract policy conduct for Black male admitted students to their detriment. 3. Georgetown induced contract formation with Mr. Austin as a student through actual fraud, misstatements on its commitment to follow the law, misstatements regarding its c ontract, misstatements regarding its own policies, and continues its deceitful pattern in its ongoing pattern of still omitting material information after admitting its violations of its own policy, contract, and the law. 4. Georgetown breached its d uties of care toward an admitted Black male student and is negligent in a. monitoring its leaderships illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct 5. Georgetown exhibits extreme bad faith to Mr. Austins detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.)(Related document(s) 67 , 63 , 14 , 68 ) (Austin, George) (Filed on 10/16/2024)

☐ 10/16/2024 73 RESPONSE TO ORDER TO SHOW CAUSE by George Jarvis Austin & *Notice of Rule 59 Forthcoming Motion within 28 days, inclusive. : Mr. Austins claims, prior to any discovery, or disclosure, include: 1. Georgetown (in concert with YGR) impermissibly used race, or racial stereotypes, to violate Mr. Austins Equal Protection, as an admitted Black male student, (after violating foundational school policies). 2. Georgetown impermissibly used race, or racial stereotypes to a. exclude (from essential Georgetown controlled programs or activities), b. create stigma, and c. stamp or mark with a badge of inferiority in as a recipient of federal funds despite over 100+ opportunities for it to self correct after Georgetowns own admission(s) of guilt or liability.Georgetown (with YGR) violates 42 USC 1981 by a. literally depriving Mr. Austins rights to contract before and after exploitation of his image or likeness for business purposes in refusing to even offer a contract, as mandated (written authorization agreement) in the same way similarly situated non-Black male admitted students are offered, in violation of their own publicly stated filming policy, b. Subjecting Mr. Austin to separate, facially discriminatory, unequal student contract policy conduct for Black male admitted students to their detriment. 3. Georgetown induced contract formation with Mr. Austin as a student through actual fraud, misstatements on its commitment to follow the law, misstatements regarding its contract, misstatements regarding its own policies, and continues its deceitful pattern in its ongoing pattern of still omitting material information after admitting its violations of its own policy, contract, and the law. 4. Georgetown breached its duties of care toward an admitted Black male student and is negligent in a. monitoring its leaderships illegal, Equal Protection, policy-contract violating conduct and b. Managing, correcting, or controlling their illegal, Equal Protection, policy and contract violating conduct 5. Georgetown exhibits extreme bad faith to Mr. Austins detriment with unconstitutional, malicious, intentional, willfully harmful conduct it could have easily avoided, and by its own policies were mandated to do the exact opposite of what Georgetown in fact did.____.* (Attachments: # 1 Exhibit, # 2 Exhibit)(Austin, George) (Filed on 10/16/2024)

☐ 10/16/2024 74 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: DECLARATION UNDER PENALTY OF PERJURY: DIRECT EVIDENCE GEORGETOWN STOLE ECONOMIC RIGHTS TO CONTRACT (& IP PROPERTY RIGHTS) THEY WERE NOT ENTITLED TO - Per US Supreme Courts General Building Contractors Assn., Inc. v. Pennsylvania, and Comcast Corp. v. Natl Assn of African Am.-Owned Media, standards of demonstrated racial animus under sec. 1981, Georgetown purposefully, and willfully deprived Mr. Austins rights to contract and engaged in a blatant deprivation of civil rights such as where a private offeror [in this case Georgetown] refuses to extend to [an AfricanAmerican, in this case Mr. Austin], because he is an [African-American], the same opportunity to enter into contracts he extends to White offerees [in this case non-Black, or White admitted students]. See e.g. Comcast Corp. v. Natl Assn of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020): (in General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), the Court explained that § 1981 was "designed to eradicate blatant deprivations of civil rights," such as where "a private offeror refuse[d] to extend to [an African-American ],... because he is [an African-American], the same opportunity to enter into contracts as he extends to [W]hite offerees." Id., at 388, 102 S.Ct. 3141).____ in Support of 73 Response to Order to Show Cause, 14 Amended Complaint, *Cited to DIRECT EVIDENCE - in forthcoming FRCP 59 Motion* filed byGeorge Jarvis Austin. (Related document(s) 73 , 14 ) (Austin, George) (Filed on 10/16/2024)

☐ 11/11/2024 75 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: shall cite to world renown Thelton E. Henderson ( californiamuseum.org/inductee/judge-thelton-e-henderson/ ), for the 42 USC 1981 legal standard... Because legendary Judge Henderson has a particularly unique insight to 1981s operation, and personal understanding of how anti-Black racial animus operates regardless of status or position in society (as he experienced both subtle, and not so subtle forms of anti-Black discriminatory animus even after his ascension and success) his analysis is particularly valuable under these facts & has extra credibility of analysis (provided his depth of personal experience with racism as a Black man, despite his accomplishments), his knowledge of how the Klu Klux Klan (and other proponents of White Supremacy) operate____Judge Breyer's, as well as

