Case No. **24-6943**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————————————

GEORGE JARVIS AUSTIN,

Plaintiff/Appellant (*Admitted Student*)

v.

GEORGETOWN UNIVERSITY, et. al. Defendants.

(*Federal Tax Identification Number: 53-0196603*)

———————————————————

On Appeal from the United States District Court for the

Northern District of California: Case No. **4:24-cv-00260-CRB (DMR)**
Charles R. Bryer, Judge,(Donna M. Ryu, recused Magistrate Judge)

———————————————————

**SUPPLEMENT (INITIAL) - EMER. MOT. - REMAND - BREYER-
IS INCOMPETENT 28 U.S.C. § 455, US & CA SUPREME COURT,
NINTH CIRCUIT, CONTROLLING PRECEDENT**

———————————————————

Mr. George Jarvis Austin,

Plaintiff-Appellant (Self-represented)

2107 Montauban Ct., Stockton, CA

209.915.6304,

gaustin07@berkeley.edu

# SUPPLEMENT (INITIAL) EMERGENCY MOTION - REMAND - BREYER IS INCOMPETENT PER 28 U.S.C. § 455, US & CA SUPREME COURT, 9TH CIR., CONTROLLING PRECEDENT
### (*Full Supplement will be filed in approx. 21 days*)

<u>Reports & Recommendations per Breyer's Documented Incompetence</u>
<u>(*re Guiding US & CA Supreme Court, 9th Circ. Controlling precedent*)</u>

**Intro.**    The full report & recommendations per guiding US & CA Supreme Court, and 9th Circuit, Controlling precedent will be filed as a supplement, to Mr. Austin's Emergency Motion, in *approximately 21 days* from 4.17.25 (i.e. approx. **5.8.25**).  Mr. Austin is taking the time to go through each of Charles Breyer's **a.** *Explicit* false-incompetent -racist statements (even when directly contradicting plead facts-controlling law) **b.** *Covert* false incompetent-biased presumptions (presented as facts, but actually false) **c.** Explicitly wrong-incompetent statements of law (per US & CA Supreme Court, and Ninth Circuit) **d.** Explicitly wrong-incompetent applications of law to facts **e.** And all other precise instances of demonstrated incompetence in this case.

**A+.**   Mr. Austin re-filed, and re-moved (per a filing clerk's violation of ACMS instructions see attached), for an Emergency Motion for Remand while alerting the Ninth Circuit of Charles Breyer's demonstrated incompetence per 28 U.S.C. § 455, US Supreme Court, CA Supreme Court, Ninth Circuit, controlling precedent.  Breyer, presiding judge, Recused himself twice, in two other of Mr. Austin's cases, on 7.26.24,

and 7.25.24, prior to this case, stating:

**TO ALL PARTIES AND COUNSEL OF RECORD:**

I, the undersigned judge of the court, finding myself disqualified in the above-entitled action, hereby recuse myself from this case and request that the case be reassigned pursuant to the provisions of paragraph E.2 of the Assignment Plan.

- **Charles R. Breyer**

Breyer's recusal based on his own admission of *"finding myself (Breyer) disqualified in the above-entitled action"* should equally apply to this action of Austin v. Georgetown, et. al. (as nothing changed in the interim)  Charles R. Breyer did not state why he was disqualified, but it is clear from the conduct of the other judges thereafter that they have decided to act illegally, in concert with one another (each acting Incompetent-racist-baised).

**A1.**    Breyer, once realizing (and twice admitting in writing) he was either temporarily or permanently incompetent to properly adjudicate this matter per plead facts, in accord with controlling law, without acting as a defense attorney, corruptly for Georgetown, was required to immediately recuse himself (as he did in the other two actions), but instead (highlighting a deep corruption-racist-incompetent pattern), continued forth with one of the most incompetent judicial orders-rulings I have ever read (and I've read thousands upon thousands and hundreds of extremely bad opinions).  This was one of the absolute worst of all time.  Breyer **1.** failed to follow the law of the Supreme

Court or Ninth Circuit **2.** Failed to protect against his own bias-prejudice, and did not hide his own racism **3.** Failed to even pretend an even handed approach **4.** Failed to read, even at a cursory level **5.** Failed to comprehend, or apply controlling law to plead facts & direct evidence **6.** Failed to recognize he just twice, in two separate actions, admitted that *"finding myself (Breyer) disqualified in the above-entitled action"* should have equally applied to this case, among other very serious moral, ethical, non-judicial acts, and legal failures.

**A2.**   To pair with this motion as a supplement Mr. Austin will go line by line, in dissecting exactly each of the most obvious, and overt, Breyer's failures of his duties, and demonstrated incompetence per *28 U.S.C. § 455*, US Supreme Court, CA Supreme Court, Ninth Circuit, controlling precedent.  The supplement will a. Take Breyer's words b. Compare with the actual pleadings-facts c. Compare with what controlling precedents says-directly contradicting Breyer's incompetence d. Overtly explain why each point is demonstrated incompetence requiring removal, or recusal of Breyer (once time for Remand, even if that Remand happens for TRO Preliminary Injunction, or Mediation prior to Briefing, Oral Argument (if needed) and later proceedings).

## EXAMPLE OF FORTHCOMING FULL SUPPLEMENT:

**(***Reports & Recommendations per Breyer's Documented Incompetence***)**

**1a.   __Breyer's Words:__**

Breyer's first order was so off basis-incompetent Mr. Austin actually felt bad for Breyer, and charged it to his age-head (slippage), not his heart, thinking maybe he just had a slip of mind in his elder years forgetting the foundation of Original Jurisdiction, and limits of Res Judicata for either 1. *Ongoing*  or 2. *Intervening*, per se illegal conduct.  However, despite Mr. Austin's provisions of opportunities for self correction, Breyer still completely misses the point, although Mr. Austin provided second-third opportunities for Breyer, to self correct, after failing the first Original Jurisdiction, Civil Procedure Jurisdiction Final Exam Question, to review the pleadings, direct evidence, etc. in light of controlling Supreme Court, and Ninth Circuit precedent.  He is simply incompetent-corrupt-racist-biased.  Per Breyer's Most Recent Incompetent Order, Docket No. 94 (filed 2/6/25), the gravemen of Breyer's argument, *as a corrupt defense counsel for Georgetown, and other defendants*, was:

"…Most of Austin's motion is dedicated to repeating his argument that Georgetown violated his privacy rights by using a photograph of him without his permission and, in the aftermath of this, discriminated against him on the basis of his race.  See Mot. to Alter Judgment at 2–22.

Once again Austin misses the point.

The first time he filed suit against Georgetown, Judge Gonzalez Rogers dismissed his claims for lack of personal jurisdiction, not for failure to state a claim. See Order Granting Motion to Dismiss, Austin v. Georgetown Univ., No. 19-cv-5631-YGR, 2021 WL 2953231 (N.D. Cal. July 14, 2021),

In Austin's later suits against Georgetown, he never remedied this personal jurisdiction problem—

even as he reiterated the same claims as in his first suit. So his subsequent suits were frivolous……"

## 1b.  **Compare Actual Pleadings-Facts**:

Mr. Austin made clear, in actual pleadings, and motions to reconsider, that he is only pleading conduct after the first, *unrelated*, disposed of case which constitutes GU defendant conduct from **7.15.21-1.16.24**.  Nowhere in those pleadings is he pleading California state claims of 3344 or Privacy violations which were the sole basis of the original suit.  The only reason the issue of Diversity Jurisdiction, and its subsequent requirements of 'minimum contacts' are even relevant, is because *these are not Original Jurisdiction* claims-causes-of-action in Federal Court.  Alternatively, *this case's primary claims are Original Jurisdiction claims of 1981, Equal Protection, Title VI of the Civil Rights of 1964* which have Original, not Diversity, Jurisdiction standing in Federal Court.  Because of this case's

claims' Original Jurisdictional standing, the Diversity Jurisdiction requirements of 1. Diversity of Party locations-residence 2 Amount in controversy exceeding $75,000 3. Specific-Personal Jurisdiction, within the larger diversity jurisdiction framework, requirements of "minimum contacts" <u>have no application, or relevance in this case</u> (*outside of distinguishing the two*).  Of note, Breyer's incompetence-bias-corruption shows clearly in his above arguments, as he completely overlooks what is actually being plead by Mr. Austin in this case, in light of controlling Supreme Court, Ninth Circuit, precedent, per GU defendant conduct from **7.15.21-1.16.24**.   See Opening Brief **DE30:**

> "...Per the Supreme Court's *Lawlorv. Nat'l Screen Serv,* The Ninth Circuit's *Eichman v. Fotomat Corp.,* & *Clark v. Yosemite Community College Dist.,* Res Judicata is inapplicable to ongoing Defendant Georgetown conduct as previous case *"cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon…"* … *"The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered…. "When other facts or conditions intervene… the issues are no longer the same and res judicata does not apply..."*
>
> A.       In fact, the Ninth Circuit's *Eichman v. Fotomat Corp.* makes clear citing the Supreme Court's *Lawlor v. National Screen Service Corp.,* that a previous action does not bar future actions for conduct that had not yet happened at the time of the previous action.  Similarly, GU's conduct from 7.15.21 to 1.16.24 had not yet occurred prior to disposition of previous unrelated case.  As applied to *Eichman* the Court ruled  *"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct…. [applying the rule] .. a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case…. [and thus] … the judgment cannot bar suit brought on post-September 7, 1977 conduct.."*  Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985). Sometimes a checklist is helpful:

☐ Has Georgetown's equal protection violations of Mr. Austin's rights between 7.15.21 to present been heard, *at all,* or on the merits?                    **Answer: <u>NO</u>**

☐ Has Georgetown's Title VI facially discriminatory exclusionary tactics, discrete, adverse acts which violate the face of the statutes per 2023 Supreme Court precedent, based on well settled anti-discriminatory law against anti-Black conduct between 7.15.21 to present been heard, *at all,* or on the merits?                    **Answer: <u>NO</u>**

☐ Has Defendant Georgetown's 42 USC 1981 facially discriminatory violations of Mr. Austin's rights, coextensive with Equal Protection per 2023, post disposition of previous case, between 7.15.21 to present been heard, *at all,* or on the merits?                    **Answer: <u>NO</u>**

☐ Have any of the other causes of action between 7.15.21 to present been heard, *at all,* or on the merits?                    **Answer: <u>NO</u>**
..........''

# See also Opening Brief **DE30**

"..<u>GU deviates, by race, *in the negative, to harm* Mr. Austin in its standard mandatory IDEAA Complaint process or procedures</u>
*( GU admits it deviates because Mr. Austin is a Black, male admitted student,*
*& purposefully fails every express IDEAA standard. )*

Georgetown's internal IDEAA complaint structure express tasks is to acknowledge, respond to, and correct complaints from student, faculty, and even non-affiliated community members. See <u>faculty handbook. georgetown.edu/ section4/a/</u> *"Any applicant for employment or admission, current or former employee or student, or third party."* …

….When GU receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, they provide Whites a set of mandatory steps including: **1.** - IDEAA staff sends acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black.  For Whites, GU **2.** IDEAA staff schedules intake meetings, after acknowledgement, but for Blacks, like Mr. Austin, did not schedule an intake meeting for and failed to even acknowledge the first step of complaint because Mr. Austin is Black.  GU's demonstrated anti-Black hatred, extreme animus, runs so deep, that they chose to treat Mr. Austin as if he is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being (as even third party Whites would receive these steps). <u>7-ER-1784-1854</u>

For Whites, GU **3.** IDEAA staff provides a general understanding of the relevant policy & grievance procedure as a normal part of intake whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black.  For Whites, GU **4.** - IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his

complaint to begin the process) because he is Black (similar to their attitude in disregarding, and disrespecting his 1981 rights to contract.

For Whites, (facultyhandbook/), GU provides: **5. -** The opportunity *at any time*, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation, whereas this opportunity was deprived and not provided for Mr. Austin,because he is Black. For Whites, GU provides **6. -** The opportunity to initiate a formal Complaint by providing a written signed statement (via email) whereas they deprived this opportunity for Mr. Austin because he is Black. For Whites, GU provides **7. -** The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) whereas they deprived this opportunity for Mr. Austin because he is Black.

For Whites, GU provides **8. -** The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, *if they have one,* as to why they conducted themselves in that manner, violating the law or policy, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black. For Whites, GU provides **9. -** The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint, whereas they deprived that opportunity for Mr. Austin (completely excluding him) because he is Black. For Whites, GU provides : **10. -** The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin because he is Black

For Whites, GU provides **11. -** The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, whereas GU deprived that opportunity for Mr. Austin because he is Black. For Whites, GU provides **12. -** The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA maintains documentation to support the findings in its report, including written findings of fact, transcripts, and audio recordings whereas GU deprived that opportunity for Mr. Austin because he is Black. For Whites, GU provides **13. -** The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation, whereas GU deprived that opportunity for Mr. Austin ( completely excluding him) because he is Black.