Magistrate Judge Ryu's (who recused herself after Mr. Austin noticed that he did not grant her consent for the proceeding, on ly ADR, and subsequently motioned for re-assignment for the entire case proceeding prior to withdrawing) colleague Judge Haywood Gilliam ( www.judiciary.senate.gov/imo/media/doc/Gilliam Responses 9-17-14.pdf ), clerked for the Legendary Judge Thelto n Henderson; DIRECT EVIDENCE as applied to controlling law (and plead facts)____ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/11/2024 76 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: Mr. Austin is a high achieving, highly recruited, accomplished, high potential, admitted Georgetown student whose 1981 rights to contract, and Equal Protection under Title VI of the Civil Rights Act of 1964 are being violated in an ongoing manner beginning 7.15.21 to present. ____ *DIRECT EVIDENCE as applied to controlling, and persuasive precedent*___ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/1 1/2024)

☐ 11/11/2024 77 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: Per 1. Brown v. Board of Education, 347 U.S. 483, 494 (1954), and 2. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29 ,2023), Georgetown^s, use of the precise ^less worthy^ or ^inferior^ derogatory racist stereotypes, against Mr. Austin, implying inferiority in civil society originate from anti-Black propaganda of the vilest Enslavers, Klu Klux Klan members, and th e staunchest Jim Crow segregationist who inspired the Nazis Third Reich ( https://www.history.com/news/how-the-nazis-were-inspired-by-jim-crow ; https://www.theatlantic.com/magazine/archive/2017/11/what-america-taught-the-nazis/540630/ ; https://hm h.org/event/the-impact-of-racist-ideologies-jim-crow-and-the-nuremberg-laws/ ) for which Georgetown admits it took active part as an institution: Slavery archive.georgetown.edu/ ____ ____ *DIRECT EVIDENCE as applied to controlling, and persuasive precedent*___ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/11/2024 78 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: Georgetown violates Mr. Austins equal Protection per Supreme Courts 1. Brown v. Board of Education, 347 U.S. 483, 494 (1954), 2. Students for Fair Admissions, Inc. v. Presid ent & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023) 3. Gebser v. Lago Vista Independent School District 4. Lawrence v. Texas 539 U.S. 558 (2003) 5. Fisher v. Univ. of Tex. at Austin 570 U.S. 297 (2013), etc. and Ninth Circuit's 1 . Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023) and 2. Monteiro v. the Tempe Union High School Dist, 158 F.3d 1022, 1034 (9th Cir. 1998) ____ *DIRECT EVIDENCE as applied to controlling, and persuasive precedent*___ filed byGeorge Ja rvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/11/2024 79 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: Mr. Austin learned to perceive discriminatory animus through experience and embodies the Creed of Equal opportunity..This oft-stated creed of President John F. Kennedy.. (an d the very Constitution of the United States, 13th, 14th and 15th Reconstruction Amendments, sec. 1981, and Civil Rights Acts of 1866 and 1964 from which that creed derives....) for Which Georgetown violates, Fundamentally (under 1981, and Title XI https://www2.ed.gov/about/offices/list/ocr/docs/hq43e4.html) *DIRECT EVIDENCE as applied to controlling, and persuasive, precedent*____ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/11/2024 80 Declaration of Mr. George Jarvis Austin (signed under penalty of perjury: Georgetown knew better, but did not do better. It demonstrated 1. it knew how to make a written contract with Mr. Austin (see below), 2. Itself promulgated a the written medi a contract requirements and 3. Purposefully violated its own promulgated written contractual requirements toward Mr. Austin because he is Black (as compared to Whites whose rights to contract, and personhood was respected). *DIRECT EVIDENCE as ap plied to controlling, and persuasive, precedent* ____ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/11/2024 81 Declaration of Mr. George Jarvis Austin (under signed penalty of perjury : Per the Supreme Court, and Georgetown itself, these are fundamental and valuable rights which are being violated against Mr. Austins interest, and rights.; *DIRECT EVIDE NCE as applied to controlling, and persuasive, precedent* ____ filed byGeorge Jarvis Austin. (Austin, George) (Filed on 11/11/2024)