For Whites, GU provides: **14. -** The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those steps are 1. appeal (if more information is needed) or 2. corrective action if the Investigation found violations of law and policy in accord with the complaint, whereas GU deprived that opportunity for Mr. Austin because he is Black. For Whites, GU provides **15.** The opportunity, & right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidential- ity to direct that prompt remedial action be taken to correct the situation, whereas GU deprived that opportunity for Mr. Austin because he is Black. For Whites, GU provides **16. -** The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued ...GU deprived that opportunity for Mr. Austin ...because he is Black.

Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures per *1981, Equal Protection & Title VI.* Georgetown impermissibly used Mr. Austin's race to treat derogatorily differently, "<u>deny, restrict, separate, segregate</u> (in application of policy)," and <u>exclude</u> Mr. Austin.  See <u>eCFR :: 34 CFR Part 100 -- Nondiscrimination - Title VI of the Civil Rights Act of 1964</u>

….When Mr. Austin did what he was instructed to do by GU, he was completely <u>excluded</u> , blackballed.  Mr. Austin reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981,privacy, publicity rights* and have not received even one follow up email to begin the publicly defined (**1-16 step)** process …. <u>7-ER-1784-1854</u>  It is of note that Mr. Austin started off very patiently, and just sought information, and clarification, before even contemplating escalating to formal internal complaints.  Mr. Austin would have preferred to resolve informally……"

# See Operative Amended Complaint:

**A.       Georgetown (in concert with YGR) impermissibly used race, or racial stereotypes, to violate Mr. Austin's Equal Protection, as an admitted Black male student, (after violating foundational school policies).  Georgetown impermissibly used race, or racial stereotypes to a. exclude (*from essential Georgetown controlled programs or activities*), b. create stigma, and c. stamp or mark with a badge of inferiority in as a recipient of federal funds *despite over 100+ opportunities for it to self correct after Georgetown's own admission(s) of guilt or liability.***

<u>Georgetown with YGR impermissibly used race to deprive Mr. Austin's  rights.</u>

83.       Georgetown impermissibly used race to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin from essential programs or activities because he is a Black male admitted student in violation of his Equal protection, violating the <u>face of the statute</u>, and Constitutional Jurisprudence (*after exploiting his image; violating his right to contract.*)  See <u>S-83</u>; para 8-81: Georgetown chose to exploit Mr. Austin's image, rights for business purpose, without consideration of his personhood, nor rights (*including contract*) under sec. 1981 because he is a Black man (*echoing the pattern of the enslavement period toward Black people*). See para.8-81;44; <u>S-83</u>

84.       Georgetown admits to violating Mr. Austin's rights to contract, privacy, and publicity, in a racially intentionally discriminatory manner, in violation of its mandatory written authorization agreement policy (with an 'evil eye and unequal hand" to his detriment) that marks Mr. Austin with a badge of inferiority. The badg- -es of inferiority violate Mr. Austin's equal protection and reflects "badges and incid- -ents of slavery," as Black persons' contract, and other rights were routinely racially abused, or ignored altogether during <u>enslavement</u> to connote presumed "inferiority" via disparate treatment)  See para. 8-81;  <u>S-84</u>

<u>Georgetown, a recipient of Federal Funds, impermissibly used race, or derogatory racial stereotypes, to exclude Mr. Austin from essential programs and activities</u>

85.     After Georgetown admitted this first violation they 'should have' taken initiative, disclosed materially omitted information, and proactively investigated why they went out of their way to treat Mr. Austin in an inferior manner (to correct disparate treatment), but did not. See Facts para 8-81;57: See S-85

86.     Instead, Mr. Austin had to formally complain to an essential program or activity of Georgetown, IDEAA, about Georgetown's leadership's actions to violate their own policies (*at least 3 separate essential Georgetown violated policies by Georgetown*) in a discriminatory manner using "race…. as a negative" to deprive Mr. Austin.  See para. 8-81;  The Originalist prohibition on Anti-Black intentional discrimination in sec. 1981, and 13th Amend., is coextensive with Equal Protection and sheds light on Georgetown's precise use of anti-Black derogatory treatment based explicitly on race, or racial stereotypes to both a. illegally give similarly situated non-Black male admitted students unfair advantage in resolving comp- -laints throughout their educational process and b. intentionally disadvantage Mr. Austin, a Black or African-American male admitted student, preemptively depriv- -ing of opportunity (right to make,  enforce, etc., a contract); See S-86

87.     Georgetown's actions toward Mr. Austin thereafter show their true racially discriminatory intent, upholding notions of "White Supremacy," enforcing stigma, "Black [Male] Inferiority" as they refused to even acknowledge Mr Austin's 100+ complaints *(despite him following their written policy), after* already admitting the violations, let alone actually doing their mandated duties.  When Mr. Austin, (*who per their express policy, and Title VI , is entitled to the essential "program or activity" of Georgetown,*) followed their directions to participate for the purpose of correction of their admitted wrongs; he was excluded based on race, or racial stereotypes, in a facially discriminatory manner. See para. 8-81; See S-87

88.     The Ninth Circuit recently ruled, when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when violation is by someone-something under University control, then it's a violation of Equal Protection to deny the student investigatory-enforcement, services as a victim, or survivor, of the violation. See para. 8-81; S-88

89.     In *Brown v. Arizona* the alleged violator was a fellow student in an area of University control; the liability-violation.. heightens when the University, or Administrators, itself is violator (as is the case here when Mitch Bailin *admits violations*). See para 8-81  In fact, Georgetown's policy explicitly says they themselves heighten the liability when there is a power imbalance or abuse of power between a student (experiencing the violations) and professor or adminis- -trator (violators). See para. 8-81**;** 58-59; See S-89

Georgetown's display of discriminatory animus is heightened by the violator's (University leadership's) relationship to the violated (student), and the subsequent 100+ discrete adverse (non)acts ..showing deliberate indifference (discrimination)

90.     Once the University has notice of the violation, and has notice of the complaint by the student, a failure to act is in itself deliberate indifference and disparate treatment (discrimination) of that complainant or student entitling, the student, to damages in private suit. See para. 8-81; See S-90

91.    Both action, and inaction when duty arises, can constitute discrete acts of adverse actions (non-actions) and thus disparate treatment and violations of policy, law and the Constitution.; See para. 8-81; See S-91

92.    Georgetown knew its own policies, the overarching law, and willfully violated privacy, publicity, 1981 contract rights.  And, was put on notice school wide, once Mitch Bailin admitted 1981, privacy, violations in writing (*but, still did not disclose materially omitted, or misstated facts to Mr. Austin i.e. how many brochures, where exactly mailed to or utilized, exactly when was photo exploited, etc.*), but made no apology for violating Georgetown Media Policy, Privacy Policies, and the surrounding law they are based on (including sec.1981). Further, when Mr. Austin publicly, with over 300+ witnesses, made over 100+ complaints, and inquiries, in a span of 4+ years to the designated body under the Universities control (IDEAA) designed to investigate-correct discriminatory violations of school policy, George- -town showed deliberate indifference animus & malice (*going out of its way to be facially discriminatory to Mr. Austin's 100+ complaints, zero acknowledged, followed up on, let alone escalated for investigation; remedy*); See S-92

93.    Mr. Austin's notice [report] provision more than meets *Brown v. Arizona* standards, as Mr. Austin followed University policy, and recommended guidelines on over 100+ instances, with over 300+ witnesses, for quickly approaching 5 years, to complain (providing 'notice') to IDEAA regarding violation of his rights and school policy *(as instructed by Georgetown policy; despite explicit admissions of violation of University policy in 2019 (after the fact), extreme departures of ordinary standards of care, violations of Mr. Austin's rights to contract in a facially discriminatory manner)*. See para. 8-81 ; See S-93

94.    Georgetown impermissibly used Mr. Austin's race (and perhaps gender, too)  to his repeated detriment, as an admitted student, and Black man to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin. Georgetown willfully violates its explicitly stated duties to "provide a mechanism for … a prompt, fair, and impartial investigation and resolution of grievances" or *ANY* first step to an investigation (let alone correction-resolution), at all per Georgetown's explicit standards. Georgetown's discriminatory conduct is highlighted in its *publicly stated policy* that every "faculty, staff, students, third parties and applicants for employment and admission" are entitled to receive a prompt, fair, and impartial investigation and resolution of grievances of discrimination, harassment, and related retaliation," but *intentionally excluded* Mr. Austin, preemptively because he is a Black man admitted student. Georgetown's discriminatory conduct is further highlighted as "the University strongly encourages Complainants (i.e., any individuals alleged to have experienced unlawful discrimination, harassment, and/or related retaliation) to report the incid- ent & seek redress through IDEAA's Grievance Procedures, but excluded Mr. Austin who reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981,privacy, publicity rights* and have not received even one follow up email to begin process (*let alone resolution*). S-94

95.    Georgetown's express exclusion of Mr. Austin because he is a Black male admitted student as compared to similarly situated non-Black male students from essential IDEAA program or activity (with clear *publicly outlined steps)* designed to investigate and correct violations of Georgetown policy, *(after Georgetown's written admission of fundamental Georgetown policy violating Mr. Austin's rights in another essential Georgetown controlled area program or activity; for business purposes*) is the essence of Equal Protection violations; See S-95

**12; Initial Supplement - Emer. Motion: Breyer is Incompetent per 28 U.S.C. § 455**

96.     Beyond Georgetown's exclusion, 'deliberate indifference' to that discrimination also highlights their animus (as they internally already knew they violated Mr. Austin's 1981 rights, *discriminatorily*, but continued to exclude from 'program(s) to correct Georgetown's previous violations*)*.  See S-96

97.     Calling a Black man a n*gg*r is perhaps the most obvious racial slur, or derogatory stereotype (*imbedded in the definition of the word www.merriam-webster.com/dictionary/n*gg*r*), but is clearly not the only one, and the same message can be communicated verbally, or with Conduct.  Treating someone as an "n-word" without actually saying the word, especially via disparate treatment to exclude and to "mark with a badge of inferiority," is just as illegal and damaging to that person as Georgetown did here (presumed "unworthy of consideration"), unapo- logetically, repeatedly, *ongoingly* violate their policies, & the law.  See  S-97

98.     Georgetown's Equal Protection violations were evident in Georgetown's repeated refusal to investigate, at all (*after they admitted 1981, privacy, publicly, and media policy violations in writing,)* as Mr. Austin reported, inquired, & formally complained (to the President's office, and other Georgetown leadership).  Mr. Austin sought to find out what was going on in the first place, and have subsequent investigation and correction to the victim or survivor of the discriminatory conduct by the university (i.e. the one being wronged; George Jarvis Austin), but Georgetown's continued displaying discriminatory intent…in refusing to investigate [discriminatory, illegal, violative] acts against a victim.";  See S-98

99.     Mr. Austin was completely excluded-blackballed creating "stigma" .. outlined in *Brown v. Board of Education*; Georgetown refused..take the first *mandated* step-action, for an admitted Black male student, that they would take *even* for a non student 3rd party complainant per their own policy (displaying even more disparate treatment; discriminatory animus), let alone similarly situated non-Black, or White, similarly situated students. See para. 8-81; 63-66;  See S-99

100.    It is well established that facially discriminatory rule application, as Georgetown is doing, *even on* facially neutral laws-policy offends the Constitution.  Any statute-policy which classifies people 'may' be irrational (or facially discrimin- -atory) as applied in particular cases.  Unequal application of law-policy, only to Mr. Austin's detriment, disrespecting his personhood, or rights because he is a Black man, student, & person equates to Equal Protection violations (i.e. when simultan- -eous unfair benefits to similarly situated others while depriving him);  S-100

101.    Georgetown's choices to create stigma with unequal treatment, attempt to mark Mr. Austin with a badge of inferiority by repeatedly, over and over again treating Mr. Austin in an inferior manner highlights Georgetown's commitment to violating Mr. Austin's right to Equal Protection.  See S-101

102.    Mr. Austin provided Georgetown over 100+ opportunities for self correction, with over 300+ witnesses; They refused to provide even a *veneer* of following the law & violate Mr. Austin's Equal Protection by exclusionary conduct (I.e. **IDEAA steps I-V**).  See para. 8-81; 28-29 ("Requirements for Filing Grievances" ideaa@george town.edu; "Procedures for Processing Grievances" IDEAA steps I-V beginning with intake - none which were complied with by Georgetown);  S-102

<u>Georgetown's initial violations of law and policy, to deprive Mr. Austin's rights, combined
with subsequent discrete, repeated, overt, and extreme deprivation along with Georgetown's
impermissible use of race, or derogatory racial stereotype, made clear Georgetown intended
to mark [Mr. Austin] with a badge of inferiority.</u>

103.    To avoid the stigma of disparate treatment (via separate and unequal
treatment and application of policies) as *Brown v. Board* articulates Georgetown's application
of law and school policy toward him should not presume 'inferiority' for Black male admitted
students, as compared to similarly situated non-Black male, or White, admitted students
(but it was, and continues to be). See S-103

104.    Georgetown chose to make clear their *intent* to facially discriminate based on race, or
derogatory racial stereotypes. See para. 8-81; 40-47.  Georgetown didn't acknowledge Mr.
Austin's complaints (as mandated), let alone take *any required* steps on his formal
complaints (i.e. excluding him) as compared to similarly situated non-Black male, or White,
admitted students. See para. 8-81: S-104

105.    Georgetown's impermissible use of race, or derogatory racial stereotype(s) of Black
males to convey assumptions of inferiority, preemptively excludes a Black male admitted
student from essential Georgetown 'program(s)-activity' based on express classification
identified through Georgetown's conduct toward Mr. Austin  (*and violates Equal Protection
as Georgetown engaged in official adverse decision making by derogatory racial stereotypes*).
See para. 6-81; S-105

106.    The combination of initial violations in total disregard of Mr. Austin's rights as a
Black male admitted student, admitting violations only *after* getting caught, refusal to
apologize for violating 1981 rights-Georgetown's (written authorization agreement policy),
with anti-Black male exclusionary policy-practices, demonstrate Georgetown's *repeated*
choices to "mark with a badge of inferiority" because of Mr. Austin race, or derogatory racial
stereotypes.  See para. 8-81  If Mr. Austin had any doubt before hand, Georgetown made
clear after that they absolutely *intended* to discriminate because of Mr. Austin's race; See
para 8-81; S-106;  Ms. Gonzalez Rogers previously has demonstrated extreme incompetence,
ultimate repeated disrespect, & anti-Black male discriminatory animus, toward Mr. Austin.
Ms. Gonzalez Rogers demonstrates an ongoing propensity to interfere with Mr. Austin's legal
exercise of his rights (*including rights to Equal Protection under the law, Privacy, 42 USC
1981, Due Process, and other Constitutional Rights*).  Ms. Gonzalez Rogers has gone out of
her way to, making overt administrative acts, show a disrespect of the Federal Rules of Civil
Procedure, or extreme incompetence of them, with discriminatory animus toward Mr. Austin
(i.e. not understanding service of process by the ECF system, nor Amending Complaints).