☐ 11/12/2024 **83** Proposed Pretrial Order *Per Motion dckt. 82* by George Jarvis Austin. (Attachments: # **1** Appendix External Points and Authorities (also embedded in Motion itself)., # **2** Supplement Motion., # **3** Declaration, # **4** Declaration, # **5** Decl aration, # **6** Declaration, # **7** Declaration, # **8** Declaration, # **9** Declaration, # **10** Declaration)(Austin, George) (Filed on 11/12/2024)

☐ 11/13/2024 **84** **Order by Judge Charles R. Breyer denying 82 Motion to Alter Judgment, Motion to Amend/Correct, Motion for Reconsideration. (crblc2, COURT STAFF) (Filed on 11/13/2024)**

---
Any non-CM/ECF Participants have been served by F irst Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)
---

☐ 11/13/2024 **85** **JUDGMENT. Signed by Judge Charles R. Breyer on November 13, 2024. (crblc2, COURT STAFF) (Filed on 11/13/2024)**

---
Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notic e of Electronic Filing (NEF)
---

☐ 11/13/2024 **87** Request for Judicial Notice *See dckt. 82,83,86 ___ (Judge Breyer makes At Least "3" (THREE) ^stunning errors^ in his first order on the Rule 59 Motion a. Mr. Austin only pleads conduct from 7.15.21 to present which has never had the opp ortunity to be heard on t he merits, and began after termination of the first case b. Per the Supreme Courts Lawlorv. Nat'l Screen Serv, The Ninth Circuits Eichman v. Fotomat Corp., & Clark v. Yosemite Community College Dist., ongoing, future, c onduct cannot be preemptiv ely assumed, nor litigated, and is not barred by Res Judicata ^ergo^ Mr. Austin could not have failed to plead something that had not yet happened c. Mr. Austin sought to prevent administrative, non-judicial, illegal interf erence from pre-determini ng outcome of cases (which is not allowable, per se illegal, and is one of at least nine exceptions to judicial immunity,).... See e.g. Per the US Supreme Courts Pierson v. Ray 386 U.S. 547 (1967); Cooter Gell v. Hartmarx C orp. 496 U.S. 384 (1990) Cited 4,115 ; Wolfe v. Strankman, 392 F.3d 358 (9th Cir. 2004) ; Baniste r v. Davis, 140 S. Ct. 1698, 1703 (2020) ; Brown v. Board of Education, 347 U.S. 483, 494 (1954) ; Supreme Courts Students for Fair Admissions, Inc . v. President & Fellows of Harvard Coll., No. 20-1199, 38 (U.S. Jun. 29,2023),)* filed byGeorge Jarvis Austin. (Attachments: # **1** Declaration, # **2** Appendix, # **3** Declaration, # **4** Declaration, # **5** Declaration, # **6** Declaration, # **7** D eclaration, # **8** Declaration, # **9** Declaration, # **10** Proposed Order)(Austin, George) (Filed on 11/13/2024)

☐ 11/13/2024 **88** NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by George Jarvis Austin. Appeal of Judgment, **85** , Order on Motion to Alter Judgment,, Order on Motion to Amend/Correct,, Order on Motion for Reconsideration, **84** , Order on Motion for S anctions, **70** (Appeal fee FEE NOT PAID.) (Attachments: # **1** Supplement Opportunity for Judge Breyer to Correct ^stunning^ errors on R.59 Motion prior to Ninth Circuit Appeal to conserve Judicial Resources (30 days don't begin unti l after disposition per FRAP rule 4...), # **2** Declaration Direct evidence in the record - signed under penalty of perjury (as are the rest attached here, also)., # **3** Appendix, # **4** Supplement, # **5** Declaration, # **6** Declaration, # **7** Declarati on, # **8** Declaration, # **9** Declaration, # **10** Proposed Order)(Austin, George) (Filed on 11/13/2024) **(USCA Case No.24-6943 )** Modified on 11/15/2024 (slh, COURT STAFF).

☐ 11/15/2024 **89** USCA Case Number 24-6943 for **88** Notice of Appeal to the Ninth Circuit filed by George Jarvis Austin. (slh, COURT STAFF) (Filed on 11/15/2024)

☐ 11/15/2024 **90** Renotice motion hearing *per 11/13/2024 dckt. 86 ___MOTION to Alter Judgment Judge Breyer makes At Least "3" (THREE) ^stunning errors^ in his first order on the Rule 59 Motion a. Mr. Austin only pleads conduct from 7.15.21 to present whi ch has never had the opportunity to be heard on t he merits, and began after termination of the first case b. Per the Supreme Courts Lawlorv. Nat'l Screen Serv, The Ninth Circuits Eichman v. Fotomat Corp., & Clark v. Yosemite Community College D ist., ongoing, future, conduct cannot be preempt ely assumed, nor litigated, and is not barred by Res Judicata ^ergo^ Mr. Austin could not have failed to plead something that had not yet happened c. Mr. Austin sought to prevent administrative, non-judicial, illegal interference from pre-determini ng outcome of cases (which is not allowable,).... See e.g. Per the US Supreme Courts Pierson v. Ray 386 U.S. 547 (1967); Cooter Gell v. Hartmarx Corp. 496 U.S. 384 (1990) Cited 4,115 ; Wolfe v. Stran kman, 392 F.3d 358, 367 (9th Cir. 2004) ; Baniste r v. Davis, 140 S. Ct. 1698, 1703 (2020) ; Brown v. Board of Education, 347 U.S. 483, 494 (1954) ; Supreme Courts Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-119 9, 38 (U.S. Jun.*