Mr. Austin adds YGR as a Defendant not for liability in the damages portion of the Demand,
but simply as the Supreme Court, Ninth Circuit, and California Supreme Court explicitly
provides for injunctive relief to prevent her *ongoing* negative, administrative, &
discriminatory interference with Mr. Austin's exercise of his Constitutional Rights to Due
Process, Equal Protection, & other fundamental rights, creating both conspiratorial criminal,
& civil injunctive, liability for Ms. YGR.  See e.g. 18 USC §241, 242.  See Dckt 15-16

## 1c.  **Compare Controlling Precedent (_directly contradicting Breyer's incompetence_):**

Per the Ninth Circuit's _L.A. Branch Naacp v. L.A. Unified Sch. Dist_, 750 F.2d 731, 746 (9th Cir. 1984), directly on-point, (_in subject matter of racial discrimination in California, and with regard to Res Judicata for ongoing per se illegal racially discriminatory conduct stemming from the same nucleus of facts, but continuing the per se illegal conduct in later years in schools for Black students_) :

" No. 81-5772.

Argued and Submitted April 10, 1984. 732 733 734

Decided December 21, 1984.

Thomas I. Atkins, General Counsel, N.A. A.C.P. Special Contribution Fund, Brooklyn, N.Y., for plaintiffs-appellees.

G. William Shea, Peter W. James, McCutchen, Black, Verleger Shea, Los Angeles, Cal., for defendants-appellants.

Before BROWNING, Chief Judge, CHOY, WALLACE, SNEED, ANDERSON, PREGERSON, POOLE, NELSON, CANBY, BOOCHEVER and NORRIS, Circuit Judges:

CANBY, Circuit Judge

BROWNING, PREGERSON, NELSON, BOOCHEVER and NORRIS, Circuit Judges, concur.

[68] PREGERSON, Circuit Judge, concurring; NELSON, Circuit Judge, joining:

I wholeheartedly concur with both the reasoning and result of Judge Canby's scholarly opinion and add these observations.

The court's opinion is an important milestone in the long struggle to achieve equality for the schoolchildren of Los Angeles.

Our decision gives plaintiffs the opportunity to prove that, after May 2, 1969, the school district intentionally discriminated against [B]lack pupils.

Of course, the decision does not permit plaintiffs to establish that de jure segregation existed before this date. But _nothing in our opinion prevents them from offering, for the purpose of shedding light on the school district's intent after May 2, 1969, evidence of de jure acts that occurred before then._

Fifteen years ago, Los Angeles Superior Court Judge Alfred Gitelson rendered his courageous decision finding that Los Angeles maintained a segregated school system. Six years ago, Los Angeles Superior Court Judge Paul Egly dedicated the remainder of his judicial career to fashioning a just and workable remedy. Somehow, their efforts were thwarted.

But today, we have opened the doors to a United States Courthouse and made it possible for
a federal district judge to address the vital social issues this case presents."

- **L.A. Branch Naacp v. L.A. Unified Sch. Dist, 750 F.2d 731, 746 (9th Cir. 1984)**

In fact, the Ninth Circuit's *Eichman v. Fotomat Corp., 759 F.2d
1434,1438-39 (9th Cir.1985),* also dealing with claims stemming from
same nucleus of facts, makes clear citing the Supreme Court's *Lawlor v.
National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99
L.Ed. 1122 (1955),* that a previous action <u>does not bar future actions for
conduct that had not yet happened</u> at the time of the previous action. As
applied to *Eichman* the Court ruled (attached highlighted for ease of
reader(s)):

> *"The judgment in Eichman I does not immunize Fotomat from liability for all future
> conduct…. [applying the rule] .. a prior judgment " `cannot be given the effect of extinguishing
> claims which did not even then exist and which could not possibly have been sued upon in the
> previous case…. [and thus] … the judgment cannot bar suit brought on post-September
> 7, 1977 conduct.."*
> - **Eichman v. Fotomat Corp., 759 F.2d 1434-39 (9th Cir. 1985)**

> "While the 1943 judgment precludes recovery on claims arising prior to its entry, <u>it
> cannot be given the effect of extinguishing claims which did not even then exist and
> which could not possibly have been sued upon in the previous case.</u>

> In the interim, moreover, there was a substantial change in the scope of the defendants'
> alleged monopoly; five other producers had granted exclusive licenses to National Screen,
> with the result that the defendants' control over the market for standard accessories
> had increased to nearly 100%.

> Under these circumstances, whether the defendants' conduct be regarded as a series of
> individual torts <u>or as one continuing tort, the 1943 judgment does not constitute a bar to</u>
> <u>the instant suit.</u>"
> - **Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985)**

> *"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct.*
> *Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at 616. See also Lawlor v. National Screen*
> *Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). California courts*
> *follow the approach taken by the Supreme Court in Lawlor v. National Screen Service Corp.,*
> *349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), that a prior judgment " `cannot be given the*
> *effect of extinguishing claims which did not even then exist and which could not possibly have*
> *been sued upon in the previous case.' " Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at*
> *615 (quoting Lawlor, 349 U.S. at 328, 75 S.Ct. at 868).*
>
> *Thus, because Eichman I was settled on September 7, 1977 and judgment was entered as of*
> *that date, the causes of action disposed of in Eichman I were for pre-September 7, 1977*
> *conduct and <u>the judgment cannot bar suit brought on post-September 7, 1977 conduct</u>. See*
> *Los Angeles Branch NAACP v. Los Angeles Unified School District, 750 F.2d 731-39 (9th Cir.*
> *1985).... Eichman I, therefore, does not preclude the pendent state claims in Eichman III*
> *insofar as the latter alleges wrongful conduct occurring after the settlement date of the*
> *former."*

- **Eichman v. Fotomat Corp., 759 F.2d 1434-39 (9th Cir. 1985)**

The Ninth Circuit's *Clark v. Yosemite Community College Dist,* 785

F.2d 781, 789 (9th Cir. 1986) (attached), also *addresses this scenario of*

*future illegal conduct creating new claims*, from a previous set of

circumstances, and further clarifies:

> *"The doctrine of res judicata extends only to the facts and conditions as they existed at the*
> *time the judgment was rendered, and to the legal rights and relations of the parties as fixed by*
> *the facts determined in the judgment. Colvig v. RKO General, Inc., 232 Cal.App.2d 56, 42*
> *Cal.Rptr. 473, 485 (1965).....*
>
> *..... <u>When other facts or conditions intervene, forming a new basis for a claim, the issues are*
> *no longer the same and res judicata does not apply</u>...."*

As to GU, in conspiracy with YGR, attempting to relate,

unrelated, distinct, cases, and further their conspiratorial *ongoing*

negative, administrative, & discriminatory interference with Mr.

Austin's exercise of his Constitutional Rights to Due Process, Equal

Protection, & other fundamental rights, (*creating both conspiratorial*

*criminal, & civil injunctive, liability e.g. 18 USC §241, 242*) the Supreme

Court, and Ninth Circuit, classify those acts as when *"other facts or conditions intervene, forming a new basis for a claim."* In this case Mr. Austin alleges conspiracy whereas per *United States v. Felix:*

> "[C]onspiracy is a distinct offense from the completed object of the conspiracy"); cf. id., at 793 ("[I]t does not violate the Double Jeopardy Clause . . . to prosecute [a continuing criminal enterprise] offense after a prior conviction for one of the predicate offenses."

This exception to Res Judicata, in the civil context, is analogous to Double Jeopardy exceptions in criminal law context whereas the Double Jeopardy Clause, which protects against being punished twice for the same offense, still does not apply when a defendant commits multiple "discrete [adverse ongoing] acts" *(like GU's 100+ separate violations of Mr. Austin Equal Protection, Due Process, and 1981 Rights to contract from* **7.15.21-1.16.24**) that repeatedly violate the same statute (i.e. continuing conduct). The Original Jurisdiction were not part of the first pleading in substance, nor temporally (as they had not yet happened), and thus could not be barred by Res Judicata. Per the US Supreme Court's *United States v. Felix* this is true even if they are part of the same criminal episode, as long as these acts are sufficiently separated by time or space, making them distinct from each other, or if intervening conduct occurs like conspiracy, versus individual actors..).See United States v. Felix, 503 U.S. 378, 390 (1992):

"In language applicable here, we pointedly stated that "the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself." Ibid.; see also Pinkerton v. United States, 328 U.S. 640, 643 (1946) ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses, . . . [a]nd the plea of double jeopardy is no defense to a conviction for both offenses"). We have continued to recognize this principle over the years. See Iannelli v. United States, 420 U.S. 770, 777-779 (1975); Garrett v. United States, 471 U.S. 773, 778 (1985) ("[C]onspiracy is a distinct offense from the completed object of the conspiracy"); cf. id., at 793 ("[I]t does not violate the Double Jeopardy Clause . . . to prosecute [a continuing criminal enterprise] offense after a prior conviction for one of the predicate offenses")."

## 1d.  Overt explanation of Breyer's incompetence:

Breyer's incompetence is readily evident on a variety of issues (especially in reading his statement in full context), but this analysis, report, recommendation will focus solely on the issue of Breyer's demonstrated incompetence with regard to Res Judicata on Original Jurisdiction claims (that had not happened yet in the prior action), by virtue of previous Diversity Jurisdiction claims Civ. Code 3344, and privacy, that happened prior to the first case filing in 2019.   Donato's statements were false-incompetent-biased because either a. Continuing illegal conduct or separately b. Intervening illegal conduct both create new per se illegal liability for GU.

Mr. Austin made clear, in actual pleadings, and motions to reconsider, that he is only pleading conduct after the first, *unrelated*, disposed of case which constitutes GU defendant conduct from **7.15.21-1.16.24**.  Nowhere in those pleadings is he pleading California state claims of 3344 or Privacy violations which were the sole basis of

the original suit.  The only reason the issue of Diversity Jurisdiction, and its subsequent requirements of 'minimum contacts' are even relevant, is because *these are not Original Jurisdiction* claims-causes-of-action in Federal Court.  Alternatively, *<u>this case's</u>* *<u>primary claims are Original Jurisdiction claims of 1981, Equal</u>* *<u>Protection, Title VI of the Civil Rights of 1964</u>* which have Original, not Diversity, Jurisdiction standing in Federal Court.  Because of this case's claims' Original Jurisdictional standing, the Diversity Jurisdiction requirements of 1. Diversity of Party locations-residence 2 Amount in controversy exceeding $75,000 3. Specific-Personal Jurisdiction, within the larger diversity jurisdiction framework, requirements of "minimum contacts" <u>have no application, or relevance in this case</u> (*outside of distinguishing the two*).  *<u>Of note, Breyer's incompetence-bias-corruption</u>* *<u>shows clearly in his above arguments, as he completely overlooks what is</u>* *<u>actually being plead by Mr. Austin in this case</u>*, in light of controlling Supreme Court, Ninth Circuit, precedent, per GU defendant conduct from **7.15.21-1.16.24**.