*29,2023)_____ MOTION to Amend/Correct 85 Judgment, 84 Order on Motion to Alter Judgment,, Order on Motion to Amend/Correct,, Order on Motion for Reconsideration, 70 Order on Motion _____, MOTION for Reconsideration re 85 Judgme nt, 84 Order on Motion to Alter Judgment,, Order on Motion to Amend/Correct,, Order on Motion for Reconsideration, 70 Order on Motion_____ Motion Hearing set for 2/7/2025 10:00 AM in Do Not Use Videoconference Only before Judge Charles R. Breyer .* filed byGeorge Jarvis Austin. (Attachments: # 1 Supplement, # 2 Appendix, # 3 Declaration, # 4 Declaration, # 5 Declaration, # 6 Declaration, # 7 Declaration, # 8 Declaration, # 9 Declaration, # 10 Declaration, # 11 Dec laration, # 12 Proposed Order)(Austin, George) (Filed on 11/15/2024)

☐ 11/28/2024 91 Notice of Appeal FEE PAID (Filing fee$605,receipt number ACANDC-20096063). (Austin, George) (Filed on 11/28/2024)

☐ 01/31/2025 92 Declaration of Mr. George Jarvis Austin (admitted student and victim of Georgetown's conduct). *United States Department of Education Notification.____* filed byGeorge Jarvis Austin. (Attachments: # 1 Supplement, # 2 Supplement, # 3 Declaration)(Austin, George) (Filed on 1/31/2025)

☐ 02/06/2025 93 CLERK'S NOTICE VACATING Motion to Alter Judgment and Motion to Amend hearing set for February 7, 2025 before the Honorable Charles R. Breyer. The Court will issue an order. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ls, COURT STAFF) (Filed on 2/6/2025)

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</ /center>

☐ 02/06/2025 **94 Order by Judge Charles R. Breyer denying 86 Motion to Alter Judgment; denying 86 Motion to Amend/Correct; denying 86 Motion for Reconsideration. (crblc2, COURT STAFF) (Filed on 2/6/2025)**

**Any non-CM/ECF Participan ts have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)**

☐ 02/06/2025 95 Notice of Settlement of ADA Access Case by George Jarvis Austin (Attachments: # 1 Supplement, # 2 Supplement, # 3 Declaration)(Austin, George) (Filed on 2/6/2025)

☐ 02/06/2025 96 EXHIBITS re 95 Notice of Settlement of ADA Access Case ADA Access Cases Only, 92 Declaration in Support, *AS OF FEBRUARY 2025 - - NOTICE OF SETTLEMENT (NOTHING OWED GEORGETOWN PER DEPARTMENT OF EDUCATION BASED ON GEORGETOWN'S REPORTE D CONDUCT ON OR BEFORE 2022 PER US DEPARTMENT OF EDUCATION___ AS OF FEBRUARY 2025* filed byGeorge Jarvis Austin. (Attachments: # 1 Supplement, # 2 Supplement, # 3 Declaration)(Related document(s) 95 , 92 ) (Austin, George) (Filed on 2/6/2 025)

☐ 03/02/2025 97 AMENDED DOCUMENT by George Jarvis Austin. Amendment to 96 Exhibits,, 95 Notice of Settlement of ADA Access Case ADA Access Cases Only, 92 Declaration in Support, ___ *Redacted US DEPARTMENT OF EDUCATION NOTICE TO MR. GEORGE JARVI S AUSTIN - - AS OF FEBRUARY 2025 - - NOTICE OF SETTLEMENT (NOTHING OWED GEORGETOWN PER DEPARTMENT OF EDUCATION BASED ON GEORGETOWN'S REPORTED CONDUCT ON OR BEFORE 2022 PER US DEPARTMENT OF EDUCATION ___ (Admitted Student and victim of Georgetow n's conduct) ___.* (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Declaration)(Austin, George) (Filed on 3/2/2025)

------------------------------------------Docket Text Ends Here --------------------------------------------------------