　　　The Ninth Circuit's *<u>L.A. Branch Naacp v. L.A. Unified Sch. Dist.</u>* directly applicable ruling states: "*the court's opinion is an important milestone in the long struggle to achieve equality for the schoolchildren*

of Los Angeles…..Our decision gives plaintiffs the opportunity to prove that, after May 2, 1969, the school district intentionally discriminated against [B]lack pupils…. nothing in our opinion prevents …. offering, for the purpose of shedding light on the school district's intent after May 2, 1969, evidence of [discriminatory] acts that occurred before then."As  See L.A. Branch Naacp v. L.A. Unified Sch. Dist, 750 F.2d 731-46 (9th Cir. 1984) :  (see attached highlighted for ease of reader(s))  At the outset, this controlling precedent, and ruling, directly contradicts the gravamen of (corrupt defense counsel) Breyer's argument (directly contradicting Supreme Court, nor Ninth Circuit controlling precedent: showing Breyer's incompetence as to this case).

    In layman's terms this means a previous case only precludes defendant actions up until that date of that judgement, it cannot, and does not preclude later discriminatory acts, nor the liability they cause, by that same defendant(s) against plaintiff(s). Although GU, YGR, and their corrupt counsel Platt, seeks to skirt the law through "interposition and nullification" anti-Black segregationist tactics, the Truth, and the Law, commands accountability for acts between 7.15.21-1.16.24 (with the ability to provide context, direct evidence, of discriminatory intent via Georgetown's previous acts per L.A. Branch Naacp v. L.A. Unified

*Sch. Dist*.  In fact, per the Supreme Court's *Lawlorv. Nat'l Screen Serv*, The Ninth Circuit's *Eichman v. Fotomat Corp.*, *Clark v. Yosemite Community College Dist.*, and *L.A. Branch Naacp v. L.A. Unified Sch. Dist,* Mr. Austin's claims from 7.15.21 to 1.16.24 are not barred by Res Judicata as his *legal injuries* as plead in the operative complaint are a. new causes of action, b. impossible to foresee, and c. never before plead, or experienced, nor litigated, (*with additional parties, harms beginning after disposition of a separate, unrelated, case which is now closed, and was disposed of*).  Unless Mr. Austin had the power of seeing the future, with certainty there is no way to preemptively block a future cause of action that has not yet happened, yet.  See Opening Brief **DE30:**

> "...Per the Supreme Court's *Lawlorv. Nat'l Screen Serv,* The Ninth Circuit's *Eichman v. Fotomat Corp., & Clark v. Yosemite Community College Dist.,* Res Judicata is inapplicable to ongoing Defendant Georgetown conduct as previous case *"cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon..."* ... *"The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered.... "When other facts or conditions intervene... the issues are no longer the same and res judicata does not apply..."*
>
> A.      In fact, the Ninth Circuit's *Eichman v. Fotomat Corp.* makes clear citing the Supreme Court's *Lawlor v. National Screen Service Corp.,* that a previous action does not bar future actions for conduct that had not yet happened at the time of the previous action.  Similarly, GU's conduct from 7.15.21 to 1.16.24 had not yet occurred prior to disposition of previous unrelated case.  As applied to *Eichman* the Court ruled  *"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct.... [applying the rule] ..  a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.... [and thus] ...  the judgment cannot bar suit brought on post-September 7, 1977 conduct.."*  Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985). Sometimes a checklist is helpful:

☐ Has Georgetown's equal protection violations of Mr. Austin's rights between 7.15.21 to present been heard, *at all,* or on the merits?                **Answer: <u>NO</u>**

☐ Has Georgetown's Title VI facially discriminatory exclusionary tactics, discrete, adverse acts which violate the face of the statutes per 2023 Supreme Court precedent, based on well

settled anti-discriminatory law against anti-Black conduct between 7.15.21 to present been heard, *at all,* or on the merits?                    Answer: <u>**NO**</u>

☐ Has Defendant Georgetown's 42 USC 1981 facially discriminatory violations of Mr. Austin's rights, coextensive with Equal Protection per 2023, post disposition of previous case, between 7.15.21 to present been heard, *at all,* or on the merits?          Answer: <u>**NO**</u>

☐ Have any of the other causes of action between 7.15.21 to present been heard, *at all,* or on the merits?                    Answer: <u>**NO**</u>

..........''

From 7.15.21-1.16.24, <u>*after Georgetown admitted in writing to*</u> <u>*violating Mr. Austin's Constitutional, and other, rights*</u>: Mr. Austin made formal written complaints-inquiries as instructed by Georgetown policy ([faculty handbook. georgetown.edu/ section4/a/](faculty handbook. georgetown.edu/ section4/a/)).  Although it would be also completely legal to do so, Mr. Austin did not stage a sit-in, hold picket signs outside of Georgetown on this issue, or engage in other peaceful protest direct actions of Georgetown's *per se illegal, ongoing, targeted anti-Black segregationist, Klu Klux Klanner, policy, practice, & procedure per 1964 US Supreme Court' in* <u>*Bell v. Maryland*</u>, *378 U.S. 226 (1964)* **(''The discrimination in these sit-in cases is <u>a relic of</u> <u>slavery</u>'')**.  Mr. Austin peacefully sought resolution, outside of litigation via the channels Georgetown itself describes as the appropriate conflict resolution mechanisms IDEAA from 7.15.21-1.16.24 for *''Any applicant for employment or admission, current or former employee or student, or third party.''*  However, in the same racially abusive-discriminatory

manner as Georgetown's other violations of Mr. Austin's rights, because

he is Black, Georgetown purposefully failed its duties owed Mr. Austin

(as an admitted Georgetown student).  See Opening Brief **DE30**

> "..<u>GU deviates, by race, *in the negative, to harm* Mr. Austin in its standard
> mandatory IDEAA Complaint process or procedures</u>
> *( GU admits it deviates because Mr. Austin is a Black, male admitted student,*
> *& purposefully fails every express IDEAA standard. )*

Georgetown's internal IDEAA complaint structure express tasks is to acknowledge, respond to, and correct complaints from student, faculty, and even non-affiliated community members. See <u>faculty handbook. georgetown.edu/ section4/a/</u> *"Any applicant for employment or admission, current or former employee or student, or third party."* …

….When GU receives a complaint via email made by *"Any applicant for employment or admission, current or former employee or student, or third party"* similarly situated Whites, they provide Whites a set of mandatory steps including: **1. -** IDEAA staff sends acknowledgement of complaint receipt for Whites, even if the acknowledgment is to say Georgetown's IDEAA needs more information to proceed through the Complaint process, whereas they did not even acknowledge Mr. Austin's complaints, AT ALL, because he is Black.  For Whites, GU **2.** IDEAA staff schedules intake meetings, after acknowledgement, but for Blacks, like Mr. Austin, did not schedule an intake meeting for and failed to even acknowledge the first step of complaint because Mr. Austin is Black.  GU's demonstrated anti-Black hatred, extreme animus, runs so deep, that they chose to treat Mr. Austin as if he is not a person, and less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being (as even third party Whites would receive these steps). <u>7-ER-1784-1854</u>

For Whites, GU **3.** IDEAA staff provides a general understanding of the relevant policy & grievance procedure as a normal part of intake whereas they refuse to answer any questions about relevant policy or procedure, and fail to provide any relevant information to Mr. Austin because he is Black.  For Whites, GU **4. -** IDEAA staff provides, At the request of the Complainant, an opportunity to proceed either with an Informal Resolution or an Investigation, whereas they failed to provide Mr. Austin with either opportunity, and failed at the very beginning to acknowledge his humanity (by refusing to even acknowledge his complaint to begin the process) because he is Black (similar to their attitude in disregarding, and disrespecting his 1981 rights to contract.

For Whites, (<u>facultyhandbook/</u>), GU provides: **5. -** The opportunity *at any time*, even if informal resolution was initially chosen, to request in writing to alternatively proceed to Investigation, whereas this opportunity was deprived and not provided for Mr. Austin,because he is Black. For Whites, GU provides **6. -** The opportunity to initiate a formal Complaint by providing a written signed statement (via email) whereas they deprived this opportunity for Mr. Austin because he is Black.  For Whites, GU provides **7. -** The opportunity to provide any supporting documentation, or evidence, to substantiate a formal Complaint (via email) whereas they deprived this opportunity for Mr. Austin because he is Black.

For Whites, GU provides **8.** - The opportunity to receive a written response from the Respondent in 20 days or less after filing complaint, *if they have one*, as to why they conducted themselves in that manner, violating the law or policy, whereas they deprived that opportunity for Mr. Austin (and completely excluded him from this Equal Protection required procedure, and policy) because he is Black.  For Whites, GU provides  **9.** - The opportunity provide rebuttal to Respondent's statement, if needed, within 10 days, after receiving Respondent's response to the initial complaint, whereas they deprived that opportunity for Mr. Austin (completely excluding him) because he is Black.  For Whites, GU provides : **10.** - The opportunity, or right, to present additional evidence, identify witnesses, and cross examine opposing witnesses in per the Complaint for Whites whereas they deprived that opportunity for Mr. Austin because he is Black

For Whites, GU provides **11.** - The opportunity, and right, to receive IDEAA's investigation, interviewing of witnesses, complainant and respondent(s), of complaint, within a prompt and reasonable time frame, whereas GU deprived that opportunity for Mr. Austin because he is Black.  For Whites, GU provides **12.** - The opportunity, and right, to have complaint substance and evidence evaluated and ascertained by IDEAA's experts for violations (and remedies), where IDEAA maintains documentation to support the findings in its report, including written findings of fact, transcripts, and audio recordings whereas GU deprived that opportunity for Mr. Austin because he is Black.  For Whites, GU provides **13.** - The opportunity, and right, to receive written notice from IDEAA as to their findings within thirty days of the conclusion of the investigation, whereas GU deprived that opportunity for Mr. Austin ( completely excluding him) because he is Black.

For Whites, GU provides: **14.** -  The opportunity, and right, to receive written notice from IDEAA of not only the findings of the investigation, but instructions on next steps whether those steps are 1. appeal (if more information is needed) or 2. corrective action if the Investigation found violations of law and policy in accord with the complaint, whereas GU deprived that opportunity for Mr. Austin because he is Black.   For Whites, GU provides  **15.** The opportunity, & right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President, or his or her designee, or other University officials (or their superiors if they are the violators) consistent with the above provisions addressing confidential- ity to direct that prompt remedial action be taken to correct the situation, whereas GU deprived that opportunity for Mr. Austin because he is Black.  For Whites, GU provides **16.** - The opportunity, and right, for corrective actions to be imposed on Respondents, where IDEAA shall monitor their implementation (and additional legal action outside of campus is still able to be pursued ...GU deprived that opportunity for Mr. Austin ...because he is Black.

Mr. Austin had no complaints against him, he simply inquired, and complained as to why Georgetown 1. Violated school policy 2. Violated his Constitutional rights to contract and 3. Why he was illegally excluded from essential campus procedures per *1981, Equal Protection & Title VI*.  Georgetown impermissibly used Mr. Austin's race to treat derogatorily differently, "deny, restrict, separate, segregate (in application of policy)," and exclude Mr. Austin.  See eCFR :: 34 CFR Part 100 -- Nondiscrimination - Title VI of the Civil Rights Act of 1964

….When Mr. Austin did what he was instructed to do by GU, he was completely excluded , blackballed.  Mr. Austin reported at least 100+ times (*after University admitted unequal treatment to Mr. Austin's detriment violating his 1981,privacy, publicity rights* and have not received even one follow up email to begin the publicly defined (**1-16 step**) process …. 7-ER-1784-1854  It is of note that Mr. Austin started off very patiently, and just sought information, and clarification, before even contemplating escalating to formal internal complaints.  Mr. Austin would have preferred to resolve informally……"

**25; Initial Supplement - Emer. Motion: Breyer is Incompetent per 28 U.S.C. § 455**

Georgetown, in conspiracy with Platt, & YGR, continues to violate Mr. Austin's rights, after stealing from him, racially abusing him, and seeking to continue to harm him (7.15.21-1.16.24) without explanation, nor apology as to their initial violations of his rights in a racially abusive manner.   Platt's, and Georgetown's filings make clear they intend to harm <u>Mr. Austin's dignity interest</u>  whereas the 2023 US Supreme Court's <u>303 Creative LLC, v. Elenis et. al.</u>, highlights to *"vindicate… deprivation of personal dignity that surely accompanies denials of equal access"* &, his Equal Protection co-extensive with 1981 rights per <u>BELL v. MARYLAND</u>

> "The Thirteenth, Fourteenth, and Fifteenth Amendments had "one pervading purpose . . . we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." Slaughter-House Cases, 16 Wall. 36, 71.
>
> Prior to those Amendments, Negroes were segregated and disallowed the use of public accommodations except and unless the owners chose to serve them…
>
> We deal here with public accommodations … whose only claim to existence is serving the public … the constitutional right of all Americans, regardless of race or color, to be treated equally…
>
> The Black Codes were a substitute for slavery;
>
> Segregation was a substitute for the Black Codes;…
>
> …The discrimination in these sit-in cases is ***a relic of slavery."***

The US Supreme Court's, & Ninth Circuit's cited here *on point cases* are in agreement: <u>Res Judicata is inapplicable to ongoing violations from 7.15.21</u> (*after disposition of previous unrelated case*) <u>to</u>

1.16.24 (*filing of this case*). For example, per the **1.** US Supreme Court's Lawlorv. Nat'l Screen Serv,  **2.** The Ninth Circuit's Eichman v. Fotomat Corp., & **3.** Clark v. Yosemite Community College Dist., <u>Res Judicata is inapplicable</u> to ongoing Defendant's Conduct (from 7.15.21-1.16.24) as the previous disposed case: ***"cannot** be given the effect of extinguishing claims which <u>did not even then exist</u> and which could not possibly have been sued upon…"* … *"The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered…. "When other facts or conditions intervene, forming a new basis for a claim, the <u>issues are no longer the same and res judicata does not apply</u>..."* See Lawlor v. Nat'l Screen Serv., 349 U.S. 322, 328 (1955) ; ;*Clark v. Yosemite Community College Dist,* 785 F.2d 781, 789 (9th Cir. 1986), *Eichman v. Fotomat Corp.*, 759 F.2d 1434,1438-39 (9th Cir.1985):

> "While the 1943 judgment precludes recovery on claims arising prior to its entry, <u>it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case</u>. In the interim, moreover, there was a substantial change in the scope of the defendants' alleged monopoly; five other producers had granted exclusive licenses to National Screen, with the result that the defendants' control over the market for standard accessories had increased to nearly 100%. Under these circumstances, whether the defendants' conduct be regarded as a series of individual torts <u>or as one continuing tort, the 1943 judgment does not constitute a bar to the instant suit</u>."
>
> - **Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir. 1985)**

In fact, the Ninth Circuit's *Eichman v. Fotomat Corp.* makes clear citing the Supreme Court's *Lawlor v. National Screen Service Corp.*, that a previous action <u>does not bar future actions for conduct that had</u>

not yet happened at the time of the previous action. As applied to

*Eichman* the Court ruled (attached highlighted for ease of reader(s)):

> *"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct…. [applying the rule] .. a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case…. [and thus] … the judgment cannot bar suit brought on post-September 7, 1977 conduct.."*
> - **Eichman v. Fotomat Corp., 759 F.2d 1434-39 (9th Cir. 1985)**

> <u>*"The judgment in Eichman I does not immunize Fotomat from liability for all future conduct*</u>. *Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at 616. See also Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955). California courts follow the approach taken by the Supreme Court in Lawlor v. National Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), that a prior judgment " `cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.' " Eichman II, 147 Cal.App.3d at 1177, 197 Cal.Rptr. at 615 (quoting Lawlor, 349 U.S. at 328, 75 S.Ct. at 868). Thus, because Eichman I was settled on September 7, 1977 and judgment was entered as of that date, the causes of action disposed of in Eichman I were for pre-September 7, 1977 conduct and <u>the judgment cannot bar suit brought on post-September 7, 1977 conduct</u>. See Los Angeles Branch NAACP v. Los Angeles Unified School District, 750 F.2d 731-39 (9th Cir. 1985).... Eichman I, therefore, does not preclude the pendent state claims in Eichman III insofar as the latter alleges wrongful conduct occurring after the settlement date of the former."*
> - **Eichman v. Fotomat Corp., 759 F.2d 1434-39 (9th Cir. 1985)**

The Ninth Circuit's *Clark v. Yosemite Community College Dist,* 785

F.2d 781, 789 (9th Cir. 1986) (attached) further clarifies:

> *"The doctrine of res judicata extends only to the facts and conditions as they existed at the time the judgment was rendered, and to the legal rights and relations of the parties as fixed by the facts determined in the judgment. Colvig v. RKO General, Inc., 232 Cal.App.2d 56, 42 Cal.Rptr. 473, 485 (1965). When other facts or conditions intervene, forming a new basis for a claim, the issues are no longer the same and res judicata does not apply…."*

Per United States v. Felix "[C]onspiracy is a distinct offense from the

completed object of the conspiracy"); cf. id., at 793 ("[I]t does not violate

the Double Jeopardy Clause . . . to prosecute [a continuing criminal

enterprise] offense after a prior conviction for one of the predicate

offenses."  This exception to Res Judicata, in the civil context, is

analogous to Double Jeopardy exceptions in criminal law context

whereas the Double Jeopardy Clause, which protects against being
punished twice for the same offense, still does not apply when a
defendant commits multiple "discrete [adverse ongoing] acts" *(like
Georgetown's numerous separate violations of Mr. Austin Equal
Protection, Due Process, and 1981 Rights to contract from 7.15.21 to
1.16.24)* that violate the same statute (i.e. continuing conduct).  Per the
US Supreme Court's United States v. Felix this is true even if they are
part of the same criminal episode, as long as these acts are sufficiently
separated by time or space, making them distinct from each other, or if
intervening conduct occurs like conspiracy, versus individual
actors…).See e.g. United States v. Felix, 503 U.S. 378, 390 (1992):

> "In language applicable here, we pointedly stated that "the same overt acts charged in a
> conspiracy count may also be charged and proved as substantive offenses, for the agreement
> to do the act is distinct from the act itself." Ibid.; see also Pinkerton v. United States, 328
> U.S. 640, 643 (1946) ("[T]he commission of the substantive offense and a conspiracy to
> commit it are separate and distinct offenses, . . . [a]nd the plea of double jeopardy is no
> defense to a conviction for both offenses"). We have continued to recognize this principle over
> the years. See Iannelli v. United States, 420 U.S. 770, 777-779 (1975); Garrett v. United
> States, 471 U.S. 773, 778 (1985) ("[C]onspiracy is a distinct offense from the completed object
> of the conspiracy"); cf. id., at 793 ("[I]t does not violate the Double Jeopardy Clause . . . to
> prosecute [a continuing criminal enterprise] offense after a prior conviction for one of the
> predicate offenses")."

Mr. Austin takes time to separately highlight these on point
Supreme Court, and Ninth Circuit, cases (in relation to Breyer's
demonstrated incompetence-bias-corruption) as they address 1 of the 2
(two) largest issues in this appeal **24-6943** namely that 1. the
pleadings-issues are <u>beyond substantive, opposite of frivolous</u> *(already*

*proven substantive with the pleadings themselves, GU admissions of fact, Supreme Court, Ninth Circuit, controlling law, as well as the* <u>*additional direct evidence*</u> *from the US Department of Education entered settlement*), and 2. That these issues arising from 7.15.21-1.16.24 have never been heard, at all, nor on the merits, (as they happened in the future) per the Supreme Court's *Lawlorv. Nat'l Screen Serv*, The Ninth Circuit's *Eichman v. Fotomat Corp.*, *Clark v. Yosemite Community College Dist.*, and *L.A. Branch Naacp v. L.A. Unified Sch. Dist.* (See attached highlighted for ease of reader(s)).

As noted in **DE38**, ***TELLINGLY***, Nowhere in Platt's Georgetown's filings, nor in Breyer's incompetent-corrupt order(s) do they address <u>*Georgetown's behavior being so horrendous, that all of Mr. Austin's loans, and anything owed, were completely discharged-refunded*</u> (over $100+K in value), because *"The US Dept. of ED Independently Confirms-Verifies, the Substance & Seriousness of Georgetown's pre-2022 reported violations of Mr. Austin's rights as of 3.7.25 via its offered, & entered, settlement with Mr. Austin"* …. *"based on your allegations regarding the school's misconduct."* (1-ER-1) As is typical for racial abusers they make the victim of abuse the problem. (1-ER-1): See e.g.

<u>"Entered 2025 Settlement for Georgetown's reported illegal conduct</u>

It is undisputed that as of 2025 Mr. Austin entered into a settlement with the US Dept. of ED valued at over 100K(+). 1-ER-1  The US Dept. of ED Independently Confirms-Verifies, the Substance & Seriousness of Georgetown's pre-2022 reported violations of Mr. Austin's rights as of 3.7.25 via its offered, & entered, settlement with Mr. Austin based on Georgetown's reported wrongdoing. 1-ER-1; 2-ER -51 Notably the US Dept. of ED. explicitly states to Mr. Austin (1-ER-1):

> "The Department has determined that you are entitled to settlement relief for loans taken out on or after 1/1/2013 associated with your enrollment at Georgetown University ................ based on your allegations regarding the school's misconduct .... Department of Education will do the following:
> - discharge your Relevant Federal Student Loans
> - provide a refund for any payments made to the Department of Education on your Relevant Federal Student Loans including Relevant Federal Student Loan debt that you previously paid off;...."

The Dept. of Ed. acts as an independent, informed, expert affirming the *substance, seriousness, & illegality of Georgetown's egregious conduct.*  The Dept. of Ed. also shows they understand the value of the violations (*over $100,000+ just with regard to value per laws directly in their wheelhouse*), because the US Department of Education took these actions not in a vacuum, but with access to tremendous amounts of Georgetown data-information, as well as Mr. Austin's information-data, in context of the pleadings, reports, etc. 1-ER-1; 2-ER-51 ...."

As a reminder Mr. Austin previously moved for Preliminary Injunction, TRO, and Judicially Ordered Mediation due to the overwhelming direct evidence, substance of the pleadings-facts, and law-precedent in Mr. Austin's favor (see below).

## Emergency Motion Full Supplement is Forthcoming

The full Supplement is forthcoming in approximately 21 days (**5.8.25**) breaking down precisely each obvious instance of Breyer's demonstrated incompetence to pair with Mr. Austin's Emergency Motion for Remand.

## Georgetown's Irreparable Harm is more than dollars & cents

**A1.** Mr. Austin moved, in 5183 words, for a Limited Remand to order Preliminary Injunction, or TRO (*as an alternative to **DE41** in case the Ninth Circuit is uncomfortable with direct issuance*) to **a.** immediately stop Georgetown from continuing this racist, per se illegal, "***relic of slavery***" anti-Black male segregationist, Klu Klux Klanner, policy-practice per *1964 US Supreme Court's Bell v. Maryland* that is actively hindering Mr. Austin's from receiving owed Equal Protection, Title VI, 1981 IDEAA complaint services-resolution for what they admitted stealing, & discriminating, **b.** correct Georgetown's racist outlier conduct per non-discriminatory status quo. See BELL v. MARYLAND, 378 U.S. 226 (1964):

> "The Thirteenth, Fourteenth, …Fifteenth Amendments had "one pervading purpose . . . the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Slaughter-House*....

> Prior to those Amendments, [i.e. during anti-Black enslavement]

> Negroes  [Blacks-Coloreds-Afro-Americans-African-Americans-etc.] were segregated ….disallowed…use of public accommodations except-unless the owners chose to serve them….

> …We deal here with public accommodations…..to use facilities whose only claim to existence is serving the public…… the constitutional right of all Americans,

> …regardless of race or color, to be treated equally…."

Per 2023 US Supreme Court's *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Jun. 30, 2023), because *"Discrimination is not simply dollars and cents, hamburgers and movies; it is…humiliation, frustration, …embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his [Race],"* Mr.

Austin suffers irreparable harm from GU's admitted-use of derogatory, slurs-stereotypes-attacks on his person, race, identity-culture, his character, professional reputation, education & economics.

**A2.**    Previously, Mr. Austin moved for  Judge-Ordered-mediation to Northern-District ADR 1. providing proactive resolution-settlement opportunity for Georgetown's (7.15.21-1.16.24) *ongoing* per-se illegal conduct admittedly based on GU's use of derogatory "[Brute](#)"-"[N*gg*r](#)" anti-Black-stereotypes-slurs 2. demonstrating <u>*Mr. Austin operates in good-faith effectively utilizing judicial-party-resources*</u>.  Mr. Austin motion for a limited remand for ADR as an alternative to  **(DE44; DE47)** in the abundance of caution in case the Ninth Circuit prefers mediation-ADR options through a remand (to provide GU a proactive, non-litigious opportunity for resolution).

**1.**    Mr. Austin *repeatedly* demonstrated openness to non-litigious resolution, but defendant co-conspirators, GU, YGR, DMR (recused), & ultimately Breyer, presiding, were collectively so corrupt-racist-imcompetent, it made ADR resolution-options impossible (*even when Mr. Austin a. Documented on DMR's docket his express interest in ADR - after already attempting directly with GU over 100+ instances in front of 300+ witnesses*), and b. voluntarily provided-offered

at least a year "cooling off" period for GU (*& another ADR opportunity*) as GU became "testy" , impatient, emotional-unreasonable-foolhardy.

**2.**    Georgetown's targeted, *ongoing,* "***relic of slavery***" anti-Black segregationist policy against Mr. Austin, because he is a Black male admitted student, is obvious-straightforward and directly addressed by the 2023 US Supreme Court. See *Students for Fair Admissions, Inc. v. President & Fellows of Harvard* Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023)  In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*  it was alleged that student applicants of different races were treated *derogatorily-differently*, because of race in the application process.  Similarly, Mr. Austin, after earning admission, was then unknowingly exploited in violation of Georgetown school policy, Constitutional and Federal law, & treated derogatorily differently by GU.  Mr. Austin was mis-treated based on *derogatory racial stereotypes* 1. in the mandatory written contract making process for commercial, or business use, and then 2. to exclude from the very IDEAA campus mechanism, & organization, designed to correct, and remedy these types of violations without need for litigation, or outside legal action. Georgetown's conduct in essence enforced either racial oppression per 42 USC 1981, and 13th, 14th Amendment, or forced an admitted

student to sue the institution they are supposed to be learning from (*an even more extreme exploitation of power, and impermissible use of race*).

**3.**     In Georgetown's recent filings they go further: admitting outright usage of derogatory anti-Black male "Brute" racist stereotypes for its per se illegal conduct.  Mr. Austin's background is pristine. Vol. 1-9-ER *(in entirety)* and has no history of anger, nor abuse whereas Platt's-Georgetown's vague, intentionally racist-derogatory reference to this type of anti-Black male "Brute" archetype is itself per se illegal, damaging, and the type of conduct the 2023 US Supreme Court expressly prohibits in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard* Coll., No. 20-1199, 202 (U.S. Jun. 29, 2023) whereas Georgetown *"fail[s] to comply with the Equal Protection Clause's [co-existent with 42 USC 1981's) twin commands that race may never be used as a "negative" and that it may not operate as a [derogatory] stereotype…."*  See Opening Brief **DE30:**

  Georgetown is calling Mr. Austin a "N*gg*r" repeatedly-continuously.

**5.**     Georgetown's per se illegal, extremely harmful, ongoing, targeted anti-Black segregationist, Klu Klux Klanner, policy-conduct toward Mr. Austin is *akin* to calling Mr. Austin a "n*gg*r," or 'n-word' each time they utilize derogatory, anti-Black male stereotypes to deny, Mr.

Austin's 1981-contract, Equal Protection, Title VI rights.

Platt's-Georgetown's *ongoing* conduct from (7.15.21-1.16.24), and

Response Brief, filing is purposefully 'conjuring' a well-tread Jim Crow,

([How the Nazis Were Inspired by Jim Crow | HISTORY](#))  Klu Klux

Klanner, Anti-Black Segregationist, derogatory, archetype,

stereotype used that inspired Nazi Germany's propaganda racial Third

Reich Regime [Vol. 1-9-ER (*in entirety*)](#).  See [N*GG*R Definition](#); See

[N*gg*r- Caricature- Anti-Black-Imagery-Jim…Crow Museum](#)

> "….There is a direct and strong link between the word *n*gg*r* and anti-Black caricatures. …it is usually directed against Black people ….. The Coon caricature, for example, portrays Black men as lazy, ignorant, and obsessively self-indulgent; these are also traits historically represented by the word *nigger*….
>
> …The Brute caricature depicts Black men as angry, physically strong, animalistic, and prone to wanton violence [and criminality]….
>
> … *N*gg*r* may be viewed as an umbrella term - a way of saying that Black people have the negative characteristics of the Coon, Buck, Tom, Mammy, Sambo, Picaninny, and other anti-Black caricatures. ***N*gg*r, like the caricatures it encompasses and implies, belittles Black people, and [attempts to] rationaliz[e] their mistreatment.*** …. shaped by a racial hierarchy which spanned three centuries. Anti-Black attitudes, values, and behavior were normative….
>
> ….Historically, *nigger* more than any word captured the personal antipathy and institutionalized racism directed toward Black people. It still does….."

; *Monteiro v. the Tempe Union High School Dist*, 158 F.3d 1022-34 (9th Cir. 1998):

> "….alleged that her … daughter and other similarly situated African-American students attended a school where they were called "n*gg*rs" by [W]hite children, …. It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit …. as … white counterparts…."

; *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103-16 (9th Cir. 2004):

> ""….Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas* ….. By considering both the existence and the severity of discrimination from the perspective of a

<u>reasonable person of the plaintiff's race</u>, we recognize forms of discrimination that are real and hurtful….

<mark>(See **DE41** for full excerpt: attached)</mark>

**6.**    As Ninth Circuit's 1. <u>*Monteiro*</u>   2. <u>*McGinest*</u> and separately 3. *The Jim Crow museum*, describes that derogatory racial caricature, slur, or stereotype "Black Inferior" is particularly offensive to a <u>*reasonable*</u> <u>Black man</u>.  Georgetown's derogatory conduct is so offensive it sounds in libel per se as highlighted by the Ninth Circuit's <u>*Knievel v. ESPN*</u> majority, and dissent, whereas GU <u>literally</u> is (per its filings) "… *accusing .. of … criminal activity*" <u>plus repeated adverse-actions based on "Brute"-derogatory stereotype</u> (*unlike* what the majority labeled as *"loose, figurative, slang language"* in *Knievel*) (attached)  As if not bad enough to discriminate violating Mr. Austin's 1981, Title VI, Equal Protection Georgetown's defamatory (per-se) type of harm reverberates in all life's areas: economic, emotional, etc. whereas *"with considerable less lilt than Iago, but … same desire to poison the mind not of a Moor — but of millions — defendant"* smears sh\*t (or poop) on Mr. Austin's name.  See Knievel v. ESPN, 393 F.3d 1068-79 (9th Cir. 2005) (*"Shakespeare's Iago said it best: Good name in man … Is the immediate jewel of their souls…. he that filches from me my good name Robs me… And makes me poor indeed… Shakespeare, Othello… (1604)"*)

**7.**    The 1. demeaning labeling, & 2. extreme discriminatory-
-exclusionary conduct (<u>outright media-contract refusal, after stealing</u>
<u>IP-rights, then excluding from non-litigious conflict resolution, while</u>
<u>attempting to block ability to sue</u>) creates instant *stigma* for the victim
*"Because "discrimination itself . . . can cause serious non-economic*
*injuries to those persons who are denied equal treatment solely because*
*of their membership in a disfavored group."* See <u>White v. Square</u>
(*quoting 1984 Supreme Court's* <u>Heckler v. Mathews</u>, *paying homage to*
<u>Brown v. Board-of-Education</u>).  The "n-word" in its heyday ultimately
meant "Black slave" or "inferior" whose rights Whites did not have to
respect.  Georgetown's targeted uses of "Black Inferiority" or "Brute" for
the express purpose violating Mr. Austin's 1981, Title VI, Equal
Protection, rights as an admitted Black-male-studen shows Georgetown
means the same thing: *"n-word" "Inferior," "Black Slave,"* whose rights
*Whites like GU don't respect.*

**8.**    <u>Georgetown's behavior is so horrendous, that all of Mr. Austin's</u>
<u>loans, and anything owed, were completely discharged-refunded</u> (over
$100+K in value), because *"The US Dept. of ED Independently*
*Confirms-Verifies, the Substance & Seriousness of Georgetown's pre-2022*
*reported violations of Mr. Austin's rights as of 3.7.25 via its offered, &*

*entered, settlement with Mr. Austin" …. "based on your allegations regarding the school's misconduct."* (1-ER-1)  As is typical for racial abusers they make the victim of abuse the problem. (1-ER-1):

> "Entered 2025 Settlement for Georgetown's reported illegal conduct
>
>     It is undisputed that as of 2025 Mr. Austin entered into a settlement with the US Dept. of ED valued at over 100K(+). 1-ER-1  The US Dept. of ED Independently Confirms-Verifies, the Substance & Seriousness of Georgetown's pre-2022 reported violations of Mr. Austin's rights as of 3.7.25 via its offered, & entered, settlement with Mr. Austin based on Georgetown's reported wrongdoing. 1-ER-1; 2-ER -51 Notably the US Dept. of ED. explicitly states to Mr. Austin (1-ER-1):
>
>> "The Department has determined that you are entitled to settlement relief for loans taken out on or after 1/1/2013 associated with your enrollment at Georgetown University ................. based on your allegations regarding the school's misconduct …. Department of Education will do the following:
>> - discharge your Relevant Federal Student Loans
>> - provide a refund for any payments made to the Department of Education on your Relevant Federal Student Loans including Relevant Federal Student Loan debt that you previously paid off;...."
>
> The Dept. of Ed. acts as an independent, informed, expert affirming the *substance, seriousness, & illegality of Georgetown's egregious conduct.* The Dept. of Ed. also shows they understand the value of the violations (*over $100,000+ just with regard to value per laws directly in their wheelhouse*), because the US Department of Education took these actions not in a vacuum, but with access to tremendous amounts of Georgetown data-information, as well as Mr. Austin's information-data, in context of the pleadings, reports, etc. 1-ER-1; 2-ER-51 ...."



January ▮ 2025

Dear George J Austin:

The Department has determined that you are entitled to settlement relief for the loans taken out on or after 1/1/2013 associated with your enrollment at Georgetown University ("Relevant Federal Student Loan(s)") based on your allegations regarding the school's misconduct. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Department of Education will do the following:

- discharge your Relevant Federal Student Loan(s);
- provide a refund for any payments made to the Department of Education on your Relevant Federal Student Loans including Relevant Federal Student Loan debt that you previously paid off; and

Sincerely,

U.S. Department of Education
Federal Student Aid

Federal Student Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION

830 First Street, NE, Washington, D.C. 20002
StudentAid.gov/borrower-defense



**Checkr**

Report completed on Oct 14, 2021 11:15 PM UTC

Consumer Report for
**George Jarvis Austin**
gaustin07@berkeley.edu

Requestor Company
**ABC Legal Services**

Status
Clear

**California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Oct 12, 2021 | Complete |
| Sex Offender Search | Oct 12, 2021 | Clear |
| Global Watchlist Search | Oct 12, 2021 | Clear |
| National Search | Oct 12, 2021 | Complete |
| Federal Search | Oct 12, 2021 | Complete |
| County Searches | Oct 14, 2021 | Clear |



**Report information**    Clear

First name          Middle name          Last name          Date of birth
George              Jarvis               Austin             XXX XX XXXX

Phone number        Zipcode              Email              Social Security
(209) 915-6304      95210                gaustin07@berkeley.  Number
                                         edu                XXX-XX-

Driver license      Previous driver
-                   licenses
                    -

Created at          Completed at
Oct 12, 2021 9:40 AM  Oct 14, 2021 11:15 PM
UTC                 UTC

**SSN Trace**    Complete

**Sex Offender Search**    Clear

**Global Watchlist Search**    Clear

**National Search**    Complete

**Federal Search**    Complete

**County Searches**    Clear

San Joaquin, CA                                    Clear

District Of Columbia, DC                           Clear

## Checkr

One Montgomery Street, Suite 2400, San Francisco, CA 94104
candidate.checkr.com - (844) 824-3257

**42; Initial Supplement - Emer. Motion: Breyer is Incompetent per 28 U.S.C. § 455**



"What law school in the country is better positioned to deal with the way the profession is going than Georgetown? We have connections to the corporate bar and criminal justice, and we have extensive clinics. We have been oriented to government and politics for decades. Wherever the legal market is going, what law school has more beachheads there than we do? That is a good place to be."

Daniel R. Ernst, Professor of Law

# Unique

## GEORGETOWN LAW

Combining a world-renowned faculty, a dedication to intellectual stimulation and community, and a location in the heart of the nation's capital, Georgetown is a unique place to study law.

### Legal Education in its Fullest Sense

Georgetown Law seeks not only to impart the tools of the lawyer's trade, but also to foster reflection and inquiry into the nature of law and the role and responsibility of lawyers in a global society. The goal is education in its fullest sense — not only mastery of "black letter law," but a sense of the philosophical, political, social and ethical dimensions of law, the awakening of an abiding curiosity about its nature and purposes, and the instilling of a sense of responsibility for its development and direction.

### A Dynamic Intellectual Community

Georgetown nurtures the very highest standards of scholarly inquiry, intellectual rigor and ethical behavior in a way that respects each student's individuality and fosters his or her particular interests and career goals. The result is a dynamic intellectual community, in which students have an unprecedented range of academic opportunities both inside and outside the classroom.

### An unparalleled Vantage Point

Located in Washington, D.C., within blocks of the U.S. Congress that enacts laws, the Supreme Court that interprets them, and the administrative agencies that enforce them, Georgetown provides an unparalleled vantage point from which its faculty and students explore the dynamic legal processes of our nation and world.



**Office of the Dean of Students**

February 28, 2019

George Austin ████████
███████ CA ████

Dear George,

Per your request, please find enclosed copies of the two Georgetown Law admissions brochures of which we are aware that include an image of you.

Sincerely,

Mitch Bailin
Associate Vice President and Dean of Students

600 New Jersey Avenue NW    Washington DC 20001-2075
(202) 662-4066



## RULES COMMITTEE

### RESOLUTION
By
**President pro Tempore of the Senate Darrell Steinberg**
RELATIVE TO COMMENDING

 

# George Austin

**WHEREAS**, George Austin was selected from a highly competitive group of outstanding college and university graduates from California and throughout the nation, and was appointed a 2012-2013 California Senate Fellow; and

**WHEREAS**, George Austin, from Stockton, graduated from the University of California, Berkeley, with a Bachelor of Arts degree in Sociology; and

**WHEREAS**, Through his service in the Senate Committee on Governance and Finance, George Austin had the unique opportunity of acquiring a deeper understanding of the legislative process and public policy formation, while also providing assistance to Senate Members, legislative committees, and their constituencies; and

**WHEREAS**, The California Senate Fellows program, established in 1973 and sponsored jointly by the Senate and California State University, Sacramento, enables 18 individuals to become full-time Senate staff members in the State Capitol for 11 months and receive six units of university graduate credit; and

**WHEREAS**, As a result of his outstanding service as a Senate Fellow, George Austin is better equipped to provide valuable leadership and contributions to educational institutions; local, regional, state, and federal governments; and professional, business, and community endeavors in the State of California and the nation; now, therefore, be it

**RESOLVED BY THE SENATE RULES COMMITTEE**, That George Austin, a 2013-2013 California Senate Fellow, be commended for his exemplary service on behalf of the Members of the Senate, and extended best wishes for every success in his future endeavors.

Senate Rules Committee Resolution No. 24 adopted this 12th day of August, 2013

 

CHAIR
Senatoris Est Civitatis                    Libertatem Tueri •






●ıll AT&T  LTE                10:00 AM                ⬤ ⚡ 54% ▬ᐧ
🔒 mail-attachment.googleusercontent.com

2012-13
## CALIFORNIA SENATE FELLOWS

**About you**
**Name:** George Austin

**Hometown:** ~~Stockton~~

**Hobbies/Interests:**  Basketball, Golf, Boxing, Cooking, Kayaking, Travel

**Favorite book(s)/movie(s)/TV show(s)/music:**  Finding Forester, Goodwill Hunting, Godfather Trilogy, Coming to America, The Golden Child, Batman Begins, Dark Knight, Dark Knight Rises, Hoop Dreams, Above the Rim, Wedding Crashers, Lord of the Rings 1 & 2, Matrix 1 & 2, Ray, Hangover

The West Wing, Doug, Bloomberg Enterprise, Charlie Rose, The Mentor, Bloomberg Game Changers, Cosby Show, The Wire, Martin

Gospel, R & B, Hip-Hop, Country

The Alchemist, Purpose Driven Life, Autobiography of Malcolm X, Developing the Leader Within – John C. Maxwell, How to Win Friends and Influence People Dale Carnegie, Think and Grow Rich Napoleon Hill, 7 Habits of Highly Effective People

**Birthday:** April 12

**3 strange/unique but interesting facts about you:**
1. Up until I was sixteen my shoes size was always 1 or 2 sizes larger than my age (i.e at twelve years old I wore a size fourteen)
2. In one day I met Oprah Winfrey, Prince, Usher, Anthony Hamilton and Barack Obama
3. I've lived in four states

**Education**
**College/University:** University of California, Berkeley

**Degree**: BA

**Major:** Sociology

**Advanced degrees:**  Georgetown Law School- JD (deferred, begin 2013)

---

2012-13
## CALIFORNIA SENATE FELLOWS

### Goals & Work/Relevant Experience
**Activities or Work Experience after College:**
- Riordan MBA Fellows Anderson School of Business (UCLA)
- Chartered Financial Analyst Level 1 Candidate December 2012
- Chartered Financial Analyst Society Scholarship Recipient
- HAAS School of Business, Arts, Science & Engineering Program (Berkeley)

**Occupational Goals/Interests:**  Business/ Law/Entrepreneurship/Finance/Education

**Policy Interests:**  Economy, Finance, Appropriations, Energy, Transportation, Economic Development, Trade (International and Domestic), Tax, Banking, Insurance



**Left screen:**

← 

Congratulations on Scholarship ☆

canadag@uchastings.edu
To GAUSTIN07@YAHOO.COM
Apr 11, 2012 at 3:09 PM

Dear George,

Congratulations once again on your admission to the University of California Hastings College of the Law Class of 2015. **It gives me great pleasure to offer you a $15,000 Chancellor's Renewable Scholarship Award**. Based on your outstanding academic record and impressive accomplishments, I believe you are truly deserving of this award, which will amount to **$45,000** during your three years at Hastings.

Delete   Move to   Forward   Reply   More

**Right screen:**

←

The Chancellor's Scholarship Award was established to help students of exceptional promise afford their legal education, and is Hastings' largest individual scholarship.  While a demonstration of financial need is required for this scholarship, this award is renewable for up to six semesters as long as you continue to demonstrate need.

Please also keep in mind that this scholarship is given in addition to our general need based grants, which will become available beginning mid-March provided you promptly complete your FAFSA and Financial Aid Supplement. We anticipate awarding grants that will range between $7,500 and $11,500 this year.

Delete   Move to   Forward   Reply   More



**Bottom screen:**

←

become available beginning mid-March provided you promptly complete your FAFSA and Financial Aid Supplement. We anticipate awarding grants that will range between $7,500 and $11,500 this year.

I look forward to welcoming you to the Hastings community this fall, and hope this scholarship award will make your years as a student and alum even more rewarding. If you have any questions, please contact me directly canadag@uchastings.edu.

Sincerely,

Greg Canada
Assistant Dean of Admissions

Delete   Move to   Forward   Reply   More



## Austin wants to be sheriff

Look out Tom Tramel, there may be a future sheriff in town.

Five-year-old George Jarvis Austin attends the Kindergarten Center and he wants to be a police officer or a sheriff when he grows up.



Son of Charlotte Hall-Austin, George has begun his school career with a positive attitude. "George is an enthusiastic learner and he is a well-liked and caring person," says one of his teachers.

His interests include T-ball and books, especially the Berenstein Bears series.

According to Principal Earl Watts, "George is a very smart child. He is totally involved in all classroom activities and loves school. With George's ability, I think he can accomplish his goals in life."

---

### University of California

ON THE NOMINATION OF THE FACULTY OF THE
COLLEGE OF LETTERS AND SCIENCE
HAVE CONFERRED UPON

GEORGE JARVIS AUSTIN

THE DEGREE OF BACHELOR OF ARTS

WITH A MAJOR IN SOCIOLOGY

WITH ALL THE RIGHTS AND PRIVILEGES THERETO PERTAINING

GIVEN AT BERKELEY
THIS NINETEENTH DAY OF DECEMBER IN THE YEAR
TWO THOUSAND AND NINE



GOVERNOR OF CALIFORNIA AND
PRESIDENT OF THE REGENTS

CHANCELLOR AT BERKELEY

PRESIDENT OF THE UNIVERSITY

ACTING EXECUTIVE DEAN OF THE COLLEGE

---

**49; Initial Supplement - Emer. Motion: Breyer is Incompetent per 28 U.S.C. § 455**

<u>GU's derogatory conduct creates stigma, violates 1981-Equal Protection.</u>

**9.**    Georgetown's *illogical* racist conduct is like smearing feces on a

clean person just to say they stink, as TSLA did to Owen *Diaz,* but even

worse toward an admitted student (after already violating his rights,

trying to destroy his future).  See (attached <u>*Diaz trial documents*</u>); Diaz

v. Tesla, Inc., 3:17-cv-06748, at *1 (N.D. Cal. Apr. 13, 2022)

> "Tesla" discriminated against [Owen Diaz] in violation of …§ 1981….[which]... prohibits discrimination in the making and enforcement of contracts-…. under California state law, the jury awarded Diaz $6.9 million in compensatory … $130 million in punitive damages. The evidence was disturbing. The jury heard … Tesla factory was saturated with racism…. faced frequent racial abuse, … N-word and other slurs. Other employees harassed him. His supervisors, …. Tesla's broader management structure, did little or nothing to respond…."

Georgetown's *illogical* racist conduct is like calling someone a '<u>n-word</u>'

or its <u>offshoots</u> in professional settings knowing HR-leadership doesn't

correct, reprimand, or take action on racial abusers just to show they

can get away using slurs-derogatory-stereotypes to make other persons

be seen as, feel like, "inferiors" or provide false 'superiority' complexes

for racial abusers. See e.g. EQUAL EMPLOYMENT OPPORTUNITY

COMMISSION, Plaintiff, v. TESLA, INC., Case No. 23-cv-04984-JSC

(*3.29.24 - ORDER* ).

> "….Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than … [the N word]......" *McGinest*....; ….The Commission alleges exactly this act. …. Since May 2015, non-Black managers, non-managerial employees, and temporary workers have *regularly addressed Black current and former Tesla employees stationed at Tesla's Fremont Factory individually and collectively by the N-word*, ….. frequently used … racial slurs, epithets,... insults openly in high-traffic work areas …. graffitied swastikas, nooses, the N-word, death threats …. other abusive language and imagery directed at Black people across desks, elevators, bathrooms, and equipment…… *Swinton v. Potomac Corp*…."



**10**.    Per the Ninth Circuit's 1981 Jury-Instructions the above framework-analysis is applicable in broader contract making (and Equal Protection) contexts because *"The definition of "because of" in this instruction is the same as … in … Title VII—Disparate Treatment …"….. "1981… states in relevant part as follows: "All persons ….shall have the same right in every State … to make contracts. . . as is enjoyed by [W]hite citizens…"* The displayed racial hatred in *Johnson v. San Francisco Unified School Dist.*, 339 F. Supp. 1315 (N.D. Cal. 1971) where Judge Weigel opined: *"Opposition to desegregation …. fosters false concepts of racial [White] superiority and of racial [Black] inferiority … [reflecting] Racial hatred"* is like GU's opposition to desegregation in **2025**, (*violating Mr. Austin's 1981, Title VI, Equal Protection, via a targeted "relic of slavery" segregationist policy*).

**11.**    GU knows this conduct is *illegal-racist*.  Per the 2023 US Supreme

Court's *Students for Fair Admissions, Inc. v. President & Fellows of*

*Harvard Coll.*, No. 20-1199, 38 (U.S. Jun. 29,2023) use of derogatory

stereotypes is <u>per se illegal</u> in a. workplaces-businesses, b. entire

contractual-relationships, c. education & d. other areas of society,

because it *"furthers "stereotypes that treat individuals as…[products] of*

*their race, evaluating their thoughts… efforts…their very worth as*

*Citizens- according to a criterion barred to the Government by history*

*and the Constitution."…Such stereotyping can only "cause.. continued*

*hurt & injury," …. contrary as it is to the "core purpose" of the Equal*

*Protection Clause <u>[co-extensive with 1981]</u>." …*

<u>Signed 9th Circuit Declaration under penalty of perjury</u>

**12.**    See attached.

<u>FACTS:</u>

**13.**    It is undisputed that:

**a.**    From **7.15.21-1.16.24**, *After* Georgetown admits violating

Mr. Austin's 1981, Equal Protection, Title VI, Privacy, Publicity

and other rights, in a racially discriminatory manner, Mr. Austin

made formal written complaints-inquiries as instructed by

Georgetown policy ([faculty handbook.georgetown.edu/section4/a/](faculty handbook.georgetown.edu/section4/a/)).

**b.**    Although it would be also completely legal to do so, Mr.

Austin did not stage a sit-in, hold picket signs outside of

Georgetown on this issue, or engage in other peaceful protest direct actions of Georgetown's *per se illegal, ongoing, targeted anti-Black segregationist, Klu Klux Klanner, policy, practice, & procedure.*

**c.**    Per *1964 US Supreme Court's <u>Bell v. Maryland</u>, 378 U.S. 226 (1964)* ***"The discrimination in these sit-in cases is <u>a relic of slavery</u>"*** with GU continuing this racist practice on Mr. Austin.

**d.**    Peaceful protest is not abuse, nor does it signify violence, it is the opposite, and protected by Free Speech, 1st Amendment (as well as other Constitutional Protections in this context).  Martin Luther King's, SNCC's, NAACP, and others Direct Action was a Peaceful response to the Violent, Oppressive, Racially Abusive Regime that sought, through violence, to oppress Blacks.

**e.**    Mr. Austin's written questions, and formal complaints to Georgetown's Department (IDEAA), cc'ing its respective leadership so that they have cannot claim ignorance to ongoing violations of law, with IDEAA designed to address complaints from  *"Any applicant for employment or admission, current or former employee or student, or third party"* is what Mr. Austin is supposed to do per Georgetown's own policies.

**14.**    It is undisputed that:

    **f.**    Despite Mr. Austin's complaints, to IDEAA, per the proper channels according to GU policy, GU failed every-one of their self described duties to Mr. Austin, and deviated by race, in the negative, to harm Mr. Austin after Georgetown admits there was no 1. offer, 2. Acceptance, 3. consideration, or 4. signature (per required written authorization), and thus no contract was made with Mr. Austin (because he is Black), in the same way as similarly situated Whites…." 7-ER-1784-1854

    **g.**    When GU receives a complaint from Whites: **1. -** IDEAA staff sends acknowledgement of complaint receipt (even if there is need of more info) then **2.** IDEAA staff schedules intake meetings **3.** IDEAA staff provides a general understanding of the relevant policy & grievance procedure (Intake) **4.** - IDEAA staff provides, At Complainant's request an opportunity for Informal Resolution or an Investigation **5.** IDEAA keeps open investigative option even if Informal Resolution is initially chosen or  **6.** Formal written signed Complaint opportunity and **7.** Opportunity to provide supporting documents-evidence **8.** Opportunity to receive written response by respondent(s) **9.** Opportunity for rebuttal **10.**

Opportunity to provide additional evidence, cross examine witnesses **11.** Opportunity to receive IDEAA's investigation, report, including their witness interviews **12.** Opportunity to have complaint, evidence, etc. evaluated by IDEAA experts **13.** Opportunity to receive written notice of findings **14.** Opportunity-right to receive next step instruction whether a. Appeal or b. Corrective action **15.** Opportunity-right, for IDEAA to forward its report findings to the Respondent's Executive Vice President or Senior Vice President for corrective-remedial action **16.** Opportunity for non-litigious remedy-corrective action.

**h.**  For Blacks, like Mr. Austin, Georgetown-IDEAA violates not only every step-opportunity-right, completely excludes & fails to acknowledge the first step of complaint because Mr. Austin is Black.  GU treats Mr. Austin as sub-human (as if he is not a person) with demonstrated anti-Black hatred, extreme animus, less than *"Any applicant for employment or admission, current or former employee or student, or third party"* or human being (as even third party Whites would receive these steps).7-ER-1784-1854

**15.**  It is undisputed that:

**i.**  Even after Georgetown's violations were so bad the US

Department of Education, with access to tremendous Georgetown data, and Mr. Austin's data, eliminated any and all debt to Georgetown (over 100K in value), Georgetown as a racial abuser, with the mindset of an abuser-enslaver, neither acknowledges nor addresses any of its own wrongdoing. (*while they are supposed to be teaching him the right way to do things, including taking responsibility for errors Georgetown made*).

**j.**    Per the Supreme Court's Lawlorv. Nat'l Screen Serv, The Ninth Circuit's Eichman v. Fotomat Corp., & Clark v. Yosemite Community College Dist. Mr. Austin's claims from 7.15.21 to 1.16.24 are not barred by Res Judicata as his legal injuries as plead in the operative complaint are a. new causes of action, b. impossible to foresee, and c. never before plead, or experienced, nor litigated.

### Mr. Austin is likely to succeed on the Merits

**16.**    Mr. Austin is likely to succeed: Per undisputed facts Georgetown admits each element of two related-relevant, claims 1. ***1981*** ; 2. ***Equal-Protection-TitleVI***.

Success on the Merits: GU violates 1981

**17.** Per Ninth Circuit 1981 Jury Instructions, *Discrimination in [Making-Enforcing] Contracts … § 1981),* Georgetown discriminates in contract rights with Mr. Austin because: 1. GU prevents "making" a mandatory-contract, after they already stole-violated-law-policy (*completely excludes him from the typical contract making process for similarly situated Whites*) between 7.15.21-1.16.24 because he is Black 2. Mr. Austin is a party to *prospective-existing* admitted student contracts with all rights per admitted student contract 3. Mr. Austin attempted to make written-media-contracts within the timeframe and was deprived "because of" racial derogatory stereotypes whereas GU applies a *"relic of slavery"* segregationist anti-Black policy that excludes Mr. Austin.  Mr. Austin a. can prove each element by a preponderance of the evidence, b. is entitled to victory-verdict in his favor *per GU's self authenticated* undisputed facts-direct evidence.

**18.** Because Georgetown blocks the opportunity for ANY "offers," or contracts, proactive communication, at all, with Mr. Austin because he is Black, GU makes  *"blatant deprivation[s] of [Mr. Austin's] civil rights"* per *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1016 (2020),* 2. *Runyon v. McCrary* 3. *General Building*

*Contractors Assn., Inc. v. Pennsylvania.* The US Supreme Court's *Lombard v. Louisiana 373 U.S. 267 (1963)* highlights that targeted segregationist practices are <u>outlawed even when there is no sign denoting the explicit use of race</u> (i.e. "No Blacks"), when conduct reveals policies refusing Blacks service-contracts.

19.    As Legendary Judge Henderson explains in *Walker v. Contra Costa County, No. C03-3723 TEH, 4 (N.D. Cal. Sep. 6, 2005) a "refusal to enter into the new contract is actionable under § 1981…..."* As applied to these facts: GU's <u>outright refusals</u> on multiple occasions *"to enter into [a] new contract"* with Mr. Austin (after already stealing valuable IP-rights, and discriminating, per GU's own standards, policies, explanation of the law) as an admitted Black-male-student (especially when making written-media-contract is mandatory per law & GU's own advertised policies) is *"is actionable under …1981."* Further down in *Walker v. Contra Costa County's* sections *"E. Disparate Treatment Claims," "*….1. *Racial Animus,"* ..... "2. *Pretext* ….," Judge Henderson's analysis confirms why Mr. Austin's pleadings survive Summary Judgment (let alone 12b motion), and also *Succeeds on the Merits with a prima facie case and multitudes of direct evidence.* Simply, the clear application of one policy for Blacks, and another for

Whites by Georgetown is a *"promising…straight- forward[1981] claim of racial discrimination."* per the Supreme Court's *Cbocs West, Inc. v. Humphries*, 553 U.S. 442-61 n.2 (2008)

<u>Success on the Merits: GU violates Equal Protection-TitleVI</u>

**20.**    In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* it was alleged that student applicants of different races were treated differently, *derogatorily differently*, because of race in the application process.  Similarly, Mr. Austin, after earning admission, was then unknowingly exploited in violation of Georgetown school policy, Constitutional and Federal law, & treated derogatorily differently by GU.  Mr. Austin was mis-treated based on derogatory racial stereotypes 1. in the mandatory written contract making process for commercial, or business use, and then 2. to exclude from the very IDEAA campus mechanism, & organization, designed to correct, and remedy these types of violations without need for litigation, or outside legal action. Georgetown's conduct in essence enforced either racial oppression per 42 USC 1981, and 13th, 14th Amendment, or forced an admitted student to sue the institution they are supposed to be learning from (*an even more extreme exploitation of power, and impermissible use of race*).

**21.**    GU purposefully failed to follow *any of* its <u>at least 1-16 steps</u>

mandatory IDEAA policies after receipt of Mr. Austin's complaint.  In doing so, Georgetown violates Mr. Austin's Equal Protection:  Per the Supreme Court's 1. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*, 2. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* 3. *Gebser v. Lago Vista Independent School District* 4. *Lawrence v. Texas 539 U.S. 558 (2003)* Georgetown impermissibly used Mr. Austin's race, or derogatory anti-Black racist stereotypes (i.e. 'Brute'-"N*gg*r").  Georgetown simultaneously violated Mr. Austin's 1981 rights to contract, in existing contract, and Mr. Austin's Title VI Equal Protection rights (and created 'Stigma') when it completely excluded Mr. Austin.

**22.**    Per *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 20-1199, 7 (U.S. Jun. 29, 2023)* Georgetown's conduct is doubly offensive to the Constitution of the United States because Georgetown admits, explicitly, to both a. treating Black men as 'inferior' or 'less worthy' (*presuming derogatory stereotype to deprive making a contract*), or b. Treating Whites as 'superior' or more worthy (*ensuring Whites had opportunity to review, decline, counteroffer, or accept proposed Georgetown contract offer, let alone not presuming derogatory stereotypes to deprive Whites their Rights to contract & Equal Protection*):

23.    Per the Supreme Court's *Gebser v. Lago Vista Independent School District  and* Ninth Circuit's *Brown v. Arizona* GU's receipt of Mr. Austin's complaints, and failure to remedy (especially after GU's admission of illegal conduct harming Mr. Austin), itself shows deliberate indifference, and racial animus (along with Equal Protection violations).  Georgetown displays deliberate indifference with its 100+ failures to correct.  Per *Gebser v. Lago Vista Independent School District 524 U.S. 274, 290 (1998)* Georgetown's conduct provides for Equal Protection "damages remedy": *"[ when] an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond"* (as Georgetown leadership did here over 100+ instances *after* admitting they violated their policy, the law (1981 failure to make mandatory contract), & Mr. Austin's rights).

24.    Per the Ninth Circuit's *Brown v. Arizona, No. 20-15568 (9th Cir. Sep. 25, 2023)* when a student is experiencing a violation of school policy and reports that conduct to the appropriate University body, especially when the violation was by someone or something under University control (*as is Georgetown's IDEAA campus resource*), then it's a violation of Equal Protection to deny that student investigatory, or

enforcement, services as a victim, or survivor, of the violation (*as is Mr.*
*Austin in this case*).  Mr. Austin had no complaints against him, he
simply inquired, and complained as to why Georgetown 1. Violated
school policy 2. Violated his Constitutional rights to contract and 3. Why
he was illegally excluded from essential campus procedures for *"Any*
*applicant for employment or admission, current or former employee or*
*student, or third party"* that GU provides for similarly situated Whites:
Georgetown impermissibly used Mr. Austin's race (and perhaps gender,
too) to his repeated detriment, as an admitted student, and Black man
to treat 1. derogatorily differently, 2. "deny, restrict, separate, segregate
(in application of policy)," and 3. exclude Mr. Austin.  See 34 CFR Part
100- Title VI

## Mr. Austin is suffering irreparable harm.

**25.**    As described in paragraphs 1-11 above,  Mr. Austin is suffering
irreparably from Georgetown's racist, derogatory, attacks on his person,
educational development, race, identity, culture, character, economics,
and professional reputation.

## Balance of Equities completely favors Mr. Austin

**26.**    Mr. Austin is still suffering from Georgetown's per se illegal,

segregationist, anti-Black policies (7.15.21-now).  Platt, and Georgetown continue to violate Mr. Austin's rights, after stealing from him, racially abusing him, and seeking to continue to harm him without explanation, nor apology.  Georgetown is obligated by their own policies, Federal, Equal Protection, Title VI, 1981 and California law to make-media-written contract (especially after already stealing-discriminating), and access to, not exclusion from IDEAA conflict resolution as an admitted student as are similarly situated Whites from 7.15.21-1.16.24.  GU is so discriminatory, extremely late, it is embarrassingly illegal.  GU loses nothing by removing per se illegal, anti-Black, demeaning, derogatory, segregationist targeted policies against Mr. Austin, it simply is doing its duty, and following the law. *Non-discrimination is the status quo* with GU *as the* *racist outlier* violating public policy & imbalancing the equites.

## Public Policy 100% favors Mr. Austin

**27.**    Georgetown's conduct is per se illegal, racist, unConstitutional, and anti-American, *plus* it completely violates Georgetown's public policy purpose as a *school*.  See e.g. *Brown v. Board of Education, 347 U.S. 483, 494 (1954)*. ("....*The words of the amendment,. [which].. contain …the right to exemption … from legal discriminations, implying*

*inferiority in civil society"* …. *in regard to the [C]olored race, for whose protection the amendment was primarily designed, [so] that no discrimination shall be made against them"* Georgetown is not only obligated to meticulously follow Equal Protection, Title VI, 1981, its own policies, but is also obligated by:

1.  <u>Mr. Austin's dignity interest</u> (whereas the 2023 US Supreme Court's <u>303 Creative LLC, v. Elenis et. al.</u>, highlights to *"vindicate… deprivation of personal dignity that surely accompanies denials of equal access.,"* and,

2.  <u>BELL v. MARYLAND</u>'s clear public policy instruction(s):

    The Thirteenth, Fourteenth, and Fifteenth Amendments had "one pervading purpose . . . we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." Slaughter-House Cases, 16 Wall. 36, 71.

    Prior to those Amendments, Negroes were segregated and disallowed the use of public accommodations except and unless the owners chose to serve them. To affirm these judgments would remit those Negroes to their old status and allow the States to keep them there by the force of their police and their judiciary.

    We deal here with public accommodations - with the right of people to eat and travel as they like and to use facilities whose only claim to existence is serving the public. What the President said in his State of the Union Message on January 8, 1964, states the constitutional right of all Americans, regardless of race or color, to be treated equally…

    The Black Codes were a substitute for slavery;

    Segregation was a substitute for the Black Codes;…

    …The discrimination in these sit-in cases is **_a relic of slavery."_**

## Motion Limited Remand for Preliminary Inj., or TRO: Granted

28.  For the above reasons Mr. Austin's motion (either directly through Ninth Circuit Order **DE41)** or alternatively in this Motions Limited

Remand for Preliminary Injunction or TRO should be granted.  The

Ninth Circuit has the chance to right several wrongs done Mr. Austin,

and to provide a good faith, proactive opportunity for effective

party-judicial resource usage (and problem solving).

**Signed, Under Penalty of Perjury.**

*"I, Mr. George Jarvis Austin, declare-certify under penalty of perjury under the laws of the United States of America, and California, that the foregoing declarations … are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          4.10.25**

## Emergency Motion Full Supplement is Forthcoming

The full Supplement is forthcoming in approximately 21 days

(**5.8.25**) breaking down precisely each obvious instance of Breyer's

demonstrated incompetence to pair with Mr. Austin's Emergency

Motion for Remand.

**Signed, Under Penalty of Perjury.**

*"I, Mr. George Jarvis Austin, declare-certify under penalty of perjury under the laws of the United States of America, and California, that the foregoing declarations … are true and correct (and as I Mr. Austin personally experienced)."*

**s/ George Jarvis Austin          4.17.25**